Dennis F. Dunne
Risa M. Rosenberg
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone:  (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica*
*as Foreign Representative of Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VITRO, S.A.B. de C.V.,<br><br>       Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 11-_____ (___) |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Alejandro Francisco Sánchez-Mujica (the "Petitioner"), as the duly-appointed

representative of Vitro, S.A.B. de C.V. ("Vitro SAB"), the debtor in a voluntary judicial

reorganization proceeding (the "Voluntary Mexican Proceeding") commenced on December 13,

2010 under the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act") and

currently pending before the Federal District Court for Civil and Labor Matters for the State of

Nuevo León, the United Mexican States (the "District Court of Nuevo León"),  respectfully

submits this verified petition for recognition (the "Verified Petition") which, together with the

form chapter 15 petition filed contemporaneously herewith (together with the Verified Petition,

the "Chapter 15 Petition"), seeks entry of an order (i) recognizing the Voluntary Mexican Proceeding as a "foreign main proceeding" pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code. In support of the Chapter 15 Petition the Petitioner has filed contemporaneously herewith and incorporated herein by reference (a) the Declaration of Alejandro Francisco Sánchez-Mujica, as Foreign Representative of Vitro, S.A.B. de C.V. (the "Foreign Representative Declaration" or "Frgn. Rep. Decl.")[1] and (b) the Declaration of Alonso Rivera Gaxiola, as Mexican Counsel to Vitro, S.A.B. de C.V. (the "Mex. Counsel Decl."), and respectfully states as follows:

## BACKGROUND

A.     **Vitro SAB's Business**

1.     Vitro SAB is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and originally incorporated in 1909. (See Frgn. Rep. Decl. ¶ 4.) Since January 5, 1976, Vitro SAB's common shares have been listed on the Mexican Stock Exchange.[2] Mexico constitutes the primary trading market for Vitro SAB's common shares – during the 12-month period beginning February 1, 2010 and ending February 1, 2011, 99.2% of trading in Vitro SAB's common shares occurred in Mexico. (See Frgn. Rep. Decl. ¶ 4.)

2.     Vitro SAB is a holding company that conducts substantially all of its operations through subsidiaries (collectively with such subsidiaries, "Vitro"). (See Frgn. Rep. Decl. ¶ 5.) Vitro is the largest manufacturer of glass containers and flat glass in Mexico, with consolidated

---

[1]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Foreign Representative Declaration.

[2]     (See Frgn. Rep. Decl. ¶ 4 n.2.)

net sales in 2010 of Ps. 23,360 million ($1,849 million).[3]  (See Frgn. Rep. Decl. ¶ 5.)  Vitro has manufacturing facilities in 11 countries and distribution centers throughout the Americas and Europe, and it exports its products to more than 50 countries worldwide.  (See Frgn. Rep. Decl. ¶ 5.)  During 2010, Vitro maintained a workforce of approximately 17,000 worldwide, about 85% of whom were located in Mexico.[4]  (See Frgn. Rep. Decl. ¶ 5.)  In 2010, 51% of Vitro's consolidated net sales were made in Mexico, with the remainder made primarily in the United States and Europe.  (See Frgn. Rep. Decl. ¶ 5.)  Vitro's operations are organized into two operating business units:  (1) the Glass Containers business unit and (2) the Flat Glass business unit, representing approximately 53% and 46%, respectively, of Vitro's consolidated net sales in 2010.  (See Frgn. Rep. Decl. ¶ 5.)

**(i)    *Glass Containers Business***

3.      Vitro's Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry.  Based on its consolidated net sales of Ps. 12,339 million ($977 million) in 2010, the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world.  (See Frgn. Rep. Decl. ¶ 6.)  Substantially all of Vitro SAB's Glass Containers subsidiaries are wholly owned except for Empresas Comegua, S.A., a joint venture in which Vitro SAB holds an investment of 49.7%.  (See Frgn. Rep. Decl. ¶ 6.)

---

[3]      Vitro SAB reports its quarterly and annual financial results in pesos, and certain of its indebtedness, as issued, is denominated in pesos.  Throughout the Foreign Representative Declaration and this Verified Petition, such financial results and indebtedness are presented in U.S. dollars, using the fixed exchange rate published by Banco de Mexico at the end of each applicable reporting period.  Additionally, some of the financial results and indebtedness presented herein are unaudited and subject to adjustment in Vitro SAB's 2010 audited financial results, which have not been finalized as of the date hereof.  (See Frgn. Rep. Decl. ¶ 5 n.3.)

[4]      Substantially all such employees are employed by Vitro SAB's affiliates.

### (ii)  *Flat Glass Business*

4.     Vitro's Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and automotive industries.  (See Frgn. Rep. Decl. ¶ 7.)  Based on its consolidated net sales of Ps. 10,688 million ($846 million) in 2010, the Flat Glass business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal.  (See Frgn. Rep. Decl. ¶ 7.)  Viméxico, S.A. de C.V. ("Viméxico"), a joint venture in which Vitro SAB holds an investment of 91.8%, is a holding company for some of the Flat Glass business unit subsidiaries.  (See Frgn. Rep. Decl. ¶ 7.)  In addition to Viméxico, Vitro SAB has partners in three additional subsidiaries: (i) Cristales Automotrices, S.A. de C.V., which conducts Vitro's automotive glass replacement installation business throughout México City, (ii) Vitro Cristalglass S.L. ("Vitro Cristalglass") , which is engaged in the manufacturing and distribution of flat glass products for the Spanish, French and Portuguese construction industries, and (iii) Vitro Chaves Industria de Vidrio, S.A., a subsidiary of Vitro Cristalglass in Portugal.  (See Frgn. Rep. Decl. ¶ 7.)

## B.     Vitro SAB's Indebtedness

5.     As of December 31, 2010, Vitro's aggregate outstanding third-party consolidated indebtedness was approximately $1.710 billion,[5] consisting of:

- $1.216 billion in outstanding principal amount under the 2012 Notes, 2017 Notes and 2013 Notes (each as defined below and, together, the "Old Notes");

---

[5]     (See Frgn. Rep. Decl. ¶ 8 n.5.)  This amount reflects amortizable discounts of approximately $6.9 million and does not include past-due interest in an aggregate approximate amount of $308 million.  Because the Voluntary Mexican Proceeding was commenced on December 13, 2010, the amounts of indebtedness incorporated into the Concurso Plan (as defined below) were taken from Vitro SAB's then most recently disclosed financial statement as of such date.  (See Frgn. Rep. Decl. ¶ 8 n.5.)

- $254.8 million in outstanding agreed amounts owing to Calyon and Fintech (each as defined below) in settlement of obligations and litigation relating to certain derivative financial instruments (the "<u>DFI Claims</u>");

- $59.5 million in outstanding principal amount under the *Certificados Bursátiles* and the ABN Note (each as defined below and, together, the "<u>Other Debt</u>" and, together with the Old Notes and the DFI Claims, the "<u>Restructured Debt</u>"); and

- $186.8 million of additional indebtedness that Vitro SAB does not plan to restructure or discharge in the Voluntary Mexican Proceeding.

The circumstances giving rise to Vitro SAB's indebtedness with respect to the Restructured Debt are discussed below. In addition, as of December 31, 2010, Vitro SAB's aggregate outstanding indebtedness to its direct and indirect subsidiaries (the "<u>Intercompany Claims</u>") was approximately $2.022 billion. (<u>See</u> Frgn. Rep. Decl. ¶ 8.)

### (i) *Old Notes*

6.      On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued (i) $225 million aggregate principal amount of 11.75% Senior Notes due 2013 (the "<u>2013 Notes</u>"), and (ii) $1.0 billion of Senior Notes, comprised of $300 million aggregate principal amount of 8.625% Senior Notes due 2012 (the "<u>2012 Notes</u>") and $700 million aggregate principal amount of 9.125% Senior Notes due 2017 (the "<u>2017 Notes</u>") under separate indentures (as each has been supplemented from time to time, collectively, the "<u>Indentures</u>"). (<u>See</u> Frgn. Rep. Decl. ¶ 9.) The Old Notes are general unsecured obligations of Vitro SAB, guaranteed, on an unsecured basis, by substantially all of Vitro SAB's wholly-owned direct and indirect subsidiaries (in such capacities, the "<u>Old Guarantors</u>"). (<u>See</u> Frgn. Rep. Decl. ¶ 9.)

### (ii) *DFI Claims*

7.      As discussed above, Vitro is an international enterprise, receiving the majority of its cash inflows from operations in currencies other than the U.S. dollar. As a result, it has significant exposure to fluctuations in the interest and currency exchange rates caused by its

commitments on U.S. dollar-denominated indebtedness. Additionally, because of the large energy requirements of its manufacturing operations, it also has significant exposure to fluctuations in the price of natural gas, its main energy input. To mitigate these exposures, and in response to market trends during the first seven months of 2008,[6] Vitro SAB and certain of its subsidiaries (collectively, the "Vitro DFI Parties") entered into certain derivative financial instruments (the "DFIs"), including (i) interest rate swap agreements to hedge future interest payments, (ii) currency swap and option agreements to hedge exposure to foreign currency exchange rate variations and (iii) forwards and other derivative agreements to hedge its exposure to natural gas price variations. (See Frgn. Rep. Decl. ¶ 10.) By the fourth quarter of 2008, the DFI positions of the Vitro DFI Parties had been materially and adversely impacted by the high volatility in commodity and currency markets in the second half of 2008, forcing the Vitro DFI Parties to unwind the majority of their open positions in the fourth quarter of 2008.[7] As discussed further below, the DFI Claims stemmed from the Vitro DFI Parties' defaults under the DFIs in early 2009.

### (iii) *Other Debt*

8. On February 13, 2003, Vitro SAB issued a *Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 03*") at an annual floating interest rate of 3.25% over the rate on 182-day *Certificados de la Tesorería de la Federación* (i.e., notes issued by the government of Mexico). (See Frgn. Rep. Decl. ¶ 11.) On July 2, 2008, Vitro SAB issued another *Certificados*

---

[6]     During this period, the Mexican peso appreciated 7.4% relative to the U.S. dollar, the Mexican equilibrium interbank interest rates ("TIIE") increased 6.5%, and natural gas prices recorded a sharp price increase, all of which exerted negative pressure on Vitro's operating and financial results. (See Frgn. Rep. Decl. ¶ 10 n.6.)

[7]     Specifically, between July 2008 and December 2008, natural gas prices plummeted more than 50%, and the Mexican peso registered a 30% devaluation against the U.S. dollar, reversing the appreciation trend experienced in the first seven months of the year and making it substantially more expensive for Vitro to service its U.S. dollar-denominated debt. (See Frgn. Rep. Decl. ¶ 10 n.7.)

*Bursátiles* note (the "*Certificados Bursátiles Vitro 08*" and, together with the *Certificados Bursátiles Vitro 03*, the "*Certificados Bursátiles*") at an annual floating interest rate of 2.50% over the 28-day TIIE. (See Frgn. Rep. Decl. ¶ 11.) As of September 30, 2010, the aggregate principal amount outstanding under the *Certificados Bursátiles Vitro 03* and *Certificados Bursátiles Vitro 08* was Ps. 150 million ($12.0 million) and Ps. 400 million ($32.0 million), respectively. (See Frgn. Rep. Decl. ¶ 11.) The *Certificados Bursátiles* are senior unsecured obligations of Vitro SAB, and are not guaranteed by any of its subsidiaries. (See Frgn. Rep. Decl. ¶ 11.)

9.      On September 29, 2008, Vitro SAB issued a promissory note (the "ABN Note") in favor of ABN Amro Bank N.V. ("ABN") in the principal amount of $15 million. (See Frgn. Rep. Decl. ¶ 12.) The ABN Note is guaranteed by Compañía Vidriera, S.A. de C.V. ("Covisa"), Viméxico, Vitro Automotríz, S.A. de C.V. ("Automotríz"), Vitro Vidrio y Cristal, S.A. de C.V. ("Vidrio y Cristal"), and Vitro Envases Norteamérica, S.A. de C.V. ("Vena"). (See Frgn. Rep. Decl. ¶ 12.)

## C.      Events Precipitating Commencement of Voluntary Mexican Proceeding

### (i)      *Global Recession*

10.      The global economic and financial crisis, and the severe economic recession which began in the second half of 2008, affected each of Vitro's major markets, Mexico, the United States and Spain, and significantly affected its businesses. (See Frgn. Rep. Decl. ¶ 13.) The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry and reduced beer bottle demand from the main client of Vitro's Glass Containers unit resulted in a 36.8% decline in Vitro's consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in Vitro's operating income for 2009 compared to 2008, from Ps. 1,710 million to

Ps. 1,329 million.  (See Frgn. Rep. Decl. ¶ 13.)  Income before taxes decreased from

Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in

2009. (See Frgn. Rep. Decl. ¶ 13.)  Net income decreased from Ps. 131 million in 2007 to a loss

of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.  (See Frgn. Rep. Decl. ¶ 13.)

Even though the economy generally showed moderate signs of recovery in 2010, some of Vitro's

markets continued to experience contraction and excess capacity, including the construction

sector in the United States and Spain.  For the twelve-month period ended December 31, 2010,

Vitro's consolidated net sales decreased 2.6% to Ps. 23,360 million ($1,849 million) from

Ps. 23,991 million ($1,770 million) for the same period ended December 31, 2009.  (See Frgn.

Rep. Decl. ¶ 13.)

 (ii)     *DFI Litigation*

11.     As discussed above, in the second half of 2008, the DFI positions of the Vitro DFI

Parties were materially and adversely impacted by the high volatility in commodity and currency

markets, resulting in margin calls by their counterparties ("Counterparties") forcing the Vitro

DFI Parties to post $85 million in collateral deposits.  (See Frgn. Rep. Decl. ¶ 14.)  To eliminate

further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008, the

Vitro DFI Parties restructured their DFI portfolio and unwound the majority of their open

positions to guarantee their ability to continue their normal course of operations.  (See Frgn. Rep.

Decl. ¶ 14.)

12.     In January 2009, four Counterparties served notices on the applicable Vitro DFI

Parties of their defaults under the relevant DFIs based on the failure to pay approximately

$293 million allegedly due thereunder.  Over the next 30 days, six out of the seven

Counterparties commenced actions (collectively, the "DFI Litigation")[8] against such Vitro DFI

Parties in the Supreme Court of the State of New York demanding payment of approximately

$240.3 million plus interest and fees allegedly payable under the DFIs. (See Frgn. Rep. Decl.

¶ 15.) On April 13, 2010, the Supreme Court of New York granted these Counterparties'

motions as to the Vitro DFI Parties' liability and referred the matter of damages to a special

referee. (See Frgn. Rep. Decl. ¶ 15.)

        **(iii)**      *Default under Old Notes and Other Debt*

13.     Vitro's defaults under the DFIs resulted in events of default under each Indenture.

(See Frgn. Rep. Decl. ¶ 16.) To preserve the cash necessary to continue its operations, Vitro

SAB stopped making scheduled interest payments on the Old Notes, and has since not made

payments on the 2012 Notes and 2017 Notes due February 2009, August 2009, February 2010,

August 2010 and February 2011, or those on the 2013 Notes due May 2009, November 2009,

May 2010 and November 2010. (See Frgn. Rep. Decl. ¶ 16.) As discussed further below,

beginning in November 2010, multiple litigations were commenced against Vitro SAB and

certain of the Old Guarantors in the United States and Mexico by certain purported beneficial

holders of the Old Notes.

14.     Vitro SAB also did not make a scheduled payment of Ps. 150 million

($11.9 million), plus accrued interest, due February 5, 2009 on the *Certificados Bursátiles Vitro

03*. (See Frgn. Rep. Decl. ¶ 17.) Subsequently, the common representative (*representante

común*) of the *Certificados Bursátiles Vitro 03* initiated legal proceedings thereon against Vitro

---

[8]     The DFI Litigation includes actions by (i) Credit Suisse International, initiated on January 30, 2009 (Index No. 09-600298); (ii) Citibank, N.A., initiated on February 06, 2009 (Index No. 09-600376); (iii) Calyon Credit Agricole CIB ("Calyon"), initiated on February 10, 2009 (Index No. 09-600407) (the "Calyon Litigation"); (iv) Barclays Bank PLC, initiated on February 18, 2009 (Index No. 09-600521); (v) Deutsche Bank AG, initiated on February 26, 2009 (Index. No. 09-600612); and (vi) Merrill Lynch Capital Services, Inc., initiated on February 27, 2009 (Index No. 09-600634).

SAB in Mexico. (See Frgn. Rep. Decl. ¶ 17.) However, as part of the negotiations with respect to the Offers (as defined below), the holders of the *Certificados Bursátiles Vitro 03* agreed to end litigation "without prejudice" until Vitro completes its restructuring, provided that if Vitro SAB is unable to complete its restructuring, the holders of the *Certificados Bursátiles Vitro 03* would be able to bring an action again. (See Frgn. Rep. Decl. ¶ 17.)

15. In addition, Vitro SAB did not make a scheduled interest payment of approximately Ps. 12 million ($1 million) due on the *Certificados Bursátiles Vitro 08* and scheduled payments totaling $191.4 million plus interest due on the New Promissory Notes (as defined below) issued as a result of the settlement of the DFI Litigation. (See Frgn. Rep. Decl. ¶ 18.)

16. In July 2009, ABN commenced a lawsuit against Vitro SAB and certain of its subsidiaries in Mexico, demanding payment of the ABN Note. (See Frgn. Rep. Decl. ¶ 19.) A first instance judgment was entered in that action against Vitro SAB, but in September 2010, the Mexican appellate court vacated that judgment and ordered the proceedings to be restarted. (See Frgn. Rep. Decl. ¶ 19.) Thereafter, this lawsuit was reinstated and a new first instance judgment was entered against Vitro SAB, which is currently being appealed; however, by court order entered in the Voluntary Mexican Proceeding, no creditor, including ABN, would be able to execute any judgment against Vitro's assets in Mexico. (See Frgn. Rep. Decl. ¶ 19.)

**(iv)** ***Restructuring Process and Negotiations***

17. As a result of all of the foregoing, in February 2009, Vitro SAB announced its intention to globally restructure all of the Restructured Debt. (See Frgn. Rep. Decl. ¶ 20.) Thereafter, Vitro SAB retained Rothschild Inc. as financial advisor and engaged in a series of transactions in an effort to strengthen its liquidity and maintain normal operations during the restructuring process. (See Frgn. Rep. Decl. ¶ 20.) As discussed further below, Vitro has also

engaged in active negotiations with certain holders of the Old Notes, the DFI Claims and the Other Debt.

(a)     **Negotiations with Steering Committee**

18.     Since February 2009, Vitro SAB has engaged in good faith in negotiations, pursuant to various confidentiality agreements, with parties, including an *ad hoc* committee of holders of the Old Notes (the "Steering Committee") and its advisors, regarding a potential restructuring. Unfortunately, those negotiations did not result in an agreement, with the Steering Committee rejecting three restructuring proposals from Vitro SAB between August 2009 and July 2010. (See Frgn. Rep. Decl. ¶ 21.) Instead, in January of 2010, certain purported holders of the Old Notes served Vitro SAB with purported notices of acceleration in respect of the 2012 Notes and 2017 Notes. (See Frgn. Rep. Decl. ¶ 21.) Nevertheless, Vitro SAB continued to negotiate with the Steering Committee in the hope of reaching a consensual resolution. However, the continued recalcitrance of the members of the Steering Committee, in conjunction with certain other developments (including the adverse rulings in the DFI Litigation and a purported acceleration of the 2013 Notes by a letter on the letterhead of the trustee under the relevant Indenture in April 2010) led Vitro SAB to explore alternative means to implement a restructuring.

(b)     **Settlement of DFI Litigation and Negotiations with Fintech**

19.     On June 7, 2010, one of the Vitro DFI Parties, Vena, reached a settlement agreement with Calyon, one of the Counterparties that had commenced the DFI Litigation, pursuant to which Calyon agreed to dismiss the Calyon Litigation in exchange for a payment of approximately $67.3 million, due June 30, 2011. (See Frgn. Rep. Decl. ¶ 22.)

20.     The other five Counterparties that had commenced the DFI Litigation sold their respective rights under the DFIs to Fintech Investments Ltd. (together with any affiliate and/or investment vehicle thereof, "Fintech").  (See Frgn. Rep. Decl. ¶ 23.)  Additionally, the only Counterparty that had not commenced litigation against Vitro SAB also sold its rights under the DFIs to Fintech.  (See Frgn. Rep. Decl. ¶ 23.)  Thereafter, Vitro SAB engaged in settlement negotiations with Fintech and, as a result, reached a settlement (the "Fintech Settlement") whereby, among other things, Fintech agreed to dismiss the applicable DFI Litigations in exchange for promissory notes in the agreed upon amounts (the "Promissory Notes").  (See Frgn. Rep. Decl. ¶ 23.)  The Promissory Notes were issued on September 3, 2010 by the three relevant Vitro DFI Parties, Covisa, Comercializadora Álcali, S.A. de C.V. ("Comali") and Vena, and guaranteed by Vitro SAB and certain of its other Mexican subsidiaries.  (See Frgn. Rep. Decl. ¶ 23.)

21.     Effective as of November 3, 2010, Covisa, Comali, and Vena assigned their respective rights and obligations under the Fintech Settlement, including the Promissory Notes, to Vitro SAB, which, in turn, issued replacement promissory notes to Fintech in the same aggregate principal amount as the Promissory Notes plus interest that had accrued thereon up to the date of the assignment (together, the "New Promissory Notes").[9]  (See Frgn. Rep. Decl. ¶ 24.)  The New Promissory Notes, which are guaranteed *por aval* by certain of Vitro SAB's Mexican subsidiaries, are subject to the Fintech Lock-Up Agreement (as defined below) and will

---

[9]     In addition to certain tax benefits realized by Vitro SAB and its subsidiaries as a result of such assignment, Vitro SAB was entitled to receive a fee from the assignor subsidiaries within 60 days of the assignment, and Fintech agreed to extend the final maturity of the payment obligations under the New Promissory Notes to March 31, 2011, with the new maturity payments due on January 31, 2011 ($10 million), February 28, 2011 ($30 million) and March 31, 2011 (approximately $151.4 million plus accrued interest).  (See Form 20-F at 2.)  Consistent with its overall restructuring plan, Vitro SAB has not paid the amounts payable under the New Promissory Notes as they became due and payable.  (See Frgn. Rep. Decl. ¶ 24 n.9.)

be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation (as defined below).  (See Frgn. Rep. Decl. ¶ 24.)

22.     Vitro SAB also engaged in negotiations with Fintech with respect to the restructuring proposal Vitro SAB had formulated for the Steering Committee in July 2010.  As a result of those negotiations, Vitro SAB agreed to make substantial changes to the July 2010 proposal for the benefit of all holders of Restructured Debt.  (See Frgn. Rep. Decl. ¶ 25.)

     **(v)     *Formulation of Concurso Plan and Offers***

23.     As a result of its negotiations with Fintech, Vitro SAB developed a new restructuring proposal (as amended from time to time, the "*Concurso* Plan")[10] that was to be effectuated through a prepackaged voluntary judicial reorganization proceeding in Mexico.  In support of the *Concurso* Plan, Fintech agreed to enter into a lock-up and plan support agreement (the "Fintech Lock-Up Agreement") in respect of all of the Restructured Debt it then held or subsequently acquired, and to provide financing for the Tender Offer (as defined below). (See Frgn. Rep. Decl. ¶ 26.)

24.     To meet the requirements for a prepackaged proceeding under the Mexican Business Reorganization Act and implement the *Concurso* Plan in the quickest and cost efficient manner possible, Vitro SAB formulated two alternative offers to the holders of the Old Notes:  a tender offer to purchase the Old Notes (the "Tender Offer") and an exchange offer and solicitation of consents to an in-court restructuring under the Mexican Business Reorganization Act (the "Exchange Offer and Consent Solicitation" and, together with the Tender Offer, the "Offers").  (See Frgn. Rep. Decl. ¶ 27.)  The Offers and the *Concurso* Plan are briefly described below.

---

[10]     A true and correct copy of the *Concurso* Plan is attached to the Foreign Representative Declaration as Exhibit F, and an English translation thereof is attached to the Foreign Representative Declaration as Exhibit G.

### (a)  Tender Offer

25.     Pursuant to the Tender Offer, Vitro SAB and Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro SAB, offered to purchase, for cash, the maximum aggregate principal amount of the Old Notes that could be purchased for $100,000,000 at a purchase price (the "Tender Offer Consideration") per $1,000 principal amount of no less than $500 but no more than $575 (as determined pursuant to a modified Dutch auction, the "Clearing Price").  (See Frgn. Rep. Decl. ¶ 28.)   To facilitate the Tender Offer, Fintech agreed to provide AIV the funds for the Tender Offer Consideration in exchange for receiving the tendered Old Notes, which it further agreed to exchange pursuant to the Exchange Offer and Consent Solicitation.  (See Frgn. Rep. Decl. ¶ 28.)

### (b)  Exchange Offer and Consent Solicitation

26.     Pursuant to the Exchange Offer and Consent Solicitation, Vitro SAB offered those holders of the Old Notes that participate in the Exchange Offer and Consent Solicitation or otherwise enter into lock-up agreements or consent to the *Concurso* Plan (the "Participating Creditors"), a cash consent payment (the "Consent Payment") equal to each Participating Creditor's *pro rata* share of $75 million held in a Mexican trust (the "Payment Trust").[11] (See Frgn. Rep. Decl. ¶ 29.)  All holders of the Old Notes who became Participating Creditors were  deemed to have consented to the *Concurso* Plan as it may be amended during the course of a voluntary Mexican reorganization proceeding (as so amended, the "*Convenio Concursal*").  (See Frgn. Rep. Decl. ¶ 29.)

---

[11]     The Consent Payment paid to any Participating Creditor was not less than 5% or greater than 10% of the aggregate principal amount of the Restructured Debt held by such Participating Creditor.  (See Frgn. Rep. Decl. ¶ 29 n.11.)

### (c)    *Concurso* **Plan**

27.    Vitro does not have the means to repay the Restructured Debt, nor does it believe that it will be able to find a material source of financing to refinance the Restructured Debt. (See Frgn. Rep. Decl. ¶ 30.)  Thus, the principal objectives of the *Concurso* Plan are to lower Vitro SAB's principal and interest payments on, and extend the maturity dates of, the Old Notes and the other Restructured Debt.  (See Frgn. Rep. Decl. ¶ 30.)

28.    Vitro SAB's *Concurso* Plan provides that, on the Issue Date,[12] the Restructured Debt will be exchanged for the following consideration:

- $850 million in aggregate principal amount of unsecured notes due 2019;[13]

- $100 million (plus the Issue Date Adjustment) in aggregate principal amount of new convertible debt obligations, which will mandatorily convert into 15% of Vitro SAB's equity interests (on a fully diluted basis) if not paid in full at maturity or upon the occurrence of certain events of default;[14]

- a cash payment (the "Restructuring Cash Payment") in an amount equal to the balance of $75 million held in the Payment Trust remaining after the making of the Consent Payments; and

- a cash restructuring fee to be determined as described in the Solicitation Statement (the "Restructuring Fee" and, together with the New Notes and the Restructuring Cash Payment, the "Restructuring Consideration").[15]

---

[12]    Subject to certain qualifications described in the Solicitation Statement, the Issue Date is expected to occur on or about the date the *Convenio Concursal* is consummated.  (See Frgn. Rep. Decl. ¶ 31 n.12.)

[13]    These notes, which will be identical in all material respects, will consist of new notes due in 2019 (the "New 2019 Notes") to be issued in exchange for the Old Notes, and new *Certificados Bursátiles* (the "New *Certificados Bursátiles*") to be issued in exchange for *Certificados Bursátiles*.

[14]    These obligations, which will be identical in all material respects, will consist of new mandatorily convertible debentures (the "New MCDs") to be issued in exchange for the Old Notes, and new *Obligaciones Convertibles en Acciones* (the "New *Obligaciones Convertibles en Acciones*" and, together with the New 2019 Notes, New *Certificados Bursátiles*, and New MCDs, the "New Notes") to be issued in exchange for *Certificados Bursátiles*.

[15]    Subject to the occurrence of the Issue Date, holders of the Restructured Debt will receive their *pro rata* share of the Restructuring Consideration (including the Restructuring Cash Payment and Restructuring Fee) regardless of whether or not they were Participating Creditors.  The holders of Intercompany Claims will not receive any Restructuring Consideration on account of such claims.  (See Frgn. Rep. Decl. ¶ 31 n.15.)

(See Frgn. Rep. Decl. ¶ 31.)  In addition, on the Issue Date, Vitro SAB's obligations under the

New 2019 Notes, including any repurchase obligation resulting from a Change of Control and

other mandatory prepayment provisions thereunder will be unconditionally guaranteed (the

"New Guarantees"), jointly and severally, on an unsecured basis, by Vitro SAB's direct and

indirect subsidiaries that are currently guarantors of the Old Notes (each, a "New Guarantor").[16]

29.     Accordingly, under the *Concurso* Plan, each holder will be entitled to receive, in

exchange for every $1,000 principal amount of Old Notes:

- $561 principal amount of New 2019 Notes;

- $66 principal amount of New MCDs (not including the Issue Date
  Adjustment);

- a *pro rata* portion of the Restructuring Cash Payment; and

- a *pro rata* portion of the Restructuring Fee.

(See Frgn. Rep. Decl. ¶ 32.)  Vitro SAB believes that the issuance of the New 2019 Notes and

New MCDs alone represent a 55.2% net present value nominal recovery to the holders of the Old

Notes on the face amount of their claims, representing a significant premium relative to the

recovery they could potentially achieve through litigation or the average market price of the Old

Notes for the twelve month period immediately preceding the launch of the Offers.  (See Frgn.

Rep. Decl. ¶ 32.)  Moreover, Vitro SAB believes that the holders of the Old Notes who

participated in the Exchange Offer and Consent Solicitation stand to receive a greater recovery of

between 68% to 73% of the face amount of their claims.[17]

30.     In exchange for their providing the Restructuring Consideration and the New

Guarantees, under the terms of the *Concurso* Plan, all obligations of Vitro SAB and its

---

[16]        (See Frgn. Rep. Decl. ¶ 31 n.16.)

[17]        (See Frgn. Rep. Decl. ¶ 32 n.17.)

subsidiaries with respect to the Restructured Debt (including all accrued interest and all guarantee obligations of the Old Guarantors) will be cancelled, regardless of whether or not any particular holder of the Restructured Debt votes to accept the *Concurso* Plan. (See Frgn. Rep. Decl. ¶ 33.)

**(vi)** ***Launch of Offers***

31.     On November 1, 2010, Vitro SAB launched the Offers, publicly disclosing its intention to commence the Voluntary Mexican Proceeding at the conclusion thereof. (See Frgn. Rep. Decl. ¶ 34.) From the outset, the Steering Committee has opposed the Offers and the *Concurso* Plan. In fact, ***six days prior*** to the launch of the Offers – unquestionably seeking to interfere with them and, Vitro SAB believes, in violation of the applicable confidentiality agreements between the parties – the Steering Committee issued a press release urging the holders of the Old Notes not to participate in the proposed restructuring and denouncing the yet-to-be-publicly-disclosed terms of the *Concurso* Plan as allegedly providing an "unacceptably poor economic outcome" for the holders of the Old Notes.[18] Thereafter, during the pendency of the Offers, several members of the Steering Committee commenced various legal proceedings in multiple jurisdictions against Vitro SAB and substantially all of the Old Guarantors.

**(a)     Commencement of Involuntary Chapter 11 Cases
Against Vitro SAB's U.S. Subsidiaries**

32.     On November 17, 2010, involuntary cases (the "U.S. Involuntary Cases") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Texas Bankruptcy Court") were commenced by four members of the

---

[18]      (See Frgn. Rep. Decl. ¶ 34 n.18.)

Steering Committee (the "U.S. Petitioning Creditors")[19] – together holding a mere 6% of the

Restructured Debt [20] – against fifteen of Vitro SAB's U.S. subsidiaries which are Old Guarantors

(the "U.S. Alleged Debtors").[21]  (See Frgn. Rep. Decl. ¶ 35.)  Except as described below, the

U.S. Involuntary Cases are being jointly administered before The Honorable Russell F. Nelms

under Case No. 10-47470.[22]

33.      Less than 24 hours after filing the involuntary petitions, the U.S. Petitioning

Creditors filed an emergency motion pursuant to section 303(f) of the Bankruptcy Code seeking

restrictions on the U.S. Alleged Debtors' ability to enter into transactions with their non-U.S.

affiliates or participate in Vitro SAB's yet-to-be-commenced reorganization proceeding in

Mexico.  (See Frgn. Rep. Decl. ¶ 36.)  However, on November 24, 2010, the Texas Bankruptcy

Court denied the requested restrictions in their entirety, finding, among other things, that the U.S.

Petitioning Creditors had failed to demonstrate that any harm would result from the U.S. Alleged

---

[19]      The U.S. Petitioning Creditors are:  (i) Knighthead Master Fund, L.P., (ii) Brookville Horizons Fund, L.P., (iii) Davidson Kempner Distressed Opportunities Fund L.P., and (iv) Lord Abbett Bond-Debenture Fund, Inc.

[20]      As represented in each involuntary petition, the U.S. Petitioning Creditors hold, in the aggregate, approximately $75 million in face amount of the $1.216 billion of the Old Notes.  (See Frgn. Rep. Decl. ¶ 35 n.20.)  Separately, counsel to the Steering Committee (which also serves as counsel to the U.S. Petitioning Creditors) filed a statement with the Texas Bankruptcy Court indicating that, as of November 29, 2010, the members of the Steering Committee (including the four U.S. Petitioning Creditors) or their affiliates "collectively are the advisor to or beneficial owner of, or the holder or manager of, various accounts with investment authority, contractual authority or voting authority for" approximately $673 million of the Old Notes.  (See Frgn. Rep. Decl. ¶ 35 n.20.)  In the more than four months that the U.S. Involuntary Proceedings have been pending, however, none of the other members of the Steering Committee (nor, for that matter, any other holder of the Old Notes or trustee under any of the Indentures) has joined the U.S. Petitioning Creditors in the involuntary petitions pursuant to section 303(c) of the Bankruptcy Code, or made the required disclosures pursuant to Bankruptcy Rule 1003 to become a petitioning creditor in the U.S. Involuntary Cases.

[21]      The U.S. Alleged Debtors are:  Vitro Asset Corp., Vitro Chemicals, Fibers & Mining, LLC ("Chemicals"), Vitro America, LLC ("Vitro America"), Troper Services, Inc., Super Sky Products, Inc. ("Super Sky Products"), Super Sky International, Inc. ("Super Sky International"), VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company, Crisa Corporation, VVP Finance Corporation ("VVP Finance"), VVP Auto Glass, Inc. ("Auto Glass"), V-MX Holdings, LLC, and Vitro Packaging, LLC ("Packaging").

[22]      The Texas Bankruptcy Court has advised that, due to the illness of Judge Nelms, the U.S. Involuntary Cases will be reassigned.

Debtors' participation in the Offers or the *Concurso* Plan, and that the U.S. Petitioning Creditors' unsubstantiated allegations and expressed distrust of Mexican law failed to justify the requested relief.  (See Frgn. Rep. Decl. ¶ 36.)

34.     Thereafter, the U.S. Alleged Debtors continued to operate their businesses in the ordinary course, and were authorized by the Texas Bankruptcy Court to continue (i) utilizing an existing working capital facility with their secured lender, Bank of America, and (ii) incurring indebtedness from Vitro SAB and certain of its Mexican subsidiaries on an unsecured basis consistent with their prepetition practices.  (See Frgn. Rep. Decl. ¶ 37.)  On December 9, 2010, the U.S. Alleged Debtors filed an answer to the involuntary petitions, denying most allegations made therein and asserting certain affirmative defenses, including that the claims of the U.S. Petitioning Creditors are contingent as to liability and subject to a *bona fide* dispute as to liability or amount, and that the U.S. Alleged Debtors are generally paying their debts as they become due.  (See Frgn. Rep. Decl. ¶ 37.)  On March 31, 2011 and April 1, 2011, a trial was held on whether orders for relief should be entered against the U.S. Alleged Debtors, after which the Texas Bankruptcy Court took the matter under advisement.

35.     By the time of the trial, the negative impact on the business operations of certain of the U.S. Alleged Debtors caused by the commencement of the U.S. Involuntary Cases and their pendency for more than four months had become severe.  On April 6, 2011, Vitro America, Super Sky International, Super Sky Products, and VVP Finance (together, the "U.S. Debtors"), moved for entry of orders for relief, and the Texas Bankruptcy Court entered such orders on that same date.  Thereafter, the U.S. Debtors filed pleadings requesting authority to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code, and have indicated that certain additional non-operating U.S. Alleged Debtors may consent to orders for relief in connection

therewith.  The remaining U.S. Alleged Debtors continued to oppose entry of orders for relief against them.  (See Frgn. Rep. Decl. ¶ 38.)

36.     On April 11, 2011, the Texas Bankruptcy Court issued an order, attached to the Foreign Representative Declaration as Exhibit M (the "Denial Order"), denying entry of orders for relief against Chemicals, Packaging and Auto Glass, the three remaining operating entities among the U.S. Alleged Debtors (the "Operating U.S. Alleged Debtors").  In the Denial Order, the Texas Bankruptcy Court found that the Operating U.S. Alleged Debtors are generally paying their debts as they become due, although it did not finally determine whether the claims of the U.S. Petitioning Creditors are contingent as to liability or subject to a *bona fide* dispute as to liability or amount.  (See Frgn. Rep. Decl. ¶ 39.)  As of the date hereof, the petitions for orders of relief against the remaining eight U.S. Alleged Debtors (the "Remaining U.S. Alleged Debtors") remain under advisement.  (See Frgn. Rep. Decl. ¶ 39.)

**(b)     Commencement of Litigation in New York State Court
Against Vitro SAB's and 49 of its non-U.S. Subsidiaries**

37.     On December 2, 2010 and December 9, 2010, respectively, two members of the Steering Committee (the "NYS Plaintiffs") commenced substantially identical law suits (the "NYS Actions") in the Supreme Court of the State of New York (the "New York State Court") against Vitro SAB and 49 of its subsidiaries in their capacities as Old Guarantors (together, the "NYS Defendants") for breach of contract and payment of accelerated principal and accrued interest with respect to their beneficial holdings of Old Notes.[23]  In each case, the respective

---

[23]     (See Frgn. Rep. Decl. ¶ 40 n.22.)  Through the verified complaint (the "Aurelius Complaint") of ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius Convergence Master, Ltd. (collectively, "Aurelius"), three funds managed or controlled by Aurelius Capital Management, LP., Aurelius alleges that it holds, in the aggregate, more than $206 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $257 million for unpaid principal and accrued interest.  (See Frgn. Rep. Decl. ¶ 40 n.22.)  In addition, through the verified complaint (the "Elliott Complaint") of Elliott International L.P. and The Liverpool Limited Partnership (collectively, "Elliott"), two funds managed or controlled by Elliott Management Corp, Elliott alleges that it holds, in the aggregate, more than $85 million

NYS Plaintiff obtained an *ex parte* order of attachment (together, the "<u>Attachment Orders</u>") with respect to all property of any NYS Defendant located in the State of New York.  (<u>See</u> Frgn. Rep. Decl. ¶ 40.)

38.     The NYS Actions and the Attachment Orders have caused significant disruptions to Vitro's businesses and reorganization efforts (as, Vitro SAB believes, was the NYS Plaintiffs' intention).  Specifically, shortly after they were obtained, the Attachment Orders were served by the NYS Plaintiffs on D.F. King & Co., Inc. ("<u>D.F. King</u>"), the Depository for the Tender Offer and the Information and Exchange Agent for the Exchange Offer and Consent Solicitation, causing D.F. King to refuse to take certain steps necessary to effectuate the transfer of the Old Notes tendered in the Tender Offer or disburse the Consent Payment to those holders of the Old Notes that consented to the *Concurso* Plan.[24]  (<u>See</u> Frgn. Rep. Decl. ¶ 41.)  Additionally, the NYS Plaintiffs served copies of the Attachment Orders on certain of Vitro's customers.  In response, some of these customers suspended payments on account of goods and services being provided by the NYS Defendants – including payments on account of receivables previously assigned by certain NYS Defendants to a trust[25] – pending an order by the New York State Court vacating the Attachment Orders or otherwise clarifying that such payments were not subject thereto.  (<u>See</u> Frgn. Rep. Decl. ¶ 41.)

---

in face amount of Old Notes, and seeks damages in the aggregate amount of more than $106 million for unpaid principal and accrued interest.  (<u>See</u> Frgn. Rep. Decl. ¶ 40 n.22.)  Both Aurelius Capital Management, LP. and Elliott Management Corp. are members of the Steering Committee, although neither is a U.S. Petitioning Creditor.

[24]     Ultimately – after nearly two weeks of expedited litigation before the New York State Court and the New York Appellate Division – an order was entered clarifying that the Attachment Orders did not apply to the Old Notes tendered or exchanged as part of the Offers.  Subsequently, D.F. King took the requisite actions and the Offers were completed.  (<u>See</u> Frgn. Rep. Decl. ¶ 41 n.23.)

[25]     Several NYS Defendants, including Automotríz , established an independent trust, pursuant to a *contrato de fideicomiso* signed on August 3, 2005 in Mexico (the "<u>Flat Glass Payment Trust</u>"), to which they sold and assigned their trade receivables.  The trustee of the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division Fiduciaria Invex Grupo Financiero ("<u>Invex</u>").  (<u>See</u> Frgn. Rep. Decl. ¶ 41 n.24.)

39.     On February 8, 2011, Justice Kornreich of the New York State Court heard argument on cross-motions by the NYS Plaintiffs to confirm and NYS Defendants to vacate the Attachment Orders, as well as an order to show cause by Invex seeking entry of an order clarifying that payments due to the Flat Glass Payment Trust from customers on account of receivables generated by Automotríz were not subject to the Attachment Orders.  (<u>See</u> Frgn. Rep. Decl. ¶ 42.)  At the conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and entered an order on Invex's order to show cause (the "<u>Partial *Vacatur* Order</u>") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. (<u>See</u> Frgn. Rep. Decl. ¶ 40.)  Justice Kornreich briefly stayed the Partial *Vacatur* Order and the NYS Plaintiffs appealed.  (<u>See</u> Frgn. Rep. Decl. ¶ 42.)  On February 10, 2011, the New York Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial *Vacatur* Order became final.  (<u>See</u> Frgn. Rep. Decl. ¶ 42.)

40.     As of the date hereof, Justice Kornreich has not issued a further ruling confirming or denying the Attachment Orders and the NYS Actions remain pending.  On March 9, 2011 and March 18, 2011, respectively, the NYS Plaintiffs submitted substantially identical motions for partial summary judgment (the "<u>Partial SJ Motions</u>") on the portions of their respective claims relating only to unpaid interest.  On March 28, 2011, the NYS Defendants filed their consolidated opposition to the Partial SJ Motions and, on April 4, 2011, the NYS Plaintiffs' submitted their replies in further support of the motions.  The New York State Court has scheduled oral argument on the Partial SJ Motions for May 3, 2011 at 10:30 a.m. (prevailing Eastern Time).  (<u>See</u> Frgn. Rep. Decl. ¶ 43.)

**(c)** **Commencement of Involuntary Mexican Proceedings
Against Vitro SAB and Certain of its Mexican Subsidiaries**

41.     On December 10, 2010, certain members[26] of the Steering Committee filed an involuntary *concurso* petition in the District Court of Nuevo León against Vitro SAB and, beginning on December 15, 2010, also filed involuntary *concurso* petitions against certain of its Mexican subsidiaries.  (See Frgn. Rep. Decl. ¶ 44.)  The Mexican District Judge (as defined below) entered orders admitting the involuntary petitions for further proceedings (each, an "Involuntary Mexican Proceeding") against Vitro SAB and 17 of its Mexican subsidiaries (together, the "Mexican Alleged Debtors").[27]  (See Frgn. Rep. Decl. ¶ 44.)

42.     Under the Mexican Business Reorganization Act, before a *concurso mercantil* declaration can be issued on an involuntary *concurso* petition, a court-appointed "visitador" must examine the books and records of an alleged debtor and issue a report to the court as to whether it satisfies the eligibility requirements to be a debtor in a *concurso* proceeding.  (See Frgn. Rep. Decl. ¶ 45.)  This process is followed by a period of time reserved for parties to submit final allegations and in certain cases additional evidence, after which the court must issue a decision either declaring the debtor insolvent (in which case its *concurso* proceeding will go forward) or absolving the debtor (in which case its *concurso* proceeding will be dismissed).  (See Frgn. Rep. Decl. ¶ 45.)

---

[26]     The relevant members of the Steering Committee include U.S. Petitioning Creditors Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Knighthead Master Fund L.P., as well as Moneda, S.A. Administradora de Fondos de Inversión como Administradora del Fondo de Inversión and Moneda Deuda Latinoamericana Fondo de Inversión.

[27]     The Mexican Alleged Debtors are:  Vidrio y Cristal, Viméxico, Automotríz, Cristales Inastillables de México, S.A. de C.V. ("Cristales Inastillables"), Vidrio Plano de México, S.A. de C.V. ("Vidrio Plano"), Vitro Flotado Cubiertas, S.A. de C.V. ("Vitro Flotado"), Vitrocar, S.A. de C.V. ("Vitrocar"), Distribuidor Vidriero LAN, S.A. de C.V. ("Distribuidor Vidriero"), Comali, Industria del Álcali, S.A. de C.V. ("Alcali"), FIC Regiomontano, S.A. de C.V. ("FIC"), Vidriera Monterrey, S.A. de C.V. ("Vidriera Monterrey"), Fabricación de Máquinas, S.A. de C.V. ("Fabricación de Máquinas"), Vidriera Guadalajara, S.A. de C.V. ("Vidriera Guadalajara"), Vidriera los Reyes, S.A. de C.V. ("Vidriera los Reyes"), Vena, and Servicios Integrales de Acabados, S.A. de C.V. ("Servicios Integrales").  (See Frgn. Rep. Decl. ¶ 44 n.26.)

43. On or about March 9, 2011, Jose Luis Elizondo Cantu, the duly appointed *visitador* in the Involuntary Mexican Proceeding, issued his report, an English translation of which is attached to the Foreign Representative Declaration as Exhibit P (the "*Visitador Report*"). In his *Visitador* Report, the *visitador* concluded, based on his review of Vitro SAB's financial books and records as of the date the involuntary *concurso* petition was filed, that Vitro SAB did ***not*** meet the requirements set forth in the Mexican Business Reorganization Act for commencement of the Involuntary Mexican Proceeding. As of the date hereof, the period for parties to submit final allegations and additional evidence has ended, and all such submissions as well as the *Visitador* Report are under consideration by the Mexican District Judge. As a consequence of the issuance of the *Concurso* Declaration (as defined below) in the Voluntary Mexican Proceeding, Vitro SAB has requested the Mexican District Judge to dismiss the Involuntary Mexican Proceeding against it pursuant to section 373-I of the Mexican Federal Code for Civil Procedure. If the Mexican District Judge refuses this request, Vitro SAB anticipates a decision on whether an involuntary *concurso mercantil* declaration against it will be denied in accordance with the *Visitador* Report would be issued within a matter of days. (See Frgn. Rep. Decl. ¶ 46.)

44. As of the date hereof, the *visitador* appointed in the Involuntary Mexican Proceedings pending against the Mexican Alleged Debtors other than Vitro SAB has submitted his reports, finding that the requirements set forth in the Mexican Business Reorganization Act for declaration of a *concurso* were met with respect to eight of the seventeen Vitro SAB subsidiaries who are Mexican Alleged Debtors,[28] but were not met with respect to the other

---

[28] Viméxico, Vidrio y Cristal, Comali, Automotríz, Vitrocar, Distribuidor Vidriero, Vitro Flotado, and Fabricación de Máquinas. (See Frgn. Rep. Decl. ¶ 47 n.27.)

nine.[29]  The period for parties to submit final allegations and additional evidence in all of these proceedings is ongoing.  Vitro SAB anticipates that decisions on whether to deny involuntary *concurso mercantil* declarations against its subsidiary Mexican Alleged Debtors will not be issued for several weeks.  (See Frgn. Rep. Decl. ¶ 47.)

### (vii)  *Results of Offers*

45.  As noted above, on November 1, 2010, Vitro SAB launched the Tender Offer and Exchange Offer and Consent Solicitation.[30]  Vitro SAB believes that participation in the Offers by the holders of Restructured Debt was negatively impacted by actions by members of the Steering Committee and other holders of Old Notes during the pendency of the Offers.  (See Frgn. Rep. Decl. ¶ 48.)  As of the date hereof, both Offers have expired in accordance with their respective terms, and payment of the Tender Offer Consideration and the Consent Payments has since been made.  (See Frgn. Rep. Decl. ¶ 48.)  Old Notes in the aggregate principal amount of approximately $44 million were tendered pursuant to the Tender Offer and Restructured Debt in the aggregate principal amount of $520 million was tendered in the Exchange Offer and Consent Solicitation.  (See Frgn. Rep. Decl. ¶ 48.)

### D.  Voluntary Mexican Proceeding

46.  On December 13, 2010, Vitro SAB commenced the Voluntary Mexican Proceeding by filing with the District Court of Nuevo León a petition requesting a *concurso mercantil* declaration under the Mexican Business Reorganization Act (the "Voluntary *Concurso* Petition," an English translation of which is attached to the Foreign Representative Declaration as Exhibit Q) together with its prepackaged *Concurso* Plan which was executed by Vitro SAB

---

[29]  Vena, FIC, Cristales Inastillables, Vidriera Monterrey, Vidriera los Reyes, Vidriera Guadalajara, Álcali, Servicios Integrales, and Vidrio Plano.  (See Frgn. Rep. Decl. ¶ 47 n.28.)

[30]  Concurrently, Vitro SAB also sought consents to the *Concurso* Plan from the other holders of Restructured Debt.  (See Frgn. Rep. Decl. ¶ 48 n.29.)

and creditors representing more than 40% in amount of its outstanding liabilities (including Intercompany Claims, as permitted under the Mexican Business Reorganization Act).[31]  The *Concurso* Plan is supported by more than 650 beneficial holders of the Old Notes and of other Restructured Debt.[32]  (See Frgn. Rep. Decl. ¶ 49.)

47.     The Voluntary *Concurso* Petition was assigned to Judge Francisco Eduardo Flores Sánchez (the "Mexican District Judge") of the Fourth Federal District Court in Nuevo León in Monterrey, Mexico.  On December 27, 2010, the Mexican District Judge issued a ruling admitting the Voluntary Mexican Petition for further proceedings, having determined that it complied with the requirements for *concurso mercantil* set forth in Article 339 of the Mexican Business Reorganization Act.  However, on January 7, 2011, the Mexican District Judge issued a resolution denying Vitro SAB's request for a *concurso mercantil* declaration on the basis that Intercompany Claims should not be considered and, therefore, the Voluntary *Concurso* Petition and *Concurso* Plan did not meet the requirements for a prepackaged proceeding under the Mexican Business Reorganization Act.  (See Frgn. Rep. Decl. ¶ 50.)

48.     On January 28, 2011, Vitro SAB, its subsidiaries and the holders of the Old Notes and *Certificados Bursátiles* that support the Concurso Plan appealed this resolution to the Magistrate for the Federal Unitary Second Appeals Court (*Tribunal Unitario*) for the Fourth Circuit in Monterrey (the "Mexican Appellate Court").  The Mexican Appellate Court agreed to review the merits of the appeal and requested an opinion regarding consideration of intercompany liabilities under the Mexican Business Reorganization Act from the Federal

---

[31]     Pursuant to article 339 of the Mexican Business Reorganization Act, commencement of a *concurso* proceeding with a pre-approved plan of reorganization requires the consent or approval of the plan from creditors representing at least 40% of all of a debtor's outstanding liabilities.  (See Frgn. Rep. Decl. ¶ 49 n.30.)

[32]     See April 11, 2011 Release attached to the Foreign Representative Declaration as Exhibit R.

Institute of Business Reorganization Specialists (the *Instituto Federal de Especialistas de Concursos Mercantiles*, or "IFECOM"), a branch of the Mexican federal judiciary. By letter dated March 23, 2011, IFECOM responded to the Mexican Appellate Court, setting forth its non-binding conclusion that the Mexican Business Reorganization Act does ***not*** preclude the consideration of intercompany obligations for purposes of an insolvency proceeding, and listing several prior *concurso* proceedings in which intercompany obligations had, in fact, been considered.[33] (See Frgn. Rep. Decl. ¶ 51.)

49.   On April 8, 2011, the Mexican Appellate Court issued its decision, reversing the January 7, 2011 resolution of the Mexican Bankruptcy Judge and holding that Vitro SAB's Voluntary *Concurso* Petition and *Concurso* Plan satisfied the requirements for a prepackaged *concurso* proceeding under the Mexican Business Reorganization Act and, therefore, issued a declaration of *concurso mercantil* (the "*Concurso* Declaration") in the Voluntary Mexican Proceeding. (See Frgn. Rep. Decl. ¶ 52.)

**E.     Filing and Subsequent Withdrawal of Prior Chapter 15 Petition**

50.   On December 14, 2010, the Petitioner previously filed a form chapter 15 petition and verified petition on behalf of Vitro SAB (attached to the Foreign Representative Declaration as Exhibit T, the "Prior Chapter 15 Petition"). See In re Vitro, S.A.B. de C.V., No. 10-16619 (SHL) (Bankr. S.D.N.Y. Dec. 14, 2010) (the "Prior Chapter 15 Case"). In conjunction with the filing thereof, the Petitioner also requested a hearing on recognition of the Voluntary Mexican Proceeding as a foreign main proceeding and, as noted in the Prior Chapter 15 Petition, the Petitioner intended to request certain injunctive relief protecting Vitro's ability to reorganize through the Voluntary Mexican Proceeding from the irreparable harm the Petitioner believed

---

[33]     (See Frgn. Rep. Decl. ¶ 51 n.32.)

would otherwise be caused by pending and future litigation by recalcitrant holders of the Old Notes.  (See Frgn. Rep. Decl. ¶ 53.)  Just hours after the Prior Chapter 15 Petition was filed, however, the U.S. Petitioning Creditors filed a motion (the "Venue Transfer Motion") in the U.S. Involuntary Cases asking the Texas Bankruptcy Court to transfer to itself the venue of the Prior Chapter 15 Case.  The Petitioner was advised by counsel that the filing of the Venue Transfer Motion had the automatic effect under applicable rules of staying all proceedings in the Prior Chapter 15 Case until such motion was resolved.  (See Frgn. Rep. Decl. ¶ 53.)

51.  Ultimately, no hearing on recognition was ever held in the Prior Chapter 15 Case, nor was any request for injunctive relief filed.  Following the January 7, 2011 denial by the District Court of Nuevo León of Vitro SAB's request for a *concurso mercantil* declaration in the Voluntary Mexican Proceeding, the Petitioner reached an agreement with the Steering Committee to withdraw the Prior Chapter 15 Petition without prejudice and close the Prior Chapter 15 Case, which the Court so ordered on January 26, 2011 (attached to the Foreign Representative Declaration as Exhibit T, the "Withdrawal Order").  (See Frgn. Rep. Decl. ¶ 54.)

## JURISDICTION AND VENUE

52.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  Venue is proper before this Court pursuant to 28 U.S.C. § 1410.

53.  Section 1410 of title 28 of the United States Code provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district—
>
> > (1)  in which the debtor has its principal place of business or principal assets in the United States;
> >
> > (2)  if the debtor does not have a place of business or assets in the United States, in which there is a pending against the debtor an action or proceeding in a Federal or State court; or

<blockquote>
(3)     in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.
</blockquote>

28 U.S.C. § 1410.

54.     Vitro SAB does not have a place of business or assets in the United States.  Thus, venue is proper in this Court under subsection (2) above because the NYS Actions are pending in the Supreme Court of the State of New York, New York County.

**RELIEF REQUESTED**

55.     The Petitioner seeks entry of an order, substantially in the form attached hereto as Exhibit A, (i) recognizing the Voluntary Mexican Proceeding as a "foreign main proceeding" pursuant to sections 1515 and 1517 of the Bankruptcy Code, and (ii) granting Vitro SAB all of the relief afforded to such proceedings pursuant to section 1520 of the Bankruptcy Code.

**BASIS FOR RELIEF**

**A.     The Chapter 15 Petition Satisfies the Requirements of Section 1517 of the Bankruptcy Code**

56.     Section 1517(a) of the Bankruptcy Code sets forth the requirements for recognition of a foreign proceeding, and provides, as relevant here, that, after notice and a hearing, a bankruptcy court shall enter an order recognizing a foreign proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.[34]  As set forth below, the Voluntary Mexican Proceeding and the Chapter 15 Petition satisfy all of the foregoing

---

[34]     According to the legislative history of section 1517, "the decision to grant recognition is not dependent upon any findings about the nature of the foreign proceedings of the sort previously mandated by section 304(c) of the Bankruptcy Code.  The requirements of this section, which incorporates the definitions in section 1502 and sections 101(23) and (24), are all that must be fulfilled to attain recognition."  H.R. Rep. 109-31, pt. 1, at 113 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 175.

requirements and accordingly, the Voluntary Mexican Proceeding should be recognized as a foreign main proceeding.

      **(i)**      ***The Voluntary Mexican Proceeding Is a "Foreign Main Proceeding"***

            **(a)**      **The Voluntary Mexican Proceeding is a "Foreign Proceeding"**

57.      As explained in the Mexican Counsel's Declaration, the Voluntary Mexican Proceeding is a "foreign proceeding" under Section 101(23) of the Bankruptcy Code, which defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. §101(23).

58.      The Voluntary Mexican Proceeding meets this definition because it is a collective administrative proceeding under the Mexican Business Reorganization Act, administered in Nuevo León, Mexico, which relates to insolvency and adjustment of debt.  (See Frgn. Rep. Decl. ¶ 57.)  The purpose of the Voluntary Mexican Proceeding is to allow Vitro SAB to implement restructuring of the Restructured Debt by obtaining judicial approval of the *Concurso* Plan.  (See Frgn. Rep. Decl. ¶ 57.)  The process is controlled by the District Court of Nuevo León, which has review and approval rights over any plan of reorganization filed by Vitro SAB in the Voluntary Mexican Proceeding.  (See Mexican Counsel Decl. ¶ 16.)

59.      Under the Mexican Business Reorganization Act, though a debtor remains in control of its business and operations, the process of formulating a plan of reorganization is overseen by a judiciary-appointed specialist, the *conciliador*, which monitors the accounting and

any transactions carried out by the debtor and possesses certain powers to protect the estate.[35] (See Mexican Counsel Decl. ¶ 13.) For these reasons, Vitro SAB's assets are "subject to control or supervision by a foreign court" and all of the requirements of section 101(23) are met.

60. Bankruptcy courts have generally held that proceedings under the Mexican Business Reorganization Act are "foreign proceedings" for purposes of granting recognition under Chapter 15 of the Bankruptcy Code. See, e.g., Order Granting Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, In re Metrofinanciera, S.A.P.I. de C.V., Case No. 10-20666 (RSS) (Bankr. S.D. Tex. Sept. 24, 2010) (attached hereto as Exhibit B, the "Metrofinanciera Order"), ¶ 8 (finding "[a]mong other things, proceedings under Mexico's Concurso Law are collective and judicial in nature"); Order Granting Recognition of Foreign Main Proceeding and Related Relief, In re Controladora Comercial Mexicana, S.A.B. de C.V., Case No. 10-13750 (SMB) (Bankr. S.D.N.Y. Aug. 19, 2010) (attached hereto as Exhibit C, the "CCM Order"), at 2 ("The Concurso Proceeding is a 'foreign proceeding' within the meaning of section 101(23) of the Bankruptcy Code."); Order Granting Recognition of Foreign Main Proceeding and Related Relief, In re Corporacion Durango S.A.B. de C.V., Case No. 08-13911 (ALG) (Bankr. S.D.N.Y. Dec. 11, 2008) (attached hereto as Exhibit D, the "Durango Order"), at 2 (same).

(b) **The Voluntary Mexican Proceeding is a "Foreign Main Proceeding"**

61. Section 1502(4) of the Bankruptcy Code defines a "foreign main proceeding" as "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. §1502(4). Thus, it must be shown that the Voluntary Mexican Proceeding is pending in the country where Vitro SAB has "the center of its main interests."

---

[35] Although as of the date hereof, no *conciliador* has been appointed in the Voluntary Mexican Proceeding, upon information and belief, Vitro SAB anticipates that a *conciliador* will be appointed within the coming days.

62.     Although the Bankruptcy Code does not provide a conclusive test to determine a debtor's center of main interests, pursuant to section 1516 of the Bankruptcy Code, it is presumed, absent evidence to the contrary, that such center is located wherever its registered office is located.  11 U.S.C. § 1516(c).  The concept of "center of main interests" has been equated by the courts to the concept of a debtor's "principal place of business."  In re Tri-Continental Exch. Ltd., 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006).

63.     There is no doubt that Mexico is Vitro SAB's "center of main interests." Vitro SAB's registered office and principal place of business is located in Nuevo León, Mexico. Therefore, Vitro SAB's center of main interests is presumed to be in Mexico.  No evidence contradicts this presumption.  On the contrary, Nuevo León, Mexico is also where all of Vitro SAB's administrative functions are conducted and from where all of its business is managed and controlled.  (See Frgn. Rep. Decl. ¶ 57.)  As the Voluntary Mexican Proceeding is a foreign proceeding located in Vitro SAB's center of main interests, it is therefore a "foreign main proceeding" for the purposes of the Bankruptcy Code.  Accordingly, the requirements of section 1517(a)(1) of the Bankruptcy Code have been satisfied.

64.     Under similar circumstances, bankruptcy courts have found proceedings under the Mexican Business Reorganization Act to be "foreign main proceedings" for purposes of granting recognition under Chapter 15 of the Bankruptcy Code.  See, e.g., Metrofinanciera Order, ¶ 8 (finding "foreign main proceeding" where debtor's center of main interests and administrative offices were located in Monterrey, Mexico, and debtor conducted operations in Mexico); CCM Order, at 2 (same); Durango Order, at 2 (same).

**(ii)** *The Foreign Representative Is a Person and Is Duly Authorized*

65.     The term "foreign representative" is defined in section 101(24) of the Bankruptcy

Code as follows:

> [A] person or body, including a person or body appointed on an
> interim basis, authorized in a foreign proceeding to administer the
> reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. §101(24).

66.     This chapter 15 case was commenced by the Petitioner, a natural person who is an

executive employee of Vitro SAB in Mexico duly appointed to serve as Vitro SAB's "foreign

representative" by the resolutions of Vitro SAB's Board of Directors for purposes of

commencing ancillary proceedings in foreign jurisdictions.  (See Frgn. Rep. Decl. ¶ 60.)  Since

the commencement of the Voluntary Mexican Proceeding, Vitro SAB has remained in

possession of and continued to manage its businesses and properties, and neither the *Concurso*

Declaration nor any other order of the Mexican District Court has appointed a foreign

representative or otherwise precluded Vitro SAB from doing so.  (See Frgn. Rep. Decl. ¶ 60.)

67.     Courts have on numerous occasions held that a foreign representative in an

ancillary proceeding may be appointed by the debtor's board of directors, and need not be

appointed by the foreign court overseeing the foreign proceeding.  See, e.g., Transcript of

Hearing for Order to Show Cause, In re Compania Mexicana de Aviacion, S.A., Case No. 14182

(MG) (Bankr. S.D.N.Y. Aug. 16, 2010) (attached hereto as Exhibit E), at 7:11-19 (holding, over

objection by creditor that petitioning foreign representative was not properly authorized to

commence chapter 15 proceeding, that "it was proper for the board of directors to designate

Johansen to serve as foreign representative to file the chapter 15 proceeding in this court. . . .

Absent Mexican court order to the contrary management alone remains in control of the

business."); see also In re Bd. of Dirs. of Hopewell Int'l Ins., Inc., 275 B.R. 699, 707 (S.D.N.Y. 2002) (holding that company's board of directors qualified as foreign representative); In re Bd. of Dirs. of Telecom Argentina S.A., No. 05- 17811 (BRL), 2006 WL 686867, at *21 (Bankr. S.D.N.Y. Feb. 24, 2006) (same); In re Netia Holdings, 277 B.R. 571, 587 n.76 (Bankr. S.D.N.Y. 2002) (same). Neither section 101(24) nor chapter 15 of the Bankruptcy Code requires foreign representatives to be appointed by foreign courts. See In re Hopewell, 275 BR. at 707 (interpreting section 101(24) of Bankruptcy Code and stressing that "nothing in the statute requires a court appointment"). Rather, section 101(24) simply requires that such representative be "authorized" to administer the reorganization or the liquidation of the debtor's assets or affairs or act as a representative of the foreign proceeding. See 11 U.S.C. § 101(24).

68.    Further, the court in each of Metrofinanciera, CCM and Durango recognized an individual who was not appointed by the Mexican court as a duly-authorized foreign representative of the debtor within the meaning of sections 101(24) and 1517(a)(2) of the Bankruptcy Code. See Metrofinanciera Order, ¶ 9 ("Mr. Amaro was properly and specifically authorized to commence these proceedings by the Debtor's board of directors, which is authorized to administer the restructuring of the Debtor's affairs under the Concurso Law."); Declaration of Lic. Fernando Del Castillo Elorza as Foreign Representative of Controladora Comercial Mexicana Pursuant to 28 U.S.C. § 1746, In re Controladora Comercial Mexicana, S.A.B. de C.V., Case No. 10-13750 (SMB) (Bankr. S.D.N.Y. July 16, 2010) (attached hereto as Exhibit F), ¶ 4, and CCM Order ¶ E (finding petitioner who had been granted power of attorney by debtor authorizing petitioner to initiate legal proceedings on behalf of debtor had been duly appointed and authorized to serve as debtor's "foreign representative"); Declaration of Gabriel Villegas Salazar Pursuant to 28 U.S.C. § 1746, In re Corporacion Durango S.A.B. de C.V., Case

No. 08-13911 (ALG) (Bankr. S.D.N.Y. Oct. 6, 2008) (attached hereto as <u>Exhibit G</u>), ¶ 4 and <u>Durango Order</u> ¶ 4 (same).

69.     The Petitioner, an individual duly appointed by Vitro SAB's Board of Directors, is thus the duly appointed foreign representative of Vitro SAB. Accordingly, the requirements of section 1517(a)(2) of the Bankruptcy Code have been satisfied.

      **(iii)**     ***Requirements of Section 1515 of the Bankruptcy Code Have Been Met***

70.     The final requirement for the recognition of a foreign main proceeding is compliance with the procedural requirements of section 1515 of the Bankruptcy Code. Section 1515 requires that a petition for recognition of a foreign proceeding shall be filed with the court and be accompanied by "evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative" and "a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative." 11 U.S.C. § 1515(b)(3) and (c). All of the requirements of section 1515 of the Bankruptcy Code have been satisfied.

71.     First, as required by section 1515(a) of the Bankruptcy Code, this chapter 15 case was properly commenced by the Petitioner on behalf of Vitro SAB through the filing of the Chapter 15 Petition.

72.     Second, as required under sections 1515(b) and (d), the Chapter 15 Petition is accompanied by (i) a certified copy of the *Concurso* Declaration, judicially declaring that Vitro SAB meets the requirements for being the subject of a proceeding under the Mexican Business Reorganization Act and triggering the commencement of the "*conciliation*" stage therein, attached as Exhibit U to the Foreign Representative Declaration,[36] and (ii) a certified copy of an

---

[36]     An English translation of the *Concurso* Declaration is being prepared and will be provided to the Court as soon as possible.

English translation of the Board resolution appointing me as the Foreign Representative of Vitro SAB, attached as Exhibit V to the Foreign Representative Declaration.

73.     Finally, in compliance with section 1515(c) of the Bankruptcy Code, the Chapter 15 Petition has been accompanied by the Foreign Representative's Declaration, wherein the Petitioner has identified, under penalty of perjury, to the best of his knowledge, all foreign proceedings currently pending with respect to Vitro SAB of which he is aware, including (i) the Involuntary Mexican Proceeding filed against Vitro SAB discussed above in paragraphs 41 and 43, and (ii) an involuntary proceeding commenced by Fintech in the District Court of Nuevo León, in respect of which Vitro SAB was served with an involuntary *concurso* petition on April 14, 2011.  Accordingly, the requirements of section 1515 of the Bankruptcy Code and, thus, of section 117(a)(3) of the Bankruptcy Code have been satisfied.

74.     Accordingly, the Petitioner respectfully submits that the Voluntary Mexican Proceeding should be recognized as Vitro SAB's "foreign main proceeding."

**B.      Vitro SAB Is Entitled to Relief Pursuant to Section 1520 of the Bankruptcy Code**

75.     Section 1520 of the Bankruptcy Code sets forth a series of statutory protections, including the automatic stay, that become effective automatically upon the entry of an order recognizing a foreign main proceeding.  <u>See</u> 11 U.S.C. § 1520.  Accordingly, the Petitioner respectfully requests that, upon recognition of the Voluntary Mexican Proceeding as a foreign main proceeding, Vitro SAB be granted the full extent of the relief provided pursuant to section 1520 of the Bankruptcy Code and submits that no further showing is needed on the issue.

<u>**NOTICE**</u>

76.     Notice of the Chapter 15 Petition has been provided to (i) the Office of the United States Trustee for the Southern District of New York, (ii) the trustees under the Indentures, or their counsel if known, (iii) Cleary Gottlieb Steen & Hamilton LLP, counsel to Fintech

Investments Ltd., (iv) White & Case LLP, counsel to the Steering Committee, (v) Friedman

Kaplan Seiler & Adelman LLP, counsel to Aurelius, (vi) Dechert LLP, counsel to Elliott, and

(vii) all parties against whom provisional relief under section 1519 of the Bankruptcy Code may

be sought.  Petitioner submits that no other or further notice need be provided.

<u>**NO PRIOR REQUEST**</u>

77.     Except as set forth in paragraphs 50-51 above, no previous request for the relief

requested herein has been made to this or any other court.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Petitioner respectfully requests that the Court (a) enter an order, substantially in the form attached hereto as <u>Exhibit A</u> granting the relief requested herein, and (b) grant Vitro SAB such other and further relief as the Court deems just and proper.

Dated:    April 14, 2011
        New York, New York

/s/ Dennis F. Dunne_____
Dennis F. Dunne
Risa M. Rosenberg
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone:  (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica*
*as Foreign Representative of Vitro, S.A.B. de C.V.*

## <u>VERIFICATION</u>

ALEJANDRO FRANCISCO SÁNCHEZ-MUJICA hereby declares:

1.      I hold the title of Executive Vice President and General Counsel of Vitro, S.A.B.

de C.V. ("<u>Vitro SAB</u>"), and have been duly appointed by Vitro SAB's Board of Directors to

commence this chapter 15 case.

2.      I have read the Chapter 15 Petition and I am informed and believe that the factual

allegations contained therein are true and correct.

3.      I verify under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed:  April 14, 2011
                State of Nuevo León, Mexico

                                        /s/ Alejandro Francisco Sánchez-Mujica
                                        ALEJANDRO FRANCISCO SÁNCHEZ-MUJICA

# **Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

VITRO, S.A.B. de C.V.,

     Debtor in a Foreign Proceeding.

Chapter 15

Case No. 11-_____ (____)

## ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

Alejandro Francisco Sánchez-Mujica (the "Petitioner"), the duly-appointed

representative of Vitro, S.A.B. de C.V. ("Vitro SAB") in a voluntary judicial reorganization

proceeding (the "Voluntary Mexican Proceeding") commenced on December 13, 2010 in the

United States of Mexico under the *Ley de Concursos Mercantiles* (the "Mexican Business

Reorganization Act") and currently pending before the Federal District Court for Civil and Labor

Matters for the State of Nuevo León, the United Mexican States (the "District Court of Nuevo

León"), having filed on April 14, 2011 the verified petition for recognition (the "Verified

Petition")[1] and the form chapter 15 petition (together with the Verified Petition, the "Chapter 15

Petition"), seeking entry of an order (i) recognizing the Voluntary Mexican Proceeding as a

"foreign main proceeding" pursuant to sections 1515 and 1517 of the Bankruptcy Code, and

(ii) granting certain related relief pursuant to section 1520 of the Bankruptcy Code; and upon the

Court's review and consideration of the Chapter 15 Petition, the Foreign Representative

Declaration and all the documents attached thereto (the "Supporting Documents"), the Mexican

Counsel Declaration, and the Notice Pursuant to 11 U.S.C. § 1518 of Entry of Order in Foreign

Proceeding Granting Debtor's Voluntary Petition for Relief under the Mexican Business

---

[1]     All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Verified Petition.

Reorganization Act (the "Notice of *Concurso* Relief" and, together with the Chapter 15 Petition, the Foreign Representative Declaration, the Supporting Documents, and the Mexican Counsel Declaration (collectively, the "Chapter 15 Pleadings"); and a hearing having been held before this Court on _____ (the "Recognition Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings, the relief sought therein, and the Recognition Hearing has been provided pursuant to the Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice, dated _____, 2011, which notice is deemed adequate for all purposes and no other or further notice thereof need be provided; and the appearances of all interested parties having been noted in the record of the Recognition Hearing; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157; and consideration of the Chapter 15 Pleadings and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and venue being proper before this Court pursuant to 28 U.S.C. § 1410; and the Court having determined that the relief sought in the Chapter 15 Petition is in the best interests of Vitro SAB, its creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Chapter 15 Pleadings establish just cause for the relief granted herein; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor, the Court hereby finds and determines as follows:

a)  This chapter 15 case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

b)  The Petitioner, Alejandro Francisco Sánchez-Mujica, is a "person" pursuant to 11 U.S.C. § 101(41) and has been duly authorized to serve as Vitro SAB's "foreign

representative" with respect to the Voluntary Mexican Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

c)     The Chapter 15 Pleadings meet all of the requirements set forth in section 1515 of the Bankruptcy Code.

d)     The Voluntary Mexican Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

e)     The Voluntary Mexican Proceeding is pending in Mexico, which is the country where Vitro SAB has the center of its main interests, and, as such, the Voluntary Mexican Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED**, that the Chapter 15 Petition is granted, and the Voluntary Mexican Proceeding is recognized as a foreign main proceeding pursuant to sections 1517(a) and 1517(b)(l) of the Bankruptcy Code; and it is further

**ORDERED**, that Vitro SAB and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code, including, without limitation, the stay under section 362 of the Bankruptcy Code, through the duration of this chapter 15 case or until otherwise ordered by this Court and, upon entry of this Order, section 1520 shall be given its full force and effect; and it is further

**ORDERED**, that no action taken by the Debtor, the Foreign Representative, their respective successors, agents, representatives or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Voluntary

Mexican Proceeding, this Order, this chapter 15 case, any further order for additional relief in this chapter 15 case, or any adversary proceeding in connection therewith, will be deemed to constitute a waiver of the immunity afforded to the Debtor, the Foreign Representative or their respective successors, agents, attorneys, or representatives pursuant to section 1510 of the Bankruptcy Code; and it is further

**ORDERED**, that the Petitioner shall serve a copy of this Order upon all known government units and creditors of Vitro SAB affected by this order (and, with respect to the holders of the Old Notes, on the trustees under the Indentures governing such notes) by first class mail no later than _____; and it is further

**ORDERED**, that Petitioner and Vitro SAB are hereby authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order; and it is further

**ORDERED**, that this Court shall retain jurisdiction to hear and determine all matters arising from the implementation and/or interpretation of this Order.

Dated:  New York, New York
       _____, 2011


                          _____
                          UNITED STATES BANKRUPTCY JUDGE

# **Exhibit B**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS

**ENTERED**
**09/24/2010**

| | |
|---|---|
| In re | Chapter 15 |
| Metrofinanciera, S.A.P.I. de C.V., Sociedad Financiera de Objeto Múltiple, E.N.R., | Case No. 10-20666 |
| Debtor in a Foreign Proceeding. | |

## ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

On August 30, 2010, José Angel Amaro (the "Petitioner"), as the authorized foreign representative of Metrofinanciera, S.A.P.I. de C.V., Sociedad Financiera de Objeto Múltiple, Entidad No Regulada ("Metrofinanciera" or the "Debtor"), commenced this case under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") by filing a Verified Petition requesting that this Court recognize the Debtor's restructuring proceedings (the "Mexican Proceedings") under Mexico's *Ley de Concursos Mercantiles*, as officially published in the *Diario Oficial de la Federación* on May 12, 2000 (the "Concurso Law"), as a foreign main proceeding and requesting related relief.[1]  On September 24, 2010, a hearing was held with respect to the Verified Petition.  Appearances were as set forth on the record.

The Court has considered the Verified Petition, the Declaration of the Petitioner filed in support of the Verified Petition, the Declaration of Eugenio Sepulveda filed in support of the Verified Petition, the Supplemental Declaration of Eugenio Sepulveda filed in support of the Verified Petition, the various other pleadings filed in support of the Verified Petition, the entire

---

[1] Capitalized terms used herein, but not defined herein, shall have the meanings ascribed to such terms in the Verified Petition.

record of this chapter 15 case prior to the Hearing, and the arguments of counsel and additional evidence presented at the Hearing.

Based on the foregoing, and good cause appearing therefore, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS AND CONCLUSIONS

### A.    Procedural Matters

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

3.    Venue is proper in this district pursuant to 28 U.S.C. § 1410(1) and (3).

4.    Notice of the filing of the Verified Petition and the Hearing has been given to the Debtor, the Bank of New York Mellon ("BNYM"), as indenture trustee for the holders of the Perpetual Notes, the Securities and Exchange Commission and the Office of the United States Trustee for the Southern District of Texas.  Such notice is deemed adequate for all purposes, and no other or further notice need be given.

### B.    The Mexican Proceeding

5.    The Debtor is a debtor in the Mexican Proceedings, which were commenced on August 13, 2009, and are currently pending before the Fourth Court of Civil and Labor Matters in the State of Nuevo León, *Juzgado Cuarto de Distrito en Materias Civil y de Trabajo en el Estado de Nuevo León*, a Mexican federal court (the "Mexican Court") sitting in the city of Monterrey, state of Nuevo León in the United Mexican States.  The purpose of the Mexican Proceeding was for the Debtor to confirm a prepackaged plan of reorganization or "Convenio" that the Debtor had negotiated with its creditors at arms' length prior to the commencement of

the Mexican Proceeding.  The Debtor's Convenio was, in fact, confirmed on June 8, 2010 and includes provisions for distributions for a number of classes of creditors, including the holders of Perpetual Notes described in the Verified Petition, some of which are United States residents and/or citizens.

6.      The Petitioner commenced this case under chapter 15 of the Bankruptcy Code for the purpose of enforcing its confirmed Convenio in the United States and establishing a procedure for making distributions due to the Perpetual Note Holders without the risk of piecemeal litigation in courts other than this Court.

7.      Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.   The Mexican Proceeding, the Petitioner and this Petition satisfy all of the foregoing requirements.

8.      The Mexican Proceeding is a "foreign main proceeding" and, as such, satisfies the first factor of the above-described test.   Among other things, proceedings under Mexico's Concurso Law are collective and judicial in nature, and the Debtor's center of main interests is in Monterrey, Mexico.   Indeed, the Debtor's administrative offices are located in Monterrey, Mexico, and the Debtor's operations are conducted entirely within Mexico.

9.      The second factor for recognition—that the foreign representative be a person or a body—is also satisfied.  Mr. Jose Angel Amaro is an individual, which qualifies as a "person" under the Bankruptcy Court.  Further, Mr. Amaro was properly and specifically authorized to

commence these proceedings by the Debtor's board of directors, which is authorized to administer the restructuring of the Debtor's affairs under the Concurso Law.

10.     Finally, the Verified Petition satisfies the requirements of section 1515 of the Bankruptcy Code.   The Verified Petition was accompanied by the Declaration of Eugenio Sepulveda, which attaches a true and correct copy of the Concurso Judgment and establishes the existence of the Mexican Proceedings.   Further, Mr. Amaro has attached resolutions from the Debtor's board of directors authorizing him to act as foreign representative.   Finally, in accordance with section 1515(c) of the Bankruptcy Code, the Amaro Declaration contains a statement identifying the Mexican Proceeding as the only foreign main proceeding currently pending with respect to Metrofinanciera.

11.     In addition to the foregoing, this Court finds that the Mexican Proceedings should be recognized as a foreign main proceeding and should be afforded full comity by this Court because, among other things, Mexico's Concurso Law (i) treats all creditors and interest holders justly, provides ample due process and is procedurally fair, (ii) protects United States creditors against prejudice and inconvenience in processing their claims, including by not discriminating against United States creditors and (iii) provides a scheme governing the distribution of the estate to secured, administrative, other priority and unsecured creditors that is consistent with the Bankruptcy Code.   Comity mandates that the procedures necessary for implemention of the Convenio within the United States be approved and mandated in the Untied States solely by this Court through this chapter 15 case.

12.     For all of the foregoing reasons and sufficient cause appearing therefor, it is hereby;

     **ORDERED, ADJUDGED AND DECREED, that:**

A.    The Mexican Proceedings are pending in Mexico, which is the location of the Debtor's center of main interests, and as such, the Mexican Proceedings constitute foreign main proceedings pursuant to section 1502(4) of the Bankruptcy Code and are entitled to recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code.

B.    All relief afforded foreign main proceedings pursuant to section 1520 of the Bankruptcy Code is granted and hereby in full force and effect;

C.    Mr. Jose Angel Amaro is recognized as the "Foreign Representative" of the Debtor in connection with the Mexican Proceeding;

D.    This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court; and

E.    The Petitioner shall provide service and notice of this Order by first class mail, postage prepaid, upon (a) all parties to litigation pending in the United States in which a Debtor is a party at the time of filing of the Petition, (b) BNYM, in its capacity as indenture trustee under the Indenture, (c) the Securities and Exchange Commission and (d) the United States Trustee for the Southern District of Texas, which service and notice shall constitute adequate and sufficient service and notice of this Order.

Dated: Corpus Christi, Texas
      September 24, 2010

UNITED STATES BANKRUPTCY JUDGE

**Exhibit C**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
In re:                                              :          Chapter 15
                                                    :
**CONTROLADORA COMERCIAL**                          :          Case No. 10-13750 (SMB)
**MEXICANA, S.A.B. de C.V.**                        :
                                                    :
              Debtor in a Foreign Proceeding.       :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<u>**ORDER GRANTING RECOGNITION OF FOREIGN MAIN**</u>
<u>**PROCEEDING AND REQUEST FOR RELATED RELIEF**</u>

Fernando del Castillo Elorza (the "Petitioner"), having filed the Verified Petition for

Recognition of Foreign Main Proceeding and Request for Related Relief, dated July 16, 2010

(the "Chapter 15 Petition"), in its capacity as the duly-appointed foreign representative of

Controladora Comercial Mexicana, S.A.B. de C.V. ("CCM"), the debtor in a voluntary

insolvency proceeding commenced under Mexico's *Ley de Concursos Mercantiles* (the

"Concurso Law"),[1] which is currently pending in Mexico before the Federal District Court; and

upon the Court's review and consideration of the Chapter 15 Petition, the Declaration of

Fernando del Castillo Elorza in Support of the Chapter 15 Petition (the "Foreign Representative

Declaration"), the Declaration of Fernando del Castillo in Support of the Chapter 15 Petition (the

"del Castillo Declaration") and the Notice Pursuant to 11 U.S.C. § 1518 of Entry of Order in

Foreign Proceeding Granting Debtor's Voluntary Petition for Relief under the Mexican Business

Reorganization Act (the "Notice of Concurso Declaration" and, together with the Chapter 15

Petition, the Foreign Representative Declaration and the del Castillo Declaration, the "Chapter

15 Pleadings"); and no objections or other responses having been filed; and a hearing having

---

[1]       Capitalized terms used herein but not otherwise defined herein shall have the meaning ascribed to them in
         the Chapter 15 Petition.

been held before this Court on August 19, 2010 (the "Recognition Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Recognition Hearing has been given to CCM's known creditors and that no other or further notice need be provided;

NOW, THEREFORE, the Court hereby finds and determines as follows:

A. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

B. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

C. Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

D. This chapter 15 case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

E. Petitioner, counsel to CCM in Mexico, is a "person" pursuant to 11 U.S.C. § 101(41) and has been duly appointed and authorized to serve as CCM's "foreign representative" with respect to the Concurso Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

F. The Chapter 15 Pleadings meet all of the requirements set forth in section 1515 of the Bankruptcy Code.

G. The Concurso Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

H. The Concurso Proceeding is pending in Mexico, which is the country where CCM has the center of its main interests, and, as such, the Concurso Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

ACCORDINGLY, after due deliberation and sufficient cause appearing therefore, **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Chapter 15 Petition is granted and the Concurso Proceeding is recognized as a foreign main proceeding pursuant to sections 1517(a) and 1517(b)(1) of the Bankruptcy Code;

2.      CCM and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code, including without limitation the stay under section 362 of the Bankruptcy Code, through the duration of this chapter 15 case or until otherwise ordered by this Court and, upon entry of this Order, section 1520 shall be given its full force and effect;

3.      Notwithstanding anything contained herein or in the Bankruptcy Code (including, without limitation, Sections 1507, 1520, 1521, or 362) to the contrary, upon the occurrence of a Trigger Event (as such term is defined in the Motion), the automatic stay of section 362 of the Bankruptcy Code (and any stay or injunction thereafter ordered by this Court or imposed by operation of any provision in the Bankruptcy Code) shall automatically be lifted without the need for further order or action of the Court solely for the purposes of allowing a Derivative Counterparty to: (i) send a notice terminating its Standstill Agreement with CCM (to the extent such notice is required pursuant to the terms of the relevant Standstill Agreement) and (ii) exercise all of its rights and remedies (including, without limitation, continuance of the Derivatives Litigation) against CCM and its assets, free of any stay or injunction ordered by this Court or imposed by operation of any provision of the Bankruptcy Code;

4.      This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this chapter 15 case, and any request by an entity for relief from the provisions of

this Order, for cause shown, that is properly commenced within the jurisdiction of this Court; and

5.     The Petitioner shall serve a copy of this Order upon all known government units and creditors of CCM affected by this order (and, with respect to the Noteholders, on the Indenture Trustees for distribution to the Noteholders) by first class mail no later than August 23, 2010.

6.     Notwithstanding the pendency of the above captioned Chapter 15 proceeding, the New York Court shall have exclusive jurisdiction over any dispute arising out of or relating to any Stipulation.

Dated: August 19, 2010
       New York, New York

                                    /s/   STUART M. BERNSTEIN
                                    THE HONORABLE STUART M. BERNSTEIN
                                    UNITED STATES BANKRUPTCY JUDGE

7495780

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 15 |
|  | ) |  |
| Corporación Durango, S.A.B. de C.V., | ) | Case No. 08-13911 (RDD) |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

## ORDER GRANTING RECOGNITION OF FOREIGN MAIN
## PROCEEDING AND REQUEST FOR RELATED RELIEF

Upon consideration of the Verified Petition for Recognition of Foreign Main

Proceeding and Request for Related Relief dated October 6, 2008 (the "Petition"), the Villegas

Salazar Declaration,[1] the del Castillo Declaration and the Notice Pursuant to 11 U.S.C. § 1518

of Entry of Order in Foreign Proceeding Granting Debtor's Voluntary Petition for Relief

under the Mexican Business Reorganization Act (the "Notice of Concurso Declaration" and,

together with the Petition, the Villegas Salazar Declaration, and the del Castillo Declaration, the

"Chapter 15 Pleadings"), each filed on October 6, 2008 by or on behalf of the Petitioner, Gabriel

Villegas Salazar, in his capacity as the duly-appointed foreign representative of Corporación

Durango, S.A.B. de C.V. ("Corporación Durango" or the "Debtor"), the debtor in a voluntary

insolvency proceeding commenced under Mexico's *Ley de Concursos Mercantiles* (the

"Mexican Business Reorganization Act" or "Concurso Law"), which is currently pending in

Mexico before the District Court for Civil Matters for the District of Durango, as well as the

Supplemental Notice pursuant to 11 U.S.C. § 1518, filed on December 9, 2008; and it appearing

that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157; and it

appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1410; and the Court

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

having considered and reviewed the Chapter 15 Pleadings and the Supplemental Notice and having held a hearing to consider the relief requested in the Petition on December 11, 2008 (the "Recognition Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings, the Petition, and the Recognition Hearing has been given to Corporación Durango's known creditors and that no other or further notice need be provided; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1.      This case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

2.      The Concurso Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

3.      The Concurso Proceeding is pending in Mexico, which is the country where the Debtor has the center of its main interests, and, as such, the Concurso Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

4.      Petitioner, Gabriel Villegas Salazar, who serves both as General Counsel and Secretary of the Board of Directors of the Debtor, has been duly appointed and authorized to serve as the Debtor's "foreign representative" with respect to the Concurso Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

5.      The Petition meets all of the requirements set forth in section 1515 of the Bankruptcy Code.

6.      The Concurso Proceeding is entitled to recognition by the Court pursuant to

section 1517(a) of the Bankruptcy Code.

7.    The Debtor and the Foreign Representative are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code.

For all of the foregoing reasons, and for the reasons stated by the Court on the record of the Recognition Hearing, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED**, that:

(A) The Concurso Proceeding is granted recognition as a foreign main proceeding pursuant to section 1517(a) of the Bankruptcy Code;

(B) The Debtor and the Foreign Representative are granted all of the relief set forth in section 1520 of the Bankruptcy Code;

(C) The relief granted in this Order shall not extend to any of the Debtor's subsidiaries or affiliates;

(D) Notwithstanding anything contained herein or in section 1520 of the Bankruptcy Code to the contrary, the stay of section 362 of the Bankruptcy Code does not operate as a stay of any and all actions or proceedings in a court of appropriate jurisdiction by the trustee under the indenture (the "Indenture") governing the Senior Notes, the ad hoc group of holders of the Senior Notes (including each of its members, the "Ad Hoc Noteholder Group"), or their representatives to determine whether any of the Senior Notes are required to be submitted for cancellation pursuant to the Indenture and/or applicable law and to enforce such submission and cancellation, and all rights of parties with respect thereto are fully preserved; and

(E) The Petitioner shall serve a copy of this Order upon all known persons and

governmental units affected by this Order by first class mail no later than December <u>16</u>, 2008.


Dated: New York, New York
       December <u>11</u>, 2008


                                    /s/Robert D. Drain_____
                                    UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit E</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK


----------------------------------------X
In Re:                               :  10-14182 (MG)
                                     :
 COMPANIA MEXICANA DE AVIACION, S.A., :  One Bowling Green
                                     :  New York, New York
               Debtor.               :  August 16, 2010
----------------------------------------X

        TRANSCRIPT OF HEARING FOR ORDER TO SHOW CAUSE
           BEFORE THE HONORABLE MARTIN GLENN
             UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


For the Debtor:              ALAN E. MARDER, ESQ.
                             EDWARD LOBELLO, ESQ.
                             Meyer, Suozzi, English & Klein, P.C.
                             990 Stewart Avenue
                             Garden City, New York  11530


For the Foreign Rep.:        WILLIAM C. HEUER, ESQ.
                             Duane Morris LLP
                             1540 Broadway
                             New York, New York  10036


For Integrated Airline:      LEWIS W. SIEGEL, ESQ.
 Services                    Collier, Halbern, Newberg, Noletti
                             & Bock, LLP
                             355 Lexington Avenue
                             New York, New York  10017


For Flying Food:             ANDREW B. ECKSTEIN, ESQ.
 Catering                    Blank, Rome LLP
                             405 Lexington Avenue
                             New York, New York  10174


For Aviation Court:          PAUL RACHMUCH, ESQ.
 Services

                    REGENCY REPORTING, INC.
             Certified Court Reporters & Videographers
          425 Eagle Rock Avenue      575 Madison Avenue
          Roseland, NJ 07068         New York, NY 10022
             www.regencyreporting.net    1-866-268-7866

1        THE COURT:  Please be seated.  Mr. Heuer.

2        MR. HEUER:  Thank you, Your Honor.

3        Your Honor, I have some very quick points and then I

4   have some news for Your Honor.

5        THE COURT:  Okay.

6        MR. HEUER:  First, at argument earlier this afternoon

7   there were some comments about Mexican law and why is the

8   injunction entered in those proceedings not as broad as the

9   injunction that we've sought here.  We've been advised by

10  Mexican counsel that there's a statute in place in Mexico that

11  says you can't unilaterally alter the terms of a contract, you

12  would need to go to court to do that.  So that's part of the

13  reason why things like that are not in that order, Your Honor.

14        Second, we've gone back, we spoke with our client

15  because we see the statute and we're trying to do the work that

16  the Court asked of us.  So 1522 by its terms requires a

17  balancing of the interests of the creditors but also of the

18  debtor.  We're trying to make this work within the context of

19  our daily operations.

20        Your Honor, I think we've made some very substantial

21  progress on what we could offer in the way of sufficient

22  protections to creditors and payments.  What we can do is we

23  can pay on fifteen days from the date we get an invoice and on

24  the cure period we would just ask for a two day cure period,

25  Your Honor, because we're in this order providing a termination

right that may not otherwise exist and that's powerful and with
all of the things that we're juggling I don't want to
inadvertently let things fall through the cracks, Your Honor,
that would be a mistake, I think, so we would just like that
protection if we're offering up the termination right, Your
Honor.

THE COURT:  Let me ask, Mr. Heuer, whether -- did you
discuss these -- your proposal with the service providers?

MR. HEUER:  I did, Your Honor.

THE COURT:  And have any of them agreed to it?

MR. HEUER:  No, Your Honor.

THE COURT:  Have you had any discussions with Mr.
Gross about the Mackery lease?

MR. HEUER:  We discussed that before.  I've not
resumed with him, Your Honor.  We put our business folks in
contact, that's what I was asked to do, and I believe that has
already happened and if it has not I committed to Mr. Gross on
a time frame to get that done.

THE COURT:  Let me ask this.  With respect to the
Mackery, it's another air bus, is the plane in the United
States?

MR. HEUER:  I do not know if the plane is in the
United States right now, Your Honor.

THE COURT:  All right.  Does anybody else wish to be
heard?

1          MR. RACHMUCH:  Your Honor, this is Paul Rachmuch from

2    Gerst & Savage on behalf of Airport Services -- Aviation Court

3    Services.  We are one of the objectors.

4          THE COURT:  Yes.  Go ahead.

5          MR. RACHMUCH:  Your Honor, we had been in discussion

6    with debtor prior to today's hearing and the terms that had

7    been discussed were net seven days.  I had discussed that with

8    my client.  I have not been any part of any discussion since

9    then regarding net fifteen so I cannot report whether my client

10   would be willing or unwilling to accept settlement at net

11   fifteen, Your Honor.

12         THE COURT:  Thank you very much.  Anyone else wish to

13   be heard?

14                    (No verbal response)

15         THE COURT:  All right.  Let me deal, first, with a

16   portion of the objection of Aircraft Services International,

17   Mr. Mascitti's client.

18         Mr. Mascitti argued that Ms. Johansen [Ph.] doesn't

19   meet the definition of a foreign representative under

20   Bankruptcy Code Section 10124 because she was not authorized to

21   act as the foreign representative by the court in Mexico.

22   Section 10124 defines the term "foreign representative" to mean

23   "a person or body including a person or body appointed on an

24   interim basis authorized in a foreign proceeding to administer

25   the reorganization with the liquidation of the debtor's assets

or affairs or to act as a representative of such proceeding."
This language reflected a change in the Bankruptcy Code in 2005
at the time that the model law was adopted into Chapter 15.
None of the parties has pointed the Court to any cases decided
since the definition of "foreign representative" was changed in
2005.  Mexicana relies on the Hopewell and Nettia cases but
they were decided under the old law.  Judge Chin in affirming
Judge Brosman in the Hopewell case pointed out that "Absolutely
nothing in the statute requires the foreign representative to
be appointed by a court," 238 BR 25 at P. 53, S.D.N.Y. 1999.
It is not clear whether that statement remains true today under
the amended Code section.  Judge Gerber in the Nettia case,
relying on Hopewell, concluded that the members of the board of
directors of a foreign corporation may commence a Section 304
proceeding in the United States on the debtor's behalf, see,
277 BR 571 at 587, Note 76, Bankruptcy Court S.D.N.Y. 2002.

        No cases have been cited by any party regarding
whether specific foreign court authorization is required for a
person to be designated as a foreign representative to file a
Chapter 15 proceeding in the United States.  In this case the
evidence establishes that Mexicana's board of directors in a
resolution which has been introduced into evidence designated a
group of individuals to administer its reorganization in Mexico
and designated Ms. Johansen to serve as the foreign
representative with authority to file the Chapter 15 petition

1    in this Court.

2         Mexican bankruptcy proceedings are different in

3    several important respects from bankruptcy proceedings in the

4    United States.  Upon the filing of the Concorso proceeding in

5    Mexico the debtor continues to manage its own business while a

6    visitor is appointed to examine the company's affairs and

7    determine whether the bankruptcy petition should be accepted.

8    The debtor's management continues in place with full power to

9    manage the business while the visitor conducts the examination.

10   If the petition is accepted by the Mexican court a conciliator

11   is appointed but the debtor's management still continues in

12   place after the appointment of the conciliator.  The

13   conciliator has the responsibility for reviewing the debtor's

14   management and accounting.  The conciliator may at any time

15   request the Mexican court to remove the debtor from the

16   administration of the business in order to protect the estate,

17   see, Jonathan Gram-Canedo, Comparative Analysis of Bankruptcy

18   Legal Provisions from Mexico and the United States:  Which

19   Legal System is More Attractive?, 6 DePaul Business &

20   Commercial Law Journal, P. 19, 2008.  The author at Page 27

21   states in part, "The Mexican Concorso's Law in Chapter 11 of

22   the U.S. Bankruptcy Code authorized the debtor to remain in

23   control of the business after the bankruptcy has been filed. .

24   . . under the Concorso's Law debtors may continue in possession

25   of the estate; however, the conciliator (or conciliador in

Spanish)_ will always be appointed and he will have the

responsibility of reviewing the debtor's management and

accounting.  The appointed conciliator may at any time request

the Court to remove the debtor from the administration of the

business in order to protect the estate."  Again, that's at

Page 27, Footnotes omitted.

Therefore, the Court concludes that the board of

directors continues to be the body with the power to appoint a

person "on an interim basis" -- that language being in Section

10124 -- to administer the reorganization or has happened here,

to file the Chapter 15 proceeding.  The Court, therefore,

concludes that it was proper for the board of directors to

designate Johansen to serve as the foreign representative to

file the Chapter 15 proceeding in this court.  Any other result

could lead to anomalous results during the GAT period while the

visitor is deciding whether to recommend the bankruptcy

petition to be accepted by the Mexican court.  Absent Mexican

court order to the contrary management alone remains in control

of the business.  While no automatic stay comes into force in

Mexico upon the filing of the Concorso proceeding the Mexican

court retains the authority to order interim relief protecting

the debtor's businesses and assets as occurred in this case.

Aircraft Services International's argument that

management could not authorize the filing of a Chapter 15

petition until the Mexican court decided whether to accept

Mexicana's bankruptcy proceeding would mean that creditors were free to seize assets or otherwise disrupt the debtor's business operations in the United States but in Mexico even after a conciliator is appointed the debtor's management continues to have the power to manage the business unless the Mexican court ordered otherwise.

With all of this said, the foreign representative here must still satisfy the other requirements of Rule 65 and Chapter 15 in order to obtain a preliminary injunction. Johansen was, however, authorized to seek that relief from this Court.

So that's the Court's ruling with respect to whether this Chapter 15 proceeding was properly filed.

On the day this Chapter 15 case was filed, the putative foreign representative sought and obtained a TRO essentially putting in place a Section 362 stay against commencing and forcing or using self-help to obtain or control any United States based assets in Mexicana. The relief was granted because Mexicana established the risk that its assets in the United States could be seized disrupting its operations. A hearing on the preliminary injunction was scheduled for today, August 16, 2010, but the order included a provision allowing any party-in-interest to seek relief from the TRO earlier if appropriate. Multiple applications were filed seeking relief from the TRO and objecting to the preliminary

injunction.  Applications for relief were filed by several

aircraft lessors including Wells Fargo and its related

entities, ILFC Group and its related entities and G.E. and its

related entities.  One jet fuel provider, Pacific Fuel, also

sought relief from the TRO.  The foreign representative has

successfully negotiated agreements with Wells Fargo, ILFC

Group, G.E. and Pacific Fuel making it unnecessary for the

Court to decide the issues raised by those objections at least

at this time.  One additional aircraft lessor, Mackery Air

Finances, also filed an objection to the preliminary injunction

arguing as had other aircraft lessors that it had terminated

its one aircraft lease pre-petition.  Additionally, a number of

service providers; fuel service, luggage and cargo service,

good service, other ramp services also objected to the

preliminary injunction principally arguing that under the

debtor's request for relief they were not "sufficiently

protected" as required by Section 1522(a) of the Bankruptcy

Code.

    The Court has not yet held a hearing to determine

whether the debtor's Concorso proceeding in Mexico is a foreign

main proceeding as the debtor contends.  The recognition

hearing is scheduled for September 7, 2010.  The debtor now

seeks a preliminary injunction pursuant to Section 1519 of the

Bankruptcy Code before recognition has been determined.

Section 1519(e) provides that "The standards, procedures and

limitations applicable to an injunction shall apply to relief under this section."  This subsection makes Federal Rule of Civil Procedure 65 applicable to this injunction proceeding.

The injunction standard in the Second Circuit is stated in many cases including <u>Jackson Dairy, Inc. v. H.P. Foote & Sons, Inc.</u>, 596 F.2d, 70 at P. 72, 2d. Cir. 1979, "(a) irreparable harm and (b) either (1) likelihood of success on the merits and (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly towards the party requesting preliminary relief."  The debtor bears the burden of proof by a preponderance of the evidence.  Additionally, Section 1522 of the Bankruptcy Code provides that "the Court may grant relief under Section 1519 or 1521 or may modify or terminate relief under subsection (c) only if the interests of the creditors and other interested entities including the debtor are sufficiently protected."  <u>See</u>, <u>In Re:  Atlas Shipping A/S</u>, 404 BR 726 at 739, Bankruptcy Court S.D.N.Y., 2009.

The hearing on the preliminary injunction requires the parties to introduce competent evidence in support of or in opposition to injunctive relief.  The Court held an evidentiary hearing on August 16, 2010 but all of the parties seemed ill-prepared to present evidence.  The debtor offered the testimony of the foreign representative and introduced several exhibits but the evidence offered by the debtor dealt primarily with the

commencement of the Mexican Concorso proceeding and the Chapter

15 proceeding in this court.  No evidence was offered dealing

with the Mackery aircraft lease or the service providers who

filed objections.  None of the objectors offered the testimony

of witnesses and only one objector, Aircraft Services

International, offered any documentary evidence.

Thus, the Court is left with very little evidence in

the record addressing the principal issues in dispute at the

preliminary injunction hearing.

In the case of Mackery, the principal issue was

whether it terminated its lease pre-petition.  In the case of

the service providers the principal issues are whether they

have binding Mexicana requiring them to continue to provide

services and whether the debtor's proposed order providing

injunctive relief provides "sufficient protection" under

Section 1522.

A Chapter 15 foreign debtor upon recognition of the

foreign proceeding as a foreign main proceeding obtains the

benefits of a Section 362 automatic stay preventing any party

from interfering with the debtor "and the property of the

debtor that is within the territorial jurisdiction of the

United States," 11 U.S.C. Section 1520(a)(1).  Of course, this

relief only applies to "property of the debtor in the United

States."  Necessarily, therefore, the foreign representative

must establish that the property it is seeking to protect is

property of the foreign debtor.  Here, Mackery contends that it

properly terminated the lease pre-petition but it offered no

evidence at the hearing in support of this contention.

Mexicana has burden of proof and it offered no evidence

regarding the Mackery lease.

As already stated, Rule 65 of the Federal Rules of

Civil Procedure requires Mexicana to establish a probability of

success on the merits.  Based on the evidence received at the

hearing today the Court concludes that the probability of

success on the merits is determinative of the outcome of the

preliminary injunction motion.  The Court finds that the debtor

has established by a preponderance of the evidence that it

faces irreparable harm to the extent that it is threatened with

the seizure of property in the United States.  The crucial

issue for the Court is whether the leased property of Mackery

is property of the foreign debtor.

To the extent that no party-in-interest has

challenged the reach of the injunctive relief sought by the

debtor, the Court concludes that the debtor has met its burden

to obtain a preliminary injunction pending determination of

whether the Concorso proceeding is a foreign main proceeding at

least to the extent of the relief granted at the time that the

debtor obtained a TRO from Judge Gonzalez.

During the hearing before Judge Gonzalez the debtor

agreed to certain provisions regarding the return of aircraft.

There was no record -- no transcript record of the hearing

before Judge Gonzalez.  Pursuant to the representations made by

the debtor, however, Mexicana filed a declaration with the

Court the following morning which, I must confess, I don't

fully understand.  I take it to mean that the debtor agreed

that any property that was in the United States at the time

that the TRO issued but that was later removed from the United

States would be returned to the United States if the bankruptcy

court so ordered.  It is not clear to me that I would have the

authority to order the return to the United States of any

property that was not in the United States at the time the TRO

entered and the undertaking was made by the debtor to return

property if they removed it.  The debtor's representation

reflected the fact that it is an airline and it flies planes

between the United States and Mexico and, perhaps, other

places.

If the debtor provides an undertaking in support of

the preliminary injunction that it will return to the United

States any property which was present in the United States at

the time the TRO was entered the Court finds that the parties

claiming an interest in the property that was removed from the

United States are sufficiently protected under 1522.

With respect to the Mackery lease where the record is

nearly devoid of competent evidence because the debtor bears

the burden or proof by a preponderance of the evidence the

Court concludes at this time that the debtor has not

established a likelihood of success on the merits that the one

aircraft covered by the Mackery lease is property of the

debtor.  Therefore, preliminary injunctive relief will not be

granted with respect to that aircraft.  If the debtor wishes to

seek protection in a separate application with respect to that

aircraft -- with respect to time -- you know, if properly

noticed, I will entertain that application.

        The Court need not and in most cases does not reach a

final determination of the merits of the claim at a preliminary

injunction hearing leaving it open to either party later to

convince the Court at any trial on the merits that a different

result is demanded based on the facts and the law as they are

further developed.  This may well have important implications

in the context of a Chapter 15 proceeding where the foreign

court may well have jurisdiction over the parties-in-interest

and is or may be the most appropriate court to decide the

ultimate merit of the issues.  Therefore, it is unnecessary for

the Court to determine whether the Mackery aircraft was --

whether that lease was terminated pre-petition or not

terminated pre-petition.  If debtor wants to make an

application with respect to that one aircraft -- I don't know

where the plane is, if it's out of the United States I can't

order its return.  The Court's power is limited to property of

the foreign debtor that is in the United States with the

1    addendum based on the undertaking that was made at the time

2    that the TRO was issued.

3           This leaves Mexicana free to argue in the Concorso

4    proceeding that under applicable law Mexicana retains property

5    rights in the aircraft subject to the Mackery lease and they

6    can seek relief under Mexican law.  If the Mexican court enters

7    an order where it continues relief as to the Mackery aircraft

8    the foreign representative in the event of recognition of a

9    foreign main proceeding can return to this Court to seek

10   enforcement of the foreign court order assuming that this Court

11   determines that the Mexican proceeding is a foreign main

12   proceeding.  The issues will be different for this Court at

13   that stage of the proceeding if the Mexican court determines

14   that Mexicana retains a protectable interest in that aircraft.

15   See, In Re:  Metcalf & Mansfield Alternative Investments, 421

16   BR 685, Bankruptcy S.D.N.Y., 2010.  Therefore, at least at this

17   time with respect to the Mackery aircraft the TRO is vacated

18   and the preliminary injunction is denied without prejudice.

19          Now, with respect to the service providers.  One of

20   the fuel providers argued in its papers -- I know Pacific Fuel

21   did but you've resolved matters with Pacific Fuel.  I think

22   somebody else did -- argued Section 556 of the Bankruptcy Code

23   applies because they're a forward [sic] contract merchant.  No

24   one made that argument today.  Several other service providers

25   have argued that they do not have binding contracts with

1   Mexicana to provide services in the United States and, hence,

2   that they should not be compelled to continue providing

3   services.  But, again, the record is exceedingly thin with

4   respect to the existence vel non of contracts providing for

5   continuing services.  It's not clear to the Court that a

6   contract needs to be in writing.  No one has briefed that

7   issue.

8          The major issue for the Court with respect to the

9   service providers is the issue of sufficient protection under

10  1522(a) of the Bankruptcy Code.  As the Court indicated earlier

11  today, the original proposal included in the proposed order

12  submitted to the Court by Mexicana did not provide sufficient

13  protection since it would have allowed periods, it seemed to

14  the Court, a minimum of forty days and some of the counsel

15  argued perhaps as long as ninety days before a provider would

16  know whether they were going to be paid for post-petition

17  services.

18          I understand that many of the providers are owed a

19  substantial amount for pre-petition claims but at least at this

20  stage those issues are not determinative of whether the Court

21  should grant relief requiring providers to continue to perform

22  services.  When we came back this afternoon -- this morning I

23  had asked Mr. Heuer whether there was anything in the Mexican

24  court order that prohibited or prevented Mexicana from -- or a

25  service provider from changing terms of payment and the Court

having not found anything in the Mexican order, Mr. Heuer

represented this afternoon that there is a statutory provision

in Mexico that would prohibit the provider from changing terms

of service and would raise a separate issue of whether that

Mexican law has extra territorial effect on service providers

here.

        In light of the record here which in today's hearing

is quite thin as I've made clear but based on prior filings and

statements made by counsel during prior hearings in this case,

it is clear to the Court that Mexicana continues to operate

under very difficult circumstances.  The debtor has not offered

any evidence regarding cash flow projections, debtor-in-

possession financing or any evidence demonstrating how it

expects to be able to pay for post-petition services but

1522(a) which is the section that requires that parties be

sufficient protected also includes the debtor among those who

needs to be protected and it's clear to the Court that if the

service providers are permitted to terminate services without

cash in advance in all likelihood the debtor will cease

operating at least in those airports or facilities where these

objectors provide the services.

        The Court, therefore, concludes that the debtor in

consultation with the objecting service providers should draft

an order requiring them to continue to provide services

provided that the debtor pays for all post-petition services

1    net seven days with a two day cure period.

2            I just want to look at my court calendar because I'm

3    going to give you a couple of days to get this order ironed

4    out.

5                    (Pause in proceedings)

6            THE COURT:  All right.  I'm going to adjourn this

7    hearing until 2:00 p.m. on Wednesday at which time you can

8    present your proposed order and any party objecting to the form

9    of the order can, likewise, appear and we'll iron out those

10   issues then.  Obviously, by agreeing to the form of the order

11   no one is waiving any of the objections that they previously

12   filed.

13           To the extent that any other objections were made

14   timely in writing before today's hearing that I've not

15   otherwise addressed, the objections are overruled.

16           With respect to the Banco Mercantile Norte objection

17   which was not timely filed, the Court declines to consider that

18   objection at the present time.  The parties should continue to

19   discuss whether they can resolve those issues consensually.  I

20   simply don't know enough about that dispute, first, to know

21   whether it really should be this Court or the Mexican court in

22   the first instance that should deal with the bank's issues.  I

23   understand that these are collateral accounts that are

24   apparently here in the United States.

25           I'd like the bank's counsel and the debtor's counsel

1     to report back to the Court on Wednesday at 2:00 when you're

2     here where things stand with respect to the bank's issues

3     regarding the collateral accounts.

4            All right.  Anybody have any other issues they want

5     to raise today?  Mr. Siegel.

6            MR. SIEGEL:  Thank you, Judge.  Lewis Siegel for

7     Integrated Air Services.

8            If the debtor is going to circulate an order by a

9     certain date I --

10           THE COURT:  Well, I didn't -- I should have given

11    them -- I mean I think you all ought to stay here and work that

12    out.  I mean you ought to get the order -- if I'm going to have

13    a hearing on Wednesday at 2:00, I mean you ought to have an

14    order -- you ought to see whether you can iron it out right

15    now.

16           MR. SIEGEL:  Yes, that was my question.

17           THE COURT:  Stay in the courtroom.  I don't have

18    another hearing.  Okay.  Stay here and see what you can work

19    out.

20           MR. SIEGEL:  Sure.  I'm trying.  I'm already getting

21    questions and -- I apologize.

22           THE COURT:  I know.  Okay.  And, you know, you ought

23    to have drafts circulating by tomorrow.  Don't wait until the

24    very last minute but stay here and see if you can work it out.

25    Okay?

1        MR. SIEGEL:  Fine.  And nothing in the orders today

2   [sic] precludes the parties from sending invoices for services

3   for services which have already been rendered.

4        THE COURT:  Absolutely not.

5        MR. SIEGEL:  Thank you, Judge.

6        THE COURT:  Anybody else have anything they want to

7   raise today?

8        MR. HEUER:  William Heuer for the foreign rep.

9        Your Honor, the TRO is set to expire by --

10       THE COURT:  The TRO remains in place.  The Court has

11  the authority under Rule 65 to continue the TRO in place for up

12  to fourteen days.  I'm not keeping it in its present form for

13  fourteen days but until these issues -- I'm glad you raised

14  that issue.  So the TRO as currently in place remains in place

15  until a preliminary injunction order is entered.

16       Let me also make clear that under 1519 relief only

17  remains in place until a foreign main proceeding has been

18  recognized as a foreign main proceeding.  You're going to have

19  to deal with relief at that time under 1521.

20       MR. HEUER:  Correct.

21       THE COURT:  Okay.

22       MR. HEUER:  Thank you, Your Honor.

23       THE COURT:  Mr. Eckstein.

24       MR. ECKSTEIN:  Yes, Your Honor.  Thank you.

25       THE COURT:  Identify yourself.

1          MR. ECKSTEIN:  Andrew Eckstein for Flying Food

2   Catering.

3          Just a point of clarification.  Your Honor indicated

4   seven days net of the two day cure period.  I don't know that

5   it was clear as to what happens at the end of two days; can the

6   providers stop providing service?

7          THE COURT:  Yes, if you haven't signed -- you know,

8   or they can come back -- if the debtor disagrees with -- if

9   you've given the two day notice and they haven't responded they

10  can run into court and seek relief but subject to that I view

11  this sort of like a conditional order lifting the stay.  You

12  know, it basically has a default provision in it that if you

13  haven't paid by a certain time you can give your two day's

14  notice and if they think they're entitled to relief let them

15  come running back in.

16         MR. ECKSTEIN:  Okay.  Thank you, Judge.

17         THE COURT:  Okay.  You'll put the language together.

18  I'm not writing the language for you.  You ought to be able to

19  work that out but that's not an uncommon provision.

20         MR. MARDER:  Good afternoon, Your Honor.  Alan Marder

21  of Meyer, Suozzi, English & Klein, conflicts counsel for the

22  debtor.

23         We just have one housekeeping issue with respect to

24  the Wells Fargo order to show cause.  The Wells Fargo order to

25  show cause involved five airplanes with ten engines on those

airplanes as well as two spare engines.  We've resolved all the
issues with respect to the five airplanes and the ten engines
that are on those airplanes.  The parties are still working out
a business arrangement with respect to the spare engines and
the two component parts.  So what we've talked to Wells Fargo
about doing is adjourning the order to show cause with respect
to those two spare engines and the spare parts for
approximately a month.  Hopefully, we can contact your chambers
and get a date, really, a holding date --

                    THE COURT:  That's fine.

                    MR. MARDER:  -- some time during the week of
September 21st in case we can't resolve it.

                    THE COURT:  That's fine.

                    MR. MARDER:  Thank you.

                    THE COURT:  Okay.  Thank you, Mr. Marder.

                    Okay.  Anyone else?

                    MR. LOBELLO:  Good afternoon, Your Honor.  Edward
LoBello, also of Meyer, Suozzi.

                    CIT reminds me, Your Honor, that we have a
stipulation with CIT.  CIT adjourned their motion.  The
stipulation simply requires that we maintain the status quo.
They were concerned that since they have filed an objection,
the objection was not heard today, that somehow the objection
would be foreclosed.  That would be inconsistent with our
understanding.

1    THE COURT:  That's fine and I agree.  I didn't

2  specifically mention CIT.  That was mentioned earlier today.  I

3  talked about Wells Fargo, ILFC, G.E.

4    MR. LOBELLO:  Your Honor, quite frankly, there's one

5  other Rolls Royce which you aren't familiar with [sic].  We

6  signed a similar stipulation with them as well.  So we have

7  those stipulations.

8    THE COURT:  All right.  So my statement that all

9  other objections are overruled excludes those parties covered

10  by stipulations with the debtor where it was agreed that the

11  objections would be carried forward.

12    You ought to include some language to that effect in

13  the order, Mr. Heuer.

14    MR. HEUER:  We will, Your Honor.  Thank you.

15    THE COURT:  Okay.  Anyone else have any other issues

16  they want to raise for today?

17            (No verbal response)

18    THE COURT:  All right.  We're adjourned.

19              *  *  *  *  *

# C E R T I F I C A T I O N

* * * * *

I certify that the foregoing is a transcript from an electronic sound recording of the proceedings in the above-entitled matter.


  S/ Carla Nutter
_____

CARLA NUTTER


Dated:  August 17, 2010

# **Exhibit F**

Gary L. Kaplan
Peter B. Siroka
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
One New York Plaza
New York, New York  10004
Telephone: (212) 859-8000
Facsimile:  (212) 859-4000

*Attorneys for Lic. Fernando del Castillo Elorza as*
*Foreign Representative of Controladora*
*Comercial Mexicana, S.A.B. de C.V.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Chapter 15 |
| | : | |
| **CONTROLADORA COMERCIAL** | : | Case No. 10-13750 (SMB) |
| **MEXICANA, S.A.B. de C.V.** | : | |
| | : | |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**DECLARATION OF LIC. FERNANDO DEL CASTILLO ELORZA**
**AS FOREIGN REPRESENTATIVE OF CONTROLADORA**
**COMERCIAL MEXICANA PURSUANT TO 28 U.S.C. § 1746**

     I, Lic. Fernando del Castillo Elorza, declare under penalty of perjury under the laws of

the United States of America that the following is true and correct:

     1.     I hereby submit this declaration (the "Declaration") in support of the Verified

Petition for Recognition of a Foreign Main Proceeding and Request for Related Relief (the

"Verified Petition") and the Motion of the Debtors for a Temporary Restraining Order and

Preliminary Injunction, which I have filed contemporaneously herewith, and which seeks entry

of an order (i) recognizing the voluntary insolvency proceeding that was initiated by

Controladora Comercial Mexicana S.A.B. de C.V. ("CCM") and is currently pending in the

District for Civil Matters in Mexico City, Federal District, Mexico (the "Concurso Proceeding")

as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code (the "Bankruptcy Code"), (ii) recognizing Fernando del Castillo Elorza as the foreign representative of CCM in connection with the Concurso Proceeding and (iii) granting related relief pursuant to section 1520 of the Bankruptcy Code.  Except as set forth below, I have personal knowledge of the matters set forth in this Declaration.

2.      Although my native language is Spanish, I am fluent in English and have elected to execute and submit this Declaration in English.

3.      I am counsel to CCM in Mexico.

4.      In order to carry out my duties as foreign representative of CCM, I am the recipient of a Power of Attorney from CCM which authorizes me to, among other things, initiate legal proceedings on behalf of CCM.  A true and correct copy of the Power of Attorney granted to me by CCM and an English translation thereof are attached hereto as **"Exhibit A"** and **"Exhibit B"**, respectively.

5.      Contemporaneously herewith, I have caused this chapter 15 case to be commenced through the filing of the Verified Petition.

6.      Originally founded in 1944, CCM is the holding company for a series of Mexican businesses that comprise the third largest operator of food retail stores in Mexico.  As of December 31, 2009, CCM's businesses operated 231 retail stores and 73 restaurants under eight different formats—six different retail store formats, one warehouse club and one chain of family restaurants—in twenty-four Mexican states.  CCM's retail brands include Comercial Mexicana, Bodega Comercial Mexicana, Mega, City Market, Sumesa, Fresko and Al Precio.  CCM also owns the Restaurantes California chain of family-style restaurants and participates in a joint-venture with Costco Wholesale Corporation to operate warehouse clubs under the Costco brand.

For the fourth quarter of 2009, CCM reported net sales of approximately MXP$ 14.441 billion (approximately US$1.139 billion) and employed approximately 33,000 people.[1]

7.      CCM's principal indebtedness consists of (i) unsecured notes, (ii) Mexican commercial paper (the "Cebures") and (iii) unsecured bank loans (the "Bank Debt").  There are three series of unsecured notes: (a) US$200 million in principal of 6.625% Senior Notes due 2015 (the "2015 Notes"); (b) MXP$ 3 billion in principal of 8.7% Senior Notes due 2027 (the "2027 Notes"), and (c) MXP$ 111,341,051 in principal of UDI-denominated 8% Senior Notes due 2010[2] (the "2010 Notes" together with the 2015 Notes and 2027 Notes, the "Notes").  The Notes are beneficially owned by many different holders (the "Noteholders"); and as such, not all Noteholders are known to CCM.  The Bank of New York Mellon acts as indenture trustee for the 2015 and 2027 Notes, while HSBC acts indenture trustee for the 2010 Notes.  The Cebures consist of MXP$ 1.5 billion of commercial paper, 97.3% of which is held by a subsidiary of CCM, Tiendas Comercial Mexicana ("Tiendas"), which acquired the Cebures in an exchange offer on May 4, 2010.  The remaining Cebures are held by a number of different owners who did not participate in the exchange offer.  The Bank Debt consists of MXP and USD denominated unsecured loans to seven different Mexican banks (the "Commercial Banks") totaling MXP$ 2.545 billion and US$99.4 million.[3]  CCM has also entered into a Settlement and Debt Acknowledgement Agreement (as defined below) to settle CCM's obligations under certain foreign exchange and interest rate Derivative Transactions (as defined below), as more fully described below.

---

[1]      As a holding company, CCM has no employees of its own.  All employees are employees of CCM's subsidiaries and affiliates.

[2]      The MXP value of the 2010 Notes is based on the UDI conversion rate as of April 28, 2010.  The 2010 Notes are 24,981,400 UDI in principal.

[3]      A list of the Commercial Banks and their respective holdings of the Bank Debt is included on Schedule 3 to the Term Sheet (defined below).

8.      CCM began engaging in hedging activities in the 1990s to control currency risk on U.S. imports and debt service.  From time to time, CCM also entered into interest rate swaps to convert long term fixed rate payments into cheaper floating rate payments, to save on debt service costs.

9.      In 2005, CCM entered into a substantial program of forward dollar purchases to hedge against the potential decline in value of the Mexican peso (the "Peso Hedges").  When the Mexican peso did not decline, CCM began to lose money on the Peso Hedges.  Subsequently, CCM entered into various derivative transactions to offset the losses from the Peso Hedges. Many of these transactions involved CCM taking positions in the U.S. dollar and other foreign currencies.

10.      During 2007 and 2008, CCM entered into derivative transactions (the "Derivative Transactions") with JP Morgan Chase Bank, N.A., Banco Nacional de Mexico, SA Institution de Banca Multiple, Grupo Financiero Banamex, Banco Santander, S.A, Grupo Financiero Santander, Barclays Bank PLC, J. Aron & Company,[4] Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG (together, the "Derivative Counterparties").

11.      In late September and early October 2008, following turmoil in the financial markets and the Lehman Brothers bankruptcy filing, there was a significant devaluation of the Mexican peso and the Euro against the U.S. dollar.  As a result of this devaluation, CCM found itself facing substantial claims for margin calls arising on account of the Derivative Transactions. In early October, the Derivative Counterparties exercised contractual provisions to terminate the transactions, and asserted claims exceeding US $2 billion against CCM for the amounts they claim are due upon such early termination.

---

[4]      On October 20, 2008, J. Aron & Company was assigned the claims in the Derivative Transactions.  For ease of reference, both J. Aron & Company and J. Aron & Company's assignor are referred to herein as "J. Aron & Company."

12.     Because of the mounting loss claims and additional margin calls associated with the Derivative Transactions, CCM faced a severe liquidity crisis and became unable to pay its suppliers and providers.  All payments to suppliers and providers temporarily ceased on October 7, 2008, the same day that CCM made its final margin call payment to the Derivative Counterparties.  On October 9, 2008, CCM filed a voluntary petition (the "First Concurso Petition") to commence a case under Mexico's *Ley de Concursos Mercantiles* (the "Concurso Law") with the District Court for Civil Matters for the Federal District, Mexico (the "Federal District Court"), which was subsequently rejected on October 27, 2008.  On October 29, 2008, CCM filed a second petition for relief under the Concurso Law with the Federal District Court (the "Second Concurso Petition").  The Second Concurso Petition was rejected on November 3, 2008.  Both the First Concurso Petition and the Second Concurso Petition were denied on technical grounds under Mexican law.

13.     On November 6, 2008, certain of the Derivative Counterparties (the "DCP Plaintiffs")[5] filed complaints against CCM in the New York State Supreme Court for New York County (the "New York Court"), which are currently pending before Justice Eileen Bransten (the "Derivatives Litigation").[6]  Generally, the complaints allege that CCM breached the underlying agreements governing the Derivative Transactions by failing to post required collateral or make payments allegedly owed to the DCP Plaintiffs.  The DCP Plaintiffs are seeking combined damages of over USD $1.5 billion.  Each of the DCP Plaintiffs moved for summary judgment in the Derivatives Litigation (such motions, the "Summary Judgment Motions").  On March 16,

---

[5]     The DCP Plaintiffs are JP Morgan Chase Bank, N.A., Barclays Bank PLC, J. Aron & Company, Merrill Lynch Capital Services Inc. and Merrill Lynch Capital Markets AG.

[6]     The case names and their index numbers are: J.P. Morgan Chase Bank, N.A. v. CCM, Index Number 603215/2008; J. Aron & Company v. CCM, Index No. 603225/2008; Merrill Lynch Capital Markets AG and Merrill Lynch Capital Services Inc. v. CCM, Index No. 603214/2008; and Barclays Bank PLC v. CCM, Index No. 603233/2008.

2010, the New York Court issued its decisions granting the Summary Judgment Motions as to liability only, and referring the quantification of losses to a special referee to hear and report. CCM has appealed those decisions. At a conference held on May 12, 2010, the New York Court invited CCM to file motions setting forth its grounds for seeking pretrial discovery on loss calculations. The parties have stipulated, subject to Court approval, that such motions will be filed on July 21, 2010, and will be argued, after briefing, on October 28, 2010. Prior to the filing of the Concurso Proceeding with the Federal District Court, CCM entered into a stipulation with each of the DCP Plaintiffs, which was so ordered by the New York Court (each a "Stipulation") staying the Derivatives Litigation pending completion of the global settlement contained in the Term Sheet and the Concurso Plan.[7] Each Stipulation provides that upon (i) the occurrence of a termination event under a Standstill Agreement (as defined below) and (ii) the expiration or earlier termination of the Subsidiary Agreement, the Stipulation will terminate, such that a DCP Plaintiff may elect to continue the Derivatives Litigation and/or exercise any of its rights and remedies against CCM or its assets.

14. Following the rejection of the Second Concurso Petition and shortly after the commencement of litigation by the DCP Plaintiffs, CCM commenced the process of negotiating a global settlement of its outstanding indebtedness with its various creditor constituencies. After more than a year of negotiations, in late May 2010, CCM agreed with the Derivative Counterparties, the Commercial Banks and certain Noteholders (the "Ad Hoc Group of Noteholders") on the terms of a restructuring to be consummated through a prenegotiated plan of reorganization under the Concurso Law that is supported by over 85% of the eligible debt and claims of CCM (as further described in the Term Sheet (defined below), the "Eligible Debt").

---

[7] A copy of a Stipulation is attached as **Exhibit 4** to the Verified Petition.

15.    On July 14, 2010, CCM commenced the Concurso Proceeding by filing a voluntary petition for relief under the Concurso Law (the "Concurso Petition") in the Federal District Court, along with a prenegotiated concurso plan of reorganization (the "Concurso Plan"). As of the date hereof, the Concurso Plan is supported by a sufficient majority so as to bind non-consenting parties under Mexican Law.  Two days after the filing of the Concurso Plan, CCM filed the Verified Petition and Verified Complaint for a temporary restraining order and preliminary injunction.

16.    The Concurso Plan, as more fully described in the term sheet setting forth the terms of the Concurso Plan, which is attached to the Verified Petition as **"Exhibit 1"** (the "Term Sheet") (defined below), provides that in exchange for extinguishment of their existing claims, (i) the Derivative Counterparties will receive their pro rata share of a financial package consisting of (a) a new term loan facility (the "New Term Loan"), (b) a new asset-linked debt facility (the "Asset-Linked Facility"), and (c) new secured bonds (the "New Bonds"); (ii) the Commercial Banks will receive their pro rata share of a financial package consisting of portions of the New Term Loan and Asset-Linked Facility; and (iii) the Noteholders will receive a portion of the New Bonds.

17.    The New Term Loan consists of two tranches: an MXP$ 5.25477 billion amortizing tranche and an MXP$ 3.40773 billion bullet tranche.  The New Term Loan is secured by, among other things (a) first-priority liens on (i) all of CCM's real property assets with a value in excess of MXP$ 50 million (with certain specific exceptions), (ii) all of the capital stock owned by CCM, directly or indirectly, in each of the Guarantors (as defined in the Term Sheet) (other than capital stock currently serving as collateral for the Scheduled Working Capital Debt Facilities (to be defined in the definitive documentation) and Credit Support Facilities (to be

defined in the definitive documentation)), (iii) all collateral previously pledged for the Scheduled

Working Capital Debt Facilities and Credit Support Facilities that ceases to secure such facilities

(each as defined in the Term Sheet), and (iv) a Creditor Proceeds Account (as defined in the

Term Sheet); and (b) the Comerci Proceeds Account (as defined in the Term Sheet) and any

funds or securities therein, to the extent held for reinvestment in connection with an asset sale or

casualty event.  The Asset-Linked Facility will consist of two tranches of (i) MXP$ 4.15074

billion and (ii) MXP$ 1.61593 million minus the amount of any cash proceeds paid by CCM to

the Tranche A2 (as defined in the Term Sheet) creditors on the Closing Date[8] from Additional

Tranche A2 Collateral Sales (as defined in the Term Sheet) made before the Closing Date,

respectively.  The two tranches of the Asset-Linked Facility are secured by separate pools of

collateral, and proceeds from the sale of such collateral will be used to pay down the balance of

the respective tranche, and if the proceeds exceed the remaining balance of such tranche the

excess must be used to pay the other tranche (60% of any excess remaining after payment of the

other tranche of the Asset-Linked Facility will be used to prepay the New Term Loan and the

New Bonds, and the remaining 40% of such excess may be used by CCM for certain enumerated

purposes set forth in the Term Sheet).  The New Bonds will consist of a series of Mexican bonds

and U.S. Dollar bonds in the amount of MXP$ 1.95143 billion and US$223.9 million,

respectively.  The New Bonds will be secured by the same collateral package as the New Term

Loan.

18.     Prior to the filing of the Concurso Proceeding, in order to facilitate the

restructuring described above, CCM entered into standstill agreements with creditors holding an

aggregate of approximately 85% of the Eligible Debt (each a "Standstill Agreement" and,

---

[8]     The "Closing Date" is the date that is three (3) days following the date on which there is a final and non-appealable judgment issued by the Mexican court with respect to the Concurso Plan.

collectively, the "Standstill Agreements").  As a material inducement for the Derivative

Counterparties to enter into such Standstill Agreements, CCM and each Derivative Counterparty

also entered into agreements which acknowledge such Derivative Counterparty's claim and settle

such claim for the consideration described above and more fully in the Term Sheet (each a

"Settlement and Debt Acknowledgement Agreement").[9]  The Standstill Agreements provide that

under certain terms and conditions set forth therein, holders of Eligible Debt and CCM will agree

to support and facilitate the restructuring on the terms and conditions set forth in the Term Sheet

and the Concurso Plan.  The Standstill Agreements further provide that pending the

consummation of the restructuring embodied in the Term Sheet and the Concurso Plan, each

Creditor (as defined in each Standstill Agreement) that enters into a Standstill Agreement will

forbear from exercising its rights and remedies in respect of certain debt and certain pending

claims.

       19.     Concurrently with entry into the Standstill Agreements, CCM and its subsidiaries

entered into agreements with those creditors that executed Standstill Agreements, which obligate

CCM and its subsidiaries, on the one hand, and those creditors executing Standstill Agreements,

on the other hand, to use their reasonable best efforts to consummate a restructuring of CCM

and/or its subsidiaries on an out-of-court basis on the same commercial and other terms as set

forth in the Term Sheet and the Concurso Plan in the event that the Concurso Proceeding is

unsuccessful (each such agreement, a "Subsidiary Agreement" and, collectively, the "Subsidiary

Agreements").[10]

---

[9]     The form of Derivative Counterparty Standstill Agreement, with the form of Settlement and Debt
Acknowledgement Agreement attached as an annex, executed by the Derivative Counterparties and CCM
is attached as **Exhibit 2** to the Verified Petition.

[10]    A copy of a Subsidiary Agreement is attached as **Exhibit 3** to the Verified Petition.

20.     The Standstill Agreements each provide that upon any termination pursuant to its terms that is not caused by a breach of such Standstill Agreement by CCM (or its principal operating subsidiary, Tiendas Comercial Mexicana, S.A. de C.V. ("TCM")) (any termination of a Standstill Agreement, a "Standstill Termination Event"), CCM and such Creditor will have the obligations set forth in the relevant Subsidiary Agreement.  CCM and the DCP Plaintiffs have agreed that upon the occurrence of a termination event with respect to any Standstill Agreement, any stays or injunctive relief in effect in this Chapter 15 case will automatically be lifted without the need for further order or action of the Court to allow the relevant DCP Plaintiff to: (i) send a notice terminating its Standstill Agreement with CCM, to the extent such a notice is required under the relevant Standstill Agreement, and (ii) exercise all of its rights and remedies (including, without limitation, continuance of the Derivatives Litigation) against CCM and its assets, free of any stay or injunction ordered by this Court.

21.     As discussed above, in order to effectuate the global settlement contemplated in the Concurso Plan, on July 14, 2010, CCM filed the Concurso Petition with the Federal District Court.  A true and correct copy of the Concurso Petition is attached as **"Exhibit C"** hereto.[11]

22.     As set forth more fully in the del Castillo Declaration, following filing of the Concurso Proceeding, an examination will be held and the Federal District Court will issue a "business reorganization judgment" determining whether the Concurso Petition will be granted. If the Concurso Petition is granted, a stay similar to the Bankruptcy Code's automatic stay will be put in place enjoining creditors from taking any actions to enforce judgments or seize assets, and CCM will begin the process of reorganization.

23.     The Concurso Plan, which reflects the terms set forth in the Term Sheet and has been subscribed to by parties holding over 85% of CCM's outstanding indebtedness, was

---

[11]     An English translation of the Concurso Petition is attached as **"Exhibit D"** hereto.

submitted along with the Concurso Petition.  In the absence of the requested relief, there is a
possibility that certain creditors (including Noteholders who have not signed lock-up
agreements) or others may commence actions against CCM in the United States in an effort to
derail CCM's efforts to restructure through the Concurso Plan and circumvent the Concurso
Process.  CCM is already faced with the Derivatives Litigation, the effect of which has been to
delay commencement of the Concurso Proceeding by dividing CCM's focus and attention and
significantly increasing the costs of restructuring.  Additional actions commenced in the United
States would exacerbate these effects and impose a significant burden and distraction to CCM's
efforts to consummate the Concurso Plan.

24.  In the absence of the Court granting the requested relief, CCM will suffer
irreparable harm.  Actions taken by third parties to delay or derail implementation of the
Concurso Plan would likely unravel CCM's entire restructuring, as such actions would lead to a
termination of the Standstill Agreements, the continuation of the Derivatives Litigation and the
exercise of additional remedies by creditors.  Abandoning the current restructuring plan would
leave CCM with significantly increased liabilities and no clear path to restructure those
liabilities.  CCM would be left with nothing but the prospect of reengaging in another round of
expensive and time consuming negotiations in order to reach a new restructuring agreement, if
such a new agreement is even possible, which would almost certainly be on significantly worse
terms than those in the Term Sheet.  Because of those concerns, I am also seeking entry of a
temporary restraining order and preliminary injunction to enjoin creditors of CCM from
initiating or continuing any proceedings or taking any actions in the United States with respect to
CCM and/or its assets pending this Court's recognition of the Concurso Proceeding as a foreign
main proceeding.

25.     I fully anticipate that CCM will be able to successfully consummate the Concurso Plan and complete its restructuring.

26.     I believe that the entry of a temporary restraining order would pose little, if any, harm upon those parties who would oppose a temporary restraining order or preliminary injunction because the scope of any such injunction would be limited to the territorial jurisdiction of the United States and such parties would not derogate any of the rights or remedies available to them in the Concurso Proceeding. There is no value lost to creditors through the continuation of the Concurso Proceeding; to the contrary, CCM will continue as a going concern through and after completion of the Concurso Proceeding, maximizing the value of its estate for the benefit of all creditors. As such, I believe that the balance of the harms weighs in favor of injunctive relief.

## STATEMENT PURSUANT TO
## SECTION 1515(C) OF THE BANKRUPTCY CODE

27.     I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

28.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that, to my knowledge, the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to CCM is the Concurso Proceeding.

## LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

29.     I am informed that Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that a foreign representative filing a petition for recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

> (A) a corporate ownership statement containing the information described in [Bankruptcy] Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of

the debtor, all parties to litigation pending in the United States in
which the debtor is a party at the time of the filing of the petition
and all entities against whom provisional relief is being sought
under § 1519 of the [Bankruptcy] Code.

30.     In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following

information:

### (A)     Administrators in the Concurso Proceeding

As noted above, the Concurso Proceeding was commenced through the filing of the

Concurso Petition in the Federal District Court earlier today.  As such, no administrator has as of

yet been appointed.  This list will be supplemented as soon as practicable, but no later than (5)

business days following the appointment of any administrator in the Concurso Proceeding.

### (B)     Parties to Litigation in the United States in Which CCM is a Party

As noted above, CCM is currently party to litigation in the United States with the

following parties:

- J.P. Morgan Chase Bank, N.A.

- J. Aron & Company

- Merrill Lynch Capital Markets AG

- Merrill Lynch Capital Services Inc.

- Barclays Bank PLC

### (C)     Parties Against Whom Provisional Relief is Sought Under Section 1519

Concurrently herewith, CCM has commenced an adversary proceeding seeking a

temporary restraining order and preliminary injunction against Does 1 through 1000, who, upon

information and belief, are Noteholders or other creditors of CCM, and all other persons

(including individuals, partnerships and corporations, and all those acting for or on their behalf),

and all governmental units (including the United States of America and any State,

Commonwealth, District, Territory, municipality, department, agency or instrumentality of the United States, a State, Commonwealth, District, Territory, municipality, a foreign state or other foreign or domestic governments, and all those acting for or on their behalf).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 16, 2010
        Mexico, D.F.

/s/ Fernando del Castillo Elorza
Fernando del Castillo Elorza

14

**<u>Exhibit G</u>**

WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone:  (305) 371-2700
Facsimile:  (305) 358-5744
John K. Cunningham (JC 4661)


1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JS-6031)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 15 |
| | ) | |
| Corporación Durango, S.A.B. de C.V., | ) | Case No. 08-_____ (      ) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

**DECLARATION OF GABRIEL VILLEGAS SALAZAR**
**PURSUANT TO 28 U.S.C. § 1746**

I, Gabriel Villegas Salazar, declare under penalty of perjury under the laws of the United

States of America that the following is true and correct:

1.      I hereby submit this declaration (the "Declaration") in support of the Verified

Petition for Recognition of Foreign Main Proceeding and Request for Related Relief (the

"Petition"), which is to be filed contemporaneously herewith, and which seeks entry of an order

(i) recognizing the voluntary judicial reorganization proceeding (the "Concurso Proceeding")

that was initiated by Corporación Durango, S.A.B. de C.V. ("Corporación Durango" or the

"Debtor") in the District Court for Civil Matters in Durango, Mexico (the "Durango District

Court"), on October 6, 2008,  as a foreign main proceeding pursuant to sections 1515 and 1517

of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and

(ii) granting related relief pursuant to section 1520 of the Bankruptcy Code.  Except as set forth

below, I have personal knowledge of the matters set forth in this Declaration.

2.       Although Spanish is my native language, I am fluent in English and have elected

to execute and submit this Declaration in English.

3.       I am an officer holding the title of General Counsel and Secretary of the Board of

Corporación Durango.  As the General Counsel and Secretary of the Board of Corporación

Durango, I have supervisory control over all business records concerning (a) Corporación

Durango's 10.50% Senior Notes due 2017 (the "Senior Notes"), including, without limitation,

any guarantees executed in connection therewith, and (b) the financial condition of Corporación

Durango, all of which are generally created contemporaneously with the events they reflect and

are kept in the ordinary course of business by Corporación Durango.  Further, I also regularly

provide services to certain Mexican operating subsidiaries of Corporación Durango (collectively,

the "Mexican Subsidiary Guarantors") that are guarantors under the Senior Notes.[1]

4.       In order to carry out my duties, I am the recipient of a Power of Attorney from

both Corporación Durango and the Mexican Subsidiary Guarantors, which authorize me to,

among other things, initiate legal proceedings on behalf of these entities.

5.       True and correct copies of the Power of Attorney granted to me by Corporación

Durango and the English translation thereof are annexed hereto as Exhibit "A" and Exhibit "B",

---

[1]       The Mexican Subsidiary Guarantors are Porteadores de Durango, S.A. de C.V., Administración
Corporativa de Durango, S.A. de C.V., Ponderosa Industrial de México, S.A. de C.V., Empaques de Cartón Titán,
S.A. de C.V., Reciclajes Centauro, S.A. de C.V., Lineas Aéreas Ejecutivas de Durango, S.A. de C.V., Inmobiliaria
Industrial Tizayuca, S.A. de C.V., Compañia Norteamericana de Inversiones en Celulosa y Papel, S.A. de C.V.,
Servicios Industriales Tizayuca, S.A. de C.V., Atenmex, S.A. de C.V., Atensa, S.A. de C.V., ECTSA, S.A. de C.V.,
EYEMSA, S.A. C.V., Cartonpack, S.A. de C.V., Administración Industrial Centauro, S.A. de C.V., and
Administración Industrial Durango, S.A. de C.V.  The Senior Notes are also guaranteed by two of the Debtor's U.S.
subsidiaries, i.e., Paper International, Inc. ("International"), formerly known as Durango International, Inc., and
Fiber Management of Texas, Inc. ("FMT").  Both International and FMT are filing voluntary petitions for relief
under chapter 11 of the Bankruptcy Code concurrently herewith.

.

respectively.[2]

6.      On October 6, 2008, Corporación Durango initiated the Concurso Proceeding pursuant to the provisions of the *Ley de Concursos Mercantiles* (the "Mexican Business Reorganization Act" or "Concurso Law") by submitting its petition to commence a case under the Mexican Business Reorganization Act (the "Voluntary Petition") with the Durango District Court.  True and correct copies of the Voluntary Petition filed with the Durango District Court and the English translation thereof are annexed hereto as Exhibit "C" and Exhibit "D", respectively.

7.      As set forth in Corporación Durango's Power of Attorney referenced in paragraph 3 above, I am empowered to appear as the duly appointed representative of Corporación Durango in the Concurso Proceeding.

8.      On October 1, 2008, the Board of Directors of Corporación Durango authorized the commencement of a proceeding under chapter 15 of the Bankruptcy Code (the "Chapter 15 Proceeding"), and I was duly selected as the foreign representative of Corporación Durango and its estate in connection with the Chapter 15 Proceeding.  An English translation of the aforementioned resolution is annexed hereto as Exhibit "B".

9.      Contemporaneously herewith, I have caused this chapter 15 case to be commenced through the filing of the Petition.

10.      Corporación Durango serves as the holding company for a number of Mexican and U.S. companies (collectively, the "Company"), which together comprise one of the leading producers of corrugated containers, containerboard and industrial paper in North America.  An organizational chart of the Corporación Durango family of companies is attached hereto as

---

[2]      I have caused a translator to translate each of the documents appended hereto.

Exhibit "E".  The Company is one of Mexico's largest paper companies and sells its products to a broad range of Mexican and U.S. manufacturers of consumable and durable goods.

11.     In Mexico, the Company is a domestic producer of newsprint with an estimated 31% market share in 2007, based on information published by the Mexican National Chamber for the Pulp and Paper Industry (*Cámara Nacional de las Industrias de la Celulosa y del Papel*), and the leading producer of corrugated containers with an approximate market share of 30% in 2007.  Corporación Durango's customers in the United States and Mexico include many of the largest industrial, construction, consumer, agricultural, and media companies such as Nestlé, Pepsico, Daimler A.G., Sara Lee, Kimberly-Clark, Vitro, Cementos Apasco, Pacess-Nike, the El Universal and Reforma newspapers, two major Mexico dailies, Quik-crete Concrete and Chiquita.

12.     As of December 31, 2007, Corporación Durango's revenues were approximately Ps. 10.1 billion which translates to approximately US$927.6 million under Mexican Financial Reporting Standards ("NIFs").[3]

13.     As a holding company, Corporación Durango has no employees of its own, as all corporate and administrative level employees are employed and compensated by Administración Corporativa de Durango, S.A. de C.V. ("ACD"), a Mexican corporation (*sociedad anónima de capital variable*) and subsidiary of Corporación Durango, formed for the purpose of providing accounting, administrative, auditing, legal and treasury services to Corporación Durango's other subsidiaries.  In return, Corporación Durango's other subsidiaries pay ACD a fixed monthly administrative fee for providing such services.

---

[3]      Amounts stated in pesos in Corporación Durango's Audited Financial Statements, dated April 29, 2008, for year ending December 31, 2007, have been converted to U.S. dollars using an exchange rate of US$1.00 = Ps. 10.9157 under NIFs.

14.     As of June 30, 2008, Corporación Durango's direct and indirect subsidiaries employed thousands of individuals to administer and operate the various plants and facilities located in the United States and Mexico.

15.     As of the date hereof, Corporación Durango has approximately US$535 million of indebtedness under the Senior Notes, which were issued by Corporación Durango and guaranteed by several of its direct and indirect subsidiaries.

16.     More specifically, beginning in 2002 and continuing through 2004, Corporación Durango experienced a severe liquidity crisis that caused the company to default on various payments of principal and interest on its unsecured indebtedness.  As a result of this crisis, and in an effort to implement a long-term solution to its capital structure and debt service requirements, Corporación Durango filed a voluntary petition to commence an insolvency proceeding under the Mexican Business Reorganization Act on May 18, 2004 (the "2004 Concurso Proceeding").

17.     Shortly thereafter, on May 20, 2004, the company's foreign representative, Gabriel Villegas Salazar, commenced a case ancillary to a foreign proceeding under section 304 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York, Case No. 04-13487 (RDD) (the "304 Proceeding" and, collectively with the 2004 Concurso Proceeding, the "2004 Proceedings"), in order to obtain ancillary relief in the United States in furtherance of Corporación Durango's ongoing reorganization efforts in Mexico.

18.     As a result of the 2004 Proceedings, Corporación Durango was able to propose a plan of reorganization that was approved by a majority of its claimholders, confirmed by the Mexican court, and ultimately consummated on February 7, 2005.  Pursuant to the aforementioned plan, Corporación Durango restructured approximately US$833.2 million (Ps.9.4 billion) in existing obligations in exchange for (i) approximately 17% of the company's issued

and outstanding capital stock (the "Series B Shares"), (ii) the execution of a restructured credit agreement by and between the company and its bank creditors (the "Restructured Credit Agreement"), pursuant to which the company issued notes in an aggregate principal amount of US$116.1 million, and (iii) the issuance of notes (the "Series B Notes") in an aggregate principal amount of US$433.8 million.

19.     More than two years after the 2004 Proceedings, Corporación Durango initiated an effort to purchase and/or redeem all of the then-outstanding Series B Notes and to prepay all amounts due under the Restructured Credit Agreement.  As of June 30, 2007, the aggregate principal amount of outstanding Series B Notes was US$418.6 million (Ps. 4.5 billion) and the aggregate principal amount outstanding under the Restructured Credit Agreement was US$86.2 million (Ps. 930.6 million).

20.     In order to effectuate the aforementioned transactions, on June 21, 2007, Corporación Durango commenced a cash tender offer for any and all of the outstanding Series B Notes.  Subsequently, on or about October 5, 2007, the company issued $520 million in principal amount of the Senior Notes—which remain outstanding—to (i) purchase all of the Series B Notes tendered in connection with the cash tender offer, (ii) redeem all of the Series B Notes not purchased in the tender offer, and (iii) prepay all amounts due under the Restructured Credit Agreement.

21.     As noted above, Corporación Durango's obligations under the Senior Notes are guaranteed by the Mexican Subsidiary Guarantors as well as by two of the company's U.S. subsidiaries.

22.     Over the course of the last year, and since the issuance of the Senior Notes in 2007, Corporación Durango, like many other entities in a variety of industries throughout the

6

world, has faced significant challenges stemming in large part from an unprecedented, unexpected and sustained rise in global energy prices. Specifically, the rising price of energy has resulted in a rapid escalation in the company's input costs.

23.     Corporación Durango's aggregated cost of energy, raw materials and freight, for example, increased by US$72.3 million in the first half of 2008 as compared to the first half of 2007. The financial consequences of these increased costs have been significant, causing the company's EBITDA to decrease by approximately 68% from the second quarter of 2007 through the second quarter of 2008. Notably, 32% of this decrease occurred in the second quarter of 2008.

24.     Unfortunately, the rising cost of energy, coupled with (i) the well-documented downturn in the U.S. economy—punctuated by recent governmental efforts to restore confidence to the world's ailing credit markets through a massive infusion of capital—which has had worldwide implications, (ii) increased foreign competition in the paper industry, and (iii) the appreciation of the Mexican Peso, have made it difficult for Corporación Durango to transfer its rising cost of goods to its customers.

25.     As a result of the foregoing, Corporación Durango is facing a liquidity crisis that has led to its failure today to make its scheduled interest payment of approximately $26.5 million on the Senior Notes. Based on these facts, Corporación Durango believed it was in the best interests of the company and its creditors to seek relief under the Mexican Business Reorganization Act in order to preserve its value as a going concern and maximize the value of its assets for the benefit of all creditors.

26.     Notwithstanding the pendency of the Concurso Proceeding, I believe that there are various U.S.-based creditors of Corporación Durango who have already or are actively

seeking to institute legal proceedings, either against Corporación Durango or against its Mexican

Subsidiary Guarantors and/or its officers and directors (the "Officers and Directors"), in order to

seize assets located within the United States and/or to disrupt the reorganization process that has

been commenced in Mexico, in derogation of the rights of Corporación Durango's other

creditors.

27.     An action against any of the aforementioned parties would be an attempt to

circumvent the bankruptcy reorganization process in Mexico.  If any such action is commenced,

Corporación Durango will suffer irreparable harm in being deprived of its right to, among other

things, have its Officers and Directors control its reorganization.  Indeed, if creditors are

permitted to initiate or continue actions against any of the aforementioned parties, I believe that

Corporación Durango's reorganization efforts may completely fail, and such injury is not

compensable in money damages.

28.     As a result of these concerns, I am seeking entry of a temporary restraining order

to temporarily enjoin creditors of Corporación Durango from initiating or continuing any action

in the U.S. in respect of Corporación Durango, the Mexican Subsidiary Guarantors, the Officers

and Directors and/or their assets pending a hearing on the request for injunctive relief set forth in

the Petition.  I am also seeking a preliminary and permanent injunction because the likelihood of

irreparable harm is certain.

29.     I fully anticipate that Corporación Durango will be able to structure and

consummate a successful plan of reorganization under the Mexican Business Reorganization

Act.

30.     I believe that the entry of a temporary restraining order would pose little, if any,

harm upon parties opposing the issuance of the temporary restraining order, preliminary or

permanent injunction because the scope of any such injunction would be limited to the territorial jurisdiction of the U.S. and such parties would be free to seek available relief in Mexico. Corporación Durango will continue to preserve its business as a going concern. Thus, it is not as if the assets of Corporación Durango will be irretrievably depleted to the detriment of the creditors. On the other hand, I believe that Corporación Durango will be irreparably harmed should creditors commence actions against Corporación Durango and the Mexican Subsidiary Guarantors in the U.S. As such, the balance of harms weighs heavily in favor of issuing the preliminary injunction.

### STATEMENT PURSUANT TO
### SECTION 1515(c) OF THE BANKRUPTCY CODE

31.     I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognitions shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

32.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to Corporación Durango that is known to me is the Concurso Proceeding.

### LIST PURSUANT TO
### INTERIM BANKRUPTCY RULE 1007(a)(4)

33.     I am informed that Interim Bankruptcy Rule 1007(a)(4) provides as follows:

> Unless the court orders otherwise, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition a list containing the name and address of all administrators in foreign proceedings of the debtor, all parties to any litigation in which the debtor is a party and that is pending in the United States at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code.

34.     In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the following lists:

### Administrators in the Concurso Proceeding

As noted above, the Concurso Proceeding was commenced through the filing of the Voluntary Petition in the Durango District Court earlier today. As such, administrators have yet to be appointed. This list will be supplemented as soon as practicable, but no later than five (5) business days following the appointment of any administrator in the Concurso Proceeding.

### Parties to Litigation in the United States

As of the date of this Declaration, Corporación Durango is not a party to any litigation pending in the United States of which I am aware.

### Entities Against Whom Provisional Relief is Sought under Section 1519

Concurrently herewith, Corporación Durango has commenced an adversary proceeding seeking a temporary restraining order and preliminary injunctive relief against the indenture trustee for the Senior Notes, Law Debenture Trust Company of New York, certain unknown holders of the Senior Notes and other creditors of Corporación Durango generally.

10

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October 6, 2008
       Mexico City, Mexico

_____

Gabriel Villegas Salazar