Dennis F. Dunne
Risa M. Rosenberg
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica as*
*Foreign Representative of Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VITRO, S.A.B. de C.V.,<br><br>     Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 11-_____ (___) |

**DECLARATION OF ALEJANDRO FRANCISCO SÁNCHEZ-MUJICA,**
**AS FOREIGN REPRESENTATIVE OF VITRO, S.A.B. DE C.V.,**
**(I) IN SUPPORT OF CHAPTER 15 PETITION FOR RECOGNITION**
**OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED**
**RELIEF AND (II) IN COMPLIANCE WITH  11 U.S.C. § 1515 AND**
**RULE 1007(a)(4) OF FEDERAL RULES OF BANKRUPTCY PROCEDURE**

I, Alejandro Francisco Sánchez-Mujica, declare under penalty of perjury under the laws

of the United States of America that the following is true and correct:

    1.    I am the Executive Vice President and General Counsel of Vitro, S.A.B. de C.V.

("Vitro SAB"), a debtor in a voluntary judicial reorganization proceeding (the "Voluntary

Mexican Proceeding") commenced on December 13, 2010 under the *Ley de Concursos*

*Mercantiles* (the "<u>Mexican Business Reorganization Act</u>") in the Federal District Court for Civil and Labor Matters for the State of Nuevo León, the United Mexican States (the "<u>District Court of Nuevo León</u>"). I am the duly-appointed foreign representative of Vitro SAB (in such capacity, the "<u>Foreign Representative</u>") and, as set forth more fully below, am authorized to commence this chapter 15 case and to submit this declaration in support thereof (the "<u>Declaration</u>").

2.      In compliance with section 1515 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>") and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), I hereby respectfully submit this Declaration, in support of the form chapter 15 petition (the "<u>Form Petition</u>") and Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief (together with the Form Petition, the "<u>Chapter 15 Petition</u>") filed contemporaneously herewith. By the Chapter 15 Petition, Vitro SAB seeks entry of an order (i) recognizing the Voluntary Mexican Proceeding as a "foreign main proceeding" pursuant to sections 1515 and 1517 of the Bankruptcy Code, and (ii) granting certain related relief pursuant to section 1520 of the Bankruptcy Code.

3.      This Declaration sets forth a description of Vitro SAB's business and material indebtedness, the circumstances surrounding the commencement of the Voluntary Mexican Proceeding and the filing of the Chapter 15 Petition, including the factual bases for the relief requested therein.[1] Unless otherwise stated, I have personal knowledge of the facts set forth

---

[1]      Many of the facts set forth in this Declaration are set forth more fully in certain publicly available documents, including (i) the Solicitation Statement dated November 1, 2010 (attached hereto as <u>Exhibit A</u>, the "<u>Nov. 1 Sol. Stmt.</u>") and supplements thereto (together with the Nov. 1 Sol. Stmt., the "<u>Solicitation Statement</u>"), (ii) Form 20-F filed by Vitro SAB with the United States Securities and Exchange Commission (the "<u>SEC</u>") on February 28, 2011, attached hereto as <u>Exhibit B</u> (the "<u>Form 20-F</u>"), and (iii) Vitro SAB's unaudited consolidated financial results for the fourth quarter of 2010, publicly released via the *Bolsa Mexicana de Valores* (the "<u>Mexican Stock Exchange</u>") on February 28, 2011, attached hereto as <u>Exhibit C</u> (the "<u>Unaudited 4Q'10 Results</u>"). Capitalized terms used but not otherwise defined herein

herein.  Although Spanish is my native language, I am fluent in English and have elected to

execute and submit this Declaration in the English language.

**VITRO SAB'S BUSINESS**

4.      Vitro SAB is a corporation with variable capital (*sociedad anónima bursátil de

capital variable*) organized under the laws of Mexico and originally incorporated in 1909.

(See Nov. 1 Sol. Stmt. at 22.)  Since January 5, 1976, Vitro SAB's common shares have been

listed on the Mexican Stock Exchange.[2]  Mexico constitutes the primary trading market for

Vitro SAB's common shares – during the 12-month period beginning February 1, 2010 and

ending February 1, 2011, 99.2% of trading in Vitro SAB's common shares occurred in Mexico.

(See Form 15F/A.)

5.      Vitro SAB is a holding company that conducts substantially all of its operations

through subsidiaries (collectively with such subsidiaries, "Vitro").  (See Nov. 1 Sol. Stmt. at 14.)

Vitro is the largest manufacturer of glass containers and flat glass in Mexico, with consolidated

net sales in 2010 of Ps. 23,360 million ($1,849 million).[3]  (See Unaudited 4Q'10 Results at 4.)

Vitro has manufacturing facilities in 11 countries and distribution centers throughout the

Americas and Europe, and it exports its products to more than 50 countries worldwide.

(See Nov. 1 Sol. Stmt. at 114.)  During 2010, Vitro maintained a workforce of approximately

---

[2]     have the meanings ascribed to them in the Solicitation Statement, Form 20-F, or Unaudited 4Q'10 Results,
as applicable.

See that certain Form 15F/A filed by Vitro SAB with the SEC on March 16, 2011, attached hereto as
Exhibit D (the "Form 15F/A").

[3]     Vitro SAB reports its quarterly and annual financial results in pesos, and certain of its indebtedness, as
issued, is denominated in pesos.  Throughout this Declaration, such financial results and indebtedness are
presented in U.S. dollars, using the fixed exchange rate published by *Banco de Mexico* at the end of each
applicable reporting period.  (See Unaudited 4Q'10 Results at 2.)  Additionally, financial results and
indebtedness presented herein that are taken from the Unaudited 4Q'10 Results are unaudited and subject to
adjustment in Vitro SAB's 2010 audited financial results, which have not been finalized as of the date
hereof.

17,000 worldwide, about 85% of whom were located in Mexico.[4]  (See Unaudited 4Q'10 Results at 16.)  In 2010, 51% of Vitro's consolidated net sales were made in Mexico, with the remainder made primarily in the United States and Europe.  (See Unaudited 4Q'10 Results at 4.)  Vitro's operations are organized into two operating business units:  (1) the Glass Containers business unit and (2) the Flat Glass business unit, representing approximately 53% and 46%, respectively, of Vitro's consolidated net sales in 2010.  (See Unaudited 4Q'10 Results at 4.)

A.     **Glass Containers Business**

6.     Vitro's Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry.  (See Nov. 1 Sol. Stmt. at 114.)  Based on its consolidated net sales of Ps. 12,339 million ($977 million) in 2010, the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world.  (See Unaudited 4Q'10 Results at 4.)  Substantially all of Vitro SAB's Glass Containers subsidiaries are wholly owned except for Empresas Comegua, S.A., a joint venture in which Vitro SAB holds an investment of 49.7%.  (See Nov. 1 Sol. Stmt. at 114.)

B.     **Flat Glass Business**

7.     Vitro's Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and automotive industries.  (See Nov. 1 Sol. Stmt. at 114.)  Based on its consolidated net sales of Ps. 10,688 million ($846 million) in 2010, the Flat Glass business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading

---

[4]          Substantially all such employees are employed by Vitro SAB's affiliates.

provider of insulated flat glass products in Spain and Portugal.  (See Unaudited 4Q'10 Results at 4.)  Vimexico, S.A. de C.V. ("Vimexico"), a joint venture in which Vitro SAB holds an investment of 91.8%, is a holding company for some of the Flat Glass business unit subsidiaries. (See Nov. 1 Sol. Stmt. at 114.)  In addition to Vimexico, Vitro SAB has partners in three additional subsidiaries: (i) Cristales Automotrices, S.A. de C.V., which conducts Vitro's automotive glass replacement installation business throughout Mexico City, (ii) Vitro Cristalglass S.L. ("Vitro Cristalglass") , which is engaged in the manufacturing and distribution of flat glass products for the Spanish, French and Portuguese construction industries, and (iii) Vitro Chaves Industria de Vidrio, S.A., a subsidiary of Vitro Cristalglass in Portugal. (See Nov. 1 Sol. Stmt. at 114.)

## VITRO SAB'S INDEBTEDNESS

8.     As of December 31, 2010, Vitro's aggregate outstanding third-party consolidated indebtedness was approximately $1.710 billion,[5] consisting of:

- $1.216 billion in outstanding principal amount under the 2012 Notes, 2017 Notes and 2013 Notes (each as defined below and, together, the "Old Notes");

- $254.8 million in outstanding agreed amounts owing to Calyon and Fintech (each as defined below) in settlement of obligations and litigation relating to certain derivative financial instruments (the "DFI Claims");

- $59.5 million in outstanding principal amount under the *Certificados Bursátiles* and the ABN Note (each as defined below and, together, the "Other Debt" and, together with the Old Notes and the DFI Claims, the "Restructured Debt"); and

---

[5]     See Unaudited 4Q'10 Results at 8.  This amount reflects amortizable discounts of approximately $6.9 million and does not include past-due interest in an aggregate approximate amount of $308 million. Because the Voluntary Mexican Proceeding was commenced on December 13, 2010, the amounts of indebtedness incorporated into the *Concurso* Plan (as defined below) were taken from Vitro SAB's then most recently disclosed financial statement (i.e., the unaudited consolidated financial results for the third quarter of 2010 set forth in the Solicitation Statement Supplement dated November 12, 2010 (attached hereto as Exhibit E, the "Nov. 12 Sol. Stmt. Supp.")).

- $186.8 million of additional indebtedness that Vitro SAB does not plan to restructure or discharge in the Mexican Proceeding.

The circumstances giving rise to Vitro SAB's indebtedness with respect to the Restructured Debt are discussed below. In addition, as of December 31, 2010, Vitro SAB's aggregate outstanding indebtedness to its direct and indirect subsidiaries (the "Intercompany Claims") was approximately $2.022 billion.

## A.  Old Notes

9.  On October 22, 2003 and on February 1, 2007, respectively, Vitro SAB issued (i) $225 million aggregate principal amount of 11.75% Senior Notes due 2013 (the "2013 Notes"), and (ii) $1.0 billion of Senior Notes, comprised of $300 million aggregate principal amount of 8.625% Senior Notes due 2012 (the "2012 Notes") and $700 million aggregate principal amount of 9.125% Senior Notes due 2017 (the "2017 Notes") under separate indentures (as each has been supplemented from time to time, collectively, the "Indentures"). (See Nov. 12 Sol. Stmt. Supp. at 23-24.) The Old Notes are general unsecured obligations of Vitro SAB, guaranteed, on an unsecured basis, by substantially all of Vitro SAB's wholly-owned direct and indirect subsidiaries (in such capacities, the "Old Guarantors"). (See Nov. 12 Sol. Stmt. Supp. at 23-24.)

## B.  DFI Claims

10.  As discussed above, Vitro is an international enterprise, receiving the majority of its cash inflows from operations in currencies other than the U.S. dollar. As a result, it has significant exposure to fluctuations in the interest and currency exchange-rates caused by its commitments on U.S. dollar-denominated indebtedness. Additionally, because of the large energy requirements of its manufacturing operations, it also has significant exposure to fluctuations in the price of natural gas, its main energy input. To mitigate these exposures, and

in response to market trends during the first seven months of 2008,[6] Vitro SAB and certain of its subsidiaries (collectively, the "Vitro DFI Parties") entered into certain derivative financial instruments (the "DFIs"), including (i) interest rate swap agreements to hedge future interest payments, (ii) currency swap and option agreements to hedge exposure to foreign currency exchange rate variations and (iii) forwards and other derivative agreements to hedge its exposure to natural gas price variations. (See Nov. 1 Sol. Stmt. at 25.) By the fourth quarter of 2008, the DFI positions of the Vitro DFI Parties had been materially and adversely impacted by the high volatility in commodity and currency markets in the second half of 2008, forcing the Vitro DFI Parties to unwind the majority of their open positions in the fourth quarter of 2008.[7] As discussed further below, the DFI Claims stem from the Vitro DFI Parties' defaults under the DFIs in early 2009.

## C.  **Other Debt**

11.     On February 13, 2003, Vitro SAB issued a *Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 03*") at an annual floating interest rate of 3.25% over the rate on 182-day *Certificados de la Tesorería de la Federación* (i.e., notes issued by the government of Mexico). (See Nov. 12 Sol. Stmt. Supp. at 24.) On July 2, 2008, Vitro SAB issued another *Certificados Bursátiles* note (the "*Certificados Bursátiles Vitro 08*" and, together with the *Certificados Bursátiles Vitro 03*, the "*Certificados Bursátiles*") at an annual floating interest rate of 2.50% over the 28-day TIIE. (See Nov. 12 Sol. Stmt. Supp. at 24.) As of September 30, 2010, the aggregate principal amount outstanding under the *Certificados Bursátiles Vitro 03* and

---

[6]     During this period, the Mexican peso appreciated 7.4% relative to the U.S. dollar, the Mexican equilibrium interbank interest rates ("TIIE") increased 6.5%, and natural gas prices recorded a sharp price increase, all of which exerted negative pressure on Vitro's operating and financial results. (See Nov. 1 Sol. Stmt. at 25.)

[7]     Specifically, between July 2008 and December 2008, natural gas prices plummeted more than 50%, and the Mexican peso registered a 30% devaluation against the U.S. dollar, reversing the appreciation trend experienced in the first seven months of the year and making it substantially more expensive for Vitro to service its U.S. dollar-denominated debt. (See Nov. 1 Sol. Stmt. at 25.)

*Certificados Bursátiles Vitro 08* was Ps. 150 million ($12.0 million) and Ps. 400 million ($32.0 million), respectively. (See Nov. 12 Sol. Stmt. Supp. at 24.) The *Certificados Bursátiles* are senior unsecured obligations of Vitro SAB, and are not guaranteed by any of its subsidiaries. (See Form 20-F at 117).

12. On September 29, 2008, Vitro SAB issued a promissory note (the "ABN Note") in favor of ABN Amro Bank N.V. ("ABN") in the principal amount of $15 million. (See Annex A to Nov. 12 Sol. Stmt. Supp. at A-3.) The ABN Note is guaranteed by Compañía Vidriera, S.A. de C.V. ("Covisa"), Vimexico, Vitro Automotríz, S.A. de C.V. ("Automotríz"), Vitro Vidrio y Cristal, S.A. de C.V. ("Vidrio y Cristal"), and Vitro Envases Norteamérica, S.A. de C.V. ("Vena"). (See Form 20-F at 117.)

## EVENTS PRECIPITATING COMMENCEMENT
## OF VOLUNTARY MEXICAN PROCEEDING

### A.    Global Recession

13. The global economic and financial crisis, and the severe economic recession which began in the second half of 2008, affected each of Vitro's major markets, Mexico, the United States and Spain, and significantly affected its businesses. (See Nov. 1 Sol. Stmt. at 24.) The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry and reduced beer bottle demand from the main client of Vitro's Glass Containers unit resulted in a 36.8% decline in Vitro's consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in Vitro's operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. (See Nov. 1 Sol. Stmt. at 24.) Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. (See Nov. 1 Sol. Stmt. at 24.) Net income decreased from Ps. 131 million in 2007 to a

loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.  (See Nov. 1 Sol. Stmt. at 24.)  Even though the economy generally showed moderate signs of recovery in 2010, some of Vitro's markets continued to experience contraction and excess capacity, including the construction sector in the United States and Spain.  For the twelve-month period ended December 31, 2010, Vitro's consolidated net sales decreased 2.6% to Ps. 23,360 million ($1,849 million) from Ps. 23,991 million ($1,770 million) for the same period ended December 31, 2009.  (See Unaudited 4Q'10 Results at 4.)

**B.      DFI Litigation**

14.      As discussed above, in the second half of 2008, the DFI positions of the Vitro DFI Parties were materially and adversely impacted by the high volatility in commodity and currency markets, resulting in margin calls by their counterparties ("Counterparties") forcing the Vitro DFI Parties to post $85 million in collateral deposits.  (See Nov. 1 Sol. Stmt. at 25.)  To eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008, the Vitro DFI Parties restructured their DFI portfolio and unwound the majority of their open positions to guarantee their ability to continue their normal course of operations. (See Nov. 1 Sol. Stmt. at 25.)

15.      In January 2009, four Counterparties served notices on the applicable Vitro DFI Parties of their defaults under the relevant DFIs based on the failure to pay approximately $293 million allegedly due thereunder.  Over the next 30 days, six out of the seven Counterparties commenced actions (collectively, the "DFI Litigation")[8] against such Vitro DFI

---

[8]      The DFI Litigation includes actions by (i) Credit Suisse International, initiated on January 30, 2009 (Index No. 09-600298); (ii) Citibank, N.A., initiated on February 06, 2009 (Index No. 09-600376); (iii) Calyon Credit Agricole CIB ("Calyon"), initiated on February 10, 2009 (Index No. 09-600407) (the "Calyon Litigation"); (iv) Barclays Bank PLC, initiated on February 18, 2009 (Index No. 09-600521); (v) Deutsche Bank AG, initiated on February 26, 2009 (Index. No. 09-600612); and (vi) Merrill Lynch Capital Services, Inc., initiated on February 27, 2009 (Index No. 09-600634).

Parties in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and fees allegedly payable under the DFIs. (See Nov. 1 Sol. Stmt. at 25.) On April 13, 2010, the Supreme Court of New York granted these Counterparties' motions as to the Vitro DFI Parties' liability and referred the matter of damages to a special referee. (See Nov. 1 Sol. Stmt. at 25.)

**C.      Default under Old Notes and Other Debt**

16.      Vitro's defaults under the DFIs resulted in events of default under each Indenture. (See Nov. 1 Sol. Stmt. at 26.) To preserve the cash necessary to continue its operations, Vitro SAB stopped making scheduled interest payments on the Old Notes, and has since not made payments on the 2012 Notes and 2017 Notes due February 2009, August 2009, February 2010, August 2010 and February 2011, or those on the 2013 Notes due May 2009, November 2009, May 2010 and November 2010. (See Form 20-F at 3.) As discussed further below, beginning in November 2010, multiple litigations were commenced against Vitro SAB and certain of the Old Guarantors in the United States and Mexico by certain purported beneficial holders of the Old Notes.

17.      Vitro SAB also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest, due February 5, 2009 on the *Certificados Bursátiles Vitro 03*. (See Nov. 1 Sol. Stmt. at 26.) Subsequently, the common representative (*representante común*) of the *Certificados Bursátiles Vitro 03* initiated legal proceedings thereon against Vitro SAB in Mexico. (See Nov. 1 Sol. Stmt. at 26.) However, as part of the negotiations with respect to the Offers (as defined below), the holders of the *Certificados Bursátiles Vitro 03* agreed to end litigation "without prejudice" until Vitro completes its restructuring, provided that if Vitro SAB is unable to complete its restructuring, the holders of

the *Certificados Bursátiles Vitro 03* would be able to bring an action again.  (See Form 20-F at 3.)

18.     In addition, Vitro SAB did not make a scheduled interest payment of approximately Ps. 12 million ($1 million) due on the *Certificados Bursátiles Vitro 08* and scheduled payments totaling $191.4 million plus interest due on the New Promissory Notes (as defined below) issued as a result of the settlement of the DFI Litigation.  (See Form 20-F at 3.)

19.     In July 2009, ABN commenced a lawsuit against Vitro SAB and certain of its subsidiaries in Mexico, demanding payment of the ABN Note.  (See Nov. 1 Sol. Stmt. at 54.)  A first instance judgment was entered in that action against Vitro SAB, but in September 2010, the Mexican appellate court vacated that judgment and ordered the proceedings to be restarted.  (See Nov. 1 Sol. Stmt. at 54.)  Thereafter, this lawsuit was reinstated and a new first instance judgment was entered against Vitro SAB, which is currently being appealed; however, by court order entered in the Voluntary Mexican Proceeding, no creditor, including ABN, would be able to execute any judgment against Vitro's assets in Mexico.  (See Form 20-F at 3.)

**D.     Restructuring Process and Negotiations**

20.     As a result of all of the foregoing, in February 2009, Vitro SAB announced its intention to globally restructure all of the Restructured Debt.  (See Nov. 1 Sol. Stmt. at 26.)  Thereafter, Vitro SAB retained Rothschild Inc. as financial advisor and engaged in a series of transactions in an effort to strengthen its liquidity and maintain normal operations during the restructuring process.  (See Nov. 1 Sol. Stmt. at 26-28.)  As discussed further below, Vitro has also engaged in active negotiations with certain holders of the Old Notes, the DFI Claims and the Other Debt.

### i. Negotiations with Steering Committee

21.     Since February 2009, Vitro SAB has engaged in good faith in negotiations, pursuant to various confidentiality agreements, with parties, including an *ad hoc* committee of holders of the Old Notes (the "Steering Committee") and its advisors, regarding a potential restructuring.  Unfortunately, those negotiations did not result in an agreement, with the Steering Committee rejecting three restructuring proposals from Vitro SAB between August 2009 and July 2010.  (See Nov. 1 Sol. Stmt. at 28.)  Instead, in January of 2010, certain purported holders of the Old Notes served Vitro SAB with purported notices of acceleration in respect of the 2012 Notes and 2017 Notes.  (See Nov. 1 Sol. Stmt. at 28.)  Nevertheless, Vitro SAB continued to negotiate with the Steering Committee in the hope of reaching a consensual resolution. However, the continued recalcitrance of the members of the Steering Committee, in conjunction with certain other developments (including the adverse rulings in the DFI Litigation and a purported acceleration of the 2013 Notes by a letter on the letterhead of the trustee under the relevant Indenture in April 2010) led Vitro SAB to explore alternative means to implement a restructuring.

### ii. Settlement of DFI Litigation and Negotiations with Fintech

22.     On June 7, 2010, one of the Vitro DFI Parties, Vena, reached a settlement agreement with Calyon, one of the Counterparties that had commenced the DFI Litigation, pursuant to which Calyon agreed to dismiss the Calyon Litigation in exchange for a payment of approximately $67.3 million, due June 30, 2011.  (See Nov. 1 Sol. Stmt. at 25.)

23.     The other five Counterparties that had commenced the DFI Litigation sold their respective rights under the DFIs to Fintech Investments Ltd. (together with any affiliate and/or investment vehicle thereof, "Fintech").  (See Nov. 1 Sol. Stmt. at 25.)  Additionally, the only Counterparty that had not commenced litigation against Vitro SAB also sold its rights under the

DFIs to Fintech.  (See Nov. 1 Sol. Stmt. at 25.)  Thereafter, Vitro SAB engaged in settlement

negotiations with Fintech and, as a result, reached a settlement (the "Fintech Settlement")

whereby, among other things, Fintech agreed to dismiss the applicable DFI Litigations in

exchange for promissory notes in the agreed upon amounts (the "Promissory Notes").  (See Form

20-F at 2.)  The Promissory Notes were issued on September 3, 2010 by the three relevant

Vitro DFI Parties, Covisa, Comercializadora Álcali, S.A. de C.V. ("Comali") and Vena, and

guaranteed by Vitro SAB and certain of its other Mexican subsidiaries.  (See Form 20-F at 2.)

24.     Effective as of November 3, 2010, Covisa, Comali, and Vena assigned their

respective rights and obligations under the Fintech Settlement, including the Promissory Notes,

to Vitro SAB, which, in turn, issued replacement promissory notes to Fintech in the same

aggregate principal amount as the Promissory Notes plus interest that had accrued thereon up to

the date of the assignment (together, the "New Promissory Notes").[9]  (See Form 20-F at 2.)  The

New Promissory Notes, which are guaranteed *por aval* by certain of Vitro SAB's Mexican

subsidiaries, are subject to the Fintech Lock-Up Agreement (as defined below) and will be

restructured pursuant to the terms of the Exchange Offer and Consent Solicitation (as defined

below).  (See Form 20-F at 2.)

25.     Vitro SAB also engaged in negotiations with Fintech with respect to the

restructuring proposal Vitro SAB had formulated for the Steering Committee in July 2010.  As a

result of those negotiations, Vitro SAB agreed to make substantial changes to the July 2010

proposal for the benefit of all holders of Restructured Debt.  (See Nov. 1 Sol. Stmt. at 28.)

---

[9]     In addition to certain tax benefits realized by Vitro SAB and its subsidiaries as a result of such assignment, Vitro SAB was entitled to receive a fee from the assignor subsidiaries within 60 days of the assignment, and Fintech agreed to extend the final maturity of the payment obligations under the New Promissory Notes to March 31, 2011, with the new maturity payments due on January 31, 2011 ($10 million), February 28, 2011 ($30 million) and March 31, 2011 (approximately $151.4 million plus accrued interest). (See Form 20-F at 2.)  Consistent with its overall restructuring plan, Vitro SAB has not paid the amounts payable under the New Promissory Notes as they became due and payable.  (See Form 20-F at 2.)

E.     **Formulation of *Concurso* Plan and Offers**

26.     As a result of its negotiations with Fintech, Vitro SAB developed a new restructuring proposal (as amended from time to time, the "*Concurso* Plan")[10] that was to be effectuated through a prepackaged voluntary judicial reorganization proceeding in Mexico.  In support of the *Concurso* Plan, Fintech agreed to enter into a lock-up and plan support agreement (the "Fintech Lock-Up Agreement") in respect of all of the Restructured Debt it then held or subsequently acquired, and to provide financing for the Tender Offer (as defined below).

27.     To meet the requirements for a prepackaged proceeding under the Mexican Business Reorganization Act and implement the *Concurso* Plan in the quickest and cost efficient manner possible, Vitro SAB formulated two alternative offers to the holders of the Old Notes:  a tender offer to purchase the Old Notes (the "Tender Offer") and an exchange offer and solicitation of consents to an in-court restructuring under the Mexican Business Reorganization Act (the "Exchange Offer and Consent Solicitation" and, together with the Tender Offer, the "Offers").  (See Nov. 1 Sol. Stmt. at 74.)  The Offers and the *Concurso* Plan are briefly described below.

i.     **Tender Offer**

28.     Pursuant to the Tender Offer, Vitro SAB and Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro SAB, offered to purchase, for cash, the maximum aggregate principal amount of the Old Notes that could be purchased for $100,000,000 at a purchase price (the "Tender Offer Consideration") per $1,000 principal amount of no less than $500 but no more than $575 (as determined pursuant to a modified Dutch auction, the "Clearing Price").  (See Nov. 1 Sol. Stmt. at 148.)  To facilitate the Tender Offer,

---

[10]     A true and correct copy of the *Concurso* Plan is attached hereto as Exhibit F, and an English translation thereof is attached hereto as Exhibit G.

Fintech agreed to provide AIV the funds for the Tender Offer Consideration in exchange for receiving the tendered Old Notes, which it further agreed to exchange pursuant to the Exchange Offer and Consent Solicitation.  (See Nov. 1 Sol. Stmt. at 22-23.)

### ii.  Exchange Offer and Consent Solicitation

29.  Pursuant to the Exchange Offer and Consent Solicitation, Vitro SAB offered those holders of the Old Notes that participate in the Exchange Offer and Consent Solicitation or otherwise enter into lock-up agreements or consent to the *Concurso* Plan (the "Participating Creditors"), a cash consent payment (the "Consent Payment") equal to each Participating Creditor's *pro rata* share of $75 million held in a Mexican trust (the "Payment Trust").[11] (See Nov. 1 Sol. Stmt. at 24.)  All holders of the Old Notes who became Participating Creditors were  deemed to have consented to the *Concurso* Plan as it may be amended during the course of a voluntary Mexican reorganization proceeding (as so amended, the "*Convenio Concursal*"). (See Nov. 1 Sol. Stmt. at 24.)

### iii.  *Concurso* Plan

30.  Vitro does not have the means to repay the Restructured Debt, nor does it believe that it will be able to find a material source of financing to refinance the Restructured Debt. (See Nov. 1 Sol. Stmt. at 23.)  Thus, the principal objectives of the *Concurso* Plan are to lower Vitro SAB's principal and interest payments on, and extend the maturity dates of, the Old Notes and the other Restructured Debt.  (See Nov. 1 Sol. Stmt. at 23.)

---

[11]  The Consent Payment paid to any Participating Creditor was not less than 5% or greater than 10% of the aggregate principal amount of the Restructured Debt held by such Participating Creditor.  (See Nov. 1 Sol. Stmt. at 24)

31.     Vitro SAB's *Concurso* Plan provides that, on the Issue Date,[12] the Restructured

Debt will be exchanged for the following consideration:

- $850 million in aggregate principal amount of unsecured notes due 2019;[13]

- $100 million (plus the Issue Date Adjustment) in aggregate principal amount of new convertible debt obligations, which will mandatorily convert into 15% of Vitro SAB's equity interests (on a fully diluted basis) if not paid in full at maturity or upon the occurrence of certain events of default;[14]

- a cash payment (the "<u>Restructuring Cash Payment</u>") in an amount equal to the balance of $75 million held in the Payment Trust remaining after the making of the Consent Payments; and

- a cash restructuring fee to be determined as described in the Solicitation Statement (the "<u>Restructuring Fee</u>" and, together with the New Notes and the Restructuring Cash Payment, the "<u>Restructuring Consideration</u>").[15]

(<u>See</u> Nov. 1 Sol. Stmt. at 23 and Nov. 12 Sol. Stmt. Supp. at 7.)  In addition, on the Issue Date,

Vitro SAB's obligations under the New 2019 Notes, including any repurchase obligation

resulting from a Change of Control and other mandatory prepayment provisions thereunder will

be unconditionally guaranteed (the "<u>New Guarantees</u>"), jointly and severally, on an unsecured

basis, by Vitro SAB's direct and indirect subsidiaries that are currently guarantors of the Old

Notes (each, a "<u>New Guarantor</u>").[16]

---

[12]     Subject to certain qualifications described in the Solicitation Statement, the Issue Date is expected to occur on or about the date the *Convenio Concursal* is consummated.  (<u>See</u> Nov. 1 Sol. Stmt. at 6.)

[13]     These notes, which will be identical in all material respects, will consist of new notes due in 2019 (the "<u>New 2019 Notes</u>") to be issued in exchange for the Old Notes, and new *Certificados Bursátiles* (the "<u>New Certificados Bursátiles</u>") to be issued in exchange for *Certificados Bursátiles*.

[14]     These obligations, which will be identical in all material respects, will consist of new mandatorily convertible debentures (the "<u>New MCDs</u>") to be issued in exchange for the Old Notes, and new *Obligaciones Convertibles en Acciones* (the "<u>New *Obligaciones Convertibles en Acciones*</u>" and, together with the New 2019 Notes, New *Certificados Bursátiles*, and New MCDs, the "<u>New Notes</u>") to be issued in exchange for *Certificados Bursátiles*.

[15]     Subject to the occurrence of the Issue Date, holders of the Restructured Debt will receive their *pro rata* share of the Restructuring Consideration (including the Restructuring Cash Payment and Restructuring Fee) regardless of whether or not they were Participating Creditors.  The holders of Intercompany Claims will not receive any Restructuring Consideration on account of such claims.  (<u>See</u> Nov. 1 Sol. Stmt. at 23.)

[16]     <u>See</u> Nov. 1 Sol. Stmt. at 218-219 (complete list of the New Guarantors).

32.     Accordingly, under the *Concurso* Plan, each holder will be entitled to receive, in exchange for every $1,000 principal amount of Old Notes:

- $561 principal amount of New 2019 Notes;

- $66 principal amount of New MCDs (not including the Issue Date Adjustment);

- a *pro rata* portion of the Restructuring Cash Payment; and

- a *pro rata* portion of the Restructuring Fee.

(See Nov. 1 Sol. Stmt. at 23.)  Vitro SAB believes that the issuance of the New 2019 Notes and New MCDs alone represent a 55.2% net present value nominal recovery to the holders of the Old Notes on the face amount of their claims, representing a significant premium relative to the recovery they could potentially achieve through litigation or the average market price of the Old Notes for the twelve month period immediately preceding the launch of the Offers.  (See Nov. 1 Sol. Stmt. at 29-30.)  Moreover, Vitro SAB believes that the holders of the Old Notes who participated in the Exchange Offer and Consent Solicitation stand to receive a greater recovery of between 68% to 73% of the face amount of their claims.[17]

33.     In exchange for their providing the Restructuring Consideration and the New Guarantees, under the terms of the *Concurso* Plan, all obligations of Vitro SAB and its subsidiaries with respect to the Restructured Debt (including all accrued interest and all guarantee obligations of the Old Guarantors) will be cancelled regardless of whether or not any particular holder of the Restructured Debt votes to accept the *Concurso* Plan.  (See Nov. 1 Sol. Stmt. at 23.)

---

[17]     See November 1, 2010 Release attached hereto as Exhibit H (the "Nov. 1 Release").

**F.     Launch of Offers**

34.     On November 1, 2010, Vitro SAB launched the Offers, publicly disclosing its intention to commence the Voluntary Mexican Proceeding at the conclusion thereof. (See Nov. 1 Release).  From the outset, the Steering Committee has opposed the Offers and the *Concurso* Plan.  In fact, ***six days prior*** to the launch of the Offers – unquestionably seeking to interfere with them and, Vitro SAB believes, in violation of the applicable confidentiality agreements between the parties – the Steering Committee issued a press release urging the holders of the Old Notes not to participate in the proposed restructuring and denouncing the yet-to-be-publicly-disclosed terms of the *Concurso* Plan as allegedly providing an "unacceptably poor economic outcome" for the holders of the Old Notes.[18]  Thereafter, during the pendency of the Offers, several members of the Steering Committee commenced various legal proceedings in multiple jurisdictions against Vitro SAB and substantially all of the Old Guarantors.

> **i.     Commencement of Involuntary Chapter 11 Cases
> Against Vitro SAB's U.S. Subsidiaries**

35.     On November 17, 2010, involuntary cases (the "U.S. Involuntary Cases") under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Texas Bankruptcy Court") were commenced by four members of the Steering Committee (the "U.S. Petitioning Creditors")[19] – together holding a mere 6% of the Restructured Debt[20] – against fifteen of Vitro SAB's U.S. subsidiaries which are Old Guarantors

---

[18]     See October 26, 2010 Release ("Ad Hoc Committee of Noteholders Reject Vitro's Initial Consent Solicitation"), attached hereto as Exhibit I.

[19]     The U.S. Petitioning Creditors are:  (i) Knighthead Master Fund, L.P., (ii) Brookville Horizons Fund, L.P., (iii) Davidson Kempner Distressed Opportunities Fund L.P., and (iv) Lord Abbett Bond-Debenture Fund, Inc.

[20]     As represented in each involuntary petition, the U.S. Petitioning Creditors hold, in the aggregate, approximately $75 million in face amount of the $1.216 billion of the Old Notes.  (See, e.g., Involuntary Petition against Vitro Asset Corp., attached hereto as Exhibit J.)  Separately, counsel to the Steering Committee (which also serves as counsel to the U.S. Petitioning Creditors) filed a statement with the Texas Bankruptcy Court indicating that, as of November 29, 2010,  the members of the Steering Committee

(the "U.S. Alleged Debtors").[21]  (See Form 20-F at 5.)  Except as described below, the U.S.

Involuntary Cases are being jointly administered before The Honorable Russell F. Nelms under

Case No. 10-47470.[22]

36.     Less than 24 hours after filing the involuntary petitions, the U.S. Petitioning

Creditors filed an emergency motion pursuant to section 303(f) of the Bankruptcy Code seeking

restrictions on the U.S. Alleged Debtors' ability to enter into transactions with their non-U.S.

affiliates or participate in Vitro SAB's yet-to-be-commenced reorganization proceeding in

Mexico.  (See Form 20-F at 5.)  However, on November 24, 2010, the Texas Bankruptcy Court

denied the requested restrictions in their entirety, finding, among other things, that the U.S.

Petitioning Creditors had failed to demonstrate that any harm would result from the Alleged U.S.

Debtors' participation in the Offers or the *Concurso* Plan, and that the U.S. Petitioning Creditors'

unsubstantiated allegations and expressed distrust of Mexican law failed to justify the requested

relief.  (See Transcript of November 24, 2010 Bench Ruling at 11:13-16, 7:20-23, attached

hereto as Exhibit L.)

37.     Thereafter, the U.S. Alleged Debtors continued to operate their businesses in the

ordinary course, and were authorized by the Texas Bankruptcy Court to continue (i) utilizing an

---

(including the four U.S. Petitioning Creditors) or their affiliates "collectively are the advisor to or beneficial owner of, or the holder or manager of, various accounts with investment authority, contractual authority or voting authority for" approximately $673 million of the Old Notes.  (See Verified Statement of White & Case LLP, attached hereto as Exhibit K.)  In the nearly five months since the U.S. Involuntary Proceedings were commenced, however, none of the other members of the Steering Committee (nor, for that matter, any other holder of the Old Notes or trustee under any of the Indentures) has sought to join in the involuntary petitions pursuant to section 303(c) of the Bankruptcy Code and made the required disclosures pursuant to Bankruptcy Rule 1003 to become a petitioning creditor in the U.S. Involuntary Cases.

[21]     The U.S. Alleged Debtors are:  Vitro Asset Corp., Vitro Chemicals, Fibers & Mining, LLC ("Chemicals"), Vitro America, LLC ("Vitro America"), Troper Services, Inc., Super Sky Products, Inc. ("Super Sky Products"), Super Sky International, Inc. ("Super Sky International"), VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company, Crisa Corporation, VVP Finance Corporation ("VVP Finance"), VVP Auto Glass, Inc. ("Auto Glass"), V-MX Holdings, LLC, and Vitro Packaging, LLC ("Packaging").

[22]     The Texas Bankruptcy Court has advised that, due to the illness of Judge Nelms, the U.S. Involuntary Cases will be reassigned.

existing working capital facility with their secured lender, Bank of America, and (ii) incurring indebtedness from Vitro SAB and certain of its Mexican subsidiaries on an unsecured basis consistent with their prepetition practices.  (See Form 20-F at 5.)  On December 9, 2010, the U.S. Alleged Debtors filed an answer to the involuntary petitions, denying most allegations made therein and asserting certain affirmative defense, including that the claims of the U.S. Petitioning Creditors are contingent as to liability and subject to a *bona fide* dispute as to liability or amount, and that the U.S. Alleged Debtors are generally paying their debts as they become due. (See Form 20-F at 5.)  On March 31, 2011 and April 1, 2011, a trial was held on whether orders for relief should be entered against the U.S. Alleged Debtors, after which the Texas Bankruptcy Court took the matter under advisement.

38.     By the time of the trial, the negative impact on the business operations of certain of the U.S. Alleged Debtors caused by the commencement of the U.S. Involuntary Cases and their pendency for more than four months had become severe.  On April 6, 2011, Vitro America, Super Sky International, Super Sky Products, and VVP Finance (together, the "U.S. Debtors"), moved for entry of orders for relief, and the Texas Bankruptcy Court entered such orders on that same date.  Thereafter, the U.S. Debtors filed pleadings requesting authority to sell substantially all of their assets pursuant to section 363 of the Bankruptcy Code, and have indicated that certain additional non-operating U.S. Alleged Debtors may consent to orders for relief in connection therewith.  The remaining U.S. Alleged Debtors continued to oppose entry of orders for relief against them.

39.     On April 11, 2011, the Texas Bankruptcy Court issued an order, attached hereto as Exhibit M (the "Denial Order"), denying entry of orders for relief against Chemicals, Packaging and Auto Glass, the three remaining operating entities among the U.S. Alleged

Debtors (the "Operating U.S. Alleged Debtors").  In the Denial Order, the Texas Bankruptcy

Court found that the Operating U.S. Alleged Debtors are generally paying their debts as they

become due, although it did not finally determine whether the claims of the U.S. Petitioning

Creditors are contingent as to liability or subject to a *bona fide* dispute as to liability or amount.

(See Denial Order at 2-4.)  As of the date hereof, the petitions for orders of relief against the

eight remaining U.S. Alleged Debtors (the "Remaining U.S. Alleged Debtors") remain under

advisement.  (See Denial Order at 4.)

### ii. Commencement of Litigation in New York State Court Against Vitro SAB's and 49 of its non-U.S. Subsidiaries

40.     On December 2, 2010 and December 9, 2010, respectively, two members of the

Steering Committee (the "NYS Plaintiffs") commenced substantially identical law suits (the

"NYS Actions") in the Supreme Court of the State of New York (the "New York State Court")

against Vitro SAB and 49 of its subsidiaries in their capacities as Old Guarantors (together, the

"NYS Defendants") for breach of contract and payment of accelerated principal and accrued

interest with respect to their beneficial holdings of Old Notes.[23]   In each case, the respective

NYS Plaintiff obtained an *ex parte* order of attachment (together, the "Attachment Orders") with

respect to all property of any NYS Defendant located in the State of New York.  (See Form 20-F

at 6.)

---

[23]     See Verified Complaint in Index No. 652146/2010 (attached hereto as Exhibit N, the "Aurelius Complaint") of ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius Convergence Master, Ltd. (collectively, "Aurelius"), three funds managed or controlled by Aurelius Capital Management, LP., and Verified Complaint in Index No. 652223/2010 (attached hereto as Exhibit O, the "Elliott Complaint") of Elliott International L.P. and The Liverpool Limited Partnership (collectively, "Elliott"), two funds managed or controlled by Elliott Management Corp.  Aurelius alleges that it holds, in the aggregate, more than $206 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $257 million for unpaid principal and accrued interest.  (See Aurelius Complaint ¶ 1.)  Elliott alleges that it holds, in the aggregate, more than $85 million in face amount of Old Notes, and seeks damages in the aggregate amount of more than $106 million for unpaid principal and accrued interest.  (See Elliott Complaint ¶ 1.)  Both Aurelius Capital Management, LP. and Elliott Management Corp. are members of the Steering Committee, although neither is a U.S. Petitioning Creditor.

41.     The NYS Actions and the Attachment Orders have caused significant disruptions to Vitro's businesses and reorganization efforts (as, Vitro SAB believes, was the NYS Plaintiffs' intention).  Specifically, shortly after they were obtained, the Attachment Orders were served by the NYS Plaintiffs on D.F. King & Co., Inc. ("D.F. King"), the Depository for the Tender Offer and the Information and Exchange Agent for the Exchange Offer and Consent Solicitation, causing D.F. King to refuse to take certain steps necessary to effectuate the transfer of the Old Notes tendered in the Tender Offer or disburse the Consent Payment to those holders of the Old Notes that consented to the *Concurso* Plan.[24]  (See Form 20-F at 6.)  Additionally, the NYS Plaintiffs served copies of the Attachment Orders on certain of Vitro's customers.  In response, some of these customers suspended payments on account of goods and services being provided by the NYS Defendants – including payments on account of receivables previously assigned by certain NYS Defendants to a trust[25] – pending an order by the New York State Court vacating the Attachment Orders or otherwise clarifying that such payments were not subject thereto. (See Form 20-F at 6.)

42.     On February 8, 2011, Justice Kornreich of the New York State Court heard argument on cross-motions by the NYS Plaintiffs to confirm and NYS Defendants to vacate the Attachment Orders, as well as an order to show cause by Invex seeking entry of an order clarifying that payments due to the Flat Glass Payment Trust from customers on account of receivables generated by Automotríz were not subject to the Attachment Orders.  (See Form 20-

---

[24]     Ultimately – after nearly two weeks of expedited litigation before the New York State Court and the New York Appellate Division – an order was entered clarifying that the Attachment Orders did not apply to the Old Notes tendered or exchanged as part of the Offers.  Subsequently, D.F. King took the requisite actions and the Offers were completed.  (See Form 20-F at 6.)

[25]     Several NYS Defendants, including Automotríz , established an independent trust, pursuant to a *contrato de fideicomiso* signed on August 3, 2005 in Mexico (the "Flat Glass Payment Trust"), to which they sold and assigned their trade receivables.  The trustee of the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division Fiduciaria Invex Grupo Financiero ("Invex").

F at 6.)  At the conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and entered an order on Invex's order to show cause (the "Partial *Vacatur* Order") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. (See Form 20-F at 6.)  Justice Kornreich briefly stayed the Partial *Vacatur* Order and the NYS Plaintiffs appealed.  (See Form 20-F at 6.)  On February 10, 2011, the New York Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial *Vacatur* Order became final.  (See Form 20-F at 6.)

43.     As of the date hereof, Justice Kornreich has not issued a further ruling confirming or denying the Attachment Orders and the NYS Actions remain pending.  On March 9, 2011 and March 18, 2011, respectively, the NYS Plaintiffs submitted substantially identical motions for partial summary judgment (the "Partial SJ Motions") on the portions of their respective claims relating only to unpaid interest.  On March 28, 2011, the NYS Defendants filed their consolidated opposition to the Partial SJ Motions and, on April 4, 2011, the NYS Plaintiffs submitted their replies in further support of the motions.  The New York State Court has scheduled oral argument on the Partial SJ Motions for May 3, 2011 at 10:30 a.m. (prevailing Eastern Time).

### iii.     Commencement of Involuntary Mexican Proceedings Against Vitro SAB and Certain of its Mexican Subsidiaries

44.     On December 10, 2010, certain members[26] of the Steering Committee filed an involuntary *concurso* petition in the District Court of Nuevo León against Vitro SAB and, beginning on December 15, 2010, also filed involuntary *concurso* petitions against certain of its Mexican subsidiaries.  (See Form 20-F at 7.)  The Mexican District Judge (as defined below)

---

[26]     The relevant members of the Steering Committee include U.S. Petitioning Creditors Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Knighthead Master Fund L.P., as well as Moneda, S.A. Administradora de Fondos de Inversión como Administradora del Fondo de Inversión and Moneda Deuda Latinoamericana Fondo de Inversión.

entered orders admitting the involuntary petitions for further proceedings (each, an "Involuntary Mexican Proceeding") against Vitro SAB and 17 of its Mexican subsidiaries (together, the "Mexican Alleged Debtors").[27]  (See Form 20-F at 7.)

45.     Under the Mexican Business Reorganization Act, before a *concurso mercantil* declaration can be issued on an involuntary *concurso* petition, a court-appointed "*visitador*" must examine the books and records of an alleged debtor and issue a report to the court as to whether it satisfies the eligibility requirements to be a debtor in a *concurso* proceeding.  (See Form 20-F at 7.)  This process is followed by a period of time reserved for parties to submit final allegations and in certain cases additional evidence, after which the court must issue a decision either declaring the debtor insolvent (in which case its *concurso* proceeding will go forward) or absolving the debtor (in which case its *concurso* proceeding will be dismissed).  (See Form 20-F at 7.)

46.     On or about March 9, 2011, Jose Luis Elizondo Cantu, the duly appointed *visitador* in the Involuntary Mexican Proceeding, issued his report, an English translation of which is attached hereto as Exhibit P (the "*Visitador* Report").  In his *Visitador* Report, the *visitador* concluded, based on his review of Vitro SAB's financial books and records as of the date the involuntary *concurso* petition was filed, that Vitro SAB did **not** meet the requirements set forth in the Mexican Business Reorganization Act for commencement of the Involuntary Mexican Proceeding.  As of the date hereof, the period for parties to submit final allegations and

---

[27]     The Mexican Alleged Debtors are:  Vidrio y Cristal, Viméxico, Automotríz, Cristales Inastillables de México, S.A. de C.V. ("Cristales Inastillables"), Vidrio Plano de México, S.A. de C.V. ("Vidrio Plano"), Vitro Flotado Cubiertas, S.A. de C.V. ("Vitro Flotado"), Vitrocar, S.A. de C.V. ("Vitrocar"), Distribuidor Vidriero LAN, S.A. de C.V. ("Distribuidor Vidriero"), Comali, Industria del Álcali, S.A. de C.V. ("Alcali"), FIC Regiomontano, S.A. de C.V. ("FIC"), Vidriera Monterrey, S.A. de C.V. ("Vidriera Monterrey"), Fabricación de Máquinas, S.A. de C.V. ("Fabricación de Máquinas"), Vidriera Guadalajara, S.A. de C.V. ("Vidriera Guadalajara"), Vidriera los Reyes, S.A. de C.V. ("Vidriera los Reyes"), Vena, and Servicios Integrales de Acabados, S.A. de C.V. ("Servicios Integrales").  (See Form 20-F at 7.)

additional evidence has ended, and all such submissions as well as the *Visitador* Report are under consideration by the Mexican District Judge. As a consequence of the issuance of the *Concurso* Declaration (as defined below) in the Voluntary Mexican Proceeding, Vitro SAB has requested the Mexican District Judge to dismiss the Involuntary Mexican Proceeding against it pursuant to section 373-I of the Mexican Federal Code for Civil Procedure. If the Mexican District Judge refuses this request, Vitro SAB anticipates a decision on whether an involuntary *concurso mercantil* declaration against it will be denied in accordance with the *Visitador* Report would be issued within a matter of days.

47.     As of the date hereof, the *visitador* appointed in the Involuntary Mexican Proceedings pending against the Mexican Alleged Debtors other than Vitro SAB has submitted his reports, finding that the requirements set forth in the Mexican Business Reorganization Act for declaration of a *concurso* were met with respect to eight of the seventeen Vitro SAB subsidiaries who are Mexican Alleged Debtors,[28] but were not met with respect to the other nine.[29] The period for parties to submit final allegations and additional evidence in all of these proceedings is ongoing. Vitro SAB anticipates that decisions on whether to deny involuntary *concurso mercantil* declarations against its subsidiary Mexican Alleged Debtors will not be issued for several weeks.

## G.     Results of Offers

48.     As noted above, on November 1, 2010, Vitro SAB launched the Tender Offer and Exchange Offer and Consent Solicitation.[30] Vitro SAB believes that participation in the Offers

---

[28]     Viméxico, Vidrio y Cristal, Comali, Automotríz, Vitrocar, Distribuidor Vidriero, Vitro Flotado, and Fabricación de Máquinas.

[29]     Vena, FIC, Cristales Inastillables, Vidriera Monterrey, Vidriera los Reyes, Vidriera Guadalajara, Álcali, Servicios Integrales, and Vidrio Plano.

[30]     Concurrently, Vitro SAB also sought consents to the *Concurso* Plan from the other holders of Restructured Debt. (See, e.g., Nov. 12 Sol. Stmt. Supp. at 7 (describing solicitation of consents from holders of

by the holders of Restructured Debt was negatively impacted by actions by members of the Steering Committee and other holders of Old Notes during the pendency of the Offers.  As of the date hereof, both Offers have expired in accordance with their respective terms, and payment of the Tender Offer Consideration and the Consent Payments has since been made.  (See Form 20-F at 5.)  Old Notes in the aggregate principal amount of approximately $44 million were tendered pursuant to the Tender Offer and Restructured Debt in the aggregate principal amount of $520 million was tendered in the Exchange Offer and Consent Solicitation.  (See Form 20-F at 5.)

### VOLUNTARY MEXICAN PROCEEDING

49.     On December 13, 2010, Vitro SAB commenced the Voluntary Mexican Proceeding by filing with the District Court of Nuevo León a petition requesting a *concurso mercantil* declaration under the Mexican Business Reorganization Act (the "Voluntary *Concurso* Petition," an English translation of which is attached hereto as Exhibit Q) together with its prepackaged *Concurso* Plan which was executed by Vitro SAB and creditors representing more than 40% in amount of its outstanding liabilities (including Intercompany Claims, as permitted under the Mexican Business Reorganization Act).[31]  The *Concurso* Plan is supported by more than 650 beneficial holders of the Old Notes and of other Restructured Debt.[32]

50.     The Voluntary *Concurso* Petition was assigned to Judge Francisco Eduardo Flores Sánchez (the "Mexican District Judge") of the Fourth Federal District Court in Nuevo León in Monterrey, Mexico.  On December 27, 2010, the Mexican District Judge issued a ruling admitting the Voluntary Mexican Petition for further proceedings, having determined that it

---

*Certificados Bursátiles*).)

[31]     Pursuant to article 339 of the Mexican Business Reorganization Act, commencement of a *concurso* proceeding with a pre-approved plan of reorganization requires the consent or approval of the plan from creditors representing at least 40% of all of a debtor's outstanding liabilities.  (See Nov. 1 Sol. Stmt. at 75.)

[32]     See April 11, 2011 Release attached hereto as Exhibit R.

complied with the requirements for *concurso mercantil* set forth in Article 339 of the Mexican Business Reorganization Act. However, on January 7, 2011, the Mexican District Judge issued a resolution denying Vitro SAB's request for a *concurso mercantil* declaration on the basis that Intercompany Claims should not be considered and, therefore, the Voluntary *Concurso* Petition and *Concurso* Plan did not meet the requirements for a prepackaged proceeding under the Mexican Business Reorganization Act.

51.    On January 28, 2011, Vitro SAB, its subsidiaries and the holders of the Old Notes and *Certificados Bursátiles* that support the *Concurso* Plan appealed this resolution to the Magistrate for the Federal Unitary Second Appeals Court (*Tribunal Unitario*) for the Fourth Circuit in Monterrey (the "Mexican Appellate Court"). The Mexican Appellate Court agreed to review the merits of the appeal and requested an opinion regarding consideration of intercompany liabilities under the Mexican Business Reorganization Act from the Federal Institute of Business Reorganization Specialists (the *Instituto Federal de Especialistas de Concursos Mercantiles,* or "IFECOM"), a branch of the Mexican federal judiciary. By letter dated March 23, 2011, IFECOM responded to the Mexican Appellate Court, setting forth its non-binding conclusion that the Mexican Business Reorganization Act does ***not*** preclude the consideration of intercompany obligations for purposes of an insolvency proceeding, and listing several prior *concurso* proceedings in which intercompany obligations had, in fact, been considered.[33]

52.    On April 8, 2011, the Mexican Appellate Court issued its decision, reversing the January 7, 2011 resolution of the Mexican Bankruptcy Judge and holding that Vitro SAB's Voluntary *Concurso* Petition and *Concurso* Plan satisfied the requirements for a prepackaged

---

[33]    See Official English translation of letter dated March 23, 2011 from the General Director of IFECOM to the Mexican Appellate Court, attached hereto as Exhibit S (the "IFECOM Letter").

*concurso* proceeding under the Mexican Business Reorganization Act and, therefore, issued a declaration of *concurso mercantil* (the "*Concurso* Declaration") in the Voluntary Mexican Proceeding.

## FILING AND SUBSEQUENT WITHDRAWAL OF PRIOR CHAPTER 15 PETITION

53.     On December 14, 2010, I previously filed with this Court a form chapter 15 petition and verified petition on behalf of Vitro SAB (the "Prior Chapter 15 Petition").  See In re Vitro, S.A.B. de C.V., No. 10-16619 (SHL) (Bankr. S.D.N.Y. Dec. 14, 2010) (the "Prior Chapter 15 Case").  In conjunction with the filing thereof, I also requested a hearing on recognition of the Voluntary Mexican Proceeding as a foreign main proceeding and, as noted in the Prior Chapter 15 Petition, I intended to request certain injunctive relief protecting Vitro's ability to reorganize through the Voluntary Mexican Proceeding from the irreparable harm I believed would otherwise be caused by pending and future litigation by recalcitrant holders of the Old Notes. (See Prior Chapter 15 Petition at 22, 25.)  Just hours after the Prior Chapter 15 Petition was filed, however, the U.S. Petitioning Creditors filed a motion (the "Venue Transfer Motion") in the U.S. Involuntary Cases asking the Texas Bankruptcy Court to transfer to itself the venue of the Prior Chapter 15 Case.  I was advised by counsel that the filing of the Venue Transfer Motion had the automatic effect under applicable rules of staying all proceedings in the Prior Chapter 15 Case until such motion was resolved.  (See Form 20-F at 7.)

54.     Ultimately, no hearing on recognition was ever held in the Prior Chapter 15 Case, nor was any request for injunctive relief filed.  Following the January 7, 2011 denial by the Mexican District Court of Vitro SAB's request for a *concurso mercantil* declaration in the Voluntary Mexican Proceeding, I reached an agreement with the Steering Committee to withdraw the Prior Chapter 15 Petition without prejudice and close the Prior Chapter 15 Case,

which this Court so ordered on January 26, 2011 (attached hereto as <u>Exhibit T</u>, the "<u>Withdrawal Order</u>").

**FILING OF CHAPTER 15 PETITION AND BASIS FOR**
**RECOGNITION OF VOLUNTARY MEXICAN PROCEEDING**

55.     On the date hereof, I commenced this case by filing the Chapter 15 Petition with this Court. For the reasons set forth below, I believe that the Voluntary Mexican Proceeding should be recognized by this Court as a foreign main proceeding, and that Vitro SAB is entitled to the rights and protections incident to such recognition pursuant to chapter 15 of the Bankruptcy Code.

**A.     <u>Voluntary Mexican Proceeding is Foreign Main Proceeding</u>**

56.     It is my understanding that, pursuant to section 101 of the Bankruptcy Code, a "foreign proceeding" is defined as a "collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

57.     Counsel has advised me that the Voluntary Mexican Proceeding is a judicial proceeding relating to insolvency or the adjustment of debt pursuant to which the assets and affairs of Vitro SAB are subject to the control and supervision of the District Court of Nuevo León for the purpose of reorganization or liquidation.[34] Accordingly, I believe that the Voluntary Mexican Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

---

[34]     Concurrently with the filing of the Chapter 15 Petition and this Declaration, a Declaration in support of the Chapter 15 Petition is being filed by Vitro SAB's Mexican Counsel setting forth a description of the applicable provisions of the Mexican Business Reorganization Act, as they apply to the Mexican Proceeding, and comparing them to similar provisions of the Bankruptcy Code.

58. Counsel has further advised me that, pursuant to section 1502 of the Bankruptcy Code, a "foreign main proceeding" is "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4).

59. In my opinion, Vitro SAB has its center of main interests in Mexico. As set forth above, Vitro SAB is organized under the laws of Mexico. In operating its business, Vitro SAB maintains primary and substantial connections to Mexico as follows:

- its principal place of business and mailing address is located in Av. Ricardo Margain Zozaya # 400, Col. Valle del Campestre, San Pedro Garza García, N.L. México, 66265;

- it is managed and controlled from its principal place of business;

- 12 of the 13 members of its board of directors (the "<u>Board of Directors</u>") reside in Mexico; and

- all administrative functions, including accounting, financial reporting, budgeting and cash management, are conducted in Nuevo León, Mexico.

60. Accordingly, I believe the Voluntary Mexican Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

**B.    <u>I am Authorized Foreign Representative of Vitro SAB</u>**

61. Counsel has advised me that, pursuant to section 101 of the Bankruptcy Code, "foreign representative" is a "person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24).

62. Contemporaneously with the commencement of the Voluntary Mexican Proceeding, pursuant to a resolution of the Board of Directors, Vitro SAB appointed me as its representative for purposes of commencing ancillary proceedings in foreign jurisdictions. Since the commencement of the Voluntary Mexican Proceeding, Vitro SAB has remained in

possession and continued to manage its businesses and properties, and neither the *Concurso* Declaration nor any other order of the Mexican District Court has appointed a foreign representative or otherwise precluded Vitro SAB from doing so.

63.     Accordingly, I believe that I am duly authorized to act as Vitro SAB's "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

**C.      Chapter 15 Petition Contains Required Disclosures**

64.     Counsel has advised me that, pursuant to sections 1515 of the Bankruptcy Code, a petition for recognition of a foreign proceeding shall be accompanied by "evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative" and "a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative." 11 U.S.C. § 1515(b)(3) and (c).

65.     In accordance with section 1515(b)(3) of the Bankruptcy Code, I have attached hereto (i) as Exhibit U, a certified copy of the *Concurso* Declaration, judicially declaring that Vitro SAB meets the requirements for being the subject of a proceeding under the Mexican Business Reorganization Act and triggering the commencement of the "*conciliation*" stage therein,[35] and (ii) as Exhibit V, a certified copy of an English translation of the Board resolution appointing me as the Foreign Representative of Vitro SAB.

66.     In accordance with section 1515(c) of the Bankruptcy Code, I hereby declare that other than the Voluntary Mexican Proceeding, I am aware of two additional foreign proceedings with respect to Vitro SAB: (i) the Involuntary Mexican Proceeding discussed above in paragraphs 44 and 46, and (ii) an involuntary proceeding commenced by Fintech in the District Court of Nuevo León (the "Fintech Involuntary Proceeding"), in respect of which Vitro SAB

---

[35]     An English translation of the *Concurso* Declaration is being prepared and will be provided to the Court as soon as possible.

was served with an involuntary *concurso* petition on April 14, 2011. As of the date hereof, I am not aware of a declaration of *concurso mercantil* having been issued in either of these proceedings.

67. Counsel has further advised me that, pursuant to Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"):

> In addition to the documents required under § 1515 of the [Bankruptcy] Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the [Bankruptcy] Code.

Fed. R. Bankr. P. 1007(a)(4).

68. In accordance with Bankruptcy Rule 1007(a)(4)(A), I filed a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1 with the Form Petition.

69. In accordance with Bankruptcy Rule 1007(a)(4)(B), I also submit the following:

**i.    Administrators of Foreign Proceedings of Vitro SAB**

As noted above, I am the duly-appointed representative of Vitro SAB for the Voluntary Mexican Proceeding for purposes of commencing ancillary proceedings in foreign jurisdictions. My full name and business address are as follows:

> Alejandro Francisco Sánchez-Mujica
> Av. Ricardo Margáin 400
> Col. Valle del Campestre
> San Pedro Garza García
> N.L. México, 66265

I am not aware of any other persons or bodies duly-appointed in the Voluntary Mexican Proceeding, Involuntary Mexican Proceeding or the Fintech Involuntary Proceeding, or

otherwise authorized, to administer foreign proceedings on behalf of Vitro SAB. No later than five business days following my becoming aware of the appointment of any administrator in the foregoing proceedings, I will supplement this Declaration with the requisite disclosure of the names and addresses of any such administrator(s).

ii.     **Parties to Litigation in the United States in Which Vitro SAB is Party**

As noted above, Vitro SAB is currently party to litigation in the United States (i.e., the NYS Actions) with the following parties (i.e., the NYS Plaintiffs):

- ACP Master, Ltd.

- Aurelius Capital Master, Ltd.

- Aurelius Convergence Master, Ltd.

- Elliott International L.P.

- The Liverpool Limited Partnership

iii.    **Entities Against Whom Provisional Relief is Sought
Pursuant to Section 1519 of the Bankruptcy Code**

Vitro SAB intends to commence an adversary proceeding seeking a temporary restraining order and preliminary injunctive relief against the indenture trustees for the Old Notes and Does 1 through 1000, who, upon information and belief, are holders of the Old Notes and other holders of the Restructured Debt. The U.S. Involuntary Cases, the NYS Actions, and the Involuntary Mexican Proceedings have caused significant disruption to Vitro in the weeks leading up to and the months following the commencement of the Voluntary Mexican Proceeding, requiring Vitro SAB to expend significant resources on litigation in the United States instead of concentrating all efforts on its Mexican restructuring process.[36] As noted

---

[36]    In particular, certain customers of Vitro SAB's Mexican subsidiaries have for several months withheld, and, upon information and belief, will continue to withhold, payments owed to such subsidiaries as a result of being served with the Attachment Orders by the NYS Plaintiffs.

above, once Vitro SAB's prepackaged *Concurso* Plan is effectuated pursuant to the Voluntary

Mexican Proceeding, the Old Notes (including the Old Guarantees) – which serve as the basis for

the various legal proceedings prosecuted by the members of the Steering Committee – will be

canceled and replaced with new, restructured obligations.  Notwithstanding the issuance of the

*Concurso* Declaration by the Mexican District Court, it is my understanding and belief that,

based on their prior actions and public statements, members of the Steering Committee and

potentially other holders of the Old Notes may continue to subject Vitro SAB and the Old

Guarantors to precipitous legal actions, including the attempted attachment of assets of the Old

Guarantors located in the United States.  Accordingly, in conjunction with the filing of the

Chapter 15 Petition, Vitro SAB intends, no sooner than three business days following the date

hereof,[37] to seek a temporary restraining order ("TRO") protecting itself and the Old Guarantors

(other than the U.S. Debtors and the Remaining U.S. Alleged Debtors)[38] from further precipitous

actions by the holders of Restructured Debt.  It is my belief that, absent entry of the TRO, such

actions, if continued, threaten irreparable harm to Vitro SAB's ability to reorganize under the

*Concurso* Plan.

     70.     Accordingly, I submit that this Declaration satisfies the requirements of section

1515 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007(a)(4).

---

[37]    Pursuant to the Withdrawal Order entered in the Prior Chapter 15 Case, Vitro SAB agreed, so long as the U.S. Involuntary Cases remained pending in the Texas Bankruptcy Court on the date the Chapter 15 Petition is filed, to "comply with the stay that would have been imposed by [Bankruptcy] Rule 1014(b) . . . for three business days following the filing of the Subsequent Chapter 15 Petition regardless of whether a motion to transfer venue pursuant to Bankruptcy Rule 1014(b) will have been filed."  (See Withdrawal Order at 2.)

[38]    The U.S. Debtors and the Remaining U.S. Alleged Debtors (so long as the U.S. Involuntary Cases remain pending against them) are protected by the automatic stay.  See 11 U.S.C. 362.  Vitro SAB reserves its right to seek an extension of the relief provided by the TRO to any or all of these entities in the event that the automatic stay ceases to apply to any of them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on this 14th day of April, 2011
in Monterrey, Mexico

/s/ Alejandro Francisco Sánchez-Mujica
Alejandro Francisco Sánchez-Mujica

Foreign Representative for the Debtor

## Exhibit A

# FORM T-3

## FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
## UNDER THE TRUST INDENTURE ACT OF 1939

# Vitro, S.A.B. de C.V.

**(Name of Applicant)**

**Ave. Ricardo Margáin 400**
**Col. Valle del Campestre**
**San Pedro Garza García, Nuevo León, 66265**
**United Mexican States ("Mexico")**
**(Address of Principal Executive Offices)**

**Securities to be Issued Under the Indentures to be Qualified**

| Title of Class | Amount |
|---|---|
| 8.0% Notes due 2019 | $850 million in aggregate principal amount |
| Mandatory Convertible Debentures | $100.0 million in aggregate principal amount, subject to adjustment |

Approximate date of proposed public offering:
**As promptly as practicable after the date of this Application for Qualification**

**Name and Address of Agent for Service:**

**Puglisi & Associates**
**850 Library Avenue, Suite 204**
**Newark, Delaware 19711**
**(302) 738-6680**

**With copies to:**

| | |
|---|---|
| **Joy K. Gallup, Esq.** | **Alejandro Sanchez Mujica** |
| **Milbank, Tweed, Hadley & McCloy LLP** | **General Counsel** |
| **1 Chase Manhattan Plaza** | **Ave. Ricardo Margain Zozaya #400** |
| **New York, NY 10005** | **Col. Valle del Campestre** |
| **(212) 530-5000** | **San Pedro Garza Garcia** |
| | **Nuevo Leon, 66265 Mexico** |
| | **+52 (81) 8863-1200** |

**THE GUARANTORS LISTED ON SCHEDULE A HERETO**

**The Applicant hereby amends this application for qualification on such date or dates as may be necessary to delay its effectiveness until (i) the 20th day after the filing of a further amendment which specifically states that it shall supersede this amendment, or (ii) such date as the SEC, acting pursuant to Section 307(c) of the Act, may determine upon the written request of the Applicant.**

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Viméxico, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Envases Nortéamerica, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| V-MX Holdings, LLC (formerly Crisa Holding Co.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Monterrey, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Compañía Vidriera, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Fabricación de Máquinas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Integrales de Acabados, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidrio Plano, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Industria del Álcali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Vidrio Lux, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Bolivian |
| Vitro Packaging, LLC | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vidrio Plano de Mexicali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Europa, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Swiss |
| Vitro Asset Corp. (formerly American Asset Holdings Corp.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Texas, USA |
| Vitro Venezuela, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Venezuelan |
| Binswanger Glass Company (formerly Troper, Inc.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Panamá, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Panamanian |
| Troper Services, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Ecuatorian |
| Vitemco Ecuador, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Amsilco Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| B.B.O. Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Crisa Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Automotriz, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Flex, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Flotado Cubiertas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Distribuidor Vidriero LAN, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Vitrocar, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Cristales Inastillables de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vidrio Plano de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| VVP Holdings, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| VVP Auto Glass, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro America, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Super Sky Products, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Super Sky International, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| VVP Finance Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Delaware, USA |
| Vitro Colombia, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Colombian |
| VVP Europa Holdings, B.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | The Netherlands |
| Vitro do Brasil Indústria e Comércio, Ltda. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Brazilian |
| Vitro Chemicals, Fibers and Mining, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Texas, USA |
| Vitro Global, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Swiss |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vitro Cosmos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |

| Name | Address | Jurisdiction of Incorporation |
|---|---|---|
| Servicios Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Inmobiliaria Vitalc, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Viqueretanos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| VAU, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Mexican |
| Vitro Car Colombia, S.A.S | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Colombian |
| Vitro Cristalglass, S.L. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico | Spanish |

The name and address, including zip code, telephone number and area code, of the above listed registrants' agent for service of process is Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711, (302) 738-6680.

# GENERAL

## 1. GENERAL INFORMATION.

(a) *Form of organization*: the issuer of the Notes (as defined below) is Vitro, S.A.B. de C.V. (the "Company" or "Vitro"), which is a corporation with variable capital (*sociedad anónima bursátil de capital variable*).

(b) *State or other sovereign power under which organized*: the Company is organized under the laws of Mexico.

## 2. SECURITIES ACT EXEMPTION APPLICABLE.

The Company (1) is proposing an exchange offer and soliciting consents ("Exchange Offer and Consent Solicitation") to an in-court restructuring through a plan or agreement ("*Concurso* Plan") under the *Ley de Concursos Mercantiles*, or bankruptcy law, of Mexico, and (2) together with Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro, are offering to purchase for cash (the "Tender Offer" and together with the Exchange Offer and Consent Solicitation, the "Tender Offer and Exchange Offer and Consent Solicitation") the Old Notes (as defined below). Holders may tender their Old Notes in either the Tender Offer or the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited, holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to tender them into the Exchange Offer and Consent Solicitation instead.

*The Exchange Offer and Consent Solicitation*

Pursuant to the *Concurso* Plan, the Company would exchange all of its outstanding 8.625% Senior Notes due 2012, referred to as the "2012 Notes," 11.75% Senior Notes due 2013, referred to as the "2013 Notes," and 9.125% Senior Notes due 2017, referred to as the "2017 Notes" (together with the 2012 Notes and 2013 Notes, the "Old Notes") and the DFI Claims and Other Debt (each as defined below) for the following consideration on a pro rata basis:

- $850 million in aggregate principal amount of new notes (the "New 2019 Notes") issued at par value to the Restructured Debt;

- $100 million in aggregate principal amount (plus the Issue Date Adjustment as defined in the Tender Offer and Exchange Offer and Consent Solicitation) of newly issued mandatory convertible debentures (the "New MCDs" and, together with the 2019, the "New Notes"), which will mandatorily convert into 15.0% of the Company's equity if not paid in full at maturity;

- a cash payment of the amount remaining, out of $75 million deposited in a Mexican trust, after making a consent payment as described further in the Company's Tender Offer and Exchange Offer and Consent Solicitation Statement filed as Exhibit T3E.1 hereto, which will be paid to all holders of the Old Notes and all holders of claims relating to the Company's derivative financial instruments ("DFI Claims") and the other debt (the "Other Debt"), on a pro rata basis; and

- a restructuring fee, in cash, based on the issue date of the New Notes.

*The Tender Offer*

The Company and AIV offer to purchase for cash the maximum aggregate principal amount of Vitro's Old Notes that can be purchased for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price per $1,000 principal amount equal to the clearing price. The Company and AIV reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

The definitive terms and conditions of the Tender Offer and Exchange Offer and Consent Solicitation will be contained in the offer documents, which are filed as Exhibits T3E.1 through T3E.3 hereto and incorporated herein by reference.

The Company intends to make the Exchange Offer and Consent Solicitation in reliance on the exemption from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), afforded by Section 3(a)(9) thereof, based upon the following facts:

- The New Notes will be offered by the Company to its existing security holders exclusively and solely in exchange for its Old Notes, its DFI Claims and its Other Debt.

- No sales of securities of the same class as the New Notes have been or are to be made by the Company or by or through an underwriter at or about the same time as the Exchange Offer and Consent Solicitation for which the exemption is claimed.

- The Company has not paid or given, and will not pay or give, directly or indirectly, any commission or other remuneration to any broker, dealer, salesman, agent or other person for soliciting tenders in the Exchange Offer and Consent Solicitation. To the extent solicitations are undertaken by the Company's officers and employees, such officers and employees will not receive additional compensation for making such solicitations. The Company has engaged Rothschild, Inc. to act as its financial advisor in connection with restructuring its debt. The fees paid to Rothschild are not contingent on the success of this Exchange Offer and Consent Solicitation and the activities undertaken by Rothschild are consistent with the activities of other financial advisors as permitted by the SEC.

- The Company has not retained a dealer-manager in connection with the Exchange Offer and Consent Solicitation.

- No holder of Old Notes has made or will be requested to make any cash payment in connection with the Exchange Offer and Consent Solicitation other than the payment of any applicable withholding or other taxes in accordance with the terms of the Exchange Offer and Consent Solicitation.

## AFFILIATIONS

### 3. AFFILIATES.

For the purposes of this application only, the directors and executive officers of the Company named in response to Item 4 hereof and the principal owners of the Company's voting securities named in response to Item 5 hereof may be deemed affiliates of the Company by virtue of the positions held by such persons in relation to the Company.

The following is a list of all wholly owned or majority owned direct and indirect subsidiaries of the Company, all of which are considered affiliate companies, as of the date of this application. A diagram depicting the relationship of each affiliate to the Company is attached hereto as Exhibit T3H.

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Viméxico, S.A. de C.V. | Mexican | 91.8% |
| Vitro Envases Nortéamerica, S.A. de C.V. | Mexican | 100% |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Mexican | 100% |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Mexican | 100% |
| Vidriera Monterrey, S.A. de C.V. | Mexican | 100% |
| Vidriera los Reyes, S.A. de C.V. | Mexican | 100% |
| Vidriera Guadalajara, S.A. de C.V. | Mexican | 100% |
| Vidriera Querétaro, S.A. de C.V. | Mexican | 100% |
| Vidriera Toluca, S.A. de C.V. | Mexican | 100% |
| Compañía Vidriera, S.A. de C.V. | Mexican | 100% |
| Fabricación de Máquinas, S.A. de C.V. | Mexican | 100% |
| Servicios Integrales de Acabados, S.A. de C.V. | Mexican | 100% |

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Mexican | 100% |
| Industria del Álcali, S.A. de C.V. | Mexican | 100% |
| Vidrio Lux, S.A. | Bolivian | 100% |
| Vitro Packaging, LLC | Delaware, USA | 100% |
| Vitro Europa, Ltd. | Swiss | 100% |
| Vitro Asset Corp (formerly American Asset Holdings Corp.) | Texas, USA | 100% |
| V-MX Holdings, LLC (formerly Crisa Holding Co.) | Delaware, USA | 100% |
| Binswanger Glass Company (formerly Troper, Inc.) | Delaware, USA | 100% |
| Troper Services, Inc. | Delaware, USA | 100% |
| Amsilco Holdings, Inc. | Delaware, USA | 100% |
| B.B.O. Holdings, Inc. | Delaware, USA | 100% |
| Crisa Corporation | Delaware, USA | 100% |
| Vitro Automotriz, S.A. de C.V. | Mexican | 100% |
| Vitro Flex, S.A. de C.V. | Mexican | 100% |
| Vitro Vidrio y Cristal, S.A. de C.V. | Mexican | 100% |
| Vitro Flotado Cubiertas, S.A. de C.V. | Mexican | 100% |
| Distribuidor Vidriero LAN, S.A. de C.V. | Mexican | 100% |
| Vitrocar, S.A. de C.V. | Mexican | 100% |
| Cristales Inastillables de México, S.A. de C.V. | Mexican | 100% |
| Vidrio Plano de México, S.A. de C.V. | Mexican | 100% |
| VVP Holdings, LLC | Delaware, USA | 100% |
| VVP Auto Glass, Inc. | Delaware, USA | 100% |
| Vitro America, LLC | Delaware, USA | 100% |
| Super Sky Products, Inc. | Delaware, USA | 100% |
| Super Sky International, Inc. | Delaware, USA | 100% |
| VVP Finance Corporation | Delaware, USA | 100% |
| Vitro Colombia, S.A. | Colombian | 100% |
| VVP Europa Holdings, B.V. | Netherlands | 91.8% |
| Vitro do Brasil Indústria e Comércio, Ltda. | Brazilian | 100% |
| Vitro Chemicals, Fibers and Mining, LLC | Texas, USA | 100% |
| Vitro Global, Ltd. | Swiss | 100% |
| Vidrio Plano, S.A. de C.V. | Mexican | 100% |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Mexican | 100% |
| Vidrio Plano de Mexicali, S.A. de C.V. | Mexican | 100% |
| Vitro Venezuela, S.A. | Venezuelan | 100% |
| Vitro Panamá, S.A. | Panamanian | 100% |
| Vitemco Ecuador, S.A. | Ecuatorian | 100% |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Mexican | 100% |
| Servicios Vitro Cosmos, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Mexican | 100% |

| Company Name | Jurisdiction of Formation | Percentage |
|---|---|---|
| Servicios Vidriera Guadalajara, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Toluca, S.A. de C.V. | Mexican | 100% |
| Servicios Vidriera Querétaro, S.A. de C.V. | Mexican | 100% |
| VAU, S.A. de C.V. | Mexican | 100% |
| Inmobiliaria Vitalc, S.A. de C.V. | Mexican | 100% |
| Viqueretanos, S.A. de C.V. | Mexican | 100% |
| Productos de Valor Agregado en Cristal, S.A. de C.V. | Mexican | 55% |
| Grupo Sordo Noriega, S.A. de C.V. | Mexican | 55% |
| Productos de Valor Agregado en Cristal del Sureste, S.A. de C.V. | Mexican | 55% |
| Cristales Automotrices, S.A. de C.V. | Mexican | 51% |
| Cristales y Servicios, S.A. de C.V. | Mexican | 51% |
| VVP Funding Corporation | Delaware, USA | 100% |
| Vitro Car Colombia, S.A.S | Colombian | 100% |
| IP Vitro Vidrio y Cristal, Ltd. | Swiss | 82.5% |
| Vitro Cristalglass, S.L. | Spanish | 65.84% |
| Vitro Chaves-Indústria de Vidrio, S.A. | Portuguese | 60% |
| Aerovitro, S.A. de C.V. | Mexican | 100% |
| Administración de Inmuebles Vitro, S.A. de C.V. | Mexican | 100% |
| Vitro International Services Corporation | Delaware, USA | 100% |
| Trabajo de Administración y Servicios, A.C. | Mexican | 100% |
| Salud Corporativa, A.C. | Mexican | 100% |
| Formación Educativa, A.C. | Mexican | 100% |
| Clínica Vitro, A.C. | Mexican | 100% |
| ASRAC Caja de Ahorro, A.C. | Mexican | 100% |
| Fundación Vitro, A.C. | Mexican | 100% |
| Desarrollo Personal y Familiar, A.C. | Mexican | 100% |

## MANAGEMENT AND CONTROL

### 4. DIRECTORS AND EXECUTIVE OFFICERS.

The following table lists the names and offices held by all of the Company's directors and officers. The mailing address and telephone number for all individuals is Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico and (52-81) 8863-1200.

| Name | Office |
|---|---|
| Adrián Sada González | Chairman of the Board of Directors |
| Hugo A. Lara García | CEO, Director |
| Alejandro Sánchez Mújica | Executive Vice President and General Counsel |
| Claudio Del Valle Cabello | Chief Financial and Administrative Officer and Chief Restructuring Officer |
| Alfonso Gómez Palacio | President of the Glass Containers Business Unit |
| David González Morales | President of the Flat Glass Business Unit |
| Tomás González Sada | Director |
| Andrés Yarte Cantú | Director |

| Name | Office |
|------|--------|
| Federico Sada Melo | International Commercial Manager of the Vitro Flat Glass Business Unit, Director |
| Jaime Serra Puche* | Director |
| Joaquín Vargas Guajardo* | Director |
| Jaime Rico Garza | President and CEO of Vitro Europa, Ltd., Director |
| Manuel Güemez de la Vega* | Director |
| Ricardo Martín Bringas* | Director |
| Mario Martín Laborín Gómez | Director |
| Guillermo Ortiz Martínez* | Director |
| Adrián G. Sada Cueva | VP of Administration and Finance of Vitro Glass Containers Business Unit, Director |

\* Independent non-management directors.

### 5. PRINCIPAL OWNERS OF VOTING SECURITIES.

The following table sets forth the Company's major shareholders and their shareholdings of our common stock as of September 24, 2010, unless otherwise indicated.

| Name | Address | Series A Shares Outstanding[1] | % of Shares Outstanding[1][2] |
|------|---------|-------------------------------|-------------------------------|
| Pension Plan Trust | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 59,484,349 | 15.39 |
| Stock Option Trust | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 39,777,907 | 10.29 |
| Mr. Alfredo Harp Helú[7][8] | Praga 21, Colonia Juárez, Delegación Cuauhtemoc México, D.F. 6600, México | 38,171,281 | 9.88 |
| Mr. Adrián Sada González[3][4][6][7] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 29,545,712 | 7.65 |
| Mr. Federico Sada González[3][5] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 29,212,591 | 7.56 |
| Ms. Alejandra Sada González[3][6][7] | Ave. Ricardo Margáin 400, Col. Valle del Campestre San Pedro Garza García, Nuevo León, 66265 Mexico | 26,058,188 | 6.74 |

(1) All of the shares that may be issued upon exercise of the Company's outstanding options are held by its Stock Option Trust, and all of its outstanding options are currently exercisable. Therefore, shares outstanding and the calculation of percentage of shares outstanding include all the Company's outstanding options.

(2) Calculation of percentage of shares outstanding based upon 386,857,143 issued shares minus 445,500 held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute.

(3) Mrs. María Nelly Sada de Yarte, her children and her children's spouses collectively hold 17,182,163 of the Company's shares, representing 4.45% of the Company's issued and outstanding shares, which are not included in the table above. Mrs. María Nelly Sada de Yarte is a sister of Mr. Adrián Sada González, Mr. Federico Sada González and Ms. Alejandra Sada González.

(4)     Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son Mr. Adrián Sada Cueva. In addition to the shares set forth below, Mr. Adrián Sada González may be deemed to be a beneficial owner of the 39,777,907 shares held by the Company's Stock Option Trust, as a member of the Technical Committee of the Stock Option Trust who shares the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.

(5)     Reported as a group with his wife, Mrs. Liliana Melo de Sada, his sons Messrs. Federico Sada Melo and Mauricio Sada Melo, and his daughter, Ms. Liliana Sada Melo.

(6)     Entered into the 2009 Shareholders Agreement. The main provisions of the 2009 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares.

(7)     Entered into the 2010 Shareholders Agreement. The main provisions of the 2010 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(8)     Board of Directors, as required by Vitro's by-laws, approved the request of Mr. Harp Helú to acquire additional shares of Vitro in excess of 9.9%, up to a maximum of 15% of the Company's equity.

### 6. UNDERWRITERS.

No person has acted as an underwriter of any securities of the Company during the three years prior to the date of the filing of this application. There is no proposed principal underwriter for the New Notes that are proposed to be offered in connection with the Indentures that are to be qualified under this application.

### CAPITAL SECURITIES

### 7. CAPITALIZATION.

(a) The following tables set forth certain information with respect to each authorized class of securities of the Company as of September 30, 2010.

| Title of Class | Amount Authorized (US$) | Amount Outstanding (US$)[1] |
|---|---|---|
| Shares of Series A, Class I, no par value | 324,000,000 | 323,554,500 |
| Shares of Series A, Class II, no par value (jointly with shares Class I referred to as "Shares") | 62,857,143 | 62,857,143 |
| 2012 Notes | 300,000,000 | 300,000,000 |
| 2013 Notes | 225,000,000 | 216,000,000 |
| 2017 Notes | 700,000,000 | 700,000,000 |
| *Certificados Bursátiles Vitro 03* | 199,982,401.55 | 11,998,944.09 |
| *Certificados Bursátiles Vitro 08* | 79,992.960.62 | 31,997,184.25 |
| DFI Claims[2] | N/A | 189,999,282 |
| RBS Note | 15,000,000 | 15,000,000 |

(b) The holders of the Shares are entitled to one vote for each share held of record on the applicable record date on all matters submitted to a vote of the stockholders.

As of September 30, 2010 there are 30,902,699 Ordinary Participation Certificates ("CPOs")[3] issued. Each CPO represents one Share and has no voting right with respect to the underlying Share, but have all the

---

1       Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.5011 pesos per one U.S. dollar, the Free Exchange Rate September 30, 2010.

2       DFI Claims arose from guarantees granted by the Company.

economic rights relating to that. The CPO trustee that holds the shares represented by CPOs is required to vote those Shares in the same manner as the majority of the shares not so held that are voted in the relevant shareholders' meeting.

## INDENTURE SECURITIES

### 8. ANALYSIS OF INDENTURE PROVISIONS.

The New 2019 Notes will be issued under an indenture (the "New 2019 Notes Indenture") and the New MCDs will be issued under an indenture (the "New MCDs Indenture" and together with the New 2019 Notes Indenture, the "Indentures"), each between the Company and The Bank of New York Mellon, as trustee (the "Trustee"). The following is a summary of the provisions of the Indentures required to be summarized by Section 305(a)(2) of the Trust Indenture Act of 1939 and is not a complete description of the Indentures' provisions discussed. Holders of New Notes are encouraged to read the entire respective Indentures because many provisions that will control the rights of a holder of New Notes are not described in this analysis. The description makes use of a number of terms defined in the Indentures and is qualified in its entirety by express reference to the Indentures.

**Events of Default**

Each of the following is an "Event of Default" under the Indentures, unless specified to pertain only to the New 2019 Notes Indenture or the New MCDs Indenture:

(a) one or more final judgments or orders for the payment of money are rendered against the Company or any of its Material Subsidiaries and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed $25.0 million (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(b) an involuntary case or other proceeding is commenced against the Company or any Material Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Material Subsidiary under the federal bankruptcy laws as now or hereafter in effect; or

(c) the Company or any of its Material Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any of its Material Subsidiaries or for all or substantially all of the property and assets of the Company or any of its Material Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (b) or (c), a "bankruptcy default"); or

(d) the Company fails to (i) make an Excess Cash Flow prepayment or repurchase or (ii) conduct a Mandatory Redemption of the New Notes.

---

[3]    The CPOs are negotiable instruments under Mexican law, have been issued by National Financiera as CPO trustee pursuant to the terms of CPOs trust agreements between the CPO trustee and Vitro. Currently the maximum number of CPOs that can be issued pursuant to the CPO agreements is 200,000,000. The CPO trust agreements established a master trust that enables non-Mexican investors to acquire CPOs representing economic interests in the Shares. The trust is necessary because, under Vitro by-laws, the Shares may not be purchased or held directly or indirectly by non-Mexican investors, other than through this mechanism.

*Events of Default: New 2019 Notes Indenture:*

(a) the Company defaults in any payment of interest (including any additional interest and Additional Amount) on any 2019 Note when the same becomes due and payable, and the default continues for 30 days;

(b) the Company defaults in the payment of principal of any 2019 Note when due and payable at maturity, upon acceleration or redemption, or otherwise (other than pursuant to an Offer to Purchase);

(c) the Company fails to make an Offer to Purchase and thereafter to accept and pay for New 2019 Notes tendered when and as required pursuant to the covenants regarding a Change of Control, Limitation on Asset Sales, or the Company or any Guarantor fails to comply with the covenant regarding Consolidation, Merger, Lease or Sale of Assets;

(d) the Company defaults in the performance of or breaches any other covenant or agreement of the Company in the New 2019 Notes Indenture or under the New 2019 Notes and the default or breach continues for a period of 45 consecutive days after written notice to the Company by the trustee or to the Company and the trustee by the holders of 25% or more in aggregate principal amount of the New 2019 Notes;

(e) there occurs with respect to any Debt of the Company or any of its Material Subsidiaries having an outstanding principal amount of $25.0 million or more in the aggregate for all such Debt of all such Persons (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal payment when due and such defaulted payment is not made, waived or extended within the applicable grace period;

(f) any Note Guaranty ceases to be in full force and effect, other than in accordance with the terms of the New 2019 Notes Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guaranty;

(g) the Company or any Restricted Subsidiary fails to comply with the covenant regarding "Limitation on Intercompany Debt"; or

(i) any Lien on assets that, individually or in the aggregate, have a fair market value of $10.0 million or more and that was incurred for the benefit of the holders of the New 2019 Notes in connection with the pledge of any ownership interest in any Strategic Joint Venture or otherwise incurred for the benefit of the holders of the New 2019 Notes in accordance with the terms of the Indentures becomes or is declared to become invalid or ineffective, or the Company or any Restricted Subsidiary denies or disaffirms its obligations under any such Lien.

*Consequences of an Event of Default Under the New 2019 Notes Indenture:*

If an Event of Default with respect to the New 2019 Notes, (other than an Event of Default relating to clause (d) or (e) above), occurs and is continuing under the New 2019 Notes Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New 2019 Notes then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee at the request of such holders shall, declare the principal of and accrued interest on the New 2019 Notes to be immediately due and payable. Upon a declaration of acceleration, such principal and interest will become immediately due and payable.

*Events of Default: New MCDs Indenture:*

(a) the Company fails to comply with its obligation to convert the New MCDs in accordance with the New MCDs Indenture upon a Mandatory Conversion Event and such failure continues for a period of 5 Business Days or more (at maturity or otherwise);

(b) the Company fails to make an Offer to Purchase all outstanding New MCDs within 30 days following a Change of Control; or

(c) there occurs with respect to the New 2019 Notes (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal or interest payment when due and such defaulted payment is not made, waived or extended within the applicable grace period.

If an Event of Default with respect to the New MCDs, (other than an Event of Default relating to clause (d) or (e) above), occurs and is continuing under the New MCDs Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New MCDs then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee and the common representative at the request of such holders shall, declare that the principal of and accrued interest on the New MCDs will convert immediately to common shares (or CPOs, as applicable).

## Authentication and Delivery of the New Notes; Use of Proceeds

One officer of the Company must sign the New Notes for the Company by either manual or facsimile signature. If an officer whose signature is on a New Note no longer holds that office at the time the Trustee authenticates the New Notes, the New Notes will nevertheless be valid.

The New Notes will not be valid until an authorized signatory of the Trustee manually signs the certificate of authentication on the New Notes. The signature will be conclusive evidence that the New Notes have been authenticated under the Indentures. At any time and from time to time after the execution and delivery of the Indentures, the Company may deliver Notes executed by the Company to the Trustee for authentication. The Trustee will authenticate and deliver New 2019 Notes in the aggregate principal amount not to exceed $850,000,000 and New MCDs in the aggregate principal amount not to exceed $100,000,000.

There will be no proceeds (and therefore no application of proceeds) from the issuance of the New Notes because the New Notes will be issued in exchange for the 2012 Notes, 2013 Notes, 2017 Notes, DFI Claims and the Other Debt of the Company pursuant to the Tender Offer and Exchange Offer and Consent Solicitation. No provisions are contained in the Indentures with respect to the Company's use of proceeds of the issuance of the New Notes.

## Release and Substitution of Property Subject to the Lien of the Indentures

The New Notes are unsecured obligations of the Company. As such, the New Notes are not secured by any lien on any property.

## Satisfaction and Discharge

The Company may discharge its obligations under the New Notes (except for those surviving obligations specifically set forth in the Indentures) when:

(a) either (i) all the New Notes have been delivered to the Trustee for cancellation, or (ii) the New Notes not delivered to the Trustee for cancellation mature within sixty days, or all of them are to be called for redemption within sixty days under arrangements satisfactory to the Trustee for giving the irrevocable notice of redemption in accordance with the Indentures and the Company has irrevocably deposited in trust with the Trustee solely for the benefit of the holders money, government notes or a combination thereof, in an amount sufficient to pay and discharge the entire debt on such New Notes; and

(b) the Company has paid or caused to be paid all sums payable under the Indentures by the Company.

Notwithstanding the satisfaction and discharge of the Indentures, certain of the Company's obligations shall survive as specified in the Indentures.

## Evidence as to Compliance with Conditions and Covenants

The Company will deliver to the Trustee within 120 days after the end of each fiscal year an Officer's Certificate stating that the Company has fulfilled its obligations under the Indentures, if there has been a Default, specifying the Default and its nature and status. The Company will deliver to the Trustee, as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default, an Officers' Certificate setting forth the details of the Default, and the action which the Company proposes to take with respect thereto.

## 9. OTHER OBLIGORS.

The New 2019 Notes will be guaranteed by the following subsidiaries of the Company:

| Other Obligor | Address |
|---|---|
| Viméxico, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Envases Nortéamerica, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| V-MX Holdings, LLC (formerly Crisa Holding Co.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Monterrey, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Compañía Vidriera, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Fabricación de Máquinas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Integrales de Acabados, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Industria del Álcali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Distribuidora de Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Lux, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Packaging, LLC | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano de Mexicali, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Europa, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Asset Corp. (formerly American Asset Holdings Corp.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Venezuela, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Binswanger Glass Company (formerly Troper, Inc.) | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Panamá, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Troper Services, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |

| Other Obligor | Address |
| --- | --- |
| Vitemco Ecuador, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Amsilco Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| B.B.O. Holdings, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Crisa Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Automotriz, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Flex, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Vidrio y Cristal, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Flotado Cubiertas, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Distribuidor Vidriero LAN, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitrocar, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Cristales Inastillables de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio Plano de México, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Holdings, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza García, N.L., 66265 Mexico |
| VVP Auto Glass, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro America, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Super Sky Products, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Super Sky International, Inc. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Finance Corporation | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Colombia, S.A. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| VVP Europa Holdings, B.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro do Brasil Indústria e Comércio, Ltda. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Chemicals, Fibers and Mining, LLC. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vitro Global, Ltd. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Vidrio y Cristal del Noroeste, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Guadalajara, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Toluca, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vitro Cosmos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Querétaro, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Servicios Vidriera Los Reyes, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |
| Inmobiliaria Vitalc, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre Garza Garcia, N.L., 66265 Mexico |

| Other Obligor | Address |
| --- | --- |
| Viqueretanos, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| VAU, S.A. de C.V. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| Vitro Car Colombia, S.A.S | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |
| Vitro Cristalglass, S.L. | Ave. Roble 660, Col. Valle del Campestre<br>Garza Garcia, N.L., 66265 Mexico |

**CONTENTS OF APPLICATION FOR QUALIFICATION**

This application for qualification comprises:

(a) Pages one to 18, consecutively.

(b) The statement of eligibility and qualification on Form T-1 of The Bank of New York Mellon, as trustee, under the Indentures to be qualified.*

(c) The following exhibits in addition to those filed as part of the statement of eligibility and qualification of the trustee:

| | |
|---|---|
| Exhibit T3A | Amended and Restated Certificate of Incorporation (acta constitutiva) of Vitro, S.A.B. de C.V., together with an English translation, is contained in the bylaws incorporated by reference herein as Exhibit T3B. |
| Exhibit T3B | Amended and Restated Bylaws (estatutos sociales) of Vitro, S.A.B. de C.V., together with an English translation, incorporated by reference to Exhibit 1.01 of the Company's Form 20-F filed with the Commission on July 1, 2009. |
| Exhibit T3C1** | New 2019 Notes Indenture between Vitro, S.A.B. de C.V., the guarantors named therein and The Bank of New York Mellon, as trustee. |
| Exhibit T3C2** | New MCDs Indenture between Vitro, S.A.B. de C.V. and The Bank of New York Mellon, as trustee. |
| Exhibit T3D | Not Applicable. |
| Exhibit T3E.1* | Tender Offer and Exchange Offer and Consent Solicitation Statement to offer to purchase for cash or exchange outstanding 2012 Notes, 2013 Notes, 2017 Notes, DFI Claims and the Other Debt for Notes due 2019 and mandatory convertible debentures. |
| Exhibit T3E.2* | Letter of Transmittal. |
| Exhibit T3E.3* | Letter of Instructions to Beneficial Holders. |
| Exhibit T3F** | Cross-reference sheet showing the location in the Indentures of the provisions inserted therein pursuant to Section 310 through 318(a), inclusive, of the Trust Indenture Act of 1939 (included as part of Exhibit T3C1 and T3C2). |
| Exhibit T3G* | Statement of eligibility and qualification on Form T-1 of The Bank of New York Mellon, as trustee, under the Indentures to be qualified. |
| Exhibit T3H* | Item 3 diagram depicting the relationship of each affiliate to Vitro, S.A.B. de C.V. |

---

\*    Filed herewith.

\*\*    To be filed by amendment.

**SIGNATURE**

Pursuant to the requirements of the Trust Indenture Act of 1939, the applicant, Vitro, S.A.B. de C.V., a corporation organized and existing under the laws of Mexico, has duly caused this application to be signed on its behalf by the undersigned, thereunto duly authorized, and its seal to be hereunto affixed and attested all in the City of San Pedro Garza Garcia and State of Nuevo León, on the 1st day of November, 2010.

VITRO, S.A.B. DE C.V.

By:  /s/ Claudio del Valle Cabello
      Name:  Claudio del Valle Cabello
      Title:    Attorney-in-Fact


By:  /s/ Alejandro Sánchez Mújica
      Name:  Alejandro Sánchez Mújica
      Title:    Attorney-in-Fact

As authorized signatory on behalf of each of
CRISTALES INASTILLABLES DE MÉXICO,
S.A. DE C.V., DISTRIBUIDOR VIDRIERO LAN,
S.A. DE C.V., DISTRIBUIDORA DE VIDRIO
Y CRISTAL, S.A. DE C.V., VAU, S.A. DE C.V.,
VIDRIO PLANO DE MÉXICO, S.A. DE C.V.,
VIDRIO PLANO, S.A. DE C.V., VIMÉXICO,
S.A. DE C.V., VITRO AUTOMOTRIZ, S.A.
DE C.V., VITRO FLEX, S.A. DE C.V., VITRO
FLOTADO CUBIERTAS, S.A. DE C.V., VITRO
VIDRIO Y CRISTAL, S.A. DE C.V. and
VITROCAR, S.A. DE C.V.

By:  /s/ Claudio del Valle Cabello
     Name:  Claudio del Valle Cabello
     Title:    Attorney-in-Fact

20

As authorized signatory on behalf of each of
VIDRIO PLANO DE MEXICALI, S.A. DE C.V.,
VIDRIO Y CRISTAL DEL NOROESTE,
S.A. DE C.V. and VITRO ENVASES
NORTEAMERICA, S.A. DE C.V.

By: /s/ Javier Arechavaleta
      Name:  Javier Arechavaleta
      Title:    Attorney-in-Fact

21

As authorized signatory on behalf of each of COMERCIALIZADORA ALCALI, S.A. DE C.V. (formerly VITRO CORPORATIVO, S.A. DE C.V.), COMPAÑÍA VIDRIERA, S.A. DE C.V., FABRICACIÓN DE MÁQUINAS, S.A. DE C.V., FIC REGIOMONTANO, S.A.P.I. DE C.V. (formerly SERVICIOS CORPORATIVOS DE EDIFICACIONES, S.A. DE C.V.), INDUSTRIA DEL ALCALI, S.A. DE C.V., INMOBILIARIA VITALC, S.A. DE C.V., SERVICIOS INTEGRALES DE ACABADOS, S.A. DE C.V., SERVICIOS VIDRIERA GUADALAJARA, S.A. DE C.V., SERVICIOS VIDRIERA LOS REYES, S.A. DE C.V., SERVICIOS VIDRIERA QUERÉTARO, S.A. DE C.V., SERVICIOS VIDRIERA TOLUCA, S.A. DE C.V., SERVICIOS VITRO COSMOS, S.A. DE C.V., VIDRIERA GUADALAJARA, S.A. DE C.V., VIDRIERA LOS REYES, S.A. DE C.V., VIDRIERA MONTERREY, S.A. DE C.V., VIDRIERA QUERÉTARO, S.A. DE C.V., VIDRIERA TOLUCA, S.A. DE C.V., VIQUERETANOS, S.A. DE C.V., and VITRO PACKAGING DE MÉXICO, S.A. DE C.V. (formerly INMOBILIARIA LOMA DEL TORO, S.A. DE C.V.)

By: /s/ Rafael Colome Carrasco
     Name: Rafael Colome Carrasco
     Title: Attorney-in-Fact

22

As authorized signatory on behalf of each of AMSILCO HOLDINGS, INC., B.B.O. HOLDINGS, INC., CRISA CORPORATION, VITRO ASSET CORP. (formerly AMERICAN ASSET HOLDINGS CORP.), VITRO CHEMICALS, FIBERS AND MINING, LLC., VITRO PACKAGING, LLC. and V-MX HOLDINGS, LLC. (formerly CRISA HOLDING CO.)

By: /s/ Rafael Colome Carrasco
    Name:  Rafael Colome Carrasco
    Title:    President and CEO

23

As authorized signatory on behalf of each of
VITRO EUROPA, LTD. and
VITRO GLOBAL, LTD.

By: /s/ Jaime Rico
      Name:  Jaime Rico
      Title:   Member of the Board and President of the
            Board

24

As authorized signatory on behalf of each of BINSWANGER GLASS COMPANY (formerly TROPER INC.), SUPER SKY INTERNATIONAL, INC., SUPER SKY PRODUCTS, INC., TROPER SERVICES, INC., VITRO AMERICA, LLC., VVP AUTO GLASS, INC., VVP FINANCE CORPORATION and VVP HOLDINGS, LLC.

By: /s/ Arturo Carrillo
     Name:  Arturo Carrillo
     Title:   President and CEO

25

As authorized signatory on behalf of each of
VITEMCO ECUADOR, S.A., VITRO CAR
COLOMBIA, S.A.S, VITRO COLOMBIA, S.A.
and VITRO VENEZUELA, S.A.

By: /s/ Alfonso Gomez
     Name:  Alfonso Gomez
     Title:   Legal Representative

26

VIDRIO LUX, S.A.

By: /s/ Hugo Aldo Suito Magnani
     Name:  Hugo Aldo Suito Magnani
     Title:   General Manager


By: /s/ Ramiro Soliz Delgadillo
     Name:  Ramiro Soliz Delgadillo
     Title:   Administrative Manager

27

VITRO PANAMÁ, S.A.

By: /s/ Ildivais O. Moreno B.
    Name:  Ildivais O. Moreno B.
    Title:   Legal Representative

VVP EUROPA HOLDINGS, B.V.

By: /s/ ANT Management Netherlands B.V.
      Name:  A. Nagelmaker / M. Hager
      Title:    Director /Proxy Holder

29

VITRO DO BRASIL INDÚSTRIA
E COMÉRCIO, LTDA.

By: /s/ Elias Mufarej
　　Name:　Elias Mufarej
　　Title:　 Administrator

30

VITRO CRISTALGLASS, S.L.

By: /s/ Claudio del Valle
    Name:  Claudio del Valle
    Title:   Attorney-in-Fact


By: /s/ Alejandro Sánchez Mújica
    Name:  Alejandro Sánchez Mújica
    Title:   Attorney-in-Fact

31

```
<DOCUMENT>
<TYPE>        EX-99.T3E.1
<FILENAME>    y87415exv99wt3ew1.htm
<DESCRIPTION> EX-99.T3E.1
<TEXT>
```

# Vitro, S.A.B. de C.V.

**Offer to Purchase and Offer to Exchange and Consent Solicitation Relating to**

**$300,000,000 Aggregate Principal Amount of 8.625% Senior Notes due 2012,**

**$216,000,000 Aggregate Principal Amount of 11.75% Senior Notes due 2013 and**

**$700,000,000 Aggregate Principal Amount of 9.125% Senior Notes due 2017**

This solicitation statement (as it may be amended or supplemented from time to time, the "Statement") relates to two alternative offers. In this Statement, (1) Vitro, S.A.B. de C.V. ("Vitro") and Administración de Inmuebles Vitro, S.A. de C.V. ("AIV"), a wholly-owned subsidiary of Vitro, are offering to purchase for cash (the "Tender Offer") the Old Notes (as defined below) and (2) Vitro is proposing an exchange offer and soliciting consents (the "Exchange Offer and Consent Solicitation") to an in-court restructuring under the *Ley de Concursos Mercantiles*, or Mexican Bankruptcy Law (as defined in "Considerations Relating to the Exchange Offer and Consent Solicitation" in this Statement, the "*Concurso* Plan").

Holders may tender their Old Notes in either the Tender Offer or the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to tender them into the Exchange Offer and Consent Solicitation instead.

Except when indicated or the context otherwise requires, the words "we," "us," "our" and "ours" in this Statement (i) refer to Vitro and AIV when used in reference to the making and execution of the Tender Offer, (ii) refer to Vitro when used in reference to the making and execution of the Exchange Offer and Consent Solicitation, and (iii) otherwise refer to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries.

## The Tender Offer

We hereby offer to purchase for cash, upon the terms and subject to the conditions set forth in this Statement and in the Letter of Transmittal, the maximum aggregate principal amount of Vitro's outstanding 8.625% Senior Notes due 2012, which we refer to as the "2012 Notes," 11.75% Senior Notes due 2013, which we refer to as the "2013 Notes," and 9.125% Senior Notes due 2017, which we refer to as the "2017 Notes" (together with the 2012 Notes and 2013 Notes, the "Old Notes") that we can purchase for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price (the "Tender Offer Consideration") per $1,000 principal amount equal to the clearing price (the "Clearing Price") determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

The Old Notes were issued by and represent obligations of Vitro. The Tender Offer is conditioned upon the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered. We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of a loan agreement in the amount of up to the Maximum Payment Amount to be entered into between Fintech Investments Ltd. (together with any affiliate and/or investment vehicle thereof, "Fintech") and AIV (the "Loan Agreement"). We will cause the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment.

Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

The amount of the Tender Offer Consideration will be determined pursuant to a modified "Dutch Auction." The Tender Offer Consideration will be the same for Old Notes of all series and will be payable in cash. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes. Acceptance of Old Notes tendered in the Tender Offer may be subject to proration as described herein. Old Notes that are tendered in the Tender Offer but not accepted will be returned to the DTC Participant (as defined below) that tendered them promptly following the Expiration Time (as defined below) unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation.

| Series of Old Notes | CUSIP No. | Outstanding Principal Amount | Tender Offer Consideration (Acceptable Bid Price Range)[1] |
|---|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 | |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 | $500 – $575 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 | |

(1)    Per $1,000 principal amount of Old Notes that are accepted for purchase.

## The Exchange Offer and Consent Solicitation

Pursuant to the *Concurso* Plan, we are proposing to exchange all of the Old Notes and the DFI Claims and Other Debt (each as defined below) in the aggregate amount of $1,515 million for the following consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of new notes (the "New 2019 Notes");

- $100.0 million (plus the Issue Date Adjustment, as defined herein) in aggregate principal amount of newly issued mandatory convertible debentures (the "New MCDs" and, together with the New 2019 Notes, the "New Notes"), which will mandatorily convert into 15.0% of our equity on a fully diluted basis if not paid in full at maturity or upon the occurrence of certain events of default;

- a cash payment (the "Restructuring Cash Payment") in an amount equal to the unpaid portion of an aggregate of $75.0 million in cash held in a Mexican trust (the "Payment Trust") after the making of the Consent Payment (as defined below); and

- a restructuring fee, in cash, based on the issue date of the New Notes to be determined as described in "Summary—The New Notes—The New 2019 Notes" (the "Restructuring Fee" and, together with the New Notes and Restructuring Cash Payment described above, the "Restructuring Consideration").

Accordingly, for every $1,000 principal amount of the Restructured Debt exchanged, holders will be entitled to receive:

- $561 principal amount of New 2019 Notes,

- $66 principal amount of New MCDs (not including the Issue Date Adjustment),

- a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent), and

- a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date).

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal* (as defined herein). The New 2019 Notes will be guaranteed by the majority of our subsidiaries (which we refer to as the "Guarantors"). For a more detailed description of the New Notes, see "Description of the New Notes" beginning on page 167. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement. See also "Summary—Consequences if the Proposed Restructuring Fails."

The Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of Old Notes held by the holder of such Old Notes (the "Note Consent Payment") for which a consent to the *Concurso* Plan is provided prior to the Expiration Time specified below. Any Old Notes submitted for exchange and consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes. We are seeking the tender of the Old Notes and consent of each person in whose name an Old Note is registered as of 5:00 p.m., New York City time, on November 1, 2010 (the "Record Date"), or persons who held Old Notes through The Depository Trust Company ("DTC") as of the Record Date ("DTC Participants" and, together with such registered holders, the "Holders"); however, we may proceed with filing the proposed *Concurso* Plan without any such consents.

Concurrently with the Exchange Offer and Consent Solicitation for the Old Notes, we will be seeking consents to the *Concurso* Plan on comparable terms from certain of the holders of (i) claims of approximately $239.8 million relating to certain of our and our subsidiaries' derivative financial instruments (including certain agreed upon amounts in settlement represented by promissory notes, the "DFI Claims") of which a significant holder has entered into a lock-up agreement with us, as described herein, and (ii) other debt (the "Other Debt" and, together with the Old Notes and the DFI Claims, the "Restructured Debt") in an aggregate principal amount equivalent to $58.5 million consisting of certain *Certificados Bursátiles* and other unsecured debt. In connection therewith, the Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of the DFI Claims and Other Debt held by the holder of such debt (the "Other Consent Payment" and, together with the Note Consent Payment, the "Consent Payment") for which a consent is provided prior to the Expiration Time specified below. Pursuant to the *Concurso* Plan, we would exchange the DFI Claims and the Other Debt for a pro rata portion of the Restructuring Consideration (based on the aggregate principal amount of debt subject to the restructuring). For additional information, see "Capitalization" and Annex A.

**Holders who participate in the Tender Offer will not receive a Consent Payment in respect of any Old Notes that are accepted for purchase in the Tender Offer or that are not accepted for purchase and are returned to such holder. Such holders may receive a Consent Payment (as described above) only in respect of any Old Notes of such holder that are included in the Exchange Offer and Consent Solicitation because (a) such holder elected in its Letter of Transmittal to have any Old Notes that are not accepted for purchase in the Tender Offer included in the Exchange Offer and Consent Solicitation and (b) such Old Notes are not accepted in the Tender Offer.**

**The Tender Offer and the Exchange Offer and Consent Solicitation will each expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated (as such time and date may be extended, the "Expiration Time"). We may, in our sole discretion (subject to applicable law), terminate either or both offers, and reserve the right to amend the terms or waive any of the conditions to either or both offers.**

**You should carefully consider the risk factors beginning on page 52 of this Statement before deciding whether or not to participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation.**

November 1, 2010

ii

# TABLE OF CONTENTS

Questions and Answers Relating to the Tender Offer and the Exchange Offer and Consent Solicitation ... 2
Considerations Relating to the Tender Offer ... 7
Considerations Relating to the Exchange Offer and Consent Solicitation ... 10
Notice to Investors ... 12
Presentation of Financial Information and Other Information ... 14
Exchange Rates ... 16
Where You Can Find More Information; Incorporation by Reference ... 17
Forward-Looking Statements ... 19
Enforceability of Civil Liabilities ... 20
Summary ... 21
Risk Factors ... 52
Capitalization ... 72
The Restructuring and the *Concurso* Plan ... 73
Selected Historical Consolidated Financial Information ... 78
Unaudited Pro Forma Financial Information ... 82
Management's Discussion and Analysis of Financial Condition and Results of Operations ... 90
Liquidity and Capital Resources ... 105
Business ... 113
Directors, Senior Management and Employees ... 131
Major Shareholders ... 140
Related Party Transactions ... 142
The Mexican Law of Commercial Reorganizations ... 143
The Tender Offer ... 147
The Exchange Offer and Consent Solicitation ... 157
Description of the New Notes ... 167
Description of the CPOs ... 228
Certain U.S. Federal Income Tax Considerations ... 233
Material Mexican Federal Tax Considerations ... 241
Important Information for Non-U.S. Holders ... 244
Annex A − *Concurso* Plan ... A-1
Index to Consolidated Financial Statements ... F-1

You should rely only on the information contained in this Statement or to which we have referred you. We have not authorized anyone to provide you with information that is different. This Statement may only be used where it is legal to do so. The information in this document may only be accurate on the date of this Statement.

Beneficial owners who wish to tender Old Notes in the Tender Offer or submit Old Notes for exchange in the Exchange Offer and Consent Solicitation, and whose Old Notes are held in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, must instruct that entity to tender or submit their Old Notes. Any such instruction must be made in accordance with procedures of the entity through which the Old Notes are held (including completing a Letter of Instruction and providing it to that entity). The valid tender of Old Notes in the Tender Offer or submission of Old Notes for exchange in the Exchange Offer and Consent Solicitation requires physical delivery by the Holder (the DTC Participant through which the Old Notes are held) of a duly executed, notarized and apostilled Transmittal Letter and other required documentation by the Expiration Date as well as completion of DTC's Automated Tender Offer Program ("ATOP") procedures. The additional time this will require should be taken into consideration in responding to the offers.

## QUESTIONS AND ANSWERS RELATING TO THE TENDER OFFER
## AND THE EXCHANGE OFFER AND CONSENT SOLICITATION

**Q. What are the Tender Offer and the Exchange Offer and Consent Solicitation?**

**A.** In the Tender Offer, Vitro and our wholly-owned subsidiary AIV are offering, upon the terms and subject to the conditions set forth in this Statement and the Letter of Transmittal, to purchase the Old Notes (Vitro's outstanding 2012 Notes, 2013 Notes and 2017 Notes) for cash pursuant to a modified Dutch auction.

In the Exchange Offer and Consent Solicitation, Vitro is proposing, upon the terms and subject to the conditions set forth in this Statement and the Letter of Transmittal, an exchange offer and solicitation of consents to an in-court restructuring from holders of Restructured Debt, including beneficial owners of the Old Notes, registered holders and their duly designated proxies, including participants in DTC whose names are shown on a security position listing as owners of the Old Notes, as of 5:00 p.m., New York City time, on November 1, 2010.

**Q. May I participate in both the Tender Offer and the Exchange Offer and Consent Solicitation?**

**A.** You may choose one of the following three options to participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation:

- You may tender your outstanding Old Notes in the Tender Offer and choose to have your Old Notes returned to you if they are not accepted in the Tender Offer;

- You may tender your outstanding Old Notes in the Tender Offer and choose to submit such Old Notes for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer; or

- You may submit your Old Notes for exchange in the Exchange Offer and Consent Solicitation.

If you submit your Old Notes for exchange in the Exchange Offer and Consent Solicitation, you are not permitted to also tender them in the Tender Offer. Alternatively, if you tender your Old Notes in the Tender Offer, you may only submit them in the Exchange Offer and Consent Solicitation on a provisional basis, i.e., for acceptance in the Exchange Offer and Consent Solicitation only if they are rejected from the Tender Offer. If your Old Notes are accepted in the Tender Offer, they will not be accepted in the Exchange Offer and Consent Solicitation. No Old Notes will be accepted in both offers.

**Q. Is there a limit on the amount of Old Notes that may be accepted in the Tender Offer?**

**A.** Yes. The funds available for the Tender Offer are limited to $100,000,000, the Maximum Payment Amount, so there is a limit on the amount of Old Notes that may be accepted in the Tender Offer. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer.

**Q. Is there a limit on the amount of Old Notes that may be accepted in the Exchange Offer and Consent Solicitation?**

**A.** No.

**Q. How are payments for my Old Notes pursuant to the Tender Offer determined?**

**A.** Because the Tender Offer is being conducted as a modified Dutch auction, you must specify the minimum amount you would be willing to receive in exchange for each $1,000 principal amount of Old Notes. This minimum amount is known as the "Bid Price." The Bid Price you specify must not be less than $500 nor more than $575. Bid Prices between those numbers must be in minimum increments of $2.50 above $500. If you do not enter a Bid Price, you will be deemed to have specified the lowest price in the range ($500). If your Bid Price is outside of this range, it will not be accepted and you will not receive any payments under the Tender Offer.

The Bid Prices of all tendering holders are used to determine the payment amount, or "Tender Offer Consideration," that you will receive. The Tender Offer Consideration will be equal to the Clearing Price, which will be determined as described under "The Tender Offer—Terms of the Tender Offer" based on the price that maximizes the principal amount of Old Notes that may be purchased without exceeding the Maximum Payment Amount.

**Q. What happens if my Old Notes are not accepted in the Tender Offer?**

**A.** If your Old Notes are not accepted in the Tender Offer and you have not elected to exchange Old Notes that are rejected from the Tender Offer pursuant to the Exchange Offer and Consent Solicitation, your Old Notes will be returned to you and you will not receive the Consent Payment. If your Old Notes are not accepted in the Tender Offer and you have elected to exchange Old Notes that are rejected from the Tender Offer pursuant to the Exchange Offer and Consent Solicitation, your Old Notes will be submitted for exchange in the Tender Offer and you will be eligible to receive the Restructuring Consideration and the Consent Payment in respect of such Old Notes.

**Q. What is being offered in exchange for the Old Notes that I hold in the Exchange Offer and Consent Solicitation?**

**A.** For each U.S.$1,000 principal amount of the Old Notes accepted in the Exchange Offer and Consent Solicitation, you will be entitled to receive $561 of New 2019 Notes, $66 of New MCDs and a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and a portion of the Restructuring Fee (depending on the Issue Date). In addition, you will receive a Consent Payment of between 5% and 10% of the principal amount of your Old Notes that are accepted in the Exchange Offer and Consent Solicitation.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to have any Old Notes that are not accepted in the Tender Offer returned to me?**

**A.** In order to participate in the Tender Offer and elect to have your Old Notes returned to you if they are not accepted in the Tender Offer you must complete the following steps:

(1) From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2) In order to complete the instruction letter and tender your Old Notes in the Tender Offer you must:

- Execute and notarize the instruction letter in Section I and check the first box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

(3) We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 1;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal.

(4) Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation?**

**A.** In order to participate in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must complete the following steps:

(1) From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2) In order to complete the instruction letter and tender your Old Notes in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must:

- Execute and notarize the instruction letter in Section I and check the second box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series;

- Sign and date the authorization in the form attached to the instruction letter as Schedule I; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

(3) We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 2;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(4) Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Exchange Offer and Consent Solicitation?**

**A.** In order to participate in the Exchange Offer and Consent Solicitation you must complete the following steps:

(1) From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2) In order to complete the instruction letter and participate in the Exchange Offer and Consent Solicitation you must:

- Execute and notarize the instruction letter in Section I and check the third box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to submit; and

- Return all pages of the completed instruction letter to your broker, dealer, trust company or other nominee.

(3) We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually submits your Old Notes in the Exchange Offer and Consent Solicitation to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. If you have received a Letter of Transmittal and have been instructed to complete it, you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section II.A.1, checking box 3;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.3;

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(4) Promptly return all completed documents to your bank, broker, dealer, trust company or other nominee.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes. What do I need to do if I do not want to participate in the Tender Offer or the Exchange Offer and Consent Solicitation?**

**A.** If you do not want to participate in the Tender Offer or the Exchange Offer and Consent Solicitation, then you do not need to complete the instruction letter or any other document relating to the Tender Offer or the Exchange Offer and Consent Solicitation.

**Q. What happens if I fail to elect either the Tender Offer or the Exchange Offer and Consent Solicitation, whether because I do not submit the Letter of Transmittal or I do submit the Letter of Transmittal, but do not indicate my election?**

**A.** If you fail to elect either option, whether by not submitting the Letter of Transmittal or failing to indicate your election in a submitted Letter of Transmittal, you will not receive the Tender Offer Consideration or the

5

Consent Payment. However, the *Convenio Concursal*, if approved and consummated, will bind all holders of the Old Notes, regardless of whether or how you voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

**Q. When will the Tender Offer and the Exchange Offer and Consent Solicitation expire?**

**A.** The Tender Offer and the Exchange Offer and Consent Solicitation will expire at 9:00 a.m., New York City time, on December 1, 2010, unless we extend the deadline at our sole discretion.

**Q. How will I be notified if the Tender Offer or the Exchange Offer and Consent Solicitation are extended?**

**A.** If we extend the Expiration Time, we will make a public announcement of the extension not later than 9:00 a.m., New York City time, on the first business day after the previously scheduled Expiration Time.

**Q. Will I have to pay any fees or other expenses?**

**A.** If you are the record owner of your Old Notes and you tender your Old Notes in the Tender Offer or exchange your Old Notes for exchange in the Exchange Offer and Consent Solicitation, you should not have to pay brokerage fees or similar expenses. If you own your Old Notes through a broker or other nominee and your broker tenders or votes your Old Notes on your behalf, your broker or nominee may charge you a fee for doing so. You should consult your broker or nominee to determine whether any charges will apply.

**Q. Can I withdraw previously tendered Old Notes or revoke my consent to the Exchange Offer and Consent Solicitation?**

**A.** You may not withdraw your previously tendered Old Notes. You may not revoke your consent to the Exchange Offer and Consent Solicitation except under very limited circumstances. See "The Exchange Offer and Consent Solicitation—Withdrawal Rights."

**Q. If I tender my Old Notes in the Tender Offer or submit my Old Notes for exchange in the Exchange Offer and Consent Solicitation, how will I be notified that you have accepted my Old Notes?**

**A.** If your Old Notes have been accepted pursuant to the Tender Offer or the Exchange Offer and Consent Solicitation, you will receive the Tender Offer Consideration or the Consent Payment, as applicable, promptly following the Expiration Time.

**Q. Who do I contact if I have questions about the Tender Offer or the Exchange Offer and Consent Solicitation?**

**A.** D.F. King & Co., Inc., which is acting as Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation, can help answer your questions. For further copies of this Statement and other materials related to the Tender Offer and the Exchange Offer and Consent Solicitation, and for questions regarding the procedures to be followed for tendering or exchanging your Old Notes, please contact D.F. King & Co., Inc. at the address and telephone number listed on the back cover of this Statement.

**Q. When will payments pursuant to the Tender Offer be made?**

**A.** The Tender Offer Consideration will be payable promptly following the Expiration Time.

**Q. When will the exchange and any payments to be made under the Exchange Offer and Consent Solicitation take place?**

**A.** We will make payment in cash of the Consent Payment in respect of the exchanged Old Notes promptly following the Expiration Time (no later than four business days following the Expiration Time). We will issue the New Notes and pay the rest of the Restructuring Consideration on the Issue Date, which will only occur if the *concurso mercantil* has been completed the *Convenio Concursal* is effectively consummated. See "The Exchange Offer and Consent Solicitation."

6

## CONSIDERATIONS RELATING TO THE TENDER OFFER

The "Tender Offer Consideration" for each $1,000 principal amount of Old Notes validly tendered pursuant to the Tender Offer on or prior to the Expiration Time and accepted for purchase by us will be equal to the Clearing Price determined pursuant to a modified "Dutch Auction" as described below under "—Bid Prices and the Determination of the Tender Offer Consideration." The Tender Offer Consideration will be payable in cash promptly after the Expiration Time to those holders whose Old Notes are accepted for purchase in the Tender Offer. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes.

Holders may tender their Old Notes in the Tender Offer or submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to exchange them in the Exchange Offer and Consent Solicitation instead. Holders that tender Old Notes in the Tender Offer but fail to specify their election will be deemed to have elected not to exchange any Old Notes that are not accepted into the Tender Offer in the Exchange Offer and Consent Solicitation instead. Old Notes that are tendered in the Tender Offer but not accepted will be returned to their holder promptly following the Expiration Time unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer.

### Bid Prices and the Determination of the Tender Offer Consideration

The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a holder elects to participate, they must specify the minimum Tender Offer Consideration (the "Bid Price") they would be willing to receive in exchange for each $1,000 principal amount of Old Notes they choose to tender in the Tender Offer. The Bid Price that the holder specifies for each $1,000 principal amount of Old Notes may not be less than $500 (the "Minimum Bid Price") nor more than $575 (the "Maximum Bid Price"). As a result, the Bid Price the holder specifies must be within the following range:

| | |
|---|---|
| **Minimum Bid Price** | $500 |
| **Maximum Bid Price** | $575 |

**Tenders of Old Notes outside of this range will not be accepted and will not be used for purposes of calculating the Clearing Price as described below**.

Bid Prices between the Minimum Bid Price and the Maximum Bid Price must be in minimum increments of $2.50 above $500. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment.

Each holder tendering Old Notes in the Tender Offer is to submit a Bid Price; holders who tender Old Notes without specifying a Bid Price will be deemed to have specified the Minimum Bid Price ($500) as their Bid Price.

Whether and to what extent your tendered Old Notes are accepted for purchase in the Tender Offer will depend upon how the Bid Price specified by you compares to Bid Prices specified by other tendering holders of Old Notes. Specifically, on the Expiration Time:

- we will use all the Bid Prices received across all series of Old Notes to calculate a single Clearing Price in accordance with the procedure set forth below; and

- the Tender Offer Consideration payable for Old Notes accepted in the Tender Offer will be the Clearing Price.

7

The Tender Offer Consideration for all Old Notes, of all series, will be the same. Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes.

The "Clearing Price" for the Old Notes will be determined by consideration of the Bid Prices of all validly tendered Old Notes of all series, in order of lowest to highest Bid Prices. The Clearing Price will be:

- the lowest single price for all tenders of Old Notes of all series such that, for all tenders of Old Notes of all series whose Bid Price is equal to or less than this lowest single price, we will be able to spend the Maximum Payment Amount under the Tender Offer, taking into account the Tender Offer Consideration and the proration described in the next paragraph (provided, however, that if the principal amount of Old Notes purchased at the Clearing Price that results from applying this formula and the proration described in the next paragraph would be less than the principal amount of the Old Notes that would be purchased using the Bid Price next lowest to such lowest single price, then the Clearing Price will be equal to such next lowest Bid Price), or

- except in the case described in the proviso in the previous bullet point, in the event that the purchase of all Old Notes validly tendered would result in us spending less than the Maximum Payment Amount under the Tender Offer, the Clearing Price will be the Maximum Bid Price.

If the amount of Old Notes validly tendered on or prior to the Expiration Time with a Bid Price equal to or less than the Clearing Price would cause us to spend more than the Maximum Payment Amount to repurchase such tendered Old Notes in the Tender Offer, then the Tender Offer will be oversubscribed, and we will accept for payment such tendered Old Notes as follows. First, we will accept for payment all Old Notes validly tendered with a Bid Price less than the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount). Second, we will accept for payment all Old Notes validly tendered with a Bid Price equal to the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount) on a prorated basis using a single proration factor.

To avoid purchases of Old Notes in principal amounts other than integral multiples of $1,000, if necessary, we will make appropriate adjustments downward to the nearest $1,000 principal amount with respect to each holder validly tendering Old Notes at a Bid Price equal to the Clearing Price. For series of Old Notes that have a minimum denomination of $2,000, the Company reserves the right to further adjust the amount of Old Notes of the relevant series that would otherwise be accepted from a given holder downward by $1,000 principal amount if an impermissible denomination of outstanding Old Notes would otherwise result. All Old Notes not accepted as a result of proration and all tenders of Old Notes with a Bid Price in excess of the Clearing Price will be rejected from the Tender Offer.

All holders whose Old Notes (regardless of series) are accepted in the Tender Offer will receive the Tender Offer Consideration even if they tendered at a Bid Price that was less than the Clearing Price.

**Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. We reserve the right, in our sole discretion, to waive or modify any one or more of the conditions to the Tender Offer in whole or in part at any time on or before the date that any Old Notes are first accepted for purchase. We also reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered.**

We will announce any increase in the Maximum Payment Amount in the Tender Offer by a press release during the pendency of the Tender Offer. If the Maximum Payment Amount is increased and there are fewer than ten business days until the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time.

Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

**See "Risk Factors," "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of certain factors that you should consider in evaluating the Tender Offer.**

Questions and requests for assistance in respect of the Tender Offer may be directed to D.F. King & Co., Inc. as the depositary in the Tender Offer (the "Depositary"), at the address and telephone numbers set forth on the back cover of this Statement.

9

## CONSIDERATIONS RELATING TO THE EXCHANGE OFFER AND CONSENT SOLICITATION

If you exchange your Old Notes and consent in the consent solicitation, you will be deemed to have consented to the proposed *Concurso* Plan set forth in Annex A (i) as it may be amended by the court during the contemplated *concurso mercantil* proceeding (as so amended, the "*Convenio Concursal*"), provided that any such amendment is not materially adverse to you as reasonably determined by the Company, (ii) whether it is filed on a prepackaged or non-prepackaged basis and (iii) whether it is filed in a voluntary or involuntary *concurso mercantil* proceeding at our option ((i) through (iii), the "*Concurso* Plan").

In addition to the Letter of Transmittal, Holders will also be required to notarize and execute an irrevocable power of attorney that will enable a third-party Mexican representative appointed by us to exercise your vote in favor of the *Convenio Concursal*, any other required documents in connection with the contemplated *concurso mercantil* proceeding and any related *concurso* filings by the Old Guarantors consistent with the *Concurso* Plan. New Notes issued pursuant to the *Convenio Concursal* will be issued in exchange for the Old Notes through a U.S.-based exchange agent that will be appointed by the Company prior to the issuance of the New Notes. Holders of DFI Claims and Other Debt who execute lock-up agreements prior to the date of this Statement will be deemed to have consented to the proposed *Concurso* Plan. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement, and the proposed terms of the New Notes to be issued pursuant to the *Concurso* Plan are set forth in the "Description of the New Notes" section of this Statement. In the event of any amendments to the *Concurso* Plan, consenting holders of Restructured Debt will be entitled to the benefit of any such amendments.

Any Old Notes tendered or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes.

The Consent Payment will be paid on or before the fourth business day following the Expiration Time to holders whose Old Notes are accepted in the Exchange Offer and Consent Solicitation.

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*, as described under "The Restructuring and the *Concurso* Plan" and "The Exchange Offer and Consent Solicitation—Condition to Delivery and Payment of the Restructuring Consideration."

We may, in our sole discretion, waive any of the conditions set forth in the Exchange Offer and Consent Solicitation, in whole or in part, at any time and from time to time. There can be no assurance that these conditions will be satisfied or waived.

**We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we**

10

believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A. See "Risk Factors Relating to the *Concurso* Plan."

See "Risk Factors," "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of certain factors that you should consider in evaluating the Exchange Offer and Consent Solicitation. See "The Restructuring and the *Concurso* Plan" and the proposed *Concurso* Plan attached hereto as Annex A for a description of the proposed restructuring and some of the consequences of consenting thereto. See also "Summary—Consequences if the Proposed Restructuring Fails."

Questions and requests for assistance in respect of the Tender Offer may be directed to D.F. King & Co., Inc. as the depositary in the Tender Offer (the "Depositary"), at the address and telephone numbers set forth on the back cover of this Statement.

11

## NOTICE TO INVESTORS

*This Statement and the Letter of Transmittal contain important information which you should read before any decision is made with respect to the Tender Offer and the Exchange Offer and Consent Solicitation.*

This Statement has not been reviewed by any U.S. federal or state securities commission or regulatory authority, nor has any such commission or authority passed upon the accuracy or adequacy of this Tender Offer and the Exchange Offer and Consent Solicitation. Any representation to the contrary is unlawful and may be a criminal offense.

You should not construe the contents of this Statement as investment, legal or tax advice. You should consult your counsel, accountant and other advisors as to legal, tax, business, financial and related aspects of the Tender Offer and the Exchange Offer and Consent Solicitation, including the proposed issuance of New Notes pursuant to the *Concurso* Plan. The Company is not making any representation to you regarding the legality of your participation in the Tender Offer and/or the Exchange Offer and Consent Solicitation under appropriate legal investment or similar laws.

In making a decision regarding the Tender Offer and/or the Exchange Offer and Consent Solicitation, you must rely on your own examination of the Company and the terms of the Tender Offer and the Exchange Offer and Consent Solicitation, including, without limitation, the merits and risks involved. The Tender Offer and the Exchange Offer and Consent Solicitation is being made on the basis of this Statement.

This Statement is being provided on a confidential basis for informational use solely in connection with the Tender Offer and the Exchange Offer and Consent Solicitation. This Statement may not be copied or reproduced in whole or in part, nor may it be distributed or any of its contents be disclosed to anyone other than the holders of Restructured Debt to whom it is being provided.

No representation or warranty, express or implied, is made by the Depositary or the Information and Exchange Agent as to the accuracy or completeness of any of the information set forth in this Statement, and nothing contained in this Statement is or shall be relied upon as a promise or representation, whether as to the past or the future. This Statement contains summaries, believed to be accurate, of some of the terms of specific documents, but reference is made to the actual documents, copies of which will be made available upon request, for the complete information contained in those documents. All summaries are qualified in their entirety by this reference.

No person is authorized in connection with the Tender Offer and the Exchange Offer and Consent Solicitation to give any information or to make any representation not contained in this Statement and the Letter of Transmittal and, if given or made, any other information or representation must not be relied upon as having been authorized. The information contained in this Statement is as of the date hereof and subject to change, completion or amendment without notice. Neither the delivery of this Statement at any time nor any subsequent commitment to enter into any financing shall, under any circumstances, create any implication that there has been no change in the information set forth in this Statement or in the affairs of the Company since the date of this Statement.

None of the Company, the Depositary, the Information and Exchange Agent, The Bank of New York Mellon (the trustee under the indentures governing the 2012 Notes and the 2017 Notes), U.S. Bank National Association as successor trustee to Wachovia Bank, National Association (the trustee under the indenture governing the 2013 Notes), nor any of their respective affiliates makes any representation to any holder of Restructured Debt as to whether to consent. If given or made, such information or representation should not be relied upon as having been authorized by any of those parties or any of their respective affiliates. Holders of Restructured Debt must make their own decisions as to whether to consents.

The distribution of this Statement, the Tender Offer and the Exchange Offer and Consent Solicitation for the Restructured Debt may be restricted by law in some jurisdictions. Persons into whose possession this Statement or any of the Restructured Debt comes must inform themselves about, and observe, any such restrictions.

---

The information contained in this Statement is exclusively our responsibility, does not require authorization and has not been reviewed or authorized by the Mexican *Comisión Nacional Bancaria y de Valores* (the "CNBV"). The acceptance of the Tender Offer and/or the Exchange Offer and Consent Solicitation and the issuance of a consent hereunder by an investor, including any investor of Mexican nationality, will be such investor's own responsibility.

We will be subject to filing a notification and certain documentation regarding the New Notes at the time of their issuance, and we have not filed before the CNBV a request for authorization or registration of the New Notes. The New Notes have not been and will not be registered with the *Registro Nacional de Valores* maintained by the CNBV and therefore the New Notes will not be subject to public offering or intermediation in Mexico except pursuant to an exception under Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law. Our notice to the CNBV regarding the issuance of the New Notes will be for information purposes only and will not imply or constitute a certification of the investment quality of the New Notes, our solvency or the accuracy or completeness of the information included in this Statement. The delivery to and receipt by the CNBV of such notice does not constitute or imply any certification as to the investment quality of the New Notes or our solvency, liquidity or credit quality or the accuracy or completeness of the information set forth herein.

13

## PRESENTATION OF FINANCIAL INFORMATION AND OTHER INFORMATION

Vitro, S.A.B. de C.V., formerly Vitro, S.A. de C.V., is a corporation (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico, and is a holding company that conducts substantially all of its operations through its subsidiaries. In this Statement, except when indicated or the context otherwise requires, (a) the words "Vitro" and "our holding company" refer to Vitro, S.A.B. de C.V., and not its consolidated subsidiaries, (b) "the Company" refers to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries and (c) the words "we," "us," "our" and "ours" (i) refer to Vitro and AIV when used in reference to the making and execution of the Tender Offer, (ii) refer to Vitro when used in reference to the making and execution of the Exchange Offer and Consent Solicitation, and (iii) otherwise refer to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries. References in this Statement to business units are to combinations of various consolidated entities that have been grouped together for management and presentation purposes.

References in this Statement to "pesos" or "Ps." are to the lawful currency of the United Mexican States, which we refer to as "Mexico." References to "U.S. dollars," "dollars" or "$" are to dollars of the United States of America, which we refer to as the "United States" or "U.S."

Our consolidated financial statements are prepared in accordance with Mexican Financial Reporting Standards ("MFRS") issued by the Mexican Board for Research and Development of Financial Reporting Standards (the "CINIF"), which differs in certain significant respects from accounting principles generally accepted in the United States, which we refer to as "U.S. GAAP."

As of December 31, 2009, we were in default under the indentures governing the Old Notes and under certain other agreements and instruments governing our debt; therefore, Ps. 15,771 million was reclassified in our consolidated financial statements as short-term debt resulting in current liabilities significantly exceeding current assets. We are currently in negotiations with our financial creditors in order to restructure our debt. We continue to operate normally as we work to achieve a financial restructuring. Our consolidated financial statements do not include the effects that could result if such financial restructuring is unable to be realized.

As disclosed in note 3(a) to the accompanying consolidated financial statements, we adopted the following new MFRS, which impacted our financial position and results of operations in 2008: NIF B-2, Statement of Cash Flows; NIF B-10, Effects of Inflation; NIF D-3, Employee Benefits; and NIF D-4, Income Taxes. In 2009: NIF B-8, Consolidated or Combined Financial Statements; NIF C-8, Intangible Assets; and D-8, Share-based Payments.

In January 2009, the CNBV published amendments to its regulations applicable to issuers (*Circular Única*), making it compulsory for public entities to prepare and present their financial statements using International Financial Accounting Standards ("IFRS") beginning 2012 (early adoption is permitted). Therefore, beginning in first quarter of 2012, we will be required to report our financial information to the Bolsa Mexicana de Valores under IFRS.

Please refer to note 3(a) to our consolidated financial statements for more information about the impacts of these changes.

In November 2008, the by-laws of Empresas Comegua, S.A. ("Comegua"), a company of which we own 49.7%, were modified regarding the control of its operations. As a result, beginning on December 1, 2008 our consolidated financial statements present our 49.7% interest in Comegua under the equity method for purposes of MFRS, whereas previously Comegua was presented as a consolidated subsidiary. As a result of the deconsolidation of Comegua in November 2008, only the results of Comegua for the first eleven months of 2008 are included in our consolidated financial statements, and Comegua's individual assets and liabilities are not included in our consolidated balance sheet as of December 31, 2008. For more details regarding the deconsolidation of Comegua, see note 20(d) to our consolidated financial statements.

In August 2008, our partner in Vitro Cristalglass S.L. ("Vitro Cristalglass") exercised its right to sell its 40% interest in the company to our subsidiary Viméxico, S.A. de C.V. ("Viméxico"), the holding company for certain of our Flat Glass business unit subsidiaries. Therefore, beginning September 1, 2008, our consolidated

14

financial statements present Vitro Cristalglass as a wholly owned subsidiary of Viméxico. In January 2009, a revised payment was agreed upon with the previous partner, extending the payment through the 2009 and 2010 periods, and providing that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company, with a subsequent capital reduction. For more information, see note 20(c) to our consolidated financial statements.

In August 2007, Viméxico acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. ("PVA"), a company dedicated to the installation of value-added glass products, for an amount of approximately $10 million, and beginning September 1, 2007, our consolidated financial statements include PVA as a wholly owned subsidiary of Viméxico. For more information, see note 20(a) to our consolidated financial statements.

In July 2007, Viméxico exercised its option to acquire the 50% equity interest in Vitro AFG, S.A. de C.V. ("Vitro AFG") held by its joint venture partner AFG Industries ("AFG"), a subsidiary of Asahi Glass Co. Limited, and beginning August 1, 2007, our consolidated financial statements present Vitro AFG as a wholly owned subsidiary of Viméxico. For more information, see note 20(b) to our consolidated financial statements.

This Statement contains translations of certain peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. These convenience translations should not be construed as representations that the peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated or at all. The exchange rate used in preparing our consolidated financial statements and in preparing convenience translations of such information into U.S. dollars is the exchange rate calculated and published by the Banco de México, or the Mexican Central Bank, in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, for the conversion of U.S. dollar-denominated amounts into pesos, which we refer to as the "Free Exchange Rate." As of December 31, 2007, 2008 and 2009, the Free Exchange Rate was 10.8662, 13.8325, and 13.0587 pesos per U.S. dollar, respectively. As of June 30, 2009 and 2010, the Free Exchange Rate was 13.2023 and 12.6567 pesos per U.S. dollar, respectively. Within this Statement, we often compare variances between periods. In such instances, when addressing changes in nominal U.S. dollars, we calculate these amounts by dividing the nominal pesos for each period by the exchange rate published by the Mexican Central Bank on the date such transactions were realized. See "Exchange Rates" for additional information regarding exchange rates.

In accordance with MFRS, our consolidated financial statements for the years ended December 31, 2008 and 2009 and for the six-month periods ended June 30, 2009 and 2010, are expressed in nominal pesos, and all amounts for prior fiscal years are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

For purposes of this Statement, we consider our "export sales" to be (a) sales of products produced by our Mexican subsidiaries to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors and (b) sales of products by our foreign distributor subsidiaries. For purposes of determining the amount of our export sales to be disclosed, we consider sales to be made at the time of sale to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors (principally Vitro America, Inc., which we refer to as "Vitro America"), and at the time of sale of the product by our foreign subsidiaries that act as our distributors to third parties outside Mexico.

Under Mexican corporate law, ordinary shares of our Series "A" common stock held by our Stock Option Trust (39,777,907 shares as of October 14, 2010, the date of our most recent general ordinary shareholder's meeting) are considered issued and outstanding and therefore are entitled to receive dividends and vote on matters on which our other shares are entitled to vote. However, for accounting purposes, our ordinary shares held by our Stock Option Trust are considered treasury stock and therefore not outstanding. Thus, for purposes of calculating net income (loss) from continuing operations per share, net income (loss) from discontinued operations per share, the cumulative effect of change in accounting principles per share and diluted and basic net income (loss) per share, as well as for purposes of determining shareholders' equity, we considered our ordinary shares held by our Stock Option Trust as treasury stock and not outstanding. As of October 14, 2010, 59,484,349 ordinary shares were held by our Pension Plan Trust. Those ordinary shares are treated as outstanding for all purposes.

Certain amounts included in this Statement may not sum due to rounding.

## EXCHANGE RATES

The following table sets forth, for each year in the five year period ended December 31, 2009, the high, low, average and annual period-end Noon Buying Rates, all expressed in pesos per U.S. dollar. No representation is made that the peso or U.S. dollar amounts referred to in this Statement could have been or could be converted into U.S. dollars or pesos, as the case may be, at the rates indicated, at any particular rate or at all.

| Year ended December 31, | Noon Buying Rate | | | |
| --- | --- | --- | --- | --- |
| | High | Low | Average | Period-End |
| 2005 | 11.41 | 10.41 | 10.89 | 10.63 |
| 2006 | 11.46 | 10.43 | 10.91 | 10.80 |
| 2007 | 11.27 | 10.67 | 10.93 | 10.86 |
| 2008 | 13.94 | 9.92 | 11.19 | 13.83 |
| 2009 | 15.37 | 12.60 | 13.57 | 13.05 |

Source: The International Monetary Fund

The following table sets forth, for each month in the nine-month period ended on September 30, 2010 and the first 29 days of October, the high and low Noon Buying Rates, all expressed in pesos per U.S. dollar.

| | Noon Buying Rate | |
| --- | --- | --- |
| | High | Low |
| January 2010 | Ps.13.01 | Ps.12.65 |
| February | 13.18 | 12.78 |
| March | 12.75 | 12.41 |
| April | 12.37 | 12.16 |
| May | 13.18 | 12.26 |
| June | 12.93 | 12.46 |
| July | 13.06 | 12.65 |
| August | 13.14 | 12.54 |
| September | 13.06 | 12.48 |
| October (through October 29) | 12.59 | 12.32 |

Source: The International Monetary Fund

## WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE

We are in the process of terminating our registration under Section 12(g) of the Exchange Act and our obligations to file periodic reports with the U.S. Securities and Exchange Commission (the "SEC") under Section 13 and Section 15(d) of the Exchange Act, as described further below. You may access and read our SEC filings through the SEC's website at www.sec.gov. This website contains reports and other information that we file electronically with the SEC. You may also read and copy any reports or other information that we have filed with the SEC at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room.

You may request a copy of our SEC filings, at no cost, by contacting us at the number or address specified below.

Vitro, S.A.B. de C.V.
Ave. Ricardo Margáin Zozaya 400
Col. Valle del Campestre
San Pedro Garza García
66265 Nuevo León, México
Tel: (52-81) 8863-1200

Later information that we file with the SEC, to the extent that we identify such information as being incorporated by reference into this Statement, will automatically update and supersede the information in this Statement. We incorporate by reference into this Statement any future submissions on Form 6-K after the date of this Statement and prior to the termination of the Tender Offer and the Exchange Offer and Consent Solicitation that are identified as being incorporated into this Statement.

On June 22, 2009, the Company announced that it had notified the Bank of New York Mellon, the holder of the ordinary deposit certificates represented by its shares in circulation, of its decision to end its depositary contract that had been subscribed with this institution and through which the corresponding American Depositary Receipts (the "ADRs") were issued. This action was due to the Company's objective to improve the trading of its shares on the BMV and address the low volume of ADRs traded through the New York Stock Exchange (the "NYSE") and the high costs involved with the trading of the ADRs on the NYSE. On August 24, 2009, the Company's ADRs stopped trading on the NYSE.

On September 8, 2010, the Company filed a Form 15-F with the SEC with the intention to deregister its ADRs and the Old Notes and terminate its reporting obligations under Section 12(g) of the Securities Exchange Act.

Vitro is already eligible to suspend its Exchange Act reporting requirements as it complies with the rules of the Exchange Act given that there are no remaining holders of Vitro's ADRs and each class of Old Notes are held of record by fewer than 300 persons registered in the DTC on a worldwide basis.

If the SEC has no objection, the deregistration and termination of reporting obligations will become effective not later than 90 days after the filing of the Form 15-F. Upon filing of the Form 15-F, Vitro's reporting obligations with the SEC were suspended until the deregistration is effective. However, Vitro will continue to provide information to the BMV and will make such information available on its website.

We maintain a website at www.vitro.com that contains information about us. Information on that website is not incorporated by reference in this Statement, unless we expressly identify information posted on that website as being incorporated by reference into this Statement.

The Company has also furnished, and will be required periodically to furnish, certain information, including quarterly and annual reports, to the BMV.

The Company will make available to the holders of the New Notes, at the corporate trust office of the Trustee at no cost, copies of the indentures governing the New Notes.

17

Questions and requests for assistance or for additional copies of this Statement or any other documents (including the above-referenced available information) may be directed to the Depositary or the Information and Exchange Agent, as applicable, at the address and telephone numbers set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

18

# FORWARD-LOOKING STATEMENTS

This Statement includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements relate to our future prospects, developments and business strategies.

These forward-looking statements are identified by our use of terms and phrases such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "predict," "project," "goals," "target," "strategy" and similar terms and phrases, and may include references to assumptions. These statements are contained in the sections entitled "Risk Factors," "Business," and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and other sections of this Statement.

These forward-looking statements reflect our best assessment at the time and thus involve uncertainty and risk. Therefore, these forward-looking statements are qualified by reference to the cautionary statements set forth in this Statement. It is possible that our future financial performance may differ materially from our expectations because of a variety of factors, some of which include, without limitation, the following:

- our ability to restructure and refinance our current debt;

- liquidity, debt repayment and access to credit;

- the general political, economic and competitive conditions in markets and countries where we have operations, including the current global recession conditions, competitive pricing pressures, inflation or deflation, increased security risks and changes in tax rates;

- fluctuations in the price and availability of energy, raw materials, labor and transportation;

- consolidation among competitors and customers;

- foreign currency exchange fluctuations relative to the U.S. dollar and the euro against the Mexican peso;

- changes in capital availability or cost, including interest rate or foreign currency exchange rate fluctuations;

- capacity utilization of our facilities;

- the ability to integrate operations of acquired businesses;

- consumer preferences for forms of packaging that are alternatives to glass containers;

- technological breakthroughs in the construction or auto industries which change the actual use or applications of glass in such industries;

- the ability to hire and retain experienced management;

- lifting of trade barriers and enforcement of measures against unfair trade practices;

- the enactment of stricter environmental laws; and

- the timing and occurrence of natural disasters and other events which are beyond our control and our capacity to recover our level of operations after such events.

Any forward-looking statements in this Statement are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the current circumstances. Forward-looking statements are not a guarantee of future performance and actual results or developments may differ materially from expectations. You are therefore cautioned not to place undue reliance on such forward-looking statements. While we continually review trends and uncertainties affecting our results of operations and financial position, we do not intend to update any particular forward-looking statements contained in this document.

## ENFORCEABILITY OF CIVIL LIABILITIES

Vitro, S.A.B. de C.V., and many of Vitro's subsidiary guarantors with respect to the Old Notes are variable capital corporations organized under the laws of Mexico. Almost all of our directors and executive officers, and the directors and executive officers of many of our subsidiary guarantors, reside outside of the United States. All or a substantial portion of our assets and the assets of many of our subsidiary guarantors and of the directors and executive officers referred to in the preceding sentence are located and the majority of our revenues and the revenues of our subsidiary guarantors are derived from sources outside the United States. As a result, it may not be possible for holders of Restructured Debt to effect service of process outside Mexico upon us or upon our subsidiary guarantors, directors or executive officers, or to enforce against such parties judgments of courts located outside Mexico predicated upon such civil liabilities under the laws of jurisdictions other than Mexico, including judgments predicated upon the civil liability provisions of the U.S. federal securities laws or other laws of the United States. We have been advised by Alejandro Sánchez Mújica, our General Counsel, that no treaty exists between the U.S. and Mexico for the reciprocal enforcement of judgments issued in the other country. Generally, Mexican courts would enforce final judgments rendered in the United States if certain requirements are met, including the review in Mexico of the U.S. judgment to ascertain compliance with certain basic principles of due process and the non-violation of Mexican law or public policy, provided that the U.S. courts would grant reciprocal treatment to Mexican judgments. Additionally, we have been advised by Mr. Sánchez that there is doubt as to the enforceability, in original actions in Mexican courts, of liabilities predicated in whole or in part on U.S. federal securities laws and as to the enforceability in Mexican courts of judgments of U.S. courts obtained in actions predicated upon the civil liability provisions of U.S. federal securities laws.

20

# SUMMARY

*This summary highlights information contained elsewhere in this Statement, and therefore it may not contain all the information that you should consider before consenting to the* Concurso *Plan.*

## Company Overview

Vitro, S.A.B. de C.V. is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and is a holding company that conducts substantially all of its operations through subsidiaries. We were incorporated in Mexico in 1909 and, based on our consolidated net sales in 2009, we believe that we are the largest manufacturer of glass containers and flat glass in Mexico. Our principal executive offices are located at Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico, telephone number (52-81) 8863-1200.

Our Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, liquor and wine, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world. Substantially all of the Glass Containers subsidiaries are wholly owned except for Comegua, our venture with London Overseas and Golden Beer in which we hold a significant investment of 49.7%. Compañia Vidriera, S.A. de C.V. ("Covisa"), which conducts a substantial majority of our glass containers operations in Mexico, is the only significant operating subsidiary (within the meaning of "significant subsidiary" in Rule 1-02 of Regulation S-X under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act")) ("Significant Operating Subsidiary") in the Glass Containers business unit.

Our Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and the automotive industries. Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal.

Viméxico, our 91.8% venture with Pilkington, is a holding company for some of the Flat Glass business unit subsidiaries. Vitro Vidrio y Cristal, S.A. de C.V. ("Vidrio y Cristal"), which manufactures and distributes our raw (float) flat glass products for the Mexican construction industry, is the only Significant Operating Subsidiary in our Flat Glass business unit. In addition to Viméxico, we have partners in three additional subsidiaries: (i) Cristales Automotrices, S.A. de C.V. ("Cristales Automotrices"), which conducts our automotive glass replacement ("AGR") installation business throughout México City, (ii) Vitro Cristalglass, which is engaged in the manufacturing and distribution of flat glass products for the Spanish, French and Portuguese construction industries and (iii) Vitro Chaves Industria de Vidrio, S.A. ("Vitro Chaves"), a subsidiary of Vitro Cristalglass in Portugal. See "Business."

## The Tender Offer

We are offering to purchase for cash, upon the terms and subject to the conditions set forth in this Statement and in the Letter of Transmittal, the maximum aggregate principal amount of Vitro's outstanding 2012 Notes, 2013 Notes and 2017 Notes that we can purchase for $100,000,000 (subject to increase, the "Maximum Payment Amount"), at a purchase price per $1,000 principal amount determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

The Old Notes were issued by and represent obligations of Vitro. Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer— Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered. We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of a loan agreement in the amount of up to the Maximum Payment Amount to be entered into between Fintech and AIV (the "Loan Agreement"). We will cause

the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment. See "The Tender Offer."

**Proposed Restructuring Plan**

We propose to effect a restructuring of the Old Notes through the *Concurso* Plan set forth in Annex A. Pursuant to the *Concurso* Plan, we would, among other things, exchange the Restructured Debt for the following Restructuring Consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of New 2019 Notes;

- $100.0 million (plus the Issue Date Adjustment) in aggregate principal amount of New MCDs, which will mandatorily convert into 15.0% of our equity on a fully diluted basis if not paid in full at maturity or upon the occurrence of certain events of default;

- the Restructuring Cash Payment, which will be paid from the remainder of the cash in the Payment Trust after the Consent Payment is made, to all holders of Restructured Debt on a pro rata basis; and

- the Restructuring Fee, as described in "Summary—The New Notes—The New 2019 Notes."

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*.

For every $1,000 principal amount of the Restructured Debt exchanged, holders will be entitled to receive:

- $561 principal amount of New 2019 Notes,

- $66 principal amount of New MCDs (not including the Issue Date Adjustment),

- a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and

- a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date).

Any intercompany debt will not receive the Restructuring Consideration and will be subordinated to payment of the Restructured Debt (subject to payments made in the ordinary course of business consistent with past practices).

The principal objectives of the restructuring described in this Statement are to lower our principal and interest payments and extend the maturity dates of the Old Notes and the other Restructured Debt. We do not have the means to repay or refinance the amounts that are payable under our indentures and other financial instruments. We believe that we are currently not likely to find a material source of financing to fund the interest and principal payments on the Old Notes. We believe that the completion of the restructuring through the *Concurso* Plan is critical to resolving our liquidity crisis and ensuring our continued viability.

While we have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*, we believe that the Exchange Offer and Consent Solicitation and the implementation of the *Concurso* Plan would benefit both you and the Company by helping us to avoid potential contentious litigation and protracted proceedings that could cause business disruptions or damage to the overall value of our business. See "—Advantages of the Proposed Restructuring" below.

### The Exchange Offer and Consent Solicitation and Consent Payment

We are seeking the tender of the Old Notes and the consent of holders of Restructured Debt to the *Concurso* Plan; however, we may proceed with filing the proposed *Concurso* Plan without any such tender or consents. Holders who tender Old Notes and deliver consents in the Exchange Offer and Consent Solicitation for Old Notes will be deemed to have consented to the proposed *Concurso* Plan. Holders of DFI Claims and Other Debt who execute lock-up agreements prior to the date of this Statement will be deemed to have consented to the proposed *Concurso* Plan. The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement.

The Payment Trust will pay a Consent Payment to holders of Restructured Debt in an amount representing such holder's pro rata share of an aggregate of $75.0 million in cash held in the Payment Trust based on the aggregate principal amount of Restructured Debt that is held by certain holders of the Restructured Debt (a) who have tendered the Old Notes into the Exchange Offer and Consent Solicitation or entered into lock-up agreements as of the date of this Statement or (b) who have provided a consent with respect to their Restructured Debt pursuant to the terms of this Statement (each such holder, a "Participating Creditor"); provided, however, that the aggregate Consent Payment paid to each Participating Creditor shall in no event be less than 5% or greater than 10% of the aggregate principal amount of Restructured Debt held by such holder. The payment of the Consent Payment shall be made by the Payment Trust on or before the fourth business day following the Expiration Time to Participating Creditors who consent to the *Concurso* Plan pursuant to the terms of this Statement.

Holders who participate in the Tender Offer will not receive a Consent Payment in respect of any Old Notes that are accepted for purchase in the Tender Offer or that are not accepted for purchase and are returned to such holder. Such holders may receive a Consent Payment (as described above) only in respect of any Old Notes of such holder that are included in the Exchange Offer and Consent Solicitation because (a) such holder elected in its Letter of Transmittal to have any Old Notes that are not accepted for purchase in the Tender Offer included in the Exchange Offer and Consent Solicitation and (b) such Old Notes are not accepted in the Tender Offer.

## Background of the Restructuring

### Our Financial Difficulties

#### The Global Recession and Its Effects on Our Business

The global economic and financial crisis, and the severe economic recession, which began in the second half of 2008, affected each of our major markets, Mexico, the United States and Spain, and has significantly affected our Glass Container and Flat Glass businesses. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand from our main client in Glass Containers resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009. Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the six-month period ended June 30, 2010, our consolidated net sales decreased 7.3% to Ps. 11,399 ($901 million) from Ps. 12,292 million ($931 million) for the same period ended June 30, 2009. For further discussion see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results" and "Selected Historical Consolidated Financial Information."

#### Claims Relating to Our Derivative Financial Instruments

We are a large consumer of natural gas with an approximate consumption of 20 million British Thermal Units ("MMBTUs") in 2008 and 17 MMBTUs in 2009 through our 21 glass container furnaces, three float glass furnaces in Mexico and our 15-year "take-or-pay" power agreement with Tractebel Energía, S. de R.L. de C.V.

("Tractebel Energía") in which natural gas is a pass through component in the energy price. See "Business—Our Raw Materials—Energy." During the first seven months of 2008, energy prices, mostly natural gas, our main energy input, recorded a sharp price increase from $6.51 to $12.60 per MMBTU, exerting negative pressure on our operating and financial results. During this period, in order to hedge against further increases in natural gas prices, we entered into certain Derivative Financial Instruments ("DFIs") that were different in characteristics and notional amounts from the derivative contracts we had historically entered into.

Additionally, during the first seven months of 2008, the Mexican peso appreciated 7.4% relative to the U.S. dollar. During the same period, the Mexican equilibrium interbank interest rates ("TIIE") increased 6.5%. During this period, we entered into certain additional DFIs materially different in characteristics and in notional amounts from the derivative contracts we had customarily entered into in order to hedge against continued increases in the value of the peso against the dollar and continued increases in interest rates.

In the fourth quarter of 2008, due to high volatility in the financial markets, coupled with a significant drop in the price of natural gas as well as a sharp decrease in the value of the Mexican peso compared to the U.S. dollar, our DFI positions were adversely impacted. Natural gas prices plummeted from a record high of $12.60 per MMBTU in July 2008 to $6.00 per MMBTU by year end 2008, and in the final months of 2008, the Mexican peso registered a 30% year end devaluation against the dollar, reversing the appreciation trend experienced in the first seven months. As a result of these changes, we were required to post $85 million in collateral deposits related to margin calls by our DFI counterparties ("Counterparties"). In order to eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008 we restructured our DFI portfolio and unwound the majority of our open positions to guarantee our ability to continue our normal course of operations. Our failure to make payment on our closed DFI positions triggered cross-default provisions in the majority of our long-term debt instruments.

During February and March 2009, six out of seven Counterparties with whom we and/or some of our subsidiaries entered into DFIs filed lawsuits in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and other fees related to the unwound positions. As of the date of this Statement, our subsidiary, Vitro Envases Nortéamerica, S.A. de C.V. ("Vena") has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six Counterparties who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. We are seeking to include this settlement in the Restructured Debt. However, if we do not reach an agreement with Calyon to do so, the amount of this settlement will not be included. The Restructuring Consideration for holders of Old Notes or other DFI Claims will not change regardless of whether the Calyon settlement is included as part of the Restructured Debt though the aggregate principal amount of the New 2019 Notes and New MCDs that we would issue on the Issue Date would be reduced accordingly. In any event, if we are unable to reach an agreement with Calyon to include our settlement with them in the Restructured Debt, we will not be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the Restructuring Consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five Counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such settlement agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had originally entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued promissory notes to Fintech in respect and in settlement of such outstanding debt ("Promissory Notes", which are the agreed upon amounts in settlement of DFI Claims and included in the definition of DFI Claims). The Promissory Notes were guaranteed "por aval" by us and some of our subsidiaries. The Promissory Notes, are subject to the Fintech Lock-up Agreement (the main terms of which are described in "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock-up Agreement") and will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation described in this Statement.

*Interest and Principal Payment Default on the Old Notes and the Other Debt*

In order to preserve the necessary cash to continue our operations, Vitro did not make scheduled interest payments due February 2009, August 2009, February 2010 and August 2010 on the 2012 Notes and 2017 Notes and did not make scheduled interest payments due May 2009, November 2009 and May 2010 on the 2013 Notes. Under the indentures governing the Old Notes, the trustee or the registered holders of at least 25% in principal amount of the Old Notes have the right to accelerate this debt. On January 4, 2010, we received a document entitled "Notice of Acceleration of Payment" from a group of holders of the 2012 Notes and 2017 Notes, which was also addressed to the trustee under the indentures governing the 2012 Notes and the 2017 Notes. At our request, counsel to the signatories of such document stated that such signatories represented holders of 25% or more of each of the relevant series of 2012 Notes and 2017 Notes. On April 12, 2010, we also received a document entitled "Notice of Default and Acceleration" on letterhead of the trustee under the indenture governing the 2013 Notes.

In addition, Vitro also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest, due February 5, 2009, on its *Certificados Bursátiles* issued in 2003 ("*Certificados Bursátiles Vitro 03*"). The common representative (*representante común*) of the *Certificados Bursátiles* initiated a legal proceeding in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment.

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit filed in the Fifth Court Specialized in Civil Proceedings (*Juzgado Quinto Civil*) brought by ABN Amro (owned at one time by RBS Bank) in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was given requiring the Company to pay the principal amount. On January 18, 2010, the Company appealed this and other rulings that were issued in proceedings where certain evidence was dismissed. In September 2010, the First Appeals Court of the Superior Tribunal of the Federal District (*Pimera Sala del Tribunal Superior de Justicia*) accepted one of the grounds for appeal on the merits, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits.

### The Restructuring Process

As a result of the foregoing, in February 2009, we announced our intention to restructure the outstanding Old Notes and the other Restructured Debt. We subsequently retained Rothschild Inc. as financial advisor to advise us on restructuring alternatives.

*Financial Liquidity Transactions*

In an effort to strengthen our liquidity and maintain normal operations during the restructuring process, we entered into the following transactions:

- *Bancomext Transaction.* In November 2008, through one of our subsidiaries, we contributed non-productive real estate assets with a book value of Ps. 1,875 million ($136 million), as of December 31, 2009, to a trust created for the sole purpose of selling such assets ("Bancomext Trust") if necessary in order to generate the necessary resources to pay off the principal from an $85 million credit obtained from a financial institution. As of December 31, 2008 and 2009 and June 30, 2010, the proceeds drawn against the loan were $85 million, $68 million and $68 million, respectively. On August 24, 2010, we finalized the sale of non-productive properties, amounting to US $63.8 million. The resources of such sale and $5.5 million were contributed to the trust to pay in full the balance of US $69.3 million to that date and thereby recover the property of our two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

- *Refinancing of Bladex Credit Facility.* In July 2009, one of our subsidiaries refinanced a $30 million credit with Banco Latinoamericano de Exportaciones, S.A. ("Bladex") for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014. This amount is not part of the Restructured Debt.

- *Fintech Sale and Leaseback Transaction.* In December 2009, we completed a $75 million transaction with Fintech Advisory Limited, an affiliate of Fintech ("Fintech Advisory"), through the creation of a Mexican trust (the "Real Estate Trust"). Vitro and its subsidiaries, Comercializadora Álcali, S.A. de C.V. ("Álcali"), Vidriera Guadalajara, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V. and Vidriera Toluca, S.A. de C.V. contributed seven real estate assets (industrial land) to the Real Estate Trust, receiving $75 million in cash contributed by Fintech Advisory to acquire these assets. We entered into a 15 year lease agreement that allows the Company to continue using the assets. The Company has the right to repurchase the title to these real estate assets in exchange for $126 million in cash in certain circumstances. If we default on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming we have not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech exercises its right to sell or lease the real estate assets, this could adversely affect our business. Additionally, after the execution of a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness and the satisfaction of certain other conditions precedent, Fintech may exercise one of two options obtained on the same date to exchange the rights over the Real Estate Trust for shares of the Company and/or a sub-holding subsidiary's common shares. The option related to the common shares of the Company, if exercised, would be for up to a maximum of 93,099,849 shares that in the aggregate are currently held by the Company's Pension and Stock Option Trusts (described herein), valued in accordance with the relevant valuation formula set forth in the option agreement and would leave Fintech with up to a maximum equity stake in the Company of approximately 24%. If those common shares are not sufficient to satisfy the $75 million option purchase, the remainder of the purchase option would be fulfilled with the delivery to Fintech of the necessary shares of the sub-holding subsidiary valued in accordance with the relevant valuation formula set forth in the option agreement. Alternatively, Fintech may elect to exercise the second option, over certain shares of the sub-holding subsidiary exclusively (Only one of the two options may be exercised). Fintech's equity options expire three years after a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness is executed. The Company has the option to repurchase the sub-holding subsidiary's shares during the three years following Fintech's exercise of either option. In the event that Fintech exercises the option related to the Company's common shares, a shareholders agreement among Fintech and the Company's controlling shareholders will come into effect and would continue to be in effect as long as Fintech holds at least a 5% ownership in Vitro. Pursuant to the terms of such shareholders agreement, among other things, subject to certain limitations and qualifications, Fintech specifically agreed to vote with Mr. Adrian Sada Gonzalez, Ms. Esther Cueva de Sada, Ms. Maria Alejandra Sada Gonzalez and Mr. Adrian Sada Cueva, and the consent of Fintech (including Fintech) will be required with respect to certain fundamental actions and voting matters affecting the Company. Moreover, under the shareholders agreement, Fintech and the other shareholders party thereto will be subject to certain transfer restrictions, in each case customary for a significant shareholder of a Company like ours.

- *Refinancing of Flat Glass Accounts Receivable Financing Program.* In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24 million) with a five year maturity.

- *Sale of Float Glass Inventory in Mexico.* In March 2010, we refinanced a transaction involving the sale of some of our float glass inventory for approximately Ps. 250 million ($20 million) for an additional year.

- *Covisa / Álcali Securitization Refinancing*. In April 2010, we refinanced the senior Ps. 550 million ($43 million) variable rate TIIE+ 4% bond of the accounts receivable securitization trust of our subsidiaries Covisa and Álcali for an additional two years. The remaining $10 million balance of the subordinated notes was repaid.

- *Renewal of Vitro America's Credit Lines*. In June 2010, we renewed $32.5 million of Vitro America's credit lines with Bank of America for an additional year.

- *Refinancing of Credit Lines in Spain*. In August 2010, we refinanced 44.8 million euros of credit lines of Vitro Cristalglass, our subsidiary in Spain. We have reached agreements to extend these credit lines for three years.

### Discussions with an Ad hoc Steering Committee for the Old Notes

As part of the negotiation process in connection with the restructuring, certain Holders claiming to represent approximately 30% of the principal amount of the Old Notes formed an ad hoc committee of holders of the Old Notes, which we refer to as the "Steering Committee." We agreed to pay the fees and expenses of the legal advisors and a financial advisor to the Steering Committee. The Steering Committee subsequently retained Chanin Capital Partners as financial advisor and White & Case LLP and Heather & Heather, S.C. as legal advisors.

We have engaged in extensive negotiations with the advisors to the Steering Committee and certain members of the Steering Committee regarding the terms of the restructuring, with the Company providing an initial restructuring proposal in August 2009. The Steering Committee responded with a counterproposal in September 2009, to which the Company responded with an additional proposal in March 2010. The Steering Committee subsequently issued another counterproposal in April 2010, and we presented another proposal in July 2010 and have continued to have discussions with various members of the Steering Committee. However, we have not been able to come to an agreement regarding the final terms of the restructuring.

### Negotiations with Fintech

In addition to our extensive negotiations with the Steering Committee, during the past two months we have been involved in active negotiations with Fintech, as a significant holder of Restructured Debt, to improve the economic terms and other terms and conditions of our prior restructuring proposal for the benefit of all holders of Restructured Debt. To that end, we held several discussions and negotiations with Fintech and its U.S. and Mexican counsel and advisors and agreed to make substantial changes to the terms and conditions of the proposed Restructuring Consideration (including the terms and conditions of the New Notes), all of which are reflected in this Statement. As a result of such negotiations and discussions, we believe that our proposed *Concurso* Plan provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity and reflects our commitment to significantly deleverage our Company and return to financial soundness. In response to the favorable outcome of such negotiations and discussions, Fintech has agreed to enter into a lock-up and plan support agreement in respect of all of its Restructured Debt and to provide the financing for our offer to purchase Old Notes pursuant to the Tender Offer, subject to certain conditions and the terms of the Loan Agreement.

### Fintech Lock-up Agreement

We have entered into a lock-up agreement with Fintech (the "Fintech Lock-Up Agreement") which provides, among other customary obligations, that (a) Fintech will cause all of Fintech's Restructured Debt to be voted in favor of acceptance of the *Concurso* Plan; (b) Fintech will submit all of its Restructured Debt for participation in the *Concurso* Plan and will receive the Restructuring Consideration in respect thereof; (c) Fintech will not participate in or support the liquidation or dissolution of Vitro, nor will it object or oppose the voluntary commencement by Vitro or certain of its subsidiaries of one of more chapter 15 or chapter 11 bankruptcy cases (provided that such cases are not inconsistent with the *Concurso* Plan and are in form and substance reasonably satisfactory to Fintech); and (d) Vitro will pay the Consent Payment in respect of all of Fintech's Restructured Debt

that is voted in favor of the *Concurso* Plan (including any Old Notes purchased in the Tender Offer and delivered to Fintech as payment under the Loan Agreement).

The Fintech Lock-Up Agreement may be terminated by either party following, among other things, a breach of that party's obligations under the Fintech Lock-Up Agreement, subject to a 30 day grace period. Following (a) any modification, amendment or supplement to the *Concurso* Plan that is prejudicial in any material respect to Fintech; (b) the rejection or reduction of Fintech's Restructuring Debt claims during the *concurso mercantil*; (c) the failure of Vitro or the Payment Trust to pay the Consent Payment on or prior to four business days following the Expiration Time; or (d) certain other events, Fintech may terminate the Fintech Lock-Up Agreement.

The Fintech Lock-Up Agreement may also be terminated by Fintech following our failure to meet certain milestones in connection with the proposed restructuring, including the occurrence of each of the following events: (a) the Expiration Time is extended beyond December 15, 2010; (b) the *concurso mercantil* proceeding is not filed on or before the earlier of the fifteenth business day after the Expiration Time and December 31, 2010; (c) the *Concurso* Plan fails to receive the support of holders representing more than fifty percent (50%) of the aggregate amount of outstanding Restructured Debt and intercompany claims by December 15, 2011; and (d) the Mexican federal court presiding over the *concurso mercantil* proceeding does not issue a first instance ruling approving the *Concurso* Plan and the *Convenio Concursal* within sixty (60) days after the conciliation stage of the *concurso mercantil* proceeding, including any extensions, concludes, but in any event by February 15, 2012.

The Fintech Lock-Up Agreement will automatically terminate upon the earlier to occur of (a) the date the *Convenio Concursal* becomes effective or is approved or (b) the Outside Consummation Date, which is the date that is fifteen (15) calendar days after the *Convenio Concursal* is approved by the Mexican federal court presiding over the *concurso mercantil* proceeding of the Company unless: (i) the Mexican federal court has issued an order or decree staying or legally prohibiting consummation of the *Convenio Concursal*; or (ii) (1) any appeal is pending, a potential outcome of which is the invalidation or reversal of the Mexican federal court's approval of the *Convenio Concursal* and (2) within fifteen (15) calendar days after approval by the Mexican federal court of the *Convenio Concursal*, the holders of a majority in amount of the acknowledged claims (as defined in the *Concurso* Plan, which, for the avoidance of doubt, includes all recognized intercompany debt) provide the Company with written consent to postpone consummation of the *Convenio Concursal* until the earlier of (A) the resolution of such pending appeal and (B) the date that is ten (10) months after the date the *Convenio Concursal* was approved by the Mexican federal court (the "Long-Stop Date"); provided, however, that if such appeal is not resolved prior to the Long-Stop Date, the Company will be required to effectuate consummation of the *Convenio Concursal*, unless legally prohibiting from doing so, within five (5) Business Days of the Long-Stop Date notwithstanding such appeal has not been resolved.

## Advantages of the Proposed Restructuring

We believe that the issuance of the New Notes in exchange for the Restructured Debt pursuant to the *Concurso* Plan provides Holders with a net present value of $835.9m, which represents a 55.2% recovery on the face value of their claims and a premium of 19.2% over the average price of the Old Notes in the last twelve months, in each case assuming (i) a 10.0% discount rate with respect to the New 2019 Notes and a 20.0% discount rate with respect to the New MCDs and (ii) pro rata treatment for alleged DFI Claims. These amounts assume that the New Notes are issued on the Value Date but exclude cash payments made as a Restructuring Cash Payment or a Consent Payment.

If the minimum 5% Consent Payment is paid, Holders participating in the Exchange Offer and Consent Solicitation will recover 60.1% on the face value of their claims and a premium of 29.9% over the average price of the Old Notes in the last twelve months. If the maximum 10% Consent Payment is paid, Holders participating in the Exchange Offer and Consent Solicitation will recover 65.2% on the face value of their claims and a premium of 40.8% over the average price of the Old Notes in the last twelve months. These recoveries for the 5% Consent Payment and 10% Consent Payment assume the New Notes are issued on the Value Date but exclude and Restructuring Cash Payment, and in each case also assume (i) and (ii) above.

We believe that the proposed *Concurso* Plan provides for a fair recovery for Holders in light of our available financial capacity. We believe the counterproposals submitted by the Steering Committee would require us to maintain an unviable leverage profile at levels that are much higher than those of our peers, which we believe would put us at a competitive disadvantage and would be objectionable to our customers and vendors. Moreover, we believe that the proposed *Concurso* Plan represents a significantly enhanced recovery for Holders relative to the recovery they could potentially achieve through litigation and higher than the average market price of the Old Notes for the last twelve months. For a more complete discussion of the *Concurso* Plan, see Annex A and "The Restructuring and the *Concurso* Plan." For a more complete discussion of the terms of the New Notes, see "Description of the New Notes."

We believe that the primary benefits of the restructuring through the implementation of the *Concurso* Plan to us and to you are:

- improving our ability to continue operating as a going concern and avoiding the risk of an involuntary *concurso mercantil* or U.S. bankruptcy proceeding, the outcome of which would be uncertain;

- lowering our interest payment obligations to more closely align our debt service obligations with our current and projected cash flows while giving us the flexibility to pursue advantageous refinancing opportunities in the future;

- enabling us to create a "serviceable" capital structure that will allow us to remain competitive and avoid a subsequent restructuring;

- providing for a fair recovery for our creditors in light of our available financial capacity and market conditions;

- avoiding potential contentious litigation and protracted proceedings to minimize any potential business disruption or any damage to the overall value of our business;

- deleveraging the Company to provide us with greater financial flexibility to maintain and improve our business; and

- extending the scheduled maturity dates of nearly all of our financial indebtedness to provide us with additional time to withstand the negative global economic conditions and the global downturn in the glass container, automotive and construction industries.

We believe the consummation of the restructuring through the *Concurso* Plan is beneficial to you, as a Holder, because we cannot assure you that an involuntary *concurso mercantil* or bankruptcy (*quiebra*) proceeding in Mexico or a U.S. bankruptcy proceeding would result in a more favorable outcome for you. Additionally, we believe that if we are subject to an involuntary *concurso mercantil* or *quiebra* proceeding or U.S. bankruptcy proceeding in lieu of the *Concurso* Plan, you will receive significantly less consideration for the Old Notes than you will receive if the restructuring based on the *Concurso* Plan is successful. See "—Consequences if the Proposed Restructuring Fails" below.

**Adverse Effects of the Proposed Restructuring on Holders**

In connection with the *Concurso* Plan, you will receive New 2019 Notes which will have a final maturity that is later than the final maturities for the Old Notes and an interest rate that is lower than the interest rates for the Old Notes. In addition, the Company will have the option to pay half of the interest in kind on the New 2019 Notes for the first three years and will be permitted to redeem the New 2019 Notes at any time at par (out of Excess Cash Flow, as defined in "Description of the New Notes," or the proceeds of new debt or equity financings). See "Description of the New Notes" for more information on the terms of the New Notes, including the New MCDs. Holding the New Notes involves risks, and after the restructuring, you may still receive less than the full principal amount of the New Notes.

We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A.

For further information, see "Risk Factors—Risk Factors Relating to Our Business—Even if our debt restructuring is successful, our indebtedness and other obligations could continue to be significant and could contain significant restrictions."

**Consequences if the Proposed Restructuring Fails**

We did not make certain interest payments described above on the Old Notes and, as the payment grace period has expired for such interest payments, the indentures governing the Old Notes provide holders of at least 25% in principal amount of the Old Notes with the right to accelerate this debt. On January 4, 2010, we received a document entitled "Notice of Acceleration of Payment" from a group of holders of the 2012 Notes and 2017 Notes, which was also addressed to the trustee under the indentures governing the 2012 Notes and the 2017 Notes. At our request, counsel to the signatories of such document stated that such signatories represented holders of 25% or more of each of the relevant series of 2012 Notes and 2017 Notes. On April 12, 2010, we also received a document entitled "Notice of Default and Acceleration" on letterhead of the trustee under the indenture governing the 2013 Notes. We are not currently able to pay the amounts due on the Old Notes. In addition, as described above, we currently owe amounts to additional creditors, including holders of certain DFI Claims and Other Debt. There can be no assurance that our creditors will not take additional legal actions against us, including instituting an involuntary *concurso mercantil* proceeding in Mexico or U.S. bankruptcy proceeding.

If we become involved in an involuntary proceeding in Mexico or the United States or a voluntary non-prepackaged proceeding in Mexico, we could not predict the duration thereof or the ability of Holders or any other creditor to influence the outcome of such proceedings. A reorganization proceeding is likely to result in significant changes to our existing obligations, including the Old Notes, which could include the cancellation or rescheduling of all or part of those obligations. During or after the pendency of any such proceeding, our ability to operate or manage our business, to retain employees, to maintain existing or create new customer relationships, to continue to collect payments for our services or to obtain any type of funding or financing would likely be significantly jeopardized and, as a result, the potential recovery for the Holders could be materially adversely affected.

In a Mexican reorganization proceeding, if we are unable to reach an agreement with the majority of our unsecured creditors, including the Holders, during the conciliation phase of the proceeding, we could be forced to enter the bankruptcy phase of a Mexican reorganization proceeding and could be subject to liquidation and ultimately be forced to sell all or substantially all of our assets. This lack of agreement could force us to operate in bankruptcy (*concurso mercantil*) for a period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees. See "The Mexican Law of Commercial Reorganizations" for a further description of a Mexican reorganization proceeding. As a result of the downturn in the global market, we expect that the proceeds from any potential liquidation and sale of our assets would not be sufficient to satisfy all of our obligations to you, and would result in a net recovery to you that is projected to be substantially less than you would receive pursuant to the *Concurso* Plan. See "Risk Factors—Risk Factors Relating to the *Concurso* Plan—If we or the Mexican Guarantors were to be declared bankrupt, holders of the New Notes may find it difficult to collect payment on the New Notes."

30

**Recent Developments**

*Earthquake in Mexicali temporarily affected our facility*

In April 2010, our flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies.

*Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León*

On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. In particular:

- two of our four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, we were able to minimize the impact on our original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- two of our three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July; however, its operations were temporarily suspended due to stability issues and it resumed full operations again in the last week of August; the other affected facility is expected to resume operations in October; our float glass facility in Mexicali, which is currently operating at 100% capacity, is temporarily supplying glass to our OEM glass processing plants; and

- our facilities at Álcali suspended operations for a few days and a portion of Álcali's end-product, raw material and packaging inventories were damaged; however, we were able to minimize the impact on our clients by working jointly to supply only the minimal amount necessary for them to continue operating.

We have not yet determined the full impact on our operating results of the damage caused by Hurricane Alex. We expect such damages will be covered by insurance less any applicable deductibles; however, we can provide no assurance as to the amount and timing of such recovery. See "Risk Factors—Risk Factors Relating to Economies in Which We Participate—Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients."

**THE TENDER OFFER**

| | |
|---|---|
| The Tender Offer | We are offering to purchase your Old Notes upon the terms and subject to the conditions set forth in this Statement. The Old Notes were issued by and are the obligations of Vitro. |
| Notes Subject to the Tender Offer | We are making a tender offer for the maximum aggregate principal amount of Vitro's 2012, 2013 and 2017 Notes that we can purchase for $100,000,000 (subject to increase as described below, the "Maximum Payment Amount") at a purchase price per $1,000 principal amount determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered. |
| | Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to submit Old Notes that are tendered but not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation. Holders that tender Old Notes in the Tender Offer but fail to specify their election will be deemed to have elected not to submit Old Notes that are tendered but not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation. Old Notes that are tendered in the Tender Offer but not accepted will be returned to the DTC Participant that tendered them promptly following the Expiration Time unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer. |
| | The following table sets forth, for each series of Old Notes, the security description for the Notes, the CUSIP number and the aggregate principal amount outstanding for that series of Old Notes: |

| Security Description | CUSIP | Outstanding Principal Amount |
|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 |

| | |
|---|---|
| Tender Offer Consideration | The "Tender Offer Consideration" for each $1,000 principal amount of Old Notes validly tendered pursuant to the Tender Offer on or prior to the Expiration Time and accepted for purchase by us (subject to proration) will be equal to the Clearing Price determined pursuant to a modified "Dutch Auction" as described herein. |

|  |  |
|---|---|
|  | Holders must validly tender their Old Notes on or prior to the Expiration Time in order to be eligible to receive the Tender Offer Consideration. |
| Submitting a Bid Price | The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a holder elects to participate, they must specify a Bid Price, which is the minimum Tender Offer Consideration they would be willing to receive in exchange for each $1,000 principal amount of Old Notes they choose to tender in the Tender Offer. The Bid Price that the holder specifies for each $1,000 principal amount of Old Notes may not be less than the Minimum Bid Price ($500) nor more than the Maximum Bid Price ($575). As a result, the Bid Price the holder specifies must be within the following range: |

| | |
|---|---|
| **Minimum Bid Price** | $500 |
| **Maximum Bid Price** | $575 |

|  |  |
|---|---|
|  | **Tenders of Old Notes outside of this range will not be accepted and will not be used for purposes of calculating the Clearing Price as described below.** |
|  | Bid Prices between the Minimum Bid Price and the Maximum Bid Price must be in minimum increments of $2.50 above $500. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment. |
|  | Each holder tendering Old Notes in the Tender Offer is to submit a Bid Price; holders who tender Old Notes without specifying a Bid Price will be deemed to have specified the Minimum Bid Price ($500) as their Bid Price. |
| Determination of Tender Offer Consideration | Whether and to what extent your tendered Old Notes are accepted for purchase in the Tender Offer will depend upon how the Bid Price specified by you compares to Bid Prices specified by other tendering holders of Old Notes, regardless of series. Specifically, on the Expiration Time: |
|  | • we will use all the Bid Prices received across all series of Old Notes to calculate a single Clearing Price in accordance with the procedure set forth below; and |
|  | • the Tender Offer Consideration payable for Old Notes accepted in the Tender Offer will be the Clearing Price. |
|  | The Tender Offer Consideration for all Old Notes, of all series, will be the same. |
|  | Holders whose Old Notes are accepted in the Tender Offer will not receive any payment in respect of accrued and unpaid interest on the Old Notes. |

| | |
|---|---|
| Clearing Price | The "Clearing Price" for the Old Notes will be determined by consideration of the Bid Prices of all validly tendered Old Notes of all series, in order of lowest to highest Bid Prices. The Clearing Price will be: |

- the lowest single price for all tenders of Old Notes of all series such that, for all tenders of Old Notes of all series whose Bid Price is equal to or less than this lowest single price, we will be able to spend the Maximum Payment Amount under the Tender Offer, taking into account the Tender Offer Consideration and the proration described in the next paragraph (provided, however, that if the principal amount of Old Notes purchased at the Clearing Price that results from applying this formula and the proration described in the next paragraph would be less than the principal amount of the Old Notes that would be purchased using the Bid Price next lowest to such lowest single price, then the Clearing Price will be equal to such next lowest Bid Price), or

- except in the case described in the proviso in the previous bullet point, in the event that the purchase of all Old Notes validly tendered would result in us spending less than the Maximum Payment Amount under the Tender Offer, the Clearing Price will be the Maximum Bid Price.

| | |
|---|---|
| Proration | If the amount of Old Notes validly tendered on or prior to the Expiration Time with a Bid Price equal to or less than the Clearing Price would cause us to spend more than the Maximum Payment Amount to repurchase such tendered Old Notes in the Tender Offer, then the Tender Offer will be oversubscribed, and we will accept for payment such tendered Old Notes as follows. |

- First, we will accept for payment all Old Notes validly tendered with a Bid Price less than the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount).

- Second, we will accept for payment all Old Notes validly tendered with a Bid Price equal to the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount) on a prorated basis using a single proration factor.

**All Old Notes not accepted as a result of proration and all tenders of Old Notes with a Bid Price in excess of the Clearing Price will be rejected from the Tender Offer.**

To avoid purchases of Old Notes in principal amounts other than integral multiples of $1,000, we will make appropriate adjustments downward to the nearest $1,000 principal amount with respect to each holder validly tendering Old Notes at a Bid Price equal to the Clearing Price. For series of Old Notes that have a minimum denomination of $2,000, the Company reserves the right to further adjust the amount of Old Notes of the relevant series that would otherwise be accepted from

|  |  |
|---|---|
|  | a given holder downward by $1,000 principal amount if an impermissible denomination of outstanding Old Notes would otherwise result. |
| Maximum Payment Amount | We will pay for the Old Notes purchased in the Tender Offer in cash. The Maximum Payment Amount of cash we will use to pay the Tender Offer Consideration for Old Notes purchased pursuant to the Tender Offer is $100,000,000 (subject to the next succeeding paragraph). We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. |
|  | We will announce any increase in the Maximum Payment Amount in the Tender Offer by a press release during the pendency of the Tender Offer. If the Maximum Payment Amount is increased and there are fewer than ten business days until the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time. |
| Source of Funds | We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of the Loan Agreement. We will cause the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment. See "The Tender Offer—Source and Amount of Funds." |
| Expiration Time | The Tender Offer will expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended by us. We expressly reserve the right, subject to applicable law, to terminate the Tender Offer at any time prior to the Expiration Time. |
| No Withdrawal Rights | Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn. |
| Payment Date | The payment date for the Tender Offer will occur promptly following the Expiration Time. The Tender Offer Consideration will be payable on such date. |
| Conditions to the Tender Offer | Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. |
| Procedure for Tendering | All of the Old Notes are held in book-entry form through the facilities of DTC. If you own Old Notes and wish to tender them in the Tender Offer, you should follow the instructions below. |
|  | If you hold your Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, you will need to timely instruct your custodian or nominee to tender your Old Notes on or prior to the Expiration Time (in order to receive the Tender Offer Consideration), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Please refer to any materials forwarded to you by your custodian or nominee to determine how you can timely instruct your custodian or nominee to take these actions. |

In order to participate in the Tender Offer, you must instruct your nominee or custodian to participate on your behalf. Your nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to tender those Old Notes in the Tender Offer to the Depositary prior to the Expiration Time.

The Tender Offer is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must tender their Old Notes in the Tender Offer in accordance with DTC's ATOP procedures. Since all Old Notes must be tendered by book-entry transfer to the applicable DTC account of the Depositary, your broker, dealer, trust company, or other nominee must execute the tender or exchange through ATOP. Financial institutions that are DTC Participants must execute tenders and exchanges through ATOP by transmitting acceptance of the Tender Offer to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Tender Offer, execute a book-entry transfer of the tendered Old Notes into the applicable DTC account of the Depositary and send to the Depositary a "book-entry confirmation," which shall include a message (the "Agent's Message") transmitted by DTC to and received by the Depositary and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant tendering that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company, AIV and their transferees may enforce such agreement against the DTC Participant.

In addition, each DTC Participant must deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary on behalf of each beneficial owner for whom it holds Old Notes. See "The Tender Offer—Procedure for Tendering Old Notes."

Depositary — D.F. King & Co., Inc.

Taxation — For a summary of certain U.S. federal income tax consequences of the disposition of Old Notes pursuant to the Tender Offer, see "Certain U.S. Federal Income Tax Considerations." For a summary of certain Mexican federal income tax consequences of the disposition of Old Notes pursuant to the Tender Offer, see "Material Mexican Tax Considerations."

Further Information — Any questions or requests for assistance concerning the Tender Offer may be directed to the Depositary at the telephone number and address set forth on the back cover of this Statement. Additional copies of this Statement, the Letter of Transmittal and the Letter of Instructions may be obtained by contacting the Depositary at the telephone number and address set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

**The Exchange Offer and Consent Solicitation**

| | |
|---|---|
| The Exchange Offer and Consent Solicitation | We are proposing an exchange offer and soliciting consents to the *Concurso* Plan, pursuant to which we would exchange the Restructured Debt for the Restructuring Consideration on a pro rata basis. For every $1,000 principal amount of the Restructured Debt exchanged, holders are entitled to receive $561 principal amount of New 2019 Notes, $66 principal amount of New MCDs (not including the Issue Date Adjustment) and a portion of the Restructuring Cash Payment on a pro rata basis (depending on how many holders consent) and a portion of the Restructuring Fee on a pro rata basis (depending on the Issue Date). The proposed *Concurso* Plan is set forth in Annex A, as summarized in "The Restructuring and the *Concurso* Plan" in this Statement. For a description of the New Notes, see "—The New Notes" below and "Description of the New Notes." |
| Notes for Which We Are Seeking Consents | We are seeking the exchange of Old Notes and consent of Holders of the 2012 Notes, the 2013 Notes and the 2017 Notes and holders of the DFI Claims, including the Promissory Notes, and Other Debt. Information on the Old Notes is set forth below. |

| Series | Outstanding Amount | CUSIP Number | ISIN Number |
|---|---|---|---|
| 2012 Notes | $300,000,000 | 92851RAC1 | US92851RAC16 |
| 2013 Notes | $216,000,000 | 92851FAD5 | US92851FAD50 |
| 2017 Notes | $700,000,000 | 92851RAD9 | US92851RAD98 |

| | |
|---|---|
| Consideration Offered in the Consent Solicitation | The Payment Trust will pay a consent payment in an amount (to be determined as described herein) of no less than 5% and no greater than 10% of the aggregate principal amount of Restructured Debt held by the holder of such Restructured Debt for which a consent is provided prior to the Expiration Time specified below. This Consent Payment will be paid from the Payment Trust to Participating Creditors no later than 4 business days following the Expiration Time. |
| Source of Funds | The Information and Exchange Agent will act as agent for the consenting Holders for the purpose of receiving the Note Consent Payment and transmitting such payments for the Note Consent Payment to the consenting Holders. Thus, the Company will cause the Payment Trust to deposit same-day funds in payment of the Note Consent Payment with the Information and Exchange Agent following the Expiration Time. The Consent Payment will be made no later than the Consent Payment Date. Under no circumstances will any additional interest be payable by the Company because of any delay in the transmission of funds from the Information and Exchange Agent to the consenting Holders. See "The Exchange Offer and Consent Solicitation—Acceptance for Payment of Note Consent Payment; Source of Funds." |

| | |
|---|---|
| Expiration Time | The Exchange Offer and Consent Solicitation will expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated. We may in our sole discretion (subject to applicable law) terminate, prior to the Expiration Time, the Exchange Offer and Consent Solicitation described herein. |
| Withdrawal Rights | Any Old Notes tendered or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes. |
| Certain Terms and Conditions of the Exchange Offer and Consent Solicitation | As described in this Statement, Vitro will, and certain of the Old Guarantors may, file for *concurso mercantil* proceedings and will submit the *Concurso* Plan to the Mexican bankruptcy court and other parties of the *concurso mercantil* proceeding. Commencement of the *concurso mercantil* proceedings and approval of the *Concurso* Plan in the *concurso mercantil* may still occur even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. For more information about the terms of the Exchange Offer and Consent Solicitation, see "The Exchange Offer and Consent Solicitation—Certain Terms and Conditions of the Exchange Offer and Consent Solicitation." For more information about *concurso mercantil* proceedings under Mexican law, see "The Mexican Law of Commercial Reorganizations." |
| | The delivery and payment of the Restructuring Consideration pursuant to the *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*. For more information about conditions to the delivery and payment of the Restructuring Consideration, see "The Exchange Offer and Consent Solicitation—Condition to Delivery and Payment of the Restructuring Consideration." |
| Procedure for Exchanging and Consenting | Beneficial owners who hold Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, will need to timely instruct their custodian or nominee to submit their Old Notes for exchange on or prior to the Expiration Time (in order to receive the Note Consent Payment), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Beneficial owners should refer to any materials forwarded by the custodian or nominee to determine how they can timely instruct their custodian or nominee to take these actions. |

In order to participate in the Exchange Offer and Consent Solicitation, beneficial owners must instruct their nominee or custodian to participate on their behalf. Each beneficial owner's nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to submit those Old Notes for exchange in the Exchange Offer and Consent Solicitation to the Information and Exchange Agent prior to the Expiration Time.

In addition to instructing the DTC Participant to submit Old Notes for exchange pursuant to the procedure set forth in "The Exchange Offer and Consent Solicitation—Procedure for Exchanging Old Notes" and —Procedure for Consenting to the *Concurso* Plan," the beneficial owner must instruct the DTC Participant to (A) properly complete and duly execute the Power of Attorney in the form attached to the Letter of Transmittal authorizing or appointing the representative to carry out all necessary or expedient steps required or advisable under Mexican law to submit the Letter of Transmittal before the Mexican court within the *concurso mercantil* proceeding, to join and adhere to any *concurso mercantil* to be filed by the Company and to execute and consent to the *Concurso* Plan and (B) properly execute and notarize the signature to the *Concurso* Plan attached to the Letter of Transmittal.

The Exchange Offer and Consent Solicitation is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation in accordance with DTC's ATOP procedures. Since all Old Notes must be exchanged by book-entry transfer to the applicable DTC account of the Information and Exchange Agent, the beneficial owner's bank, broker, dealer, trust company, or other nominee must execute exchange through ATOP. Financial institutions that are DTC Participants must execute exchanges through ATOP by transmitting acceptance of the Exchange Offer and Consent Solicitation to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Exchange Offer and Consent Solicitation, execute a book-entry transfer of the exchanged Old Notes into the applicable DTC account of the Information and Exchange Agent, and send to the Information and Exchange Agent a "book-entry confirmation," which shall include an Agent's Message transmitted by DTC to and received by the Information and Exchange Agent and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant exchanging Old Notes that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company may enforce such agreement against the DTC Participant.

In addition, each DTC Participant must deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Information and Exchange Agent on behalf of each beneficial owner for whom it holds Old Notes. See "The Exchange Offer and Consent Solicitation—Procedure for Exchanging Old Notes."

| | |
|---|---|
| Consequences to Holders of Restructured Debt Not Consenting | We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise. Therefore, we believe it is in your interest to consent to the *Concurso* Plan set forth in Annex A. |
| Information and Exchange Agent | D.F. King & Co., Inc. |
| Payment Trust | A trust organized under the laws of Mexico has been created and funded to hold the Consent Payment and the Restructuring Cash Payment in escrow pending the approval and consummation of the *Concurso* Plan. |
| Use of Proceeds | We will not realize any proceeds from the Exchange Offer and Consent Solicitation. |
| Certain U.S. Federal Income Tax Considerations | See the discussion herein under the heading "Certain U.S. Federal Income Tax Considerations" for a discussion of the tax consequences of the exchange of Old Notes for the Restructuring Consideration and Note Consent Payment. The exchange of a class of Old Notes for the Restructuring Consideration will be a taxable event for U.S. federal income tax purposes unless it qualifies as a recapitalization. If the exchange is a taxable event, U.S. Holders will be required to pay current tax on any gain resulting from the exchange. The U.S. Federal income tax treatment in connection with receipt of the Note Consent Payment is unclear. The Note Consent Payment may give rise to ordinary taxable income for a U.S. Holder even if the exchange qualifies as a recapitalization or the Holder would otherwise recognize a loss on the exchange. The New Notes will likely be treated as issued with original issue discount and may be subject to special rules applicable to contingent payment debt instruments. These rules could result in U.S. Holders being required to include amounts in taxable income in advance of the receipt of cash payments. |
| | The United States Federal income tax consequences associated with exchanging Restructured Debt for the Restructuring Consideration, receiving the Note Consent Payment, and of owning the New Notes is very complex. U.S. Holders should consult their own tax advisers as to the United States Federal income tax consequences to them of granting |

their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

See "Certain U.S. Federal Income Tax Considerations" for a discussion of the tax consequences of the disposition of Old Notes pursuant to the Tender Offer.

Material Mexican Federal Tax Considerations

Under Mexican tax law, consent payments made to Foreign Holders (as defined under "Material Mexican Federal Tax Considerations—Mexican Income Tax Considerations" below) of the Old Notes will be considered to qualify as "interest" for Mexican tax purposes, as they will be viewed as a yield under the Old Notes, and therefore the tax treatment described below in "Material Mexican Federal Tax Considerations—Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes" will be applicable to such payments.

The summary of Mexican federal tax considerations provided in this Statement is based on the federal tax laws of Mexico (including the tax treaties described in "Material Mexican Federal Tax Considerations—Tax Treaties") as in effect on the date hereof, as well as on the rules and regulations of Mexico available on or before such date and now in effect. All of the foregoing is subject to change, which change could affect the continued validity of this summary. In addition you should be aware that the federal tax laws of Mexico, the tax treaties and the rules and regulations thereunder may have changed at the time of issuance of the New Notes, and such change could affect the continued validity of the summary contained in this Statement.

Holders to whom this Statement is addressed and any persons that may acquire the New Notes should consult their own tax advisers as to the Mexican or other tax consequences of granting their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

Further Information

Any questions or requests for assistance concerning the Exchange Offer and Consent Solicitation may be directed to the Information and Exchange Agent at the address and telephone numbers set forth on the back cover of this Statement. Additional copies of this Statement, the Letter of Transmittal and the Letter of Instructions may be obtained by contacting the Information and Exchange Agent at the address and telephone numbers set forth on the back cover of this Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

**The New Notes**

*I. The New 2019 Notes*

New 2019 Notes

The New 2019 Notes will be issued to recognized creditors in the *concurso* proceedings.

Issuer

Vitro

Principal Amount

$850.0 million

Value Date and Restructuring Fee

Regardless of the date of issuance and date of delivery of the New Notes pursuant to the *Concurso* Plan, the maturity date, amortization provisions and other relevant terms and conditions of the New Notes will be based on a value date of January 1, 2011 (the "Value Date"). On the date of issuance, Vitro will pay holders a one time restructuring fee equal to an annualized return of 8.00% on the aggregate principal amount of the New 2019 Notes, calculated for the period from the Value Date to the date of issuance (the "New 2019 Notes Restructuring Fee").

Interest

Fixed interest rate, payable semi-annually in arrears on each June 30th and December 31st, commencing with the first such date immediately following the Issue Date, will accrue on the New 2019 Notes in accordance with the following grid:

| Year | Total Interest Rate | Per Annum Cash Rate | Per Annum PIK Rate |
|---|---|---|---|
| Year 1 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 2 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 3 | 8.0% | 8.0% or 4.0% if PIK Option elected | 4.0% if elected |
| Year 4 | 8.0% | 8.0% | None |
| Year 5 | 8.0% | 8.0% | None |
| Year 6 | 8.0% | 8.0% | None |
| Year 7 | 8.0% | 8.0% | None |
| Year 8 | 8.0% | 8.0% | None |

Interest that is elected to be paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the New 2019 Notes, and shall be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New 2019 Notes shall bear interest at the rate then applicable to the New 2019 Notes, beginning on the date such interest is paid in kind and added to the principal amount thereof. The Company may only elect to pay interest in kind (the "PIK Option") if certain conditions described in "Description of the New Notes—New 2019 Notes—Principal, Maturity and Interest" are met. In the event that

42

the Company exercises the PIK Option, certain consequences and restrictions on the Company will apply, as described in "Description of the New Notes—New 2019 Notes—Principal, Maturity and Interest."

All interest shall be computed on the basis of a year of 360 days consisting of twelve 30-day months.

| | |
|---|---|
| Maturity Date | Eight years after the Value Date. |
| Amortization | The amortization of the New 2019 Notes is payable at the end of each year on the immediately preceding regular record date, upon the following schedule: |

Year 1: None
Year 2: None
Year 3: None
Year 4: None
Year 5: June 30, 2015 — $12,500,000
      December 31, 2015 — $12,500,000
Year 6: June 30, 2016 — $12,500,000
      December 31, 2016 — $12,500,000
Year 7: June 30, 2017 — $12,500,000
      December 31, 2017 — $12,500,000
Year 8: Balance at maturity.

| | |
|---|---|
| Guarantors | The obligations of the Company pursuant to the New 2019 Notes, including any repurchase obligation resulting from a Change of Control and other mandatory prepayment provisions under the New 2019 Notes, will be unconditionally guaranteed, jointly and severally, on an unsecured basis, by the Guarantors. Each Guarantor will provide a guarantee of the New 2019 Notes on the Issue Date. See "Description of the New Notes—New 2019 Notes—Guaranties." |
| Change of Control | Following a Change of Control, holders of the New 2019 Notes will have the right to put their New 2019 Notes to Vitro at 101% of the aggregate principal amount of the New 2019 Notes, plus accrued and unpaid interest to the date of repayment. |
| Excess Cash Sweep | In the event that the yield-to-maturity of the New Notes is equal to or higher than 9%, Vitro will annually apply 70% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. In the event that the yield-to-maturity of the New Notes is lower than 9%, Vitro will annually apply 50% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Excess Cash Sweep." |
| | 30% or 50% of the Excess Cash Flow, as applicable, can be used at Vitro's discretion for general corporate purposes and optional redemptions of its New Notes, subject to the covenant described under "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments." |

| | |
|---|---|
| Optional Redemption | Redemptions of New 2019 Notes may be made by Vitro at any time and from time to time at a redemption price equal to par plus accrued interest thereon. |
| | See "Description of the New Notes—New 2019 Notes—Optional Redemption." |
| Mandatory Redemption | The New 2019 Notes are subject to mandatory redemption upon an equity issuance by Vitro if certain conditions are met. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Mandatory Redemption." |
| Certain Covenants | The indenture governing the New 2019 Notes (the "New 2019 Notes Indenture" and, together with the indenture governing the New MCDs, the "New Indentures") will contain covenants limiting our ability and our subsidiaries' ability to: |

- incur additional debt or issue subsidiary preferred stock or stock with a mandatory redemption feature before the maturity of the New 2019 Notes;

- create, acquire or participate in strategic joint ventures;

- pay dividends on our capital stock;

- redeem or repurchase capital stock or prepay or repurchase subordinated debt;

- make some types of investments and sell assets;

- create liens;

- engage in transactions with affiliates, except on an arm's-length basis;

- enter into hedging agreements;

- enter into sale and leaseback transactions;

- make certain capital expenditures; and

- consolidate or merge with, or sell substantially all our assets to, another person.

In addition, under the terms of the New 2019 Notes, we will be required to assign all of our intercompany debt to a voting trust pursuant to which all such intercompany debt will be voted by the trustee of such trust (at the instruction of a majority of third party creditors) in the event of a subsequent *concurso mercantil* or other similar insolvency proceeding involving us and/or our subsidiaries. Certain other restrictions will apply to our intercompany debt. See "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Intercompany Debt."

44

| | |
|---|---|
| | See "Description of the New Notes—New 2019 Notes—Certain Covenants" for a description of these covenants. |
| Events of Default | For a discussion of certain events of default that will permit acceleration of the principal of the New 2019 Notes plus accrued interest, see "Description of the New Notes—New 2019 Notes—Default and Remedies." |
| Ratings | We intend to obtain ratings for the New 2019 Notes. |
| Trustee | The Bank of New York Mellon will act as trustee (the "Trustee") for the New 2019 Notes. |
| Paying Agent | The Trustee will initially act as the Paying Agent. |
| Exchange Agent | New 2019 Notes issued pursuant to the *Concurso* Plan will be issued in exchange for the Old Notes through a U.S.-based exchange agent that will be appointed by Vitro prior to the issuance of the New 2019 Notes. |
| Transferability | We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions. See "Description of the New Notes—Certain Transfer Restrictions." |

### II. The New MCDs

| | |
|---|---|
| New MCDs | The New MCDs (*obligaciones convertibles en acciones*) will be issued to recognized creditors in the *concurso* proceedings. |
| Issuer | Vitro |
| Principal Amount | $100.0 million, plus the Issue Date Adjustment described below. |
| Issue Date Adjustment | On the date of issuance, Vitro will adjust and increase the principal amount of the New MCDs by an aggregate amount equal to a one time restructuring fee equal to an annualized return of 10.50% (on $100 million principal amount) calculated for the period from the Value Date to the date of issuance (the "Issue Date Adjustment"). |

| | |
|---|---|
| Interest | Fixed interest rate, payable annually in kind in arrears will accrue on the New MCDs in accordance with the following grid: |

| Year | Per Annum PIK Rate |
|---|---|
| Year 1 | 10.50% |
| Year 2 | 10.50% |
| Year 3 | 10.50% |
| Year 4 | 10.50% |
| Year 5 | 10.50% |

All accrued interest will be added to the Additional PIK Principal of the New MCDs, and shall be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New MCDs shall bear interest at the rate then applicable to the New MCDs, beginning on the date such interest is paid in kind and added to the principal amount thereof.

All interest shall be computed on the basis of a year of 360 days consisting of twelve 30-day months.

| | |
|---|---|
| Maturity Date | Five years after the Value Date. |
| Mandatory Conversion | The New MCDs will be mandatorily convertible into common shares or Ordinary Participation Certificates (*Certificados de Participacion Ordinaria*, or "CPOs") of Vitro representing in aggregate 15.0% of our equity on a fully diluted basis if the New MCDs are not repaid at maturity or upon the occurrence and continuation of certain events of default. For more information regarding the CPOs, see "Description of the CPOs." |
| Amortization | None |
| Guarantors | None |
| Change of Control | Following a Change of Control, holders of the New MCDs will have the right to put their New MCDs to Vitro at 101% of the aggregate principal amount of the New MCDs (less the applicable prepayment discount described below), plus accrued and unpaid interest to the date of repayment. |
| Excess Cash Sweep | In the event that the yield-to-maturity of the New Notes is equal to or higher than 9%, Vitro will annually apply 70% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. In the event that the yield-to-maturity of the New Notes is lower than 9%, Vitro will annually apply 50% of Excess Cash Flow to repurchase New Notes through market purchases or prepay the New Notes. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Excess Cash Sweep." |
| | 30% or 50% of the Excess Cash Flow, as applicable, can be used at Vitro's discretion for general corporate purposes and optional redemptions of its New Notes, subject to the covenant described under "Description of the New Notes—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments." |

| | |
|---|---|
| Optional Redemption | Redemptions of New MCDs may be made by Vitro at any time and from time to time at a redemption price equal to par (less the applicable prepayment discount described below) plus accrued interest. |
| | Redemptions of New MCDs will be subject to the following prepayment discounts: |
| | Year 1: 35.7%<br>Year 2: 30.2%<br>Year 3: 24.2%<br>Year 4: 17.7%<br>Year 5: 10.6% |
| Mandatory Redemption | The New MCDs are subject to mandatory redemption upon an equity issuance by Vitro if certain conditions are met. See "Description of the New Notes—Provisions Applicable to All of the New Notes—Mandatory Redemption." |
| Events of Default | For a discussion of certain events of default that will permit acceleration of the principal of the New MCDs plus accrued interest, see "Description of the New Notes—New MCDs—Default and Remedies." |
| Ratings | We intend to obtain ratings for the New MCDs. |
| Trustee | The Bank of New York Mellon will act as Trustee for the New MCDs. |
| Conversion Agent | Vitro will initially appoint the Trustee as the Conversion Agent. |
| Common Representative | A Mexican financial institution (expected to be The Bank of New York Mellon, S.A., Institución de Banca Múltiple) appointed at the shareholders' meeting of Vitro approving the issuance of the New MCDs. |
| | See "Description of the New Notes—New MCDs—Common Representative of the New MCDs." |
| Paying Agent | The Trustee will initially act as paying agent. |
| Exchange Agent | New MCDs issued pursuant to the *Concurso* Plan will be issued in exchange for the Old Notes through a U.S.-based exchange agent that will be appointed by Vitro prior to the issuance of the New MCDs. |
| Transferability | We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of |

securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions. See "Description of the New Notes—Certain Transfer Restrictions."

**The *Concurso* Plan**

The *Concurso* Plan

The *Concurso* Plan for which we are seeking consent consists of a restructuring agreement to implement a plan of reorganization under the *Ley de Concursos Mercantiles*, or Mexican Bankruptcy Law (the "Mexican Bankruptcy Law"). Pursuant to the Mexican Bankruptcy Law, in order to initiate a *concurso* proceeding with a pre-approved reorganization agreement, the plan of reorganization must be approved and subscribed by Vitro and creditors representing at least 40% of all of Vitro's outstanding liabilities. We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to initiate a *concurso* proceeding with a pre-approved reorganization agreement, even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received.

We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

Under the *Concurso* Plan, the holders of Restructured Debt that consent in the Exchange Offer and Consent Solicitation will be entitled to receive the Restructuring Consideration on a pro rata basis. If you exchange your Old Notes or consent in the consent solicitation, you will be deemed to have consented to the proposed *Concurso* Plan.

Voting on the *Concurso* Plan; Required Acceptances

According to the Mexican Bankruptcy Law, in order for a plan of reorganization to become effective, such plan must be agreed upon and executed by Vitro and a number of recognized creditors representing more than 50% of the sum of (i) the amount of recognized claims of unsecured creditors, and (ii) the amount of recognized claims of secured creditors or creditors with special privileges that decide to join or are parties to the plan of reorganization. The commencing of a *concurso* proceeding with a pre-approved reorganization agreement presumes the consent or approval of the plan from creditors representing at least 40% of all of Vitro's outstanding liabilities. Under the Mexican Bankruptcy Law, there is no voting on the plan as such, but the law provides for the adherence or acceptance of the proposed plan either in advance of filing as the *Concurso* Plan or during the statutory term for such purpose within the proceeding.

Effects of Exchanging and Voting

If you exchange your Old Notes or consent in the consent solicitation, you are thereby agreeing with the *Concurso* Plan and, as it may be requested to be amended by the Court presiding over the *concurso* proceeding of Vitro or the Work-out Specialist (*Conciliador*) during the proceeding, to the definitive terms of the plan to be approved by the Court or *Convenio Concursal*, as long as such amendments do not affect in a material or substantive manner the terms of the *Concurso* Plan.

49

Pursuant to the Mexican Bankruptcy Law, once a plan of reorganization becomes effective and is approved by the competent bankruptcy court, it binds (i) Vitro; (ii) all common or unsecured recognized creditors; (iii) all secured recognized creditors that join or execute the plan; and (iv) those secured recognized creditors that do not execute the *Concurso* Plan but whose recognized claims are to be paid under the reorganization plan.

According to the Mexican Bankruptcy Law, all unsecured recognized creditors would be deemed to have consented to the reorganization plan, without any right to express an opinion on such plan, provided the plan contemplates payment of their claims owed at the time the *concurso* ruling became effective.

Secured recognized creditors that do not join or execute the reorganization plan may, under certain specific rules provided by the Mexican Bankruptcy Law, start or continue to enforce their collateral, unless the reorganization plan provides for the repayment of their claims or the payment of the value of their corresponding collateral. In such case, any amount of the recognized amount of claims that exceeds the value of the collateral shall be regarded as a common or unsecured claims.

| | |
|---|---|
| Interest | As a general rule under the Mexican Bankruptcy Law, upon issuance of the *concurso* ruling all outstanding debts shall cease accruing interest and be converted into *UDIs* or *Unidades de Inversion*, with the exception of secured claims which continue to accrue interest up to the value of the corresponding collateral. In the case of the Old Notes, once the *concurso* ruling is issued all amounts outstanding will be converted into Pesos at the exchange rate calculated and published by the Banco de México or the Mexican Central Bank, in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and then from Pesos into UDIs. |
| Voting Record Date | Pursuant to the Mexican Bankruptcy Law, there is no need for recognized creditors to hold a meeting and vote on a reorganization plan. Rather, the Mexican Bankruptcy Law provides that once the Work-out Specialist believes the reorganization plan has sufficient consents to be approved, including those granted in advance in the case or pre-approved plans of reorganization, such as the *Concurso* Plan, the Work-out Specialist shall present the agreement to recognized creditors, who will have the right to review it within a period of 10 days and adhere to it, if desired. |
| | Once the Work-out Specialist considers that the *Concurso* Plan is subscribed by the required majority, the *Concurso* Plan shall be presented to the bankruptcy court, which court shall grant recognized creditors a five-day period to object to the authenticity of their consent and to exercise "veto" rights, in case a majority of recognized creditors (in number) or recognized creditors holding a majority of recognized debt so desire. |
| In-Court Solicitation Expiration Time | Within the *concurso* proceeding, the recognized creditors shall be required to review and execute the *Concurso* Plan within 10 days following the date on which the Work-out Specialist presents the pre-approved restructuring agreement for the consideration and approval of recognized creditors. |

| | |
|---|---|
| Withdrawal | Acceptance and subscription of the *Concurso* Plan in the *concurso* proceeding may not be withdrawn by the Holders of the Old Notes. |
| Waiver of Acceleration and Extension of Accrued and Unpaid Interest | Pursuant to the Mexican Bankruptcy Law, upon the issuance of the *concurso* ruling all foreclosure and attachment proceedings (except for labor indemnities and wages) are suspended or stayed and generally, debts shall cease accruing interest, with the exception of secured debts up to the value of the corresponding collateral. |
| Processing Fee | The Mexican Bankruptcy Law does not provide for the payment of a processing fee. Costs and expenses related to the *concurso* proceeding incurred by Vitro will be paid from the bankruptcy estate and, in certain circumstances, specifically if an involuntary petition does not succeed, by the party that initiated the *concurso* proceeding. |
| Voting Agent and Information Agent | The Mexican Bankruptcy Law does not provide for the appointment of an agent for recognized creditors nor the existence or appointment of an information agent. |

# RISK FACTORS

*You should carefully consider the following risk factors, as well as all of the other information presented in this Statement, including our consolidated financial statements and the notes thereto. In general, investing in the securities of issuers in emerging market countries such as Mexico involves certain risks not typically associated with investing in securities of U.S. companies.*

*The risks and uncertainties described below are not the only risks and uncertainties affecting us or the New Notes. Additional risks and uncertainties that we do not know about or that we currently think are immaterial also may impair our business operations or our ability to make payments on the New Notes and under other existing indebtedness.*

*This Statement also contains forward-looking statements that involve risks. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including risks faced by us describing this section, and under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." See also cautionary statements regarding "Forward-Looking Statements."*

*For purposes of this section, when we state that a risk, uncertainty or problem may, could or would have an "adverse effect" on us, we mean that the risk, uncertainty or problem may, could or would have an adverse effect on our business, financial condition, liquidity, results of operations or prospects, except as otherwise indicated or as the context may otherwise require.*

## RISK FACTORS RELATING TO THE TENDER OFFER

### *The amount of Old Notes accepted for payment in the Tender Offer will be limited.*

The amount of Old Notes accepted for payment in the Tender Offer will be limited, because we are offering to purchase the maximum aggregate principal amount of Vitro's 2012 Notes, 2013 Notes and 2017 Notes that we can purchase for the Maximum Payment Amount at a purchase price per $1,000 principal amount determined in accordance with the procedures described in this Statement. See "The Tender Offer—Terms of the Tender Offer." We will not be able to determine the Clearing Price or the Tender Offer Consideration until the Expiration Time.

### *Consummation of the Tender Offer is subject to certain conditions and if such conditions are not met, the Tender Offer will be terminated.*

Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "The Tender Offer—Conditions to the Tender Offer" in this Statement. In addition, we may terminate the Tender Offer for any reason in our sole discretion if any of the applicable conditions described herein are unsatisfied. We may also decide to terminate the Tender Offer but continue with the Exchange Offer and Consent Solicitation. There can be no assurance that such conditions will be met, that we will not terminate the Tender Offer, or that, in the event that the Tender Offer is not consummated, the market value and liquidity of the Old Notes will not be materially adversely affected.

### *The Maximum Payment Amount is subject to change in the sole discretion of Vitro and AIV.*

We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. If we increase the Maximum Payment Amount in the Tender Offer, we will promptly announce such increase by a press release. If the Maximum Payment Amount is increased and there are fewer than ten business days from and including the date of such announcement to the scheduled Expiration Time, we will extend the Tender Offer so that at least ten business days remain until the Expiration Time.

***Old Notes not tendered in the Tender Offer will be tendered in the Exchange Offer and Consent Solicitation or will remain outstanding and will be subject to the* concurso mercantil *proceedings.***

Old Notes not tendered and purchased in the Tender Offer will remain outstanding or will be tendered in the Exchange Offer and Consent Solicitation, at the election of the holder, provided that the holder elects to have any Old Notes that are not accepted for purchase in the Tender Offer to be included in the Exchange Offer and Consent Solicitation at the time such holder tenders its Old Notes into the Tender Offer. If you do not tender your Old Notes in the Tender Offer, your Old Notes will become subject to the *concurso mercantil* proceedings described below under "The Exchange Offer and Consent Solicitation." As a result, holders that do not participate in the Exchange Offer and Consent Solicitation will not receive the Consent Payment they would have received upon election of one of the options so to participate described in this Statement.

## RISK FACTORS RELATING TO THE *CONCURSO* PLAN

***If the* Concurso *Plan or any other revised plan or prepackaged plan of* concurso mercantil *is not consummated, we will not be able to successfully restructure our debt.***

We are in default under our indentures and other financial instruments, and our future is dependent upon our ability to restructure our debt and other financial instruments.

Vitro did not make scheduled interest payments due February 2009, August 2009, February 2010 and August 2010 on the 2012 Notes and 2017 Notes and did not make scheduled interest payment due May 2009, November 2009 and May 2010 on the 2013 Notes. In addition, Vitro also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest due February 5, 2009, on our *Certificados Bursátiles Vitro 03*. The common representative of the *Certificados Bursátiles Vitro 03* initiated a legal proceeding in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment. For further discussion, see "Summary—Background of the Restructuring—Our Financial Difficulties—Interest and Principal Default on the Old Notes and the Other Debt."

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010, the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010, the Court of Appeals accepted one of the appeals, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits.

In the fourth quarter of 2008, we decided to unwind a majority of our open derivative positions that had been adversely affected due to the high volatility experienced in the financial markets, which resulted in a significant devaluation between the Mexican peso and the U.S. dollar and the Mexican peso and the euro (see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations"), as well as a significant reduction in natural gas prices. As of the date of this Statement, our subsidiary, Vena has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six Counterparties who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. We are seeking to include this settlement in the Restructured Debt. However, if we do not reach an agreement with Calyon to do so, the amount of this settlement will not be included. The Restructuring Consideration for holders of Old Notes and other DFI Claims will not change regardless of whether the Calyon settlement is included as part of the Restructured Debt, though the aggregate principal amount of the New 2019 Notes and New MCDs that we would issue on the Issue Date would be reduced accordingly. In any event, if we are unable to reach an agreement with Calyon to include our settlement with them in the Restructured Debt, we will not

be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the Restructuring Consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five Counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such settlement agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued the Promissory Notes to Fintech in respect and in settlement of such outstanding debt. The Promissory Notes were guaranteed "*por aval*" by us and some of our subsidiaries. The Promissory Notes are subject to the Fintech Lock-up Agreement (the main terms of which are described in "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock-up Agreement") and will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation described in this Statement.

We do not have the means to repay or refinance the amounts that are payable under our indentures and other financial instruments. We believe that we are currently not likely to find a material source of financing to fund the interest and principal payments on the Old Notes. Our future is dependent on our ability to restructure our obligations under our indentures and other financial instruments, which will involve a significant reduction of the claims of the holders of Restructured Debt and other financial instruments. If we are faced with a Mexican or U.S. bankruptcy that is protracted and contentious, this could force us to operate in uncertain circumstances for an extended period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees, and may result in a liquidation of the Company.

We believe it is likely that each holder of Restructured Debt would incur a significant loss if the *Concurso* Plan or any other revised plan or prepackaged plan of *concurso mercantil* is not consummated. In addition, in our opinion, the recovery that would be received by holders of Restructured Debt in a liquidation scenario would very likely be materially less than they would receive under the *Concurso* Plan.

***Even if the* Concurso *Plan is approved by the Mexican bankruptcy court and consummated in Mexico, our ability to successfully restructure our debt is dependant upon certain relief being granted in foreign jurisdictions, including the U.S.***

Certain of our assets are located in jurisdictions outside of Mexico, including the United States. In addition, certain of our indirect subsidiaries, who are guarantors of certain of the Company's obligations, including the Old Notes, are organized, have their principal place of business and/or have significant assets in foreign jurisdictions, including the United States. In order to commence and operate effectively during the *Concurso* proceeding, and to thereafter fully implement the terms and conditions of the *Concurso* Plan upon its approval by the Mexican bankruptcy court and consummation in Mexico (including, without limitation, the release of our subsidiaries' guarantees of the Old Notes and any claims, in the nature of subrogation or otherwise, such subsidiaries may have against the Company) we will need to obtain relief from courts in one or more of these foreign jurisdictions to protect our assets and/or prevent the exercise of remedies against our subsidiaries from jeopardizing our ability to maintain operations and service our restructured debt.

As a part of the implementation of the restructuring, we may commence proceedings in certain applicable foreign jurisdictions to recognize, give effect to and implement the *Concurso* Plan in such jurisdictions, including an ancillary proceeding in the United States pursuant to chapter 15 of the United States Bankruptcy Code, as amended (the "U.S. Bankruptcy Code") seeking recognition of the *concurso mercantil* proceeding in Mexico (the "Main Proceeding"). See "The Restructuring and the *Concurso* Plan." Upon commencement of such proceedings, we may seek relief in such proceedings, including, among other things, a stay and/or injunction, enjoining all creditors of the Company or its subsidiaries from taking any action to enforce any pre-petition claims against the Company or its subsidiaries in such jurisdictions. In addition, upon approval of the *Concurso* Plan in the *concurso mercantil* proceeding in Mexico, we may request that the foreign court in which such proceedings have been commenced issue

an order implementing the *Concurso* Plan in such jurisdiction, including a permanent injunction against any action to enforce against the Company or ay of its direct or indirect subsidiaries any claims dealt with or discharged in the *Concurso* Plan.

It is possible that some or all of the relief we request in an ancillary proceeding that is necessary to implement the *Concurso* Plan in a foreign jurisdiction with regard to the Company's indirect subsidiaries in such jurisdictions may not be granted by the foreign court in which such proceedings have been commenced. In that event, it may not be possible to successfully complete our restructuring plan with regard to the Company's indirect subsidiaries in such jurisdictions notwithstanding approval of the *Concurso* Plan by the Mexican bankruptcy court and consummation thereof in Mexico.

**If the Concurso Plan or any other revised plan or prepackaged plan of concurso mercantil is not consummated, we may be subject to an involuntary Mexican or U.S. reorganization related proceeding.**

Since we have defaulted on our Old Notes, some of our creditors have already taken legal action against us. Some or all of our other creditors may also take legal action against us, including instituting an involuntary *concurso mercantil* in Mexico or filing an involuntary petition against us in the United States under the U.S. Bankruptcy Code. If we become involved in an involuntary proceeding in Mexico or the United States or if holders challenge or seek to invalidate the *Concurso* Plan, we could not predict the ability of holders of Restructured Debt or any other creditor to influence the outcome of such proceedings. A reorganization proceeding is likely to result in significant changes to our existing obligations, including the Old Notes, which could include the cancellation or rescheduling of all or part of those obligations, and we could be subject to liquidation and ultimately be forced to sell all or substantially all of our assets. See "The Mexican Law of Commercial Reorganizations" for a further description of a Mexican reorganization proceeding. During or after the pendency of any such proceeding, our ability to operate or manage our business, to retain employees, to maintain existing or create new customer relationships, to continue to collect payments for our services or to obtain any type of funding or financing would likely be significantly jeopardized and, as a result, the potential recovery for the holders of Restructured Debt could be materially adversely affected. As a result of the downturn in the global market, we expect that the proceeds from any potential liquidation and sale of our assets would not be sufficient to satisfy all of our obligations to holders of Restructured Debt, and would result in a net recovery to holders of Restructured Debt that is projected to be substantially less than they would receive pursuant to the *Concurso* Plan. In addition, in the event that we become involved in an involuntary proceeding in Mexico or the United States, subject to certain qualifications and cure periods, holders who have signed lock-up agreement with us will be entitled to terminate their commitments under such lock-up agreements. See "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock-up Agreement".

**If we or the Mexican Guarantors were to be declared bankrupt, holders of the New Notes may find it difficult to collect payment on the New Notes.**

Under the Mexican Bankruptcy Law, if we or the Mexican Guarantors are declared bankrupt or become subject to *concurso mercantil,* or judicial reorganization, our obligations and the obligations of the Mexican Guarantors under the New Notes, respectively, (i) would be converted into Mexican pesos and then from Mexican pesos into UDIs and would not be adjusted to take into account any devaluation of the Mexican peso relative to the U.S. dollar occurring after such conversion, (ii) would be satisfied at the time claims of all our creditors are satisfied, (iii) would be subject to the outcome of, and priorities recognized in, the relevant proceedings, (iv) would cease to accrue interest from the date a *concurso mercantil* is declared and (v) would be subject to certain statutory preferences, including tax, social security and labor claims and claims of secured creditors. In addition, the guarantees may not be enforceable. See "—Risk Factors Relating to the New Notes" and "—Risk Factors Relating to the New Notes—The guarantees may not be enforceable" in particular, which risk factors may also be applicable to the Old Notes.

**We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will tender Old Notes and participate in the Exchange Offer and Consent Solicitation, to approve the Concurso Plan or any other revised plan or prepackaged plan of concurso mercantil, and holders of Restructured Debt will be bound by the terms of any such Concurso plan, if approved and consummated.**

We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the tender of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no tender of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

**The Concurso Plan may not be commenced, may not become effective or may be dismissed regardless of the number and amount of holders of Restructured Debt that vote to accept the Concurso Plan.**

The approval and effectiveness of the *Concurso* Plan are subject to certain conditions and requirements that may not be satisfied, and the Mexican bankruptcy court may conclude that the requirements for approval and effectiveness of the *Concurso* Plan have not been satisfied. See "The Restructuring and the *Concurso* Plan" and "The Mexican Law of Commercial Reorganizations."

**We may not be able to successfully complete our restructuring plan and continue our operations.**

Our ability to successfully complete our restructuring plan and continue our operations is also dependent on:

- The overall strength and stability of general economic conditions in the glass container, automotive and construction industries;

- Customer confidence in our viability going forward, and our ability to continue to maintain and expand our customer base;

- The availability of adequate financing on acceptable terms from our suppliers and their continuing business relationships with us;

- Our ability to maintain receivables securitization and sale of receivables programs which provide working capital for operations;

- Our ability to sell non-productive assets at favorable prices; and

- Development of new products and new uses for our products.

56

## RISK FACTORS RELATING TO OUR BUSINESS

*Our business and our ability to continue operations are highly dependent on sales volume, which has been significantly affected by the global economic and financial crisis and the severe recession.*

Our operational and financial results are highly sensitive to sales volume, as demonstrated by the sharp declines in each of our core businesses, Glass Containers and Flat Glass sales, in relation to the global economic and financial crisis, and the severe recession, that began in the second half of 2008, particularly in the markets in which we operate, principally Mexico, the Unites States and Europe. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand for our main client in our Glass Containers business unit, resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the six-month period ended June 30, 2010, we experienced a 7.3% decline year over year of our consolidated net sales compared with the same period of 2009, from Ps. 12,292 million to Ps. 11,399 million, reflecting lower volumes and price erosion as well as the effect of the appreciation of the Mexican peso to the U.S. dollar of 3.1% for that same period. Operating income in the same period went down from Ps. 633 million in 2009 to Ps. 616 million in 2010, due to the same factors affecting sales and increased natural gas prices. Net loss in the same period went from a loss of Ps. 409 million in 2009 to a loss of Ps. 459 million in 2010.

The continuation of the economic downturn will continue to adversely affect our business and our ability to maintain profitable operations. A continued downturn in the Mexican economy, from which we derived 44% and 46% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively, would reduce the demand for our products and negatively impact our results of operations. Similarly, a prolonged economic downturn in the United States and Europe, from which we derived 47% and 46% of our consolidated net sales in 2008 and 2009, respectively, would have an adverse impact on the exports and foreign subsidiaries' sales of our Flat Glass and Glass Containers business units. In recent years, economic conditions in Mexico have become increasingly correlated to economic conditions in the United States. Therefore, continuing adverse economic conditions in the United States could have a significant adverse effect on the Mexican economy. Also, in the past, economic crises in Asia, Russia, Brazil, Argentina and other countries have adversely affected the Mexican economy and therefore our results of operations.

*We have insufficient liquidity to repay our existing obligations and meet our capital requirements.*

For the twelve months ended June 30, 2010, our operating income was Ps. 1,311 million ($103 million). As of June 30, 2010, our total consolidated indebtedness was Ps. 19,347 million ($1,528 million), of which Ps. 17,557 million ($1,387 million) is short-term debt. As of June 30, 2010, our unrestricted cash and cash equivalent balances were Ps. 2,203 million ($174 million).

As a result of our financial condition, a number of our suppliers have imposed more restrictive payment terms and security arrangements, which further restrict our liquidity. In addition, under our arrangements to purchase the minority interest in Vitro Cristalglass, we are obligated to make payments of approximately 7 million euros ($10 million) from July 2010 to December 2010. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations."

As of June 30, 2010, we had open DFI hedges with Petróleos Mexicanos, S.A. de C.V., which we refer to as "Pemex," for approximately 32% of our estimated natural gas consumption for the remainder of the year at an average price of approximately $6.80 per MMBTU for 2010, and approximately 19% of our estimated natural gas

consumption at an average price of approximately $7.32 per MMBTU for 2011. As of June 30, 2010, our open DFIs with Pemex had a mark-to-market liability value of approximately $13.8 million. Although Pemex has historically never required collateral or requested early termination, Pemex has historically had the right to seek such remedies pursuant to the agreements and recently requested some collateral.

Under the Pemex agreements mentioned above, we are obligated to make monthly settlement payments until December 2011 to the extent the market price on the monthly settlement date of natural gas is below the exercise price set forth in the agreement. During the first 6 months of 2010, we have made monthly settlement payments of an aggregate of Ps. 113 million ($8.9 million). If the market price of natural gas increases above the exercise price set forth in the agreement, we will be entitled to receive payments from Pemex. However, if the market price ($4.04 per MMBTU as of June 30, 2010) remains low or continues to decrease, our monthly settlement payments will continue at the same level or increase. If the negative mark-to-market value increases, we could be more likely subject to an unprecedented Pemex margin call, which would adversely impact our liquidity.

Under our indentures governing the Old Notes, we are prohibited from incurring additional debt, other than the refinancing of outstanding debt and other limited exceptions, and, in addition, based upon our financial condition, we may not be able to arrange debt and other financings that could provide us with additional liquidity to operate our businesses.

***Even if our debt restructuring is successful, our indebtedness and other obligations could continue to be significant and could contain significant restrictions.***

Even if we are successful in restructuring our obligations under our indentures governing the Old Notes and other financial instruments and complete our restructuring plan, we could continue to have a significant amount of indebtedness and other obligations. Our ability to make scheduled interest and principal payments on the restructured debt will depend upon our ability to achieve profitability levels to support our new debt, which may be dependent upon an improvement in the current economic environment in the industries we operate. Our net interest expense on debt for the twelve months ended June 30, 2010 was Ps. 2,254 million ($178 million), while our operating income was Ps. 1,311 million ($103 million).

The amount of our interest payment requirements could adversely affect our business in a number of ways, including but not limited to, the following:

- We may have less cash available to expand and improve our business, since we are required to dedicate a significant portion of our cash flow from operations to the payment of interest on our debt;

- Our ability to obtain additional debt financing may be limited and the terms on which such financing is obtained may be negatively affected; and

- Our ability to compete effectively against better-capitalized competitors and to withstand downturns in our business may be affected since a significant portion of our cash flow from operations is required to be dedicated to making interest payments. As a result, we may lose market share and experience lower sales, which, in turn, could result in a material adverse effect on our financial condition, results of operations and liquidity.

***Price pressures that result from over-capacity, lower-margin business opportunities, flat glass customers' initiatives, and consolidation of our customer base may adversely affect our businesses.***

Due to the global economic and financial crisis and the severe recession, there is a significant over-capacity in the markets in which we operate; therefore, we could face significant pricing pressure or could be forced to temporarily enter into different business segments with lower margins within our Glass Containers and Flat Glass businesses.

58

Downward pricing pressure by automotive manufacturers is a characteristic of the automotive industry. Virtually all automakers have aggressive price reduction initiatives and objectives each year with their suppliers, and such actions are expected to continue in the future. In addition, estimating such amounts is subject to risk and uncertainties as any price reductions are a result of negotiations and other factors. If we are unable to offset customer price reduction in the future through improved operating efficiencies and other cost reduction initiatives, our results of operations would be adversely affected.

Some of our largest customers, mainly in the Glass Containers business, have acquired companies with similar or complementary product lines. This consolidation has increased the concentration of our business with our largest customers. In many cases, such consolidation has been accompanied by pressure from customers for lower prices, reflecting the increase in the total volume of products purchased or the elimination of a price differential between the acquiring customer and the company acquired. Increased pricing pressures from our customers may have a material adverse effect on our results of operations.

*We have customers that are significant to us and the loss of all or a portion of their business will have an adverse effect on us.*

Because of the relative importance of our largest customers, our business is exposed to a certain degree of risk related to customer concentration. In December 2008, Grupo Modelo, one of our key customers in our Glass Containers business notified us that due to the current world market contraction, it would significantly reduce its beer bottle orders from us. Based on our consolidated sales for 2008, the volume reduction impact on our annual consolidated sales for 2009 was approximately 6.45%, measured in Mexican pesos.

Our significant customers in our Flat Glass segment are major original equipment car and truck manufacturers, Ford, General Motors, Chrysler, Nissan and Freightliner. Our automotive sales in 2009 declined 34% from 2008. The global downturn affected the level of sales in the automotive industry, and some of our key customers are rationalizing their product offering after emerging from reorganizations under U.S. bankruptcy laws or industry consolidations which may further reduce our levels of sales to this business segment. Given that our profitability depends on our maintenance of a high capacity utilization rate, the loss of all or a portion of the sales volume from a significant customer would have an adverse effect on us.

*We have to pay interest and principal on our U.S. dollar-denominated debt with revenues generated in Mexican pesos or other currencies, as we do not generate sufficient revenue in U.S. dollars from our operations.*

As of June 30, 2010, 89% of our outstanding debt was denominated in U.S. dollars. We do not generate sufficient revenues in U.S. dollars from our operations to service our entire U.S. dollar-denominated debt. Consequently, we have to use revenues generated in pesos or other currencies to service our U.S. dollar-denominated debt. A devaluation of the Mexican peso against the U.S. dollar could adversely affect our ability to service our debt.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

*We have experienced rising operating costs in each of our businesses.*

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations. Each one dollar change in our unit price of natural gas per million MMBTU has a direct impact of approximately $18 million on our annual operating costs based on our average historical consumption of approximately 1.5 million MMBTUs per month.

For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price for the year ended December 31, 2008 of $6.07 per MMBTU. Our operating income was also affected by the increase in natural gas price as the average price increasing 22% from $3.71 to $4.54 per MMBTU for the six-month period ended June 30, 2009 compared to the same period of 2010.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. As of June 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates and foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. In addition, the New Indentures governing the New Notes contain restrictions on entering into hedging agreements. See "Description of the New Notes—Certain Covenants—Hedging Agreements." If the price of natural gas increases, we cannot assure you we would be able to raise the prices of our products to fully reflect the increases in our operating costs and, therefore, our results of operations could be adversely affected by continued high prices of natural gas.

Furthermore, although a further decrease in the price of natural gas would have a positive impact of substantially reducing our cost of goods sold, the benefits to our cost of sales would be realized over a period of time, whereas such a further decrease would also have an adverse effect on the fair market value of our natural gas DFIs, resulting in losses that would be immediately recorded within our comprehensive financial results in our statements of operations as a result of mark-to-market valuation accounting requirements. See "Summary—Background of the Restructuring—Our Financial Difficulties—Claims Relating to Our Derivative Financial Instruments."

We are also a large consumer of soda ash with a consumption of approximately 300 thousand metric tons in 2009, which represented approximately 4% of our cost of goods sold. In the last four years, the price of the soda ash has increased by approximately 70%.

Other potential sources of significant variations in our cost of goods sold are packaging and freight costs, which represented 6% and 2% respectively of our cost of goods sold in 2009, respectively.

***We operate in a highly competitive industry in which we compete with global competitors and vertically integrated customers, have relatively high fixed costs and are faced with sharply decreasing demands.***

Historically, aggressive investment by our global competitors such as Compagnie de Saint Gobain ("Saint Gobain") and Guardian Industries Corporation ("Guardian"), and vertically integrated DFIs customers with glass manufacturing facilities in Mexico, coupled with the increased imports of low-cost competitive products into several of our important markets, has resulted in an increase in capacity that has brought significant pricing pressure on our products, particularly in our flat glass construction market where the industry is faced with over-capacity. Similarly, our competitors may make new investments in Mexico in the glass containers market. Loss of existing or future market share to competitors or customers in any of our business units may adversely affect our performance and, to the extent that one or more of our competitors becomes more successful than us with respect to any key competitive factor, our results of operations, financial position and liquidity may be adversely affected.

Our operations have relatively high fixed costs relating to equipment purchases and employee costs. Customer financial difficulties have resulted, and could result in the future, in sharp decreases in demand and we may be unable to adjust our cost structure in a timely manner to compensate for shortfalls in sales. If current and anticipated customers do not place orders with us in accordance with our expectations or at all, it may be difficult to plan our capacity which cannot be altered easily. If our capacity does not match our customer demand, we will be burdened with expensive and unutilized overcapacity which could have an adverse effect on our business and results of operations.

***We face intense competition from other glass container producers, as well as from makers of alternative forms of packaging.***

We face competition from other glass container producers, as well as from makers of alternative forms of packaging, such as aluminum cans and plastic containers. We compete with each rigid packaging competitor on the basis of price, quality, service and the marketing attributes of the container. Advantages or disadvantages in any of these competitive factors may be sufficient to cause the customer to consider changing suppliers and/or using an alternative form of packaging. We also compete with manufacturers of non-rigid packaging alternatives, including flexible pouches and aseptic cartons, in serving the packaging needs of, among others, juice and food customers.

***Difficult market conditions in the automotive industry may affect our operating margins and results of operations.***

The North American automotive industry has recently faced difficult market conditions. North American automobile manufacturers have experienced slower demand and increased pricing pressures on their products. Even though the industry has shown moderate signs of recovery in 2010, these difficult market conditions in the automotive industry may continue to lead to additional pricing pressure on our products and may lead to loss of sales volume, either of which may have an adverse effect on us. In addition, the automotive industry has experienced pressures due to increased oil prices and the elimination of certain tax incentives in the United States which could decrease our OEM business sales, as the U.S. demand in the automobile sector has declined.

Certain of our flat glass products sold to OEMs in the automotive industry are sold under global purchase agreements, which are entered into after completion of a bidding process. Such automotive OEMs have significant buying power which, coupled with substantial competition, puts pressure on prices and margins relating to products supplied under the global purchase agreements. As a result, even if we were awarded the right to sell to an automotive OEM under a global purchase agreement, we may sell at operating margins that are lower than margins generally achievable from sales to other flat glass customers. The automotive OEM business line represented 9% and 7% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively.

***The costs of complying with environmental protection and health and safety laws, and any liabilities arising thereunder, may increase and adversely affect our business, results of operations, cash flows or financial condition.***

We are subject to various environmental protection and health and safety laws and regulations governing, among other things, the generation, storage, handling, use, remediation, disposal and transportation of hazardous materials, the emission and discharge of hazardous materials into the ground, air or water, and the health and safety of our employees.

We are also required to obtain permits from governmental authorities for certain operations. We cannot assure you that we have been or will be at all times in complete compliance with such laws, regulations and permits. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators. We could also be held liable for any and all consequences arising out of human exposure to hazardous substances or other environmental damage.

Since 1998, we have been participating in a voluntary audit program at our Mexican facilities. As a result of audits by and implementation of certain measures suggested by the *Procuraduría Federal de Protección al Ambiente* (Federal Environmental Protection Agency), which we refer to as "PROFEPA," action plans are entered into, and costs are incurred, to make environmental investments and improvements required for PROFEPA Clean Industry certification.

Environmental laws are complex, change frequently and have tended to become more stringent over time. While we have budgeted for future capital and operating expenditures to maintain compliance with environmental laws, we cannot assure you that environmental laws will not change or become more stringent in the future. Therefore, we cannot assure you that our costs of complying with current and future environmental and health and

61

safety laws, and our liabilities arising from past or future releases of, or exposure to, hazardous substances will not adversely affect our business, results of operations, cash flow or financial condition.

***Substitution trends in the glass container industry may continue to adversely affect our business.***

Glass containers have been, and continue to be, subject to competition from alternate forms of packaging, including plastic containers, aluminum cans and laminated paper containers. In mature glass containers markets, such as in the United States, demand for glass containers began a sustained long-term decline in the 1970s (although such decline has substantially diminished in recent years). In connection with such decline, the glass containers industry experienced a reduction in capacity and consolidation among glass container producers. The remaining glass containers producers in mature markets have faced, and may continue to face, pricing pressures as a result of competition from other forms of packaging. Mexico is becoming a mature market, with increased competition from alternate forms of packaging, particularly plastic, aluminum cans and laminated paper containers. Such products have adversely affected, and may continue to adversely affect, our prices and operating margins, principally with respect to glass containers for the beer, soft drinks and food industries. Our Glass Containers business unit represented 52% of our consolidated net sales in 2009.

***Protracted constraints on our capital expenditures may impact our business operations.***

We are constrained in our capital expenditures by our current financial condition. Therefore, our capital expenditures are limited in 2010. During 2009, we invested $77 million. Should we be unable to fund the total amount of our capital expenditures with cash flows from operations, we may be required to defer a portion of such expenditures to future periods. See "Liquidity and Capital Resources." A prolonged constraint on our available resources for capital expenditures could have a materially adverse effect on our results of operations.

## RISK FACTORS RELATING TO ECONOMIES IN WHICH WE PARTICIPATE

***Economic developments in Mexico, the United States and Europe affect our business.***

The year 2009 was characterized by a continuation of the slowdown in global economic activity and a global recession that led to tight credit markets and a global decline in demand. The global economic deceleration had its roots in the U.S. economy, which experienced growth decline from 2.1% in 2007 to 0.4% in 2008 and contracted at a rate of 2.4% in 2009. During the global economic crisis, the United States and other countries around the world, and particularly Spain's construction market, experienced deteriorating economic conditions. Global consumer confidence eroded amidst concerns over declining asset values, inflation, energy costs, geopolitical issues, the availability and cost of credit, rising unemployment, and the stability and solvency of financial institutions, financial markets, businesses and sovereign nations.

The housing and construction markets in the United States have been seriously affected by the sub-prime mortgage crisis, which has also affected the economy overall. The growth in housing sales and construction financed by credit played a large role in the economy's expansion by lifting other sectors of the economy. Losses on sub-prime mortgages have negatively affected not only the housing and construction markets but other sectors and the availability of credit generally. Increased foreclosures could generate increased inventory on the housing market which could affect our residential and commercial construction sales. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Trend Information."

As a consequence of the global economic and financial crisis, and the severe recession, that began in the second half of 2008, the Mexican economy entered into a recession. In 2009, Mexico's GDP registered a contraction rate of 6.5%. In 2008, Mexico's GDP registered a growth rate of 1.3%, a lower figure than the GDP growth rate of 3.3% reported for 2007. The majority of our manufacturing facilities are located in Mexico. Most of our manufacturing facilities are located in Mexico. Our consolidated net sales resulting from sales to parties located within Mexico were 42%, 44% and 46% for each of the years ended December 31, 2007, 2008 and 2009, respectively. Thus, the current recession in Mexico could affect our operations to the extent that we are unable to reduce our costs and expenses in response to falling demand. These factors could result in a decrease in our sales and revenues.

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. In Mexico, for 2010, we expect the country to continue confronting difficulties, due to a slower than expected recovery in the domestic market and in the U.S. economy.

Future economic declines in or affecting Mexico, the United States or Europe could adversely affect us and our ability to obtain financing.

***Foreign currency exchange rate fluctuations may have an adverse effect on our operating income and our total comprehensive financial result.***

Our total comprehensive financing result is impacted by changes in the value of the Mexican peso relative to the U.S. dollar. Foreign currency exchange gains or losses included in our total financing cost result primarily from the impact of changes in the U.S. dollar-Mexican peso exchange rate on our Mexican subsidiaries' U.S. dollar-denominated monetary liabilities (such as U.S. dollar-denominated debt and accounts payable arising from imports of raw materials and equipment) and assets (such as U.S. dollar-denominated cash, cash equivalents and accounts receivable). Because historically our U.S. dollar-denominated liabilities have exceeded our U.S. dollar-denominated monetary assets, the devaluation and appreciation of the Mexican peso resulted in exchange losses and gains, respectively. The closing exchange rate of 2009, Ps. 13.0587 per one dollar, compared with the closing exchange rate of 2008, Ps. 13.8325 per one dollar, showed an appreciation of the Mexican peso of 5.6%. This appreciation reflected an exchange gain in our financial statement. As of June 30, 2010 the exchange rate is Ps. 12.6567 per one dollar, an appreciation of 3.1% compared with the closing exchange rate of Ps. 13.0587 in December 31, 2009. Accordingly, during the six-month period ended June 30, 2010, the appreciation of the Mexican peso relative to the U.S. dollar resulted in foreign currency exchange gains. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations."

Changes in the value of the Mexican peso to the U.S. dollar also have an effect on our results of operations. In general, a devaluation of the Mexican peso results in an increase of our operating margins, and an appreciation of the Mexican peso results in a decrease in our operating margins, in each case, when measured in pesos. This is because the aggregate amount of our consolidated net sales denominated in or linked to the U.S. dollar exceeds the aggregate amount of our costs of goods sold and our general, administrative and selling expenses denominated in or linked to the U.S. dollar.

A substantial portion of the sales generated by our Mexican subsidiaries and U.S. subsidiaries are either denominated in or linked to the U.S. dollar. The prices of a significant number of the products we sell in Mexico, particularly flat glass for automotive uses and capital goods, are linked to the U.S. dollar. In addition, substantially all of our export sales are invoiced in U.S. dollars and subsequently translated into Mexican pesos using the exchange rate in effect at the date of the transaction.

Further, a strong Mexican peso relative to the U.S. dollar makes the Mexican market more attractive for importers and competitors that might not otherwise sell in the Mexican market. A strong Mexican peso relative to the U.S. dollar also makes our products with prices denominated in or affected by the value of the U.S. dollar less competitive or profitable. With respect to such products, when the Mexican peso appreciates we must either increase our prices in U.S. dollars, which makes our products less price-competitive, or bear reduced operating margins when measured in pesos. Given the competitive nature of the industries in which we operate, we have chosen to reduce our operating margins for such products in response to appreciation of the Mexican peso relative to the U.S. dollar in the past.

The sales generated by our Spanish subsidiary are either denominated in or linked to the euro, while its cost of goods sold is denominated in or linked to the U.S. dollar. Changes in the value of the U.S. dollar to the euro may have an adverse effect on us in a similar fashion to those described with respect to the value of the Mexican peso above.

***We may be adversely affected by increases in natural gas prices, interest rates or foreign exchange rate changes that we are unable to mitigate through derivative transactions due to our financial condition.***

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations.

Interest rate risk exists primarily with respect to our floating-rate Mexican peso and U.S. dollar-denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR increase significantly, our ability to service our debt will be adversely affected. As of June 30, 2010, our TIIE-rate and LIBOR-rate debt amounted to Ps. 1,548 million ($122 million) and Ps. 623 million ($49 million), respectively.

Because our net sales and a significant portion of our operations are denominated in the Mexican peso and the U.S. dollar, our business is subject to adverse effects of foreign exchange rate fluctuations. These fluctuations may result from changes in economic conditions, investor sentiment, monetary and fiscal policies, the liquidity of global markets, international and regional political events, and acts of war or terrorism. In addition, the fluctuation of the foreign exchange rate may adversely affect our U.S. dollar-denominated debt.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases, interest rates or foreign exchange rates. As of June 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates or foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

***Developments in other emerging market countries may adversely affect our business or the market price of our securities.***

As is the case with respect to securities of issuers from other emerging markets, the market value of securities of Mexican companies is, to varying degrees, affected by economic and market conditions in other emerging market countries. Although economic conditions in these countries may differ significantly from economic conditions in Mexico, investors' reactions to developments in any of these other countries may have an adverse effect on the market value of securities of Mexican issuers. In recent years, for example, prices of both Mexican debt securities and Mexican equity securities dropped substantially as a result of developments in Russia, Asia and Brazil.

During recent years, Venezuela, Colombia and certain EU markets have shown instability related to certain political and economic troubles (e.g., sovereign debt problems in Greece, Spain and Portugal). In the countries in which we operate, we are subject to government protectionist measures, anti-dumping regulation, actions aimed at imposing controls on capital and other such practices that may adversely affect our business.

In addition, the correlation between economic conditions in Mexico and the United States has sharpened as a result of the North American Free Trade Agreement (NAFTA) and increased economic activity between the two countries. As a result of the slowing economy in the United States and the uncertainty it could have on the general economic conditions in Mexico and the United States, our financial condition and results of operations could be adversely affected. In addition, due to recent developments in the international credit markets, capital availability and cost could be significantly affected and could restrict our ability to obtain financing or refinance our existing indebtedness on favorable terms, if at all.

***If foreign currency exchange controls and other restrictions are imposed, we may not be able to service our debt in U.S. dollars, which exposes investors to foreign currency exchange risk.***

In the past, the Mexican economy has experienced balance of payments deficits, shortages in foreign currency reserves and other problems that have affected the availability of foreign currencies in Mexico. The Mexican government does not currently restrict or regulate the ability of persons or entities to convert pesos into U.S. dollars. However, it has done so in the past and could do so again in the future. We cannot assure you that the Mexican government or any other government in countries in which we operate will not institute a restrictive currency exchange control policy in the future. Such restrictive foreign currency exchange control policies could prevent or restrict access to U.S. dollars and limit our ability to service our U.S. dollar-denominated debt.

***Political events in Mexico could affect Mexican economic policy and adversely affect us.***

Our business, financial condition and/or results of operations may be affected by economic, political or social developments in Mexico, including, among other things, any political or social instability, changes in the rate of economic growth or contraction, changes in the exchange rate between the Mexican peso and the U.S. dollar, an increase in Mexican inflation or interest rates, changes in Mexican taxation and any amendments to existing Mexican laws and regulations.

Federal Congressional mid-term elections were held on July 5, 2009, and the opposition Institutional Revolutionary Party (Partido Revolucionario Institucional, or "PRI") won a relative majority of the seats in the Mexican Congress, while the National Action Party (Partido Acción Nacional) lost its majority position. The PRI congressional majority, as well as its de-facto coalition with Mexico's Green Party (Partido Verde Ecologista de Mexico) and the possible lack of alignment between the President and this new legislature may result in government gridlock. We cannot provide any assurance that the current political situation or any future political developments in Mexico will not have a material adverse effect on our results of operations and financial condition.

***Security issues and social instability in Mexico could adversely affect us.***

High incidences of crime throughout Mexico, including kidnappings and drug trafficking, could have an adverse effect on our business as foreign investors may be less likely to invest in Mexico, which could negatively impact our domestic economy. Social instability in Mexico or adverse social or political developments in or affecting Mexico could adversely affect us and our ability to obtain financing. The possibility of having similar or other incidents in the future could adversely affect our business and operations.

***We face risks related to health epidemics and other outbreaks.***

In April 2009, an outbreak of A H1N1 virus occurred in Mexico and the United States, followed by cases in Asia and Europe. A future occurrence of A H1N1 virus or other adverse public health developments in Mexico, or in the countries where we operate, may have a material adverse effect on our business operations. Our operations may be impacted by a number of health-related factors, including, among other things, quarantines or closures of our facilities that could disrupt our operations, and a general slowdown in the Mexican economy. Any of the foregoing events or other unforeseen consequences of public health problems could adversely affect our business and results of operations.

***Our financial statements may not give you the same information as financial statements prepared under United States accounting principles or Exchange Act reporting requirements.***

Mexican companies listed on the Bolsa Mexicana de Valores, which we refer to as the "Mexican Stock Exchange," including us, must prepare their financial statements in accordance with MFRS. MFRS differs in certain significant respects from U.S. GAAP as it relates to our consolidated financial statements, including, among other things, the treatment of minority interests, workers' profit sharing, accounting for the effects of deferred income taxes and consolidation of subsidiaries. Moreover, we filed a Form 15F for deregistration to terminate our registration and reporting requirements under the Exchange Act; if such deregistration is successfully completed, we will no longer be required to disclose financial and other information that is compliant with Exchange Act reporting

requirements. For these and other reasons, the presentation of financial statements and reported earnings prepared in accordance with MFRS may differ materially from the presentation of financial statements and reported earnings prepared in accordance with U.S. GAAP and Exchange Act reporting requirements.

***Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients.***

In April 2010, our float glass facility in Mexicali and the inventories in that plant sustained damage as the result of an earthquake, which caused a temporary halt in production and the loss of a large amount of inventories. On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. See "Summary—Recent Developments—Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León."

Our operations may be impacted in the future by a number of natural disasters or their consequences, including, among other things, flood, damage to roads, highways and/or bridges, and interruption of water, electricity and natural gas supply, which could disrupt our operations and impact our service to our clients.

## RISK FACTORS RELATING TO THE NEW NOTES

***Our ability to repay the New Notes and our other debt depends on cash flow from our subsidiaries.***

Vitro is a holding company whose only material assets will be its ownership interests in its subsidiaries. Consequently, we depend on distributions or other inter-company transfers of funds from our subsidiaries to meet our debt service and other obligations, including with respect to the New Notes. Our non-guarantor subsidiaries are not obligated to make funds available to us for payments on the New Notes. We cannot assure you that the operating results of our subsidiaries will be sufficient to enable us to make payments on the New Notes. Furthermore, under Mexican law, our subsidiaries may only pay dividends out of retained earnings and after all losses from prior fiscal years have been satisfied.

***The New Indentures governing the New Notes are expected to contain certain restrictive covenants.***

The New Indentures governing the terms of our indebtedness are expected to contain certain covenants that are customary for similar indebtedness. Such covenants include, among other things, restrictions on our ability and our subsidiaries' ability to (i) incur additional debt or issue subsidiary preferred stock or stock with a mandatory redemption feature before the maturity of the New 2019 Notes, (ii) pay dividends on our capital stock, (iii) redeem or repurchase capital stock or prepay or repurchase subordinated debt, (iv) make some types of investments and sell assets, (v) create liens, (vi) create, acquire or participate in strategic joint ventures, (vii) engage in transactions with affiliates, except on an arm's-length basis, (viii) enter into sale and leaseback transactions, (ix) make certain capital expenditures, (x) enter into hedging agreements; and (xi) consolidate or merge with, or sell substantially all our assets, to another person. In addition, under the terms of the New Indentures, we will be required to assign all of our intercompany debt to a voting trust pursuant to which all such intercompany debt will be voted by the trustee of such trust (at the instruction of a majority of third party creditors) in the event of a subsequent *concurso mercantil* or other similar insolvency proceeding involving us and/or our subsidiaries. As of June 30, 2010, under the restrictive covenants of our current indentures, we were prohibited from incurring any additional debt other than certain limited permitted debt exceptions.

The restrictions in our New Indentures governing the New Notes could include similar restrictions that could limit our flexibility to adjust to changes in our business and the industries in which we operate, and limit our ability to fund future operations, acquisitions or meet extraordinary capital needs.

***The guarantees may not be enforceable.***

The guarantees provide a basis for a direct claim against the Guarantors; however, it is possible that the guarantees may not be enforceable under Mexican law. Mexican law does not prohibit the giving of guarantees and

66

as a result does not prevent the guarantees of the New Notes from being valid, binding and enforceable against the Guarantors in the event that a Guarantor becomes subject to a *concurso mercantil* or to a bankruptcy (*quiebra*). However, the relevant guarantee may be deemed to have been a fraudulent transfer and declared void if the Guarantor is deemed not to have received fair consideration in exchange for such guarantee.

***The guarantees of our non-Mexican Guarantors may be held to be unenforceable under fraudulent conveyance laws or limited by other applicable laws.***

We have agreed to cause our non-Mexican Guarantors to guarantee the New Notes. The guarantees of such non-Mexican Guarantors may be subject to review under various laws for the protection of creditors. It is possible that the creditors of such non-Mexican Guarantors may challenge a guarantee as a fraudulent transfer under relevant U.S. federal and state laws by claiming, for example, that, since the guarantees of such non-Mexican Guarantors were incurred for our benefit (and only indirectly, if at all, for the benefit of such non-Mexican Guarantors), the obligations of such non-Mexican Guarantors were incurred for less than reasonable equivalent value or fair consideration. Moreover, laws for the protection of creditors of other jurisdictions also provide similar remedies to creditors of a guarantor. Under certain circumstances, including a finding that a guarantor was insolvent at the time its guarantee was issued, a court could hold that the obligations of the guarantor under the guarantee may be voided or is subordinate to other obligations of the guarantors or that the amount for which a guarantor is liable under a guarantee may be limited. Different jurisdictions define "insolvency" differently. However, a guarantor generally would be considered insolvent under applicable U.S. laws at the time it guaranteed the New Notes if:

- the fair market value (or fair saleable value) of its assets is less than the amount required to pay its total existing debts and liabilities (including the probable liability of contingent liabilities) as they become absolute or mature; or

- the guarantor were incurring debts beyond its ability to pay as such debts mature.

In addition, in compliance with Swiss law, the aggregate amount payable by each Swiss Guarantor will be limited for each such Swiss Guarantor to an amount equal to the maximum amount of the freely distributable retained earnings of such Swiss Guarantor as of such time. There may be other limitations on the guarantees of our other non-Mexican Guarantors required under local applicable laws.

We cannot assure you what standard a court would apply to determine whether a guarantor was "insolvent" as of the date the New Notes were guaranteed. Irrespective of the method of valuation, a court may determine that the guarantees constituted fraudulent transfers on another ground whether or not a guarantor was insolvent on the date the guarantee was issued. In addition, although the New Indentures governing the New Notes will limit the amount of the guarantees to the amount that will result in the guarantees not constituting fraudulent transfers or improper corporate distributions, we cannot be certain which standard a court would apply in determining the maximum liability of the guarantors.

***Payments on the New Notes and the guarantees will be junior to any secured debt obligations of Vitro and the Guarantors, as the case may be, and effectively junior to debt obligations of any non-guarantor subsidiaries.***

The New Notes and the guarantees will constitute unsecured unsubordinated obligations of Vitro and the Guarantors and will rank equal in right of payment with all of the other existing and future unsecured unsubordinated indebtedness of Vitro and the Guarantors, respectively. Although the holders of the New Notes will have a direct, but unsecured, claim on the assets and property of Vitro, payment on the New Notes will be subordinated to any secured debt of Vitro to the extent of the assets and property securing such debt. Payment on the guarantees of the New Notes will be subordinated to any present or future secured debt of the Guarantors to the extent of the assets and property securing such debt. Payment on the New Notes will also be effectively subordinated to the payment of secured and unsecured debt and other creditors of our and the Guarantors' non-guarantor subsidiaries. In addition, under Mexican law, the obligations of Vitro and the Guarantors under the guarantees are subordinated to certain statutory preferences, including claims for salaries, wages, secured obligations, social security and taxes. In the event of Vitro's and of the Guarantors' *concurso mercantil,* or bankruptcy liquidation, such statutory preferences will have preference over any other unsecured claims, including

claims by any holder of the New Notes. As of June 30, 2010, our secured debt was Ps. 2,324 million ($183.6 million).

Not all of our subsidiaries will be guarantors of the New Notes. However, our financial information (including our financial statements incorporated by reference) is presented on a consolidated basis. For the six-month period ended June 30, 2010, our non-guarantor subsidiaries accounted for 3% of our revenues and 9% of our total assets. As of June 30, 2010, our non-guarantor subsidiaries had Ps. 865 million ($68 million) of indebtedness, all of which is structurally senior to the New Notes.

### U.S. Holders of the Old Notes accepting the Concurso Plan may recognize income in the exchange offer.

A U.S. Holder (as defined under "Certain U.S. Federal Income Tax Considerations") that exchanges Old Notes for the Restructuring Consideration will be subject to U.S. federal income tax on any gain resulting from the exchange unless the exchange qualifies as a "recapitalization." In addition, the Note Consent Payment and Restructuring Fee may give rise to ordinary taxable income for a U.S. Holder even if the exchange qualifies as a recapitalization or the Holder would otherwise recognize a loss on the exchange. Finally, the terms of the New 2019 Notes will likely subject the New 2019 Notes to the original issue discount rules and, possibly, to certain rules applicable to contingent payment debt instruments. These rules could result in U.S. Holders being required to include amounts in taxable income in advance of the receipt of cash payments on the New 2019 Notes. The proper characterization for U.S. tax purposes of the New MCDs is unclear. See the discussion herein under the heading "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations" for a discussion of the tax consequences of the exchange of the Old Notes for the Restructuring Consideration and Note Consent Payment.

The U.S. federal income tax consequences associated with exchanging Old Notes for the Restructuring Consideration, receiving the Note Consent Payment and Restructuring Fee and owning the New Notes are very complex. U.S. Holders should consult their own tax advisers as to the U.S. federal income tax consequences to them of granting their consent, and of the ownership and disposition of the New Notes, including the application of the tax considerations discussed in this Statement to their particular situations, as well as the application of state, local, foreign or other tax laws.

### The provisions of the New Indentures governing the New Notes generally will not apply to our Unrestricted Subsidiaries and therefore their ability, among other things, to incur debt, encumber their assets and make payments and distributions will not be limited thereby.

Generally, the covenants and events of default to be included in the New Indentures governing the New Notes will not apply to the Unrestricted Subsidiaries. See "Description of the New Notes." As a result, the New Indentures governing the New Notes will impose no limitations on the ability of the Unrestricted Subsidiaries, among other things, to incur debt, make restricted payments, pledge their assets, make asset sales and permit restrictions on their ability to pay dividends or make other distributions to us or to issue their stock to third parties.

Moreover, our Unrestricted Subsidiaries will not guarantee the New Notes. Thus, the New Notes will be effectively subordinated to all obligations, including indebtedness and trade payables, of our Unrestricted Subsidiaries. As a result, when evaluating our credit risk and making an investment decision with respect to the New Notes, you should not expect that the assets or cash flow of, if any, or our equity interest in, the Unrestricted Subsidiaries will be available to repay the principal of, or pay interest on, the New Notes. Subject to the limitations described under "Description of the New Notes—Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries," we will be permitted to designate new or existing subsidiaries as Unrestricted Subsidiaries.

### Absent an exemption from registration under the Securities Act, we cannot assure you that the New Notes will not be subject to certain transfer restrictions. There is no established trading market for the New Notes and holders of New Notes may not be able to sell the New Notes at the price that holders paid, or at all.

We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in

exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions.

There is no established trading market for the New Notes. We do not intend to list the New Notes on any securities exchange or to arrange for their quotation on any automated dealer quotation system. As a result, we can make no assurances as to the liquidity of any trading market for the New Notes.

We also can make no assurances that holders of New Notes will be able to sell their New Notes at a particular time or that the prices that such holders receive when they sell the New Notes will be equal to or more than the prices they paid for the New Notes. Future trading prices of the New Notes will depend on many factors, including:

- our operating performance and financial condition;

- ratings of our debt published by credit rating agencies;

- the level, direction and volatility of market interest rates generally;

- the time remaining to maturity of the New Notes;

- the liquidity of the New Notes generally and the interest of securities dealers in making a market in the New Notes;

- the market for similar securities; and

- general economic and political conditions.

***We may not have the ability to raise funds necessary to finance the Change of Control offer required by the New Indentures governing the New Notes.***

If we undergo a Change of Control (as defined in the New Indentures governing the New Notes), we may need to refinance large amounts of our debt, including the New Notes and certain indebtedness. Under the New Indentures governing the New Notes, if a Change of Control occurs, we must offer to buy back the New Notes for a price equal to 101% of the outstanding principal amount of the applicable New Notes, plus any accrued and unpaid interest. We may not have sufficient funds available to us to make any required repurchases of the New Notes upon a Change of Control. If we fail to repurchase the Old Notes, as applicable, in those circumstances, we will be in default under the applicable indenture.

Any future debt that we incur may also contain restrictions on repurchasing the New Notes upon a Change of Control. If any Change of Control occurs, we may not have sufficient funds to satisfy all of our debt obligations.

***Various provisions of Mexican law may make it difficult for holders of New Notes to convert payments they receive in pesos into U.S. dollars or may make it difficult for holders of New Notes to recognize the full value of payments to them.***

We are required to make payments of amounts owed on the New Notes in U.S. dollars. However, under the *Ley Monetaria de los Estados Unidos Mexicanos*, which we refer to as the "Mexican Monetary Law," obligations to

69

make payments in Mexico in foreign currency, whether by agreement or upon enforcement of a judgment, may be discharged in pesos at the exchange rate for pesos prevailing at the time and place of payment. This rate is currently determined by the Mexican Central Bank every business day in Mexico and published the next business day in Mexico's Daily Official Gazette of the Federal Government. Accordingly, we will be legally entitled to make payment of amounts due on the New Notes in pesos if payment of the New Notes is sought in Mexico through the enforcement of a non-Mexican judgment or otherwise. If we elect to make payments due on the New Notes in pesos in accordance with the Mexican Monetary Law, we can make no assurances that the amounts paid may be converted by the payee into U.S. dollars or that, if converted, such amounts would be sufficient to purchase U.S. dollars equal to the amount of principal, interest or additional amounts due on the New Notes.

***You may not be able to effect service of process on us, our non-U.S. subsidiaries, our directors or our officers or to enforce in Mexican courts judgments obtained against us in the United States.***

We are a corporation (*sociedad anonima bursátil de capital variable*) organized under the laws of Mexico. Almost all of our directors and officers reside outside the United States. Substantially all of the assets of such persons are located outside the United States. A substantial portion of our assets are located (and a majority of our resources are derived from sources) in Mexico. As a result, it may not be possible for investors to effect service of process within the United States or in any other jurisdiction outside of Mexico upon us, our non-U.S. subsidiaries, our directors or our officers or to enforce against us, our non-U.S. subsidiaries, our directors or our officers in any jurisdiction outside of Mexico judgments predicated upon the laws of any such jurisdiction, including any judgment predicated upon the U.S. federal and state securities laws. We have been advised by our special Mexican counsel, Kuri Breña, Sánchez Ugarte y Aznar S.C., that there is uncertainty as to the enforceability in Mexican courts, in original actions or in actions for enforcement of judgments obtained in courts of jurisdictions outside of Mexico, of civil liabilities arising under the laws of any jurisdiction outside of Mexico, including any judgment predicated solely upon the U.S. federal and state securities laws.

***Judgments of Mexican courts enforcing the obligations of the Company and the Guarantors in respect of the New Notes would be paid only in pesos.***

Under the Mexican Monetary Law, in the event that any proceedings are brought in Mexico seeking performance of the obligations of the Company or the Guarantors under the New Notes, pursuant to a judgment or on the basis of an original action, we and the Guarantors may discharge our obligations denominated in any currency other than Mexican pesos by paying Mexican pesos converted at the rate of exchange prevailing on the date payment is made. This rate is currently determined by the Mexican Central Bank every business day in Mexico and published the next business day in Mexico's Daily Official Gazette of the Federal Government.

In addition, if we or the Guarantors are declared bankrupt or become subject to *concurso mercantil,* our obligations and the obligations of the Guarantors under the New Notes, respectively, (i) would be converted into Mexican pesos and then from Mexican pesos into UDIs and would not be adjusted to take into account any devaluation of the Mexican peso relative to the U.S. dollar occurring after such conversion, (ii) would be satisfied at the time claims of all our creditors are satisfied, (iii) would be subject to the outcome of, and priorities recognized in, the relevant proceedings, (iv) would cease to accrue interest from the date a *concurso mercantil* is declared and (v) would be subject to certain statutory preferences, including tax, social security and labor claims and claims of secured creditors. In addition, the guarantees may not be enforceable.

***Our by-laws only permit Mexican ownership of our shares, and we do not have an ADS program. Upon conversion of the New MCDs, you may not hold shares directly but only through our CPO program.***

Our by-laws (*estatutos sociales*) contain limitations for share holding by non-Mexican investors. We may consider modifying our by-laws prior to the conversion of the New MCDs in order to avoid such restrictions. Because a by-law amendment requires shareholder approval at an extraordinary shareholders' meeting, no assurance may be given that the shareholders will approve such an amendment. Absent such amendment, non-Mexican investors may not directly hold our shares and may only be entitled to the benefits of our shares through our CPO program, which we have in place through a Mexican trust in Nacional Financiera. Moreover, the Company does not have an American Depositary Shares ("ADS") program in place, and does not intend to implement one in the near

70

future. Therefore, shares or CPOs resulting from the conversion of the New MCDs may not be traded in any market other than Mexico.

***If you hold New MCDs, you will not be entitled to any rights with respect to our by-laws and our shares, but will be subject to all changes made with respect to our shares.***

If you hold New Notes, you will not be entitled to any rights with respect to our shares (including, without limitation, voting rights or rights to receive any dividends or other distributions) but will be subject to all changes affecting our shares. You will have rights with respect to our shares only if and when you tender your New MCDs for conversion and comply with the other requirements to convert them and, in limited cases, under the conversion rate adjustments applicable to the New MCDs, as set forth in "Description of the New Notes." For example, in the event that an amendment is proposed to our by-laws (*estatutos sociales*) requiring shareholder approval and the record date for determining the shareholders of record entitled to vote on the amendment occurs prior to the conversion date, you will not be entitled to vote on the amendment, although you will nevertheless be subject to any changes in the powers, preferences or special rights of our shares that result from the amendment. Similarly, if we declare a dividend and the record date determining the shareholders of record entitled to the dividend occurs prior to the conversion date, you will not be entitled to the dividend. See "Description of the New Notes."

***There are restrictions in Mexico on resale of the New Notes.***

The New Notes will not be recorded in Mexico's National Securities Registry (*Registro Nacional de Valores*). As a result, you may transfer or resell the New Notes and the shares issuable upon conversion of the New Notes in Mexico only in a private transaction or otherwise pursuant to a private placement exception set forth under Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law, to institutional and qualified buyers. Participating Creditors who consent pursuant to the terms of this Statement should proceed on the assumption that they may have to hold the New Notes until maturity. See "Notice to Investors."

***We may not be able to obtain shareholders' or regulatory authorizations for the issuance of the New MCDs and sufficient shares for purposes of timely satisfying our settlement obligations in connection with a conversion.***

We expect to obtain shareholders' authorization for the issuance of the New MCDs and additional ordinary shares, free of preemptive rights, to be kept in our treasury for the purpose of complying with our conversion obligations under the New MCDs. Because the issuance of the New MCDs and the issuance of ordinary shares require shareholder approval and such a covenant may not be enforced through specific performance, no assurances may be given that our shareholders will authorize the issuance of the New MCDs and such additional shares. In addition, under our by-laws, non-Mexican investors may only be entitled to the benefits of our shares through a CPO program that we have in place through a Mexican trust agreement with Nacional Financiera. See "Description of the CPOs." Failure by us to have sufficient ordinary shares, free of preemptive rights, available for conversion, would result in an event of default under the New MCDs and you would have to pursue your remedies provided in the New MCDs.

***An adverse rating of the New Notes may cause their trading prices to fall.***

We intend to obtain ratings for the New Notes. If a rating agency rates the New Notes, it may assign a rating that is lower than investors' expectations. Rating agencies also may lower ratings on the New Notes in the future. If rating agencies assign a lower-than-expected rating or reduce, or indicate that they may reduce, their ratings in the future, the trading price of the New Notes could decline significantly.

71

# CAPITALIZATION

The following table sets forth our capitalization on a consolidated basis as of June 30, 2010:

- on an actual basis; and

- as adjusted to give effect to the *Concurso* Plan.

This table should be read in conjunction with "Selected Historical Consolidated Financial Information," "Unaudited Pro Forma Financial Information," "Liquidity and Capital Resources" and the consolidated financial statements included in this Statement.

| | As of June 30, 2010 | | | |
| --- | --- | --- | --- | --- |
| | **Actual** (Ps. millions) | **Actual** ($ millions)[(1)] | **As Adjusted** (Ps. millions) | **As Adjusted** ($ millions)[(1)] |
| **Restructured Debt:** | | | | |
| **Old Notes** | | | | |
| 2012 Notes | 3,797 | 300 | — | — |
| 2013 Notes | 2,734 | 216 | — | — |
| 2017 Notes | 8,860 | 700 | — | — |
| **Total** | **15,391** | **1,216** | **—** | **—** |
| **DFI Claims (including Promissory Notes)** | **3,040** | **240** | **—** | **—** |
| **Other Debt** | | | | |
| *Certificados Bursátiles Vitro 03* | 150 | 12 | — | — |
| *Certificados Bursátiles Vitro 08* | 400 | 32 | — | — |
| Other | 190 | 15 | — | — |
| **Total** | **740** | **58** | **—** | **—** |
| **Total debt subject to restructuring** | **19,171** | **1,515** | **—** | **—** |
| Total past-due interest | 2,622 | 207 | — | — |
| Unamortized discounts | (96) | (8) | — | — |
| **Total** | **21,697** | **1,714** | **—** | **—** |
| **Non-restructured Debt:** | | | | |
| **Total debt not subject to restructuring** | **3,314** | **262** | **3,314** | **262** |
| **New 2019 Notes** | **—** | **—** | **10,758** | **850** |
| **Total Debt** | **25,011** | **1,976** | **14,072** | **1,112** |
| **Stockholders' Equity:** | | | | |
| Majority stockholders' equity | 10 | 0 | 6,344[(2)] | 501[(2)] |
| Minority stockholders' equity | 1,312 | 104 | 1,312 | 104 |
| New MCDs | — | — | 1,266 | 100 |
| **Total stockholders' equity** | **1,322** | **104** | **8,922** | **705** |
| **Total Capitalization** | **26,332** | **2,080** | **22,994** | **1,817** |

---

(1)   Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.6567 pesos per one U.S. dollar, the Free Exchange Rate June 30, 2010.

(2)   Includes gains from restructured debt, net of applicable tax.

## THE RESTRUCTURING AND THE *CONCURSO* PLAN

We have not commenced a *concurso* proceeding under the Mexican Bankruptcy Law. The Exchange Offer and Consent Solicitation requests advance acceptance of the *Concurso* Plan in the event that a *concurso* proceeding is commenced and the *Concurso* Plan is filed along with a voluntary or involuntary *concurso mercantil* declaration petition, and contains information relevant to a decision to accept or reject the *Concurso* Plan. Concurrently with this Exchange Offer and Consent request, we are seeking consent from the holders of the DFI Claims and the Other Debt with respect to the *Concurso* Plan.

If the requisite 40% acceptance requirement for the *Concurso* Plan is met, we will file a request for a *concurso mercantil* declaration pursuant to the Mexican Bankruptcy Law, to pursue the restructuring through the *Concurso* Plan.

For a summary of our financial condition, the background of and reasons for the restructuring and the reasons why we are seeking acceptance of the *Concurso* Plan, see "Summary—Background of the Restructuring."

We have decided to effect the restructuring through the commencement of a *concurso* proceeding, and in order to pursue a Mexican bankruptcy reorganization in the quickest and most cost efficient manner, we are proposing an exchange offer and soliciting acceptances of the *Concurso* Plan from the holders of the Restructured Debt pursuant to this Statement. The *Concurso* Plan provides for, among other things, the distribution of the Restructuring Consideration to the holders of the Restructured Debt on a pro rata basis. If the *Concurso* Plan is consummated, we will implement a recognition and ratification proceeding in the United States through chapter 15 of the U.S. Bankruptcy Code and issue the New Notes, which we will distribute with the Restructuring Cash Payment in full settlement and satisfaction of the claims arising from or related to the Old Notes.

The distributions to the holders of Restructured Debt under the *Concurso* Plan are subject to proration with all other recognized creditors.

The *Concurso* Plan or restructuring agreement is attached to this Statement as Annex A. The *Concurso* Plan and this Statement should be read and studied in their entirety prior to voting on the *Concurso* Plan. See "Risk Factors" for a discussion of risks associated with the *Concurso* Plan and the transactions contemplated thereunder. You are urged to consult your counsel about the *Concurso* Plan and its effect on your legal rights before voting.

We have prepared the *Concurso* Plan for effecting our restructuring through a *concurso* proceeding. We are therefore separately soliciting the tender of Old Notes and the consent of each Holder in favor of the *Concurso* Plan in the Exchange Offer and Consent Solicitation along with the consent from each holder of the DFI Claims arising from guarantees issued by the Company and the Other Debt.

The Company will issue the New Notes following the approval of the *Convenio Concursal*. See "Summary—Background of Restructuring—The Restructuring Process—Fintech Lock-up Agreement".

### Anticipated Events in a *Concurso* Proceeding with a Pre-approved Restructuring Agreement

The *Concurso* Plan constitutes a restructuring agreement to be filed with a petition for a *concurso* proceeding governed by the Mexican Bankruptcy Law, to be approved within the Work-out Stage of such proceeding and affecting all creditors recognized therein. The Work-out Stage shall not last more than one calendar year following the last publication of the *Concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government. In the event the Company does enter into the pre-approved restructuring agreement with creditors holding the sufficient percentage of the outstanding liabilities of the Company provided for in the Mexican Bankruptcy Law (40%), the *concurso* of the Company shall be declared, starting with the Work-out Stage, without exhausting a previous review of the financial and accounting situation of the Company, known as the *Visit* procedure in the *concurso*. See "The Mexican Law of Commercial Reorganizations" section of this Statement for more information on the *concurso* proceeding.

The Mexican Bankruptcy Law provides that a debtor may continue to operate its business and remains in possession of its property and management of its business unless the Work-out Specialist requests the bankruptcy court and the bankruptcy court concedes in a contested procedure the removal of management on grounds of protection of the estate of the debtor. The filing of a reorganization case also triggers the automatic stay provisions of the Mexican Bankruptcy Law.

The *Concurso* Plan provides that recognized creditors, including the holders of Restructured Debt, will be entitled to receive the Restructuring Consideration on a pro rata basis. More specifically, pursuant to the *Concurso* Plan, the Company would, among other things, exchange the Restructured Debt for the following Restructuring Consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of New 2019 Notes;

- $100.0 million in aggregate principal amount of New MCDs (not including the Issue Date Adjustment), which will mandatorily convert into 15.0% of our equity if not paid in full at maturity;

- the Restructuring Cash Payment, which will be paid from the remainder of the cash in the Payment Trust after the Consent Payment is made, to all holders of the Restructured Debt on a pro rata basis; and

- a restructuring fee based on the issue date of the New Notes to be determined as described in "Summary—The New Notes—The New 2019 Notes."

Any intercompany debt will not receive the Restructuring Consideration and (other than ordinary course payments) will be subordinated to payment of the Restructured Debt.

The delivery and payment of the Restructuring Consideration pursuant to the proposed *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal*, including its implementation through a further chapter 15 bankruptcy case in the United States to recognize and ratify the restructuring agreement and the issuance of the New Notes. See "Description of the New Notes" for a more detailed description of the New Notes.

### Filing of Concurso *Proceeding Petition*

Pursuant to article 339 of the Mexican Bankruptcy Law, a *concurso* declaration request with a pre-approved plan of reorganization must be admitted by the *bankruptcy* court if (i) the request is filed by the Company together with creditors representing at least 40% of the Company's outstanding liabilities; (ii) the requests complies with the requirements set forth in article 20 of the Mexican Bankruptcy Law; (iii) the Company represents to be in default or in imminent default of its payment obligations representing at least 35% of its total outstanding liabilities for more than 30 days or lacks sufficient liquid assets (as identified in Article 10 section II of the Mexican Bankruptcy Law) to meet at least 80% of its overdue obligations; and (iv) the request is filed along with the pre-approved restructuring agreement executed by the Company and creditors representing at least said 40% of the Company's outstanding liabilities. Participating Creditors that deliver their consent in the consent solicitation will adhere to the petition of the Company for the *concurso* and will authorize an attorney-in-fact appointed by the Company to appear on their behalf before the bankruptcy court in order to pursue the corresponding *concurso* proceeding declaration and the approval of the *Concurso* Plan, or as it may be requested to be adjusted by the bankruptcy court or the Work-out Specialist, the restructuring plan or *Convenio Concursal* to be approved by said court.

### Concurso *Ruling or Declaration*

After filing the *concurso* declaration request and provided all the filing and legal requirements are met, the bankruptcy court will declare the Company in *concurso mercantil*, without the prior review of the financial condition by a court-appointed Visitor Specialist as provided in article 341 of the Mexican Bankruptcy Law. Thenceforth and pursuant to article 342 of the Mexican Bankruptcy Law, the Company's *concurso* proceeding will

be substantiated in the same manner as any other *concurso* proceeding, except that any restructuring proposal shall be based on the *Concurso* Plan initially submitted by the Company and the filing creditors.

The *concurso* ruling shall comply with the requirements set forth in article 43 of the Mexican Bankruptcy Law and shall address, among other, the following: (i) the initiation of the Work-out Stage; (ii) an order to the Company to suspend all payments that the Company should otherwise make, except for those required for the ongoing operation of the business; (iii) the date for the look-back period from which the entity's transactions may be scrutinized in order to determine if such transactions could have constituted fraudulent conveyances (the "Retroactive Date" and the period thenceforth, the "Retroactive Period") (the statutory Retroactive Date is 270 days prior to the initial declaratory ruling, but the Retroactive Period may be extended if certain conditions are met); (iv) the order to the Federal Institute of Bankruptcy Specialists or *IFECOM* to appoint the Work-out Specialist or *conciliador*, who shall conduct a part of the *concurso* proceedings without the intervention of the judiciary; (v) an order to the Work-out Specialist, to initiate the recognition of claims proceeding; and (vi) a notice to the creditors of their right to request the recognition of their claims.

Pursuant to article 44 of the Mexican Bankruptcy Law, the bankruptcy court will give notice of the *concurso* ruling to the Company and the IFECOM on the day after the *concurso* ruling is issued. The bankruptcy court will also notify all creditors whose domiciles are known by means of certified mail or by any other legal means. Moreover, the Work-out Specialist shall file the *concurso* ruling for registration with the Public Registry of Commerce located at the place where the Company has its corporate domicile (San Pedro Garza García, State of Nuevo Leon, Mexico) and shall publish a summary of the *concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and in a newspaper with broad distribution coverage in the place where the *concurso* proceeding is substantiated. Those parties to the *concurso* proceeding not notified pursuant to articles 44 and 45 of the Mexican Bankruptcy Law shall be considered notified of the *concurso* ruling on the day the publication in the newspaper is made.

### Appointment of the Work-out Specialist

The Federal Institute of Bankruptcy Specialists or *IFECOM* shall appoint the Work-out Specialist or *conciliador*, who shall conduct a part of the Work-out Stage of the *concurso* proceeding without the intervention of the judiciary. The Work-out Specialist shall inform the holders of Restructured Debt and other creditors of its appointment and designate a domicile for purposes of the *concurso* proceeding. The holders of Restructured Debt shall have the right to contest the appointment of the Work-out Specialist in those cases where a conflict of interest exists as provided in articles 56 and 328 of the Mexican Bankruptcy Law.

### Recognition of Debts Request

Pursuant to article 122 of the Mexican Bankruptcy Law, each creditor may request the recognition of its claims against the Company (i) within 20 days following the date on which the *concurso* ruling is published in the Federal Official Gazette; (ii) within the term provided in article 129 of the Mexican Bankruptcy Law for objecting to the preliminary list of creditors; or (iii) within the term to appeal the debt recognition ruling. No debt recognition request shall be made after the term to appeal the debt recognition ruling has elapsed.

The debt recognition request will be filed with the Work-out Specialist by using the forms provided by the IFECOM for such purposes, containing the information specified in article 125 of the Mexican Bankruptcy Law and including the originals or certified copies of the documents evidencing the debt to be recognized.

### Lists of Recognized Creditors

In accordance with article 121 of the Mexican Bankruptcy Law, the Work-out Specialist shall prepare and submit to the bankruptcy court a preliminary list of creditors within 30 days from the day on which the *concurso* ruling is published in the Official Gazette. Such list shall be prepared based on the accounting records of the Company, the information provided by the Company and creditors' recognition requests. The preliminary list of recognized creditors shall provide (i) the name and domicile of each creditor; (ii) the recognized amount of the claim; (iii) the collateral, terms and conditions of each claim, including a description of the type of document

75

evidencing the claim; and (iv) the ranking assigned to such claim pursuant to the Mexican Bankruptcy Law. The list shall also contain a description of those credits that will not be recognized and the reasons thereto. Pursuant to article 129 of the Mexican Bankruptcy Law, upon receiving the preliminary list from the Work-out Specialist, the bankruptcy court shall, within a term of five days, make the list available to the Company and the creditors in order for those to review it and submit in writing any objections and make such objection available to the Work-out Specialist on the following day. The Work-out Specialist shall have a period of 10 days to prepare and present to the bankruptcy court the definitive list of recognized creditors based on the preliminary list of recognized creditors and the objections submitted by the Company and the creditors.

### Credit Recognition and Ranking Ruling

The bankruptcy court shall issue the debt recognition, graduation and ranking ruling within five days from the date on which the definitive list of recognized creditors is submitted by the Work-out Specialist. On the following day, the bankruptcy court shall notify the credit recognition, graduation and ranking ruling to the recognized creditors and the Work-out Specialist through the publication made through the bankruptcy court board or *estrados*. Any of the creditors, including any holders of Restructured Debt, the Company or the Work-out Specialist may appeal the Credit Recognition and Ranking Ruling in terms of articles 135 to 144 of the Mexican Bankruptcy Law.

### Agreement with Recognized Creditors

The Company and the recognized creditors representing the majority (as defined in the Mexican Bankruptcy Law) shall enter into an agreement for the payment of debts within a period of 185 days after the publication of the *concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government (article 145 of the Mexican Bankruptcy Law). Under certain circumstances, such term may be extended for up to two additional extensions of 90 days each. The required majority under article 157 of the Mexican Bankruptcy Law for the approval of the restructuring plan consists of a number of recognized creditors representing more than 50% of the sum of (i) the recognized amount to all recognized unsecured creditors, and (ii) the recognized amount to those secured recognized creditors or creditors with special privileges joining or executing the restructuring plan. As mentioned above, the commencing of a *concurso* presumes the approval from creditors representing at least 40% of all of the Company's outstanding liabilities.

Pursuant to article 161 of the Mexican Bankruptcy Law, once the Work-out Specialist considers that the *Concurso* Plan has sufficient votes to be approved, the Work-out Specialist shall present the plan to recognized creditors, who will have the right to review and sign it within a term of 10 days. Once the *Concurso* Plan is executed by the required majority, the Work-out Specialist shall present it to the bankruptcy court. The bankruptcy court shall grant recognized creditors or creditors with special privileges that executed the *Concurso* Plan a five-day term to present objections based on the authenticity of their vote. Recognized creditors representing a majority in number or in amount may veto the *Concurso* Plan.

Pursuant to the Mexican Bankruptcy Law, once a *Concurso* Plan becomes effective and is approved by the competent bankruptcy court, it shall bind (i) the Company; (ii) all common recognized creditors; (iii) all secured recognized creditors that subscribe the *Concurso* Plan; and (iv) those secured recognized creditors that do not subscribe the *Concurso* Plan but whose recognized credits are to be paid under the *Concurso* Plan. According to the Mexican Bankruptcy Law, all unsecured recognized creditors would be deemed to have consented to the *Concurso* Plan, without any right to express an opinion on such plan, provided the plan contemplates payment of their credits owed at the time the *concurso* ruling becomes effective.

## *Concurso* Ruling Effects

Among the most important effects of the *concurso* ruling are (in each case, subject to certain exceptions): (i) the suspension of payments by the Company; (ii) the suspension of foreclosure and attachment proceedings (except for labor indemnities and wages); and (iii) the cessation of interest accrual on all payment obligations, and their conversion to UDIs (*Unidades de Inversión*), however, secured obligations will continue in their denominated currency and will only accrue ordinary interest provided for in the corresponding documentation, up to the value of

76

the assets securing such obligations. The *concurso* ruling does not suspend the obligation to pay salaries, taxes or employer related contributions. Any assets that are in possession of the Company but which are not rightfully owned by the Company may be separated from the bankruptcy estate. Subject to certain exceptions provided for in the Mexican Bankruptcy Law, the general provisions of contracts law and the agreements between the parties shall continue to govern the company's outstanding transactions.

In addition, there are certain agreements which are not considered terminated due to a *concurso* ruling unless in the opinion of the Work-out Specialist their fulfillment is not in the best interest of the bankruptcy estate including, among other things: (i) preliminary and final agreements pending enforcement; (ii) deposits, credit extensions, commission or agency agreements; and (iii) lease agreements.

## Graduation and Ranking of Creditors

Subject to certain rules and exceptions (i.e., labor liabilities, bankruptcy estate management expenses, attorney fees, and Work-out Specialist, Receiver and inspector fees), pursuant to Section Seventh of the Mexican Bankruptcy Law, the ranking of creditors generally shall be as follows: (i) solely privileged creditors, or *acreedores singularmente privilegiados*, meaning those holding credits related to funeral and medical expenses (only applicable to individuals); (ii) secured creditors with *in rem* right guarantees (mortgage or pledge), or *acreedores con garantía real*; (iii) certain labor liabilities; (iv) creditors which under the Mexican Commercial Code have special privileges by right of retention; (v) certain labor and tax liabilities; and (vi) common creditors, on a *pro rata* basis, without distinction as to the date on which their credits were granted or became due.

Holders of the Restructured Debt would be considered common creditors.

## U.S. Bankruptcy Proceeding

As a part of the implementation of the restructuring, Vitro shall, following the *concurso mercantil* filing, file an ancillary proceeding in the United States (the "Chapter 15 Proceeding") pursuant to chapter 15 of the United States Bankruptcy Code, as amended (the "U.S. Bankruptcy Code") based on the *concurso mercantil* proceeding in Mexico (the "Main Proceeding").

The purpose of the filing of a Chapter 15 Proceeding would be the recognition of the Main Proceeding to give effect to the *Concurso* Plan in the United States. In addition, Vitro intends to file various motions in the Chapter 15 Proceeding, seeking, among other things, application of the automatic stay under section 362 of the U.S. Bankruptcy Code and a preliminary injunction co-extensive with the automatic stay to implement such stay, enjoining all U.S. creditors of Vitro or its subsidiaries from taking any action to enforce any pre-petition claims against Vitro or its subsidiaries. In addition, upon approval of the *Concurso* Plan in the *concurso mercantil* proceeding in Mexico, Vitro intends to request that the Court in the Chapter 15 Proceeding enter an order implementing the *Concurso* Plan in the United States, including a permanent injunction against any action to enforce any claims dealt with or discharged in the *Concurso* Plan.

As a part of the Exchange Offer and Consent Solicitation, each holder of Restructured Debt shall agree that upon the filing of a Chapter 15 Proceeding, it will not challenge the Chapter 15 Proceeding during or after the pendency of the Main Proceeding, including, without limitation, seeking relief from the automatic stay or challenging or seeking relief from any injunction or restraining order sought or entered to implement such a stay.

## SELECTED HISTORICAL CONSOLIDATED FINANCIAL INFORMATION

The following table presents selected consolidated financial information and other data for each of the periods presented. This information and data should be read in conjunction with, and is qualified in its entirety by reference to, our consolidated financial statements and the notes thereto included elsewhere in this Statement and the information under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" as it relates to 2007, 2008 and 2009. The years ended December 31, 2005 and 2006 are derived from our public financial statements not included in this Statement. Our consolidated financial statements are prepared in accordance with MFRS.

Financial data expressed in pesos and set forth in the following table for 2008, 2009 and June 30, 2009 and 2010 are presented in nominal pesos and for all amounts pertaining to fiscal year 2007 and earlier are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

| | | | Year Ended December 31, | | | | Six Months Ended June 30, | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
| | | | (Ps. millions)[1] | | | ($ millions)[2] | (Ps. millions) | | ($ millions)[2] |
| **Income Statement Data:** | | | | | | | | | |
| **MFRS:** | | | | | | | | | |
| Net sales | Ps.26,567 | Ps.27,876 | Ps.28,591 | Ps.29,013 | Ps.23,991 | $1,837 | Ps.12,292 | Ps.11,399 | $ 901 |
| Cost of sales | 19,198 | 20,230 | 20,187 | 21,279 | 17,180 | 1,316 | 8,723 | 8,386 | 663 |
| Gross profit | 7,369 | 7,646 | 8,404 | 7,734 | 6,811 | 521 | 3,569 | 3,013 | 238 |
| Selling, general and administrative expenses | 5,530 | 5,529 | 5,700 | 6,024 | 5,482 | 420 | 2,936 | 2,397 | 189 |
| Operating income | 1,839 | 2,117 | 2,704 | 1,710 | 1,329 | 101 | 633 | 616 | 49 |
| Financing result: | | | | | | | | | |
| Interest expense, net | 2,355 | 2,155 | 1,836 | 2,089 | 2,772 | 212 | 1,355 | 1,267 | 100 |
| Derivative financial instruments | 17 | 337 | 201 | 3,766 | 570 | 44 | 459 | 108 | 9 |
| Exchange loss (gain), net | (417) | 224 | 94 | 3,222 | (976) | (75) | (774) | (285) | (23) |
| Gain from monetary position[3] | (455) | (440) | (471) | — | — | — | — | — | — |
| Total comprehensive financing result | 1,500 | 2,276 | 1,660 | 9,077 | 2,366 | 181 | 1,039 | 1,090 | 86 |
| Other expenses (income), net[4] | 494 | (229) | 869 | 495 | 291 | 22 | 159 | 152 | 12 |
| (Loss) income before income and asset tax | (155) | 70 | 175 | (7,858) | (1,352) | (104) | (551) | (612) | (48) |
| Income and asset tax expense (benefit) | (519) | 228 | 44 | (2,175) | (598) | (47) | (142) | (152) | (12) |
| Net income (loss) from continuing operations before changes in accounting principles | 364 | (158) | 131 | (5,682) | (754) | (57) | (409) | (459) | (36) |
| Net income (loss) from discontinued operations | 3 | (31) | — | — | — | — | — | — | — |
| Gain on sale of discontinued operations | — | 480 | — | — | — | — | — | — | — |
| Cumulative effect of changes in accounting principle | (124) | — | — | — | — | — | — | — | — |
| Net income (loss) | 243 | 291 | 131 | (5,682) | (754) | (57) | (409) | (459) | (36) |
| Net income (loss) of majority interest | 63 | 401 | (13) | (5,706) | (787) | (60) | (362) | (459) | (36) |
| Net income (loss) from continuing operations per share | 1.33 | (0.54) | 0.38 | (16.57) | (2.17) | (0.17) | (1.18) | (1.33) | (0.11) |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| | | | **Year Ended December 31,** | | | | **Six Months Ended June 30,** | | |
| | | | (Ps. millions)[1] | | | ($ millions)[2] | (Ps. millions) | | ($ millions)[2] |
| Net income (loss) from discontinued operations per share | 0.01 | 1.55 | — | — | — | — | — | — | — |
| Diluted and basic net income (loss) of majority interest per share | 0.23 | 1.39 | (0.04) | (16.64) | (2.27) | (0.18) | (1.04) | (1.32) | (0.10) |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| | | | **As of December 31,** | | | | **As of June 30,** | | |
| | | | (Ps. Millions)[1] | | | ($ millions)[2] | (Ps. Millions) | | ($ millions)[2] |
| **Balance Sheet Data:** | | | | | | | | | |
| **MFRS:** | | | | | | | | | |
| Cash and cash equivalents[11] | 1,441 | 1,222 | 1,638 | 1,428 | 2,616 | 200 | 2,518 | 199 | |
| Current assets | 9,863 | 9,175 | 11,136 | 11,981 | 10,096 | 773 | 10,391 | 820 | |
| Total assets from discontinued operations | 2,021 | — | — | — | — | — | — | — | |
| Total assets | 32,937 | 28,695 | 32,187 | 35,774 | 32,652 | 2,500 | 32,281 | 2,551 | |
| Current liabilities | 8,675 | 4,835 | 7,140 | 29,063 | 27,580 | 2,112 | 27,862 | 2,200 | |
| Total debt [12] | 15,959 | 12,826 | 14,918 | 22,062 | 20,101 | 1,540 | 19,347 | 1,528 | |
| Total liabilities from discontinued operations | 1,398 | — | — | — | — | — | — | — | |
| Total liabilities | 23,704 | 19,329 | 22,801 | 32,666 | 30,668 | 2,348 | 30,959 | 2,446 | |
| Stockholders' equity | 9,234 | 9,366 | 9,386 | 3,108 | 1,984 | 152 | 1,322 | 105 | |
| Minority interest in consolidated subsidiaries | 3,198 | 1,892 | 1,960 | 1,404 | 1,464 | 112 | 1,312 | 104 | |
| Majority stockholders' equity | 6,036 | 7,474 | 7,426 | 1,704 | 520 | 40 | 10 | 1 | |

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2009 | 2010 | 2010 |
|---|---|---|---|---|---|---|---|---|---|
| | | | **Year Ended December 31,** | | | | **Six Months Ended June 30,** | | |
| | | | (Ps. Millions)[1] | | | ($ millions)[2] | (Ps. Millions) | | ($ millions)[2] |
| **Other Data:** | | | | | | | | | |
| **MFRS:** | | | | | | | | | |
| Capital expenditures [10] | 1,107 | 1,252 | 2,695 | 1,798 | 1,009 | 77 | 185 | 232 | 18 |
| Depreciation and amortization | 1,854 | 1,795 | 1,414 | 1,469 | 1,473 | 113 | 727 | 754 | 60 |
| Total shares issued at end of period[5] | 324 | 386.9 | 386.9 | 386.9 | 386.9 | | 386.9 | 386.9 | |
| Total shares held in Stock Option Trust at end of period[5][9] | 22.3 | 17.6 | 17.5 | 11.7 | 39.8 | | 39.8 | 39.8 | |
| Total shares held as treasury stock at end of period[5] [9] | 28.2 | 28.3 | 28.3 | 28.5 | 0.4 | | 0.4 | 0.4 | |
| Total shares issued and outstanding at end of period[5] | 273.5 | 341.0 | 341.0 | 346.7 | 346.7 | | 346.7 | 346.7 | |
| Average total shares outstanding during period[5] | 273.1 | 289.6 | 341.0 | 342.8 | 346.7 | | 346.7 | 346.7 | |
| **Inflation and Foreign Currency Exchange Rate Data:** | | | | | | | | | |
| Percentage of change in INPC[6] | 3.3% | 4.1% | 3.8% | 6.5% | 3.6% | | 1.28% | 1.39% | |

| | Year Ended December 31, | | | | | Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009** | **2009** | **2010** | **2010** |
| | | | (Ps. Millions)[1] | | | ($ millions)[2] | (Ps. Millions) | ($ millions)[2] |
| Peso/dollar exchange rate at the end of period[7] | 10.6344 | 10.8116 | 10.8662 | 13.8325 | 13.0587 | | 13.2023 | 12.6567 |
| Average exchange rate[8] | 10.8786 | 10.9034 | 10.9371 | 11.1939 | 13.5723 | | 13.9607 | 12.7038 |

---

(1) Except per share amounts, number of shares and inflation and foreign currency exchange rate data.

(2) Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 13.0587 and 12.6567 pesos per one U.S. dollar, the Free Exchange Rate on December 31, 2009 and June 30, 2010, respectively.

(3) Through December 31, 2007, the gain from monetary position reflected the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decreased in purchasing power over time. This means that losses were incurred by holding monetary assets over time, whereas gains were realized by maintaining monetary liabilities. Beginning January 1, 2008, we stopped recognizing gains in monetary position as well as inflation effects. See "Presentation of Financial Information and Other Information" for more information on changes in NIF B-10 regarding effects of inflation.

(4) Other expenses (income), net, include:

| | Year Ended December 31, (millions) | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009** |
| Restructuring charges (i) | Ps. 332 | Ps. 61 | Ps. 7 | Ps. 185 | Ps. 265 |
| Impairment of long-lived assets | 385 | 393 | 122 | 196 | 207 |
| Loss (gain) from sale of long-lived assets | 6 | (795) | 47 | (3) | (209) |
| Loss (gain) from sale of subsidiaries | 137 | (68) | 11 | | |
| Assignment of Vitro Club Trust (ii) | (458) | | | | |
| Early extinguishment of employee retirement obligations | 18 | 8 | 97 | 69 | |
| Fees and costs for extinguishment of debt | | | 488 | | 7 |
| Statutory employee profit sharing | 51 | 55 | 54 | 10 | 13 |
| Other | 23 | 117 | 43 | 38 | 8 |
| | Ps. 494 | Ps. (229) | Ps. 869 | Ps. 495 | Ps. 291 |

---

(i) The restructuring charges relate to the downsizing and streamlining of our corporate functions and organization at some of our business units and are part of an ongoing benefit arrangement.

(ii) The Vitro Club holds land and facilities for our employee's recreational activities, which are held in a trust (the "Trust"). The Trust can only be assigned if all of the participants name one entity as the sole beneficiary. In 2005, all the participants named the Company as the sole beneficiary, and therefore the Company has the right to take control of the Trust. The Company recorded the fair value of the assets and recognized other income of Ps. 458 million. At the end of 2008, we decided to temporarily suspend the services provided at the Vitro Club facilities. In April 2010, as part of the cost reduction plan, we sold the land and facilities of Vitro Club.

(5) Millions of shares.

(6) Calculated using year-end INPC of the most recent year divided by the year-end INPC of the previous year.

(7) Based on the Free Exchange Rate at the end of the period.

(8) Calculated using the average of Free Exchange Rates on the last day of each month during the period.

(9) See "Major Shareholders."

(10) For 2008, 2009, and 2010, these amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters.

(11)  Does not include restricted cash for the years 2005 to 2009. As of June 30, 2010, includes restricted cash due to the change in NIF C-1.

(12)  As mentioned above, NIF B-8 establishes that special purpose entities, over which control is exercised, should be consolidated. We adopted this bulletin beginning January 1, 2009. As a result of this bulletin the amounts as of December 2008 and 2009 include the Company's securitization transactions. For the years ended as of December 31, 2005, 2006 and 2007 the amount of the Company's securitizations were Ps. 1,518, Ps. 1,744 and Ps. 1,631, respectively; such transactions are not included in this table.

 As of December 31, 2008 and 2009, we were in default under the indentures governing the Old Notes for $300 million, $216 million and $700 million and certain other debt; therefore, Ps. 16,689 million and Ps. 15,771 million were reclassified as short-term debt.

## UNAUDITED PRO FORMA FINANCIAL INFORMATION

We prepared the following unaudited pro forma consolidated balance sheet as of June 30, 2010 and the unaudited pro forma consolidated statements of operations for the year ended December 31, 2009 and for the six-month and twelve-month periods ended June 30, 2010, to illustrate the estimated effects on our consolidated financial position and results of operations for the proposed debt restructuring described in this Statement, which contemplates the cancellation of Restructured Debt in exchange for the Restructuring Consideration.

The unaudited pro forma balance sheet has been prepared assuming the transaction was consummated as of the balance sheet date. The unaudited pro forma statements of operations have been prepared assuming the transaction was consummated at the beginning of the period presented. The pro forma balance sheet includes adjustments that are both recurring and non-recurring, while the pro forma statements of operations only include adjustments that have a continuing impact. Because the pro forma balance sheet and pro forma statements of operations assume that the transaction occurred on different dates (i.e., the most recent balance sheet date, as compared to the beginning of the fiscal year presented for the pro forma statements of operations), and because of the difference in presenting non-recurring adjustments, the adjustments reflected in the pro forma balance sheet do not reconcile with the adjustments in the pro forma statements of operations.

We have prepared the unaudited pro forma financial information for informational purposes only. It does not purport to indicate the results of operations that would actually have occurred had the transaction taken place on the date indicated or which may be expected to be achieved in the future. You should read the unaudited pro forma consolidated financial information together with our consolidated financial statements and the notes thereto included elsewhere in this Statement and the information under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations." Our consolidated financial statements are prepared in accordance with MFRS, which differs in certain significant respects from U.S. GAAP.

The convenience translation was determined using the exchange rate as of December 31, 2009 and June 30, 2010, which was Ps. 13.0587 and Ps. 12.6567 per dollar, respectively.

**Unaudited Pro Forma Consolidated Balance Sheet**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Consolidated Balance Sheet as of June 30, 2010**
(Millions of Mexican pesos)

| | Actual | Pro Forma Adjustment* | | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | Ps. 2,518 | Ps. (949)(a) | | Ps. 1,569 | $ 124 |
| Trade receivables, net | 3,511 | | | 3,511 | 277 |
| Taxes receivable | 155 | | | 155 | 12 |
| Other receivables | 834 | | | 834 | 66 |
| Inventories, net | 3,373 | | | 3,373 | 266 |
| Current assets | 10,391 | (949) | | 9,442 | 745 |
| | | | | | |
| Investments in associated company | 854 | | | 854 | 67 |
| Land and buildings, net | 6,392 | | | 6,392 | 505 |
| Machinery and equipment, net | 7,717 | | | 7,717 | 610 |
| Construction in progress | 462 | | | 462 | 37 |
| Goodwill | 512 | | | 512 | 40 |
| Deferred taxes | 4,918 | (2,390)(b) | | 2,528 | 200 |
| Employee benefits | 41 | | | 41 | 3 |

82

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| Other assets | 994 | | 994 | 79 |
| Non-current assets | 21,890 | (2,390) | 19,500 | 1,541 |
| Total assets | Ps.32,281 | Ps. (3,339) | Ps. 28,942 | $ 2,286 |

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| **Liabilities** | | | | |
| Short-term borrowings | Ps. 791 | Ps. | Ps. 791 | $ 62 |
| Current maturities of long-term debt | 16,766 | (16,035)(c) | 731 | 58 |
| Trade payables | 1,581 | | 1,581 | 125 |
| Accrued expenses | 1,032 | | 1,032 | 81 |
| Derivative financial instruments | 3,243 | (3,040)(d) | 203 | 16 |
| Interest payable | 3,307 | (2,622)(e) | 685 | 54 |
| Other current liabilities | 1,142 | | 1,142 | 90 |
| Current liabilities | 27,862 | (21,697) | 6,165 | 486 |
| Long-term debt | 1,790 | 10,758(f) | 12,548 | 991 |
| Taxes payable | 1,072 | | 1,072 | 85 |
| Other long-term liabilities | 235 | | 235 | 19 |
| Long-term liabilities | 3,097 | 10,758 | 13,855 | 1,095 |
| Total liabilities | 30,959 | (10,939) | 20,020 | 1,581 |
| | | | | |
| Stockholder's equity | | | | |
| Capital stock | 387 | | 387 | 31 |
| Restatement of capital stock | 7,245 | | 7,245 | 572 |
| Restated capital stock | 7,632 | | 7,632 | 603 |
| Treasury stock | (547) | | (547) | (43) |
| Additional paid-in capital | 1,644 | | 1,644 | 130 |
| Translation effects of foreign subsidiaries | 319 | | 319 | 25 |
| Mandatory convertible debentures | | 1,266(g) | 1,266 | 100 |
| Accumulated deficit | (9,038) | 6,334(h) | (2,704) | (214) |
| Controlling interest | 10 | 7,600 | 7,610 | 601 |
| Non-controlling interest in consolidated subsidiaries | 1,312 | | 1,312 | 104 |
| Total stockholders' equity | 1,322 | 7,600 | 8,922 | 705 |
| Total liabilities and stockholders' equity | Ps.32,281 | Ps. (3,339) | Ps. 28,942 | $ 2,286 |

---

\*    Reflects the following pro forma adjustments:

(a)    This amount reflects the Restructuring Cash Payment.

(b)    This amount reflects the tax effect related to the proposed debt restructuring. In a *concurso mercantil* proceeding in Mexico, any gain resulting from the reduction in net debt is taxable up to the amount of net operating tax loss carryforwards.

(c)    This amount reflects the cancellation of the Old Notes and the Other Debt.

(d)    This amount reflects the cancellation of the DFI Claims.

(e)    This amount reflects the cancellation of interest payable in relation to the Restructured Debt.

(f)    This amount reflects the issuance of $850.0 million of New 2019 Notes.

(g)    This amount reflects the issuance of $100.0 of New MCDs.

(h)    This amount reflects the gain that would be recognized as a result of the proposed restructuring based on the terms described in this Statement.

**Unaudited Pro Forma Consolidated Statements of Operations**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Statement of Operations for the six-month period ended June 30, 2010**
(Millions of Mexican pesos)

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| Net sales | Ps.11,399 | Ps. — | Ps. 11,399 | $ 901 |
| Cost of sales | 8,386 | — | 8,386 | 663 |
| Gross profit | 3,013 | — | 3,013 | 238 |
| Selling, general and administrative expenses | 2,397 | — | 2,397 | 189 |
| Operating income | 616 | — | 616 | 49 |
| Interest expense (income), net | 1,267 | (514)(a) | 753 | 59 |
| Derivative financial instruments | 108 | — | 108 | 9 |
| Exchange (gain) loss | (285) | 237(b) | (48) | (4) |
| Total comprehensive financing result | 1,090 | (277) | 813 | 64 |
| (Loss) gain after financing cost | (474) | 277 | (197) | (15) |
| Other expenses (income), net | 152 | — | 152 | 12 |
| Equity in earnings of associated company | 14 | — | 14 | 1 |
| Income (loss) before taxes | (612) | 277 | (335) | (26) |
| Income tax (benefit) expense | (153) | 83(c) | (70) | (6) |
| Net (loss) income for the period | Ps. (459) | Ps. 194 | Ps. (265) | $ (20) |
| Net noncontrolling interest (loss) income | Ps. (1) | Ps. — | Ps. (1) | $ 0 |
| Net controlling interest (loss) income | (458) | 194 | (264) | (20) |
| | Ps. (459) | Ps. 194 | Ps. (265) | $ (20) |

\*  Reflects the following pro forma adjustments:

(a)  This amount reflects the net decrease in interest expense related to the cancellation of the Restructured Debt, which was offset by an increase in interest expense associated with the Restructuring Consideration (assuming interest expense related to the New 2019 Notes based on an interest rate of 8.0%, less interest income earned as a result of the Restructuring Cash Payment).

(b)  This amount reflects the net decrease in our foreign exchange gain related to the cancellation of the Restructured Debt (a significant portion of which is denominated in U.S. dollars), which was offset by an increase in our foreign exchange gain related to the Restructuring Consideration (100% of which is denominated in U.S. dollars).

(c)  This amount reflects the tax effects of the pro forma adjustments noted in (a) and (b) above.

**Unaudited Pro Forma Consolidated Statements of Operations**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Statement of Operations for the twelve-month period ended June 30, 2010**
(Millions of Mexican pesos)

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| Net sales | Ps.23,098 | Ps. — | Ps. 23,098 | $ 1,825 |
| Cost of sales | 16,831 | — | 16,831 | 1,330 |
| Gross profit | 6,267 | — | 6,267 | 495 |
| Selling, general and administrative expenses | 4,956 | — | 4,956 | 392 |
| Operating income | 1,311 | — | 1,311 | 103 |
| Interest expense (income), net | 2,684 | (1,028)(a) | 1,656 | 131 |
| Derivative financial instruments | 219 | | 219 | 17 |
| Exchange (gain) loss | (487) | 72(b) | (415) | (33) |
| Total comprehensive financing result | 2,416 | (956) | 1,460 | 115 |
| Gain (loss) after financing cost | (1,105) | 956 | (149) | (12) |
| Other expenses (income), net | 283 | | 283 | 22 |
| Equity in earnings of associated company | (25) | | (25) | (2) |
| Income (loss) before taxes | (1,413) | 956 | (457) | (36) |
| Income tax (benefit) expense | (609) | 287(c) | (322) | (25) |
| Net (loss) income for the year | Ps. (804) | Ps. 669 | Ps. (135) | $ (11) |
| Net noncontrolling interest income | 78 | | 78 | 6 |
| Net controlling interest (loss) income | Ps. (882) | Ps. 669 | Ps. (213) | $ (17) |
| | Ps. (804) | Ps. 669 | Ps. (135) | $ (11) |

---

\*   Reflects the following pro forma adjustments:

(a)   This amount reflects the net decrease in interest expense related to the cancellation of the Restructured Debt, which was offset by the effects of the Restructuring Consideration (includes interest expense related to the New 2019 Notes with an interest rate of 8% and less interest income earned as a result of the $75 million cash payment).

(b)   This amount reflects the net decrease in our foreign exchange gain related to the cancellation of the Restructured Debt (a significant portion is in U.S. dollars), which was offset by the effects of the Restructuring Consideration (100% is in U.S. dollars).

(c)   This amount reflects the tax effect related to the pro forma adjustments noted in (a) and (b) above.

**Unaudited Pro Forma Statements of Operations**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Statement of Operations for the year ended December 31, 2009**
(Millions of Mexican pesos)

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| Net sales | Ps.23,991 | Ps. — | Ps. 23,991 | $ 1,837 |
| Cost of sales | 17,180 | — | 17,180 | 1,316 |
| Gross profit | 6,811 | — | 6,811 | 521 |
| Selling, general and administrative expenses | 5,482 | — | 5,482 | 420 |
| Operating income | 1,329 | — | 1,329 | 101 |
| Interest expense (income), net | 2,772 | (1,060)(a) | 1,712 | 131 |
| Derivative financial instruments | 570 | — | 570 | 44 |
| Exchange (gain) loss | (976) | 457(b) | (519) | (40) |
| Total comprehensive financing result | 2,366 | (603) | 1,763 | 135 |
| Gain (loss) after financing cost | (1,037) | 603 | (434) | (34) |
| Other expenses (income), net | 291 | — | 291 | 22 |
| Equity in earnings of associated company | (24) | — | (24) | (2) |
| Income (loss) before taxes | (1,352) | 603 | (749) | (58) |
| Income tax (benefit) expense | (598) | 181(c) | (417) | (32) |
| Net (loss) income for the year | Ps. (754) | Ps. 422 | Ps. (332) | $ (26) |
| Net noncontrolling interest income | 33 | — | 33 | 3 |
| Net controlling interest (loss) income | Ps. (787) | Ps. 422 | Ps. (365) | $ (29) |
| | Ps. (754) | Ps. 422 | Ps. (332) | $ (26) |

---

\* Reflects the following pro forma adjustments:

(a) This amount reflects the net decrease in interest expense related to the cancellation of the Restructured Debt, which was offset by an increase in interest expense associated with the Restructuring Consideration (assuming interest expense related to the New 2019 Notes based on an interest rate of 8%, less interest income earned as a result of the Restructuring Cash Payment).

(b) This amount reflects the net decrease in our foreign exchange gain related to the cancellation of the Restructured Debt (a significant portion of which is denominated in U.S. dollars), which was offset by an increase in our foreign exchange gain related to the Restructuring Consideration (100% of which is denominated in U.S. dollars).

(c) This amount reflects the tax effects of the pro forma adjustments noted in (a) and (b) above.

**Unaudited Pro Forma Consolidated Ratios**

**Vitro, S.A.B. de C.V. and Subsidiaries**

(Millions of Mexican pesos)

| | Actual | Actual (Millions of U.S. dollars) | | As Adjusted | | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|---|---|
| **Year ended December 31, 2009:** | | | | | | |
| Operating income | Ps. 1,329 | $ | 101 | Ps. | 1,329 | $ | 101 |
| Add non-cash items: | | | | | | |
| Depreciation and amortization | 1,473 | | 113 | | 1,473 | | 113 |
| Non cash provision of employee benefits | 416 | | 32 | | 416 | | 32 |
| 2009 EBITDA* | Ps. 3,217 | $ | 246 | Ps. | 3,217 | $ | 246 |
| | | | | | | |
| **Ratios:** | | | | | | |
| 2009 EBITDA / 2009 Net Interest | 1.16x | | | | 2.78x | |
| June 2010 Debt / 2009 EBITDA | 6.01x | | | | 4.37x | |
| June 2010 Debt + DFI Claims / 2009 EBITDA | 6.99x | | | | 4.37x | |
| June 2010 Total Liabilities / Stockholders' Equity | 23.42x | | | | 1.84x | |

---

\* This amount reflects earning before interest, taxes plus depreciation and amortization, and provision for employee benefits (EBITDA).

| | Actual | Pro Forma Adjustment |
|---|---|---|
| Ratio of Earnings to Fixed Charges December 2009 | —(1) | —(2) |

---

(1) Our earnings were insufficient to cover fixed charges for the year ended December 31, 2009 by approximately Ps. 1,279.

(2) Our earnings after pro forma adjustments were insufficient to cover fixed charges for the year ended December 31, 2009 by approximately Ps. 677.

| | Actual | Actual (Millions of U.S. dollars) | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| **Twelve-month period ended June 30, 2010:** | | | | |
| Operating income | Ps. 1,311 | $ 103 | Ps. 1,311 | $ 103 |
| Add non-cash items: | | | | |
| Depreciation and amortization | 1,503 | 119 | 1,503 | 119 |
| Non cash items due to early extinguishment of employee benefits | 422 | 33 | 422 | 33 |
| 2010 EBITDA* | Ps. 3,236 | $ 255 | Ps. 3,236 | $ 255 |
| **Twelve-month period ended June 30, 2010 Ratios:** | | | | |
| 2010 EBITDA / 2010 Net Interest | 1.20x | | 2.89x | |
| June 2010 Debt / 2010 EBITDA | 5.98x | | 4.35x | |
| June 2010 Debt + DFI Claims / 2010 EBITDA | 6.92x | | 4.35x | |
| June 2010 Total Liabilities / Stockholders' Equity | 23.42x | | 1.84x | |

---

\*      This amount reflects earning before interest, taxes plus depreciation and amortization, and provision for employee benefits (EBITDA).

| | Actual | Pro Forma Adjustment |
|---|---|---|
| Ratio of Earnings to Fixed Charges June 2010 | —(3) | —(4) |

---

(3)      Our earnings were insufficient to cover fixed charges for the twelve-month period ended June 30, 2010 by approximately Ps. 1,388.

(4)      Our earnings after pro forma adjustments were insufficient to cover fixed charges for the twelve-month period ended June 30, 2010 by approximately Ps. 432.

89

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION
AND RESULTS OF OPERATIONS**

*You should read this discussion in conjunction with, and this discussion is qualified in its entirety by reference to, our consolidated financial statements and notes thereto and other financial information included elsewhere in this Statement. Our consolidated financial statements are prepared in accordance with MFRS, which differs in certain significant respects from U.S. GAAP. See "Presentation of Financial Information and Other Information." This section contains forward-looking statements that involve risks and uncertainties. Our actual results may differ materially from those discussed in the forward-looking statements as a result of various factors, including without limitation those set forth in "Risk Factors" and the other matters set forth in this Statement. See "Forward-Looking Statements."*

## OPERATING RESULTS

### Factors Affecting Our Results of Operations

Our statement of operations is affected by, among other factors, (i) the level of demand and price for our products in the countries in which we operate, (ii) our costs of production, which principally consist of costs of raw materials, labor, energy and depreciation, (iii) the relationship between the Mexican peso, the U.S. dollar and the euro, (iv) financing costs, which are incurred in Mexican pesos, U.S. dollars and euros and (v) increased competition in our domestic market and abroad. See "Risk Factors."

### Trend Information

During 2009, the world economy continued to experience the financial and economic crisis which began in the second half of 2008 affecting industrial sectors such as the construction and automotive sectors that are very important to us. Its effects were reflected in high unemployment rate growth, credit scarcity, and reduced demand from the construction and automotive industries in Mexico, the United States and Spain, where Vitro has a strong presence. Even though the economy has shown moderate signs of recovery in 2010, some of our markets, including the construction sectors of the United States and Spain, are still experiencing contraction and excess capacity.

### Developments in the Glass Containers Business

Results for 2009 were affected by the continuing financial and economic crisis, which led to a prolonged and deep contraction in our markets.

In December 2008, Grupo Modelo, one of the key customers in our Glass Containers business, notified us that, due to the current world market contraction, it would significantly reduce its beer bottle orders from us. Based on our consolidated sales for 2008, the volume reduction impact on our annual consolidated sales for 2009 was approximately 6.45%, measured in Mexican pesos.

The Glass Containers business unit's sales volumes declined in 2009, primarily because of a decline in demand in the beer sector, as mentioned above, and the other sectors targeted by the Glass Containers business. This changed market condition required capacity adjustments in order to meet the lower demand levels. In addition, we implemented a cost and expense reduction program, which included workforce adjustments due to lower capacity utilization, cancellation of airplane leasing contracts, divestiture of non-productive assets and the elimination of non-strategic services.

Going forward, we expect increased competition in the domestic glass container market. As a result of the market contraction in 2009, we believe that there will continue to be overcapacity, which may continue to affect market dynamics and lead to further price erosion.

### Developments in the Flat Glass Business

The global economic meltdown had a significant impact on diverse markets, including the construction and automotive industries, which had a materially negative effect on our business results.

The Flat Glass business unit's consolidated net sales for 2009 contracted by 13.7%, measured in Mexican pesos, compared to 2008, as mentioned in "—Year Ended December 31, 2009 Compared to Year Ended December 31, 2008—Flat Glass Business Unit" below, mainly due to the fact that the markets we serve entered into a recession at the end of 2008.

The construction and automotive sectors that we serve were affected by a decrease in sales caused by a severe drop in U.S. automotive demand, a reduction of exports to the United States and the contraction in the U.S., Spanish and Mexican real estate market. Sales from our U.S. subsidiary also faced one of its sharpest contractions in recent history.

Vitro's subsidiaries in Spain, Portugal and France were also impacted by the challenging global economic environment. Spain, where the largest portion of Vitro's regional facilities are located, showed a sharp contraction in its markets caused by the bursting of the real estate bubble, which will continue to negatively impact the Company going forward. Verres et Glaces d'Epinay, our French subsidiary, commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

In the case of the automotive glass market, the general industry collapse was compounded by the weak financial situation of some of the large automotive original equipment manufacturing companies, who resorted to federal aid in order to mitigate their severe financial problems. The Flat Glass business unit took the necessary measures to minimize the effect, adjusting production capacity to reduced demand and, in doing so, continued to serve the needs of its customers at competitive prices. Management made significant adjustments to Vitro's cost structure at all facilities, in Mexico as well as abroad, in order to adapt to the changed market environment.

Going forward, we expect our Flat Glass business unit to partially stabilize. Our OEM segment is showing signs of recovery in 2010 due to increased auto sales in the United States and Mexico. We expect our construction segment in Mexico to remain stable. However, the future for the construction market in the United States, Spain, France and Portugal remains uncertain. Recently, our operations in the flat glass manufacturing and processing facilities were impacted by rain and flooding from Hurricane Alex, resulting in damage that we expect will be covered by insurance, less applicable deductibles, which we expect will impact our results of operations. See "Summary—Recent Developments—Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León."

### Natural Gas Prices and Related Derivative Financial Instruments

Our cost of goods sold is highly correlated to the prices of our raw materials, particularly natural gas. For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price of $6.07 per MMBTU for the year ended December 31, 2008. During the first six months of the current year, the average price of natural gas increased 22% from $3.71 to $4.54 per MMBTU for the six-month period ended June 30, 2009 compared to the same period of 2010.

Historically, we have not been able to raise the prices of our products to fully reflect the increases in our operating costs that result from increases in the price of natural gas, thereby adversely affecting our results of operations.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. This strategy is susceptible to the risk that a decrease in natural gas prices could have an adverse effect on the fair market value of the DFIs, resulting in related losses reflected in our comprehensive financial results. While a material decline in natural gas prices would have the beneficial impact of substantially reducing our cost of goods sold, such benefits would be realized over a period of time, whereas the

91

adverse effect in the value of the DFIs is recorded immediately in our financial result as a result of mark-to-market accounting rules.

As of June 30, 2010, we had open DFI hedges with Pemex for approximately 32% of our estimated natural gas consumption for the remainder of the year at an average price of approximately $6.80 per MMBTU for 2010, and approximately 19% of our estimated natural gas consumption at an average price of approximately $7.32 per MMBTU for 2011. As of June 30, 2010, our open DFIs with Pemex had a mark-to-market liability value of approximately $13.8 million. In addition, under our remaining DFIs, we are obligated to make monthly settlement payments until December 2011 to the extent the market price on the monthly settlement date of natural gas is below the exercise price set forth in the agreement. For the first six months of 2010, we made aggregate monthly settlement payments of approximately Ps. 113 million ($8.9 million).

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis applied valuation models fully accepted for these types of instruments and took into consideration changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately $5 million.

Because of our financial condition, we are currently unable to enter into significant additional hedging transactions to minimize our exposure to further increases or decreases in the price of natural gas, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. Therefore, substantial increases in the price of natural gas may cause us to realize significant losses in our results of operations and relative stability and, alternatively, further decreases in the price of natural gas may cause us to realize losses in our comprehensive financial results.

### Economic Developments in Mexico, the United States and Europe Affecting Our Business

A substantial portion of our operations are in Mexico and a substantial majority of our consolidated net sales are made in Mexico, the United States and Europe. Therefore, economic conditions in Mexico, the United States and Europe have a significant effect on our business, results of operations and financial position.

2008 was considered a year of unprecedented events in modern times as it left a financial system in crisis. In 2009, the world economy decelerated abruptly and some national economies actually collapsed. World GDP decreased by 2.2% in 2009 according to International Monetary Fund statistics. The global economic deceleration had its roots in the U.S. economy, which contracted at a rate of 2.4% in 2009 compared to GDP growth rate of 0.4% in 2008. The sub-prime mortgage crisis that started in the U.S. in mid-2008 and moved into the financial markets affected the availability of credit in a manner that hurt many other sectors of the economy, including industrial sectors such as the construction and automotive sectors that are very important to us.

In 2009, Mexico's GDP registered a contraction rate of 6.5%. In 2008, Mexico's GDP registered a growth rate of 1.3%, a lower figure than the GDP growth rate of 3.3% reported for 2007. For 2010, we expect the country to continue confronting difficulties due to a slower-than-expected recovery of the U.S. economy, one of our principal commercial markets, and an instability shown in the European Union markets that significantly affects the Spanish market.

Most of our manufacturing facilities are located in Mexico. Our consolidated net sales resulting from sales to parties located within Mexico were 42%, 44% and 46% for each of the years ended December 31, 2007, 2008 and 2009, respectively.

Although the Mexican government's continued fiscal and monetary policy helps the country maintain low levels of inflation and a manageable deficit, it does not provide the flexibility necessary to support Mexico's economic improvement. As a result, new investment and growth in aggregate purchasing power have been marginal. Several factors could affect the growth of Mexico's economy and its industrial sector in particular. These factors include (i) the extent of the U.S. economic recovery and the participation of Mexico's industrial sector in that

recovery and (ii) the Mexican government's approval and implementation of fiscal and other structural reforms, such as the evolution of energy prices, particularly natural gas.

### *Inflation and Foreign Currency Exchange Rate Fluctuations*

The following table sets forth, for the periods presented, certain information relating to inflation and foreign currency exchange rates:

| | For the Year Ended December 31, | | | For the Six-Month Period Ended June 30, | |
|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2009 | 2010 |
| Nominal Mexican peso devaluation relative to the U.S. dollar[1] | 0.5% | 27.3% | (5.6%) | (4.6%) | (3.1%) |
| Nominal dollar devaluation relative to the euro | 11.2% | (5.2%) | 3.5% | 7.7% | (18.2%) |
| Mexican inflation (based on changes in INPC)[1] | 3.8% | 6.5% | 3.6% | 1.3% | 1.4% |
| Free Exchange Rate as of year end[1] | Ps.10.8662 | Ps.13.8325 | Ps.13.0587 | Ps.13.2023 | Ps.12.6567 |
| Mexican GDP growth rate[2] | 3.3% | 1.3% | (6.5%) | | |
| Exchange rate of euro per Mexican peso as of year end[3] | Ps.15.9526 | Ps19.2534 | Ps.19.5789 | Ps.18.6561 | Ps.15.5234 |
| Exchange rate of dollar per euro as of year end [3] | $ 1.4680 | $ 1.3918 | $ 1.4992 | $ 1.4130 | $ 1.2264 |

(1)   Source: Banco de México.

(2)   Source: *Instituto Nacional de Estadística, Geografía e Informática* (National Institute of Statistics, Geography and Information).

(3)   Source: Federal Reserve Bank of New York—Noon Buying Rates as to euro-to-dollar exchange rate and Banco de México as to U.S. dollar-to-Mexican peso exchange rate.

### *Effects of Inflation and Foreign Currency Exchange Rate Fluctuations on Operating Margins*

Changes in the value of the Mexican peso to the U.S. dollar have an effect on our results of operations. In general, as described more fully in the following paragraphs, a devaluation of the Mexican peso will likely result in an increase in our operating margins and an appreciation of the Mexican peso will likely result in a decrease in our operating margins, in each case measured in Mexican pesos. This is because the aggregate amount of our consolidated net sales denominated in or affected by U.S. dollars exceeds the aggregate amount of our cost of goods sold and our selling, general and administrative expenses denominated in or affected by U.S. dollars.

A substantial portion of the sales generated by our Mexican subsidiaries and the total sales of our U.S. subsidiaries are either denominated in or affected by U.S. dollars. The prices of a significant number of the products we sell in Mexico, particularly flat glass products for automotive uses and capital goods, are linked to the U.S. dollar. In addition, substantially all of our export sales are invoiced in U.S. dollars and subsequently translated into Mexican pesos using the exchange rate in effect at the time of the transaction. As a result, when the Mexican peso devaluates against the U.S. dollar, as was the case in 2006, 2007 and 2008, the same level of U.S. dollar sales as in a prior period will result in higher Mexican peso revenues in the more recent period. Conversely, when the Mexican peso appreciates against the U.S. dollar, as was the case in 2005 and 2009, the same level of U.S. dollar sales as in a prior period will result in lower Mexican peso revenues in the more recent period. Moreover, because a material portion of our cost of goods sold, including labor costs and selling, general and administrative expenses, is invoiced in Mexican pesos and is not directly affected by the relative value of the Mexican peso to the U.S. dollar, the appreciation or devaluation of the Mexican peso relative to the U.S. dollar has a significant effect on our operating margins, at least in the short-term.

Further, a strong Mexican peso relative to the U.S. dollar makes the Mexican market more attractive for importers and competitors that might not otherwise sell in the Mexican market. A strong Mexican peso relative to the U.S. dollar also makes our products with prices that are denominated in or affected by U.S. dollars less competitive or profitable. With respect to such products, when the Mexican peso appreciates we must either increase our prices in U.S. dollars, which makes our products less price-competitive, or bear reduced operating margins when measured in Mexican pesos. Given the competitive nature of the industries in which we operate, we

have chosen to reduce our operating margins for such products in response to appreciation of the Mexican peso relative to the U.S. dollar in the past.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

### Effects of Inflation and Foreign Currency Exchange Rate Fluctuations on Total Comprehensive Financing Result

Beginning in 2008, our total comprehensive financing result includes (i) net interest expense, (ii) net effect of changes in nominal foreign currency exchange rates on monetary assets and liabilities denominated in foreign currencies and (iii) gains or losses related to hedging transactions. Net interest expense is calculated as the nominal amount of interest expense incurred by us with respect to our short-term and long-term debt, minus the nominal amount of interest income generated by us with respect to our monetary assets.

Our total comprehensive financing result is also impacted by changes in the nominal value of the Mexican peso relative to the U.S. dollar. Foreign currency exchange gains or losses included in total financing cost result primarily from the impact of nominal changes in the U.S. dollar-Mexican peso exchange rate on our Mexican subsidiaries' U.S. dollar-denominated monetary liabilities (such as U.S. dollar-denominated debt and accounts payable arising from imports of raw materials and equipment) and assets (such as U.S. dollar-denominated cash and cash equivalents and accounts receivable from exports). Because historically our U.S. dollar-denominated liabilities have exceeded our U.S. dollar-denominated monetary assets, the devaluation and appreciation of the Mexican peso resulted in exchange losses and gains, respectively. Accordingly, in 2006, 2007 and 2008, the nominal devaluation of the Mexican peso relative to the U.S. dollar resulted in foreign currency exchange losses.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

### Effect of Increases in Interest Rates

Interest rate risk exists primarily with respect to our floating-rate Mexican peso and U.S. dollar-denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR increases significantly, our ability to service our debt will be adversely affected.

As of June 30, 2010, our floating-rate Mexican peso and U.S. dollar-denominated debt amounted to Ps. 1,698 million ($134 million) and Ps. 1,597 million ($126 million), respectively. Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to either fixed or floating interest rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. See "Risk Factors—Risk Factors Relating to Economies in Which We Participate—We may be adversely affected by increases in natural gas prices, interest rates or foreign exchange rate changes that we are unable to mitigate through derivative transactions due to our financial condition."

### Government, Economic, Fiscal, Monetary or Political Policies or Factors

For a discussion of government economic, fiscal, monetary or political policies that could materially affect our operations or investments, please refer to "Risk Factors—Risk Factors Relating to Economies in Which We Participate."

**Results of Operations**

The following table sets forth, for the periods presented, selected items of our consolidated statements of operations calculated as a percentage of our consolidated net sales.

| | For the year ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 70.6 | 73.3 | 71.6 |
| Gross profit | 29.4 | 26.7 | 28.4 |
| General, administrative and selling expenses | 19.9 | 20.8 | 22.9 |
| Operating income | 9.5 | 5.9 | 5.5 |
| Total comprehensive financing result | 5.8 | 31.3 | 9.9 |
| Net income | 0.5 | (19.6) | (3.1) |

The following table sets forth, for the periods presented, the consolidated net sales, export sales and operating income (before corporate and other eliminations) of each of our business units, as well as the contribution to our consolidated results of operations, in percentage terms, of the consolidated net sales, export sales and operating income (after corporate and other eliminations, and reflecting export sales in U.S. dollars) of each of our business units. Peso amounts set forth in the following table are presented in nominal Mexican pesos except that all amounts pertaining to fiscal year 2007 contained in this Statement are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | For the year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | | 2008 | | 2009 | | 2009 |
| | Amount | % of Total | Amount | % of Total | Amount | % of Total | Amount |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] |
| **Net sales** | | | | | | | |
| Glass Containers | Ps.14,676 | 51% | Ps. 5,524 | 53% | Ps.12,452 | 52% | $ 954 |
| Flat Glass | 13,605 | 48% | 13,230 | 46% | 11,453 | 47% | 877 |
| Corporate and other eliminations | 310 | 1% | 259 | 1% | 86 | 1% | 7 |
| Consolidated net sales | Ps.28,591 | 100% | Ps.29,013 | 100% | Ps.23,991 | 100% | $ 1,837 |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] |
| **Net sales** | | | | | | | |
| Domestic | Ps.12,008 | 42% | Ps.12,831 | 44% | Ps.11,152 | 46% | $ 854 |
| Exports | 6,673 | 23% | 6,547 | 23% | 6,568 | 28% | 503 |
| Foreign Subsidiaries | 9,910 | 35% | 9,635 | 33% | 6,271 | 26% | 480 |
| | Ps.28,591 | 100% | Ps.29,013 | 100% | Ps.23,991 | 100% | $ 1,837 |
| | ($ millions[2], except for percentages) | | | | | | |
| **Net sales** | | | | | | | |
| Domestic | $ 1,078 | 42% | $ 1,157 | 44% | $ 824 | 46% | |
| Exports | 601 | 24% | 600 | 23% | 484 | 28% | |
| Foreign Subsidiaries | 881 | 34% | 870 | 33% | 461 | 26% | |
| | $ 2,560 | 100% | $ 2,627 | 100% | $ 1,770 | 100% | |
| | ($ millions[2], except for percentages) | | | | | | |
| **Export sales** | | | | | | | |
| Glass Containers | $ 364 | 61% | $ 383 | 64% | $ 349 | 72% | |
| Flat Glass | 237 | 39% | 217 | 36% | 136 | 28% | |
| Consolidated export sales | $ 601 | 100% | $ 600 | 100% | $ 484 | 100% | |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] |
| **Operating income (loss)** | | | | | | | |
| Glass Containers | Ps. 2,054 | 76% | Ps. 1,661 | 97% | Ps. 1,956 | 147% | $ 150 |
| Flat Glass | 782 | 29% | 186 | 11% | (591) | (45)% | (45) |
| Corporate and other eliminations | (132) | (5)% | (137) | (8)% | (36) | (3)% | (4) |
| Consolidated operating income | Ps. 2,704 | 100% | Ps. 1,710 | 100% | Ps. 1,329 | 100% | $ 101 |

---

(1)    These amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 13.0587 Mexican pesos per U.S. dollar, the Free Exchange Rate on December 31, 2009.

(2)    Dollar figures reported herein are in nominal U.S. dollars derived by dividing each month's nominal Mexican pesos by the exchange rate published by Banco de México for such month's end.

### *Six-Month Period Ended June 30, 2010 Compared to Six-Month Period Ended June 30, 2009*

*Net Sales*

Our consolidated net sales decreased 7.3% from Ps. 12,292 million ($971 million) for the six-month period ended June 30, 2009 to Ps. 11,399 million ($901 million) for the same period of 2010. This decrease was primarily due to price erosion and lower sales volumes in glass containers caused by overall excess capacity, as well as to lower sales volumes from our flat glass subsidiaries located in the United States, Spain and Colombia.

Domestic sales increased 2.4% from Ps. 5,728 million ($453 million) for the six-month period ended June 30, 2009 to Ps. 5,867 million ($464 million) for the same period of 2010. This increase was mainly driven by higher sales volumes in the automotive industry, partially offset by lower volumes in domestic sales for the Glass Containers business unit.

Export sales increased 10.5%, measured in nominal U.S. dollars, from $237 million for the six-month period ended June 30, 2009 to $262 million for the same period of 2010. This increase was mainly due to higher sales volumes in our third-party exports automotive market.

Foreign subsidiaries' sales decreased 25.6%, measured in nominal U.S. dollars, from $234 million in the six-month period ended June 30, 2009 to $174 million for the same period of 2010. This decrease was mainly triggered by lower demand in the construction markets in the United States and Spain. Foreign subsidiaries' sales and export sales each represented 27% of our consolidated net sales for the six-month period ended June 30, 2010.

*Glass Containers Business Unit*

Consolidated net sales of our Glass Containers business unit decreased 8.9%, measured in Mexican pesos, from Ps. 6,404 million ($506 million) for the six-month period ended June 30, 2009 to Ps. 5,834 million ($461 million) for the same period of 2010. The main driver for this decrease was price erosion and lower sales volumes caused by overall excess capacity, and also by the decrease in volume in the beer bottle segment in the domestic market and the wine and liquor segments.

Export sales decreased 3.3%, measured in nominal U.S. dollars, in the six-month period ended June 30, 2010 compared to the same period of 2009 due to a volume decline in all segments, except in CFT (cosmetics, fragrances and toiletries). Although foreign subsidiaries' sales increased 25% from $4 million for the six-month period ended June 30, 2009 to $5 million for the same period of 2010, such sales represented only 1% of the net sales of the Glass Containers business unit for the six-month period ended June 30, 2010.

*Flat Glass Business Unit*

Consolidated net sales of our Flat Glass business unit decreased 5.9% from Ps. 5,764 million ($455 million) for the six-month period ended June 30, 2009 to Ps. 5,425 million ($429 million) for the same period of 2010. This decrease resulted from lower sales volumes faced by our foreign subsidiaries, partially offset by a slight recovery in the automotive sector.

Domestic sales increased 22.8% from Ps. 1,787 ($141 million) for the six-month period ended June 30, 2009 to Ps. 2,195 million ($173 million) for the same period of 2010. This increase was mainly driven by a slight recovery in the automotive OEM market and float glass sales volumes. Additionally, during 2009 our Flat Glass

96

business unit faced strong pricing pressure from its domestic market competitors, causing the Company to increase its exports to Central and South America, which have lower sales margins.

Export sales increased 56.4%, measured in nominal U.S. dollars, from $55 million for the six-month period ended June 30, 2009 to $86 million for the same period of 2010. This increase was mainly due to higher automotive safety glass sales.

Foreign subsidiaries' sales decreased 26.5%, measured in nominal U.S. dollars, from $230 million for the six-month period ended June 30, 2009 to $169 million for the same period of 2010. This decrease was due to adverse economic conditions that mainly affected the construction markets in the United States and Spain, which are both crucial markets for the Company.

Generally, we realize higher profit margins in our domestic market business and, accordingly, our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity whenever possible.

*Operating Income*

Our consolidated operating income decreased 2.8% from Ps. 633 million ($50 million) for the six-month period ended June 30, 2009 to Ps. 616 million ($49 million) for the same period of 2010. This decrease was due to the price erosion and the lower volumes that had a negative impact on our fixed cost absorption. All of the above was partially offset by a slight recovery in the automotive industry and by savings related to our cost and expense reduction initiatives implemented in 2008 through the third quarter of 2009. Our operating income was also affected by the increase in natural gas price as the average price increased 22% from $3.71 per MMBTU for the six-month period ended June 30, 2009 compared to $4.54 per MMBTU for the same period of 2010.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit decreased 21.8% from Ps. 924 million ($73 million) for the six-month period ended June 30, 2009 to Ps. 722 million ($57 million) for the same period of 2010. This decrease was mainly driven by the lower volumes in the domestic beer market, 22% increase in the average gas price and, as previously mentioned, price erosion due to overcapacity in the markets in which we participate.

*Flat Glass Business Unit*

Operating loss of our Flat Glass business unit was Ps. 73 million ($6 million) for the six-month period ended June 30, 2010, compared to Ps. 277 million ($22 million) for the same period of 2009. This loss decrease was due to improved sales volumes partially offset by higher energy costs of 22%.

*Total Comprehensive Financing Result*

Our total comprehensive financing cost increased 4.9% from Ps. 1,039 million ($82 million) for the six-month period ended June 30, 2009 to Ps. 1,090 million ($86 million) for the same period of 2010. This increase was primarily due to lower exchange gain of Ps. 285 million ($23 million) in 2010 compared to a gain of Ps. 774 million ($61 million) in 2009.

*Other Expenses (Income), Net*

Other expenses (income), net decreased from Ps. 159 million ($13 million) for the six-month period ended June 30, 2009 to Ps. 152 million ($12 million) for the same period of 2010. During the six-month period ended June 30, 2010, the balance included (i) loss from the sale of long-lived assets of Ps. 71 million ($6 million), (ii) severance expense of Ps. 45 million ($4 million) and (iii) workers profit sharing (PTU) of Ps. 8 million ($1 million).

*Income Taxes*

On December 7, 2009, amendments to the Regular Income Tax ("ISR") Law of 2009 were published, to become effective beginning in 2010. These amendments state that: (i) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015 and (ii) ISR relating to any tax consolidation benefit obtained in 2005 and thereafter should be paid during the sixth through the tenth year after such benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained between 1982 (the tax consolidation starting year) and 1998 may be required in those cases provided by law.

Income tax represented an income tax gain of Ps. 152 million ($12 million) for the period ended June 30, 2010 compared to an income tax gain of Ps. 142 million ($11 million) for the same period of 2009. The amount for 2010 represents a deferred income tax gain of Ps. 525 million ($41 million) that was offset by an accrued income tax expense of Ps. 373 million ($29 million), and the amount for 2009 represents a deferred income tax of Ps. 177 million ($14 million) that was offset by an accrued income tax expense of Ps. 35 million ($3 million).

*Net Income*

For the six-month period ended June 30, 2010, we generated a consolidated net loss of Ps. 459 million ($36 million) compared to a net loss of Ps. 409 million ($32 million) for the same period of 2009. This increase in losses was mainly due to a lower operating income affected by higher energy costs and other expenses and to a lower exchange gain.

**Year Ended December 31, 2009 Compared to Year Ended December 31, 2008**

*Net Sales*

Our consolidated net sales decreased 17.3% from Ps. 29,013 million ($2,222 million) for the year ended December 31, 2008 to Ps. 23,991 million ($1,837 million) for the year ended December 31, 2009. On a comparable basis, excluding the sales from Comegua, which was presented as a consolidated subsidiary until November 2008, consolidated net sales decreased 10.7% from Ps. 26,854 million ($2,056 million) for the year ended December 31, 2008 to Ps. 23,991 million ($1,837 million) for the year ended December 31, 2009. The market contraction we experienced in 2009, primarily in the beer containers and automotive markets in the United States as well as the construction markets in the United States and Spain, adversely impacted our sales volume and, consequently, our profit.

Domestic sales declined 13.1%, measured in Mexican pesos, from Ps. 12,831 million ($983 million) for the year ended December 31, 2008 to Ps. 11,152 million ($854 million) for the year ended December 31, 2009. This decrease was mainly due to sales volume declines in the food and beer segments for our Glass Containers business unit attributable to the 2009 economic contraction.

Export sales, which were principally affected by lower sales volumes in the automotive market, decreased 19.3%, measured in nominal U.S. dollars, from $600 million in 2008 to $484 million in 2009.

Foreign subsidiaries' sales decreased 47%, measured in nominal U.S. dollars, from $870 million in 2008 to $461 million in 2009. This decrease was mainly triggered by lower demand in the construction markets in the United States and Spain, as well as the deconsolidation of Comegua in December 2008. Foreign subsidiaries' sales and export sales represented 26% and 28%, respectively, of our consolidated net sales for the year ended December 31, 2009.

*Glass Containers Business Unit*

Consolidated net sales of our Glass Containers business unit decreased 20% from Ps. 15,484 million ($1,186 million) for the year ended December 31, 2008 to Ps. 12,385 million ($948 million) for the year ended December 31, 2009. The main driver for this sales decrease was a significant decrease in sales volume in the beer

98

bottle segment, as well as a sales volume decrease in the food and the wine and liquor domestic markets during 2009, partially offset by an increase in cosmetic segment sales volumes.

Export sales decreased 8.9% year-over-year, measured in nominal U.S. dollars, due to a volume decline in all segments, except in CFT (cosmetics, fragrances and toiletries), from $383 million in 2008 to $349 million in 2009. Foreign subsidiaries' sales decreased 97% year-over-year, measured in nominal U.S. dollars, from $209 million to $6 million. On a comparable basis, excluding Comegua's deconsolidation, foreign subsidiaries' sales decreased 50% year-over-year from $12 million to $6 million, also measured in nominal U.S. dollars.

*Flat Glass Business Unit*

Consolidated net sales of our Flat Glass business unit were Ps. 11,377 million ($871 million) for the year ended December 31, 2009, a decrease of 13.7%, measured in Mexican pesos, compared to Ps. 13,187 million ($1,010 million) for the year ended December 31, 2008. This result was due to economic conditions and declining demand in the construction and automotive sectors, both affecting our business profit in 2009.

A decrease in domestic sales of 2.7% year-over-year was mainly driven by lower automotive glass sales in both our OEM and AGR markets, as well as by lower flat glass volumes. Additionally, the Float Glass business faced strong pricing pressure from its domestic market competitors, which made the Company apply a price adjustment and redirect part of its sales towards float glass exportation to Central and South America, obtaining lower margins.

Export sales decreased 37.3% year-over-year, measured in nominal U.S. dollars, from $217 million in 2008 to $136 million in 2009. This decrease was affected by lower automotive glass sales though partially offset by higher volumes in flat glass sold to Central and South America.

Foreign subsidiaries' sales decreased 31.3%, measured in nominal U.S. dollars, from $661 million in 2008 to $454 million in 2009. This decrease was due to adverse economic conditions which mainly affected the construction markets in the United States and Spain, which are both crucial markets for the Company.

Generally, we realize higher profit margins in our domestic market business, and, accordingly, whenever possible our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity.

*Operating Income*

Our consolidated operating income decreased 22.3% from Ps. 1,710 million ($131 million) for the year ended December 31, 2008 to Ps. 1,329 million ($101 million) for the year ended December 31, 2009. This decrease was due to lower volumes that had a negative impact on our fixed cost absorption, which was affected by a decline in the beer market and a significant decline in the automotive and construction markets, as well as to Comegua's deconsolidation in December 2008. All of the above were partially offset by savings related to our cost and expense reduction initiatives, through 2008 and up to the third quarter in 2009. Since the last quarter of 2008, we have adopted a significant and focused cost reduction plan, which includes reducing our workforce, optimizing production capacity in order to maximize utilization and efficiencies, generating savings in the supply chain, packaging and maintenance, canceling aircraft leasing contracts, divesting non-productive assets, and eliminating the outsourcing of non-strategic services, among other things. We estimate that these initiatives, as well as other initiatives aimed at reducing operating costs, reducing corporate expenses and improving efficiency, will result in annual savings of approximately $122 million from the third quarter of 2009 (which is when we completed the full implementation of these initiatives) and onward.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit increased 17.8% from Ps. 1,661 million ($127 million) for the year ended December 31, 2008 to Ps. 1,956 million ($150 million) for the year ended December 31, 2009. This increase was mainly driven by lower gas prices that decreased 56% in annual average price from $8.40

per MMBTU in 2008 to $3.70 per MMBTU in 2009, an increase in cosmetic segment sales volumes that was one of our most profitable segments, and the successful implementation of our cost reduction program.

*Flat Glass Business Unit*

Operating loss of our Flat Glass business unit was Ps. 591 million ($45 million) for the year ended December 31, 2009, compared to an operating income of Ps. 186 million ($14 million) for the year ended December 31, 2008. This increased loss was due to higher energy and raw materials costs coupled with lower production volumes and the corresponding lower fixed cost absorption, which resulted from the sluggish construction and automotive markets in Mexico, the U.S. and Spain.

*Total Comprehensive Financing Result*

Our total comprehensive financing cost decreased 74% from Ps. 9,077 million ($695 million) for the year ended December 31, 2008 to Ps. 2,366 million ($181 million) for the year ended December 31, 2009. This decrease was primarily due to the change of the value claimed by our Counterparties in the DFI Claims from a loss of Ps. 3,766 million ($288 million) for the year ended December 31, 2008 to a loss of $570 million ($44 million) for the year ended December 31, 2009; and from a non-cash foreign exchange loss of Ps. 3,222 million ($247 million) for the year ended December 31, 2008 to a gain of Ps. 976 million ($75 million) during the year ended December 31, 2009, as a result of an appreciation of the Mexican peso during the year ended December 31, 2009 compared to a depreciation in 2008.

*Other Expenses (Income), Net*

Other expenses (income), net decreased from a loss of Ps. 495 million ($38 million) for the year ended December 31, 2008 to a loss of Ps. 291 million ($22 million) for the year ended December 31, 2009. This decrease was mainly due to (i) a gain from the sale of long-lived assets of Ps. 209 million ($16 million) in 2009 compared to a gain of Ps. 3 million ($0.2 million) in 2008; (ii) fees and costs related to debt restructuring of Ps. 7 million ($0.5 million) for the year ended December 31, 2009 compared to the absence of these fees in 2008; and (iii) workers profit sharing (PTU) of Ps. 13 million ($1 million) for the year ended December 31, 2009 compared to Ps. 10 million ($0.7 million) in 2008.

*Income Taxes*

On December 7, 2009, amendments to the ISR Law of 2009 were published, to become effective beginning in 2010; these amendments state that: (a) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015, and (b) ISR relating to any tax consolidation benefit obtained in 2005 and thereafter should be paid during the sixth through the tenth year after the benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained between 1982 (tax consolidation starting year) and 1998 may be required in those cases provided by law.

Income tax for the year ended December 31, 2009 represented an income tax benefit of Ps. 598 million ($46 million) compared to an income tax benefit of Ps. 2,175 million ($167 million) for the year ended December 31, 2008. The amount for 2009 represents a current benefit of income tax of Ps. 3 million and a deferred income tax gain of Ps. 595 million, and the amount for 2008 represents a current income tax of Ps. 123 million and a deferred income tax gain of Ps. 2,298 million from tax loss carryforwards generated in 2008 by the Company, resulting primarily from foreign exchange losses on our U.S. dollar-denominated debt as well as from payments made for margin calls on our derivative financial instruments. The Company has also recorded deferred tax assets, primarily related to the DFI Claims brought by the Counterparties. Based on our financial projections, we believe we will generate sufficient taxable income in future years to allow us to recover our deferred tax assets up to the amount of the recorded asset.

*Net Loss*

For the year ended December 31, 2009, we generated a consolidated net loss of Ps. 754 million ($57 million) compared to a net loss of Ps. 5,682 million ($435 million) for the year ended December 31, 2008. This decrease was mainly due to a lower total comprehensive financing result derived from the items previously mentioned.

***Year Ended December 31, 2008 Compared to Year Ended December 31, 2007***

*Net Sales*

Our consolidated net sales increased 1.5% from Ps. 28,591 million ($2,067 million) for the year ended December 31, 2007 to Ps. 29,013 million ($2,097 million) for the year ended December 31, 2008. During the year ended December 31, 2008, domestic sales grew 6.9% while foreign subsidiaries' sales and export sales declined 2.8% and 1.9% year-over-year, respectively. The complex international financial situation and severe contractions in the markets we serve adversely impacted the Company's sales volumes in the last quarter of 2008.

Domestic sales increased as a result of an improved product mix at the Glass Containers business unit which compensated a moderate volume drop year-over-year mostly driven by a sharp drop in volumes towards the last quarter of 2008. Export sales decreased from $601 million to $600 million, measured in nominal U.S. dollars. This decrease was mainly due to lower volumes in the last quarter of the year 2008 in the automotive business line at the Flat Glass business unit, partially offset by higher float glass volumes sold in the South and Central American markets. Foreign subsidiaries' sales, measured in nominal U.S. dollars, decreased from $881 million to $870 million. This decrease was mainly due to weakening markets and softening demand at the Flat Glass business unit, specifically in the United States and Spanish construction markets. Measured in nominal U.S. dollars, our export and foreign subsidiaries' sales represented 23% and 33%, respectively, of our consolidated net sales for the year ended December 31, 2008.

*Glass Containers Business Unit*

Net sales of our Glass Containers business unit increased 5.8% from Ps. 14,639 million ($1,058 million) for the year ended December 31, 2007 to Ps. 15,484 million ($1,119 million) for the year ended December 31, 2008. The main driver of this sales increase was an improved overall product mix in the domestic market. Moreover, the food, beer and soft drinks business lines in the domestic market experienced an increase in volume during the first nine months of 2008 which was offset by an overall volume decline during the last quarter of year 2008 linked to the difficult economic environment. On December 18, 2008, the Company announced that Grupo Modelo, one of the key customers in the Glass Containers business unit, had notified the Company that, due to the current world market contraction, it would significantly reduce its beer bottle orders from us.

Export sales grew 5.1% year-over-year from $365 million to $383 million due to a better product mix at the food, soft drinks and wine and liquor business lines coupled with higher volumes in CFT (cosmetics, fragrances and toiletries) and wine and liquor business lines. Foreign subsidiaries' sales grew 1.6% year-over-year despite the deconsolidation of Comegua starting December 1, 2008. For more information regarding the deconsolidation of Comegua and its effects on our balance sheet and income statement, see "Presentation of Financial Information and Other Information."

*Flat Glass Business Unit*

Net sales of our Flat Glass business unit were Ps. 13,187 million ($953 million) for the year ended December 31, 2008, a decrease of 3%, compared to Ps. 13,591 million ($983 million) for the year ended December 31, 2007. This result was due to the global economic conditions and declining demand in the construction and automotive sectors at year end, both crucial for the Company.

An increase in domestic sales of 5.7% year-over-year was mainly driven by higher automotive glass sales due to higher volumes in both the OEM and AGR markets for the first nine months of the year, partially offset by a

reversal in such trend in the last quarter of 2008 in connection with the world market contraction. Float glass volumes in the construction market remained stable year-over-year with a similar downward trend in the last quarter of 2008 although the Company maintained its market share in the Mexican market.

Export sales decreased 8.4% year-over-year, measured in nominal U.S. dollars, from $237 million in 2007 to $217 million in 2008. This decrease was mainly due to lower automotive glass sales in the OEM and AGR markets, which were partially offset by higher float glass volumes sold to the Central and South American markets. This decrease in the AGR market is in line with the Company's strategy to focus on the domestic market. In May 2009, we decided to sell the inventory which was dedicated to serve the AGR distribution market in the United States, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in the AGR distribution market, but remain in the retail and installation segment. We also consolidated operations and closed six distribution centers and ten installation centers.

Generally, we realize higher profit margins in our domestic market business, and, accordingly, whenever possible our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity.

Therefore, our export sales correlate to our available capacity, mainly in our Flat Glass business unit, including both its float and automotive businesses. In 2006, we decided to decrease our export AGR sales in the automotive business when our OEM market sales increased. Specifically, export prices as well as rising energy and freight costs in 2006 significantly impacted the profitability of our export business, causing us to decide to temporarily exit the export market by shutting down a flat glass manufacturing furnace in Mexico City, which reduced our export capacity.

In 2007, however, we increased exports within both the float and automotive businesses. In the automotive business, we had less OEM volume and thus increased our AGR export sales. In the float business, we acquired a 50% share of the Mexicali flat glass facility from our previous joint venture partner AFG, which also gave us additional capacity dedicated to our export business. Going forward, we will continue to adjust our export sales depending on domestic growth rates and capacity utilizations.

Measured in nominal U.S. dollars, sales from foreign subsidiaries decreased 2.4% year-over-year from $677 million to $661 million. Sales at Vitro Cristalglass decreased 4% as a result of a weakening construction market and softening demand. Sales at Vitro America were adversely affected by the slowdown in demand from the U.S. residential construction market and in the commercial construction market due to the difficult economic environment, which was partially offset by a 2% increase in sales at Vitro Colombia due to increased volumes associated with regional demand.

*Operating Income*

Our consolidated operating income decreased 36.8% from Ps. 2,704 million ($195 million) for the year ended December 31, 2007 to Ps. 1,710 million ($124 million) for the year ended December 31, 2008. This decrease was due to higher energy and raw materials costs and the transfer of a plant in Mexico City to Toluca, as well as to lower volumes that had a negative impact on our fixed cost absorption. All of the above was partially offset by a better product mix in the domestic glass container market and by savings related to our cost and expense reduction initiatives. In 2008, our implemented cost and expense reduction initiatives saved $40 million. These savings relate primarily to production capacity optimization to maximize utilization and efficiency; supply chain, packaging and maintenance savings; a reduction in our workforce; and cost-cutting measures at the corporate level including cancellation of two airplane leasing contracts and limitations on employee and executive committee business travel.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit decreased 19.1% from Ps. 2,054 million ($148 million) for the year ended December 31, 2007 to Ps. 1,661 million ($120 million) for the year ended December 31, 2008. This decrease was driven by lower production volumes and their impact on fixed cost absorption, higher energy and raw materials costs and the costs associated with the transfer of a plant in Mexico City

102

to Toluca. We believe these factors were partially offset by better production efficiencies, a better product mix in the domestic market, and the continued cost reduction initiatives. Our improved production efficiencies include (i) increases in our production speed, (ii) improvements in waste management, and (iii) the use of lighter weight products. In 2007 these improved production efficiencies helped to improve our operating income by 14.9%; however, due to the various factors negatively affecting our financial condition in 2008, we were unable to estimate the benefits of these efficiency improvements on our net income in 2008.

*Flat Glass Business Unit*

Operating income of our Flat Glass business unit was Ps. 186 million ($13 million) for the year ended December 31, 2008, a decrease of 76.2%, compared to Ps. 782 million ($57 million) for the year ended December 31, 2007. This decrease was due to higher energy and raw materials costs coupled with lower production volumes and the corresponding lower fixed cost absorption — resulting from the sluggish construction and automotive markets.

*Total Comprehensive Financing Result*

Our total comprehensive financing expense increased 446.8% from Ps. 1,660 million ($120 million) for the year ended December 31, 2007 to Ps. 9,077 million ($656 million) for the year ended December 31, 2008. This increase was primarily due to the change of the value claimed by our Counterparties in the DFI Claims from a loss of Ps. 201 million ($15 million) for the year ended December 31, 2007 to a loss of Ps. 3,766 million ($272 million) for the year ended December 31, 2008, and to an increase in non-cash foreign exchange loss from Ps. 94 million ($7 million) in the year ended December 31, 2007 to Ps. 3,222 million ($233 million) during the year ended December 31, 2008, as a result of a higher depreciation of the Mexican peso during the year ended December 31, 2008, and the elimination of the monetary position at the beginning of year ended December 31, 2008 due to the new Mexican Financial Reporting Standards. Derivative instruments losses for the year ended December 31, 2008 were comprised mainly of losses in natural gas price DFIs of approximately Ps. 2,432 million ($176 million) due to decreases in the natural gas prices during the final months of 2008, and of losses in foreign exchange rate DFIs of approximately Ps. 1,578 million ($114 million) due to the high volatility that the markets experienced in the final months of 2008 that resulted in a sharp increase in Mexican peso/U.S. dollar foreign exchange rates, partially offset by gains in interest rate DFIs of approximately Ps. 59 million ($4 million) due to decreases in the TIIE.

*Other Expenses (Income), Net*

Other expenses (income), net decreased by Ps. 374 million ($27 million) from a loss of Ps. 869 million ($63 million) for the year ended December 31, 2007 to a loss of Ps. 495 million ($36 million) for the year ended December 31, 2008. This decrease was mainly due to (i) an absence of fees and costs related to debt restructuring for the year ended December 31, 2008 compared to Ps. 488 million ($35 million) incurred for the extinguishment of debt associated with our debt restructuring completed during 2007; (ii) a gain from the sale of long-lived assets of Ps. 3 million ($0.2 million) in 2008 compared to a loss of Ps. 47 million ($3 million) in 2007; and (iii) workers profit sharing (PTU) of Ps. 10 million ($0.7 million) during the year ended December 31, 2008 compared to Ps. 54 million ($3.9 million) during the year ended December 31, 2007.

*Income Taxes*

Income tax for the year ended December 31, 2008 represented an income tax benefit of Ps. 2,175 million ($157 million) compared to an expense of Ps. 44 million ($3 million) for the year ended December 31, 2007. In 2008 the Company generated tax loss carryforwards resulting primarily from foreign exchange losses on our U.S. dollar-denominated debt as well as from payments made for margin calls on our derivative financial instruments. The Company has also recorded deferred tax assets, primarily related to the derivative liability claimed by our Counterparties. Based on our financial projections, we believe we will generate sufficient taxable income in future years to allow us to recover our deferred tax assets up to the amount of the recorded asset.

103

*Net Income*

For the year ended December 31, 2008, we generated a consolidated net loss of Ps. 5,682 million ($411 million) compared to a net income of Ps. 131 million ($9 million) for the year ended December 31, 2007. This increased loss was mainly due to a higher total comprehensive financing result derived from the change of the value claimed by our Counterparties in our derivative instrument transactions. Such losses were partially offset by income tax benefits and lower levels of other expenses.

# LIQUIDITY AND CAPITAL RESOURCES

Our net interest expense on debt for the year ended December 31, 2009 was Ps. 2,772 million ($212 million) and our total comprehensive financing cost was Ps. 2,366 million ($181 million), while our operating income was Ps. 1,329 million ($101 million). As of December 31, 2009, our total consolidated indebtedness was Ps. 20,101 million ($1,540 million), of which Ps. 18,197 million ($1,393 million) is short-term debt. As of December 31, 2009 and June 30, 2010, our unrestricted cash and cash equivalent balances were Ps. 2,616 million ($200 million) and Ps. 2,203 million ($174 million), respectively.

We are in default under our indentures and other financial instruments, and our future is dependent upon our ability to restructure our debt and other financial instruments. Given the amount of such obligations and the level of our cash and operating income, we do not currently have sufficient liquidity to service our debt.

In order to generate liquidity to continue as a going concern, we must restructure our obligations under our indentures and other financial instruments, which will involve a significant reduction of the claims of the Holders of the Old Notes and other financial instruments, resulting in a significant decrease of our debt and interest expenses. If we are able to enter into consensual arrangements with our financial creditors, as part of that process we would make filings under Mexican and U.S. bankruptcy laws to accomplish a reorganization of our debt. If we are unable to enter into consensual arrangements with our financial creditors, we could be forced to seek relief through filings under Mexican and U.S. bankruptcy laws, which could force us to operate in uncertain circumstances for a period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees, and may result in a liquidation of the Company. See "Risk Factors—Risk Factors Relating to the *Concurso* Plan" and "Risk Factors—Risks Factors Relating to Our Business—We have insufficient liquidity to repay our existing obligations and meet our capital requirements."

As part of the measures we have adopted to improve our financial position and preserve liquidity, we have adopted a significant and focused cost reduction plan, which includes reducing our workforce, optimizing production capacity in order to maximize utilization and efficiencies, generating savings in the supply chain, packaging and maintenance, canceling aircraft leasing contracts, divesting non-productive assets and eliminating the outsourcing of non-strategic services, among other things. We estimate that these initiatives, as well as other initiatives aimed at reducing operating costs, reducing corporate expenses and improving efficiency, will result in annual savings of approximately $122 million from the third quarter of 2009 (which is when we completed the full implementation of these initiatives) and onward.

Our ability to continue operations while we restructure our business also depends on our ability to achieve financing on reasonable terms. For a discussion of our recent financing activity, see "—Liquidity in 2010" below.

## Liquidity in 2010

In order to improve our liquidity in 2010, we implemented the following actions:

- *Fintech Sale and Leaseback Transaction.* In December 2009, we completed a $75 million transaction with Fintech Advisory Limited, an affiliate of Fintech ("Fintech Advisory"), through the creation of a Mexican trust (the "Real Estate Trust"). Vitro and its subsidiaries, Comercializadora Álcali, S.A. de C.V. ("Álcali"), Vidriera Guadalajara, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V. and Vidriera Toluca, S.A. de C.V. contributed seven real estate assets (industrial land) to the Real Estate Trust, receiving $75 million in cash contributed by Fintech Advisory to acquire these assets. We entered into a 15 year lease agreement that allows the Company to continue using the assets. The Company has the right to repurchase the title to these real estate assets in exchange for $126 million in cash in certain circumstances. If we default on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming we have not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech exercises its right to sell or lease the real estate assets, this could adversely affect our business. Additionally, subject to the execution of a restructuring plan or agreement for the

restructuring of substantially all of our financial indebtedness and the satisfaction of certain other conditions precedent, Fintech may exercise one of two options obtained on the same date to exchange the rights over the Real Estate Trust for shares of the Company and/or a sub-holding subsidiary's common shares. The option related to the common shares of the Company, if exercised, would be for up to a maximum of 93,099,849 shares that in the aggregate are currently held by the Company's Pension and Stock Option Trusts (described herein), valued in accordance with the relevant valuation formula set forth in the option agreement and would leave Fintech with up to a maximum equity stake in the Company of approximately 24%. If those common shares are not sufficient to satisfy the $75 million option purchase, the remainder of the purchase option would be fulfilled with the delivery to Fintech of the necessary shares of the sub-holding subsidiary valued in accordance with the relevant valuation formula set forth in the option agreement. Alternatively, Fintech may elect to exercise the second option, over certain shares of the sub-holding subsidiary exclusively. Only one of the two options may be exercised. Fintech's equity options expire three years after a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness is executed. The Company has the option to repurchase the sub-holding subsidiary's shares during the three years following Fintech's exercise of either option. In the event that Fintech exercises the option related to the Company's common shares, a shareholders agreement among Fintech and the Company's controlling shareholders will come into effect and would continue to be in effect as long as Fintech holds at least a 5% ownership in Vitro. Pursuant to the terms of such shareholders agreement, among other things, subject to certain limitations and qualifications, Fintech specifically agreed to vote with Mr. Adrian Sada Gonzalez, Ms. Esther Cueva de Sada, Ms. Maria Alejandra Sada Gonzalez and Mr. Adrian Sada Cueva, and the consent of such persons (including Fintech) will be required with respect to certain fundamental actions and voting matters affecting the Company. Moreover, under the shareholders agreement, Fintech and the other shareholders party thereto will be subject to certain transfer restrictions, in each case customary for a significant shareholder of a Company like ours.

- *Refinancing of Flat Glass Accounts Receivable Financing Program.* In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24 million) with a five-year maturity.

- *Sale of Float Glass Inventory in Mexico.* In March 2010, we refinanced a transaction involving the sale of some of our float glass inventory for approximately Ps. 250 million ($20 million) for an additional year.

- *Covisa / Álcali Securitization Refinancing.* In April 2010, we refinanced the senior Ps. 550 million ($43 million) variable rate TIIE+ 4% bond of our subsidiaries Covisa and Álcali for an additional two years. The remaining $10 million balance of the subordinated notes was repaid.

- *Renewal of Vitro America's Credit Lines.* In June 2010, we renewed $32.5 million of Vitro America's credit lines with Bank of America for an additional year.

- *Refinancing of Credit Lines in Spain.* In August 2010, we refinanced 44.8 million euros of credit lines of Vitro Cristalglass, our subsidiary in Spain. We have reached agreements to extend these credit lines for three years.

## Principal Sources and Uses of Cash

Our policy is to invest available cash in short-term instruments issued by Mexican and international banks and in securities issued by the governments of Mexico and the United States.

Over the past three years, the principal source of our liquidity has generally been cash generated from operations in each of our business units, debt issuances and the sale of certain assets. Our principal uses of cash have generally been for capital expenditure programs, interest payments, debt repayment and dividend payments.

The following is a summary of the principal sources and uses of cash for the three years ended December 31, 2009. Financial data expressed in Mexican pesos and set forth in the following table for 2008 and 2009 are presented in nominal Mexican pesos and for all amounts pertaining to fiscal year 2007 are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | **2007** | **2008** | **2009** |
| | (in millions of Mexican pesos) | | |
| Sources: | | | |
| Net resources generated by operating activities (2007) and cash flows generated from operating activities (2008 and 2009) | Ps. 1,674 | Ps.2,736 | Ps.3,966 |
| Sale of assets | 109 | 20 | 1,410 |
| Debt issuance | 16,891 | 3,034 | 1,559 |
| | | | |
| Uses: | | | |
| Interest payments | 2,341 | 2,044 | 943 |
| Capital expenditures | 2,695 | 1,798 | 1,009 |
| Debt repayments | 14,323 | 1,020 | 2,483 |
| Dividends declared and paid | 215 | 274 | 14 |

**Changes in Working Capital**

Our working capital decreased Ps. 1,714 million ($131 million) during the year ended December 31, 2009. This decrease was principally attributable to lower activity due to market conditions. Our working capital is insufficient for our present and future operational requirements. For a further discussion of our liquidity, see "Risk Factors—Risk Factors Relating to Our Business—We have insufficient liquidity to repay our existing obligations and meet our capital requirements."

**Capital Expenditures**

We operate in capital-intensive industries and require ongoing investments to update our assets and technology. In prior years, funds for those investments and for working capital needs, partnership transactions, acquisitions and dividends have been provided by a combination of cash generated from operations, short-term and long-term debt and, to a lesser extent, divestitures. Our capital expenditures program is currently focused on maintenance of our manufacturing facilities. Our capital expenditures program also contemplates the purchase and maintenance of environmental protection equipment required to meet applicable environmental laws and regulations, as such may be in effect from time to time.

During the year ended December 31, 2009, we paid aggregate capital expenditures of Ps. 1,009 million ($77 million) that primarily consisted of capital expenditures for capacity expansion, relocation of a glass container facility and the purchase of a new furnace for the Company's automotive glass operation.

During 2010, we expect to make capital expenditures of approximately Ps. 1,266 million ($100 million) as follows:

- Our Glass Containers business unit expects to make capital expenditures of Ps. 861 million ($68 million), which will be used: to provide maintenance to certain furnaces and IS machines; for a palletizing center; and for infrastructure in one of our facilities. The remainder will be applied to new product molds.

- Our Flat Glass business unit expects to make capital expenditures of Ps. 405 million ($32 million), which will be used mainly for maintenance of our facilities.

The capital expenditures are expected to be financed with cash flows generated by our operations and with current cash on hand. Should we be unable to fund the total amount of our capital expenditures with cash flows from operations, we might defer a portion of such expenditures to future periods.

For the year ended December 31, 2009, our Glass Containers business unit accounted for 68% of our capital expenditures, which was primarily used for maintenance to certain of our furnaces and IS machines. The remaining 32% of our capital expenditures for the year ended December 31, 2009 was incurred by the Mexican subsidiaries of our Float Glass business unit and used mainly for maintenance.

For the year ended December 31, 2008, our capital expenditures paid totaled Ps. 1,798 ($131 million). Our Glass Containers business unit accounted for 86% of our capital expenditures, which was primarily used for production capacity expansion in Vidriera Monterrey, the relocation of the Vidriera Mexico operations to the Vidriera Toluca facility and the maintenance of certain furnaces and IS machines in Vidriera Los Reyes and Vidriera Toluca. The remaining 14% of our capital expenditures for the year ended December 31, 2008 was incurred by the Mexican subsidiaries of our Flat Glass business unit and used mainly for the purchase of a new furnace for the Company's automotive glass operations and the remainder used by its foreign subsidiaries.

For the year ended December 31, 2007, our capital expenditures totaled Ps. 2,695 million ($248 million). Our Glass Containers business unit accounted for 86% of our capital expenditures, which was primarily used for the maintenance of certain furnaces, relocation of our Vidriera Mexico operation to the Vidriera Toluca facility and production capacity expansion. The remaining 14% of our capital expenditures for the year ended December 31, 2007 was incurred by our Flat Glass business unit and used mainly for major furnace repairs and production capacity expansion.

## Indebtedness

The following table sets forth the aggregate amounts of our outstanding short-term and long-term debt as of June 30, 2010.

As of June 30, 2010, we were in default related to our long-term debt obligations; therefore, substantially all of our long-term debt is now presented as short-term debt. We are currently in payment default under our Old Notes and our *Certificados Bursátiles Vitro 03* and other credit agreements.

| | As of June 30, 2010 | |
| --- | --- | --- |
| | (Ps. millions) | ($ millions)[1] |
| Short-term debt[2][3] | Ps.17,557 | $1,388 |
| Long-term debt[4][5] | 1,790 | 141 |

(1) Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at a rate of 12.6567 Mexican pesos per U.S. dollar, the Free Exchange Rate on June 30, 2010.

(2) Includes the current portion of our long-term debt, which was Ps. 16,766 million ($1,325 million) as of June 30, 2010.

(3) 96%, 3% and 1% of the aggregate amount of our short-term debt as of June 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

(4) Excludes the current portion of our long-term debt. If the current portion of our long-term debt were included, the aggregate amount of outstanding long-term debt as of June 30, 2010 would be Ps. 18,556 million ($1,466 million).

(5) 27%, 64% and 9% of the aggregate amount of our long-term debt as of June 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

*Short-Term Debt*—Our short-term debt consists primarily of (i) long-term debt obligations which were reclassified due to defaults and are now presented as short-term obligations, (ii) unsecured and secured borrowing arrangements with Mexican and foreign banks denominated in Mexican pesos, U.S. dollars and euros and (iii) accounts receivable financing programs. We engage, from time to time, in the ordinary course of business, in a number and variety of

short-term loan arrangements with a number of Mexican and foreign banks. Such loans generally have a maturity ranging from 30 to 365 days and have interest rates ranging from 1.5% to 8% above LIBOR for the U.S. dollar-denominated loans and from 1.10% to 1.25% above Euribor for our euro-denominated loans, and have fixed and floating market rates for the Mexican peso-denominated loans.

**Long-term debt reclassified to short-term due to defaults:**

| Facility | Outstanding Principal Amount as of June 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| 2012 Notes<br>*Issuer:* Vitro | $300 million | *Interest Rate:* 8.625% per annum. | February 1, 2012 |
| *Guarantors:* Wholly owned subsidiaries of Vitro, Vitro Envases Norteamérica, S.A. de C.V. ("VENA") and Viméxico | | *Interest Payment Dates:* August 1 and Semiannually on February 1 of each year. | . |
| 2017 Notes<br>*Issuer:* Vitro | $700 million | *Interest Rate:* 9.125% per annum. | |
| *Guarantors:* Wholly owned subsidiaries of Vitro, VENA and Viméxico | | *Interest Payment Dates:* Semiannually on August 1 and February 1 of each year. | February 1, 2017 |
| 2013 Notes<br>*Issuer:* Vitro | | *Interest Rate:* 11.75% per annum. | |
| *Guarantors:* Wholly owned subsidiaries of Vitro, VENA and Viméxico | $216 million | *Interest Payment Dates:* Semiannually on May 1 and November 1 of each year. | November 1, 2013 |
| *Certificados Bursatiles Vitro 03* | | *Interest Rate:* Cetes + 3.25% | |
| *Issuer:* Vitro | Ps. 150 million ($11.9 million) | *Interest Payment Dates:* Every 28th day from October 21, 2004. | February 5, 2009 |

*Long-Term Debt*—The following is a brief summary of our significant long-term indebtedness outstanding as of June 30, 2010:

**Long-term debt:**

| Facility | Outstanding Principal Amount as of June 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| *Certificados Bursatiles Vitro 08* | | *Interest Rate:* TIIE (28 days) + 2.50% | |
| *Issuer:* Vitro | Ps. 400 million ($31.6 million) | *Interest Payment Dates:* Every 28th day from July 2, 2008. | April 7, 2011 |
| *Bancomex*[1] | $68.3 million | *Interest Rate:* Libor (3 months) + 5.00% | April 3, 2011 |
| *Issuer: Administración de Inmuebles Vitro* | | *Interest Payment Dates:* Every 90th day from November 3, 2008. | |
| Capital Leases | $12.6 million | *Interest rate on case by case basis* | Several installments through 2015 |
| | Ps. 298 million | *Interest Rate:* TIIE + 4% | Several installments |

| Facility | Outstanding Principal Amount as of June 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| *Secured debt* | ($23.5 million) | | through 2014 |
| *Secured borrowing related to the Glass Containers accounts receivable securitization* | Ps. 550 million $(43.5 million) | *Interest Rate:* TIIE + 4% | Several installments through 2012 |
| *Secured borrowing related to the Flat Glass accounts receivable financing program* | Ps. 300 million ($23.7 million) | *Interest Rate:* TIIE + 4% | Several installments through 2014 |
| *Unsecured debt* | $30 million | *Interest Rate:* LIBOR + 8% | Several installments through 2014 |

_____

(1)    See "—Indebtedness."

Below is a summary of the terms of the foregoing facilities or securities.

*2012 Notes and 2017 Notes.* On February 1, 2007 we completed the offering of $1.0 billion of Senior Notes, comprised of $300 million of 2012 Notes and $700 million of 2017 Notes. The 2012 Notes and the 2017 Notes are general unsecured obligations of Vitro. The indenture governing the 2012 Notes and the 2017 Notes contains certain customary restrictive covenants, including, but not limited to, restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. The 2012 Notes and the 2017 Notes are guaranteed by VENA and substantially all of its wholly owned subsidiaries and Viméxico and substantially all of its wholly owned subsidiaries.

We are currently in payment default with respect to these notes. See "Summary—Background of the Restructuring—Our Financial Difficulties—Interest and Principal Payment Default on the Old Notes and the Other Debt."

*2013 Notes.* On October 22, 2003, Vitro completed an offering of $225 million aggregate principal amount of 2013 Notes. The 2013 Notes are general unsecured obligations of Vitro. The indenture governing the 2013 Notes contains certain customary restrictive covenants, including restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. Upon issuance of the 2012 Notes and 2017 Notes mentioned above, the holders of the 2013 Notes have been extended the benefit of a guarantee by the subsidiary guarantors substantially similar to the guarantee provided with respect to the 2012 Notes and the 2017 Notes. Part of the 2013 Notes were prepaid in June 2008 and, as of June 30, 2010, the total amount outstanding was $216 million.

We are currently in payment default with respect to these notes. See "Summary—Background of the Restructuring—Our Financial Difficulties—Interest and Principal Payment Default on the Old Notes and the Other Debt."

*Certificados Bursátiles Vitro 03.* On October 10, 2002, we opened a medium-term notes program under which we were able to issue up to an aggregate principal amount of Ps. 2.5 billion. On February 13, 2003 we issued a *Certificados Bursátiles* note which bears an annual floating interest rate of 3.25% over the 182-day CETES. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of June 30, 2010, the total amount outstanding for this program was Ps. 150 million ($11.9 million).

We are currently in payment default with respect to this debt. See "Summary—Background of the Restructuring—Our Financial Difficulties—Interest and Principal Payment Default on the Old Notes and the Other Debt."

110

*Certificados Bursátiles Vitro 08.* On July 2, 2008, we opened a medium-term notes program under which we were able to issue up to an aggregate principal amount of Ps. 1.0 billion. On this same date, we issued a *Certificados Bursátiles* note which bears an annual floating interest rate of 2.50% over the 28-day TIIE. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of June 30, 2010, the total amount outstanding for this program was Ps. 400 million ($31.6 million).

*Bancomext.* In November 2008, through one of our subsidiaries, we contributed non-productive real estate assets with a book value of Ps. 1,875 million ($136 million), as of December 31, 2009, to a trust created for the sole purpose of selling such assets ("Bancomext Trust") if necessary in order to generate the necessary resources to pay off the principal from an $100 million credit obtained from a financial institution. As of December 31, 2008 and 2009 and June 30, 2010, the proceeds drawn against the loan were $85 million, $68 million and $68 million, respectively. On August 24, 2010, we finalized the sale of non-productive properties, amounting to US $63.8 million. The resources of such sale and $5.5 million were contributed to the trust to pay in full the balance of US $69.3 million to that date and thereby recover the property of our two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

*Flat Glass Accounts Receivable Financing Program.* In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($23.7 million) with a five-year maturity. The new issuance bears an annual floating interest rate of 4.0% over the 28-day TIIE.

*Covisa / Álcali Securitization.* In April 2010, we refinanced the senior Ps. 550 million ($43.5 million) variable rate TIIE+ 4% bond issued by the Trustee of the accounts receivable securitization program of our subsidiaries Covisa and Álcali for an additional two years. The bond bears an annual floating interest rate of 4.0% over the 28-day TIIE. The remaining $10 million balance of the subordinated notes was repaid.

*Bladex Credit Facility.* In July 2009, we refinanced a $30 million credit with Bladex for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014.

## Other Restrictions on Dividend Payments

Pursuant to article 20 of the *Ley General de Sociedades Mercantiles* (the "Mexican General Law of Corporations"), 5% of the annual net income of Mexican corporations must be set aside to create or increase a mandatory legal reserve until such reserve amounts to not less than 20% of such corporation's outstanding equity capital. Thereafter, a majority of our shares present at such annual general ordinary shareholders' meeting may allocate all or a portion of the remainder of our net income to a reserve fund for the purchase of our shares or other reserve funds. As of the date of this Statement, our mandatory legal reserve amounted to at least 20% of our outstanding equity capital per the requirement described above.

Certain of the instruments governing our indebtedness, under certain circumstances, restrict our ability to pay dividends. See "—Indebtedness" above.

## Share Repurchases and Sales

As of October 14, 2010, the date of our most recent general ordinary shareholders' meeting, 445,500 of our shares are held as treasury stock. In addition, 39,777,907 of our shares are held in the Stock Option Trust are treated as treasury shares for accounting purposes, and under Mexican corporate law are considered issued and outstanding.

## Real Estate Matter

In December 2006, Vitro sold real estate located in Mexico City for $100 million, 80% payable on the date of the sale and the remainder payable on the delivery date of the property. As of December 31, 2008, the Company was in compliance with the terms of the contract. In 2009, the Company received a $5 million payment and is still seeking legal remedies for payment of the remaining amount.

On August 16, 2010, the court absolved the purchaser of the remaining payment claimed. The Company has filed an appeal against the decision, which is pending resolution. The Company and its legal counsel believe it has sufficient evidence to obtain a favorable ruling on this issue.

**PBGC Matter**

As part of the disposal of Anchor Glass Container Corp. ("Anchor") in August 1996, in a transaction approved by the U.S. Bankruptcy Court, we entered into a term sheet which contemplated an agreement pursuant to which we would provide to the Pension Benefit Guaranty Corporation (the "PBGC"), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets, which we refer to as "New Anchor." The amount of the guaranty was originally limited to $70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semiannual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionately reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by $7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

On April 15, 2002, New Anchor filed a pre-negotiated plan of reorganization under chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

On June 20, 2003, the PBGC wrote to us, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of $219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than $122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of our limited guaranty had occurred. Accordingly, in its letter, the PBGC demanded payments pursuant to the term sheet of $7 million on or before August 1, 2003 and of $3.5 million semiannually through August 1, 2011. We intend to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by us. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, we will establish an appropriate accounting reserve. As of this date, we have not established any reserves in connection with such potential liability.

**Energy**

Certain of our subsidiaries agreed to purchase, in the aggregate, 90 megawatts of electrical power and 1.3 million tons of steam per year pursuant to a 15-year "take-or-pay" power purchase agreement with Tractebel Energía in which natural gas is a pass through component in the energy price. This contract took effect in October 2000 and the price at which we are required to purchase electrical power and steam is based on variables such as inflation, the Mexican peso/U.S. dollar exchange rate and the price of natural gas, the future value of which is uncertain.

# BUSINESS

## Business Overview

Vitro, S.A.B. de C.V. is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and is a holding company that conducts substantially all of its operations through subsidiaries. We were incorporated in Mexico in 1909 and, based on our consolidated net sales in 2009, we believe that we are the largest manufacturer of glass containers and flat glass in Mexico. Our principal executive offices are located at Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico, telephone number (52-81) 8863-1200.

Our consolidated net sales for the year ended December 31, 2009 totaled Ps. 23,991 million ($1,837 million). In 2009, 46% and 46% of our consolidated net sales were sales made in Mexico and in the United States and Europe, respectively. Our operations are organized into two operating business units: the Glass Containers business unit (representing approximately 52% of our consolidated net sales in 2009) and the Flat Glass business unit (representing approximately 47% of our consolidated net sales in 2009).

As of December 31, 2009, our total assets were Ps. 32,652 million ($2,500 million). We have manufacturing facilities in 11 countries and distribution centers throughout the Americas and Europe and export our products to several countries.

Our Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world. Substantially all of the Glass Containers subsidiaries are wholly owned except for Comegua, our venture with London Overseas and Golden Beer, in which we hold an investment of 49.7%. Covisa, which conducts a substantial majority of our glass containers operations in Mexico, is the only Significant Operating Subsidiary in the Glass Containers business unit.

Our Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and the automotive industries. Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal.

Viméxico, our 91.8% venture with Pilkington, is a holding company for some of the Flat Glass business unit subsidiaries. Vidrio y Cristal, which manufactures and distributes our raw flat glass products for the Mexican construction industry, is the only Significant Operating Subsidiary in our Flat Glass business unit. In addition to Viméxico, we have partners in three additional subsidiaries: (i) Cristales Automotrices, which conducts our AGR installation business throughout México City, (ii) Vitro Cristalglass, which is engaged in the manufacturing and distribution of flat glass products for the Spanish, French and Portuguese construction industries and (iii) Vitro Chaves, a subsidiary of Vitro Cristalglass.

## Acquisitions

In July 2008, Viméxico was notified by its venture partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, our consolidated financial statements present Vitro Cristalglass as a wholly owned subsidiary of Viméxico. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527 million). The difference between the purchase price and the book value resulted in a charge of Ps. 60 million, recorded in majority stockholders' equity. The total amount of the purchase price its being paid throughout 2009 and 2010.

In April 2008, the Company, through its subsidiary Vitro Cristalglass, completed the acquisition of the operations of Verres et Glaces d'Epinay, a Paris-based value-added flat glass company, for an equivalent of Ps. 41 million ($4 million). The new operations have been incorporated into a new subsidiary, which is now engaged in the production and distribution of value-added glass products to the French residential and commercial construction market. Verres et Glaces d'Epinay commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

In August 2007, Vidrio y Cristal acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V., a company engaged in the installation of value-added glass products, for an equivalent of Ps. 110 million ($10 million).

In July 2007, Viméxico exercised its option to acquire the remaining 50% of the outstanding shares of Vitro AFG (now Vidrio y Cristal del Noroeste, S.A. de C.V.) from its joint venture partner AFG Industries Inc. for Ps. 67 million ($6 million) in cash. This company's primary operations are the manufacture, processing and distribution of flat glass.

### *Our Operating Business Units*

Our organizational structure, comprised of the Glass Containers and Flat Glass business units, allows us to focus on the needs of the distinct end markets we serve, which results in a diversified revenue base, and enables us to take advantage of our expertise in the efficient production and distribution of high quality glass products.

### Business Segment Data

The following table sets forth the business segment data for the three years ended December 31, 2009. Financial data expressed in Mexican pesos and set forth in the following table are presented in nominal Mexican pesos except for all amounts pertaining to fiscal year 2007 that are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated | $ million |
|---|---|---|---|---|---|
| | | | (Ps. million) | | ($ million) |
| **2009** | | | | | |
| Net sales | Ps.12,452 | Ps.11,453 | Ps. 229 | Ps.24,134 | $1,848 |
| Intersegment sales | 67 | 76 | | 143 | 11 |
| Consolidated net sales | 12,385 | 11,377 | 229 | 23,991 | 1,837 |
| Operating income | 1,956 | (591) | (36) | 1,329 | 101 |
| Total assets | 21,878 | 15,029 | (4,255) | 32,652 | 2,500 |
| Capital expenditures[1] | 735 | 264 | 10 | 1,009 | 77 |
| **2008** | | | | | |
| Net sales | Ps.15,524 | Ps.13,230 | 342 | Ps.29,096 | $2,103 |
| Intersegment sales | 40 | 43 | | 83 | 6 |
| Consolidated net sales | 15,484 | 13,187 | 342 | 29,013 | 2,097 |
| Operating income | 1,661 | 186 | (137) | 1,710 | 124 |
| Total assets | 19,723 | 15,358 | 693 | 35,774 | 2,586 |
| Capital expenditures[1] | 1,538 | 255 | 5 | 1,798 | 130 |
| **2007** | | | | | |
| Net sales | Ps.14,676 | Ps.13,605 | Ps. 361 | Ps.28,642 | $2,636 |
| Intersegment sales | 37 | 14 | | 51 | 5 |
| Consolidated net sales | 14,639 | 13,591 | 361 | 28,591 | 2,631 |
| Operating income | 2,054 | 782 | (132) | 2,704 | 249 |

114

| | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated | $ million |
|---|---|---|---|---|---|
| | | | (Ps. million) | | ($ million) |
| Total assets | 17,803 | 13,708 | 2,312 | 33,823 | 3,113 |
| Capital expenditures[1] | 2,328 | 324 | 43 | 2,695 | 248 |

(1)  These amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters of Ps. 2,695 million ($248 million) for 2007, Ps. 1,909 million ($138 million) for 2008 and Ps. 638 million ($49 million) for 2009.

The following table sets forth the business segment data as a percentage of consolidated data.

| | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated |
|---|---|---|---|---|
| **2009** | | | | |
| Consolidated net sales | 52% | 47% | 1% | 100% |
| Operating income | 147% | (44%) | (3%) | 100% |
| Total assets | 67% | 46% | (13%) | 100% |
| Capital expenditures | 73% | 26% | 1% | 100% |
| **2008** | | | | |
| Consolidated net sales | 53% | 46% | 1% | 100% |
| Operating income | 97% | 11% | (8%) | 100% |
| Total assets | 56% | 42% | 2% | 100% |
| Capital expenditures | 86% | 14% | 0% | 100% |
| **2007** | | | | |
| Consolidated net sales | 51% | 48% | 1% | 100% |
| Operating income | 76% | 29% | (5%) | 100% |
| Total assets | 53% | 40% | 7% | 100% |
| Capital expenditures | 86% | 12% | 2% | 100% |

The following factors result in greater operating profit margins in our Glass Containers business as compared to our Flat Glass business:

(a)  We hold a significant portion of the non-captive market in Mexico. In 2009, we served approximately 76% of the non-captive market in Mexico. We define a non-captive market to exclude buyers (such as beverage and beer bottlers) that are supplied glass containers by their affiliates. Our production flexibility to service niche markets, as well as our high quality products and manufacturing capacity, offers a strong competitive advantage that makes us the leading supplier of the non-captive market in Mexico.

(b)  We believe that significant entry barriers exist for foreign competitors to enter into our domestic market, which is very capital intensive. Based on a 76% non-captive glass container market share, we believe we are the leading glass container producer in Mexico. The glass container industry is very capital intensive, which, added to high freight costs for foreign competitors, results in a significant cost barrier to entry.

(c)  Our facilities are located in proximity to our clients' facilities. We operate nine manufacturing facilities strategically located throughout Mexico. The proximity to our clients' facilities allows us to reduce freight costs and conduct a more efficient supply chain with our customers.

(d)  We enjoy long-established relationships with many of our customers, some of which have lasted more than 50 years. We have a long-established relationship with The Coca-Cola Company, Herdez McCormick, Nestlé and Grupo Domeq, which have been clients for more than 50 years.

(e) We have the ability to manufacture short-run orders. We have the ability to supply short-runs of customized, decorated containers. Our high-tech engineering allows us to develop molds in a shorter period of time than industry standards. These factors give us a fast time to market and the ability to develop new customized products in a timely manner for our customers, who, as a result, are willing to pay above-market average prices.

(f) Our sales in the U.S. target niche markets. We believe that we are the largest importer of glass containers into the U.S. as we serve target niche markets, such as the wine and liquor market, the "nostalgia" soft drink market and the cosmetics market.

In addition, in the Flat Glass business, approximately 40% of our sales in the U.S. market is distribution, which customarily provides smaller profit margins. Approximately 29% of the Flat Glass business' sales are in our domestic market, where we continue to experience increased price competition from foreign companies with operations in Mexico, which has further reduced our operating profits. Additionally, exports of float glass, which is a commodity, have low profit margins. The following table sets forth the breakdown of revenue by geographic market for the three years ended December 31, 2009:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | 2007 | 2008 | 2009 |
|  | | (Ps. million) | |
| Net sales[1] to customers in: | | | |
| Mexico | Ps.12,008 | Ps.12,831 | Ps.11,152 |
| All foreign countries, mainly the United States and Europe | 16,583 | 16,182 | 12,839 |
| Consolidated | Ps.28,591 | Ps.29,013 | Ps.23,991 |

(1)   Net sales are attributed to countries based on the location of the customer.

Consolidated net sales to any single external customer did not exceed more than 8% of Vitro's total consolidated net sales in any year presented.

### Glass Containers

Based on the Glass Containers business unit's consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe it is the largest glass container producer in Mexico and Central America and among the largest in the world. In 2008, this business unit accounted for 53% of our consolidated net sales. During the same period, 37% of the net sales of the Glass Containers business unit came from exports and 1% came from sales by our foreign subsidiaries that are part of the business unit.

The Glass Containers business unit produces glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceuticals and cosmetics industries. Its customers include leading companies such as Grupo Arca, Avon, Bacardi, Skyy Spirits, Campbells, Coty, Diageo, Encore Glass, Estee Lauder, Gerber, Grupo Cuervo, Grupo Domecq, Grupo Modelo, Herdez McCormick, Jafra, Jeyes, Jumex, Nestle, Pepsi Cola, Pisa, Procter & Gamble, Sauza, Tamazula and The Coca-Cola Company. In addition, our Glass Containers business unit manufactures and distributes:

- Soda ash, sodium bicarbonate, calcium chloride and salt, which are the main raw materials used in the manufacture of glass products, and also used in the pharmaceutical, food and detergent industries; and

- Capital goods such as glass forming machines and molds.

The Glass Containers business unit operates nine manufacturing facilities in Mexico, three in Central America and one in Bolivia, and has two recycling plants in Mexico. The Glass Containers business unit, which exports to the United States mainly through one of our subsidiaries, has five sales offices, four design centers and one distribution center in the United States.

*Flat Glass*

The Flat Glass business unit is comprised of two main businesses: Flat Glass manufacturing and distribution and Automotive Safety Glass manufacturing and distribution. Most of our Flat Glass business unit's operations (approximately 66%) are dedicated to the building products industry, while the remainder (approximately 34%) of the unit's operations is concentrated in the automotive industry. In 2009, 29% of our Flat Glass business unit's sales derived from Mexico, 16% derived from exports, and 54% derived from sales by foreign subsidiaries. Sales by our U.S. foreign subsidiaries represented 40% of the Flat Glass business unit's sales.

Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second-largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal. In 2009, this business unit accounted for 47% of Vitro's consolidated net sales.

In July 2008, Vimexico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, our consolidated financial statements present Vitro Cristalglass as a wholly owned subsidiary of Vimexico. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527 million). The difference between the purchase price and the book value resulted in a charge of Ps. 60 million, recorded in majority stockholders' equity.

In January 2009, a revised payment was agreed upon with the previous partner, extending payment through the 2009-2010 periods, and it was agreed that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company and that subsequently there would be a capital reduction.

In July, 2007, Vimexico exercised its option to acquire 50% of the outstanding shares of Vitro AFG (now Vidrio y Cristal del Noroeste, S.A. de C.V.) from its joint venture partner AFG Industries Inc. for Ps. 67 million ($6 million) in cash. With the termination of this joint venture, Vimexico became the sole owner of this entity, the primary operations of which include the manufacture, processing and distribution of flat glass.

In 2009, our Float Glass manufacturing business represented 15% of our Flat Glass business unit's total sales to third parties. A substantial portion is supplied to the construction industry and to a lesser extent is supplied to the automotive safety glass industry, as well as glass furniture and home appliance manufacturers. We believe we are the leading float glass manufacturing business in Mexico on the basis of sales, with a 45% market share in Mexico as of December 31, 2009. As of December 31, 2009, the Float Glass manufacturing business owned four float glass furnaces, of which one in Mexico City has been shut down since March 2006 (fully written-down for accounting purposes as a result of an impairment charge recorded in 2006).

In 2009, our Automotive Safety Glass manufacturing and distribution business represented 15% of our Flat Glass business unit's total sales, with sales primarily derived from the automotive OEM market in North America. On the basis of volume, we estimate we are the third-largest automotive safety glass manufacturing and distribution business in North America. We produce the total amount of required float glass used as a raw material for the manufacturing of automotive safety glass internally through Vidrio y Cristal.

Based on the number of molding furnaces the business unit currently operates in Mexico, we believe the Automotive Safety Glass manufacturing and distribution business is also a major manufacturer of safety glass products for the automotive OEM and AGR markets in Mexico. Our Automotive Safety Glass manufacturing and distribution business' customer base includes General Motors, Ford Motor Co., Chrysler, Volkswagen, Nissan and Freightliner.

Our foreign subsidiaries perform a substantial majority of our flat glass operations in the United States and derive 86% of their sales from the distribution and fabrication of construction glass and 14% from the distribution and installation of auto glass. Our foreign subsidiaries in Europe engage in the manufacture and distribution of value-added flat glass products for the Spanish, French and Portuguese construction industries, with specialties in value-added glass products and glass for landmark construction projects. Our foreign subsidiaries also conduct our

117

Colombian flat glass operations and are engaged in the manufacture and distribution of flat glass products for the construction and automotive markets.

Through one of our subsidiaries we process, distribute and install flat glass products for the construction and automotive markets in the United States. We operate in 23 states in the United States through six fabrication centers, 14 distribution centers and 82 installation centers. A portion of the glass we process in the United States is produced by the business unit in Mexico, and the balance is purchased from unaffiliated third parties. In 2009, around 50% of our U.S. subsidiary's glass purchases in terms of volume were supplied from our flat glass Mexican subsidiaries.

During 2008, 2009 and the first half of 2010, we consolidated some of our operations in order to increase efficiencies and reduced three fabrication facilities, ten distribution centers and 20 installation centers. In May 2009, we decided to sell the inventory which was dedicated to serve the automotive replacement market, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in such market.

In Europe, we currently have four processing facilities throughout Spain and one distribution center in Barcelona, Spain, one processing facility in Chaves, Portugal and one in Lisbon, Portugal, and a processing facility in Villetaneuse, France. Verres et Glaces d'Epinay, our French subsidiary, commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

**Our Products**

The following table sets forth our principal products, customers and end-users and sales regions by business line within each of our two business units.

**Glass Containers:**

| Business Line | Products | Customers and End-Users | Sales Regions |
|---|---|---|---|
| Glass Containers | Glass containers | Soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries | Mexico, the United States, Canada, the Caribbean, Central and South America, Europe and Asia |
| Raw Materials | Soda ash, sodium bicarbonate, calcium chloride and salt | Glass manufacturers and detergent producers, pharmaceutical and food producers | Mexico, the United States, Canada, Europe and Central and South America |
| Machinery and Molds | Glass forming machines, castings for glass molds, machinery parts and electronic controls | Flat Glass business unit, Glass Containers business unit, glass manufacturers and other third-party manufacturers | Mexico, the United States and Central and South America |

**Flat Glass:**

| Business Line | Products | Customers and End-Users | Sales Regions |
|---|---|---|---|
| Float Glass | Float glass, architectural tempered safety glass, insulated glass units, laminated, table tops | Construction industry, distributors, retailers and installers, furniture and home appliances manufacturers and Automotive Safety Glass manufacturers | Mexico, the United States, Canada, Europe and Central and South America |
| Automotive Glass | Windshields, side laminated glass, rear and side tempered glass | Automotive OEMs, AGR market, distributors and installers | Mexico, the United States, Canada and Central and South America |

See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Operating Results—Factors Affecting Our Results of Operations" for a breakdown of our consolidated net sales by business unit.

**Our Operations**

*Glass Containers Business Unit*

Our Glass Containers business unit, which accounted for 52% of our consolidated net sales in 2009, manufactures and distributes glass containers for the food, juices, beverage, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its net sales of Ps. 12,452 million ($954 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world.

As of December 31, 2009, our Glass Containers business unit's total assets were Ps. 21,878 million ($1,675 million). The business unit owns nine manufacturing facilities in Mexico, three in Central America and one in Bolivia. In 2009, we believe our Glass Containers business unit's sales represented approximately 76% of the non-captive glass container market in Mexico and approximately 3% of the glass container market in the United States, in each case in terms of units. We define a non-captive market to exclude buyers (such as beverage and beer bottlers) that are supplied with glass containers by their affiliates. In Mexico, the Glass Containers business unit has four design centers, one of which specializes in the cosmetics and pharmaceuticals market.

The Glass Containers business unit has developed both a short-term and long-term strategy as follows.

*Short-Term:*

Given the current economic conditions coupled with the restructuring process the Company is currently undergoing, this business unit plans to:

(a) Preserve cash to guarantee operations through strict expense controls and non-payment of scheduled interest payments to the extent necessary;

(b) Reduce capital expenditures to a minimum level, mostly oriented toward required maintenance activities;

(c) Continue with the initiatives aimed at reducing costs and expenses; and

(d) Constantly communicate with clients and suppliers to maintain continuous operations.

*Long-Term:*

Once our economic conditions have improved and the debt restructuring process is finalized, this business unit will continue to:

(a) Focus on current operations to maximize organic growth and to take advantage of future opportunities;

(b) Consolidate its competitive position by defending share and margins in markets in which it operates;

(c) Use its growing position in niche markets and focus on value-added products to enhance profitability;

(d) Continue the promotion of new product development;

(e) Enhance operating efficiencies; and

119

(f)   Maximize cash flow through growth in sales and margins while optimizing the use of capital expenditures and assets.

Among the business unit's key competitive strengths are its productivity, quality levels, wide variety of glass colors and decorative alternatives, versatile production processes and vertical integration with respect to raw materials, machinery and molds. The business unit's high levels of productivity and quality, as well as its ability to rapidly meet changes in demand, allow it to aggressively compete with other container technologies in Mexico and offer value-added products at attractive prices in the United States and other export markets. The versatility and flexibility of the business unit's production processes are reflected in the business unit's ability to offer customers special glass colors and fast turnarounds on small production runs on a cost-efficient basis, as well as decorating and labeling processes, including ultraviolet organic paints, "plastishield," adhered ceramic labels and heat transfer labels. In addition, we believe that the location of the business unit's facilities is a competitive strength that has helped us implement our business strategy. The business unit's capacity to produce cost efficient short runs with a wide variety of colors, shapes and decorations, its innovative designs and its "one-stop shop" concept, which provides its customers with a complete packaging solution, including glass containers, closures, carriers, labels and boxes, also enable it to compete effectively in value-added markets.

Our Glass Containers business unit manufactures glass containers for both high-volume markets and value-added markets. We refer to markets that demand high volumes of standard products at competitive prices as high-volume markets, and we refer to markets that require shorter production runs of highly designed products that involve premium pricing as value-added markets. The business unit's business strategy has emphasized the introduction of products into value-added markets in addition to retaining our market share in the Mexican high-volume markets. The specialty nature of the products sold in value-added markets allows the business unit to have a better price mix, resulting in higher margins.

One of our Glass Containers business unit's competitive advantages is its time to market on the product development cycle for glass containers where we have a response time of three weeks for a prototype, which we believe is shorter than the response time of some of the other world-class producers of glass containers. Similarly, the business unit's technological expertise permits the introduction of new products with innovative customized images in order to meet the design requirements of its customers.

For the production of glass bottles, the Glass Containers business unit utilizes its own technology, some of which has been patented, and technology provided by Owens-Illinois pursuant to a series of technical assistance agreements that began in 1964 and expired in September 1999. We currently have the right to use the technology provided to us by Owens-Illinois under these technical assistance agreements. Our glass container labeling capability includes state-of-the-art technology in organic paints. This process, which is called ultraviolet cure, was developed to further our continuous efforts to grow in high-margin niche markets by providing value-added products. We hold the patent for this type of paint, which is more environmentally friendly than similar products in the market due to its organic nature. We have supplied this type of decoration for several years to customers such as The Coca-Cola Company.

Additionally, we have a contract with Technosoft, which provides software to the design area, and a technical agreement with BDF and Quantum for mold design analysis and manufacturing.

Sales of the Glass Containers business unit in the beer and soft drinks business lines in Mexico are seasonal, with hot weather positively affecting our sales. As a result, second and third quarter sales are typically higher than sales in the first and fourth quarters. Accordingly, the Glass Containers business unit generally builds its inventory of glass containers during the fourth and first quarters in anticipation of seasonal demand.

In Mexico, the business unit has 21 furnaces in six glass container manufacturing facilities, each located near a major customer. We estimate that in 2009 our Glass Containers business unit's manufacturing facilities produced approximately 41% of the glass tonnage melting capacity in Mexico, and that we sold 76% of the glass container units on the Mexican non-captive market in 2009.

In the United States, our Glass Containers business unit's distributor has four design centers, five sales offices and one distribution center, all strategically located to serve its target markets. In 2009, we believe the

business unit's imports into the United States represented approximately 22% of all sales of imported glass containers in the United States, which would make it the largest glass container importer into the United States in terms of sales.

*Mexican Operations*

We believe that the Glass Containers business unit is the largest glass container producer in Mexico based on the business unit's net sales in 2009. In 2009 the Glass Containers business unit's sales to the Mexican market were Ps. 7,952 million ($609 million). The Glass Containers business unit produces glass containers, raw materials, machinery and molds at nine manufacturing facilities located throughout Mexico. The business unit's facilities are located in close proximity to major customers, ensuring heightened responsiveness to customer design and production requirements and optimizing transportation costs. Substantially all of the Glass Containers business unit's facilities in Mexico have obtained the Hazard Analysis and Critical Control Points (HACCP) and ISO 9000:2000 certifications. During 2009, the glass facilities were operating at approximately 71% of their capacity. We also own two cullet-processing plants, which supply us with cullet. In the cullet processing plants, scrap or broken glass is gathered for re-melting and mixed with virgin raw materials in order to obtain cost reductions in the production process without affecting the quality of the products. Although there are currently no mandatory recycling laws in Mexico similar to those in force in the United States or in other countries, we conduct campaigns throughout Mexico to collect glass containers.

The Glass Containers business unit's customers include leading companies such as Grupo Arca, Avon, Bacardí, Skyy Spirits, Campbells, Coty, Diageo, Encore Glass, Estee Lauder, Gerber, Grupo Cuervo, Grupo Pedro Domecq, Grupo Modelo, Herdez McCormick, Jafra, Jeyes, Jumex, Nestle, Pepsi Cola, Pisa, Procter & Gamble, Sauza, Tamazula and The Coca-Cola Company. In Mexico, the Glass Containers business unit relies primarily on its own sales and marketing force, utilizing outside sales representatives to service customers with smaller volume demand. The business unit has implemented an online system for sharing information with customers. From their respective offices, the business unit's customers can access product information, place orders, check inventories, trace shipments and consult account statements. Our "one-stop shop" concept, which provides our customers with a complete packaging solution, including containers, closures, carriers, labels and boxes, enables us to compete effectively in value-added markets. We have selectively implemented this concept within Mexico, the United States and Central America.

*Exports and U.S. Operations*

Total export sales of the Glass Containers business unit, which do not include the sales of our Central and South American operations, amounted to $354 million (nominal U.S. dollars) in 2009. The large majority of the export sales of the business unit are made to the United States, principally through our distribution subsidiary in the United States, which also sources a small amount of the glass containers it sells from third parties. The Glass Containers business unit increased export sales into the United States by offering value-added specialty products, particularly to the cosmetics market and the wine and liquor bottlers in the United States. The business unit also produces special promotional containers for soft drink bottlers in the United States. The exports represented 37% of the Glass Containers business unit's net sales in 2009.

*Central and South American Operations*

Comegua is a Panamanian holding company that operates manufacturing facilities in Guatemala, Costa Rica, and Panama and supplies glass containers to the soft drink, food, beer and wine and liquor markets throughout Central America and the Caribbean. Beginning on December 1, 2008, our 49.7% investment in Comegua is accounted for under the equity method. Comegua's consolidated net sales for the first eleven months of 2008 were Ps. 2,159 million ($156 million). See "Presentation of Financial Information and Other Information."

We also own 100% of the common stock of a company that owns and operates the only glass container manufacturing facility in Bolivia. Its net sales in 2009 were Ps. 136 million ($10 million). This company distributes glass containers for the soft drinks, food, beer and wine and liquor industries throughout Bolivia, southern Peru and Chile.

*Raw Materials, Machinery and Molds*

Our raw materials operations are carried out by one of our subsidiaries. This subsidiary's net sales in 2009 were Ps. 2,009 million ($154 million). Its principal products are soda ash, sodium bicarbonate, calcium chloride and salt for industrial and commercial consumption. Most of its soda ash production, which is used in the manufacture of glass, detergents and tripolyphosphates, is sold to third parties. Our raw materials subsidiary competes in the soda ash sector with the Ansac, a United States exporter of natural soda ash, and maintains a separate sales and marketing force for its products, which are distributed directly to its customers.

Our machinery and molds operations are conducted through one of our subsidiaries which was founded in 1943 to source our needs for molds and machinery for our glass manufacturing operations. It had net sales of Ps. 439 million ($34 million) for the year ended December 31, 2009. It produces state-of-the-art glass-forming machines for our internal use in two facilities, one in Monterrey, Mexico and one in Mexico City. In addition, the subsidiary produces castings of special alloys for glass molds and for different types of machinery and parts for machinery used in the oil industry. It also produces mold equipment for the glass industry and ancillary equipment for the glass, packaging and other industries, as well as electronic controls for machinery operating and process controls for glass-forming machines. Finally, it also manufactures annealing lehrs, which are ovens used to anneal glass, for the float and hollow glass industries. The machinery and molds produced are mainly for our own use. The products of Fama, our subsidiary that manufactures capital goods such as glass forming machines and molds, are mainly sold to us. The subsidiary generally competes with major international manufacturers of machinery and equipment for the glass industry.

*Competition*

Based on the business unit's net sales in 2009 of Ps. 12,452 million ($954 million), we believe the Glass Containers business unit is the principal supplier of glass containers in Mexico. The Glass Containers business unit competes with various smaller domestic manufacturers as well as with the glass container operations of the two major Mexican beer producers that produce bottles for their own consumption. The Glass Containers business unit in Mexico also competes with alternative forms of packaging, including metal, plastic, paper and aseptic containers. In the soft drinks industry, the Glass Containers business unit has faced increasing competition from polyethylene therephtalate containers ("PET"), as well as, to a lesser extent, from aluminum cans. In particular, since 1993 the shift of soft drinks and food containers from glass to PET has continued, albeit at a slower rate in recent years. In response to the shift in soft drinks and food containers from glass to PET, we continue to implement measures to offset the effect of PET substitution, including improving operating efficiencies, new product presentations and customer service. In 2009, for the fifth consecutive year, the soft drinks glass market increased versus the previous year, and our overall sales in the Mexican soft drinks market experienced a 0.4% compound annual growth rate from 2004 to 2009.

In Mexico, the business unit competes for customers primarily on the basis of service (focusing on on-time deliveries and design), quality (including the ability to conform to a wide variety of specifications) and scale (including the ability to assure customers of the capacity necessary to support their growth).

The Glass Containers business unit faces greater competition in the United States than in Mexico, mainly from Saint Gobain and Owens-Illinois. However, the business unit has utilized its competitive advantage to supply a variety of higher margin, value-added products, including specialty food, beverage, cosmetics and wine and liquor glass containers, and has increased its production expertise and flexibility, thereby allowing it to realize higher operating margins relative to traditional products. The business unit's ability to offer cost-effective short production runs, quick new product turn-around, an extensive glass color selection, diverse labeling capabilities and unique container designs are all examples of the application of its competitive strengths. The Glass Containers business unit competes primarily on quality, design and price in the United States. In Central America, the Glass Containers business unit competes with a number of smaller regional manufacturers.

**Flat Glass Business Unit**

Flat glass accounted for 47% of our consolidated net sales in 2009. In 2009, the Flat Glass business unit's net sales were Ps. 11,453 million ($877 million) and its export sales were $136 million (nominal U.S. dollars).

During 2009, 16% of the business unit's net sales were derived from export sales and 54% were derived from its foreign subsidiaries.

The business unit's customer base includes several large distributors and installers in the construction industry in Mexico and abroad, several automotive manufacturers such as General Motors, Ford Motor Co., Daimler Chrysler, Volkswagen, Nissan and Freightliner, and distributors and installers in the automotive replacement industry.

As of December 31, 2009, the Flat Glass business unit's total assets were Ps. 15,029 million ($1,151 million). The business unit owns over 250 operating centers, including three float glass furnaces and four automotive safety glass processing facilities in Mexico, six fabrication facilities in the United States, four processing facilities in Spain, one in France and two in Portugal. We believe our float glass capacity represented 57% of the float glass produced in Mexico and 3% of the total installed capacity in the NAFTA region.

The Flat Glass business unit has developed both a short-term and long-term strategy as follows.

*Short-Term:*

Given the current economic conditions coupled with the restructuring process the Company is currently undergoing, this business unit plans to:

(a)  Preserve cash to guarantee operations through strict expense controls and non-payment of scheduled interest payments to the extent necessary;

(b)  Reduce capital expenditures to a minimum level, mostly oriented toward required maintenance activities;

(c)  Continue with the initiatives aimed at reducing costs and expenses; and

(d)  Constantly communicate with clients and suppliers to maintain continuous operations.

*Long-Term:*

Once our economic conditions have improved and the debt restructuring process is finalized, this business unit will continue to:

(a)  Enhance operating efficiencies;

(b)  Improve cash flow and optimize asset use;

(c)  Protect and increase our market share in the Mexican market for construction glass, reducing our reliance on the export market;

(d)  Maintain our leading position and growth trend in the OEM glass business through increasing participation with the Asian car manufacturers;

(e)  Consolidate and grow North American leadership of laminated window products for the OEMs and other value-added products;

(f)  Diversify our client portfolio;

(g)  Increase fabrication of value-added products in the United States and Mexico;

(h)  Increase its European presence through Vitro Cristalglass; and

(i)  Leverage the "Vitro" brand name.

123

For the construction market, we rely on a preferred client network, Vitromart, which consists of 115 of the business unit's largest distributors of flat glass for the construction industry. Additionally, our Flat Glass business unit's strategy has emphasized production-retail integration for the Mexican auto glass replacement market. Two of our subsidiaries form the biggest automotive glass-replacement installation chain in Mexico. They operate 180 installation centers throughout Mexico, of which 64 are owned by these two companies and 116 are franchised. Both companies have agreements with the main insurance companies operating in Mexico in order to provide a complete service to such companies' clients.

*Mexican Operations*

We believe that the Flat Glass business unit is the largest flat glass producer in Mexico based on the business unit's net sales in Mexico in 2009. The business unit maintains six distribution centers throughout Mexico where construction customers or automotive customers can access information about the availability of products on a real-time basis. Approximately 42% of flat glass sales are from the Mexican operations, of which Ps. 3,304 million ($253 million) are sold in Mexico and $115 million (nominal U.S. dollars) are exports. Most of these export sales are made to automotive OEMs in the United States. The principal product that some of our subsidiaries produce and distribute is float glass for the construction industry, principally for commercial and residential uses, as well as raw material for the automotive safety glass producers. Some of our subsidiaries also produce tabletops and coated glass. For the Mexican automotive industry, our subsidiaries produce safety glass products such as windshields, side and back lights, rear quarters and sunroofs.

Vidrio y Cristal operates two float glass furnaces near Monterrey, Mexico and another subsidiary operates one in Mexicali, Mexico. Products at these facilities are manufactured using the float method, which involves pouring molten glass over a molten tin bath. During 2009, these float glass facilities were operating at 92% of their capacity. Additionally, we also have a furnace in Mexico City that has been shut down since 2006; therefore, its potential capacity is not included in our capacity utilization calculation.

Vidrio y Cristal and another subsidiary sell raw glass to builders, glass installers and distributors in the construction segment and a small proportion to the automotive safety glass producers as raw material. The sales force markets its construction products to a large number of distributors and is supported by a technical support department that offers technical advice to construction glass installers. These subsidiaries have designated commercial executives to serve as individualized customer service representatives for the business unit's principal purchasers of construction products.

For the production of automotive safety glass, we operate four processing facilities in Mexico for the automotive OEM market and the AGR market. Sales are made directly to automotive OEMs in Mexico and the United States, while the AGR market is serviced through the business unit's distribution centers throughout Mexico, independent distributors and installers and some of our stores. Our subsidiaries sell automotive safety glass products to automobile manufacturers in Mexico, the United States and other markets; main clients include General Motors, Ford, Chrysler, Volkswagen, Nissan and Freightliner.

Light vehicle production in North America decreased 32% in 2009 compared to 2008 but is expected to increase approximately 35% in 2010 due to an increase in vehicle demand. Our OEM sales are highly correlated to light vehicle production in North America, so any change in the latter could materially affect our sales and operating income.

In order to better serve our customers, we have established account plans for automotive OEMs. OEM account plans consist of staff whose time is exclusively dedicated to major OEMs and who provide specialized assistance in the areas of engineering, service and sales.

The Mexican peso revaluation effect has raised our Mexican peso-denominated sales in dollar terms, and also raised our Mexican peso-denominated expenses. The currency revaluation mostly affects our export sales.

*United States Operations*

The United States operations of the Flat Glass business unit are conducted through one of our subsidiaries, which, based on its consolidated net sales in 2009, is one of the largest distributors of flat glass products in the United States. In 2009, it had consolidated net sales of $337 million, of which 86% were to the construction industry and 14% were to the AGR market.

Our U.S. subsidiary purchases flat glass as raw material from our Mexican subsidiaries and from United States manufacturers and uses it to process tempered, spandrel, insulated, laminated, mirrored and other products. In 2009, our Mexican subsidiaries supplied 50% of all flat glass purchased by our U.S. subsidiary; the other purchases, which our Mexican subsidiaries could not supply, include coated and other proprietary products. The end products are sold directly to distributors as well as to end-buyers through our U.S. subsidiary's own distribution centers and retail shops. Our U.S. subsidiary sells its construction products to builders and glass installers, who use its products in industrial and commercial projects such as skyscrapers and other buildings. It also distributes and sells to furniture manufacturers in the United States a significant number of custom-made glass tabletops produced by the Flat Glass business unit's manufacturing plants in Mexico. Additionally, certain of our Mexican subsidiaries engage in the design, manufacture and installation of custom skylights in the United States and several other countries. In May 2009, we decided to sell the inventory which was dedicated to serve the distribution AGR market, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in the AGR distribution business in the United States, but remain in retail and installation segment.

Our U.S. subsidiary operates six fabrication facilities, 14 distribution centers and 82 installation centers in the United States.

*European Operations*

The Flat Glass business unit competes in the European flat glass construction market through Vitro Cristalglass, Verres et Glaces d'Epinay and Vitro Chaves, mainly with value-added products.

Vitro Cristalglass processes and distributes insulated glass, laminated glass and tempered glass, mainly for the Spanish, French and Portuguese markets. Vitro Cristalglass operates with four insulated glass manufacturing centers and two distribution centers, located in Barcelona and La Coruña. Additionally, Vitro Cristalglass has the biggest semi-finished manufacturing processing center in Spain, located in Ponferrada. Verres et Glaces d'Epinay, which is located in Villetaneuse, France and was acquired by Vitro Cristalglass in April 2008, manufactures insulated glass and serves the commercial and residential market in Northern France. See "—Acquisitions" above. Vitro Chaves manufactures and distributes insulated and laminated glass products in Portugal with their main facility located in Chaves (north of Lisbon) and a distribution center located in Lisbon. In 2009, Vitro Cristalglass and Vitro Chaves had consolidated net sales of Ps. 1,511 million ($116 million). Most of the sales of Vitro Cristalglass are of insulated glass windows, a value-added product, which are distributed to builders by Vitro Cristalglass' own sales force. Vitro Chaves' main products are insulated and laminated glass for the construction industry, which are distributed through its own and Vitro Cristalglass' distribution networks.

*Central and South American Operations*

Through its Colombian subsidiary and, to a lesser extent, through its subsidiaries in Venezuela, Ecuador and Panama, the Flat Glass business unit processes tempered and laminated glass for the automotive replacement, construction and specialty markets in Central and South America. Our Colombian subsidiary has one processing facility which is located in Colombia. In 2009, our Colombian subsidiary and its subsidiaries had consolidated net sales of Ps. 488 million ($36 million). The company is expanding into the OEM automotive glass market in Colombia and other Andean Pact nations as well as into the automotive replacement market in South America. It markets its products through a network of independent distributors to small- and medium-sized builders.

*Competition*

In Mexico, some of our Mexican flat glass subsidiaries face competition in the construction industry mainly from Saint Gobain, Guardian and imports of glass products. Guardian, which since 1999 has competed with our Flat Glass business unit as an importer of raw flat glass products, completed the construction of a float glass furnace in Queretaro in 2004, which is estimated to produce 200,000 tons of float glass per year. The local competition of such subsidiaries compete primarily on price, service and quality. See "Risk Factors—Risk Factors Relating to Our Business—We operate in a highly competitive industry in which we compete with global competitors and vertically integrated customers, have relatively high fixed costs and are faced with sharply decreasing demands."

With respect to automotive safety glass, the business unit's principal competition includes Saint Gobain, PGW, Asahi, Pilkington, Zeledyne and imports of low-volume automotive glass products that are being utilized in new automotive designs produced in Mexico. Saint Gobain operates an automotive glass manufacturing facility located in Cuautla, Mexico.

Our U.S. subsidiary faces competition in the United States from a variety of flat glass manufacturers in the United States, as well as from a large number of medium- and small-sized fabricators and distributors of flat glass products. Such subsidiary competes in the United States primarily on the basis of breadth of geographic distribution capabilities, service (on a full line of products), price and quality.

In Europe, Vitro Cristalglass, as an insulated glass manufacturer, faces competition with regional competitors and integrated competitors like Saint Gobain. In Central and South America, Vitro Colombia's main competitors are Guardian, Pilkington and Saint Gobain.

## Our Raw Materials

*Soda Ash, Sand and Feldspar*

The most important raw materials we utilize are soda ash, silica sand and feldspar. In 2005, we entered into a supply agreement with Unimin Corporation ("Unimin") that has been amended to extend its maturity until June 2013, whereby we have committed to purchase, and certain of Unimin's subsidiaries are committed to sell, our requirements of silica sand and feldspar at predetermined prices subject to adjustments according to a formula which takes into consideration market conditions. In 2009, we entered into a four-year supply agreement with American Natural Soda Ash Corporation ("Ansac"), whereby we have committed to purchase, and Ansac is committed to sell, 100% of our yearly requirements of soda ash at predetermined prices that depend on volume and market conditions. We have the production capacity, through one of our subsidiaries, to supply to a large extent the soda ash required by our glass making operations in Mexico.

To the extent that any of our Mexican subsidiaries require silica sand or soda ash of a different grade than that which we produce or that is produced by Unimin or by Ansac, those subsidiaries may acquire such silica sand or soda ash from various suppliers in the United States. We are not dependent on any single supplier for any of the raw materials utilized in our operations.

*Energy*

We, through certain of our subsidiaries, agreed to purchase, in the aggregate, 90 megawatts of electrical power and 1.3 million tons of steam per year pursuant to a 15-year "take-or-pay" power purchase agreement with Tractebel Energía, S. de R.L. de C.V. This contract took effect in October 2000 and the price at which we are required to purchase electrical power and steam is based on variables such as inflation, the Mexican peso/U.S. dollar exchange rate and the price of natural gas, the future value of which is uncertain.

*Fuel*

We are a large consumer of natural gas with an approximate consumption of 17 million MMBTUs in 2009 from operation of our 21 glass container furnaces and three float glass furnaces in Mexico. Our cost of goods sold is highly correlated to the price of natural gas. In recent years, every U.S. dollar fluctuation per MMBTU has had an

126

annual impact of approximately $18 million on our cost of goods sold based on our average historical consumption of approximately 1.5 million MMBTUs per month.

During the first nine months of 2009, the natural gas price decreased 56% from its closing price on 2008 of $6.07 per MMBTU. As of December 31, 2009, the natural gas price was $4.40 per MMBTU, an annual decrease of 28%. However, during the first six months of 2010, the average natural gas price was $4.54 per MMBTU, showing an increase of 22% from the average price of $3.71 per MMBTU for the same period of 2009.

In the ordinary course of our business, we have historically entered into swaps and other derivative instruments to hedge our exposure to natural gas price increases. The percentage of estimated fuel consumption hedged has varied from 10% to 100%. The percentage of consumption hedged and the hedged prices change constantly according to market conditions based on the Company's needs and to the use of alternative fuels within its production processes. As of December 31, 2009, the Company had hedges for approximately 32% of its estimated consumption at an average price of approximately $6.80 per MMBTU for 2010 and approximately 19% of its estimated consumption at an average price of approximately $7.32 per MMBTU for 2011.

Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in the price of natural gas, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. Therefore, increases in the price of natural gas may cause us to realize significant losses in our results of operations.

The greater the percentage of our natural gas consumption for which we do not have hedges, the more vulnerable we are to realizing significant losses in our results of operations should the price of natural gas increase. Because of our financial condition, we are currently unable to enter into additional hedging transactions to further minimize our exposure to increases in the price of natural gas. However, as a result of our current natural gas hedges, a further decline in natural gas prices, while reducing our operating costs, would increase our financial expenses related to such hedges. For further information, see "Risk Factors—Risk Factors Relating to Our Business—We have experienced rising operating costs in each of our businesses."

## Our Capital Expenditures

Our capital expenditures program is currently focused on new investments in technological upgrades and maintenance of our manufacturing facilities, as well as expansion of our production capacity. Our capital expenditures program also contemplates the purchase and maintenance of environmental protection equipment required to meet applicable environmental laws and regulations, as such may be in effect from time to time. The following table sets forth, for the periods presented, our capital expenditures by business unit.

| | Year ended December 31, | | |
| Business Unit | 2007 | 2008 | 2009 |
| | | (Ps. millions) | |
| Glass Containers | Ps. 2,328 | Ps. 1,538 | Ps. 735 |
| Flat Glass | 324 | 255 | 264 |
| Corporate and other | 43 | 5 | 10 |
| Total | Ps. 2,695 | Ps. 1,798 | Ps. 1,009 |

For 2008 and 2009, these capital expenditures are those effectively paid during the year, so they differ with the capital expenditures realized which are Ps. 1,909 and Ps. 638 million for 2008 and 2009, respectively.

During 2010, we expect to make capital expenditures in the range of Ps. 1,266 million ($100 million) as follows:

- Our Glass Containers business unit expects to make capital expenditures of Ps. 861 million ($68 million), which will be used: to provide maintenance to certain of our furnaces and IS machines; for a palletizing center; and for infrastructure in one of our facilities. The remainder will be applied to new product molds.

- Our Flat Glass business unit expects to make capital expenditures of Ps. 405 million ($32 million), which will be used mainly for maintenance of our facilities.

The capital expenditures are expected to be financed with cash flows generated by our operations and with current cash on hand. Should we be unable to fund the total amount of our capital expenditures with cash flows from operations, we might defer a portion of such expenditures to future periods.

See "Liquidity and Capital Resources—Capital Expenditures" for a discussion of our principal capital expenditures during the last three full fiscal years.

### Our Property, Plant and Equipment

All of our assets and property are located in Mexico, the United States, Central and South America and Europe. On December 31, 2009, the net book value of land and buildings, machinery and equipment and construction in progress was Ps. 15,338 million ($1,175 million), of which Ps. 14,062 million ($1,077 million) represented assets located in Mexico; Ps. 383 million ($29 million) represented assets located in the United States; Ps. 265 million ($20 million) represented assets located in Central and South America; and Ps. 628 million ($48 million) represented assets located in Europe.

Our principal executive offices are located in the Monterrey, Mexico area. We own and operate 34 manufacturing facilities worldwide, of which our float glass furnaces are our largest facilities. Our subsidiary Vitro Cristalglass has granted a lien on one of its facilities.

The following table sets forth, for the periods presented, the average capacity utilization and location of each of our business unit's principal manufacturing facilities.

| Business Unit | | Average Capacity Utilization 2008 | Average Capacity Utilization 2009 | Number of Facilities by City or Country |
|---|---|---|---|---|
| Glass Containers | | 86% | 71% | Monterrey (3) Guadalajara Mexico City (2) Querétaro Toluca (2) Costa Rica Guatemala Panama Bolivia |
| Flat Glass | Float Furnaces[1] | 106%[1] | 92% | Monterrey (4) Mexico City (2) Mexicali United States (6) |
| | Automotive Facilities | 74% | 49 | Colombia Spain (4) Portugal (2) France |

(1) Capacity utilization may sometimes be greater than 100% because pulling capacity is calculated based on a certain number of changes in glass color and thickness, determined by historical averages. Additionally, we also have a furnace in Mexico City that has been shut down since 2006; therefore, its potential capacity is not included in our capacity utilization calculation.

We also maintain over 64 installation centers in Mexico and 14 distribution centers and 82 installation centers in the United States, most of which are leased.

We believe that all our facilities are adequate for our present needs and suitable for their intended purpose and that our manufacturing facilities are generally capable of being utilized at a higher capacity to support increases in demand.

See "—Our Capital Expenditures" above and "Liquidity and Capital Resources—Capital Expenditures" for a discussion of our capital expenditures.

## Environmental Matters

Our Mexican operations are subject to Mexican federal, state and municipal laws and regulations relating to the protection of the environment. The primary federal environmental law is the *Ley General de Equilibrio Ecológico y la Protección al Ambiente* ("LGEEPA" or the General Ecological and Environmental Protection Law) pursuant to which regulations have been promulgated concerning air pollution, noise pollution, environmental impact assessments, environmental audits and hazardous wastes and substances. LGEEPA sets forth the legal framework applicable to the generation and handling of hazardous wastes and substances, the release of contaminants into the air, soil and water, as well as the environmental impact assessment procedure. The *Ley de Aguas Nacionales*, or National Water Law, and regulations thereunder govern the prevention and control of water pollution.

The *Ley General para la Prevención y Gestión Integral de los Residuos*, or General Law for the Prevention and Integrated Management of Waste, regulates the generation, handling, transportation, storage and final disposal of hazardous waste, as well as the import and export of hazardous materials and hazardous wastes. The Mexican federal government has established a public registry where federally regulated emission sources report their air and water emissions, as well as information on the generation, handling, transportation and disposal of hazardous substances.

In addition to the foregoing, *Normas Oficiales Mexicanas* ("Mexican Official Standards"), which are technical standards issued by regulatory authorities pursuant to the *Ley General de Metrología y Normalización*, or General Law of Metrology and Normalization, and other laws that include the aforementioned environmental laws, establish standards relating to air emissions (including air emissions for glass manufacturing operations), waste water discharges, the generation, handling and disposal of hazardous wastes and noise control, among other things.

The Mexican federal authority in charge of overseeing compliance with the federal environmental laws is the *Secretaría del Medio Ambiente y Recursos Naturales*, or Secretary of Environment and Natural Resources, which we refer to as "SEMARNAT." An agency of SEMARNAT, PROFEPA, has the authority to enforce the Mexican federal environmental laws. As part of its enforcement powers, PROFEPA can bring administrative, civil and criminal proceedings against companies and individuals that violate environmental laws, regulations and Mexican Official Standards and has the authority to impose a variety of sanctions. These sanctions may include, among other things, monetary fines, revocation of authorizations, concessions, licenses, permits or registrations, administrative arrests, seizure of contaminating equipment, and in certain cases, temporary or permanent closure of facilities.

Additionally, as part of its inspection authority, PROFEPA is entitled to periodically inspect the facilities of companies the activities of which are regulated by the Mexican environmental legislation and verify compliance therewith. Furthermore, in special situations or certain areas where federal jurisdiction is not applicable or appropriate, the state and municipal authorities can administer and enforce certain environmental regulations of their respective jurisdictions.

In 1998, our subsidiaries initiated a voluntary environmental auditing program implemented by PROFEPA. This program entails PROFEPA-approved auditors conducting environmental audits of the relevant facilities to determine if such facilities comply with applicable Mexican environmental laws. Once an audit is completed, the auditor issues a report of findings and recommendations, which must be delivered to PROFEPA. The audited facility thereafter enters into an agreement with PROFEPA on an action plan to be undertaken, pursuant to which, after being implemented to PROFEPA's satisfaction, the audited entity receives the *Industria Limpia* ("Clean Industry") certificate. The Clean Industry certificate is valid for two years and may be extended at the request of the audited entity, provided that an auditor reaudits and certifies that the relevant facility operates pursuant to the Clean Industry

129

certificate that was previously granted. Obtaining this certificate implies that the audited facility is in compliance with applicable Mexican environmental laws at the time of receipt of the certificate.

A PROFEPA-approved independent auditor has completed environmental audits at all 15 of our facilities in Mexico. All of these facilities have already obtained the Clean Industry certificate.

Our foreign operations are subject to federal, state and local laws relating to the protection of the environment of the country in which such operations are conducted. From time to time, we conduct environmental assessments of our foreign operations, some of which are currently underway, to determine whether we are in compliance with applicable foreign environmental laws. We expect to spend approximately $1 million in capital expenditures over the next two years to comply with these and other environmental regulations as they become effective or are modified. We may, however, incur amounts greater than currently estimated due to changes in law and other factors beyond our control. Although there can be no assurance, we do not believe that continued compliance with Mexican and foreign environmental laws applicable to our operations will have a material adverse effect on our financial position or results of operations.

## DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES

Unless the context otherwise requires, in the sections entitled "Directors," "Senior Management" and "Share Ownership" of this section, the words "we," "us," "our" and "ours" refer to Vitro, S.A.B. de C.V. and not to its consolidated subsidiaries.

**Directors**

Our Board of Directors is responsible for the management of our business. Our by-laws provide that our Board of Directors will consist of the number of directors determined by our shareholders at the annual general ordinary shareholders' meeting, up to a maximum of 21 members, and that each member of our Board of Directors shall be elected at such shareholders' meeting for a renewable term of one year. Each director shall serve until his or her successor is duly elected and takes office. At our general ordinary shareholders' meeting held on April 29, 2010, our shareholders resolved that our Board of Directors would consist of 13 directors. We have no alternate directors.

A list of our current directors, their principal occupations and directorships, the year they first became a director and the year of their birth are set forth below.

| Name | Principal Occupation | First Became a Director | Year of Birth |
|---|---|---|---|
| Adrián Sada González | Chairman of the Board of Directors of Vitro, S.A.B. de C.V. | 1984 | 1944 |
| Hugo A. Lara García | Chief Executive Officer of Vitro S.A.B. de C.V. | 2009 | 1965 |
| Tomás González Sada | Chairman of the Board, President and Chief Executive Officer of Cydsa, S.A.B. de C.V. | 1980 | 1943 |
| Andrés Yarte Cantú | Chairman of the Boards of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V. and K Inver, S.A. de C.V. S.A. | 1991 | 1941 |
| Federico Sada Melo | International Commercial Manager of the Vitro Flat Glass Business Unit | 2009 | 1979 |
| Jaime Serra Puche* | President of SAI — Consultores, S.C. | 1998 | 1951 |
| Joaquín Vargas Guajardo* | Chairman of the Board of Directors of Grupo MVS Comunicaciones, S.A. de C.V. | 2000 | 1954 |
| Jaime Rico Garza | President and Chief Executive Officer of Vitro Europa, Ltd. | 2008 | 1957 |
| Manuel Güemez de la Vega* | Chairman of the Board of Regio Empresas, S.A. de C.V. and Grupo PREZ | 2006 | 1942 |
| Ricardo Martín Bringas* | Chief Executive Officer and Vice-Chairman of Organización Soriana, S.A.B. de C.V. | 2007 | 1960 |
| Mario Martín Laborín Gómez* | Chief Executive Officer of ABC Holding | 2010 | 1952 |
| Guillermo Ortiz Martínez* | President of Guillermo Ortiz y Asociados, S.C. | 2010 | 1948 |
| Adrián G. Sada Cueva | Vice President of Administration and Finance of Vitro Glass Containers Business Unit | 2010 | 1975 |

---

\* Independent non-management directors.

Mexican securities law requires that at least 25% of the members of the Board of Directors be independent. Vitro's Board of Directors is comprised of approximately 38% independent directors as of April 29, 2010. The directors receive directors' fees of two *Centenarios*, which are 37.5-gram gold coins, or its equivalent monetary value, per each meeting of our Board of Directors they attend and two *Centenarios*, or its equivalent monetary value, per each meeting of a committee of our Board of Directors they attend, except for the members of the Audit Committee who receive three *Centenarios*, or its equivalent monetary value, per each meeting of such committee they attend plus a monthly fee of Ps. 20,000.

The following are brief descriptions of the current occupations and biographical information of each of our directors:

### *Adrián Sada González, Chairman of the Board of Directors of Vitro:*

Mr. Sada is a member of the Boards of Directors of Alfa, S.A.B. de C.V., Gruma, S.A.B. de C.V., Cydsa, S.A.B. de C.V., Regio Empresas, S.A. de C.V., the Latin American Executive Board for the Wharton School of Finance, the Mexican Businessmen Council and the Consejo de Industriales de Nuevo León. Mr. Sada is also President of our Finance and Planning Committee.

### *Hugo A. Lara García, Chief Executive Officer of Vitro:*

In 1987, Mr. Lara joined Christianson Group, where he held several positions such as National Sales Manager, Account Manager, Research and Development Quality Assurance. In 1992, he joined Ceras Johnson, S.A. de C.V., where he held several positions such as Account Manager, Business Development Manager of Latin America and Group Manager. In 1999, Mr. Lara was appointed as Sales Manager and General Manager at Parmalat de México, S.A. de C.V. Mr. Lara joined us in 2004 as Glass Containers business unit's Commercial Vice President and Vidrio y Cristal's Vice President; in 2006 was appointed President of the Flat Glass business unit; and in November 2008 he was appointed Chief Executive Officer.

### *Federico Sada Melo, International Commercial Manager of Flat Glass Business Unit:*

Mr. Sada is member of the Boards of Directors of Chipinque Ecological Park, Pronatura, Pro-Nature Conservation Association. Mr. Sada is also Board member of Instituto de Empresa Alumni.

### *Tomás González Sada, Chairman of the Board, President and Chief Executive Officer of Cydsa, S.A.B. de C.V.:*

Mr. González is the Vice-President of the Mexican Institute of Competitiveness, the Treasurer of the Fundación Martínez Sada, a member of the Boards of Directors of Regio Empresas, S.A. de C.V. and of the Mexican Businessmen Council, member of the Board of Trustees of the Universidad Regiomontana and Honorary Consul-General of Japan in Monterrey, Mexico.

### *Andrés Yarte Cantú, Chairman of the Boards of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V., and K-Inver, S.A. de C.V.:*

Mr. Yarte is Chairman of the Boards of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V., and K-Inver, S.A. de C.V.

### *Jaime Serra Puche, President, SAI-Consultores, S.C.:*

Mr. Serra is President of SAI-Consultores, S.C.; founder of Aklara (Electronic auctions), Centro de Arbitraje de Mexico (CAM), and Mexico NAFTA Fund (Private Capital Fund); Member of the Boards of Chiquita Brands International, Fondo México, Tenaris and Grupo Modelo; Mexico's Secretary of Finance and Public Credit (1994), Secretary of Trade and Industry (1988-1994), and Undersecretary of Revenue in the Ministry of Finance (1986-1988); Member of Trustees of the Yale University (1994-2001); Co-chair of the President's Council on International Activities of Yale University; and Member of the Trilateral Commission and the US-Mexico Bilateral Council.

### *Joaquín Vargas Guajardo, Chairman of the Board of Directors of Grupo MVS Comunicaciones, S.A. de C.V.:*

Mr. Vargas is a member of the Boards of Bolsa Mexicana de Valores; Grupo Costamex, S.A. de C.V.; Grupo Financiero Santander; Grupo Posadas; and Médica Sur; and is a member of the Mexican Businessman Council. Mr. Vargas is also President of our Audit Committee.

### *Jaime Rico, President and Chief Executive Officer of Vitro Europa, Ltd.:*

Mr. Rico has been Chairman of the Board of IP Vidrio y Cristal, Ltd. and Vitro Global, Ltd. and member of the Board of Directors of Vitro Cristalglass, S.L. Mr. Rico is the President and CEO of Vitro Europa, Ltd.

*Manuel Güemez de la Vega, Chairman of the Board of Regio Empresas and Grupo PREZ:*

Mr. Güemez is Chairman of the Boards of Regio Empresas, S.A. de C.V. and Grupo PREZ and member of the Advisory Committee of Grupo de Seguridad Integral and alternate director of Gruma. Mr. Güemez is also President of our Corporate Practices Committee.

*Ricardo Martín Bringas, Chief Executive Officer and Vice-Chairman of Organización Soriana, S.A.B. de C.V.:*

Mr. Martín has held executive positions in the management and finance departments of several companies, such as Organización Soriana, S.A.B. de C.V., La Ciudad de París and Restaurantes Martin's. Mr. Martín is currently the Chief Executive Officer and Vice-Chairman of Organización Soriana and member of the Boards of Directors of HSBC México, S.A. de C.V., Grupo Financiero Banamex, S.A. de C.V., Grupo Financiero Banorte, S.A. de C.V., Banco Mercantil del Norte, S.A. de C.V., Asociación Nacional de Tiendas de Autoservicio y Departamentales (ANTAD), Instituto Tecnológico y de Estudios Superiores de Monterrey, Consejo Mexicano de Hombres de Negocios, Grupo de Empresarios de Nuevo León and Teléfonos de México, S.A.B. de C.V.

*Mario Martín Laborín Gómez, Chief Executive Officer of ABC Holding:*

Mr. Laborín has been Corporate and Treasury Director of Grupo Visa (FEMSA); Co-Founder and CEO of Grupo Vector; CEO of BBVA Bancomer and Chairman of its brokerage firm; CEO of Nacional Financiera S.N.C.; and CEO of Banco Nacional de Comercio Exterior (Bancomext). Mr. Laborín is currently CEO of ABC Holdings and member of the Boards of TV Azteca, Cervecería Cuauhtémoc, Transportación Marítima Mexicana, Bancomer, Bolsa Mexicana de Valores, Mexder, Indeval, Xignux, Megacable, Cydsa and Gruma.

*Guillermo Ortiz Martínez, President of Guillermo Ortiz y Asociados, S.C.:*

Mr. Ortiz was Governor of the Bank of Mexico from December 1994 to December 2009. Mr. Ortiz served as Secretary of Finance and Public Credit in the Mexican Federal Government from 1988 to 1994; Executive Director at the International Monetary Fund (1984-1988); and Manager as well as Deputy Manager in the Economic Research Department of the Bank of Mexico (1977-1984).

*Adrián G. Sada Cueva, Vice President of Administration and Finance of Glass Containers business:*

Mr. Sada is a member of the Board of Coparmex Nuevo León, Consejo Ejecutivo de la Universidad de Monterrey, Empresas Comegua, S.A., Pronatura Noreste, Organización de Vida Silvestre, A.C. and Club Deportivo Cazadores Monterrey, A.C. He has served as President of Vitro Automotriz, S.A. de C.V. (2006-2008) and President of Vitro Cristalglass, S.L. (2003-2005).

**Secretary and Surveillance**

On April 29, 2010, our shareholders at the General Ordinary Shareholders' Meeting reelected our Executive Vice President and General Counsel Alejandro Sánchez Mújica as the Secretary of our Board of Directors. According to the *Ley del Mercado de Valores*, or Mexican Securities Market Law, our Secretary is not a member of the Board of Directors.

The Board of Directors, through the Audit and Corporate Practices Committees as well as the external auditor, conducts surveillance of Vitro and of the subsidiaries controlled by Vitro, taking into consideration the financial, administrative and legal circumstances of each entity.

**Senior Management**

The following table sets forth certain information with respect to our senior managers. There are no arrangements or understandings with major shareholders, customers, suppliers or others pursuant to which any of them was selected as a member of the senior management.

| Name | Title | Current Position Held Since | Year of Birth |
|---|---|---|---|
| Hugo A. Lara García | Chief Executive Officer | 2008 | 1965 |
| Alejandro Sánchez Mújica | Executive Vice President and General Counsel | 2005 | 1954 |
| Claudio Del Valle Cabello | Chief Financial and Administrative Officer and Chief Restructuring Officer | 2003 | 1960 |
| Alfonso Gómez Palacio | President of the Glass Containers Business Unit | 2009 | 1942 |
| David González Morales | President of the Flat Glass Business Unit | 2009 | 1955 |

The following are brief biographies of each of our senior managers:

### Hugo Lara García, Chief Executive Officer:

Mr. Lara received a Bachelor in Chemical Engineering at La Salle University in Mexico City. Later, Mr. Lara received a Master in Business Administration, an International Business Diploma and a Master in International Business at the ITESM, Campus Estado de México. In 1987, Mr. Lara joined Christianson Group, where he held several positions such as National Sales Manager, Account Manager, Research and Development Quality Assurance. In 1992, he joined Ceras Johnson, S.A. de C.V., where he held several positions such as Account Manager, Business Development Manager of Latin America and Group Manager. In 1999, Mr. Lara was appointed as Sales Manager and General Manager at Parmalat de México, S.A. de C.V. Mr. Lara joined us in 2004 as Glass Containers business unit's Commercial Vice President and Vidrio y Cristal's Vice President; in 2006 was appointed President of the Flat Glass business unit; and in November 2008 was appointed Chief Executive Officer.

### Alejandro Sánchez Mújica, Executive Vice President and General Counsel:

Mr. Sánchez Mújica earned a law degree from the Escuela Libre de Derecho in Mexico City, where he graduated in 1978. In addition, he earned a Master of Comparative Jurisprudence degree from The University of Texas at Austin, School of Law in 1979 and a Master of Arts (Economics and Administration) also from the University of Texas at Austin in 1980. In 1983, he joined the Secretaría de Programación y Presupuesto, as advisor to the Undersecretary of Regional Development. In 1983, Mr. Sánchez Mújica also joined the Instituto para el Depósito de Valores ("INDEVAL") as Legal Manager. In 1985 he joined DESC, Sociedad de Fomento Industrial (currently known as Grupo KUO, S.A.B. de C.V.), as Legal Manager of Industrias Negromex, S.A. de C.V. and later of Novum, S.A. de C.V., afterward becoming Executive Legal Director. In 1992, he became the Corporate Legal Director of Pulsar Internacional, S.A. de C.V. In 2003 he joined the law firm of Thompson & Knight, where he was made Senior Partner. In 2005, Mr. Sánchez Mújica joined us as our Executive Vice President and General Counsel.

Mr. Sánchez Mújica is member of several Mexican and foreign corporations, such as of the Advisory Board Member of the University of Texas Lady Bird Johnson Wildflower Center and of the Fundación Pro Museo Nacional de Historia, is Secretary of the board of Trustees of Chipinque Ecological Park and is a member of the board of Cámara de la Industria de Transformación de Nuevo León (CAINTRA).

### Claudio Del Valle Cabello, Chief Financial and Administrative Officer and Chief Restructuring Officer:

Mr. Del Valle earned a Bachelor in Public Accounting at the Universidad Regiomontana in Monterrey, Mexico. In 1978, Mr. Del Valle began working for Gómez Morfín Meljem and Asoc. (now Galaz, Yamazaki, Ruiz Urquiza S.C., Member of Deloitte Touche Tohmatsu) as a Junior Auditor and later became Senior Supervisor. In 1985, Mr. Del Valle joined us as Chief of Special Studies for our former raw materials business. In 1986, he became our Tax Consolidation Manager. In 1992, Mr. Del Valle was appointed Vice President for Administration of Vitro Corporativo, S.A. de C.V. and in 1995 was appointed Vice President of Finance and Controller of Anchor Glass Container Corp. In 1996, Mr. Del Valle was appointed our Vice President of Treasury and Administration. In 2002, Mr. Del Valle was appointed our Chief Financial Officer and, in August 2003, he was named our Chief Administrative Officer. In November 2008, the Finance and Administrative areas were merged and put under

134

charge of Mr. Del Valle who, to focus the efforts necessary to carry out the financial restructuring process required by the Company, since April 2009, was also designated Chief Restructuring Officer, on a temporary basis.

Mr. Del Valle is a member of the Accounting Institute of the State of Nuevo León, Mexico. Also, in 2001 Mr. Del Valle was appointed Vice President of the Tax Committee of the Mexican Stock Exchange. Mr. Del Valle was the President of the Issuers' Committee of the Mexican Stock Exchange and as of today acts as Vice President Tax of the Issuers' Committee of the Mexican Stock Exchange and is currently a member of the Board of Directors of Universidad Regiomontana and Gas Industrial de Monterrey.

### Alfonso Gómez Palacio, President of the Glass Containers Business Unit:

Mr. Gómez Palacio received a Bachelor and Master in Business Administration at the University of California at Berkeley. Later, Mr. Gómez Palacio received a degree in Advanced Studies in Business Administration and Commerce at the University of Bordeaux in France. He was appointed Commercial Vice President of the Glass Containers business unit in 1985 and Executive Vice President of the same business unit in 1992. Mr. Gómez Palacio was appointed Vice President of Marketing and Sales of the Glass Containers business unit in October 2002 and, in May 2003, he was appointed President of the Glass Containers business unit.

On October 2006, Mr. Gómez Palacio announced his plan to retire on June 30, 2007. Mr. Gómez Palacio came back from his retirement to lead our Glass Containers business unit during the Company's restructuring process from June 2009.

### David González Morales, President of the Flat Glass Business Unit:

Mr. González received a Bachelor degree in Economics at the Universidad de Monterrey. Later, Mr. González received a Master degree in Science at the University of Missouri. In 1976 Mr. González joined Grupo Alfa, S.A.B. de C.V., as an Economics Analyst. Mr. González joined us in 1980 as Chief of Industrial Economics for our Glass Containers business unit and then held different managerial positions such as Price Manager, Administration Manager, North Zone Sales Manager, Strategic and Economics Planning Manager, and Business Development Manager. In 1994, he was appointed Vice President of Development Administration for our former Diverse Industries business and in 1999 was appointed as Vice President of Enbosa, S.A. de C.V. In 2002, he was appointed as International Vice President for our Glass Containers business unit. In 2003, Mr. González was appointed as Vice President of our Value Added Business and then in 2004 as President of Vitro Cristalglass, both of which are part of our Flat Glass business unit. In 2006, he was appointed Co-President of Glass Containers business unit and, in 2007, subsequent to Mr. Alfonso Gómez Palacios's retirement, he was appointed President of the Glass Containers business unit. On June 26, 2009, Mr. González was appointed as Flat Glass President.

### Family Relationship of Directors and Senior Management

Six of our 17 directors and senior managers are related by blood (including first cousins) or marriage to another member of this same group. Mr. Adrián Sada González is father of Mr. Adrián Sada Cueva, a cousin of Mr. Tomás González Sada and a uncle of Mr. Federico Sada Melo. Mr. Andrés Yarte Cantú is Mr. Adrián Sada González brother-in-law, as well as a cousin by marriage of Mr. Tomás González Sada and uncle-in-law of Mr. Federico Sada Melo and Mr. Adrián Sada Cueva. Mr. Jaime Rico Garza is a nephew-in-law of Mr. Adrián Sada González.

### Use of Certain Assets and Services

Certain of our directors and senior managers received personal services performed by certain of our personnel, mainly security services in México, a number of whom are exclusively dedicated to performing such services. The receipt of such services was done in accordance with our *Política de Uso Especial de Servicios Corporativos y de Seguridad*, our corporate and security services policy, approved by our Board of Directors with the prior favorable opinions of the Audit Committee and of the Corporate Practices Committee. The aggregate amount of compensation set forth below includes the cost of granting the use of assets and providing such services.

**Compensation**

For the year ended December 31, 2009, the aggregate compensation we paid to our directors and senior managers was approximately Ps. 229 million ($17.5 million). This amount includes directors' fees, salaries, the use of certain assets and services, as described above, and variable compensation.

During 2009, we accrued amounts relating to pension and retirement benefits for our senior managers. Our independent directors were not entitled to pension or retirement benefits from us during 2009. In accordance with actuarial practices in Mexico, reserves for seniority premiums and pensions are determined in the aggregate for each one of our subsidiaries using average amounts for variables such as turnover, age and life expectancy. We therefore cannot determine the amount reserved for pension or retirement benefits for any individual employee, including our senior managers. The aggregate amount of compensation set forth in the previous paragraph does not include the cost of pension and retirement benefits for our senior managers. See "—Pension Benefits" below.

*Directors' Compensation*

Pursuant to the Mexican General Law of Corporations, our shareholders, at our annual general ordinary shareholders' meeting held on April 29, 2010, agreed to compensate our directors with two Centenarios, or its equivalent monetary value, per each meeting of the Board of Directors they attend. Likewise, at such annual general ordinary shareholders' meeting, the shareholders resolved that the members of each of our Board of Director's committees, other than the Audit Committee's members, shall receive two Centenarios, or its equivalent monetary value, per each committee meeting they attend. In consideration of the Audit Committee's members' expanded responsibilities they receive three Centenarios, or its equivalent monetary value, per each meeting they attend plus a monthly fee of Ps. 20,000. The aggregate amount of compensation set forth in "—Compensation" includes fees paid to our directors.

*Variable Compensation*

In 2005, we modified our variable compensation plan established in 2001 in order to standardize and integrate our foreign subsidiaries to this scheme. This plan aligns the objectives of our employees with our business strategy and its purpose is to: (i) recognize the extraordinary performance of our employees, (ii) align the interests and incentives of our employees with those of the Company, (iii) focus on key priorities and (iv) attract and retain talented employees. This plan is based on the improvement of (i) cash flow from operations, (ii) compliance with the capital expenditures budget and (iii) individual performance. Depending on the results of such metrics, our employees are eligible to receive a bonus equal to an amount ranging between 1.2 and 6.0 times their monthly base salary. For the year ended December 31, 2009, we paid Ps. 82.6 million ($6.3 million) under our variable compensation plan mentioned above.

In 2006, we created a long-term incentive plan for certain key executives. This plan aligns the objectives of our key executives with our business strategy and its purpose is to: (i) achieve financial value for the medium and long term, (ii) achieve a sustainable yield, (iii) focus on Vitro's results, (iv) complement our executive's compensation and (v) attract and retain talented employees. This plan is based on the improvement of economic value added of the Company (an internal performance measure). For the year ended December 31, 2009, we did not pay any amount under our long-term variable compensation plan.

*Employee Stock Option Plan*

We maintain an Employee Stock Option Plan established in March 1998 (the "Plan"). The Plan specifies the amount of shares, time and initial exercise price, which is equal to the average closing price on the BMV of the common shares on the 20 days prior to the grant date, except for options issued during 2000, 2001 and 2002, which were Ps. 11.00, Ps. 8.27 and Ps. 7.53, respectively. The vesting period of the options is 5 years and the life of such options is 10 years.

We have not granted any stock options since 2002.

The following table sets forth, for each of the periods presented, the number of options granted during such period and certain information, as of December 31, 2009.

136

| | For the year ended December 31, | | | | | | Total outstanding |
|---|---|---|---|---|---|---|---|
| | **1998** | **1999** | **2000\*\*** | **2001** | **1998\*** | **2002** | |
| Options granted | 2,813,300 | 2,893,000 | 4,851,900 | 3,204,800 | 940,950 | 3,941,950 | |
| Options cancelled, expired or exercised at December 31, 2009 | 2,813,300 | 2,893,000 | 3,986,950 | 2,827,950 | 478,050 | 3,208,150 | |
| Options outstanding December 31, 2009 | | | 864,950 | 376,850 | 462,900 | 733,800 | 2,438,500 |
| Exercise Price | | | Ps. 11.00 | Ps. 8.27 | Ps.13.00 | Ps. 7.53 | |

---

\*      During the year ended in 2001, we modified the price of 940,950 options granted in 1998 and their maturity date to 2011.

\*\*      The options granted in 2000 expired on March 2010.

Compensation cost charged against income for the Plan was Ps. 1 million, for each of 2007, 2008 and 2009, respectively. The aggregate amount of compensation set forth in "—Compensation" includes fees paid to our directors and does not include the cost of the grant of options under the Plan.

### Pension Benefits

Our pension benefit obligations and the related costs are calculated using actuarial models and assumptions applicable in the countries where the plans are located, principally in the United States and Mexico. Two critical assumptions, discount rate and expected return on assets, are important elements of plan expense and/or liability measurement. We evaluate these critical assumptions at least annually. Other assumptions involve demographic factors such as retirement, mortality and turnover rates, as well as the rate of increases in compensation. These assumptions are evaluated periodically and are updated to reflect our experience. Actual results in any given year will often differ from actuarial assumptions because of economic and other factors. The discount rate enables us to state expected future cash flows at a present value on the measurement date. We have little latitude in selecting this rate since it is determined jointly between us and the pension plan's actuary and is required to represent the market rate for high-quality fixed income investments. A lower discount rate increases the present value of benefit obligations and increases pension expense. To determine the expected long-term rate of return on pension plan assets, we consider the current and expected asset allocations, as well as historical and expected returns on various categories of plan assets. With respect to the pension plans in the United States, as of December 31, 2009, the assets set aside to satisfy the estimated obligations under such pension plans were sufficient to meet the estimated obligations as they come due. With respect to the pension plans in Mexico, as of December 31, 2009, the assets set aside to satisfy the estimated obligations under such pension plans were Ps. 1,140 million while the related estimated obligations were Ps. 3,052 million. Our aggregate pension expense in 2009 was approximately Ps. 445 million.

As of December 31, 2009, the assets of our pension plans include 53,341,849 Vitro shares. See "Major Shareholders" and "Related Party Transactions."

### Severance Benefits

All of our senior managers, executives who are members of the Board of Directors and children of senior managers working for Vitro, are entitled to a severance payment net of taxes equal to up to three times of their gross annual base salary, if they cease to be employed by us in connection with a change of control of Vitro, S.A.B. de C.V. This severance benefit is in addition to any severance payment due to such persons under Mexican law.

## Employees

As of December 31, 2009, we employed 16,807 personnel, approximately 81% of whom were located in Mexico.

The following table sets forth, for the periods indicated, the period end and average number of employees of each of our two operating business units and our corporate offices.

| Business Unit | 2007 Period End | 2007 Average | 2008 Period End | 2008 Average | 2009 Period End | 2009 Average |
|---|---|---|---|---|---|---|
| Glass Containers | 13,967 | 13,717 | 10,044 | 13,575 | 8,445 | 8,881 |
| Flat Glass | 9,488 | 8,965 | 8,785 | 9,284 | 7,667 | 7,766 |
| Corporate Offices | 987 | 815 | 556 | 624 | 695 | 745 |
| Total | 24,442 | 23,497 | 19,385 | 23,483 | 16,807 | 17,392 |

The following table sets forth, for the periods indicated, our employees by geographic location.

| Business Unit | 2007 Period End | 2007 Average | 2008 Period End | 2008 Average | 2009 Period End | 2009 Average |
|---|---|---|---|---|---|---|
| Mexico | 18,070 | 17,063 | 15,406 | 17,486 | 13,602 | 13,875 |
| United States | 2,632 | 2,676 | 2,436 | 2,530 | 1,878 | 2,115 |
| Rest of the world | 3,740 | 3,758 | 1,543 | 3,468 | 1,327 | 1,402 |
| Total | 24,442 | 23,497 | 19,385 | 23,484 | 16,807 | 17,392 |

## Relation with Labor Unions

In Mexico, all of our workers (others than our *empleados de confianza*) are currently affiliated with labor unions. Labor relations in each manufacturing facility in Mexico are governed by separate collective bargaining agreements which were entered into between the relevant subsidiary and a union selected by the employees of the relevant facility. The terms of the collective bargaining agreements are renegotiated every two years, except for wages, which are negotiated every year. For over 60 years, we have not experienced any strikes that materially affected our overall operations in Mexico and management believes that it has a good relationship with its employees and the labor unions to which they are affiliated.

In the United States, a majority of our workers are currently affiliated with labor unions. Management believes that it has a good relationship with its employees in the United States and the labor unions to which they are affiliated.

## Share Ownership

The following table sets forth information regarding the beneficial ownership of our shares by each of our directors and senior managers as of October 14, 2010, the date of our most recent general ordinary shareholders' meeting. The voting power exercisable by our directors and senior managers may be greater than the percentage of our shares held by them. See "Major Shareholders" and "Related Party Transactions."

| Name | Number of Shares Owned | Percentage of Shares Outstanding[3] | Granted Options[4] | Outstanding Options[4][5] | Exercise Price on Grant Date | Adjusted Exercise Price | Expiration Time |
|---|---|---|---|---|---|---|---|
| Adrián Sada González | 29,545,712[1][6] | 7.65% | 90,400 | 90,400 | 13.00 | N/A | March 2011 |
| | | | 550,000 | 137,500 | 8.27 | N/A | March 2011 |
| | | | 550,000 | 275,000 | 7.53 | N/A | March 2012 |
| Hugo A. Lara García | * | * | — | — | — | — | — |
| Tomás González Sada | * | * | — | — | — | — | — |
| Andrés Yarte Cantú | * | * | — | — | — | — | — |
| Federico Sada Melo | 29,212,591[2] | 7.56% | — | — | — | — | — |
| Jaime Serra Puche | * | * | — | — | — | — | — |
| Joaquín Vargas Guajardo | * | * | — | — | — | — | — |
| Jaime Rico Garza | * | * | — | — | — | — | — |

| Name | Number of Shares Owned | Percentage of Shares Outstanding[3] | Granted Options[4] | Outstanding Options[4][5] | Exercise Price on Grant Date | Adjusted Exercise Price | Expiration Time |
|---|---|---|---|---|---|---|---|
| Manuel Güemez de la Vega | * | * | — | — | — | — | — |
| Ricardo Martín Bringas | * | * | — | — | — | — | — |
| Alejandro Sánchez Mújica | * | * | — | — | — | — | — |
| Claudio Del Valle Cabello | *[6] | * | 15,100 | 15,100 | 13.00 | N/A | March 2011 |
| | | | 59,000 | 14,750 | 8.27 | N/A | March 2011 |
| | | | 60,500 | 30,250 | 7.53 | N/A | March 2012 |
| David González Morales | * | * | — | — | — | — | — |

---

\*      Beneficially owns less than one percent of our shares.

(1)      Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son, Mr. Adrián Sada Cueva. Entered into the following agreements: (a) a Shareholders Agreement with Ms. Alejandra Sada González which was effective as of December 11, 2009 (the "2009 Shareholders Agreement"), the main provisions of which set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares; and (b) a Shareholders Agreement with Mr. Alfredo Harp Helú and Ms. Alejandra Sada González which was effective as of April 28, 2010 (the "2010 Shareholders Agreement"), the main provisions of which set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(2)      Reported as a group with his parents, Mr. Federico Sada González and Mrs. Liliana Melo de Sada, his brother, Mr. Mauricio Sada Melo, and his sister, Ms. Liliana Sada Melo.

(3)      For purposes of calculating percentage of shares outstanding, we use the number of our shares outstanding that was 386,411,643 shares, which is the number equal to our 386,857,143 issued shares minus the shares held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute. See "Major Shareholders—Shares Subject to Dispute."

(4)      The options listed below are options to purchase our shares.

(5)      All the options are exercisable.

(6)      In addition to the shares set forth below, Messrs. Adrián Sada González and Claudio Del Valle Cabello may be deemed to be beneficial owners of the 39,777,907 shares held by our Stock Option Trust, as they are members of the Technical Committee of the Stock Option Trust and share the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.

     See "—Compensation—Employee Stock Option Plan" for a discussion of the only arrangement providing our employees with equity-based compensation.

# MAJOR SHAREHOLDERS

As of October 14, 2010, the date of our most recent general ordinary shareholders' meeting, 386,857,143 of our shares were issued of which 386,411,643 of our shares were issued and outstanding. As of such date, 445,500 of our shares were held as treasury stock, 39,777,907 of our shares were held by the Stock Option Trust, and 59,484,349 of our shares were held by the Pension Plan Trust. Under Mexican corporate law, shares held as treasury stock are not considered outstanding. Under Mexican corporate law, our shares held by the Stock Option Trust are considered issued and outstanding and therefore are entitled to receive dividends and vote on matters on which other of our shares are entitled to vote. However, for accounting purposes, the shares held by the Stock Option Trust are considered treasury stock and therefore not outstanding. Under Mexican corporate law, the shares held by the Pension Plan Trust are considered issued and outstanding for all purposes. Accordingly, all information relating to Major Shareholders and the voting rights relating to our common stock, includes all shares held by the Stock Option Trust and the Pension Plan Trust.

We had one class of ADSs, registered under the Securities Act, which were terminated and delisted on August 24, 2009. Our ADSs were evidenced by ADRs, and each of our ADSs represented three CPOs. Each CPO represents one of our shares. Our CPOs have no voting rights with respect to the underlying shares, but have all the economic rights relating to those shares. The trustee that holds our shares represented by CPOs is required to vote those shares in the same manner as the majority of our shares not so held that are voted in the relevant shareholders' meeting. This has the effect of increasing the voting power of holders of our shares (other than the trustee) in excess of the percentage of our shares held by such holders. Therefore, the voting power exercisable by our major shareholders may be greater than the percentage of our shares outstanding held by them. As of October 14, 2010, 31 million of our shares were represented by CPOs. For further information regarding the CPOs, see "Description of the CPOs."

The following table sets forth our major shareholders and their shareholdings as of October 14, 2010.

| Name | Shares Outstanding[1] | % of Shares Outstanding[2] |
|---|---|---|
| Pension Plan Trust | 59,484,349 | 15.39 |
| Stock Option Trust | 39,777,907 | 10.29 |
| Mr. Alfredo Harp Helú[7][8] | 38,171,281 | 9.88 |
| Mr. Adrián Sada González[3] [4] [6] [7] | 29,545,712 | 7.65 |
| Mr. Federico Sada González[3] [5] | 29,212,591 | 7.56 |
| Ms. Alejandra Sada González[3] [6] [7] | 26,058,188 | 6.74 |

---

(1) All of the shares that may be issued upon exercise of our outstanding options are held by our Stock Option Trust, and all of our outstanding options are currently exercisable.

(2) Calculation of percentage of shares outstanding based upon 386,857,143 issued shares minus 445,500 held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute. See "—Shares Subject to Dispute" below.

(3) Mrs. María Nelly Sada de Yarte, her children and her children's spouses collectively hold 17,182,163 of our shares, representing 4.45% of our issued and outstanding shares, which are not included in the table above. Mrs. María Nelly Sada de Yarte is a sister of Mr. Adrián Sada González, Mr. Federico Sada González and Ms. Alejandra Sada González

(4) Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son Mr. Adrián Sada Cueva. In addition to the shares set forth below, Mr. Adrián Sada González may be deemed to be a beneficial owner of the 39,777,907 shares held by our Stock Option Trust, as a member of the Technical Committee of the Stock Option Trust who shares the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.

(5) Reported as a group with his wife, Mrs. Liliana Melo de Sada, his sons Messrs. Federico Sada Melo and Mauricio Sada Melo, and his daughter, Ms. Liliana Sada Melo.

(6) Entered into the 2009 Shareholders Agreement. The main provisions of the 2009 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares.

(7)   Entered into the 2010 Shareholders Agreement. The main provisions of the 2010 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(8)   Board of Directors, as required by Vitro's by-laws, approved the request of Mr. Harp Helú to acquire additional shares of Vitro in excess of 9.9%, up to a maximum of 15% of the Company's equity.

**Shares Subject to Dispute**

On June 23, 2008, we initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A., and Citigroup, Inc., requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by-laws.

According to our by-laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire any Vitro shares. Such by-laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares.

A cautionary measure has been announced to date to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure. There is a pending dispute regarding the implementation of this measure.

Vitro is contesting the irregular purchase of these shares, amounting to 14.9% of its outstanding common stock. In January 2010, a district judge ruled in favor of Banamex and on August 18, 2010, the appellate court denied Vitro its recourse. The Company will file its *amparo*, or constitutional challenge, against the latter in a timely and correct manner, and such constitutional challenge is pending resolution.

141

# RELATED PARTY TRANSACTIONS

On March 20, 2009, with the approval of the Corporate Practices Committee, Vitro's Board of Directors enacted the Related Party Transaction Policy. The purpose of such policy is to establish the requirements that need to be complied with before a transaction can be entered into by and between Vitro and/or any of our affiliates, with any related party. Accordingly, such policy establishes which operations with related parties require shareholder approval, Board of Directors' approval and/or Corporate Practices Committee approval.

## Arrangements with Respect to Real Estate

On certain occasions, until October 2008, we used real estate owned by relatives of certain directors and senior managers to meet with customers, suppliers or for other business purposes. We used to pay an annual fee for the right to use these properties for a specified number of days per year. Additionally, we also used to pay maintenance and operating costs. In 2007 and 2008, the aggregate amounts paid as annual fees were approximately Ps. 10 million, and Ps. 8 million, respectively.

## Goods Sold

We sell flat glass products and glass containers to certain companies whose shareholders are directors and senior managers. In 2007, 2008 and 2009, the aggregate amount of these sales was Ps. 69 million, Ps. 71 million and Ps. 56 million, respectively.

Comegua, an associated company, sells glass containers to Cervecería Centroamericana and to Cervecería de Costa Rica, our partners in such company. In 2007, 2008 and 2009, the aggregate amount of these sales was $9 million, $20 million and $12 million, respectively.

## Sale of Real Estate

In 2007, a member of our Board of Directors purchased an unused parcel of real estate from one of our subsidiaries. The price of the real estate was $5.4 million. We received several offers for the property and such member of the board made the highest offer. The transaction was approved by our Audit Committee in accordance with our charter at the time.

## Purchase of Supermarket Coupons

We purchase supermarket coupons for our employees at a supermarket chain in which one member of our Board of Directors is a shareholder. In 2008 and 2009, the amount of these purchases was Ps. 80 million and Ps. 90 million, respectively. We received several offers for this service and this chain made the best offer.

## Compensation

For the years ended December 31, 2007, 2008 and 2009, the aggregate compensation we paid to our directors and senior managers was approximately Ps. 273 million, Ps. 183 million and Ps. 229 million, respectively. This amount includes fees, salaries, the use of certain assets and services, and variable compensation.

## THE MEXICAN LAW OF COMMERCIAL REORGANIZATIONS

**Overview of the Mexican Bankruptcy Law**

The Mexican Bankruptcy Law of 2000, or *Ley de Concursos Mercantiles* (the "Mexican Bankruptcy Law") generally applies to all commercial entities in Mexico. Pursuant to the Mexican Bankruptcy Law, an entity (the "entity" or the "company") is deemed to be in breach of its payment obligations, when it fails to comply with payment obligations in favor of two or more different creditors if: (i) its obligations that are 30 days or more past due represent at least 35% of all its obligations; and (ii) it does not have cash or cash equivalents (as identified in the Mexican Bankruptcy Law) to comply with at least 80% of its past due obligations.

The debtor, any of its creditors or the *Ministerio Público Federal* ("Federal Attorney General") may request a *concurso* declaration. However, (i) only one of the above conditions must be met if a *concurso* declaration request is made by the debtor and (ii) both conditions must be met if a creditor or the Federal Attorney General files a *concurso* declaration request or arguably if the debtor and a group of its creditors request a prearranged *concurso* proceeding.

The *concurso* proceeding has two successive stages: work-out, or *conciliación* (the "Work-out Stage") and bankruptcy (the "Bankruptcy Stage"). The Work-out Stage is intended to be a mediation proceeding where the entity subject to the procedure continues operating the business and attempts to reach an agreement with its recognized creditors. The Work-out Stage cannot exceed one calendar year following the last publication of the *concurso* ruling in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government. In the event that the entity fails to reach an agreement with creditors within the specified timeframe, a bankruptcy will be declared. The purpose of the Bankruptcy Stage is to liquidate all of the assets of the debtor in order to pay its recognized creditors with the proceeds of the liquidation.

### *Relevant Procedural Aspects*

#### *Filing of Concurso Suit or Petition*

Once the *concurso mercantil* petition has been filed before the corresponding authorities, the tax authorities and the Federal Institute of Bankruptcy Specialists (the "IFECOM") are notified and the IFECOM must appoint a specialist, or *visitador* (the "Visitor Specialist") so that such specialist may inspect and verify that the company meets the abovementioned conditions in order to be declared in *concurso*.

During this time period, the judge may take preventive measures to protect the entity's assets that are subject to the proceedings (the "Bankruptcy Estate"), as well as the creditors' rights. Once the judge receives the Visitor's opinion, the judge will issue the initial declaratory ruling, which addresses, among other rulings, the following: (i) the initiation of the Work-out Stage or the termination of the proceeding; (ii) an order to the company to suspend all payments that the company should otherwise make, except for those required for the ongoing operation of the business; (iii) the date from which the entity's transactions shall be more closely scrutinized in order to determine if such transactions could have constituted fraudulent conveyances (the "Retroactive Date" and the period thenceforth, the "Retroactive Period") (the statutory Retroactive Date is 270 days prior to the initial declaratory ruling, but the Retroactive Period may be extended if certain conditions are met); (iv) an order to the work-out specialist, or *conciliador* (the "Work-out Specialist") to initiate the recognition of credits proceeding; and (v) a notice to the creditors to request the recognition of their credits.

#### *Concurso Ruling Effects*

Among the most important effects of the *concurso* ruling are (in each case, subject to certain exceptions): (i) the suspension of payments; (ii) the suspension of foreclosure and attachment proceedings (except for labor indemnities and wages); and (iii) the cessation of interest accrual on all payment obligations, and their conversion to UDIs (*Unidades de Inversión*), however, secured obligations will continue in their denominated currency and will only accrue ordinary interest provided for in the corresponding documentation, up to the value of the assets securing such obligations. The *concurso* ruling does not suspend the obligation to pay salaries or to make tax or social

security contributions. Any assets that are in possession of the company but of which the company is not the rightful owner, may be separated from the Bankruptcy Estate. Subject to certain exceptions provided for in the Mexican Bankruptcy Law, the general provisions of contracts law and the agreements between the parties shall continue to govern the company's outstanding transactions.

In addition, there are certain agreements which are not considered terminated due to a *concurso* ruling unless in the opinion of the Work-out Specialist their fulfillment is not in the best interest of the Bankruptcy Estate including, among other things: (i) preliminary and final agreements pending enforcement; (ii) deposits, credit extensions, commission or agency agreements; and (iii) lease agreements.

### Work-out Stage

Once the insolvency ruling has been issued, the IFECOM will designate a Work-out Specialist whose primary goal will be to negotiate an agreement between the company and its creditors for the payment of the company's liabilities. The company may not reach any agreement only with one group of creditors; such agreements shall cover all recognized creditors. Agreements in contravention of the foregoing shall be null and void, and creditors seeking to reach independent agreements shall lose their rights in the Insolvency Proceeding. The Work-out Specialist may request the judge to prematurely conclude the Work-out Stage if it considers that the company or its creditors do not have the will to reach an agreement or if he believes it is impossible to reach it.

In accordance with the Mexican Bankruptcy Law, throughout all the Work-out Stage, an agreement or restructuring plan can only be approved if the debtor consents. Therefore, there is no exclusivity period. A plan cannot be imposed on the debtor without its consent.

Within 20 days (45 days for foreign creditors) after the last publication of the *concurso* ruling, any creditor of the company may file its corresponding proof of claim against the company, stating, among other information: (i) the amount due by the entity; (ii) the terms and conditions of the obligations; (iii) a description of the collateral, if any; (iv) ranking and preference; and (v) any suit or proceeding relating to the obligation.

Within 30 days of the last publication of the *concurso* ruling, the Work-out Specialist shall prepare and deliver to the judge a preliminary list of the creditors of the company, stating ranking and preference. The company and its creditors may object to such preliminary list. The Work-out Specialist will then have a 10 day term to provide its definitive proposal to the judge. Within five days thereafter, the judge shall issue a ruling providing for the credit recognition, ranking and preference (the "Credit Recognition and Ranking Ruling"). Any of the creditors, the entity or the Work-out Specialist may appeal the Credit Recognition and Ranking Ruling.

Creditors may also file a proof of claim in the term for objection to the provisional list of creditors filed by the Work-out Specialist referred to above and in the term for appeal of the Credit Recognition and Ranking Ruling.

In order to protect their interests in the *concurso* proceedings, any group of creditors representing at least 10% of the total liabilities of the company may appoint an overseer, or *interventor* (the "Overseer"*)* who will represent the creditors' interests and will be responsible for monitoring the actions of the Work-out Specialist and the receiver, or *síndico* (the "Receiver"*)*, as well as the management of the company.

During the Work-out Stage, the company's management will continue managing the company, but the Work-out Specialist may request the judge to remove the company's management of such duties if it is convenient to protect the Estate. If the Work-out Specialist deems it appropriate, it may request the judge to order the closing of the company with the Overseer's prior opinion.

After the judge has issued the Credit Recognition and Ranking Ruling, the Work-out Specialist will negotiate an agreement (the "Work-out Agreement") between the company and its recognized creditors representing more than 50% of the sum of: (i) the recognized amount owed to unsecured recognized creditors; and (ii) the recognized amount owed to secured recognized creditors participating in the plan.

144

Once the Work-out Specialist believes the Agreement has sufficient contents to be approved, the Work-out Specialist shall present the agreement to the judge, who will grant recognized creditors the right to review it in a term of 10 days and, after such review, adhere to it. After the first reviewing term, if the agreement has the consent of the debtor and at least the majority of the Recognized Creditors, the agreement duly executed is filed before the court. The court then grants creditors a 5 day term to object the authenticity of their consent and to exercise "veto" rights, in case a majority of Recognized Creditors (in number) or Recognized Creditors holding a majority of recognized debt so desire.

Thereafter, the Court reviews the agreement and its compliance with all the requirements provided for in the Mexican Bankruptcy Law and ensures that its provisions do not contravene public policy, and will issue a resolution approving the agreement. The compliance and performance of the Work-out Agreement shall be mandatory. Subject to certain requirements, all unsecured recognized creditors shall be deemed to have consented to the Work-out Agreement.

For unsecured recognized creditors that are not party to the Work-out Agreement, the agreement may only provide: (i) a payment delay, with the capitalization of regular interest, for a term not to exceed the shortest term agreed to by unsecured creditors executing the Work-out Agreement representing at least 30% of unsecured recognized amounts; (ii) a release of principal and accrued but unpaid interest, equal to the lowest release agreed to by unsecured creditors representing at least 30% of unsecured recognized amounts who execute the Work-out Agreement; and (iii) a combination of release and payment delay, provided that the terms and conditions of such combination is identical to those agreed to by unsecured creditors representing at least 30% of unsecured recognized amounts who execute the Work-out Agreement.

Secured recognized creditors that did not execute the Work-out Agreement may, under certain specific rules provided by the Mexican Bankruptcy Law, start or continue to enforce their collateral, unless the Work-out Agreement provides for the repayment of their credits or the payment of the value of their corresponding collateral. In such case, any amount of the recognized debt that exceeds the value of the collateral shall be regarded as a regular credit.

### The Bankruptcy

In the event that the Work-out Stage is not successful, the entity shall be sold either as a going concern or its assets shall be disposed for liquidation purposes in order to pay its obligations. The bankruptcy shall be declared by the judge (the "Bankruptcy Judgment"). In the Bankruptcy Judgment, the judge shall appoint a Receiver who shall fully replace the entity's management in the operation of the entity's business for its final liquidation.

From the date the Bankruptcy Judgment is issued, the acts carried out by the company and its representatives shall be null and void. Acts carried out by the company may be permitted if prior authorization of the Receiver has been obtained, except in cases where those acts relate to assets over which the company still has full disposition power and payments were made to the company after the issuance date with knowledge that it had been declared bankrupt.

#### Sale of the Company's Assets

Once the bankruptcy has been declared, even if the credit recognition has not been concluded, the Receiver shall proceed to sell the Bankruptcy Estate with the purpose of obtaining the largest amount possible for such sale. The sale shall be carried out pursuant to the public offering procedure provided for in the Mexican Bankruptcy Law, unless otherwise permitted by the judge.

#### Payment Preference

Subject to certain rules and exceptions (i.e., labor liabilities, Bankruptcy Estate management expenses, attorney fees, and Work-out Specialist, Receiver and inspector fees), the payment ranking of creditors generally shall be as follows: (i) solely privileged creditors, or *acreedores singularmente privilegiados*, meaning those holding credits related to funeral and medical expenses (only applicable to individuals); (ii) secured creditors with *in rem*

145

right guarantees (mortgage or pledge), or *acreedores con garantía real*; (iii) certain labor liabilities; (iv) creditors which under the Mexican Commercial Code have special privileges by right of retention; (v) certain labor and tax liabilities; and (vi) common creditors, on a *pro rata* basis, without distinction as to the date on which their credits were granted or became due.

Note that ranking of creditors may result in highly complex situations and the foregoing indications constitute a mere description of the Mexican Bankruptcy Law; in all cases, creditor ranking shall be based on specific and detailed analysis of the legal and financial business structure of the entity.

### Fraudulent Conveyance Considerations

The Mexican Bankruptcy Law includes provisions that: (i) render certain transactions considered fraudulent conveyances to be null and void if conducted during the Retroactive Period; and (ii) establish the presumption that certain transactions are fraudulent conveyances ("Fraudulent Conveyances") unduly affecting the Bankruptcy Estate and, therefore, the entity's creditors. Fraudulent Conveyances are defined as those transactions entered into with the purpose of negatively affecting the creditors of the entity and such purpose is shared by the entity and the other party, except in cases in which no consideration is involved.

Additionally, the Mexican Bankruptcy Law establishes that, if conducted during the Retroactive Period, the following transactions would be presumed to be fraudulent conveyances: (i) transactions in which no consideration is involved; (ii) transactions not entered into on market terms; (iii) entity's release of debt; (iv) payment of amounts not due and payable; (v) granting of collateral or additional collateral not originally contemplated by the transaction documents; (vi) payments in kind where such method of payment was not originally agreed to in the transaction documents; and (vii) certain related party transactions against the Estate including, but not limited to, transactions with shareholders, directors, management and affiliates, except for *bona fide* transactions.

### Prepackaged Deals

In connection with *concurso mercantil* petitions that include a pre-approved restructuring agreement (the "Restructuring Agreement") under the Mexican Bankruptcy Law, the petition request must be filed along with a proposal for the restructuring of the company's liabilities by the debtor together with creditors representing at least 40% of its outstanding liabilities. Upon filing the insolvency petition the company and filing creditors can request the court to dictate preemptive measures contemplated by the Mexican Bankruptcy Law. If all requirements are met, the court shall declare the *concurso* of the company, without the prior review of the financial condition of the petitioner by a court appointed Visitor. The court decision declaring the *concurso* must comply with all requirements prescribed by the Mexican Bankruptcy Law, and thenceforth the *concurso* proceedings will be substantiated in the same manner as any other *concurso* that any restructuring proposal shall be based on the restructuring plan initially submitted by the company and the filing creditors.

146

# THE TENDER OFFER

**Terms of the Tender Offer**

*Tender Offer; Maximum Payment Amount; Tender Offer Consideration; Modified Dutch Auction Procedure.* On the terms and subject to the conditions of the Tender Offer (including, if the Tender Offer is amended or extended, the terms and conditions of any amendment or extension), we are offering to purchase for cash the maximum aggregate principal amount of Vitro's 2012 Notes, 2013 Notes and 2017 Notes that we can purchase for $100,000,000 (subject to increase as described below, the "Maximum Payment Amount") at a purchase price per $1,000 principal amount determined in accordance with the procedures set forth below. We reserve the right, but are not obligated, to increase the Maximum Payment Amount by up to 30% without permitting holders to withdraw Old Notes that have been previously tendered in the Tender Offer. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered.

The "Tender Offer Consideration" for each $1,000 principal amount of any series of Old Notes validly tendered pursuant to the Tender Offer on or prior to the Expiration Time and accepted for purchase by us will be equal to the Clearing Price determined pursuant to a modified "Dutch Auction" as described below.

The table below sets forth the CUSIP Number, outstanding principal amount, and acceptable Bid Price range for each series of Old Notes.

| Series of Old Notes | CUSIP No. | Outstanding Principal Amount | Tender Offer Consideration (Acceptable Bid Price Range)[1] |
|---|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 | |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 | $500 - $575 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 | |

(1)   Per $1,000 principal amount of Old Notes that are accepted for purchase.

Holders must validly tender their Old Notes on or prior to the Expiration Time in order to be eligible to receive the Tender Offer Consideration.

The Tender Offer Consideration will be payable in cash promptly after the Expiration Time to those holders whose Old Notes are accepted for purchase in the Tender Offer.

The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a holder elects to participate, they must specify a Bid Price, which is the minimum Tender Offer Consideration they would be willing to receive in exchange for each $1,000 principal amount of Old Notes they choose to tender in the Tender Offer. The Bid Price that the holder specifies for each $1,000 principal amount of Old Notes may not be less than the Minimum Bid Price ($500) nor more than the Maximum Bid Price ($575). As a result, the Bid Price the holder specifies must be within the following range:

| | |
|---|---|
| **Minimum Bid Price** | $500 |
| **Maximum Bid Price** | $575 |

**Tenders of Old Notes outside of this range will not be accepted and will not be used for purposes of calculating the Clearing Price as described below.**

Bid Prices between the Minimum Bid Price and the Maximum Bid Price must be in minimum increments of $2.50 above $500. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment.

Each holder tendering Old Notes in the Tender Offer is to submit a Bid Price; holders who tender Old Notes without specifying a Bid Price will be deemed to have specified the Minimum Bid Price ($500) as their Bid Price.

147

Whether and to what extent your tendered Old Notes are accepted for purchase in the Tender Offer will depend upon how the Bid Price specified by you compares to Bid Prices specified by other tendering holders of each series of Old Notes. Specifically, on the Expiration Time:

- we will use all the Bid Prices received to calculate a single Clearing Price in accordance with the procedure set forth below; and

- the Tender Offer Consideration payable for Old Notes accepted in the Tender Offer will be the Clearing Price. The Tender Offer Consideration for all Old Notes, of all series, will be the same.

The "Clearing Price" for the Old Notes will be determined by consideration of the Bid Prices of all validly tendered Old Notes of all series, in order of lowest to highest Bid Prices. The Clearing Price will be:

- the lowest single price for all tenders of Old Notes of all series such that, for all tenders of Old Notes of all series whose Bid Price is equal to or less than this lowest single price, we will be able to spend the Maximum Payment Amount under the Tender Offer, taking into account the Tender Offer Consideration and the proration described in the next paragraph (provided, however, that if the principal amount of Old Notes purchased at the Clearing Price that results from applying this formula and the proration described in the next paragraph would be less than the principal amount of the Old Notes that would be purchased using the Bid Price next lowest to such lowest single price, then the Clearing Price will be equal to such next lowest Bid Price), or

- except in the case described in the proviso in the previous bullet point, in the event that the purchase of all Old Notes validly tendered would result in us spending less than the Maximum Payment Amount under the Tender Offer, the Clearing Price will be the Maximum Bid Price.

If the amount of Old Notes validly tendered on or prior to the Expiration Time with a Bid Price equal to or less than the Clearing Price would cause us to spend more than the Maximum Payment Amount to repurchase such tendered Old Notes in the Tender Offer, then the Tender Offer will be oversubscribed, and we will accept for payment such tendered Old Notes as follows. First, we will accept for payment all Old Notes validly tendered with a Bid Price less than the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount). Second, we will accept for payment all Old Notes validly tendered with a Bid Price equal to the Clearing Price (to the extent such acceptance would not result in a payment in respect of the Tender Offer in excess of the Maximum Payment Amount) on a prorated basis using a single proration factor.

To avoid purchases of Old Notes in principal amounts other than integral multiples of $1,000, if necessary, we will make appropriate adjustments downward to the nearest $1,000 principal amount with respect to each holder validly tendering Old Notes at a Bid Price equal to the Clearing Price. For series of Old Notes that have a minimum denomination of $2,000, the Company reserves the right to further adjust the amount of Old Notes of the relevant series that would otherwise be accepted from a given holder downward by $1,000 principal amount if an impermissible denomination of outstanding Old Notes would otherwise result. All Old Notes not accepted as a result of proration and all tenders of Old Notes with a Bid Price in excess of the Clearing Price will be rejected from the Tender Offer.

All holders whose Old Notes (regardless of series) are accepted in the Tender Offer will receive the Tender Offer Consideration even if they tendered at a Bid Price that was less than the Clearing Price.

The maximum amount of cash we will use to pay the Tender Offer Consideration for Old Notes accepted pursuant to the Tender Offer will be equal to the Maximum Payment Amount.

**Our obligation to accept Old Notes in the Tender Offer and pay the Tender Offer Consideration is conditioned on the satisfaction or waiver of the conditions set forth in the section titled "—Conditions to the Tender Offer" in this Statement. The Tender Offer is not conditioned on any minimum amount of Old Notes being tendered.**

Payment of the Tender Offer Consideration will be made in cash promptly after the Expiration Time. See "—Acceptance of Old Notes for Payment."

Holders may tender their Old Notes in the Tender Offer or submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation. Because the size of the Tender Offer is limited (as described below), holders that tender Old Notes in the Tender Offer will be required to specify whether, if their Old Notes are not accepted in the Tender Offer, they elect to exchange them in the Exchange Offer and Consent Solicitation instead. Holders that tender Old Notes in the Tender Offer but fail to specify their election will be deemed to have elected not to exchange any Old Notes that are not accepted into the Tender Offer in the Exchange Offer and Consent Solicitation instead. Old Notes that are tendered in the Tender Offer but not accepted will be returned to the DTC Participant that tendered them promptly following the Expiration Time unless their holder has elected to submit them for exchange in the Exchange Offer and Consent Solicitation if they are not accepted in the Tender Offer.

The Tender Offer will expire at the Expiration Time, which will be 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated. We have the right to extend the Tender Offer, from time to time, at our discretion, in which event the term "Expiration Time" shall mean the latest time and date at which the Tender Offer, as so further extended, shall expire. We shall notify the Depositary of any extension of the Tender Offer by oral or written notice and shall make a public announcement thereof, as described herein.

## Conditions to the Tender Offer

Notwithstanding any other term of the Tender Offer, and in addition to (and not in limitation of) the right to extend and amend the Tender Offer at any time, in our sole discretion, we will not be required to accept for payment or, subject to any applicable rules and regulations of the SEC, including Rule 14e-1(c) under the Exchange Act, pay for, and may delay the acceptance for payment of or, subject to the restriction referred to above, the payment for, any tendered Old Notes, and may terminate the Tender Offer, if, before such time as any Old Notes have been accepted for payment pursuant to the Tender Offer, any of the following events or conditions exist or shall occur and remain in effect or shall be determined by us in our reasonable judgment to exist or have occurred:

(1) there shall have been threatened, instituted or be pending before any court, agency, authority or other tribunal any action, suit or proceeding by any government or governmental, regulatory or administrative agency or authority or by any other person, domestic or foreign, or any judgment, order or injunction entered, enforced or deemed applicable by any such court, authority, agency or tribunal, which challenges or seeks to make illegal, or to delay or otherwise directly or indirectly to restrain, prohibit or otherwise affect the making of the Tender Offer, the acquisition of Old Notes pursuant to the Tender Offer or is otherwise related in any manner to, or otherwise affects, the Tender Offer;

(2) there shall have been any action threatened or taken, or any approval withheld, or any statute, rule or regulation invoked, proposed, sought, promulgated, enacted, entered, amended, enforced or deemed to be applicable to the Tender Offer, we, or any of Vitro's subsidiaries, by any government or governmental, regulatory or administrative authority or agency or tribunal, domestic or foreign, which, in the reasonable judgment of us, would or might directly or indirectly result in any of the consequences referred to in paragraph (1) above;

(3) we have determined in our reasonable judgment that the acceptance for payment of, or payment for, some or all of the Old Notes in the Tender Offer could violate, conflict with or constitute a breach of any contract, order, statute, law, regulation, executive order, decree, or judgment of any court to which Vitro, any of its subsidiaries or AIV may be bound or subject;

(4) at any time on or after the date of this Statement, any change (or any condition, event or development involving a prospective change) shall have occurred or been threatened in the business, properties, assets, liabilities, capitalization, stockholders' equity, condition (financial or otherwise), operations, franchises, licenses, permits, permit applications, results of operations or prospects of Vitro or AIV, which, in our reasonable judgment, is or may be materially adverse, or we will have become aware of any fact which, in our reasonable judgment, has or may have material adverse significance with respect to Vitro and its subsidiaries;

149

(5) at any time on or after the date of this Statement, there shall have occurred (i) any general suspension of trading in, or limitation on prices for, securities on any national securities exchange or market in the United States, (ii) a declaration of a banking moratorium or any suspension of payments in respect of banks in the United States, (iii) any limitation (whether or not mandatory) by any governmental authority or agency on, or other event which, in the reasonable judgment of us, might materially adversely affect the extension of credit by banks or other lending institutions in the United States, (iv) commencement or declaration of a war, armed hostilities or other national or international calamity directly or indirectly involving the United States or any country in which Vitro, any of its subsidiaries or AIV conducts its business, (v) a material change in United States currency exchange rates or a suspension of, or limitation on, the markets for U.S. dollars, (vi) any decline in either the Dow Jones Industrial Average or the Standard & Poor's Index of 500 Industrial Companies by an amount in excess of 15% measured from the close of business on the date of this Statement, (vii) a material impairment in the trading market for debt securities in the United States or (viii) in the case of any of the foregoing existing on at the opening of business on the date of this Statement, a material acceleration or worsening thereof; or

(6) any approval, permit, authorization, consent or other action of any domestic or foreign governmental, administrative or regulatory agency, authority, tribunal or third party shall not have been obtained on terms satisfactory to us, which, in their judgment in any such case, and regardless of the circumstances (including any action or inaction by Vitro, AIV or any of their respective affiliates) giving rise to any such condition, makes it inadvisable to proceed with the Tender Offer and/or with such acceptance for payment or payment.

The foregoing conditions are for our sole benefit and the failure of any such condition to be satisfied may be asserted by Vitro or AIV regardless of the circumstances, including any action or inaction by us, giving rise to any such failure and any such failure may be waived by us in whole or in part at any time and from time to time in our sole discretion.

Subject to applicable law, we may also terminate the Tender Offer at any time before the Expiration Time and prior to the satisfaction or waiver of the conditions hereto in our sole discretion. If any of the foregoing conditions to the Tender Offer shall not have been satisfied or waived prior to the Expiration Time, we reserve the right, but will not be obligated, subject to applicable law, to:

- return Old Notes tendered pursuant to the Tender Offer to tendering holders;

- waive all unsatisfied conditions and accept for payment and purchase all Old Notes that are validly tendered on or prior to the Expiration Time;

- extend the Expiration Time and retain all tendered Old Notes until the purchase date for the Tender Offer; or

- otherwise amend the Tender Offer.

The failure of us at any time to exercise any of the foregoing rights will not be deemed a waiver of any other right, and each right will be deemed an ongoing right which may be asserted at any time and from time to time. See "—Extensions, Amendments and Termination."

## Letter of Transmittal and Letter of Instructions; Representations and Warranties of Holders

A tender of Old Notes under the procedures described herein will constitute the Holder's acceptance of the terms and conditions of the Tender Offer. In addition, by tendering its Old Notes in the Tender Offer, the Holder represents, warrants and agrees, for the benefit of the Company, AIV and any party to whom the Company or AIV transfers the Old Notes or the right to receive Old Notes that:

- it has received and reviewed the Statement;

- it is the beneficial owner of, or a duly authorized representative of one or more such beneficial owners of, the Old Notes tendered in the Tender Offer thereby and it has full power and authority to execute

the Letter of Transmittal and make the representations, warranties and agreements made thereby, and has full power and authority to tender, sell, assign and transfer the Old Notes tendered thereby;

- the Old Notes being tendered in the Tender Offer thereby were owned as of the date of tender, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and acknowledges that the Company will acquire good, indefeasible and unencumbered title to such Old Notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when the Company accepts the same;

- it will not sell, pledge, hypothecate or otherwise encumber or transfer any Old Notes tendered in the Tender Offer thereby from the date of the Letter of Transmittal and agrees that any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

- in evaluating the Tender Offer and in making its decision whether to participate therein by submitting the Letter of Transmittal and tendering its Old Notes in the Tender Offer, such Holder has made its own independent appraisal of the matters referred to therein and in any related communications and is not relying on any statement, representation or warranty, express or implied, made to such Holder by the Company, AIV or the Depositary other than those contained in the Statement (as supplemented to the Expiration Time);

- the execution and delivery of the Letter of Transmittal shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions set out or referred to in the Statement;

- the submission of the Letter of Transmittal to the Depositary shall, subject to the terms and conditions of the Tender Offer generally, constitute the irrevocable appointment of the Depositary as its attorney and agent for the purpose of effecting the Tender Offer;

- the terms and conditions of the Tender Offer shall be deemed to be incorporated in, and form a part of, the Letter of Transmittal which shall be read and construed accordingly; and

- the Company, AIV and others (including any party to whom the Company or AIV transfers Old Notes or the right to receive Old Notes) will rely upon the truth and accuracy of the foregoing acknowledgments, representations, warranties and agreements, and that if any of the acknowledgments, representations, warranties and agreements deemed to have been made by it by its participation in the Tender Offer or its acquisition of the New Notes are no longer accurate, it will promptly notify the Company.

The representations and warranties and agreements of a Holder tendering Old Notes in the Tender Offer shall be deemed to be repeated and reconfirmed on and as of the Expiration Time.

**Procedure for Tendering Old Notes**

All of the Old Notes are held in book-entry form through the facilities of DTC. If you own Old Notes and wish to tender them in the Tender Offer, you should follow the instructions below.

If you hold your Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, you will need to timely instruct your custodian or nominee to tender your Old Notes on or prior to the Expiration Time (in order to receive the Tender Offer Consideration), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Please refer to any materials forwarded to you by your custodian or nominee to determine how you can timely instruct your custodian or nominee to take these actions.

In order to participate in the Tender Offer, you must instruct your nominee or custodian to participate on your behalf. Your nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to tender those Old Notes in the Tender Offer to the Depositary prior to the Expiration Time.

If you hold your Old Notes through a broker or bank, you should ask your broker or bank if you will be charged a fee to tender your Old Notes through the broker or bank.

The Tender Offer is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must tender their Old Notes in the Tender Offer in accordance with DTC's ATOP procedures. Since all Old Notes must be tendered by book-entry transfer to the applicable DTC account of the Depositary, your broker, dealer, trust company, or other nominee must execute the tender or exchange through ATOP. Financial institutions that are DTC Participants must execute tenders and exchanges through ATOP by transmitting acceptance of the Tender Offer to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Tender Offer, execute a book-entry transfer of the tendered Old Notes into the applicable DTC account of the Depositary and send to the Depositary a "book-entry confirmation," which shall include a message (the "Agent's Message") transmitted by DTC to and received by the Depositary and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgement from a DTC Participant tendering that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company, AIV and their transferees may enforce such agreement against the DTC Participant.

*The Role of a DTC Participant*

To validly participate in the Tender Offer, DTC Participants must (i) deliver Old Notes by means of book-entry transfer into the applicable DTC account of the Depositary, (ii) transmit electronic confirmation through ATOP, whereby an Agent's Message will be sent to the Depositary, and (iii) deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary.

Additionally, in the case of DTC Participants instructed to tender Old Notes in the Tender Offer and have such Old Notes that are tendered but not accepted in the Tender Offer be exchanged in the Exchange Offer and Consent Solicitation, both (A) a duly executed and notarized copy of the power of attorney (the "Power of Attorney") in the form attached to the Letter of Transmittal authorizing or appointing the representative to carry out all necessary or expedient steps required or advisable under Mexican law to submit the Letter of Transmittal before the Mexican court within the *concurso mercantil* proceeding, to join and adhere to any *concurso mercantil* to be filed by the Company and to execute and consent to the *Concurso* Plan and (B) a properly executed and notarized signature to the *Concurso* Plan attached to the Letter of Transmittal, must be received by the Depositary at its address set forth on the back cover of this Statement, on or prior to the Expiration Time.

By taking these actions with respect to the Tender Offer, you and your custodian or nominee will be deemed to have agreed (i) to the terms and conditions of the Tender Offer as set forth in this Statement and the Letter of Transmittal and (ii) that Vitro, AIV and the Depositary may enforce the terms and conditions against you and your custodian or nominee.

**The Letter of Transmittal and Old Notes should be sent to the Depositary and not to Vitro, AIV, the Information and Exchange Agent or the relevant trustee for the Old Notes. The Depositary will not accept any tender materials other than the Letter of Transmittal or the DTC Participant's Agent's Message.**

*Specification of Bid Price*

In accordance with the instructions contained in the enclosed Letter of Transmittal, in the case where the DTC Participant chooses to tender Old Notes in the Tender Offer and in the case where the DTC Participant chooses to tender Old Notes in the Tender Offer and to have Old Notes that are not accepted in the Tender Offer be exchanged in the Exchange Offer and Consent Solicitation, such DTC Participant must properly indicate (i) the series of Old Notes being tendered therewith and (ii) either (a) in the applicable column of the boxes therein entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, the Bid Price

152

(no less than the Minimum Bid Price ($500) and in increments of $2.50 per $1,000 principal amount above the Minimum Bid Price but not greater than the Maximum Bid Price ($575) at which such Old Notes are being tendered, or (b) not specify a Bid Price, in which case the DTC Participant will be deemed to have specified the Minimum Bid Price in respect of such Old Notes being tendered and to accept the Clearing Price determined by us in accordance with the terms of the Tender Offer. **In accordance with the instructions contained in the Letter of Transmittal, each Bid Price must be in increments of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment. The Bid Price each DTC Participant specifies, if any, must be within a range between $500 and $575 per $1,000 principal amount, and no Old Notes will be accepted outside this range.**

A Holder cannot change its Bid Price with respect to Old Notes already tendered.

*General Provisions*

The method of delivery of Old Notes and all other documents or instructions including, without limitation, the Agent's Message and the Letter of Transmittal, is at your risk. A tender will be deemed to have been received only when the DTC Participant (i) delivers Old Notes by means of book-entry transfer into the applicable DTC account of the Depositary, (ii) transmits electronic confirmation through ATOP, whereby an Agent's Message will be sent to the Depositary, and (iii) delivers a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary. Additionally, in the case of DTC Participants instructed to tender Old Notes in the Tender Offer and have such Old Notes that are tendered but not accepted in the Tender Offer be exchanged in the Exchange Offer and Consent Solicitation, both (A) a Power of Attorney in the form attached to the Letter of Transmittal and (B) a properly executed and notarized signature to the *Concurso* Plan attached to the Letter of Transmittal, must be received by the Depositary at its address set forth on the back cover of this Statement, on or prior to the Expiration Time.

All questions concerning the validity, form, tenders (including time of receipt), and acceptance of tendered Old Notes will be determined by the Company in its sole discretion, which determination will be final and binding. The Company reserves the absolute right to reject any and all tenders of Old Notes not in proper form or any Old Notes the acceptance for exchange of which may, in the opinion of its counsel, be unlawful. The Company also reserves the absolute right to waive any defect or irregularity in tenders of Old Notes, whether or not similar defects or irregularities are waived in the case of other exchanged securities. The interpretation of the terms and conditions by the Company shall be final and binding on all parties. Unless waived, any defects or irregularities in connection with tenders of Old Notes in the Tender Offer must be cured within such time as the Company shall determine. None of the Company, the Depositary or any other person will be under any duty to give notification of defects or irregularities with respect to tenders of Old Notes in the Tender Offer, nor shall any of them incur any liability for failure to give such notification.

Tenders of Old Notes in the Tender Offer will not be deemed to have been made until such defects or irregularities have been cured or waived. Any Old Notes received by the Depositary that are not validly tendered and as to which the defects or irregularities have not been cured or waived will be returned by the Depositary to the beneficial owners, unless otherwise provided in the Letter of Transmittal, as soon as practicable following the Expiration Time or the withdrawal or termination of the Tender Offer.

Tenders of Old Notes in the Tender Offer pursuant to any of the procedures described in the Statement and in the instructions in the Letter of Transmittal and acceptance of such Old Notes by the Company will constitute a binding agreement between you and the Company and AIV upon the terms and conditions of the Tender Offer. Any submitted Old Notes that are not accepted in the Tender Offer for any reason will be returned by crediting the account maintained at DTC from which such Old Notes were submitted.

**We have not provided guaranteed delivery provisions in connection with the Tender Offer. Old Notes being tendered must be delivered to the Depositary in accordance with the procedures described in this Statement, on or prior to the Expiration Time (in order for you to participate in the Tender Offer and receive the Tender Offer Consideration).**

The Old Notes will be accepted for tender in denominations of $1,000 principal amount and integral multiples thereof.

*Backup Withholding and Information Reporting*

For a summary of certain U.S. federal income tax consequences of the disposition of Old Notes pursuant to the Tender Offer, see "Certain U.S. Federal Income Tax Considerations."

## Acceptance of Old Notes for Payment

Upon the terms and subject to the conditions of the Tender Offer (including if the Tender Offer is extended or amended, the terms and conditions of any such extension or amendment) and applicable law, we will accept for payment, and thereby purchase, all Old Notes validly tendered with a Bid Price equal to or less than the Clearing Price, on or prior to the Expiration Time, subject to possible proration.

We will be deemed to have accepted for payment pursuant to the Tender Offer and thereby have purchased, validly tendered Old Notes pursuant to the Tender Offer, if, as and when we give oral or written notice to the Depositary of their acceptance of such Old Notes for purchase pursuant to the Tender Offer. We will announce acceptance for payment of the Old Notes. In all cases, payment for Old Notes purchased pursuant to the Tender Offer will be made by deposit of the Maximum Payment Amount with the Depositary, which will act as agent for tendering holders for the purpose of receiving payments from us and transmitting such payments to such holders.

We reserve the right, subject to applicable law, to (1) keep the Tender Offer open or extend the Expiration Time to a later date and time, (2) waive all conditions to the Tender Offer for Old Notes tendered on or prior to the Expiration Time and (3) increase the Maximum Payment Amount.

We expressly reserve the right, in our sole discretion and subject to Rule 14e-1(c) under the Exchange Act, to delay acceptance for payment of, or payment for, Old Notes in order to comply, in whole or in part, with any applicable law. See "—Conditions to the Tender Offer." In all cases, payment by the Depositary to holders of consideration for Old Notes accepted for purchase pursuant to the Tender Offer will be made only after the DTC Participant timely (i) delivers Old Notes by means of book-entry transfer into the applicable DTC account of the Depositary, (ii) transmits electronic confirmation through ATOP, whereby an Agent's Message will be sent to the Depositary, and (iii) delivers a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary.

If the Tender Offer is terminated or withdrawn, or the Old Notes subject to the Tender Offer are not accepted for payment, no consideration will be paid or payable to holders of those Old Notes. If any tendered Old Notes are not purchased pursuant to the Tender Offer for any reason, Old Notes tendered by book-entry transfer will be credited to the account maintained at DTC from which those Old Notes were delivered promptly following the Expiration Time or termination of the Tender Offer (except any Old Notes not accepted for payment in the Tender Offer submitted by the Holder for exchange in the Exchange Offer and Consent Solicitation).

We reserve the right to transfer or assign, in whole at any time or in part from time to time, to one or more of their respective affiliates, the right to purchase Old Notes validly tendered pursuant to the Tender Offer, but any such transfer or assignment will not relieve us of our obligations under the Tender Offer or prejudice the rights of tendering holders to receive consideration pursuant to the Tender Offer.

Holders will not be obligated to pay brokerage fees or commissions or, except as otherwise provided in Instruction 9 of the Letter of Transmittal, transfer taxes with respect to our purchase of the Old Notes pursuant to the Tender Offer. If you hold Old Notes through a broker or bank, you should consult that institution as to whether it charges any service fees. We will pay certain fees and expenses of the Depositary in connection with the Tender Offer. See "—Fees and Expenses."

**Under no circumstances will any additional interest be payable because of any delay in the transmission of funds to the holders of purchased Old Notes or otherwise.**

**Source and Amount of Funds**

The maximum amount of cash we will use to pay the Tender Offer Consideration for Old Notes accepted pursuant to the Tender Offer will be equal to the Maximum Payment Amount.

We expect to obtain the funds required to consummate the Tender Offer with the net proceeds of the Loan Agreement. We will cause the Old Notes that are accepted in the Tender Offer to be delivered to Fintech as payment for AIV's obligations under the Loan Agreement. Fintech will be permitted to exchange Old Notes it receives as a result in the *Concurso* Plan and receive a related consent payment.

Fintech's obligation to fund the Loan Agreement is subject to certain customary conditions, including the provision of certain representations and warranties by AIV, the valid tender of the Old Notes by holders and receipt of tendered Old Notes by the Depositary.

**No Withdrawal Rights**

Any tenders of Old Notes in the Tender Offer are irrevocable and may not be withdrawn.

**Extensions, Amendments and Termination**

We expressly reserve the right (but will not be obligated), at any time or from time to time, on or prior to the Expiration Time, regardless of whether any of the events set forth in "—Conditions to the Tender Offer" shall have occurred or shall have been determined by us to have occurred, to:

- waive any and all conditions to the Tender Offer;

- extend the Expiration Time;

- otherwise amend the Tender Offer in any respect; or

- terminate the Tender Offer at any time,

in each case, by giving written notice of such waiver, extension, amendment or termination to the Depositary. If we make a material change in the terms of the Tender Offer or the information concerning the Tender Offer or waive a material condition of the Tender Offer, we will disseminate additional materials relating to the Tender Offer and extend the Tender Offer to the extent required by law. In addition, if we change the range for Bid Prices, then we will extend the Expiration Time, if necessary, to ensure that we comply with applicable law. We will publicly announce any waiver, extension, amendment or termination in the manner described under "—Announcements" below.

There can be no assurance that we will exercise our right to extend, terminate or amend the Tender Offer. Irrespective of any amendment to the Tender Offer, all Old Notes previously tendered pursuant to the Tender Offer and not accepted for purchase will remain subject to the Tender Offer and may be accepted thereafter for payment by us, except when such acceptance is prohibited by law.

**Announcements**

There can be no assurance that the Company will exercise its right to extend the Expiration Time. Any extension, amendment or termination will be followed as promptly as practicable by a public announcement thereof, with the announcement in the case of an extension to be issued no later than 9:00 a.m., New York City time, on the first business day after the previously scheduled Expiration Time. Without limiting the manner in which the Company may choose to make any public announcement, the Company shall have no obligation to publish, advertise or otherwise communicate any such public announcement other than by issuing a release to PR Newswire.

**Depositary**

D.F. King & Co., Inc. has been appointed as the Depositary for the Tender Offer. Questions and requests for assistance, and all correspondence in connection with the Tender Offer, or requests for additional Letters of Instructions and any other required documents, may be directed to the Depositary at the address and telephone numbers set forth on the back cover of this Statement. The Depositary will also assist with the mailing of this Statement and related materials to Holders, respond to inquiries of and provide information to Holders in connection with the Tender Offer, and provide other similar advisory services as the Company may request from time to time.

Subject to the terms and conditions set forth in the agreement between the Company and Depositary, the Company has agreed to pay the Depositary customary fees for its services in connection with the Tender Offer. The Company has also agreed to reimburse the Depositary for its reasonable out-of-pocket expenses and to indemnify it against certain liabilities.

**Fees and Expenses**

As stated above, the Company will pay the Depositary reasonable and customary fees for its services (and will reimburse it for its reasonable out-of-pocket expenses in connection therewith), and will pay brokerage houses and other custodians, nominees and fiduciaries their reasonable out-of-pocket expenses incurred in connection with forwarding copies of this Statement and related documents to the beneficial owners of the Old Notes and in handling or forwarding consents for payment. In addition, the Company will indemnify the Depositary against certain liabilities in connection with its services, including liabilities under the U.S. federal securities laws.

**Miscellaneous**

Other than with respect to the Depositary, none of the Company or any of its affiliates has engaged, or made any arrangements for, and authorized any person to provide any information or to make any representations in connection with the Tender Offer, other than those expressly set forth in this Statement, and, if so provided or made, such other information or representations must not be relied upon as having been authorized by the Company, or any of its affiliates. The delivery of this Statement shall not, under any circumstances, create any implication that the information set forth herein is correct as of any time subsequent to the date hereof.

## THE EXCHANGE OFFER AND CONSENT SOLICITATION

### Background and Purpose

The Company, together with our financial advisors, has been evaluating various alternatives for achieving our restructuring objectives. For more information on our restructuring objectives, see "Summary—Proposed Restructuring Plan." We believe, but cannot guarantee, that this Exchange Offer and Consent Solicitation process will meet our restructuring objectives. The Company is proposing an Exchange Offer and Consent Solicitation to the *Concurso* Plan, in the form attached to this Statement as Annex A, from holders of Restructured Debt.

As of the date of this Statement, $1,216,000,000 aggregate principal amount of the Old Notes is outstanding.

***Holders of Restructured Debt should carefully review the information included under "Risk Factors." Holders of Restructured Debt should understand that an investment in the New Notes issued pursuant to the* Concurso *Plan involves a high degree of risk, including the significant possibility of loss of a significant portion of their investment in the New Notes.***

### Certain Terms and Conditions of the Exchange Offer and Consent Solicitation

Upon the terms and subject to the conditions set forth in this Statement and in the accompanying Letter of Transmittal, the Company is hereby seeking the exchange of the Old Notes and consent from holders of Restructured Debt to the *Concurso* Plan, which contemplates the exchange of the Restructured Debt for the Restructuring Consideration on a pro rata basis. The Consent Payment will be paid from the Payment Trust no later than four business days following the Expiration Time (the "Consent Payment Date") for consents validly delivered prior to the Expiration Time, as defined below. Holders of Restructured Debt who do not submit for exchange the Old Notes and do not so consent or consent after the Expiration Time will not receive the Consent Payment. For more information on the Consent Payment, see "—Consent Payment." As described in this Statement, Vitro will, and certain of the Old Guarantors may, file for *concurso mercantil* proceedings and will submit the *Concurso* Plan to the Mexican bankruptcy court and other parties of the *concurso mercantil* proceeding. Commencement of the *concurso mercantil* proceedings and approval of the *Concurso* Plan in the *concurso mercantil* may still occur even if there is no exchange of Old Notes and no consents of holders of Restructured Debt are received.

The delivery and payment of the Restructuring Consideration pursuant to the *Concurso* Plan is subject to, among other things, the approval of the *Convenio Concursal* by the Mexican bankruptcy court. For more information about conditions to the delivery and payment of the Restructuring Consideration, see "—Condition to Delivery and Payment of the Restructuring Consideration." For the terms and conditions of the New Notes, see "Description of the New Notes."

Only a registered Holder can effectively exchange the Old Notes and deliver a consent with respect to the Old Notes to the *Concurso* Plan, and such exchange and consent will be effective as to the aggregate principal amount of such Old Notes, accrued interest thereunder and any other claims arising under such Old Notes. Pursuant to the terms of the indentures governing the Old Notes, subsequent transfers of Old Notes on the applicable security register for such Old Notes will not have the effect of revoking any consent theretofore given by the registered Holder of such Old Notes, and such consents will remain valid. Any Old Notes submitted for exchange or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event we amend the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date (as defined herein) or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of Old Notes.

157

**Consent Payment**

Assuming satisfaction of all conditions to the Exchange Offer and Consent Solicitation, any holder of Restructured Debt who validly submits for exchange Old Notes or delivers a consent (pursuant to the terms of a lock-up agreement entered into with us prior to the Expiration Time) will be eligible to receive a consent payment equal to an amount representing such holder's pro rata share of an aggregate of $75.0 million in cash held in the Payment Trust based on the aggregate principal amount of Restructured Debt that is held by Participating Creditors; provided, however, that the aggregate Consent Payment paid to each Participating Creditor shall in no event be less than 5% or greater than 10% of the aggregate principal amount of Restructured Debt held by such holder. The payment of the Consent Payment shall be made by the Payment Trust to Participating Creditors who consent pursuant to the terms of this Statement following the Expiration Time (as defined below).

The Note Consent Payment with respect to Holders will be paid to Holders as of the Record Date who are entitled thereto, notwithstanding any subsequent transfer of the Old Notes, no later than the Consent Payment Date. The Company will only pay the Note Consent Payment to Holders who have validly submitted for exchange the Old Notes and delivered consents prior to the Expiration Time. The right to receive the Consent Payment is not transferable. The Company will only pay the Other Consent Payment to holders of DFI Claims and Other Debt who have validly delivered consents prior to the Expiration Time pursuant to the terms hereof, to be paid no later than the Consent Payment Date. For more information on valid delivery of consents, see "—Procedure for Consenting to the *Concurso* Plan."

Under no circumstances will the Company make any Consent Payment to any holder of Restructured Debt who does not properly submit for exchange and/or consent. Please refer to "Material Mexican Federal Tax Considerations" for information regarding Mexican taxation applicable to the Note Consent Payment.

**Consequences to Holders of Restructured Debt if the *Concurso* Plan Is Approved with or without the Holders of Restructured Debt**

We have the requisite majority, among debt controlled by the Company, debt subject to lock-up agreements and other creditors that we believe will participate in the Exchange Offer and Consent Solicitation, to accomplish a prearranged *concurso mercantil*. Nevertheless, we are seeking the exchange of the Old Notes and the consents from holders of Restructured Debt because we believe that having such holders in agreement with us on the terms of our *Concurso* Plan could expedite our reorganization process to the benefit of both such holders and us. The *Concurso* Plan set forth in Annex A, which we believe provides for a fair recovery for holders of Restructured Debt in light of our available financial capacity, represents our final restructuring proposal. We intend to commence *concurso mercantil* proceedings and proceed with filing the proposed *Concurso* Plan even if there is no exchange of Old Notes and no consents of holders of Restructured Debt are received. If the *Concurso* Plan is contested or litigation is initiated, we reserve the right to terminate the Exchange Offer and Consent Solicitation and not proceed with the *Concurso* Plan. The *Convenio Concursal*, if approved and consummated, will bind all holders of Restructured Debt, regardless of whether or how they voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

**Conditions to Approval of the *Concurso* Plan**

Approval of the *Concurso* Plan shall not occur unless and until each of the conditions set forth below has been satisfied or duly waived:

(a)  receipt of the requisite percentage of consents of creditors approving the *Concurso* Plan;

(b)  commencement of *concurso mercantil* proceedings; and

(c)  the approval of the *Convenio Concursal* by the Mexican bankruptcy court.

**Condition to Delivery and Payment of the Restructuring Consideration**

Delivery and payment of the Restructuring Consideration shall not occur unless there is approval of the *Convenio Concursal* by the Mexican bankruptcy court.

Distributions to be made pursuant to the *Concurso* Plan will be made on or around the date that is fifteen (15) calendar days after the *Convenio Concursal* is approved by the Mexican federal court presiding over the *concurso mercantil* proceeding of the Company unless: (i) the Mexican federal court has issued an order or decree staying or legally prohibiting consummation of the *Convenio Concursal*; or (ii) (1) any appeal is pending, a potential outcome of which is the invalidation or reversal of the Mexican federal court's approval of the *Convenio Concursal* and (2) within fifteen (15) calendar days after approval by the Mexican federal court of the *Convenio Concursal*, the holders of a majority in amount of the acknowledged claims (as defined in the *Concurso* Plan, which, for the avoidance of doubt, includes all recognized intercompany debt) provide the Company with written consent to postpone consummation of the *Convenio Concursal* until the earlier of (A) the resolution of such pending appeal and (B) the Long-Stop Date; provided, however, that if such appeal is not resolved prior to the Long-Stop Date, the Company will be required to effectuate consummation of the *Convenio Concursal*, unless legally prohibiting from doing so, within five (5) Business Days of the Long-Stop Date notwithstanding such appeal has not been resolved.

The foregoing conditions are for the sole benefit of the Company and may be asserted by the Company regardless of the circumstances (including any action or inaction by the Company) giving rise to such condition or may be waived in whole or in part at any time and from time to time in its sole discretion.

**Letter of Transmittal and Letter of Instructions; Representations and Warranties of Holders**

An exchange of Old Notes under the procedures described herein will constitute the Holder's acceptance of the terms and conditions of the Exchange Offer and Consent Solicitation. In addition, by submitting its Old Notes for exchange in the Exchange Offer and Consent Solicitation, the Holder represents, warrants and agrees, for the benefit of the Company and any party to whom the Company transfers the Old Notes or the right to receive Old Notes that:

- it has received and reviewed the Statement;

- it is the beneficial owner of, or a duly authorized representative of one or more such beneficial owners of, the Old Notes exchanged in the Exchange Offer and Consent Solicitation thereby and it has full power and authority to execute the Letter of Transmittal and make the representations, warranties and agreements made thereby, and has full power and authority to tender, exchange, sell, assign and transfer the Old Notes tendered thereby;

- the Old Notes being exchanged in the Exchange Offer and Consent Solicitation thereby were owned as of the date of exchange, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and acknowledges that the Company will acquire good, indefeasible and unencumbered title to such Old Notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when the Company accepts the same;

- it will not sell, pledge, hypothecate or otherwise encumber or transfer any Old Notes exchanged in the Exchange Offer and Consent Solicitation thereby from the date of the Letter of Transmittal and agrees that any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

- in evaluating the Exchange Offer and Consent Solicitation and in making its decision whether to participate therein by submitting the Letter of Transmittal and submitting its Old Notes for exchange in the Exchange Offer and Consent Solicitation, such Holder has made its own independent appraisal of the matters referred to therein and in any related communications and is not relying on any statement, representation or warranty, express or implied, made to such Holder by the Company or the Information and Exchange Agent other than those contained in the Statement (as supplemented to the Expiration Time);

159

- the execution and delivery of the Letter of Transmittal shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions set out or referred to in the Statement;

- the submission of the Letter of Transmittal to the Information and Exchange Agent shall, subject to the terms and conditions of the Exchange Offer and Consent Solicitation generally, constitute the irrevocable appointment of the Information and Exchange Agent as its attorney and agent for the purpose of effecting the Exchange Offer and Consent Solicitation or the representative authorized by the Power of Attorney as its attorney and agent, for the purpose of effecting the *Concurso* Plan, to join and adhere to the *concurso mercantil* petition to be filed by the Company and to execute and consent to the *Concurso* Plan, as applicable, and an irrevocable instruction to such attorney and agent to complete and execute all or any form(s) of transfer and other document(s) deemed necessary or expedient in the opinion of such attorney and agent in relation to the Old Notes exchanged in the Exchange Offer and Consent Solicitation thereby in favor of the Company and or such other person or persons as the Company may direct and to deliver such form(s) of transfer and other document(s) in the attorney's and agent's opinion and other document(s) of title relating to such Old Notes' registration and to execute all such other documents and to do all such other acts and things as may be in the opinion of such attorney or agent necessary or expedient for the purpose of, or in connection with, the acceptance of the Exchange Offer and Consent Solicitation, and to vest in the Company and or its nominees such Old Notes;

- the terms and conditions of the Exchange Offer and Consent Solicitation shall be deemed to be incorporated in, and form a part of, the Letter of Transmittal which shall be read and construed accordingly; and

- the Company and others (including any party to whom the Company transfers Old Notes or the right to receive Old Notes) will rely upon the truth and accuracy of the foregoing acknowledgments, representations, warranties and agreements, and that if any of the acknowledgments, representations, warranties and agreements deemed to have been made by it by its participation in the Exchange Offer and Consent Solicitation or its acquisition of the New Notes are no longer accurate, it will promptly notify the Company.

The representations and warranties and agreements of a Holder submitting Old Notes for exchange in the Exchange Offer and Consent Solicitation shall be deemed to be repeated and reconfirmed on and as of the Expiration Time, the filing of the Company's *concurso mercantil* petition, the Consent Payment Date, the date of consent to the *Convenio Concursal*, the approval of the *Convenio Concursal* and the Issue Date.

## Procedure for Exchanging Old Notes

All of the Old Notes are held in book-entry form through the facilities of DTC. Holders who own Old Notes and wish to exchange them in the Exchange Offer and Consent Solicitation should follow the instructions below.

Beneficial owners who hold Old Notes in a brokerage or custodian account through a custodian or nominee, including a broker, dealer, bank or trust company, will need to timely instruct their custodian or nominee to exchange their Old Notes on or prior to the Expiration Time (in order to receive the Note Consent Payment), in the manner described below and upon the terms and conditions set forth in this Statement and the Letter of Transmittal. Beneficial owners should refer to any materials forwarded by the custodian or nominee to determine how they can timely instruct their custodian or nominee to take these actions.

In order to participate in the Exchange Offer and Consent Solicitation, beneficial owners must instruct their nominee or custodian to participate on their behalf. Each beneficial owners' nominee or custodian should arrange for the DTC Participant holding the Old Notes through its DTC account to submit those Old Notes for exchange in the Exchange Offer and Consent Solicitation to the Information and Exchange Agent prior to the Expiration Time.

Beneficial owners who hold their Old Notes through a broker or bank should ask their broker or bank if they will be charged a fee to exchange their Old Notes through the broker or bank.

The Exchange Offer and Consent Solicitation is being conducted using DTC's ATOP procedures. Accordingly, DTC Participants holding Old Notes through DTC should note that before completing, executing and delivering the Letter of Transmittal, DTC Participants must submit their Old Notes for exchange in the Exchange Offer and Consent Solicitation in accordance with DTC's ATOP procedures. Since all Old Notes must be exchanged by book-entry transfer to the applicable DTC account of the Information and Exchange Agent, the beneficial owner's bank, broker, dealer, trust company, or other nominee must execute exchange through ATOP. Financial institutions that are DTC Participants must execute exchanges through ATOP by transmitting acceptance of the Exchange Offer and Consent Solicitation to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Exchange Offer and Consent Solicitation, execute a book-entry transfer of the exchanged Old Notes into the applicable DTC account of the Information and Exchange Agent, and send to the Information and Exchange Agent a "book-entry confirmation," which shall include an Agent's Message transmitted by DTC to and received by the Information and Exchange Agent and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant exchanging Old Notes that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company may enforce such agreement against the DTC Participant.

*The Role of a DTC Participant*

To validly participate in the Exchange Offer and Consent Solicitation, DTC Participants must (i) deliver Old Notes by means of book-entry transfer into the applicable DTC account of the Information and Exchange Agent, (ii) transmit electronic confirmation through ATOP, whereby an Agent's Message will be sent to the Information and Exchange Agent, and (iii) deliver a separate executed, notarized and apostiled and properly completed Letter of Transmittal and other required documentation to the Information and Exchange Agent.

Additionally, both (A) a properly completed and duly executed Power of Attorney, in the form attached to the Letter of Transmittal and (B) a properly executed and notarized signature to the *Concurso* Plan attached to the Letter of Transmittal, must be received by the Information and Exchange Agent its address set forth on the back cover of this Statement, on or prior to the Expiration Time.

By taking these actions with respect to the Exchange Offer and Consent Solicitation, the Holder and his or her custodian or nominee will be deemed to have agreed (i) to the terms and conditions of the Exchange Offer and Consent Solicitation as set forth in this Statement and the Letter of Transmittal and (ii) that Vitro and the Information and Exchange Agent may enforce the terms and conditions against such Holder and such Holder's custodian or nominee.

**The Letter of Transmittal and Old Notes should be sent to the Information and Exchange Agent and not to Vitro or the relevant trustee for the Old Notes. The Information and Exchange Agent will not accept any exchange materials other than the Letter of Transmittal and the DTC Participant's Agent's Message.**

*General Provisions*

The method of delivery of Old Notes and all other documents or instructions including, without limitation, the Agent's Message and the Letter of Transmittal, is at the beneficial owner's risk. An exchange will be deemed to have been received only when the DTC Participant (i) delivers Old Notes by means of book-entry transfer into the applicable DTC account of the Information and Exchange Agent, (ii) transmits electronic confirmation through ATOP, whereby an Agent's Message will be sent to the Information and Exchange Agent, and (iii) delivers a separate executed, notarized and apostiled and properly completed Letter of Transmittal and other required documentation to the Information and Exchange Agent. Additionally, both (A) a properly completed and duly executed Power of Attorney, in the form attached to the Letter of Transmittal and (B) a properly executed and notarized signature to the *Concurso* Plan attached to the Letter of Transmittal, must be received by the Information and Exchange Agent at its address set forth on the back cover of this Statement, on or prior to the Expiration Time.

All questions concerning the validity, form, exchanges (including time of receipt), and acceptance of exchanged Old Notes will be determined by the Company in its sole discretion, which determination will be final and binding. The Company reserves the absolute right to reject any and all exchanges of Old Notes not in proper form or any Old Notes the acceptance for exchange of which may, in the opinion of its counsel, be unlawful. The Company also reserves the absolute right to waive any defect or irregularity in exchanges of Old Notes, whether or not similar defects or irregularities are waived in the case of other tendered securities. The interpretation of the terms and conditions by the Company shall be final and binding on all parties. Unless waived, any defects or irregularities in connection with exchanges of Old Notes in the Exchange Offer and Consent Solicitation must be cured within such time as the Company shall determine. None of the Company, the Information and Exchange Agent or any other person will be under any duty to give notification of defects or irregularities with respect to exchanges of Old Notes in the Exchange Offer and Consent Solicitation, nor shall any of them incur any liability for failure to give such notification.

Exchanges of Old Notes in the Exchange Offer and Consent Solicitation will not be deemed to have been made until such defects or irregularities have been cured or waived. Any Old Notes received by the Information and Exchange Agent that are not validly exchanged and as to which the defects or irregularities have not been cured or waived will be returned by the Information and Exchange Agent to the DTC Participant, unless otherwise provided in the Letter of Transmittal, as soon as practicable following the Expiration Time or the withdrawal or termination of the Exchange Offer and Consent Solicitation.

Exchanges of Old Notes in the Exchange Offer and Consent Solicitation pursuant to any of the procedures described in the Statement and in the instructions in the Letter of Transmittal and acceptance of such Old Notes by the Company will constitute a binding agreement between the holder and the Company upon the terms and conditions of the Exchange Offer and Consent Solicitation. Any submitted Old Notes that are not accepted in the Exchange Offer and Consent Solicitation for any reason will be returned by crediting the account maintained at DTC from which such Old Notes were submitted.

**We have not provided guaranteed delivery provisions in connection with the Exchange Offer and Consent Solicitation. Old Notes being exchanged must be delivered to the Information and Exchange Agent in accordance with the procedures described in this Statement, on or prior to the Expiration Time (in order for the Holder to receive the Note Consent Payment).**

*Fractional Notes and De Minimis Payments*

The Old Notes will be accepted for exchange in denominations of $1,000 principal amount and integral multiples thereof and any New Notes will be issued in $2,000 principal amount and integral multiples thereof and will be issued by deposit book-entry form with the Information and Exchange Agent. If any DTC Participant submits a principal amount of the Old Notes for exchange in the Exchange Offer and Consent Solicitation that would result in the DTC Participant receiving a fractional interest in the New Notes, then the principal amount of the New Notes that the DTC Participant will receive will be rounded up to the nearest $1,000 if the fractional interest in the New Notes would be greater than or equal to $500 and rounded down to the nearest $1,000 if the fractional interest in the New Notes would be less than $500.

*Backup Withholding and Information Reporting*

For a summary of certain U.S. federal income tax consequences of the disposition of Old Notes pursuant to the Exchange Offer and Consent Solicitation, see "Certain U.S. Federal Income Tax Considerations."

**Procedure for Consenting to the *Concurso* Plan**

**For a beneficial owner of Old Notes to validly consent to the *Concurso* Plan, such beneficial owner must submit the Letter of Instructions and, if so instructed, the Letter of Transmittal, in accordance with the instructions on the Letter of Transmittal and the Letter of Instructions to the DTC Participant.** In order to receive the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee, the consent of the Holder of such Old Notes must be received prior to the Expiration Time.

162

The Exchange Offer and Consent Solicitation is being made to all persons in whose name an Old Note was registered as of the Record Date. Only Holders may execute and deliver a consent. For the purposes of the Exchange Offer and Consent Solicitation, the term "Holder" shall be deemed to include DTC Participants who held Old Notes through DTC as of the Record Date. In order to cause a consent to be given with respect to Old Notes held through DTC, such DTC Participant must complete and sign the relevant Letter of Transmittal and documents specified therein and deliver them to the Information and Exchange Agent in accordance with the instructions set forth herein and therein. A beneficial owner of an interest in Old Notes held through a DTC Participant must complete and sign the Letter of Instructions and documents specified therein and deliver them to such DTC Participant in order to cause a consent to be given with respect to such Old Notes.

In addition to instructing the DTC Participant to submit Old Notes for exchange pursuant to the procedure set forth in "—Procedure for Exchanging Old Notes" above, the beneficial owner must instruct the DTC Participant to (A) properly complete and duly execute the Power of Attorney in the form attached to the Letter of Transmittal authorizing or appointing the representative to carry out all necessary or expedient steps required or advisable under Mexican law to submit the Letter of Transmittal before the Mexican court within the *concurso mercantil* proceeding, to join and adhere to any *concurso mercantil* to be filed by the Company and to execute and consent to the *Concurso* Plan and (B) properly execute and notarize the signature to the *Concurso* Plan attached to the Letter of Transmittal. Certain of the foregoing documents, including the Power of Attorney, are provided in Spanish, with an accompanying translation in English for the Holder's convenience; unless otherwise indicated in the Letter of Transmittal and the Letter of Instructions, Holders will be required to execute and notarize the Spanish versions of such documents.

The execution and delivery of a consent will not affect a Holder's right to sell or transfer Old Notes. All validly delivered consents received by the Information and Exchange Agent prior to the Expiration Time will be effective notwithstanding a record transfer of such Old Notes subsequent to the Record Date. The transfer of Old Notes after the Record Date will not have the effect of revoking any consent validly delivered to the Information and Exchange Agent. Each consent properly received by the Information and Exchange Agent will be counted notwithstanding any transfer of the Old Notes to which such consent relates. The Note Consent Payment will be paid to Holders as of the Record Date who are entitled thereto, notwithstanding any subsequent transfer of the Old Notes.

**Holders who wish to consent to the *Concurso* Plan should complete and execute, notarize and apostille, as applicable, the relevant Letter of Transmittal and documents specified therein and mail, hand deliver, send by overnight courier or facsimile (confirmed by physical delivery of an original) their properly completed and executed, notarized and apostilled, as applicable, Letter of Transmittal and documents specified therein to the Information and Exchange Agent at the address or facsimile number set forth in the section of this Statement entitled "—Information and Exchange Agent" and on the relevant Letter of Transmittal, all in accordance with the instructions set forth herein and therein.**

**Letters of Transmittal and documents specified therein should be delivered to the Information and Exchange Agent, not to the Company or any other person. However, the Company reserves the right to accept any consent received by the Company or any other party that is otherwise in proper form.**

**Holders who are beneficial owners of Old Notes held through a bank, broker or other financial institution and wish to consent to the *Concurso* Plan must contact such entity to consent on their behalf. Such holders are urged to contact such entity promptly in order to allow adequate processing time.**

All Letters of Transmittal and documents specified therein that are properly completed, executed, notarized and apostilled, as applicable, and delivered to the Information and Exchange Agent will be given effect in accordance with the specifications thereof.

Letters of Transmittal and documents specified therein of Holder(s) must be executed in exactly the same manner as such Holder(s) name(s) are registered with DTC in the case of Holders who are DTC Participants. If a Letter of Transmittal or document specified therein is signed by a trustee, partner, executor, administrator, guardian, attorney-in-fact, officer of a corporation or other person acting in a fiduciary or representative capacity, such person

163

must so indicate when signing and must submit with such document evidence satisfactory to the Company of authority to execute such document. **If no aggregate principal amount of the Old Notes as to which a consent is delivered is specified, but the Letter of Transmittal is otherwise properly completed and executed, notarized and apostilled, the Holder will be deemed to have given a consent with respect to the entire aggregate principal amount of the Old Notes which such Holder holds.**

### Acceptance for Payment of Note Consent Payment; Source of Funds

Upon the terms and subject to the conditions of the Exchange Offer and Consent Solicitation, the Company will accept all Old Notes submitted for exchange and consents that are validly delivered. For purposes of the Exchange Offer and Consent Solicitation, the Company will be deemed to have accepted the Old Notes and consents if, as and when it has given written notice to the Information and Exchange Agent of its acceptance of such exchanges and consents.

The Information and Exchange Agent will act as agent for the consenting Holders for the purpose of receiving the Note Consent Payment and transmitting such payments for the Note Consent Payment to the consenting Holders. Thus, the Company will cause the Payment Trust to deposit same-day funds in payment of the Note Consent Payment with the Information and Exchange Agent following the Expiration Time. The Consent Payment will be made no later than the Consent Payment Date. **Under no circumstances will any additional interest be payable by the Company because of any delay in the transmission of funds from the Information and Exchange Agent to the consenting Holders.**

### Withdrawal Rights

Any Old Notes submitted for exchange or consents provided after the date of this Statement are irrevocable and may not be withdrawn, except (i) in the event the Company amends the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date does not occur on or before the Outside Consummation Date, or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes.

### Extensions, Amendments and Termination

We expressly reserve the right (but will not be obligated), at any time or from time to time, on or prior to the Expiration Time, regardless of whether any of the events set forth in "—Certain Terms and Conditions of the Exchange Offer and Consent Solicitation" shall have occurred or shall have been determined by us to have occurred, to:

- waive any and all conditions to the Exchange Offer and Consent Solicitation;
- extend the Expiration Time;
- otherwise amend the Exchange Offer and Consent Solicitation in any respect; or
- terminate the Exchange Offer and Consent Solicitation at any time,

in each case, by giving written notice of such waiver, extension, amendment or termination to the Information and Exchange Agent. If we make a material change in the terms of the Exchange Offer and Consent Solicitation or the information concerning the Exchange Offer and Consent Solicitation or waive a material condition of the Exchange Offer and Consent Solicitation, we will disseminate additional materials relating to the Exchange Offer and Consent Solicitation and extend the Exchange Offer and Consent Solicitation to the extent required by law. We will publicly announce any waiver, extension, amendment or termination in the manner described under "—Announcements" below.

164

There can be no assurance that we will exercise their right to extend, terminate or amend the Exchange Offer and Consent Solicitation. Irrespective of any amendment to the Exchange Offer and Consent Solicitation, all Old Notes previously exchanged pursuant to the Exchange Offer and Consent Solicitation and not accepted for purchase will remain subject to the Exchange Offer and Consent Solicitation and may be accepted thereafter for payment by us, except when such acceptance is prohibited by law.

In order to receive the Consent Payment, the Restructuring Cash Payment or the Restructuring Fee, the submission for exchange of the Old Notes and/or consent of Participating Creditors must be received prior to the Expiration Time. Holders may consent to the *Concurso* Plan by validly submitting their Letter of Transmittal, Letter of Instructions and documents specified therein. See "—Procedure for Consenting to the *Concurso* Plan."

New Notes issued pursuant to the *Concurso* Plan will be issued in denominations of $10,000 principal amount and integral multiples thereof and will be issued in exchange for the Old Notes through a U.S.-based exchange agent that will be appointed by the Company prior to the issuance of the New Notes.

Neither the New Notes nor the guarantees have been or will be registered under the Securities Act or any state securities laws. We are making the Exchange Offer and Consent Solicitation in accordance with Section 3(a)(9) of the Securities Act, which will result in the New Notes being freely transferable, like the Old Notes, when issued in exchange for the Old Notes. Upon filing of our *concurso mercantil* petition, we intend to seek an order of a bankruptcy judge in connection with a bankruptcy proceeding whether pursuant to chapter 11 of the U.S. Bankruptcy Code or an ancillary proceeding pursuant to chapter 15 of the U.S. Bankruptcy Code providing an exemption from registration under the Securities Act and applicable state and local laws requiring registration of securities with respect to the New Notes issued under the *Concurso* Plan in exchange for all of the Restructured Debt. We cannot provide any assurance that we will be successful in obtaining such an order. If we do not obtain such an order, the New Notes issued in exchange for the DFI Claims and Other Debt will be subject to certain transfer restrictions.

## Announcements

There can be no assurance that the Company will exercise its right to extend the Expiration Time. Any extension, amendment or termination will be followed as promptly as practicable by a public announcement thereof, with the announcement in the case of an extension to be issued no later than 9:00 a.m., New York City time, on the first business day after the previously scheduled Expiration Time. Without limiting the manner in which the Company may choose to make any public announcement, the Company shall have no obligation to publish, advertise or otherwise communicate any such public announcement other than by issuing a release to PR Newswire.

## Information and Exchange Agent

D.F. King & Co., Inc. has been appointed as Information and Exchange Agent for the Exchange Offer and Consent Solicitation. Questions and requests for assistance, and all correspondence in connection with the Exchange Offer and Consent Solicitation, or requests for additional Letters of Transmittal, Letters of Instructions and any other required documents, may be directed to the Information and Exchange Agent at the address and telephone numbers set forth on the back cover of this Statement. The Information and Exchange Agent will also assist with the mailing of this Statement and related materials to Holders, respond to inquiries of and provide information to Holders in connection with the Exchange Offer and Consent Solicitation, and provide other similar advisory services as the Company may request from time to time.

Subject to the terms and conditions set forth in the agreement between the Company and the Information and Exchange Agent, the Company has agreed to pay the Information and Exchange Agent customary fees for its services in connection with the Exchange Offer and Consent Solicitation. The Company has also agreed to reimburse the Information and Exchange Agent for its reasonable out-of-pocket expenses and to indemnify it against certain liabilities.

**Fees and Expenses**

As stated above, the Company will pay the Information and Exchange Agent reasonable and customary fees for its services (and will reimburse it for its reasonable out-of-pocket expenses in connection therewith), and will pay brokerage houses and other custodians, nominees and fiduciaries their reasonable out-of-pocket expenses incurred in connection with forwarding copies of this Statement and related documents to the beneficial owners of the Old Notes and in handling or forwarding consents for payment. In addition, the Company will indemnify the Information and Exchange Agent against certain liabilities in connection with its services, including liabilities under the federal securities laws.

**Miscellaneous**

Other than with respect to the Information and Exchange Agent, none of the Company or any of its affiliates has engaged, or made any arrangements for, and authorized any person to provide any information or to make any representations in connection with the Exchange Offer and Consent Solicitation, other than those expressly set forth in this Statement, and, if so provided or made, such other information or representations must not be relied upon as having been authorized by the Company, or any of its affiliates. The delivery of this Statement shall not, under any circumstances, create any implication that the information set forth herein is correct as of any time subsequent to the date hereof.

# DESCRIPTION OF THE NEW NOTES

In this Description of the New Notes, the word "Company" refers only to Vitro, S.A.B. de C.V. (a *sociedad anónima bursátil de capital variable* incorporated under the laws of Mexico), and any successor obligor on the notes, and not to any of its subsidiaries. All references to "$" or "dollars" are to United States of America dollars. You can find the definitions of certain terms used in this description under the subheading "—Certain Definitions."

The Company will issue $850.0 million in aggregate principal amount of new notes (the "New 2019 Notes") and $100.0 million plus the Issue Date Adjustment in aggregate principal amount of newly issued mandatory convertible debentures (the "New MCDs" and, together with the New 2019 Notes, the "New Notes"), which will mandatorily convert into 15.0% of our equity if not paid in full at maturity, each under an indenture governing the respective series (the "New 2019 Notes Indenture" and the "New MCD Indenture", collectively, the "New Indentures"), among the Company, the Guarantors (as defined herein), and The Bank of New York Mellon as trustee (the "Trustee"). The New Notes will be issued on the Issue Date to the holders of the Restructured Debt on a pro rata basis, based on the principal amount of Restructured Debt held by each holder relative to the aggregate principal amount of all the Restructured Debt. The New Notes will be distributed through an exchange agent that will be a financial institution or bank in the U.S. The terms of the New Notes include those stated in the New Indentures and those made part of the New Indentures by reference to the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act").

The Company will issue the New Notes in replacement of the Restructured Debt pursuant to the *Concurso* Plan. The delivery of the New Notes is subject to the approval and consummation of the *Concurso* Plan. See "The Restructuring and the *Concurso* Plan."

Regardless of the Issue Date and date of delivery of the New Notes pursuant to the *Concurso* Plan, the maturity date, amortization provisions and other relevant terms and conditions of the New Notes will be based on a value date of January 1, 2011 (the "Value Date"). On the Issue Date of the New Notes, the Company will (1) pay holders the Restructuring Fee, (2) include all Excess Cash Flow accumulated from the Value Date in the first cash sweep following the Issue Date and otherwise make prepayments or repurchases of the New Notes pursuant to the terms described under "—Excess Cash Sweep" and (3) use any proceeds from Asset Sales and equity issuances (if any) that otherwise would be required to be used for prepayments or repurchases pursuant to the terms described under "New 2019 Notes—Optional Redemption," "New MCDs—Optional Redemption" and "Provisions Applicable to All of the New Notes—Mandatory Redemption."

The issuance of the New Notes under the *Concurso* Plan will be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities.

The following description is a summary of the material provisions of the New Indentures. Because this is a summary, it may not contain all the information that is important to you. You are urged to read the New Indentures in their entirety. Copies of the proposed form of the New Indentures will be available upon request. Certain defined terms used in this description but not defined below under "—Certain Definitions" have the meanings assigned to them in the New Indentures.

## I. NEW 2019 NOTES

### Basic Terms of the New 2019 Notes

The New 2019 Notes:

- will be general unsecured obligations of the Company;
- will be *pari passu* in right of payment to all senior unsecured Debt of the Company;

- will be effectively junior in right of payment to any secured Debt of the Company to the extent of the assets securing such Debt;

- will be senior in right of payment to any future subordinated Debt of the Company; and

- will be unconditionally guaranteed by the Guarantors.

**Principal, Maturity and Interest**

The Company will issue $850.0 million in aggregate principal amount of the New 2019 Notes under the *Concurso* Plan. The Company will issue the New 2019 Notes in denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof. The New 2019 Notes will mature eight years after the Value Date.

*Interest*

Interest on the New 2019 Notes will accrue at a fixed interest rate, payable semiannually commencing with the first six-month scheduled interest payment date immediately following the Issue Date, in accordance with the following grid:

| Year | Total Interest Rate | Per Annum Cash Rate | Per Annum PIK Rate |
|---|---|---|---|
| Year 1 (from Jan. 1, 2011 to Dec. 31, 2011) | 8.0% | 8.0% (or 4.0% if PIK Option is elected) | 4.0% (if elected) |
| Year 2 (from Jan. 1, 2012 to Dec. 31, 2012) | 8.0% | 8.0% (or 4.0% if PIK Option is elected) | 4.0% (if elected) |
| Year 3 (from Jan. 1, 2013 to Dec. 31, 2013) | 8.0% | 8.0% (or 4.0% if PIK Option is elected) | 4.0% (if elected) |
| Year 4 (from Jan. 1, 2014 to Dec. 31, 2014) | 8.0% | 8.0% | None |
| Year 5 (from Jan. 1, 2015 to Dec. 31, 2015) | 8.0% | 8.0% | None |
| Year 6 (from Jan. 1, 2016 to Dec. 31, 2016) | 8.0% | 8.0% | None |
| Year 7 (from Jan. 1, 2017 to Dec. 31, 2017) | 8.0% | 8.0% | None |
| Year 8 (from Jan. 1, 2018 to Dec. 31, 2018) | 8.0% | 8.0% | None |

Interest that is elected to be paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the New 2019 Notes, and will be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New 2019 Notes will bear interest at the rate then applicable to the New 2019 Notes, beginning on the date such interest is paid in kind and added to the principal amount thereof. The Company may only elect to pay interest in kind (up to half of the applicable interest payment) (the "PIK Option") if (i) based on the most recently available consolidated balance sheet of the Company, Unrestricted Cash (as defined

below) would be less than $95.0 million after giving effect to the payment of half of the relevant scheduled interest payment that the Company wishes to pay in kind through the exercise of the PIK Option, (ii) no Default or Event of Default has occurred and is continuing, and (iii) all New Notes that have been repurchased through Market Purchases prior to the interest period in respect of which the Company wishes to exercise the PIK Option have been canceled.

The Company must elect the form of interest payment with respect to each interest period in the first three years after the Value Date by delivering a notice to the trustee 30 days prior to the relevant interest payment date. The trustee shall promptly deliver a corresponding notice to the holders. In the absence of such an election for any such interest period, interest on the New 2019 Notes shall be payable in entirely in cash. After year three (following the Value Date), the Company will make all interest payments on the New 2019 Notes entirely in cash. Notwithstanding anything to the contrary, the payment of accrued interest in connection with any Market Purchases or any redemption of New 2019 Notes as described under "—Optional Redemption", under "Provisions Applicable to All of the New Notes—Excess Cash Sweep" or pursuant to any other covenant in the New Indentures shall be made solely in cash.

In the event that the Company elects to exercise the PIK Option with respect to any interest period as described above, the Company will not be permitted to repurchase any New Notes through Market Purchases during such interest period or during the immediately following interest period. Any required prepayment of the New Notes during such interest periods pursuant to the covenant described under "Provisions Applicable to All of the New Notes—Excess Cash Sweep" or pursuant to any other covenant in the New Indentures shall be made solely through redemptions of the New Notes (at par).

Interest on the New 2019 Notes will accrue from the Issue Date or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

Interest on overdue principal and interest (including Additional Amounts, if any) will accrue at a rate that is 2.0% higher than the then applicable interest rate on the New 2019 Notes. The Company will make each interest payment to the holders of record on the 15th day immediately preceding the applicable interest payment date. If the due date for payment of any amount in respect of principal or interest on any of the New 2019 Notes is not a Business Day, the holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day and shall not be entitled to any further interest or other payment as a result of any such delay.

*Principal*

The New 2019 Notes will provide that principal will be due and payable in semiannual installments to the registered holder of the New 2019 Notes on the regular record date immediately preceding each semiannual installment, based upon the following schedule:

Year 1: None

Year 2: None

Year 3: None

Year 4: None

Year 5: June 30, 2015: $12,500,000

       December 31, 2015: $12,500,000

Year 6: June 30, 2016: $12,500,000

December 31, 2016: $12,500,000

Year 7: June 30, 2017: $12,500,000

December 31, 2017: $12,500,000

Year 8: Balance at maturity.

There are no amortization provisions for the New MCDs.

**Optional Redemption**

The Company may redeem the New 2019 Notes at its option, at any time in whole or from time to time in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address. The optional redemption may only be paid out of (1) Excess Cash Flow, in accordance with the covenant described under "Provisions Applicable to All of the New Notes—Excess Cash Sweep", or (2) the proceeds of, or in exchange for (a) Permitted Refinancing Debt, (b) an offering of Equity Interests of the Company (other than the issuance of Equity Interests upon conversion of the New MCDs), or (c) an Asset Sale, in accordance with the covenant described under "—Certain Covenants—Limitation on Asset Sales." To redeem the New 2019 Notes the Company must pay a redemption price equal to:

(a) 100% of the principal amount of the New 2019 Notes to be redeemed; *plus*

(b) accrued and unpaid interest (including any Additional Amounts), if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

If fewer than all of the New 2019 Notes are being redeemed, the trustee will select the New 2019 Notes to be redeemed *pro rata*, by lot or by any other method the trustee in its sole discretion deems fair and appropriate, in denominations of $1,000 principal amount and multiples thereof. Upon surrender of any New 2019 Note redeemed in part, the holder will receive a New 2019 Note equal in principal amount to the unredeemed portion of the surrendered New 2019 Note. Once notice of redemption is sent to the holders, New 2019 Notes called for redemption become due and payable at the redemption price on the redemption date, and, commencing on the redemption date, New 2019 Notes redeemed will cease to accrue interest. Any redeemed New 2019 Notes will be promptly canceled.

**Mandatory Redemption**

The mandatory redemption provisions with respect to the New 2019 Notes are described under "Provisions Applicable to All of the New Notes—Mandatory Redemption" below.

**Excess Cash Sweep**

The excess cash sweep with respect to the New 2019 Notes is described under "Provisions Applicable to All of the New Notes—Excess Cash Sweep" below.

**Ranking**

*Structural Subordination.* Substantially all the operations of the Company are conducted through its subsidiaries. Claims of creditors of non-guarantor subsidiaries, including trade creditors, secured creditors and creditors holding debt and guarantees issued by those subsidiaries, and claims of preferred and minority stockholders (if any) of those subsidiaries generally will have priority with respect to the assets and earnings of those subsidiaries over the claims of creditors of the Company, including holders of the New 2019 Notes. The New 2019 Notes and each Note Guaranty therefore will be effectively subordinated to creditors (including trade creditors)

170

and preferred and minority stockholders (if any) of subsidiaries of the Company (other than the Guarantors). As of June 30, 2010, third party total liabilities of the Company's subsidiaries (other than the Guarantors) would have been approximately $84.0 million, including trade payables. Although the New 2019 Notes Indenture limits the incurrence of Debt and Disqualified or Preferred Stock of Restricted Subsidiaries, the limitation is subject to a number of significant exceptions. Moreover, the New 2019 Notes Indenture does not impose any limitation on the incurrence by Restricted Subsidiaries of liabilities that are not considered Debt or Disqualified or Preferred Stock under the New 2019 Notes Indenture. See "—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock."

***Pari Passu* Status**

The New Notes will constitute direct, unconditional and unsubordinated obligations of the Company ranking at all times *pari passu* in priority of payment, in right of security and in all other respects among themselves and with all other unsecured and unsubordinated Debt of the Company now or hereafter outstanding, except to the extent that such other Debt may be preferred by mandatory provisions of applicable law.

**Guaranties**

The obligations of the Company pursuant to the New 2019 Notes, including any repurchase obligation resulting from a Change of Control and any mandatory prepayment obligations under the New 2019 Notes Indenture, will be unconditionally guaranteed, jointly and severally, on an unsecured basis, by the Guarantors. The New MCDs will not be guaranteed. Each Guarantor will provide a guarantee of the New 2019 Notes on the Issue Date. If after the Issue Date the Company or any of its Restricted Subsidiaries acquires or creates a Subsidiary that is a Restricted Subsidiary after giving effect to such transaction (other than (i) a Finance Subsidiary or (ii) a Project Finance Entity), the new Restricted Subsidiary must provide a guaranty of the New 2019 Notes on terms no less favorable to the holders of the New 2019 Notes than the terms of the guarantees provided by the Guarantors on the Issue Date. If after the Issue Date the Company or any of its Restricted Subsidiaries acquires, creates, participates in or otherwise contributes any assets to a Strategic Joint Venture that does not become a Guarantor, the Company or such Restricted Subsidiary will pledge, concurrently with the acquisition or creation of, or participation in, such Strategic Joint Venture, all of its ownership interest in the Strategic Joint Venture as collateral for the Company's obligations under the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture.

In compliance with Swiss law the aggregate amount payable by each Swiss Subsidiary Guarantor will be limited for each such Swiss Subsidiary Guarantor to an amount equal to the maximum amount of the freely distributable retained earnings of such Swiss Subsidiary Guarantor as of such time. There may be other limitations on the guarantees of our other non-Mexican Guarantors required under applicable local laws. See "Risk Factors—Risk Factors Relating to the Notes—The guarantees of our non-Mexican Subsidiary Guarantors may be held to be unenforceable under fraudulent conveyance laws or limited by other applicable laws."

The Note Guaranty of a Guarantor with respect to the New 2019 Notes will terminate upon:

(1) a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (other than to the Company or a Restricted Subsidiary) permitted by the New 2019 Notes Indenture,

(2) the designation in accordance with the New 2019 Notes Indenture of the Guarantor as an Unrestricted Subsidiary,

(3) the pledge of Capital Stock of any new Strategic Joint Venture involving such Guarantor created by the Company, provided that (i) such Strategic Joint Venture is engaged in a Permitted Business and (ii) such pledge is validly granted concurrently with the acquisition or creation of, or participation in, such Strategic Joint Venture and otherwise in accordance with the terms of the New 2019 Notes Indenture, or

(4) defeasance or discharge of the New 2019 Notes, as provided below under the caption "—Defeasance and Discharge."

**Certain Covenants**

The New 2019 Notes Indenture will contain covenants including, among others, the following:

*Limitation on Debt and Disqualified or Preferred Stock.* (a) The Company:

(1) will not, and will not permit any of its Restricted Subsidiaries to, Incur any Debt; and

(2) will not, and will not permit any Restricted Subsidiary to, Incur any Disqualified Stock, and will not permit any of its Restricted Subsidiaries to Incur any Preferred Stock (other than Disqualified or Preferred Stock of Restricted Subsidiaries held by the Company or a Substantially Wholly Owned Restricted Subsidiary, so long as it is so held);

*provided* that the Company or any Restricted Subsidiary may Incur Debt and the Company or any Restricted Subsidiary may Incur Disqualified Stock and the Company or any Restricted Subsidiary may Incur Preferred Stock if, on the date of the Incurrence, after giving effect to the Incurrence and the receipt and application of the proceeds therefrom, the Leverage Ratio is not greater than 3.0 to 1.0; *provided further* that any Debt Incurred, or reclassified as Debt Incurred, pursuant to this sentence ("Ratio Debt") shall at all times represent unsecured obligations of the Company or the relevant Restricted Subsidiary and shall not rank senior in right of payment to the New 2019 Notes and New MCDs.

(b) Notwithstanding the foregoing, the Company and, to the extent provided below, any Restricted Subsidiary may Incur the following Debt ("Permitted Debt"):

(1) Any of the following types of Debt of the Company or any Guarantor that do not, in the aggregate, exceed $100.0 million at any time outstanding, less any amount of such Debt permanently repaid (i) as provided by the covenant described under the caption "— Certain Covenants—Limitation on Asset Sales" or (ii) pursuant to clause (g) of the definition of "Excess Cash Flow":

(A) Debt Incurred for working capital needs of the Company and its Restricted Subsidiaries in the ordinary course of business;

(B) Debt Incurred to fund Permitted Capital Expenditures;

(C) Debt Incurred for the purpose of making interest payments on Debt permitted by this covenant;

(D) either (x) Project Finance Guarantees Incurred in accordance with the covenant described under the caption "—Certain Covenants—Limitation on Transactions with Project Finance Subsidiaries" or (y) Debt Incurred to fund a Project Finance Investment; or

(E) Debt of the Company or any Restricted Subsidiary Incurred on or after the Issue Date not otherwise permitted by this covenant;

*provided* that if the Leverage Ratio on any date shall be equal to or less than 3.0 to 1.0 (a "Leverage Compliance Date"), the reduction of such $100.0 million by any permanent repayments of the Debt set forth in clauses (A) through (E) above prior to such Leverage Compliance Date shall be reversed,

172

(2) Debt Incurred in connection with a Permitted Receivables Financing, the net proceeds of which are used to fund the working capital needs of the Company and its Restricted Subsidiaries in the ordinary course of business;

(3) Purchase Money Debt of the Company or any Restricted Subsidiary, not to exceed $25.0 million at any time outstanding, less any amount of such Debt permanently repaid (i) as provided by the covenant described under the caption "—Certain Covenants—Limitation on Asset Sales" or (ii) pursuant to clause (g) of the definition of "Excess Cash Flow"; *provided* that if a Leverage Compliance Date occurs, the reduction of such $25.0 million by any permanent repayments of such Purchase Money Debt prior to such Leverage Compliance Date shall be reversed,

(4) Debt of the Company or any Restricted Subsidiary outstanding on the Issue Date ("Existing Debt") and listed on a schedule to the Indenture for the New 2019 Notes;

(5) Debt of the Company or any Restricted Subsidiary of the Company so long as such Debt continues to be owed to the Company or a Restricted Subsidiary ("Intercompany Debt"), provided that (i) if the obligor is the Company or a Guarantor, such Debt is subordinated in right of payment to the New 2019 Notes in accordance with the covenant described under the caption "—Certain Covenants—Limitation on Intercompany Debt," (ii) in the event that at any time any such Debt ceases to be held by the Company or a Restricted Subsidiary, such Debt shall be deemed Incurred and not permitted by this clause (5) at the time such event occurs, and (iii) such Debt is otherwise Incurred in accordance with the terms of the covenant described under the caption "—Certain Covenants—Limitation on Intercompany Debt";

(6) Debt of the Company and the Guarantors not to exceed in aggregate the sum of $850.0 million and any interest thereon paid in kind in accordance with the Company's exercise of the PIK Option as permitted under "—Principal, Maturity and Interest—Interest", in each case in respect of the New 2019 Notes and Note Guaranties issued on the Issue Date (and any additional Note Guaranties issued after the Issued Date) pursuant to the New 2019 Notes;

(7) Debt ("Permitted Refinancing Debt") constituting an extension or renewal of, replacement of, or substitution for, or issued in exchange for, or the net proceeds of which are used to repay, redeem, repurchase, refinance or refund, including by way of defeasance (all of the above, for purposes of this clause, "refinance") (i) Debt permitted pursuant to this covenant or (ii) the New MCDs issued on the Issue Date (and any accrued interest thereon), in an amount not to exceed the outstanding principal amount of the Debt or New MCDs so refinanced (less, in the case of the New MCDs, the applicable MCD Prepayment Discount), *plus* premiums, fees and expenses; *provided* that, in the case of the New MCDs and Debt other than Existing Debt:

(A) in case the Debt to be refinanced is subordinated in right of payment to the New 2019 Notes, the new Debt, by its terms or by the terms of any agreement or instrument pursuant to which it is outstanding, is expressly made subordinate in right of payment to the New 2019 Notes at least to the extent that the Debt to be refinanced is subordinated to the New 2019 Notes,

(B) the new Debt does not (i) have a Stated Maturity prior to the Stated Maturity of the Debt to be refinanced, and the Average Life of the new Debt is equal or greater than the remaining Average Life of the Debt to be refinanced, and (ii) rank senior in right of payment to the Debt to be refinanced,

(C) in no event may Debt of the Company or any Guarantor be refinanced pursuant to this clause by means of any Debt of any Restricted Subsidiary that is not a Guarantor,

(D) in the event that the Debt being refinanced is the New 2019 Notes or the Permitted Refinancing Debt is being Incurred to refinance the New MCDs, the new Debt is made *pari passu* or subordinated to the New Notes or New MCDs, as applicable, and the proceeds from the Incurrence of any such new Debt are used exclusively to prepay the New 2019 Notes and/or New MCDs (as the case may be) within 30 days of the Incurrence of such new Debt,

173

(E) in the event that the Debt being refinanced is Project Finance Indebtedness, such Permitted Refinancing Debt is (i) also Project Finance Indebtedness and is (ii) recourse to no cash flow, revenues, assets, capital stock or other interests other than the same aggregate cash flow or net cash flow (or the revenues or any portion thereof) or assets of, or capital stock or other interests in the relevant Project Finance Entity that were pledged in connection with the Incurrence of the Project Finance Indebtedness being Refinanced, and

(F) Debt Incurred pursuant to clauses (5), (8), (9) and (12) may not be refinanced pursuant to this clause;

(8) Hedging Agreements of the Company or any Restricted Subsidiary entered into in the ordinary course of business for the purpose of limiting risks associated with the business of the Company and its Restricted Subsidiaries and not for speculation in accordance with the covenant described under the caption "—Certain Covenants—Limitation on Hedging Agreements";

(9) Debt of the Company or any Restricted Subsidiary with respect to letters of credit and bankers' acceptances issued in the ordinary course of business and not supporting Debt, including letters of credit supporting performance, surety or appeal bonds or indemnification, adjustment of purchase price or similar obligations;

(10) Acquired Debt, *provided* that after giving effect to the Incurrence thereof, the Leverage Ratio is not greater than the Leverage Ratio immediately prior to such Incurrence;

(11) Project Finance Indebtedness Incurred by a Project Finance Entity;

(12) Attributable Debt Incurred in connection with a Sale and Leaseback Transaction involving the sale and lease of the headquarters of the Company, located in San Pedro Garza García, 66265 Nuevo León, Mexico; and

(13) Debt of the Company or any Guarantor consisting of Guarantees of Debt of the Company or any Restricted Subsidiary Incurred under any other clause of this covenant.

For purposes of determining compliance with the "Limitation on Debt and Disqualified or Preferred Stock" covenant described above, (A) in the event that an item of Debt meets the criteria of more than one of the types of Debt described above, the Company, in its sole discretion, shall classify such item of Debt and only be required to include the amount and type of such Debt in one of such clauses, although the Company may divide and classify an item of Debt in one or more of the types of Debt and may later re-divide or reclassify all or a portion of such item of Debt in any manner that complies with the "Limitation on Debt and Disqualified or Preferred Stock" covenant described above and (B) the amount of Debt issued at a price that is less than the principal amount thereof shall be equal to the amount of the liability in respect thereof determined in conformity with Mexican GAAP.

*Limitation on Strategic Joint Ventures*

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to:

(a) create, acquire, participate in or otherwise contribute any assets to any Strategic Joint Venture, unless:

(1) such Strategic Joint Venture is engaged in a Permitted Business,

(2) after giving effect to the Proportional Debt of such Strategic Joint Venture as if it had been Incurred by the Company or such Restricted Subsidiary and the Proportional EBITDA of such Strategic Joint Venture as if it had been earned by the Company or such Restricted Subsidiary, the Leverage Ratio is not greater than the Leverage Ratio immediately prior to such Incurrence,

(3) concurrently with the creation or acquisition of, or participation in, such Strategic Joint Venture, either (a) the Strategic Joint Venture provides a Note Guaranty on terms no less favorable to the holders of the New 2019 Notes than the terms of the guarantees provided by the Guarantors on the Issue Date or (b) the Company and/or the relevant Restricted Subsidiary (or Restricted Subsidiaries) pledge all of their ownership interests in the Strategic Joint Venture as collateral for the Company's obligations under the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture, and

(4) the Company promptly delivers a notice to the Trustee, certified by the Chief Financial Officer of the Company, (x) listing all of the Debt and EBITDA of such Strategic Joint Venture at the time such Strategic Joint Venture was created or acquired by the Company or such Restricted Subsidiary and (y) certifying that the creation or acquisition of, or participation in, such Strategic Joint Venture was consummated in accordance with the terms of this covenant;

and

(b) cause or permit any Strategic Joint Venture to Incur any Debt unless, after giving effect to the Incurrence of the Proportional Debt of such Strategic Joint Venture as if it had been Incurred by the Company or such Restricted Subsidiary on the date it was Incurred by such Strategic Joint Venture and the Proportional EBITDA of such Strategic Joint Venture as if it had been earned by the Company or such Restricted Subsidiary, the Leverage Ratio is not greater than the Leverage Ratio immediately prior to such Incurrence.

*Limitation on Restricted Payments.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly (the payments and other actions described in the following clauses being collectively "Restricted Payments"):

- declare or pay any dividend or make any distribution on its Equity Interests (other than on the New MCDs pursuant to the terms of the New MCDs Indenture) held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries (other than (x) dividends or distributions paid solely in the Company's Qualified Equity Interests or (y) dividends or distributions by a Restricted Subsidiary on shares of its Common Stock that are paid *pro rata* to all holders of such Common Stock or, if such Restricted Subsidiary has more than one class of Capital Stock, any dividend or distribution by such Restricted Subsidiary on all shares of its Capital Stock that is paid *pro rata* to all holders of such Capital Stock in proportion to such holders' equity interest in such Restricted Subsidiary);

- purchase, redeem, retire or otherwise acquire for value any Equity Interests of the Company (other than the New MCDs repurchased or redeemed pursuant to the terms of the New Indentures) held by Persons other than the Company or any of its Wholly Owned Restricted Subsidiaries;

- repay, redeem, repurchase, defease, retire or otherwise acquire for value, or make any payment on or with respect to, any Subordinated Debt (other than for value payable solely in Subordinated Debt that constitutes Permitted Refinancing Debt or in shares of Capital Stock of the Company (other than Disqualified Stock or Preferred Stock)) except a payment of interest or principal at Stated Maturity and except as contemplated by the covenant described under the caption "—Certain Covenants—Limitation on Asset Sales"; or

- make any Investment other than a Permitted Investment;

unless, at the time of, and after giving effect to, the proposed Restricted Payment:

(1) no Default has occurred and is continuing,

(2) the Company has not exercised its PIK Option for the interest period in which such proposed Restricted Payment would be made,

175

(3) the Leverage Ratio is not greater than 3.1 to 1.0, and

(4) the aggregate amount expended for all Restricted Payments made on or after the Issue Date would not, subject to paragraph (c), exceed the sum of:

(A) 50% of the aggregate amount of the Consolidated Net Income (or, if the Consolidated Net Income is a loss, *minus* 100% of the amount of the loss) accrued on a cumulative basis during the period, taken as one accounting period, beginning on the date of issuance of the New 2019 Notes and ending on the last day of the Company's most recently completed fiscal quarter for which internal consolidated financial statements are available, *plus*

(B) subject to paragraph (c), the aggregate net cash proceeds received by the Company (other than from a Subsidiary) after the Issue Date from

(x) the issuance and sale of its Qualified Equity Interests, including by way of issuance of its Disqualified Equity Interests or Debt to the extent since converted into Qualified Equity Interests of the Company or

(y) a contribution by a Person other than a Restricted Subsidiary to the equity capital of the Company not representing an interest in Disqualified Stock including the New MCDs if converted; *plus*

(C) the cash return, after the Issue Date, on any other Investment made after the Issue Date pursuant to this paragraph (a), as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of such Investment so made; *plus*

(D) to the extent not included in clause (A) above, an amount equal to the net reduction in Investments in Unrestricted Subsidiaries resulting from payments of interest on Debt, dividends, repayments of loans or advances, or other transfers of assets, in each case to the Company or any Restricted Subsidiary from Unrestricted Subsidiaries, or from any revocation of the designation of an Unrestricted Subsidiary (valued in each case as provided in the definition of "Investments"), not to exceed, in the case of any Unrestricted Subsidiary, the amount of Investments previously made by the Company and any Restricted Subsidiary in such Unrestricted Subsidiary included as a Restricted Payment pursuant to this clause (4).

*provided* that any Restricted Payments permitted to be made pursuant to this clause (a) may only be made out of any available funds (to the extent not already used) in the Company ECF Account.

(b) The foregoing will not prohibit:

(1) the payment of any dividend within 90 days after the date of declaration thereof if, at the date of declaration, such payment would comply with paragraph (a) and such dividend is made out of any available funds (to the extent not already used) in the Company ECF Account;

(2) dividends or distributions by a Restricted Subsidiary payable, on a *pro rata* basis or on a basis more favorable to the Company, to all holders of any class of Capital Stock of such Restricted Subsidiary a majority of which is held, directly or indirectly through Restricted Subsidiaries, by the Company;

(3) the repayment, redemption, repurchase, defeasance or other acquisition or retirement for value of Subordinated Debt with the proceeds of, or in exchange for, Permitted Refinancing Debt;

(4) the purchase, redemption or other acquisition or retirement for value of Equity Interests of the Company or any Restricted Subsidiary in exchange for, or out of the proceeds of a substantially concurrent

176

offering of, Qualified Equity Interests of the Company or any Restricted Subsidiary or of a cash contribution to the common equity of the Company;

(5) the repayment, redemption, repurchase, defeasance or other acquisition or retirement of Subordinated Debt of the Company in exchange for, or out of the proceeds of, a substantially concurrent offering of, Qualified Equity Interests of the Company; and

(6) any Investment made in exchange for, or out of the net cash proceeds of, a substantially concurrent offering of Qualified Equity Interests of the Company;

*provided* that, in each case above no Default has occurred and is continuing or would occur as a result thereof.

(c) Proceeds of the issuance of Qualified Equity Interests will be included under clause (3) of paragraph (a) only to the extent they are not applied as described in clause (4), (5) or (6) of paragraph (b). Restricted Payments permitted pursuant to clause (2), (3), (4), (5) or (6) of paragraph (b) will not be included in making the calculations under clause (3) of paragraph (a).

*Limitation on Liens.* The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, incur or permit to exist any Lien of any nature whatsoever on any of its properties or assets, whether owned at the Issue Date or thereafter acquired, other than Permitted Liens, without effectively providing that the New 2019 Notes are secured equally and ratably with (or, if the obligation to be secured by the Lien is subordinated in right of payment to the New 2019 Notes or any Note Guaranty, prior to) the obligations so secured for so long as such obligations are so secured.

*Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries.* (a) Except as provided in paragraph (b), the Company will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to

(1) pay dividends or make any other distributions on any Equity Interests of the Restricted Subsidiary owned by the Company or any other Restricted Subsidiary,

(2) pay any Debt or other obligation owed to the Company or any other Restricted Subsidiary,

(3) make loans or advances to the Company or any other Restricted Subsidiary, or

(4) transfer any of its property or assets to the Company or any other Restricted Subsidiary.

(b) The provisions of paragraph (a) do not apply to any encumbrances or restrictions:

(1) existing on the Issue Date in the New 2019 Indenture or any other agreements in effect on the Issue Date, and any extensions, renewals, replacements or refinancings of any of the foregoing; *provided* that the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the holders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

(2) existing under or by reason of applicable law;

(3) existing:

(A) with respect to any Person, or to the property or assets of any Person, at the time the Person is acquired by the Company or any Restricted Subsidiary, or

177

(B) with respect to any Unrestricted Subsidiary at the time it is designated or is deemed to become a Restricted Subsidiary,

which encumbrances or restrictions (i) are not applicable to any other Person or the property or assets of any other Person and (ii) were not put in place in anticipation of such event and any extensions, renewals, replacements or refinancings of any of the foregoing, *provided* the encumbrances and restrictions in the extension, renewal, replacement or refinancing are, taken as a whole, no less favorable in any material respect to the holders than the encumbrances or restrictions being extended, renewed, replaced or refinanced;

(4) of the type described in clause (a)(4) arising or agreed to in the ordinary course of business (i) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease or license, (ii) by virtue of any Lien on, or agreement to transfer, option or similar right with respect to any property or assets of, the Company or any Restricted Subsidiary or (iii) not relating to any Debt;

(5) with respect to a Restricted Subsidiary and imposed pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Capital Stock of, or property and assets of, the Restricted Subsidiary that is permitted by the covenant described under the caption "—Certain Covenants—Limitation on Asset Sales";

(6) customary restrictions with respect to a Finance Subsidiary, pursuant to the terms of the related Permitted Receivables Financing by the Finance Subsidiary;

(7) contained in the terms governing any Debt if the encumbrances or restrictions are (i) ordinary and customary for a financing of that type and (ii) are not materially more restrictive than encumbrances or restrictions in effect on the Issue Date;

(8) customary provisions in joint venture agreements and other similar agreements entered into in the ordinary course of business;

(9) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(10) contained in agreements relating to the distribution of dividends by the Company or any Subsidiary and the Person owning any Equity Interest in any Restricted Subsidiary that is not a Wholly Owned Subsidiary; or

(11) required pursuant to the New 2019 Indenture.

*Guaranties by Restricted Subsidiaries.* If after the Issue Date the Company or any of its Restricted Subsidiaries acquires or creates a Subsidiary that is a Restricted Subsidiary after giving effect to such transaction (other than (i) a Finance Subsidiary or (ii) a Project Finance Entity subject to the following sentence), the Company must cause the new Restricted Subsidiary to provide a Note Guaranty. If after the Issue Date the Company or any of its Restricted Subsidiaries acquires, creates, participates in or otherwise contributes any asset to a Strategic Joint Venture that does not become a Guarantor, the Company or the relevant Restricted Subsidiary will, concurrently with the creation or acquisition of, or participation in, such Strategic Joint Venture, pledge its ownership interest in the Strategic Joint Venture as collateral for the Company's obligations under the New 2019 Notes, in accordance with the terms of the Indenture.

*Repurchase of the New Notes upon a Change of Control.* Not later than 30 days following a Change of Control, the Company will make an Offer to Purchase all outstanding New Notes at a purchase price equal to 101% of the principal amount (less, in the case of the New MCDs, the applicable MCD Prepayment Discount) plus accrued interest to the date of purchase.

An "Offer to Purchase" must be made by written offer, which will specify the principal amount of the New Notes subject to the offer and the purchase price. The offer must specify an expiration date (the "expiration date") not less than 30 days or more than 60 days after the date of the offer and a settlement date for purchase (the "purchase date") not more than five Business Days after the expiration date. The offer must include information concerning the business of the Company and its Subsidiaries which the Company in good faith believes will enable the holders to make an informed decision with respect to the Offer to Purchase. The offer will also contain instructions and materials necessary to enable holders to tender the New Notes pursuant to the offer.

A holder may tender all or any portion of its New Notes pursuant to an Offer to Purchase, subject to the requirement that any portion of a New Note tendered must be in a multiple of $1,000 principal amount. Holders shall be entitled to withdraw New Notes tendered up to the close of business on the expiration date. On the purchase date the purchase price will become due and payable on each New Note accepted for purchase pursuant to the Offer to Purchase, and interest on New Notes purchased will cease to accrue on and after the purchase date.

The Company shall comply with Rule 14e-1 under the Exchange Act and all other applicable laws in making any Offer to Purchase, and the above procedures will be deemed modified as necessary to permit such compliance.

The Company has agreed in the Indenture that it will timely repay Debt or obtain consents as necessary under, or terminate, agreements or instruments that would otherwise prohibit an Offer to Purchase required to be made pursuant to the Indentures.

Future debt of the Company may prohibit the Company from purchasing New Notes in the event of a Change of Control, may provide that a Change of Control is a default or may require repurchase of such debt upon a Change of Control. Moreover, the exercise by the holders of their right to require the Company to purchase the New Notes could cause a default under other debt, even if the Change of Control itself does not, due to the financial effect of the purchase on the Company.

Finally, the Company's ability to pay cash to the holders following the occurrence of a Change of Control may be limited by the Company's then existing financial resources. There can be no assurance that sufficient funds will be available when necessary to make the required purchase of the New Notes. See "Risk Factors—Risk Factors Relating to the Notes—We may not have the ability to raise the funds necessary to finance the Change of Control offer required by the New Indentures Governing the New Notes."

The phrase "all or substantially all," as used with respect to the assets of the Company in the definition of "Change of Control," is subject to interpretation under applicable state law, and its applicability in a given instance would depend upon the facts and circumstances. As a result, there may be a degree of uncertainty in ascertaining whether a sale or transfer of "all or substantially all" the assets of the Company has occurred in a particular instance, in which case a holder's ability to obtain the benefit of these provisions could be unclear.

Except as described above with respect to a Change of Control, the New Indentures do not contain provisions that permit the holder of the New Notes to require that the Company purchase or redeem the New Notes in the event of a takeover, recapitalization or similar transaction.

The provisions under the New Indentures relating to the Company's obligation to make an offer to repurchase the New Notes as a result of a Change of Control may be waived or amended as described in "—Amendments and Waivers."

*Limitation on Asset Sales.* The Company will not, and will not permit any Restricted Subsidiary to, make any Asset Sale unless the following conditions are met:

(1) The Asset Sale is for fair market value, as determined in good faith by either the Board of Directors or the finance committee (or its successor committee) of the Board of Directors.

(2) At least 75% of the consideration consists of (i) cash or Cash Equivalents, (ii) property or assets (other than Capital Stock) to be owned by and used in the business of the Company or any Restricted Subsidiary of a nature or type used in a business similar or related to the business of the Company and its Restricted Subsidiaries on the date of such Asset Sale and/or (iii) Capital Stock in one or more Persons principally engaged in a Permitted Business which thereby become Restricted Subsidiaries.

(A) For purposes of this clause (2), the assumption by the purchaser of Debt or other obligations (other than Subordinated Debt) of the Company or a Restricted Subsidiary pursuant to a customary novation agreement, and instruments or securities received from the purchaser that are promptly, but in any event within 30 days of the closing, converted by the Company to cash, to the extent of the cash actually so received, shall be considered cash received at closing.

(B) When the proceeds of an Asset Sale are delivered in the form of Capital Stock of a Person, or if the assets subject to the Asset Sale consist of a portion of the Capital Stock of a Restricted Subsidiary and the (i) Capital Stock of such Person acquired or remaining held by the Company or any Restricted Subsidiary represents an interest in a Strategic Joint Venture and (ii) such Strategic Joint Venture cannot become or remain a Guarantor, the Company shall, concurrently with the creation or acquisition of, or participation in, such Strategic Joint Venture, pledge such Capital Stock of such Strategic Joint Venture as collateral for the Company's obligations pursuant to the New 2019 Notes in accordance with the terms of the New 2019 Indenture.

(3) Within 360 days after the receipt of any Net Cash Proceeds from an Asset Sale, the Net Cash Proceeds may be used:

(A) to permanently repay (x) the New Notes or (y) Debt that is (i) not Subordinated Debt of the Company or a Guarantor or any Debt of a Restricted Subsidiary that is not a Guarantor and (ii) permitted pursuant to the covenant "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary; *provided* that if a Leverage Compliance Date occurs, the permanent reduction of any amount of Debt permitted to be incurred pursuant to such covenant prior to such Leverage Compliance Date shall be reversed, or

(B) to acquire all or substantially all of the assets of a Permitted Business, to purchase Equity Interests in a Restricted Subsidiary from a third party, or to acquire a majority of the Voting Stock of another Person that thereupon becomes (i) a Restricted Subsidiary engaged in a Permitted Business or (ii) a Strategic Joint Venture, the Capital Stock of which is pledged as collateral for the New 2019 Notes in accordance with the terms of the 2019 Indenture, or to make Permitted Capital Expenditures or otherwise acquire long-term assets that are to be used in a Permitted Business.

(4) The Net Cash Proceeds of an Asset Sale not applied pursuant to clause (3) within 360 days of the Asset Sale constitute "Excess Proceeds." Excess Proceeds of less than $10.0 million will be carried forward and accumulated. When accumulated Excess Proceeds equals or exceeds $10.0 million, the Company must, within 30 days, either repurchase New Notes through Market Purchases or make an Offer to Purchase New Notes up to an aggregate amount equal to such accumulated Excess Proceeds.

In the case of an Offer to Purchase New Notes, the purchase price for the New Notes will be (i) in the case of the New 2019 Notes, 100% of the principal amount and (ii) in the case of the New MCDs, 100% of the principal amount less the applicable MCD Prepayment Discount at the time of the Offer to Purchase, in each case plus accrued interest to the date of purchase. If the Offer to Purchase is for less than all of the outstanding New Notes, and the New Notes in an aggregate principal amount in excess of the purchase amount are tendered and not withdrawn pursuant to the offer, the Company will purchase New Notes having an aggregate principal amount equal to the purchase amount on a *pro rata* basis, with adjustments so that only New 2019 Notes in multiples of $1,000 principal amount and New

MCDs in multiples of $10,000 will be purchased. Upon completion of the Offer to Purchase, Excess Proceeds will be reset at zero.

Any New Notes repurchased through Market Purchases or otherwise redeemed must be immediately surrendered to the Trustee for cancellation.

*Limitation on Transactions with Shareholders and Affiliates.* (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, enter into, renew or extend any transaction or arrangement including the purchase, sale, lease or exchange of property or assets, or the rendering of any service with (x) any holder, or any Affiliate of any holder, of 5% or more of any class of Voting Stock of the Company or (y) any Affiliate of the Company or any Restricted Subsidiary (a "Related Party Transaction"), except upon fair and reasonable terms that when taken as a whole are no less favorable to the Company or the Restricted Subsidiary than could be obtained at that time in a comparable arm's-length transaction with a Person that is not an Affiliate of the Company.

(b) After the Issue Date, any Related Party Transaction or series of Related Party Transactions with an aggregate value in excess of $5.0 million must first be approved by a majority of the Board of Directors who are disinterested in the subject matter of the transaction pursuant to a Board Resolution delivered to the trustee. Prior to entering into any Related Party Transaction or series of Related Party Transactions after the Issue Date with an aggregate value in excess of $10.0 million, the Company must in addition obtain and deliver to the trustee a favorable written opinion from an Independent Financial Advisor as to the fairness of the transaction to the Company and its Restricted Subsidiaries from a financial point of view.

(c) The foregoing paragraphs do not apply to:

(1) the payment of reasonable and customary regular fees to directors of the Company;

(2) any Restricted Payments not prohibited by the "Limitation on Restricted Payments" covenant described above;

(3) transactions solely among or between Guarantors or solely among or between the Company and a Guarantor;

(4) reasonable fees and compensation paid to, and any indemnity provided on behalf of, officers, directors, employees, consultants or agents of the Company or any Restricted Subsidiary as determined in good faith by the Board of Directors, including contributions to a pension trust for employees of the Company and its Restricted Subsidiaries and the acquisition in the open market, and contribution of, Capital Stock of the Company to a stock option trust for employees of the Company and its Restricted Subsidiaries;

(5) transactions, including Related Party Transactions, undertaken pursuant to any contractual obligations or rights in existence on the Issue Date (as in effect on the Issue Date or as amended, modified or replaced from time to time so long as the amended, modified or new obligations or rights, taken as a whole, are no less favorable to the Company or any Restricted Subsidiary and any of their Subsidiaries than those in effect on the Issue Date);

(6) transactions entered into as part of a financing effected by a Finance Subsidiary; and

(7) loans and advances to officers, directors and employees of the Company or any Restricted Subsidiary for travel, entertainment, moving and other relocation expenses, in each case made in the ordinary course of business and in an aggregate principal amount at any time not exceeding $2.0 million.

*Limitation on Transactions with Project Finance Entities*

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Project Finance Entity *unless* such transaction is upon terms that are no less favorable to the Company or its Restricted Subsidiary, as the case may be, than the Company or its Restricted Subsidiary would obtain in a comparable arm's-length transaction with a Person who is not an Affiliate of the Company.

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, make any Investment in any Project Finance Entity (a "Project Finance Investment") except to the extent that such Project Finance Investment is funded with (i) funds from the Company ECF Account available as of the date such Project Finance Investment is made or Incurred or (ii) Debt Incurred pursuant to clause (b)(1)(D) of the covenant described in the caption " —Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock."

The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, issue any Project Finance Guaranty except as permitted by the terms of the covenant described in the caption "—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock."

*Line of Business.* The Company will not, and will not permit any of its Restricted Subsidiaries, to engage in any business other than a Permitted Business, except for immaterial operations incidental to acquired businesses.

*Designation of Restricted and Unrestricted Subsidiaries.* (a) The Board of Directors may designate any Subsidiary, including a newly acquired or created Subsidiary, to be an Unrestricted Subsidiary if:

(1) no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such designation;

(2) the Company could Incur at least $1.00 of Debt under the covenant described under the caption "—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock";

(3) (A) The Subsidiary does not own any Disqualified Stock of the Company or Disqualified or Preferred Stock of a Restricted Subsidiary or hold any Debt of, or any Lien on any property of, the Company or any Restricted Subsidiary, if such Disqualified or Preferred Stock or Debt could not be Incurred under the covenant described under the caption "—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" or such Lien would violate the covenant described under the caption "—Certain Covenants—Limitation on Liens"; and

(B) the Subsidiary does not own any Voting Stock of a Restricted Subsidiary, and all of its Subsidiaries are Unrestricted Subsidiaries;

(2) At the time of the designation, the designation would be permitted under the covenant described under the caption "—Limitation on Restricted Payments";

(3) To the extent the Debt of the Subsidiary is not Non-Recourse Debt, any Guarantee or other credit support thereof by the Company or any Restricted Subsidiary is permitted under the covenants described under the captions "—Limitation on Debt and Disqualified or Preferred Stock" and "—Limitation on Restricted Payments";

(4) The Subsidiary is not party to any transaction or arrangement with the Company or any Restricted Subsidiary that would not be permitted under the covenant described under the caption "—Limitation on Transactions with Shareholders and Affiliates"; and

(5) Neither the Company nor any Restricted Subsidiary has any obligation to subscribe for additional Equity Interests of the Subsidiary or to maintain or preserve its financial condition or cause it to achieve

specified levels of operating results, except to the extent permitted by the covenants described under the captions "—Limitation on Debt and Disqualified and Preferred Stock" and "—Limitation on Restricted Payments."

Once so designated the Subsidiary will remain an Unrestricted Subsidiary, subject to paragraph (b).

(b) (1) A Subsidiary previously designated an Unrestricted Subsidiary which fails to meet the qualifications set forth in paragraph (a) will be deemed to become at that time a Restricted Subsidiary, subject to the consequences set forth in paragraph (d).

(2) The Board of Directors may designate an Unrestricted Subsidiary to be a Restricted Subsidiary if the designation would not cause a Default.

(c) Upon a Restricted Subsidiary becoming an Unrestricted Subsidiary,

(1) all existing Investments of the Company and the Restricted Subsidiaries therein (valued at the Company's proportional share of the fair market value of its assets less liabilities) will be deemed made at that time;

(2) all existing Capital Stock or Debt of the Company or a Restricted Subsidiary held by it will be deemed Incurred at that time, and all Liens on property of the Company or a Restricted Subsidiary held by it will be deemed incurred at that time;

(3) all existing transactions between it and the Company or any Restricted Subsidiary will be deemed entered into at that time;

(4) it is released at that time from its Note Guaranty, if any; and

(5) it will cease to be subject to the provisions of the New 2019 Notes Indenture, as a Restricted Subsidiary.

(d) Upon an Unrestricted Subsidiary becoming, or being deemed to become, a Restricted Subsidiary,

(1) all of its Debt and Disqualified or Preferred Stock will be deemed Incurred at that time for purposes of the covenant described under the caption "—Limitation on Debt and Disqualified or Preferred Stock," but will not be considered the sale of Equity Interests for purposes of the covenants described under the caption "—Limitation on Asset Sales";

(2) Investments therein previously charged under the covenant described under the caption "—Limitation on Restricted Payments" will be credited thereunder;

(3) it may be required to issue a Note Guaranty pursuant to the provisions of the section captioned "—Guaranties of Restricted Subsidiaries"; and

(4) it will thenceforward be subject to the provisions of the New 2019 Notes Indenture, as a Restricted Subsidiary.

(e) Any designation by the Board of Directors of a Subsidiary as a Restricted Subsidiary or Unrestricted Subsidiary will be evidenced to the trustee by promptly filing with the trustee a copy of the Board Resolution giving effect to the designation and an Officers' Certificate certifying that the designation complied with the foregoing provisions.

*Anti-Layering.* Neither the Company nor any Guarantor may Incur any Debt that is subordinate in right of payment to other Debt of the Company or the Guarantor unless such Debt is also subordinate in right of payment to

183

the New 2019 Notes or the relevant Note Guaranty on substantially identical terms. This does not apply to distinctions between categories of Debt that exist by reason of any Liens or Guarantees securing or in favor of some but not all of such Debt and will not apply to any New MCDs.

*Hedging Agreements.* The Company will cause its hedging policy to remain in effect until all the New Notes have been repaid. Such hedging policy shall at all times prohibit hedging for speculative purposes. The Company will not, and will not permit any of its Restricted Subsidiaries to, Incur Hedging Agreements that are not in compliance with the Company's hedging policy. The Company's hedging policy allows Hedging Agreements Incurred in the ordinary course of business for the purpose of limiting risks associated with the business of the Company and its Restricted Subsidiaries and not for speculation.

In addition, the Company will not, and will not permit any Restricted Subsidiary to, Incur any Hedging Agreement or any transaction under any Hedging Agreement, other than:

  (a) natural gas Hedging Agreements in respect of, and whose nominal value shall not exceed, natural gas reasonably projected by the Company or its Restricted Subsidiaries to be used for operational purposes in the ordinary course of business during the 18 months following the date of such Hedging Agreements;

  (b) forward purchase contracts for dollars in respect of, and whose nominal value shall not exceed, the interest payments required to be made by the Company or its Restricted Subsidiaries in dollars within the 365 days following the date of such currency hedge or future pursuant to Debt permitted to be Incurred under the covenant described in "—Limitation on Debt and Disqualified or Preferred Stock"; and

  (c) interest rate Hedging Agreements in respect of, and whose nominal value shall not exceed, the interest payments required to be made by the Company or its Restricted Subsidiaries in the Average Life (as of the date of the Incurrence of such Hedging Agreement) of Debt permitted to be Incurred under the covenant described in "—Limitation on Debt and Disqualified or Preferred Stock".

*Limitation on Sale and Leaseback Transactions.* The Company will not, and will not permit any Restricted Subsidiary to, enter into any Sale and Leaseback Transaction with respect to any property or asset (subject to the following paragraph) unless

(1) the Company or the Restricted Subsidiary would be entitled to Incur Debt in an amount equal to the Attributable Debt with respect to such Sale and Leaseback Transaction pursuant to the covenant described under the caption "—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock," and in which case, the corresponding Debt will be deemed Incurred pursuant to those provisions,

(2) the Company or the Restricted Subsidiary would be entitled to enter into such transaction pursuant to the covenant described under the caption "—Certain Covenants—Limitation on Liens" had such Sale and Leaseback Transaction been structured as a mortgage loan rather than as a Sale and Leaseback Transaction, and

(3) the proceeds will be used in compliance with the covenant described under the caption "—Certain Covenants—Limitation on Asset Sales" in respect of such transaction.

Notwithstanding the foregoing, the Company may enter into Sale and Leaseback Transactions with respect to the headquarters of the Company, located in San Pedro Garza García, 66265 Nuevo León, Mexico.

*Limitation on Intercompany Debt.*

 (a) All Intercompany Debt (other than Ordinary Course Intercompany Debt) existing as of the date on which the *concurso mercantil* petition of the Company is accepted by the relevant Mexican federal court (such date, the "Petition Acceptance Date") and subject to the *Concurso* Plan (the "Existing Intercompany Debt") and all Intercompany Debt (other than Ordinary Course Intercompany Debt) Incurred after the Petition Acceptance Date

184

will be subordinated to the New Notes pursuant to the terms of a subordination and revolving credit agreement (the "Intercompany Subordination and Credit Agreement"), the terms of which, among other things, will provide that (i) no cash payments will be permitted to be made in respect of such Intercompany Debt while any of the New Notes remain outstanding, (ii) all such Intercompany Debt will be subordinated to the New Notes in liquidation and in right of payment and (iii) all such Intercompany Debt will be assigned to a trust organized under Mexican law (the "*Fideicomiso*") as provided in paragraph (c) below.

(b) All Ordinary Course Intercompany Debt whether Incurred before or after the Petition Acceptance Date will be Incurred pursuant to, and in accordance with the terms of, the Intercompany Subordination and Credit Agreement, the terms of which, among other things, will provide that (i) the Company and/or its Restricted Subsidiaries will be permitted to Incur additional Ordinary Course Intercompany Debt and make and collect payments in respect of such Ordinary Course Intercompany Debt so long as such Ordinary Course Intercompany Debt is Incurred, and such payments are made or collected, in the ordinary course of business consistent with past practices, (ii) all such Ordinary Course Intercompany Debt will be subordinated to the New Notes in liquidation and in right of payment (subject to the preceding clause (i)) and (iii) all such Ordinary Course Intercompany Debt will be assigned to the *Fideicomiso* as provided in paragraph (c) below.

(c) All Intercompany Debt will be assigned to the *Fideicomiso*. The *Fideicomiso* will not create unnecessary burden on the operations relating to the ordinary course of business of the Company and, among other things, will provide that (i) the trustee of the *Fideicomiso* will be able to take all necessary actions to give effect to the subordination of the Intercompany Debt pursuant to the terms of the Intercompany Subordination and Credit Agreement (provided that, with respect to any Ordinary Course Intercompany Debt, the Company will be permitted to continue Incurring such Ordinary Course Intercompany Debt and making and collecting payments in respect thereof as provided in clause (i) of the preceding paragraph (b)), and (ii) during the pendency of any proceeding filed by or against the Company or any Restricted Subsidiary seeking relief as debtor, or seeking to adjudicate the Company or any Restricted Subsidiary as bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of the Company or any Restricted Subsidiary or its debts under any law relating to bankruptcy, insolvency, reorganization, *concurso mercantil*, *quiebra*, or relief of debtors, or seeking appointment of a receiver, trustee, assignee, custodian, liquidator or *visitador*, *conciliador* or *sindico* or any other similar official for the Company or for any substantial part of its property, the trustee of the *Fideicomiso* will be entitled to vote any claims that the Company or any Subsidiary of the Company might have based on Intercompany Debt in accordance with the instructions of holders of the New Notes (other than the Company or any Subsidiary thereof) representing a majority of the then outstanding Debt under the New Notes.

(d) The Company and each Restricted Subsidiary will enter into the Intercompany Subordination and Credit Agreement and the *Fideicomiso* on or prior to the Issue Date. Any Subsidiary that becomes a Restricted Subsidiary shall become party to the Intercompany Subordination and Credit Agreement and the *Fideicomiso* at the time it becomes a Restricted Subsidiary.

**Limitations on Capital Expenditures.**

(a) Subject to clauses (b) and (c) below, the Company will not, and will not cause or permit any of its Restricted Subsidiaries to, directly or indirectly, make any capital expenditures or investments in deferred charges during any fiscal year that would cause the aggregate capital expenditures and investments in deferred charges for such year to exceed $120.0 million if at the time of making such capital expenditure or investment in deferred charges, the Leverage Ratio is greater than 3.0 to 1 ("Permitted Capital Expenditures").

(b) To the extent that the Company and its Restricted Subsidiaries do not expend the full amount of Permitted Capital Expenditures in any given fiscal year, the Company and its Restricted Subsidiaries will be permitted to carry forward any unused Permitted Capital Expenditures to the immediately following two fiscal years.

(c) The restriction set forth in the preceding clause (a) shall not apply to any capital expenditures or investments in deferred charges made by a Project Finance Entity, provided that such capital expenditures or investments in deferred charges are financed solely by Project Finance Indebtedness.

185

**Consolidation, Merger, Lease or Sale of Assets**

The New 2019 Notes Indenture will further provide as follows regarding consolidation, merger, lease or sale of all or substantially all of the assets of the Company or a Guarantor:

*Consolidation, Merger, Lease or Sale of All or Substantially All Assets by the Company.* (a) The Company will not:

- consolidate with or merge with or into any Person, or

- sell, convey, transfer, lease or otherwise dispose of all or substantially all of its assets as an entirety or substantially an entirety, in one transaction or a series of related transactions, to any Person, or

- permit any Person to merge with or into the Company,

unless

(1) either: (A) the Company is the surviving corporation; or (B) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is (i) an internationally-recognized entity organized or existing under the laws of Mexico, a member of the European Union or any state of the United States of America or the District of Columbia engaged in a Permitted Business whose Capital Stock is publicly-traded on the New York Stock Exchange, the London Stock Exchange or any other internationally-recognized stock exchange, or (ii) a Subsidiary of an entity described in the preceding clause (i) whose Consolidated Net Worth is at least substantially the same as the Consolidated Net Worth of the Company (or of all or substantially all of its assets, as the case may be) immediately prior to such transaction, and in each case expressly assumes by supplemental indenture all of the obligations of the Company under the New 2019 Notes Indenture and the New 2019 Notes;

(2) immediately after giving effect to the transaction, no Default has occurred and is continuing;

(3) immediately after giving effect to the transaction on a pro forma basis, the Company or the resulting, surviving or transferee Person has a Consolidated Net Worth without taking into account any purchase accounting adjustments equal to or greater than the Consolidated Net Worth of the Company immediately prior to such transaction;

(4) immediately after giving effect to the transaction on a pro forma basis, the Leverage Ratio of the Company or the resulting surviving or transferee Person is not greater than the Leverage Ratio of the Company immediately prior to such transaction; and

(5) the Company delivers to the trustee an Officers' Certificate and an Opinion of Counsel, each stating that the consolidation, merger or transfer and the supplemental indenture (if any) comply with the New 2019 Notes Indenture;

*provided*, that clauses (2) through (4) do not apply (i) to the consolidation or merger of the Company with or into a Guarantor or the consolidation or merger of a Restricted Subsidiary with or into the Company or (ii) if, in the good faith determination of the Board of Directors, whose determination is evidenced by a Board Resolution, the principal purpose of the transaction is to change the jurisdiction of incorporation of the Company.

(b) Upon the consummation of any transaction effected in accordance with these provisions, if the Company is not the continuing Person, the resulting, surviving or transferee Person will succeed to, and be substituted for, and may exercise every right and power of, the Company under the New 2019 Notes Indenture and the New 2019 Notes with the same effect as if such successor Person had been named as the Company in the New 2019 Notes Indenture and New 2019 Notes Indenture. Upon such substitution, the Company will be released from

its obligations under the New 2019 Notes Indenture and the New 2019 Notes unless the Company has leased all or substantially all of its assets, whether in one transaction or a series of transactions, to one or more other Persons.

*Consolidation, Merger, Lease or Sale of Assets by a Guarantor.* No Guarantor may:

- consolidate with or merge with or into any Person, or

- sell, convey, transfer, lease or dispose of, all or substantially all its assets as an entirety or substantially as an entirety, in one transaction or a series of related transactions, to any Person, or

- permit any Person to merge with or into such Guarantor

unless

(1) the other Person is the Company or any Restricted Subsidiary that (A) is a Guarantor or becomes a Guarantor concurrently with the transaction or (B) is, or as a result of such transaction will be, a Strategic Joint Venture that is not a Guarantor and the Company pledges, concurrently with such transaction, the Capital Stock of such Strategic Joint Venture as collateral for the Company's obligations pursuant to the New 2019 Notes in accordance with the terms of the New 2019 Notes Indenture; or

(2) (A) either (x) the Guarantor is the continuing Person or (y) the resulting, surviving or transferee Person is (i) an internationally-recognized entity organized or existing under the laws of Mexico, a member of the European Union or any state of the United States of America or the District of Columbia engaged in a Permitted Business whose Capital Stock is publicly-traded on the New York Stock Exchange, the London Stock Exchange or any other internationally-recognized stock exchange, or (ii) a Subsidiary of an entity described in the preceding clause (i) whose Consolidated Net Worth is at least substantially the same as the Consolidated Net Worth of the Guarantor (or of all or substantially all of its assets, as the case may be) immediately prior to such transaction, and in each case expressly assumes by supplemental indenture all of the obligations of the Guarantor under its Note Guaranty; and

(B) immediately after giving effect to the transaction, no Default has occurred and is continuing; or

(3) the transaction constitutes a sale or other disposition (including by way of consolidation or merger) of the Guarantor or the sale or disposition of all or substantially all the assets of the Guarantor (in each case other than to the Company or a Restricted Subsidiary) otherwise permitted by the New 2019 Notes Indenture.

**Default and Remedies**

*Events of Default.* An "Event of Default" with respect to the New 2019 Notes occurs if

(1) the Company defaults in the payment of the principal of any New 2019 Note when the same becomes due and payable at maturity, upon acceleration or redemption, or otherwise (other than pursuant to an Offer to Purchase);

(2) the Company defaults in the payment of interest (including any additional interest and Additional Amounts) on any New 2019 Note when the same becomes due and payable, and the default continues for a period of 30 days;

(3) the Company fails to make an Offer to Purchase and thereafter to accept and pay for New 2019 Notes tendered when and as required pursuant to the covenants described under the captions "—Certain Covenants—Repurchase of Notes Upon a Change of Control" or "—Certain Covenants—Limitation on

187

Asset Sales," or the Company or any Guarantor fails to comply with the covenant described under the caption "—Consolidation, Merger, Lease or Sale of Assets";

(4) the Company defaults in the performance of or breaches any other covenant or agreement of the Company in the New 2019 Notes Indenture or under the New 2019 Notes and the default or breach continues for a period of 45 consecutive days after written notice to the Company by the trustee or to the Company and the trustee by the holders of 25% or more in aggregate principal amount of the New 2019 Notes;

(5) there occurs with respect to any Debt of the Company or any of its Material Subsidiaries having an outstanding principal amount of $25.0 million or more in the aggregate for all such Debt of all such Persons (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal payment when due and such defaulted payment is not made, waived or extended within the applicable grace period;

(6) one or more final judgments or orders for the payment of money are rendered against the Company or any of its Material Subsidiaries and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed $25.0 million (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(7) an involuntary case or other proceeding is commenced against the Company or any Material Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Material Subsidiary under the federal bankruptcy laws as now or hereafter in effect;

(8) the Company or any of its Material Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any of its Material Subsidiaries or for all or substantially all of the property and assets of the Company or any of its Material Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (7) or (8), a "bankruptcy default");

(9) any Note Guaranty ceases to be in full force and effect, other than in accordance with the terms of the New 2019 Notes Indenture, or a Guarantor denies or disaffirms its obligations under its Note Guaranty;

(10) the Company fails to (i) make an Excess Cash Flow prepayment or repurchase in accordance with "—Excess Cash Flow" or (ii) conduct a Mandatory Redemption of the New 2019 Notes in accordance with "—Mandatory Redemption" below;

(11) the Company or any Restricted Subsidiary fails to comply with the covenant described under the caption "—Limitation on Intercompany Debt"; or

(12) any Lien on assets that, individually or in the aggregate, have a fair market value of $10.0 million or more and that was incurred for the benefit of the holders of the New 2019 Notes in connection with the pledge of any ownership interest in any Strategic Joint Venture or otherwise incurred for the benefit of the holders of the New 2019 Notes in accordance with the terms of the New Indentures becomes or is declared

to become invalid or ineffective, or the Company or any Restricted Subsidiary denies or disaffirms its obligations under any such Lien.

*Consequences of an Event of Default.* If an Event of Default with respect to the New 2019 Notes, other than a bankruptcy default with respect to the Company, occurs and is continuing under the New 2019 Notes Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New 2019 Notes then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee at the request of such holders shall, declare the principal of and accrued interest on the New 2019 Notes to be immediately due and payable. Upon a declaration of acceleration, such principal and interest will become immediately due and payable.

The holders of a majority in principal amount of the outstanding New 2019 Notes by written notice to the Company and to the trustee may waive all past defaults and rescind and annul a declaration of acceleration and its consequences if:

(1) all existing Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the New 2019 Notes that have become due solely by the declaration of acceleration, have been cured or waived, and

(2) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in "—Consequences of an Event of Default" or "—Amendments and Waivers—Amendments with Consent of Holders," the holders of a majority in principal amount of the outstanding New 2019 Notes may, by written notice to the trustee, waive an existing Default and its consequences. Upon such waiver, the Default will cease to exist, and any Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

The holders of a majority in principal amount of the outstanding New 2019 Notes may, upon indemnification of the trustee, direct the time, method and place of conducting any proceeding for any remedy available to the trustee or exercising any trust or power conferred on the trustee. However, the trustee may refuse to follow any direction that conflicts with law or the New 2019 Notes Indenture, that may involve the trustee in personal liability, or that the trustee determines in good faith may be unduly prejudicial to the rights of holders of New 2019 Notes not joining in the giving of such direction, and may take any other action it deems proper that is not inconsistent with any such direction received from holders of New 2019 Notes.

A holder may not institute any proceeding, judicial or otherwise, with respect to the New 2019 Notes Indenture or the New 2019 Notes, or for the appointment of a receiver or trustee, or for any other remedy under the New 2019 Notes Indenture or the New 2019 Notes, unless:

(1) the holder has previously given to the trustee written notice of a continuing Event of Default;

(2) holders of at least 25% in aggregate principal amount of outstanding New 2019 Notes have made written request to the trustee to institute proceedings in respect of the Event of Default in its own name as trustee under the New 2019 Notes Indenture;

(3) holders have offered to the trustee indemnity reasonably satisfactory to the trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4) the trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5) during such 60-day period, the holders of a majority in aggregate principal amount of the outstanding New 2019 Notes have not given the trustee a direction that is inconsistent with such written request.

Notwithstanding anything to the contrary, the right of a holder of a New 2019 Note to receive payment of principal of or interest on its New 2019 Note on or after the Stated Maturities thereof, or to bring suit for the enforcement of any such payment on or after such dates, may not be impaired or affected without the consent of that holder.

If any Default with respect to the New 2019 Notes occurs and is continuing and is known to a Responsible Officer of the trustee, the trustee will send notice of the Default to each holder within 90 days after it occurs, unless the Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any New 2019 Note, the trustee may withhold the notice if and so long as the Board of Directors, the executive committee or a trust committee of officers of the trustee in good faith determine that withholding the notice is in the interest of the holders.

## II. NEW MCDs

### Basic Description of the New MCDs

The New MCDs:

- will be general unsecured obligations of the Company;

- will be *pari passu* in right of payment to all senior unsecured Debt of the Company;

- will be effectively junior in right of payment to any secured Debt of the Company to the extent of the assets securing such Debt;

- will be senior in right of payment to any future subordinated Debt of the Company;

- will have interest paid in kind;

- will be subject to mandatory conversion into common shares of the Company if not repaid at maturity or upon a mandatory repayment event;

- will be subject to optional prepayments with discounts as described below; and

- will contain any other features as may be necessary to qualify as "*obligaciones convertibles en acciones*" under Mexican law.

In no event shall the Company be permitted to exercise voting rights with respect to any New MCDs that the Company or its Affiliates may acquire. Any New MCDs repurchased by the Company through Market Purchases or otherwise redeemed pursuant to a mandatory prepayment provision of the New Indentures shall be immediately canceled.

### Principal, Maturity and Interest

The Company will issue an aggregate amount equal to the sum of $100.0 million *plus* the Issue Date Adjustment in aggregate principal amount of the New MCDs under the *Concurso* Plan. The Company will issue the New MCDs in denominations of $10,000 principal amount and integral multiples of $1,000 in excess thereof. The New MCDs will mature five years after the Value Date.

Interest on the New MCDs will accrue from the Issue Date at a fixed interest rate, payable in kind semiannually in arrears commencing with the first six-month scheduled interest payment date immediately following the Issue Date, in accordance with the following grid:

| Year | Per Annum PIK Rate |
|------|--------------------|
| Year 1 | 10.50% |
| Year 2 | 10.50% |
| Year 3 | 10.50% |
| Year 4 | 10.50% |
| Year 5 | 10.50% |

Interest that is paid in kind will be added to the outstanding principal amount (the "Additional PIK Principal") of the New MCDs and will be considered principal for all purposes, and without limiting the foregoing, the Additional PIK Principal of the New MCDs will bear interest at the rate then applicable to the New MCDs, beginning on the date such interest is paid in kind and added to the principal amount thereof.

Notwithstanding anything to the contrary, the payment of accrued interest in connection with any redemption of New MCDs as described under "—Optional Redemption", under "Provisions Applicable to All of the New Notes—Excess Cash Sweep" or pursuant to any other covenant in the New Indentures shall be made solely in cash.

Interest on the New MCDs will accrue from the Issue Date or, if interest has already been paid, from the date it was most recently paid. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

The Company will make each interest payment to the holders of record on the 15th day immediately preceding the applicable interest payment date. If the due date for payment of any amount in respect of principal or interest on any of the New MCDs is not a Business Day, the holder thereof shall not be entitled to payment of the amount due until the next succeeding Business Day and shall not be entitled to any further interest or other payment as a result of any such delay.

**Mandatory Conversion**

The New MCDs are mandatorily convertible into common shares of the Company representing, in aggregate:

(i) if no New MCDs have been redeemed or repurchased and cancelled prior to the date of such conversion, 15% of the Capital Stock of the company on a fully-diluted basis, or

(ii) if any New MCDs have been redeemed or repurchased and cancelled prior to the date of such conversion, an amount of Capital Stock of the Company equal to (x) 15% of the Capital Stock of the company on a fully-diluted basis multiplied by (y) a fraction, the numerator of which is the aggregate principal amount of New MCDs outstanding on the date of conversion, and the denominator of which is the aggregate principal amount of New MCDs outstanding on the Issue Date,

if (a) not repaid at maturity or (b) in an event of default leading to an acceleration of conversion, as described below, (a "Mandatory Conversion Event"). The number of shares upon conversion may be adjusted downwards to the nearest whole number of shares.

The Company's current by-laws limit the foreign ownership of the Company's common shares. In order to change the by-laws, approval by vote at a shareholders' meeting is required and such a vote is not anticipated in the near future. Unless the Company's by-laws are amended, all non-Mexican holders of the New MCDs will receive non-voting CPOs as opposed to common shares with voting rights. See "Risk Factors—Risk Factors Relating to the New Notes—Our by-laws only permit Mexican ownership of our shares, and we do not have an ADS program. Upon conversion of the New MCDs, you may not hold shares directly but only through our CPO program." All references to the common shares to be issued upon conversion of the New MCDs shall be deemed to include such CPOs as applicable.

*Conversion Procedure*

(a) Promptly after a Mandatory Conversion Event, the holder of any New MCD shall surrender such New MCD duly endorsed or assigned to the Company or in blank at the office of the Conversion Agent.

(b) New MCDs will be deemed to have been converted immediately prior to the close of business on the date of the occurrence of the Mandatory Conversion Event, and at such time the rights of the holders of such MCDs will cease, and the Person or Persons entitled to receive the common shares of the Company issuable upon conversion will be treated for all purposes as the record holder or holders of such common shares at such time. As promptly as practicable after the Mandatory Conversion Event, and upon receipt of written notice from the Company that a Mandatory Conversion Event has occurred, the Company shall deliver or cause to be delivered to the Conversion Agent a certificate or certificates representing the number of common shares issuable to the holders of the New MCDs.

## Common Representative of the New MCDs

Under the Mexican law of Negotiable Instruments and Credit Operations, *Ley General de Títulos y Operaciones de Crédito*, at the Company's shareholders' meeting approving the issuance of New MCDs, a common representative of New MCD holders must be appointed and the representative must accept such designation. The common representative is expected to be The Bank of New York Mellon, S.A., Institución de Banca Múltiple. The common representative of New MCD holders may only resign for reasons that are recognized as significant under the applicable law (for example, serious wrongdoing on the part of the issuer, substantial financial difficulties of the common representative or force majeure). Any such reason would have to be proved to and approved by a court of first instance of the corporate domicile of the common representative. The common representative may be removed and replaced by New MCD holders at any time. In accordance with the *Ley General de Títulos y Operaciones de Crédito* and the indenture (*acta de emision*), the rights and obligations of the common representative of MCD holders will be, among others, the following: (i) to confirm that the issuance of New MCDs meets the requirements set forth in the *Ley General de Títulos y Operaciones de Crédito*, including, among others, to confirm the data in the Company balance sheet prepared for purposes of the issuance of the New MCDs, including confirmation of the value of the Company's total net assets; (ii) to verify that the guaranties granted for the payment of New MCDs, if any, are legal, binding and enforceable against guarantors and the value of such guaranties; (iii) to confirm that the indenture (*acta de emision*) of the New MCDs is recorded with the Public Registry of Commerce corresponding to the corporate domicile of the Company; (iv) to authorize the New MCDs issued by the Company; (v) to exercise the rights and legal actions pertaining to the New MCD holders; (vi) to call and preside over the meetings of New MCD holders and implement the resolutions adopted at such meetings; (vii) to attend the Company's shareholders' meetings and to obtain from the Board of Directors and the Company's officials and management the financial information and any other data required to comply with its obligations; (viii) to sign on behalf of New MCD holders any documents or contracts that may be needed; and (ix) any other obligations set forth in the indenture (*acta de emision*) of New MCDs.

## Meetings of New MCD Holders

Under Mexican law of Negotiable Instruments and Credit Operations, *Ley General de Títulos y Operaciones de Crédito*, meetings of New MCD holders may be held upon the request of the common representative or holders representing at least 10% of New MCDs. The notice of the meeting shall contain the agenda and shall be published in the Federal Official Gazette of Mexico and in a daily newspaper of large circulation in the Company's domicile. New MCD holders may be represented at a meeting by any person designated in writing as a proxy. Except for the matters listed below requiring a quorum of a super-majority at any meeting of New MCD holders held upon first call, only a majority of the New MCD holders must be present regarding all other matters. A quorum at a meeting discussing the (i) removal and designation of the common representative; (ii) granting of extensions or standstill to the Company or (iii) modification of the Company's resolutions approving the issuance of New MCDs, is met if the holders of at least 75% of the New MCDs are represented. Upon second or subsequent call, a quorum at a meeting of the New MCD holders shall exist despite the

192

percentage of New MCD holders present. The resolutions shall be adopted by a simple majority of the New MCD holders present at the meeting upon first call, and upon second call the resolution shall be adopted by the New MCDs represented at such meeting. The resolutions legally adopted by the meeting of New MCD holders shall be binding on all New MCD holders, including those absent or dissenting.

## Change of Control

The provisions for a Change of Control covenant for the New MCDs are the same as that for the New 2019 Notes. See "—New 2019 Notes—Repurchase of the New Notes upon a Change of Control."

## Optional Redemption

The Company may redeem the New MCDs at its option, at any time in whole or from time to time in part, upon not less than 30 nor more than 60 days' prior notice mailed by first-class mail to each holder's registered address. The optional redemption may only be paid out of (1) Excess Cash Flow, in accordance with the covenant described under "Provisions Applicable to All of the New Notes—Excess Cash Sweep", or (2) the proceeds of, or in exchange for (a) Permitted Refinancing Debt, (b) an offering of Equity Interests of the Company, or (c) an Asset Sale, in accordance with the covenant described under "—New 2019 Notes—Certain Covenants—Limitation on Asset Sales." To redeem the New MCDs prior to maturity, the Company must pay a redemption price equal to:

(a) the principal amount of the New MCDs to be redeemed subject to the following prepayment discounts (collectively the "MCD Prepayment Discounts"):

Year 1: 35.7%

Year 2: 30.2%

Year 3: 24.2%

Year 4: 17.7%

Year 5: 10.6%; *plus*

(b) accrued and unpaid interest (including Additional Amounts), if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date).

If fewer than all of the New MCDs are being redeemed, the trustee will select the New MCDs to be redeemed *pro rata*, by lot or by any other method in compliance with Mexican law, in denominations of $10,000 principal amount and integral multiples of $1,000 in excess thereof. Upon surrender of any New MCD redeemed in part, the holder will receive a new note equal in principal amount to the unredeemed portion of the surrendered note. Once notice of redemption is sent to the holders, New MCDs called for redemption become due and payable at the redemption price on the redemption date, and, commencing on the redemption date, New MCDs redeemed will cease to accrue interest.

## Mandatory Redemption

The mandatory redemption provisions with respect to the New MCDs are described under "—Provisions Applicable to All of the New Notes—Mandatory Redemption" below.

## Excess Cash Sweep

The excess cash sweep with respect to the New MCDs is described under "Provisions Applicable to All of the New Notes—Excess Cash Sweep" below.

**Default and Remedies**

*Events of Default.* An "MCD Event of Default" occurs if:

(1) the Company fails to comply with its obligation to convert the New MCDs in accordance with the New MCD Indenture upon a Mandatory Conversion Event and such failure continues for a period of 5 Business Days or more (at maturity or otherwise);

(2) the Company fails to make an Offer to Purchase all outstanding New MCDs within 30 days following a Change of Control (see "—Provisions Applicable to All of the New Notes —Change of Control");

(3) there occurs with respect to the New 2019 Notes (i) an event of default that results in such Debt being due and payable prior to its scheduled maturity or (ii) failure to make a principal or interest payment when due and such defaulted payment is not made, waived or extended within the applicable grace period;

(4) one or more final judgments or orders for the payment of money are rendered against the Company or any of its Material Subsidiaries and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed $25.0 million (in excess of amounts which the Company's insurance carriers have agreed to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(5) an involuntary case or other proceeding is commenced against the Company or any Material Subsidiary with respect to it or its debts under any bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 days; or an order for relief is entered against the Company or any Material Subsidiary under the federal bankruptcy laws as now or hereafter in effect;

(6) the Company or any of its Material Subsidiaries (i) commences a voluntary case under any applicable bankruptcy, *concurso mercantil*, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (ii) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Company or any of its Material Subsidiaries or for all or substantially all of the property and assets of the Company or any of its Material Subsidiaries or (iii) effects any general assignment for the benefit of creditors (an event of default specified in clause (5) or (6), a "bankruptcy default");

(7) the Company fails to (i) make an Excess Cash Flow prepayment or repurchase in accordance with "—Provisions Applicable to All of the New Notes —Excess Cash Flow" or (ii) conduct a Mandatory Redemption of the New MCDs in accordance with "—Provisions Applicable to All of the New Notes —Mandatory Redemption from Equity Issuances" below.

*Consequences of an MCD Event of Default.* If an MCD Event of Default, other than a bankruptcy default with respect to the Company, occurs and is continuing under the New MCD Indenture, the trustee or the holders of at least 25% in aggregate principal amount of the New MCDs then outstanding, by written notice to the Company (and to the trustee if the notice is given by the holders), may, and the trustee and the common representative at the request of such holders shall, declare that the principal of and accrued interest on the New MCDs will convert immediately to common shares (or CPOs, as applicable).

194

The holders of a majority in principal amount of the outstanding New MCDs by written notice to the Company and to the trustee may waive all past defaults and rescind and annul a declaration of acceleration and its consequences if:

(1) all existing MCD Events of Default, other than the nonpayment of the principal of, premium, if any, and interest on the New MCDs that have become due solely by the declaration of acceleration, have been cured or waived, and

(2) the rescission would not conflict with any judgment or decree of a court of competent jurisdiction.

Except as otherwise provided in "—Consequences of an MCD Event of Default" or "—Provisions Applicable to All of the New Notes— Amendments and Waivers—Amendments with Consent of Holders," the holders of a majority in principal amount of the outstanding New MCDs, by written notice to the trustee, waive an existing MCD Default and its consequences. Upon such waiver, the MCD Default will cease to exist, and any MCD Event of Default arising therefrom will be deemed to have been cured, but no such waiver will extend to any subsequent or other Default or impair any right consequent thereon.

The holders of a majority in principal amount of the outstanding New MCDs may, upon indemnification of the trustee, direct the time, method and place of conducting any proceeding for any remedy available to the trustee or exercising any trust or power conferred on the trustee. However, the trustee may refuse to follow any direction that conflicts with law or the New MCD Indenture, that may involve the trustee in personal liability, or that the trustee determines in good faith may be unduly prejudicial to the rights of holders of New MCDs not joining in the giving of such direction, and may take any other action it deems proper that is not inconsistent with any such direction received from holders of New MCDs.

A holder may not institute any proceeding, judicial or otherwise, with respect to the New MCD Indenture or the New MCDs, or for the appointment of a receiver or trustee, or for any other remedy under the New MCD Indenture or the New MCDs, unless:

(1) the holder has previously given to the trustee written notice of a continuing MCD Event of Default;

(2) holders of at least 25% in aggregate principal amount of outstanding New MCDs have made written request to the trustee to institute proceedings in respect of the MCD Event of Default in its own name as trustee under the New MCD Indenture;

(3) holders have offered to the trustee indemnity reasonably satisfactory to the trustee against any costs, liabilities or expenses to be incurred in compliance with such request;

(4) the trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(5) during such 60-day period, the holders of a majority in aggregate principal amount of the outstanding New MCDs have not given the trustee a direction that is inconsistent with such written request.

Notwithstanding anything to the contrary, the right of a holder of a New MCD to receive payment of principal of or interest on its New MCDs on or after the Stated Maturities thereof, or to bring suit for the enforcement of any such payment on or after such dates, may not be impaired or affected without the consent of that holder.

If any MCD Default occurs and is continuing and is known to a Responsible Officer of the trustee, the trustee will send notice of the MCD Default to each holder within 90 days after it occurs, unless the MCD Default has been cured; *provided* that, except in the case of a default in the payment of the principal of or interest on any New MCD, the trustee may withhold the notice if and so long as the Board of Directors, the executive committee or

a trust committee of officers of the trustee in good faith determine that withholding the notice is in the interest of the holders.

## III. PROVISIONS APPLICABLE TO ALL OF THE NEW NOTES

### Excess Cash Sweep

If, for any fiscal year of the Company and its Restricted Subsidiaries (each, a "Calculation Period"), there shall be Excess Cash Flow as of the last day of such Calculation Period, then the Company shall, no later than 60 days after the Excess Cash Flow Calculation Date relating to such Calculation Period, apply such Excess Cash Flow as follows:

(a) in the event that the yield-to-maturity of the New Notes, based on the average closing trading prices of the New Notes during the 20 business days beginning on March 1st, is equal to or higher than 9%, then 70% of such Excess Cash Flow shall be applied either to (i) repurchase New Notes through Market Purchases or (ii) prepay New Notes as described below; and

(b) in the event that the yield-to-maturity of the New Notes, based on the average closing trading prices of the New Notes during the 20 business days beginning on March 1st, is lower than 9%, then 50% of such Excess Cash Flow shall be applied either to (i) repurchase New Notes through Market Purchases or (ii) prepay New Notes as described below.

Any Excess Cash Flow that is required to be used for prepayment or repurchases of New Notes (as set forth above) shall be deposited into a segregated account (the "ECF Payment Account") and such funds shall be used to either repurchase New Notes through Market Purchases or prepay New Notes as described below by no later than 60 days following the relevant Excess Cash Flow Calculation Date. Any Excess Cash Flow that is not required to be deposited into the ECF Payment Account for prepayment or repurchases of New Notes shall be deposited into a separate account (the "Company ECF Account") and the funds deposited therein can be used at the Company's discretion for general corporate purposes, including dividends and optional repurchases or redemptions of the New Notes, subject to the terms and conditions of the New Indentures, including the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments." Within 30 days of the end of the relevant 60-day period, the Company shall notify the Trustee of the aggregate amount of New Notes repurchased through Market Purchases and shall immediately after the end of the relevant 60-day period surrender any such New Notes to the Trustee for cancellation.

*Calculation of Excess Cash Flow.* The calculation of Excess Cash Flow in respect of any given Calculation Period will be made as of the last day of such Calculation Period, based on the Company's consolidated financial statements as of such date and will be certified by both the Chief Financial Officer of the Company and by an independent public accountant that regularly conducts audit services for the Company; *provided*, *however*, that for the initial Calculation Period, the amount of Excess Cash Flow shall include all Excess Cash Flow (calculated pursuant to the formula set forth in the definition thereof) for the period commencing on the Value Date through the end of the first fiscal year immediately following the Issue Date. Excess Cash Flow calculations must be made on or before the date on which audited financial statements are required by the CNBV to be delivered in respect of each fiscal year of the Company and in any event by no later than April 30th of each year (the date on which such calculation is made, the "Excess Cash Flow Calculation Date"), and shall be promptly delivered to the Trustee for distribution to the holders of the New Notes.

*Prepayment of New Notes.* Any Excess Cash Flow that is applied to prepay the New Notes may be applied to prepay either the New 2019 Notes and/or the New MCDs, at the Company's discretion, on a pro-rata basis within each series. Any Excess Cash Flow that is applied to prepay the New Notes shall be applied to prepay first, any capitalized interest, and second, the outstanding principal amount (less, in the case of the New MCDs, the applicable MCD Prepayment Discount) and accrued and unpaid interest and Additional Amounts, of the New Notes. In the case of a prepayment of the New 2019 Notes, such prepayment will be applied in direct order of maturity among the remaining unpaid installments of the New 2019 Notes until the New 2019 Notes are no longer outstanding.

**Methods of Receiving Payments on the New Notes**

If a holder of New Notes in an aggregate principal amount of $10.0 million or more has given adequate wire transfer instructions to the Company and the trustee in writing at least 10 days in advance, the Company will pay all principal, interest, Additional Amounts and premium, if any, on that holder's New Notes in accordance with those instructions. All other payments on the New Notes will be made at the office or agency of the paying agent and registrar within the City and State of New York, unless the Company elects to make interest payments by check mailed to the holders at their address set forth in the register of holders.

**Paying Agent and Registrar for the Notes**

The trustee will initially act as paying agent and registrar for each series of the New Notes. The Company may change the paying agent (s) or registrar(s) for either series of the New Notes without prior notice to the holders of the New Notes of such series, and the Company or any of its Subsidiaries may act as paying agent or registrar.

**Transfer and Exchange**

A holder may transfer or exchange New Notes within each series in accordance with the provisions of the New Indentures. The registrar and the trustee may require a holder, among other things, to furnish appropriate endorsements and transfer documents in connection with a transfer of New Notes. Holders will be required to pay all taxes due on transfer or other similar governmental charges payable in connection therewith. The Company will not be required to transfer or exchange any New Note selected for redemption. Also, the Company will not be required to transfer or exchange any New Note for a period of 15 days before a selection of New Notes to be redeemed.

**Additional Amounts**

All payments under or in respect of the New Notes or any Note Guaranty shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, levies, imposts, assessments or governmental charges (including penalties, interest and additions related thereto) (collectively, "Taxes") of whatever nature imposed, levied, collected, withheld or assessed unless such withholding or deduction is required by law. In the event any such withholding or deduction imposed or levied by a Tax Jurisdiction (as defined below) is required to be made from any payments under or with respect to the New Notes or any Note Guaranty, the Company or the relevant Guarantor, as applicable, shall pay to holders of the New Notes such additional amounts ("Additional Amounts") as will result in the net payment to such holder (including Additional Amounts) of the amount that would otherwise have been receivable by such holder in the absence of such withholding or deduction, except that no such Additional Amounts shall be payable with respect to:

(a) any Taxes that would not have been so withheld or deducted but for the holder or beneficial owner of the New Notes having a present or former connection to the relevant Tax Jurisdiction (including having a permanent establishment in such Tax Jurisdiction, being a citizen or resident or national of, incorporated in or carrying on a business, in the relevant Tax Jurisdiction in which such Taxes are imposed) other than the mere receipt of payments in respect of the New Notes or any Note Guaranty, the mere holding or ownership of such New Note or beneficial interest in the New Note or the exercise of any rights under the New Notes, any Note Guaranty or the New Indentures;

(b) where presentation is required for payment on a New Note, any Taxes that would not have been so withheld or deducted if the New Note had been presented for payment within 30 days after the Relevant Date (as defined below), except to the extent that the holder would have been entitled to Additional Amounts had the New Note been presented on any day during such 30-day period;

(c) any Taxes that would not have been so withheld or deducted but for the failure by the holder or the beneficial owner of the New Note or any payment in respect of such New Note, after written request made to that holder or beneficial owner at least 30 days before any such withholding or deduction would be payable, by the Company or the relevant Guarantor, as applicable, to comply with any certification,

197

identification, information, documentation or other similar reporting requirement concerning its nationality, residence, identity or connection with the relevant Tax Jurisdiction, which is required or imposed by a statute, regulation or published administrative interpretation of general application of the relevant Taxing Jurisdiction as a precondition to exemption from all or part of such Taxes;

(d) any estate, inheritance, gift, sales, transfer, personal property or similar Taxes imposed with respect to any New Note;

(e) any Taxes payable other than by withholding or deduction;

(f) any withholding or deduction imposed on a payment to an individual that is required to be made pursuant to the European Council Directive 2003/48/EC on the taxation of savings income (the "Directive") implementing the conclusions of the European Counsel of Economic and Finance Ministers (ECOFIN) meeting on June 3, 2003, or any law implementing or complying with, or introduced in order to conform to, such Directive;

(g) any Taxes imposed in connection with a New Note presented for payment by or on behalf of a holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant New Note to another paying agent;

(h) any payment on a New Note or a Note Guaranty to a holder that is a fiduciary or partnership or a person other than the sole beneficial owner of any such payment, to the extent that a beneficiary or settlor with respect to such fiduciary, a member of such a partnership or the beneficial owner of the payment would not have been entitled to the Additional Amounts had the beneficiary, settlor, member or beneficial owner been the holder of the New Note or Note Guaranty; or

(i) any combination of (a) through (h) above.

Notwithstanding the foregoing, the limitations on the Company's or relevant Guarantor's obligation to pay Additional Amounts set forth in clauses (c) and (h) above shall not apply if (i) the provision of information, documentation or other evidence described in such clauses (c) and (h) would be materially more onerous, in form, in procedure or in the substance of information disclosed, to a holder or beneficial owner of a New Note (taking into account any relevant differences between U.S. and Mexican law rules, regulations or published administrative interpretation of general application) than comparable information or other reporting requirements imposed under U.S. tax law, regulation and administrative practice (such as IRS Forms W-8BEN and W-9) or (ii) Rule 3.23.8 issued by the Ministry of Finance and Public Credit on April 28, 2006 or a substantially similar successor of such rule is in effect, unless the provision of the information, documentation or other evidence described in clauses (c) and (h) is expressly required by statute, regulation, rule, ruling or published administrative interpretation of general application in order to apply Rule 3.23.8 (or a substantially similar successor of such rule), the Company cannot obtain such information, documentation or other evidence on its own through reasonable diligence and the Company otherwise would meet the requirements for application of Rule 3.23.8 (or such successor of such rule). In addition, such clauses (c) and (h) shall not be construed to require that a non-Mexican pension or retirement fund or a non-Mexican financial institution or another holder register with the Ministry of Finance and Public Credit for the purpose of establishing eligibility for an exemption from or reduction of Mexican withholding tax or to require that a holder or beneficial owner certify or provide information concerning whether it is or is not a tax-exempt pension or retirement fund.

If the Directive imposes taxes upon New Notes presented for payment, the Company or relevant Guarantor will at all times maintain a paying agent with a specified office in a Member State of the European Union that will not be obligated to withhold or deduct tax pursuant to the Directive or any law implementing or complying with, or introduced in order to conform to, the Directive.

"Tax Jurisdiction" means (1) Mexico or any political subdivision thereof or any authority therein or thereof having the power to tax, (2) any jurisdiction in which the Company or any Guarantor (including any successor

198

entity) is then incorporated, engaged in business or resident for tax purposes or any political subdivision thereof or therein having the power to tax or (3) any jurisdiction by or through which payment is made.

"Relevant Date" means whichever is the later of (i) the date on which such payment first becomes due and (ii) if the full amount payable has not been received in New York City, New York by the trustee on or prior to such due date, the date on which, the full amount having been so received, notice to that effect shall have been given to the holders of the New Notes in accordance with the New Indentures.

References to principal, interest or any other amount payable on or in respect of any New Note shall be deemed also to refer to any Additional Amounts which may be payable as set forth in the New Indentures or in the New Notes to the extent that Additional Amounts are, were or would be payable in respect thereof.

At least ten Business Days prior to the first interest payment date (and at least ten Business Days prior to each succeeding interest payment date if there has been any change with respect to the matters set forth in the below-mentioned Officers' Certificate), the Company or the relevant Guarantor, as applicable, will furnish to the trustee and the paying agent an Officers' Certificate instructing the trustee and the paying agent whether payments of principal of or interest on the New Notes due on such interest payment date shall be without deduction or withholding for or on account of any Taxes by the Tax Jurisdictions. If any such deduction or withholding shall be required, at least 20 days prior to such interest payment date (unless the obligation to pay Additional Amounts arises after the 20th day prior to the payment date, in which case the Company or the relevant Guarantor shall notify the trustee and the paying agent in writing promptly thereafter), the Company, or the relevant Guarantor, as applicable, will furnish the trustee and the paying agent with an Officers' Certificate that specifies the amount, if any, required to be withheld on such payment to holders of the New Notes. If the Company or any Guarantor is obligated to pay Additional Amounts with respect to such payment, the Officers' Certificate must also set forth any other information reasonably necessary to enable the paying agent to pay Additional Amounts to the holders on the relevant payment date. For these purposes, any Officers' Certificate required by the New Indentures to be provided to the trustee and any paying agent shall be deemed to be duly provided if telecopied to the trustee and such paying agent.

The Company or the relevant Guarantor, as applicable, will make all withholdings and deductions required by law and will remit the full amount deducted or withheld to the relevant Tax authority in accordance with applicable law. The Company or the relevant Guarantor, as applicable, will obtain official receipts from each Tax authority evidencing the payment of any Taxes so deducted or withheld, or, if such receipts are not obtainable, such other documentation reasonably acceptable to the trustee. The Company, or the relevant Guarantor, as applicable, shall furnish to the trustee the official receipts (or a certified copy of the official receipts or other such documentation, as applicable) evidencing payment of Taxes. The Company or the relevant Guarantor, as applicable, will attach to each certified copy or other such documentation, as applicable, a certificate stating (x) that the amount of such Tax evidenced by the certified copy was paid in connection with payments under or with respect to the New Notes then outstanding upon which such Taxes were due and (y) the amount of such withholding tax paid per $1,000 of principal amount of the New Notes. Copies of such receipts or other such documentation, as applicable, shall be made available to holders of the New Notes upon request.

The Company and the relevant Guarantor, as applicable, shall promptly pay when due, and indemnify the holder for, any present or future stamp, issue, registration, court and/or documentary taxes, and/or any other excise taxes, similar charges or similar levies imposed by the Tax Jurisdictions on the execution, delivery, registration or enforcement of any of the New Notes, the New Indentures, any Note Guaranty or any other document or instrument referred to herein or therein.

The Company and the relevant Guarantor, as applicable, will indemnify and hold harmless each holder of New Notes and, upon written request of any holder of New Notes, reimburse each such holder, for the amount of:

(1) any Taxes (other than Taxes excluded under clauses (a) through (i) levied or imposed and paid by such holder as a result of payments made on or with respect to the New Notes; *provided* that reasonable supporting documentation is provided; and

(2) any Taxes (other than Taxes excluded under clauses (a) through (i)) levied or imposed with respect to any reimbursement under the foregoing clause (1), so that the net amount received by such holder after such reimbursement will not be less than the net amount the holder would have received if Taxes (other than Taxes excluded under clauses (a) through (i)) on such reimbursement had not been imposed.

Any payments made pursuant to the preceding sentence will be treated as Additional Amounts for all relevant purposes.

**Optional Tax Redemption**

The New Notes may be redeemed at the Company's election, as a whole, but not in part, by the giving of notice as provided in the New Indentures, at a price equal to the outstanding principal amount thereof, together with any Additional Amounts then due and that will become due on the redemption date as a result of the redemption and accrued and unpaid interest to the redemption date, if (1) as a result of any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the relevant Tax Jurisdiction, or any change in the official application, administration or interpretation of such laws, regulations or rulings in the relevant Tax Jurisdiction, the Company or the relevant Guarantor, as applicable, has or will become obligated to pay any Additional Amounts on the New Notes in excess of the Additional Amounts the Company would be obligated to pay if payments made on the New Notes were subject to withholding or deduction of Mexican taxes at a rate of 4.9% ("Excess Additional Amounts"), (2) such change or amendment is announced on or after the Issue Date (or, if the relevant Tax Jurisdiction has changed since the date of the New Indentures, the date on which the then current Tax Jurisdiction became the applicable Tax Jurisdiction under the New Indentures), (3) such obligation would have arisen absent a further issuance of the New Notes pursuant to the New Indentures, and (4)  such obligation cannot be avoided by the Company or the relevant Guarantor, as applicable, taking reasonable measures available to it (including, without limitation, changing the jurisdiction from or through which payments are made); *provided*, *however*, that no such notice of redemption shall be given earlier than 60 days prior to the earliest date on which the Company or the relevant Guarantor, as applicable, would be obliged to pay such Excess Additional Amounts. Prior to the giving of any notice of redemption of the New Notes pursuant to the foregoing, the Company will deliver to the trustee (1) an Officers' Certificate stating that the conditions precedent to the right of the Company to so redeem have occurred and that the obligation to pay Excess Additional Amounts cannot be avoided by the Company by taking commercially reasonable measures available to it, and (2) a written opinion of independent legal counsel of recognized standing in the relevant Tax Jurisdiction to the effect that the Company has become obligated to pay Excess Additional Amounts as a result of a change or amendment described above.

**Mandatory Redemption from Equity Issuances**

In the event that the yield-to-maturity of the New Notes, based on the average closing trading prices of the New Notes during the 20 business days immediately preceding the receipt of the proceeds from any issuance of Capital Stock (not including any the Capital Stock issued upon conversion of New MCDs), is higher than 9%, the Company shall be required to apply 25% of the cash proceeds from such issuance of Capital Stock, within 60 days of the receipt of such proceeds, to either (at the discretion of the Company):

(a) prepay or redeem the New 2019 Notes and/or the remaining New MCDs in whole or in part (a "Mandatory Redemption") at par; or

(b) repurchase the New Notes through Market Purchases.

If fewer than all of the New Notes are being redeemed, the trustee will select the New Notes to be redeemed *pro rata*, by lot or by any other method the trustee in its sole discretion deems fair and appropriate, in denominations of $1,000 principal amount and multiples thereof. Upon surrender of any New Note redeemed in part, the holder will receive a New Note equal in principal amount to the unredeemed portion of the surrendered New Note. Once notice of redemption is sent to the holders, New Notes called for redemption become due and payable at the redemption price on the redemption date, and, commencing on the redemption date, New Notes redeemed will cease to accrue interest.

**Financial Reports**

The Company shall provide to the trustee and to the holders of the New Notes:

(1) annual consolidated financial statements audited by an internationally recognized firm of independent public accountants within 120 days after the end of the Company's fiscal year, and unaudited quarterly consolidated financial statements (including a balance sheet, income statement and cash flow statement for the fiscal quarter or quarters then ended and the corresponding fiscal quarter or quarters from the prior year) within 60 days of the end of each of the first three fiscal quarters of each fiscal year. These annual and quarterly consolidated financial statements will be (a) prepared in accordance with Mexican GAAP, *provided* that the application of Mexican GAAP is consistent, and (b) accompanied by a "management discussion and analysis" or other report of management providing an overview in reasonable detail of the results of operations and financial condition of the Company and its Subsidiaries for the periods presented. English translations will be provided of any of the foregoing documents prepared in another language; and

(2) if applicable, copies (including English translations of documents prepared in another language) of public filings which reasonably would be material to the holders of New Notes made with any securities exchange or securities regulatory agency or authority within ten (10) days of such filing; *provided*, *however*, that the Company will not be required to so provide copies of (a) public filings which may be obtained from the U.S. Securities and Exchange Commission (the "SEC") via the EDGAR System or its successor or (b) annual reports filed (in Spanish) with the CNBV.

None of the information provided pursuant to the preceding numbered paragraphs shall be required to comply with Regulation S-K as promulgated by the SEC.

**Reports to Trustee**

The Company will deliver to the trustee under each of the New Indentures:

(1) within 120 days after the end of each fiscal year a certificate stating that the Company has fulfilled its obligations under the New Indentures or, if there has been a Default or MCD Default, as applicable, specifying the Default or MCD Default, as applicable and its nature and status; and

(2) as soon as possible and in any event within 30 days after the Company becomes aware or should reasonably become aware of the occurrence of a Default or MCD Default, as applicable an Officers' Certificate setting forth the details of the Default or MCD Default, as applicable and the action which the Company proposes to take with respect thereto.

(3) if the Company or any of its Restricted Subsidiaries adopts IFRS in lieu of Mexican GAAP, within 30 days of the earlier of the dates on which quarterly or annual consolidated financial statements are provided to (i) the Trustee or (ii) the CNBV,

(i) a description of the material differences between IFRS and Mexican GAAP to the extent they impact the covenants under the New Indentures, and

(ii) a description of any differences between the calculation of Leverage Ratio and Excess Cash Flow under (x) IFRS and (y) Mexican GAAP;

(4) the reports required to be provided in accordance with the covenant described under the caption "—Excess Cash Flow."

**No Liability of Directors, Officers, Employees, Incorporators, Members and Stockholders**

No director, officer, employee, incorporator, member or stockholder of the Company or any Guarantor, as such, will have any liability for any obligations of the Company or such Guarantor under the New Notes, any Note Guaranty or the New Indentures or for any claim based on, in respect of, or by reason of, such obligations. Each holder of New Notes by accepting a New Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the New Notes. This waiver may not be effective to waive liabilities under the U.S. federal securities laws and it is the view of the SEC that such a waiver is against public policy.

**Amendments and Waivers**

*Amendments Without Consent of Holders.* The Company and the trustee may amend or supplement the New Indentures or the New Notes without notice to or the consent of any holder:

(1) to cure any ambiguity, defect or inconsistency in the New Indentures or the New Notes;

(2) to comply with the covenant described under the caption "—Certain Covenants—Consolidation, Merger and Sale of Assets";

(3) to comply with any requirements of the SEC in connection with the qualification of the New Indentures under the Trust Indenture Act;

(4) to evidence and provide for the acceptance of an appointment by a successor trustee;

(5) to provide for uncertificated notes in addition to or in place of certificated notes, *provided* that the uncertificated notes are issued in registered form for purposes of Section 163(f) of the Code, or in a manner such that the uncertificated notes are described in Section 163 (f)(2)(B) of the Code;

(6) to provide for any Guarantee of the New Notes, to secure the New Notes or to confirm and evidence the release, termination or discharge of any Guarantee of or Lien securing the New Notes when such release, termination or discharge is permitted by the New Indentures;

(7) to conform the text of the New Indentures or the New Notes to any provision of this "Description of the New Notes"; or

(8) to make any change that would provide any additional rights or benefits to the holders or that does not materially and adversely affect the rights of any holder.

*Amendments With Consent of Holders.* Each of the New Indentures operates independent of the other with respect to the following: (a) Except as otherwise provided in "—Default and Remedies—Consequences of a Default" or paragraph (b), the Company and the trustee may amend the relevant New Indenture and the New 2019 Notes or the New MCDs, as the case may be, with the written consent of the holders of a majority in principal amount of the outstanding New 2019 Notes or the New MCDs, as the case may be, and the holders of a majority in principal amount of the outstanding New 2019 Notes or the New MCDs, as the case may be, may waive future compliance by the Company with any provision of the relevant New Indentures or the New 2019 Notes or the New MCDs, as the case may be.

(b) Notwithstanding the provisions of paragraph (a), without the consent of each holder affected, an amendment or waiver may not:

(1) reduce the principal amount of or change the Stated Maturity of any installment of principal of any New 2019 Note or New MCD, as the case may be,

(2) reduce the rate of or change the Stated Maturity of any interest payment on any New 2019 Note or New MCD, as the case may be,

(3) reduce the amount payable upon, or discount applicable to, the redemption of any New 2019 Notes or the New MCDs, as the case may be, or change the time of any mandatory redemption, or modify, amend or waive the obligations to make mandatory prepayments of the New Notes in accordance with "—Excess Cash Sweep", in a manner materially adverse to the holders of the New 2019 Notes or the New MCDs, as the case may be, or, in respect of an optional redemption, the times at which any New 2019 Note or New MCD, as the case may be, may be redeemed or, once notice of redemption has been given, the time at which it must thereupon be redeemed,

(4) after the time an Offer to Purchase is required to have been made, reduce the purchase amount or purchase price, or extend the latest expiration date or purchase date thereunder,

(5) change the place or currency of payment of principal of, or any premium or interest on, any New 2019 Note or New MCD, as the case may be,

(6) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, necessary for modifications or waiver of compliance with certain provisions of the relevant New Indenture or for waiver of certain defaults under the relevant New Indenture and their consequences;

(7) (i) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required for the adoption of a resolution at a meeting of holders of such New Notes, (ii) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required for a quorum at a meeting of holders of such New Notes, or (iii) reduce the percentage in principal amount of outstanding New 2019 Notes or the New MCDs, as the case may be, that is required to request the calling of a meeting of holders of such New Notes;

(8) modify any prepayment or redemption provision in a manner that alters the pro rata sharing of payments required thereby;

(9) impair the right of any holder of New 2019 Notes or the New MCDs, as the case may be, to receive any principal payment or interest payment on such holder's New 2019 Notes or the New MCDs, as the case may be, on or after the Stated Maturity thereof, or to institute suit for the enforcement of any such payment,;

(10) modify or change any provision of the relevant New Indenture affecting the ranking of the New 2019 Notes or the New MCDs, as the case may be, or any relevant Note Guaranty in a manner adverse to the holders of the New 2019 Notes or the New MCDs, as the case may be,, or waive or amend the provision in the relevant New Indenture requiring that the New 2019 Notes or the New MCDs, as the case may be, rank *pari passu* with all other senior unsecured debt of the Company;

(11) make any change in the provisions of the New Indentures described under "—Additional Amounts" or "—Optional Tax Redemption" that adversely affects the rights of any holder or amend the terms of the New 2019 Notes or the New MCDs, as the case may be, or the relevant New Indenture in a way that would result in the loss of an exemption from any of the Taxes described thereunder or would otherwise adversely affect any holder for United States or Mexican tax purposes;

(12) modify the governing law or jurisdiction applicable to the relevant New Indenture;

(13) make any change in any Note Guaranty that would adversely affect the holders; or

(14) terminate or deprive any holders of the New 2019 Notes or the New MCDs, as the case may be, of the benefit of any Liens on assets that, individually or in the aggregate, have a fair market value of $10.0 million or more.

It is not necessary for holders to approve the particular form of any proposed amendment, supplement or waiver, but is sufficient if their consent approves the substance thereof.

Neither the Company nor any of its Subsidiaries or Affiliates may, directly or indirectly, pay or cause to be paid any consideration, whether by way of interest, fee or otherwise, to any holder for or as an inducement to any consent, waiver or amendment of any of the terms or provisions of the New Indentures or the New Notes of a series unless such consideration is offered to be paid or agreed to be paid to all holders of the New Notes of such series that consent, waive or agree to amend such term or provision within the time period set forth in the solicitation documents relating to the consent, waiver or amendment.

## Defeasance and Discharge

The Company may discharge certain of its obligations under a series of the New Notes and the New Indentures by irrevocably depositing in trust with the trustee money or U.S. Government Obligations sufficient to pay principal of and interest on the New Notes of such series to maturity or redemption within sixty days, subject to meeting certain other conditions.

The Company may also elect to

(1) discharge most of its obligations in respect of a series of the New Notes and the New Indentures, not including obligations related to the defeasance trust or to the replacement of New Notes or its obligations to the trustee ("legal defeasance") or

(2) discharge its obligations with respect to a series of New Notes under most of the covenants and under clauses (3) and (4) of the sections captioned "—Consolidation, Merger, Lease or Sale of Assets" under each of "New 2019 Notes" and "New MCDs" (and the events listed in clauses (3), (4), (5) and (6) under "—Default and Remedies—Events of Default" under each of "New 2019 Notes" and "New MCDs" and, in the case of a covenant defeasance of the New 2019 Notes, clause (9) under "New 2019 Notes—Default and Remedies—Events of Default", will no longer constitute Events of Default) ("covenant defeasance")

by irrevocably depositing in trust with the trustee money or U.S. Government Obligations sufficient to pay principal of and interest on the New Notes of such series to maturity or redemption and by meeting certain other conditions, including delivery to the trustee of either a ruling received from the Internal Revenue Service or an Opinion of Counsel to the effect that the holders of New Notes of such series will not recognize income, gain or loss for federal income tax purposes as a result of the defeasance and will be subject to federal income tax on the same amount and in the same manner and at the same times as would otherwise have been the case. In the case of legal defeasance, such an opinion could not be given absent a change of law after the date of the New Indentures. The defeasance would in each case be effective when 123 days have passed since the date of the deposit in trust.

In the case of either discharge or defeasance, the Note Guarantees with respect to such series of New 2019 Notes, if any, will terminate.

## Enforceability of Judgments

Since the Company is organized under the laws of Mexico and the Subsidiaries of the Company may be incorporated in various non-U.S. jurisdictions, including Mexico, and all of their directors and substantially all of their officers and certain of the experts named herein are non-U.S. residents, and all or a significant portion of the assets of those persons may be, and the most significant portion of the Company's and Subsidiaries' assets are, located outside the United States, it may not be possible for investors to effect service of process within the United States upon those persons or to enforce against them or against the Company or the Subsidiaries in U.S. courts judgments predicated upon civil liability provisions of the US. federal or state securities laws. See "Enforceability of Civil Liabilities."

An obligation denominated in a currency other than Mexican currency which is payable in Mexico may be satisfied through the payment of Mexican currency at the rate of exchange determined and published by *Banco de México* (the Bank of Mexico), or the Central Bank, in effect on the date such payment occurs. Pursuant to the *Ley Monetaria de los Estados Unidos Mexicanos* (Mexican Monetary Law), in the event that proceedings are brought in Mexico seeking to enforce the obligations of the Company and/or each of the Guarantors under the New Notes, the Company or any Guarantors would not be required to discharge such obligations in Mexico in a currency other than Mexican currency, and any difference resulting from the conversion of such Mexican currency into U.S. dollars may not be claimed from or enforced against the Company or such Guarantors. The exchange currency rate is currently determined by the Central Bank every business banking day in Mexico, published the second following business banking day in the Official Gazette of the Federation (*Diario Oficial de la Federación*).

## Currency Indemnity

U.S. dollars are the sole currency of account and payment for all sums payable by the Company or the Guarantors under or in connection with the New Notes, including damages. Any amount received or recovered in a currency other than dollars (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the winding up or dissolution of the Company or the Guarantors or otherwise) by any holder of a New Note in respect of any sum expressed to be due to it from the Company or the Guarantors shall constitute a discharge to the Company or the Guarantors only to the extent of the dollar amount which the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so). If that dollar amount is less than the dollar amount expressed to be due to the recipient under any New Note, the Company or the Guarantors shall indemnify the recipient against any loss sustained by it as a result. In any event, the Company or the Guarantors shall indemnify the recipient against the cost of making any such purchase. For the purposes of this paragraph, it will be sufficient for the holder of a New Note to certify in a satisfactory manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of dollars been made with the amount so received or recovered in that other currency on the date of receipt or recovery (or, if a purchase of dollars on such date had not been practicable, on the first date on which it would have been practicable, it being required that the need for a change of date be certified in the manner mentioned above). These indemnities constitute a separate and independent obligation from the other obligations of the Company or the Guarantors, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any holder of a New Note and shall constitute in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due under any New Note.

## Concerning the Trustee

The Bank of New York Mellon will be the trustee under each of the New Indentures. A Mexican institution (expected to be The Bank of New York Mellon, S.A., Institución de Banca Múltiple) will be the common representative for the New MCDs. There may be minor changes in the Description of the New Notes to accommodate input from the applicable trustee or common representative and its respective counsel that is not materially adverse to the holders. Except during the continuance of an MCD Event of Default or an Event of Default with respect to the New 2019 Notes, the trustee need perform only those duties that are specifically set forth in the New Indentures and no others, and no implied covenants or obligations will be read into the New Indentures against the trustee. In case an MCD Event of Default or an Event of Default with respect to the New 2019 Notes has occurred and is continuing, the trustee shall exercise those rights and powers vested in it by the New Indentures, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs. No provision of the New Indentures will require the trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties thereunder, or in the exercise of its rights or powers, unless it receives indemnity satisfactory to it against any loss, liability or expense.

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the trustee, should it become a creditor of any obligor on the New Notes, to obtain payment of claims in certain cases, or to realize on certain property received in respect of any such claim as security or otherwise. The trustee is permitted to engage in other transactions with the Company and its Affiliates; *provided*

that if it acquires any conflicting interest it must either eliminate the conflict within 90 days, apply to the Commission for permission to continue, or resign.

**Certain Transfer Restrictions**

Any New Notes issued in exchange for the DFI Claims or Other Debt will not be registered under the Securities Act and may not be offered, sold or delivered in the United States or to, or for the account or benefit of, any U.S. person, except pursuant to an effective registration statement or in a transaction not subject to the registration requirements of the Securities Act or in accordance with an applicable exemption from the registration requirements thereof. Accordingly, the New Notes issued in exchange for the DFI Claims and Other Debt are being offered and sold only pursuant to Regulation S.

Each holder acquiring such New Notes will be deemed to have represented and agreed that it understands that with respect to any transfer of interests in a Regulation S note, on or prior to the 40th day after the Issue Date, if to a transferee who takes delivery in the form of an interest in a restricted note, the Trustee will require written certification from the transferee or transferor, as the case may be, to the effect that (i) such transferee is acquiring the New Notes for its own account or for accounts as to which it exercises sole investment discretion and that it and, if applicable, each such account is a qualified institutional buyer within the meaning of Rule 144A, in each case, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (ii) the transferor did not acquire such New Notes as part of the initial distribution thereof and the transfer is being effected pursuant to and in accordance with an applicable exemption from the registration requirements of the Securities Act and the transferor has delivered to the Trustee such additional evidence that Vitro or the Trustee may require as to compliance with such available exemption.

**Book-Entry; Delivery and Form**

The New 2019 Notes will be, issued in fully registered global form in minimum denominations of $2,000 principal amount and integral multiples of $1,000 in excess thereof. Each of the New 2019 Notes and the New MCDs initially will be represented by a single permanent global certificate (which may be subdivided) without interest coupons (together with the global certificates that were issued for the Old Notes on the Issue Date, the "Global Notes").

The Global Notes will be deposited upon issuance with the trustee as custodian for DTC, in New York, New York, and registered in the name of DTC or its nominee for credit to an account of a direct or indirect participant in DTC, including Euroclear Bank S.A./N.V., as operator of the Euroclear System ("Euroclear"), and Clearstream Banking, société anonyme ("Clearstream"), as described below under "—Depositary Procedures."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for New Notes in certificated form except in the limited circumstances described below under "—Exchange of Book-Entry Notes for Certificated Notes."

Transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants (including, if applicable, those of Euroclear and Clearstream), which may change from time to time.

The trustee is not required (i) to issue, register the transfer of or exchange any New Note for a period of 15 days before a selection of New Notes to be redeemed or purchased pursuant to the *Concurso* Plan, (ii) to register the transfer of or exchange any New Note so selected for redemption or purchase in whole or in part, except, in the case of a partial redemption or purchase, that portion of any New Note not being redeemed or purchased, or (iii) if a redemption or a purchase pursuant to the *Concurso* Plan is to occur after a regular record date but on or before the corresponding interest payment date, to register the transfer or exchange of any New Note on or after the regular record date and before the date of redemption or purchase.

No service charge will be imposed in connection with any transfer or exchange of any New Note, but the Company may in general require payment of a sum sufficient to cover any transfer tax or similar governmental charge payable in connection therewith.

*Depositary Procedures*

The following description of the operations and procedures of DTC, Euroclear and Clearstream are provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. The Company takes no responsibility for these operations and procedures and urges investors to contact the systems or their participants directly to discuss these matters.

DTC is a limited-purpose trust company created to hold securities for its participating organizations (collectively, the "Participants") and facilitate the clearance and settlement of transactions in those securities between Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the "Indirect Participants"). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through Participants or Indirect Participants. DTC has no knowledge of the identity of beneficial owners of securities held by or on behalf of DTC. DTC's records reflect only the identity of Participants to whose accounts securities are credited. The ownership interests and transfer of ownership interests of each beneficial owner of each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

Pursuant to procedures established by DTC:

- upon deposit of the Global Notes, DTC will credit the accounts of Participants designated by the initial purchasers with portions of the principal amount of the Global Notes; and

- ownership of such interests in the Global Notes will be maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes may hold their interests therein directly through DTC, if they are Participants in such system, or indirectly through organizations (including Euroclear and Clearstream) that are Participants or Indirect Participants in such system. Euroclear and Clearstream will hold interests in the New Notes on behalf of their participants through customers' securities accounts in their respective names on the books of their respective depositaries, which are Euroclear Bank, S.A./N.V., as operator of Euroclear, and Citibank, N.A., as operator of Clearstream. The depositaries, in turn, will hold interests in the New Notes in customers' securities accounts in the depositaries' names on the books of DTC.

All interests in a Global Note, including those held through Euroclear or Clearstream, will be subject to the procedures and requirements of DTC. Those interests held through Euroclear or Clearstream will also be subject to the procedures and requirements of these systems. The laws of some states require that certain persons take physical delivery of certificates evidencing securities they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of beneficial owners of interests in a Global Note to pledge such interests to persons or entities that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests. For certain other restrictions on the transferability of the New Notes, see "— Exchange of Book-Entry Notes for Certificated Notes."

**Except as described below, owners of interests in the Global Notes will not have New Notes registered in their names, will not receive physical delivery of New Notes in certificated form and will not be considered the registered owners or holders thereof under the New Indentures for any purpose.**

Payments in respect of the principal of and premium, if any, and interest on a Global Note registered in the name of DTC or its nominee will be payable by the trustee (or the Paying Agents if other than the trustee) to DTC in its capacity as the registered holder under the Indenture. The Company and the trustee will treat the persons in whose names the New Notes, including the Global Notes, are registered as the owners thereof for the purpose of receiving such payments and for any and all other purposes whatsoever. Consequently, none of the Company, the trustee or any agent of the Company or the trustee has or will have any responsibility or liability for:

- any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interests in the Global Notes, or for maintaining, supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

- any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised the Company that its current practice, upon receipt of any payment in respect of securities such as the New Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date in amounts proportionate to their respective holdings in the principal amount of the relevant security as shown on the records of DTC, unless DTC has reason to believe it will not receive payment on such payment date. Payments by the Participants and the Indirect Participants to the beneficial owners of New Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the trustee or the Company. Neither the Company nor the trustee will be liable for any delay by DTC or any of its Participants in identifying the beneficial owners of the New Notes, and the Company and the trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Except for trades involving only Euroclear and Clearstream participants, interests in the Global Notes are expected to be eligible to trade in DTC's Same-Day Funds Settlement System and secondary market trading activity in such interests will therefore settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its Participants.

Transfers between Participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same-day funds, and transfers between participants in Euroclear and Clearstream will be effected in accordance with their respective rules and operating procedures.

Cross-market transfers between Participants in DTC, on the one hand, and Euroclear or Clearstream participants, on the other hand, will be effected through DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by their depositaries. Cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the ease may be, by the counterparty in that system in accordance with the rules and procedures and within the established deadlines (Brussels time) of that system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositaries to take action to effect final settlement on its behalf by delivering or receiving interests in the relevant Global Note in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear and Clearstream participants may not deliver instructions directly to the depositaries for Euroclear or Clearstream.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Note from a Participant in DTC will be credited and reported to the relevant Euroclear or Clearstream participant, during the securities settlement processing day (which must be a Business Day for Euroclear and Clearstream) immediately following the settlement date of DTC. DTC has advised the Company that cash received in Euroclear or Clearstream as a result of sales of interests in a Global Note by or through a

Euroclear or Clearstream participant to a Participant in DTC will be received with value on the settlement date of DTC but will be available in the relevant Euroclear or Clearstream cash account only as of the Business Day for Euroclear or Clearstream following DTC's settlement date.

DTC has advised the Company that it will take any action permitted to be taken by a holder of New Notes only at the direction of one or more Participants to whose account with DTC interests in the Global Notes are credited and only in respect of such portion of the aggregate principal amount of the New Notes as to which such Participant or Participants has or have given such direction.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures to facilitate transfers of interests in the Global Notes among participants in DTC, Euroclear and Clearstream, they are under no obligation to perform or to continue to perform such procedures, and the procedures may be discontinued at any time. Neither the Company nor the trustee will have any responsibility for the performance by DTC, Euroclear or Clearstream or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

The information in this section concerning DTC, Euroclear and Clearstream and their book-entry systems has been obtained from sources that the Company believes to be reliable, but the Company takes no responsibility for the accuracy thereof.

*Exchange of Book-Entry Notes for Certificated Notes*

The Global Notes are exchangeable for certificated notes in definitive, fully registered form without interest coupons (the "Certificated Notes") only in the following limited circumstances:

- DTC notifies the Company that it is unwilling or unable to continue as depositary for the Global Notes or DTC ceases to be a clearing agency registered under the Exchange Act at a time when DTC is required to be so registered in order to act as depositary, and in each ease the Company fails to appoint a successor depositary within 90 days of such notice;

- the Company notifies the trustee in writing that the Global Notes shall be so exchangeable; or

- if there shall have occurred and be continuing an MCD Event of Default or an Event of Default with respect to the New 2019 Notes and the trustee has received a request from DTC.

In all cases, Certificated Notes delivered in exchange for any Global Note or beneficial interests therein will be registered in the names, and issued in any approved denominations, requested by or on behalf of DTC (in accordance with its customary procedures).

**Same Day Settlement and Payment**

The New Notes represented by the global notes are expected to be eligible to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such New Notes will, therefore, be required by DTC to be settled in immediately available funds. The Company expects that secondary trading in any certificated notes will also be settled in immediately available funds.

**Governing Law**

The New Indentures, including any Note Guaranties, and the New Notes shall be governed by, and construed in accordance with, the laws of the State of New York.

209

**Certain Definitions**

"80% Owned Subsidiary" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary 80% or more of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Restricted Subsidiaries (or a combination thereof).

"Acquired Debt" means Debt of a Person existing at the time the Person merges with or into or becomes a Restricted Subsidiary and not Incurred in connection with, or in contemplation of, the Person merging with or into or becoming a Restricted Subsidiary.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with, such Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with") with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Asset Sale" means any sale, lease, transfer or other disposition of any assets by the Company or any Restricted Subsidiary, including by means of a merger, consolidation or similar transaction and including any sale or issuance of the Equity Interests of any Restricted Subsidiary (each of the above referred to as a "disposition"), *provided* that the following are not included in the definition of "Asset Sale":

(1) a disposition to the Company or a Substantially Wholly Owned Restricted Subsidiary, including the sale or issuance by the Company or any Restricted Subsidiary of any Equity Interests of any Restricted Subsidiary to the Company or any Substantially Wholly Owned Restricted Subsidiary;

(2) the disposition by the Company or any Restricted Subsidiary in the ordinary course of business of (i) cash and cash management investments, (ii) inventory and other assets acquired and held for resale in the ordinary course of business, (iii) damaged, worn out or obsolete assets, or (iv) rights granted to others pursuant to leases or licenses;

(3) the sale or discount of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(4) a transaction covered by the provisions under the caption "—New 2019 Notes—Consolidation, Merger, Lease or Sale of Assets";

(5) a Restricted Payment permitted under the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Restricted Payments" or a Permitted Investment;

(6) a Sale and Leaseback Transaction;

(7) dispositions of accounts receivable and related assets in connection with a Permitted Receivables Financing;

(8) foreclosures on Liens that are permitted under the covenant described under the caption "Limitation on Liens" above; and

(9) dispositions of assets with an aggregate fair market value of less than $5.0 million in any 12-month period.

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction, the present value, discounted at the interest rate implicit in the Sale and Leaseback Transaction, of the total obligations of the lessee for rental payments during the remaining term of the lease in the Sale and Leaseback Transaction.

"Average Life" means, with respect to any Debt, the quotient obtained by dividing (i) the sum of the products of (x) the number of years from the date of determination to the dates of each successive scheduled principal payment of such Debt and (y) the amount of such principal payment by (ii) the sum of all such principal payments.

"Board of Directors" means the board of directors of the Company.

"Board Resolution" means a resolution duly adopted by the Board of Directors, in accordance with the by-laws of the Company, and all applicable requirements of law, certified by the Secretary of the Company, to have been duly adopted by the Board of Directors thereof and to be in full force and effect on the date of such certification.

"Business Day" means any day other than a Saturday or Sunday, or a day on which commercial banking institutions in The City of New York or Mexico City are authorized or required by law, regulation or executive order to remain closed.

"Capital Lease" means, with respect to any Person, any lease of any property (whether real, personal or mixed) of which the discounted present value of the rental obligations of such Person as lessee, in conformity with Mexican GAAP is required to be capitalized on the balance sheet of such Person.

"Capital Lease Obligation" means the discounted present value of the rental obligations of a Person under a Capital Lease.

"Capital Stock" means, with respect to any Person, any and all shares of stock of a corporation, partnership interests or other equivalent interests (however designated, whether voting or non-voting) in such Person's equity, entitling the holder to receive a share of the profits and losses, and a distribution of assets, after liabilities, of such Person.

"Cash Equivalents" means

(1) direct obligations of the United States of America or any agency or instrumentality thereof with a maturity of 365 days or less from the date of acquisition and other obligations issued or directly and fully Guaranteed or insured by the United States of America or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States of America is pledged in support thereof);

(2) demand deposits, time deposits, certificates of deposit or Eurodollar deposits with a maturity of 365 days or less from the date of acquisition of any financial institution which at the date of acquisition has outstanding indebtedness rated at least "A-" by S&P or at least "A3" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(3) commercial paper with a maturity of 180 days or less from the date of acquisition of an issuer which at the date of acquisition has outstanding indebtedness rated at least "A-l" by Standard & Poor's Rating Group or at least "P-l" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(4) repurchase agreements and reverse repurchase agreements relating to marketable obligations directly or indirectly issued or unconditionally guaranteed by the United States of America or issued by any agency thereof and backed by the full faith and credit of the United States government, in each case maturing within one year from the date of acquisition; *provided*, *however*, that the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency;

(5) securities with maturities of six months or less from the date of acquisition issued or fully and unconditionally guaranteed by any state, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at the date of acquisition at least "A-" by S&P or "A3" by Moody's (or the equivalent of such rating by such rating organization, or, if no rating of S&P or Moody's then exists because neither of the foregoing then rates obligations of the type described in this clause, the equivalent of such rating by any other United States nationally recognized securities rating agency);

(6) instruments backed by letters of credit of institutions satisfying the requirements of clause (2) above;

(7) *Certificados de la Tesorería de la Federación (Cetes)*, *Bonos de Desarrollo del Gobierno Federal (Bondes)* or *Bonos Ajustables del Gobierno Federal (Ajustabonos)*, in each case, issued by the government of Mexico;

(8) any other instruments issued or guaranteed by the government of Mexico and denominated and payable in pesos;

(9) any investment in any fund substantially all the assets of which consist of investments of the type described in clauses (1) through (8) above;

(10) repurchase agreements or reverse repurchase agreements relating to marketable obligations of a type described in clause (7) or (8) above or with a bank described in clause (11) below; and

(11) demand deposits, certificates of deposit, time deposits and bankers' acceptances maturing not more than 180 days (or 365 days in the case of subclause (A)(I) or (B)(I) of this clause 11) after the acquisition thereof (A) denominated in pesos and issued by (I) any of the five top-rated banks (as evaluated by any internationally recognized rating agency) organized under the laws of Mexico or any other state thereof, or (II) any such bank which at the date of acquisition is a lender to or has made available a line of credit to (in each case in an amount equal to or greater than the amount of the proposed acquisition), the Company or any of its Restricted Subsidiaries, (B) in any jurisdiction other than Mexico where the Company or any of its Restricted Subsidiaries conducts business and (I) issued by one of the three largest banks doing business in such jurisdiction, or (II) any such bank in such jurisdiction which at the date of acquisition is a lender to or has made available a line of credit to (in each case in an amount equal to or greater than the amount of the proposed acquisition), the Company or any of its Restricted Subsidiaries, or (C) issued by any bank which at the date of acquisition is a lender to or has made available a line of credit to the Company or any of its Restricted Subsidiaries and which is not under intervention, receivership or any similar arrangement at the time of acquisition; *provided* that the aggregate amount of all such demand deposits, certificates of deposit, time deposits and bankers' acceptances acquired in accordance with this clause (C) does not exceed $50.0 million at any one time or (D) issued by any bank which at the date of acquisition has an outstanding loan to the Company or any of its Restricted Subsidiaries in an aggregate principal amount at least equal to the aggregate principal amount of such demand deposit, certificate of deposit, time deposit or bankers' acceptance.

"Change of Control" means

(1) the merger or consolidation of the Company with or into another Person or the merger of another Person with or into the Company or the merger of any Person with or into a Subsidiary of the Company if Capital Stock of the Company is issued in connection therewith, or the sale of all or substantially all the assets of the Company to another Person (in each case, unless such other Person is a Permitted Holder) unless (x) holders of a majority of the aggregate voting power of the Voting Stock of the Company immediately prior to such transaction, hold securities of the surviving or transferee Person that represent, immediately after such transaction, at least a majority of the aggregate voting power of the Voting Stock of the surviving Person or (y) (i) the surviving or transferee Person is (A) an internationally-recognized entity organized or existing under the laws of Mexico, a member of the European Union or any state of the United

212

States of America or the District of Columbia engaged in a Permitted Business whose Capital Stock is publicly-traded on the New York Stock Exchange, the London Stock Exchange or any other internationally-recognized stock exchange, or (B) a Subsidiary of an entity described in the preceding clause (A) whose Consolidated Net Worth is at least substantially the same as the Consolidated Net Worth of the Company (or of all or substantially all of its assets, as the case may be) immediately prior to such merger, consolidation or sale, and (ii) immediately following such merger, consolidation or sale, on a pro forma basis, the Leverage Ratio of the surviving Person is no greater than the Leverage Ratio of the Company immediately prior to such merger, consolidation or sale; or

(2) any "person" or "group" (as such terms are used for purposes of Sections 13(d) and 14(d) of the Exchange Act), other than Permitted Holders, is or becomes the "beneficial owner" (as such term is used in Rules 13d-3 under the Exchange Act), directly or indirectly, of more than 35% of the total voting power of the Voting Stock of the Company.

"Commission" means the United States Securities and Exchange Commission.

"Common Stock" means Capital Stock not entitled to any preference on dividends or distributions, upon liquidation or otherwise.

"Consolidated Net Income" means, for any period, the aggregate net income (or loss) of the Company and its Restricted Subsidiaries for such period determined on a consolidated basis in conformity with Mexican GAAP *provided* that the following (without duplication) will be excluded in computing Consolidated Net Income:

(1) the net income (or loss) of any Person that is not a Restricted Subsidiary, except to the extent of the lesser of:

(x) the dividends or other distributions actually paid in cash to the Company or any of its Restricted Subsidiaries (subject to clause (3) below) by such Person during such period, and

(y) the Company's *pro rata* share of such Person's net income earned during such period;

(2) the net income (but not loss) of any Restricted Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary of such net income would not have been permitted for the relevant period by charter or by any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such Restricted Subsidiary;

(3) any net after-tax gains (or losses) attributable to Asset Sales;

(4) any net after-tax extraordinary gains (or losses); and

(5) the cumulative effect of a change in accounting principles.

In calculating the aggregate net income (or loss) of the Company and its Restricted Subsidiaries on a consolidated basis, income attributable to Unrestricted Subsidiaries will be excluded altogether.

"Consolidated Net Tangible Assets" means the total amount of assets of the Company and its Restricted Subsidiaries, less applicable depreciation, amortization and other valuation reserves, after deducting therefrom:

(1) all current liabilities, excluding intercompany items, and

(2) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangibles,

213

all as set forth on the most recent quarterly or annual consolidated balance sheet of the Company and its Restricted Subsidiaries prepared in accordance with Mexican GAAP.

"Consolidated Net Worth" means, with respect to any Person, at any date of determination, the consolidated stockholder's equity of such Person (and, in the case of the Company, the Company and its Restricted Subsidiaries), calculated excluding

(1) any amounts attributable to Disqualified Stock,

(2) treasury stock, and

(3) all write-ups (other than write-ups resulting from foreign currency translations and write-ups of tangible assets of a going concern business made in accordance with Mexican GAAP as a result of the acquisition of such business) subsequent to the date of the New Indentures in the book value of any asset.

"Conversion Agent" means, the trustee under the New MCD Indenture, as appointed by the Company.

"Debt" means, with respect to any Person, without duplication,

(1) all indebtedness of such Person for borrowed money;

(2) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments, excluding obligations in respect of trade letters of credit or bankers' acceptances issued in respect of Trade Payables to the extent not drawn upon or presented, or, if drawn upon or presented, the resulting obligation of the Person is paid within 10 Business Days;

(4) all obligations of such Person to pay the deferred and unpaid purchase price of property or services which are recorded as liabilities under Mexican GAAP, excluding Trade Payables arising in the ordinary course of business;

(5) all obligations of such Person as lessee under Capital Leases, including all Attributable Debt under a Sale and Leaseback Transaction under which such Person is a lessee;

(6) all Debt of other Persons Guaranteed by such Person to the extent so Guaranteed (including under Project Finance Guarantees);

(7) all Debt of other Persons secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person;

(8) Disqualified Stock of such Person;

(9) all obligations of such Person under Hedging Agreements;

(10) all sales of account receivables of such person (including under any Permitted Receivables Financing) together with any obligation of such Person to pay any discount, interest, fees, indemnities, penalties, recourse, expenses or other amounts in connection therewith (except to the extent such sales of account receivables are Non-Recourse Debt); and

(11) the net present value of all future payments of such Person under operating leases; *provided* that (i) an operating lease will only be counted as Debt if the nominal value of the payments due under such operating lease and any other substantially related operating lease in any given calendar year exceeds $250,000 and the remaining term of such operating lease is more than 3 years and (ii) the net present value

214

of future payments of operating leases will be calculated using a discount rate of 9% for payments denominated in U.S. dollars and 12% for payments denominated in any other currency.

The amount of Debt of any Person will be deemed to be:

(A) with respect to contingent obligations, the maximum liability upon the occurrence of the contingency giving rise to the obligation;

(B) with respect to Debt secured by a Lien on an asset of such Person but not otherwise the obligation, contingent or otherwise, of such Person, the lesser of (x) the fair market value of such asset on the date the Lien attached and (y) the amount of such Debt;

(C) with respect to any Debt issued with original issue discount, the face amount of such Debt less the remaining unamortized portion of the original issue discount of such Debt, as determined in conformity with Mexican GAAP;

(D) with respect to any Hedging Agreement, the net amount payable if such Hedging Agreement terminated at that time due to default by such Person; and

(E) otherwise, the outstanding principal amount thereof.

Notwithstanding the foregoing, "Debt" shall not include (i) any liability to the Pension Benefit Guaranty Corporation under the term sheet dated January 29, 1997 and entered into in connection with the sale of assets of Anchor Glass Container Corporation (or any definitive agreement in respect thereof or instrument relating thereto), (ii) Trade Payables or (iii) the New MCDs (and any accrued interest thereon).

"Default" means any event that is, or after notice or passage of time or both would be, an Event of Default with respect to the New 2019 Notes.

"Disqualified Equity Interests" means Equity Interests that by their terms or upon the happening of any event are:

(1) required to be redeemed or redeemable at the option of the holder prior to the Stated Maturity of the New Notes for consideration other than Qualified Equity Interests, or

(2) convertible at the option of the holder into Disqualified Equity Interests or exchangeable for Debt;

*provided* that Equity Interests will not constitute Disqualified Equity Interests solely because of provisions giving holders thereof the right to require repurchase or redemption upon an "asset sale" or "change of control" occurring prior to the Stated Maturity of the notes if those provisions:

(A) are no more favorable to the holders than the covenants described above under the captions "—New 2019 Notes—Certain Covenants—Limitation on Asset Sales" and "—New 2019 Notes—Certain Covenants—Repurchase of Notes Upon a Change of Control," and

(B) specifically state that repurchase or redemption pursuant thereto will not be required prior to the Company's repurchase of the notes as required by the New Indentures.

"Disqualified Stock" means Capital Stock constituting Disqualified Equity Interests.

215

"EBITDA" means, for any period, the sum of Consolidated Net Income, plus or minus, as the case may be, without duplication, to the extent such amount was deducted or added, as the case may be, in calculating Consolidated Net Income:

(1) Interest Expense, *plus*

(2) income and alternative minimum tax (IETU) and workers' profit sharing (other than income taxes (either positive or negative) attributable to extraordinary gains or losses or to gains or losses on sales of assets), *plus*

(3) depreciation expense, *plus*

(4) amortization expense, *plus*

(5) non-cash items related to pension plan liabilities, *plus*

(6) extraordinary non-recurring severance payments to employees, *plus*

(7) to the extent deducted from Consolidated Net Income, any payments made under any operating lease counted as Debt pursuant to clause (11) of the definition thereof; *plus*

(8) any other non-cash items according to Mexican GAAP that are reported below the "operating income (loss)" line on the Company's consolidated statements of operations, all as determined on a consolidated basis for the Company and its Restricted Subsidiaries in conformity with Mexican GAAP.

"Equity Interests" means all Capital Stock and all warrants or options with respect to, or other rights to purchase, Capital Stock, but excluding Debt convertible into equity other than the New MCDs.

"Excess Cash Flow" means, for each Calculation Period, without duplication, the amount equal to the sum of the following items for the Company and its 80% Owned Subsidiaries as of the last day of such Calculation Period:

(a) EBITDA increased by the sum of dividends received in cash and interest income; *plus/minus*

(b) any negative/positive change in the working capital of the Company and its Restricted Subsidiaries; *minus*

(c) any cash used to make a Qualified Investment in a Subsidiary; *minus*

(d) the proceeds of any Permitted Receivables Financing received during such Calculation Period; *minus*

(e) the aggregate amount of Interest Expense in respect of Debt permitted pursuant to the covenant "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" paid in cash during such Calculation Period from cash generated by operations of the Company or its 80% Owned Subsidiaries (except, for the avoidance of doubt, any Interest Expense in respect of Project Finance Indebtedness); *minus*

(f) all income taxes and other similar taxes paid in cash during such Calculation Period; *minus*

(g) all payments that are (i) principal payments in respect of the New Notes or (ii) payments made to permanently repay Debt that is (x) not Subordinated Debt of the Company or a Guarantor or any Debt of a Restricted Subsidiary that is not a Guarantor and (y) permitted pursuant to the covenant "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" (and in the case of a revolving credit, permanently reduce the commitment thereunder by such amount), in each case owing to a Person other than the Company or any Restricted Subsidiary and in each case paid in cash during such

216

Calculation Period from cash generated by operations of Company or its 80% Owned Subsidiaries; *provided* that if a Leverage Compliance Date occurs, the permanent reduction of any amount of Debt permitted to be incurred pursuant to such covenant prior to such Leverage Compliance Date shall be reversed; *minus*

(h) all Permitted Capital Expenditures paid in cash during such Calculation Period; *plus/minus*

(i) any cash collateral required to be released/posted during such Calculation Period in connection with Hedging Agreements permitted under the New Indentures; *minus*

(j) without duplication, severance payments and pension plan obligations paid in cash during such Calculation Period and not included in the calculation of operating income; *minus*

(k) the amount, if any, necessary to replenish the amount of Unrestricted Cash as of the last day of such Calculation Period to an amount equal to $95.0 million;

*provided*, *however*, that for the initial Calculation Period, the amount of Excess Cash Flow shall include all Excess Cash Flow (calculated pursuant to the formula set forth above) for the period commencing on the Value Date through the end of the first fiscal year immediately following the Issue Date.

For the purposes of determining Excess Cash Flow, to the extent any cash amounts included in items (c) through (k) above are included in the calculation of the change in working capital of the Company and its Restricted Subsidiaries, such amount shall not be duplicated in calculating items (c) through (k) above.

"Finance Subsidiary" means any Subsidiary of the Company that is designated a "Finance Subsidiary" by the Board of Directors and (i) in the case of a Finance Subsidiary that is created to issue Debt of the Company or a Restricted Subsidiary other than in connection with a Permitted Receivables Financing, does not hold any assets (other than Intercompany Debt) and does not engage in any activity other than issuing such Debt of the Company or its Restricted Subsidiary or issuing Capital Stock, or (ii) in the case of a Finance Subsidiary that is created in connection with a Permitted Receivables Financing, does not hold any assets (other than (x) Intercompany Debt or (y) accounts receivable in connection with such Permitted Receivables Financing) and does not engage in any activity other than issuing Debt in connection with such Permitted Receivables Financing or issuing Capital Stock, and, in each case of the foregoing, any activity necessary, incidental or related to the foregoing; *provided* that (a) any Intercompany Debt held by any such Finance Subsidiary shall be subordinated to the New Notes and transferred to the Fideicomiso pursuant to the terms of the covenant "—New 2019 Notes—Certain Covenants—Limitation on Intercompany Debt" and (b) any Debt of such Finance Subsidiary shall be Non-Recourse Debt.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt or other obligation of any other Person and, without limiting the generality of the foregoing, any obligation, direct or indirect, contingent or otherwise, of such Person (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, to take-or-pay, or to maintain financial statement conditions or otherwise) or (ii) entered into for purposes of assuring in any other manner the obligee of such Debt or other obligation of the payment thereof or to protect such obligee against loss in respect thereof, in whole or in part; *provided* that the term "Guarantee" does not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantor" means (i) ViMéxico, S.A. de C.V. ("ViMexico"), (ii) Vitro Envases Norteamérica, S.A. de C.V. ("VENA"), (iii) Comercializadora Alcali, S.A. de C.V., (iv) Fic Regiomontano, S.A.P.I. de C.V., (v) V-Mx Holdings, LLC, (vi) Vitro Packaging de Mexico, S.A. de C.V., (vii) Vidriera Monterrey, S.A. de C.V., (viii) Vidriera Los Reyes, S.A. de C.V., (ix) Vidriera Guadalajara, S.A. de C.V., (x) Vidriera Querétaro, S.A. de C.V., (xi) Vidriera Toluca, S.A. de C.V., (xii) Compañía Vidriera, S.A. de C.V., (xiii) Fabricación de Máquinas, S.A. de C.V., (xiv) Servicios Integrales de Acabados, S.A. de C.V., (xv) Vidrio Plano, S.A. de C.V., (xvi) Industria del Alcali, S.A. de C.V., (xvii) Distribuidora de Vidrio y Cristal, S.A. de C.V., (xviii) Vidrio Lux, S.A., (xix) Vitro

217

Packaging, LLC, (xx) Vidrio Plano de Mexicali, S.A. de C.V., (xxi) Vitro Europa, Ltd., (xxii) Vitro Asset Corp., (xxiii) Vitro Venezuela, S.A., (xxiv) Binswanger Glass Company, (xxv) Vitro Panamá, S.A., (xxvi) Troper Services, Inc., (xxvii) Vitemco Ecuador, S.A., (xxviii) Amsilco Holdings, Inc., (xxix) BBO Holdings, Inc., (xxx) Crisa Corporation, (xxxi) Vitro Automotriz, S.A. de C.V., (xxxii) Vitro Flex, S.A. de C.V., (xxxiii) Vitro Vidrio y Cristal, S.A. de C.V., (xxxiv) Vitro Flotado Cubiertas, S.A. de C.V., (xxxv) Distribuidor Vidriero LAN, S.A. de C.V., (xxxvi) Vitrocar, S.A. de C.V., (xxxvii) Cristales Inastillables de México, S.A. de C.V., (xxxviii) Vidrio Plano de Mexico, S.A. de C.V., (xxxix) VVP Holdings LLC., (xl) VVP Auto Glass, Inc., (xli) Vitro America, LLC, (xlii) Super Sky Products, Inc., (xliii) Super Sky International, Inc., (xliv) VVP Finance Corporation, (xlv) Vitro Colombia, S.A., (xlvi) VVP Europa Holdings, B.V., (xlvii) Vitro do Brasil Indústria e Comércio, Ltda., (xlviii) Vitro Chemicals, Fibers and Mining, LLC, (xlix) Vitro Global, Ltd., (l) Vidrios y Cristal del Noroeste, S.A. de C.V., (li) Servicios Vidriera Guadalajara, S.A. de C.V., (lii) Servicios Vidriera Toluca, S.A. de C.V., (liii) Servicios Vitro Cosmos, S.A. de C.V., (liv) Servicios Vidriera Querétaro, S.A. de C.V., (lv) Servicios Vidriera los Reyes, S.A. de C.V., (lvi) Inmobiliaria Vitalc, S.A. de C.V., (lvii) Viqueretanos, S.A. de C.V., (lviii) VAU, S.A. de C.V., (lix) Vitro Car Colombia, S.A.S., (lx) Vitro Cristalglass, S.L., (lxi) each Restricted Subsidiary that executes a supplemental indenture in the form set forth as an exhibit to the applicable indenture providing for the Guarantee of the payment of the notes of the relevant series, or (lxii) any successor obligor under its Note Guaranty pursuant to provisions of the section entitled "—New 2019 Notes—Consolidation, Merger, Lease or Sale of Assets," in each case unless and until such Guarantor is released from its Note Guaranty pursuant to the New 2019 Indenture.

"Hedging Agreement" means (i) any interest rate swap agreement, interest rate cap agreement or other agreement designed to protect against fluctuations in interest rates or (ii) any foreign exchange forward contract, currency swap agreement or other agreement designed to protect against fluctuations in foreign exchange rates or (iii) any commodity or raw material futures contract or any other agreement designed to protect against fluctuations in raw material prices of any commodity or raw material used in a Permitted Business.

"IFRS" mean International Financial Reporting Standards.

"Incur" means, with respect to any Debt or Capital Stock, to incur, create, issue, assume or Guarantee such Debt or Capital Stock. If any Person becomes a Restricted Subsidiary on any date after the date of the New Indentures (including by redesignation of an Unrestricted Subsidiary or failure of an Unrestricted Subsidiary to meet the qualifications necessary to remain an Unrestricted Subsidiary), the Debt and Capital Stock of such Person outstanding on such date will be deemed to have been Incurred by such Person on such date for purposes of the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock," but will not be considered the sale or issuance of Equity Interests for purposes of the covenant described under the caption "New 2019 Notes—Certain Covenants—Limitation on Asset Sales." The accretion of original issue discount or payment of interest in kind will not be considered an Incurrence of Debt.

"Independent Financial Advisor" means an accounting firm, appraisal firm, investment banking firm or consultant of internationally recognized standing that is, in the judgment of the Board of Directors, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction.

"Interest Expense" means, for any period, the consolidated interest expense of the Company and its Restricted Subsidiaries, *plus*, to the extent not included in such consolidated interest expense, and to the extent incurred, accrued or payable by the Company or its Restricted Subsidiaries, without duplication, (i) interest expense attributable to Sale and Leaseback Transactions, (ii) amortization of debt discount and debt issuance costs, (iii) capitalized interest, (iv) non-cash interest expense, (v) commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing, (vi) net costs or expenses associated with Hedging Agreements (including the amortization of fees), (vii) any of the above expenses with respect to Debt of another Person Guaranteed by the Company or any of its Restricted Subsidiaries and (viii) any premiums, fees, discounts, expenses and losses on the sale of accounts receivable (and any amortization thereof) payable by the Company or any Restricted Subsidiary in connection with a Permitted Receivables Financing or on the issuance of any Debt as determined on a consolidated basis and in accordance with Mexican GAAP.

"Investment" means

(1) any direct or indirect advance, loan or other extension of credit to another Person (other than advances to customers in the ordinary course of business that are, in conformity with Mexican GAAP, recorded as accounts receivable on the balance sheet of the Company or its Restricted Subsidiaries, travel and similar advances to employees in the ordinary course of business and advances of sales commissions to agents in the ordinary course of business),

(2) any capital contribution to another Person, by means of any transfer of cash or other property or in any other form,

(3) any purchase or acquisition of Equity Interests other than the New MCDs, bonds, notes or other Debt, or other instruments or securities issued by another Person, including the receipt of any of the above as consideration for the disposition of assets or rendering of services, or

(4) any Guarantee of any obligation of another Person.

If the Company or any Restricted Subsidiary (x) sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary so that, after giving effect to that sale or disposition, such Person is no longer a Subsidiary of the Company, or (y) designates any Restricted Subsidiary as an Unrestricted Subsidiary in accordance with the provisions of the New Indentures, all remaining Investments of the Company and the Restricted Subsidiaries in such Person shall be deemed to have been made at such time.

"Issue Date" means, with respect to a series of New Notes, the date on which such New Notes are issued under the New Indentures.

"Leverage Ratio" means, on any date of determination (the "transaction date"), the ratio of:

(x) Debt (on a consolidated basis) of the Company and its Restricted Subsidiaries, other than Project Finance Indebtedness, to

(y) the aggregate amount of EBITDA (on a consolidated basis) for the four fiscal quarters immediately prior to the transaction date for which internal consolidated financial statements are available (the "reference period");

*provided* that

(1) any Debt, Disqualified Stock or Preferred Stock that is repaid or redeemed on the transaction date will be excluded;

(2) pro forma effect will be given to:

(A) the creation, designation or redesignation of Restricted and Unrestricted Subsidiaries,

(B) the acquisition or disposition of companies, divisions or lines of businesses by the Company and its Restricted Subsidiaries, including any acquisition or disposition of a company, division or line of business since the beginning of the reference period by a Person that became a Restricted Subsidiary after the beginning of the reference period, and

(C) the discontinuation of any discontinued operations

that have occurred since the beginning of the reference period as if such events had occurred, and, in the case of any disposition, the proceeds thereof applied, on the first day of the reference period. To the extent that pro forma effect is to be given to an acquisition or disposition of a company, division or

219

line of business, the pro forma calculation will be based upon the most recent four full fiscal quarters for which the relevant financial information is available; and

(3) if and to the extent any Strategic Joint Venture is not combined or consolidated with the Company under Mexican GAAP the Proportional Debt of such Strategic Joint Venture shall be included in the preceding clause (x) for purposes of calculating the Debt of the Company and its Restricted Subsidiaries and (ii) only the Proportional EBITDA from such Strategic Joint Venture shall be included in the preceding clause (y) for purposes of calculating the consolidated EBITDA of the Company and its Restricted Subsidiaries.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or Capital Lease).

"Market Purchase" means the purchase of any New Notes available for sale in the secondary market through broker-dealers or similar intermediaries at a price lower than the principal amount thereof (plus any accrued and unpaid interest thereon).

"Material Subsidiary" means, on any date, any Subsidiary, or group of Subsidiaries, that would, taken together, produce 5% or more of the Company's EBITDA for the four fiscal quarters immediately prior to such date for which internal consolidated financial statements are available, other than Vitro Envases Nortéamerica, S.A. de C.V.

"MCD Default" means any event that is, or after notice or passage of time or both would be, an MCD Event of Default with respect to the New MCDs.

"Mexican GAAP" means the Mexican Financial Reporting Standards issued by the Mexican Board for Research and Development of Financial Reporting Standards. If, at any time after the Issue Date, the Company elects or is required by the CNBV to apply IFRS in lieu of Mexican GAAP, thereafter, references herein to Mexican GAAP shall be construed to mean IFRS; provided that any such election, once made, shall be irrevocable. The Issuer shall give notice of any such election to the Trustee.

"Mexico" means the *Estados Unidos Mexicanos* (the United Mexican States) and any branch of power thereof and any ministry, department, authority or statutory corporation or other entity (including a trust), owned or controlled directly or indirectly by the *Estados Unidos Mexicanos* or any of the foregoing.

"Moody's" means Moody's Investors Service, Inc. and its successors.

"Net Cash Proceeds" means, with respect to any Asset Sale, the proceeds of such Asset Sale in the form of cash or Cash Equivalents, including payments in respect of deferred payment obligations (to the extent corresponding to the principal, but not interest, component thereof) when received in the form of cash or Cash Equivalents (except to the extent such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary) and proceeds from the conversion of other property received when converted to cash or Cash Equivalents, net of:

(1) brokerage commissions and other fees and expenses (including fees and expenses of counsel, accountants and investment bankers) related to such Asset Sale,

(2) provisions for all taxes (whether or not such taxes will actually be paid or are payable) as a result of such Asset Sale without regard to the consolidated results of operations of the Company and its Restricted Subsidiaries taken as a whole,

(3) payments made to repay Debt or any other obligation outstanding at the time of such Asset Sale that either (A) is secured by a Lien on the property or assets sold or (B) is required to be paid as a result of such sale and

220

(4) appropriate amounts to be provided by the Company or any Restricted Subsidiary as a reserve against any liabilities associated with such Asset Sale, including, without limitation, pension and other post-employment benefit liabilities, liabilities related to environmental matters and liabilities under any indemnification obligations associated with such Asset Sale, all as determined in conformity with Mexican GAAP.

"Non-Recourse Debt" means Debt as to which (i) neither the Company nor any Restricted Subsidiary provides any Guarantee and as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Company or any Restricted Subsidiary and (ii) no default thereunder would, as such, constitute a default under any Debt of the Company or any Restricted Subsidiary.

"Note Guaranty" means the guaranty of the notes of each series by a Guarantor pursuant to the New 2019 Indenture.

"Obligations" means, with respect to any Debt, all obligations (whether in existence on the Issue Date or arising afterwards, absolute or contingent, direct or indirect) for or in respect of principal (when due, upon acceleration, upon redemption, upon mandatory repayment or repurchase pursuant to a mandatory offer to purchase, or otherwise), premium, interest, penalties, fees, indemnification, reimbursement and other amounts payable and liabilities with respect to such Debt, including all interest accrued or accruing after the commencement of any bankruptcy, insolvency or reorganization or similar case or proceeding at the contract rate (including, without limitation, any contract rate applicable upon default) specified in the relevant documentation, whether or not the claim for such interest is allowed as a claim in such case or proceeding.

"Officers' Certificate" means a certificate signed on behalf of the Company or a Guarantor, as the case may be, by two officers of the Company or Guarantor, as applicable, one of whom must be the principal executive officer, principal financial officer, the treasurer, or the principal accounting officer of the Company or the Guarantor, as applicable, that meets the requirements set forth in the New Indentures.

"Old Notes" means the Company's outstanding 8.625% Senior Notes due 2012, 11.75% Senior Notes due 2013 and 9.125% Senior Notes due 2017.

"Opinion of Counsel" means a written opinion of counsel, who may be an employee of or counsel for the Company and who shall be reasonably acceptable to the trustee.

"Ordinary Course Intercompany Debt" means Intercompany Debt issued by the Company or its Restricted Subsidiaries to the Company or a Restricted Subsidiary in the ordinary course of business, consistent with past practice, including without limitation trade payables and Intercompany Debt issued for treasury management purposes of the Company or such Restricted Subsidiary.

"Permitted Business" means any of the businesses in which the Company and its Restricted Subsidiaries are engaged on the Issue Date, and any business reasonably related, incidental, complementary or ancillary thereto.

"Permitted Holders" means any or all of the following:

(1) any member of the Board of Directors on the Issue Date;

(2) a parent, brother or sister of any of the individuals named in clause (1);

(3) the spouse or a former spouse of any individual named in clause (1) or (2);

(4) the lineal descendants of any person named in clauses (1) through (3) and the spouse or a former spouse of any such lineal descendant;

(5) the estate or any guardian, custodian or other legal representative of any individual named in clauses (1) through (4);

(6) any trust established solely for the benefit of any one or more of the individuals named in clauses (1) through (5);

(7) any Person in which all of the Equity Interests are owned, directly or indirectly, by any one or more of the Persons named in clauses (1) through (6);

(8) the Company's employee stock option trust and subsidiary trusts of such trust; and

(9) anyone who enters into a voting agreement with any one or more of the Persons named in clauses (1) through (7) above, in which the vote is generally controlled by one or more of such Persons named in clauses (1) through (7) above.

"Permitted Investments" means:

(1) any Investment in the Company or in a Guarantor that is engaged in a Permitted Business;

(2) any Investment in Cash Equivalents;

(3) any Investment by the Company or any Subsidiary of the Company in a Person, if as a result of such Investment,

(A) such Person becomes a Substantially Wholly Owned Restricted Subsidiary of the Company that is (i) a Guarantor engaged in a Permitted Business or (ii) a Strategic Joint Venture engaged in a Permitted Business, the Capital stock of which is pledged, concurrently with the acquisition or creation of, or participation in, such Strategic Joint Venture, as collateral for the Company's obligations under the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture, or

(B) such Person is merged or consolidated with or into, or transfers or conveys substantially all its assets to, or is liquidated into, the Company or a Substantially Wholly Owned Restricted Subsidiary that is (i) a Guarantor engaged in a Permitted Business or (ii) a Strategic Joint Venture engaged in a Permitted Business, the Capital Stock of which is pledged, concurrently with the acquisition or creation of such Strategic Joint Venture, as collateral for the Company's obligations pursuant to the New 2019 Notes, in accordance with the terms of the New 2019 Notes Indenture;

(4) Investments received as non-cash consideration in an Asset Sale made pursuant to and in compliance with the provisions of "—New 2019 Notes—Certain Covenants—Limitation on Asset Sales";

(5) any Investment acquired solely in exchange for Qualified Stock of the Company;

(6) Hedging Agreements otherwise permitted under the New Indentures;

(7) (i) receivables owing to the Company or any Restricted Subsidiary if created or acquired in the ordinary course of business, (ii) Cash Equivalents or other cash management investments or liquid or portfolio securities pledged as collateral pursuant to the covenant described under the caption "—New 2019 Notes—Certain Covenants—Limitation on Liens," (iii) endorsements for collection or deposit in the ordinary course of business, and (iv) securities, instruments or other obligations received in compromise or settlement of debts created in the ordinary course of business, or by reason of a composition or readjustment of debts or reorganization of another Person, or in satisfaction of claims or judgments;

(8) Investments in Unrestricted Subsidiaries in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed $1.0 million (net of, with respect to the

222

Investment in any particular Person, the cash return thereon received after the Issue Date as a result of any sale for cash, repayment, redemption, liquidating distribution or other cash realization (not included in Consolidated Net Income), not to exceed the amount of Investments in such Person made after the Issue Date in reliance on this clause);

(9) payroll, travel and expenses of officers and employees in the ordinary course of business;

(10) Investments in a Finance Subsidiary that are necessary or desirable to effect any Permitted Receivables Financing;

(11) Project Finance Investments; *provided* that such Project Finance Investment is funded with funds from the Company ECF Account available as of the date such Project Finance Investment is made or Incurred;

(12) any Qualified Investment in a Subsidiary; and

(13) in addition to Investments listed above, Investments in Persons engaged in Permitted Businesses in an aggregate amount, taken together with all other Investments made in reliance on this clause, not to exceed 5% of Consolidated Net Tangible Assets; *provided* that such Investments are made solely out of any available funds (to the extent not already used) in the Company ECF Account.

"Permitted Liens" means

(1) Liens existing on the Issue Date (other than Liens permitted pursuant to clause (15) below);

(2) Liens securing the notes or any Note Guaranties;

(3) pledges or deposits under worker's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits or encumbrances in connection with bids, tenders, contracts or leases, or to secure public or statutory obligations, surety bonds, customs duties and the like, or for the payment of rent, in each case incurred in the ordinary course of business and not securing Debt;

(4) Liens imposed by law, such as carriers', vendors', warehousemen's and mechanics' liens, in each case for sums not yet due or being contested in good faith and by appropriate proceedings;

(5) Liens in respect of taxes and other governmental assessments and charges which are not yet due or which are being contested in good faith and by appropriate proceedings;

(6) minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or zoning or other restrictions as to the use of real property, not interfering in any material respect with the conduct of the business of the Company and its Restricted Subsidiaries;

(7) licenses or leases or subleases as licensor, lessor or sublessor of any of its property, including intellectual property, in the ordinary course of business;

(8) customary Liens in favor of trustees and escrow agents, and netting and setoff rights, banker's liens and the like in favor of financial institutions and counterparties to financial obligations and instruments, including Hedging Agreements permitted under the terms of the New Indentures;

(9) customary Liens prohibiting the disposition of assets pursuant to merger agreements, stock or asset purchase agreements and similar agreements in respect of the disposition of such assets;

223

(10) judgment liens, and Liens securing appeal bonds or letters of credit issued in support of or in lieu of appeal bonds, that in the aggregate do not exceed $25.0 million, so long as no MCD Event of Default or no Event of Default with respect to the New 2019 Notes then exists;

(11) pledges of any Capital Stock or other Equity Interests in any Project Finance Entity or any special purpose holding company owning such Project Finance Entity to secure Project Finance Indebtedness (other than from an Affiliate of the Company or any Restricted Subsidiary) Incurred by such Project Finance Entity;

(12) Liens securing any Purchase Money Debt permitted under the covenant described under the caption "—New 2019 Notes— Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" above;

(13) Liens on property of a Person at the time such Person becomes a Restricted Subsidiary of the Company, *provided* such Liens were not created in contemplation thereof and do not extend to any other property of the Company or any Restricted Subsidiary;

(14) Liens on property at the time the Company or any of the Restricted Subsidiaries acquires such property, including any acquisition by means of a merger or consolidation with or into the Company or a Restricted Subsidiary of such Person, *provided* such Liens were not created in contemplation thereof and do not extend to any other property of the Company or any Restricted Subsidiary;

(15) customary margin requirements and the like (including any liens on real property for natural gas derivatives) securing Hedging Agreements entered into in compliance with the covenant described under the caption "—New 2019 Notes—Certain Covenants— Limitation on Hedging Agreements";

(16) Liens arising in connection with Debt permitted pursuant to clause (1) of paragraph (b) of the covenant described under the caption "Limitation on Debt and Disqualified or Preferred Stock" above;

(17) any Lien which secures only Debt owing by one or more Restricted Subsidiaries to the Company or a Guarantor, to the extent required by applicable law;

(18) Liens on the headquarters of the Company, located in San Pedro Garza García, 66265 Nuevo León, Mexico arising in connection with a Sale and Leaseback Transaction in connection therewith;

(19) extensions, renewals or replacements of any Liens referred to in clause (1), (2), (12), (13), (14) or (16) in connection with the refinancing of the obligations secured thereby, *provided* that such Lien does not extend to any other property and that such extension, renewal or replacement of the obligation secured by such Lien constitutes "Permitted Refinancing Debt" in accordance with the covenant described under clause (5) of the caption ""—New 2019 Notes—Certain Covenants—Limitation on Debt and Disqualified or Preferred Stock" above;

(20) Liens on the assets of a Project Finance Entity to secure the Project Finance Indebtedness issued by such Project Finance Entity; and

(21) other Liens for operating purposes and arising in the ordinary course of business securing obligations in an aggregate amount not exceeding $20.0 million.

"Permitted Receivables Financing" means any receivables financing facility, factoring program or arrangement pursuant to which accounts receivable of the Company or any Restricted Subsidiaries are sold or are financed by third parties on terms that the Board of Directors has concluded are customary and market terms fair to the Company and its Restricted Subsidiaries; *provided* that (i) any debt obligation related to such Permitted Receivables Financing shall be Non-Recourse Debt, except for customary rights of indemnity in such financings, and (ii) neither the Company nor any Restricted Subsidiary shall be obligated to generate accounts receivable at any point pursuant to any such transaction.

"Person" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or any other entity, including a government or political subdivision or an agency or instrumentality thereof.

"Preferred Stock" means, with respect to any Person, any and all Capital Stock which is preferred as to the payment of dividends or distributions, upon liquidation or otherwise, over another class of Capital Stock of such Person.

"Project Finance Entity" means any special purpose entity or Mexican trust (*fideicomiso*) in which the Company or any Restricted Subsidiary has an interest as an equity holder or beneficiary, in each case, formed for the purpose of (i) constructing, developing, extending, expanding or improving (or acquiring or purchasing, in order to complete any such construction, development, extension, expansion or improvement), fixed or capital assets or other property, plant or equipment or (ii) being a holding company that owns at least 95% of the Equity Interests in any Person meeting the criteria set forth in clause (i) above, and which in any case satisfies each of the following criteria:

(a) such Project Finance Entity does not conduct business with the customers or Affiliates of the Company or any Restricted Subsidiary unless any such business (x) is conducted on an arm's-length basis and on terms no less favorable to such Project Finance Entity than it would obtain in a comparable arm's-length transaction with a Person which is not a customer or Affiliate of the Company or any Restricted Subsidiary and (y) is not reasonably expected to have a material adverse effect on the assets, liabilities, cash flows, business or operations of the Company and its Restricted Subsidiaries taken as a whole (disregarding such Project Finance Entity), in each case as certified by a qualified independent expert; and

(b) the sole source of recourse of any creditor of such Project Finance Entity for the payment of principal, interest and other amounts of Debt will be (v) recourse to the aggregate cash flow or net cash flow (or the revenues or any portion thereof as may be negotiated by such Project Finance Entity) generated by the assets of such Project Finance Entity, and/or (w) recourse to the assets of such Project Finance Entity, and/or (x) a Project Finance Guaranty, and/or (y) recourse to the capital stock or other equity or quasi-equity interests in such Project Finance Entity that is pledged in connection with the Incurrence of such Project Finance Indebtedness, and/or (z) recourse to credit enhancement (e.g., letters of credit, insurance policies, surety bonds, guaranty contracts of the types customary in project finance transactions and in respect or as a result of which there is no recourse, whether direct or indirect, to the Company, any of its Restricted Subsidiaries (other than the relevant Project Finance Entity) or any Strategic Joint Venture) provided by third parties (other than Subsidiaries of the Company or Strategic Joint Ventures).

"Project Finance Guaranty" means a guarantee, surety or other similar obligation in respect of Project Finance Indebtedness, granted to lenders (other than Affiliates of the Company) to a project of the relevant Project Finance Entity in respect of completion of the construction, development, extension, expansion or improvement of that project.

"Project Finance Indebtedness" means Debt Incurred by any Project Finance Entity in connection with the financing of all or any part of the purchase price or cost of the construction, development, extension, expansion or improvement of any of its assets (including the purchase price of and acquisition costs relating to materials, equipment and other assets required to complete such construction, development, extension, expansion or improvement); *provided* that the sole source of recourse of any creditor of such Project Finance Entity for the payment of principal, interest, premium, fees and other amounts of Debt shall be (i) recourse to the aggregate cash flow or net cash flow (or the revenues or any portion thereof as may be negotiated by such Project Finance Entity) generated by the assets of the Project Finance Entity, and/or (ii) recourse to the assets of such Project Finance Entity, and/or (iii) a Project Finance Guaranty, and/or (iv) recourse to the capital stock or other interests in such Project Finance Entity that is pledged in connection with the Incurrence of such Project Finance Indebtedness, and/or (v) recourse to credit enhancement (e.g., letters of credit, insurance policies, surety bonds, guaranty contracts of the types customary in project finance transactions and in respect or as a result of which there is no recourse, whether direct or indirect, to the Company, any of its Restricted Subsidiaries (other than the relevant Project Finance Entity) or any Strategic Joint Venture) provided by third parties (other than Subsidiaries of the Company or Strategic Joint Ventures).

225

"Proportional Debt" means, with respect to any Strategic Joint Venture, the Debt of such Strategic Joint Venture multiplied by a fraction, the numerator of which is the amount of Capital Stock of such Strategic Joint Venture owned by the Company or its Restricted Subsidiaries, and the denominator of which is the total amount of Capital Stock of such Strategic Joint Venture.

"Proportional EBITDA" means, with respect to any Strategic Joint Venture, the EBITDA of such Strategic Joint Venture multiplied by a fraction, the numerator of which is the amount of Capital Stock of such Strategic Joint Venture owned by the Company or its Restricted Subsidiaries, and the denominator of which is the total amount of Capital Stock of such Strategic Joint Venture.

"Purchase Money Debt" means Debt (a) consisting of the deferred purchase price of property, conditional sale obligations, Capital Leases, obligations under any title retention agreement, other purchase money obligations and obligations in respect of industrial revenue bonds, in each case where the maturity of such Debt does not exceed the anticipated useful life of the property being financed, and (b) Incurred to finance the acquisition, construction, development, improvement or lease by the Company or a Restricted Subsidiary of such property, including additions and improvements thereto.

"Qualified Equity Interests" means all Equity Interests of a Person other than Disqualified Equity Interests.

"Qualified Investment in a Subsidiary" means an Investment in a Subsidiary that is not an 80% Owned Subsidiary, the result of which Investment is that such Subsidiary becomes an 80% Owned Subsidiary; *provided* that no Investment in a Subsidiary shall be a Qualified Investment in a Subsidiary unless, concurrently with such Investment, such Subsidiary becomes a Guarantor.

"Qualified Stock" means all Capital Stock of a Person other than Disqualified Stock.

"Responsible Officer" means, when used with respect to the trustee, any officer within the corporate trust department of the trustee, including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of the trustee who customarily performs functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such person's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of the New Indentures.

"Restricted Subsidiary" means any Subsidiary of the Company other than an Unrestricted Subsidiary.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw-Hill, Inc. and its successors.

"Sale and Leaseback Transaction" means, with respect to any Person, an arrangement whereby such Person enters into a lease of property previously transferred by such Person to the lessor.

"Significant Subsidiary" means any Subsidiary, or group of Subsidiaries, that would, taken together, be a "significant subsidiary" as defined in Article 1, Rule 1-02 (w)(1) or (2) of Regulation S-X promulgated under the Securities Act, as such regulation is in effect on the date of the New Indentures.

"Stated Maturity" means (i) with respect to any Debt, the date specified as the fixed date on which the final installment of principal of such Debt is due and payable or (ii) with respect to any scheduled installment of principal of or interest on any Debt, the date specified as the fixed date on which such installment is due and payable as set forth in the documentation governing such Debt, not including any contingent obligation to repay, redeem or repurchase prior to the regularly scheduled date for payment; *provided* that in the case of Debt that has become immediately due and payable due to acceleration, the Stated Maturity shall be the date of acceleration.

"Strategic Joint Venture" means with respect to any Person, any corporation, association or other business entity of which 51% or less of the outstanding Capital Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof), other than any such corporation, association

226

or other business entity that is combined or consolidated in accordance with Mexican GAAP, with such Person for purposes of general financial reporting. Unless otherwise specified, "Strategic Joint Venture" means a Strategic Joint Venture of the Company.

"Subordinated Debt" means any Debt of the Company or any Guarantor which is subordinated in right of payment to the New Notes or the Note Guaranty, as applicable, pursuant to a written agreement to that effect.

"Subsidiary" means with respect to any Person, (i) any corporation, association or other business entity of which more than 50% of the outstanding Voting Stock is owned, directly or indirectly, by, or, in the case of a partnership, the sole general partner or the managing partner or the only general partners of which are, such Person and one or more Subsidiaries of such Person (or a combination thereof) or (ii) any other corporation, association or other business entity that is combined or consolidated in accordance with Mexican GAAP with such Person for purposes of general financial reporting. Unless otherwise specified, "Subsidiary" means a Subsidiary of the Company.

"Substantially Wholly Owned" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary 90% or more of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Wholly Owned Restricted Subsidiaries (or a combination thereof).

"Swiss Subsidiary Guarantor" means each of Vitro Europa, Ltd. and Vitro Global, Ltd. (both incorporated in Switzerland), or any successor thereto.

"Trade Payables" means, with respect to any Person, any accounts payable owed by such Person arising in the ordinary course of business in connection with the acquisition of goods or services and required to be paid within one year from the date of Incurrence thereof which constitute accounts payable and are considered current liabilities in accordance with Mexican GAAP.

"U.S. Government Obligations" means obligations issued or directly and fully guaranteed or insured by the United States of America or by any agent or instrumentality thereof, *provided* that the full faith and credit of the United States of America is pledged in support thereof.

"Unrestricted Cash" means, with respect to any interest period, unencumbered cash on the Company's consolidated balance sheet as of the last day of the most recent fiscal period preceding such interest period for which consolidated financial statements are available.

"Unrestricted Subsidiary" means Administración de Inmuebles Vitro S.A. de C.V., and any Subsidiary of the Company that at the time of determination has previously been designated, and continues to be, an Unrestricted Subsidiary in accordance with "—New 2019 Notes— Certain Covenants—Designation of Restricted and Unrestricted Subsidiaries."

"Voting Stock" means, with respect to any Person, Capital Stock of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"Wholly Owned" means, with respect to any Restricted Subsidiary, a Restricted Subsidiary all of the outstanding Capital Stock of which (other than any director's qualifying shares) is owned by the Company and one or more Wholly Owned Restricted Subsidiaries (or a combination thereof).

227

# DESCRIPTION OF THE CPOs

The following is a description of certain provisions of (i) the Trust Agreement dated as of November 24, 1989, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "First Trust Agreement," (ii) the Trust Agreement dated as of November 28, 1990, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "Second Trust Agreement" and, together with the First Trust Agreement, the "CPO Trust Agreements," (iii) the public deed dated as of November 29, 1990, which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "First CPO Deed," (iv) the public deed dated as of June 24, 1998 which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "Second CPO Deed," and (v) applicable provisions of the *Ley General de Títulos y Operaciones de Crédito*, which we refer to as the "Negotiable Instruments Law." We refer to the First CPO Deed and the Second CPO Deed together as the "CPO Deeds." This description does not purport to be complete and is qualified in its entirety by reference to the CPO Trust Agreements, the CPO Deeds and the provisions of Mexican law referred to in this description.

The CPO Trust Agreements established a master trust that enables non-Mexican investors to acquire CPOs representing economic interests in our shares. The trust is necessary because, under our by-laws, our shares may not be purchased or held directly or indirectly by non-Mexican investors, other than through these mechanisms.

The terms of the CPO Trust Agreement were authorized by an official communication dated November 27, 1990 from the *Dirección General de Inversiones Extranjeras de la Comisión Nacional de Inversiones Extranjeras*. The CPO Trust Agreement is registered with the *Registro Nacional de Inversiones Extranjeras*, or National Registry of Foreign Investment. An official communication of the CNBV authorized the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements.

CPOs, which are negotiable instruments under Mexican law, have been issued by the CPO Trustee pursuant to the terms of the CPO Trust Agreements and the CPO Deeds and may be redeemed as described in "—Deposit and Withdrawal of Our Shares." Each CPO represents an economic interest in one of our shares held in the CPO Trust. Currently, the maximum number of CPOs that can be issued pursuant to the CPO Deeds is 200,000,000. Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such rights are exercisable by the CPO Trustee pursuant to the terms of the CPO Trust Agreements. Pursuant to the *Ley de Inversión Extranjera*, or Foreign Investment Law, the CPO Trust Agreement qualifies as a "neutral investment" trust because, among other things, voting rights in respect of the underlying shares are exercisable only by the CPO Trustee in the same manner as the majority of the outstanding shares and not by the holders of the CPOs.

## Deposit and Withdrawal of Our Shares

Holders of our shares may deliver such shares to the account of the CPO Trustee at the S.D. Indeval, S.A. de C.V. ("Indeval") through their financial advisor (bank or brokerage house) and receive in return CPOs delivered by the CPO Trustee pursuant to the CPO Trust Agreements. All of our shares delivered to the CPO Trustee will be held in trust by the CPO Trustee in accordance with the terms and conditions of the CPO Trust Agreements. We will deem the CPO Trustee to be the holder of the shares delivered to the CPO Trustee. Transfer of ownership of those of our shares that underlie CPOs will be effected through the records maintained by Indeval.

The CPO Trustee will deliver CPOs in respect of our shares transferred as described above. All of the CPOs are evidenced by a single certificate, which we refer to as the "Global CPO," which has been issued to and deposited with Indeval, acting as depositary. Ownership of CPOs deposited with Indeval will be shown on, and transfer of the ownership of such CPOs will be effected through, records maintained by Indeval and Indeval Depositors. Holders of CPOs are not entitled to receive physical certificates evidencing such CPOs but may request statements issued by Indeval and Indeval Depositors evidencing ownership of CPOs. Holders of CPOs that are non-Mexican investors are not entitled to withdraw the shares that are held in the CPO Trust and represented by CPOs.

228

Holders of CPOs may sell their CPOs (i) to a non-Mexican investor, in which case the non-Mexican investor will become the transferee of such CPOs or (ii) to a Mexican investor, in both cases through the Mexican Stock Exchange, in which case the Mexican investor would be the transferee of the shares underlying such CPOs directly or, by keeping such shares deposited at an account at Indeval, such CPOs will be held by the CPO Trustee pending delivery.

**Dividends, Other Distributions and Preemptive and Other Rights**

Holders of CPOs are entitled to receive the economic benefits related to the shares underlying such CPOs, including those dividends or distributions approved by our shareholders, and to receive the proceeds from the sale of such shares at the termination of the CPO Trust Agreement. See "Item 10. Additional Information—Mexican Corporate Law and By-Laws—Termination of the CPO Trust." The CPO Trustee, through Indeval, will distribute cash dividends and other cash distributions received by it with respect to our shares held in the CPO Trust to the holders of the CPOs in proportion to their respective holdings in the same currency in which they were received. Dividends paid with respect to our shares underlying CPOs will be distributed to CPO holders by Indeval on the business day following the date on which Indeval receives the funds on behalf of the CPO Trustee.

If a distribution by us consists of a stock dividend on our shares, such distributed shares will be transferred to Indeval on behalf of the CPO Trustee, and held in the CPO Trust. The CPO Trustee will distribute to the holders of outstanding CPOs, in proportion to their holdings, additional CPOs in an aggregate number equal to the aggregate number of our shares received by the CPO Trustee as the stock dividend. If the maximum amount of CPOs that may be delivered under the CPO Deeds would be exceeded as a result of a dividend on our shares, a new CPO deed will be entered into setting forth that new CPOs (including those CPOs exceeding the number of CPOs authorized under the CPO Deed) may be issued. If the CPO Trustee receives any distribution with respect to our shares held in the CPO Trust (other than in the form of cash or additional shares), the CPO Trustee will adopt such method as it may deem legal, equitable and practicable to effect the distribution of such property. If we offer, or cause to be offered, to the holders of our shares, the right to subscribe for additional shares, subject to applicable law, the CPO Trustee will offer to each holder of CPOs the right to instruct the CPO Trustee to subscribe for such holder's proportionate share of such additional shares (subject to such holder providing the CPO Trustee (through Indeval) with the funds necessary to subscribe for such additional shares). If an offering of rights occurs and CPO holders provide the CPO Trustee with the necessary funds, the CPO Trustee (through Indeval) will subscribe for the corresponding number of our shares, which will be placed in the CPO Trust (to the extent possible), and deliver additional CPOs (through Indeval) in respect of such shares to the applicable CPO holders pursuant to the CPO Deeds or, if applicable, through a new CPO deed.

According to Mexican law, dividends or other distributions and the proceeds from the sale of our shares held in the CPO Trust that are not received or claimed by a CPO holder within three years from the receipt of such dividends or distributions by the CPO Trustee or ten years from such sale will become the property of the Mexican *Secretaría de Salud*.

**Changes Affecting Our Shares**

With respect to our shares, upon any change in par value, a stock split, any other reclassification, a merger or consolidation affecting us, or if we pay dividends by distributing shares or other goods different from our shares, the CPO Trustee shall determine, in an equitable and proportional manner, any required amendments to be made to the CPO Trust, the CPO Deeds and the CPOs, as well as to the instruments representing such CPOs. If in connection with a redemption of our shares, any of our shares held in the CPO Trust are called for redemption, the CPO Trustee will, in accordance with the instructions of the CPO Technical Committee (as defined in "—Administration of the CPO Trust") determine, in any manner deemed to be legal, equitable and practicable, the CPOs that are to be redeemed (in a number equal to the number of our shares held in the CPO Trust called for redemption) and pay the holders of such CPOs their proportionate share of the consideration paid by us in respect thereof.

**Voting of Our Shares**

Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such voting rights are exercisable only by the CPO Trustee, which is required by the terms of the CPO Trust to vote such shares in the same manner as a majority of our outstanding shares that are not held in the CPO Trust are voted at the relevant shareholders' meeting. Because CPOs grant no voting rights to holders thereof, such holders do not have the benefit of any rights (including minority protection rights) granted under applicable law or our by-laws to holders of our shares.

**Administration of the CPO Trust**

Pursuant to the terms of the CPO Trust Agreement, the CPO Trustee administers the CPO Trust under the direction of a technical committee. The technical committee of the CPO Trust, which we refer to as the "CPO Technical Committee," consists of five members and their respective alternates. Each of the following entities appoints one member of the CPO Technical Committee: the *Comisión Nacional de Inversiones Extranjeras*, the Mexican Stock Exchange, the *Asociación Mexicana de Casas de Bolsa*, the CPO Common Representative (as defined below) and the CPO Trustee. Actions taken by the CPO Technical Committee must be approved by a majority of the members present at any meeting of such committee, at which at least the majority of the members are present. Banco Santander Mexico, S.A. has been appointed as the common representative of the holders of CPOs and we refer to it as the "CPO Common Representative."

Pursuant to the Negotiable Instruments Law, the duties of the CPO Common Representative include, among others (i) verifying the due execution and terms of the CPO Trust Agreements, (ii) verifying the existence of our shares being held in the CPO Trust, (iii) authenticating the Global CPO, (iv) exercising the rights of the CPO holders in connection with the payment of any dividend or distribution to which such CPO holders are entitled, (v) undertaking any other action to protect the rights, actions or remedies to which CPO holders are entitled, (vi) calling and presiding over CPO holders' general meetings, each of which we refer to as a "CPO General Meeting," and (vii) carrying out the decisions adopted thereat. The CPO Common Representative may request from the CPO Trustee all information and data necessary for the performance of its duties. The CPO holders, by a resolution adopted at a duly held CPO General Meeting, may (i) revoke the appointment of the CPO Common Representative and appoint a substitute CPO Common Representative and (ii) instruct the CPO Common Representative to undertake certain actions.

Holders of CPOs representing at least 10% of the aggregate number of outstanding CPOs may request that the CPO Common Representative call a CPO General Meeting, including in such request the order of business for such meeting. Announcements of CPO General Meetings shall be published in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, and in one of the newspapers with the widest distribution in the domicile of the CPO Trustee, which is currently México City, at least ten days in advance of the date on which the CPO General Meeting is scheduled. Announcements of CPO General Meetings shall include the order of business for such meetings.

In order for holders of CPOs to be entitled to attend CPO General Meetings, such holders must request a statement from Indeval or an Indeval Depositor, not less than two days prior to the date on which such meeting is scheduled evidencing their holdings of CPOs and must submit such statement to the institution designated for such purpose in the notice for such meeting on or before the day prior to the date on which such meeting is scheduled. Persons appointed by an instrument in writing as representatives for a holder of CPOs will be entitled to attend CPO General Meetings.

At CPO General Meetings, each holder of a CPO will be entitled to one vote per CPO owned by him, her or it. Resolutions of the CPO holders must be approved by at least a majority of CPOs present at a CPO General Meeting at which there is a quorum. A quorum at a CPO General Meeting initially is constituted by holders of a majority of CPOs delivered and, if no quorum is present at such meeting, any CPOs present at a subsequently called CPO General Meeting shall constitute a quorum. Resolutions adopted by the required number of CPO at a duly convened CPO General Meeting will bind all CPOs, including absent and dissident holders.

230

Certain matters must be approved at a special CPO General Meeting at which, for the first call, at least 75% of the CPOs delivered must be present, and resolutions with respect to such matters must be approved by a majority of CPOs present at such meeting. Such matters include appointment and revocation of the CPO Common Representative and the granting of consents, waivers or grace periods to the CPO Trustee. If a quorum is not present with respect to a CPO General Meeting discussing any such matters, a subsequent meeting may be called at which action may be taken regardless of the percentage of delivered CPOs present at such meeting.

### Enforcement of Rights of CPO Holders

In accordance with the Negotiable Instruments Law, CPO holders may, with certain limitations, individually and directly exercise certain rights with respect to CPOs. Such rights include, among others, the right to cause the CPO Trustee to distribute dividends or other distributions received by it (directly or through Indeval), to cause the CPO Common Representative to protect the rights to which the CPO holders are entitled and to enforce such rights and to bring actions against the CPO Common Representative for civil liabilities in the event of willful misconduct.

### Status of CPO Holders

The CPO Trust Agreements and the CPO Deeds provide that any investor deemed a non-Mexican investor acquiring CPOs shall be considered under the CPO Trust Agreement, by virtue of its acquisition of CPOs, to be a Mexican national with respect to its holdings of CPOs and shall be deemed to have agreed not to invoke the protection of its own government. If such protection is invoked, such CPO holder will forfeit its CPOs to the Mexican government. A holder of CPOs is deemed to have invoked the protection of the home government of such holder by, for example, asking such government to interpose a diplomatic claim against the Mexican government with respect to the CPO holders' rights or by bringing suit in its home jurisdiction against the Mexican government with respect to such rights. CPO holders will not be deemed to have waived any of their other rights, including any rights such holders may have pursuant to the terms and provisions of the CPOs.

### Termination of the CPO Trust

The CPO Trust Agreement and the CPOs issued under the CPO Deeds will expire 30 years after the date of execution of the CPO Trust Agreement. The CPO Trustee will commence the procedure for the termination of the CPO Trust Agreement 12 months prior to its expiration. At the time of such termination, the CPO Trustee will sell our shares held in the CPO Trust and will distribute the proceeds of such sale to the holders of the CPOs on a pro rata basis in accordance with the number of CPOs owned by each holder. The CPO Trust may also be terminated upon a resolution approved by a majority of the CPOs present at a CPO General Meeting. Notwithstanding the foregoing, the CPO Trust Agreement cannot be terminated if any dividends or other distributions previously received by the CPO Trustee remain unpaid to the CPO holders.

Upon the expiration of the CPO Trust Agreement, subject to obtaining the applicable authorizations from the Mexican government, the CPO Trustee and any CPO holder may execute a new trust agreement with the same terms as the CPO Trust Agreement. There can be no assurances that a new trust agreement will be executed. In such a case, our shares represented by the CPOs owned by any holder who executes the new trust agreement will be transferred by the CPO Trustee to the new trust created pursuant to such new trust agreement, and new ordinary participation certificates issued under the new trust agreement will be issued by the trustee and delivered to such holder.

### Limitations Affecting CPO Holders

Each of our shares is entitled to one vote at general shareholders' meetings. Holders of CPOs are not entitled to vote the underlying shares. Voting rights with respect to the underlying shares are exercisable only by the CPO Trustee, which is required to vote all such shares in the same manner as the majority of our shares that are not held in the CPO Trust are voted at the relevant meeting.

Our by-laws prohibit direct or indirect ownership of our shares by non-Mexican nationals. Any acquisition of our shares in violation of such provision would be null and void under Mexican law and such shares would be cancelled and our capital accordingly reduced. Non-Mexican nationals may, however, hold an economic interest in our shares through a neutral investment trust such as the CPO Trust.

## CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DOCUMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a discussion of the principal U.S. federal income tax consequences of the Tender Offer and exchange for holders of the Old Notes who are U.S. Holders (as defined below). This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Code"), final and proposed Treasury regulations promulgated thereunder, Internal Revenue Service ("IRS") rulings and pronouncements and judicial decisions in effect as of the date of this document, all of which may change, possibly with retroactive effect. This discussion applies only to U.S. Holders (as defined below) that hold the Old Notes, and, if receiving New Notes pursuant to the exchange, will hold the New Notes as capital assets. Holders of Restructured Debt other than Old Notes are urged to contact their own tax advisors regarding the U.S. federal income tax consequences of the exchange of Restructured Debt for the Restructuring Consideration.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to U.S. Holders in light of their particular circumstances, such as holders to whom special tax treatment applies, including (1) banks, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, subchapter S corporations, entities treated as partnerships for U.S. federal income tax purposes, and tax exempt organizations, (2) persons who hold Old Notes or who will hold the New Notes as part of a straddle, hedge, conversion transaction or other integrated investment, (3) persons whose functional currency is not the U.S. dollar, (4) persons that use a mark to market method of accounting and (5) persons who, for U.S. federal income tax purposes, are or will be considered as owning 10% or more, directly or by attribution, of the Company. In addition, this discussion does not address alternative minimum taxes or state, local or non-U.S. taxes (other than certain Mexican tax issues). Furthermore, this discussion does not address the tax consequences to Fintech and does not address any aspects of U.S. federal tax law (such as the estate tax, gift tax or the Medicare tax on net investment income) other than U.S. federal income tax law. For purposes of this discussion, we assume that the advances made by Fintech to fund the Tender Offer, followed by the transfer of Old Notes to Fintech and Fintech's subsequent participation in the exchange, is not treated as an acquisition by Fintech of New 2019 Notes and New MCDs for cash.

No opinion of counsel has been sought or obtained with respect to any U.S. tax consequences of the Tender Offer and exchange and no tax opinion is given by this discussion. No rulings or determination letters from the IRS or any other taxing authorities have been obtained or sought with respect to the Tender Offer and exchange, and the description below is not binding upon the IRS or such other taxing authorities. With respect to some of the tax consequences discussed herein, the tax law is unclear. Accordingly, it is possible that the IRS may disagree with the description below of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in this regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF OLD NOTES ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE, AND LOCAL) OF THE TENDER OFFER AND EXCHANGE TO THEM. THE COMPANY IS NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE TENDER OFFER AND EXCHANGE AS TO ANY SPECIFIC HOLDER, NOR IS THE COMPANY RENDERING ANY FORM OF LEGAL OPINION AS TO SUCH TAX CONSEQUENCES.

For purposes of this discussion the term "U.S. Holder" means a holder of Old Notes who is a beneficial owner of such instrument and that is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or any other entity treated as a corporation for U.S. federal income

tax purposes) created or organized in the United States or under the laws of the United States or of any state of the United States or the District of Columbia, (iii) an estate, the income of which is subject to U.S. federal income tax regardless of its source, or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and at least one U.S. person has authority to control all substantial decisions of the trust or (B) it has a valid election in effect to be treated as a U.S. person.

**Tax Consequences to U.S. Holders Who Receive Cash for Old Notes Pursuant to the Tender Offer**

A U.S. Holder that receives cash in exchange for Old Notes pursuant to the Tender Offer will recognize gain or loss equal to the difference between the amount realized on the sale of the Old Notes pursuant to the Tender Offer and the U.S. Holder's adjusted basis in the Old Notes tendered. The amount realized will equal the amount of cash received for the tendered Old Notes (other than amounts attributable to accrued but unpaid interest, which will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income). Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year.

A U.S. Holder that acquired Old Notes subsequent to their original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, such holder will be required to treat any gain on the tender of the Old Notes as ordinary income to the extent of the market discount accrued to the date of the disposition pursuant to the Tender Offer.

**Tax Consequences to U.S. Holders Who Participate in the Exchange**

*Tax Treatment of U.S. Holders of Old Notes*

The tax consequences to U.S. Holders that own more than one class of Old Notes will be determined separately for each class of Old Notes held. The tax treatment of U.S. Holders that exchange Old Notes for the Restructuring Consideration will depend on whether or not such exchange qualifies as a "recapitalization" under the Code. In general, for an exchange of Old Notes for the Restructuring Consideration to qualify as a recapitalization, the class of Old Notes surrendered must be treated as a "security" for U.S. federal income tax purposes and one or more classes of New Notes received must be treated as either stock or a security. In this regard, the term "security" is not clearly defined under current U.S. federal income tax law. Whether a debt instrument is a security is determined based on all the facts, including the term of the debt instrument, the presence or absence of certain shareholder type rights and certain other factors. Generally, corporate debt instruments with maturities when issued of less than five years are not considered securities while corporate debt instruments with maturities when issued of ten years or more are considered securities. Each of the classes of Old Notes had a term to maturity at original issuance of five years or more. As a result, it may be reasonable to treat each class of Old Notes as a security for U.S. federal income tax purposes. Each class of New Notes will also have a term to maturity of at least five years. In addition, it is possible that the New MCDs could be treated as stock for U.S. federal income tax purposes as described below. It therefore may be reasonable to treat each class of New Notes as a security (or possibly stock in the case of the New MCDs).

If each class of Old Notes and New Notes is a security, the exchange of the Old Notes for the Restructuring Consideration (other than any Restructuring Consideration treated as paid in respect of accrued interest) should qualify as a recapitalization under the Code. If the exchange of Old Notes for the Restructuring Consideration is treated as a recapitalization, a U.S. Holder of Old Notes will not recognize gain on the exchange of such Old Notes for the Restructuring Consideration, except (i) to the extent of any cash and the fair market value of any property received that is not a security or stock or (ii) to the extent any portion of the Restructuring Consideration is treated as payment of accrued interest on the Old Notes as discussed more fully below. If the exchange is a recapitalization, a U.S. Holder of Old Notes will not be permitted to recognize a loss on the exchange of Old Notes for the Restructuring Consideration.

234

If the exchange is a recapitalization and each class of New Notes is treated as a security (or stock), a U.S. Holder's total tax basis in New Notes received in exchange for a class of Old Notes (other than any such New Notes received in respect of accrued interest) will be equal to that holder's tax basis in such class of Old Notes surrendered pursuant to the exchange increased by the amount of any gain recognized on the exchange and decreased by the amount of any cash and the fair market value of any property that is not a security (or stock) received in the exchange. A U.S. Holder's total basis in the New Notes received in the exchange will be allocated between the New 2019 Notes and the New MCDs received in the exchange according to their relative fair market values. A U.S. Holder's holding period for New Notes received in the exchange (other than any New Notes received in exchange for accrued interest) will include that person's holding period for the Old Notes surrendered in exchange therefor.

A possible characterization of the New MCDs is that they are neither debt nor equity of the Company, but instead are a contractual claim of the holder against the Company. In the event the proper characterization of the New MCDs is as a contractual claim, the New MCDs will be treated as "other property" of the Company rather than as securities. In such case, if the exchange is a recapitalization, a U.S. Holder will recognize gain on the exchange, if any, to the extent of both the cash received and the fair market value of the New MCDs received in the exchange.

If the New MCDs are treated as debt for U.S. federal income tax purposes and the exchange is *not* treated as a recapitalization because the Old Notes surrendered are not securities or none of the New Notes received are securities, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the issue price of each class of New Notes (other than any New Notes treated as paid in respect of accrued interest) and the amount of any cash received in connection with the exchange less (y) the holder's tax basis in the Old Notes surrendered. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year. If the exchange is not treated as a recapitalization, a U.S. Holder's tax basis in each class of New Notes received pursuant to the exchange (other than any New Notes received in exchange for accrued interest) will be equal to the issue price of those notes and the holding period for the New Notes received (other than any New Notes received in exchange for accrued interest) will begin the day after the exchange.

If the exchange is not treated as a recapitalization, the correct U.S. federal tax characterization of the New MCDs will affect the calculation of the amount realized by a U.S. Holder. If the New MCDs are treated not as debt, but as equity or as other property of the Company, a U.S. Holder will recognize taxable gain (or loss) in an amount equal to the excess (or deficit) of (x) the sum of the issue price of the New 2019 Notes, the fair market value of the New MCDs and any cash received in connection with the exchange less (y) the holder's tax basis in their Old Notes surrendered. Subject to the discussion below regarding accrued market discount, any such gain or loss will be capital gain or loss, and such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder held the Old Notes surrendered for more than one year. A U.S. Holder's tax basis in the New 2019 Notes received pursuant to the exchange (other than any such notes received in exchange for accrued interest) will be equal to the issue price of those notes and their basis in the New MCDs will equal their fair market value. The holding period for the New Notes received pursuant to the exchange will begin the day after the exchange.

A U.S. Holder that acquired Old Notes subsequent to their original issuance with more than a *de minimis* amount of market discount will be subject to the market discount rules under the Code. Under those rules, assuming that a U.S. Holder has made no election to include market discount in income on a current basis, any gain recognized on the exchange will be characterized as ordinary income to the extent of the accrued market discount as of the date of the exchange. If the exchange of New Notes for Old Notes is treated as a recapitalization, any accrued market discount remaining thereon which has not been recognized as ordinary income should be carried over to the New Notes. See below for a discussion regarding the treatment of market discount.

Under current law, it is uncertain whether the Note Consent Payment will be treated as part of the consideration for Old Notes in the exchange or as a separate fee paid to a U.S. Holder. If the Note Consent Payment is treated as part of the consideration for Old Notes in the exchange, it will be taken into account in determining gain or loss recognized as described in the preceding paragraphs. If the Note Consent Payment is separate income payable to a U.S. Holder, the payment will likely be taxable to the U.S. Holder as ordinary income and will not be treated as part of the amount realized in exchange for Old Notes as described above.

Under current law, the treatment of the New 2019 Notes Restructuring Fee is unclear. A possible characterization of the fee is that it is part of the consideration for Old Notes in the exchange, and should be taken into account in determining gain or loss recognized as described in the preceding paragraphs. The New 2019 Notes Restructuring Fee could also be treated as part of the Note Consent Payment, and would therefore be part of the consideration for the Old Notes or separate income payable to a U.S. Holder, as described above. Another possible characterization is that some or all of the New 2019 Notes Restructuring Fee should be treated as a payment for pre-issuance accrued interest on the New 2019 Notes. Other characterizations are also conceivable. U.S. Holders should consult their own tax advisors regarding the treatment of the New 2019 Notes Restructuring Fee.

### *Tax Treatment of Amounts Received for Accrued Interest*

Notwithstanding the above, a U.S. Holder of Old Notes will be treated as receiving an interest payment to the extent that a portion of the Restructuring Consideration is treated as paid with respect to accrued interest on the Old Notes. Any such amounts will be treated as ordinary taxable income for a U.S. Holder that had not previously included such accrued interest in income. Under current law, it is not clear whether a U.S. Holder that previously included accrued interest in income should recognize an ordinary or capital loss to the extent of accrued interest previously included in income that is not paid in full. A U.S. Holder's tax basis in any New Notes treated as debt that are received in exchange for accrued interest on Old Notes generally will be equal to the issue price of those New Notes, and the holding period of such notes generally will begin on the day after the exchange. Where notes with accrued but unpaid interest are being satisfied for an amount that is less than the principal and accrued interest on the notes, it may be reasonable for a U.S. Holder to treat all amounts received as allocated first to the principal portion of such Old Notes and thereafter to any accrued interest on such notes. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. Each U.S. Holder of claims is urged to consult its tax advisor regarding the allocation of consideration.

## Tax Consequences of Owning New Notes

### *New 2019 Notes*

If the "issue price" of the New 2019 Notes is less than their "stated redemption price at maturity" by more than a *de minimis* amount (1/4 of 1 percent of a debt instrument's stated redemption price at maturity multiplied by the number of complete years or, in certain cases, weighted average life, to the instrument's stated maturity), the New 2019 Notes will be treated as having original issue discount ("OID").

The issue price of debt instruments issued in a debt for debt exchange depends on whether a substantial amount of the debt instruments received or surrendered are treated as "traded on an established market" within the meaning of the applicable Treasury Regulations. Debt instruments are treated as "traded on an established market" if, among other things, the debt is listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934 or if price quotations are readily available from dealers, brokers or traders. If neither debt surrendered nor debt received in an exchange is treated as traded on an established market, the issue price of the debt received will generally equal the principal amount of the debt if the debt provides for adequate interest.

As noted above, if the New 2019 Notes are treated as "traded on an established market," the issue price of the New 2019 Notes would be their fair market value on the date of the exchange. If the New 2019 Notes are not so traded but the Old Notes are, the issue price of the New 2019 Notes would be equal to the fair market value of the Old Notes surrendered in exchange for the New 2019 Notes.

The stated redemption price at maturity of a debt instrument is the sum of all payments due under the instrument other than payments of qualified stated interest. "Qualified stated interest" includes stated interest, calculated as the product of a single fixed rate of interest (or certain qualified floating rates) and the outstanding principal amount of the instrument, that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually.

As a portion of the interest on the New 2019 Notes in the first three years of issuance is payable, at the election of the Company, in additional debt of the Company, only the portion of interest required to be paid in cash

236

at least annually will be treated as qualified stated interest. The portion of the interest on the New 2019 Notes exceeding the amount required to be paid in cash at least annually will not be treated as qualified stated interest. The stated redemption price at maturity of the New 2019 Notes will thus include the remaining portion of interest payable on the notes and all other scheduled payments on the notes. While the issue price of the New 2019 Notes cannot currently be determined, it is anticipated that the stated redemption price at maturity of the New 2019 Notes will exceed the issue price of such notes by more than a *de minimis* amount, with the result that the New 2019 Notes are anticipated to be treated as issued with OID.

A U.S. Holder of a note issued with OID must include such OID as ordinary interest income for U.S. federal income tax purposes as it accrues under a constant yield method in advance of receipt of the cash payments attributable to such income, regardless of such U.S. Holder's regular method of tax accounting and the timing or amount of any actual payments. In general, the amount of OID included in income by a U.S. Holder of a note issued with OID is the sum of the daily portions of OID with respect to the note for each day during the taxable year (or portion of the taxable year) on which the U.S. Holder held the note. The daily portion of OID on any note issued with OID is determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be of any length and may vary in length over the term of the note, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs either on the final day or first day of an accrual period. The amount of OID allocable to each accrual period generally is equal to the difference between (i) the product of the note's "adjusted issue price" at the beginning of the accrual period and the note's yield to maturity (determined on the basis of compounding at the close of each accrual period and appropriately adjusted to take into account the length of the particular accrual period) and (ii) the amount of any qualified stated interest payments allocable to such accrual period. The "adjusted issue price" of a note issued with OID at the beginning of any accrual period is the sum of the issue price of the note plus the amount of OID allocable to all prior accrual periods minus the amount of any prior payments on the note that were not qualified stated interest payments. Under these rules, U.S. Holders generally will have to include in taxable income increasingly greater amounts of OID in successive accrual periods.

When determining the yield and maturity of a note that, by its terms, provides the issuer (or holder) with an unconditional option or options that, if exercised, require payments to be made on the note under an alternative schedule or schedules, such issuer (or holder) will be deemed to exercise or not exercise an option or combination of options in a manner that, in the case of an issuer, minimizes, or, in the case of a holder, maximizes the yield on the debt instrument. If, contrary to the presumption, the option is, or is not, exercised, then for purposes of calculating OID, the debt instrument is treated as retired and reissued on the date of the change in circumstances for an amount equal to its adjusted issue price on that date.

When calculating the yield and maturity of the New 2019 Notes for purposes of calculating OID accruals, the Company will be deemed to exercise any option that will reduce the yield on the instrument. Here, the Company has the option to pay the interest due on the New 2019 Notes in the first two years in kind and a right to redeem such notes prior to maturity. The deemed exercise of these options will depend on certain factors, including the exact issue price of the New 2019 Notes, which will not be known until after the exchange occurs. As such, it cannot currently be determined when the Company will be deemed to exercise any of its unconditional options. In the event the Company does not exercise an option as expected, the New 2019 Notes will be treated as retired and reissued and the yield and maturity will again be assessed at that time, taking into account any existing options of the Company or holder that will decrease or increase the yield, respectively.

In the event that the New 2019 Notes have an issue price that differs from their face value, certain terms and conditions of the New 2019 Notes, for example the Excess Cash Flow Sweep or a Mandatory Redemption upon an equity offering, could result in the New 2019 Notes being treated as "Contingent Payment Debt Instruments," which are subject to special rules under applicable Treasury regulations governing instruments issued with OID.

### *Acquisition Premium, Market Discount and Bond Premium With Respect to New 2019 Notes*

If a U.S. Holder has a tax basis in a New 2019 Note that is more than the issue price of such note but less than or equal to the stated redemption price at maturity of such note, such holder has acquisition premium with

237

respect to such note to the extent of that excess, and the holder will not include OID on the new note in income to the extent of the acquisition premium.

A U.S. Holder that has a tax basis in a New 2019 Note that is less than the issue price of the note will be subject to the market discount rules (unless the amount of the excess of the issue price over the basis is less than a specified *de minimis* amount, in which case market discount is considered to be zero). A U.S. Holder may elect (but is not required) to take market discount into income over the remaining life of a note, either on a ratable or economic yield basis. Once made, this election to include market discount in income currently applies to all market discount obligations acquired in or after the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Absent such an election, a U.S. Holder will be required to treat any principal payment on, or any gain recognized on the sale, exchange, redemption, retirement or other disposition of a New 2019 Note as ordinary income to the extent of any accrued market discount that has not previously been included in income at the time of such payment or disposition. In addition, a U.S. Holder may be required to defer, until the maturity date of the note or its earlier disposition, the deduction of all or a portion of the interest expense on any indebtedness incurred or continued to purchase or carry such note.

As discussed above, if the exchange of Old Notes for New Notes is treated as a recapitalization, a U.S. Holder who acquired its Old Notes at a market discount may be required to carry over to the New 2019 Notes that they receive any accrued market discount with respect to the Old Notes to the extent that the accrued market discount was not previously included in income. In that case, a U.S. Holder holding such notes may have all or part of any market discount effectively converted into OID because the issue price of the New 2019 Notes, while not known exactly, is expected to be less than the stated redemption price at maturity of such notes.

If a U.S. Holder has a tax basis in a New 2019 Note that exceeds the note's stated redemption price at maturity, the note has bond premium to the extent of that excess, and the holder will not be required to include OID, if any, on a New 2019 Note in income. A U.S. Holder generally may elect to amortize the premium using the constant yield to maturity method as a reduction of the U.S. Holder's non-OID interest income from the note. Once made, the election to amortize premium on a constant yield to maturity method applies to all debt obligations held or subsequently acquired by the electing U.S. Holder on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. Premium on a note held by a U.S. Holder that does not make such election will decrease the gain or increase the loss otherwise recognized on the sale, exchange, redemption, retirement or other taxable disposition of a note.

### Dispositions of New 2019 Notes

A U.S. Holder will generally recognize taxable gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a note in an amount equal to the difference between the amount realized upon such sale, exchange, redemption, retirement or other taxable disposition (reduced by any amounts attributable to accrued but unpaid qualified stated interest, which will be taxable as ordinary interest income) and such U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in a note will generally equal such U.S. Holder's initial investment in the note, (i) increased by the amount of any OID included in the U.S. Holder's gross income with respect to the note (including any amounts of OID included in the U.S. Holder's income as a result of the election to treat all interest as OID, as discussed above) and (ii) reduced by the amount of any payments received with respect to the note that are not payments of qualified stated interest. Such gain or loss will generally be long-term capital gain or loss if the Note is held for more than one year. Certain non-corporate U.S. Holders (including individuals) may be eligible for preferential tax rates in respect of long-term capital gain, which rates currently are scheduled to increase on January 1, 2011. The deductibility of capital losses by U.S. Holders is subject to limitations.

### New MCDs

The proper characterization for U.S. tax purposes of the New MCDs is unclear. While the New MCDs could be treated as debt convertible into common stock of the Company, they are more likely to be treated as an instrument other than debt for U.S. tax purposes. In that case, the New MCDs could be treated as preferred equity of the Company convertible into common stock, as ordinary common equity of the Company or as a contractual

arrangement between the Company and each holder that is neither debt nor equity. Other characterizations are also conceivable.

The timing, character and source of income recognized by a U.S. Holder could be different depending on the proper characterization of the New MCDs. U.S. Holders should consult their own tax advisors regarding the tax characterization of the New MCDs received in the exchange.

### *Mexican Withholding Taxes and Foreign Tax Credits*

Payments on the New Notes may be subject to withholding tax imposed by Mexico. Pursuant to the terms of the New Notes, the Company will be required to pay additional amounts in respect of such withholding so that, subject to certain exceptions, the net amount received by each U.S. Holder will equal the amounts that would have been received in the absence of such withholding. Although not free from doubt, such additional amounts will likely be treated as additional interest or dividend income at the time they are paid by the Company or accrue in accordance with the U.S. Holder's method of accounting for tax purposes.

Subject to numerous limitations, U.S. Holders may receive a foreign tax credit with respect to Mexican withholding taxes imposed on payments made on the New Notes. Any amounts attributable to interest or additional amounts paid in respect of New Notes generally will be treated as foreign source passive income or, in some cases, general category income, for U.S. foreign tax credit limitation purposes.

If any foreign income tax is withheld on the sale or other taxable disposition of a New Note, the amount realized by a U.S. Holder will include the gross amount of the proceeds of that sale or other taxable disposition before deduction of such tax. Capital gain or loss, if any, realized by a U.S. Holder on the sale or other taxable disposition of the notes generally will be treated as U.S.-source gain or loss for U.S. foreign tax credit purposes. Consequently, in the case of a gain from the disposition of a note that is subject to foreign income tax, the U.S. Holder may not be able to benefit from the foreign tax credit for the tax unless the U.S. Holder can apply the credit against U.S. federal income tax payable on other income from foreign sources. Alternatively, the U.S. Holder may take a deduction for the foreign income tax if the U.S. Holder does not elect to claim a foreign tax credit for any foreign income taxes paid during the taxable year.

The foreign tax credit rules are complex, and U.S. Holders should consult their own tax advisors regarding the availability of foreign tax credits or deductions of foreign income taxes based on their particular circumstances.

## Non-U.S. Holders

For purposes of the following discussion a "Non-U.S. Holder" means a beneficial owner of notes that is not, for U.S. federal income tax purposes, a U.S. Holder or a partnership (or an entity or arrangement classified as a partnership for such purposes). Subject to the discussion below regarding backup withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax on:

    (a)   The cash proceeds received from the sale of an Old Note pursuant to the Tender Offer;

    (b)   The exchange of Old Notes for the Restructuring Consideration;

    (c)   Interest and any additional amounts paid in respect of the New Notes; or

    (d)   Gain realized on the sale, exchange, redemption, retirement or other taxable disposition of the New Notes,

unless, in the case of any payments treated as interest (including OID, amounts constituting yield on the New MCDs and amounts treated as paid in respect of accrued interest), such payments are effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, in the case of any amounts treated as gain, such gain is

239

(i) effectively connected with the conduct by the Non-U.S. Holder of a trade or business in the United States (and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment) or, (ii) in the case of gain realized by an individual Non-U.S. Holder, the Non-U.S. Holder is present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met.

**Information Reporting and Backup Withholding**

In general, U.S. tax information reporting requirements may apply to transfers and payments made pursuant to the Tender Offer and the Exchange Offer and Consent Solicitation, payments with respect to the New Notes and the proceeds of sale of such New Notes by holders other than certain exempt persons. Backup withholding of U.S. federal income tax may apply at applicable rates to payments made pursuant to the Tender Offer and exchange, payments with respect to the New Notes and the proceeds of sale of the New Notes, if the holder fails to provide a correct taxpayer identification number or certification of exempt status or, with respect to certain payments, if a holder fails to report in full all interest and dividend income and the IRS notifies the payor of the holder's under reporting. Any amounts withheld under the backup withholding rules from a payment to a holder will generally be allowed as a refund or credit against the holder's federal income tax liability provided the required information is timely furnished to the IRS.

Recently enacted legislation requires certain U.S. Holders to report information with respect to their investment in certain "foreign financial assets" not held through a custodial account with a U.S. financial institution to the IRS. Investors who fail to report required information could become subject to substantial penalties. Prospective investors are encouraged to consult with their own tax advisors regarding the possible implications of this new legislation on the New Notes received in the exchange.

# MATERIAL MEXICAN FEDERAL TAX CONSIDERATIONS

## Certain Mexican Tax Consequences

The following summary of certain Mexican federal income tax considerations contains a description of certain Mexican federal income tax consequences of the Note Consent Payment and the Tender Offer Consideration and of the payment of interest or disposition of the New Notes, but does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision of a holder to provide the required consent or to tender Old Notes. This summary does not describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than Mexico.

This summary is based on the federal tax laws of Mexico as in effect on the date of this Statement (including the tax treaties described below under "—Tax Treaties"), as well as on the rules and regulations of Mexico available on or before such date and now in effect. All of the foregoing is subject to change, which change could affect the continued validity of this summary. In addition you should be aware that the federal tax laws of Mexico, the tax treaties and the rules and regulations thereunder may have changed at the time of issuance of the New Notes, and such change could affect the continued validity of this summary.

Holders to whom this Statement is addressed and any persons that may acquire the New Notes should consult their own tax advisers as to the Mexican or other tax consequences of tendering their Old Notes for purchase by us or granting their consent, and the ownership and disposition of the New Notes, including the application of the tax considerations discussed below to their particular situations, as well as the application of state, local, foreign or other tax laws.

## Mexican Income Tax Considerations

The following is a general summary of the principal consequences under the Mexican *Ley del Impuesto sobre la Renta* (the "Mexican Income Tax Law") and the rules and regulations thereof, as currently in effect, of the Tender Offer Consideration, the Note Consent Payment and the purchase, ownership and disposition of the New Notes by a holder that is not a resident of Mexico and that will not hold the New Notes, or a beneficial interest therein, in connection with the conduct of a trade or business through a permanent establishment in Mexico (a "Foreign Holder").

The determination of "tax residency" pursuant to Mexican tax laws is based upon subjective elements, involving the consideration of a number of factors. For purposes of Mexican taxation, individuals are considered residents of Mexico when they have established their place of residence (i.e., home) in Mexico; if an individual has his or her home in Mexico and in another country as well, he or she shall be deemed to be a resident of Mexico if his or her "center of vital interest" is located within Mexican national territory. The center of vital interest of an individual is considered to be located in Mexico if, among other circumstances: (i) more than 50% of his or her total income for the relevant calendar year is derived from Mexican sources; or (ii) the main center of his or her professional activities is located in Mexico. Mexican nationals who filed a change of tax residence to a country or jurisdiction in which his or her income is subject to a preferred tax regime pursuant to the provisions of the Mexican Income Tax Law will be considered Mexican residents for tax purposes during the year notice of such residence change is filed and during the following three years unless such country has a comprehensive tax information exchange treaty in effect with Mexico. Mexican government officials and employees are also Mexican residents for Mexican tax purposes even if their center of vital interest is located outside Mexico. A legal entity is considered a Mexican resident when the main administration of its business or its place of effective management is in Mexico. Unless otherwise proven, a Mexican national is considered a Mexican resident for tax purposes. A Foreign Holder conducting a trade or business through a permanent establishment in Mexico will be required to pay income tax in Mexico on income attributable to such permanent establishment, which could include income from the New Notes.

## Tax Treaties

Mexico has entered into and is negotiating tax treaties with several countries that may reduce the amount of Mexican withholding tax to which payments of interest of the notes may be subject. Prospective beneficiaries of the

241

Tender Offer Consideration or the Note Consent Payment and prospective holders of the New Notes should consult their own tax advisors as to the tax consequences and benefits, if any, of such treaties.

**Taxation of Tender Offer Consideration, Consent Payments and Exchange of Notes**

Under Mexican tax law, consent payments made to Foreign Holders of the Old Notes will be considered to qualify as "interest" for Mexican tax purposes, as they will be viewed as a yield under the Old Notes, and therefore the tax treatment described below in "—Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes" will be applicable to such payments.

Additionally, under Mexican tax law, a positive difference between the value received by us at the time of issuance of the Old Notes and the price at which a holder that is not a resident of Mexico sells such Old Notes to us would be viewed as a capital gain since we will purchase the Old Notes at a discount from their issue price. Capital gains on such sale will not be subject to Mexican taxes.

**Note Consent Payment; Payment of Interest, Principal and Premium in Respect of the New Notes**

Under Mexican tax law, the Note Consent Payment and any payments of interest we make in respect of the New Notes (including payments of principal in excess of the issue price of such New Notes, which, under Mexican law, are deemed to be interest) to a Foreign Holder will be subject to a Mexican withholding tax assessed at a rate of 4.9% if: (i) the New Notes are placed through banks or brokerage houses, or *casas de bolsa*, in a country with which Mexico has entered into a tax treaty for the avoidance of double taxation, which is in effect; (ii) the issuance of the New Notes and a summary of their main features are timely reported to the CNBV; and (iii) the information requirements specified by the Mexican Tax Administration Service, or *Servicio de Administración Tributaria* (the "SAT") under general rules issued from time to time are satisfied. In case such requirements are not met or cease to be met, the applicable withholding tax rate will be 10% and, in such case, if the effective beneficiary of such payments is deemed to have a preferential tax regime (e.g., a person who is not subject to taxation on income in its country of residence or a person whose effective income tax rate is lower than 75% of the Mexican income tax rate, which is currently 30%), the withholding tax will be substantially higher.

Under general regulations published by the SAT currently in effect, the information requirements which must be satisfied are that: (i) we timely file with the SAT certain information relating to us and the issuance of the New Notes; (ii) we timely file with the SAT information on the interest paid and information representing that no party related to us jointly or individually, directly or indirectly, is the effective beneficiary or 5% or more of the aggregate amount of each interest payment on a quarterly basis; and (iii) we maintain records which evidence compliance with items (i) and (ii) above.

Even if the above requirements are met, currently a withholding tax of 30% will apply if the effective beneficiaries of the interest paid on the New Notes, whether directly or indirectly, individually or collectively with related persons, who receive more than 5% of the aggregate amount of such payments on the New Notes are: (i) shareholders who own, directly or indirectly, individually or collectively with related persons, more than 10% of our voting stock; or (ii) entities with more than 20% stock owned, directly or indirectly, individually or collectively with related persons, by us or by persons related to us. For such purposes, under the Mexican Income Tax Law, persons are considered related if one possesses an interest in the business of the other, common interests exist between them or a third person holds an interest in the business or property of both persons.

Under the Mexican Income Tax Law, payments of interest we make on the New Notes to a non-Mexican pension or retirement fund will generally be exempt from Mexican withholding taxes, provided that: (i) the fund is the effective beneficiary of such interest income; (ii) the fund is duly established pursuant to the laws of its country of origin; (iii) the relevant interest income is exempt from taxation in such country; and (iv) the fund is duly registered with the SHCP for such purpose.

If we agree to pay additional amounts to the holders of the New Notes with respect to the Mexican withholding taxes mentioned above, any refunds of such additional amounts will be for our account. See "Description of the New Notes—Additional Amounts").

Holders or beneficial owners of the Old Notes providing their consent and receiving the Note Consent Payment, and holders or beneficial owners of the New Notes, may be requested to provide certain information or documentation necessary to enable us to establish the appropriate Mexican withholding tax rate applicable to such holders or beneficial owners. In the event that the specified information or documentation concerning the holder or beneficial owner, if requested, is not provided on a timely basis, our obligations to pay additional amounts may be limited (as described in "Description of the New Notes—Additional Amounts").

Under the Mexican Income Tax Law, payments of principal we make to a Foreign Holder will not be subject to any Mexican withholding or similar taxes.

**Tender Offer Consideration; Taxation of the Disposition of the Notes**

Under the Mexican Income Tax Law, capital gains resulting from the sale or other disposition of the Old Notes or the New Notes by a Foreign Holder to another Foreign Holder are not taxable in Mexico. For purposes of the above, a positive difference between the value received by us at the time of issuance of the Old Notes and the price at which a holder that is not a resident of Mexico sells such Old Notes to us would constitute a capital gain. As we will purchase the Old Notes at a discount from their original issue price, capital gains on such sale will not be subject to Mexican income taxes. Foreign Holders should consult their tax advisors with respect to the tax consequences on capital gains realized on the disposition of the Old Notes or the New Notes from a Foreign Holder to a Mexican resident or Foreign Holder with a permanent establishment in Mexico.

**Other Mexican Taxes**

A Foreign Holder will not be liable for estate, gift, inheritance or similar taxes with respect to the New Notes held. There are no Mexican stamp, issue, registration or other similar taxes payable by a Foreign Holder with respect to the New Notes.

## IMPORTANT INFORMATION FOR NON-U.S. HOLDERS

### United Kingdom

This Statement, any accompanying letter, and any other communications made in connection with the *Concurso* Plan are directed only at persons who (i) are outside the United Kingdom or (ii) have professional experience in matters relating to investments or (iii) are persons falling within Article 49(2)(a) to (d) (high net worth companies, unincorporated associations, etc.) of The Financial Services and Markets Act 2000 (Financial Promotion) Order 2001 (the Financial Promotion Order) (all such persons together being referred to as relevant persons). In the United Kingdom, this Statement and any other communication made with the *Concurso* Plan must not be acted on or relied on by persons who do not meet the above criteria. In the United Kingdom, any investment or investment activity to which this Statement relates is available only to persons who meet the above criteria and will be engaged in only with persons who meet the above criteria.

Neither this Statement nor any accompanying letter has been delivered for registration to any Registrar of Companies in the United Kingdom and no prospectus, within the meaning of the Public Offers of Securities Regulations 1995 as amended (the Regulations), has been published or is intended to be published in respect of the *Concurso* Plan. We have not authorized any the Exchange Offer and Consent Solicitation or offer to the public in the United Kingdom within the meaning of the Regulations with respect to the *Concurso* Plan. The Exchange Offer and Consent Solicitation with respect to the *Concurso* Plan is only made in the United Kingdom to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business.

By exchanging your Old Notes or voting for or against the *Concurso* Plan, you will represent, warrant and confirm that you:

- are persons of a kind described in Article 19 or Article 49 of the Financial Promotion Order;

- are persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business; and

- expressly invite us to provide information to you and to discuss with you the Exchange Offer and Consent Solicitation and the *Concurso* Plan.

### European Economic Area

This Statement has been prepared on the basis that the Exchange Offer and Consent Solicitation will be made pursuant to an exemption under Directive 2003/71/EC (the "Prospectus Directive"), as implemented in member states of the European Economic Area ("EEA"), from the requirement to produce a prospectus for the Exchange Offer and Consent Solicitation. Accordingly, any person making or intending to make any the Exchange Offer and Consent Solicitation within the EEA as contemplated in this Statement should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such the Exchange Offer and Consent Solicitation. The Company has not authorized, and does not authorize, the making of any the Exchange Offer and Consent Solicitation or offer through any financial intermediary.

### Hong Kong Special Administrative Region

The Exchange Offer and Consent Solicitation will not be made in Hong Kong by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong) and no advertisement, invitation or document relating to the Exchange Offer and Consent Solicitation may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be

244

accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

## Singapore

This Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Statement or any other document or material in connection with the Exchange Offer and Consent Solicitation may not be circulated or distributed, nor may the Exchange Offer and Consent Solicitation be made, whether directly or indirectly, to persons in Singapore other than (1) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (2) to a relevant person pursuant to Section 275(1), or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions, specified in Section 275 of the SFA or (3) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA in each case subject to compliance with conditions set forth in the SFA.

Where New Notes are issued under Section 275 of the SFA to a relevant person which is:

(a)   a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)   a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor,

shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred for six months after that corporation or that trust has acquired the New Notes under Section 275 of the SFA except:

(1)   to an institutional investor (for corporations, under Section 274 of the SFA) or to a relevant person or any person pursuant to Section 275(2) of the SFA, or to any person pursuant to an offer that is made on terms such that such shares, debentures and units of shares and debentures of that corporation or such rights and interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets, and further for corporations, in accordance with the conditions specified in Section 275 of the SFA;

(2)   where no consideration is given for the transfer; or

(3)   where the transfer is by operation of law.

## Mexico

The New Notes have not been registered with the National Securities Registry (*Registro Nacional de Valores*) maintained by the Mexican National Banking and Securities Commission (*Comisión Nacional Bancaria y de Valores*, or CNBV), and may not be offered or sold publicly, or otherwise be the subject of brokerage activities in Mexico, except in accordance with Article 8 of the *Ley del Mercado de Valores*, or Mexican Securities Market Law. We will notify the CNBV of the issuance of the New Notes, including their principal characteristics. Such notice will be delivered to the CNBV to comply with a legal requirement and for information purposes only, and the delivery to and the receipt by the CNBV of such notice does not constitute or imply any certification as to the investment quality of the New Notes or of the Company's solvency, liquidity or credit quality or the accuracy or completeness of the information set forth in this Statement. The information contained in this Statement is our exclusive responsibility has not been reviewed or authorized by the CNBV. In making a decision to accept the Exchange Offer and Consent Solicitation, exchange Old Notes and issue a consent hereunder, all holders of

Restructured Debt, including any Mexican investors who may acquire New Notes from time to time, must rely on their own review and examination of the Company.

ANNEX A

*CONCURSO* PLAN

**RESTRUCTURING AGREEMENT EXECUTED PURSUANT TO ARTICLES 3, 153, 157, 165, 339 AND OTHER APPLICABLE ARTICLES OF THE MEXICAN BANKRUPTCY AND REORGANIZATION LAW (*LEY DE CONCURSOS MERCANTILES*) ENTERED INITIALLY INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. AND THE EXECUTING CREDITORS AND FOR ITS FURTHER SUBSCRIPTION, IN ITS CASE, BY THE ADHERING CREDITORS.**

**INDEX**

A N T E C E D E N T S     A-3
R E P R E S E N T A T I O N S     A-4
C L A U S E S     A-6
   **FIRST. DEFINITIONS AND EXHIBITS**     A-6
      **Section 1.01** Defined Terms.     A-6
      **Section 1.02 Rules of Interpretation**     A-9
      **Section 1.03** Exhibits.     A-10
      **Section 1.04** Representation Inclusions.     A-10
   **SECOND. PURPOSE.**     A-10
   **THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**     A-10
   **FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**     A-11
   **FIFTH. PAYMENT AND IMPLEMENTATION.**     A-11
      **Section 5.01** Payment.     A-11
      **Section 5.02** Implementation.     A-11
         **Section 5.02.1** Description of the New 2019 Notes.     A-12
         **Section 5.02.2** Description of the New Mandatory Convertible Debentures     A-13
         **Section 5.02.3** Cash Contribution Description     A-13
         **Section 5.02.4** Restructuring Fee Description     A-13
      **Section 5.03** Treatment of Acknowledged Creditors.     A-14
      **Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.     A-14
      **Section 5.05** Other obligations to consider.     A-14
   **SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PORTION AND THE RESTRUCTURING FEE.**     A-15
   **SEVENTH. CURRENCY.**     A-15
   **EIGHTH. FURTHER DOCUMENTS.**     A-16
   **NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.**     A-16
   **TENTH. BINDING EFFECT.**     A-16
   **ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.**     A-16
   **TWELFTH. PATRIMONY.**     A-16
   **THIRTEENTH. MANAGEMENT AND SURVEILLANCE.**     A-16
   **FOURTEENTH. CONTINUANCE.**     A-17
   **FIFTEENTH. EQUAL TREATMENT.**     A-17
   **SIXTEENTH.** *CONCURSO* **PETITION AND PREVIOUS RESTRUCTURING PLAN.**     A-17
   **SEVENTEENTH. NULLITY.**     A-17
   **EIGHTEENTH. APPLICABLE LAW.**     A-17
   **NINETEENTH. JURISDICTION AND VENUE.**     A-17
   **TWENTIETH. HEADINGS.**     A-17

**RESTRUCTURING AGREEMENT (THIS "AGREEMENT" OR "VITRO RESTRUCTURING AGREEMENT") ENTERED INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. ("VITRO"), AND THOSE PERSONS WHOSE NAMES ARE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT ON BEHALF OF THE VITRO CREDITORS (JOINTLY REFERRED TO AS THE "EXECUTING CREDITORS") AND THE CREDITORS WHOSE NAMES WILL BE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT THAT FROM TIME TO TIME MAY BE INCLUDED IN THIS AGREEMENT, SUBJECT TO THE FOLLOWING ANTECEDENTS, REPRESENTATIONS AND CLAUSES:**

### A N T E C E D E N T S

I.   On October 10, 2002, Vitro registered a program for the issuance of medium term stock traded certificates (*certificados bursátiles de mediano plazo*) for a total sum of $2,500,000,000.00 (two billion five hundred million pesos 00/100 Mexican Currency) (the "Vitro 02 Program"). On February 13, 2003, Vitro issued 11,400,000 (eleven million four hundred thousand) stock traded certificates (*certificados bursátiles*) for a total amount of $1,140,000,000.00 (one billion one hundred forty million pesos 00/100 Mexican Currency) pursuant to the Vitro 02 Program (the "Cebures Vitro 03"). The common representative (*representante común*) for the holders of the Cebures Vitro 03 is Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II.   On October 22, 2003, Vitro completed an issuance throughout international markets of US$225,000,000.00 (two hundred twenty-five million dollars 00/100 Currency of the United States of America) with 11.75% Senior Notes due on 2013 (the "2013 Notes").

III.   On February 1, 2007, Vitro completed an issuance throughout international markets of US$1,000,000,000.00 (one billion dollars 00/100 Currency of the United States of America), which consisted of US$300,000,000.00 (three hundred million dollars 00/100 currency of the United States of America) with 8.625% Senior Notes due 2012 (the "2012 Notes") and US$700,000,000.00 (seven hundred million dollars 00/100 Currency of the United States of America) with 9.125% Senior Notes due 2017 (the "2017 Notes" and jointly with the 2013 Notes and the 2012 Notes, the "Notes").

IV.   On September 29, 2008, Vitro issued a promissory note in favor of ABN AMRO BANK N.V. (owned at one time by RBS Bank), for US$15,000,000.00 (fifteen million dollars 00/100 Currency of the United States of America) (the "ABN Note").

V.   On July 1, 2008, Vitro registered a program for the issuance of long term stock traded certificates (*certificados bursátiles de largo plazo*) for an amount of up to $1,000,000,000.00 (one billion pesos 00/100 Mexican Currency) (the "Vitro 08 Program"). On July 2, 2008, Vitro issued 4,000,000 (four million) stock traded certificates (*certificados bursátiles*) for $400,000,000.00 (four hundred million pesos 00/100 Mexican Currency) pursuant to the Vitro 08 Program (the "Cebures Vitro 08", and jointly with the Cebures Vitro 03, the "Cebures"). The common representative (*representante común*) of the holders of Cebures Vitro 08 is Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI.   On September 3, 2010, Vitro entered into, as guarantor for its subsidiaries Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. and Comercializadora Álcali, S.A. de C.V., a Settlement and Debt Acknowledgement Agreement with Fintech Investments Ltd., in its capacity of creditor (the "Settlement Agreement") whereby it secured payment of the total amount of US$189,999,282.00 (one hundred eighty-nine million nine hundred ninety-nine thousand two hundred eighty-two dollars 00/100 Currency of the United States of America) plus interest accrued at 4.25% (four point twenty five percent) up to the maturity date, in favor of Fintech Investments Ltd, and executed as "*aval*" three promissory notes for the aforementioned amount (the "Fintech Notes").

VII.   Vitro has reached an agreement with the Executing Creditors in order to restructure its indebtedness upon the Closing Date (as such term is defined below), pursuant to the following terms and conditions

provided in this Agreement which will be filed though a *concurso mercantil* proceeding, in any of its modalities pursuant to what is set forth in the LCM (as defined below), including, if necessary, a *concurso mercantil* petition, whereby this Agreement will be attached as a prearranged agreement or a prepackage reorganization agreement.

VIII.  Pursuant to Article 339, Section IV, of the Mexican Bankruptcy and Reorganization Law (*Ley de Concursos Mercantiles*) ("LCM"), this Agreement contains the terms and conditions agreed between Vitro and the Executing Creditors for the Vitro indebtedness restructuring; *provided, however,* that Vitro and the Executing Creditors intend for this Agreement to become, once it has been approved by the Judge, a reorganization agreement as set forth in Title V, Sole Chapter of the LCM, in order for this Agreement, once all legal requirements have been satisfied, to be presented by means of the *Conciliador* (as such term is defined below) appointed in the *concurso mercantil* by the Federal Institute of *Concurso Mercantil* Specialists ("IFECOM") pursuant to Article 43, Section IV if the LCM (the "*Conciliador*") before all other creditors which are legally acknowledged by means of the Debt Acknowledgement Judgment (as such term is defined below), pursuant to Article 132 of the LCM (the "Remaining Creditors", and jointly with the Executing Creditors, the "Acknowledged Creditors").

# R E P R E S E N T A T I O N S

I.  **Vitro represents, under oath and through its representatives, that:**

A.  It is a corporation duly incorporated and existing under the Laws of Mexico and that its restructuring of indebtedness which is the purpose of this Agreement, as well as its execution and performance, have been duly authorized by its board of directors through its meeting held on September 24, 2010, pursuant applicable law and regulations.

B.  Its representatives have sufficient authority to enter into this Agreement, which has not been revoked or limited in any way as of the date hereof, pursuant to a certified copy of the public instrument attached hereto as **Exhibit "B"**, which shall also form part of this Agreement.

C.  It wishes to enter into this Agreement in order to agree on the form, restructuring terms, payment and/or novation conditions, as the case may be, of its indebtedness as set forth herein and that, on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Furthermore, it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil* proceeding, pursuant to what is set forth in Articles 166 and 262, Section I and other relative and applicable provisions of the LCM.

D.  Pursuant to its accounting records, as of [September] [30], it has (a) non subsidiary direct or indirect credit liabilities which amount to $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the Unites States of America), (b) liabilities as a result of the "*aval*" granted in favor of third parties regarding its subsidiaries' obligations which amount to $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the United States of America), and (c) direct or indirect subsidiary liabilities, for an amount of $[•] ([•] pesos 00/100 Mexican Currency), equivalent to US$[•].00 ([•] dollars 00/100 Currency of the United States of America) (amounts mentioned in item (c) above will be referred to as "Intercompany Claims").

E.  That the liabilities owed to the Executing Creditors represent at least [•]% of the total Vitro liabilities, pursuant to its accounting records.

F.  That it is a holding company and as such, its ability to meet its obligations is dependant on the dividends that it receives from its subsidiaries.

G.  That it acknowledges the claims of the Executing Creditors and those of the Remaining Creditors, in the amounts, degree and specific characteristics indicated in the creditors and debtors description

which pursuant to Article 20, Section III of the LCM, shall be attached as an exhibit to the *concurso mercantil* petition to be filed.

H.    That it does not owe (i) any claims from those mentioned in Article 224, Section I of the LCM, nor (ii) any claims singularly privileged (as defined in Article 218 of the LCM), nor (iii) any claims with other guarantees and privileges (as defined in Article 219 of the LCM).

I.    That it does not have due tax claims of any kind, including but not limited to, claims related to social security claims.

J.    That the Company has not executed any specific agreements with any of its Acknowledged Creditors with regards to a repayment of indebtedness, contrary to the LCM.

K.    The execution of this Agreement does not violate or breach, or in any way contravene any provisions of its current corporate by-laws nor any law, including without limitation, the LCM.

L.    That the Company is authorized, under the laws of Mexico, to enter into and comply with its obligations set forth in this Agreement, without any other necessary authorizations, aside from those required from *concurso mercantil* proceedings.

M.    That it completely accepts the terms set forth herein and that this Agreement, once approved by the Judge, will provide the terms needed to Consummate the Restructuring (as such term is defined below) on the Closing Date (as such term is defined below).

**II.**    **Each of the Executing Creditors, as well as the Adhering Creditors that execute this Agreement, hereby represents under oath that:**

A.    It is Vitro's creditor as respectively identified under its own signature page under this Agreement.

B.    As for holders of the Notes, it evidences its capacity as a Vitro creditor by means of (i) the certification issued and delivered by The Depository Trust Company ("DTC") to Vitro, whereby the record holders are evidenced and (ii) the duly notarized and apostilled Letter of Transmittal issued and delivered by all of the last beneficial owners of the Notes (or their authorized representatives) which contains a certification regarding its ownership of the Notes regarding the beneficial owner; and (iii) the Letter of Instruction issued by the beneficial owner of the Notes to the corresponding record holder.

C.    As for holders of Cebures, it evidences its capacity as a Vitro creditor by means of (i) a Cebures deposit certificate issued by the S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima ("Indeval") and (ii) a Cebures holder's certificate issued by the broker who acts as a custodian for such Cebures.

D.    It wishes to enter into this Agreement in order to agree on the form, terms and conditions of Vitro's payment of indebtedness pursuant to what is set forth herein, which on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Likewise it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil*, pursuant to what is set forth in Articles 166 and 262 Section I and other related and applicable articles of the LCM.

E.    At the latest within the term provided in Article 122 Section II of the LCM, it shall request the Acknowledgement of all of its credits before the *Conciliador* which is appointed in Vitro's *concurso mercantil* proceeding.

A-5

F.  Its representatives have the necessary authority to enter into this Agreement, which has not been revoked or limited in any way as of this date, pursuant to the document which is attached hereto as **Exhibit "C"**, and which shall form part of this Agreement.

**III.  All parties to this Agreement represent, by means of their representative and under oath that:**

A.  They mutually agree to their authority and capacity with which they execute this Agreement, for all necessary legal effects.

As a consequence of the above, and pursuant to the previous representations, Vitro and the Executing Creditors agree to execute this Agreement pursuant to what is set forth if the following clauses, and as of this moment request that the *Conciliador* present to the Remaining Creditors this Agreement, which Vitro and the Executing Creditors propose to the Remaining Creditors for their acceptance and execution, pursuant to what is set forth in Articles 4, Section I, 132, 146 and 161 of the LCM:

**C L A U S E S**

**FIRST. DEFINITIONS AND EXHIBITS**

**Section 1.01** Defined Terms.

Unless otherwise set forth in this Agreement, any capitalized term used herein shall have the following meaning:

| *TERM* | *DEFINITION* |
| --- | --- |
| *2012 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *2013 Notes* | shall have the meaning ascribed to it in Antecedent II of this Agreement. |
| *2017 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *ABN Note* | shall have the meaning ascribed to it in Antecedent IV of this Agreement. |
| *Acknowledged Claims* | shall mean the credits which are acknowledged in the Debt Acknowledgement Judgment. |
| *Acknowledged Creditors* | shall mean all creditors which are legally acknowledged pursuant to Article 132 of the LCM by means of a definitive sentence issued by the Judge which rules over the corresponding *concurso mercantil*. |
| *Adhering Creditors* | shall mean all Remaining Creditors that execute this Agreement. |
| *Agreement* | shall mean this Restructuring Agreement, which may be amended from time to time during the *concurso mercantil* proceedings, and once definitively approved by the Judge, shall be converted into the restructuring agreement provided in Title V, Sole Chapter of the LCM. |

A-6

wl

| TERM | DEFINITION |
|---|---|
| *Cash Contribution* | shall mean the cash payment made on the Closing Date, as provided in Section 5.02(c) of this Agreement. |
| *Cebures* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Cebures Vitro 03* | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| *Cebures Vitro 08* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Closing Date* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Conciliador* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Consent Payment* | shall have the meaning ascribed to it in the Trust. |
| *Consummate the Restructuring* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Debt Acknowledgement Judgment* | shall mean the debt Acknowledgement, degree and order sentence dictated by the Judge pursuant to what is set forth in Article 132 of the LCM. |
| *Description of the Notes* or *DON* | shall mean the Description of the New Notes, pursuant to the document which is attached hereto as **Exhibit "D"** which provides the principal characteristics of the New 2019 Notes and the New Mandatory Convertible Debentures. |
| *Executing Creditors* | shall mean all creditors which are listed in **Exhibit "A"** of this Agreement. |
| *Existing Indebtedness* | shall mean jointly liabilities being restructured by means of this Agreement, which include the Notes, the Cebures, the ABN Note, the Fintech Notes and the Settlement Agreement. |
| *Extended Closing Date* | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| *Fintech Notes* | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |
| *Guarantors* | shall mean all Vitro subsidiaries which shall act as guarantors under the New 2019 Notes, which are identified under the definition of Guarantors of Certain Definitions within the Description of the Notes. |
| *IFECOM* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |

| TERM | DEFINITION |
|---|---|
| *Intercompany Claims* | shall have the meaning ascribed to it in representation I.D. of this Agreement, expressly excluding any Intercompany Claims in the Ordinary Course of Business (as such term is defined in the Description of the Notes). |
| *Issue Date Adjustment* | shall mean the adjustment or increase made by Vitro on the date the New Mandatory Convertible Debentures are issued equal to an annual rate of return of 10.50% (ten point one percent) of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) calculated for the period between Value Date and the issuance date of the New Mandatory Convertible Debentures. |
| *Judge* | shall mean the District Judge for Civil and Labor Matters in Monterrey, Nuevo Leon, who shall rule over the Vitro *concurso mercantil* proceeding. |
| *LCM* | shall mean the Mexican Bankruptcy and Reorganization Act (*Ley de Concursos Mercantiles*). |
| *LGTOC* | shall mean the Mexican Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*). |
| *Mexico* | shall mean the United States of Mexico. |
| *New 2019 Notes* | shall have the meaning ascribed to it in Section 5.02(a) of this Agreement. |
| *New Debt* | shall mean the indebtedness created as a result of the Restructuring Instruments. |
| *New Mandatory Convertible Debentures* | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| *Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *Remaining Creditors* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Restructuring* | shall have the meaning ascribed to it in Clause Second of this Agreement. |
| *Restructuring Fee* | shall have the meaning ascribed to it in Section 5.02 of this Agreement. |
| *Restructuring Instruments* | shall mean jointly the definitive documentation with regards to the 2019 New Notes and other documentation related to the restructuring of the Existing Indebtedness. |
| *Settlement Agreement* | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |

A-8

| TERM | DEFINITION |
|---|---|
| *Trust* | shall mean the irrevocable management and payment trust number 986 dated September 8, 2010 created by Vidriera Los Reyes, S.A. de C.V., a direct subsidiary of Vitro, in its capacity of settlor; before Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, in its capacity of trustee. A copy of the Trust is attached hereto as **Exhibit "E"**, which shall form part of this Agreement. |
| *Value Date* | shall mean January 1, 2011. |
| *Visitador* | shall mean the person appointed by the IFECOM which shall determine if Vitro complied with the provisions set forth in Article 10 of the LCM, as well as to confirm if the termination of the credits caused such actions, and shall also suggest the Judge to issue precautionary measures to be issued as considered necessary to protect the restructured assets, pursuant to Article 37 of the LCM. |
| *Vitro* | shall mean Vitro, S.A.B. de C.V. |
| *Vitro 02Program* | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| *Vitro 08 Program* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Voting Trust* | shall mean the irrevocable management trust to be created pursuant to section 5.04. A copy of the Voting Trust is attached here to as **Exhibit "G"**, which shall form part of this Agreement. |

**Section 1.02 Rules of Interpretation**

In this Agreement as well as its Exhibits:

I.  the index and headings of the Clauses and Sections are for reference only and shall not affect the interpretation of this Agreement;

II.  references to any document or agreement, including this Agreement, shall include: (a) all exhibits or other documents attached thereto; (b) all documents or agreements issued or executed to substitute such agreements; and (c) any amendments, additional modifications or compilations of such agreements;

III.  "*include*" or "*including*" are deemed to be followed by "*without limitation*";

IV.  a reference to a party includes that party's authorized successors and permitted assigns;

V.  the words "*of this*", "*in this*" and "*under this*" and similar words or phrases, will refer to this Agreement in general and not to a particular provision of this Agreement;

VI.  reference to "*days*" shall mean calendar days;

VII.  words importing the singular include the plural and vice versa;

VIII.  references to a Clause, Exhibit or Section are references to a relevant clause or section of, or exhibit to this Agreement, unless otherwise expressly stated; and

IX.  all documents which are attached to this Agreement shall form part this Agreement as if they were fully set forth herein.

**Section 1.03** Exhibits.

The following Exhibits shall form part of this Agreement:

**Exhibit "A"** List of Executing Creditors.

**Exhibit "B"** Public instrument, which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"** Public instruments which contain the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"** Description of the New Notes, attached in English, accompanied by its Spanish translation.

**Exhibit "E"** Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.

**Exhibit "F"** Form of Cash Contribution and Restructuring Fee.

**Exhibit "G"** Form of Voting Trust.

**Section 1.04** Representation Inclusions.

The parties agree that those representations made by Vitro herein are the main reason for which the Executing Creditors are executing this Agreement.

**SECOND. PURPOSE.**

Pursuant to Articles 1, 48, 157, 166, 262, Section I, and other applicable articles of the LCM, the purpose of this Agreement is, subject to the terms and conditions provided herein and subject to the implementation of the transactions described herein, and subject to the approval of this Agreement by the Judge, that Vitro continues operations, preserves its existence and avoids payment default which may put at risk its viability, as well as other companies with which it maintains a business relation, through the restructuring to which the parties to this Agreement have agreed (the "Restructuring"), which includes the payment, possible capitalization, restructuring and/or novation, as the case may be, of the Acknowledged Claims with the acquittals, forbearances, restructures, grants and/or amendments and/or releases of security interests provided for and subject to the terms herein.

**THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**

**Section 3.01** General Operating Expenses.

Vitro will continue to make payment of all direct and indirect labor and tax obligations and operating expenses, on a timely basis, as they become due, and will continue to perform under all of its contractual obligations pursuant to the LCM.

**FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**

Vitro hereby acknowledges and accepts to owe to the Executing Creditors and the Remaining Creditors, the claims corresponding to the Existing Indebtedness in the amounts provided under section I.D. of the representations section of this Agreement on the terms and conditions of each of the documents which originated such liabilities and for the principal amount, interest and other accessories, the amount that appears in front of the name of each Executing Creditor in each signature page of this Agreement.

Notwithstanding the foregoing, each of the Executing Creditors is hereby obligated to file, at the latest within in the term set forth in Article 122, Section II of the LCM, before the *Conciliador*, their respective proofs of claim or debt Acknowledgement petitions and to undertake all necessary procedures in that regard.

**FIFTH. PAYMENT AND IMPLEMENTATION.**

**Section 5.01** Payment.

Vitro will pay the corresponding Executing Creditors' as well as the Remaining Creditors' Acknowledged Claims, in the terms set forth herein.

This Agreement, once approved by the Judge shall be extensive to the Remaining Creditors as provided in article 165 of the LCM.

**Section 5.02** Implementation.

The Executing Creditors, Adhering Creditors and Vitro will implement the Restructuring by means of the filing, voting and approval, in each case, of this Agreement pursuant to the LCM, its further recognition and enforcement in the United States of America through the filing and presentment of a Chapter 15 proceeding under the United States Bankruptcy Code, as well as by means of issuance and delivery at the Closing Date to the Acknowledged Creditors of the instruments referred to in subsections (a) and (b) as well as the payments referred to in subsections (c) and (d), as follows:

(a)   pro rata amongst the Acknowledged Creditors, the Notes to be issued by Vitro on the terms and conditions provided under Section 5.02.1 of this Agreement (the "New 2019 Notes");

(b)   pro rata amongst the Acknowledged Creditors, the Mandatory Convertible Debentures to be issued by Vitro on the terms and conditions provided under Section 5.02.2 of this Agreement (the "New Mandatory Convertible Debentures");

(c)   pro rata amongst the Acknowledged Creditors, a cash payment for the remaining US$75,000,000.00 (seventy-five million dollars 00/100 Currency of the United States of America) which are contributed to the Trust, once the Consent Payments have been discounted (the "Cash Contribution"); and

(d)   pro rata cash payment which shall correspond to restructuring fee resulting from the application of the formula provided under Section 5.02.4 of this Agreement (hereinafter, the "Restructuring Fee").

The parties agree that notwithstanding the provisions under this Agreement, creditors under the Intercompany Debt will not receive any instruments or payments described above and that their liabilities will be restructured as provided for in Section 5.04 of this Agreement.

None of the instruments offered by Vitro pursuant to this Agreement and which comprise the New Debt will be registered under the United States Securities Act of 1933, as such has been amended from time to time, based on the exemption provided under Section 3(a)(9) of such law, nor shall they be registered before the National Stock Registry (*Registro Nacional de Valores*) controlled by the Mexican National Securities and

Exchange Commission (*Comisión Nacional Bancaria y de Valores*). Therefore, Vitro, as a result of the legal opinion provided by the legal advisors for the Executing Creditors, shall have the right to implement such processes and to request from the Acknowledged Creditors, any such statements and/or certifications which are reasonably considered as necessary or convenient to verify compliance with necessary requirements to apply the corresponding legal exemptions.

**Section 5.02.1** Description of the New 2019 Notes.

The New 2019 Notes shall be issued by Vitro in accordance with the laws of the United States of America on the Closing Date pursuant to the terms and conditions of Section I of the Description of the Notes and the terms and conditions provided for in the corresponding New 2019 Notes indenture.

The New 2019 Notes shall:

I.     have a principal amount of US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America);

II.    have a term of eight (8) years following the Value Date;

III.   constitute direct, unconditional and non-subordinated obligations of Vitro, and rank *pari passu* or identical, one on one basis, versus Vitro's non-secured and non-subordinated debt;

IV.    be unconditionally and jointly guaranteed by each of the Guarantors;

V.     have a fixed annual interest rate of 8.0%, payable semiannually in due installments and which may be partially capitalized and paid in kind, by 50% (fifty percent), during the first 3 (three) years following the Value Date, at Vitro's election, subject to the compliance by Vitro with certain conditions set forth in the Description of the Notes;

VI.    not have amortization or principal payments during the first 4 (four) years following the Value Date and, from the fifth year until the seventh year following the Value Date, shall have amortizations or principal payments of US$25,000,000.00 (twenty-five million dollars 00/100 Currency of the United States of America) payable semiannually;

VII.   totally or partially redeemable at Vitro's option, at any time during their term, subject to certain conditions set forth in the Description of the Notes, at a price equal to 100% of their value *plus* interest generated up to the redemption date;

VIII.  be totally or partially mandatorily redeemable, in the event that Vitro (i) performs a stock issuance subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

IX.    be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its value *plus* interests generated up to the redemption date.

All of the terms and conditions, as well as the customary and regular negative and affirmative covenants for this kind of transaction, including without limitation, any limitations to incur additional debt, limitations on investments and creation of liens or encumbrances, limitations on certain payments, limitations on the sale of assets, limitations of transactions with partners or affiliates, and early termination events under which the New 2019 Notes will be subject, are contained in Section I of the Description of the Notes called New 2019 Notes and in the New 2019 Notes indenture.

The principal amount of the New 2019 Notes may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.2** Description of the New Mandatory Convertible Debentures.

The New Mandatory Convertible Debentures shall be issued by Vitro pursuant to the laws of the Unites States of America, complying with all applicable provisions under the General Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*), on the Closing Date pursuant to the terms and conditions of Section II of the Description of the Notes and the terms and conditions provided under the New Mandatory Convertible Debentures indenture.

The New Mandatory Convertible Debentures shall:

I.  have a principal amount of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) *plus* the Issue Date Adjustment;

II.  have a term of five (5) years following the Value Date;

III.  constitute direct obligations of Vitro, and shall rank *pari passu* or identical, one on one basis, versus Vitro's non-guaranteed debt;

IV.  have an annual fixed interest rate equal to 10.50%, which may be totally capitalized and paid in kind, on an annual basis, during its term;

V.  be mandatorily convertible into shares of Vitro which represent 15% of its corporate capital at the end of its term, in the event that they are not paid in cash at the end of its term or in the absence of mandatory redemptions pursuant to the Description of the Notes;

VI.  be totally or partially redeemable at Vitro's option, at any time during their term, subject to the terms and conditions set forth in the Description of the Notes, at a price equal to 100% of their value (subject to prepayment discounts set forth in the Description of the New Notes) *plus* the interest generated up to the redemption date;

VII.  be totally or partially mandatorily redeemable, in the event that Vitro (i) issues capital stock subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

VIII.  be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its principal *plus* the interest generated up to the redemption date.

All of the terms and conditions, terms and conversion procedures, as well as the negative and affirmative covenants and early termination events which govern the New Mandatory Convertible Debentures are provided under Section II of the Description of the Notes and in the New Mandatory Convertible Debentures indenture.

The principal amount of the New Mandatory Convertible Debentures and as a consequence the basis for the Issue Date Adjustment calculation may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.3** Cash Contribution Description.

Vitro shall pay in cash, on the Closing Date, pro-rata, in favor of all Acknowledged Creditors (except for Intercompany Claims), an amount equal to US$75,000,000.00 (seventy-five million dollars 00/100 Currency of the United States of America), which are contributed to the Trust, *minus* the Consent Payment.

**Section 5.02.4** Restructuring Fee Description.

Vitro shall pay as a Restructuring Fee on the Closing Date, in the amount equal to the annual interest rate of 8.0% (eight percent) regarding the US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America) calculated for the period between the Value Date and the New 2019 Note issuance.

The principal amount used to estimate the Restructuring Fee may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.03** Treatment of Acknowledged Creditors.

All Acknowledged Creditors (except for Intercompany Claims) shall receive a pro-rata portion of the New 2019 Notes and the New Mandatory Convertible Debentures as provided under the Description of the Notes, as well as the Cash Contribution and Restructuring Fee.

The parties expressly agree and accept that the terms and conditions set forth herein grant a just, equal and reasonable treatment to all claims of the Acknowledged Creditors.

**Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.

The holders of Intercompany Claims against Vitro accept that they will receive a less favorable treatment than the rest of the Acknowledged Creditors, since they shall not be entitled to receive any of the instruments and payments set forth in Section 5.02 of this Agreement.

As a substitution to what is set forth above, such creditors accept to receive a note for the amount of their Intercompany Claim, payable within a 9 (nine) year term which shall begin on the date on which the New 2019 Notes and the New Mandatory Convertible Debentures are issued, and shall have a fixed annual interest rate of 2.5% (two point five percent) and shall be payable in one single bullet payment at maturity.

Additionally, no principal or interest payment concerning the Intercompany Claims shall be made prior to payment of principal, interest or any other amounts owed under the New 2019 Notes and the New Mandatory Convertible Debentures.

Vitro and the Guarantors shall create an irrevocable trust agreement (the "Voting Trust") where they shall contribute all of their Intercompany Claims in order to be managed and voted pursuant to what is set forth under such Voting Trust. Such Intercompany Claims shall remain in the Voting Trust for the remainder of the credit term, or 9 (nine) years, which shall begin on the date on which the New 2019 Notes and the New Mandatory Convertible Debentures are issued.

**Section 5.05** Other Obligations to Consider.

Pursuant to what is stated in representation I.F of this Agreement, Vitro is a holding company and it is in its best interest to achieve a comprehensive restructuring of its liabilities and those of its subsidiaries, and Vitro has included, within the economic terms set forth herein, those liabilities of its subsidiary denominated Vitro Envases Norteamérica, S.A. de C.V., which acts as a Guarantor in this Agreement, and currently owes Calyon Credit Agricole CIB ("Calyon"), an amount equal to US$63,383,806.00 (sixty three million three hundred eighty three thousand eight hundred six dollars 00/100 Currency of the United States of America) plus interest and commissions owed for an amount equal to US$3,905,298.00 (three million nine hundred five thousand two hundred ninety eight dollars 00/100 Currency of the United States of America). In the event the terms of this Agreement are accepted by Calyon, Vitro shall assume such debt and will deliver Calyon its proportional share of the New 2019 Notes, the New Mandatory Convertible Debentures, the Restructuring Fee and its Cash Contribution, pursuant to what is set forth in Section 5.02 herein. Furthermore, Calyon shall be considered as an Adhering Creditor for all legal and economic purposes under this Agreement, as of the date in which the Judge approved this Agreement.

Vitro shall grant Calyon with the same term to execute and approve this Agreement as well as to

A-14

accept the benefits bestowed in its favor under this Section 5.05 as the one granted in favor of the Remaining Creditors pursuant to article 161 third paragraph of the LCM.

In the event Calyon does not accept the benefits bestowed in its favor pursuant to this Section 5.05, the corresponding amounts of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee to be delivered and paid to each Acknowledged Creditor shall remain unchanged, pursuant to what is set forth in Section 5.02, and Vitro shall only reduce the amount of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee, in order to deduct such proportional amounts which would have been distributed to Calyon if it had accepted the rights granted in its favor; *provided, however*, that the Cash Contribution available to the Acknowledged Creditors shall remain unchanged pursuant to Section 5.02(c). Furthermore, in the event Calyon does not accept the benefits bestowed in its favor pursuant to Section 5.05, Vitro shall not be in a position to offer Calyon a more favorable treatment regarding payment of its indebtedness than the treatment offered to the Acknowledged Creditors under this Agreement.

## SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PORTION AND THE RESTRUCTURING FEE.

Vitro shall be obligated to pay the Cash Contribution and the Restructuring Fee, through electronic wire transfer to the account indicated by each one of the Acknowledged Creditors in a written form pursuant to the forms attached hereto as Exhibit F, or before the court through certified or cash checks.

Vitro must pay the Cash Contribution and the Restructuring Fee and shall issue the New Notes and, in general terms consummate the Restructuring ("Consummate the Restructuring") provided for in this Agreement no later than (15) fifteen calendar days following the date in which the publication in the lists of the court where the *concurso mercantil* proceeding is taking place becomes effective, of the resolution issued by the Judge approving this Agreement (notwithstanding existing recourses or appeals pending of resolution), or the immediate following business day in the event case the effective date falls on a non-business day (the "Closing Date"), unless:

a)  There is a court order or decree granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring, as set forth in this Agreement; or

b)  There is a recourse or appeal which, if resolved against Vitro, may invalidate this Agreement as approved by the Judge and within the fifteen (15) calendar days following the date on which the resolution approving this Agreement has become effective, the majority of the Acknowledged Creditors vote in favor of extending the Consummation Date, in which case the Closing Date shall be extended to the earlier of (A) the date in which the recourse or appeal is resolved in final and non-amendable form and (B) ten (10) months starting as of the date on which the resolution approving this Agreement becomes effective (in either case, the "Extended Closing Date").

For the avoidance of doubt, in the event that the recourse or appeal mentioned in paragraph (b)(i) is still pending and the majority of the Acknowledged Creditors vote against the extension of the Closing Date, then Vitro shall Consummate the Restructuring no later than the Closing Date notwithstanding such recourse or appeal. Likewise, in the event the majority of the Acknowledged Creditors vote in favor of extending the Closing Date, but such recourse or appeal is not resolved before the Extended Closing Date, then Vitro shall Consummate the Restructuring within five (5) calendar days following the Extended Closing Date or the immediately following business day if such date falls on a non-business day (except in the event that a judicial order or decree has been issued granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring).

## SEVENTH. CURRENCY.

According to the last paragraph of Article 159 of the LCM, the claims will subsist in the same currency in which they were originally agreed.

**EIGHTH. FURTHER DOCUMENTS.**

The parties agree to take any necessary actions to ratify the terms of this Agreement, once approved by the Judge, and any other agreement derived therefrom, including the Restructuring Instruments, at the latest at the Closing Date.

Vitro shall be obligated to make and cause all of the Guarantors to agree to the terms of this Agreement, once approved by the Judge, and the Restructuring Instruments pursuant to what is set forth in the Description of the Notes, through their signature to the Restructuring Instruments.

**NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.**

Given the nature of this Agreement and the objectives of the *concurso* proceeding, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, this Agreement and the Restructuring Instruments issued by Vitro thereto, novate, substitute and extinguish the prior obligations, indentures, instruments, documents, agreements and guarantees in which the Acknowledged Claims were stipulated or agreed upon, and also extinguishes the personal guarantees that were granted by third parties and/or Vitro's direct or indirect subsidiaries with respect to the obligations, instruments, documents and agreements from which the Acknowledged Claims arose.

The Acknowledged Creditors shall hereby expressly acknowledge and approve the waiver of the difference between the face amount of the Acknowledged Claims and the New Debt resulting from this Agreement, and, as a consequence of the execution of this Agreement, grant Vitro and its guarantors the fullest release with respect to such original claims, and as of the date of the judicial approval of this Agreement, only the New Debt, in the terms set forth in this Agreement shall survive.

**TENTH. BINDING EFFECT.**

Pursuant to the provisions of the LCM, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, it shall be mandatory to Vitro and to all the Acknowledged Creditors, including those Remaining Creditors who, through absence or explicit rejection, have not executed this Agreement.

**ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.**

The consent granted by the Executing Creditors with regards to this Agreement, as well as by the Adhering Creditors that execute this Agreement, shall be irrevocable and binds any transferee of the same, and any successor and/or assignee of the same from the moment in which this Agreement was executed; therefore, in the event there is any assignment or transfer of the claims of such creditors, the assignees, successors and/or transferees by any cause or title or reason, are bound irrevocably by the terms of this Agreement; *provided, however,* that the Executing Creditors and the Adhering Creditors that execute this Agreement, must ratify this Agreement in the event of amendments or modifications to the Agreement which breach or contravene the terms and conditions set forth herein, or in the event such changes or amendments materially affect any of the Executing Creditors or Adhering Creditors or any of their interests or rights as set forth herein.

**TWELFTH. PATRIMONY.**

In terms of article 2964 of the Federal Civil Code, Vitro responds for the compliance of its obligations under this Agreement with its entire patrimony.

**THIRTEENTH. MANAGEMENT AND SURVEILLANCE.**

During the *concurso mercantil* proceedings, Vitro will continue its ordinary course of business, and shall maintain management and administration of its assets under the surveillance of the court through the

*Conciliador*, as well as during the term referred to in Clause Sixth of this Agreement, in which case surveillance will be the responsibility of its corresponding corporate entities.

**FOURTEENTH.  CONTINUANCE.**

Vitro agrees that during the *concurso mercantil* proceedings it shall comply with its operational obligations and activities in which it is involved, in order to secure the continuance of its corporate existence.

**FIFTEENTH.  EQUAL TREATMENT.**

This Agreement is intended, and shall be always construed in such manner, to provide equal treatment to all the Acknowledged Creditors.

**SIXTEENTH.  *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.**

The execution of this Agreement by the Executing Creditors implies the execution, acceptance and consent of such Executing Creditors with respect to the *concurso mercantil* petition to be filed by Vitro to be considered as a prepackaged restructuring plan, pursuant to what is set forth in Title Fourteen of the LCM.

Subject to the condition precedent that this Agreement be approved by the Judge pursuant to Article 164 of the LCM, the Executing Creditors and those who execute this Agreement in the future, agree and irrevocably consent to each and every one of the clauses stated herein regarding claims against Vitro which each of them holds and are indicated in the signature pages of this Agreement or the ones which result in their favor in the Debt Acknowledgement Judgment.

**SEVENTEENTH.  NULLITY.**

If for any reason any of the clauses of this Agreement is deemed invalid, such circumstance shall only affect that clause and the rest of the terms and conditions herein shall survive in its terms.

**EIGHTEENTH.  APPLICABLE LAW.**

This Agreement shall be governed by the LCM and other applicable laws pursuant to Article 8 of the LCM.

**NINETEENTH.  JURISDICTION AND VENUE.**

The parties that execute this Agreement and those who agree and consent to its execution in the future pursuant to Articles 161 and 162 of the LCM, agree that construction, compliance and enforcement of this Agreement will be subject to the exclusive jurisdiction of the H. District Judge which shall rule over the Vitro *concurso mercantil* proceeding.

**TWENTIETH.  HEADINGS.**

The headings of the clauses of this Agreement are merely for reference and do not affect its content.

This Agreement is signed by Vitro and the Executing Creditors, as well as by the Recognized Creditors that consent to it, on the date which appears on each signature page.

[*REST OF THE PAGE WAS INTENTIONALLY LEFT BLANK*]

A-17

Signature page of the Vitro Restructuring Agreement.

VITRO, S.A.B. DE C.V.

By: _____
    Name:
    Title:
    Date:

Signature page of the Vitro Restructuring Agreement.

Credit:

     2012 Notes

          Note Number:     [    ]
          Nominal Value:    [    ]

     2013 Notes

          Note Number:     [    ]
          Nominal Value:    [    ]

     2017 Notes

          Note Number:     [    ]
          Nominal Value:    [    ]

     Cebures Vitro 03

          Certificate Number:   [    ]
          Nominal Value:    [    ]

     Cebures Vitro 08

          Certificate Number:   [    ]
          Nominal Value:    [    ]

Other credits:

     Identification:          [    ]

[Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgement Judgment in favor of the Creditor's name which is indicated below.]

_____

[CREDITOR NAME]

Represented by:  _____
          Name:
          Title:
          Date:

**EXHIBIT LIST**

| | |
|---|---|
| **Exhibit "A"** | List of Executing Creditors. |
| **Exhibit "B"** | Public instrument which contains the power of attorney of the legal representative of Vitro. |
| **Exhibit "C"** | Public instrument which contains the power of attorney of the legal representatives for the Executing Creditors. |
| **Exhibit "D"** | Description of the Notes, attached in English form, accompanied by its Spanish translation. |
| **Exhibit "E"** | Irrevocable Management and Payment Trust Number 986 dated September 8, 2010. |
| **Exhibit "F"** | Form of Cash Payment and Restructuring Fee. |
| **Exhibit "G"** | Form of Voting Trust. |

A-20

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

| **Content** | **Page** |
|---|---|
| Independent auditors' report | F-2 |
| Consolidated balance sheets | F-4 |
| Consolidated statements of operations | F-6 |
| Consolidated statement of changes in financial position | F-7 |
| Consolidated statements of cash flows | F-9 |
| Consolidated statements of changes in stockholders' equity | F-11 |
| Notes to consolidated financial statements | F-12 |

F-1

**Independent Auditors' Report**

To the Board of Directors and Stockholders of Vitro, S.A.B. de C.V.
Garza García, N. L., Mexico

We have audited the accompanying consolidated balance sheets of Vitro, S.A.B. de C.V. and subsidiaries (the Company) as of December 31, 2008 and 2009, and the related consolidated statements of operations and changes in stockholders' equity for each of the three years in the period ended December 31, 2009, the consolidated statement of changes in financial position for the year ended December 31, 2007 and the consolidated statements of cash flows for the years ended December 31, 2008 and 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in Mexico. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement and that they are prepared in accordance with Mexican Financial Reporting Standards. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the financial reporting standards used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

For the years ended December 31, 2008 and 2009, the Company incurred net losses of Ps. 5,682 million and Ps. 754 million, respectively, and one of its business units, which represented 29% of consolidated operating income in 2007 and 11% in 2008, incurred an operating loss in 2009. Additionally, the Company was not in compliance with covenants related to its long-term debt obligations and has received notices of acceleration from its bondholders. As a result, the Company has presented its long-term debt that is currently callable by its creditors as short-term, which has resulted in current liabilities significantly exceeding current assets. As disclosed in Notes 10 and 23 to the accompanying consolidated financial statements, the Company continues to operate normally as it works to achieve its financial restructuring with its creditors. The accompanying financial statements do not include the effects that could result if Company ´s plans are unable to be realized.

As disclosed in note 3 a) to the accompanying consolidated financial statements, the Company adopted the following new Mexican Financial Reporting Standards, which impacted its financial position and results of operations; in 2008: NIF B-2, Statement of Cash Flows; NIF B-10, Effects of Inflation; NIF D-3, Employee Benefits and NIF D-4, Income Taxes. In 2009: NIF B-8, Consolidated or Combined Financial Statements; NIF C-8, Intangible Assets and D-8, Share-based Payments.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Vitro, S.A.B. de C.V. and subsidiaries as of December 31, 2008 and 2009, the results of their operations and changes in their stockholder's equity for each of the three years in the period ended December 31, 2009, as well as changes in their financial position for the year ended December 31, 2007 and their cash flows for the years ended December 31, 2008 and 2009, in conformity with Mexican Financial Reporting Standards.

Our audits also comprehended the translation of the Mexican peso amounts into U.S. dollar amounts and, in our opinion, such translation has been made in conformity with the basis stated in note 2 a). The translation of the financial statement amounts into U.S. dollars and the translation of the financial statements into English have been made solely for the convenience of readers.

Galaz, Yamazaki, Ruiz Urquiza, S.C.
Member of Deloitte Touche Tohmatsu Limited

C.P.C. Jorge Alberto Villarreal González

September 27, 2010

F-2

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | December 31, | | Millions of US dollars (Convenience Translation) December 31, 2009 |
|---|---|---|---|
| | 2008 | 2009 | |
| **Assets** | | | |
| Cash and cash equivalents | Ps. 1,428 | Ps. 2,616 | US$ 200 |
| Trade receivables, net | 4,301 | 3,201 | 245 |
| Taxes receivable | 589 | 146 | 11 |
| Other receivables | 1,485 | 961 | 74 |
| Inventories, net | 4,178 | 3,172 | 243 |
| Current assets | 11,981 | 10,096 | 773 |
| | | | |
| Investment in associated company | 996 | 886 | 68 |
| Land and buildings, net | 8,051 | 6,774 | 519 |
| Machinery and equipment, net | 7,890 | 8,001 | 612 |
| Construction in progress | 1,332 | 563 | 43 |
| Goodwill | 771 | 721 | 55 |
| Deferred taxes | 3,418 | 4,515 | 346 |
| Other assets | 1,335 | 1,096 | 84 |
| Long-term assets | 23,793 | 22,556 | 1,727 |
| | | | |
| | Ps.35,774 | Ps.32,652 | US$ 2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

|  |  |
|---|---|
| Hugo A. Lara García | Claudio L. Del Valle Cabello |
| Chief Executive Officer | Chief Financial and Administrative Officer |

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | December 31, 2008 | December 31, 2009 | Millions of US dollars (Convenience Translation) December 31, 2009 |
|---|---|---|---|
| Liabilities | | | |
| Short-term borrowings | Ps. 2,309 | Ps. 1,680 | US$ 129 |
| Current maturities of long-term debt | 16,887 | 16,517 | 1,265 |
| Trade payables | 2,356 | 1,595 | 122 |
| Accrued expenses | 589 | 713 | 54 |
| Derivative financial instruments | 3,777 | 3,328 | 255 |
| Interest payable | 735 | 2,428 | 186 |
| Other current liabilities | 2,410 | 1,319 | 101 |
| Current liabilities | 29,063 | 27,580 | 2,112 |
| | | | |
| Long-term debt | 2,866 | 1,904 | 146 |
| Employee benefits | 461 | 66 | 5 |
| Deferred taxes | 11 | | |
| Taxes payable | | 850 | 65 |
| Other long-term liabilities | 265 | 268 | 20 |
| Long-term liabilities | 3,603 | 3,088 | 236 |
| Total liabilities | 32,666 | 30,668 | 2,348 |
| Commitments and contingencies (note 12) | | | |
| | | | |
| Stockholders' equity | | | |
| Capital stock: no par value, 386,857,143 shares issued and outstanding in 2008 and 2009 | 387 | 387 | 30 |
| Restatement of capital stock | 7,245 | 7,245 | 555 |
| Restated capital stock | 7,632 | 7,632 | 585 |
| Treasury stock (40,204,310 in 2008 and 2009) | (547) | (547) | (42) |
| Additional paid-in capital | 1,761 | 1,645 | 126 |
| Translation effects of foreign subsidiaries | 402 | 370 | 28 |
| Accumulated deficit | (7,544) | (8,580) | (657) |
| Controlling interest | 1,704 | 520 | 40 |
| Noncontrolling interest in consolidated subsidiaries | 1,404 | 1,464 | 112 |
| Total stockholders' equity | 3,108 | 1,984 | 152 |
| Total liabilities and stockholders' equity | Ps.35,774 | Ps.32,652 | US$ 2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Operations**
(Millions of Mexican pesos, except per share amounts)

| | 2007 | 2008 | 2009 | Millions of US dollars (Convenience Translation) December 31, 2009 |
|---|---|---|---|---|
| | | Year ended December 31, | | |
| Net sales | Ps.$28,591 | Ps.29,013 | Ps.23,991 | US$ 1,837 |
| Cost of sales | 20,187 | 21,279 | 17,180 | 1,316 |
| Gross profit | 8,404 | 7,734 | 6,811 | 521 |
| Selling, general and administrative expenses | 5,700 | 6,024 | 5,482 | 420 |
| Operating income | 2,704 | 1,710 | 1,329 | 101 |
| Total comprehensive financing result | 1,660 | 9,077 | 2,366 | 181 |
| Income (loss) after financing cost | 1,044 | (7,367) | (1,037) | (80) |
| Other expenses, net | 869 | 495 | 291 | 22 |
| Equity in earnings (losses) of associated company | | 5 | (24) | (2) |
| Income (loss) before taxes | 175 | (7,857) | (1,352) | (104) |
| Income tax expense (benefit) | 44 | (2,175) | (598) | (47) |
| Net income (loss) for the year | Ps. 131 | Ps (5,682) | Ps (754) | US$ (57) |
| | | | | |
| Net noncontrolling interest income | Ps. 144 | Ps. 24 | Ps. 33 | US$ 3 |
| Net controlling interest loss | (13) | (5,706) | (787) | (60) |
| | Ps. 131 | Ps.(5,682) | Ps. (754) | US$ (57) |

Earnings (losses) per common share (based on weighted average shares
outstanding of 341,042,193 for 2007, 342,834,251 for 2008 and
346,652,833 for 2009):

| | 2007 | 2008 | 2009 | |
|---|---|---|---|---|
| Income (loss) per share | Ps. 0.38 | Ps.(16.57) | Ps. (2.17) | US$ (0.17) |
| Noncontrolling interest income | (0.42) | (0.07) | (0.10) | (0.01) |
| Net controlling interest loss | Ps. (0.04) | Ps.(16.64) | Ps. (2.27) | US$ (0.18) |

The accompanying notes are an integral part of these consolidated financial statements.

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statement of Changes in Financial Position**
(Millions of Mexican pesos)

| | Year ended December 31, 2007 |
|---|---|
| Operating activities: | |
| Net income from continuing operations | Ps. 131 |
| Add (deduct) non-cash items: | |
| Depreciation and amortization | 1,414 |
| Provision for employee benefits | 261 |
| Early extinguishment of employee benefits | 97 |
| Amortization of debt issuance costs | 170 |
| Loss from sale of subsidiaries and associated companies | 11 |
| Impairment of long-lived assets | 122 |
| Loss from sale of long-lived assets | 47 |
| Mark-to market of derivative financial instruments | 216 |
| Deferred taxes and workers' profit sharing | (351) |
| | 2,118 |
| Increase in trade receivables | (81) |
| Increase in inventories | (308) |
| Increase in trade payables | 243 |
| Change in other current assets and liabilities | 174 |
| Employee benefits | (472) |
| Net resources generated by operating activities | 1,674 |
| | |
| Financing activities: | |
| Proceeds from short-term bank loans | 2,602 |
| Proceeds from long-term bank loans | 14,289 |
| Amortization in real terms of bank loans | (611) |
| Payment of short-term bank loans | (4,864) |
| Payment of long-term bank loans | (9,459) |
| Debt issuance costs | (293) |
| Dividends paid to stockholders of Vitro [1] | (136) |
| Dividends paid to noncontrolling interest | (79) |
| Purchase of treasury stock | (1) |
| Other financing activities | 487 |
| Net resources generated by financing activities | 1,935 |
| | |
| Investing activities: | |
| Investments in land, buildings, machinery and equipment | (2,695) |
| Proceeds from sale of land, buildings, machinery and equipment | 72 |
| Restricted cash | (88) |

F-6

| | Year ended December 31, 2007 |
|---|---:|
| Investment in subsidiaries | (181) |
| Proceeds from sale of subsidiaries and associated companies | 37 |
| Other long-term assets | (36) |
| Deferred charges | (302) |
| Net resources used in investing activities | (3,193) |
| Net increase in cash and cash equivalents | 416 |
| | |
| Balance at beginning of year | 1,222 |
| Balance at end of year | Ps. 1,638 |

---

(1)   This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Cash Flows**
(Millions of Mexican pesos)

| | Year ended December 31, | | Millions of US dollars (Convenience Translation) |
| --- | --- | --- | --- |
| | 2008 | 2009 | 2009 |
| **Operating activities:** | | | |
| Loss before income taxes | Ps.(7,857) | Ps.(1,352) | US$ (104) |
| Items related to investing activities: | | | |
| Depreciation and amortization | 1,469 | 1,473 | 113 |
| Gain from sale of long-lived assets | (3) | (209) | (16) |
| Impairment and retirement of long-lived assets | 196 | 207 | 16 |
| Foreign exchange loss | 79 | 6 | 0 |
| Interest income | (58) | (51) | (4) |
| Equity in (income) loss of associated company | (5) | 24 | 2 |
| Items related to financing activities: | | | |
| Amortization of debt issuance costs | 55 | 80 | 6 |
| Derivative financial instruments | 3,766 | 570 | 44 |
| Foreign exchange loss (gain) | 3,655 | (1,177) | (90) |
| Interest expense | 2,092 | 2,750 | 211 |
| Increase (decrease) for: | | | |
| Trade receivables | (101) | 1,049 | 80 |
| Inventories | (19) | 871 | 67 |
| Trade payables | (317) | (587) | (45) |
| Other current assets and liabilities | (93) | 381 | 29 |
| Employee benefits | 88 | (397) | (30) |
| Income taxes (paid) recoverable | (211) | 358 | 27 |
| Net cash provided by operating activities | 2,736 | 3,996 | 306 |
| | | | |
| **Investing activities:** | | | |
| Investments in machinery and equipment | (1,798) | (1009) | (77) |
| Proceeds from sale of machinery and equipment | 20 | 1,410 | 108 |
| Investment in subsidiaries, net of cash acquired | (63) | (454) | (35) |
| Other assets | 332 | 18 | 1 |
| Deferred charges | (262) | (174) | (13) |
| Interest received | 60 | 54 | 4 |
| Net cash used in investing activities | (1,711) | (155) | (12) |
| | | | |
| **Excess cash to be applied to financing activities** | 1,025 | 3,841 | 294 |
| | | | |
| **Financing activities:** | | | |
| Proceeds from (payments of) short-term bank loans | Ps. 1,058 | Ps. (15) | US$ (1) |
| Interest paid | (2,044) | (943) | (72) |
| Dividends paid to stockholders of Vitro, S.A.B. de C.V. [(1)] | (143) | | |
| Dividends paid to noncontrolling interest | (131) | (14) | (1) |
| Issuance of capital stock to noncontrolling interest | 22 | | |
| Proceeds from long-term bank loans | 1,976 | 1,559 | 119 |
| Payments of long-term bank loans | (1,020) | (2,468) | (189) |
| Sale of treasury stock | 75 | | |
| Debt issuance costs | (63) | (11) | (1) |
| Derivative financial instruments | (1,138) | (824) | (63) |
| Other financing activities | (36) | 5 | 0 |
| Net cash used in financing activities | (1,444) | (2,711) | (208) |

F-8

| | Year ended December 31, | | Millions of US dollars (Convenience Translation) |
| --- | --- | --- | --- |
| | 2008 | 2009 | 2009 |
| Net (decrease) increase in cash and cash equivalents | (419) | 1,130 | 86 |
| Adjustment to cash flows due to exchange rate fluctuations | 93 | 1 | 0 |
| Deconsolidation of subsidiary | (105) | | |
| Cash and cash equivalents: | | | |
| At the beginning of year (includes restricted cash of Ps. 526 and Ps. 304 at December 31, 2008 and 2009, respectively) | 2,163 | 1,732 | 133 |
| At the end of year (includes restricted cash of Ps. 304 and Ps. 247 at December 31 2008 and 2009, respectively) | Ps. 1,732 | Ps. 2,863 | US$ 219 |

[1]    This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F-9

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**
(Millions of Mexican pesos)

| | Restated capital stock | Treasury stock and additional paid-in capital | Shortfall in restatement of capital | Other reserves(1) | Translation effect of foreign subsidiaries | Retained earnings (accumulated deficit) | Noncontrolling interest | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| **Balance at January 1, 2007** | Ps. 7,632 | Ps. 1,816 | Ps. (21,090) | Ps.(2,302) | | Ps. 21,418 | Ps. 1,892 | Ps. 9,366 |
| Dividends (Ps. 0.37 per share)(2) | | | | | | (136) | | (136) |
| Decrease in noncontrolling interest | | | | | | | (57) | (57) |
| Purchase of treasury stock | | (1) | | | | | | (1) |
| Comprehensive income | | | (64) | 166 | | (13) | 125 | 214 |
| **Balance at December 31, 2007** | 7,632 | 1,815 | (21,154) | (2,136) | | 21,269 | 1,960 | 9,386 |
| Reclassification for adoption of new Mexican Financial Reporting Standards | | | 21,154 | 2,136 | | (22,964) | | 326 |
| Dividends (Ps. 0.40 per share)(2) | | | | | | (143) | | (143) |
| Decrease in noncontrolling interest | | (676) | | | | | (815) | (1,491) |
| Sale of treasury stock | | 75 | | | | | | 75 |
| Comprehensive loss | | | | | Ps. 402 | (5,706) | 259 | (5,045) |
| **Balance at December 31, 2008** | 7,632 | 1,214 | 0 | 0 | 402 | (7,544) | 1,404 | 3,108 |
| Effect in retained earnings of cancellation of preoperating costs | | | | | | (12) | (1) | (13) |
| Effect of liability related to Mexican Tax Reform | | | | | | (237) | | (237) |
| Increase in noncontrolling interest | | (116) | | | | | 106 | (10) |
| Comprehensive loss | | | | | (32) | (787) | (45) | (864) |
| **Balance at December 31, 2009** | Ps. 7,632 | Ps. 1,098 | Ps. 0 | Ps. 0 | Ps. 370 | Ps. (8,580) | Ps. 1,464 | Ps. 1,984 |

(1) Includes the initial cumulative effect of deferred tax and the additional minimum liability related to employee benefits.

(2) This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
For the years ended December 31, 2007, 2008 and 2009
*(Millions of Mexican pesos, except per share amounts)*

1. **Activities of the Company**

   Vitro, S.A.B. de C.V. (Vitro or the Company) is a Mexican holding company, and together with its subsidiaries serves multiple product markets, including construction and automotive glass; food and beverage, wine, liquor, cosmetics and pharmaceutical glass containers. Vitro's subsidiaries also produce raw materials and equipment and capital goods for industrial use which are vertically integrated into the Glass Containers business unit.

2. **Basis of presentation and principles of consolidation**

   a) *Basis of presentation*

      The accompanying consolidated financial statements of Vitro and its subsidiaries (the Company) are prepared on the basis of Mexican Financial Reporting Standards (NIFs or MFRS) as of the date of these consolidated financial statements.

      The consolidated financial statements and notes as of December 31, 2009 and 2008 and for the years then ended, include balances and transactions denominated in Mexican pesos of different purchasing power, while those as of December 31, 2007 and for the year ended December 31, 2007 are presented in Mexican pesos of purchasing power of December 31, 2007; consequently, they are not comparable.

      Additionally, solely for the convenience of users, the consolidated financial statements as of and for the year ended December 31, 2009, have been translated into United States of America (US) dollars at the rate of Ps. 13.0587 per dollar, the rate of exchange determined by the Banco de México (Mexico's Central Bank) as of December 31, 2009. Such arithmetical translation should not be construed as a representation that the peso amounts shown could be converted into US dollars at such rate or at any other rate.

      In the consolidated financial statements and these notes, references to pesos or "Ps." correspond to Mexican pesos, and references to dollars or "US$" correspond to dollar of the United States of America (the United States).

   b) *Consolidated subsidiaries*

      Those companies and special purpose entities in which Vitro either, directly or indirectly, controls are included in the consolidated financial statements. For those companies in which Vitro has joint control, the proportionate consolidation method is used. This method consists of consolidating on a proportionate basis the assets, liabilities, stockholders' equity and revenues and expenses. All significant intercompany balances and transactions have been eliminated in consolidation.

      The investment in associated company is valued under the equity method (see note 20 d).

      At December 31, 2009, the main subsidiaries the Company consolidates in each reportable segment and its percentage of share ownership, directly or indirectly, are as follows:

F-11

| FLAT GLASS | GLASS CONTAINERS | CORPORATE |
|---|---|---|
| Viméxico, S.A. de C.V. (91.80%) | Vitro Envases Norteamérica, S.A. de C.V. (100%) | Vitro Corporativo, S.A. de C.V. (100%) |
| Vidrio y Cristal del Noroeste, S.A. de C.V. (91.80%)(1) | Fabricación de Máquinas, S.A. de C.V. (100%) | Aerovitro, S.A. de C.V.(100%) |
| Vitro Flotado Cubiertas, S.A. de C.V. (91.80%) | Compañía Vidriera, S.A. de C.V. (100%) | Clinica Vitro, A.C.(100%) |
| Vidrio Plano de México, S.A. de C.V. (91.80%) | Vidriera Monterrey, S.A. de C.V. (100%) | American Assets Holding, Co. (100%) |
| Vitro Flex, S.A. de C.V. (91.80%) | Vidriera Guadalajara, S.A. de C.V. (100%) | |
| Cristales Automotrices, S.A. de C.V. (46.81%) | Vidriera Los Reyes, S.A. de C.V. (100%) | |
| Vitro Colombia, S.A. (91.80%) | Vidriera Querétaro, S.A. de C.V. (100%) | |
| Vitro America, LLC. (100%) | Vidriera Toluca, S.A. de C.V. (100%) | |
| Vitro Cristalglass, S.L. (99.29%)(2) | Vitro Packaging, LLC. (100%) | |
| Vitro Chaves Industria de Vidro, S.A. (59.57%) | Vitro Packaging México, S. A. de C.V. (100%) | |
| Vitro Automotriz, S.A. de C.V. (99.92%) | Industria del Álcali, S.A. de C.V. (100%) | |
| Vitro Vidrio y Cristal, S.A. de C.V. (99.99%) | Vidrio Lux, S.A. (100%) | |
| Productos de Valor Agregado en Cristal, S.A. de C.V. (55%) (3) | | |

(1) In July 2007, Viméxico acquired the remaining 50% of the outstanding shares of Vitro AFG, S.A. de C.V. (Vitro AFG) from AFG Industries Inc. (AFG Industries), in order to assume control and increase its ownership to 100%, subsequently changing its legal name to Vidrio y Cristal del Noroeste, S.A. de C.V. (see note 20 b).

(2) In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated (see note 20 c).

(3) In August 2007, Vitro Vidrio y Cristal, S.A. de C.V. (Vitro VyC) acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. (PVA) (see note 20 a).

c)  *Translation of financial statements from foreign subsidiaries*

To consolidate financial statements of foreign subsidiaries, the accounting policies of the foreign entity are first converted to MFRS. The financial statements are subsequently translated to Mexican pesos considering the following methodologies:

Beginning in 2008, foreign operations whose functional currency is the same as their local currency translate their financial statements to Mexican pesos (the Company's reporting currency) using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for assets and liabilities; 2) historical exchange rates for stockholders' equity, revenues, costs and expenses. Through 2007, the financial statements of foreign subsidiaries that operated independently of the Company recognized the effects of inflation of the country in which they operate and were then translated to Mexican pesos using the closing exchange rate in effect at the balance sheet date. In 2007, 2008 and 2009, translation effects are recorded in stockholders' equity.

Beginning in 2008, foreign operations with a functional currency different from the local currency translate their financial statements from the local currency to the functional currency, using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for monetary assets and liabilities; 2) historical exchange rates for non-monetary assets and liabilities and stockholders' equity; and 3) the rate on the date of accrual of revenues, costs and expenses, except those arising from non-monetary items that are translated using the historical exchange rate for the related non-monetary item. Translation effects are recorded within comprehensive financing result. Subsequently, to translate the financial statements from the functional currency to Mexican pesos, the methodology described in the preceding paragraph is used.

Recording and functional currencies of foreign subsidiaries are as follows:

| Companies in: | Recording Currency | Functional Currency |
|---|---|---|
| United States of America | Dollar | Dollar |
| Europe | Euro | Euro |
| Central and South America | Local | Dollar |

d)  *Comprehensive income (loss).* - Represents changes in stockholders' equity during the year, for concepts other than distributions and activity in contributed common stock, and is comprised of the net income (loss) of the year, plus other comprehensive income (loss) items of the same period, which are presented directly in stockholders' equity without affecting the consolidated statements of operations. Other comprehensive income (loss) items consist of the translation effects of foreign subsidiaries and, until 2007, the shortfall in restatement of capital and the additional minimum labor liability adjustment.

e)  *Classification of costs and expenses.* - Costs and expenses presented in the consolidated statements of operations were classified according to their function which allows for the analysis of the Company's gross margin.

f)  *Income from operations.* - The Company continues to present operating income in the statements of operations as it is an important financial indicator within the industry and helps to evaluate the Company's performance. Operating income includes ordinary income and cost of sales as well as operating costs. This presentation is comparable with the one used in the consolidated financial statements as of December 31, 2007 and 2008.

**3.   Summary of significant accounting policies**

The accompanying consolidated financial statements have been prepared in conformity with MFRS, which require that management make certain estimates and use certain assumptions that affect the amounts reported in the financial statements and their related disclosures; however, actual results may differ from such estimates. The Company's management, upon applying professional judgment, considers that estimates made and assumptions used were adequate under the circumstances. Some of the significant items subject to this estimates and assumptions include the carrying amounts of land, building, machinery and equipment, intangible assets, goodwill, estimates of valuation of account receivables, inventory, deferred income tax assets, valuation of financial instruments and employee benefits liabilities. The significant accounting policies of the Company are as follows:

a)   *Changes in accounting policies*

Beginning January 1, 2008 and 2009, the Company adopted the following new NIF´s; consequently the accompanying consolidated financial statements are not comparable.

**For Fiscal Year 2008**

- *NIF B-2, Statement of cash flows* (NIF B-2) - Supersedes Bulletin B-12, *Statement of changes in financial position*. NIF B-2 permits the presentation of such statement using either the direct or the indirect method; the Company elected the indirect method. The statement of cash flows is presented in nominal pesos. According to NIF B-2, this standard should be recognized prospectively; consequently, the Company presents a consolidated statement of cash flows for the years 2008 and 2009, and consolidated statement of changes in financial position for 2007.

- *NIF B-10, Effects of inflation* (NIF B-10) - Considers two economic environments: a) an inflationary environment, where cumulative inflation over a three-year period is 26% or more, in which case, the effects of inflation need to be recognized, and b) non-inflationary environment, where inflation is less than 26% in the same period, in which case, the effects of inflation may not be recognized in the financial statements. Also, NIF B-10 eliminates the replacement cost and specific index valuation methods and requires that the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non-monetary assets be reclassified to retained earnings, except for the gain (loss) from holding non-monetary assets that is identified with inventories or fixed assets that have not been realized as of the effective date of this standard. Such amounts should be maintained in stockholders' equity and realized within current earnings of the period in which such assets are depreciated or sold. The Company determined it was impractical to identify the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non-monetary assets relating to unrealized assets as of January 1, 2008; therefore, on that date, the Company reclassified the entire balance of shortfall in restatement of capital of Ps. 21,154 to retained earnings. NIF B-10 establishes that this accounting change be recognized prospectively.

Since cumulative inflation over the three fiscal years prior to those ended December 31, 2008 and 2009 was 11.56% and 14.34%, respectively, the environment in which the Company operates is no longer inflationary, and the Company discontinued recognition of the effects of inflation in its financial statements beginning January 1, 2008. However, assets, liabilities and stockholders' equity at December 31, 2008 and 2009 include restatement effects recognized through December 31, 2007.

- *NIF D-3, Employee benefits* (NIF D-3) - Incorporates current and deferred statutory employee profit sharing (PTU) as part of its provisions and establishes that deferred PTU must be determined using the asset and liability method established in NIF D-4, *Income Taxes*, instead of only considering temporary differences that arise in the reconciliation between the accounting result and income for PTU purposes. This change did not have effect in the Company's financial position.

Additionally, as of December 31, 2008, NIF D-3 removed the recognition of the additional minimum liability, which resulted in the elimination of Ps. 796, of which Ps. 338 was related to the intangible labor obligation asset and Ps. 458 was related to the additional minimum labor obligation in stockholders' equity.

F-14

Additionally, Ps. 42 and Ps. 38 were recognized in earnings for the years ended December 31, 2008 and 2009, respectively, for unamortized items as of December 31, 2007.

NIF D-3 also incorporates the career salary concept in the actuarial calculation and limits the amortization period of the following items to the lesser of five years or the employee's remaining labor life:

(i)    The beginning balance of the transition liability for termination and retirement benefits.

(ii)    The beginning balance of prior service costs and plan modifications.

(iii)    The beginning balance of actuarial gains and losses from retirement benefits.

- *NIF D-4, Income taxes* (NIF D-4) - Eliminated the permanent difference concept; clarifies and incorporate certain definitions, and required that the balance of the initial cumulative effect of deferred income taxes of Ps. 1,810 be reclassified to retained earnings.

**For Fiscal Year 2009**

- *NIF B-8, Consolidated or combined financial statements* - Establishes that special purpose entities, over which control is exercised, should be consolidated. Provided certain requirements are met, it allows the option to present stand-alone financial statements of intermediate controlling companies and requires that potential voting rights be considered to analyze whether control exists.

As a result of the analysis performed due to the requirements noted above, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated financial statements (see note 10). The condensed amounts and the effect on the balance sheet as of December 31, 2008 resulting from the retrospective application of the standard, as well as comparative presentation as of December 31, 2009 is as follows:

| | December 31, 2008 As Presented | Debit (Credit) | December 31, 2008 As Restated | December 31, 2009 |
|---|---|---|---|---|
| Other receivables | Ps. 1,255 | Ps. 230* | Ps. 1,485 | Ps. 90 |
| Trade receivables | 1,492 | 2,809 | 4,301 | 1,058 |
| Retained undivided interests in securitized receivables | 1,213 | (1,213) | | |
| Short-term borrowings | (1,601) | (708) | (2,309) | (845) |
| Interests payable | (728) | (7) | (735) | (3) |
| Long-term debt | (1,755) | (1,111) | (2,866) | (300) |

---

*    Represents restricted cash presented in other accounts receivable.

- *NIF C-8, Intangible assets* — Establishes the following significant amendments:

(i)    The intangible asset concept is redefined, establishing that the separability condition is not the only condition needed to be identified.

(ii)    Establishes that the acquisition cost must be considered in the initial valuation, identifying the cases of an individual business acquisition or internally arising business, and requiring that it be probable that future economic benefits must flow to the entity.

(iii)    Establishes that subsequent disbursements on research and development projects in progress must be recognized as expenses when accrued, if they are part of the research phase, or, as an intangible asset, if they meet the criteria to be recognized as such.

(iv)    The assumption that an intangible asset could not exceed its useful life of twenty years was eliminated.

As a result of adopting this NIF in 2009, the unamortized balance as of December 31, 2008 of capitalized preoperating costs of Ps. 13 net of income tax was written off against retained earnings.

- *NIF D-8 Share-based payments* - Eliminates the supplemental condition of International Financial Reporting Standard (IFRS) No. 2, Share-based payments, and establishes the same recognition requirements for share-based payment arrangements. The adoption of this new NIF did not impact the Company's financial position or results of operations, as the Company adopted the requirements of IFRS 2 as of its effective date.

b)   *Changes in accounting estimates*

Due to the sale of certain plots of land of its subsidiaries in December 2009, the Company revised the estimated useful life of the assets built on such land to a maximum of 15 years, which is equivalent to the term in the lease agreement for such plots of land. The Company recognized the change in estimate prospectively, which impacted current period earnings by Ps. 26.

c)   *Recognition of the effects of inflation*

As mentioned in a) above, beginning January 1, 2008, the Company discontinued the recognition of the effects of inflation. Until December 31, 2007, the Company recognized effects of inflation by adjusting its financial statements in terms of pesos with the purchasing power of the date the balance sheets was presented.

Vitro's Mexican subsidiaries previously used the Indice Nacional de Precios al Consumidor (Mexican National Consumer Price Index, or NCPI), published by Banco de Mexico to restate the financial statements. For Vitro's foreign subsidiaries the Consumer Price Index - All Urban Consumers - All Items, Unadjusted (CPI) published by the US Labor Department was previously used to restate the financial statements, and the restated financial statements were translated into Mexican pesos using the applicable exchange rate at the end of the last period presented, except in the case of the Company's subsidiaries located in Spain for which it applied the Price Consumption Index (PCI), published by the National Institute of Statistics of Spain before translation into Mexican pesos using the exchange rate of the Euro of the last period presented.

Through December 31, 2007, such recognition resulted mainly in inflationary gains or losses on non-monetary and monetary items that are presented in the financial statements under the following two captions:

- *Shortfall in restatement of capital* − This item, which is an element of stockholders' equity, represents the accumulated effect of holding nonmonetary assets and the effect of the initial monetary position gain or loss. The cumulative effect of holding nonmonetary assets represents the increase between the specific values of nonmonetary assets in excess of or below the increase attributable to general inflation.

- *Monetary position result* − Monetary position result reflects the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decrease in purchasing power over time. This means that losses are incurred by holding monetary assets, whereas gains are realized by maintaining monetary liabilities. The net effect is presented in the statements of operations as part of the total comprehensive financing result. For foreign subsidiaries the result from monetary position is calculated using the CPI, except in the case of the Company's subsidiaries located in Spain for which it applies the PCI.

Inflation rates in Mexico for the years ended December 31, 2007, 2008 and 2009, based on the NCPI, are 3.76%, 6.53% and 3.57%, respectively.

F-16

d)  *Cash and cash equivalents*

Consist mainly of bank deposits in checking accounts and readily available investments of highly liquid short-term investments. They are valued at the lower of acquisition cost plus accrued yields or estimated net realizable value and are recognized in results of operations as they accrue.

e)  *Investments in securities*

According to its intent, from the date of acquisition, the Company classifies its investments in securities instruments in any of the following categories: (1) trading, when the Company intends to trade debt and equity instruments in the short-term, before their maturity, if any. These investments are stated at fair value; any fluctuations in the value of these investments are recognized in current earnings; (2) held-to-maturity, when the Company intends to and is financially capable of holding financial instruments until their maturity. These investments are recognized and maintained at amortized cost; and (3) available-for-sale, investments that include those that are classified neither as trading nor held-to-maturity. These investments are stated at fair value; any unrealized gains and losses resulting from valuation, net of income tax, are recorded as a component of other comprehensive income within stockholders' equity and reclassified to current earnings upon their sale or maturity. The monetary position resulting from the effects of inflation on available-for-sale investment is recorded as a component of other comprehensive income. Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

Investments in securities classified as held-to-maturity and available-for-sale are subject to impairment tests. If there is evidence that the reduction in fair value is other than temporary, the impairment is recognized in current earnings.

Financial liabilities derived from the issuance of debt instruments are recorded at the value of the obligations they represent. Any expenses, premiums and discounts related to the issuance of debt financial instruments are amortized over the life of the instruments.

f)  *Derivative financial instruments*

In addition to market, credit and liquidity risks, the Company is exposed to risks such as: natural gas prices, interest rates and foreign exchange currency fluctuations between the peso/US dollar and peso/euro.

The Company has a policy for its derivative financial instruments (DFI) operations, which sets forth the guidelines for the analysis, negotiation, authorization, contracting, operating, monitoring and recording DFI, in order to analyze the risk exposure to financial markets, commodities and fluctuations in the economic and financial variables.

For the risk strategies and the surveillance regarding the compliance of the chosen risk, there is a Risk Committee which acts in compliance with the policy, and which is comprised by various Company officials.

The Company states all derivatives at fair value in the balance sheet, regardless of the purpose for holding them. The recognition of the changes in the fair value of derivative instruments that are designated as a hedge for accounting purposes depends on if they are fair value hedges or cash flow hedges.

Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

When derivatives are entered into to hedge risks, and such derivatives meet all hedging requirements, their designation is documented describing the transaction's objective, characteristics, accounting treatment and how the ineffectiveness of the instrument will be measured.

Changes in the fair value of derivative instruments designated as hedges for accounting purposes are recognized as follows: (1) for fair value hedges, changes in both the derivative instrument and the hedged item are recognized in current earnings; (2) for cash flow hedges, changes in the derivative instrument are

temporarily recognized as a component of other comprehensive income and then reclassified to current earnings when affected by the hedged item. Any ineffective portion of the change in fair value is immediately recognized in current earnings, within total comprehensive financing result.

The Company's derivative financial instruments have not been designated as hedges for accounting purposes. Changes in fair value of such derivative instruments are recognized in current earnings as a component of total comprehensive financing result.

The Company reviews all contracts entered into to identify embedded derivatives that should be segregated from the host contract for purposes of valuation and recognition. When an embedded derivative is identified and the host contract has not been stated at fair value and adequate elements for its valuation exist, the embedded derivative is segregated from the host contract and stated at fair value. Initial valuation and changes in the fair value of the embedded derivatives at the closing of each period are recognized in current earnings.

g)  *Inventories and cost of sales*

Inventories are stated at the average purchase price or at the average production price, without exceeding net realizable value. Cost of sales is determined by applying such average amounts when the inventories are utilized or sold at the time of the sale. Through December 31, 2007, cost of sales was previously restated using replacement cost or the latest production cost at the time of the sale.

h)  *Investment in associated company*

Investment in associated company in which the Company holds 49.7% of its capital stock is valued using the equity method of accounting.

i)  *Land, buildings, machinery and equipment*

Expenditures for land, buildings, machinery and equipment, including major maintenance activities and improvements that extend useful lives, are capitalized and beginning on January 1, 2008, are recorded at acquisition cost. Balances arising from acquisitions made through December 31, 2007 were restated for the effects of inflation by applying factors derived from the NCPI through that date. The initial balance to apply the NCPI was the net replacement value of the Company's long-lived asset as of December 31, 1996. For machinery and equipment purchased in a foreign country, the restatement was based on the inflation index mentioned above and the exchange rate at the end of each period.

Beginning on January 1, 2007, the carrying value of qualifying assets includes the capitalization of total comprehensive financing result (CFR).

Depreciation is calculated using the straight-line method based on the remaining estimated useful lives of the related assets. Depreciation begins in the month in which the asset is placed in service. The estimated useful lives of the assets are as follows:

|  | Years |
|---|---|
| Buildings | 15 to 50 |
| Machinery and equipment | 3 to 30 |

Maintenance and repair expenses are recorded as costs and expenses in the period incurred.

j)  *Other assets*

Other assets primarily include debt issuance costs and the capitalized software costs. They are recorded at acquisition value and, until December 31, 2007, were restated using factors derived from the NCPI. The debt issuance costs are amortized over the term of the related financial liability and capitalized software is amortized over a period of 80 months, which is its expected useful life.

k)   *Impairment of long-lived assets in use*

The Company reviews the carrying amounts of long-lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price. Impairment is recorded when the carrying amounts exceed the greater of the amounts mentioned above. The impairment indicators considered for these purposes are, among others, the operating losses or negative cash flows in the period if they are combined with a history or projection of losses, depreciation and amortization charged to results, which in percentage terms in relation to revenues are substantially higher than that of previous years, obsolescence, reduction in the demand for the products manufactured, competition and other legal and economic factors.

l)   *Provisions*

Provisions are recognized for current obligations that result from a past event, that are probable to result in the use of economic resources, and can be reasonably estimated.

m)   *Goodwill*

Goodwill represents the excess of cost over fair value of subsidiaries as of the date of acquisition and at least once a year is subject to impairment tests. Through December 31, 2007 it was restated using the NCPI. The Company recognizes goodwill corresponding to the controlling interest and beginning in 2009, the noncontrolling interest.

n)   *Employee benefits*

Direct employee benefits are calculated based on the services rendered by employees, considering their most recent salaries. The liability is recognized as it accrues.

Seniority premiums, pension plans and severance payments are recognized as costs over the expected service period of employees and are calculated by independent actuaries using the projected unit credit method, using nominal interest rates beginning in 2008 and real (inflation-adjusted) interest rates through 2007.

o)   *Share-based payment plans*

The Company has historically utilized equity incentive plans that permit the Company to grant stock options and nonvested shares (equity awards) to certain employees and directors of the Company. The Company recognizes the fair value of equity awards computed at the award's grant date over the period in which the requisite service is rendered.

p)   *Foreign currency balances and transactions*

Foreign currency transactions are recorded at the applicable exchange rate in effect at the transaction date. Monetary assets and liabilities denominated in foreign currency are translated into Mexican pesos at the applicable exchange rate in effect at the balance sheet date. Exchange fluctuations are recorded as a component of net comprehensive financing cost in the consolidated statements of operations.

q)   *Revenue recognition*

Revenues and related costs are recognized in the period in which risks and rewards of ownership of the inventories are transferred to customers, which generally coincides with the shipment of products to customers in satisfaction of orders.

r)   *Statutory employee profit sharing (PTU)*

Statutory employee profit sharing is recorded in the results of the year in which it is incurred and presented under other income and expenses in the accompanying consolidated statement of operations. Beginning in 2008 deferred PTU is derived from temporary differences that resulted from comparing the accounting and

F-19

tax basis of assets and liabilities and, through 2007, resulted from comparing the accounting result and income for PTU purposes. Deferred PTU is recognized only when it can be reasonably assumed that such difference will generate a liability or benefit, and there is no indication that circumstances will change in such a way that the liabilities will not be paid or benefits will not be realized.

s)   *Income taxes*

Income taxes, which calculated as the higher of regular income tax (ISR) or the Business Flat Tax (IETU) are recorded in the results of the year they are incurred. To recognize deferred income taxes, based on its financial projections, the Company determines whether it expects to incur ISR or IETU and accordingly recognizes deferred taxes based on the tax it expects to pay. Deferred taxes are calculated by applying the corresponding tax rate to the applicable temporary differences resulting from comparing the accounting and tax bases of assets and liabilities and including, if any, future benefits from tax loss carryforwards and certain tax credits. Deferred tax assets are recorded only when there is a high probability of recovery.

Tax on assets (IMPAC), prevailing until 2007, that were expected to be recoverable are recorded as an advance payment of ISR and presented in the balance sheet increasing the deferred ISR asset.

t)   *Earnings (loss) per share*

Basic earnings (loss) per common share are calculated by dividing consolidated net income (loss) for the controlling interest by the weighted average number of shares outstanding during the year. Diluted earnings per share are determined by adjusting consolidated net income and common shares on the assumption that the entity's commitments to issue or exchange its own shares would be realized. Diluted earnings per share is not presented for periods in which the effect of including common stock equivalents is anti-dilutive or periods in which the Company records a net loss from continuing operations as was the case in 2008 and 2009. In 2007 diluted earnings per share was not presented as it is the same as basic earnings per share.

u)   *Foreign subsidiaries as economic hedges*

The Company's management designated some liabilities as economic hedges of their foreign subsidiaries. The resulting exchange rate fluctuation is presented in the shortfall in restatement of capital within stockholders' equity to the extent the net investment in the foreign subsidiary covers the investment. Through December 31, 2007, the result from monetary position is measured using inflation factors from the designated subsidiary's country of origin. The effect related to this hedge for 2007, 2008 and 2009 was a net (loss) gain to comprehensive income, net of income tax, of Ps. (16), Ps. (601) and Ps. 118, respectively.

**4.   Trade receivable**

a)   *Trade receivables*

Trade receivables are summarized as follows:

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Trade receivables[1] | Ps. 4,713 | Ps. 3,571 |
| Allowance for doubtful accounts and other discounts | (412) | (370) |
|  | Ps. 4,301 | Ps. 3,201 |

---

[1]   Trade receivables include balances of Ps. 2,850 and Ps. 1,609 as of December 31, 2008 and 2009, respectively, which serve as collateral as part of the Company's accounts receivable securitization facilities. Although the related trusts in which they are held are included in the Company's consolidated financial statements, they are legally independent (see Note 3 a).

b)    *Other receivables:*

Other receivables include Ps. 298 and Ps. 218 of restricted cash as of December 31, 2008 and 2009, respectively. This amount includes Ps. 230 and Ps. 90 from the Company's account receivable securitization facilities.

5.    **Inventories**

Inventories are summarized as follows:

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Semi-finished and finished products | Ps.  2,892 | Ps.  2,120 |
| Raw materials | 699 | 474 |
| Packaging materials | 86 | 74 |
| Spare parts | 296 | 243 |
| Refractory | 85 | 94 |
| Merchandise in transit and other | 241 | 318 |
|  | 4,299 | 3,323 |
| Less allowance for obsolescence and slow moving parts | 121 | 151 |
|  | Ps.  4,178 | Ps.  3,172 |

As of December 31, 2009, inventory of Ps. 237 has been provided as a guarantee for certain of the Company's short-term financing transactions.

6.    **Land, buildings, machinery and equipment**

a)    *Land, buildings, machinery and equipment are summarized as follows:*

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Land | Ps.  3,278 | Ps.  2,351 |
| Buildings | 10,801 | 10,589 |
| Less: Accumulated depreciation | 6,028 | 6,166 |
|  | Ps.  8,051 | Ps.  6,774 |
| Machinery and equipment | Ps.24,734 | Ps.25,399 |
| Less: Accumulated depreciation | 16,844 | 17,398 |
|  | Ps.  7,890 | Ps.  8,001 |

b)    In 2007, 2008 and 2009, the Company capitalized CFR of Ps. 10, Ps. 474 and Ps. 3 respectively, directly attributable to the acquisition of qualifying assets.

c)    *Sale of real estate*

In December 2006, Vitro sold real estate located in Mexico City for US$100 million, 80% payable on the date of sale and the remainder payable on the delivery date of the property.

Vitro guaranteed up to US$80 million in favor of the purchaser payable in the event that the property was not delivered to the purchaser prior to December 2009. As of December 31, 2008, the Company fulfilled all the requirements demanded under the contract. In 2009 the Company received US$5 million and as of the issuance date of these consolidated financial statements is seeking legal remedies for payment of the remaining amount (see note 23 e).

On December 15, 2009, the Company sold, through a trust, seven real estate properties, on which some of its manufacturing facilities are located, receiving US$75 million in the transaction, and has entered into a 15-year lease agreement that allows the Company to continue using such assets. The Company has the right to repurchase the title to these real estate assets in exchange for US$126 million in cash.

Additionally, subject to the occurrence of uncertain future events, the buyer of such properties may exercise an option obtained on the same date requiring the Company to obtain the rights over the trust, and to deliver its own shares and/or a sub-holding subsidiary's common shares. The option related to the representative shares of the Company's stockholders equity, would be from the shares that are currently held by the Pension and Stock Option Trusts and the remainder to complete US$75 million would be fulfilled with the delivery of a percentage of the sub-holding subsidiary ´s shares, both valued under the terms included in the agreement. The Company has the option to repurchase the sub-holding subsidiary's shares during the next three years following their delivery.

d) *Fixed assets contributed to a trust*

In November 2008, the Company, through one of its subsidiaries, contributed non-productive real estate assets with a book value of Ps. 1,875 as of December 31, 2008 to a trust created for the sole purpose to sell such assets, if necessary, in order to generate the necessary resources to pay off the principal from a US$100 million line of credit obtained from a financial institution. As of December 31, 2008 and 2009, the proceeds drawn against the loan were US$85 million and US$68 million, respectively (see note 23 f).

**7. Other assets**

As of December 31, 2008 and 2009, the balance in other assets includes Ps. 808 and Ps. 639, of capitalized software costs, respectively, and Ps. 286 and Ps. 255, of debt issuance costs, respectively, as well as Ps. 6 and Ps. 29 of restricted cash, respectively.

**8. Derivative financial instruments**

Derivative financial instruments have not been designated as hedges because they do not meet all of the requirements according to MFRS and are therefore classified as trading instruments for accounting purposes.

During 2009, no new derivative financial instruments were purchased. As of December 31, 2009, only those derivative instruments whose purpose is to mitigate the risk of increases in the price of natural gas, which were entered into prior to 2009, remain outstanding, as follows:

| Open derivative financial instruments | Notional MMBTUs* | Period | Fair Value Asset (liability) |
|---|---|---|---|
| Natural gas swaps with Pemex | 8,640,000** | 2010 - 2011** | Ps. (191) |
| Embedded derivatives identified in supply contracts[1] | | | 2 |
| Total open derivative financial instruments | | | Ps. (189) |

---

\*     Million British Thermal Units.

\*\*    As of December 31, 2009, the Company has hedges for approximately 32% of its estimated consumption at an average price of approximately US$6.80 per MMBTU for 2010 and 19% of its estimated consumption at an average price of approximately US$7.32 per MMBTU for 2011.

[1]    Included in other receivables

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis was performed applying valuation models fully accepted for these types of instruments, and considering changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately US$5 million.

The following table discloses the derivative financial instruments the Company unwound in 2008:

| Summary of unwound derivative financial instruments | Value of unwound positions (liability) |
| --- | --- |
| Natural gas contracts | Ps.(2,825) |
| Foreign exchange options | (1,556) |
| Interest rate options | 133 |
| Total unwound derivative financial instruments | (4,248) |
| Cash deposited as collateral | 1,111 |
| Total unwound derivative financial instruments, net | Ps.(3,137) |

In the fourth quarter of 2008 the Company's management decided to unwind a majority of its open derivative positions that had been adversely affected due to high volatility experienced in the financial markets, which resulted in a significant devaluation between the peso/US dollar and peso/euro parity, as well as a significant reduction in energy prices.

As of December 31, 2008, certain positions have been unwound for approximately US$325 million and have not been paid. The cash deposited with the third parties as collateral related to these positions is approximately US$85 million (not including interest) and for accounting purposes in accordance with MFRS, is presented net of the derivative financial instruments liability as a right of offset exists.

During February and March of 2009, six out of the seven banks that are counterparties with whom the Company and some of its subsidiaries entered into derivative financial instruments (the Counterparties) have filed law suits in the Supreme Court of the State of New York demanding the payment of US$240 million plus interest and other fees related to the unwound derivative instruments.

The Counterparties have requested that a resolution be sought through the courts by filing a motion for summary judgment. This solution was postponed on various occasions beginning in August 2009 (see notes 23 b and 23 c).

9. **Short-term borrowings**

At December 31, 2008 and 2009, the short-term borrowings denominated in pesos totaled Ps. 308 and Ps. 786, respectively, and at December 31, 2008 and 2009 denominated in US dollars totaled Ps. 1,359 and Ps. 404, respectively, and denominated in euros totaled Ps. 642 and Ps. 490, respectively. During 2009, the Company's weighted average interest rate for short-term borrowings denominated in pesos, US dollars and euros was 11.05%, 10.09% and 4.08%, respectively.

10. **Long-term debt**

Long-term debt consists of the following:

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2009 |
| *I.     Foreign Subsidiaries (payable in US dollars):* | | |
| Unsecured debt, floating interest rate based on Fixed Term Deposits (DTF) plus a spread of 6%, principal payable in several installments through 2013. | Ps.     13 | Ps.     11 |

F-23

| | | December 31, | |
|---|---|---|---|
| | | **2008** | **2009** |
| | Capital lease, with fixed interest rate ranging between 6% and 7.67%, maturing in several installments through 2012. | 12 | 44 |
| *II.* | *Foreign Subsidiaries (payable in euros):* | | |
| | Unsecured debt, interest rate based on EURIBOR plus a margin ranging from 1.10% to 1.25%, with different maturity dates up to 2014. | 57 | 44 |
| | Capital leases, floating interest rate based on EURIBOR, plus a margin ranging from 0.625% to 1.25%, with different maturity dates up to 2014. | 40 | 37 |
| | Fixed interest rate capital leases ranging from 0.84% to 3.84%, with different maturity dates up to 2010. | 11 | 2 |
| *III.* | *Vitro and Mexican Subsidiaries (payable in US dollars):* | | |
| | 11.75% Guaranteed senior unsecured notes due in 2013[1]. | 2,976 | 2,811 |
| | 8.625% Guaranteed senior unsecured notes due in 2012[1]. | 4,120 | 3,898 |
| | 9.125% Guaranteed senior unsecured notes due in 2017[1]. | 9,593 | 9,062 |
| | Secured debt with fixed interest rate of 7.86%, maturing in several installments through 2011 (see note 6 d). | 1,178 | 892 |
| | Capital lease with fixed interest rate of 10.7494%, maturing in several installments through 2016. | 92 | 79 |
| | Unsecured debt, floating interest rate based on LIBOR plus 8%, maturing in several installments through 2014. | | 392 |
| | Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 10.75%, maturing in 2010. | 263 | |
| | Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 6.5%, maturing in 2010. | 298 | |
| *IV.* | *Vitro and Mexican Subsidiaries (payable in Mexican pesos):* | | |
| | Unsecured medium-term notes, floating interest rate based on 182- day Mexican treasury bonds (CETES) plus a spread of 3.25%, payable in 2009. | 150 | 150 |
| | Unsecured medium-term notes, floating interest based on TIIE plus a spread of 2.50%, and maturing in 2011. | 400 | 400 |
| | Secured debt, floating interest rate based on TIIE plus a 4% spread, maturing in several installments through 2014. | | 299 |

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2010. | 550 | |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2014. | | 300 |
| Total long-term debt | 19,753 | 18,421 |
| Less current maturities | 198 | 746 |
| Less reclassification of long-term debt[1] | 16,689 | 15,771 |
| Long-term debt, excluding current maturities of long-term debt | Ps. 2,866 | Ps. 1,904 |

[1] As of December 31, 2008 and 2009, the Company was in default under the indentures governing the Senior Notes due 2012, 2013 and 2017 for US$300 million, US$216 million and US$700 million, respectively; therefore, Ps. 16,689 and Ps. 15,771, respectively, were reclassified as short-term. As a result, as of December 31, 2008, other contracts of approximately US$81 million with maturity in 2009, entered into default, of which US$52 million were refinanced.

As of December 31, 2009, the interest rates of EURIBOR, CETES, TIIE, LIBOR and DTF were 1.24%, 4.61%, 8.74%, 0.25% and 4.11%, respectively.

The schedule of contractual principal payments of long-term debt as of December 31, 2009 is as follows:

| Year ending December 31, | | |
|---|---|---|
| 2011 | Ps. | 864 |
| 2012 | | 142 |
| 2013 | | 139 |
| 2014 | | 752 |
| 2015 and thereafter | | 7 |
| | | Ps. 1,904 |

The Company is continuing discussions with the Counterparties, its bondholders and its creditors to achieve an organized financial restructuring to improve its financial position. The Company maintains its normal operations as it seeks to achieve a restructuring of its indebtedness (see notes 23 a and 23 c). In addition, the Company has adopted cost reduction initiatives throughout its entire organization, while optimizing production capacity according to its actual level of operation. Also, the Company has significantly reduced its capital expenditures for 2009 and future years.

In May 2009 the Company received notification of an executive mercantile trial initiated by Scotia Bank Inverlat, Casa de Bolsa, S.A. de C.V. Grupo Financiero Scotia Inverlat in its capacity as common representative for the holders of Certificados Bursátiles with the ticker symbol "VITRO 03" demanding payment of Ps. 150.3 plus interest. Evidence and pleas were heard during September and October 2009. At that time the court ruled that the plaintiff had wrongfully conducted this proceeding and therefore, the process would have to be handled as an ordinary mercantile trial. In October 2009, the judge made a definitive ruling against Vitro, and sentenced it to pay the disputed amount plus interest, therefore, the Company filed an appeal against this ruling, requesting that the proceedings begin again, to cancel the liens, to reverse the ruling and to pronounce judgment against the plaintiff and order payment of legal expenses. During April 2010, the appeals court granted Vitro its petition and revoked the decision of the lower court and invalidated the proceedings and ordered the parties to begin the case again.

F-25

In July 2009 the Company and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its character as creditor demanding the payment of US$15 million plus interest. During September and October 2009 hearings ended on the evidence and pleas. In October 2009 a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010 the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010 the Court of Appeals accepted one of the appeals being revised, because it had merits due to violation of certain defense rights and order to restart the proceeding to gather evidence by the Company, leaving without effects the first instance judgment and the appeal without merits.

11. **Employee benefits**

*a)* The Company has a defined benefit pension plan that covers all its personnel, which consists of a lump sum payment or a monthly pension calculated based on the aggregate of a basic pension, an additional seniority pension and an additional pension for equal or less earnings than the ceiling used for the Mexican Social Security Institute.

The retirement ages are as follows:

- Normal. - Personnel that are 65 years old with 20 or more years of service.

- Advanced. - Personnel that are 60 years old with a minimum of 20 or more years of service, reducing the pension by a percentage point each year before reaching 65 years of age.

- Early. - Personnel that are 50 years old with 10 or more years of service, reducing the pension by a percentage according to the age at the moment of retirement.

- Aggregate of 100. - With the approval of the Technical Committee, personnel whose aggregate age and years of service is 100.

- Deferred. - Personnel who do not accept retirement upon becoming 65 years old lose all the rights to receive a pension from the plan.

This plan also provides seniority premium benefits, which consist of a lump sum payment of 12 days' wage for each year worked, calculated using the most recent salary, not to exceed twice the legal minimum wage established by law, as well as severance payments, which consists of a three month and twenty days wage payment for each year served. The related liability and annual cost of such benefits are calculated by an independent actuary on the basis of formulas defined in the plans using the projected unit credit method.

*b)* The present values of these obligations and the rates used for the calculations are:

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Vested benefit obligation | Ps. 2,514 | Ps. 3,052 |
| Nonvested benefit obligation | 486 | 446 |
| Defined benefit obligation | 3,000 | 3,498 |
| Plan assets at fair value | (684) | (1,140) |
| Unfunded status | 2,316 | 2,358 |
| Unrecognized items: | | |
| Prior service costs and plan amendments | (222) | (163) |
| Unrecognized transition obligation | (138) | (125) |
| Unrecognized actuarial gains and losses | (1,495) | (2,004) |
| Projected net liability | Ps. 461 | Ps. 66 |

F-26

At December 31, 2008 and 2009 the plan assets presented above, includes 53.3 million Vitro shares.

Assumptions

|  | December 31, | |
|  | 2008 | 2009 |
|---|---|---|
| Discount rate | 10.25% | 9.50% |
| Expected rate of return on plan assets | 12.25% | 10.50% |
| Rate of compensation increase | 3.50% | 3.50% |

*c)*  Net periodic cost consists of:

|  | Year ended December 31, | | |
|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Service cost | Ps.     96 | Ps.     143 | Ps.     81 |
| Interest cost | 149 | 268 | 287 |
| Amortization of unrecognized prior service costs | 56 | 72 | 68 |
| Actuarial gains and losses | 48 | 177 | 91 |
| Effect of reduction and early liquidation | 97 | | |
| Expected yield on plan assets | (88) | (166) | (82) |
| Net periodic cost | Ps.     358 | Ps.     494 | Ps.     445 |

Certain unrecognized items as of December 31, 2007 are being amortized to results of operations within a maximum period of 5 years or the employee's remaining service life, if less. Through December 31, 2007, these items were amortized to results of operations based on the employee's average remaining labor life. Starting in 2008, unrecognized items incurred from January 1, 2008 are amortized to results of operations based on the employees' average remaining service lives, which is between 10 and 16 years. This change represented a charge to current earnings of Ps. 42 and Ps. 38 in 2008 and 2009, respectively.

*d)*  Changes in present value of the defined benefit obligation:

|  | Year ended December 31 | |
|  | 2008 | 2009 |
|---|---|---|
| Present value of the defined benefit obligation as of January 1 | Ps.  3,319 | Ps.  3,000 |
| Service cost | 143 | 81 |
| Interest cost | 268 | 287 |
| Benefits paid | (526) | (431) |
| Actuarial (gain) loss | (112) | 561 |
| Deconsolidation of Comegua | (92) | |
| Present value of the defined benefit obligation as of December 31 | Ps.  3,000 | Ps.  3,498 |

*e)*  Changes in fair value of plan assets:

F-27

|  | Year ended December 31, | |
| --- | --- | --- |
|  | **2008** | **2009** |
| Fair value of plan assets as of January 1 | Ps. 1,548 | Ps. 684 |
| Expected return | 166 | 82 |
| Actuarial losses | (912) | (39) |
| Contributions made by the Company | 140 | 774 |
| Benefits paid | (258) | (361) |
| Fair value of plan assets as of December 31 | Ps. 684 | Ps. 1,140 |

Classification of plan assets as of December 31, 2009:

|  | Expected Yield | Actual Yield |
| --- | --- | --- |
| Capital instruments (Vitro A shares) | 13.00% | 3.00% |
| Other | 8.67% | 4.42% |

The rate of return on the plan assets is determined using a composition of 42% of Vitro's shares and 58% in investments in securities.

## 12. Commitments and contingencies

*a)*  In October 2000, several subsidiaries of Vitro, which have facilities throughout Monterrey, Mexico and the Mexico City area, entered into a 15-year energy purchase agreement for approximately 90 Megawatts of electricity and 1.3 million tons of steam per year with Tractebel Energía de Monterrey, S. de R.L. de C.V.

*b)*  The Company has several non-cancelable operating lease agreements for the rent of warehouses and equipment. Rental expense for the years ended December 31, 2007, 2008 and 2009 was Ps. 541, Ps. 646 and Ps. 794, respectively.

Future minimum lease payments under these agreements are as follows:

| | |
| --- | --- |
| 2010 | Ps.861 |
| 2011 | 809 |
| 2012 | 714 |
| 2013 | 664 |
| 2014 | 620 |
| 2015 and thereafter | 626 |

*c)*  As part of the disposal of Anchor Glass Containers Corporation (Anchor) in August 1996, in a transaction approved by the U.S. Bankruptcy Court, the Company entered into a term sheet which contemplated an agreement pursuant to which the Company would provide to the Pension Benefit Guaranty Corporation (PBGC), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets New Anchor. The amount of the guaranty was originally limited to US$70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semi-annual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionally reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by US$7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

F-28

On April 15, 2002, New Anchor filed a pre-negotiated plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated, and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

On June 20, 2003, the PBGC wrote to the Company, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of US$219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than US$122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of the Company's limited guaranty had occurred. Accordingly, to such letter, the PBGC demanded payments pursuant to the term sheet of US$7 million on or before August 1, 2003 and of US$3.5 million semiannually through August 1, 2011. The Company intends to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by the Company. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, the Company will establish an appropriate accounting reserve. As of this date, the Company has not established any reserves in connection with such potential liability.

d) On December 2006, Viméxico (formerly Vitro Plan) concluded at an extraordinary shareholders' meeting to approve the merger of Vitro Plan into Viméxico, which was a creditor of Vitro Plan. As a result of the merger, all assets, rights, liabilities and obligations of Vitro Plan were absorbed by Viméxico. Prior to the merger, Vitro Plan was a direct 65%-owned subsidiary of Vitro and Pilkington Group LTD (Pilkington) owned the remaining 35%. As a result of the merger, Viméxico became a 91.8%-owned subsidiary of Vitro and Pilkington the owner of the remaining 8.2%.

Although the merger became entirely effective once all the respective authorizations were obtained and having prepared all the respective acts, publications and registrations, Pilkington, who voted against such approval, began a legal procedure in January 2007 against the merger. In February 2008 in first instance, in June 2008 in second instance, and finally in February 2009, the protection requested by Pilkington was denied. The Company was notified that the opposing action exercised by Pilkington was declared unprecedented in a final and unappealable sentence with respect to the resolutions approved by the majority at the extraordinary general stockholders' meeting in December 2006. Thus, the foregoing resolutions were confirmed as valid and mandatory for all stockholders, including those dissenting.

However, in the first week of December 2007, the Company was notified of a new complaint filed by Pilkington, claiming the annulment of such extraordinary general stockholders' meeting. This position goes against the claims sustained in the first trial and was filed after Pilkington specifically desisted from this action after the first trial. Accordingly, Vitro also expects to obtain a favorable resolution from this claim. In this proceeding all evidence and allegations were submitted and the Company is awaiting the final ruling.

e) On June 23, 2008, the Company initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A. and Citigroup, requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by-laws.

According to the Company's by-laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire Vitro shares. Such by-laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares.

A cautionary measure was granted by the court to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure, nonetheless it was not possible to implement.

F-29

In January 2010 a district judge ruled in favor of Banamex. Vitro is contesting the irregular purchase of these shares amounting to 14.9% of its common stock outstanding. The Company has submitted its appeal in a timely and correct manner to this sentence issued by a lower court.

On August 18, 2010, the Appeals Court issued a resolution denying the recourse presented by Vitro opposing the decision issued by the lower court. At this time, Vitro is preparing to present a final appeal through an "Amparo" against the decision issued by the Appeals Court.

### 13. Foreign currency operations

*a)*  At December 31, 2009, the foreign currency denominated assets and liabilities of the Company's Mexican subsidiaries consist of the following:

|                     | Millions of dollars | Mexican pesos |
|---------------------|---------------------|---------------|
| Monetary assets     | US$  227            | Ps.  2,969    |
| Inventories         | 16                  | 209           |
| Fixed assets        | 194                 | 2,533         |
| Monetary liabilities| 1,817               | 23,729        |

*b)*  Foreign currency operations of the Company's Mexican subsidiaries for the year ended December 31, 2009, consisted of the following:

|                      | Millions of dollars | Mexican pesos |
|----------------------|---------------------|---------------|
| Exports              | US$484              | Ps.6,568      |
| Imports              | 183                 | 2,487         |
| Interest expense, net| 159                 | 2,158         |

*c)*  The condensed financial information of the principal foreign subsidiaries of the Company at December 31, 2009, consisted of the following:

|                         | United States | Central and South America | Europe   |
|-------------------------|---------------|---------------------------|----------|
| Net sales               | Ps.6,834      | Ps.624                    | Ps.1,506 |
| Operating income (loss) | (148)         | 96                        | (190)    |
| Total assets            | 1,948         | 718                       | 2,525    |
| Total liabilities       | 875           | 188                       | 1,317    |
| Capital expenditures    | 82            | 8                         | 10       |

*d)*  The exchange rates of the Mexican peso against the US dollar and the Euro, used for purposes of the Company's consolidated financial statements at the following dates were:

|                   | US dollar | Euro      |
|-------------------|-----------|-----------|
| December 31, 2007 | Ps.10.8662| Ps.15.9526|
| December 31, 2008 | 13.8325   | 19.2534   |
| December 31, 2009 | 13.0587   | 19.5789   |

On September 27, 2010, the exchange rate was Ps. 12.5168 per US dollar and     Ps. 16.8539 per Euro.

**14. Stockholders' equity**

*a)* The capital stock of the Company consists of 386,857,143, ordinary, nominative, fully paid common shares, without par value, at December 31, 2008 and 2009.

*b)* The Company maintains an Employee Stock Option Plan established in March 1998 (the Plan). The Plan specifies the amount of shares, time and initial exercise price. The vesting period of the options is five years and the life of such options is 10 years.

The following table summarizes the activity relating to the Plan:

| Options | 2000 | 2001 | 1998* | 2002 | Total Outstanding |
|---|---|---|---|---|---|
| Options granted | 4,851,900 | 3,204,800 | 940,950 | 3,941,950 | |
| Options cancelled or exercised at December 31, 2009 | 3,986,950 | 2,827,950 | 478,050 | 3,208,150 | |
| Options outstanding at December 31, 2009 | 864,950 | 376,850 | 462,900 | 733,800 | 2,438,500 |
| Exercise price | Ps.   11.00 | Ps.   8.27 | Ps.   13.00 | Ps.   7.53 | |

---

* During the year 2001, the Company modified the price of the 940,950 options granted in 1998 and its maturity date to 2011.

The closing price of the Company's shares on the BMV on December 31, 2009 was Ps. 8.24.

The estimated fair value of the options was made on the grant date using the Black-Scholes option-pricing model.

*c)* At December 31, 2008 and 2009, the Company held 40,204,310 of treasury shares, which includes 11,739,741 and 39,758,810 shares held by the Stock Option Trust (see note 14 b) at December 31, 2008 and 2009, respectively.

*d)* Retained earnings include the statutory legal reserve. Mexican General Corporate Law requires that at least 5% of net income of the year be transferred to the legal reserve until the reserve equals 20% of capital stock at par value (historical pesos). The legal reserve may be capitalized but may not be distributed unless the entity is dissolved. The legal reserve must be replenished if it is reduced for any reason. At December 31, 2008 and 2009, the legal reserve, in historical pesos, was Ps. 72.

*e)* Stockholders' equity, except restated paid-in capital and tax retained earnings, will be subject to income tax at the rate in effect when a dividend is distributed. Any tax paid on such distribution may be credited against annual and estimated income taxes of the year in which the tax on dividends is paid and the following two fiscal years.

At December 31, 2009, the majority interest stockholders' equity tax account, corresponding to the contributed capital account and the net tax income account was Ps. 2,513 and Ps. 2,375, respectively.

*f)* Dividends declared and paid:

| Stockholders' meeting date | Dividend Amount | | Payment Date |
|---|---|---|---|
| | Nominal Value | Restated Value | |
| March 28, 2007 | Ps. 133 | Ps. 136* | April 2007 |
| April 17, 2008 | 143 | 143 | May 2008 |

\*     This amount is restated for inflationary effect until December 31, 2007.

      During 2009 no dividends were paid.

    *g)*    Noncontrolling interest in consolidated subsidiaries consists of the following:

| | December 31 | |
|---|---|---|
| | 2008 | 2009 |
| Capital stock | Ps. 457 | Ps. 443 |
| Paid in capital | 616 | 736 |
| Translation effects of foreign subsidiaries | 235 | 155 |
| Retained earnings | 96 | 130 |
| | Ps. 1,404 | Ps. 1,464 |

    *h)*    Controlling interest consists of the following:

| | December 31, 2009 | | |
|---|---|---|---|
| | Value | Restatement* | Value |
| Capital stock | Ps. 387 | Ps. 7,245 | Ps. 7,632 |
| Treasury stock | (223) | (324) | (547) |
| Paid-in capital | 355 | 1,290 | 1,645 |
| Translation effects of foreign subsidiaries | 370 | | 370 |
| (Accumulated deficit) retained earnings | (11,144) | 2,564 | (8,580) |
| | Ps.(10,255) | Ps. 10,775 | Ps. 520 |

\*     Amounts are restated for inflationary effect until December 31, 2007.

**15.  Total comprehensive financing result**

    The following represents a summary of the Company's total comprehensive financing result for the periods presented:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2007** | **2008** | **2009** |
| Interest expense on debt denominated in US dollars | Ps. 1,698 | Ps. 1,703 | Ps. 1,847 |
| Interest expense on debt denominated in pesos | 130 | 157 | 300 |
| Interest income | (175) | (58) | (51) |
| Derivative financial instruments | 201 | 3,766 | 570 |
| Exchange loss (gain) | 94 | 3,222 | (976) |
| Gain from monetary position | (471) | | |
| Other financing expenses, net | 183 | 287 | 676 |
| | Ps. 1,660 | Ps. 9,077 | Ps. 2,366 |

16. **Other expenses (income), net**

The following represents a summary of the Company's other expenses (income), net for the periods presented:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2007** | **2008** | **2009** |
| Restructuring charges | Ps. 7 | Ps. 185 | Ps. 265 |
| Impairment of long-lived assets | 122 | 196 | 207 |
| (Gain) loss from sale of long-lived assets | 47 | (3) | (209) |
| (Gain) loss from sale of subsidiaries | 11 | | |
| Early extinguishment of employee retirement obligations | 97 | 69 | |
| Fees and costs for extinguishment of debt | 488 | | 7 |
| Statutory employee profit sharing | 54 | 10 | 13 |
| Other | 43 | 38 | 8 |
| | Ps. 869 | Ps. 495 | Ps. 291 |

17. **Tax loss carryforwards**

At December 31, 2009, tax loss carryforwards consist of the following:

| | Tax loss carryforwards | |
|---|---|---|
| **Expiration Year** | **Controlling interest** | **Noncontrolling interest** |
| 2010 | Ps. 106 | Ps. 4 |
| 2011 | 280 | 1 |
| 2012 | 466 | 1 |
| 2013 | 156 | |
| 2014 | 421 | |
| 2015 | 132 | |
| 2016 | 266 | 1 |
| 2017 | 111 | |
| 2018 | 962 | 59 |
| 2019 | 1,601 | 51 |
| | Ps. 4,501 | Ps. 117 |

18.  **Income and asset taxes**

*a)*  In accordance with the Mexican tax law, the Company in 2008 and 2009 is subject to ISR and IETU. Until 2007, the Company was subject to ISR and IMPAC.

ISR.- The Company pays ISR, together with subsidiaries on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. The ISR rate is 28% for 2007, 2008 and 2009, and, based on changes to the ISR Law on December 7, 2009, will be 30% for 2010 to 2012, 29% for 2013 and 28% for 2014 and subsequent years.

The foreign subsidiaries calculate their ISR based on the individual results of each subsidiary pursuant to the specific tax regimes in each country.

Within the amendments to the ISR Law of 2009, to become effective beginning in 2010, states that: a) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015, and b) ISR relating to tax benefits obtained in the 2005 tax consolidation and thereafter, should be paid during the sixth through the tenth year after that in which the benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained from 1982 (tax consolidation starting year) through 1998 may be required in those cases provided by law.

The effects in the financial information, resulting from the approval of changes to the ISR Law related to the consolidation regime resulted in a decrease in shareholders' equity within retained earnings of $237, an increase of $564 in deferred tax assets and $85 in recoverable taxes, and an increase in taxes payable of $886 (including $36 payable in the short term).

IETU.- On January 1, 2008, the IETU went into effect. IETU applies to the sale of goods, the provision of independent services and the granting of use or enjoyment of goods, according to the terms of the IETU law, less certain authorized deductions. Revenues, as well as deductions and certain tax credits, are determined based on cash flows generated beginning January 1, 2008. The IETU law establishes that the IETU rate will be 16.5% in 2008, 17.0% in 2009, and 17.5% in 2010 and subsequently. Similarly, the IMPAC Law was repealed upon enactment of the IETU Law, however, under certain circumstances, IMPAC paid in the ten years prior to the year in which ISR is paid, may be refunded, according to the terms of the law. In addition, as opposed to ISR which allows for fiscal consolidation, companies that expect to incur IETU must file individual returns.

Based on its financial projections and according to INIF 8, *Effects of the Business Flat Tax*, the Company determined that it will basically pay ISR. Therefore, it only recognizes deferred ISR.

IMPAC.- Through 2007, the Company paid tax on assets on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. In 2007, IMPAC was calculated by applying 1.25% to the value of the assets of the year, without deducting any debt amounts.

*b)*  The income and asset tax expense (benefit) included in the Company's results are:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2007** | **2008** | **2009** |
| Current | Ps. 395 | Ps.   123 | Ps.   (3) |
| Deferred | (145) | (2,298) | (595) |
|  | 250 | (2,175) | (598) |
| Asset tax | (206) | | |
|  | Ps.   44 | Ps.(2,175) | Ps.(598) |

F-34

c)     Net deferred tax assets presented in the consolidated balance sheets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | **2008** | **2009** |
| Allowance for doubtful accounts | Ps.     42 | Ps.    125 |
| Reserve for employee benefits | 231 | 286 |
| Tax loss carryforwards | 1,201 | 2,550 |
| Intangible asset | 667 | 700 |
| Fixed assets | (18) | (27) |
| Derivative financial instruments | 1,441 | 984 |
| Inventories | 35 | 51 |
| Other | 407 | 185 |
| Total | 4,006 | 4,854 |
| Valuation allowance | (599) | (339) |
| | Ps.  3,407 | Ps.  4,515 |

| | December 31, | |
| --- | --- | --- |
| | **2008** | **2009** |
| Balance: | | |
| Deferred tax assets | Ps.  3,418 | Ps.  4,515 |
| Deferred tax liabilities | (11) | |
| | Ps.  3,407 | Ps.  4,515 |

d)     Following is a reconciliation between the Company's effective income tax rate and the statutory rate:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | **2007** | **2008** | **2009** |
| Effective income tax rate | 25% | 28% | 44% |
| Asset tax presented as income tax | 120 | | |
| Intangible asset | (28) | (2) | |
| Sale of subsidiaries | 8 | | |
| Foreign subsidiaries | (5) | (3) | (6) |
| Effect of inflation | (2) | 4 | 7 |
| Effect of reduction in statutory rate on deferred ISR | | | (1) |
| Valuation allowance | (15) | 4 | (20) |
| Nondeductible expenses | (10) | | 4 |
| Other | (65) | (3) | |
| Statutory income tax rate | 28% | 28% | 28% |

F-35

e) The deferred income tax effect, reduced from the movements in stockholders' equity for insufficiency in restated stockholders' equity, the effect of cancelling preoperating costs, the equity effect of the additional labor liability as well as from the exchange loss capitalized in the translation effect of foreign subsidiaries is presented as follows:

| | Year ended December 31, | | |
| Income tax effect of: | 2007 | 2008 | 2009 |
|---|---|---|---|
| Shortfall in restatement of capital: | Ps. 119 | | |
| Minimum labor liability | (126) | | |
| Effect of cancelling preoperating costs | | | Ps. 6 |
| Translation effects of foreign subsidiaries | | Ps. 234 | (44) |
| | Ps. (7) | Ps. 234 | Ps. (38) |

**19. Related party transactions**

The transactions with related parties, carried out in the ordinary course of business, were as follows:

a) *Arrangements with respect to real estate.-* On certain occasions, until October 2008, the Company used real estate owned by relatives of certain directors and senior managers to meet with customers, suppliers or for other business purposes. The Company paid an annual fee for the right to use these properties for a specified number of days per year. Additionally, it had agreed to pay maintenance and operating costs. In 2007 and 2008, the aggregate amounts paid as annual fees were approximately Ps. 10, and Ps. 8, respectively.

b) *Goods sold.-* The Company sells flat glass products and glass containers to certain companies whose shareholders are directors and senior managers. In 2007, 2008 and 2009, the aggregate amount of these sales was Ps. 69, Ps. 71 and Ps. 56, respectively.

Empresas Comegua, S.A., an associated company, sells glass containers to Cervecería Centroamericana and to Cervecería de Costa Rica, its noncontrolling interest. In 2007, 2008 and 2009, the aggregate amount of these sales was US$9 million, US$20 million and US$12 million, respectively.

c) *Purchase of supermarket coupons.-* The Company purchases supermarket coupons for its employees at a supermarket store in which one member of its board of directors is a shareholder. In 2008 and 2009, the amount of these purchases was Ps. 80 and Ps. 90, respectively.

d) *Sale of real estate.-* In 2007, a member of the Company's Board of Directors, purchased an unused parcel of real estate from one of its subsidiaries. The price of the real estate was US$5.4 million. The Company received several offers for the property and such member of the Board made the highest offer. The transaction was approved by the Company's Audit Committee in accordance with its charter at the time.

e) *Compensation.-* For the years ended December 31, 2007, 2008 and 2009, the aggregate compensation the Company paid to its directors and senior managers was approximately Ps. 273, Ps. 183 and Ps. 229, respectively. This amount includes fees, salaries, the use of certain assets and services, variable compensation and retirement benefits.

**20. Business dispositions and acquisitions**

a) *Acquisition of 55% of the shares of PVA.-* In August 2007, Vitro VyC acquired 55% of the outstanding shares of PVA, a company dedicated to the installation of value added crystal products for Ps. 110. As a

result of the preliminary purchase price allocation, the Company recorded goodwill of Ps. 85 in 2007. During the first half of 2008, pursuant to the guidelines established in NIF B-7, *Business Acquisitions*, the items comprising such goodwill were analyzed further and Ps. 61 was reclassified as an intangible asset.

b)  *Acquisition of 50% of the shares of Vidrio y Cristal del Noroeste, S.A. de C.V. (formerly Vitro AFG).* - In July 2007, Viméxico exercised its option to acquire the remaining 50% of the outstanding shares of Vitro AFG from its joint venture partner AFG Industries, a subsidiary of Asahi Glass Co. Limited (a Japanese company) for a purchase price of US$6 million. In accordance with NIF C-15, *Impairment of Long-Lived Assets and Their Disposal*, the Company recognized an impairment charge of Ps. 91 related to the termination of the joint venture with AFG Industries.

With the closing of this transaction, Viméxico terminated the joint venture and became the sole-owner of this entity, located in Mexicali, Baja California, Mexico, whose primary operations include the manufacturing, processing and distribution of flat glass, thereby increasing Vitro's available production capacity by 78,000 tons on an annual basis.

c)  *Purchase of 40% of Vitro Cristalglass.* - In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527). The difference between the purchase price and the book value resulted in a charge of Ps. 60, recorded in majority stockholders' equity.

In January 2009 a revised payment was agreed upon with the previous partner, by extending it through the 2009-2010 periods, and that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company and that subsequently, there would be a capital reduction.

d)  *Deconsolidation of Empresas Comegua, S.A.* - In November 2008, the Company announced that together with its two Central American partners, decided to modify the corporate by-laws of Comegua regarding the control of its operations. As a result, beginning on that date, the Company now accounts for its 49.7% participation in Comegua under the equity method.

Comegua's relevant data is as follows:

| Condensed consolidated balance sheet: | Year ended December 31, | |
|---|---|---|
| | 2008 | 2009 |
| Assets: | | |
| Cash and cash equivalents | Ps. 74 | Ps. 128 |
| Trade receivables | 775 | 628 |
| Inventories | 505 | 442 |
| Fixed assets and other long-term assets | 2,366 | 2,159 |
| Total assets | 3,720 | 3,357 |
| Liabilities : | | |
| Trade payables | 474 | 538 |
| Short-term borrowings | 389 | 773 |
| Long-term debt and other liabilities | 851 | 264 |
| Total liabilities | Ps. 1,714 | Ps. 1,575 |

| Condensed consolidated income statements:: | Year ended December 31, 2007 | From January 1 to November 30, 2008 | December 2008 | Year ended December 31, 2009 |
|---|---|---|---|---|
| Net sales | Ps. 2,127 | Ps. 2,159 | Ps. 233 | Ps. 2,064 |
| Cost of sales | 1,546 | 1,584 | 163 | 1,369 |

F-37

| Condensed consolidated income statements:: | Year ended December 31, 2007 | From January 1 to November 30, 2008 | December 2008 | Year ended December 31, 2009 |
|---|---|---|---|---|
| Gross profit | 581 | 575 | 70 | 695 |
| Selling, general and administrative expenses | 437 | 449 | 50 | 582 |
| Operating income | 144 | 126 | 20 | 113 |
| Total comprehensive financing result | 30 | 56 | 8 | 95 |
| Other expenses (income), net | 51 | 17 | (2) | 13 |
| Income tax expense | 24 | 23 | 4 | 55 |
| Net income (loss) | Ps.  39 | Ps.  30 | Ps.  10 | Ps.  (50) |

## 21. Business segment data

The accounting policies of the Company's segments are the same as those followed by Vitro. The Company evaluates the performance of its segments on the basis of operating income. Intersegment sales and transfers are accounted for as if the sales and transfers were to third parties, that is, at current market prices.

Vitro's reportable segments are strategic business units that offer different products. The segments are managed separately; each requires different manufacturing operations, technology and marketing strategies; and each segment primarily serves a different customer base.

The Company has two reportable segments: Glass Containers and Flat Glass. The principal products of each of the segments are summarized below:

| Segment | Principal products |
|---|---|
| Glass Containers | Glass containers, sodium carbonate and bicarbonate, capital goods, precision components and molds for glass industry. |
| Flat Glass | Flat glass for the construction and automotive industries. |

Segment data is presented as follows:

| 2007 | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | Ps.14,676 | Ps.13,605 | Ps.   361 | Ps.28,642 |
| Intersegment sales | 37 | 14 | | 51 |
| Consolidated net sales | 14,639 | 13,591 | 361 | 28,591 |
| Operating income (loss) | 2,054 | 782 | (132) | 2,704 |
| Total assets | 17,803 | 13,708 | 2,312 | 33,823 |
| Capital expenditures | 2,328 | 324 | 43 | 2,695 |
| Depreciation and amortization | 870 | 480 | 64 | 1,414 |
| Goodwill | 3 | 870 | | 873 |
| Impairment | 31 | 91 | | 122 |

| 2008 | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | Ps.15,524 | Ps.13,230 | Ps.   342 | Ps.29,096 |
| Intersegment sales | 40 | 43 | | 83 |
| Consolidated net sales | 15,484 | 13,187 | 342 | 29,013 |
| Operating income (loss) | 1,661 | 186 | (137) | 1,710 |
| Total assets | 19,723 | 15,358 | 693 | 35,774 |
| Capital expenditures | 1,538 | 255 | 5 | 1,798 |
| Depreciation and amortization | 897 | 484 | 88 | 1,469 |
| Goodwill | | 771 | | 771 |
| Impairment | | 196 | | 196 |

| 2009 | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated |
|---|---|---|---|---|
| Net sales | Ps.12,452 | Ps.11,453 | Ps.    229 | Ps.24,134 |
| Intersegment sales | 67 | 76 | | 143 |
| Consolidated net sales | 12,385 | 11,377 | 229 | 23,991 |
| Operating income (loss) | 1,956 | (591) | (36) | 1,329 |
| Total assets | 21,878 | 15,029 | (4,255) | 32,652 |
| Capital expenditures | 735 | 264 | 10 | 1,009 |
| Depreciation and amortization | 854 | 575 | 44 | 1,473 |
| Goodwill | | 702 | 19 | 721 |
| Impairment | | 207 | | 207 |

Export sales from Mexico, substantially all of which are denominated in US dollars, are mainly to the United States, Canada and Europe and were as follows (in million of US dollars):

| Year ended December 31, | | |
|---|---|---|
| 2007 | 2008 | 2009 |
| US$601 | US$600 | US$484 |

Certain geographic information about the Company's operations is summarized as follows:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Net sales (1) to customers in: | | | |
| Mexico | Ps.12,008 | Ps.12,831 | Ps.11,152 |
| All foreign countries, mainly the United States, Canada and Europe | 16,583 | 16,182 | 12,839 |
| | Ps.28,591 | Ps.29,013 | Ps.23,991 |

(1)     Net sales are attributed to countries based on the location of the customer.

Consolidated net sales to any single external customer did not exceed more than 8% of Vitro's total consolidated net sales in 2007 and 2008, and 3% in 2009.

Geographical information of land and buildings, machinery and equipment, and construction in progress is summarized as follows:

| | December 31, | | |
|---|---|---|---|
| | 2007 | 2008 | 2009 |
| Land and buildings, machinery and equipment | | | |
| Mexico | Ps.14,960 | Ps.15,816 | Ps.14,062 |
| All foreign countries, mainly the United States, Europe, Central and South America | 2,881 | 1,457 | 1,276 |
| | Ps.17,841 | Ps.17,273 | Ps.15,338 |

F-39

**22. New accounting principles**

As part of its efforts to converge Mexican standards with international standards, during 2009, the Mexican Board for Research and Development of Financial Information Standards (CINIF) issued the following NIFs and Interpretations of Financial Reporting Standards (INIF), applicable to profitable entities, which become effective as follows:

*a)*     For the fiscal year that begin on January 1, 2010:

C-1, *Cash and cash equivalents*
Improvements to NIFs for 2010
INIF 14, *Construction contracts, sale of real property and rendering of related services*
INIF 17, *Service concession contracts*

Some of the most important changes established by these standards are:

*NIF C-1, Cash and cash equivalents*, requires restricted cash and cash equivalents to be included within the cash and cash equivalents caption, as opposed to Bulletin C-1, which required presentation under separate captions; NIF C-1 replaces the caption on-demand temporary investments with the caption on-demand available investments clarifying that this type of investment has a maturity of up to three months from its acquisition date.

*Improvements to NIFs for 2010* - The main improvements generating accounting changes that must be recognized retroactively are:

*NIF B-1, Accounting changes and correction of errors,* requires further disclosures in case the Company applies a particular Standard for the first time.

*NIF B-2, Statement of cash flows,* requires recognition of the effects of fluctuations in exchange rates used for translating cash in foreign currencies, and changes in fair value of cash in the form of precious metal coins, and other cash items, at fair value, in a specific line item.

*NIF B-7, Business acquisitions*, requires recognition of intangible assets or provisions because the acquired business has a contract whose terms and conditions are favorable or unfavorable with respect to market, only when the acquired business is the lessee in an operating lease. This accounting change should be recognized retroactively and not go further than January 1, 2009.

NIF C-7, *Investments in associated companies and other permanent investments*, modifies how the effects derived from increases in equity percentages in an associated company are determined. It also establishes that the effects due to an increase or decrease in equity percentages in associated companies should be recognized under equity in income (loss) of associated companies, rather than in the non-ordinary line item within the statement of income.

NIF C-13, *Related parties,* requires that, if the direct or ultimate controlling entity of the reporting entity does not issue financial statements available for public use, the reporting entity should disclose the name of the closest, direct / indirect, controlling entity that issues financial statements available for public use.

INIF 14, Construction contracts, sale of real property and rendering of related services, is a supplement to Bulletin D-7, Construction and manufacturing contracts for certain capital assets, and requires segregation of the different components of the contracts in order to define whether the contract refers to construction of real property, sale of real property, or rendering related services, and establishes the rules for recognizing revenue and related costs and expenses, based on the different elements identified in the contract. INIF 14 provides guidance for the appropriate use of the percentage-of-completion method for revenue recognition.

INIF 17, *Service concession contracts,* is a supplement to Bulletin D-7, *Construction and manufacturing contracts for certain capital assets*, and establishes that, when the infrastructure of the service concession

contracts falls within the scope of this INIF, it should not be recognized under property, plant and equipment. It also establishes that when the operator renders construction or improvement services, as well as operation services under the same contract, revenues should be recognized for each type of service, based on the fair value of each consideration received at the time the service is rendered. When amounts are clearly identified and, after they are quantified, the applicable revenue recognition criterion should be followed, taking the nature of the service rendered into consideration. Also, INIF 17 establishes that, when the operator renders construction or improvement services, both revenues and the associated costs and expenses should be recognized under the percentage-of-completion method and consideration received, or receivable, should be recognized, initially, at fair value. Revenues from operation services should be recognized as the services are rendered.

*b)*   For the fiscal year that begins on January 1, 2011:

NIF B-5, *Financial segment information,* uses a managerial approach to disclose financial information by segments, as opposed to Bulletin B-5, which also used a managerial approach but required that the financial information be classified by economic segments, geographical areas, or homogeneous client groups. NIF B-5 does not require different risks among business areas to separate them. It allows areas in the preoperating stage to be classified as a segment, and requires separate disclosure of interest income, interest expense and liabilities, as well as disclosure of the entity's information as a whole with respect to products, services, geographical areas and major customers and suppliers. Like the previous Bulletin, this Standard is mandatory only for public companies or companies in the process of becoming public.

At the issuance date of these consolidated financial statements, the Company continues determining the effects of adopting these new standards on its financial information.

*c)*   International financial reporting standards

In January 2009, the Mexican Banking and Securities Commission published amendments to its National Securities Law, making it compulsory for public entities to prepare and present their financial statements using International Financial Accounting Standards beginning 2012 (early adoption is permitted).

At the issuance date of these consolidated financial statements, the Company continues determining the effects of adopting International Financial Accounting Standards as it relates to its consolidated financial statements.

## 23. Subsequent Events

*a)*   Debt

On January 4, 2010, the Company received, from a group of its bondholders, a Notice of Acceleration of payment for the Senior Notes due 2012 and 2017. A minority group of at least twenty five percent of the bond holders may request the Notice of Acceleration, which is considered a standard operating procedure when an issuer is in default. As of the issuance date of these consolidated financial statements, the outstanding principal amount of these Notes is US$1,000 million.

In accordance with the Mexican Bankruptcy Law (Ley de Concurso Mercantil), if more than thirty five percent of a company's outstanding obligations are past due, the company itself, any creditor or the public ministry could request that the company declare bankruptcy.

On April 12, 2010, the Company announced that it received a document on letterhead of the U.S. Bank National Association, which serves as trustee of the Senior Notes due 2013, entitled "Notice of Default and Acceleration" referenced to the 2013 Notes. The outstanding principal amount of these Notes, as of the issuance date of these consolidated financial statements, is US$216 million.

In August, 2010 the Company refinanced the credit lines in euros from its subsidiary in Spain, Vitro Cristalglass, S.L., extending the term for three years from the agreement signature in amount of 44.8 million euros.

*b)* Derivative financial instruments

On April 12, 2010 the judge of the Supreme Court of the State of New York issued a ruling regarding the request for summary judgment made by Vitro's counterparties in financial derivatives transactions. The judge granted Vitro's counterparties' motions as to liability only and denied them as to the amounts sought by said counterparties, finding that the financial institutions had not provided sufficient and reasonable detail to verify the methods and accuracy of their calculations. The Court then referred the issue of damages to a Special Referee for further proceedings and recommendation to the Court, and held the motions for summary judgment in abeyance pending receipt of the report of the recommendations of the Special Referee.

On June 7, 2010, the Company reached agreements to settle the amount related to DFIs. Vitro reached an agreement to settle the amount related to derivative financial instruments ("DFIs") with Calyon, London Branch ("Calyon"). In addition, on September 6, 2010 the Company reached a settlement agreement with Fintech Investments Ltd. ("Fintech"), the firm that recently acquired the DFIs claims, previously owned by Credit Suisse International, Deutsche Bank AG, London Branch, Merrill Lynch Capital Services, Citibank, N.A., Barclays Bank, PLC and Cargill, Incorporated.

The amount of the settlement agreed with Calyon and Fintech is US$67.3 MM and US$190.0 MM, including interest for US$3.9 and US$13.6, respectively, recognized by the Company.

As a result of these settlements, all of the lawsuits related with the DFIs have been dismissed.

*c)* Status or the Restructuring process

As part of Company's debt restructuring discussions with creditors (see note 10), the Company has presented a restructuring counterproposal (the "Counterproposal") to representatives of certain holders of Senior Notes, The Counterproposal for the restructuring includes the Senior Notes and other impaired debt.

While the proposal was not accepted, in order to reach a consensual restructuring agreement, the Company is working on a consent solicitation statement.

The Company believes that the proposal included in the Consent will assure the sustainability of the Company and significantly enhancing the worthiness of its restructured debt. Additionally, the Company believes that the proposal represents a higher recovery than the average market price for the last six months of the senior notes due 2012, 2013 and 2017.

The Company continues to negotiate with the Ad Hoc Bondholder Committee in an effort to secure their support of the Consent in advance of its launch but there can be no assurances that such support will be achieved.

*d)* Natural disasters

In April 2010, the Company ´s flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies

On July 1, 2010, manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Float glass manufacturing and automotive processing facilities and facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. In particular:

- of four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, the Company was able to minimize the impact for original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- Two of three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July;

however, its operations were temporarily suspended due to stability issues and it resumed operations again in the last week of August; the other affected facility is expected to resume operations in October; float glass facility in Mexicali, which is currently operating at 100% capacity, is temporarily supplying glass to its OEM glass processing plants; and

- Facilities at Álcali suspended operations for a few days and a portion of Álcali's end-product, raw material and packaging inventories were damaged; however, the Company was able to minimize the impact on its clients by working jointly to supply only the minimal amount necessary for them to continue operating.

The Company has not yet determined the full impact on its operating results of the damage caused by Hurricane Alex. The Company expects such damages will be covered by insurance less any applicable deductibles; however, it can provide no assurance as to the amount and timing of such recovery.

e) Receivable from sale of real estate

On August 16, 2010, final decision in first instance was issued in which it absolved the purchaser of the real estate sold by the Company of the remaining payment claimed. The Company has filed an appeal against the decision, which is pending to be resolved. The Company and its legal counsel believe it has sufficient evidence to obtain a favorable final ruling on this issue (see note 6 c).

f) On August 24, 2010, the Company finalized the sale of non-productive properties, amounting to US $63.8 million. The resources of such sale, and US$5.5 million was contributed in addition by the Company, were intended to pay a debt that is owed to a trust (see note 6 d), by paying in full the balance of US $69.3 million to that date and therefore recovering the property of their two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

**24. Authorization of financial statements issuance**

On September 27, 2010, the issuance of the consolidated financial statements was authorized by Hugo A. Lara García, Chief Executive Officer and Claudio L. Del Valle Cabello, Chief Financial and Administrative Officer.

These consolidated financial statements are subject to approval at the ordinary stockholders' meeting, who may modify the financial statements, based on provisions set forth by the Mexican General Corporate Law.

Requests for assistance in completing and delivering any Letter of Transmittal, Letter of Instructions or document specified therein or requests for additional copies of this Statement, any Letter of Transmittal, any Letter of Instructions or other related documents should be directed to the Depositary or the Information and Exchange Agent, as applicable, at its address and telephone numbers below.

**The Depositary for the Tender Offer is:**

**D.F. King & Co., Inc.**

*Registered or Certified Mail/Overnight Courier/Hand:*
48 Wall Street — 22nd Floor, New York, NY 10005

*By Facsimile (for Eligible Institutions Only):* (212) 809 — 8838
*Attn*: Elton Bagley

*For Confirmation*: (212) 493 — 6996

*Banks and Brokers call:* (212) 269 — 5550
*All others call toll free:* (800) 431 — 9633

**The Information and Exchange Agent for the Exchange Offer and Consent Solicitation is:**

**D.F. King & Co., Inc.**

*By Registered or Certified Mail/Overnight Courier/Hand:*
48 Wall Street — 22nd Floor, New York, NY 10005

*Banks and Brokers call:* (212) 269 — 5550

*All others call toll free:* (800) 431 — 9633

vitro@dfking.com

```
<DOCUMENT>
<TYPE>        EX-99.T3E.2
<FILENAME>    y87415exv99wt3ew2.htm
<DESCRIPTION> EX-99.T3E.2
<TEXT>
```

**TO BE USED BY HOLDERS AND BENEFICIAL OWNERS**

**LETTER OF TRANSMITTAL**

# Vitro, S.A.B. de C.V.

**Offer to Purchase and Offer to Exchange and Consent Solicitation Relating to**

**$300,000,000 Aggregate Principal Amount of 8.625% Senior Notes due 2012,**

**$216,000,000 Aggregate Principal Amount of 11.75% Senior Notes due 2013 and**

**$700,000,000 Aggregate Principal Amount of 9.125% Senior Notes due 2017**

*The Depositary for the Tender Offer is:*

**D.F. King & Co., Inc.**
*By Registered or Certified Mail,*
*by Hand or by Overnight Courier*

**48 Wall Street - 22nd Floor**
**New York, New York 10005**

*By Facsimile (for Eligible Institutions only):* (212) 809-8838
*Attn:* Elton Bagley
*For Confirmation:* (212) 493-6996

*Banks and Brokers call:* (212) 269-5550
*All others call toll free:* (800) 431-9633

| | |
|---|---|
| *The Exchange Agent for the Exchange Offer and Consent Solicitation is:* | *The Information Agent for the Exchange Offer and Consent Solicitation is:* |
| **D.F. King & Co., Inc.** | **D.F. King & Co., Inc.** |
| *By Registered or Certified Mail,* | *By Registered or Certified Mail,* |
| *by Hand or by Overnight Courier* | *by Hand or by Overnight Courier* |
| **48 Wall Street - 22nd Floor** | **48 Wall Street - 22nd Floor** |
| **New York, New York 10005** | **New York, New York 10005** |
| *By Facsimile (for Eligible Institutions only):* (212) 809-8838 | *Banks and Brokers call:* (212) 269-5550 |
| *Attn:* Elton Bagley | *All others call toll free:* (800) 431-9633 |
| *For Confirmation:* (212) 493-6996 | vitro@dfking.com |

DTC Participants who have questions regarding completing this Letter of Transmittal should contact the Depositary or the Information and Exchange Agent, as applicable.

---

**THE TENDER OFFER AND THE EXCHANGE OFFER AND CONSENT SOLICITATION EXPIRE AT 9:00 A.M., NEW YORK CITY TIME, ON DECEMBER 1, 2010, UNLESS EXTENDED BY US (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EXPIRATION TIME"). ANY TENDER OF OLD NOTES IN THE TENDER OFFER PROVIDED AFTER THE DATE OF THE STATEMENT IS IRREVOCABLE AND MAY NOT BE WITHDRAWN AND ANY EXCHANGE OF OLD NOTES AND CONSENTS PROVIDED IN THE EXCHANGE OFFER AND CONSENT SOLICITATION AFTER THE DATE OF THE STATEMENT ARE IRREVOCABLE AND MAY NOT BE WITHDRAWN, EXCEPT IN THE LIMITED CIRCUMSTANCES SET FORTH IN THE STATEMENT.**

Capitalized terms used but not defined herein have the meanings given to them in the solicitation statement dated November 1, 2010 (as the same may be amended or supplemented from time to time, the "**Statement**") of Vitro, S.A.B. de C.V. (the "**Company**").

**DELIVERY OF THIS LETTER OF TRANSMITTAL (AS THE SAME MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME, THE "LETTER OF TRANSMITTAL") OTHER THAN AS SET FORTH HEREIN WILL NOT CONSTITUTE A VALID DELIVERY. THE INSTRUCTIONS CONTAINED IN THIS LETTER OF TRANSMITTAL SHOULD BE READ CAREFULLY BEFORE IT IS COMPLETED.**

The terms of the Tender Offer (as defined below) and the Exchange Offer and Consent Solicitation (as defined below) set forth in the Statement, including under "The Tender Offer," "The Exchange Offer and Consent Solicitation," "Certain U.S. Federal Income Tax Considerations" and "Material Mexican Federal Tax Considerations," are incorporated herein by reference and form part of the terms and conditions of this Letter of Transmittal.

By execution hereof, the undersigned acknowledges receipt of the Statement and this Letter of Transmittal.

(1) The Company and Administración de Inmuebles Vitro, S.A. de C.V. ("**AIV**"), a wholly-owned subsidiary of the Company, are offering, upon the terms and subject to the conditions set forth in the Statement and this Letter of Transmittal, to purchase for cash (the "**Tender Offer**") the Company's 11.75% Senior Notes due 2012 (the "**2012 Notes**"), the 11.75% Senior Notes due 2013 (the "**2013 Notes**") and the 9.125% Senior Notes due 2017 (the "**2017 Notes**" and, together with the 2012 Notes and the 2013 Notes, the "**Old Notes**").

(2) The Company is proposing, upon the terms and subject to the conditions set forth in the Statement and this Letter of Transmittal, an exchange offer and solicitation of consents (the "**Exchange Offer and Consent Solicitation**") to an in-court restructuring, from holders of Restructured Debt (as described in the Statement), including beneficial owners of the Old Notes (the "**Beneficial Owners**"), registered holders and their duly designated proxies, including participants in The Depository Trust Company ("**DTC**") whose names are shown on a security position listing as owners of the Old Notes (the "**DTC Participants**"), as of 5:00 pm, New York City time, on November 1, 2010 (the "**Record Date**").

The Tender Offer and the Exchange Offer and Consent Solicitation are not being made to, nor will tenders of Old Notes in the Tender Offer or exchanges of Old Notes in the Exchange Offer and Consent Solicitation be accepted from or on behalf of, holders in any jurisdiction in which the making or acceptance of the Tender Offer and the Exchange Offer and Consent Solicitation would not be in compliance with the laws of such jurisdiction.

To validly participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation, DTC Participants must (i) deliver Old Notes by means of book-entry transfer into the applicable DTC account of the Depositary or the Information and Exchange Agent, as applicable, (ii) transmit electronic confirmation through ATOP (as described below), whereby an Agent's Message (as described below) will be sent to the Depositary or the Information and Exchange Agent, as applicable, and (iii) deliver a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation to the Depositary or the Information and Exchange Agent, as applicable.

Additionally, in the case of DTC Participants instructed to tender Old Notes in the Tender Offer and have such Old Notes that are tendered but not accepted in the Tender Offer be exchanged in the Exchange Offer and Consent Solicitation and DTC Participants instructed to exchange Old Notes in the Exchange Offer and Consent Solicitation, both (A) a duly executed and notarized Power of Attorney (as defined below), in the form attached to this Letter of Transmittal as Schedule I.A, I.B or I.C, as applicable, with blanks therein to be completed by the DTC Participant and (B) a properly executed and notarized signature to the *Concurso* Plan attached to this Letter of Transmittal as Schedule II, must be received by the Depositary or the Information and Exchange Agent, as applicable, at its addresses set forth herein, on or prior to the Expiration Time.

The Tender Offer and the Exchange Offer and Consent Solicitation are being conducted using DTC's Automated Tender Offer Program ("**ATOP**"). Accordingly, DTC Participants holding Old Notes through

DTC should note that before completing, executing and delivering this Letter of Transmittal, DTC Participants must tender their Old Notes in the Tender Offer and exchange their Old Notes in the Exchange Offer and Consent Solicitation in accordance with DTC's ATOP procedures. Since all Old Notes must be tendered or exchanged by book-entry transfer to the applicable DTC account of the Depositary or the Information and Exchange Agent, as applicable, the Beneficial Owner's bank, broker, dealer, trust company, or other nominee must execute the tender or exchange through ATOP. Financial institutions that are DTC Participants must execute tenders and exchanges through ATOP by transmitting acceptance of the Tender Offer and/or the Exchange Offer and Consent Solicitation to DTC on or prior to the Expiration Time.

DTC will verify acceptance of the Tender Offer and/or the Exchange Offer and Consent Solicitation, execute a book-entry transfer of the tendered Old Notes into the applicable DTC account of the Depositary or the Information and Exchange Agent, as applicable, and send to the Depositary or the Information and Exchange Agent, as applicable, a "book-entry confirmation," which shall include a message (the "**Agent's Message**") transmitted by DTC to and received by the Depositary or the Information and Exchange Agent, as applicable, and forming part of a book-entry confirmation, which states that DTC has received an express acknowledgment from a DTC Participant tendering or exchanging Old Notes that the DTC Participant has received and agrees to be bound by the terms of the Letter of Transmittal as a signatory thereof and that the Company, AIV (if applicable) and their transferees may enforce such agreement against the DTC Participant.

This Letter of Transmittal must be properly executed, notarized and, if executed outside Mexico, must be: (1) authenticated by either (i) an apostille under the terms of the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents (October 5, 1961) (the "**Hague Convention**"), or (ii) in a country that is not a contracting party to the Hague Convention, an appropriate seal from a Mexican consulate and, if the owner is a corporation, executed under the corporation's common seal or signed on its behalf by a duly authorized officer of the corporation; and (2) physically delivered by hand delivery, mail or overnight courier to (a) the Depositary in the case of the Tender Offer, at the following address: 48 Wall Street - 22nd Floor, New York, NY 10005 or (b) the Information and Exchange Agent in the case of the Exchange Offer and Consent Solicitation, at the following address: 48 Wall Street - 22nd Floor, New York, NY 10005, as applicable, and in all cases in a manner that will ensure receipt prior to the Expiration Time. Letters of Transmittal executed in Mexico must be (1) executed before a notary public in Mexico; and (2) physically delivered by hand delivery or overnight courier to the Depositary or the Information and Exchange Agent, as applicable, at the address set forth above in all cases in a manner that will ensure receipt prior to the Expiration Time. The additional time that the delivery of this Letter of Transmittal duly authenticated and legalized will take should be taken into account by DTC Participants. None of the Company, the Depositary or the Information and Exchange Agent will assume any responsibility if DTC Participants do not deliver this Letter of Transmittal in proper form and time. Questions concerning the procedures necessary to obtain an apostille or seal from a Mexican consulate may be directed to the Information and Exchange Agent.

Additionally, before completing this Letter of Transmittal, DTC Participants must first tender their Old Notes in the Tender Offer or exchange their Old Notes in the Exchange Offer and Consent Solicitation through DTC's ATOP system as described in the Statement and in this Letter of Transmittal.

**Please note that the DTC Participant must fill out a separate Letter of Transmittal for each Beneficial Owner on whose behalf it holds the Old Notes.**

Beneficial Owners should only complete this Letter of Transmittal if requested to do so by their bank, broker, dealer, trust company or other nominee.

If choosing to tender Old Notes in the Tender Offer, DTC Participants must, on their own behalf and on behalf of the Beneficial Owners:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the bid price each DTC Participant wishes to submit;

- Execute, notarize and apostille this Letter of Transmittal in Section III.A.1, checking box 1;

- Provide the relevant details about special payment instructions, if any, and about themselves and their accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described herein.

If choosing to tender Old Notes in the Tender Offer and to submit Old Notes that are tendered but not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation, DTC Participants must, on their own behalf and on behalf of the Beneficial Owners:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the bid price each DTC Participant wishes to submit;

- Execute, notarize and apostille this Letter of Transmittal in Section III.A.1, checking box 2;

- Provide the relevant details about special payment instructions, if any, and about themselves and their accounts in Section III.A.2;

- Complete the IRS Form W-9 or other withholding forms described herein; and

- Execute and notarize the signature page to the *Concurso* Plan attached to this Letter of Transmittal as Schedule II.

If choosing to exchange Old Notes in the Exchange Offer and Consent Solicitation, DTC Participants must, on their own behalf and on behalf of the Beneficial Owners:

- Indicate in Section II the aggregate principal amounts of the Old Notes they wish to submit;

- Execute, notarize and apostille this Letter of Transmittal in Section III.A.1, checking box 3;

- Provide the relevant details about special payment instructions, if any, and about themselves and their accounts in Section III.A.3;

- Complete the IRS Form W-9 or other withholding forms described herein;

- Execute and notarize the signature page to the *Concurso* Plan attached to this Letter of Transmittal as Schedule II.

**Section I. Tender of Old Notes in the Tender Offer**

If the applicable Beneficial Owner's bank, broker, dealer, trust company or other nominee requires the Beneficial Owner to complete this Letter of Transmittal, then such Beneficial Owner must complete the box below entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and sign this Letter of Transmittal in Section III.A.1.

The Tender Offer is being conducted as a modified "Dutch Auction." This means that if a DTC Participant elects to participate, such DTC Participant must specify the minimum Tender Offer Consideration (as described in the Statement) such DTC Participant would be willing to receive in exchange for each $1,000 principal amount of Old Notes such DTC Participant chooses to tender in the Tender Offer (the "**Bid Price**").

Indicate in the boxes below the aggregate principal amount of each series of Old Notes to which this Letter of Transmittal relates, and either (i) specify the Bid Price (in increments of $2.50) within the range of $500 (the "**Minimum Bid Price**") and $575 that the DTC Participant would be willing to receive in exchange for each $1,000 principal amount of Old Notes (the "**Maximum Bid Price**"), or (ii) do not specify a Bid Price, in which case the DTC Participant will be deemed to have specified the Minimum Bid Price and to accept. If the space provided below is inadequate, the DTC Participant should list the principal amount of each series of Old Notes being tendered and the Maximum Bid Price, if any, on a separately executed schedule and affix the schedule to this Letter of Transmittal.

Please read the accompanying instructions carefully.

**Bid Price for 2012 Notes**

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED* | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2012 NOTES ARE BEING TENDERED** | VOI NUMBER*** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

**Bid Price for 2013 Notes**

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED* | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2013 NOTES ARE BEING TENDERED** | VOI NUMBER*** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

5

**Bid Price for 2017 Notes**

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED* | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2017 NOTES ARE BEING TENDERED** | VOI NUMBER*** |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

---

\*    Unless otherwise indicated in the column labeled "Principal Amount Tendered" and subject to the terms and conditions of the Statement, the applicable DTC Participant will be deemed to have tendered the entire aggregate principal amount indicated in the column labeled "Aggregate Principal Amount Represented" in respect of that series of Old Notes. See Instruction 7.

\*\*    Each Bid Price must be in multiples of $2.50 per $1,000 principal amount. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment. **The Bid Price each DTC Participant specifies, if any, must be within a range between $500 and $575 per $1,000 principal amount, and no Old Notes will be accepted outside this range.** DTC Participants who tender Old Notes without specifying a Bid Price will be deemed to have selected the Minimum Bid Price in respect of that series of Old Notes.

\*\*\*    Be sure that the VOI Number matches the reference number provided to the applicable DTC Participant by DTC, as the case may be, and corresponds to this Letter of Transmittal. Failure to do so may result in such DTC Participant's submission being deemed defective.

<u>**Section II. Exchange of Old Notes in the Exchange Offer and Consent Solicitation**</u>

If the applicable Beneficial Owner's bank, broker, dealer, trust company or other nominee requires the Beneficial Owner to complete this Letter of Transmittal, then such Beneficial Owner must complete the box below under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given" and sign this Letter of Transmittal in Section III.A.1.

**Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given (see Instructions 6 and 8)**

Please read the accompanying instructions carefully.

| OLD NOTES | CUSIP | ISIN | AGGREGATE PRINCIPAL AMOUNT | VOI NUMBER*** |
|---|---|---|---|---|
| 2012 Notes | 92851RAC1 | US92851RAC16 | | |
| 2013 Notes | 92851FAD5 | US92851FAD50 | | |
| 2017 Notes | 92851RAD9 | US92851RAD98 | | |
| **Total Aggregate Principal Amount Submitted for Tender in Exchange Offer and Consent Solicitation** | | | | |

***  Be sure that the VOI Number matches the reference number provided to the applicable DTC Participant by DTC, as the case may be, and corresponds to this Letter of Transmittal. Failure to do so may result in such DTC Participant's submission being deemed defective.

**PLEASE READ THE ACCOMPANYING INSTRUCTIONS CAREFULLY**

**DTC Participants identified in an Agent's Message in respect of the Tender Offer or
the Exchange Offer and Consent Solicitation will be deemed to have signed
this Letter of Transmittal and are each referred to herein as an "undersigned."**

Ladies and Gentlemen:

Pursuant to the Tender Offer (as described in the Statement) by Vitro, S.A.B. de C.V. (the "**Company**") and Administración de Inmuebles Vitro, S.A. de C.V. ("**AIV**"), a wholly-owned subsidiary of the Company, as co-offerors in the Tender Offer, and the Exchange Offer and Consent Solicitation by the Company, and upon the terms and subject to the conditions set forth in the solicitation statement dated November 1, 2010 (the "**Statement**") and this Letter of Transmittal (the "**Letter of Transmittal**"), the undersigned hereby either (i) tenders to the Company and AIV for purchase in the Tender Offer the aggregate principal amount of Old Notes indicated in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, (ii) tenders to the Company and AIV for purchase in the Tender Offer and submits to the Company any such Old Notes that are not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation in the aggregate principal amount of Old Notes indicated in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and acknowledges and agrees that, subject to the terms and conditions described herein and in the Statement, the exchange of Old Notes constitutes the delivery of a consent to the approval of the *Concurso* Plan (as described in the Statement) with respect to the exchanged Old Notes, or (iii) submits to the Company for exchange in the Exchange Offer and Consent Solicitation the aggregate principal amount of Old Notes indicated in the box in Section II under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given" and acknowledges and agrees that, subject to the terms and conditions described herein and in the Statement, the exchange of Old Notes constitutes the delivery of a consent to the approval of the *Concurso* Plan with respect to the exchanged Old Notes.

Subject to and effective upon the Company's acceptance of the Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation hereby, upon the terms and conditions contained herein and in the Statement, the undersigned hereby:

1.  irrevocably sells, assigns and transfers to or upon the order of the Company or its nominees, all right, title and interest in and to, and any and all claims in respect of or arising or having arisen as a result of the undersigned's status as a holder of, all Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation, such that thereafter it shall have no contractual or other rights or claims in law or equity against the Company or any fiduciary, trustee, fiscal agent or other person connected with the Old Notes arising under, from or in connection with such Old Notes;

2.  acknowledges that, pursuant to the Tender Offer and the Exchange Offer and Consent Solicitation, it is not receiving accrued and unpaid interest on its Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation, and agrees that at the Expiration Time in the case of the Tender Offer and on the Issue Date (as described in the Statement) in the case of the Exchange Offer and Consent Solicitation, solely in regard to its Old Notes tendered or exchanged, the interest payments on its Old Notes that were scheduled to be made on February 2009, August 2009, February 2010 and August 2010 with respect to the 2012 Notes and 2017 Notes and on May 2009, November 2009, May 2010 and November 2010 with respect to the 2013 Notes, were never due and payable for the purposes of Mexican law;

3.  waives any and all rights with respect to the Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation hereby (including, without limitation, any existing or past defaults and their consequences in respect of such Old Notes); and

4.  releases and discharges the Company, the trustee under the indentures governing the 2012 Notes and the 2017 Notes, the trustee under the indenture governing the 2013 Notes and the Trustee (each as described in the Statement) from any and all claims the undersigned may have, now or in the future, arising out of or related to the Old Notes tendered in the Tender Offer and exchanged in

the Exchange Offer and Consent Solicitation hereby, including, without limitation, any and all claims that the undersigned is entitled to receive additional principal or interest payments with respect to the Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation hereby (other than as expressly provided in the Statement and in this Letter of Transmittal) or to participate in any redemption or defeasance of the Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation hereby.

The undersigned understands that tenders of Old Notes in the Tender Offer and exchanges of Old Notes in the Exchange Offer and Consent Solicitation pursuant to any of the procedures described in the Statement and in the instructions in this Letter of Transmittal and acceptance of such Old Notes by the Company will constitute a binding agreement between the undersigned, the Company and AIV in the case of the Tender Offer and a binding agreement between the undersigned and the Company in the case of the Exchange Offer and Consent Solicitation upon the terms and conditions of the Tender Offer and the Exchange Offer and Consent Solicitation. Any submitted Old Notes that are not accepted in the Tender Offer and the Exchange Offer and Consent Solicitation for any reason will be returned by crediting the account maintained at DTC from which such Old Notes were submitted.

In the case of the Tender Offer, unless otherwise indicated in the box in Section III.A.2 entitled "Special Payment Instructions for Tender Offer Consideration," please issue and mail the check for payment with respect to any Old Notes accepted for payment to the address(es) of the registered holder(s) appearing in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable. In the case of the Exchange Offer and Consent Solicitation, unless otherwise indicated in the box in Section III.A.3 entitled "Special Payment Instructions for Note Consent Payment, Restructuring Cash Payment or Restructuring Fee," please issue and mail the check for payment with respect to any Old Notes accepted for payment to the address(es) of the registered holder(s) corresponding to the Unique Blocking or VOI Reference Number appearing in Section II under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given."

In the event of termination of the Tender Offer or the Exchange Offer and Consent Solicitation, the respective Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation will be credited to such Beneficial Owner's account through DTC and such Beneficial Owner's DTC Participant, unless otherwise indicated in the box in Section III.A.2 entitled "Special Payment Instructions for Tender Offer Consideration" or the box in Section III.A.3 entitled "Special Payment Instructions for Note Consent Payment, Restructuring Cash Payment or Restructuring Fee," as applicable. The undersigned recognizes, however, that neither the Company nor AIV (if applicable) has any obligations pursuant to the "Special Payment Instructions for Tender Offer Consideration" and "Special Payment Instructions for Note Consent Payment, Restructuring Cash Payment or Restructuring Fee" provisions of this Letter of Transmittal to transfer any Old Notes from the name of the registered holder(s) thereof if the Company and, if applicable, AIV do not accept for payment any of the aggregate principal amount of such Old Notes.

The undersigned understands that, in the case of the Tender Offer, the Company and, if applicable, AIV will, upon the terms and subject to the conditions of the Tender Offer, determine the price to be for the Old Notes validly tendered pursuant to the Tender Offer, after taking into account the number of Old Notes so tendered and the Bid Price in respect of each series of Old Notes, as applicable, specified by tendering DTC Participants. The undersigned understands that the Company and AIV will select the lowest Clearing Price (as described in the Statement) that will allow them to purchase the largest aggregate principal amount of Old Notes up to the Maximum Payment Amount (as described in the Statement), upon the terms and subject to the conditions of the Tender Offer.

The undersigned hereby authorizes and instructs, upon the terms and subject to the conditions of the Tender Offer and the Exchange Offer and Consent Solicitation or the representative authorized and appointed by the duly executed and notarized copy of the power of attorney (if the Beneficial Owner is a company, either the notary public certifies the signature and the corporate records of the granting company or the notary public just certifies the signature and an officer of the granting company certifies the company records) (the "**Power of Attorney**") in the form attached to this Letter of Transmittal as Schedule I.A, I.B or I.C, as applicable, to carry out all necessary or expedient steps required or advisable under Mexican law to submit the Letter of Transmittal before the Mexican court within the *concurso mercantil* proceeding, to join and adhere to any *concurso mercantil* to be filed by the Company and to execute and consent to the *Concurso* Plan.

All authority conferred or agreed to be conferred by this Letter of Transmittal shall not be affected by, and shall survive, the death or incapacity of the undersigned, and any obligation of the undersigned hereunder

shall be binding upon the heirs, executors, administrators, trustees in bankruptcy, personal and legal representatives, successors and assigns of the undersigned.

The undersigned hereby represents, warrants and agrees, for the benefit of the Company, AIV (if applicable) and any party to whom the Company or AIV transfers Old Notes or the right to receive Old Notes that:

1. it has received and reviewed the Statement;

2. it is the Beneficial Owner of, or a duly authorized representative of one or more such Beneficial Owners of, the Old Notes tendered in the Tender Offer and/or exchanged in the Exchange Offer and Consent Solicitation hereby and it has full power and authority to execute this Letter of Transmittal and make the representations, warranties and agreements made hereby, and has full power and authority to tender, exchange, sell, assign and transfer the Old Notes tendered or exchanged hereby;

3. the Old Notes being tendered in the Tender Offer and/or exchanged in the Exchange Offer and Consent Solicitation hereby were owned as of the date of tender and/or exchange, free and clear of any liens, charges, claims, encumbrances, interests and restrictions of any kind, and acknowledges that the Company will acquire good, indefeasible and unencumbered title to such Old Notes, free and clear of all liens, charges, claims, encumbrances, interests and restrictions of any kind, when the Company accepts the same;

4. it will not sell, pledge, hypothecate or otherwise encumber or transfer any Old Notes tendered in the Tender Offer and/or exchanged in the Exchange Offer and Consent Solicitation hereby from the date of this Letter of Transmittal and agrees that any purported sale, pledge, hypothecation or other encumbrance or transfer will be void and of no effect;

5. in evaluating the Tender Offer and the Exchange Offer and Consent Solicitation and in making its decision whether to participate therein by submitting this Letter of Transmittal and tendering its Old Notes in the Tender Offer and/or exchanging its Old Notes in the Exchange Offer and Consent Solicitation, such holder has made its own independent appraisal of the matters referred to herein and in any related communications and is not relying on any statement, representation or warranty, express or implied, made to such holder by the Company, AIV (if applicable), the Depositary or the Information and Exchange Agent other than those contained in the Statement (as supplemented to the Expiration Time);

6. the execution and delivery of this Letter of Transmittal shall constitute an undertaking to execute any further documents and give any further assurances that may be required in connection with any of the foregoing, in each case on and subject to the terms and conditions set out or referred to in the Statement;

7. the submission of the Letter of Transmittal to the Depositary or the Information and Exchange Agent, as applicable, shall, subject to the terms and conditions of the Tender Offer or the Exchange Offer and Consent Solicitation generally, constitute the irrevocable appointment of the Depositary as its attorney and agent for the purpose of effecting the Tender Offer or the Information and Exchange Agent as its attorney and agent for the purpose of effecting the Exchange Offer and Tender Offer, as applicable, or the representative authorized by the Power of Attorney as its attorney and agent, for the purpose of effecting the *Concurso* Plan, to join and adhere to the *concurso mercantil* petition to be filed by the Company and to execute and consent to the *Concurso* Plan, as applicable, and an irrevocable instruction to such attorney and agent to complete and execute all or any form(s) of transfer and other document(s) deemed necessary or expedient in the opinion of such attorney and agent in relation to the Old Notes tendered in the Tender Offer and exchanged in the Exchange Offer and Consent Solicitation hereby in favor of the Company and, if applicable, AIV or such other person or persons as the Company may direct and to deliver such form(s) of transfer and other document(s) in the attorney's and agent's opinion and other document(s) of title relating to such Old Notes' registration and to execute all such other documents and to do all such other acts and things as may be in the opinion of such attorney or agent necessary or expedient for the purpose of, or in

10

connection with, the acceptance of the Tender Offer or Exchange Offer and Consent Solicitation, and to vest in the Company and, if applicable, AIV or their nominees such Old Notes;

8. the terms and conditions of the Tender Offer and the Exchange Offer and Consent Solicitation shall be deemed to be incorporated in, and form a part of, this Letter of Transmittal which shall be read and construed accordingly; and

9. the Company, AIV (if applicable) and others (including any party to whom the Company or AIV transfers Old Notes or the right to receive Old Notes) will rely upon the truth and accuracy of the foregoing acknowledgments, representations, warranties and agreements, and that if any of the acknowledgments, representations, warranties and agreements deemed to have been made by it by its participation in the Tender Offer or the Exchange Offer and Consent Solicitation or its acquisition of the New Notes (as described in the Statement) are no longer accurate, it will promptly notify the Company.

The representations and warranties and agreements of a holder tendering Old Notes in the Tender Offer shall be deemed to be repeated and reconfirmed on and as of the Expiration Time. The representations and warranties and agreements of a holder exchanging Old Notes in the Exchange Offer and Consent Solicitation shall be deemed to be repeated and reconfirmed on and as of the Expiration Time, the filing of the Company's *concurso mercantil* petition, the Consent Payment Date (as described in the Statement), the date of consent to the *Convenio Concursal* (as described in the Statement), the approval of the *Convenio Concursal* and the Issue Date.

**Section III.**

**A.1. Letter of Transmittal Signature**

<b>DTC PARTICIPANT(S) SIGN HERE</b>

By completing, executing and delivering this Letter of Transmittal, the undersigned hereby (check one):

1. ☐ tenders to the Company and AIV with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and instructs that any such Old Notes tendered but not accepted in the Tender Offer be returned to the undersigned;

2. ☐ tenders to the Company and AIV with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and, with respect to any Old Notes tendered but not accepted for payment in the Tender Offer, submits to the Company for exchange, joins and adheres to the *concurso mercantil* petition to be filed by the Company and consents to the *Concurso* Plan with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, or;

3. ☐ submits to the Company for exchange, joins and adheres to the *concurso mercantil* petition to be filed by the Company and consents to the *Concurso* Plan with respect to the aggregate principal amount of the Old Notes listed in Section II under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given."

| | |
|---|---|
| **Signature of DTC Participant(s) or Authorized Signatory\*\*\*\*** | **Date** |
| **Signature of DTC Participant(s) or Authorized Signatory\*\*\*\*** | **Date** |
| **Signature of DTC Participant(s) or Authorized Signatory\*\*\*\*** | **Date** |

Area Code and Telephone Number: _____

If a Beneficial Owner is tendering any Old Notes in the Tender Offer or exchanging any Old Notes in the Exchange Offer and Consent Solicitation, this Letter of Transmittal must be signed by the DTC Participant(s) exactly as the name(s) appear(s) on a securities position listing of DTC or by any person(s) authorized to become the DTC Participant(s) by endorsements and documents transmitted herewith. If the signature is by a trustee, executor, administrator, guardian, attorney-in-fact, officer or other person, acting in a fiduciary or representative capacity, please set forth at the line entitled "Capacity (full title)" and submit evidence satisfactory to the Depositary or the Information and Exchange Agent, as applicable, and the Company and, if applicable, AIV, of such person's authority to so act.

Name(s): _____

<b>(Please Type or Print)</b>

Capacity (full title): _____

Address: _____

**(Including Zip Code)**

**\*\*\*\* IMPORTANT: Each Letter of Transmittal must be properly notarized and, if executed outside Mexico, must be authenticated by either (i) an apostille under the terms of the Hague Convention, or (ii) in a country that is not a contracting party to the Hague Convention, an appropriate seal from a Mexican consulate and, if the owner is a corporation, executed under the corporation's common seal or signed on its behalf by a duly authorized officer of the corporation. Please plan accordingly and obtain the necessary authentication prior to delivering this Letter of Transmittal by hand, mail or overnight courier to the Depositary or the Information and Exchange Agent, as applicable, at the address set forth on the front cover of this Letter of Transmittal in a manner that will ensure receipt on or prior to the Expiration Time. QUESTIONS CONCERNING THE PROCEDURES NECESSARY TO OBTAIN AN APOSTILLE MAY BE DIRECTED TO THE DEPOSITARY OR THE INFORMATION AND EXCHANGE AGENT, AS APPLICABLE.**

On the _____ day of _____ in the year 2010 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and he/she acknowledged to me that he/she executed the same, and that he/she made such appearance before the undersigned in the County of _____, State of _____.

_____
Notary Public
My Commission Expires: _____

***(TO BE NOTARIZED AND APOSTILLED OR LEGALIZED AT THE MEXICAN CONSULATE)***

**A.2.** **Special Payment Instructions for Tender Offer Consideration**

      To be completed in connection with the Tender Offer ONLY if the Old Notes in an aggregate principal amount not tendered or not accepted for payment are to be issued in the name of, or if the payment check for the Tender Offer Consideration is to be issued to the order of, someone other than the person or persons whose signature(s) appears within this Letter of Transmittal, or issued to an address different from that shown in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, within this Letter of Transmittal, or if Old Notes tendered by book-entry transfer that are not accepted for payment are to be credited to an account maintained at the book-entry transfer facility other than the one designated above. Please read the accompanying instructions carefully.

---

**SPECIAL PAYMENT INSTRUCTIONS**
**(See Instructions 3, 4, 5, 10 and 11)**

Issue (check as applicable): ☐  2012 Notes    ☐   2013 Notes  ☐   2017 Notes

☐ Payment Check(s)

Name : _____
(Please Print)

Address : _____
(Please include Zip Code)

Taxpayer Identification Number : _____
(Social Security Number or Employer Identification Number)

A correct taxpayer identification number must also be provided on IRS Form W-9, if applicable.

☐ Credit unpurchased Old Notes by book-entry to the book-entry transfer facility account set forth below:

DTC Account Number : _____

Number of Account Party : _____

---

14

**A.3. Special Payment Instructions for Note Consent Payment, Restructuring Cash Payment or Restructuring Fee**

      To be completed in connection with the Exchange Offer and Consent Solicitation ONLY if the Old Notes in an aggregate principal amount not exchanged are to be issued in the name of, or if the payment check for the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee (each as described in the Statement) is to be issued to the order of, someone other than the person or persons whose signature(s) appears within this Letter of Transmittal, or issued to an address different from that shown in boxes in Section II under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given." Please read the accompanying instructions carefully.

---

**SPECIAL PAYMENT INSTRUCTIONS**
**(See Instructions 3, 4, 5, 10 and 11)**

Issue (check as applicable): ☐ 2012 Notes  ☐ 2013 Notes ☐ 2017 Notes

☐ Payment Check(s)

Name : _____
                                 (Please Print)

Address : _____
                          (Please include Zip Code)

Taxpayer Identification Number : _____
             (Social Security Number or Employer Identification Number)

A correct taxpayer identification number must also be provided on IRS Form W-9, if applicable.

---

**INSTRUCTIONS FORMING PART OF THE TERMS AND CONDITIONS OF THE TENDER OFFER
AND THE EXCHANGE OFFER AND CONSENT SOLICITATION**

1. **Expiration Time**. Subject to the terms and conditions set forth herein and in the Statement, the Tender Offer and the Exchange Offer and Consent Solicitation will be open until 9:00 a.m., New York City time, on December 1, 2010, unless extended by the Company and, if applicable, AIV (such time and date, as it may be extended, the "**Expiration Time**"). Consummation of the *Concurso* Plan shall not occur unless and until each of the conditions, as described in the Statement, is satisfied or waived. Any tender of Old Notes in the Tender Offer provided after the date of the Statement is irrevocable and may not be withdrawn and any exchange of Old Notes and consents provided in the Exchange Offer and Consent Solicitation after the date of the Statement are irrevocable and may not be withdrawn, except in the limited circumstances set forth in the Statement.

2. **One Letter of Transmittal for each Beneficial Owner**. DTC Participants are required to fill out a separate Letter of Transmittal for each Beneficial Owner.

3. **Signatures on Letter of Transmittal, Instruments of Transfer and Endorsements**. Signatures on this Letter of Transmittal must correspond to the names of the DTC Participants as shown on the security position listing them as the owner of such Old Notes.

When this Letter of Transmittal is signed by holders of the Old Notes submitted hereby, no endorsements of Old Notes or separate instruments of transfer are required unless Old Notes not accepted by the Company pursuant to the *Concurso* Plan are to be returned to a person other than the holder, in which case signatures on such Old Notes or instruments must be guaranteed by an Eligible Institution.

4. **Signature Guarantees of DTC Participant(s)**. All signatures of DTC Participant(s) on this Letter of Transmittal must be guaranteed by a firm or other entity identified in Rule 17Ad-15 under the Securities Exchange Act of 1934, as amended, including (as such terms are defined therein): (a) a bank; (b) a broker, dealer, municipal securities dealer, municipal securities broker, government securities dealer or government securities broker; (c) a credit union; (d) a national securities exchange, registered securities association or clearing agency; or (e) a savings institution that is a participant in a Securities Transfer Association recognized program (each, an "**Eligible Institution**"). However, signatures need not be guaranteed if this Letter of Transmittal is executed by an Eligible Institution. If the DTC Participant of the Old Notes is a person other than the signer of this Letter of Transmittal, see Instruction 3.

5. **Delivery of Letter of Transmittal, Old Notes and Additional Required Documents**. This Letter of Transmittal is to be used by DTC Participants choosing to participate in the Tender Offer and/or the Exchange Offer and Consent Solicitation. A tender of Old Notes in the Tender Offer and an exchange of Old Notes in the Exchange Offer and Consent Solicitation will be deemed to have been received only when the Depositary or the Information and Exchange Agent, as applicable, receives (i) confirmation of book-entry transfer of the Old Notes into the applicable DTC account of the Depositary or the Information and Exchange Agent, as applicable, (ii) a duly completed Agent's Message through the facilities of DTC at the DTC account of the Depositary or the Information and Exchange Agent, as applicable, and (iii) a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation.

Additionally, in the case of DTC Participants instructed to tender Old Notes in the Tender Offer and submit any such Old Notes that are not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation and in the case of DTC Participants instructed to submit Old Notes for exchange in the Exchange Offer and Consent Solicitation, both (A) a properly completed and duly executed Power of Attorney, in the form attached to this Letter of Transmittal as Schedule I.A, I.B or I.C, as applicable, with blanks therein to be completed by the DTC Participant and (B) a properly executed and notarized signature to the *Concurso* Plan attached to this Letter of Transmittal as Schedule II, must be received by the Depositary or the Information and Exchange Agent, as applicable, at its addresses set forth herein, on or prior to the Expiration Time.

If submissions of Old Notes are forwarded to the Depositary or the Information and Exchange Agent, as applicable, in multiple deliveries, a separate executed, notarized and apostilled and properly completed Letter of Transmittal and other required documentation must accompany each such delivery.

The method of delivery of the Letter of Transmittal, any required signature guarantees and all other required documents, including delivery through DTC, is at the election and risk of the DTC Participant and delivery will be deemed to be made only when actually received by the Depositary or the Information and Exchange Agent, as applicable. If delivery is by mail, it is suggested that the DTC Participant use properly insured, registered mail with return receipt requested, and that the mailing be made sufficiently in advance of the Expiration Time to permit delivery to the Depositary or the Information and Exchange Agent, as applicable, prior to such date.

No alternative, conditional or contingent submissions will be accepted. All submitting DTC Participants, by execution of this Transmittal Letter, waive any right to receive any notice of the acceptance of their Old Notes.

6. **Delivery of the New Notes and Cash Payment in the Tender Offer and/or the Exchange Offer and Consent Solicitation**. The New Notes will be issued by deposit in book-entry form with the Information and Exchange Agent. In the case where the DTC Participant chooses to tender Old Notes in the Tender Offer and in the case where the DTC Participant chooses to tender Old Notes in the Tender Offer and to have Old Notes that are not accepted in the Tender Offer to be exchanged in the Exchange Offer and Consent Solicitation, the appropriate DTC Participant name and number (along with any other required account information) needed to permit delivery must be provided in the boxes in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable. In the case where the DTC Participant chooses to exchange Old Notes in the Exchange Offer and Consent Solicitation, the appropriate DTC Participant name and number (along with any other required account information) needed to permit delivery must be provided or in Section II under the heading "Description of Old Notes Exchanged in the Exchange Offer and Consent Solicitation and in Respect of which Consent is Given." Failure to do so will render a tender of the Old Notes defective, and the Company will have the right, which it may waive, to reject such delivery.

7. **Partial Tenders and Unpurchased Old Notes in the Tender Offer**. If fewer than all of the Old Notes owned by a Beneficial Owner are tendered in the Tender Offer, the DTC Participant must fill in the aggregate principal amounts of such Old Notes tendered in the fourth column of the box in Section I entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable. The entire aggregate principal amount represented by the Old Notes delivered to the Depositary will be deemed to have been tendered, unless otherwise indicated.

8. **Amount of Tenders in the Tender Offer and the Exchange Offer and Consent Solicitation**. The Old Notes will be accepted for tender and exchange in denominations of $1,000 principal amount and integral multiples thereof and any New Notes will be issued in $2,000 principal amount and integral multiples thereof and will be issued by deposit book-entry form with the Depositary or the Information and Exchange Agent, as applicable. If any DTC Participant tenders a principal amount of the Old Notes in the Tender Offer with the option of having Old Notes that are not accepted in the Tender Offer to be exchanged in the Exchange Offer and Consent Solicitation or the DTC Participant exchanges a principal amount of the Old Notes in the Exchange Offer and Consent Solicitation that would result in the DTC Participant receiving a fractional interest in the New Notes, then the principal amount of the New Notes that the DTC Participant will receive will be rounded up to the nearest $1,000 if the fractional interest in the New Notes would be greater than or equal to $500 and rounded down to the nearest $1,000 if the fractional interest in the New Notes would be less than $500. The Note Consent Payment (as described in the Statement) for the Old Notes will be paid on the Consent Payment Date.

9. **Transfer Taxes**. The Company will pay or cause to be paid any transfer taxes with respect to the transfer and sale of Old Notes to it, or to its order, pursuant to the Tender Offer and the Exchange Offer and Consent Solicitation. If payment is to be made to, or if Old Notes not tendered, exchanged or purchased are to be registered in the name of, any persons other than the DTC Participant, or if tendered or exchanged Old Notes are registered in the name of any persons other than the persons signing this Letter of Transmittal, the amount of any transfer taxes (whether imposed on the DTC Participant or such other person) payable on account of the transfer to such other person will be deducted from the payment unless satisfactory evidence of the payment of such taxes or exemption therefrom is submitted.

10. **Special Payment and Delivery Instructions**. DTC Participants tendering Old Notes in the Tender Offer or exchanging Old Notes in the Exchange Offer and Consent Solicitation should indicate in the box in Section II.A.2 or II.A.3, as applicable, the name and address to which checks constituting payments for the Old Notes to be purchased in the Tender Offer or exchanged in the Exchange Offer and Consent Solicitation are to be

issued or sent, if different from the name and address of the DTC Participant or acting holder signing this Letter of Transmittal. In the case of issuance in a different name, the taxpayer identification number or social security number of the person named must also be indicated.

11. **Determination of Validity, Form, Legality, etc.** All questions concerning the validity, form, tenders (including time of receipt), and acceptance of tendered or exchanged Old Notes will be determined by the Company in its sole discretion, which determination will be final and binding. The Company reserves the absolute right to reject any and all tenders or exchanges of Old Notes not in proper form or any Old Notes the acceptance for exchange of which may, in the opinion of its counsel, be unlawful. The Company also reserves the absolute right to waive any defect or irregularity in tenders or exchanges of Old Notes, whether or not similar defects or irregularities are waived in the case of other tendered securities. The interpretation of the terms and conditions by the Company shall be final and binding on all parties. Unless waived, any defects or irregularities in connection with tenders of Old Notes in the Tender Offer and exchanges of Old Notes in the Exchange Offer and Consent Solicitation must be cured within such time as the Company shall determine. None of the Company, the Depositary, the Information and Exchange Agent or any other person will be under any duty to give notification of defects or irregularities with respect to tenders of Old Notes in the Tender Offer and exchanges of Old Notes in the Exchange Offer and Consent Solicitation, nor shall any of them incur any liability for failure to give such notification.

Tenders of Old Notes in the Tender Offer and exchanges of Old Notes in the Exchange Offer and Consent Solicitation will not be deemed to have been made until such defects or irregularities have been cured or waived. Any Old Notes received by the Depositary or the Information and Exchange Agent that are not validly tendered or exchanged and as to which the defects or irregularities have not been cured or waived will be returned by the Depositary or the Information and Exchange Agent, as applicable, to the Beneficial Owners, unless otherwise provided in this Letter of Transmittal, as soon as practicable following the Expiration Time or the withdrawal or termination of the Tender Offer and the Exchange Offer and Consent Solicitation.

12. **Waiver of Conditions**. The Company reserves the absolute right to amend or waive any of the conditions in the Tender Offer and the Exchange Offer and Consent Solicitation concerning any Old Notes at any time.

13. **Withdrawal**. Any tender of Old Notes in the Tender Offer provided after the date of the Statement is irrevocable and may not be withdrawn. Any exchange of Old Notes and consents provided in the Exchange Offer and Consent Solicitation are irrevocable and may not be withdrawn, except (i) in the event the Company amends the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date (as described in the Statement) does not occur on or before the Outside Consummation Date (as described in the Statement), or (v) if the proposed *Concurso* Plan is amended in a manner that would have a material adverse effect on holders of the Old Notes.

14. **Requests for Assistance or Additional Copies**. Questions and requests for assistance and requests for additional copies of the Statement, this Letter of Transmittal and of IRS Form W-9 may be directed to the Depositary or the Information and Exchange Agent, as applicable, at the address and telephone number indicated herein.

## IMPORTANT TAX INFORMATION

Under U.S. federal income tax law, a tendering DTC Participant may be subject to backup withholding tax with respect to the delivery by the Depositary of the Tender Offer or the Information and Exchange Agent of the Exchange Offer and Consent Solicitation, as applicable, unless such DTC Participant provides the Company (as payer), through the Information and Exchange Agent, with either (i)(a) such DTC Participant's correct taxpayer identification number ("**TIN**") on IRS Form W-9 (which may be obtained on the Internal Revenue Service website at *www.irs.gov*) certifying that the TIN provided on Form W-9 is correct (or that such DTC Participant has applied for a TIN); (b) certification that (A) the DTC Participant has not been notified by the Internal Revenue Service that he or she is subject to backup withholding tax as a result of a failure to report all interest or dividends or (B) the Internal Revenue Service has notified the DTC Participant that he or she is no longer subject to backup withholding tax and (c) that the DTC Participant is a United States person or (ii) an adequate basis for exemption from backup withholding tax. Failure to provide such DTC Participant's taxpayer identification number on IRS Form W-9, if applicable, may subject the tendering DTC Participant (or other payee) to a $50 penalty imposed by

the Internal Revenue Service. More serious penalties may be imposed for providing false information which, if willfully done, may result in fines and/or imprisonment. DTC Participants that are exempt from backup withholding should indicate their exempt status on IRS Form W-9. A tendering DTC Participant that is not a U.S. Holder, as defined in the Statement, may qualify for an exemption from backup withholding by submitting to the Depositary or the Information and Exchange Agent, as applicable, a properly completed appropriate IRS Form W-8 (which the Depositary or the Information and Exchange Agent, as applicable, will provide upon request or which may be obtained on the Internal Revenue Service website at www.irs.gov) signed under penalty of perjury, certifying that the DTC Participant is not a U.S. Holder.

**SCHEDULE I.A**

## PODER IRREVOCABLE

En la Ciudad de [_____], Estado (o Provincia) de [_____], [_____] [País], el [___] de [_____] de 2010, ante mi, [_____] Notario Público, debidamente autorizado para actuar en el Estado (o Provincia) de [_____], [_____] [País], compareció el Sr. [_____] en su carácter de [_____] [cargo desempeñado en la Sociedad otorgante] de [_____] [nombre de la Sociedad] (la "Sociedad"), sociedad debidamente constituida y existente bajo las leyes de [_____] [País], y manifestó: que por medio del presente instrumento y actuando en nombre de la Sociedad, en cumplimiento de la condición establecida en la Solicitud de Consentimiento emitida por Vitro, S.A.B. de C.V. ("Vitro") el día [ ] (la "Solicitud") y como medio para cumplir con las obligaciones de la Sociedad derivadas del otorgamiento de su consentimiento conforme a la Solicitud, confiere y otorga en favor del(os) señor(es) [_____] para que lo ejerciten conjunta o separadamente, un poder irrevocable para pleitos y cobranzas, general en cuanto a sus facultades, pero especial en cuanto a su objeto y tan amplio como en derecho sea necesario, en términos de lo dispuesto por el artículo 2554 del Código Civil Federal y sus correlativos en los códigos civiles de todas las entidades federativas de la República Mexicana, para efecto de que los apoderados representen a la Sociedad ante toda clase de particulares y/o ante toda clase de autoridades judiciales o administrativas o de cualquier tipo, en los Estados Unidos Mexicanos ("México"), respecto de cualquier y todos los actos relacionados con la reestructura de la deuda de Vitro y/o cualesquiera de las empresas subsidiarias directas e indirectas de Vitro, incluyendo sin limitación a Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontano, S.A.P.I. de C.V., Viméxico, S.A. de C.V. y Vitro Vidrio y Cristal, S.A. de C.V. y Vitro Automotriz, S.A. de C.V. (en lo sucesivo conjuntamente las "Subsidiarias de Vitro" e, individualmente cada una de ellas, una "Subsidiaria de Vitro"), así como de cualquier demanda o solicitud o procedimiento de concurso mercantil, ya sea voluntario o

## IRREVOCABLE POWER OF ATTORNEY

In the City of [_____], State (or Province) of [_____], in [_____] [Country] on [_____], 2010, before me, [_____] Notary Public, duly authorized to act in the State (or Province) of [_____], [_____] [Country], appeared Mr. [_____], acting as [_____] [duty in the Granting Company] of [_____] [name of the Granting Company] (the "Company"), a Corporation duly organized, validly existing and in good standing under the laws of [_____] [Country] and stated that by means of this instrument and acting on behalf of the Company, in compliance with the condition set forth in the Consent Solicitation issued by Vitro, S.A.B. de C.V. ("Vitro") on [ ] (the "Consent Solicitation") and as a manner to fulfill obligations of the Company arising from the granting of its consent in the terms of the Consent Solicitation, confers and grants in favor of Mr. or Messrs. [_____] an irrevocable power of attorney for lawsuits and collections, to be exercised jointly or individually, which shall be general regarding the actions authorized, yet limited as to its purpose and as broad as may be required by law, pursuant to Article 2554 of the Federal Civil Code and the related provisions in the civil codes for the federal entities of the Mexican Republic, for the attorneys-in-fact to act on behalf of the Company before any private individual and/or any judicial, administrative or any other authority within the United Mexican States ("Mexico"), regarding any and all acts related to the restructuring of the debt of Vitro and/or any of the direct or indirect subsidiaries of Vitro, including without limitation Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontano, S.A.P.I. de C.V., Viméxico, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. and Vitro Automotriz, S.A. de C.V. (hereinafter, collectively, the "Subsidiaries of Vitro" and, individually each of them, a "Subsidiary of Vitro"), and any claim or petition or procedure of *concurso mercantil*, either voluntary or involuntary, prepackaged or without previous plan or agreement of Vitro and/or of any Subsidiary of Vitro.

involuntario, con o sin convenio previo, de Vitro y/o de cualquier Subsidiaria de Vitro.

En tal virtud, los apoderados gozarán de todas las facultades generales y aún aquellas para las que la ley exige cláusula especial, que para dicha clase de apoderados establece la ley, incluyendo, en forma enunciativa y no limitativa, las siguientes:

(1) Para negociar y en su caso suscribir y/o celebrar con Vitro y/o con Vitro y uno o más de los acreedores de dicha empresa y/o con cualquier Subsidiaria de Vitro y uno o más de los acreedores de la misma, un plan de reestructura previo o de cualquier tipo y/o un convenio de reestructura y/o un convenio judicial y/o un convenio concursal y/o cualesquier otro documento en virtud del cual acuerden términos y condiciones para una reestructura de los pasivos de Vitro y/o de cualquier Subsidiaria de Vitro, ya sea en términos de lo dispuesto en la Ley de Concursos Mercantiles o en cualquier otra ley aplicable y vigente en México;

(2) Para suscribir en forma conjunta con Vitro y/o con cualquier Subsidiaria de Vitro, en caso de que ello resulte necesario, una solicitud de declaración de concurso mercantil de Vitro y/o de cualquier Subsidiaria de Vitro;

(3) Para transigir;

(4) Para desistirse de toda clase de demandas, incluida la de amparo;

(5) Para articular y absolver posiciones;

(6) Para acudir ante notario público Mexicano de su elección para protocolizar este instrumento público, en caso de que lo estime conveniente o en caso de que ello resulte necesario para que el presente poder surta efectos con arreglo a la ley mexicana, así como para apostillar el presente documento y/o realizar cualquier otro acto que resulte o estime conveniente y/o necesario para que el mismo sea válido y eficaz conforme a las leyes aplicables;

[La Sociedad]

[_____]

Considering the foregoing, the attorneys-in-fact shall be empowered with all general powers including those for which the law requires the inclusion of a special clause, and including but not limited to the following:

(1) To negotiate and when applicable execute and/or enter into with Vitro and/or with Vitro and one or more of its creditors and/or with any Subsidiary of Vitro and one or more creditors of the same, a prepackaged or any other kind of restructuring plan and/or a restructuring agreement and/or a judicial agreement and/or a *convenio concursal* and/or any other document by means of which they shall agree on the terms and conditions of a restructuring of Vitro's indebtedness and/or of any Subsidiary of Vitro, which will be carried out under the *Concursos Mercantiles Act* or any other applicable legal provision which is in full force and effect within Mexico;

(2) To execute together with Vitro and/or with any Subsidiary of Vitro, in the event necessary, a request for the declaration of *concurso mercantil* of Vitro and/or of any Subsidiary of Vitro;

(3) To negotiate and conclude transactions;

(4) To abandon any kind of lawsuits, including *amparo;*

(5) To appear before any court and take legal positions before the court;

(6) To appear before the Notary Public of its choice to notarize this public instrument for its delivery and execution according to Mexican Law, in case it is deemed convenient or necessary for this power of attorney to be effective under Mexican law, as well as to apostille this document and/or perform any other act that is or is deemed to be convenient and/or necessary for this document to be valid and enforceable in accordance with the applicable laws;

[The Company]

[_____]

Yo, [_____] en mi carácter de Notario Público, en este acto:

### DOY FE:

En este día [____] del mes de [_____] de 2010, [_____] [nombre de quien firma el poder](el "Firmante"), quien tiene capacidad legal, otorga este poder en representación de la Sociedad.

El suscrito Notario Público certifica:

(1) que la representación que tiene el citado poderdante es legítima de acuerdo con las constancias, libros, instrumentos y documentos de la Sociedad que al efecto me fueron presentados, y que constituyen una prueba directa y objetiva de la legal existencia y subsistencia de la sociedad otorgante y de la representación mencionada, ya que habiéndolas examinado cuidadosamente me cercioré plenamente de su autenticidad y de que se cumplió con los requisitos que exigen los ordenamientos legales para tener por acreditada en forma indubitable la personalidad del Firmante. Los documentos citados que tuve a la vista y que constituyen una prueba directa y objetiva de la personalidad del Firmante son las siguientes:

a) El acta constitutiva de fecha [_____], otorgada ante [_____] [o certificado de incorporación, que señale fecha y quien lo emite, según disponga la ley del país de nacionalidad de la Sociedad] registrada por [_____] en [_____] el día [____] de [_____] de [____] [y el certificado de subsistencia, si la ley del país de nacionalidad de la Sociedad lo contempla].

b) Los estatutos de la Sociedad , fechados el [_____] autorizados en [_____], por [_____].

c) La resolución en la que se confieren poderes al Firmante para actuar en nombre y representación de la Sociedad] para otorgar este poder consistente en [____] (que deberá señalar fecha y procedencia) [_____].

[En caso de que el poder conforme al cual se le confieren facultades al Firmante para suscribir el presente poder haya sido otorgado por el Consejo de Administración de la Sociedad, deberá relacionarse

---

The undersigned, [_____] in my capacity as Notary Public, hereby:

### GIVE FULL FAITH AND CREDIT THAT:

On this [____] day of [_____], 2010, [_____] [name of signatory of Power of Attorney] (the "Signatory"), having sufficient legal capacity, did grant the foregoing power of attorney on behalf of the Company.

The undersigned Notary Public certifies that:

(1) the Signatory has the valid authority to bind the Company in accordance with records, books, instruments and documents of the Company, which constitute direct and positive evidence of the legal existence and good standing of the Company and of the capacity above mentioned as I have examined such records, and I have fully verified their authenticity and that all requirements have been fulfilled to demonstrate fully the legal capacity of the Signatory. The documents and records examined and which constitute direct and positive evidence of the legal capacity of the Signatory are:

a) The act of incorporation, dated [_____], granted before [_____] [or certificate of incorporation stating date of issuance and issuer, as the case may be according to the law of the jurisdiction of incorporation of the Company] duly recorded with [_____] in [_____] on [date], [and the certificate of good standing, if the law of the jurisdiction of incorporation of the Company so provides].

b) The bylaws of the Company dated [_____] executed in [_____] by [_____].

c) The resolution whereby the Signatory is empowered to act on behalf of the Company to grant this power consisting of [____] (which shall include date and issuer) [_____].

[If the power of attorney or other authorization that the Signatory has been granted by the Board of Directors of the Company, the instrument by which the members of the Board were appointed must be

el instrumento en el cual se designaron a los miembros del Consejo de Administración, indicando la fecha y lugar de dicha resolución].

(2) Con base en los documentos referidos en el párrafo (1) anterior, de los cuales se desprende la actual existencia legal de la Sociedad y la capacidad legal del Firmante y conforme a los cuales estoy en posibilidad de certificar:

a) Que la Sociedad es una sociedad debidamente constituida y que existe legalmente conforme a las leyes de [_____] [País].

b) Que el otorgante, bajo protesta de decir verdad, manifestó que su nombre es [_____], de nacionalidad [_____], quien es [_____] de la Sociedad.

c) Que el Firmante, bajo protesta de decir verdad, manifestó ante mí que la personalidad con la que comparece ante mí no ha sido limitada o revocada así como que la capacidad legal de la Sociedad para otorgar el presente poder no ha variado.

d) Que el principal asiento de los negocios de la Sociedad se encuentra ubicado en [_____].

e) Que el acto o actos para los que se confiere el presente poder están comprendidos entre los que constituye el objeto de la Sociedad.

f) En su calidad de [_____] de la Sociedad, el otorgante tiene capacidad suficiente para firmar y otorgar este Poder a nombre de la Sociedad.

g) Que este instrumento se otorga en los idiomas inglés y español, manifestando el Firmante que por este medio aprueba en nombre de la Sociedad la versión en español, la cual prevalecerá en caso de inconsistencia.

h) Que el Artículo 2554 (Dos Mil Quinientos Cincuenta y Cuatro) del Código Civil Federal de México, es del tenor literal siguiente:

"En todos los poderes generales para pleitos y cobranzas, bastará que se diga que se otorgan con todas las facultades generales que requieran cláusula especial conforme a la ley, para que se entiendan conferidos sin limitación alguna.

En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter para

mentioned in this power, stating the date and place thereof].

(2) That, on the basis of the documents described in paragraph (1) above, which prove the legal existence of the Company and the legal capacity of the Signatory, I am able to certify that:

a) the Company is a corporation duly organized and legally existing under the laws of [_____] [Country].

b) The Signatory under oath stated that his name is [_____] of [_____] nationality, who is [_____] of the Company.

c) The Signatory under oath stated before me that his legal capacity to appear before me has not been limited or revoked and that the Company's legal capacity to grant this power has not been modified.

d) That the main place of business of the Company is located at [_____].

e) That the purpose for which the present Power of Attorney is granted on behalf of the Company is permitted within its corporate purpose.

f) That the Signatory as [_____] of the Company, has legal capacity to sign and grant this Power on behalf of the Company.

g) That this instrument is executed in both the English and Spanish languages, and the Signatory states that he expressly approves the Spanish version on behalf of the Company, which shall prevail in case of inconsistency.

h) That Article 2554 (two thousand five hundred and fifty four) of the Federal Civil Code of Mexico, reads as follows:

"In all general powers of attorney for lawsuits and collections in which it is stated that they are granted with all the general and special powers that require the inclusion of a special clause pursuant to the law, it will be understood that they are granted without limitation.

In general powers of attorney to administer assets, it shall be sufficient to state that they are granted for

que el apoderado tenga toda clase de facultades administrativas.

En los poderes generales para ejercer actos de dominio, bastará que se den con ese carácter para que el apoderado tenga todas las facultades de propietario, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos.

Cuando se quisieren limitar las facultades de los apoderados en cualquiera de los tres casos antes mencionados, se consignarán las limitaciones, o los poderes serán especiales. Los notarios insertarán este artículo en los testimonios notariales de los poderes que otorguen".

i) Que leí el presente documento al otorgante y le expliqué su valor y fuerza legal, y una vez que el otorgante manifestó su conformidad con el contenido del presente documento, lo ratificó y firmó ante mi en esta fecha.

En fe de lo cual y para certificar lo anterior plasmé mi firma y sello de Notario Público.

Doy fe.

_____

Notario Público

El anterior instrumento que consta de \_\_\_ páginas fue firmado y ratificado ante mí por _____ en nombre de la Sociedad, en este día \_\_\_ de \_\_\_\_ de 2010.

Doy fe.

_____

Notario Público

Mi patente concluye el

_____

such purpose in order for the attorney-in-fact to have broad administrative powers.

In general powers of attorney to take actions relating to ownership, it shall be sufficient to state that they are granted for such purpose in order for the attorney-in-fact to have all the powers of the owner, both with respect to the assets and to take any actions to defend such assets.

If limitations are to be imposed on powers granted according to the three preceding paragraphs, such limitations shall be clearly expressed or the power of attorney shall be a special power. All Notary Publics shall transcribe this Article on the instrument containing the power of attorney granted before them".

i) That I read this instrument to the Signatory acting on behalf of the Company, explaining its legal force and effect, and once the Signatory stated his agreement with the contents of this document, he ratified it and signed it on behalf of the Company before me on this date.

In witness whereof given under my hand and seal of office. Doy fe.

I hereby certify.

_____

Notary Public

This instrument given in _____ pages was signed and ratified before me by _____ on this \_\_\_ day of _____, 2010.

I hereby certify.

_____

Notary Public

My commission expires on

_____

**SCHEDULE I.B**

| PODER IRREVOCABLE | IRREVOCABLE POWER OF ATTORNEY |

En la Ciudad de [_____], Estado (o Provincia) de [_____], [_____] [País], el [____] de [_____] de 2010, ante mi, [_____] Notario Público, debidamente autorizado para actuar en el Estado (o Provincia) de [_____], [_____] [País], compareció el Sr. [_____] en su carácter de [_____] [cargo desempeñado en la Sociedad otorgante] de [_____] [nombre de la Sociedad] (la "Sociedad"), sociedad debidamente constituida y existente bajo las leyes de [_____] [País], y manifestó: que por medio del presente instrumento y actuando en nombre de la Sociedad, en cumplimiento de la condición establecida en la Solicitud de Consentimiento emitida por Vitro, S.A.B. de C.V. ("Vitro") el día [ _____ ] (la "Solicitud") y como medio para cumplir con las obligaciones de la Sociedad derivadas del otorgamiento de su consentimiento conforme a la Solicitud, confiere y otorga en favor de los señores [_____] para que lo ejerciten conjunta o separadamente, un poder irrevocable para pleitos y cobranzas, general en cuanto a sus facultades, pero especial en cuanto a su objeto y tan amplio como en derecho sea necesario, en términos de lo dispuesto por el artículo 2554 del Código Civil Federal y sus correlativos en los códigos civiles de todas las entidades federativas de la República Mexicana, para efecto de que los apoderados representen a la Sociedad ante toda clase de particulares y/o ante toda clase de autoridades judiciales o administrativas o de cualquier tipo, en los Estados Unidos Mexicanos ("México"), respecto de cualquier y todos los actos relacionados con la reestructura de la deuda de Vitro y/o cualesquiera de las empresas subsidiarias directas e indirectas de Vitro, incluyendo sin limitación a Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontano, S.A.P.I. de C.V., Viméxico, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. y Vitro Automotriz, S.A. de C.V. (en lo sucesivo conjuntamente las "Subsidiarias de Vitro" e, individualmente cada una de ellas, una "Subsidiaria de Vitro"), así como de cualquier demanda o solicitud o procedimiento de concurso mercantil, ya sea voluntario o involuntario, con o sin convenio previo de Vitro y/o de cualquier Subsidiaria de Vitro:

In the City of [_____], State (or Province) of [_____], in [_____] [Country] on [_____], 2010, before me, [_____] Notary Public, duly authorized to act in the State (or Province) of [_____], [_____] [Country], appeared Mr. [_____], acting as [_____] [duty in the Granting Company] of [_____] [name of the Granting Company] (the "Company"), a Corporation duly organized, validly existing and in good standing under the laws of [_____] [Country] and stated that by means of this instrument and acting on behalf of the Company, in compliance with the condition set forth in the Consent Solicitation issued by Vitro, S.A.B. de C.V. ("Vitro") on [_____ ] (the "Consent Solicitation") and as a manner to fulfill obligations of the Company arising from the granting of its consent in the terms of the Consent Solicitation, confers and grants in favor of Mr. or Messrs. [_____] an irrevocable power of attorney for lawsuits and collections, to be exercised jointly or individually, which shall be general regarding the actions authorized, yet limited as to its purpose and as broad as may be required by law, pursuant to Article 2554 of the Federal Civil Code and the related provisions in the civil codes for the federal entities of the Mexican Republic, for the attorneys-in-fact to act on behalf of the Company before any private individual and/or any judicial, administrative or any other authority within the United Mexican States ("Mexico"), regarding any and all acts related to the restructuring of the debt of Vitro and/or any of the direct or indirect subsidiaries of Vitro, including without limitation Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontana, S.A.P.I. de C.V., Viméxico, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. and Vitro Automotriz, S.A. de C.V. (hereinafter, collectively, the "Subsidiaries of Vitro" and, individually each of them, a "Subsidiary of Vitro"), and any claim or petition or procedure of concurso mercantil, either voluntary or involuntary, prepackaged or without previous plan or agreement of Vitro and/or of any Subsidiary of Vitro:

En tal virtud, los apoderados gozarán de todas las facultades generales y aún aquellas para las que la ley exige cláusula especial, que para dicha clase de apoderados establece la ley, incluyendo, en forma enunciativa y no limitativa, las siguientes:

(1) Para negociar y en su caso suscribir y/o celebrar con Vitro y/o con Vitro y uno o más de los acreedores de dicha empresa y/o con cualquier Subsidiaria de Vitro y uno o más de los acreedores de la misma, un plan de reestructura previo o de cualquier tipo y/o un convenio de reestructura y/o un convenio judicial y/o un convenio concursal y/o cualesquier otro documento en virtud del cual acuerden términos y condiciones para una reestructura de los pasivos de Vitro y/o de cualquier Subsidiaria de Vitro, ya sea en términos de lo dispuesto en la Ley de Concursos Mercantiles o en cualquier otra ley aplicable y vigente en México;

(2) Para suscribir en forma conjunta con Vitro y/o con cualquier Subsidiaria de Vitro, en caso de que ello resulte necesario, una solicitud de declaración de concurso mercantil de Vitro y/o de cualquier Subsidiaria de Vitro;

(3) Para transigir;

(4) Para desistirse de toda clase de demandas, incluida la de amparo;

(5) Para articular y absolver posiciones;

(6) Para acudir ante notario público Mexicano de su elección para protocolizar este instrumento público, en caso de que lo estime conveniente o en caso de que ello resulte necesario para que el presente poder surta efectos con arreglo a la ley mexicana, así como para apostillar el presente documento y/o realizar cualquier otro acto que resulte o estime conveniente y/o necesario para que el mismo sea válido y eficaz conforme a las leyes aplicables;

[La Sociedad]

_____

Considering the foregoing, the attorneys-in- fact shall be empowered with all general powers including those for which the law requires the inclusion of a special clause, and including but not limited to the following:

(1) To negotiate and when applicable execute and/or enter into with Vitro and/or with Vitro and one or more of its creditors and/or with any Subsidiary of Vitro and one or more of the creditors of the same, a prepackaged or any other kind of restructuring plan and/or a restructuring agreement and/or a judicial agreement and/or a *convenio concursal* and/or any other document by means of which they shall agree on the terms and conditions of a restructuring of Vitro's indebtedness and/or of any Subsidiary of Vitro, which will be carried out under the *Concursos Mercantiles Act* or any other applicable legal provision which is in full force and effect within Mexico;

(2) To execute together with Vitro and/or with any Subsidiary of Vitro, in the event necessary, a request for the declaration of *concurso mercantil* of Vitro and/or any Subsidiary of Vitro;

(3) To negotiate and conclude transactions;

(4) To abandon any kind of lawsuits, including *amparo;*

(5) To appear before any court and take legal positions before the court;

(6) To appear before the Notary Public of its choice to notarize this public instrument for its delivery and execution according to Mexican Law, in case it is deemed convenient or necessary for this power of attorney to be effective under Mexican law, as well as to apostille this document and/or perform any other act that is or is deemed to be convenient and/or necessary for this document to be valid and enforceable in accordance with the applicable laws;

[The Company]

_____

Yo, [_____] en mi carácter de [_____][Secretario del órgano de administración o funcionario que tenga facultades de certificación de documentos o/y registros corporativos de la Sociedad otorgante], en este acto:

## DOY FE:

En este día [___] del mes de [_____] de 2010, [_____] [nombre de quien firma el poder](el "Firmante"), quien tiene capacidad legal, otorga este poder en representación de la Sociedad.

El suscrito certifica:

(1) que la representación que tiene el citado poderdante es legítima de acuerdo con las constancias, libros, instrumentos y documentos de la Sociedad que al efecto me fueron presentados, y que constituyen una prueba directa y objetiva de la legal existencia y subsistencia de la sociedad otorgante y de la representación mencionada, ya que habiéndolas examinado cuidadosamente me cercioré plenamente de su autenticidad y de que se cumplió con los requisitos que exigen los ordenamientos legales para tener por acreditada en forma indubitable la personalidad del Firmante. Los documentos citados que tuve a la vista y que constituyen una prueba directa y objetiva de la personalidad del Firmante son las siguientes:

a) El acta constitutiva de fecha [_____], otorgada ante [_____] [o certificado de incorporación, que señale fecha y quien lo emite, según disponga la ley del país de nacionalidad de la Sociedad] registrada por [_____ en [_____] el día [_____] de [_____] de [___] [y el certificado de subsistencia, si la ley del país de nacionalidad de la Sociedad lo contempla].

b) Los estatutos de la Sociedad , de fecha [_____] autorizados en [_____], por [_____].

[En caso de que el poder conforme al cual se le confieren facultades al Firmante para suscribir el presente poder haya sido otorgado por el Consejo de Administración de la Sociedad, deberá relacionarse el instrumento en el cual se designaron a los miembros del Consejo de Administración,

The undersigned, _____ in my capacity as [_____][Secretary of the board of directors or officer that has authority to certify documents and/or corporate information or records of the Company], hereby:

## GIVE FULL FAITH AND CREDIT THAT:

On this [___] day of [_____], 2010, [_____] [name of signatory of Power of Attorney] (the "Signatory"), having sufficient legal capacity, did grant the foregoing power of attorney on behalf of the Company.

The undersigned certifies that:

(1) the Signatory has the valid authority to bind the Company in accordance with records, books, instruments and documents of the Company, which constitute direct and positive evidence of the legal existence and good standing of the Company and of the capacity above mentioned as I have examined such records, and I have fully verified their authenticity and that all requirements have been fulfilled to demonstrate fully the legal capacity of the Signatory. The documents and records examined and which constitute direct and positive evidence of the legal capacity of the Signatory are:

a) The act of incorporation, dated [_____], granted before [_____] [or certificate of incorporation stating date of issuance and issuer, as the case may be according to the law of the jurisdiction of incorporation of the Company] duly recorded with [_____] in [_____] on [date] [_____], [and the certificate of good standing, if the law of the jurisdiction of incorporation of the Company so provides].

b) The bylaws of the Company dated [date] executed in [_____] by [_____].

[If the power of attorney or other authorization that the Signatory has been granted by the Board of Directors of the Company, the instrument by which the members of the Board were appointed must be mentioned in this power, stating the date and place thereof].

indicando la fecha y lugar de dicha resolución]. [_____]

[_____]

(2) Con base en los documentos referidos en el párrafo (1) anterior, de los cuales se desprende la actual existencia legal de la Sociedad y la capacidad legal del Firmante y conforme a los cuales estoy en posibilidad de certificar:

a) Que la Sociedad es una sociedad debidamente constituida y que existe legalmente conforme a las leyes de [_____] [País].

b) Que el otorgante, bajo protesta de decir verdad, manifestó que su nombre es [_____], de nacionalidad [_____], quien es [_____] de la Sociedad.

c) Que el Firmante, bajo protesta de decir verdad, manifestó ante mí que la personalidad con la que comparece ante mí no ha sido limitada o revocada así como que la capacidad legal de la Sociedad para otorgar el presente poder no ha variado.

d) Que el principal asiento de los negocios de la Sociedad se encuentra ubicado en [_____].

e) Que el acto o actos para los que se confiere el presente poder están comprendidos entre los que constituye el objeto de la Sociedad.

f) En su calidad de [_____] de la Sociedad, el otorgante tiene capacidad suficiente para firmar y otorgar este Poder a nombre de la Sociedad.

g) Que este instrumento se otorga en los idiomas inglés y español, manifestando el Firmante que por este medio aprueba en nombre de la Sociedad la versión en español, la cual prevalecerá en caso de inconsistencia.

h) Que el Artículo 2554 (Dos Mil Quinientos Cincuenta y Cuatro) del Código Civil Federal de México, es del tenor literal siguiente:

"En todos los poderes generales para pleitos y cobranzas, bastará que se diga que se otorgan con todas las facultades generales que requieran cláusula especial conforme a la ley, para que se entiendan conferidos sin limitación alguna.

En los poderes generales para administrar bienes,

(2) That, on the basis of the documents described in paragraph (1) above, which prove the legal existence of the Company and the legal capacity of the Signatory, I am able to certify that:

a) the Company is a corporation duly organized and legally existing under the laws of [_____] [Country].

b) The Signatory under oath stated that his name is [_____] of [_____] nationality, who is [_____] of the Company.

c) The Signatory under oath stated before me that his legal capacity to appear before me has not been limited or revoked and that the Company's legal capacity to grant this power has not been modified.

d) That the main place of business of the Company is located at [_____].

e) That the purpose for which the present Power of Attorney is granted on behalf of the Company is permitted within its corporate purpose.

f) That the Signatory as [_____] of the Company, has legal capacity to sign and grant this Power on behalf of the Company.

g) That this instrument is executed in both the English and Spanish languages, and the Signatory states that he expressly approves the Spanish version on behalf of the Company, which shall prevail in case of inconsistency.

h) That Article 2554 (two thousand five hundred and fifty four) of the Federal Civil Code of Mexico, reads as follows:

"In all general powers of attorney for lawsuits and collections in which it is stated that they are granted with all the general and special powers that require the inclusion of a special clause pursuant to the law, it will be understood that they are granted without limitation.

In general powers of attorney to administer assets, it

bastará expresar que se dan con ese carácter para que el apoderado tenga toda clase de facultades administrativas.

En los poderes generales para ejercer actos de dominio, bastará que se den con ese carácter para que el apoderado tenga todas las facultades de propietario, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos.

Cuando se quisieren limitar las facultades de los apoderados en cualquiera de los tres casos antes mencionados, se consignarán las limitaciones, o los poderes serán especiales. Los notarios insertarán este artículo en los testimonios notariales de los poderes que otorguen".

i) Que leí el presente documento al otorgante y le expliqué su valor y fuerza legal, y una vez que el otorgante manifestó su conformidad con el contenido del presente documento, lo ratificó y firmó ante mi en esta fecha.

En fe de lo cual y para certificar lo anterior plasmé mi firma.

Doy fe.

[_____]
Por: [_____][nombre]
Cargo: [_____]

[Secretario del órgano de administración o funcionario que tenga facultades de certificación de documentos y/o registros corporativos de la Sociedad otorgante]

El anterior instrumento que consta de [___] páginas fue firmado y ratificado ante mí por [_____] en nombre de la Sociedad, en este día [___] de [_____] de 2010.

Doy fe.

[_____]
Notario Público

Mi patente concluye el

[_____]

shall be sufficient to state that they are granted for such purpose in order for the attorney-in-fact to have broad administrative powers.

In general powers of attorney to take actions relating to ownership, it shall be sufficient to state that they are granted for such purpose in order for the attorney-in-fact to have all the powers of the owner, both with respect to the assets and to take any actions to defend such assets.

If limitations are to be imposed on powers granted according to the three preceding paragraphs, such limitations shall be clearly expressed or the power of attorney shall be a special power. All Notary Publics shall transcribe this Article on the instrument containing the power of attorney granted before them".

i) That I read this instrument to the Signatory acting on behalf of the Company, explaining its legal force and effect, and once the Signatory stated his agreement with the contents of this document, he ratified it and signed it on behalf of the Company before me on this date.

In witness whereof given under my hand.

I hereby certify.

[_____]
By: [_____][name]
Duty: [_____]

[Secretary of the board of directors or officer that has authority to certify documents and/or corporate information or records of the Company]

This instrument given in [_____] pages was signed and ratified before me by [_____] on this [___] day of [_____], 2010.

I hereby certify.

[_____]
Notary Public:

My commission expires on

[_____]

**SCHEDULE I.C**

| PODER IRREVOCABLE | IRREVOCABLE POWER OF ATTORNEY |
|---|---|

En la Ciudad de [_____], Estado (o Provincia) de [_____], [_____] [País], el [____] de [_____] de 2010, ante mi, [_____] Notario Público, debidamente autorizado para actuar en el Estado (o Provincia) de [_____], [_____] [País], compareció el Sr. [_____] (el "Otorgante") , y manifestó: que por medio del presente instrumento y actuando en nombre de la Sociedad, en cumplimiento de la condición establecida en la Solicitud de Consentimiento emitida por Vitro, S.A.B. de C.V. ("Vitro") el día [ ] (la "Solicitud") y como medio para cumplir con las obligaciones de la Sociedad derivadas del otorgamiento de su consentimiento conforme a la Solicitud, confiere y otorga en favor del (os) señor(es) [_____] para que lo ejerciten conjunta o separadamente, un poder irrevocable para pleitos y cobranzas, general en cuanto a sus facultades, pero especial en cuanto a su objeto y tan amplio como en derecho sea necesario, en términos de lo dispuesto por el artículo 2554 del Código Civil Federal y sus correlativos en los códigos civiles de todas las entidades federativas de la República Mexicana, para efecto de que los apoderados representen a la Sociedad ante toda clase de particulares y/o ante toda clase de autoridades judiciales o administrativas o de cualquier tipo, en los Estados Unidos Mexicanos ("México"), respecto de cualquier y todos los actos relacionados con la reestructura de la deuda de Vitro y/o cualesquiera de las empresas subsidiarias directas e indirectas de Vitro, incluyendo sin limitación a Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontano, S.A.P.I. de C.V., Viméxico, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. y Vitro Automotriz, S.A. de C.V. (en lo sucesivo conjuntamente las "Subsidiarias de Vitro" e, individualmente cada una de ellas, una "Subsidiaria de Vitro"), así como de cualquier demanda o solicitud o procedimiento de concurso mercantil, ya sea voluntario o involuntario, con o sin convenio previo de Vitro y/o de cualquier Subsidiaria de Vitro:

En tal virtud, los apoderados gozarán de todas las facultades generales y aún aquellas para las que la

In the City of [_____], State (or Province) of [_____], in [_____] [Country] on [_____], 2010, before me, [_____] Notary Public, duly authorized to act in the State (or Province) of [_____], [_____] [Country], appeared Mr. [_____] (the "Granting Person"), and stated that by means of this instrument and acting on behalf of the Company, in compliance with the condition set forth in the Consent Solicitation issued by Vitro, S.A.B. de C.V. ("Vitro") on [ ] (the "Consent Solicitation") and as a manner to fulfill obligations of the Company arising from the granting of its consent in the terms of the Consent Solicitation, confers and grants in favor of Mr. or Messrs. [_____] an irrevocable power of attorney for lawsuits and collections, to be exercised jointly or individually, which shall be general regarding the actions authorized, yet limited as to its purpose and as broad as may be required by law, pursuant to Article 2554 of the Federal Civil Code and the related provisions in the civil codes for the federal entities of the Mexican Republic, for the attorneys-in-fact to act on behalf of the Company before any private individual and/or any judicial, administrative or any other authority within the United Mexican States ("Mexico"), regarding any and all acts related to the restructuring of the debt of Vitro and/or any of the direct or indirect subsidiaries of Vitro, including without limitation Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Toluca, S.A. de C.V., FIC Regiomontano, S.A.P.I. de C.V., Viméxico, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. y Vitro Automotriz, S.A. de C.V. (hereinafter, collectively the "Subsidiaries of Vitro" and, individually each of them, a "Subsidiary of Vitro"), and any claim or petition or procedure of *concurso mercantil*, either voluntary or involuntary, prepackaged or without previous plan or agreement of Vitro and/or any Subsidiary of Vitro:

Considering the foregoing, the attorneys-in- fact shall be empowered with all general powers including

ley exige cláusula especial, que para dicha clase de apoderados establece la ley, incluyendo, en forma enunciativa y no limitativa, las siguientes:

(1) Para negociar y en su caso suscribir y/o celebrar con Vitro y/o con Vitro y uno o más de los acreedores de dicha empresa y/o con cualquier Subsidiaria de Vitro y uno o más de los acreedores de la misma, un plan de reestructura previo o de cualquier tipo y/o un convenio de reestructura y/o un convenio judicial y/o un convenio concursal y/o cualesquier otro documento en virtud del cual acuerden términos y condiciones para una reestructura de los pasivos de Vitro y/o de cualquier Subsidiaria de Vitro, ya sea en términos de lo dispuesto en la Ley de Concursos Mercantiles o en cualquier otra ley aplicable y vigente en México;

(2) Para suscribir en forma conjunta con Vitro y/o con cualquier Subsidiaria de Vitro, en caso de que ello resulte necesario, una solicitud de declaración de concurso mercantil de Vitro y/o de cualquier Subsidiaria de Vitro;

(3) Para transigir;

(4) Para desistirse de toda clase de demandas, incluida la de amparo;

(5) Para articular y absolver posiciones;

(6) Para acudir ante notario público Mexicano de su elección para protocolizar este instrumento público, en caso de que lo estime conveniente o en caso de que ello resulte necesario para que el presente poder surta efectos con arreglo a la ley mexicana, así como para apostillar el presente documento y/o realizar cualquier otro acto que resulte o estime conveniente y/o necesario para que el mismo sea válido y eficaz conforme a las leyes aplicables;

[Otorgante]

_____

those for which the law requires the inclusion of a special clause, and including but not limited to the following:

(1) To negotiate and when applicable execute and/or enter into with Vitro and/or with Vitro and one or more of its creditors and/or with any Subsidiary of Vitro and one or more creditors of the same, a prepackaged or any other kind of restructuring plan and/or a restructuring agreement and/or a judicial agreement and/or a *convenio concursal* and/or any other document by means of which they shall agree on the terms and conditions of a restructuring of Vitro's indebtedness and/or of any Subsidiary of Vitro, which will be carried out under the *Concursos Mercantiles Act* or any other applicable legal provision which is in full force and effect within Mexico;

(2) To execute together with Vitro and/or with any Subsidiary of Vitro, in the event necessary, a request for the declaration of *concurso mercantil* of Vitro and/or of any Subsidiary of Vitro;

(3) To negotiate and conclude transactions;

(4) To abandon any kind of lawsuits, including *amparo;*

(5) To appear before any court and take legal positions before the court;

(6) To appear before the Notary Public of its choice to notarize this public instrument for its delivery and execution according to Mexican Law, in case it is deemed convenient or necessary for this power of attorney to be effective under Mexican law, as well as to apostille this document and/or perform any other act that is or is deemed to be convenient and/or necessary for this document to be valid and enforceable in accordance with the applicable laws;

[Granting Person]

_____

Yo, _____ en mi carácter de Notario Público, en este acto:

## DOY FE:

En este día ___ del mes de _____ de 2010, el Otorgante otorga este poder.

El suscrito Notario Público certifica:

a) Que el Otorgante, bajo protesta de decir verdad, manifestó que sus datos generales son los siguientes:

Nombre: [_____]
Nacionalidad: [_____]
Estado civil: [_____]
Edad: [_____]
Ocupación: [_____]
Domicilio: [_____]

b) Que este instrumento se otorga en los idiomas inglés y español, manifestando el Otorgante que por este medio aprueba en nombre de la Sociedad la versión en español, la cual prevalecerá en caso de inconsistencia.

c) Que el Artículo 2554 (Dos Mil Quinientos Cincuenta y Cuatro) del Código Civil Federal de México, es del tenor literal siguiente:

"En todos los poderes generales para pleitos y cobranzas, bastará que se diga que se otorgan con todas las facultades generales que requieran cláusula especial conforme a la ley, para que se entiendan

The undersigned, _____ in my capacity as Notary Public, hereby:

## GIVE FULL FAITH AND CREDIT THAT:

On this ____ day of _____, 2010, the "Granting Person did grant the foregoing power of attorney.

The undersigned Notary Public certifies that:

a) The Granting Person under oath stated that his personal information or data is as follows:

Name: [_____]
Nationality: [_____]
Marital or Civil Status: [_____]
Age: [_____]
Occupation: [_____]
Domicile or Address: [_____]

b) That this instrument is executed in both the English and Spanish languages, and the Granting Person states that he expressly approves the Spanish version on behalf of the Company, which shall prevail in case of inconsistency.

c) That Article 2554 (two thousand five hundred and fifty four) of the Federal Civil Code of Mexico, reads as follows:

"In all general powers of attorney for lawsuits and collections in which it is stated that they are granted with all the general and special powers that require the inclusion of a special clause pursuant to the law, it

conferidos sin limitación alguna.

En los poderes generales para administrar bienes, bastará expresar que se dan con ese carácter para que el apoderado tenga toda clase de facultades administrativas.

En los poderes generales para ejercer actos de dominio, bastará que se den con ese carácter para que el apoderado tenga todas las facultades de propietario, tanto en lo relativo a los bienes, como para hacer toda clase de gestiones a fin de defenderlos.

Cuando se quisieren limitar las facultades de los apoderados en cualquiera de los tres casos antes mencionados, se consignarán las limitaciones, o los poderes serán especiales. Los notarios insertarán este artículo en los testimonios notariales de los poderes que otorguen".

d) Que leí el presente documento al otorgante y le expliqué su valor y fuerza legal, y una vez que el otorgante manifestó su conformidad con el contenido del presente documento, lo ratificó y firmó ante mi en esta fecha.

El anterior instrumento que consta de ___ páginas fue firmado y ratificado ante mí por el Otorgante, en este día ___ de _____ de 2010.

Doy fe.

_____
Notario Público

---

will be understood that they are granted without limitation.

In general powers of attorney to administer assets, it shall be sufficient to state that they are granted for such purpose in order for the attorney-in-fact to have broad administrative powers.

In general powers of attorney to take actions relating to ownership, it shall be sufficient to state that they are granted for such purpose in order for the attorney-in-fact to have all the powers of the owner, both with respect to the assets and to take any actions to defend such assets.

If limitations are to be imposed on powers granted according to the three preceding paragraphs, such limitations shall be clearly expressed or the power of attorney shall be a special power. All Notary Publics shall transcribe this Article on the instrument containing the power of attorney granted before them".

d) That I read this instrument to the Signatory acting on behalf of the Company, explaining its legal force and effect, and once the Signatory stated his agreement with the contents of this document, he ratified it and signed it on behalf of the Company before me on this date.

This instrument given in _____ pages was signed and ratified before me by the Granting Person on this ___ day of _____, 2010.

I hereby certify.

_____
Notary Public:

**SCHEDULE II**

Hoja de firma del Convenio de Reestructura de Vitro.

Crédito:

Notas 2012:

Número de notas: [                ]
Valor nominal: [                ]

Notas 2013

Número de notas: [                ]
Valor nominal: [                ]

Notas 2017

Número de notas: [                ]
Valor nominal: [                ]

Cebures Vitro 03

Número de certificados: [                ]
Valor nominal: [                ]

Cebures Vitro 08

Número de certificados: [                ]
Valor nominal: [                ]

Otros créditos:

Identificación: [                ]

[El consentimiento que se otorga a través de esta firma es por el monto que resulte reconocido en la Sentencia de Reconocimiento de Créditos a favor del Acreedor cuyo nombre se indica a continuación.]

_____

[NOMBRE DEL ACREEDOR]

Representado por:_____
Nombre:
Título:
Fecha:

**[This is the English translation of the signature page. Please sign the Spanish version of the signature page on the preceding page.]**

Signature page of the Vitro Restructuring Agreement.

Credit:

  2012 Notes

   Note Number: [          ]
   Nominal Value: [          ]

  2013 Notes

   Note Number: [          ]
   Nominal Value: [          ]

  2017 Notes

   Note Number: [          ]
   Nominal Value: [          ]

  Cebures Vitro 03

   Certificate Number: [          ]
   Nominal Value: [          ]

  Cebures Vitro 08

   Certificate Number: [          ]
   Nominal Value: [          ]

Other credits:

  Identification: [          ]

[Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgment Judgment in favor of the Creditor's name which is indicated below.]

_____

[CREDITOR NAME]

Represented by:_____
 Name:
 Title:
 Date:

Any questions or requests for assistance or for additional copies of the Statement, this Letter of Transmittal, or related documents may be directed to the Depositary at its telephone numbers set forth below.

The Depositary for the Tender Offer is:

**D.F. King & Co., Inc.**

*By Registered or Certified Mail,*
*by Hand or by Overnight Courier*

**48 Wall Street - 22nd Floor**
**New York, New York 10005**

*By Facsimile (for Eligible Institutions only):* (212) 809-8838
*Attn*: Elton Bagley
*For Confirmation:* (212) 493-6996

*Banks and Brokers call:* (212) 269-5550
*All others call toll free:* (800) 431-9633

The Exchange Agent for the Exchange Offer and Consent Solicitation is:

**D.F. King & Co., Inc.**

*By Registered or Certified Mail,*
*by Hand or by Overnight Courier*

**48 Wall Street - 22nd Floor**
**New York, New York 10005**

*By Facsimile (for Eligible Institutions only):* (212) 809-8838
*Attn*: Elton Bagley
*For Confirmation:* (212) 493-6996

Any questions or requests for assistance or for additional copies of the Statement, this Letter of Transmittal, or related documents may be directed to the Information Agent at its telephone numbers set forth below.

The Information Agent for the Exchange Offer and Consent Solicitation is:

**D.F. King & Co., Inc.**

**48 Wall Street - 22nd Floor**
**New York, New York 10005**

*Banks and Brokers call:* (212) 269-5550
*All others call toll free:* (800) 431-9633
vitro@dfking.com

<DOCUMENT>
<TYPE>      EX-99.T3E.3
<FILENAME>  y87415exv99wt3ew3.htm
<DESCRIPTION>  EX-99.T3E.3
<TEXT>

### LETTER OF INSTRUCTIONS TO BENEFICIAL OWNERS

## Vitro, S.A.B. de C.V.

### Offer to Purchase and Offer to Exchange and Consent Solicitation Relating to

### $300,000,000 Aggregate Principal Amount of 8.625% Senior Notes due 2012,

### $216,000,000 Aggregate Principal Amount of 11.75% Senior Notes due 2013 and

### $700,000,000 Aggregate Principal Amount of 9.125% Senior Notes due 2017

---

**THE TENDER OFFER AND THE EXCHANGE OFFER AND CONSENT SOLICITATION EXPIRE AT 9:00 A.M., NEW YORK CITY TIME, ON DECEMBER 1, 2010, UNLESS EXTENDED BY US (SUCH TIME AND DATE, AS IT MAY BE EXTENDED, THE "EXPIRATION TIME"). ANY TENDER OF OLD NOTES IN THE TENDER OFFER PROVIDED AFTER THE DATE OF THE STATEMENT IS IRREVOCABLE AND MAY NOT BE WITHDRAWN AND ANY EXCHANGE OF OLD NOTES AND CONSENTS PROVIDED IN THE EXCHANGE OFFER AND CONSENT SOLICITATION AFTER THE DATE OF THE STATEMENT ARE IRREVOCABLE AND MAY NOT BE WITHDRAWN, EXCEPT IN THE LIMITED CIRCUMSTANCES SET FORTH IN THE STATEMENT.**

---

November 1, 2010

To Our Clients:

Enclosed for your consideration are a solicitation statement dated November 1, 2010 (as the same may be amended or supplemented from time to time, the "**Statement**") and a form of Letter of Transmittal (the "**Letter of Transmittal**") to be considered in conjunction with this Letter of Instructions (as the same may be amended or supplemented from time to time, the "**Letter of Instructions**") relating to (1) the Tender Offer (as described in the Statement) by Vitro, S.A.B. de C.V. (the "**Company**") and Administración de Inmuebles Vitro, S.A. de C.V. ("**AIV**"), a wholly-owned subsidiary of the Company, as co-offerors in the Tender Offer and (2) the Exchange Offer and Consent Solicitation (as described in the Statement) by the Company from holders of record as of 5:00 p.m., New York Ctiy time, on November 1, 2010 (the "**Record Date**") of the Company's 8.625% Senior Notes due 2012 (the "**2012 Notes**"), the 11.75% Senior Notes due 2013 (the "**2013 Notes**") and the 9.125% Senior Notes due 2017 (the "**2017 Notes**" and, together with the 2012 Notes and the 2013 Notes, the "**Old Notes**") to the approval of the *Concurso* Plan (as described in the Statement), pursuant to which the Company would exchange all of the outstanding Restructured Debt for the Restructuring Consideration (each as described in the Statement) on a pro rata basis. Capitalized terms used but not defined herein have the meanings given to them in the Statement.

If you are choosing to tender Old Notes in the Tender Offer, please follow the procedure below:

- Execute and notarize this Letter of Instructions in Section I, and check box 1;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of the Old Notes and the bid price you wish to submit;

- Make sure you received and reviewed the Statement;

- If you believe you have received any incorrect or incomplete documents, including this Letter of Instructions, contact your broker, dealer nominee or other person who sent you these materials immediately; and

- Return all pages of the completed Letter of Instructions to your broker, dealer, nominee or other person who sent you these materials.

If you are choosing to tender Old Notes in the Tender Offer and to submit any such Old Notes that are not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation, please follow the procedure below:

- Execute and notarize this Letter of Instructions in Section I, and check box 2;

- Provide the relevant details about special payment instructions, if any, and about yourselves and your accounts in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of the Old Notes and the bid price you wish to submit;

- Make sure you received and reviewed the Statement;

- If you believe you have received any incorrect or incomplete documents, including this Letter of Instructions, contact your broker, dealer nominee or other person who sent them these materials immediately; and

- Return all pages of the completed Letter of Instructions to your broker, dealer, nominee or other person who sent you these materials.

If you are choosing to exchange Old Notes in the Exchange Offer and Consent Solicitation, please follow the procedure below:

- Execute and notarize this Letter of Instructions in Section I, and check box 3;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.1 or III.A.2, as applicable;

- Indicate in Section III.A.3 the aggregate principal amount of the Old Notes that you wish to submit;

- Make sure you received and reviewed the Statement;

- If you believe you have received any incorrect or incomplete documents, including this Letter of Instructions, contact your broker, dealer nominee or other person who sent you these materials immediately; and

- Return all pages of the completed Letter of Instructions to your broker, dealer, nominee or other person who sent you these materials.

**IT IS RECOMMENDED THAT YOU DELIVER THESE INSTRUCTIONS TO THE HOLDER OF RECORD WITH SUFFICIENT TIME SO THAT YOUR INSTRUCTIONS MAY BE PROCESSED PRIOR TO THE DEADLINE FOR DELIVERY. PLEASE CONFIRM ALL DEADLINES WITH SUCH PERSON. IF THE COMPLETED INSTRUCTIONS ARE NOT RECEIVED IN A TIMELY MANNER, YOUR OLD NOTES MAY NOT BE SUBMITTED PRIOR TO THE EXPIRATION TIME.**

**IF YOU HAVE ANY QUESTIONS REGARDING THE TENDER OFFER OR THE EXCHANGE OFFER AND CONSENT SOLICITATION OR THIS LETTER OF INSTRUCTIONS, PLEASE CALL THE DEPOSITARY OR THE INFORMATION AND EXCHANGE AGENT, AS APPLICABLE, AT ITS PHONE NUMBER LISTED ON THE BACK COVER OF THE STATEMENT.**

This material is being forwarded to you as the beneficial owner of Old Notes held by us for your account but not registered in your name. Delivery of Old Notes and consent may be made by us as the holder of record and only pursuant to your instructions.

Accordingly, we request instructions as to whether you wish us to (i) tender to the Company and AIV for purchase in the Tender Offer the aggregate principal amount of Old Notes indicated in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, (ii) tender to the Company and AIV for purchase in the Tender Offer and submit to the Company any such Old Notes that are not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation in the aggregate principal amount of Old Notes indicated in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, or (iii) submit to the Company for exchange in the Exchange Offer and Consent Solicitation the aggregate principal amount of Old Notes indicated in the box in Section III.A.3 under the heading "Amounts of Old Notes Exchanged in the Exchange Offer and Consent Solicitation," with respect to any of the Old Notes held by us for your account. If you wish to have us do so, please so instruct us by completing, signing and returning to us the instruction form that appears on the reverse side hereof.

If you fail to elect either option, whether by not submitting the Letter of Transmittal or failing to indicate your election in a submitted Letter of Transmittal, you will not receive the Tender Offer Consideration or the Consent Payment (each as described in the Statement). However, the *Convenio Concursal* (as described in the Statement), if approved and consummated, will bind all holders of the Old Notes, regardless of whether or how you voted with respect to the *Concurso* Plan in the consent solicitation or otherwise.

## INSTRUCTIONS TO HOLDER(S) OF RECORD

The undersigned acknowledges receipt of the Statement and the enclosed material referred to therein relating to the Tender Offer by the Company and AIV and the Exchange Offer and Consent Solicitation by the Company from holders of record as of the Record Date of the Old Notes to the approval of the *Concurso* Plan, which contemplates the exchange of the Old Notes for the Note Restructuring Consideration on a pro rata basis (as described in the Statement).

This will instruct you to (i) tender to the Company and AIV for purchase in the Tender Offer the aggregate principal amount of Old Notes indicated in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, (ii) tender to the Company and AIV for purchase in the Tender Offer and submit to the Company any such Old Notes that are not accepted for payment in the Tender Offer for exchange in the Exchange Offer and Consent Solicitation in the aggregate principal amount of Old Notes indicated in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, or (iii) submit to the Company for exchange in the Exchange Offer and Consent Solicitation the aggregate principal amount of Old Notes indicated in the box in Section III.A.3 under the heading "Amounts of Old Notes Exchanged in the Exchange Offer and Consent Solicitation."

Unless otherwise indicated in Section II.A.2 in the case of the Tender Offer or in Section III.A.2 in the case of the Exchange Offer and Consent Solicitation, the Depositary or the Information and Exchange Agent, as applicable, will deliver the Tender Offer Consideration and/or the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee (each as described in the Statement), as applicable, to the undersigned at the address set forth in Section II.A.1. Consenting holders should indicate, in the applicable box, the name and address to which the Tender Offer Consideration and/or the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee, as applicable, are to be issued or sent, if different from the name and address of the person submitting this Letter of Instructions. In the case of issuance or payment in a different name, the tax identification number of the person named must also be indicated and an IRS Form W-9 for such recipient must be completed in addition to the IRS Form W-9 provided by the consenting holder. An IRS Form W-9 may be obtained on the Internal Revenue Service website at *www.irs.gov*. If no such instructions are given, the Tender Offer Consideration and/or the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee, as applicable, will be sent to the name and address of the person signing this Letter of Instructions.

### Section I.   Confirmations

I, the undersigned beneficial owner or intermediary, hereby represent, warrant and undertake to the Company, the Depositary or the Information and Exchange Agent, as applicable, and my custodian bank or brokerage firm holder (you should tick the applicable box in (D) below if you agree):

(A)   that I authorize and instruct to submit irrevocable ATOP instructions to DTC for the Old Notes specified herein, with the effect on and, in the case of the Exchange Offer and Consent Solicitation, from the date hereof until the Old Notes are cancelled or the Old Notes are validly withdrawn (i) in the event the Company amends the Exchange Offer and Consent Solicitation in a manner that is materially adverse to holders of Restructured Debt, (ii) as required by applicable law, (iii) in the event the *concurso mercantil* proceeding of the Company is not filed on or before December 31, 2010, (iv) if the Issue Date (as described in the Statement) does not occur on or before the Outside Consummation Date (as described in the Statement), or (v) the proposed *Concurso* Plan is amended in a manner that would have a material effect on holders of the Old Notes, and to deliver a Letter of Instructions to the Depositary or the Information and Exchange Agent, as necessary and applicable, to confirm the substance of the information contained in such ATOP or blocking instructions; and

(B)   that I am the relevant beneficial owner(s) or intermediary(ies) of the Old Notes identified herein and have authority

1. to give the confirmation set out in Section II.A.3 on behalf of myself or the person identified in Section II.A.2 herein in the case of the Tender Offer or in Section III.A.3 on behalf of myself or the person identified in Section III.A.2 herein in the case of the Exchange Offer and Consent Solicitation;

2. to indicate the aggregate principal amount of Old Notes as required in Section II.A.3 herein in the case of the Tender Offer or in Section III.A.3 herein in the case of the Exchange Offer and Consent Solicitation; and

(C) that I irrevocably authorize and instruct you

1. to execute the Letter of Transmittal, the Power of Attorney attached thereto as Schedule I.A., I.B or I.C, as applicable, and the signature page of the *Concurso* Plan attached thereto as Schedule II;

2. to produce this Letter of Instructions or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby;

3. to deliver a copy of this Letter of Instructions to the Depositary or the Information and Exchange Agent, as applicable, for the benefit of the Company and, if applicable, AIV;

4. to join and adhere to the *concurso mercantil* petition to be filed by the Company, in accordance with the Statement;

5. to execute and consent to the *Concurso* Plan; and

(D) that, with respect to the Old Notes, I hereby instruct you to (check one)

1. ☐ tender to the Company and AIV with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and instruct that any such Old Notes tendered but not accepted in the Tender Offer be returned to the undersigned;

2. ☐ tender to the Company and AIV with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, and, with respect to any Old Notes tendered but not accepted for payment in the Tender Offer, submit to the Company for exchange, join and adhere to the *concurso mercantil* petition to be filed by the Company and consent to the *Concurso* Plan with respect to the aggregate principal amount of the Old Notes listed in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable, or;

3. ☐ submit to the Company for exchange, join and adhere to the *concurso mercantil* petition to be filed by the Company and consent to the *Concurso* Plan with respect to the aggregate principal amount of the Old Notes listed in Section III.A.3 under the heading "Amounts of Old Notes Exchanged in the Exchange Offer and Consent Solicitation."

| | |
|---|---|
| **Date authorized** | **Signature of beneficial owner or duly authorized representative*** |

STATE OF _____ )

                                                      : ss.:

COUNTY OF _____ )

     On the _____ day of _____ in the year 2010 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and he/she acknowledged to me that he/she executed the same, and that he/she made such appearance before the undersigned in the County of _____, State of _____.

_____
Notary Public

**\* IMPORTANT: Each Letter of Instructions must, if signed by a duly authorized representative acting , provide the applicable information as set out below.**

(a) In the case of a representative acting on behalf of the beneficial owner, provide the following information:

(i) Authority to execute on behalf of the beneficial owner. [_____]

(ii) Date and place of the document evidencing such authority. [_____]

(b) In the case of the beneficial owner being an entity different than an individual, provide the following information:

(i) The beneficial owner is a corporation duly organized and legally existing under the laws of [_____] [Country].

(iii) The main place of business of the beneficial owner is located at [_____].

(iv) The act of incorporation is dated [_____] and was granted before [_____] [or certificate of incorporation stating date of issuance and issuer, as the case may be according to the law of the jurisdiction of incorporation of the beneficial owner] duly recorded with [_____] in [_____] on [date] [_____], [and the certificate of good standing, if the law of the jurisdiction of incorporation of the beneficial owner so provides].

(v) The bylaws of the beneficial owner are dated [_____] [date] and were executed in [_____] by [_____].

(vi) The resolution whereby the signatory is empowered to act on behalf of the beneficial owner to grant this instruction consists of [_____] (which shall include date and issuer) [_____].

(c) If the power of attorney or other authorization to the signatory has been granted by the Board of Directors of the beneficial owner, the instrument by which the members of the Board of Directors were appointed must be mentioned in this space, stating the date and place thereof.

[_____]

**Section II.** **Tender of Old Notes in the Tender Offer**

**A.1.** **Payment Instructions**

To be completed if the Tender Offer Consideration is to be issued in the name of the person who submits this Letter of Instructions.

---

**PLEASE SIGN HERE**

Dated : _____, 2010

Signature(s) : _____

Print Name(s) : _____

Address : _____

_____

*(Please include Zip Code)*

Telephone Number : _____

*(Please include Area Code)*

Tax Identification Number : _____

(*Social Security Number or Employer Identification Number*)

My Account Number with You : _____

---

**A.2.** **Special Payment Instructions for Tender Offer Consideration**

To be completed in connection with the Tender Offer ONLY if the Old Notes in an aggregate principal amount not tendered or not accepted for payment are to be issued in the name of, or if the payment check for the Tender Offer Consideration (as described in the Statement) is to be issued to the order of, someone other than the person or persons whose signature(s) appears within this Letter of Instructions, or issued to an address different from that shown in the boxes in Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable," within this Letter of Instructions, or if Old Notes tendered by book-entry transfer that are not accepted for payment are to be credited to an account maintained at the book-entry transfer facility other than the one designated above.

---

**SPECIAL PAYMENT INSTRUCTIONS**

Issue (check as applicable): ☐ 2012 Notes  ☐ 2013 Notes  ☐ 2017 Notes

☐ Payment Check(s)

Name : _____

(Please Print)

Address : _____

(Please include Zip Code)

---

| Taxpayer Identification Number : |
|---|
| (Social Security Number or Employer Identification Number) |

A correct taxpayer identification number must also be provided on IRS Form W-9, if applicable.

☐ Credit unpurchased Old Notes by book-entry to the book-entry transfer facility account set forth below:

DTC Account Number : _____

Number of Account Party : _____

## A.3. Bid Price

If your bank, broker, dealer, trust company or other nominee requires you to complete this Letter of Instructions, then you must complete the boxes below entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable. This means that if you elect to participate, you must specify the minimum Tender Offer Consideration (as described in the Statement) you would be willing to receive in exchange for each $1,000 principal amount of Old Notes you choose to tender in the Tender Offer (the "**Bid Price**").

If fewer than all of the Old Notes owned by you are tendered, you must fill in the aggregate principal amounts of such Old Notes tendered in the fourth column of the boxes in this Section II.A.3 entitled "Bid Price for 2012 Notes," "Bid Price for 2013 Notes" and "Bid Price for 2017 Notes," as applicable. The entire aggregate principal amount represented by the Old Notes delivered to the Depositary will be deemed to have been tendered, unless otherwise indicated.

Indicate in the box below the aggregate principal amount of each series of Old Notes to which this Letter of Transmittal relates, and either (i) specify the Bid Price (in increments of $2.50) within the range of $500 (the "**Minimum Bid Price**") and $575 that you would be willing to receive in exchange for each $1,000 principal amount of Old Notes (the "**Maximum Bid Price**"), or (ii) do not specify a Maximum Bid Price, in which case you will be deemed to have specified the Minimum Bid Price. If the space provided below is inadequate, you should list the principal amount of each series of Old Notes being tendered and the Maximum Bid Price, if any, on a separately executed schedule and affix the schedule to this Letter of Transmittal.

### Bid Price for 2012 Notes

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED** | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2012 NOTES ARE BEING TENDERED*** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

### Bid Price for 2013 Notes

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED** | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2013 NOTES ARE BEING TENDERED*** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**Bid Price for 2017 Notes**

| NAME AND ADDRESS(ES) OF HOLDER(S) OR NAME OF DTC PARTICIPANT AND DTC PARTICIPANT'S DTC ACCOUNT NUMBER IN WHICH OLD NOTES ARE HELD (PLEASE FILL IN, IF BLANK) | AGGREGATE PRINCIPAL AMOUNT REPRESENTED** | PRINCIPAL AMOUNT TENDERED | BID PRICE AT WHICH 2017 NOTES ARE BEING TENDERED*** |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

---

\*\*    Unless otherwise indicated in the column labeled "Principal Amount Tendered" and subject to the terms and conditions of the Statement, you will be deemed to have tendered the entire aggregate principal amount indicated in the column labeled "Aggregate Principal Amount Represented" in respect of that series of Old Notes.

\*\*\*   Each Bid Price must be in multiples of $2.50 per $1,000 principal amount. If any Bid Price is not submitted in a whole increment of $2.50, such Bid Price will be rounded down to the nearest $2.50 increment. **The Bid Price you specify, if any, must be within a range between $2.50 and $2.50 per $1,000 principal amount, and no Old Notes will be accepted outside this range**. If you tender Old Notes without specifying a Bid Price, you will be deemed to have selected the Minimum Bid Price in respect of that series of Old Notes.

9

**Section III. Tender of Old Notes in the Exchange Offer and Consent Solicitation**

**A.1. Payment Instructions**

To be completed if the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee is to be issued in the name of the person who submits this Letter of Instructions.

---

**PLEASE SIGN HERE**

Dated : _____, 2010

Signature(s) : _____

Print Name(s) : _____

Address : _____

_____
(<em>Please include Zip Code</em>)

Telephone Number : _____
(<em>Please include Area Code</em>)

Tax Identification Number : _____
(<em>S</em>ocial Security Number or Employer Identification Number)

My Account Number with You : _____

---

**A.2. Special Payment Instructions for Note Consent Payment, Restructuring Cash Payment or Restructuring Fee**

To be completed ONLY if the Note Consent Payment, the Restructuring Cash Payment or the Restructuring Fee is to be issued in the name of someone other than the person who submits this Letter of Instructions.

---

**SPECIAL PAYMENT INSTRUCTIONS**

Issue (check as applicable): ☐ 2012 Notes   ☐ 2013 Notes   ☐ 2017 Notes

☐ Payment Check(s)

Name : _____
(Please Print)

Address : _____
(Please include Zip Code)

Taxpayer Identification Number : _____
(Social Security Number or Employer Identification Number)

---

**A.3. Amount of Old Notes Exchanged in the Exchange Offer and Consent Solicitation**

| OLD NOTES | CUSIP | ISIN | AGGREGATE PRINCIPAL AMOUNT |
|---|---|---|---|
| 2012 Notes | 92851RAC1 | US92851RAC16 | |
| 2013 Notes | 92851FAD5 | US92851FAD50 | |
| 2017 Notes | 92851RAD9 | US92851RAD98 | |
| Total Aggregate Principal Amount Submitted for Tender | | | |

<DOCUMENT>
<TYPE>      EX-99.T3G
<FILENAME>  y87415exv99wt3g.htm
<DESCRIPTION> EX-99.T3G
<TEXT>

# FORM T-1

## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

### STATEMENT OF ELIGIBILITY
### UNDER THE TRUST INDENTURE ACT OF 1939 OF A
### CORPORATION DESIGNATED TO ACT AS TRUSTEE

### CHECK IF AN APPLICATION TO DETERMINE
### ELIGIBILITY OF A TRUSTEE PURSUANT TO
### SECTION 305(b)(2) ☑

---

# THE BANK OF NEW YORK MELLON
### (Exact name of trustee as specified in its charter)

|  |  |
|---|---|
| New York<br>(State of incorporation<br>if not a U.S. national bank) | 13-5160382<br>(I.R.S. employer<br>identification no.) |
| One Wall Street, New York, NY<br>(Address of principal executive offices) | 10286<br>(Zip code) |

---

### Vitro, S.A.B. de C.V.
### (Exact name of obligor as specified in its charter)

|  |  |
|---|---|
| Mexico<br>(State or other jurisdiction of<br>incorporation or organization) | Not Applicable<br>(I.R.S. employer<br>identification no.) |
| Ave. Ricardo Margáin 400<br>Col. Valle del Campestre<br>San Pedro Garza García, Nuevo León<br>Mexico<br>(Address of principal executive offices) | 66265<br>(Zip code) |

---

### Notes due 2019
### Mandatory Convertible Debentures
### (Title of the indenture securities)

1. **General information. Furnish the following information as to the Trustee:**

   (a) **Name and address of each examining or supervising authority to which it is subject.**

| Name | Address |
|------|---------|
| Superintendent of Banks of the State of New York | One State Street, New York, N.Y. 10004-1417, and Albany, N.Y. 12223 |
| Federal Reserve Bank of New York | 33 Liberty Street, New York, N.Y. 10045 |
| Federal Deposit Insurance Corporation | Washington, D.C. 20429 |
| New York Clearing House Association | New York, New York 10005 |

   (b) **Whether it is authorized to exercise corporate trust powers.**

   Yes.

2. **Affiliations with Obligor.**

   **If the obligor is an affiliate of the trustee, describe each such affiliation.**

   None.

16. **List of Exhibits.**

   **Exhibits identified in parentheses below, on file with the Commission, are incorporated herein by reference as an exhibit hereto, pursuant to Rule 7a-29 under the Trust Indenture Act of 1939 (the "Act") and 17 C.F.R. 229.10(d).**

   1. A copy of the Organization Certificate of The Bank of New York Mellon (formerly The Bank of New York and formerly Irving Trust Company) as now in effect, which contains the authority to commence business and a grant of powers to exercise corporate trust powers. (Exhibit 1 to Amendment No. 1 to Form T-1 filed with Registration Statement No. 33-6215, Exhibits 1a and 1b to Form T-1 filed with Registration Statement No. 33-21672, Exhibit 1 to Form T-1 filed with Registration Statement No. 33-29637 and Exhibit 1 to Form T-1 filed with Registration Statement No. 333-121195.)

   4. A copy of the existing By-laws of the Trustee. (Exhibit 4 to Form T-1 filed with Registration Statement No. 333-121195.)

   6. The consent of the Trustee required by Section 321(b) of the Act. (Exhibit 6 to Form T-1 filed with Registration Statement No. 333-106702.)

   7. A copy of the latest report of condition of the Trustee published pursuant to law or to the requirements of its supervising or examining authority.

## SIGNATURE

Pursuant to the requirements of the Act, the Trustee, The Bank of New York Mellon, a corporation organized and existing under the laws of the State of New York, has duly caused this statement of eligibility to be signed on its behalf by the undersigned, thereunto duly authorized, all in The City of New York, and State of New York, on the 29th day of September, 2010.

THE BANK OF NEW YORK MELLON

By:  /s/ Kevin Binnie
     Kevin Binnie
     Vice President

-3-

EXHIBIT 7

Consolidated Report of Condition of

THE BANK OF NEW YORK MELLON

of One Wall Street, New York, N.Y. 10286
And Foreign and Domestic Subsidiaries,

a member of the Federal Reserve System, at the close of business June 30, 2010, published in accordance with a call made by the Federal Reserve Bank of this District pursuant to the provisions of the Federal Reserve Act.

Dollar Amounts In Thousands

### ASSETS

| | |
|---|---:|
| Cash and balances due from depository institutions: | |
| Noninterest-bearing balances and currency and coin | 2,894,000 |
| Interest-bearing balances | 70,096,000 |
| Securities: | |
| Held-to-maturity securities | 3,740,000 |
| Available-for-sale securities | 47,179,000 |
| Federal funds sold and securities purchased under agreements to resell: | |
| Federal funds sold in domestic offices | 1,000 |
| Securities purchased under agreements to resell | 1,090,000 |
| Loans and lease financing receivables: | |
| Loans and leases held for sale | 22,000 |
| Loans and leases, net of unearned income | 25,167,000 |
| LESS: Allowance for loan and lease losses | 525,000 |
| Loans and leases, net of unearned income and allowance | 24,642,000 |
| Trading assets | 6,020,000 |
| Premises and fixed assets (including capitalized leases) | 1,025,000 |
| Other real estate owned | 6,000 |
| Investments in unconsolidated subsidiaries and associated companies | 883,000 |
| Direct and indirect investments in real estate ventures | 0 |
| Intangible assets: | |
| Goodwill | 4,897,000 |
| Other intangible assets | 1,403,000 |
| Other assets | 12,096,000 |
| Total assets | 175,994,000 |

**LIABILITIES**

| | |
|---|---:|
| Deposits: | |
| In domestic offices | 67,709,000 |
| Noninterest-bearing | 39,261,000 |
| Interest-bearing | 28,448,000 |
| In foreign offices, Edge and Agreement subsidiaries, and IBFs | 72,585,000 |
| Noninterest-bearing | 2,240,000 |
| Interest-bearing | 70,345,000 |
| Federal funds purchased and securities sold under agreements to repurchase: | |
| Federal funds purchased in domestic offices | 2,906,000 |
| Securities sold under agreements to repurchase | 12,000 |
| Trading liabilities | 7,528,000 |
| Other borrowed money: | |
| (includes mortgage indebtedness and obligations under capitalized leases) | 1,619,000 |
| Not applicable | |
| Not applicable | |
| Subordinated notes and debentures | 3,490,000 |
| Other liabilities | 5,096,000 |
| Total liabilities | 160,945,000 |

**EQUITY CAPITAL**

| | |
|---|---:|
| Perpetual preferred stock and related surplus | 0 |
| Common stock | 1,135,000 |
| Surplus (exclude all surplus related to preferred stock) | 8,545,000 |
| Retained earnings | 6,215,000 |
| Accumulated other comprehensive income | -1,208,000 |
| Other equity capital components | 0 |
| Total bank equity capital | 14,687,000 |
| Noncontrolling (minority) interests in consolidated subsidiaries | 362,000 |
| Total equity capital | 15,049,000 |
| Total liabilities and equity capital | 175,994,000 |

I, Thomas P. Gibbons, Chief Financial Officer of the above-named bank do hereby declare that this Report of Condition is true and correct to the best of my knowledge and belief.

Thomas P. Gibbons,
Chief Financial Officer

We, the undersigned directors, attest to the correctness of this statement of resources and liabilities. We declare that it has been examined by us, and to the best of our knowledge and belief has been prepared in conformance with the instructions and is true and correct.

Gerald L. Hassell
Robert P. Kelly                                    Directors
Catherine A. Rein

```
<DOCUMENT>
<TYPE>          EX-99.T3H
<FILENAME>      y87415exv99wt3h.htm
<DESCRIPTION>   EX-99.T3H
<TEXT>
```

# Vitro

## Organization Chart



**GLASS CONTAINERS UNIT MÉXICO**

Vitro, S.A.B. de C.V.*

99.998% — FIC Regiomontano, S.A.P.I de C.V.*

99.998% — Vitro Envases Norteamérica, S.A. de C.V.*

Under FIC Regiomontano (99.998%):
- Vidriera Monterrey, S.A. de C.V.*
- Compañía Vidriera, S.A. de C.V.*
- Servicios Vidriera Guadalajara, S.A. de C.V.*
- Servicios Vidriera Querétaro, S.A. de C.V.*
- Vidriera Los Reyes, S.A. de C.V.*
- Vidriera Querétaro, S.A. de C.V.*
- Servicios Vidriera Toluca, S.A. de C.V.*
- Servicios Vidriera Los Reyes, S.A. de C.V.*
- Vidriera Guadalajara, S.A. de C.V.*
- Vidriera Toluca, S.A. de C.V.*
- Servicios Vitro Cosmos, S.A. de C.V.*

Under Vitro Envases Norteamérica (99.998%):
- Industria del Álcali, S.A. de C.V.*
- Fabricación de Máquinas, S.A. de C.V.*
- Vitro Packaging de México S.A. de C.V.*
- Viqueretanos, S.A. de C.V.*
- Inmobiliaria Vitalc, S.A. de C.V.*
- Servicios Integrales de Acabados, S.A. de C.V.*

Legend:
- Holding Co.
- Operating Co.
- Assets Co.
- Services Co.
- Distributing Co.

*Mexican Co.



**GLASS CONTAINERS UNIT FOREIGN COMPANIES**

Vitro, S.A.B. de C.V.*

99.99% — FIC Regiomontano, S.A.P.I de C.V.*

99.99% — Vitro Envases Norteamérica, S.A. de C.V.*

Vidrio Lux S.A (100%) (Bolivian)

Empresas Comegua, S.A. (49.72%) (Panamanian) (Continue next page)

Vitro Europa Ltd. (100%) (Swiss)

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*Mexican Co.





**GLASSWARE UNIT FOREIGN COMPANIES**

Vitro, S.A.B. de C.V. (Mexican)

FIC Regiomontano, S.A.P.I. de C.V. (Mexican)

100%

Vitro Asset Corp.*

100%

V-MX Holdings, LLC*
100%

Crisa Corporation*
100%

Vitro Packaging de México, S.A. de C.V. 100% (Mexican)

99.998%

Amsilco Holdings, Inc.*

100%

Vitro Packaging, LLC.*
100%

Vitro Chemicals, Fibers and Mining, LLC*
100%

B.B.O. Holdings, Inc.* (100%)

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*US Company



*Mexican Company



**FLAT GLASS UNIT MÉXICO**

Vitro, S.A.B. de C.V.*

Pilkington Group Limited (British) (8%)

Viméxico, S.A. de C.V.* (92%)

FIC Regiomontano, S.A.P.I. de C.V. (100%) (Mexican)

(99.03%)

Distribuidora de Vidrio y Cristal, S.A. de C.V. * (100%)

Cristales Inastillables de México, S.A. de C.V. * (100%)

Vitro Flex, S.A. de C.V.* (100%)

Vitrocar, S.A. de C.V.* (100%)

Vau, S.A. de C.V.* (100%)

Cristales Automotrices, S.A. de C.V.* (51%)

Posselt Ortiz Family (49%)

Vitro Automotriz, S.A. de C.V.*

0.07%

Cristales y Servicios, S.A. de C.V. * (51%)

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*Mexican Company



**FLAT GLASS UNIT UNITED STATES**

VITRO, S.A.B. DE C.V. (Mexican)

99.99%

FIC Regiomontano, S.A.P.I de C.V. (Mexican)

100%

Vitro Asset Corp.*

100 %

VVP Holdings, LLC.*

100 %

VVP Auto Glass, Inc.*

100 %

Vitro America, LLC.*

100 %

Binswanger Glass Company*

100 %

Super Sky International, Inc.*

100 %

VVP Finance, Corporation*

100 %

VVP Funding, Corporation*

100 %

Troper Services, Inc.*

100 %

Super Sky Products, Inc.*

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*US Company





**FLAT GLASS UNIT EUROPE**

- VITRO, S.A.B. DE C.V. (Mexican)
- Vitro Global, Ltd. (Swiss) — 100%
- Pilkington Nederland, B.V.
- Pilkington, Group Limited (British) (8%)
- Viméxico, S.A. de C.V. (Mexican) — 92%
- IP Vitro Vidrio y Cristal, Ltd. (Swiss) — 51%, 31.85%, 17.15%
- VVP Europa Holdings B.V. (Dutch) (100%)
- FIC Regiomontano, S.A.P.I. de C.V. (Mexican) — 100%
- Vitro Cristalglass S.L. (Spanish) (60%)
- Chaves Family (40%)
- Vitro Chaves- Indústria de Vidrio, S.A. (Portuguese) (60%)
- Vitro Cristalglass France, SA (French) (100%)

Legend:
- Holding Co.
- Operating Co.
- Assets Co.
- Services Co.
- Distributing Co.



**CORPORATE SECTOR MÉXICO**

VITRO, S.A.B. DE C.V.*

Comercializadora Álcali, S.A. de C.V.* (100%)

Aerovitro, S.A. de C.V.* (58.86%)

Some Vitro's Mexican Subsidiaries

FIC Regiomontano, S.A.P.I. de C.V. * (100%)

Administración de Inmuebles Vitro, S.A. de C.V.* (100%)

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*Mexican Company





**CIVIL ASSOCIATIONS / NON PROFIT ASSOCIATIONS**
**MÉXICO**

VITRO, S.A.B. DE C.V.
(Mexican)

Some Vitro's
Mexican Subsidiaries

Trabajo de Administración
y Servicios, A.C.*

Clinica Vitro, A.C.*

Salud Corporativa, A.C.*

ASRAC Caja de Ahorro, A.C.*

Formación Educativa, A.C.*

Fundación Vitro, A.C.*

Desarrollo Personal y
Familiar, A.C.*

Holding Co.
Operating Co.
Assets Co.
Services Co.
Distributing Co.

*Mexican Associations

# VITRO SAB DE CV

AVE RICARDO MAGAIN 400
GARZA GARCIA
MEXICO NUEVO LEON, O5 66265
528. 329.1200

## 20−F

**FORM 20−F**
**Filed on 02/28/2011 − Period: 12/31/2009**
File Number 001−10905



LIVEDGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 20−F

☐     **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☑     **ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE FISCAL YEAR ENDED ON DECEMBER 31, 2009**

OR

☐     **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**FOR THE TRANSITION PERIOD FROM _____ TO _____**

OR

☐     **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report**

**COMMISSION FILE NUMBER: 1−10905**

# Vitro, S.A.B. de C.V.

(Exact name of Registrant as specified in its charter)

**N/A**
(Translation of Registrant's name into English)

**United Mexican States**
(Jurisdiction of incorporation or organization)

**Ave. Ricardo Margáin Zozaya 400, Col. Valle del Campestre,
San Pedro Garza García, Nuevo León, 66265 México**
(Address of principal executive offices)

**Claudio Luis del Valle Cabello
Ave. Ricardo Margáin Zozaya 400, Col. Valle del Campestre,
San Pedro Garza García, Nuevo León, 66265 México
Tel: (52 81) 8863−1200
Fax: (52 81) 8335−7799**
(Name, Telephone, E−mail and/or Facsimile Number and Address of Company Contact Person)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Shares of Series "A" common stock, no par value | New York Stock Exchange* |
| Ordinary Participation Certificate, each representing one share of Series "A" common stock | New York Stock Exchange* |
| American Depositary Shares, evidenced by American Depositary Receipts, each representing three Ordinary Participation Certificates | New York Stock Exchange |

* Not for trading, but only in connection with the registration of American Depositary Shares, pursuant to the requirements of the Securities and Exchange Commission.
Securities registered or to be registered pursuant to Section 12(g) of the Act:
None
Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:
11.75% Senior Notes due 2013
8.625% Senior Notes due 2012
9.125% Senior Notes due 2017
The number of outstanding shares of each of the issuer's classes of capital stock
as of December 31, 2009:
386, 857, 143 shares of Series "A" common stock, no par value
Indicate by check mark if the registrant is a well−known seasoned issuer, as defined in Rule 405 of the Securities Act

Yes ☐           No ☑

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Yes ☐           No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☐           No ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or non−accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b−2 of the Exchange Act. (Check one):

Large accelerated filer ☐          Accelerated filer ☑          Non−accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐   International Financial Reporting Standards as issued by the International Accounting Standards Board ☐   Other ☑

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow:

Item 17 ☐          Item 18 ☑

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b−2 of the Exchange Act).

Yes ☐          No ☑

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Presentation of Certain Information | iii |
| Forward−Looking Statements | v |
| Item 1. Identity of Directors, Senior Management and Advisers | 1 |
| Item 2. Offer Statistics and Expected Timetable | 1 |
| Item 3. Key Information | 1 |
| Recent Developments | 1 |
| Risk Factors | 10 |
| Exchange Rates | 23 |
| Selected Consolidated Financial Information | 24 |
| Item 4. Information on the Company | 28 |
| Organizational Structure | 28 |
| Business | 29 |
| Item 4A. Unresolved Staff Comments | 45 |
| Item 5. Operating and Financial Review and Prospects | 46 |
| Operating Results | 46 |
| Liquidity and Capital Resources | 60 |
| Off−Balance Sheet Arrangements | 66 |
| Tabular Disclosure of Contractual Obligations | 67 |
| Accounting Considerations | 68 |
| Research and Development | 71 |
| Item 6. Directors, Senior Management and Employees | 72 |
| Directors and Senior Management | 72 |
| Board Practices | 79 |
| Employees | 83 |
| Share Ownership | 84 |
| Item 7. Major Shareholders and Related Party Transactions | 85 |
| Major Shareholders | 85 |
| Related Party Transactions | 87 |
| Item 8. Financial Information | 88 |
| Item 9. The Offer and Listing | 91 |
| Listing Details | 91 |
| Markets | 94 |
| Item 10. Additional Information | 95 |
| Mexican Corporate Law and By−Laws | 95 |
| Material Contracts | 107 |
| Exchange Controls | 107 |
| Material Tax Consequences | 108 |

| | Page |
|---|---|
| Where You Can Find More Information | 112 |
| Item 11. Quantitative and Qualitative Disclosures About Market Risk | 113 |
| Item 12. Description of Securities Other than Equity Securities | 117 |
| Item 13. Defaults, Dividend Arrearages and Delinquencies | 117 |
| Item 14. Material Modifications to the Rights of Security Holders and Use of Proceeds | 117 |
| Item 15. Controls and Procedures | 117 |
| Item 16. Reserved | 120 |
| Item 16A. Audit Committee Financial Expert | 120 |
| Item 16B. Code of Ethics | 120 |
| Item 16C. Principal Accountant Fees and Services | 121 |
| Item 16D. Exemption from the Listing Standards for Audit Committees | 121 |
| Item 16E. Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 121 |
| Item 16F. Not Applicable | 121 |
| Item 16G. Corporate Governance Differences from NYSE Practices | 121 |
| Item 17. Financial Statements | 125 |
| Item 18. Financial Statements | 125 |
| Item 19. Exhibits | 126 |
| Exhibit 4.09 | |
| Exhibit 4.10 | |
| Exhibit 4.11 | |
| Exhibit 8.1 | |
| Exhibit 12.1 | |
| Exhibit 12.2 | |
| Exhibit 13.1 | |

## PRESENTATION OF CERTAIN INFORMATION

Vitro, S.A.B. de C.V., formerly Vitro, S.A. de C.V., is a corporation (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico, and is a holding company that conducts substantially all of its operations through its subsidiaries. In this annual report, except when indicated or the context otherwise requires, (a) the words "Vitro" and "our holding company" refer to Vitro, S.A.B. de C.V., and not its consolidated subsidiaries and (b) the words "the Company," "we," "us," "our" and "ours" refer to Vitro, S.A.B. de C.V., together with its consolidated subsidiaries. References in this annual report to business units are to combinations of various consolidated entities that have been grouped together for management and presentation purposes.

References in this annual report to "pesos" or "Ps." are to the lawful currency of the United Mexican States, which we refer to as "Mexico". References to "U.S. dollars," "dollars" or "$" are to dollars of the United States of America, which we refer to as the "United States" or "U.S."

Our consolidated financial statements are prepared in accordance with Mexican Financial Reporting Standards ("MFRS") issued by the Mexican Board for Research and Development of Financial Reporting Standards (the "CINIF"), which differs in certain significant respects from accounting principles generally accepted in the United States, which we refer to as "U.S. GAAP." See Note 25 to our consolidated financial statements as of December 31, 2009 and for each of the three years in the period ended December 31, 2009 which provides a description of the principal differences between MFRS and U.S. GAAP as they relate to us.

As of December 31, 2009, we were in default under the indentures governing the $300 Million Senior Notes due 2012 (the "2012 Notes"), the $216 Million Senior Notes due 2013 (the "2013 Notes") and the $700 Million Senior Notes due 2017 (the "2017 Notes" together with the 2012 Notes and the 2013 Notes, the "Old Notes"). Therefore, Ps. 15,771 million was reclassified in our consolidated financial statements as short−term debt resulting in current liabilities significantly exceeding current assets. Vitro is also in default with respect to certain other debt, as described under "Recent Developments—Vitro's Financial Difficulties—Interest and principal payment default on the Old Notes and Vitro's other debt". We are currently in negotiations with our financial creditors in order to restructure our debt. We continue to operate normally as we work to achieve a financial restructuring. Our consolidated financial statements do not include the effects that could result if such financial restructuring is unable to be realized.

As disclosed in Note 3 (a) of our consolidated financial statements we adopted the following new MFRS, which impacted our financial position and results of operations in 2008: NIF B−2, *Statement of Cash Flows*; NIF B−10, *Effects of Inflation*; NIF D−3, *Employee Benefits;* and NIF D−4, *Income Taxes*. In 2009: NIF B−8, *Consolidated or Combined Financial Statements*; NIF C−8, *Intangible Assets*; and D−8, *Share−based Payments*. Please refer to Note 3 (a) to our consolidated financial statements for more information about the impacts of these changes.

In January 2009, the Comisión Nacional Bancaria y de Valores (the "CNBV") published amendments to its regulations applicable to issuers (*Circular Única*), making it compulsory for public entities to prepare and present their financial statements using International Financial Accounting Standards ("IFRS") beginning 2012 (early adoption is permitted). Therefore, beginning in first quarter of 2012, we will be required to report our financial information to the Bolsa Mexicana de Valores under IFRS.

In November 2008, the corporate by−laws of Empresas Comegua, S.A. ("Comegua"), a company of which we own 49.7%, were modified regarding the control of its operations. As a result, beginning on December 1, 2008 our consolidated financial statements present our 49.7% interest in Comegua under the equity method for purposes of MFRS, whereas previously Comegua was presented as a consolidated subsidiary. As a result of the deconsolidation of Comegua in November 2008, only the results of Comegua for the first eleven months of 2008 are included in our consolidated financial statements, and Comegua's individual assets and liabilities are not included in our consolidated balance sheet as of December 31, 2008. See Note 20 (d) of our consolidated financial statements for more information.

In August 2008, our partner in Vitro Cristalglass S.L. ("Vitro Cristalglass") exercised its right to sell its 40% interest in the company to our subsidiary Viméxico, S.A. de C.V. ("Viméxico"), the holding company for our Flat Glass business unit. Therefore, beginning September 1, 2008, our consolidated financial statements present Vitro Cristalglass as a wholly−owned subsidiary of Viméxico. In January 2009, a revised payment schedule was agreed upon with the previous partner, extending the payment through the 2009 and 2010 periods, and providing that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company, with a subsequent capital reduction. We completed these payments in December 2010. For more information, see Note 20(c) to our consolidated financial statements.

iii

In August, 2007, Viméxico acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. ("PVA"), a company dedicated to the installation of value−added glass products, for an amount of approximately $10 million, and beginning September 1, 2007, our consolidated financial statements include PVA as a wholly−owned subsidiary of Viméxico. For more information, see Note 20(a) to our consolidated financial statements.

In July, 2007, Viméxico exercised its option to acquire the 50% equity interest in Vitro AFG, S.A. de C.V. ("Vitro AFG") held by its joint venture partner AFG Industries ("AFG"), a subsidiary of Asahi Glass Co. Limited, and beginning August 1, 2007, our consolidated financial statements present Vitro AFG as a wholly−owned subsidiary of Viméxico. For more information, see Note 20(b) to our consolidated financial statements.

This annual report contains translations of certain constant peso amounts into U.S. dollars at specified rates solely for the convenience of the reader. These convenience translations should not be construed as representations that the constant peso amounts actually represent such U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated or at all. The exchange rate used in preparing our consolidated financial statements and in preparing convenience translations of such information into U.S. dollars is the exchange rate calculated and published by the Banco de México, or the Mexican Central Bank, in the *Diario Oficial de la Federación*, Mexico's Daily Official Gazette of the Federal Government, for the conversion of U.S. dollar−denominated amounts into pesos, which we refer to as the "Free Exchange Rate." As of December 31, 2007, 2008 and 2009, the Free Exchange Rate was 10.8662, 13.8325 and 13.0587 pesos per U.S. dollar, respectively. As of September 30, 2009 and 2010, the Free Exchange Rate was 13.5042 and 12.5011 pesos per 1.00 U.S. dollar, respectively. Within this annual report, we often compare variances between periods. In such instances, when addressing changes in nominal U.S. dollars, we calculate these amounts by dividing the nominal pesos for each period by the exchange rate published by the Mexican Central Bank on the date such transactions were realized. See "Item 3. Key Information—Exchange Rates" for additional information regarding exchange rates.

In accordance with MFRS, our consolidated financial statements for the year ended December 31, 2008 and 2009 are expressed in nominal pesos, and all amounts for prior fiscal years are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

For purposes of this annual report, we consider our "export sales" to be (a) sales of products produced by our Mexican subsidiaries to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors and (b) sales of products by our foreign distributor subsidiaries. For purposes of determining the amount of our export sales to be disclosed, we consider sales to be made at the time of sale to third parties outside Mexico and to our foreign subsidiaries that do not act as our distributors (principally Vitro America, Inc., which we refer to as "Vitro America"), and at the time of sale of the product by our foreign subsidiaries that act as our distributors (principally Vitro Packaging, Inc., which we refer to as "Vitro Packaging") to third parties outside Mexico.

Under Mexican corporate law, ordinary shares of our Series "A" common stock held by our Stock Option Trust (39,777,907 shares as of October 14, 2010, the date of our most recent general ordinary shareholder's meeting) are considered issued and outstanding and therefore are entitled to receive dividends and vote on matters on which our other shares are entitled to vote. However, for accounting purposes, our ordinary shares held by our Stock Option Trust are considered treasury stock and therefore not outstanding. Thus, for purposes of calculating net income (loss) from continuing operations per share, net income (loss) from discontinued operations per share, the cumulative effect of change in accounting principles per share and diluted and basic net income (loss) per share, as well as for purposes of determining shareholders' equity, we considered our ordinary shares held by our Stock Option Trust as treasury stock and not outstanding. As of October 14, 2010, 59,484,349 ordinary shares were held by our Pension Plan Trust. Those ordinary shares are treated as outstanding for all purposes.

Certain amounts included in this annual report may not sum due to rounding.

## FORWARD−LOOKING STATEMENTS

This annual report includes forward−looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These statements relate to our future prospects, developments and business strategies.

These forward−looking statements are identified by our use of terms and phrases such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "predict," "project," "goals," "target," "strategy" and similar terms and phrases, and may include references to assumptions. These statements are contained in the sections entitled "Item 3. Key Information—Risk Factors", "Item 4. Information on the Company", and "Item 5. Operating and Financial Review and Prospects" and other sections of this annual report.

These forward−looking statements reflect our best assessment at the time and thus involve uncertainty and risk. Therefore, these forward−looking statements are qualified by reference to the cautionary statements set forth in this annual report. It is possible that our future financial performance may differ materially from our expectations because of a variety of factors, some of which include, without limitation, the following:

- our ability to restructure and refinance our current debt;

- liquidity, debt repayment and access to credit;

- the general political, economic and competitive conditions in markets and countries where we have operations, including the global recession conditions, competitive pricing pressures, inflation or deflation, increased security risks and changes in tax rates;

- fluctuations in the price and availability of energy, raw materials, labor and transportation;

- consolidation among competitors and customers;

- foreign currency exchange fluctuations relative to the U.S. dollar and the euro against the Mexican peso;

- changes in capital availability or cost, including interest rate or foreign currency exchange rate fluctuations;

- capacity utilization of our facilities;

- the ability to integrate operations of acquired businesses;

- consumer preferences for forms of packaging that are alternatives to glass containers;

- technological breakthroughs in the construction or auto industries which change the actual use or applications of glass in such industries

- the ability to hire and retain experienced management;

- lifting of trade barriers and enforcement of measures against unfair trade practices;

- the enactment of stricter environmental laws; and

- the timing and occurrence of natural disasters and other events which are beyond our control and our capacity to recover our level of operations after such events.

Any forward−looking statements in this annual report are based on certain assumptions and analysis made by us in light of our experience and perception of historical trends, current conditions, expected future developments and other factors we believe are appropriate under the current circumstances. Forward−looking statements are not a guarantee of future performance and actual results or developments may differ materially from expectations. You are therefore cautioned not to place undue reliance on such forward−looking statements. While we continually review trends and uncertainties affecting our results of operations and financial position, we do not intend to update any particular forward−looking statements contained in this document.

**Item 1. Identity of Directors, Senior Management and Advisers**
Not applicable
**Item 2. Offer Statistics and Expected Timetable**
Not applicable
**Item 3. Key Information**

## RECENT DEVELOPMENTS

### Vitro's Financial Difficulties

***The global recession and its effects on our business***

The global economic and financial crisis, and the severe economic recession, which began in the second half of 2008, affected each of our major markets, Mexico, the United States and Spain, and has significantly affected our Glass Container and Flat Glass businesses. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand from our main client in Glass Containers resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009. Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the nine−month period ended September 30, 2010, our consolidated net sales decreased 4.8% to Ps. 17,498 million ($1,400 million) from Ps. 18,389 million ($1,362 million) for the same period ended September 30, 2009.

For further discussion see "Item 5. Operating and Financial Review and Prospects—Operating Results—Trend Information."

***Claims relating to our derivative financial instruments***

We are a large consumer of natural gas with an approximate consumption of 20 million British Thermal Units ("MMBTU") in 2008 and 17 MMBTUs in 2009 through our 21 glass container furnaces, three float glass furnaces in Mexico and our 15−year "take−or−pay" power agreement with Tractebel Energía, S. de R.L. de C.V. ("Tractebel Energía") in which natural gas is a pass through component in the energy price. For more information see "Item 4. Information on the Company—Business—Our Raw Materials—Energy." During the first seven months of 2008, energy prices, mostly natural gas, our main energy input, recorded a sharp price increase from $6.51 to $12.60 per MMBTU, exerting negative pressure on our operating and financial results. During this period, in order to hedge against further increases in natural gas prices, we entered into certain Derivative Financial Instruments ("DFIs") that were different in characteristics and notional amounts from the derivative contracts we had historically entered into.

Additionally, during the first seven months of 2008, the Mexican peso appreciated 7.4% relative to the U.S dollar. During the same period, the Mexican equilibrium interbank interest rates ("TIIE") increased 6.5%. During this period, we entered into certain additional DFIs materially different in characteristics and in notional amounts from the derivative contracts we had customarily entered into in order to hedge against continued increases in the value of the peso against the dollar and continued increases in interest rates.

In the fourth quarter of 2008, due to high volatilities in the financial markets, coupled with a significant drop in the price of natural gas as well as a sharp decrease in the value of the Mexican peso compared to the U.S. dollar, our DFI positions were adversely impacted. Natural gas prices plummeted from a record high of $12.60 per MMBTU in July 2008 to $6.00 per MMBTU by year end 2008, and in the final months of 2008, the Mexican peso registered a 30% year end devaluation against the dollar, reversing the appreciation trend experienced in the first seven months. As a result of these changes, we were required to post $85 million in collateral deposits related to margin calls by our DFI counterparties ("Counterparties"). In order to eliminate further liquidity deterioration related to additional margin calls, in the fourth quarter of 2008 we restructured our DFI portfolio and unwound the majority of our open positions to guarantee our ability to continue our normal course of operations. Our failure to make payment on our closed DFI positions triggered cross−default provisions in the majority of our long−term debt instruments.

During February and March 2009, six out of seven Counterparties with whom we and some of our subsidiaries entered into DFIs filed lawsuits in the Supreme Court of the State of New York demanding payment of approximately $240.3 million plus interest and other fees related to the unwound positions. As of the date hereof, our subsidiary, Vitro Envases Norteamérica, S.A. de C.V. ("Vena") has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six Counterparties who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. We are seeking to include this settlement in the general restructuring of our debt, as described further below. In any event, if we are unable to reach an agreement with Calyon to include our settlement with them in the general restructuring described below, we will not be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the Restructuring Consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five Counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement (the "Settlement Agreement") and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such Settlement Agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had originally entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued promissory notes to Fintech in respect and in settlement of such outstanding debt ("Promissory Notes", which are the agreed upon amounts in settlement of DFI Claims and included in the definition of DFI Claims). The Promissory Notes were guaranteed "por aval" by us and some of our Mexican subsidiaries.

Effective as of November 3, 2010, the subsidiaries that issued the Promissory Notes assigned their respective rights and obligations under the Settlement Agreement and the Promissory Notes to Vitro. As a result of such assignment, Vitro issued two new promissory notes (the "New Promissory Notes") to Fintech in lieu of the assigned Promissory Notes, one in the same aggregate principal amount as the prior Promissory Notes and the other in an aggregate principal amount equal to the interest that had accrued on the prior Promissory Notes up to the date of the assignment. In addition to the tax benefits realized by Vitro and its subsidiaries as a result of such assignment, Vitro is entitled to receive a fee from the assignor subsidiaries within 60 days of the assignment. Also, in connection with the assignment of the Promissory Notes, Fintech agreed to extend the final maturity of the payment obligations under the New Promissory Notes to March 31, 2011, with new scheduled maturity payments becoming due on January 31, 2011 ($10 million), February 28, 2011 ($30 million) and March 31, 2011 (approximately $151.4 million plus accrued interest). The New Promissory Notes, which are guaranteed "por aval" by certain of Vitro's Mexican subsidiaries, replace and supersede the prior Promissory Notes and are subject to the same lock−up agreement with Fintech (the main terms of which were described in the solicitation statement for the Offers described below). Due to a court order in the Voluntary Concurso Proceeding dated December 24, 2010 forbidding payment of any and all past due obligations, Vitro has not paid and does not expect to pay the amounts payable under the New Promissory Notes (as and when they become due and payable). The New Promissory Notes will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation described below.

*Interest and principal payment default on the Old Notes and Vitro's other debt*

In order to preserve the necessary cash to continue our operations, we did not make scheduled interest payments due February 2009, August 2009, February 2010, August 2010 and February 2011 on the 2012 Notes and the 2017 Notes and did not make scheduled interest payments due May 2009, November 2009, May 2010 and November 2010 on the 2013 Notes. Under the indentures governing the Old Notes, the trustee or the registered holders of at least 25% in principal amount of the Old Notes have the right to accelerate this debt. On January 4, 2010, we received a document entitled "Notice of Acceleration of Payment" from a group of holders of the 2012 Notes and 2017 Notes, which was also addressed to the trustee under the indentures governing the 2012 Notes and the 2017 Notes. At our request, counsel to the signatories of such document stated that such signatories represented holders of 25% or more of each of the relevant series of 2012 Notes and 2017 Notes. On April 12, 2010, we also received a document entitled "Notice of Default and Acceleration" on letterhead of the trustee under the indenture governing the 2013 Notes.

In addition, we did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest, due February 5, 2009 on our *Certificados Bursátiles* issued in 2003 ("*Certificados Bursátiles Vitro 03*"). The common representative (*representante común*) of the *Certificados Bursátiles Vitro 03* initiated legal proceedings in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment. As part of the negotiations to issue the Offers (as defined below), the holders of the *Certificados Bursátiles Vitro 03* agreed to end litigation "without prejudice" until Vitro completes its restructuring process. In this process it was agreed that if Vitro is unable to restructure the *Certificados Bursátiles Vitro 03,* the holders would be able to bring an action again.

In addition, we did not make a scheduled interest payment of approximately Ps. 12 million ($1 million) on our *Certificados Bursátiles Vitro 08* and a scheduled payment of approximately Ps. 120 million ($10 million) on the New Promissory Notes issued to Fintech in respect of the settlement related to our DFI claims.

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit filed in the Fifth Court Specialized in Civil Proceedings (*Juzgado Quinto Civil*) brought by ABN Amro (owned at one time by RBS Bank) in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was issued requiring the Company to pay the principal amount. On January 18, 2010, the Company appealed this and other rulings that were issued in proceedings where certain evidence was dismissed. In September 2010, the First Appeals Court of the Superior Tribunal of the Federal District (*Primera Sala del Tribunal Superior de Justicia*) accepted one of the grounds for appeal on the merits, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits.

The legal proceeding was reinstated and continues, however, under the current voluntary *Concurso Mercantil*, no creditor, including RBS Bank would be able to execute any decision because, by court order, all execution proceedings have been suspended.

**Vitro's Restructuring Process**

As a result of the foregoing, in February 2009, we announced our intention to restructure the outstanding Old Notes and the other debt mentioned above. We subsequently retained Rothschild Inc. as financial advisor to advise us on restructuring alternatives.

***Financial liquidity transactions***

In an effort to strengthen our liquidity and maintain normal operations during the restructuring process, we entered into the following transactions:

*Bancomext Transaction*

In November 2008, through one of our subsidiaries, we contributed non−productive real estate assets with a book value of Ps. 1,875 million ($136 million), as of December 31, 2009, to a trust created for the sole purpose of selling such assets (the "Bancomext Trust") if necessary in order to generate the necessary resources to pay off the principal from an $85 million credit obtained from a financial institution. As of December 31, 2008 and 2009 and June 30, 2010, the proceeds drawn against the loan were $85 million, $68 million and $68 million, respectively. On August 24, 2010, we finalized the sale of non−productive properties, amounting to $63.8 million. The resources of such sale and $5.5 million were contributed to the trust to pay in full the balance of $69.3 million to that date and thereby recover the property of our two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

3

*Refinancing of Bladex Credit Facility*

In July 2009, one of our subsidiaries refinanced a $30 million credit with Banco Latinoamericano de Exportaciones, S.A. ("Bladex") for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014. This amount is not part of the Restructured Debt.

*Fintech Sale and Leaseback Transaction*

In December 2009, we completed a $75 million transaction with Fintech Advisory Limited, an affiliate of Fintech ("Fintech Advisory"), through the creation of a Mexican trust (the "Real Estate Trust"). Vitro and its subsidiaries, Comercializadora Alcali, S.A. de C.V. ("Alcali"), Vidriera Guadalajara, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V. and Vidriera Toluca, S.A. de C.V. contributed seven real estate assets (industrial land) to the Real Estate Trust, receiving $75 million in cash contributed by Fintech Advisory to acquire these assets. We entered into a 15 year lease agreement that allows the Company to continue using the assets. The Company has the right to repurchase the title to these real estate assets in exchange for $126 million in cash in certain circumstances. If we default on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming we have not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech exercises its right to sell or lease the real estate assets, this could adversely affect our business. Additionally, after the execution of a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness and the satisfaction of certain other conditions precedent, Fintech may exercise one of two options obtained on the same date to exchange the rights over the Real Estate Trust for shares of the Company and/or a sub−holding subsidiary's common shares. The option related to the common shares of the Company, if exercised, would be for up to a maximum of 93,099,849 shares that in the aggregate are currently held by the Company's Pension and Stock Option Trusts (described under Item 7. Major Shareholders and Related Party Transactions), valued in accordance with the relevant valuation formula set forth in the option agreement and would leave Fintech with up to a maximum equity stake in the Company of approximately 24%. If those common shares are not sufficient to satisfy the $75 million option purchase, the remainder of the purchase option would be fulfilled with the delivery to Fintech of the necessary shares of the sub−holding subsidiary valued in accordance with the relevant valuation formula set forth in the option agreement. Alternatively, Fintech may elect to exercise the second option, over certain shares of the sub−holding subsidiary exclusively (only one of the two options may be exercised). Fintech's equity options expire three years after a restructuring plan or agreement for the restructuring of substantially all of our financial indebtedness is executed. The Company has the option to repurchase the sub−holding subsidiary's shares during the three years following Fintech's exercise of either option. In the event that Fintech exercises the option related to the Company's common shares, a shareholders agreement among Fintech and the Company's controlling shareholders will come into effect and would continue to be in effect as long as Fintech holds at least a 5% ownership in Vitro. Pursuant to the terms of such shareholders agreement, among other things, subject to certain limitations and qualifications, Fintech specifically agreed to vote with Mr. Adrian Sada Gonzalez, Ms. Esther Cueva de Sada, Ms. Maria Alejandra Sada Gonzalez and Mr. Adrian Sada Cueva, and the consent of such persons (including Fintech) will be required with respect to certain fundamental actions and voting matters affecting the Company. Moreover, under the shareholders agreement, Fintech and the other shareholders party thereto will be subject to certain transfer restrictions, in each case customary for a significant shareholder of a Company like ours.

*Refinancing of Flat Glass Accounts Receivable Financing Program*

In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24 million) with a five year maturity.

*Refinancing Transaction Related to our Float Glass Inventory in Mexico*

In March 2010, we extended the terms by one year of financing arrangements for approximately Ps. 250 million ($20 million) whereby inventory was provided as a guarantee for such borrowings.

*Covisa / Álcali Securitization Refinancing*

In April 2010, we refinanced the senior Ps. 550 million ($43 million) variable rate TIIE+ 4% bond of the accounts receivable securitization trust of our subsidiaries Covisa and Álcali for an additional two years. The remaining $10 million balance of the subordinated notes was repaid.

*Renewal of Vitro America's Credit Lines*

In June 2010, we renewed $32.5 million of Vitro America's credit lines with Bank of America for an additional year.

*Refinancing of Credit Lines in Spain*

In August 2010, we refinanced 44.8 million euros of credit lines of Vitro Cristalglass, our subsidiary in Spain. We have reached agreements to extend these credit lines for three years.

**Restructuring negotiations**

For almost two years, Vitro has worked diligently to resolve its financial situation by seeking to achieve a consensual restructuring on terms that would provide Vitro's creditors a fair recovery in light of the Company's financial capacity and permit the Company to regain its financial footing. To that end, Vitro engaged in active negotiations with various groups of creditors, including an ad hoc group of holders of Old Notes (the "Ad Hoc Bondholders Group"), as well as Fintech, a significant creditor of the Company.

**Vitro's Tender Offer and Exchange Offer and Consent Solicitation**

As a result of the negotiations mentioned above, Vitro conducted two alternative offers in respect of the outstanding Old Notes: (1) a cash tender offer which was conducted as a modified Dutch auction (the "Tender Offer") and (2) an exchange offer and consent solicitation (the "Exchange Offer and Consent Solicitation" and, together with the Tender Offer, the "Offers"). Both offers applied to all three series of the Old Notes. The Offers were conducted in contemplation of, and as a step towards, restructuring most of Vitro's outstanding debt through an in−court proceeding under the insolvency law of Mexico, as described below. Both Offers were launched on November 1, 2010 and have since expired in accordance with their respective terms. Old Notes in the aggregate principal amount of approximately $44 million were tendered pursuant to the Tender Offer and Restructured Debt in the aggregate principal amount of approximately $520 million were tendered in the Exchange Offer and Consent Solicitation. There was a delay in the settlement of payments with respect to both Offers as a result of the Attachment Orders (defined and described below), but this delay was resolved and the Tender Offer consideration and the consent payments pursuant to the Exchange Offer and Consent Solicitation have been made.

**Minority Noteholders commence involuntary chapter 11 cases against Vitro's U.S. subsidiaries**

On November 17, 2010 four members of the Ad Hoc Bondholders Group who together hold approximately $75 million in face amount of Old Notes (the "Minority Noteholders"), or less than 5% of Vitro's outstanding consolidated debt to be restructured, filed involuntary petitions under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas Fort Worth Division (the "Texas Bankruptcy Court") against fifteen U.S. subsidiaries of Vitro which are guarantors of Vitro's obligations under the Old Notes (the "U.S. Alleged Debtors"). On December 9, 2010, the U.S. Alleged Debtors filed an answer to the involuntary petitions, asserting that such petitions should be dismissed because the Minority Noteholders do not hold non−contingent undisputed claims and because the U.S. Alleged Debtors are generally paying their debts as they become due — which are prerequisites for the commencement of involuntary bankruptcy cases under the U.S. Bankruptcy Code. As of the date hereof, no orders for relief have been entered by the Texas Bankruptcy Court in respect of the involuntary petitions. A hearing before the Texas Bankruptcy Court to consider whether such orders for relief should be entered or the involuntary petitions should be dismissed was commenced on February 24, 2011 and was adjourned until March 31, 2011.

Since the filing of the involuntary petitions, the U.S. Alleged Debtors have continued to operate their businesses in the ordinary course, as they are authorized to do under the U.S. Bankruptcy Code. After filing the involuntary petitions, the Minority Noteholders sought to restrict the U.S. Alleged Debtors' ability to enter into transactions with their non−U.S. affiliates or participate in Vitro's planned restructuring. However, on November 24, 2010, the Texas Bankruptcy Court denied the requested restrictions in their entirety. Additionally, the Texas Bankruptcy Court approved Vitro America LLC's continued utilization, on unchanged terms, of its working capital facility with its secured lender, Bank of America, first, on December 3, 2010, on an interim basis, and on January 21, 2011, on a final basis. The Texas Bankruptcy Court also authorized Vitro America LLC to incur additional unsecured indebtedness from Vitro S.A.B. or a non−debtor affiliate.

*New York State Litigation against Vitro and certain of its non−U.S. subsidiaries*

On December 3, 2010, three funds managed by the Ad Hoc Bondholders Group member Aurelius Capital Management (collectively, "Aurelius") filed suit against Vitro and 49 of its non−U.S. subsidiaries (collectively, the "Defendants") in the Supreme Court of the State of New York (the "New York State Court") premised on Vitro's default and non−payment of the Old Notes (the "Aurelius Case"), and obtained a pre−judgment order of attachment from the New York State Court with respect to any assets of Vitro located in New York (the "Aurelius Order"). On December 9, 2010, certain funds managed by another Ad Hoc Bondholders Group member, Elliott Management Corp. (collectively, "Elliott"), also filed suit against the Defendants in the New York State Court (the "Elliott Case") and also obtained a pre−judgment order of attachment (the "Elliott Order" and, together with the Aurelius Order, the "Attachment Orders"). On December 28, 2010, Vitro removed the Aurelius Case and the Elliott Case to the U.S. District Court for the Southern District of New York, both of which were in turn referred to the U.S. Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") in which the Chapter 15 Case (as defined and described below) was pending at the time. However, after certain developments in Mexico (discussed below) resulted in the withdrawal of the Chapter 15 Petition (as defined below), the Defendants agreed to the remand of the Aurelius Case and Elliott Case back to the New York State Court. An order of remand was entered on January 14, 2011, and the cases have been reactivated in, and are currently pending before the New York State Court.

On December 9, 2010, the Aurelius Order was served on D.F. King & Co., Inc. ("D.F. King"), the Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation. In response, D.F. King determined not to direct the settlement of the Tender Offer or instruct the Depository Trust Company to complete the settlement until D.F. King received further guidance from the New York State Court as to whether its instructions to settle the Tender Offer would violate the terms of the Attachment Orders. As a result, the settlement of the Tender Offer and the distribution of the consent payments pursuant to the Exchange Offer and Consent Solicitation were temporarily delayed. On December 16, 2010, the New York State Court issued an order clarifying that the Old Notes tendered or exchanged pursuant to the Offers were not subject to the Orders of Attachment. However, before such order took effect, Aurelius appealed to the New York State Supreme Court, Appellate Division, First Department and requested that the order be stayed while the appeal was pending. On December 21, 2010, the New York State Supreme Court, Appellate Division, First Department denied the stay, and the New York State Court's order took effect. Subsequently, D.F. King took the requisite actions and the Tender Offer consideration and the consent payments pursuant to the Exchange Offer and Consent Solicitation were made.

Aurelius and Elliott have served copies of the Attachment Orders on certain of Vitro's customers, some of which had suspended payments to Vitro pending an order by the New York State Court vacating the Attachment Orders or otherwise clarifying that such payments were not subject thereto. In particular, some customers suspended payments on account of receivables previously assigned by certain Vitro subsidiaries to an independent trust. Certain of Vitro's subsidiaries, including Vitro Automotriz, S.A. de C.V. ("Automotriz"), established an independent trust, pursuant to a contrato de fideicomiso signed on August 3, 2005 in Mexico (the "Flat Glass Payment Trust"), to which they sold and assigned their trade receivables. The trustee of the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division Fiduciaria Invex Grupo Financiero ("Invex"). On February 1, 2011, Invex submitted an an order to show cause seeking entry of an order clarifying that payments due to the Flat Glass Payment Trust from customers on account of receivables generated by Automotriz were not subject to the Attachment Orders, which as explained further below, was recently heard and decided by the New York State Court.

On December 13, 2010, the Defendants moved the New York State Court to vacate the Attachment Orders. Aurelius and Elliott opposed this motion and, on December 15, 2010 and December 21, 2010, respectively, moved to confirm their respective Attachment Orders. On January 4, 2011, the Defendants made their submission in further support of the pending motion to vacate and in opposition to Aurelius and Elliotts' motion to confirm the Attachment Orders, and on January 21, Aurelius and Elliott submitted their response on both motions. On February 8, 2011, Justice Kornreich of the New York State Court heard argument on the cross−motions to confirm and to vacate the Attachment Orders, as well as Invex's order to show cause. At the conclusion of the hearing, Justice Kornreich took the cross−motions under advisement and entered an order on Invex's order to show cause (the "Partial *Vacatur* Order") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. Justice Kornreich briefly stayed the Partial *Vacatur* Order and the plaintiffs appealed. On February 10, 2011, the New York State Supreme Court, Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial *Vacatur* Order became final.

At the direction of Justice Kornreich, the parties have also been negotiating the terms on which they will mediate their disputes. Counsel for the Ad Hoc Bondholders Group advised Justice Kornreich that the group intends to participate fully in the mediation.

***Vitro's Voluntary Concurso Proceeding and Chapter 15 Case***

On December 13, 2010, to accomplish its proposed in−court restructuring as contemplated by the Exchange Offer and Consent Solicitation, Vitro commenced a voluntary *concurso mercantil* proceeding (the "Voluntary *Concurso* Proceeding") under the Mexican Business Reorganization Act by filing a petition and pre−packaged *Concurso* Plan in the Fourth District Court for Civil and Labor Matters for the State of Nuevo León (the "Mexican Bankruptcy Court"). On December 14, 2010, Alejandro Francisco Sánchez−Mujica, as Vitro's duly−authorized foreign representative, filed a chapter 15 petition for recognition of the Voluntary *Concurso* Proceeding as a foreign main proceeding under the U.S. Bankruptcy Code (the "Chapter 15 Petition") with the New York Bankruptcy Court, commencing Vitro's chapter 15 case (the "Chapter 15 Case"). Later that same day, the Minority Noteholders filed a motion (the "Venue Transfer Motion") in the Texas Bankruptcy Court, seeking to transfer venue of the Chapter 15 Case to the Texas Bankruptcy Court. The filing of the Venue Transfer Motion had the automatic effect under applicable rules of staying all proceedings in the Chapter 15 Case until the Venue Transfer Motion was resolved.

By resolution dated January 7, 2011, Judge Francisco Eduardo Flores Sánchez of the Fourth Federal District Court of the Fourth Judicial Circuit located in Monterrey, México denied Vitro's request for issuance of a "business reorganization judgment" (*sentencia de* concurso mercantil), stating that Vitro's petition and Concurso Plan did not meet the requirements for a pre−packaged proceeding under the Mexican Business Reorganization Act. This decision was appealed and on January 28, 2011, the Magistrate for the Federal Unitary Second Appeals Court (Tribunal Unitario) for the Fourth Circuit in Monterrey concluded that the appeals against the ruling that dismissed the pre−packaged insolvency request submitted by Vitro and certain creditors should also be dismissed, concluding that such decision is not appealable. An ordinary remedy was filed to appeal this procedural decision and a decision is expected at any time. If the ordinary remedy is denied or dismissed, Vitro would still be in a position to file for a constitutional recourse (Amparo) to review the decision issued by the Appeals Court.

Meanwhile, since no voluntary *concurso* proceeding with respect to Vitro was pending in Mexico, Vitro agreed to withdraw its Chapter 15 Petition, which in turn rendered moot the Venue Transfer Motion. On January 26, 2011, the New York Bankruptcy Court approved the withdrawal of the Chapter 15 Petition without prejudice to Vitro's right to re−file it at a later date, and closed the Chapter 15 Case.

***Involuntary Concurso Proceedings***

On December 13, 2010, certain members of the Ad Hoc Bondholders Group filed involuntary petitions in the Mexican Bankruptcy Court against Vitro, and beginning on December 23, 2010, also filed involuntary petitions against certain of its Mexican subsidiaries. The Mexican Bankruptcy Court has entered orders commencing involuntary proceedings (each, an "Involuntary *Concurso* Proceeding") against Vitro and Vitro Vidrio y Cristal, S.A. de C.V., Viméxico, S.A. de C.V., Vitro Automotríz, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitrocar, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V., Comercializadora Álcali, S.A. de C.V., Industria del Álcali, S.A. de C.V., FIC Regiomontano, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Fabricación de Máquinas, S.A. de C.V., Vidriera Guadalajara, S.A. de C.V., Vidriera los Reyes, S.A. de C.V., Vitro Envases Norteamérica, and Servicios Integrales de Acabados, S.A. de C.V. Under the Mexican Business Reorganization Act, before the Mexican Bankruptcy Court considers whether to issue a declaration of *concurso mercantil* in any of the Involuntary *Concurso* Proceedings, a court−appointed "*visitador*" must examine each alleged debtor's books and records to determine if it satisfies the eligibility requirements to be a debtor in *concurso mercantil* and issue a report to the Mexican Bankruptcy Court. This process may last several weeks from the appointment of the *visitador*, and is followed by a 30−day period during which parties may submit additional evidence. Thereafter, the Mexican Bankruptcy Court will issue a ruling on whether the Involuntary *Concurso* Proceedings will proceed or be dismissed.

Under Mexican bankruptcy law upon admission of a Concurso proceeding, the Mexican Bankruptcy Court has 24 hours to request from the Federal Institute of Bankruptcy Specialists, or IFECOM, the designation of a "visitador" within the following five days. Once such designation is made, the IFECOM must immediately inform the court and the "visitador" of its designation. Under the foregoing rules, a "visitador" has been or will be appointed for the Concurso proceedings of Vitro Vidrio y Cristal, S.A. de C.V., Viméxico, S.A. de C.V., Vitro Automotriz, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitrocar, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V. Comercializadora Álcali, S.A. de C.V., Industria del Álcali, S.A. de C.V., FIC Regiomontano, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Fabricación de Máquinas, S.A. de C.V., Vidriera Guadalajara, S.A. de C.V., Vidriera los Reyes, S.A. de C.V. and Vitro Envases Norteamérica, S.A. de C.V. and Servicios Integrales de Acabados, S.A. de C.V.

**Other Recent Developments**

***Earthquake in Mexicali temporarily affected our facility***

In April 2010, our flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies. The Company estimates the damage to its inventories and fixed assets to be $7.0 million. We recorded a receivable related to the insurance proceeds expected to be received net of applicable deductibles, which resulted in a net loss of $0.9 million recorded in our 2010 consolidated statement of operations.

***Temporary suspension of operations at manufacturing facilities in García, Nuevo León***

On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. In particular:

- two of our four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, we were able to minimize the impact on our original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- two of our three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July 2010; however, its operations were temporarily suspended due to stability issues and it resumed full operations again in the last week of August 2010; the other affected facility resumed operations in September 2010; our float glass facility in Mexicali, which is currently operating at 100% capacity, temporarily supplied glass to our OEM glass processing plants; and

- our facilities at Alcali suspended operations for a few days and a portion of Alcali's end−product, raw material and packaging inventories were damaged; however, we were able to minimize the impact on our clients by working jointly to supply only the minimal amount necessary for them to continue operating.

The Company's insurance policy covers such events, minus applicable deductibles. As of December 31, 2010, the Company's insurance claims, net of applicable deductibles, were $6.8 million for damaged inventories and $14.2 million for damaged fixed assets. As a result of the insurance claims described above, the insurance company made an advance payment to the Company of $20 million, which reduced the losses related to such losses in the Company's consolidated statements of operations.

8

As of December 31, 2010, the Company is currently evaluating the negative impact of business interruption resulting from Hurricane Alex. The Company is also evaluating all damages caused to its assets, most significantly to its float glass furnaces, which at some point during 2011 will likely have to be shut down in order to evaluate any internal damages and estimate time and costs of repairs.

We expect all beforementioned damages will be covered by insurance less any applicable deductibles; however, we can provide no assurance as to the amount and timing of such recovery. See "Risk Factors −Risk Factors Relating to Economies in Which We Participate — Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients.

***Cost Reduction Initiatives***

We have adopted a significant and focused cost reduction plan, which includes reducing our workforce, optimizing production capacity in order to maximize utilization and efficiencies, generating savings in the supply chain, packaging and maintenance, canceling aircraft leasing contracts, divesting non−productive assets and eliminating the outsourcing of non−strategic services, among other things. We estimate that these initiatives, as well as other initiatives aimed at reducing operating costs, reducing corporate expenses and improving efficiency, will result in annual savings of approximately $122 million from the third quarter of 2009 (which is when we completed the full implementation of these initiatives) and onward.

***Termination of ADRs***

On June 19, 2009, we notified The Bank of New York Mellon ("BNY Mellon") as Depositary of the *Certificados de Participación Ordinaria* ("CPOs") representing our outstanding shares of our decision to terminate the Amended and Restated Deposit Agreement dated December 17, 2007 under which the American Depositary Receipts ("ADRs") were issued. On June 25, 2009, BNY Mellon notified the holders of the ADRs that the Deposit Agreement would terminate on August 24, 2009 and from that date our ADRs ceased trading on the New York Stock Exchange ("NYSE"). On August 14, 2009, we filed a Form 25 with the SEC to voluntarily withdraw the ADRs from listing on the NYSE and terminate the registration of the ADRs under Section 12(b) of the Exchange Act.

On September 8, 2010, the Company filed a Form 15F with the SEC with the intention to deregister its ADRs and the Old Notes and terminate its reporting obligations under Section 12(g) of the Exchange Act. On November 23, 2010, Vitro filed a Form 15 to suspend Vitro's reporting obligations with the SEC until the deregistration pursuant to the Form 15F is effective. Vitro is eligible to suspend its Exchange Act reporting requirements given that there are no remaining holders of Vitro's ADRs and each class of Old Notes are held of record by fewer than 300 persons registered in DTC on a worldwide basis. The Form 15F will not be declared effective by the SEC to terminate Vitro's reporting obligations under the Exchange Act until Vitro files the reports it was obligated to file prior to the filing of the Form 15.

Vitro will continue to provide information to the BMV and will make such information available on its website.

## RISK FACTORS

*You should carefully consider the following risk factors, as well as all of the other information presented in this annual report, including our consolidated financial statements and the notes thereto. In general, investing in the securities of issuers in emerging market countries such as Mexico involves certain risks not typically associated with investing in securities of U.S. companies.*

*The risks and uncertainties described below are not the only risks and uncertainties affecting us. Additional risks and uncertainties that we do not know about or that we currently think are immaterial also may impair our business operations or our ability to make payments under our existing indebtedness.*

*This annual report also contains forward−looking statements that involve risks. Our actual results could differ materially from those anticipated in these forward−looking statements as a result of certain factors, including risks faced by us describing this section, and under the "Item 5. Operating and Financial Review and Prospects." See also cautionary statements regarding "Forward−Looking Statements."*

*For purposes of this section, when we state that a risk, uncertainty or problem may, could or would have an "adverse effect" on us, we mean that the risk, uncertainty or problem may, could or would have an adverse effect on our business, financial condition, liquidity, results of operations or prospects, except as otherwise indicated or as the context may otherwise require.*

### RISK FACTORS RELATING TO THE *CONCURSO* PLAN

*If the* Concurso *Plan or any other revised plan or prepackaged plan of* concurso mercantil *is not consummated, we will not be able to successfully restructure our debt.*

We are in default under our indentures and other financial instruments, and our future is dependent upon our ability to restructure our debt and other financial instruments.

Vitro did not make scheduled interest payments due February 2009, August 2009, February 2010, August 2010 and February 2011 on the 2012 Notes and 2017 Notes and did not make a scheduled interest payment due May 2009, November 2009, May 2010 and November 2010 on the 2013 Notes. In addition, Vitro also did not make a scheduled payment of Ps. 150 million ($11.9 million), plus accrued interest due February 5, 2009, on our *Certificados Bursátiles Vitro 03*. Also, we did not make a scheduled interest payment of approximately Ps. 12 million ($1 million) on our *Certificados Bursátiles Vitro 08,* and a scheduled principal payment of approximately Ps. 120 million ($10 million) on the Fintech settlement related to our DFI claims. The common representative of the *Certificados Bursátiles Vitro 03* initiated a legal proceeding in Mexico involving attachment of Vitro's assets in order to demand payment of Ps. 150 million ($11.9 million), plus accrued interest to date, on such *Certificados Bursátiles Vitro 03*. A first instance ruling requiring Vitro to pay was issued and appealed by the Company. In its April 30, 2010 ruling, the Appeals Court dismissed the case involving the attachment of Vitro's assets; however, the court converted the case into a legal proceeding not involving such attachment. As part of the negotiations to issue the Offers, the holders of the *Certificados Bursátiles Vitro 03* agreed to end litigation "without prejudice" until Vitro completes its restructuring process. In this process it was agreed that if Vitro is unable to restructure the *Certificados Bursátiles Vitro 03, the holders* would be able to bring an action again.

In July 2009, we and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its capacity as creditor demanding the payment of $15 million plus interest. During September and October 2009, a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010, the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010, the Court of Appeals accepted one of the appeals, finding a violation of certain defense rights, and ordered to restart the proceedings to gather evidence by the Company, leaving without effect the ruling on the first instance judgment and the appeal without merits. The legal proceeding was reinstated and continues, however under the current voluntary *Concurso Mercantil*, no creditor, including RBS Bank, would be able to execute any decision because by court order all execution proceedings have been suspended.

In the fourth quarter of 2008, we decided to unwind a majority of our open derivative positions that had been adversely affected due to the high volatility experienced in the financial markets, which resulted in a significant devaluation between the Mexican peso and the U.S. dollar and the Mexican peso and the euro (see "Item 5. Operating and Financial Review and Prospects—Operating Results—Trend Information—Inflation and Foreign Currency Exchange Rate Fluctuations"), as well as a significant reduction in natural gas prices. As of the date of this Statement, our subsidiary Vena has reached a settlement agreement with Calyon Credit Agricole CIB ("Calyon"), one of the six *Counterparties* who filed lawsuits, and the Calyon lawsuit was dismissed. The amount of the settlement agreed with Calyon is $63.4 million plus interest and other fees of $3.9 million. If we are unable to reach an agreement with Calyon to include our settlement with them in the restructured debt, we will not be able to subsequently enter into a restructuring transaction with Calyon on terms more favorable than the restructuring consideration (in terms of recovery, terms and conditions of new restructured securities or otherwise).

The other five counterparties who filed lawsuits sold their DFI Claims (including their rights under the related lawsuits) to Fintech. The other Counterparty not party to the lawsuits sold its DFI Claim to Fintech also. Following Fintech's purchase of such DFI Claims, we engaged in settlement negotiations with Fintech. As a result of such negotiations, Fintech agreed to dismiss the lawsuits related to the DFI Claims and we and Fintech entered into a settlement agreement and standstill and tolling agreements with respect to such lawsuits and DFI Claims. Under the terms of such settlement agreement, among other things, we and certain of our subsidiaries acknowledged the debt outstanding under such DFI Claims (in an aggregate principal amount of approximately $176.4 million) and our subsidiaries that had originally entered into the DFIs with the Counterparties that sold such DFI Claims to Fintech issued the Promissory Notes to Fintech in respect and in settlement of such outstanding debt. The Promissory Notes were guaranteed "*por aval*" by us and some of our subsidiaries. The Promissory Notes are subject to a lock−up agreement with Fintech and will be restructured pursuant to the terms of the Exchange Offer and Consent Solicitation. For further discussion, see "Item 3—Key Information — Recent Developments — Vitro's Financial Difficulties—Interest and Principal payment Default on the Old Notes and Vitro's other debt."

We do not have the means to repay or refinance the amounts that are payable under our indentures and other financial instruments. We believe that we are currently not likely to find a material source of financing to fund the interest and principal payments on the Old Notes. Our future is dependent on our ability to restructure our obligations under our indentures and other financial instruments, which will involve a significant reduction of the claims of the holders of Restructured Debt and other financial instruments. If we are faced with a Mexican or U.S. bankruptcy that is protracted and contentious, this could force us to operate in uncertain circumstances for an extended period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees, and may result in a liquidation of the Company.

We believe it is likely that each holder of Restructured Debt would incur a significant loss if the *Concurso* Plan or any other revised plan or prepackaged plan of *concurso mercantil* is not consummated. In addition, in our opinion, the recovery that would be received by holders of Restructured Debt in a liquidation scenario would very likely be materially less than they would receive under the *Concurso* Plan.

***Even if the Concurso Plan is approved by the Mexican bankruptcy court and consummated in Mexico, our ability to successfully restructure our debt is dependant upon certain relief being granted in foreign jurisdictions, including the U.S.***

Certain of our assets are located in jurisdictions outside of Mexico, including the United States. In addition, certain of our indirect subsidiaries, who are guarantors of certain of the Company's obligations, including the Old Notes, are organized, have their principal place of business and/or have significant assets in foreign jurisdictions, including the United States. In order to commence and operate effectively during the Concurso proceeding, and to thereafter fully implement the terms and conditions of the Concurso Plan upon its approval by the Mexican bankruptcy court and consummation in Mexico (including, without limitation, the release of our subsidiaries' guarantees of the Old Notes and any claims, in the nature of subrogation or otherwise, such subsidiaries may have against the Company) we will need to obtain relief from courts in one or more of these foreign jurisdictions to protect our assets and/or prevent the exercise of remedies against our subsidiaries from jeopardizing our ability to maintain operations and service our restructured debt.

11

As a part of the implementation of the restructuring, we may commence proceedings in certain applicable foreign jurisdictions to recognize, give effect to and implement the Concurso Plan in such jurisdictions, including an ancillary proceeding in the United States pursuant to chapter 15 of the United States Bankruptcy Code, as amended (the "U.S. Bankruptcy Code") seeking recognition of the concurso mercantil proceeding in Mexico (the "Main Proceeding"). See "The Restructuring and the Concurso Plan." Upon commencement of such proceedings, we may seek relief in such proceedings, including, among other things, a stay and/or injunction, enjoining all creditors of the Company or its subsidiaries from taking any action to enforce any pre−petition claims against the Company or its subsidiaries in such jurisdictions. In addition, upon approval of the Concurso Plan in the concurso mercantil proceeding in Mexico, we may request that the foreign court in which such proceedings have been commenced issue an order implementing the Concurso Plan in such jurisdiction, including a permanent injunction against any action to enforce against the Company or ay of its direct or indirect subsidiaries any claims dealt with or discharged in the Concurso Plan.

It is possible that some or all of the relief we request in an ancillary proceeding that is necessary to implement the Concurso Plan in a foreign jurisdiction with regard to the Company's indirect subsidiaries in such jurisdictions may not be granted by the foreign court in which such proceedings have been commenced. In that event, it may not be possible to successfully complete our restructuring plan with regard to the Company's indirect subsidiaries in such jurisdictions notwithstanding approval of the Concurso Plan by the Mexican bankruptcy court and consummation thereof in Mexico.

**If the Concurso Plan or any other revised plan or prepackaged plan of concurso mercantil is not consummated, we may be subject to an involuntary Mexican or U.S. reorganization related proceeding.**

Since we have defaulted on our Old Notes, some of our creditors have already taken legal action against us. Some or all of our other creditors may also take legal action against us, including instituting an involuntary *concurso mercantil* in Mexico or filing an involuntary petition against us in the United States under the U.S. Bankruptcy Code. If we become involved in an involuntary proceeding in Mexico or the United States or if holders challenge or seek to invalidate the *Concurso* Plan, we could not predict the ability of holders of Restructured Debt or any other creditor to influence the outcome of such proceedings. A reorganization proceeding is likely to result in significant changes to our existing obligations, including the Old Notes, which could include the cancellation or rescheduling of all or part of those obligations, and we could be subject to liquidation and ultimately be forced to sell all or substantially all of our assets. See "The Mexican Law of Commercial Reorganizations" for a further description of a Mexican reorganization proceeding. During or after the pendency of any such proceeding, our ability to operate or manage our business, to retain employees, to maintain existing or create new customer relationships, to continue to collect payments for our services or to obtain any type of funding or financing would likely be significantly jeopardized and, as a result, the potential recovery for the holders of Restructured Debt could be materially adversely affected. As a result of the downturn in the global market, we expect that the proceeds from any potential liquidation and sale of our assets would not be sufficient to satisfy all of our obligations to holders of Restructured Debt, and would result in a net recovery to holders of Restructured Debt that is projected to be substantially less than they would receive pursuant to the *Concurso* Plan. In addition, in the event that we become involved in an involuntary proceeding in Mexico or the United States, subject to certain qualifications and cure periods, holders who have signed lock−up agreement with us will be entitled to terminate their commitments under such lock−up agreements.

**The Concurso Plan may not be commenced, may not become effective or may be dismissed regardless of the number and amount of holders of Restructured Debt that vote to accept the Concurso Plan.**

The approval and effectiveness of the *Concurso* Plan are subject to certain conditions and requirements that may not be satisfied, and the Mexican bankruptcy court may conclude that the requirements for approval and effectiveness of the *Concurso* Plan have not been satisfied. See "The Restructuring and the *Concurso* Plan" and "The Mexican Law of Commercial Reorganizations."

**We may not be able to successfully complete our restructuring plan and continue our operations.**

Our ability to successfully complete our restructuring plan and continue our operations is also dependent on:

- The overall strength and stability of general economic conditions in the glass container, automotive and construction industries;

- Customer confidence in our viability going forward, and our ability to continue to maintain and expand our customer base;

- The availability of adequate financing on acceptable terms from our suppliers and their continuing business relationships with us;

- Our ability to maintain receivables securitization and sale of receivables programs which provide working capital for operations;

- Our ability to sell non−productive assets at favorable prices; and

- Development of new products and new uses for our products.

In December 2009, we completed a $75 million transaction with Fintech Advisory through the creation of the Real Estate Trust. See "Recent Developments — Financial Liquidity Transactions — Fintech Sale and Leaseback Transaction". If we default on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming we have not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech Advisory exercises its right to sell or lease the real estate assets, this could adversely affect our business.

## RISK FACTORS RELATING TO OUR BUSINESS

### *Our business and our ability to continue operations are highly dependent on sales volume, which has been significantly affected by the continued global economic crisis*

Our operational and financial results are highly sensitive to sales volume, as demonstrated by the sharp declines in each of our core businesses, Glass Containers and Flat Glass sales, in relation to the global economic and financial crisis, and the severe recession, that began in the second half of 2008, particularly in the markets in which we operate, principally Mexico, the Unites States and Europe. The sharp decline in demand for new cars and trucks in the automobile industry, for new homes and buildings in the construction industry, and reduced beer bottle demand for our main client in our Glass Containers business unit, resulted in a 36.8% decline in our consolidated operating income for 2008 compared to 2007, from Ps. 2,704 million to Ps. 1,710 million, and a further 22.3% decline in our operating income for 2009 compared to 2008, from Ps. 1,710 million to Ps. 1,329 million. Income before taxes decreased from Ps. 175 million in 2007 to a loss of Ps. 7,857 million in 2008 and a loss of Ps. 1,352 million in 2009. Net income decreased from Ps. 131 million in 2007 to a loss of Ps. 5,682 million in 2008 and a loss of Ps. 754 million in 2009.

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. For the nine−month period ended September 30, 2010, we experienced a net decreased of 4.8% year over year of our consolidated net sales compared with the same period of 2009, from Ps. 18,389 million ($1,362 million) to Ps. 17,498 million ($1,400 million). Net sales in our Flat Glass business unit decreased 5.7% primarily due to lower sales volumes from our Flat Glass business unit subsidiaries located in the United States, Spain and Colombia, which were partially offset by a slight recovery in the automotive original equipment manufacturers ("OEM") market and float glass sales volumes for the construction industry. The sales in dollars were affected when measured in pesos by a 7.5% average peso appreciation, from an average of Ps. 13.75 in 2009 to an average of Ps. 12.72 in 2010. Net Sales in our Glass Containers business unit decreased 4.6% due to price erosion caused by overall excess capacity.

Our consolidated operating income increased 0.8% from Ps. 1,056 million ($78 million) for the nine−month period ended September 30, 2009 to Ps. 1,065 million ($85 million) for the same period of 2010. This increase was due to a slight recovery in the automotive industry and by savings related to our cost and expense reduction initiatives implemented in 2008 through the third quarter of 2009. Our operating income was also affected by the increase in natural gas price as the average price increased 25% from $3.55 per MMBTU for the nine−month period ended September 30, 2009 compared to $4.43 per MMBTU for the same period of 2010.

The continuation of the economic downturn will continue to adversely affect our business and our ability to maintain profitable operations. A continued downturn in the Mexican economy, from which we derived 44% and 46% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively, would reduce the demand for our products and negatively impact our results of operations. Similarly, a prolonged economic downturn in the United States and Europe, from which we derived 47% and 46% of our consolidated net sales in 2008 and 2009, respectively, would have an adverse impact on the exports and foreign subsidiaries' sales of our Flat Glass and Glass Containers business units. In recent years, economic conditions in Mexico have become increasingly correlated to economic conditions in the United States. Therefore, continuing adverse economic conditions in the United States could have a significant adverse effect on the Mexican economy. Also, in the past, economic crises in Asia, Russia, Brazil, Argentina and other countries have adversely affected the Mexican economy and therefore our results of operations.

13

***We have insufficient liquidity to repay our existing obligations and meet our capital requirements***

For the last twelve months, ended September 30, 2010, our operating income was Ps. 1,337 million ($107 million). As of September 30, 2010, our total consolidated indebtedness was Ps. 21,323 million ($1,706 million), of which Ps. 19,602 million ($1,568 million) is short−term debt. As of September 30, 2010, our unrestricted cash and cash equivalent balances were Ps. 2,438 million ($195 million).

As a result of our financial condition, a number of our suppliers have imposed more restrictive payment terms and security arrangements, which further restrict our liquidity. In addition, under our arrangements to purchase the minority interest in Vitro Cristalglass, during 2010 we made payments of €7.4 million ($9.4 million). See "Item 5. Operating and Financial Review and Prospects—Operating Results—Trend Information—Inflation and Foreign Currency Exchange Rate Fluctuations."

As of September 30, 2010, we had open DFI hedges with Petróleos Mexicanos, S.A. de C.V., which we refer to as "Pemex," for approximately 32% of our estimated natural gas consumption for the remainder of the year at an average price of approximately $6.80 per MMBTU for 2010, and approximately 19% of our estimated natural gas consumption at an average price of approximately $7.32 per MMBTU for 2011. As of September 30, 2010, our open DFIs with Pemex had a mark−to−market liability value of approximately $14.8 million. Although Pemex has historically never required collateral or requested early termination, Pemex has historically had the right to seek such remedies pursuant to the agreements and recently requested some collateral.

Under the Pemex agreements mentioned above, we are obligated to make monthly settlement payments until December 2011 to the extent the market price on the monthly settlement date of natural gas is below the exercise price set forth in the agreement. During the first 9 months of 2010, we have made monthly settlement payments of an aggregate of Ps. 133 million ($10.5 million). If the market price of natural gas increases above the exercise price set forth in the agreement, we will be entitled to receive payments from Pemex. However, if the market price ($3.49 per MMBTU as of September 30, 2010) remains low or continues to decrease, our monthly settlement payments will continue at the same level or increase. If the negative mark−to−market value increases, we could be more likely subject to an unprecedented Pemex margin call, which would adversely impact our liquidity.

Under our indentures governing the Old Notes, we are prohibited from incurring additional debt, other than the refinancing of outstanding debt and other limited exceptions, and, in addition, based upon our financial condition, we may not be able to arrange debt and other financings that could provide us with additional liquidity to operate our businesses.

***Even if our debt restructuring is successful, our indebtedness and other obligations could continue to be significant and could contain significant restrictions***

Even if we are successful in restructuring our obligations under our indentures governing the Old Notes and other financial instruments and complete our restructuring plan, we could continue to have a significant amount of indebtedness and other obligations. Our ability to make scheduled interest and principal payments on the restructured debt will depend upon our ability to achieve profitability levels to support our new debt, which may be dependent upon an improvement in the current economic environment in the industries we operate. Our net interest expense on debt for the twelve months ended September 30, 2010 was Ps. 2,255 million ($180 million), while our operating income was Ps. 1,337 million ($107 million).

The amount of our interest payment requirements could adversely affect our business in a number of ways, including but not limited to, the following:

- We may have less cash available to expand and improve our business, since we are required to dedicate a significant portion of our cash flow from operations to the payment of interest on our debt;

- Our ability to obtain additional debt financing may be limited and the terms on which such financing is obtained may be negatively affected; and

- Our ability to compete effectively against better−capitalized competitors and to withstand downturns in our business may be affected since a significant portion of our cash flow from operations is required to be dedicated to making interest payments. As a result, we may lose market share and experience lower sales, which, in turn, could result in a material adverse effect on our financial condition, results of operations and liquidity.

14

***Price pressures that result from over−capacity, lower−margin business opportunities, flat glass customers' initiatives, and consolidation of our customer base may adversely affect our businesses***

Due to the global economic and financial crisis and the severe recession, there is a significant over−capacity in the markets in which we operate; therefore, we could face significant pricing pressure or could be forced to temporarily enter into different business segments with lower margins within our Glass Containers and Flat Glass businesses.

Downward pricing pressure by automotive manufacturers is a characteristic of the automotive industry. Virtually all automakers have aggressive price reduction initiatives and objectives each year with their suppliers, and such actions are expected to continue in the future. In addition, estimating such amounts is subject to risk and uncertainties as any price reductions are a result of negotiations and other factors. If we are unable to offset customer price reduction in the future through improved operating efficiencies and other cost reduction initiatives, our results of operations would be adversely affected.

Some of our largest customers, mainly in the Glass Containers business, have acquired companies with similar or complementary product lines. This consolidation has increased the concentration of our business with our largest customers. In many cases, such consolidation has been accompanied by pressure from customers for lower prices, reflecting the increase in the total volume of products purchased or the elimination of a price differential between the acquiring customer and the company acquired. Increased pricing pressures from our customers may have a material adverse effect on our results of operations.

***We have customers that are significant to us and the loss of all or a portion of their business will have an adverse effect on us.***

Because of the relative importance of our largest customers, our business is exposed to a certain degree of risk related to customer concentration. In December 2008, Grupo Modelo, one of our key customers in our Glass Containers business notified us that due to the current world market contraction, it would significantly reduce its beer bottle orders from us. Based on our consolidated sales for 2008, the volume reduction impact on our annual consolidated sales for 2009 was approximately 6.45%, measured in Mexican pesos.

Our significant customers in our Flat Glass segment are major original equipment car and truck manufacturers, Ford, General Motors, Chrysler, Nissan and Freightliner. Our automotive sales in 2009 declined 34% from 2008. The global downturn affected the level of sales in the automotive industry, and some of our key customers are rationalizing their product offering after emerging from reorganizations under U.S. bankruptcy laws or industry consolidations which may further reduce our levels of sales to this business segment. Given that our profitability depends on our maintenance of a high capacity utilization rate, the loss of all or a portion of the sales volume from a significant customer would have an adverse effect on us.

***We have to pay interest and principal on our U.S. dollar−denominated debt with revenues generated in Mexican pesos or other currencies, as we do not generate sufficient revenue in U.S. dollars from our operations.***

As of September 30, 2010, 90% of our outstanding debt was denominated in U.S. dollars. We do not generate sufficient revenues in U.S. dollars from our operations to service our entire U.S. dollar−denominated debt. Consequently, we have to use revenues generated in pesos or other currencies to service our U.S. dollar−denominated debt. A devaluation of the Mexican peso against the U.S. dollar could adversely affect our ability to service our debt.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

***We have experienced rising operating costs in each of our businesses***

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations. Each one dollar change in our unit price of natural gas per million MMBTU has a direct impact of approximately $18 million on our annual operating costs based on our average historical consumption of approximately 1.5 million MMBTUs per month.

15

For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price for the year ended December 31, 2008 of $6.07 per MMBTU. Our operating income was also affected by the increase in natural gas price as the average price increasing 25% from $3.55 to $4.43 per MMBTU for the nine−month period ended September 30, 2009 compared to the same period of 2010.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. As of September 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates and foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. If the price of natural gas increases, we cannot assure you we would be able to raise the prices of our products to fully reflect the increases in our operating costs and, therefore, our results of operations could be adversely affected by continued high prices of natural gas.

Furthermore, although a further decrease in the price of natural gas would have a positive impact of substantially reducing our cost of goods sold, the benefits to our cost of sales would be realized over a period of time, whereas such a further decrease would also have an adverse effect on the fair market value of our natural gas DFIs, resulting in losses that would be immediately recorded within our comprehensive financial results in our statements of operations as a result of mark−to−market valuation accounting requirements. See "Item 3. Key Information — Recent Developments— Vitro's Financial Difficulties — Claims relating to our derivative financial instruments".

We are also a large consumer of soda ash with a consumption of approximately 300 thousand metric tons in 2009, which represented approximately 4% of our cost of goods sold. In the last four years, the price of the soda ash has increased by approximately 70%.

Other potential sources of significant variations in our cost of goods sold are packaging and freight costs, which represented 6% and 2% respectively of our cost of goods sold in 2009, respectively.

***We operate in a highly competitive industry in which we compete with global competitors and vertically integrated customers, have relatively high fixed costs and are faced with sharply decreasing demands***

Historically, aggressive investment by our global competitors such as Compagnie de Saint Gobain ("Saint Gobain") and Guardian Industries Corporation ("Guardian"), and vertically integrated customers with glass manufacturing facilities in Mexico, coupled with the increased imports of low−cost competitive products into several of our important markets, has resulted in an increase in capacity that has brought significant pricing pressure on our products, particularly in our flat glass construction market where the industry is faced with overcapacity. Similarly, our competitors may make new investments in Mexico in the glass containers market. Loss of existing or future market share to competitors or customers in any of our business units may adversely affect our performance and, to the extent that one or more of our competitors becomes more successful than us with respect to any key competitive factor, our results of operations, financial position and liquidity may be adversely affected.

Our operations have relatively high fixed costs relating to equipment purchases and employee costs. Customer financial difficulties have resulted, and could result in the future, in sharp decreases in demand and we may be unable to adjust our cost structure in a timely manner to compensate for shortfalls in sales. If current and anticipated customers do not place orders with us in accordance with our expectations or at all, it may be difficult to plan our capacity which cannot be altered easily. If our capacity does not match our customer demand, we will be burdened with expensive and unutilized overcapacity which could have an adverse effect on our business and results of operations.

16

***We face intense competition from other glass container producers, as well as from makers of alternative forms of packaging***

We face competition from other glass container producers, as well as from makers of alternative forms of packaging, such as aluminum cans and plastic containers. We compete with each rigid packaging competitor on the basis of price, quality, service and the marketing attributes of the container. Advantages or disadvantages in any of these competitive factors may be sufficient to cause the customer to consider changing suppliers and/or using an alternative form of packaging. We also compete with manufacturers of non−rigid packaging alternatives, including flexible pouches and aseptic cartons, in serving the packaging needs of, among others, juice and food customers.

***Difficult market conditions in the automotive industry may affect our operating margins and results of operations***

The North American automotive industry has recently faced difficult market conditions. North American automobile manufacturers have experienced slower demand and increased pricing pressures on their products. Even though the industry has shown moderate signs of recovery in 2010, these difficult market conditions in the automotive industry may continue to lead to additional pricing pressure on our products and may lead to loss of sales volume, either of which may have an adverse effect on us. In addition, the automotive industry has experienced pressures due to increased oil prices and the elimination of certain tax incentives in the United States which could decrease our OEM business sales, as the U.S. demand in the automobile sector has declined.

Certain of our flat glass products are sold to OEMs in the automotive industry under global purchase agreements, which are entered into after completion of a bidding process. Such automotive OEMs have significant buying power which, coupled with substantial competition, puts pressure on prices and margins relating to products supplied under the global purchase agreements. As a result, even if we were awarded the right to sell to an automotive OEM under a global purchase agreement, we may sell at operating margins that are lower than margins generally achievable from sales to other flat glass customers. The automotive OEM business line represented 9% and 7% of our consolidated net sales for the years ended December 31, 2008 and 2009, respectively.

***The costs of complying with environmental protection and health and safety laws, and any liabilities arising thereunder, may increase and adversely affect our business, results of operations, cash flows or financial condition***

We are subject to various environmental protection and health and safety laws and regulations governing, among other things, the generation, storage, handling, use, remediation, disposal and transportation of hazardous materials, the emission and discharge of hazardous materials into the ground, air or water, and the health and safety of our employees.

We are also required to obtain permits from governmental authorities for certain operations. We cannot assure you that we have been or will be at all times in complete compliance with such laws, regulations and permits. If we violate or fail to comply with these laws, regulations or permits, we could be fined or otherwise sanctioned by regulators. We could also be held liable for any and all consequences arising out of human exposure to hazardous substances or other environmental damage.

Since 1998, we have been participating in a voluntary audit program at our Mexican facilities. As a result of audits by and implementation of certain measures suggested by the Procuraduría Federal de Protección al Ambiente (Federal Environmental Protection Agency), which we refer to as "PROFEPA," action plans are entered into, and costs are incurred, to make environmental investments and improvements required for PROFEPA Clean Industry certification.

Environmental laws are complex, change frequently and have tended to become more stringent over time. While we have budgeted for future capital and operating expenditures to maintain compliance with environmental laws, we cannot assure you that environmental laws will not change or become more stringent in the future. Therefore, we cannot assure you that our costs of complying with current and future environmental and health and safety laws, and our liabilities arising from past or future releases of, or exposure to, hazardous substances will not adversely affect our business, results of operations, cash flow or financial condition.

17

***Substitution trends in the glass container industry may continue to adversely affect our business***

Glass containers have been, and continue to be, subject to competition from alternate forms of packaging, including plastic containers, aluminum cans and laminated paper containers. In mature glass containers markets, such as in the United States, demand for glass containers began a sustained long−term decline in the 1970s (although such decline has substantially diminished in recent years). In connection with such decline, the glass containers industry experienced a reduction in capacity and consolidation among glass container producers. The remaining glass containers producers in mature markets have faced, and may continue to face, pricing pressures as a result of competition from other forms of packaging. Mexico is becoming a mature market, with increased competition from alternate forms of packaging, particularly plastic, aluminum cans and laminated paper containers. Such products have adversely affected, and may continue to adversely affect, our prices and operating margins, principally with respect to glass containers for the beer, soft drinks and food industries. Our Glass Containers business unit represented 52% of our consolidated net sales in 2009.

***Protracted constraints on our capital expenditures may impact our business operations***

We are constrained in our capital expenditures by our current financial condition. Therefore, our capital expenditures are limited in 2010. During 2009, we invested $77 million. Should we be unable to fund the total amount of our capital expenditures with cash flows from operations, we may be required to defer a portion of such expenditures to future periods. See "Liquidity and Capital Resources." A prolonged constraint on our available resources for capital expenditures could have a materially adverse effect on our results of operations.

**RISK FACTORS RELATING TO ECONOMIES IN WHICH WE PARTICIPATE**

*Economic developments in Mexico, the United States and Europe affect our business.*

The year 2009 was characterized by a continuation of the slowdown in global economic activity and a global recession that led to tight credit markets and to a global decline in demand. The global economic deceleration had its roots in the U.S. economy, which experienced growth decline from 2.1% in 2007 to 0.4% in 2008 and contracted at a rate of 2.4% in 2009. During the global economic crisis, the United States and other countries around the world, and particularly Spain's construction market, experienced deteriorating economic conditions. Global consumer confidence eroded amidst concerns over declining asset values, inflation, energy costs, geopolitical issues, the availability and cost of credit, rising unemployment, and the stability and solvency of financial institutions, financial markets, businesses and sovereign nations.

The housing and construction markets in the United States have been seriously affected by the sub–prime mortgage crisis, which has also affected the economy overall. The growth in housing sales and construction financed by credit played a large role in the economy's expansion by lifting other sectors of the economy. Losses on subprime mortgages have negatively affected not only the housing and construction markets but other sectors and the availability of credit generally. Increased foreclosures could generate increased inventory on the housing market which could affect our residential and commercial construction sales. See "Item 5. Operating and Financial Review and Prospects—Operating Results—Trend Information."

As a consequence of the global economic and financial crisis, and the severe recession, that began in the second half of 2008, the Mexican economy entered into a recession. In 2009, Mexico's GDP registered a contraction rate of 6.5%. In 2008, Mexico's GDP registered a growth rate of 1.3%, a lower figure than the GDP growth rate of 3.3% reported for 2007. The majority of our manufacturing facilities are located in Mexico. Therefore, our consolidated net sales resulting from sales to parties located in Mexico were 42%, 44%, and 46%, for each of the years ended December 31, 2007, 2008 and 2009, respectively. Thus, the current recession in Mexico could affect our operations to the extent that we are unable to reduce our costs and expenses in response to falling demand. These factors could result in a decrease in our sales and revenues.

Even though the economy has shown moderate signs of recovery in 2010, some of our markets are still experiencing contraction and excess capacity, including the construction sector in the United States and Spain. In Mexico, for 2010, we expect the country to continue confronting difficulties, due to a slower than expected recovery in the domestic market and in the U.S. economy.

Future economic decline in or affecting Mexico, the United States or Europe could adversely affect us and our ability to obtain financing.

*Foreign currency exchange rate fluctuations may have an adverse effect on our operating income and our total comprehensive financial result*

Our total comprehensive financing result is impacted by changes in the value of the Mexican peso relative to the U.S. dollar. Foreign currency exchange gains or losses included in our total financing cost result primarily from the impact of changes in the U.S. dollar–Mexican peso exchange rate on our Mexican subsidiaries' U.S. dollar–denominated monetary liabilities (such as U.S. dollar–denominated debt and accounts payable arising from imports of raw materials and equipment) and assets (such as U.S. dollar–denominated cash, cash equivalents and accounts receivable). Because historically our U.S. dollar–denominated liabilities have exceeded our U.S. dollar–denominated monetary assets, the devaluation and appreciation of the Mexican peso resulted in exchange losses and gains, respectively. The closing exchange rate of 2009, Ps. 13.0587 per one dollar, compared with the closing exchange rate of 2008, Ps. 13.8325 per one dollar, showed an appreciation of the Mexican peso of 5.6%. This appreciation reflected an exchange gain in our financial statement. As of September 30, 2010 the exchange rate is Ps. 12.5011 per one dollar, an appreciation of 4.27% compared with the closing exchange rate of Ps. 13.0587 in December 31, 2009. Accordingly, during the nine–month period ended September 30, 2010, the appreciation of the Mexican peso relative to the U.S. dollar resulted in foreign currency exchange gains. See "Item 5. Operating and Financial Review and Prospects —Operating Results—Inflation and Foreign Currency Exchange Rate Fluctuations."

19

Changes in the value of the Mexican peso to the U.S. dollar also have an effect on our results of operations. In general, a devaluation of the Mexican peso results in an increase of our operating margins, and an appreciation of the Mexican peso results in a decrease in our operating margins, in each case, when measured in pesos. This is because the aggregate amount of our consolidated net sales denominated in or linked to the U.S. dollar exceeds the aggregate amount of our costs of goods sold and our general, administrative and selling expenses denominated in or linked to the U.S. dollar.

A substantial portion of the sales generated by our Mexican subsidiaries and U.S. subsidiaries are either denominated in or linked to the U.S. dollar. The prices of a significant number of the products we sell in Mexico, particularly flat glass for automotive uses and capital goods, are linked to the U.S. dollar. In addition, substantially all of our export sales are invoiced in U.S. dollars and subsequently translated into Mexican pesos using the exchange rate in effect at the date of the transaction.

Further, a strong Mexican peso relative to the U.S. dollar makes the Mexican market more attractive for importers and competitors that might not otherwise sell in the Mexican market. A strong Mexican peso relative to the U.S. dollar also makes our products with prices denominated in or affected by the value of the U.S. dollar less competitive or profitable. With respect to such products, when the Mexican peso appreciates we must either increase our prices in U.S. dollars, which makes our products less price−competitive, or bear reduced operating margins when measured in pesos. Given the competitive nature of the industries in which we operate, we have chosen to reduce our operating margins for such products in response to appreciation of the Mexican peso relative to the U.S. dollar in the past.

The sales generated by our Spanish subsidiary are either denominated in or linked to the euro, while its cost of goods sold is denominated in or linked to the U.S. dollar. Changes in the value of the U.S. dollar to the euro may have an adverse effect on us in a similar fashion to those described with respect to the value of the Mexican peso above.

***We may be adversely affected by increases in natural gas prices, interest rates or foreign exchange rate changes that we are unable to mitigate through derivative transactions due to our financial condition***

Some of our components of our costs of goods sold are subject to market price variations, especially energy costs which represented approximately 10% of our consolidated cost of goods sold in 2009. Such cost is directly linked to the price of natural gas which has experienced significant volatility in recent years. Since the price of natural gas in Mexico is tied to the price of natural gas in Southern Texas, which in turn is fully exposed to market factors such as demand in the United States or the amount of available natural gas reserves, we are exposed to such price variations.

Interest rate risk exists primarily with respect to our floating−rate Mexican peso and U.S. dollar−denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR increase significantly, our ability to service our debt will be adversely affected. As of September 30, 2010, our TIIE−rate and LIBOR−rate debt amounted to Ps. 1,548 million ($124 million) and Ps. 486 million ($39 million), respectively.

Because our net sales and a significant portion of our operations are denominated in the Mexican peso and the U.S. dollar, our business is subject to adverse effects of foreign exchange rate fluctuations. These fluctuations may result from changes in economic conditions, investor sentiment, monetary and fiscal policies, the liquidity of global markets, international and regional political events, and acts of war or terrorism. In addition, the fluctuation of the foreign exchange rate may adversely affect our U.S. dollar−denominated debt.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases, interest rates or foreign exchange rates. As of September 30, 2010, however, the only hedging arrangements to which we remain subject consist of hedging contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in natural gas prices, interest rates or foreign exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

***Developments in other emerging market countries may adversely affect our business or the market price of our securities***

As is the case with respect to securities of issuers from other emerging markets, the market value of securities of Mexican companies is, to varying degrees, affected by economic and market conditions in other emerging market countries. Although economic conditions in these countries may differ significantly from economic conditions in Mexico, investors' reactions to developments in any of these other countries may have an adverse effect on the market value of securities of Mexican issuers. In recent years, for example, prices of both Mexican debt securities and Mexican equity securities dropped substantially as a result of developments in Russia, Asia and Brazil.

During recent years, Venezuela, Colombia and certain EU markets have shown instability related to certain political and economic troubles (e.g., sovereign debt problems in Greece, Spain and Portugal). In the countries in which we operate, we are subject to government protectionist measures, anti–dumping regulation, actions aimed at imposing controls on capital and other such practices that may adversely affect our business.

In addition, the correlation between economic conditions in Mexico and the United States has sharpened as a result of the North American Free Trade Agreement ("NAFTA") and increased economic activity between the two countries. As a result of the slowing economy in the United States and the uncertainty it could have on the general economic conditions in Mexico and the United States, our financial condition and results of operations could be adversely affected. In addition, due to recent developments in the international credit markets, capital availability and cost could be significantly affected and could restrict our ability to obtain financing or refinance our existing indebtedness on favorable terms, if at all.

***If foreign currency exchange controls and other restrictions are imposed, we may not be able to service our debt in U.S. dollars, which exposes investors to foreign currency exchange risk***

In the past, the Mexican economy has experienced balance of payments deficits, shortages in foreign currency reserves and other problems that have affected the availability of foreign currencies in Mexico. The Mexican government does not currently restrict or regulate the ability of persons or entities to convert pesos into U.S. dollars. However, it has done so in the past and could do so again in the future. We cannot assure you that the Mexican government or any other government in countries in which we operate will not institute a restrictive currency exchange control policy in the future. Such restrictive foreign currency exchange control policies could prevent or restrict access to U.S. dollars and limit our ability to service our U.S. dollar–denominated debt.

***Political events in Mexico could affect Mexican economic policy and adversely affect us***

Our business, financial condition and/or results of operations may be affected by economic, political or social developments in Mexico, including, among other things, any political or social instability, changes in the rate of economic growth or contraction, changes in the exchange rate between the Mexican peso and the U.S. dollar, an increase in Mexican inflation or interest rates, changes in Mexican taxation and any amendments to existing Mexican laws and regulations.

Federal Congressional mid–term elections were held on July 5, 2009, and the opposition Institutional Revolutionary Party (Partido Revolucionario Institucional, or "PRI") won a relative majority of the seats in the Mexican Congress, while the National Action Party (Partido Acción Nacional) lost its majority position. The PRI congressional majority, as well as its de–facto coalition with Mexico's Green Party (Partido Verde Ecologista de Mexico) and the possible lack of alignment between the President and this new legislature may result in government gridlock. We cannot provide any assurance that the current political situation or any future political developments in Mexico will not have a material adverse effect on our results of operations and financial condition.

***Security issues and social instability in Mexico could adversely affect us***

High incidences of crime throughout Mexico, including kidnappings and drug trafficking, could have an adverse effect on our business as foreign investors may be less likely to invest in Mexico, which could negatively impact our domestic economy. Social instability in Mexico or adverse social or political developments in or affecting Mexico could adversely affect us and our ability to obtain financing. The possibility of having similar or other incidents in the future could adversely affect our business and operations.

***We face risks related to health epidemics and other outbreaks***

In April 2009, an outbreak of AH1N1 virus occurred in Mexico and the United States followed by cases in Asia and Europe. A future occurrence of AH1N1 virus or other adverse public health developments in Mexico, or in the countries where we operate, may have a material adverse effect on our business operations. Our operations may be impacted by a number of health−related factors, including, among other things, quarantines or closures of our facilities that could disrupt our operations, and a general slowdown in the Mexican economy. Any of the foregoing events or other unforeseen consequences of public health problems could adversely affect our business and results of operations.

***Our financial statements may not give you the same information as financial statements prepared under United States accounting principles or Exchange Act reporting requirements***

Mexican companies listed on the Bolsa Mexicana de Valores, which we refer to as the "Mexican Stock Exchange," including us, must prepare their financial statements in accordance with MFRS. MFRS differs in certain significant respects from U.S. GAAP as it relates to our consolidated financial statements, including, among other things, the treatment of minority interests, workers' profit sharing, accounting for the effects of deferred income taxes and consolidation of subsidiaries. For these and other reasons, the presentation of financial statements and reported earnings prepared in accordance with MFRS may differ materially from the presentation of financial statements and reported earnings prepared in accordance with U.S. GAAP and Exchange Act reporting requirements. See Note 25 to our audited consolidated financial statements included elsewhere in this annual report for a description of the principal differences between MFRS and U.S. GAAP. Moreover, we filed a Form 15F for deregistration to terminate our registration and reporting requirements under the Exchange Act; if such deregistration is successfully completed, we will no longer be required to disclose financial and other information that is compliant with Exchange Act reporting requirements.

***Our operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on our service to clients***

In April 2010, our float glass facility in Mexicali and the inventories in that plant sustained damage as the result of an earthquake, which caused a temporary halt in production and the loss of a large amount of inventories. On July 1, 2010, our manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Our float glass manufacturing and automotive processing facilities and our facilities at Alcali suffered significant damage and were forced to temporarily suspend operations. See "—Item 3. Key Information — Recent Developments — Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León." Our operations may be impacted in the future by a number of natural disasters or their consequences, including, among other things, flood, damage to roads, highways and/or bridges, and interruption of water, electricity and natural gas supply, which could disrupt our operations and impact our service to our clients.

22

## EXCHANGE RATES

The following table sets forth, for each year in the six year period ended December 31, 2010, the high, low, average and annual period−end Noon Buying Rates, all expressed in pesos per U.S. dollar. No representation is made that the peso or U.S. dollar amounts referred to in this annual report could have been or could be converted into U.S. dollars or pesos, as the case may be, at the rates indicated, at any particular rate or at all.

|  | Noon Buying Rate | | | |
|---|---|---|---|---|
| **Year ended December 31,** | **High** | **Low** | **Average** | **Period−End** |
| 2005 | 11.41 | 10.41 | 10.89 | 10.63 |
| 2006 | 11.46 | 10.43 | 10.91 | 10.80 |
| 2007 | 11.27 | 10.67 | 10.93 | 10.86 |
| 2008 | 13.94 | 9.92 | 11.19 | 13.83 |
| 2009 | 15.37 | 12.60 | 13.57 | 13.05 |
| 2010 | 13.92 | 12.16 | 12.69 | 12.36 |

Source: The International Monetary Fund

The following table sets forth, the monthly exchange rates the high and low Noon Buying Rates, all expressed in pesos per U.S. dollar.

|  | Noon Buying Rate[1] | |
|---|---|---|
|  | **High** | **Low** |
| January 2010 | 13.01 | 12.65 |
| February | 13.18 | 12.78 |
| March | 12.75 | 12.41 |
| April | 12.37 | 12.16 |
| May | 13.18 | 12.26 |
| June | 12.93 | 12.46 |
| July | 13.06 | 12.65 |
| August | 13.14 | 12.54 |
| September | 13.06 | 12.48 |
| October | 12.59 | 12.32 |
| November | 12.49 | 13.92 |
| December | 12.33 | 12.42 |
| January 2011 | 12.26 | 12.02 |
| February (through February 24) | 12.19 | 11.99 |

Source: The International Monetary Fund

### SELECTED CONSOLIDATED FINANCIAL INFORMATION

The following table presents selected consolidated financial information and other data for each of the periods presented. This information and data should be read in conjunction with, and is qualified in its entirety by reference to, our consolidated financial statements and the notes thereto included elsewhere in this annual report and the information under the section entitled "Item 5. Operating and Financial Review and Prospects" as it relates to 2007, 2008 and 2009. The years ended December 31, 2005 and 2006 are derived from our audited financial statements not included in this annual report. Our consolidated financial statements are prepared in accordance with MFRS, which differs in certain significant respects from U.S. GAAP. Note 25 to our consolidated financial statements for the year ended December 31, 2009 provides a description of the principal differences between MFRS and U.S. GAAP as they relate to us.

Financial data expressed in pesos and set forth in the following table for 2008 and 2009 are presented in nominal pesos and for all amounts pertaining to fiscal year 2007 and earlier are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

| | | | | | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2005** | | **2006** | | **2007** | | **2008** | | **2009** | **2009** |
| | | | | | **(Ps. millions)**[(1)] | | | | | **($ millions)**[(2)] |
| **Income Statement Data:** | | | | | | | | | | |
| **MFRS:** | | | | | | | | | | |
| Net sales | Ps. 26,567 | Ps. 27,876 | | Ps. 28,591 | | Ps. 29,013 | | Ps. 23,991 | $ | 1,837 |
| Cost of sales | 19,198 | | 20,230 | | 20,187 | | 21,279 | | 17,180 | 1,316 |
| Gross profit | 7,369 | | 7,646 | | 8,404 | | 7,734 | | 6,811 | 521 |
| Selling, general and administrative expenses | 5,530 | | 5,529 | | 5,700 | | 6,024 | | 5,482 | 420 |
| Operating income | 1,839 | | 2,117 | | 2,704 | | 1,710 | | 1,329 | 101 |
| Financing result: | | | | | | | | | | |
| Interest expense, net | 2,355 | | 2,155 | | 1,836 | | 2,089 | | 2,772 | 212 |
| Derivative financial instruments [(10)] | 17 | | 337 | | 201 | | 3,766 | | 570 | 44 |
| Exchange loss (gain), net | (417) | | 224 | | 94 | | 3,222 | | (976) | (75) |
| Gain from monetary position[(3)] | (455) | | (440) | | (471) | | — | | — | — |
| Total comprehensive financing result | 1,500 | | 2,276 | | 1,660 | | 9,077 | | 2,366 | 181 |
| Other expenses (income), net[(4)] | 494 | | (229) | | 869 | | 495 | | 291 | 22 |
| (Loss) income before income and asset tax | (155) | | 70 | | 175 | | (7,858) | | (1,352) | (104) |
| Income and asset tax expense (benefit) | (519) | | 228 | | 44 | | (2,175) | | (598) | (47) |
| Net income (loss) from continuing operations before changes in accounting principles | 364 | | (158) | | 131 | | (5,682) | | (754) | (57) |
| Net income (loss) from discontinued operations [(5)] | 3 | | (31) | | — | | — | | — | — |
| Gain on sale of discontinued operations [(5)] | — | | 480 | | — | | — | | — | — |
| Cumulative effect of changes in accounting principle [(10)] | (124) | | — | | — | | — | | — | — |
| Net income (loss) | 243 | | 291 | | 131 | | (5,682) | | (754) | (57) |
| Net income (loss) of majority interest | 63 | | 401 | | (13) | | (5,706) | | (787) | (60) |
| Net income (loss) from continuing operations per share | 1.33 | | (0.54) | | 0.38 | | (16.57) | | (2.17) | (0.17) |
| Net income (loss) from discontinued operations per share | 0.01 | | 1.55 | | — | | — | | — | — |
| Diluted and basic net income (loss) of majority interest per share | 0.23 | | 1.39 | | (0.04) | | (16.64) | | (2.27) | (0.18) |
| **U.S. GAAP**[(11)]**:** | | | | | | | | | | |
| Net sales | Ps. 24,292 | Ps. 25,655 | | Ps. 26,159 | | Ps. 26,854 | | Ps. 23,991 | $ | 1,837 |
| Operating income | 831 | | 1,436 | | 2,524 | | 1,454 | | 778 | 60 |

24

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 |
|---|---|---|---|---|---|---|
| | | | (Ps. millions)[1] | | | ($ millions)[2] |
| Net income (loss) from continuing operations[5][11] | (183) | (554) | 485 | (7,836) | (1,796) | (138) |
| Net income (loss) | (287) | (74) | 576 | (6,368) | (2,587) | (198) |
| Net income (loss) from continuing operations per share[5][11] | (0.66) | (1.92) | 1.37 | (18.57) | (7.46) | (0.57) |
| Net income (loss) from discontinued operations per share[5][11] | (0.38) | 1.66 | 0 | 0 | 0 | 0 |
| Diluted and basic net income (loss) per share | (1.04) | (0.26) | 1.37 | (18.57) | (7.46) | (0.57) |
| **Balance Sheet Data:** | | | | | | |
| **MFRS:** | | | | | | |
| Cash and cash equivalents | 1,441 | 1,222 | 1,638 | 1,428 | 2,616 | 200 |
| Current assets [15] | 11,588 | 10,924 | 12,772 | 11,981 | 10,096 | 773 |
| Total assets from discontinued operations [5] | 2,021 | — | — | — | — | — |
| Total assets [15] | 34,663 | 30,444 | 33,824 | 35,774 | 32,652 | 2,500 |
| Current liabilities [13] | 8,968 | 4,840 | 7,146 | 29,063 | 27,580 | 2,112 |
| Total debt[12] | 17,679 | 14,570 | 16,549 | 22,062 | 20,101 | 1,540 |
| Total liabilities from discontinued operations[5] | 1,398 | | | | | |
| Total liabilities | 25,429 | 21,078 | 24,438 | 32,666 | 30,668 | 2,348 |
| Stockholders' equity | 9,234 | 9,366 | 9,386 | 3,108 | 1,984 | 152 |
| Minority interest in consolidated subsidiaries | 3,198 | 1,892 | 1,960 | 1,404 | 1,464 | 112 |
| Majority stockholders' equity | 6,036 | 7,474 | 7,426 | 1,704 | 520 | 40 |
| **U.S. GAAP[5][11] :** | | | | | | |
| Total assets | Ps. 30,579 | Ps. 26,097 | Ps. 29,985 | Ps. 32,789 | Ps. 30,145 | $ 2,308 |
| Total liabilities | 23,178 | 19,272 | 22,923 | 32,573 | 33,064 | 2,532 |
| Net assets | 7,401 | 6,825 | 7,062 | 216 | (2,919) | (224) |
| Capital stock | 7,566 | 7,632 | 7,632 | 7,632 | 7,632 | 584 |
| Stockholders' equity | 7,401 | 6,825 | 7,062 | 216 | (2,919) | (224) |
| **Other Data:** | | | | | | |
| **MFRS:** | | | | | | |
| Capital expenditures[14] | 1,107 | 1,252 | 2,695 | 1,798 | 1,009 | 77 |
| Depreciation and amortization | 1,854 | 1,795 | 1,414 | 1,469 | 1,473 | 113 |
| Total shares issued at end of period[6] | 324 | 386.9 | 386.9 | 386.9 | 386.9 | |
| Total shares held in Stock Option Trust at end of period[6] [12] [14] | 22.3 | 17.6 | 17.5 | 11.7 | 39.8 | |
| Total shares held as treasury stock at end of period[6] | 28.2 | 28.3 | 28.3 | 28.5 | 0.4 | |
| Total shares issued and outstanding at end of period[6] | 273.5 | 341.0 | 341.0 | 346.7 | 346.7 | |
| Average total shares outstanding during period[6] | 273.1 | 289.6 | 341.0 | 342.8 | 346.7 | |
| **Inflation and Foreign Currency Exchange Rate Data:** | | | | | | |
| Percentage of change in INPC[7] | 3.3% | 4.1% | 3.8% | 6.5% | 3.6% | |
| Peso/dollar exchange rate at the end of period[8] | 10.6344 | 10.8116 | 10.8662 | 13.8325 | 13.0587 | |
| Average exchange rate[9] | 10.8786 | 10.9034 | 10.9371 | 11.1939 | 13.5723 | |

(1)   Except per share amounts, number of shares and inflation and foreign currency exchange rate data.

(2)   Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 13.0587 pesos per one U.S. dollar, the Free Exchange Rate on December 31, 2009.

(3)   Through December 31, 2007, the gain from monetary position reflected the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decreased in purchasing power over time. This means that losses were incurred by holding monetary assets over time, whereas gains were realized by maintaining monetary liabilities. Beginning January 1, 2008, we stopped recognizing gains in monetary position as well as inflation effects. See "Presentation of Certain Information" for more information on changes in NIF B−10 regarding effects of inflation.

(4)   Other expenses (income), net, includes:

| | | Year ended December 31, (millions) | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **2009** |
| Restructuring charges (i) | Ps. 332 | Ps. 61 | Ps. 7 | Ps. 185 | 265 |
| Impairment of long−lived assets | 385 | 393 | 122 | 196 | 207 |
| Loss (gain) from sale of long−lived assets | 6 | (795) | 47 | (3) | (209) |
| Loss (gain) from sale of subsidiaries | 137 | (68) | 11 | | |
| Assignment of Vitro Club Trust (ii) | (458) | | | | |
| Early extinguishment of employee retirement obligations | 18 | 8 | 97 | 69 | |
| Fees and costs for extinguishment of debt | | | 488 | | 7 |
| Statutory employee profit sharing | 51 | 55 | 54 | 10 | 13 |
| Other | 23 | 117 | 43 | 38 | 8 |
| | Ps. 494 | Ps. (229) | Ps. 869 | Ps. 495 | Ps. 291 |

(i)   The restructuring charges relate to the downsizing and streamlining of our corporate functions and organization at some of our business units and are part of an ongoing benefit arrangement.

(ii)   The Vitro Club holds land and facilities for our employees' recreational activities, which are held in a trust (the "Trust"). The Trust can only be assigned if all of the participants name one entity as the sole beneficiary. In 2005, all the participants named the Company as the sole beneficiary, and therefore the Company has the right to take control of the Trust. The Company recorded the fair value of the assets and recognized other income of Ps. 458 million. At the end of 2008, we decided to temporarily suspend the services provided at the Vitro Club facilities. In April 2010, as part of the cost reduction plan, we sold the land and facilities of Vitro Club.

(5)   On June 16, 2006, we completed the sale of our 51% equity ownership interest in Vitrocrisa to Libbey, the owner of the remaining 49% equity interest. All financial and operating information relating to Vitrocrisa in this annual report, which was previously presented as one of our reportable segments is now presented as a discontinued operation. In addition, the discussion of our indebtedness in this annual report does not include the indebtedness of Vitrocrisa, which is presented under MFRS in our consolidated balance sheets as a part of "Total liabilities of discontinued operations".

(6)   Millions of shares.

(7)   Calculated using year−end INPC of the most recent year divided by the year−end INPC of the previous year.

(8)   Based on the Free Exchange Rate at the end of the period.

(9)   Calculated using the average of Free Exchange Rates on the last day of each month during the period.

(10) Effective January 1, 2005, the Company adopted the provisions of Bulletin C−10, "Derivative Financial Instruments and Hedging Activities", which requires that all derivative instruments be recognized at fair value, sets the rules to recognize hedging activities and requires separation, if practical, of embedded derivative instruments. Through December 31, 2004, according to prior accounting standards (Bulletin C−2, "Financial Instruments"), the Company did not recognize the effect of hedging derivatives under financial expenses until the flow exchanges were executed.

(11) From 2005 to 2006, certain of our subsidiaries were classified as discontinued operations in our U.S. GAAP consolidated financial information as they meet the definition of held for sale for U.S. GAAP purposes. These subsidiaries did not meet the definition of discontinued operations for MFRS purposes as they do not constitute the sale of a significant portion of our business.

(12) The total shares held in the Stock Option Trust as of April 29, 2009, were 39.8 million. See "Item 16E. Purchase of Equity Securities by the Issuers and Affiliated Purchasers."

(13) As of December 31, 2008 and 2009, we were in default under the indentures governing the Old Notes for $300 million, $216 million and $700 million and certain other debt; therefore, Ps. 16,689 million and Ps. 15,771 million were reclassified as short−term debt.

(14) For 2008 and 2009, these amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters.

(15) As mentioned above, NIF B−8 establishes that special purpose entities, over which control is exercised, should be consolidated. We adopted this bulletin beginning January 1, 2009. As a result of this standard, the amounts as of December 2008 and 2009 include the Company's account receivable securitization transactions. For the years ended as of December 31, 2005, 2006 and 2007 the amount of the Company's securitizations were Ps. 1,720, Ps. 1,744 and Ps. 1,631, respectively; such transactions are included in this table.

**Dividends per Share**

The following table sets forth, for each year in the five year period ended December 31, 2009, the dividends and dividends per share Vitro declared and paid with respect to such year, expressed in pesos and U.S. dollars. All peso amounts contained in the table below are stated in nominal pesos.

| Fiscal Year With Respect to Which Dividend Was Declared | Month Dividend Was Declared | Total Dividend Amount[1] | Dividend per Share | Dividend per Share[2] | Month Dividend Was Paid |
|---|---|---|---|---|---|
| | | (Ps. millions) | (Pesos) | (Dollars) | |
| 2005 | April 2006 | 89 | 0.30 | 0.0270 | May 2006 |
| 2006 | March 2007 | 133 | 0.37 | 0.0334 | April 2007 |
| 2007 | April 2008 | 143 | 0.40 | 0.0372 | May 2008 |
| 2008[3] | | | | | |
| 2009[3] | | | | | |

(1) Under Mexican corporate law, our shares held by the Stock Option Trust are considered issued and outstanding and therefore are entitled to receive dividends.

(2) For purposes of calculating the dividends paid in U.S. dollars per share, we divided the dividends paid in Mexican peso per share by the Free Exchange Rate as of the date on which such dividend was declared.

(3) For 2008 and 2009 no dividends were declared.

Item 4.    Information on the Company

**ORGANIZATIONAL STRUCTURE**

At December 31, 2009, the main subsidiaries the Company consolidates in each reportable segment and its percentage of share ownership, directly or indirectly, were as follows. Unless otherwise noted, all the subsidiaries listed below were incorporated in Mexico:

| FLAT GLASS | GLASS CONTAINERS | CORPORATE |
|---|---|---|
| Viméxico, S.A. de C.V. (91.80%) | Vitro Envases Norteamérica, S.A. de C.V. (100%) | FIC Regiomontano, S.A.P.I. de C.V. |
| Vidrio y Cristal del Noroeste, S.A. de C.V. (91.80%)[1] | Fabricación de Máquinas, S.A. de C.V. (100%) | Aerovitro, S.A. de C.V. (100%) |
| Vitro Flotado Cubiertas, S.A. de C.V. (91.80%) | Compañía Vidriera, S.A. de C.V. (100%) | Clínica Vitro, A.C. (100%) |
| Vidrio Plano de México, S.A. de C.V. (91.80%) | Vidriera Monterrey, S.A. de C.V. (100%) | American Asset Holdings, Corp. (100%)[9] |
| Vitro Flex, S.A. de C.V. (91.80%) | Vidriera Guadalajara, S.A. de C.V. (100%) | |
| Cristales Automotrices, S.A. de C.V. (46.81%) | Vidriera Los Reyes, S.A. de C.V. (100%) | |
| Vitro Colombia, S.A. (91.80%)[4] | Vidriera Querétaro, S.A. de C.V. (100%) | |
| Vitro America, LLC. (100%)[5] | Vidriera Toluca, S.A. de C.V. (100%) | |
| Vitro Cristalglass, S.L. (99.29%)[2][6] | Vitro Packaging, LLC. (100%)[5] | |
| Vitro Chaves Industria de Vidro, S.A. (59.57%)[7] | Vitro Packaging de México, S. A. de C.V. (100%) | |
| Vitro Automotriz, S.A. de C.V. (99.92%) | Industria del Álcali, S.A. de C.V. (100%) | |
| Vitro Vidrio y Cristal, S.A. de C.V (99.99%) | Comercializadora Alcalí, S.A. de C.V. (100%) | |
| Productos de Valor Agregado en Cristal, S.A. de C.V. (55%)[3] | Vidrio Lux, S.A. (100%)[8] | |

(1)    In July 2007, Viméxico acquired the remaining 50% of the outstanding shares of Vitro AFG, S.A. de C.V. (Vitro AFG) from AFG Industries Inc. (AFG Industries), in order to assume control and increase its ownership to 100%, subsequently changing its legal name to Vidrio y Cristal del Noroeste, S.A. de C.V. See Note 20 (b) to our Consolidated Financial Statements included in this annual report.

(2)    In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated. See Note 20 (c) to our Consolidated Financial Statements included in this annual report.

(3)    In August 2007, Vitro Vidrio y Cristal, S.A. de C.V. (Vitro VyC) acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. (PVA). See Note 20 (a) to our Consolidated Financial Statements included in this annual report.

(4)    Incorporated in Colombia.

(5)    Formed under Delaware law in the United States.

(6)    Incorporated in Spain.

(7)    Incorporated in Portugal

(8)    Incorporated in Bolivia

(9)    Incorporated in Texas, United States.

28

**BUSINESS**

**Business Overview**

Vitro, S.A.B. de C.V. is a corporation with variable capital (*sociedad anónima bursátil de capital variable*) organized under the laws of Mexico and is a holding company that conducts substantially all of its operations through subsidiaries. We were incorporated in Mexico in 1909 and, based on our consolidated net sales in 2009, we believe that we are the largest manufacturer of glass containers and flat glass in Mexico. Our principal executive offices are located at Ave. Ricardo Margáin 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico, telephone number (52−81) 8863−1200. Our agent for service of process, exclusively for actions brought by the SEC pursuant to the requirements of the U.S. federal securities laws, is CT Corporation System, 111 Eighth Avenue, New York, New York 10011.

Our consolidated net sales for the year ended December 31, 2009 totaled Ps. 23,991 million ($1,837 million). In 2009, 46% and 46% of our consolidated net sales were sales made in Mexico and in the United States and Europe, respectively. Our operations are organized into two operating business units: the Glass Containers business unit (representing approximately 52% of our consolidated net sales in 2009) and the Flat Glass business unit (representing approximately 47% of our consolidated net sales in 2009).

As of December 31, 2009, our total assets were Ps. 32,652 million ($2,500 million). We have manufacturing facilities in 11 countries, distribution centers throughout the Americas and Europe and export our products to several countries.

Our Glass Containers business unit manufactures and distributes glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world. Substantially all of the Glass Containers subsidiaries are wholly owned except for Comegua, our venture with London Overseas and Golden Beer in which we hold an investment of 49.7%. Covisa, which conducts a substantial majority of our glass containers operations in Mexico, is the only Significant Operating Subsidiary in the Glass Containers business unit.

Our Flat Glass business unit focuses on the manufacturing, processing and distribution of flat glass for the construction and the automotive industries. Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal. Vimexico, our 91.8% venture with Pilkington is a holding company for some of the Flat Glass business unit subsidiaries. Vitro Vidrio y Cristal, S.A. de C.V. ("Vidrio y Cristal"), which manufactures and distributes our raw flat glass products for the Mexican construction industry, is the only Significant Operating Subsidiary in our Flat Glass business unit. In addition to Vimexico, we have partners in three additional subsidiaries: (i) Cristales Automotrices, S.A. de C.V. ("Cristales Automotrices"), which conducts our automotive glass replacement ("AGR") installation business throughout Mexico City, (ii) Vitro Cristalglass, which is engaged in the manufacturing and distribution of flat glass products for the Spanish, French and Portuguese construction industries. and (iii) Vitro Chaves, S.A. ("Vitro Chaves"), a subsidiary of Vitro Cristalglass.

**Acquisitions**

In July 2008, Vimexico was notified by its venture partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, our consolidated financial statements present Vitro Cristalglass as a wholly owned subsidiary of Vimexico. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527 million). The difference between the purchase price and the book value resulted in a charge of Ps. 60 million, recorded in majority stockholders' equity. The total amount of the purchase price its being paid throughout 2009 and 2010.

In April 2008, the Company, through its subsidiary Vitro Cristalglass, completed the acquisition of the operations of Verres et Glaces d'Epinay, a Paris−based value−added flat glass company, for an equivalent of Ps. 41 million ($4 million). The new operations have been incorporated into a new subsidiary, which is now engaged in the production and distribution of value−added glass products to the French residential and commercial construction market. Verres et Glaces d'Epinay commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

In August 2007, Vidrio y Cristal acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V., a company engaged in the installation of value−added glass products, for an equivalent of Ps. 110 million ($10 million).

In July 2007, Viméxico exercised its option to acquire the remaining 50% of the outstanding shares of Vitro AFG (now Vidrio y Cristal del Noroeste, S.A. de C.V.) from its joint venture partner AFG Industries Inc. for Ps. 67 million ($6 million) in cash. This company's primary operations are the manufacture, processing and distribution of flat glass.

***Our Operating Business Units***

Our organizational structure, comprised of the Glass Containers and Flat Glass business units, allows us to focus on the needs of the distinct end markets we serve, which results in a diversified revenue base, and enables us to take advantage of our expertise in the efficient production and distribution of high quality glass products.

**Business Segment Data**

The following table sets forth the business segment data for the three years ended December 31, 2009. Financial data expressed in Mexican pesos and set forth in the following table are presented in nominal pesos except for all amounts pertaining to fiscal year 2007 that are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | Glass Containers | | Flat Glass | | Corporate & Eliminations | | Consolidated | | $ million | |
|---|---|---|---|---|---|---|---|---|---|---|
| | (Ps. million) | | | | | | | | ($ million) | |
| **2009** | | | | | | | | | | |
| Net sales | Ps. | 12,452 | Ps. | 11,453 | Ps. | 229 | Ps. | 24,134 | $ | 1,848 |
| Intersegment sales | | 67 | | 76 | | | | 143 | | 11 |
| Consolidated net sales | | 12,385 | | 11,377 | | 229 | | 23,991 | | 1,837 |
| Operating income | | 1,956 | | (591) | | (36) | | 1,329 | | 101 |
| Total assets | | 21,878 | | 15,029 | | (4,255) | | 32,652 | | 2,500 |
| Capital expenditures[1] | | 735 | | 264 | | 10 | | 1,009 | | 77 |
| **2008** | | | | | | | | | | |
| Net sales | Ps. | 15,524 | Ps. | 13,230 | Ps. | 342 | Ps. | 29,096 | $ | 2,103 |
| Intersegment sales | | 40 | | 43 | | | | 83 | | 6 |
| Consolidated net sales | | 15,484 | | 13,187 | | 342 | | 29,013 | | 2,097 |
| Operating income | | 1,661 | | 186 | | (137) | | 1,710 | | 124 |
| Total assets | | 19,723 | | 15,358 | | 693 | | 35,774 | | 2,586 |
| Capital expenditures[1] | | 1,538 | | 255 | | 5 | | 1,798 | | 130 |
| **2007** | | | | | | | | | | |
| Net sales | Ps. | 14,676 | Ps. | 13,605 | Ps. | 361 | Ps. | 28,642 | $ | 2,636 |
| Intersegment sales | | 37 | | 14 | | | | 51 | | 5 |
| Consolidated net sales | | 14,639 | | 13,591 | | 361 | | 28,591 | | 2,631 |
| Operating income | | 2,054 | | 782 | | (132) | | 2,704 | | 249 |
| Total assets | | 17,803 | | 13,708 | | 2,312 | | 33,823 | | 3,113 |
| Capital expenditures[1] | | 2,328 | | 324 | | 43 | | 2,695 | | 248 |

[1] These amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters of Ps. 1,909 million ($138 million) for 2008 and Ps. 638 million ($49 million) for 2009.

The following table sets forth the business segment data as a percentage of consolidated data.

| | Glass Containers | Flat Glass | Corporate & Eliminations | Consolidated |
|---|---|---|---|---|
| **2009** | | | | |
| Consolidated net sales | 52% | 47% | 1% | 100% |
| Operating income | 147% | (44%) | (3%) | 100% |
| Total assets | 67% | 46% | (13%) | 100% |
| Capital expenditures | 73% | 26% | 1% | 100% |
| **2008** | | | | |
| Consolidated net sales | 53% | 46% | 1% | 100% |
| Operating income | 97% | 11% | (8%) | 100% |
| Total assets | 56% | 42% | 2% | 100% |
| Capital expenditures | 86% | 14% | 0% | 100% |
| **2007** | | | | |
| Consolidated net sales | 51% | 48% | 1% | 100% |
| Operating income | 76% | 29% | (5%) | 100% |
| Total assets | 53% | 40% | 7% | 100% |
| Capital expenditures | 86% | 12% | 2% | 100% |

The following factors result in greater operating profit margins in our Glass Containers business as compared to our Flat Glass business:

(i) We hold a significant portion of the non−captive market in Mexico. In 2009, we served approximately 76% of the non−captive market in Mexico. We define a non−captive market to exclude buyers (such as beverage and beer bottlers) that are supplied glass containers by their affiliates. Our production flexibility to service niche markets, as well as our high quality products and manufacturing capacity, offers a strong competitive advantage that makes us the leading supplier of the non−captive market in Mexico.

(ii) We believe that significant entry barriers exist for foreign competitors to enter into our domestic market, which is very capital intensive. Based on a 76% non−captive glass container market share, we believe we are the leading glass containers producer in Mexico. The glass container industry is very capital intensive, which added to high freight costs for foreign competitors, results in significant cost barrier to entry.

(iii) Our facilities are located in proximity to our clients' facilities. We operate nine manufacturing facilities strategically located throughout Mexico. The proximity to our clients' facilities allows us to reduce freight costs and conduct a more efficient supply chain with our customers.

(iv) We enjoy long−established relationships with many of our customers, some of which have lasted more than 50 years. We have a long−established relationship with The Coca−Cola Company, Herdez McCormick, Nestlé and Grupo Domeq, which have been clients for more than 50 years.

(v) We have the ability to manufacture short−run orders. We have the ability to supply short−runs of customized, decorated containers. Our high−tech engineering allows us to develop molds in a shorter period of time than industry standards. These factors give us a fast time to market and the ability to develop new customized products in a timely manner for our customers, who, as a result, are willing to pay above market average prices.

(vi) Our sales in the U.S. target niche markets. We believe that we are the largest importer of glass containers into the U.S. as we serve target niche markets, such as the wine and liquor market, the "nostalgia" soft drink market and the cosmetics market.

31

In addition, in the Flat Glass business, approximately 40% of our sales in the U.S. market is distribution, which customarily provides smaller profit margins. Approximately 29% of the Flat Glass business' sales are in our domestic market, where we continue to experience increased price competition from foreign companies with operations in Mexico, which has further reduced our operating profits. Additionally, exports of float glass, which is a commodity, have low profit margins. The following table sets forth the breakdown of revenue by geographic market for the three years ended December 31, 2009:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | | 2008 | | 2009 | |
| | | | (Ps. million) | | | |
| Net sales (1) to customers in: | | | | | | |
| Mexico | Ps. | 12,008 | Ps. | 12,831 | Ps. | 11,152 |
| All foreign countries, mainly the United States and Europe | | 16,583 | | 16,182 | | 12,839 |
| Consolidated | Ps. | 28,591 | Ps. | 29,013 | Ps. | 23,991 |

(1)   Net sales are attributed to countries based on the location of the customer.

Consolidated net sales to any single external customer did not exceed more than 8% of Vitro's total consolidated net sales in any year presented.

*Glass Containers*

Based on the Glass Containers business unit's consolidated net sales of Ps. 12,385 million ($948 million) in 2009, we believe it is the largest glass container producer in Mexico and Central America and among the largest in the world. In 2009, this business unit accounted for 52% of our consolidated net sales. During the same period, 38% of the net sales of the Glass Containers business unit came from exports and 1% came from sales by our foreign subsidiaries that are part of the business unit.

The Glass Containers business unit produces glass containers for the soft drink, beer, food, juices, wine and liquor, pharmaceuticals and cosmetics industries. Its customers include leading companies such as Grupo Arca, Avon, Bacardi, Skyy Spirits, Campbells, Coty, Diageo, Encore Glass, Estee Lauder, Gerber, Grupo Cuervo, Grupo Domecq, Grupo Modelo, Herdez McCormick, Jafra, Jeyes, Jumex, Nestle, Pepsi Cola, Pisa, Procter & Gamble, Sauza, Tamazula and The Coca−Cola Company. In addition, our Glass Containers business unit manufactures and distributes:

- Soda ash, sodium bicarbonate, calcium chloride and salt, which are the main raw materials used in the manufacture of glass products, and also used in the pharmaceutical, food and detergent industries; and
- Capital goods such as glass forming machines and molds.

The Glass Containers business unit operates nine manufacturing facilities in Mexico, three in Central America and one in Bolivia, and has two recycling plants in Mexico. The Glass Containers business unit, which exports to the United States mainly through one of our subsidiaries, has five sales offices, four design centers and one distribution center in the United States.

*Flat Glass*

The Flat Glass business unit is comprised of two main businesses: Float Glass manufacturing and distribution and Automotive Safety Glass manufacturing and distribution. Most of our Flat Glass business unit's operations (approximately 66%) are dedicated to the building products industry, while the remainder (approximately 34%) of the unit's operations is concentrated in the automotive industry. In 2009, 30% of our Flat Glass business unit's sales derived from Mexico, 16% derived from exports, and 54% derived from sales by foreign subsidiaries. Sales by our U.S. foreign subsidiary represented 40% of the Flat Glass business unit's sales.

Based on the Flat Glass business unit's consolidated net sales of Ps. 11,377 million ($871 million) in 2009, we believe the business unit is the largest flat glass producer in Mexico, the second−largest in Latin America, one of the largest distributors of flat glass products in the United States and a leading provider of insulated flat glass products in Spain and Portugal. In 2009, this business unit accounted for 47% of Vitro's consolidated net sales.

In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, our consolidated financial statements present Vitro Cristalglass as a wholly−owned subsidiary of Viméxico. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527 million). The difference between the purchase price and the book value resulted in a charge of Ps. 60 million, recorded in majority stockholders' equity.

In January 2009, a revised payment schedule was agreed upon with the previous partner, extending the payment through the 2009−2010 periods, and it was agreed that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company and that subsequently there would be a capital reduction.

In July, 2007, Viméxico exercised its option to acquire 50% of the outstanding shares of Vitro AFG (now Vidrio y Cristal del Noroeste, S.A. de C.V.) from its joint venture partner AFG Industries Inc. for Ps. 67 million ($6 million) in cash. With the termination of this joint venture, Viméxico became the sole owner of this entity, the primary operations of which include the manufacture, processing and distribution of flat glass.

In 2009, our Float Glass manufacturing business represented 15% of our Flat Glass business unit's total sales to third parties. A substantial portion is supplied to the construction industry and to a lesser extent is supplied to the automotive safety glass industry, as well as furniture and home appliance manufacturers. We believe we are the leading float glass manufacturing business in Mexico on the basis of sales, with a 45% market share in Mexico as of December 31, 2009. As of December 31, 2009, the Float Glass manufacturing business owned four float glass furnaces of which one in Mexico City has been shut down since March 2006 (fully written−down for accounting purposes as a result of an impairment charge recorded in 2006).

In 2009, our Automotive Safety Glass manufacturing and distribution business represented 15% of our Flat Glass business unit's total sales, with sales primarily derived from the automotive OEM market in North America. On the basis of volume in pieces, we estimate we are the third−largest automotive safety glass manufacturing and distribution business in North America. We produce the total amount of required float glass used as a raw material for the manufacturing of automotive safety glass internally through Vidrio y Cristal.

Based on the number of molding furnaces the business unit currently operates in Mexico, we believe the Automotive Safety Glass manufacturing and distribution business is also a major manufacturer of safety glass products for the automotive OEM and AGR markets in Mexico. Our Automotive Safety Glass manufacturing and distribution business' customer base includes General Motors, Ford Motor Co., Chrysler, Volkswagen, Nissan and Freightliner.

Our foreign subsidiaries perform a substantial majority of our flat glass operations in the United States and derive 86% of its sales from the distribution and fabrication of construction glass and 14% from the distribution and installation of auto glass. Our foreign subsidiaries in Europe engage in the manufacture and distribution of value−added flat glass products for the Spanish, French and Portuguese construction industries, with specialties in value−added glass products and glass for landmark construction projects. Our foreign subsidiaries also conduct our Colombian flat glass operations and are engaged in the manufacture and distribution of flat glass products for the construction and automotive markets.

Through one of our subsidiaries we process, distribute and install flat glass products for the construction and automotive markets in the United States. We operate in 23 states in the United States through 6 fabrication centers, 14 distribution centers and 82 installation centers. A portion of the glass we process in the United States is produced by the business unit in Mexico, and the balance is purchased from unaffiliated third parties. In 2009, around 50% of our U.S. subsidiary's glass purchases in terms of volume were supplied from our Flat Glass Mexican subsidiaries.

During 2008, 2009 and the first half of 2010, we consolidated some of our operations in order to increase efficiencies and reduce three fabrication facilities, ten distribution centers and 20 installation centers. In May 2009, we decided to sell the inventory which was dedicated to serve the automotive replacement market, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in such market.

33

In Europe, we currently have four processing facilities throughout Spain and one distribution center in Barcelona, Spain, one processing facility in Chaves, Portugal and one in Lisbon, Portugal, and a processing facility in Villetaneuse, France. Verres et Glaces d'Epinay, our French subsidiary, commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

**Our Products**

The following table sets forth our principal products, customers and end−users and sales regions by business line within each of our two business units.

**Glass Containers:**

| Business Line | Products | Customers and End−Users | Sales Regions |
|---|---|---|---|
| Glass Containers | Glass containers | Soft drink, beer, food, juices, wine and liquor, pharmaceutical and cosmetics industries | Mexico, the United States, Canada, the Caribbean, Central and South America, Europe and Asia. |
| Raw Materials | Soda ash, sodium bicarbonate, calcium chloride and salt | Glass manufacturers and detergent producers, pharmaceutical and food producers | Mexico, the United States, Canada, Europe and Central and South America |
| Machinery and Molds | Glass forming machines, castings for glass molds, machinery parts and electronic controls | Flat Glass business unit, Glass Containers business unit, glass manufacturers and other third−party manufacturers | Mexico, the United States and Central and South America |

**Flat Glass:**

| Business Line | Products | Customers and End−Users | Sales Regions |
|---|---|---|---|
| Float Glass | Float glass, architectural tempered safety glass, insulated glass units, laminated, table tops | Construction industry, distributors, retailers and installers, furniture and home appliances manufacturers and Automotive Safety Glass manufacturers. | Mexico, the United States, Canada, Europe and Central and South America |
| Automotive Glass | Windshields, side laminated glass, rear and side tempered glass | Automotive OEMs, AGR market, distributors and installers | Mexico, the United States, Canada and Central and South America |

See "Item 5. Operating and Financial Review and Prospects—Results of Operations" and Note 21 to our consolidated financial statements included elsewhere in this annual report for a breakdown of our consolidated net sales by business unit and geographic market for each year in the three year period ended December 31, 2009.

**Our Operations**

*Glass Containers Business Unit*

Our Glass Containers business unit, which accounted for 52% of our consolidated net sales in 2009, manufactures and distributes glass containers for the food, juices, beverage, pharmaceutical and cosmetics industries, as well as raw materials, machinery and molds for the glass industry, and, based on its net sales of Ps. 12,452 million ($954 million) in 2009, we believe the Glass Containers business unit is the largest glass container producer in Mexico and Central America and among the largest in the world.

As of December 31, 2009, our Glass Containers business unit's total assets were Ps. 21,878 million ($1,675 million). The business unit owns nine manufacturing facilities in Mexico, three in Central America and one in Bolivia. In 2009, we believe our Glass Containers business unit's sales represented approximately 76% of the non−captive glass container market in Mexico and approximately 3% of the glass containers market in the United States, in each case in terms of units. We define a non−captive market to exclude buyers (such as beverage and beer bottlers) that are supplied with glass containers by their affiliates. In Mexico, the Glass Containers business unit has four design centers, one of which specializes in the cosmetics and pharmaceuticals market.

The Glass Containers business unit has developed both a short and long−term strategy as follows.

*Short−Term:*

Given the current economic conditions coupled with the restructuring process the Company is currently undergoing, this business unit plans to:

- Preserve cash to guarantee operations through strict expense controls and non−payment of scheduled interest payments to the extent necessary;
- Reduce capital expenditures to a minimum level, mostly oriented towards required maintenance activities;
- Continue with the initiatives aimed at reducing costs and expenses; and
- Constantly communicate with clients and suppliers to maintain continuous operations.

*Long−Term:*

Once our economic conditions have improved and the debt restructuring process is finalized, this business unit will continue to:

- Focus on current operations to maximize organic growth and to take advantage of future opportunities;
- Consolidate its competitive position by defending share and margins in markets in which it operates;
- Use its growing position in niche markets and focus on value added products to enhance profitability;
- Continue the promotion of innovative new product development;
- Enhance operating efficiencies; and
- Maximize cash flow through growth in sales and margins while optimizing the use of capital expenditures and assets.

Among the business unit's key competitive strengths are its productivity, quality levels, wide variety of glass colors and decorative alternatives, versatile production processes and vertical integration with respect to raw materials, machinery and molds. The business unit's high levels of productivity and quality, as well as its ability to rapidly meet changes in demand, allow it to aggressively compete with other container technologies in Mexico and offer value−added products at attractive prices in the United States and other export markets. The versatility and flexibility of the business unit's production processes are reflected in the business unit's ability to offer customers special glass colors and fast turnarounds on small production runs on a cost−efficient basis, as well as decorating and labeling processes, including ultraviolet organic paints, "plastishield," adhered ceramic labels and heat transfer labels. In addition, we believe that the location of the business unit's facilities is a competitive strength that has helped us implement our business strategy. The business unit's capacity to produce cost efficient short runs with a wide variety of colors, shapes and decorations, its innovative designs and its "one−stop shop" concept, which provides its customers with a complete packaging solution, including glass containers, closures, carriers, labels and boxes, also enable it to compete effectively in value−added markets.

Our Glass Containers business unit manufactures glass containers for both high−volume markets and value−added markets. We refer to markets that demand high volumes of standard products at competitive prices as high−volume markets, and we refer to markets that require shorter production runs of highly designed products that involve premium pricing as value−added markets. The business unit's business strategy has emphasized the introduction of products into value−added markets in addition to retaining our market share in the Mexican high−volume markets. The specialty nature of the products sold in value−added markets allows the business unit to have a better price mix, resulting in higher margins.

One of our Glass Containers business unit's competitive advantages is its time to market on the product development cycle for glass containers where we have a response time of three weeks for a prototype, which we believe is shorter than the response time of some of the other world−class producers of glass containers. Similarly, the business unit's technological expertise permits the introduction of new products with innovative customized images in order to meet the design requirements of its customers.

For the production of glass bottles, the Glass Containers business unit utilizes its own technology, some of which has been patented, and technology provided by Owens−Illinois pursuant to a series of technical assistance agreements that began in 1964 and expired in September 1999. We currently have the right to use the technology provided to us by Owens−Illinois under these technical assistance agreements. Our glass containers labeling capability includes state−of−the−art technology in organic paints. This process, which is called ultraviolet cure, was developed to further our continuous efforts to grow in high−margin niche markets by providing value−added products. We hold the patent for this type of paint, which is more environmentally friendly than similar products in the market due to its organic nature. We have supplied this type of decoration for several years to customers such as The Coca−Cola Company.

Additionally, we have a contract with Technosoft, which provides software to the design area, and a technical agreement with BDF and Quantum for mold design analysis and manufacturing.

Sales of the Glass Containers business unit in the beer and soft drinks business lines in Mexico are seasonal, with hot weather positively affecting our sales. As a result, second and third quarter sales are typically higher than sales in the first and fourth quarters. Accordingly, the Glass Containers business unit generally builds its inventory of glass containers during the fourth and first quarters in anticipation of seasonal demand.

In Mexico, the business unit has 21 furnaces in six glass container manufacturing facilities, each located near a major customer. We estimate that in 2009 our Glass Containers business unit's manufacturing facilities produced approximately 41% of the glass tonnage melting capacity in Mexico, and that we sold 76% of the glass container units on the Mexican non−captive market in 2009.

In the United States, our Glass Containers business unit's distributor, has four design centers, five sales offices and one distribution center, all strategically located to serve its target markets. In 2009, we believe the business unit's imports into the United States represented approximately 22% of all sales of imported glass containers into the United States, which would make it the largest glass container importer into the United States in terms of sales.

*Mexican Operations*

We believe that the Glass Containers business unit is the largest glass containers producer in Mexico based on the business unit's net sales in 2009. In 2009 the Glass Containers business unit's sales to the Mexican market were Ps 7,952 million ($609 million). The Glass Containers business unit produces glass containers, raw materials, machinery and molds at nine manufacturing facilities located throughout Mexico. The business unit's facilities are located in close proximity to major customers, ensuring heightened responsiveness to customer design and production requirements and optimizing transportation costs. Substantially all of the Glass Containers business unit's facilities in Mexico have obtained the Hazard Analysis and Critical Control Points (HACCP) and ISO 9000:2000 certifications. During 2009, the glass facilities were operating at approximately 71% of their capacity. We also own two cullet−processing plants, which supply us with cullet. In the cullet processing plants, scrap or broken glass is gathered for re−melting and mixed with virgin raw materials in order to obtain cost reductions in the production process without affecting the quality of the products. Although there are currently no mandatory recycling laws in Mexico similar to those in force in the United States or in other countries, we conduct campaigns throughout Mexico to collect glass containers.

The Glass Containers business unit's customers include leading companies such as Grupo Arca, Avon, Bacardí, Skyy Spirits, Campbells, Coty, Diageo, Encore Glass, Estee Lauder, Gerber, Grupo Cuervo, Grupo Pedro Domecq, Grupo Modelo, Herdez McCormick, Jafra, Jeyes, Jumex, Nestle, Pepsi Cola, Pisa, Procter & Gamble, Sauza, Tamazula and The Coca−Cola Company. In Mexico, the Glass Containers business unit relies primarily on its own sales and marketing force, utilizing outside sales representatives to service customers with smaller volume demand. The business unit has implemented an online system for sharing information with customers. From their respective offices, the business unit's customers can access product information, place orders, check inventories, trace shipments and consult account statements. Our "one−stop shop" concept, which provides our customers with a complete packaging solution, including containers, closures, carriers, labels and boxes, enables us to compete effectively in value−added markets. We have selectively implemented this concept within Mexico, the United States and Central America.

36

*Exports and U.S. Operations*

Total export sales of the Glass Containers business unit, which do not include the sales of our Central and South American operations, amounted to $354 million (nominal U.S. dollars) in 2009. The large majority of the export sales of the business unit are made to the United States, principally through our distribution subsidiary in the United States, which also sources a small amount of the glass containers it sells from third parties. The Glass Containers business unit increased export sales into the United States by offering value−added specialty products, particularly to the cosmetics market and the wine and liquor bottlers in the United States. The business unit also produces special promotional containers for soft drink bottlers in the United States. The exports represented 37% of the Glass Containers business unit's net sales in 2009.

*Central and South American Operations*

Comegua is a Panamanian holding company that operates manufacturing facilities in Guatemala, Costa Rica, and Panama and supplies glass containers to the soft drink, food, beer and wine and liquor markets throughout Central America and the Caribbean. Beginning on December 1, 2008, our 49.7% investment in Comegua is accounted for under the equity method. Comegua's consolidated net sales for the first eleven months of 2008 were Ps. 2,159 million ($156 million). See Note 20 (d) of our consolidated financial statements to see the effects on our consolidated balance sheet and statement of operations of the deconsolidation of Comegua.

We also own 100% of the common stock of a company that owns and operates the only glass container manufacturing facility in Bolivia. Its net sales in 2009 were Ps. 136 million ($10 million).This company distributes glass containers for the soft drinks, food, beer, and wine and liquor industries throughout Bolivia, southern Peru and Chile.

*Raw Materials, Machinery and Molds*

Our raw materials operations are carried out by one of our subsidiaries. This subsidiary's net sales in 2009 were Ps. 2,009 million ($154 million). Its principal products are soda ash, sodium bicarbonate, calcium chloride and salt for industrial and commercial consumption. Most of its soda ash production, which is used in the manufacture of glass, detergents and tripolyphosphates, is sold to third parties. Our raw materials subsidiary competes in the soda ash sector with the American Natural Soda Ash Corporation ("Ansac"), a United States exporter of natural soda ash and maintains a separate sales and marketing force for its products, which are distributed directly to its customers.

Our machinery and molds operations are conducted through one of our subsidiaries who was founded in 1943 to source our needs for molds and machinery for our glass manufacturing operations. It had net sales of Ps. 439 million ($34 million) for the year ended December 31, 2009. It produces state−of−the−art glass−forming machines in two facilities, one in Monterrey, Mexico and one in Mexico City. In addition, the subsidiary produces castings of special alloys for glass molds and for different types of machinery and parts for machinery used in the oil industry. It also produces mold equipment for the glass industry and ancillary equipment for the glass, packaging and other industries, as well as electronic controls for machinery operating and process controls for glass−forming machines. Finally, it also manufactures annealing lehrs, which are ovens used to anneal glass, for the float and hollow glass industries. The machinery and molds produced are mainly for our own use. The products of Fama, our subsidiary that manufactures capital goods such as glass forming machines and molds, are mainly sold to us. The subsidiary generally competes with major international manufacturers of machinery and equipment for the glass industry.

37

*Competition*

Based on the business unit's net sales in 2009 of Ps. 12,452 million ($954 million) we believe the Glass Containers business unit is the principal supplier of glass containers in Mexico. The Glass Containers business unit competes with various smaller domestic manufacturers as well as with the glass container operations of the two major Mexican beer producers that produce bottles for their own consumption. The Glass Containers business unit in Mexico also competes with alternative forms of packaging, including metal, plastic, paper and aseptic containers. In the soft drinks industry, the Glass Containers business unit has faced increasing competition from polyethylene therephtalate containers ("PET"), as well as, to a lesser extent, from aluminum cans. In particular, since 1993 the shift of soft drinks and food containers from glass to PET has continued, albeit at a slower rate in recent years. In response to the shift in soft drinks and food containers from glass to PET, we continue to implement measures to offset the effect of PET substitution, including improving operating efficiencies, new product presentations and customer service. In 2009, for the fifth consecutive year, the soft drinks glass market increased versus the previous year, and our overall sales in the Mexican soft drinks market experienced a 0.4% compound annual growth rate from 2004 to 2009.

In Mexico, the business unit competes for customers primarily on the basis of service (focusing on on−time deliveries and design), quality (including the ability to conform to a wide variety of specifications) and scale (including the ability to assure customers of the capacity necessary to support their growth).

The Glass Containers business unit faces greater competition in the United States than in Mexico, mainly from Saint Gobain and Owens−Illinois. However, the business unit has utilized its competitive advantage to supply a variety of higher margin, value−added products, including specialty food, beverage, cosmetics and wine and liquor glass containers, and has increased its production expertise and flexibility, thereby allowing it to realize higher operating margins relative to traditional products. The business unit's ability to offer cost−effective short production runs, quick new product turn−around, an extensive glass color selection, diverse labeling capabilities and unique container designs are all examples of the application of its competitive strengths. The Glass Containers business unit competes primarily on quality, design and price in the United States. In Central America, the Glass Containers business unit competes with a number of smaller regional manufacturers.

***Flat Glass Business Unit***

Flat Glass accounted for 47% of our consolidated net sales in 2009. In 2009, the Flat Glass business unit's net sales were Ps. 11,453 million ($877 million) and its export sales were $136 million (nominal U.S. dollars). During 2009, 16% of the business unit's net sales were derived from export sales and 54% were derived from its foreign subsidiaries.

The business unit's customer base includes several large distributors and installers in the construction industry in Mexico and abroad, several automotive manufacturers such as General Motors, Ford Motor Co., DaimlerChrysler, Volkswagen, Nissan and Freightliner, and distributors and installers in the automotive replacement industry.

As of December 31, 2009, the Flat Glass business unit's total assets were Ps. 15,029 million ($1,151 million). The business unit owns over 250 operating centers, including three float glass furnaces and four automotive safety glass processing facilities in Mexico, six fabrication facilities in the United States, four processing facilities in Spain, one in France and two in Portugal. We believe our float glass capacity represented 57% of the float glass produced in Mexico and 3% of the total installed capacity in the NAFTA region.

38

The Flat Glass business unit has developed both a short and long−term strategy as follows.

*Short−Term:*

Given the current economic conditions coupled with the restructuring process the Company is currently undergoing, this business unit plans to:

- Preserve cash to guarantee operations through strict expense controls and non−payment of scheduled interest payments to the extent necessary;
- Reduce capital expenditures to a minimum level, mostly oriented towards required maintenance activities;
- Continue with the initiatives aimed at reducing costs and expenses; and
- Constantly communicate with clients and suppliers to maintain continuous operations.

*Long−Term:*

Once our economic conditions have improved and the debt restructuring process is finalized, this business unit will continue to:

- Enhance operating efficiencies;
- Improve cash flow and optimize asset use;
- Protect and increase our market share in the Mexican market for construction glass, reducing our reliance on the export market;
- Maintain our leading position and growth trend in the OEM glass business through increasing participation with the Asian car manufacturers;
- Consolidate and grow North American leadership of laminated window products for the OEMs and other value−added products;
- Diversify our client portfolio;
- Increase fabrication of value−added products in the United States and Mexico;
- Increase its European presence through Vitro Cristalglass; and
- Leverage the "Vitro" brand name.

For the construction market, we rely on a preferred client network, Vitromart, which consists of 115 of the business unit's largest distributors of flat glass for the construction industry. Additionally our Flat Glass business unit's strategy has emphasized production−retail integration for the Mexican auto glass replacement market. Two of our subsidiaries form the biggest automotive glass−replacement installation chain in Mexico. They operate 180 installation centers throughout Mexico, of which 64 are owned by these two companies and 116 are franchised. Both companies have agreements with the main insurance companies operating in Mexico in order to provide a complete service to such companies' clients.

*Mexican Operations*

We believe that the Flat Glass business unit is the largest flat glass producer in Mexico based on the business unit's net sales in Mexico in 2009. The business unit maintains six distribution centers throughout Mexico where construction customers or automotive customers can access information about the availability of products on a real−time basis. Approximately 42% of Flat Glass sales are from the Mexican operations, of which Ps. 3,304 million ($253 million) are sold in Mexico and $115 million (nominal U.S. dollars) are exports. Most of these export sales are made to automotive OEMs in the United States. The principal product that some of our subsidiaries produce and distribute is float glass for the construction industry, principally for commercial and residential uses, as well as raw material for the automotive safety glass producers. Some of our subsidiaries also produce tabletops and coated glass. For the Mexican automotive industry, our subsidiaries produce safety glass products such as windshields, side and back lights, rear quarters and sunroofs.

Vidrio y Cristal operates two float glass furnaces near Monterrey, Mexico and another subsidiary operates one in Mexicali, Mexico. Products at these facilities are manufactured using the float method, which involves pouring molten glass over a molten tin bath. During 2009, these float glass facilities were operating at 92% of their capacity. Additionally, we also have a furnace in Mexico City that has been shut down since 2006; therefore its potential capacity is not included in our capacity utilization calculation. See "Item 4. Information on the Company—Business—Our Property, Plant and Equipment.".

39

Vidrio y Cristal and another subsidiary sell raw glass to builders, glass installers and distributors in the construction segment and a small proportion to the automotive safety glass producers as raw material. The sales force markets its construction products to a large number of distributors and is supported by a technical support department that offers technical advice to construction glass installers. These subsidiaries have designated commercial executives to serve as individualized customer service representatives for the business unit's principal purchasers of construction products.

For the production of automotive safety glass, we operate four processing facilities in Mexico for the automotive OEM market and the AGR market. Sales are made directly to automotive OEMs in Mexico and the United States, while the AGR market is serviced through the business unit's distribution centers throughout Mexico, independent distributors and installers and some of our stores. Our subsidiaries sell automotive safety glass products to automobile manufacturers in Mexico, the United States and other markets; main clients include General Motors, Ford, Chrysler, Volkswagen, Nissan and Freightliner.

Light vehicle production in North America decreased 32% in 2009 compared to 2008 but is expected to increase approximately 35% in 2010 due to an increase in vehicle demand. Our OEM sales are highly correlated to light vehicle production in North America, so any change in the latter could materially affect our sales and operating income.

In order to better serve our customers, we have established account plans for automotive OEMs. OEM account plans consist of staff whose time is exclusively dedicated to major OEMs and who provide specialized assistance in the areas of engineering, service and sales.

The Mexican peso revaluation effect has raised our Mexican peso−denominated sales in dollar terms, and also raised our Mexican peso−denominated expenses. The currency revaluation mostly affects our export sales.

*United States Operations*

The United States operations of the Flat Glass business unit are conducted through one of our subsidiaries, which, based on its consolidated net sales in 2009, is one of the largest distributors of flat glass products in the United States. In 2009, it had consolidated net sales of $337 million, of which 86% were to the construction industry and 14% were to the AGR market.

Our U.S. subsidiary purchases flat glass as raw material from our Mexican subsidiaries and from United States manufacturers and uses it to process tempered, spandrel, insulated, laminated, mirrored and other products. In 2009, our Mexican subsidiaries supplied 50% of all flat glass purchased by our U.S. subsidiary; the other purchases, which our Mexican subsidiaries could not supply, include coated and other proprietary products. The end products are sold directly to distributors as well as to end−buyers through our U.S. subsidiary's own distribution centers and retail shops. Our U.S. subsidiary sells its construction products to builders and glass installers, who use its products in industrial and commercial projects such as skyscrapers and other buildings. It also distributes and sells to furniture manufacturers in the United States a significant number of custom−made glass tabletops produced by the Flat Glass business unit's manufacturing plants in Mexico. Additionally, certain of our Mexican subsidiaries engage in the design, manufacture and installation of custom skylights in the United States and several other countries. In May 2009, we decided to sell the inventory which was dedicated to serve the distribution AGR market, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in the AGR distribution business in the United States, but remain in retail and installation segment.

Our U.S. subsidiary operates 6 fabrication facilities, 14 distribution centers and 82 installation centers in the United States.

*European Operations*

The Flat Glass business unit competes in the European flat glass construction market through Vitro Cristalglass, Verres et Glaces d'Epinay and Vitro Chaves, mainly with value added products.

Vitro Cristalglass processes and distributes insulated glass, laminated glass and tempered glass mainly for the Spanish, French and Portuguese markets. Vitro Cristalglass operates with four insulated glass manufacturing centers and two distribution centers, located in Barcelona and La Coruña. Additionally, Vitro Cristalglass has the biggest semi−finished manufacturing processing center in Spain, located in Ponferrada. Verres et Glaces d'Epinay, which is located in Villetaneuse, France and was acquired by Vitro Cristalglass in April 2008, manufactures insulated glass and serves the commercial and residential market in Northern France. Vitro Chaves manufactures and distributes insulated and laminated glass products in Portugal with their main facility located in Chaves (in northern Portugal) and a distribution center located in Lisbon. In 2009, Vitro Cristalglass and Vitro Chaves had consolidated net sales of Ps. 1,511 million ($116 million). Most of the sales of Vitro Cristalglass are of insulated glass windows, a value−added product, which are distributed to builders by Vitro Cristalglass' own sales force. Vitro Chaves' main products are insulated and laminated glass for the construction industry, which are distributed through its own and Vitro Cristalglass' distribution network.

40

*Central and South American Operations*

Through its Colombian subsidiary and, to a lesser extent, through its subsidiaries in Venezuela, Ecuador and Panama, the Flat Glass business unit processes tempered and laminated glass for the automotive replacement, construction and specialty markets in Central and South America. Our Colombian subsidiary has one processing facility which is located in Colombia. In 2009, our Colombian subsidiary and its subsidiaries had consolidated net sales of Ps. 488 million ($36 million). The company is expanding into the OEM automotive glass market in Colombia and other Andean Pact nations as well as into the automotive replacement market in South America. It markets its products through a network of independent distributors to small− and medium−sized builders.

*Competition*

In Mexico, some of our Mexican flat glass subsidiaries face competition in the construction industry mainly from Saint Gobain, Guardian, and imports of glass products. Guardian, which since 1999 has competed with our Flat Glass business unit as an importer of raw flat glass products, completed the construction of a float glass furnace in Queretaro in 2004, which is estimated to produce 200,000 tons of float glass per year. The local competition of such subsidiaries compete primarily on price, service and quality. See "Item 3. Key Information—Risk Factors—Risk Factors Relating to Our Business—We operate in a highly competitive industry in which we compete with global competitors and vertically integrated customers, have relatively high fixed costs and are faced with sharply decreasing demands."

With respect to automotive safety glass, the business unit's principal competition includes Saint Gobain, PGW, Asahi, Pilkington, Zeledyne and imports of low−volume automotive glass products that are being utilized in new automotive designs produced in Mexico. Saint Gobain operates an automotive glass manufacturing facility located in Cuautla, Mexico.

Our U.S. subsidiary faces competition in the United States from a variety of flat glass manufacturers in the United States, as well as from a large number of medium− and small−sized fabricators and distributors of flat glass products. Such subsidiary competes in the United States primarily on the basis of breadth of geographic distribution capabilities, service (on a full line of products) price and quality.

In Europe, Vitro Cristalglass, as an insulated glass manufacturer, faces competition with regional competitors and integrated competitors like Saint Gobain. In Central and South America, Vitro Colombia's main competitors are Guardian, Pilkington and Saint Gobain.

**Our Raw Materials**

*Soda Ash, Sand and Feldspar*

The most important raw materials we utilize are soda ash, silica sand and feldspar. In 2005, we entered into a supply agreement with Unimin Corporation ("Unimin") that has been amended to extend its maturity until June 2013, whereby we have committed to purchase, and certain of Unimin's subsidiaries are committed to sell, our requirements of silica sand and feldspar at predetermined prices subject to adjustments according to a formula which takes into consideration market conditions. In 2009, we entered into a four−year supply agreement with Ansac, whereby we have committed to purchase, and Ansac is committed to sell, 100% of our yearly requirements of soda ash at predetermined prices, that depend on volume and market conditions. We have the production capacity, through one of our subsidiaries, to supply to a large extent the soda ash required by our glass making operations in Mexico.

To the extent that any of our Mexican subsidiaries require silica sand or soda ash of a different grade than that which we produce or that is produced by Unimin or by Ansac, those subsidiaries may acquire such silica sand or soda ash from various suppliers in the United States. We are not dependent on any single supplier for any of the raw materials utilized in our operations.

41

*Energy*

We, through certain of our subsidiaries, agreed to purchase, in the aggregate, 90 megawatts of electrical power and 1.3 million tons of steam per year pursuant to a 15−year "take−or−pay" power purchase agreement with Tractebel Energía, S. de R.L. de C.V. ("Tractebel Energía"). This contract took effect in October 2000 and the price at which we are required to purchase electrical power and steam is based on variables such as inflation, the Mexican peso/U.S. dollar exchange rate and the price of natural gas, the future value of which is uncertain.

*Fuel*

We are a large consumer of natural gas with an approximate consumption of 17 million MMBTUs in 2009 from operation of our 21 glass container furnaces and three float glass furnaces in Mexico. Our cost of goods sold is highly correlated to the price of natural gas. In recent years, every U.S. dollar fluctuation per MMBTU has had an annual impact of approximately 18million on our cost of goods sold based on our average historical consumption of approximately 1.5 million MMBTUs per month.

During the first nine months of 2009, the natural gas price decreased 56% from its closing price on 2008 of $6.07 per MMBTU. As of December 31, 2009, the natural gas price was $4.40 per MMBTU, an annual decrease of 28%. However, during the first nine months of 2010, the average natural gas price was $4.43 per MMBTU, showing an increase of 25% from the average price of $3.55 per MMBTU for the same period of 2009.

In the ordinary course of our business, historically we have entered into swaps and other derivative instruments to hedge our exposure to natural gas price increases. The percentage of estimated fuel consumption hedged has varied from 10% to 100%. The percentage of consumption hedged and the hedged prices change constantly according to market conditions based on the Company's needs and to the use of alternative fuels within its production processes. As of December 31, 2009, the Company had hedges for approximately 32% of its estimated consumption at an average price of approximately $6.80 per MMBTU for 2010 and 19% of its estimated consumption at an average price of approximately $7.32 per MMBTU for 2011. Because of our financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in the price of natural gas and were we able to enter into such transactions, we could not assure you they would be on favorable terms. Therefore, increases in the price of natural gas may cause us to realize significant losses in our results of operations. See "Item 11. Quantitative and Qualitative Disclosures About Market Risk—Natural Gas Price Risk."

The greater the percentage of our natural gas consumption for which we do not have hedges, the more vulnerable we are to realizing significant losses in our results of operations should the price of natural gas increase. However, as a result of our current natural gas hedges, a further decline in natural gas prices, while reducing our operating costs, would increase our financial expenses related to such hedges. For further information, see "Item 3. Key Information—Risk Factors—We have experienced rising operating costs in each of our businesses."

42

**Our Capital Expenditures**

Our capital expenditures program is currently focused on new investments in technological upgrades and maintenance of our manufacturing facilities, as well as expansion of our production capacity. Our capital expenditures program also contemplates the purchase and maintenance of environmental protection equipment required to meet applicable environmental laws and regulations, as such may be in effect from time to time. The following table sets forth, for the periods presented, our capital expenditures by business unit.

| Business Unit | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2007 | | 2008 | | 2009 |
| | | (Ps. millions) | | | | |
| Glass Containers | Ps. | 2,328 | Ps. | 1,538 | Ps. | 735 |
| Flat Glass | | 324 | | 255 | | 264 |
| Corporate and other | | 43 | | 5 | | 10 |
| Total | Ps. | 2,695 | Ps. | 1,798 | Ps. | 1,009 |

For 2008 and 2009, these capital expenditures are those effectively paid during the year, so they differ with the capital expenditures realized which are Ps. 1,909 and Ps. 638 million for 2008 and 2009, respectively.

During 2010, we expect to close the year with capital expenditures of approximately Ps. 885 million ($70 million) as follows:
- Our Glass Containers Business Unit expects to close the year with capital expenditures of Ps. 594 million ($47 million), which is being used to provide maintenance to certain of our furnaces and IS machines; for a palletizing center, and for infrastructure in one of our facilities. The remainder is being applied to new product molds.
- Our Flat Glass Business Unit expects to close the year with capital expenditures of Ps. 291 million ($23 million), which is being used mainly for maintenance of our facilities.

The capital expenditures are being financed with cash flows generated by our operations and with current cash on hand and are made primarily to our Mexican facilities. We are deferring a portion of such expenditures to future periods.

See "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources", for a discussion of our principal capital expenditures during the last three full fiscal years.

**Our Property, Plant and Equipment**

All of our assets and property are located in Mexico, the United States, Central and South America and Europe. On December 31, 2009, the net book value of land and buildings, machinery and equipment and construction in progress was Ps. 15,338 million ($1,175 million), of which Ps. 14,062 million ($1,077 million) represented assets located in Mexico; Ps. 383 million ($29 million) represented assets located in the United States; Ps. 265 million ($20 million) represented assets located in Central and South America; and Ps. 628 million ($48 million) represented assets located in Europe.

Our principal executive offices are located in the Monterrey, Mexico area. We own and operate 34 manufacturing facilities worldwide, of which our float glass furnaces are our largest facilities. Our subsidiary Vitro Cristalglass has granted a lien on one of its facilities.

43

The following table sets forth, for the periods presented, the average capacity utilization and location of each of our business unit's principal manufacturing facilities.

| Business Unit | | Average Capacity Utilization 2008 | Average Capacity Utilization 2009 | Number of Facilities by City or Country |
|---|---|---|---|---|
| Glass Containers | | 86% | 71% | Monterrey(3) Guadalajara Mexico City(2) Querétaro Toluca (2) Costa Rica Guatemala Panama Bolivia |
| Flat Glass | Float Furnaces[1] | 106%[1] | 92% | Monterrey(4) Mexico City(2) Mexicali |
| | Automotive Facilities | 74% | 49% | United States(6) Colombia Spain(4) Portugal (2) France |

(1) Capacity utilization may sometimes be greater than 100% because pulling capacity is calculated on a certain number of changes in glass color and thickness, determined by historical averages. Additionally, we also have a furnace in Mexico City that has been shut down since 2006; therefore its potential capacity is not included in our capacity utilization calculation.

We also maintain over 64 installation centers in Mexico and 14 distribution centers and 82 installation centers in the United States, most of which are leased.

We believe that all our facilities are adequate for our present needs and suitable for their intended purpose and that our manufacturing facilities are generally capable of being utilized at a higher capacity to support increases in demand.

See "Item 4. Information on the Company—Our Capital Expenditures" and "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources—Capital Expenditures" for a discussion of our capital expenditures.

**Environmental Matters**

Our Mexican operations are subject to Mexican federal, state and municipal laws and regulations relating to the protection of the environment. The primary federal environmental law is the *Ley General de Equilibrio Ecológico y la Protección al Ambiente* ("LGEEPA" or the General Ecological and Environmental Protection Law) pursuant to which regulations have been promulgated concerning air pollution, noise pollution, environmental impact assessments, environmental audits and hazardous wastes and substances. LGEEPA sets forth the legal framework applicable to the generation and handling of hazardous wastes and substances, the release of contaminants into the air, soil and water, as well as the environmental impact assessment procedure. The *Ley de Aguas Nacionales* or National Water Law, and regulations thereunder govern the prevention and control of water pollution.

The *Ley General para la Prevención y Gestión Integral de los Residuos* or General Law for the Prevention and Integrated Management of Waste, regulates the generation, handling, transportation, storage and final disposal of hazardous waste, as well as the import and export of hazardous materials and hazardous wastes. The Mexican federal government has established a public registry where federally regulated emission sources report their air and water emissions, as well as information on the generation, handling, transportation and disposal of hazardous substances.

In addition to the foregoing, *Normas Oficiales Mexicanas* ("Mexican Official Standards"), which are technical standards issued by regulatory authorities pursuant to the *Ley General de Metrología y Normalización* or General Law of Metrology and Normalization, and other laws that include the aforementioned environmental laws, establish standards relating to air emissions (including air emissions for glass manufacturing operations), waste water discharges, the generation, handling and disposal of hazardous wastes and noise control, among other things.

44

The Mexican federal authority in charge of overseeing compliance with the federal environmental laws is the *Secretaria del Medio Ambiente y Recursos Naturales* or Secretary of Environment and Natural Resources, which we refer to as "SEMARNAT". An agency of SEMARNAT, the *Procuraduria Federal de Protección al Ambiente* or Federal Environmental Protection Agency, which we refer to as "PROFEPA", has the authority to enforce the Mexican federal environmental laws. As part of its enforcement powers, PROFEPA can bring administrative, civil and criminal proceedings against companies and individuals that violate environmental laws, regulations and Mexican Official Standards and has the authority to impose a variety of sanctions. These sanctions may include, among other things, monetary fines, revocation of authorizations, concessions, licenses, permits or registrations, administrative arrests, seizure of contaminating equipment, and in certain cases, temporary or permanent closure of facilities.

Additionally, as part of its inspection authority, PROFEPA is entitled to periodically inspect the facilities of companies whose activities are regulated by the Mexican environmental legislation and verify compliance therewith. Furthermore, in special situations or certain areas where federal jurisdiction is not applicable or appropriate, the state and municipal authorities can administer and enforce certain environmental regulations of their respective jurisdictions.

In 1998, our subsidiaries initiated a voluntary environmental auditing program implemented by PROFEPA. This program entails PROFEPA−approved auditors conducting environmental audits of the relevant facilities to determine if such facilities comply with applicable Mexican environmental laws. Once an audit is completed, the auditor issues a report of findings and recommendations, which must be delivered to PROFEPA. The audited facility thereafter enters into an agreement with PROFEPA on an action plan to be undertaken, pursuant to which, after being implemented to PROFEPA's satisfaction, the audited entity receives the *Industria Limpia* ("Clean Industry") certificate. The Clean Industry certificate is valid for two years and may be extended at the request of the audited entity, provided that an auditor reaudits and certifies that the relevant facility operates pursuant to the Clean Industry certificate that was previously granted. Obtaining this certificate implies that the audited facility is in compliance with applicable Mexican environmental laws at the time of receipt of the certificate.

A PROFEPA−approved independent auditor has completed environmental audits at all 15 of our facilities in Mexico. All of these facilities have already obtained the Clean Industry certificate.

Our foreign operations are subject to federal, state and local laws relating to the protection of the environment of the country in which such operations are conducted. From time to time, we conduct environmental assessments of our foreign operations, some of which are currently underway, to determine whether we are in compliance with applicable foreign environmental laws. We expect to spend approximately $1 million in capital expenditures over the next two years to comply with these and other environmental regulations as they become effective or are modified. We may, however, incur amounts greater than currently estimated due to changes in law and other factors beyond our control. Although there can be no assurance, we do not believe that continued compliance with Mexican and foreign environmental laws applicable to our operations will have a material adverse effect on our financial position or results of operations.

**Item 4A.    Unresolved Staff Comments**

Not applicable

**Item 5.    Operating and Financial Review and Prospects**

*You should read this discussion in conjunction with, and this discussion is qualified in its entirety by reference to, our consolidated financial statements and notes thereto and other financial information included elsewhere in this annual report. Our consolidated financial statements are prepared in accordance with MFRS, which differs in certain significant respects from U.S. GAAP. Note 25 to our consolidated financial statements for the year ended December 31, 2009 provides a description of the principal differences between MFRS and U.S. GAAP as they relate to us. This section contains forward−looking statements that involve risks and uncertainties. Our actual results may differ materially from those discussed in the forward−looking statements as a result of various factors, including without limitation those set forth in "Item 3. Key Information—Risk Factors" and the other matters set forth in this annual report. See "Forward−Looking Statements."*

OPERATING RESULTS

**Factors Affecting Our Results of Operations**

Our statement of operations is affected by, among other factors, (i) the level of demand and price for our products in the countries in which we operate, (ii) our costs of production, which principally consist of costs of raw materials, labor, energy and depreciation, (iii) the relationship between the Mexican peso, the U.S. dollar and the euro, (iv) financing costs, which are incurred in Mexican pesos, U.S. dollars and euros, and (v) increased competition in our domestic market and abroad. See "Item 3. Key Information—Risk Factors."

**Trend Information**

During 2009, the world economy continued to experience the financial and economic crisis which began in the second half of 2008 affecting industrial sectors such as the construction and automotive sectors that are very important to us. Its effects were reflected in high unemployment rate growth, credit scarcity, and reduced demand from the construction and automotive industries in Mexico, the United States and Spain, where Vitro has a strong presence. Even though the economy has shown moderate signs of recovery in 2010, some of our markets, including the construction sectors of the United States and Spain, are still experiencing contraction and excess capacity.

***Developments in the Glass Containers Business***

Results for 2009 were affected by the continuing financial and economic crisis, which led to a prolonged and deep contraction in our markets.

In December 2008, Grupo Modelo, one of our key customers in our Glass Containers business, notified us that due to the current world market contraction, it would significantly reduce its beer bottle orders from us. Based on our consolidated sales, the volume reduction impact on our annual consolidated sales for 2009 was approximately 6.45% measured in Mexican pesos.

The Glass Containers business unit's sales volumes declined in 2009, primarily because of a decline in demand in the beer sector, as mentioned above, and the other sectors targeted by the Glass Containers business. This changed market condition required capacity adjustments in order to meet the lower demand levels. In addition, we implemented a cost and expense reduction program, which included workforce adjustments due to lower capacity utilization, cancellation of airplane leasing contracts, divestiture of non−productive assets and the elimination of non−strategic services.

Going forward, we expect increased competition in the domestic glass container market. As a result of the market contraction in 2009, we believe that there will continue to be overcapacity, which may continue to affect market dynamics and lead to further price erosion.

***Developments in the Flat Glass Business***

The global economic meltdown had a significant impact on diverse markets, including the construction and automotive industries, which had a materially negative effect on our business results.

46

The Flat Glass business unit's consolidated net sales for 2009 contracted by 13.7%, measured in Mexican pesos, compared to 2008, as mentioned in "—Year Ended December 31, 2009 Compared to Year Ended December 31, 2008—Flat Glass Business Unit" below, mainly due to the fact that the markets we serve entered into a recession at the end of 2008.

The construction and automotive sectors that we serve were affected by a decrease in sales caused by a severe drop in U.S. automotive demand, a reduction of exports to the United States and the contraction in the U.S., Spanish and Mexican real estate market. Sales from our U.S. subsidiary also faced one of its sharpest contractions in recent history.

Vitro's subsidiaries in Spain, Portugal and France were also impacted by the challenging global economic environment. Spain, where the largest portion of Vitro's regional facilities are located, showed a sharp contraction in its markets caused by the bursting of the real estate bubble, which will continue to negatively impact the Company going forward. Verres et Glaces d'Epinay, our French subsidiary, commenced a bankruptcy proceeding in France and will be subject to liquidation in the near future.

In the case of the automotive glass market, the general industry collapse was compounded by the weak financial situation of some of the large automotive original equipment manufacturing companies, who resorted to federal aid in order to mitigate their severe financial problems.

The Flat Glass business unit took the necessary measures to minimize the effect, adjusting production capacity to reduced demand and, in doing so, continued to serve the needs of its customers at competitive prices. Management made significant adjustments to Vitro's cost structure at all facilities, in Mexico as well as abroad, in order to adapt to the changed market environment.

Going forward, we expect our Flat Glass business unit to partially stabilize. Our OEM segment is showing signs of recovery in 2010 due to increased auto sales in the United States and Mexico. We expect our construction segment in Mexico to remain stable. However, the future for the construction market in the United States, Spain, France and Portugal remains uncertain. Recently, our operations in the flat glass manufacturing and processing facilities were impacted by rain and flooding from Hurricane Alex, resulting in damage that we expect will be covered by insurance, less applicable deductibles, which we expect will impact our results of operations. See "Item 3. Key Information—Recent Developments—Temporary Suspension of Operations at Manufacturing Facilities in García, Nuevo León."

***Natural Gas Prices and Related Derivative Financial Instruments***

Our cost of goods sold is highly correlated to the prices of our raw materials, particularly natural gas. For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price for the year ended December 31, 2008 of $6.07 per MMBTU. Our operating income was also affected by the increase in natural gas price as the average price increased 25% from $3.55 to $4.43 per MMBTU for the nine−month period ended September 30, 2009 compared to the same period of 2010.

Historically, we have not been able to raise the prices of our products to fully reflect the increases in our operating costs that result from increases in the price of natural gas, thereby adversely affecting our results of operations.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. This strategy is susceptible to the risk that a decrease in natural gas prices could have an adverse effect on the fair market value of the DFIs, resulting in related losses reflected in our comprehensive financial results. While a material decline in natural gas prices would have the beneficial impact of substantially reducing our cost of goods sold, such benefits would be realized over a period of time, whereas the adverse effect in the value of the DFIs is recorded immediately in our financial result as a result of mark−to−market accounting rules.

As of September 30, 2010, we had open DFI hedges with Pemex for approximately 32% of our estimated natural gas consumption for the remainder of the year at an average price of approximately $6.80 per MMBTU, and 19% of our estimated natural gas consumption at an average price of approximately $7.32 per MMBTU for 2011. Since the NYMEX closing price of natural gas as of June 23, 2009 was $3.88 per MMBTU, our current natural gas hedges are out of the money. As of September 30, 2010, our open DFIs with Pemex had a mark−to−market liability value of approximately $14.8 million. In addition, under our remaining DFIs, we are obligated to make monthly settlement payments until December 2011 to the extent the market price on the monthly settlement date of natural gas is below the exercise price set forth in the agreement. For the first nine months of 2010, we made aggregate monthly settlement payments of approximately Ps. 133 million ($10.5 million).

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis applied valuation models fully accepted for these types of instruments and took into consideration changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately $5 million.

Because of our financial condition, we are currently unable to enter into additional hedging transactions to minimize our exposure to further increases or decreases in the price of natural gas, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. Therefore, substantial increases in the price of natural gas may cause us to realize significant losses in our results of operations and relative stability and, alternatively, further decreases in the price of natural gas may cause us to realize significant losses in our comprehensive financial results.

For further discussion regarding our exposure to natural gas price fluctuations, see "Item 11. Quantitative and Qualitative Disclosures About Market Risk—Natural Gas Price Risk" and "Item 3. Key Information— Risk Factors—Risk Factors Relating to Our Business— We have experienced rising operating costs in each of our businesses."

### *Economic Developments in Mexico, the United States and Europe Affecting Our Business*

A substantial portion of our operations are in Mexico and a substantial majority of our consolidated net sales are made in Mexico, the United States and Europe. Therefore, economic conditions in Mexico, the United States and Europe have a significant effect on our business, results of operations and financial position.

2008 was considered a year of unprecedented events in modern times as it left a financial system in crisis. In 2009, the world economy decelerated abruptly and some national economies actually collapsed. World GDP decreased by 2.2% in 2009, according to International Monetary Fund statistics. The global economic deceleration had its roots in the U.S. economy, which contracted at a rate of 2.4% in 2009 compared to GDP growth rate of 0.4% in 2008. The sub−prime mortgage crisis that started in the U.S. in mid−2008 and moved into the financial markets affected the availability of credit in a manner that hurt many other sectors of the economy, including industrial sectors such as the construction and automotive sectors that are very important to us.

In 2009, Mexico's GDP registered a contraction rate of 6.5%. In 2008, Mexico's GDP registered a growth rate of 1.3% a lower figure than the GDP growth rate of 3.3% reported for 2007. For 2010, we expect the country to continue confronting difficulties due to slower−than−expected recovery of the U.S. economy, one of our principal commercial markets, and an instability shown in the European Union markets that significantly affects the Spanish market.

Most of our manufacturing facilities are located in Mexico. Our consolidated net sales resulting from sales to parties located within Mexico were 42%, 44% and 46% for each of the years ended December 31, 2007, 2008 and 2009, respectively. Although the Mexican government's continued fiscal and monetary policy helps the country maintain low levels of inflation and a manageable deficit, it does not provide the flexibility necessary to support Mexico's economic improvement. As a result, new investment and growth in aggregate purchasing power have been marginal. Several factors could affect the growth of Mexico's economy and its industrial sector. These factors include (i) the extent of the U.S. economic recovery and the participation of Mexico's industrial sector in that recovery and (ii) the Mexican government's approval and implementation of fiscal and other structural reforms, such as the evolution of energy prices, particularly natural gas.

48

*Inflation and Foreign Currency Exchange Rate Fluctuations*

The following table sets forth, for the periods presented, certain information relating to inflation and foreign currency exchange rates:

| | | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Nominal Mexican peso devaluation relative to the U.S. dollar[1] | | 0.5% | | 27.3% | | (5.6%) |
| Nominal dollar devaluation relative to the euro | | 11.2% | | (5.2%) | | 3.5% |
| Mexican inflation (based on changes in INPC)[1] | | 3.8% | | 6.5% | | 3.6% |
| Free Exchange Rate as of year end(1) | Ps. | 10.8662 | Ps. | 13.8325 | Ps. | 13.0587 |
| Mexican GDP growth rate[2] | | 3.3% | | 1.3% | | (6.5%) |
| Exchange rate of euro per Mexican peso as of year end[3] | Ps. | 15.9526 | Ps. | 19.2534 | Ps. | 19.5789 |
| Exchange rate of dollar per euro as of year end[3] | $ | 1.4680 | $ | 1.3918 | $ | 1.4992 |

(1)    Source: Banco de México.

(2)    Source: *Instituto Nacional de Estadística, Geografía e Informática (National Institute of Statistics, Geography and Information.*

(3)    Source: Federal Reserve Bank of New York—Noon Buying Rates as to euro−to−dollar exchange rate and Banco de México as to dollar−to−peso exchange rate.

*Effects of Inflation and Foreign Currency Exchange Rate Fluctuations on Operating Margins*

Changes in the value of the peso to the U.S. dollar have an effect on our results of operations. In general, as described more fully in the following paragraphs, a devaluation of the peso will likely result in an increase in our operating margins and an appreciation of the Mexican peso will likely result in a decrease in our operating margins, in each case, measured in pesos. This is because the aggregate amount of our consolidated net sales denominated in or affected by U.S. dollars exceeds the aggregate amount of our cost of goods sold and our selling, general and administrative expenses denominated in or affected by U.S. dollars.

A substantial portion of the sales generated by our Mexican subsidiaries and the total sales of our U.S. subsidiaries are either denominated in or affected by the value of the U.S. dollar. The prices of a significant number of the products we sell in Mexico, particularly flat glass for automotive uses and capital goods, are linked to the U.S. dollar. In addition, substantially all of our export sales are invoiced in U.S. dollars and subsequently translated into Mexican pesos using the exchange rate in effect at the time of the transaction. As a result, when the Mexican peso devaluates against the U.S. dollar, as was the case in 2006, 2007 and 2008, the same level of U.S. dollar sales as in a prior period will result in higher Mexican peso revenues in the more recent period. Conversely, when the Mexican peso appreciates against the U.S. dollar, as was the case in 2005 and 2009, the same level of U.S. dollar sales as in a prior period will result in lower Mexican peso revenues in the more recent period. Moreover, because a material portion of our cost of goods sold, including labor costs, and selling, general and administrative expenses, is invoiced in Mexican pesos and is not directly affected by the relative value of the Mexican peso to the U.S. dollar, the appreciation or devaluation of the Mexican peso relative to the U.S. dollar has a significant effect on our operating margins, at least in the short term.

Further, a strong Mexican peso relative to the U.S. dollar makes the Mexican market more attractive for importers and competitors that might not otherwise sell in the Mexican market. A strong Mexican peso relative to the U.S. dollar also makes our products with prices that are denominated in or are affected by the value of the U.S. dollar less competitive or profitable. With respect to such products, when the Mexican peso appreciates, we must either increase our prices in U.S. dollars, which makes our products less price−competitive, or bear reduced operating margins when measured in Mexican pesos. Given the competitive nature of the industries in which we operate, we have chosen to reduce our operating margins for such products in response to appreciation of the Mexican peso relative to the U.S. dollar in the past.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

***Effects of Inflation and Foreign Currency Exchange Rate Fluctuations on Total Comprehensive Financing Result***

Beginning in 2008, our total comprehensive financing result includes (i) net interest expense, (ii) net effect of changes in nominal foreign currency exchange rates on monetary assets and liabilities denominated in foreign currencies and (iii) gains or losses related to hedging transactions. Net interest expense is calculated as the nominal amount of interest expense incurred by us with respect to our short−term and long−term debt, minus the nominal amount of interest income generated by us with respect to our monetary assets.

Our total comprehensive financing result is also impacted by changes in the nominal value of the Mexican peso relative to the U.S. dollar. Foreign currency exchange gains or losses included in total financing cost result primarily from the impact of nominal changes in the U.S. dollar−Mexican peso exchange rate on our Mexican subsidiaries' U.S. dollar−denominated monetary liabilities (such as dollar−denominated debt and accounts payable arising from imports of raw materials and equipment) and assets (such as U.S. dollar−denominated cash and cash equivalents and accounts receivable from exports). Because historically our U.S. dollar−denominated liabilities have exceeded our U.S. dollar−denominated monetary assets, the devaluation or appreciation of the peso resulted in exchange losses or gains, respectively. Accordingly, in 2006, 2007 and 2008, the nominal devaluation of the Mexican peso relative to the U.S. dollar resulted in foreign currency exchange losses.

Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to fluctuations in foreign currency exchange rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

***Effect of Increases in Interest Rates***

Interest rate risk exists primarily with respect to our floating−rate Mexican peso and U.S. dollar−denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR increases significantly, our ability to service our debt will be adversely affected.

As of September 30, 2010, our floating−rate Mexican peso and U.S. dollar−denominated debt amounted to Ps. 1,698 million ($136 million) and Ps. 642 million ($51 million) respectively. Because of our financial condition, we are currently unable to enter into hedging transactions to mitigate our exposure to either fixed or floating interest rates, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. See "Item 3. Key Information—Risk Factors—Risk Factors Relating to Economies in Which We Participate—We may be adversely affected by increases in natural gas prices, interest rates or foreign exchange rate changes that we are unable to mitigate through derivative transactions due to our financial condition" and "Item 11. Quantitative and Qualitative Disclosures About Market Risk."

**Government, Economic, Fiscal, Monetary or Political Policies or Factors**

For a discussion of government economic, fiscal, monetary or political policies that have materially affected or could materially affect our operations or investments, please refer to "Item 3. Key Information—Risk Factors—Risk Factors Relating to Economies in which We Participate."

**Results of Operations**

The following table sets forth, for the periods presented, selected items of our consolidated statements of operations calculated as a percentage of our consolidated net sales.

|  | For the year ended December 31, | | |
|  | **2007** | **2008** | **2009** |
|---|---|---|---|
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 70.6 | 73.3 | 71.6 |
| Gross profit | 29.4 | 26.7 | 28.4 |
| General, administrative and selling expenses | 19.9 | 20.8 | 22.9 |
| Operating income | 9.5 | 5.9 | 5.5 |
| Total comprehensive financing result | 5.8 | 31.3 | 9.9 |
| Net income | 0.5 | (19.6) | (3.1) |

The following table sets forth, for the periods presented, the consolidated net sales, export sales and operating income (before corporate and other eliminations) of each of our business units, as well as the contribution to our consolidated results of operations, in percentage terms, of the consolidated net sales, export sales and operating income (after corporate and other eliminations, and reflecting export sales in U.S. dollars) of each of our business units. Peso amounts set forth in the following table are presented in nominal Mexican pesos except that all amounts pertaining to fiscal year 2007 contained in this annual report are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | For the year ended December 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2007** | | **2008** | | **2009** | | **2009** | |
| | **Amount** | **% of Total** | **Amount** | **% of Total** | **Amount** | **% of Total** | **Amount** | |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] | |
| **Net sales** | | | | | | | | |
| Glass Containers | Ps. 14,676 | 51% | Ps. 15,524 | 53% | Ps. 12,452 | 52% | $ 954 | |
| Flat Glass | 13,605 | 48% | 13,230 | 46% | 11,453 | 47% | 877 | |
| Corporate and other eliminations | 310 | 1% | 259 | 1% | 86 | 1% | 7 | |
| Consolidated net sales | Ps. 28,591 | 100% | Ps. 29,013 | 100% | Ps. 23,991 | 100% | $ 1,837 | |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] | |
| **Net sales** | | | | | | | | |
| Domestic | Ps. 12,008 | 42% | Ps. 12,831 | 44% | Ps. 11,152 | 46% | $ 854 | |
| Exports | 6,673 | 23% | 6,547 | 23% | 6,568 | 28% | 503 | |
| Foreign Subsidiaries | 9,910 | 35% | 9,635 | 33% | 6,271 | 26% | 480 | |
| | Ps. 28,591 | 100% | Ps. 29,013 | 100% | Ps. 23,991 | 100% | $ 1,837 | |
| | ($ millions[2], except for percentages) | | | | | | | |
| **Net sales** | | | | | | | | |
| Domestic | $ 1,078 | 42% | $ 1,157 | 44% | $ 824 | 46% | | |
| Exports | 601 | 24% | 600 | 23% | 484 | 28% | | |
| Foreign Subsidiaries | 881 | 34% | 870 | 33% | 461 | 26% | | |
| | $ 2,560 | 100% | $ 2,627 | 100% | $ 1,770 | 100% | | |
| | ($ millions[2], except for percentages) | | | | | | | |
| **Export sales** | | | | | | | | |
| Glass Containers | $ 364 | 61% | $ 383 | 64% | $ 349 | 72% | | |
| Flat Glass | 237 | 39% | 217 | 36% | 136 | 28% | | |
| Consolidated export sales | $ 601 | 100% | $ 600 | 100% | $ 484 | 100% | | |
| | (Ps. millions, except for percentages) | | | | | | ($ millions)[1] | |
| **Operating income (loss)** | | | | | | | | |
| Glass Containers | Ps. 2,054 | 76% | Ps. 1,661 | 97% | Ps. 1,956 | 147% | $ 150 | |
| Flat Glass | 782 | 29% | 186 | 11% | (591) | (45)% | (45) | |
| Corporate and other eliminations | (132) | (5)% | (137) | (8)% | (36) | (3)% | (4) | |
| Consolidated operating income | Ps. 2,704 | 100% | Ps. 1,710 | 100% | Ps. 1,329 | 100% | $ 101 | |

[1]  These amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 13.0587 pesos per one U.S. dollar, the Free Exchange Rate on December 31, 2009.

[2]  Dollar figures reported herein are in nominal dollars derived by dividing each month's nominal Mexican pesos by exchange rate published by the Banco de México for such month's end.
    For the purpose of following comparisons when we are explaining the variation of an account year–over–year (or period–over–period) we divided the amounts of both years using the same exchange rate which is the most recent period rate in order to eliminate the effect of exchange rate fluctuation. This comparisons differs from the methodology used in the rest of this report where we use, for convenience purposes, the closing exchange rate of the period which we are referring to.

***Nine−Month Period Ended September 30, 2010 Compared to Nine−Month Period Ended September 30, 2009***

*Net Sales*

     Our consolidated net sales decreased 4.8% from Ps. 18,389 million ($1,471 million) for the nine−month period ended September 30, 2009 to Ps. 17,498 million ($1,400 million) for the same period of 2010. Net sales in our Flat Glass business unit decreased 5.7% primarily due to lower sales volumes from our Flat Glass business unit subsidiaries located in the United States, Spain and Colombia, which were partially offset by a slight recovery in the automotive original equipment manufacturers ("OEM") market and float glass sales volumes for the construction industry. The sales in dollars were affected when measured in pesos by a 7.5% average peso appreciation, from an average of Ps. 13.75 in 2009 to an average of Ps. 12.72 in 2010. Net Sales in our Glass Containers business unit decreased 4.6% due to price erosion caused by overall excess capacity.

     Domestic sales increased 4.5% from Ps. 8,338 million ($667 million) for the nine−month period ended September 30, 2009 to Ps. 8,710 million ($697 million) for the same period of 2010. This increase was mainly driven by higher sales volumes in the automotive and domestic construction industries, which were partially offset by lower volumes in domestic sales for the Glass Containers business unit.

     Export sales increased 9.5%, measured in nominal U.S. dollars, from $369 million for the nine−month period ended September 30, 2009 to $404 million for the same period of 2010. This increase was mainly due to higher export sales volumes to the automotive OEM market.

     Foreign subsidiaries' sales decreased 21.3%, measured in nominal U.S. dollars, from $356 million for the nine−month period ended September 30, 2009 to $280 million for the same period of 2010. This decrease was mainly triggered by lower demand in the construction markets in the United States and Spain. Foreign subsidiaries' sales and export sales represented 20% and 29%, respectively, of our consolidated net sales for the nine−month period ended September 30, 2010.

*Glass Containers Business Unit*

     Consolidated net sales of our Glass Containers business unit decreased 4.6% from Ps. 9,617 million ($769 million) for the nine−month period ended September 30, 2009 to Ps. 9,172 million ($734 million) for the same period of 2010. The main driver for this decrease was price erosion caused by overall excess capacity.

     In the domestic market, sales volumes increased in all segments, except for beer, which experienced a 48% decrease. For the nine−month period ended September 30, 2010, CFT and soft drinks volume increased 9% and 7%, respectively, compared to the same period last year.

     Overall, domestic market volumes decreased 1%, which coupled with price erosion resulted in a 4% sales decrease.

     Export sales increased 2.2%, measured in nominal U.S. dollars, in the nine−month period ended September 30, 2010 compared to the same period of 2009 due to higher sales volumes in all segments, except for the beer segment, which experienced a 57% decrease. Although foreign subsidiaries' sales increased 154% from $4 million for the nine−month period ended September 30, 2009 to $9 million for the same period of 2010, such sales represented only 1% of the net sales of the Glass Containers business unit for that period.

*Flat Glass Business Unit*

     Consolidated net sales of our Flat Glass business unit decreased 5.7% from Ps. 8,600 million ($688 million) for the nine−month period ended September 30, 2009 to Ps. 8,111 million ($649 million) for the same period of 2010. In 2010, we recovered volumes in float glass for the construction industry and safety glass for the automotive industry, offset by lower sales by foreign subsidiaries in United States, Spain and Colombia. The sales in dollars are affected when measured in pesos by a 7.5% average peso appreciation, from an average of Ps. 13.75 in 2009 to an average of Ps. 12.72 in 2010.

Domestic sales increased 27.3% from Ps. 2,366 ($189 million) for the nine−month period ended September 30, 2009 to Ps. 3,013 million ($241 million) for the same period of 2010. This increase was mainly driven by an important recovery in the automotive OEM market and float glass sales volumes for the construction industry.

Export sales increased 31%, measured in nominal U.S. dollars, from $94 million for the nine−month period ended September 30, 2009 to $123 million for the same period of 2010. This increase was mainly due to higher automotive sales volumes to the OEM and automotive glass replacement ("AGR") markets.

Foreign subsidiaries' sales decreased 23%, measured in nominal U.S. dollars, from $353 million for the nine−month period ended September 30, 2009 to $271 million for the same period of 2010. This decrease was due to adverse economic conditions that mainly affected the construction markets in the United States and Spain, which are both crucial markets for us.

Generally, we realize higher profit margins in our domestic market business and, accordingly, our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity whenever possible.

*Operating Income*

Our consolidated operating income increased 0.8% from Ps. 1,056 million ($84 million) for the nine−month period ended September 30, 2009 to Ps. 1,065 million ($85 million) for the same period of 2010. This increase was due to a slight recovery in the automotive industry and by savings related to our cost and expense reduction initiatives implemented in 2008 through the third quarter of 2009. Our operating income was also affected by the increase in natural gas price as the average price increased 25% from $3.55 per MMBTU for the nine−month period ended September 30, 2009 compared to $4.43 per MMBTU for the same period of 2010.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit decreased 18.4% from Ps. 1,523 million ($122 million) for the nine−month period ended September 30, 2009 to Ps. 1,242 million ($99 million) for the same period of 2010. This decrease was mainly driven by the lower volumes in the domestic beer market, a 25% increase in the average gas price and price erosion due to overcapacity in the markets in which we participate.

*Flat Glass Business Unit*

Operating loss of our Flat Glass business unit was Ps. 182 million ($15 million) for the nine−month period ended September 30, 2010, compared to the loss of Ps. 398 million ($32 million) for the same period of 2009. This recovery was due to improved sales volumes in the domestic market and a better price mix, partially offset by higher energy costs, which experienced a 25% increase, and the negative results in our foreign subsidiaries.

*Total Comprehensive Financing Result*

Our total comprehensive financing cost decreased 28% from Ps. 2,099 million ($168 million) for the nine−month period ended September 30, 2009 to Ps. 1,632 million ($130 million) for the same period of 2010. This decrease was primarily due to lower derivative financial instruments losses from Ps. 482 million ($39 million) for the nine−month period ended September 30, 2009 to Ps. 158 million ($13 million) for the same period of 2010. Additionally, we had a higher exchange gain of Ps. 454 million ($36 million) in 2010 compared to a gain of Ps. 378 million ($30 million) in 2009.

*Other Expenses (Income), Net*

Other expenses (income), net decreased from Ps. 376 million ($30 million) for the nine−month period ended September 30, 2009 to Ps. 309 million ($25 million) for the same period of 2010. During the nine−month period ended September 30, 2010, the balance included (i) loss from the sale of long−lived assets of Ps. 175 million ($14 million), (ii) severance expense of Ps. 58 million ($5 million), (iii) workers profit sharing (PTU) of Ps. 59 million ($5 million) and (iv) fees and costs for extinguishment of debt of Ps. 17 million ($1 million).

53

*Income Taxes*

On December 7, 2009, amendments to the Regular Income Tax ("ISR") Law of 2009 were published, to become effective beginning in 2010. These amendments state that: (i) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015 and (ii) ISR relating to any tax consolidation benefit obtained in 2005 and thereafter should be paid during the sixth through the tenth year after such benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained between 1982 (the tax consolidation starting year) and 1998 may be required in those cases provided by law.

Income tax represented an income tax benefit of Ps. 198 million ($16 million) for the period ended September 30, 2010 compared to an income tax benefit of Ps. 130 million ($10 million) for the same period of 2009. The amount for 2010 represents a deferred income tax benefit of Ps. 490 million ($39 million) that was offset by current income tax expense of Ps. 292 million ($23 million), and the amount for 2009 represents a deferred income tax benefit of Ps. 204 million ($16 million) that was offset by current income tax expense of Ps. 74 million ($6 million).

*Net Income*

For the nine–month period ended September 30, 2010, we generated a consolidated net loss of Ps. 659 million ($53 million) compared to a net loss of Ps. 1,292 million ($103 million) for the same period of 2009. This decrease in the net loss was mainly due to decreased total comprehensive financing costs.

***Year Ended December 31, 2009 Compared to Year Ended December 31, 2008***

*Net Sales*

Our consolidated net sales decreased 17.3% from Ps. 29,013 million ($2,222 million) for the year ended December 31, 2008 to Ps. 23,991 million ($1,837 million) for the year ended December 31, 2009. On a comparable basis, excluding the sales from Comegua, which was presented as a consolidated subsidiary until November 2008, consolidated net sales decreased 10.7% from Ps. 26,854 million ($2,056 million) for the year ended December 31, 2008 to Ps. 23,991 million ($1,837 million) for the year ended December 31, 2009. The market contraction we experienced in 2009, primarily in the beer containers and automotive markets in the United States as well as the construction markets in the United States and Spain, adversely impacted our sales volume and, consequently, our profit.

Domestic sales declined 13.1%, measured in Mexican pesos, from Ps. 12,831 million ($983 million) for the year ended December 31, 2008 to Ps. 11,152 million ($854 million) for the year ended December 31, 2009. This decrease was mainly due to sales volume declines in the food and beer segments for our Glass Containers business unit attributable to the 2009 economic contraction.

Export sales, which were principally affected by lower sales volumes in the automotive market, decreased 19.3%, measured in nominal U.S. dollars, from $600 million in 2008 to $484 million in 2009.

Foreign subsidiaries' sales decreased 47%, measured in nominal U.S. dollars, from $870 million in 2008 to $461 million in 2009. This decrease was mainly triggered by lower demand in the construction markets in the United States and Spain, as well as the deconsolidation of Comegua in December 2008. Foreign subsidiaries' sales and export sales represented 26% and 28%, respectively, of our consolidated net sales for the year ended December 31, 2009.

*Glass Containers Business Unit*

Consolidated net sales of our Glass Containers business unit decreased 20% from Ps. 15,484 million ($1,186 million) for the year ended December 31, 2008 to Ps. 12,385 million ($948 million) for the year ended December 31, 2009. The main driver for this sales decrease was a significant decrease in sales volume in the beer bottle segment, as well as a sales volume decrease in the food and the wine and liquor domestic markets during 2009, partially offset by an increase in cosmetic segment sales volumes.

Export sales decreased 8.9% year−over−year, measured in nominal U.S. dollars, due to a volume decline in all segments, except in CFT (cosmetics, fragrances and toiletries), from $383 million in 2008 to $349 million in 2009. Foreign subsidiaries' sales decreased 97% year−over−year, measured in nominal U.S. dollars, from $209 million to $6 million. On a comparable basis, excluding Comegua's deconsolidation, foreign subsidiaries' sales decreased 50% year−over−year from $12 million to $6 million, also measured in nominal U.S. dollars.

*Flat Glass Business Unit*

Consolidated net sales of our Flat Glass business unit were Ps. 11,377 million ($871 million) for the year ended December 31, 2009, a decrease of 13.7%, measured in Mexican pesos, compared to Ps. 13,187 million ($1,010 million) for the year ended December 31, 2008. This result was due to economic conditions and declining demand in the construction and automotive sectors, both affecting our business profit in 2009.

A decrease in domestic sales of 2.7% year−over−year was mainly driven by lower automotive glass sales in both our OEM and AGR markets, as well as by lower flat glass volumes. Additionally, the Float Glass business faced strong pricing pressure from its domestic market competitors, which made the Company apply a price adjustment and redirect part of its sales towards float glass exportation to Central and South America, obtaining lower margins.

Export sales decreased 37.3% year−over−year, measured in nominal U.S. dollars, from $217 million in 2008 to $136 million in 2009. This decrease was affected by lower automotive glass sales though partially offset by higher volumes in flat glass sold to Central and South America.

Foreign subsidiaries' sales decreased 31.3%, measured in nominal U.S. dollars, from $661 million in 2008 to $454 million in 2009. This decrease was due to adverse economic conditions which mainly affected the construction markets in the United States and Spain, which are both crucial markets for the Company.

Generally, we realize higher profit margins in our domestic market business, and, accordingly, whenever possible our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity.

*Operating Income*

Our consolidated operating income decreased 22.3% from Ps. 1,710 million ($131 million) for the year ended December 31, 2008 to Ps. 1,329 million ($101 million) for the year ended December 31, 2009. This decrease was due to lower volumes that had a negative impact on our fixed cost absorption, which was affected by a decline in the beer market and a significant decline in the automotive and construction markets, as well as to Comegua's deconsolidation in December 2008. All of the above were partially offset by savings related to our cost and expense reduction initiatives, through 2008 and up to the third quarter in 2009. Since the last quarter of 2008, we have adopted a significant and focused cost reduction plan, which includes reducing our workforce, optimizing production capacity in order to maximize utilization and efficiencies, generating savings in the supply chain, packaging and maintenance, canceling aircraft leasing contracts, divesting non−productive assets, and eliminating the outsourcing of non−strategic services, among other things. We estimate that these initiatives, as well as other initiatives aimed at reducing operating costs, reducing corporate expenses and improving efficiency, will result in annual savings of approximately $122 million from the third quarter of 2009 (which is when we completed the full implementation of these initiatives) and onward.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit increased 17.8% from Ps. 1,661 million ($127 million) for the year ended December 31, 2008 to Ps. 1,956 million ($150 million) for the year ended December 31, 2009. This increase was mainly driven by lower gas prices that decreased 56% in annual average price from $8.40 per MMBTU in 2008 to $3.70 per MMBTU in 2009, an increase in cosmetic segment sales volumes that was one of our most profitable segments, and the successful implementation of our cost reduction program.

*Flat Glass Business Unit*

Operating loss of our Flat Glass business unit was Ps. 591 million ($45 million) for the year ended December 31, 2009, compared to an operating income of Ps. 186 million ($14 million) for the year ended December 31, 2008. This increased loss was due to higher energy and raw materials costs coupled with lower production volumes and the corresponding lower fixed cost absorption, which resulted from the sluggish construction and automotive markets in Mexico, the U.S. and Spain.

*Total Comprehensive Financing Result*

Our total comprehensive financing cost decreased 74% from Ps. 9,077 million ($695 million) for the year ended December 31, 2008 to Ps. 2,366 million ($181 million) for the year ended December 31, 2009. This decrease was primarily due to the change of the recorded liability related to our DFIs from a loss of Ps. 3,766 million ($288 million) for the year ended December 31, 2008 to a loss of Ps. 570 million ($44 million) for the year ended December 31, 2009; and from a non–cash foreign exchange loss of Ps. 3,222 million ($247 million) for the year ended December 31, 2008 to a gain of Ps. 976 million ($75 million) during the year ended December 31, 2009, as a result of an appreciation of the Mexican peso during the year ended December 31, 2009 compared to a depreciation in 2008.

*Other Expenses (Income), Net*

Other expenses (income), net decreased from a loss of Ps. 495 million ($38 million) for the year ended December 31, 2008 to a loss of Ps. 291 million ($22 million) for the year ended December 31, 2009. This decrease was mainly due to (i) a gain from the sale of long–lived assets of Ps. 209 million ($16 million) in 2009 compared to a gain of Ps. 3 million ($0.2 million) in 2008; (ii) fees and costs related to debt restructuring of Ps. 7 million ($0.5 million) for the year ended December 31, 2009 compared to the absence of these fees in 2008; and (iii) workers profit sharing (PTU) of Ps. 13 million ($1 million) for the year ended December 31, 2009 compared to Ps. 10 million ($0.7 million) in 2008.

*Income Taxes*

On December 7, 2009, amendments to the ISR Law of 2009 were published, to become effective beginning in 2010; these amendments state that: (a) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015, and (b) ISR relating to any tax consolidation benefit obtained in 2005 and thereafter should be paid during the sixth through the tenth year after the benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained between 1982 (tax consolidation starting year) and 1998 may be required in those cases provided by law.

Income tax for the year ended December 31, 2009 represented an income tax benefit of Ps. 598 million ($46 million) compared to an income tax benefit of Ps. 2,175 million ($167 million) for the year ended December 31, 2008. The amount for 2009 represents a current income tax benefit of Ps. 3 million and a deferred income tax benefit of Ps. 595 million, and the amount for 2008 represents a current income tax expense of Ps. 123 million and a deferred income tax benefit of Ps. 2,298 million from tax loss carry forwards generated in 2008, resulting primarily from foreign exchange losses on our U.S. dollar–denominated debt as well as from payments made for margin calls on our derivative financial instruments. The Company has also recorded deferred tax assets, primarily related to its DFI liabilities. Based on our financial projections, we believe we will generate sufficient taxable income in future years to allow us to recover our deferred tax assets up to the amount of the recorded asset.

*Net Loss*

For the year ended December 31, 2009, we generated a consolidated net loss of Ps. 754 million ($57 million) compared to a net loss of Ps. 5,682 million ($435 million) for the year ended December 31, 2008. This decrease was mainly due to a lower total comprehensive financing result derived from the items previously mentioned.

### Year Ended December 31, 2008 Compared to Year Ended December 31, 2007

#### Net Sales

Our consolidated net sales increased 1.5% to Ps. 29,013 million ($2,097 million) for the year ended December 31, 2008 from Ps. 28,591 million ($2,067 million) for the year ended December 31, 2007. During the year ended December 31, 2008, domestic sales grew 6.9% while foreign subsidiaries' sales and export sales declined 2.8% and 1.9%, year−over−year, respectively. The complex international financial situation and severe contractions in the markets we serve adversely impacted the Company's sales volumes in the last quarter of 2008.

Domestic sales increased as a result of an improved product mix at the Glass Containers business unit which compensated a moderate volume drop year−over−year mostly driven by a sharp drop in volumes towards the last quarter of 2008. Export sales decreased to $600 million from $601 million, measured in nominal U.S. dollars. This decrease was mainly due to lower volumes in the last quarter of the year 2008 in the automotive business line at the Flat Glass business unit, partially offset by higher float glass volumes sold in the South and Central American markets. Foreign subsidiaries' sales, measured in U.S. dollars, decreased to $870 million from $881 million. This decrease mainly due to weakening markets and softening demand at the Flat Glass business unit specifically in the United States and Spanish construction markets. Measured in nominal U.S. dollars, our export and foreign subsidiaries' sales represented 23% and 33%, respectively, of our consolidated net sales for the year ended December 31, 2008.

#### Glass Containers Business Unit

Net sales of our Glass Containers business unit increased 5.8% to Ps. 15,484 million ($1,119 million) for the year ended December 31, 2008 from Ps. 14,639 million ($1,058 million) for the year ended December 31, 2007. The main driver of this sales increase was an improved overall product mix in the domestic market. Moreover, the food, beer and soft drinks business lines in the domestic market experienced an increase in volume during the first nine months of 2008 which was offset by an overall volume decline during the last quarter of year 2008 linked to the difficult economic environment. On December 18, 2008, the Company announced that Grupo Modelo, one of the key customers in the Glass Containers business unit, had notified the Company that due to the current world market contraction, it would significantly reduce its beer bottle orders from us.

Export sales grew 5.1% year−over−year from $365 million to 383 million, due to a better product mix at the food, soft drinks and wine and liquor business lines coupled with higher volumes in CFT (cosmetics, fragances and toiletries) and wine and liquor business lines. Foreign subsidiaries' sales grew 1.6% year−over−year despite the deconsolidation of Comegua starting December 1, 2008. For more information regarding the deconsolidation of Comegua and its effects on our balance sheet and income statement, see "Presentation of Certain Information" and Note 20 (d) of our consolidated financial statements.

#### Flat Glass Business Unit

Net sales of our Flat Glass business unit were Ps. 13,187 million ($953 million) for the year ended December 31, 2008, a decrease of 3% compared to Ps. 13,591 million ($983 million) for the year ended December 31, 2007. This result was due to the global economic conditions and declining demand in the construction and automotive sectors at year end, both crucial for the Company.

An increase in domestic sales of 5.7% year−over−year was mainly driven by higher automotive glass sales due to higher volumes in both OEM and AGR markets for the first nine months of the year, partially offset by a reversal in such trend in the last quarter of 2008 in connection with the world market contraction. Float glass volumes in the construction market remained stable year−over−year with a similar downward trend the last quarter of 2008 although the Company maintained its market share in the Mexican market.

Export sales decreased 8.4% year−over−year, measured in nominal U.S. dollars, from $237 million in 2007 to $217 million in 2008. This decrease was mainly due to lower automotive glass sales in the OEM and AGR markets, which were partially offset by higher float glass volumes sold to the Central and South American markets. This decrease in the AGR market is in line with the Company's strategy to focus on the domestic market. In May 2009, we decided to sell its inventory which was dedicated to serve the AGR market in the United States, including windshields and side and back windows for American and foreign cars and trucks; therefore, since that date, we are no longer participating in the AGR distribution market, but remain in the retail and installation segment. We also consolidated operations and closed six distribution centers and ten installation centers.

57

Generally, we realize higher profit margins in our domestic market business, and, accordingly, whenever possible our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity.

Therefore, our export sales correlate to our available capacity, mainly in our Flat Glass business unit, including both its float and automotive businesses. In 2006, we decided to decrease our export AGR sales in the automotive business when our OEM market sales increased. Specifically, export prices as well as rising energy and freight cost in 2006 significantly impacted the profitability of our export business, causing us to decide to temporarily exit the export market by shutting down a flat glass manufacturing furnace in Mexico City, which reduced our export capacity.

In 2007, however, we increased exports within both float and automotive businesses. In the automotive business, we had less OEM volume and thus increased our AGR export sales. In the float business, we acquired a 50% share of the Mexicali flat glass facility from our previous joint venture partner AFG, which also gave us additional capacity dedicated to our export business. Going forward, we will continue to adjust our export sales depending on domestic growth rates and capacity utilizations.

Measured in nominal U.S. dollars, sales from foreign subsidiaries decreased 2.4% year−over−year to $661 million from $677 million. Sales at Vitro Cristalglass decreased 4% as a result of a weakening construction market and softening demand. Sales at Vitro America were adversely affected by the slowdown in demand from the U.S. residential construction market and in the commercial construction market due to the difficult economic environment, which was partially offset by a 2% increase in sales at Vitro Colombia due to increased volumes associated with regional demand.

*Operating Income*

Our consolidated operating income decreased 36.8% to Ps. 1,710 million ($124 million) for the year ended December 31, 2008 from Ps. 2,704 million ($195 million) for the year ended December 31, 2007. This decrease was due to higher energy and raw materials costs and the transfer of a plant in Mexico City to Toluca, as well as to lower volumes that had a negative impact on our fixed cost absorption. All of the above was partially offset by a better product mix in the domestic glass container market and by savings related to our cost and expense reduction initiatives. In 2008, our implemented cost and expense reduction initiatives saved $40 million. These savings relate primarily to production capacity optimization to maximize utilization and efficiency; supply chain, packaging and maintenance savings; a reduction in our workforce; and cost−cutting measures at the corporate level including cancellation of two airplane leasing contracts and limitations on employee and executive committee business travel.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit decreased 19.1% to Ps. 1,661 million ($120 million) for the year ended December 31, 2008 from Ps. 2,054 million ($148 million) for the year ended December 31, 2007. This decrease was driven by lower production volumes and their impact on fixed cost absorption, higher energy and raw materials costs and the costs associated with the transfer of a plant in Mexico City to Toluca. We believe these factors were partially offset by better production efficiencies, a better product mix in the domestic market, and the continued cost reduction initiatives. Our improved production efficiencies include (i) increases in our production speed, (ii) improvements in waste management, and (iii) the use of lighter weight products. In 2007 these improved production efficiencies helped to improve our operating income by 14.9%; however, due to the various factors negatively affecting our financial condition in 2008, we were unable to estimate the benefits of these efficiency improvements on our net income in 2008.

58

*Flat Glass Business Unit*

Operating income of our Flat Glass business unit was Ps. 186 million ($13 million) for the year ended December 31, 2008, a decrease of 76.2% compared to Ps. 782 million ($57 million) for the year ended December 31, 2007. This decrease was due to higher energy and raw materials costs coupled with lower production volumes and the corresponding lower fixed cost absorption — resulting from the sluggish construction and automotive markets.

*Total Comprehensive Financing Result*

Our total comprehensive financing expense increased 446.8% from Ps. 1,660 million ($120 million) for the year ended December 31, 2007 to Ps. 9,077 million ($656 million) for the year ended December 31, 2008. This increase was primarily due to the change of the value claimed by our Counterparties in DFI Claims from a loss of Ps. 201 million ($15 million) for the year ended December 31, 2007 to a loss of Ps. 3,766 million ($272 million) for the year ended December 31, 2008, and to an increase in non−cash foreign exchange loss from Ps. 94 million ($7 million) in the year ended December 31, 2007 to Ps. 3,222 million ($233 million) during the year ended December 31, 2008, as a result of a higher depreciation of the Mexican peso during the year ended December 31, 2008, and the elimination of the monetary position at the beginning of year ended December 31, 2008 due to the new Mexican Financial Reporting Standards. Derivative instruments losses for the year ended December 31, 2008 were comprised mainly of losses in natural gas price DFIs of approximately Ps. 2,432 million ($176 million), mainly due to decreases in the natural gas prices during the final months of 2008, and of losses in foreign exchange rate DFIs of approximately Ps. 1,578 million ($114 million) due to the high volatility that the markets experienced in the final months of 2008 that resulted in a sharp increase in Mexican peso/U.S. dollar foreign exchange rates, partially offset by gains in interest rate DFIs of approximately Ps. 59 million ($4 million) mainly due to decreases in the TIIE.

*Other Expenses (Income), Net*

Other expenses (income), net decreased by Ps. 374 million ($27 million) to a loss of Ps. 495 million ($36 million) for the year ended December 31, 2008 from a loss of Ps. 869 million ($63 million) for the year ended December 31, 2007. This decrease was mainly due to (i) an absence of fees and costs related to debt restructuring for the year ended December 31, 2008 compared to Ps. 488 million ($35 million) incurred for the extinguishment of debt associated with our debt restructuring completed during 2007; (ii) a gain from the sale of long−lived assets of Ps. 3 million ($0.2 million) in 2008 compared to a loss of Ps. 47 million ($3 million) in 2007; and (iii) workers profit sharing (PTU) of Ps. 10 million ($0.7 million) during the year ended December 31, 2008 compared to Ps. 54 million ($3.9 million) during the year ended December 31, 2007.

*Income Taxes*

Income tax for the year ended December 31, 2008 represented an income tax benefit of Ps. 2,175 million ($157 million) compared to an expense of Ps. 44 million ($3 million) for the year ended December 31, 2007. In 2008 the Company generated tax loss carry forwards resulting primarily from foreign exchange losses on our U.S. dollar−denominated debt as well as from payments made for margin calls on our derivative financial instruments. The Company has also recorded deferred tax assets, primarily related to the derivative liability claimed by our Counterparties. Based on our financial projections and taking into consideration our tax planning strategies, we believe we will generate sufficient taxable income in future years to allow us to recover our deferred tax assets up to the amount of the recorded asset.

*Net Income*

For the year ended December 31, 2008, we generated a consolidated net loss of Ps. 5,682 million ($411 million) compared to a net income of Ps. 131 million ($9 million) for the year ended December 31, 2007. This increased loss was mainly due to a higher total comprehensive financing result derived from the change of the value claimed by our Counterparties in our derivative instrument transactions. Such losses were partially offset by income tax benefits and lower levels of other expenses.

59

# LIQUIDITY AND CAPITAL RESOURCES

Our net interest expense on debt for the year ended December 31, 2009 was Ps. 2,772 million ($212 million) and our total comprehensive financing cost was Ps. 2,366 million ($181 million), while our operating income was Ps. 1,329 million ($101 million). As of December 31, 2009, our total consolidated indebtedness was Ps. 20,101 million ($1,540 million), of which Ps. 18,197 million ($1,393 million) is short−term debt and our unrestricted cash and cash equivalent balances were Ps. 2,616 million ($200 million). As of September 30, 2010, our total consolidated indebtedness was Ps. 21,323 (1,706 millon), of which Ps. 19,602 is short−term debt. The increase of the debt was due to the settlement of our DFI agreements with Fintech. Our unrestricted cash and cash equivalent balances were Ps. 2,203 million ($174 million).

In order to generate liquidity to continue as a going concern, we must restructure our obligations under our indentures and other financial instruments, which will involve a significant reduction of the claims of the Holders of the Old Notes and other financial instruments, resulting in a significant decrease of our debt and interest expenses. If we are able to enter into consensual arrangements with our financial creditors, as part of that process we would make filings under Mexican and U.S. bankruptcy laws to accomplish a reorganization of our debt. If we are unable to enter into consensual arrangements with our financial creditors, we could be forced to seek relief through filings under Mexican and U.S. bankruptcy laws, which could force us to operate in uncertain circumstances for a period of time, which could materially adversely affect the relationships between us and our customers, suppliers and employees, and may result in a liquidation of the Company. See "Risk Factors—Risks Factors Relating to Our Business—We have insufficient liquidity to repay our existing obligations and meet our capital requirements."

As part of the measures we have adopted to improve our financial position and preserve liquidity, we have adopted a significant and focused cost reduction plan, which includes reducing our workforce, optimizing production capacity in order to maximize utilization and efficiencies, generating savings in the supply chain, packaging and maintenance, canceling aircraft leasing contracts, divesting non−productive assets and eliminating the outsourcing of non−strategic services, among other things. We estimate that these initiatives, as well as other initiatives aimed at reducing operating costs, reducing corporate expenses and improving efficiency, will result in annual savings of approximately $122 million from the third quarter of 2009 (which is when we completed the full implementation of these initiatives) and onward.

Our ability to continue operations while we restructure our business also depends on our ability to achieve financing on reasonable terms. For a discussion of our recent financing activity, see "Item 3. Key Information—Recent Developments.

***Principal Sources and Uses of Cash***

Our policy is to invest available cash in short−term instruments issued by Mexican and international banks and securities issued by the governments of Mexico and the United States.

Over the past three years, the principal source of our liquidity has generally been cash generated from operations in each of our business units and the sale of certain assets. Our principal uses of cash have generally been for capital expenditure programs, interest payments, debt repayment and dividend payments.

The following is a summary of the principal sources and uses of cash for the three years ended December 31, 2009. Financial data expressed in Mexican pesos and set forth in the following table for 2008 and 2009 are presented in nominal pesos and for all amounts pertaining to fiscal year 2007 are restated in constant Mexican pesos as of December 31, 2007, except where otherwise indicated.

| | For the Year Ended December 31, | | | | | | Nine-month period ended September 30, |
|---|---|---|---|---|---|---|---|
| | | 2007 | | 2008 | | 2009 | 2010 |
| | | | | (in millions of pesos) | | | |
| Sources: | | | | | | | |
| Net resources generated by operating activities (2007) and cash flows generated from operating activities (2008 and 2009) | Ps. | 1,674 | Ps. | 2,736 | Ps. | 3,996 | Ps. 1,345 |
| Sale of assets | | 109 | | 20 | | 1,410 | 946 |
| Debt issuance | | 16,891 | | 3,034 | | 1,559 | 2,785 |
| | | | | | | | |
| Uses: | | | | | | | |
| Interest payments | | 2,341 | | 2,044 | | 943 | 558 |
| Capital expenditures | | 2,695 | | 1,798 | | 1,009 | 446 |
| Debt repayments | | 14,323 | | 1,020 | | 2,483 | 3,962 |
| Dividends declared and paid | | 215 | | 274 | | 14 | 6 |

*Changes in Working Capital (Negative Working Capital)*

    For the nine-month period ended September 30, 2010, our working capital increased Ps. 611 million ($49 million) due primarily to increased activity in certain industries such as the automotive industry. For the year ended December 31, 2009, our working capital decreased Ps. 1,714 million ($131 million). This decrease was principally attributable to lower activity due to market conditions. Our working capital is insufficient for our present and future operational requirements. For a further discussion of our liquidity, see "Item 3. Key Information—Risk Factors—Risk Factors Relating to Our Business—We have insufficient liquidity to repay our existing obligations and meet our capital requirements."

*Capital Expenditures*

    We operate in capital-intensive industries and require ongoing investments to update our assets and technology. In prior years, funds for those investments and for working capital needs, partnership transactions, acquisitions and dividends have been provided by a combination of cash generated from operations, short- and long-term debt and, to a lesser extent, divestitures.

    Our capital expenditures program is currently focused on maintenance of our manufacturing facilities. Our capital expenditures program also contemplates the purchase and maintenance of environmental protection equipment required to meet applicable environmental laws and regulations, as such may be in effect from time to time.

    During the year ended December 31, 2009, we paid aggregate capital expenditures of Ps. 1,009 million ($77 million) that primarily consisted of capital expenditures for capacity expansion, relocation of a glass container facility and the purchase of a new furnace for the Company's automotive glass operation.

    During 2010, we expect to close the year with capital expenditures of approximately Ps. 885 million ($70 million) as follows:

- Our Glass Containers business unit expects to close the year with capital expenditures of Ps. 594 million ($47 million), which is being used to provide maintenance to certain furnaces and IS machines; for a palletizing center; and for infrastructure in one of our facilities. The remainder is being applied to new product molds.
- Our Flat Glass business unit expects to close the year with capital expenditures of Ps.291 million ($23 million), which is being used mainly for maintenance of our facilities.

The capital expenditures are being financed with cash flows generated by our operations and with current cash on hand and are being made primarily to our Mexican facilities. We are deferring a portion of such expenditures to future periods.

For the year ended December 31, 2009, our Glass Containers business unit accounted for 68% of our capital expenditures, which was primarily used for maintenance to certain of our furnaces and IS machines. The remaining 32% of our capital expenditures for the year ended December 31, 2009 was incurred by the Mexican subsidiaries of our Flat Glass business unit and used mainly for maintenance.

For the year ended December 31, 2008, our capital expenditures totaled Ps. 1,798 million ($131 million). Our Glass Containers business unit accounted for 86% of our capital expenditures, which was primarily used for production capacity expansion in Vidriera Monterrey, the relocation of the Vidriera Mexico operations to the Vidriera Toluca facility, and the maintenance of certain furnaces and IS machines in Vidriera Los Reyes and Vidriera Toluca. The remaining 14% of our capital expenditures for the year ended December 31, 2008 was incurred by the Mexican subsidiaries of our Flat Glass business unit and used mainly for the purchase of a new furnace for the Company's automotive glass operations and the remainder used by its foreign subsidiaries.

For the year ended December 31, 2007, our capital expenditures totaled Ps. 2,695 million ($248 million). Our Glass Containers business unit accounted for 86% of our capital expenditures, which was primarily used for the maintenance of certain furnaces, relocation of our Vidriera Mexico operation to the Vidriera Toluca facility and production capacity expansion. The remaining 14% of our capital expenditures for the year ended December 31, 2007 was incurred by our Flat Glass business unit and used mainly for major furnace repairs and production capacity expansion.

### Indebtedness

The following table sets forth the aggregate amounts of our outstanding short−term and long−term debt as of December 31, 2009.

|  | As of December 31, 2009 | |
|---|---|---|
|  | (Ps. millions) | ($ millions)[1] |
| Short−term debt[2][3] | Ps.  18,197 | $  1,394 |
| Long−term debt[4][5] | 1,904 | 146 |

[1] Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at a rate of 13.0587 pesos per U.S. dollar, the Free Exchange Rate on December 31, 2009.

[2] Includes the current portion of our long−term debt, which was Ps. 15,771 million ($1,208 million) as of December 31, 2009.

[3] 92%, 5% and 3% of the aggregate amount of our short−term debt as of December 31, 2009 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

[4] Excludes the current portion of our long−term debt. If the current portion of our long−term debt were included, the aggregate amount of outstanding long−term debt as of December 31, 2009 would be Ps. 17,675 million ($1,354 million).

[5] 44%, 52% and 3% of the aggregate amount of our long−term debt as of December 31, 2009 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

*Short−Term Debt*—Our short−term debt consists primarily of (i) long−term debt obligations which were reclassified due to defaults and are now presented as short−term obligations and (ii) unsecured and secured borrowing arrangements with Mexican and foreign banks denominated in Mexican pesos, U.S. dollars and euros. We engage, from time to time, in the ordinary course of business, in a number and variety of short−term loan arrangements with a number of Mexican and foreign banks. Such loans generally have a maturity ranging from 30 to 365 days and have interest rates ranging from 1.5% to 8% above LIBOR for the U.S. dollar−denominated loans, from 1.10% to 1.25% above Euribor for our euro−denominated loans, and have fixed and floating market rates for the Mexican peso−denominated loans.

*As of September 30, 2010*

The following table sets forth the aggregate amounts of our outstanding short−term and long−term debt as of September 30, 2010.

We are currently in payment default under our Old Notes and our *Certificados Bursátiles* Vitro 03 and other credit agreements.

|  | As of September 30, 2010 | |
|---|---|---|
|  | (Ps. millions) | ($ millions)[1] |
| Short−term debt[2][3][6] | Ps. 19,602 | $ 1,568 |
| Long−term debt[4][5] | 1,721 | 138 |

(1) Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at a rate of 12.5011 pesos per U.S. dollar, the Free Exchange Rate on September 30, 2010.

(2) Includes the current portion of our long−term debt, which was Ps. 15,838 million ($1,267 million) as of September 30, 2010.

(3) 96%, 3% and 1% of the aggregate amount of our short−term debt as of September 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

(4) Excludes the current portion of our long−term debt. If the current portion of our long−term debt were included, the aggregate amount of outstanding long−term debt as of September 30, 2010 would be Ps. 17,559 million ($1,405 million).

(5) 25%, 61% and 14% of the aggregate amount of our long−term debt as of September 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

(6) The short−term debt includes $253.4 million dollars of debt regarding the DFI claims.

*Short−Term Debt*—Our short−term debt consists primarily of (i) long−term debt obligations which were reclassified due to defaults and are now presented as short−term obligations, (ii) unsecured and secured borrowing arrangements with Mexican and foreign banks denominated in Mexican pesos, U.S. dollars and euros and (iii) accounts receivable financing programs. We engage, from time to time, in the ordinary course of business, in a number and variety of short−term loan arrangements with a number of Mexican and foreign banks. Such loans generally have a maturity ranging from 30 to 365 days and have interest rates ranging from 1.5% to 8% above LIBOR for the U.S. dollar−denominated loans, from 1.10% to 1.25% above Euribor for our euro−denominated loans, and have fixed and floating market rates for the Mexican peso−denominated loans.

The short−term debt includes $253.4 million dollars of debt regarding the DFI claims.

**Long−term debt reclassified to short−term due to defaults:**

| Facility | Outstanding Principal Amount as of September 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| 2012 Notes<br>*Issuer:* Vitro<br><br>Guarantors: Wholly owned subsidiaries of Vitro, VENA and Vimexico | $300 million | *Interest Rate:* 8.625% per annum.<br><br>*Interest Payment Dates:* Semiannually on August 1 and February 1 of each year. | February 1, 2012 |
| 2017 Notes<br>*Issuer:* Vitro<br><br>*Guarantors:* Wholly owned subsidiaries of Vitro, VENA and Vimexico | $700 million | *Interest Rate:* 9.125% per annum.<br><br>*Interest Payment Dates:* Semiannually on August 1 and February 1 of each year. | February 1, 2017 |
| 2013 Senior Notes<br>*Issuer:* Vitro<br><br>Guarantors: Wholly owned subsidiaries of Vitro, VENA and Vimexico | $216 million | *Interest Rate:* 11.75% per annum.<br><br>*Interest Payment Dates:* Semiannually on May 1 and November 1 of each year. | November 1, 2013 |
| *Certificados Bursatiles Vitro 03*<br>*Issuer:* Vitro | Ps. 150 million ($12 million) | *Interest Rate:* Cetes + 3.25%<br><br>*Interest Payment Dates:* Every 28th day from October 21, 2004. | February 5, 2009 |

*Long−Term Debt—* The following is a brief summary of our significant long−term indebtedness outstanding as of September 30, 2010. For further description of our long−term indebtedness, refer to Note 10 to our annual consolidated financial statements included elsewhere in this annual report:

**Long−term debt:**

| Facility | Outstanding Principal Amount as of September 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| *Certificados Bursatiles Vitro 08*<br>*Issuer: Vitro* | Ps. 400 million<br>($32 million) | *Interest Rate:* TIIE (28 days) + 2.50%<br>*Interest Payment Dates*: Every 28th day from July 2, 2008. | April 7, 2011 |
| *Capital Leases* | $9.4 million | *Interest rate on case by case basis* | Several installments through 2015 |
| *Secured debt* | Ps. 298 million<br>($23.8 million) | *Interest rate: TIIE + 4%* | Severall installments through 2014 |
| *Secured borrowing related to the Glass Containers accounts receivable securitization* | Ps. 550 million<br>($44 million) | *Interest rate: TIIE + 4%* | Several installments through 2012 |
| *Secured borrowing related to the Flat Glass accounts receivable financing program* | Ps. 300 million<br>($24 million) | *Interest rate: TIIE + 4%* | Severall installments through 2014 |
| *Unsecured debt* | $28 million | *Interes rate: LIBOR + 8%* | Severall installments through 2014 |

(1)    See *"—Indebtedness."*

Below is a summary of the terms of the foregoing facilities or securities.

   *2012 Notes and 2017 Notes.* On February 1, 2007 we completed the offering of $1.0 billion of Senior Notes, comprised of $300 million of 2012 Notes and $700 million of 2017 Notes. The 2012 Notes and the 2017 Notes are general unsecured obligations of Vitro. The indenture governing the 2012 Notes and the 2017 Notes contains certain customary restrictive covenants, including, but not limited to, restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. The 2012 Notes and the 2017 Notes are guaranteed by substantially all of Vitro's wholly owned subsidiaries.

   We are currently in interest payment default with respect to these notes. See Item 13. Defaults, Dividends arrearages and Delinquencies.

   *2013 Notes.* On October 22, 2003, Vitro completed an offering of $225 million aggregate principal amount of 2013 Notes. The 2013 Notes are general unsecured obligations of Vitro. The indenture governing the 2013 Notes contains certain customary restrictive covenants, including restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. Upon issuance of the 2012 Notes and 2017 Notes mentioned above, the holders of the 2013 Notes have been extended the benefit of a guarantee by the subsidiary guarantors substantially similar to the guarantee provided with respect to the 2012 Notes and the 2017 Notes. Part of the 2013 Notes were prepaid on June 25, 2008 and, as of September 30, 2010, the total amount outstanding was $216 million.

We are currently in interest payment default with respect to these notes. See Item 13. Defaults, Dividends arrearages and Delinquencies.

*Certificados Bursátiles Vitro 03*. On October 10, 2002, we opened a medium−term notes program under which we were able to issue up to an aggregate principal amount of Ps. 2.5 billion. On February 13, 2003 we issued a *Certificados Bursátiles note which* bears an annual floating interest rate of 3.25% over the 182−day CETES. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of September 30, 2010, the total amount outstanding for this program was Ps. 150 million ($12 million).

We are currently in principal and interest payment default with respect to this debt. See Item 13. Defaults, Dividends arrearages and Delinquencies.

*Certificados Bursátiles Vitro 08*. On July 2, 2008, we opened a medium−term notes program under which we were able to issue up to an aggregate principal amount of Ps. 1.0 billion. On this same date, we issued a *Certificados Bursátiles* note which bears an annual floating interest rate of 2.50% over the 28−day TIIE. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of September 30, 2010, the total amount outstanding for this program was Ps. 400 million ($32 million). As of February 2011, we are currently in interest payment default. For further discussion, see "Item 3—Key Information — Recent Developments — Vitro's Financial Difficulties—Interest and Principal payment Default on the Old Notes and Vitro's other debt."

*Flat Glass Accounts Receivable Financing Program*. In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24 million) with a five−year maturity. The new issuance bears an annual floating interest rate of 4.0% over the 28−day TIIE.

*Covisa / Alcali Securitization*. In April 2010, we refinanced the senior Ps. 550 million ($44 million) variable rate TIIE+ 4% bond issued by the Trustee of the accounts receivable securitization program of our subsidiaries Covisa and Alcali for an additional two years. The bond bears an annual floating interest rate of 4.0% over the 28−day TIIE. The remaining $10 million balance of the subordinated notes was repaid.

*Bladex Credit Facility*. In July 2009, we refinanced a $30 million credit with Bladex for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014. As of September 30, 2010, the total amount outstanding under this program was $28.0 million.

***Other Restrictions on Dividend Payments***

Pursuant to article 20 of the *Ley General de Sociedades Mercantiles* (the "Mexican General Law of Corporations"), 5% of the annual net income of Mexican corporations must be set aside to create or increase a mandatory legal reserve until such reserve amounts to not less than 20% of such corporation's outstanding equity capital. Thereafter, a majority of our shares present at such annual general ordinary shareholders' meeting may allocate all or a portion of the remainder of our net income to a reserve fund for the purchase of our shares or other reserve funds. As of the date of this annual report, our mandatory legal reserve amounted to at least 20% of our outstanding equity capital per the requirement described above.

Certain of the instruments governing our indebtedness, under certain circumstances, restrict our ability to pay dividends. See "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources—Indebtedness."

***Share Repurchases and Sales***

As of October 14, 2010, the date of our most recent general ordinary shareholders' meeting, 445,500 of our shares are held as treasury stock. In addition, 39,777,907 of our shares are held in the Stock Option Trust and are treated as treasury shares for accounting purposes, and under Mexican corporate law are considered issued and outstanding.

**Real Estate Matter**

In December 2006, Vitro sold real estate located in Mexico City for $100 million, 80% payable on the date of the sale and the remainder payable on the delivery date of the property. As of December 31, 2008, the Company is in compliance with the terms of the contract. In 2009, the Company received a $5 million payment and is still seeking legal remedies for payment of the remaining amount. On August 16, 2010, the court absolved the purchaser of the remaining payment claimed. The Company has filed an appeal against the decision, which is pending resolution. On January 10, 2011 the Appeals Court in Mexico City issued its decision revoking the ruling issued by the lower court and granting Vitro all of its petitions, and condemning the other party to pay Vitro all of its claims including an amount of approximately of $15 million plus legal costs and attorneys fees. We expect that the counterparty will appeal the decision through an *amparo* proceeding in the upcoming weeks.

**PBGC Matter**

As part of the disposal of Anchor Glass Container Corp. ("Anchor") in August 1996, in a transaction approved by the U.S. Bankruptcy Court, we entered into a term sheet which contemplated an agreement pursuant to which we would provide to the Pension Benefit Guaranty Corporation (the "PBGC"), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets, which we refer to as "New Anchor." The amount of the guaranty was originally limited to $70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semiannual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionally reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by $7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

On April 15, 2002, New Anchor filed a pre−negotiated plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

On June 20, 2003, the PBGC wrote to us, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of $219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than $122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of our limited guaranty had occurred. Accordingly, in its letter, the PBGC demanded payments pursuant to the term sheet of $7 million on or before August 1, 2003 and of $3.5 million semiannually through August 1, 2011. We intend to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by us. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, we will establish an appropriate accounting reserve. As of this date, we have not established any reserves in connection with such potential liability.

**Energy**

Certain of our subsidiaries agreed to purchase, in the aggregate, 90 megawatts of electrical power and 1.3 million tons of steam per year pursuant to a 15−year "take−or−pay" power purchase agreement with Tractebel Energía in which natural gas is a pass through component in the energy price. This contract took effect in October 2000 and the price at which we are required to purchase electrical power and steam is based on variables such as inflation, the Mexican peso/U.S. dollar exchange rate and the price of natural gas, the future value of which is uncertain.

**Off−Balance Sheet Arrangements**

As disclosed in Note 3(a) of our consolidated financial statements in 2009, for purposes of MFRS we adopted NIF B−8, Consolidated or combined financial statements. This standard establishes that special purpose entities, over which control is exercised, should be consolidated.

As a result of adopting NIF B−8, under MFRS our securitizations of trade receivables programs are no longer considered an off−balance sheet arrangement, therefore it became a difference between MFRS and the U.S. GAAP. You can find additional information in our Financial Statements attached to this report (Note 25) as it relates to differences between MFRS and U.S. generally accepted accounting principles. Under MFRS we don't have any off−balance sheet arrangements.

**TABULAR DISCLOSURE OF CONTRACTUAL OBLIGATIONS**

The following table sets forth a summary of our contractual obligations and commercial commitments, in millions of pesos as of December 31, 2009.

| Contractual Obligations | Total | | Less than 1 year[7] | | 1−3 years | | 3−5 years | | More than 5 years | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Ps. millions) | | | | | |
| Short− and long−term debt[1][2][3] | Ps. | 29,480 | Ps. | 19,940 | Ps. | 4,761 | Ps. | 3,004 | Ps. | 1,776 |
| Operating leases[4] | | 4,294 | | 861 | | 1,523 | | 1,284 | | 626 |
| Unconditional purchase obligations[5] | | 0 | | 0 | | 0 | | 0 | | 0 |
| Other long−term obligations[6] | | 2,972 | | 330 | | 634 | | 600 | | 1,408 |
| Total contractual obligations | Ps. | 36,746 | Ps. | 21,131 | Ps. | 6,918 | Ps. | 4,888 | Ps. | 3,810 |

[1] Does not include DFIs. For a description of our outstanding DFIs, see "Item 11. Quantitative and Qualitative Disclosures about Market Risk—Natural Gas Price Risk."

[2] Includes scheduled interest payments with fixed and variable rates. For our variable interest rate debt, we utilized the rates in effect as of December 31, 2009, as disclosed in Note 10 of our consolidated financial statements when estimating the scheduled interest payments. For the 2012 Notes and 2017 Notes, we are adding 200 basis points for the subsequent 2 years, as we are in default on these notes, assuming we can resolve this matter within that period. Additionally for the less than a year column, we are including the normal and default interests since the default date to December 31, 2009.

[3] Includes Ps. 152 million of capital lease obligations.

[4] The amounts set forth above under "Operating leases" include mainly payments that will be made under leases relating to warehouses, forklifts and computer equipment. We eliminated the leases regarding our two aircraft leases.

[5] Certain of our subsidiaries agreed to purchase, in the aggregate, 90 megawatts of electrical power and 1.3 million tons of steam per year pursuant to a 15−year "take−or−pay" power purchase agreement with Tractebel Energía. This contract began in April 2003 and the price at which we are required to purchase electrical power and steam is based on variables such as inflation, the peso/U.S. dollar exchange rate and the price of natural gas, whose future value is uncertain.

[6] Expected benefit payments regarding the company pension plans, seniority premium and severance indemnities.

[7] Includes long−term debt reclassification as short−term debt.

## ACCOUNTING CONSIDERATIONS

**Critical Accounting Estimates**

We prepare our consolidated financial statements in conformity with MFRS. As such, we are required to make certain estimates, judgments and assumptions that we believe are reasonable based on the available information. These estimates and assumptions affect the reported amounts of assets and liabilities at the date of the financial statements, the reported amounts of revenues and expenses during the periods presented and the related disclosures. The significant accounting policies that we believe are the most sensitive to such estimates and relevant to aid you in fully understanding and evaluating our reported financial statements are the following:

*Trade Receivables*

We perform ongoing credit evaluations of our customers and adjust credit limits based upon payment history and the customer's current creditworthiness, as determined by our review of their current credit information. We continually monitor collections and payments from customers and maintain an allowance for doubtful accounts based upon our historical experience and any specific customer collection issues that we have identified. While such credit losses have historically been within our expectations and the provisions established, we cannot guarantee that we will continue to experience the same credit loss rates that we have in the past. A significant change in our experience of credit losses could have a material adverse impact on our consolidated results of operations and financial position.

*Contingencies*

Contingencies, by their nature, relate to uncertainties that require management to exercise judgment both in assessing the likelihood that a liability has been incurred as well as in estimating the amount of potential loss. Provisions are recognized for current obligations that (i) result from a past event, (ii) are probable to result in the use of economic resources, and (iii) can be reasonably estimated. We believe the amounts recorded or disclosed in our financial statements are based on the best estimates and judgments of management. However, actual outcomes could differ from our estimates. See "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources—PBGC Matter."

*Financial Instruments*

The Company applies the provisions of Bulletin C‑10, "Derivative Financial Instruments and Hedging Activities," of MFRS, which requires that all derivative instruments be recognized at fair value, sets the rules to recognize hedging activities and requires separation, if practical, of embedded derivative instruments. With respect to cash flow hedging, Bulletin C‑10 establishes that the effective portion be recognized temporarily in other comprehensive income within stockholders' equity, with subsequent reclassification to current earnings at the time it is affected by the hedged item. The ineffective portion should be immediately recognized in current earnings.

Fair values of financial instruments are estimated using available market information or other appropriate valuation methodologies that require considerable judgment in interpreting and developing estimates. The use of different market assumptions and/or estimation methodologies may have a material adverse effect on the estimated fair value amounts. See "Item 11. Quantitative and Qualitative Disclosures About Market Risk."

For U.S. GAAP purposes, the Company adopted the provisions of ASC 820 "Fair Value Measurements and Disclosures" (previously SFAS No. 157), as they relate to its financial instruments carried at fair value beginning in 2008. ASC 820 establishes a framework for measuring fair value and expands disclosure about fair value measurements. Under this standard, fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date. ASC 820 establishes a hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The hierarchy is broken down into three levels based on the observability of inputs. See Note 25to our consolidated financial statements for a further description of the impacts ASC 820 had on our consolidated financial position and results of operations as well as information regarding the fair value hierarchy as it relates to our financial instruments.

*Environmental Obligations*

Our operations are subject to the environmental laws and regulations of the jurisdictions in which we conduct our operations. An environmental reserve is recorded to cover the costs of expected environmental obligations when we become aware that an expenditure may be required. We estimate the cost for the environmental obligations based on historical experience, results of monitoring and the known extent of exposure. We do not believe that continued compliance with these environmental laws will have a material adverse effect on our financial condition or results of operations. However, a significant change in laws, the discovery of previously unknown contamination and other factors beyond our control could result in expenditures that are materially greater than currently estimated or the reserves we have recorded.

*Impairment of Long−Lived Assets*

Long−lived assets, which include property, goodwill, intangible assets and certain other assets, comprise a significant portion of our total assets. We make judgments and estimate the carrying value of these assets, including amounts to be capitalized, depreciation and amortization methods and useful lives. Additionally, the carrying values of these assets are periodically reviewed for impairment or whenever events or circumstances indicate that the carrying amounts may not be recoverable. An impairment loss is recorded in the period in which it is determined that the carrying amount is not recoverable. This requires us to make long−term forecasts of our future revenues and costs relating to the assets under review. These forecasts require assumptions about demand for our products, future market conditions and technological developments. Significant and unanticipated changes to these assumptions could result in a determination that the value of these long−lived assets has been impaired in a future period.

Certain material events or circumstances may indicate that carrying amounts of our long−lived assets may not be recoverable. Our policy is to review the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable. The impairment indicators considered for these purposes are, among others, as follows: operating losses or negative cash flows in the period if they are combined with a projection of losses, reduction in the demand for the products manufactured, competition, capacity utilization reduction, obsolescence or technological changes, decrease of market value of assets and other legal and economic factors. During the current economic crisis we are continuously analyze the indicators; if the global recession persists, we will likely incur additional impairment losses.

*Recoverability of Deferred Tax Assets*

In assessing the realizability of deferred tax assets, management considers whether it is highly probable that the deferred tax assets will be realized. The realization of deferred tax assets is dependent upon the generation of future taxable income of the appropriate character. Management considers the scheduled reversal of taxable temporary differences, projected future taxable income, and tax planning strategies that we believe will generate sufficient taxable income in future years that will allow us to recover our deferred tax assets.

As of December 31, 2009, we had a net deferred tax asset of Ps. 4,515 million recorded for purposes of MFRS. We understand that the SEC has taken the view that a going−concern paragraph in the audit report would ordinarily necessitate a valuation allowance for all deferred tax assets not assured of realization by either offsetting existing taxable temporary differences or carryback to open tax years. We have evaluated the relevant facts and circumstances regarding the recoverability of our deferred tax assets. The going−concern paragraph has been included in the auditors' report as a we were not in compliance with covenants related to our long−term debt obligations, which due to presenting such obligations as short−term resulted in current liabilities significantly exceeding current assets. While this represents a serious liquidity issue for the Company and points to uncertainty regarding Company's ability to continue operating solvency, we do not believe it is appropriate at this time to modify the financial statements to reflect adjustments that might result from the outcome of such uncertainty. Our financial projections, as well as certain tax planning strategies, which we believe are prudent and feasible and if necessary would be implemented, would allow us to generate sufficient taxable income to recover our recorded deferred tax assets. In recent years, we have been able to fully utilize all of our net operating loss carryfowards. Therefore, as of December 31, 2009, for purposes of MFRS the valuation allowance we have recorded reflects the amount of our deferred tax assets that we do not expect to be able to utilize.

For purposes of U.S. GAAP we evaluated the relevant facts and circumstances regarding the recoverability of our deferred tax assets, which included financial projections approved by our Board of Directors as well as certain tax planning strategies. Additionally, we performed an analysis of our subsidiaries and for those entities with cumulative tax losses over the previous three years (2007−2009) a valuation allowance was recorded. As of December 31, 2009, the valuation allowance recorded at a consolidated level for U.S. GAAP purposes reflects the amount of the Company's deferred tax assets we expect to be able to utilize based on the factors described above.

Beginning in October 2007, based on our financial projections, we are required to determine whether our subsidiaries will essentially incur income tax ("ISR") or the new Business Flat Tax ("IETU") and, accordingly, recognize deferred taxes based on the tax we will pay. Deferred taxes are calculated by applying the corresponding tax rate to the applicable temporary differences resulting from comparing the accounting and tax bases of assets and liabilities and including, if any, future benefits from tax loss carryforwards and certain tax credits.

**New Accounting Pronouncements**

*MFRS*

For a discussion of the new accounting pronouncements under MFRS please refer to Note 22 to our consolidated financial statements.

*U.S. GAAP*

For a discussion of the new accounting pronouncements under U.S. GAAP please refer to Note 25 to our consolidated financial statements.

## RESEARCH AND DEVELOPMENT

Our Flat Glass business unit uses both its own technology, some of which has been patented, and also benefits significantly from the technology and technical information acquired from certain of our partners through technology licensing arrangements with them, which have since expired. In particular, the expired technology license agreement with Pilkington provided us with state−of−the−art float glass technology. We have negotiated an extended patent license for the remaining life of the patents we use from Pilkington. As we notified Pilkington in September 2005, the Automotive Technical Assistance Agreement was terminated effective as of September 2006.

Our Glass Containers business unit also uses both its own technology, some of which has been patented, and also technology provided by Owens−Illinois pursuant to a series of technical assistance agreements, which have since expired. These technical assistance agreements were effective from 1964 to September 1999. Under the terms of these technical assistance agreements, we continue to have the right to free use of the technology provided to us by Owens−Illinois during the effective period of these agreements. We have an extended patent license for the remaining life of the patents we use from Owens. However, we do not currently have any rights to the technology developed by Owens−Illinois after September 1999.

We own a number of trademarks and patents which, in the aggregate, are important to the conduct of our business. Except for our "Vitro" trademark, none of these trademarks and patents is individually material to our business as a whole.

One of our subsidiaries conducted a portion of its business through partnership or technology alliances with non−Mexican partners, which also licensed technology, trademarks and trade names to our subsidiaries for use in the manufacture and sale of various flat glass products, under the belief that these partnership, alliances and license arrangements could provide us with important competitive advantages. However, such alliance terminated in July 2007 and we cannot be certain that these ex−partners will not choose to conduct business directly in Mexico because of the termination of their relationship with us. In addition, there can be no assurance that we will be successful in renewing any partnership, technical assistance, license or other agreements or arrangements upon their expiration, in renewing these agreements on terms as favorable as the present ones, in forming similar alliances with other partners or in developing equivalent technologies independently. See "Item 4. Information on the Company—Business—Our Operating Business Units."

From the beginning of 2009, each business unit is responsible for the research and development activities, which allows us to reduce expenses related to their activities.

We did not have any material expenditures related to research activities for the last three years and do not expect to incur any material expenditures in the near future.

**Item 6.    Directors, Senior Management and Employees**
**DIRECTORS AND SENIOR MANAGEMENT**

Unless the context otherwise requires, in the sections entitled "Directors and Senior Management," "Board Practices" and "Share of Ownership" of this Item 6, the words "we," "us," "our" and "ours" refer to Vitro, S.A.B. de C.V. and not its consolidated subsidiaries.

**Directors**

The following information relates to our directors (*consejeros*). There are no arrangements or understandings with major shareholders, customers, suppliers or others pursuant to which any of them was elected as a director.

Our Board of Directors is responsible for the management of our business. Our | provide that our Board of Directors will consist of the number of directors determined by our shareholders at the annual general ordinary shareholders' meeting, up to a maximum of 21 members, and that each member of our Board of Directors shall be elected at such shareholders' meeting for a renewable term of one year. Each director shall serve until his or her successor is duly elected and takes office. At our general ordinary shareholders' meeting held on April 29, 2010, our shareholders resolved that our Board of Directors would consist of 13 directors. We have no alternate directors.

A list of our current directors, their principal occupations and directorships, the year they first became a director and the year of their birth are set forth below.

| Name | Principal Occupation | First Became a Director | Year of Birth |
|---|---|---|---|
| Adrián Sada González | Chairman of the Board of Directors of Vitro, S.A.B. de C.V. | 1984 | 1944 |
| Hugo A. Lara García | Chief Executive Officer of Vitro S.A.B. de C.V. | 2009 | 1965 |
| Tomás González Sada | Chairman of the Board, President and Chief Executive Officer of Cydsa, S.A.B. de C.V. | 1980 | 1943 |
| Andrés Yarte Cantú | Chairman of the Board of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V. and K Inver, S.A. de C.V. | 1991 | 1941 |
| Federico Sada Melo | International Commercial Manager of the Flat Glass Business Unit | 2009 | 1979 |
| Jaime Serra Puche* | President of SAI−Consultores, S.C. | 1998 | 1951 |
| Joaquín Vargas Guajardo* | Chairman of the Board of Directors of Grupo MVS Comunicaciones, S.A. de C.V. | 2000 | 1954 |
| Jaime Rico Garza | President and Chief Executive Officer of Vitro Europa, Ltd. | 2008 | 1957 |
| Manuel Güemez de la Vega* | Chairman of the Board of Regio Empresas S.A. de C.V. and Grupo PREZ | 2006 | 1942 |
| Ricardo Martin Bringas* | Chief Executive Officer and Vice−Chairman of Organización Soriana, S.A.B. de C.V. | 2007 | 1960 |
| Mario Martín Laborín Gómez* | Chief Executive Officer of ABC Holding | 2010 | 1952 |
| Guillermo Ortiz Martínez* | Presiden of Guillermo Ortiz y Asociados, S.C. | 2010 | 1948 |
| Adrián G. Sada Cueva | Vice President of Administration and Finance of Vitro Glass Containers Business Unit | 2010 | 1975 |

\*    Independent non−management directors.

Mexican securities law requires that at least 25% of the members of the Board of Directors be independent. Vitro's Board of Directors is comprised of approximately 38% independent directors as of April 29, 2010. The directors receive directors' fees of two *Centenarios*, which are 37.5−gram gold coins, or its equivalent monetary value, per each meeting of our Board of Directors they attend and two *Centenarios*, or its equivalent monetary value, per each meeting of a committee of our Board of Directors they attend, except for the members of the Audit Committee who receive three *Centenarios*, or its equivalent monetary value, per each meeting of such committee they attend plus a monthly fee of Ps. 20,000.

The following are brief descriptions of the current occupations and biographical information of each of our directors:

***Adrián Sada González, Chairman of the Board of Directors of Vitro:***

Mr. Sada is a member of the Boards of Directors of Alfa, S.A.B. de C.V., Gruma, S.A.B. de C.V., Cydsa, S.A.B. de C.V., Regio Empresas, S.A. de C.V., the Latin American Executive Board for the Wharton School of Finance, the Mexican Businessmen Council and the Consejo de Industriales de Nuevo León. Mr. Sada is also President of our Finance and Planning Committee.

***Hugo A. Lara García, Chief Executive Officer of Vitro S.A.B. de C.V.:***

In 1987, Mr. Lara joined Christianson Group, where he held several positions such as National Sales Manager, Account Manager, Research and Development Quality Assurance. In 1992, he joined Ceras Johnson, S.A. de C.V., where he held several positions such as Account Manager, Business Development Manager of Latin America and Group Manager. In 1999, Mr. Lara was appointed as Sales Manager and General Manager at Parmalat de México, S.A. de C.V. Mr. Lara joined us in 2004 as the Glass Containers business unit's Commercial Vice President and Vidrio y Cristal's Vice President. In 2006, he was appointed President of the Flat Glass business unit and in November 2008 he was appointed Chief Executive Officer.

***Federico Sada Melo, International Commercial Manager of Flat Glass Business Unit:***

Mr. Sada is member of the Board of Directors of Chipinque Ecological Park, Pronatura, Pro−Nature Conservation Association. Mr. Sada is also Board member of Instituto de Empresa Alumni.

***Tomás González Sada, Chairman of the Board, President and Chief Executive Officer of Cydsa, S.A.B. de C.V.:***

Mr. González is the Vice−President of the Mexican Institute of Competitiveness, the Treasurer of the Fundación Martínez Sada, a member of the Boards of Directors of Regio Empresas, S.A. de C.V. and the Mexican Businessmen Council, member of the Board of Trustees of the Universidad Regiomontana and Honorary Consul−General of Japan in Monterrey, Mexico.

***Andrés Yarte Cantú, Chairman of the Boards of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V., and K Inver,S.A. de C.V.:***

Mr. Yarte is Chairman of the Boards of Directors and Chief Executive Officer of Empresas Yarte, S.A. de C.V., and K−Inver, S.A. de C.V.

***Jaime Serra Puche, President, SAI−Consultores, S.C.:***

Mr. Serra is President of SAI−Consultores, S.C.; founder of Aklara (Electronic auctions), Centro de Arbitraje de Mexico (CAM), and Mexico NAFTA Fund (Private Capital Fund); Member of the Boards of Chiquita Brands International, Fondo México, Tenaris and Grupo Modelo; Mexico's Secretary of Finance and Public Credit (1994), Secretary of Trade and Industry (1988−1994), and Undersecretary of Revenue in the Ministry of Finance (1986−1988); Member of Trustees of the Yale University (1994−2001); Co−chair of the President's Council on International Activities of Yale University; and Member of the Trilateral Commission and the US−Mexico Bilateral Council.

73

***Joaquín Vargas Guajardo, Chairman of the Board of Directors of Grupo MVS Comunicaciones, S.A. de C.V.:***

      Mr. Vargas is a member of the Boards of Bolsa Mexicana de Valores; Grupo Costamex, S.A. de C.V.; Grupo Financiero Santander; Grupo Posadas and Médica Sur; and is a member of the Mexican Businessman Council. Mr.Vargas is also President of our Audit Committee.

***Jaime Rico, President and Chief Executive Officer of Vitro Europa, Ltd.:***

      Mr. Rico has been Chairman of the Board of IP Vidrio y Cristal, Ltd. and Vitro Global, Ltd. and member of the Board of Directors of Vitro Cristalglass, S.L. Mr. Rico is the President and CEO of Vitro Europa, Ltd.

***Manuel Güemez de la Vega, Chairman of the Board of Regio Empresas and Grupo PREZ:***

      Mr. Güemez is Chairman of the Boards of Regio Empresas, S.A. de C.V. and Grupo PREZ and member of the Advisory Committee of Grupo de Seguridad Integral and alternate director of Gruma. Mr. Güemez is also President of our Corporate Practices Committee.

***Ricardo Martín Bringas, Chief Executive Officer and Vice−Chairman of Organización Soriana, S.A.B. de C.V.:***

      Mr. Martin has held executive positions in the management and finance departments of several companies, such as Organización Soriana, S.A.B. de C.V., La Ciudad de París and Restaurantes Martin's. Mr. Martin is currently the Chief Executive Officer and Vice−Chairman of Organización Soriana and member of the Boards of Directors of HSBC México, S.A. de C.V., Grupo Financiero Banamex, S.A. de C.V., Grupo Financiero Banorte, S.A. de C.V., Banco Mercantil del Norte, S.A. de C.V., Asociación Nacional de Tiendas de Autoservicio y Departamentales (ANTAD), Instituto Tecnológico y de Estudios Superiores de Monterrey, Consejo Mexicano de Hombres de Negocios, Grupo de Empresarios de Nuevo León and Teléfonos de México, S.A.B. de C.V.

***Mario Martín Laborín Gómez, Chief Executive Officer of ABC Holding:***

      Mr. Laborín has been Corporate and Treasury Director of Grupo Visa (FEMSA); Co−Founder and CEO of Grupo Vector; CEO of BBVA Bancomer and Chairman of its brokerage firm; CEO of Nacional Financiera S.N.C.; and CEO of Banco Nacional de Comercio Exterior (Bancomext). Mr. Laborín is currently CEO of ABC Holdings and member of the Boards of TV Azteca, Cervecería Cuauhtémoc, Transportación Marítima Mexicana, Bancomer, Bolsa Mexicana de Valores, Mexder, Indeval, Xignux, Megacable, Cydsa and Gruma.

***Guillermo Ortiz Martínez, President of Guillermo Ortiz y Asociados, S.C.:***

      Mr. Ortiz was Governor of the Bank of Mexico from December 1994 to December 2009. Mr. Ortiz served as Secretary of Finance and Public Credit in the Mexican Federal Government from 1988 to 1994; Executive Director at the International Monetary Fund (1984−1988); and Manager as well as Deputy Manager in the Economic Research Department of the Bank of Mexico (1977−1984).

***Adrián G. Sada Cueva, Vice President of Administration and Finance of Glass Containers business:***

      Mr. Sada is a member of the Board of Coparmex Nuevo León, Consejo Ejecutivo de la Universidad de Monterrey, Empresas Comegua, S.A., Pronatura Noreste, Organización de Vida Silvestre, A.C. and Club Deportivo Cazadores Monterrey, A.C. He has served as President of Vitro Automotriz, S.A. de C.V. (2006−2008) and President of Vitro Cristalglass, S.L. (2003−2005).

**Secretary and Surveillance**

      On April 29, 2010, our shareholders at the General Ordinary Shareholders' Meeting reelected our Executive Vice President and General Counsel Alejandro Sánchez Mújica as the Secretary of our Board of Directors. According to the *Ley del Mercado de Valores* or Mexican Securities Market Law, our Secretary is not a member of the Board of Directors.

      The Board of Directors, through the Audit and Corporate Practices Committees as well as the external auditor, conducts surveillance of Vitro and of the subsidiaries controlled by Vitro, taking into consideration the financial, administrative and legal circumstances of each entity.

**Senior Management**

The following table sets forth certain information with respect to our senior managers (*directores generales*). There are no arrangements or understandings with major shareholders, customers, suppliers or others pursuant to which any of them was selected as a member of the senior management.

| Name | Title | Current Position Held Since | Year of Birth |
|------|-------|-----------------------------|---------------|
| Hugo A. Lara García | Chief Executive Officer | 2008 | 1965 |
| Alejandro Sánchez Mújica | Executive Vice President and General Counsel | 2005 | 1954 |
| Claudio Del Valle Cabello | Chief Financial and Administrative Officer and Chief Restructuring Officer | 2003 | 1960 |
| Alfonso Gómez Palacio | President of the Glass Containers Business Unit | 2009 | 1942 |
| David González Morales | President of the Flat Glass Business Unit | 2009 | 1955 |

The following are brief biographies of each of our senior managers:

***Hugo Lara García, President and Chief Executive Officer***

Mr. Lara received a Bachelor in Chemical Engineering at La Salle University in Mexico City. Later, Mr. Lara received a Master in Business Administration, an International Business Diploma and a Master in International Business at the ITESM, Campus Estado de México. In 1987, Mr. Lara joined Christianson Group, where he held several positions such as National Sales Manager, Account Manager, Research and Development Quality Assurance. In 1992, he joined Ceras Johnson, S.A. de C.V., where he held several positions such as Account Manager, Business Development Manager of Latin America and Group Manager. In 1999, Mr. Lara was appointed as Sales Manager and General Manager at Parmalat de México, S.A. de C.V. Mr. Lara joined us in 2004 as Glass Containers business unit's Commercial Vice President and Vidrio y Cristal's Vice President; in 2006 was appointed President of the Flat Glass business unit; and in November 2008 he was appointed Chief Executive Officer.

***Alejandro Sánchez Mújica, Executive Vice President and General Counsel:***

Mr. Sánchez earned a law degree from the Escuela Libre de Derecho in Mexico City, where he graduated in 1978. In addition, he earned a Master of Comparative Jurisprudence degree from The University of Texas at Austin, School of Law in 1979 and a Master of Arts (Economics and Administration) also from the University of Texas at Austin in 1980. In 1983, he joined the Secretaría de Programación y Presupuesto, as advisor to the Undersecretary of Regional Development. In 1983, Mr. Sánchez also joined the Instituto para el Depósito de Valores ("INDEVAL") as Legal Manager. In 1985 he joined DESC, Sociedad de Fomento Industrial (currently known as Grupo KUO, S.A.B. de C.V.), as Legal Manager of Industrias Negromex, S.A. de C.V. and later of Novum, S.A. de C.V., afterward becoming Executive Legal Director. In 1992, he became the Corporate Legal Director of Pulsar Internacional, S.A. de C.V. In 2003 he joined the law firm of Thompson & Knight, where he was made Senior Partner. In 2005, Mr. Sánchez joined us as our Executive Legal Vice−President and General Counsel.

Mr. Sánchez Mújica is member of several Mexican and foreign corporations, such as of the Advisory Board Member of the University of Texas Lady Bird Johnson Wildflower Center and of the Fundación Pro Museo Nacional de Historia, is Secretary of the board of Trustees of Chipinque Ecological Park and is a member of the board of Cámara de la Industria de Transformación de Nuevo León (CAINTRA).

***Claudio Del Valle Cabello, Chief Financial and Administrative Officer and Chief Restructuring Officer:***

Mr. Del Valle earned a Bachelor in Public Accounting at the Universidad Regiomontana in Monterrey, Mexico. In 1978, Mr. Del Valle began working for Gómez Morfín Meljem and Asoc. (now Galaz, Yamazaki, Ruiz Urquiza S.C., Member of Deloitte Touche Tohmatsu) as a Junior Auditor and later became Senior Supervisor. In 1985, Mr. Del Valle joined us as Chief of Special Studies for our former raw materials business. In 1986, he became our Tax Consolidation Manager. In 1992, Mr. Del Valle was appointed Vice President for Administration of Vitro Corporativo, S.A. de C.V. and in 1995 was appointed Vice President of Finance and Controller of Anchor Glass Container Corp. In 1996, Mr. Del Valle was appointed our Vice President of Treasury and Administration. In 2002, Mr. Del Valle was appointed our Chief Financial Officer and, in August 2003, he was named our Chief Administrative Officer. In November 2008, the Finance and Administrative areas were merged and put under charge of Mr. Del Valle who, to focus the efforts necessary to carry out the financial restructuring process required by the Company, since April 2009, was also designated Chief Restructuring Officer on a temporary basis.

Mr. Del Valle is a member of the Accounting Institute of the State of Nuevo León, Mexico. Also, in 2001 Mr. Del Valle was appointed Vice President of the Tax Committee of the Mexican Stock Exchange. Mr. Del Valle was the President of the Issuers' Committee of the Mexican Stock Exchange and as of today acts as Vice President Tax of the Issuers' Committee of the Mexican Stock Exchange and is currently a member of the Board of Directors of Universidad Regiomontana and Gas Industrial de Monterrey.

***Alfonso Gómez Palacio, President of the Glass Containers Business Unit:***

Mr. Gómez Palacio received a Bachelor and Master in Business Administration at the University of California at Berkeley. Later, Mr. Gómez Palacio received a degree in Advanced Studies in Business Administration and Commerce at the University of Bordeaux in France. He was appointed Commercial Vice President of the Glass Containers business unit in 1985 and Executive Vice President of the same business unit in 1992. Mr. Gómez Palacio was appointed Vice President of Marketing and Sales of the Glass Containers business unit in October 2002 and, in May 2003, he was appointed President of the Glass Containers business unit.

On October 2006, Mr. Gómez Palacio announced his plan to retire on June 30, 2007. Mr. Gómez Palacio came back from his retirement to lead our Glass Containers business unit during the Company's restructuring process from June 2009.

***David González Morales, President of the Flat Glass Business Unit:***

Mr. González received a Bachelor degree in Economics at the Universidad de Monterrey. Later, Mr. González received a Master degree in Science at the University of Missouri. In 1976 Mr. González joined Grupo Alfa, S.A.B. de C.V., as an Economics Analyst. Mr. González joined us in 1980 as Chief of Industrial Economics for our Glass Containers business unit and then held different managerial positions such as Price Manager, Administration Manager, North Zone Sales Manager, Strategic and Economics Planning Manager, and Business Development Manager. In 1994, he was appointed Vice President of Development Administration for our former Diverse Industries business and in 1999 was appointed as Vice President of Enbosa, S.A. de C.V. In 2002, he was appointed as International Vice President for our Glass Containers business unit. In 2003, Mr. González was appointed as Vice President of our Value Added Business and then in 2004 as President of Vitro Cristalglass, both of which are part of our Flat Glass business unit. In 2006, he was appointed Co−President of Glass Containers business unit and, in 2007, subsequent to Mr. Alfonso Gómez Palacios's retirement, he was appointed President of the Glass Containers business unit. On June 26, 2009, Mr. González was appointed as Flat Glass President.

**Family Relationship of Directors and Senior Management**

Six of our 17 directors and senior managers are related by blood (including first cousins) or marriage to another member of this same group. Mr. Adrián Sada González is father of Mr. Adrián Sada Cueva, a cousin of Mr. Tomás González Sada and a uncle of Mr. Federico Sada Melo. Mr. Andrés Yarte Cantú is Mr. Adrián Sada González brother−in−law, as well as a cousin by marriage of Mr. Tomás González Sada and uncle−in−law of Mr. Federico Sada Melo and Mr. Adrián Sada Cueva. Mr. Jaime Rico Garza is a nephew−in−law of Mr. Adrián Sada González.

**Use of Certain Assets and Services**

Certain of our directors and senior managers received personal services performed by certain of our personnel, mainly security services in Mexico, a number of whom are exclusively dedicated to performing such services. The receipt of such services was done in accordance with our *Política de Uso Especial de Servicios Corporativos y de Seguridad*, our corporate and security services policy, approved by our Board of Directors with the prior favorable opinions of the Audit Committee and of the Corporate Practices Committee. The aggregate amount of compensation set forth in "Item 6. Directors, Senior Management and Employees—Directors and Senior Managements—Compensation" includes the cost of granting the use of assets and providing such services.

76

**Compensation**

For the year ended December 31, 2009, the aggregate compensation we paid to our directors and senior managers was approximately Ps. 229 million ($17.5 million). This amount includes directors' fees, salaries, the use of certain assets and services, as described above, and variable compensation.

During 2009, we accrued amounts relating to pension and retirement benefits for our senior managers. Our independent directors were not entitled to pension or retirement benefits from us during 2009. In accordance with actuarial practices in Mexico, reserves for seniority premiums and pensions are determined in the aggregate for each one of our subsidiaries using average amounts for variables such as turnover, age and life expectancy. We therefore cannot determine the amount reserved for pension or retirement benefits for any individual employee, including our senior managers. The aggregate amount of compensation set forth in the previous paragraph does not include the cost of pension and retirement benefits for our senior managers. See "Item 6. Directors, Senior Management and Employees—Directors and Senior Management—Compensation—Pension Benefits."

***Directors' Compensation***

Pursuant to the Mexican General Law of Corporations, our shareholders, at our annual general ordinary shareholders' meeting held on April 29, 2010, agreed to compensate our directors with two Centenarios, or its equivalent monetary value, per each meeting of the Board of Directors they attend. Likewise, at such annual general ordinary shareholders' meeting, the shareholders resolved that the members of each of our Board of Director's committees, other than the Audit Committee's members, shall receive two Centenarios, or its equivalent monetary value, per each committee meeting they attend. In consideration of the Audit Committee's members' expanded responsibilities they receive three Centenarios, or its equivalent monetary value, per each meeting they attend plus a monthly fee of Ps. 20,000. The aggregate amount of compensation set forth in "Item 6. Directors, Senior Management and Employees—Directors and Senior Management— Compensation" includes fees paid to our directors.

***Variable Compensation***

In 2005, we modified our variable compensation plan established in 2001 in order to standardize and integrate our foreign subsidiaries to this scheme. This plan aligns the objectives of our employees with our business strategy and its purpose is to: (i) recognize the extraordinary performance of our employees, (ii) align the interests and incentives of our employees with those of the Company, (iii) focus on key priorities and (iv) attract and retain talented employees. This plan is based on the improvement of (i) cash flow from operations, (ii) compliance with the capital expenditures budget and (iii) individual performance. Depending on the results of such metrics, our employees are eligible to receive a bonus equal to an amount ranging between 1.2 and 6.0 times their monthly base salary. For the year ended December 31, 2009, we paid Ps. 82.6 million ($6.3 million) under our variable compensation plan mentioned above.

In 2006, we created a long term incentive plan for certain key executives. This plan aligns the objectives of our key executives with our business strategy and its purpose is to: (i) achieve financial value for the medium and long term, (ii) achieve a sustainable yield, (iii) focus on Vitro's results, (iv) complement our executive's compensation and (v) attract and retain talented employees. This plan is based on the improvement of economic value added of the Company (an internal performance measure). For the year ended December 31, 2009, we did not pay any amount under our long term variable compensation plan.

***Employee Stock Option Plan***

We maintain an Employee Stock Option Plan established in March 1998 (the "Plan"). The Plan specifies the amount of shares, time and initial exercise price, which is equal to the average closing price on the BMV of the common shares on the 20 days prior to the grant date, except for options issued during 2000, 2001 and 2002, which were Ps. 11.00, Ps. 8.27 and Ps. 7.53, respectively. The vesting period of the options is 5 years and the life of such options is 10 years.

We have not granted any stock options since 2002. Please refer to Note 14 of our Consolidated Financial Statements.

The following table sets forth, for each of the periods presented, the number of options granted during such period and certain other information, as of December 31, 2009.

| | | | | For the year ended December 31, | | | | |
|---|---|---|---|---|---|---|---|---|
| | **1998** | **1999** | **2000\*\*** | **2001** | **1998\*** | **2002** | | **Total outstanding** |
| Options granted | 2,813,300 | 2,893,000 | 4,851,900 | 3,204,800 | 940,950 | 3,941,950 | | |
| Options cancelled, expired or exercised at December 31, 2009 | 2,813,300 | 2,893,000 | 3,986,950 | 2,827,950 | 478,050 | 3,208,150 | | |
| Options outstanding December 31, 2009 | | | 864,950 | 376,850 | 462,900 | 733,800 | | 2,438,500 |
| Exercise Price | | | Ps. 11.00 | Ps. 8.27 | Ps. 13.00 | Ps. 7.53 | | |

\* During the year ended in 2001, we modified the price of 940,950 options granted in 1998 and extended their maturity date to 2011.

\*\* The options granted in 2000 expired on March 2010.

Compensation cost charged against income for the Plan was Ps. 1 million, for each of 2007, 2008 and 2009. The aggregate amount of compensation set forth in "Item 6. Directors, Senior Management and Employees—Directors and Senior Management—Compensation" includes fees paid to our directors and does not include the cost of the grant of options under the Plan.

### Pension Benefits

Our pension benefit obligations and the related costs are calculated using actuarial models and assumptions applicable in the countries where the plans are located, principally in the United States and Mexico. Two critical assumptions, discount rate and expected return on assets, are important elements of plan expense and/or liability measurement. We evaluate these critical assumptions at least annually. Other assumptions involve demographic factors such as retirement, mortality and turnover rates, as well as the rate of increases in compensation. These assumptions are evaluated periodically and are updated to reflect our experience. Actual results in any given year will often differ from actuarial assumptions because of economic and other factors. The discount rate enables us to state expected future cash flows at a present value on the measurement date. We have little latitude in selecting this rate since it is determined jointly between us and the pension plan's actuary and is required to represent the market rate for high–quality fixed income investments. A lower discount rate increases the present value of benefit obligations and increases pension expense. To determine the expected long–term rate of return on pension plan assets, we consider the current and expected asset allocations, as well as historical and expected returns on various categories of plan assets. With respect to the pension plans in the United States, as of December 31, 2009, the assets set aside to satisfy the estimated obligations under such pension plans were sufficient to meet the estimated obligations as they come due. With respect to the pension plans in Mexico, as of December 31, 2009, the assets set aside to satisfy the estimated obligations under such pension plans were Ps. 1,140 million while the related estimated obligations were Ps. 3,052 million. Our aggregate pension expense in 2009 was approximately Ps. 445 million. Further information on our principal pension plans, including changes in related accounting and financial reporting standards and policies, the assumptions used in calculating the referenced obligations, is provided in Notes 3, 11 and 25 to our consolidated financial statements for the years ended December 31, 2007, 2008 and 2009.

As of December 31, 2009, the assets of our pension plans include 53,341,849 Vitro shares. See "Item 7. Major Shareholders and Related Party Transactions—Major Shareholders."

### Severance Benefits

All of our senior managers, executives who are members of the Board of Directors and children of senior managers working for Vitro, are entitled to a severance payment net of taxes equal to up to three times of their gross annual base salary, if they cease to be employed by us in connection with a change of control of Vitro, S.A.B. de C.V. This severance benefit is in addition to any severance payment due to such persons under Mexican law.

## BOARD PRACTICES

According to our by−laws, our shareholders determine the number of directors that will constitute our Board of Directors at a general ordinary shareholders meeting. Our Board of Directors may consist of up to a maximum of 21 members and each member of our Board of Directors is elected at a general ordinary shareholders' meeting for a renewable term of one year. If at the end of the one−year term of office any of our directors is not reelected at a general ordinary shareholders' meeting or if a director resigns and there is no designation of a substitute director or the substitute director has not taken office, then such director will continue to serve for a maximum term of up to 30 calendar days. Thereafter, the Board of Directors may appoint provisional directors who will be ratified or substituted at the next general ordinary shareholders' meeting. At the general ordinary shareholders meeting held on April 29, 2009, our shareholders resolved that our Board of Directors would consist of 13 directors, 6 of whom are independent directors, which means that 46% of our directors are independent, notwithstanding that the Mexican Law of the Securities Market only requires that a minimum of 25% of directors must be independent. We have no alternate directors. We have not entered into a service contract with any of our directors to provide benefits to such director upon expiration of such director's term of office.

Pursuant to our by−laws, our Board of Directors must meet at least four times per calendar year and must dedicate one such meeting to the analysis of our medium− and long−term strategies. Board meetings usually take place at our principal executive offices however, Board meetings may be held anywhere within or outside of Mexico. For a quorum to exist at a Board meeting, a majority of the directors must be in attendance. The affirmative vote of a majority of the directors present at a duly called Board meeting is required for the adoption of any resolution. Minutes must be prepared after every Board meeting to reflect the resolutions adopted and any relevant discussions that took place. Such minutes must be signed by the Chairman and the Secretary of the Board. Resolutions adopted at Board meetings not conducted in person have the same force and effect as those adopted at Board meetings conducted in person as long as such resolutions are unanimously adopted and confirmed in writing.

Our Board of Directors is authorized to create as many committees as it deems appropriate for the discharge of its duties, in addition to the Corporate Practices Committee and the Audit Committee. To that effect, the Board of Directors has also constituted the Finance and Planning Committee, notwithstanding that this is not a Mexican or a US requirement for foreign issuers. On April 27, 2007 the Board of Directors enacted the charters for each of these Committees, all of which took effect on May 1, 2007.

The Corporate Practices Committee and the Audit Committee must be comprised in their entirety by independent directors proposed by the Chairman of the Board and elected by the Board of Directors, whereas the Finance and Planning Committee may be comprised of any directors that the Board of Directors freely determines. The committees meet as often as necessary, but at least 2 to 4 times a year and must provide a report of their activities and findings to our Board of Directors either upon the Board's request or at any time the committee deems appropriate, in addition to the annual report of activities of each committee that must be submitted to the Board of Directors, which is subsequently presented to the general ordinary shareholders meeting that reviews the results at the end of every fiscal year. According to their charters, the Committees should also duly and timely inform to the Board of Directors, no later than on the following Board of Directors meeting, regarding the unanimous resolutions adopted by such Committees

Consistent with our corporate by−laws, the Mexican Law of the Securities Market and the board and governance practices mandated by the Sarbanes−Oxley Act of 2002, we have established an Audit Committee that is exclusively comprised of members of our Board of Directors who are deem to be independent (as such term is defined under the Mexican Law of the Securities Market, as well as the U.S. federal securities laws and the applicable rules and regulations thereunder and the corporate governance rules of the NYSE). The independent qualification is determined at our Shareholders Meeting and may be questioned within the next 30 days by the *CNBV*. Our Audit Committee is responsible for among other matters, verifying that our management is in compliance with its obligations regarding internal controls and the preparation of financial statements. In addition, our Audit Committee is responsible for the appointment, compensation and oversight of our independent external auditors. Our Audit Committee meets regularly with our management and our independent external auditors.

The members of our Audit Committee are Messrs. Jaime Serra Puche, Joaquín Vargas and Manuel Güemez de la Vega. Mr. Joaquín Vargas is the President of our Audit Committee. Although none of the members of our audit committee qualifies as an "audit committee financial expert", as such term is defined under Item 401(e) of Regulation S−K, the Audit Committee and its members are in compliance with Mexico's rules and practice for this type of committee, which includes, among other requirements knowledge of accounting standards, the ability to evaluate the application of such accounting standards, knowledge and experience in the preparation, audit, evaluation, and/or analysis of financial statements and knowledge of the internal controls involved in the preparation of financial reports.

The charter of the Audit Committee provides that: (i) the members of the committee (except for its president) must be elected by our Board of Directors, as proposed by the Chairman of the Board of Directors, (ii) the committee must be comprised of at least three independent directors, (iii) the president of the committee must be appointed and can only be removed by shareholders' resolution at a general shareholders meeting, (iv) any two members of the committee may call a meeting through written notice given to the other members of the committee at least five days before such meeting, (v) the committee must meet at least three times per year, (vi) the committee must provide an annual report on its activities to our Board of Directors and to the general ordinary shareholders meeting that reviews the results at the end of every fiscal year, (vii) the attendance of at least a majority of the committee's members is required to constitute a quorum and resolutions shall be adopted by the vote of at least the majority of committee members present at the relevant meeting at which a quorum exists, (viii) resolutions may be adopted without a meeting, provided such resolutions are approved unanimously and confirmed in writing and (ix) the committee must perform such duties as required by law and by our Board of Directors. The charter also provides that the Audit Committee must verify that external audit duties are duly performed and must confirm our compliance with all laws and regulations regarding the reliability, sufficiency and transparency of Vitro's financial statements.

Our Audit Committee has the authority to, among other things: (i) give opinions to the Board of Directors on the following matters, in addition to any other matters the Audit Committee is required to review pursuant to the Mexican Law of Securities Market or which the Board of Directors from time to time may request: a) unusual or sporadic transactions or transactions exceeding certain amounts specified by law, b) guidelines regarding the internal control and internal audit functions of Vitro and the companies controlled by Vitro, c) accounting policies of Vitro, to assure conformity with the accounting standards issued or recognized by the CNBV, through its general dispositions, d) Vitro's financial statements and e) engagement of Vitro's external auditor and additional or supplemental related services; (ii) evaluate the performance of the external auditor and analyze opinions (including opinion regarding the sufficiency on our internal control), or reports prepared and issued by the external auditor and supervise the outcome of the disagreements, if any, between Vitro's administration and the external auditor; (iii) discuss Vitro's financial statements with those responsible for preparing or reviewing the financial statements and advise the Board of Directors on its approval, as well as analyze the financial information that is annually rendered to the SEC in the annual report on Form 20−F; (iv) inform the Board of Directors of the status of Vitro's internal control and internal audit system, and that of the companies controlled by Vitro, including the identification of irregularities, if any; (v) draft the opinion that the Board of Directors renders regarding the Chief Executive Officer's annual report and submit it to the consideration of the Board of Directors for its subsequent presentation to the shareholders meeting, based upon, among other elements, in the opinion of the external auditor; (vi) support the Board of Directors in the preparation of the reports referred to in the Article 28, section IV, paragraphs d) and e) of the Mexican Law of the Securities Market; (vii) supervise the operations referred to in articles 28, section III, and 47 of the Mexican Law of the Securities Market; (viii) request the opinion of independent experts in the cases it deems convenient, or when required pursuant to the Mexican Law of the Securities Market; (ix) request from management and employees of Vitro and of the companies controlled by Vitro, reports regarding the preparation of financial statements or any other as it deems necessary for the fulfillment of its functions; (x) investigate any potential violation that comes to its knowledge on the operations, guidelines and operational policies, internal controls, internal audit and accounting records of Vitro or the companies controlled by Vitro; (xi) receive comments from shareholders, directors, management, employees and in general by any third party regarding the subject matters referred to in (x) above, as well as take the actions that it deems necessary regarding those comments; (xii) supervise that procedures are adequate to receive, process and resolve complaints regarding accounting, internal control or audit, including proceedings for confidential and anonymous complaints of employees; (xiii) report to the Board of Directors any relevant irregularity detected in the course of the fulfillment of its functions and, in its case, the corrective measures or, proposed measures which must be applied; (xiv) call shareholders meetings and request agenda items to be analyzed by the same, as it deems necessary; (xv) supervise that the Chief Executive Officer executes the resolutions adopted by the shareholders and the Board of Directors at their respective meetings; (xvi) supervise the mechanisms and internal controls that allow the verification of the acts and operations of Vitro and of the companies controlled by Vitro to ensure compliance with applicable law, as well as apply methodologies that allow supervision of such compliance; (xvii) follow up on relevant risks that Vitro and the companies controlled by Vitro are exposed to, based upon information provided to it by the Corporate Practices Committee, the Finance and Planning Committee and any additional committees that may be created by the Board of Directors, the Chief Executive Officer and Vitro's external auditor, as well as to the accounting systems, internal control and internal audit, registry, archive or information of the above; and (xviii) verify that each of the members of the Audit Committee complies at all times with the requirements for director independence.

Our Finance and Planning Committee is currently formed by ten members of the Board: Messrs. Adrián Sada González, Jaime Serra Puche, Guillermo Ortiz Martínez, Mario Laborín Gómez, Tomás González Sada, Hugo Alejandro Lara García, Jaime Rico Garza, Adrián Sada Cueva, Federico Sada Melo y Andrés Yarte Cantú. Mr. Adrián Sada González is the President of our Finance and Planning Committee. Not all of the members of this Committee are "independent directors". The Finance and Planning Committee in accordance with its charter has to perform the following activities: (i) opine on the annual budget and follow up on the compliance of Vitro's budget and its control system; (ii) analyze and suggest the guidelines for Vitro's Strategic Plan and follow up on such Plan; (iii) analyze periodically the results of the investments made on projects previously approved by the Board of Directors or the Finance and Planning Committee, comparing their return against budgeted returns previously submitted; (iv) evaluate and comment on the investment and financing policies and support the Board of Directors in the supervision of compliance with such policies and in the review of financial projections; (v) evaluate and approve the investment projects that comply with the terms and conditions of the policy in effect either in a general or special meeting; (vi) opine on the hedgings that Vitro would like to acquire, including the terms of such hedgings, with a previous detailed risk analysis; (vii) support the Board in the evaluation of financings, refinancing or financial restructurings, including an analysis of the risk involved in such transactions; and (viii) give an opinion to the Board on any matter requested by it and by the Chief Executive Officer, if and when such matter is not related to an opinion rendered by the Audit Committee or the Corporate Practices Committee, pursuant to the Mexican Securities Law or its regulations.

Pursuant to the Mexican Law of Securities Market, we have established a Corporate Practices Committee. In accordance with its charter, this committee has to perform the following activities: (i) render an opinion to the Board of Directors about the following matters, in addition to any other matters the Corporate Practices Committee is required to review pursuant to the Mexican Law of the Securities Market or which the Board of Directors from time to time may request: a) determine the policies and guidelines for the use of assets owned by Vitro and the companies controlled by Vitro, b) related party transactions with Vitro and the companies controlled by Vitro, except those which do not require the prior approval of the Board of Directors pursuant to policies and guidelines previously approved by the Board of Directors and those established pursuant to the Mexican Law of the Securities Market, c) the appointment, election and dismissal of the Chief Executive Officer and determination of his or her total compensation, as well as the remuneration of the Chairman of the Board of Directors, d) the establishment of policies for the appointment and total compensation of key management (other than the CEO and the Chairman), e) waiver for a Director, manager or an officer, to engage any business opportunity for their own benefit or that of third parties, which involves Vitro or any companies controlled by Vitro or in which Vitro has a substantial influence, when the amount of the business opportunity is greater than 5% (five percent) of the consolidated assets of Vitro, based upon the figures of the immediately preceding quarter, f) mandatory public offerings of securities for percentages below those determined in section III of article 98 of the Mexican Law of the Securities Market, g) the execution of agreements related to mandatory public offerings with negative and affirmative covenants that benefit the issuer of such offer or Vitro, pursuant to article 100 of the Mexican Law of Securities Market, h) failure to execute mandatory public offerings if Vitro's economic viability is at risk pursuant to section III of article 102 of the Mexican Law of the Securities Market, and i) the determination of the tender price for Vitro's shares, due to the cancellation of the registry of Vitro's securities before the National Registry of Securities *(Registro Nacional de Valores)*, ("RNV"), pursuant to article 108 of the Mexican Law of the Securities Market; additionally, in the event the Board of Directors adopts any resolutions regarding any of the foregoing matters that are not in accordance with the opinions rendered by the Corporate Practices Committee, this Committee, through its President, shall instruct the Chief Executive Officer to disclose such circumstances; (ii) support the Board of Directors in the preparation of the annual report, which pursuant to paragraph b), article 172 of the Mexican General Law of Corporations must disclose the main accounting and information policies, their rationale and the criteria used in the preparation of the financial information; (iii) support the Board of Directors in the preparation of the annual report that must be submitted at the general shareholder meeting relating to the operations and activities in which the Board of Directors participated during the corresponding fiscal year; (iv) render an opinion on the annual report prepared by the Board of Directors about the performance of key management; (v) approve the general increases in the wages and salaries of the employees and personnel of

81

Vitro and of the companies controlled by Vitro; (vi) supervise the size and configuration of the Board of Directors to ensure that decision making is effective and in compliance with applicable legal provisions mandating that at least 25% of its members are independent and that its number shall not be greater than 21 members; (vii) supervise the compliance of Vitro's social responsibility policies and the disclosure of such compliance, including endowment policies; (viii) review and approve responses to the Questionnaire Regarding Compliance with Recommendations for Better Corporate Practices and informing the Board of Directors of its timely filing; (ix) supervise the application of Vitro's Code of Ethics and propose any amendments it deems necessary; (x) periodically review Vitro's corporate policies and the charters of the Committees to ensure that all of them are consistent and, if necessary, resolve any matter or conflict or inconsistency between any of them; (xi) support the Board of Directors in the development of policies regarding the distribution and communication of information to shareholders and the public markets, as well as the directors and managers of Vitro, that comply with the Mexican Law of the Securities Market; and (xii) coordinate and supervise, together with the support of the Chief Executive Officer, the training of newly–appointed directors to ensure they are provided with all information regarding the background and operations of Vitro, as well as an understanding of the legal and regulatory framework to which the Directors are subject, with a particular emphasis on his or her fiduciary duties of loyalty, diligence and confidentiality.

The Corporate Practices Committee is currently comprised of three independent directors, Mr. Manuel Güemez de la Vega, who was appointed as President of the Committee in a resolution adopted by our shareholders at the general ordinary shareholders meeting held on April 29, 2010, and Messrs. Ricardo Martín Bringas and Joaquín Vargas Guajardo. Pursuant to the Mexican Law of the Securities Market and our corporate by–laws, this committee must be comprised of at least three independent directors appointed by the Board of Directors, except for its president who can only be appointed and removed by a shareholders' resolution.

82

## EMPLOYEES

As of December 31, 2009, we employed 16,807 personnel, approximately 81% of whom were located in Mexico.

The following table sets forth, for the periods indicated, the period end and average number of employees of each of our two operating business units and our corporate offices.

| Business Unit | 2007 Period End | Average | 2008 Period End | Average | 2009 Period End | Average |
|---|---|---|---|---|---|---|
| Glass Containers | 13,967 | 13,717 | 10,044 | 13,575 | 8,445 | 8,881 |
| Flat Glass | 9,488 | 8,965 | 8,785 | 9,284 | 7,667 | 7,766 |
| Corporate Offices | 987 | 815 | 556 | 624 | 695 | 745 |
| Total | 24,442 | 23,497 | 19,385 | 23,483 | 16,807 | 17,392 |

The following table sets forth, for the periods indicated, our employees by geographic location.

| Business Unit | 2007 Period End | Average | 2008 Period End | Average | 2009 Period End | Average |
|---|---|---|---|---|---|---|
| Mexico | 18,070 | 17,063 | 15,406 | 17,486 | 13,602 | 13,875 |
| United States | 2,632 | 2,676 | 2,436 | 2,530 | 1,878 | 2,115 |
| Rest of the world | 3,740 | 3,758 | 1,543 | 3,468 | 1,327 | 1,402 |
| Total | 24,442 | 23,497 | 19,385 | 23,484 | 16,807 | 17,392 |

**Relation with Labor Unions**

In Mexico, all of our workers (others than our *empleados de confianza*) are currently affiliated with labor unions. Labor relations in each manufacturing facility in Mexico are governed by separate collective bargaining agreements which were entered into between the relevant subsidiary and a union selected by the employees of the relevant facility. The terms of the collective bargaining agreements are renegotiated every two years, except for wages, which are negotiated every year. For over 60 years, we have not experienced any strikes that materially affected our overall operations in Mexico and management believes that it has a good relationship with its employees and the labor unions to which they are affiliated.

In the United States, a majority of our workers are currently affiliated with labor unions. Management believes that it has a good relationship with its employees in the United States and the labor unions to which they are affiliated.

## SHARE OWNERSHIP

The following table sets forth information regarding the beneficial ownership of our shares by each of our directors and senior managers as of October 14, 2010, the date of our most recent general ordinary shareholders' meeting. The voting power exercisable by our directors and senior managers may be greater than the percentage of our shares held by them. See "Item 7. Major Shareholders and Related Party Transactions—Major Shareholders."

| Name | Number of Shares Owned | Percentage of Shares Outstanding (3) | Granted Options (4) | Outstanding Options (4)(5) | Exercise Price on Grant Date | Adjusted Exercise Price | Expiration Date |
|---|---|---|---|---|---|---|---|
| Adrián Sada González | 29,545,712(1)(6) | 7.65% | 90,400 | 90,400 | 13.00 | N/A | March 2011 |
| | | | 550,000 | 137,500 | 8.27 | N/A | March 2011 |
| | | | 550,000 | 275,000 | 7.53 | N/A | March 2012 |
| Hugo A. Lara García | * | * | — | — | — | — | — |
| Tomás González Sada | * | * | — | — | — | — | — |
| Andrés Yarte Cantú | * | * | — | — | — | — | — |
| Federico Sada Melo | 29,212,591(2) | 7.56% | — | — | — | — | — |
| Jaime Serra Puche | * | * | — | — | — | — | — |
| Joaquín Vargas Guajardo | * | * | — | — | — | — | — |
| Jaime Rico Garza | * | * | — | — | — | — | — |
| Manuel Güemez de la Vega | * | * | — | — | — | — | — |
| Ricardo Martin Bringas | * | * | — | — | — | — | — |
| Alejandro Sánchez Mújica | * | * | — | — | — | — | — |
| Claudio Del Valle Cabello | *(6) | * | 15,100 | 15,100 | 13.00 | N/A | March 2011 |
| | | | 59,000 | 14,750 | 8.27 | N/A | March 2011 |
| | | | 60,500 | 30,250 | 7.53 | N/A | March 2012 |
| David González Morales | * | * | — | — | — | — | — |

\* Beneficially owns less than one percent of our shares.

(1) Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son, Mr. Adrián Sada Cueva. Entered into the following agreements: (a) a Shareholders Agreement with Ms. Alejandra Sada González which was effective as of December 11, 2009 (the "2009 Shareholders Agreement"), the main provisions of which set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares; and (b) a Shareholders Agreement with Mr. Alfredo Harp Helú and Ms. Alejandra Sada González which was effective as of April 28, 2010 (the "2010 Shareholders Agreement"), the main provisions of which set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(2) Reported as a group with his parents, Mr. Federico Sada González and Mrs. Liliana Melo de Sada, his brother, Mr. Mauricio Sada Melo, and his sister, Ms. Liliana Sada Melo.

(3) For purposes of calculating percentage of shares outstanding, we use the number of our shares outstanding that was 386,411,643 shares, which is the number equal to our 386,357,143 issued shares minus the shares held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute. See Item 7 "Major Shareholders and Related Party Transactions—Major Shareholders—Shares subject to dispute."

(4) The options listed below are options to purchase our shares.

(5) All the options are exercisable.

(6) In addition to the shares set forth below, Messrs. Adrián Sada González and Claudio Del Valle Cabello may be deemed to be beneficial owners of the 39,777,907 shares held by our Stock Option Trust, as they are members of the Technical Committee of the Stock Option Trust and share the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.
      See "Item 6. Directors, Senior Management and Employees—Directors and Senior Management —Compensation—Employee Stock Option Plan" for a discussion of the only arrangement providing our employees with equity−based compensation.

**Item 7. Major Shareholders and Related Party Transactions**

Unless the context otherwise requires, in the section entitled "Major Shareholders" of this Item 7 the words "we,", "us," "our," and "ours" refer to Vitro, S.A.B. de C.V. and not its consolidated subsidiaries.

## MAJOR SHAREHOLDERS

As of October 14, 2010, the date of our most recent general ordinary shareholders' meeting, 386,857,143 of our shares were issued of which 386,411,643 of our shares were issued and outstanding. See "Item 10. Additional Information—Mexican Corporate Law and By−Laws—Capital Structure." As of such date, 445,500 of our shares were held as treasury stock, 39,777,907 of our shares were held by the Stock Option Trust, and 59,484,349 of our shares were held by the Pension Plan Trust. Under Mexican corporate law, shares held as treasury stock are not considered outstanding. Under Mexican corporate law, our shares held by the Stock Option Trust are considered issued and outstanding and therefore are entitled to receive dividends and vote on matters on which other of our shares are entitled to vote. However, for accounting purposes, the shares held by the Stock Option Trust are considered treasury stock and therefore not outstanding. Under Mexican corporate law, the shares held by the Pension Plan Trust are considered issued and outstanding for all purposes. Accordingly, all information relating to Major Shareholders and the voting rights relating to our common stock, includes all shares held by the Stock Option Trust and the Pension Plan Trust.

We had one class of American Depositary Shares "ADSs", registered under the Securities Act which were terminated and delisted on August 24, 2009. Our ADSs were evidenced by American Depositary Receipts "ADRs", and each of our ADSs represented three Ordinary Participation Certificates "CPOs". Each CPO represents one of our shares. Our CPOs have no voting rights with respect to the underlying shares, but have all the economic rights relating to those shares. The trustee that holds our shares represented by CPOs is required to vote those shares in the same manner as the majority of our shares not so held that are voted in the relevant shareholders' meeting. This has the effect of increasing the voting power of holders of our shares (other than the trustee) in excess of the percentage of our shares held by such holders. Therefore, the voting power exercisable by our major shareholders may be greater than the percentage of our shares outstanding held by them. As of October 14, 2010, 31 million of our shares were represented by CPOs. For further information regarding the termination of our ADRs, see "Item 3. Key Information—Recent Developments—Termination of ADRs."

The following table sets forth our major shareholders and their shareholdings as of October 14, 2010.

| Name | Shares Outstanding[1] | % of Shares Outstanding[2] |
| --- | --- | --- |
| Pension Plan Trust[9] | 59,484,349 | 15.39 |
| Stock Option Trust[9] | 39,777,907 | 10.29 |
| Mr. Alfredo Harp Helú[7] [8] | 38,171,281 | 9.88 |
| Mr. Adrián Sada González[3] [4] [6] [7] | 29,545,712 | 7.65 |
| Mr. Federico Sada González[3] [5] | 29,212,591 | 7.56 |
| Ms. Alejandra Sada González[3] [6] [7] | 26,058,188 | 6.74 |

(1) All of the shares that may be issued upon exercise of our outstanding options are held by our Stock Option Trust, and all of our outstanding options are currently exercisable.

(2) Calculation of percentage of shares outstanding based upon 386,357,143 issued shares minus 445,500 held as treasury stock. The total amount of outstanding shares includes 53.6 million of shares that are subject to dispute. See Item 7 "Major Shareholders and Related Party Transactions−Major Shareholders−Shares subject to dispute."

(3) Mrs. María Nelly Sada de Yarte, her children and her children's spouses collectively hold 17,182,163 of our shares, representing 4.45% of our issued and outstanding shares, which are not included in the table above. Mrs. María Nelly Sada de Yarte is a sister of Mr. Adrián Sada González, Mr. Federico Sada Gonzalez and Ms. Alejandra Sada González

(4) Reported as a group with his wife, Mrs. Esther Cueva de Sada, and his son Mr. Adrián Sada Cueva. In addition to the shares set forth below, Mr. Adrián Sada González may be deemed to be a beneficial owner of the 39,777,907 shares held by our Stock Option Trust, as a member of the Technical Committee of the Stock Option Trust who shares the right to vote and the right to sell the shares held by the Stock Option Trust with the other member of the Technical Committee.

(5) Reported as a group with his wife, Mrs. Liliana Melo de Sada, his sons Messrs. Federico Sada Melo and Mauricio Sada Melo, and his daughter, Ms. Liliana Sada Melo.

(6) Entered into the 2009 Shareholders Agreement. The main provisions of the 2009 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights and (ii) any transfer of their shares.

(7) Entered into the 2010 Shareholders Agreement. The main provisions of the 2010 Shareholders Agreement set forth the rules to be followed by the abovementioned shareholders with respect to: (i) joint exercise of their voting rights, except with respect to certain specific and relevant matters, and (ii) any transfer of their shares.

(8) Board of Directors, as required by Vitro's by-laws, approved the request of Mr. Harp Helú to acquire additional shares of Vitro in excess of 9.9%, up to a maximum of 15% of the Company's equity.

(9) Fintech holds stock options that would be excercised for most of these shares. See Item 3—Key Information — Recent Developments".

**Shares subject to dispute**

On June 23, 2008, the Company initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A. and Citigroup, requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by-laws.

According to the Company's by-laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire Vitro shares. Such by-laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares.

A cautionary measure was granted by the court to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure. There is pending dispute regarding the implementation of this measure.

In January 2010, a district judge ruled in favor of Banamex. Vitro is contesting the irregular purchase of these shares amounting to 14.9% of its common stock outstanding. The Company submitted its appeal in a timely and correct manner to this ruling issued by a lower court.

On August 18, 2010, the Appeals Court issued a resolution denying the recourse presented by Vitro opposing the decision issued by the lower court. At that time, Vitro presented a final appeal through an amparo proceeding against the decision issued by the Appeals Court.

The amparo proceeding was filed before the Federal Circuit Court promptly after the Federal Appeals Court issued its decision denying the recourse described above. We expect that before the end of the first quarter of 2011, the court will issue a final decision on this matter.

**Fintech's Stock options**

Fintech holds stock options for up to a maximum of 93,099,849 shares as described under "Item 3. Key Information—Recent Developments."

**RELATED PARTY TRANSACTIONS**

On March 20, 2009, with the approval of the Corporate Practices Committee, Vitro's Board of Directors enacted the Related Party Transaction Policy. The purpose of such policy is to establish the requirements that need to be complied with before a transaction can to be entered into by and between Vitro and/or any of our affiliates, with any related party. Accordingly, such policy establishes which operations with related parties require shareholder approval, Board of Directors' approval and/or Corporate Practices Committee approval.

**Arrangements with Respect to Real Estate**

On certain occasions, until October 2008, we used real estate owned by relatives of certain directors and senior managers to meet with customers, suppliers or for other business purposes. We used to pay an annual fee for the right to use these properties for a specified number of days per year. Additionally, we also used to pay maintenance and operating costs. In 2007 and 2008, the aggregate amounts paid as annual fees were approximately Ps. 10 million and Ps. 8 million, respectively.

**Goods Sold**

We sell flat glass products and glass containers to certain companies whose shareholders are directors and senior managers. In 2007, 2008 and 2009, the aggregate amount of these sales was Ps. 69 million, Ps. 71 million and Ps. 56 million, respectively.

Comegua, an associated company, sells glass containers to Cervecería Centroamericana and to Cervecería de Costa Rica, our partners in such company. In 2007, 2008 and 2009, the aggregate amount of these sales was $9 million, $20 million and $12 million, respectively.

**Sale of Real Estate**

In 2007, a member of our Board of Directors, purchased an unused parcel of real estate from one of our subsidiaries. The price of the real estate was $5.4 million. We received several offers for the property and such member of the board made the highest offer. The transaction was approved by our Audit Committee in accordance with our charter at the time.

**Purchase of Supermarket Coupons**

We purchase supermarket coupons for our employees at a supermarket chain in which one member of our Board of Directors is a shareholder. In 2008 and 2009, the amount of these purchases was Ps. 80 million and Ps. 90 million, respectively. We received several offers for this service and this chain made the best offer.

**Compensation**

For the years ended December 31, 2007, 2008 and 2009, the aggregate compensation we paid to our directors and senior managers was approximately Ps. 273 million, Ps. 183 million and Ps. 229 million, respectively. This amount includes fees, salaries, the use of certain assets and services, and variable compensation.

**Item 8. Financial Information**

**Consolidated Financial Statements**

See "Item 18. Financial Statements" and pages F–1 to F–164 for a copy of our audited consolidated financial statements as of December 31, 2008 and 2009, and for the years ended December 31, 2007, 2008 and 2009.

**Export Sales**

The following table sets forth, for the periods presented, a breakdown of our domestic sales, export sales and sales attributable to our foreign subsidiaries. Financial data expressed in pesos and set forth in the following table for 2008 and 2009 are presented in nominal pesos and for all amounts pertaining to fiscal year 2007 are restated in constant pesos as of December 31, 2007, except where otherwise indicated.

| | Glass Containers (Ps. millions) | % of Consolidated Net Sales | Flat Glass (Ps. millions) | % of Consolidated Net Sales | Corporate and other[1] eliminations (Ps. millions) | % of Consolidated Net Sales | Consolidated (Ps. millions) | % of Consolidated Net Sales |
|---|---|---|---|---|---|---|---|---|
| **2009** | | | | | | | | |
| Domestic sales | Ps. 7,557 | 61% | Ps. 3,366 | 30% | Ps. 229 | 100% | Ps. 11,152 | 46% |
| Export sales | 4,746 | 38% | 1,822 | 16% | | | 6,568 | 27% |
| Foreign subsidiaries | 82 | 1% | 6,189 | 54% | | | 6,271 | 26% |
| Total net sales | Ps. 12,385 | 100% | Ps. 11,377 | 100% | Ps. 229 | 100% | Ps. 23,991 | 100% |
| **2008** | | | | | | | | |
| Domestic sales | Ps. 9,028 | 58% | Ps. 3,461 | 26% | 342 | 100% | Ps. 12,831 | 44% |
| Export sales | 4,179 | 27% | 2,368 | 18% | | | 6,547 | 23% |
| Foreign subsidiaries | 2,277 | 15% | 7,358 | 56% | | | 9,635 | 33% |
| Total net sales | Ps. 15,484 | 100% | Ps. 13,187 | 100% | 342 | 100% | Ps. 29,013 | 100% |
| **2007** | | | | | | | | |
| Domestic sales | Ps. 8,186 | 56% | Ps. 3,974 | 29% | 361 | 100% | Ps. 12,706 | 44% |
| Export sales | 4,305 | 29% | 1,946 | 14% | | | 5,974 | 21% |
| Foreign subsidiaries | 2,240 | 15% | 7,671 | 57% | | | 9,911 | 35% |
| Total net sales | Ps. 14,731 | 100% | Ps. 13,591 | 100% | 361 | 100% | Ps. 28,591 | 100% |

**Legal Proceedings**

For information regarding Vitro's restructuring process and *Concurso Mercantil* proceedings in Mexico and the United States and Legal proceedings relating to our *Certificados Bursátiles 03*, *Certificados Bursátiles 08* and other debt, please see "Item 3. Key Information—Recent Developments."

*PBGC Matter*

As part of the disposal of Anchor Glass Container Corp. ("Anchor") in August 1996, in a transaction approved by the U.S. Bankruptcy Court, we entered into a term sheet which contemplated an agreement pursuant to which we would provide to the Pension Benefit Guaranty Corporation (the "PBGC"), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets, which we refer to as "New Anchor." The amount of the guaranty was originally limited to $70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semiannual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionally reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by $7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

On April 15, 2002, New Anchor filed a pre−negotiated plan of reorganization under chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

On June 20, 2003, the PBGC wrote to us, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of $219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than $122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of our limited guaranty had occurred. Accordingly, in its letter, the PBGC demanded payments pursuant to the term sheet of $7 million on or before August 1, 2003 and of $3.5 million semiannually through August 1, 2011. We intend to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by us. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, we will establish an appropriate accounting reserve. As of this date, we have not established any reserves in connection with such potential liability.

### Pilkington Matter

On December 2006, Viméxico (formerly Vitro Plan) concluded at an extraordinary shareholders' meeting to approve the merger of Vitro Plan into Viméxico, which was a creditor of Vitro Plan. As a result of the merger, all assets, rights, liabilities and obligations of Vitro Plan were absorbed by Viméxico. Prior to the merger, Vitro Plan was a direct 65%−owned subsidiary of Vitro and Pilkington Group LTD (Pilkington) owned the remaining 35%. As a result of the merger, Viméxico became a 91.8%−owned subsidiary of Vitro and Pilkington the owner of the remaining 8.2%.

Although the merger became entirely effective once all the respective authorizations were obtained and having prepared all the respective acts, publications and registrations, Pilkington, who voted against such approval, began a legal procedure in January 2007 contesting the merger. In February 2008 in first instance, in June 2008 in second instance, and finally in February 2009, the protection requested by Pilkington was denied. The Company was notified that the opposing action exercised by Pilkington was declared unprecedented in a final and unappealable sentence with respect to the resolutions approved by the majority at the extraordinary general stockholders' meeting in December 2006. Thus, the foregoing resolutions were confirmed as valid and mandatory for all stockholders, including those dissenting.

However, in the first week of December 2007, the Company was notified of a new complaint filed by Pilkington, claiming the annulment of such extraordinary general stockholders' meeting. This position goes against the claims sustained in the first trail and was filed after Pilkington specifically desisted from this action after the first trial. Accordingly, Vitro also expects to obtain a favorable resolution from this claim. In this proceeding all evidence and allegations were submitted and the Company is awaiting the final ruling.

### Shares subject to dispute

On June 23, 2008, the Company initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A. and Citigroup, requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by−laws.

According to the Company's by−laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire Vitro shares. Such by−laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares.

A cautionary measure was granted by the court to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure. There is a pending dispute regarding the implementation of this measure.

In January 2010, a district judge ruled in favor of Banamex. Vitro is contesting the irregular purchase of these shares amounting to 14.9% of its common stock outstanding. The Company has submitted its appeal in a timely and correct manner to this sentence issued by a lower court.

On August 18, 2010, the Appeals Court issued a resolution denying the recourse presented by Vitro opposing the decision issued by the lower court. At that time, Vitro presented a final appeal through an amparo proceeding against the decision issued by the Appeals Court.

The amparo proceeding was filed before the Federal Circuit Court promptly after the Federal Appeals Court issued its decision denying the recourse described above. We expect that before the end of the first quarter of 2011, the court will issue a final decision on this matter.

### Real Estate Matter

In December 2006, Vitro sold real estate located in Mexico City for $100 million, 80% payable on the date of sale and the remainder payable on the delivery date of the property. As of December 31, 2008, the Company was in compliance with the terms of the contract. In 2009, the Company received a $5 million payment and is still seeking legal remedies for payment of the remaining amount. On August 16, 2010, the lower court absolved the purchaser of the remaining payment claimed. The Company filed an appeal against the decision. On January 10, 2011 the Appeals Court in Mexico City issued its decision revoking the ruling issued by the lower court and granting Vitro all of its petitions, and condemning the other party to pay Vitro all of its claims of approximately $15 million plus legal costs and attorneys fees. We expect that the counterparty will appeal the decision through the Amparo proceeding in the upcoming weeks.

### Dividend Policy

Holders of the majority of our issued and outstanding Shares, acting at a general ordinary shareholders' meeting, determine whether dividends are to be paid by Vitro and the amount and date of their payment. This decision is generally, but not necessarily, based on the recommendation of Vitro's Board of Directors. The Board of Directors, taking into account our financial position generally determines and proposes to the general ordinary shareholders meeting the timing for the payment of the dividends See "Item 3. Key Information—Selected Consolidated Financial Information—Dividends per Share" for the dividends we have paid since 2005.

### Significant Changes

Since the date of our annual financial statements, no significant change in our financial information has occurred, except for what is mentioned in this annual report.

**Item 9. The Offer and Listing**

Unless the context otherwise requires, in this Item 9 the words "we," "us," "our" and "ours" refer to Vitro, S.A.B. de C.V. and not its consolidated subsidiaries or the entities with which it consolidated.

### LISTING DETAILS

We are registered as a public company in Mexico. Our shares are listed on the Mexican Stock Exchange, where they trade under the symbol "VITROA." Our ADSs were listed on the NYSE and traded under the symbol "VTO." On November 29, 2006 Vitro changed its name as approved a general extraordinary stockholders' meeting from Vitro, S.A. de C.V. to Vitro, S.A.B. de C.V. due to a requirement of the Ley del Mercado de Valores, which we refer to as Mexican Law of the Securities Market, issued on June 28, 2006. This new law requires every company that is listed on the BMV, to include "Bursátil" (publicly traded) in their legal name or use the letter "B" after S.A.

Our ADRs have stopped trading on the NYSE. For further information regarding the termination of our ADRs and the filing of our Form 15−F and Form 15, see "Item 3. Key Information—Recent Developments—Termination of ADRs."

The following table sets forth, for each year in the five year period ended December 31, 2009, the reported highest and lowest market quotation in nominal pesos on the Mexican Stock Exchange for our shares, and the high and low sales price in nominal dollars on the NYSE for our ADSs. There is no public market outside of Mexico for our shares.

| | BMV | | NYSE | |
| | Pesos per Share[1][2] | | U.S. dollars per ADS[2][3] | |
| Year | High | Low | High | Low |
|------|------|-----|------|-----|
| 2005 | 14.58 | 7.33 | 4.08 | 2.07 |
| 2006 | 20.30 | 8.35 | 5.55 | 2.19 |
| 2007 | 30.99 | 19.06 | 8.53 | 5.16 |
| 2008 | 24.00 | 4.50 | 6.58 | 1.10 |
| 2009 | 8.30 | 3.80 | 1.92[4] | 0.70[4] |
| 2010 | 12.18[5] | 6.31[5] | [4] | [4] |

[1] Source: Infosel.

[2] Not adjusted for dividends.

[3] Each of our ADSs indirectly represents three of our shares.

[4] Since August 24, 2009, our ADRs were delisted from NYSE.

[5] On June 2, 2010 our shares were suspended for trading on Mexican Stock Exchange, suspension that was lifted on October 21, 2010.

The following table sets forth, for each quarter in the three year period ended December 31, 2009, and for the second quarter of 2010, the reported highest and lowest market quotation in nominal pesos on the Mexican Stock Exchange for our shares and the high and low sales price in nominal dollars on the NYSE for our ADSs.

| Year | BMV Pesos per Share[1][2] | | NYSE U.S. dollars per ADS[2][3] | |
|---|---|---|---|---|
| | High | Low | High | Low |
| **2007** | | | | |
| First Quarter | Ps. 24.68 | Ps. 19.06 | $ 6.72 | $ 5.16 |
| Second Quarter | 29.58 | 24.47 | 8.30 | 6.63 |
| Third Quarter | 30.99 | 24.84 | 8.53 | 6.63 |
| Fourth Quarter | 28.61 | 19.10 | 7.88 | 5.25 |
| **2008** | | | | |
| First Quarter | Ps. 24.00 | Ps. 16.90 | $ 6.58 | $ 4.70 |
| Second Quarter | 20.01 | 17.33 | 5.78 | 5.04 |
| Third Quarter | 17.20 | 11.82 | 4.93 | 3.21 |
| Fourth Quarter | 12.09 | 4.50 | 3.28 | 1.10 |
| **2009** | | | | |
| First Quarter | Ps. 8.30 | Ps. 3.80 | $ 1.85 | $ 0.70 |
| Second Quarter | 8.12 | 4.50 | 1.92 | 0.91 |
| Third Quarter | 7.68 | 5.05 | 1.71 | [4]1.04 |
| Fourth Quarter | 8.24 | 6.16 | [4] | [4] |
| **2010** | | | | |
| First Quarter | 9.21 | 6.31 | [4] | [4] |
| Second Quarter | [5]12.18 | [5]8.62 | [4] | [4] |
| Third Quarter | [5] | [5] | [4] | [4] |
| Fourth Quarter | [5]15.90 | [5]12.12 | [4] | [4] |

[1]  Source: Infosel.

[2]  Not adjusted for dividends.

[3]  Each of our ADSs indirectly represents three of our shares.

[4]  Since August 24, 2009, our ADRs were delisted from NYSE.

[5]  On June 2, 2010 our shares were suspended for trading on Mexican Stock Exchange, suspension that was lifted on October 21, 2010.

The following table sets forth, for each for the period ended December 31, 2010 the reported highest and lowest market quotation in nominal pesos on the Mexican Stock Exchange for our shares and the high and low sales price in nominal dollars on the NYSE for our ADSs.

| Month | BMV Pesos per Share[1][2] | | | | NYSE U.S. dollars per ADS[3] | |
|---|---|---|---|---|---|---|
| | High | | Low | | High | Low |
| December 2009 | Ps. | 8.24 | Ps. | 6.50 | | |
| January 2010 | Ps. | 8.01 | Ps. | 6.36 | | |
| February | | 6.79 | | 6.31 | | |
| March | | 9.21 | | 6.70 | | |
| April | | 10.86 | | 8.62 | | |
| May | | 12.18 | | 9.99 | | |
| June – October[4] | | 12.48 | | 12.12 | | |
| November | | 15.90 | | 12.57 | | |
| December | | 15.78 | | 14.90 | | |

[1]    Source: Infosel.

[2]    Not adjusted for dividends.

[3]    From August 24, 2009 our American one Depositary Receipts (ADR's) stopped trading on the NYSE.

[4]    From June 1 to October 28 our share was suspended on the BMV.

# MARKETS

**Trading on the Mexican Stock Exchange**

The Mexican Stock Exchange, located in Mexico City, is the only stock exchange in Mexico. Operating continuously since 1907, it is organized as a corporation whose shares are held by brokerage firms, which are the sole authorized entities to trade on the exchange. Trading on the Mexican Stock Exchange takes place electronically through the centralized automated system of the exchange, which is open each business day between the hours of 8:30 a.m. and 3:00 p.m., Mexico City time. Most transactions in listed Mexican securities take place through the Mexican Stock Exchange. Trades on or off the Mexican Stock Exchange involving ten percent or more of an issuer's outstanding capital stock must be reported to the CNBV, which in turn must notify the Mexican Stock Exchange of such trade. Directors, officers and other insiders must report to the CNBV any and all transactions undertaken with respect to securities of the issuer with which they are related. In addition, directors, officers and other insiders holding stock representing 5% or more of the outstanding capital stock of the related issuer may not buy or sell such stock within a period of three months from the date of their last purchase or sale.

The Mexican Stock Exchange publishes a daily official price list (*Boletín Diario de Precios y Cotizaciones*) that includes price information on each listed security traded that day. The Mexican Stock Exchange operates a system of automatic temporary suspensions of trading in shares of a particular issuer as a means of controlling excessive price volatility. Each day a price band is established with upper and lower limits. If during the day a bid or offer is accepted at a price outside this price band, trading in the shares is automatically suspended for one hour. Suspension periods in effect at the close of trading are not carried over to the next trading day. Our shares, as well as other securities of Mexican issuers that are publicly traded in the United States, however, are not subject to the above−described temporary suspension of trading rules dictated by the Mexican Stock Exchange. In addition, the Mexican Stock Exchange may also suspend trading of a security, including securities not subject to the automatic suspension systems, for up to five days if it determines that disorderly trading is occurring with respect to such security; such suspension may be extended beyond five days if so approved by the CNBV.

**Trading on the New York Stock Exchange**

Since November 19, 1991, our ADSs have been listed on the NYSE. Since May 6, 1992, each of our ADSs represents three CPOs issued by a Mexican trust, which we refer to as the "CPO Trust." Nacional Financiera is the trustee for the CPO Trust and we refer to it as the "CPO Trustee." Each CPO represents economic interests, but does not grant voting rights, in one of our shares held in the CPO Trust. The ADSs are evidenced by ADRs. ADRs evidencing ADSs are issued by Bank of New York, as depositary, which we refer to as the "Depositary", pursuant to the Deposit Agreement dated as of June 24, 2005 among Vitro, S.A.B de C.V., the CPO Trustee, the Depositary and all registered holders, from time to time, of the ADRs issued thereunder. An ADR may evidence any number of ADSs.

As of April 29, 2009, approximately 4% of our outstanding shares were publicly held through CPOs and approximately 11% of our outstanding shares were publicly held through ADSs. Holders of ADSs and CPOs have no voting rights with respect to the underlying shares, but have all economic rights relating to those shares. Pursuant to the Trust Agreements dated as of November 24, 1989 and November 28, 1990, Nacional Financiera, as CPO Trustee, is required to vote our shares held by the CPO Trust in the same manner as the majority of our shares that are not so held that are voted at the relevant meeting. Consequently, under Mexican law, holders of CPOs and ADSs are not able to exercise voting or other rights granted to minorities. However, if a Mexican national acquires CPOs, it may request from the CPO Trustee the cancellation of such CPOs and delivery of the underlying shares.

Our ADRs have stopped trading on the NYSE. For further information regarding the termination of our ADRs and the filing of our Form 15−F and Form 15, see "Item 3. Key Information—Recent Developments—Termination of ADRs."

The shares representing our capital stock will continue trading on the Mexican Stock Exchange.

**Item 10. Additional Information**

Unless the context otherwise requires, in this Item 10 the words "we," "us," "our" and "ours" refer to Vitro, S.A.B. de C.V. and not its consolidated subsidiaries or the entities with which it consolidated.

## MEXICAN CORPORATE LAW AND BY−LAWS

Set forth below is a brief summary of certain provisions of our by−laws and applicable Mexican law. This summary does not purport to be complete and is qualified by reference to our by−laws and applicable Mexican law.

**General Information and Corporate Purpose**

We were incorporated on August 27, 1936 as Fomento de Industria y Comercio, S.A., a corporation (*sociedad anónima*) formed under the laws of Mexico as the holding company for our then operating companies, among them Vidriera Monterrey, S.A., which was incorporated on December 6, 1909. The incorporation deed was registered on October 3, 1936 in the *Registro Público de la Propiedad y del Comercio de Monterrey*, which we refer to as the "Public Registry of Commerce of Monterrey," as entry number 139, volume 82, book 3. On May 9, 1980, we changed our corporate name to Vitro, S.A. and the deed pursuant to which our name was changed was registered in the Public Registry of Commerce of Monterrey on June 9, 1980 as entry number 1,224, volume 117, book 4. We adopted the variable capital corporate form on March 30, 1998 and the deed pursuant to which we adopted such corporate form was registered in the Public Registry of Commerce of Monterrey on April 1, 1998 as entry number 2,091, volume 207−42, book 4. On December 7, 2006 we changed our corporate name to Vitro, S.A.B. de C.V., and the deed number 17,738, pursuant to which our name was changed was registered in the Public Registry of Commerce of Monterrey on December 15, 2006, with the electronic entry number 1062*9.

Our corporate domicile is San Pedro Garza García, State of Nuevo León, Mexico and our principal executive offices are located at Ave. Ricardo Margáin Zozaya 400, Col. Valle del Campestre, San Pedro Garza García, Nuevo León, 66265 Mexico.

Pursuant to the second clause of our by−laws, our principal corporate purposes are (i) to subscribe for, dispose of or acquire shares of capital stock, bonds, *obligaciones*, certificates, promissory notes, securities granting optional rights and other securities (*títulos valor*) and other documents issued in series or *masa* and, in general, to carry on all such transactions permitted by law, (ii) to acquire or offer the shares representing our capital stock in accordance with the applicable law and the policies and resolutions of our Board of Directors regarding the acquisition and placement of shares of our capital stock through the Mexican Stock Exchange or through any other markets in which such shares are listed, (iii) to enter into contracts and transactions of a civil, mercantile, credit or financial nature including derivative transactions, repurchase agreement (*reportos*) and trusts (*fideicomiso*) in accordance with applicable law, (iv) to enter into loan agreements and to guarantee (as surety or otherwise), and grant liens to secure, the indebtedness of our subsidiaries and our affiliated or associated companies and, with the approval of our Board of Directors, of any other person, (v) to issue, accept, endorse and guarantee "*por aval*" negotiable instruments issued by us, our subsidiaries and our associated or affiliated companies and, with the approval of our Board of Directors, of any other third party, (vi) to render all kinds of services and to carry out analyses and studies with respect to the promotion, enhancement and restructuring of our subsidiaries and our associated or affiliated companies, (vii) to acquire, transfer, enlarge, modify, repair, maintain, administer, dispose of and lease such tangible property, real estate or *derechos reales* and *derechos personales* necessary for our operation and (viii) generally, to enter into agreements, to carry out transactions and to perform all acts necessary or convenient for the achievement of our fundamental corporate purposes.

**Directors' and Shareholders' Conflict of Interest**

The provisions of Mexican law described below govern issues relating to conflicts of interests that may arise between us, on the one hand, and our directors, the Secretary of the Board of Directors, and shareholders, on the other. Clause 42 of our by−laws states that any issue not expressly provided for in our by−laws will be governed by the Mexican Law of the Securities Market and Mexican General Law of Corporations. Pursuant to article 34 of the Mexican Law of the Securities Market, any of our directors or the Secretary of the Board of Directors who has a conflict of interest with us with respect to a transaction must disclose such fact to our other directors, must not be part and abstain from any discussions or voting on such transaction. Article 37 of the Mexican Law of the Securities Market states that any of our directors that does not comply with the requirements described in the immediately foregoing sentence will be liable to us for any damages suffered by us arising out of such transaction.

Under article 52 of the Mexican Law of the Securities Market, any of our shareholders that has a conflict of interest with us with respect to a transaction must abstain from voting on such transaction. Any of our shareholders that does not comply with the requirement described in the immediately foregoing sentence will be liable to us for any damages suffered by us arising out of such transaction, but only if the transaction would not have been approved without such shareholder's favorable vote.

**Related Party Transactions and Certain Other Transactions**

Pursuant to article 28 of the Mexican Law of the Securities Market and article 29 of our by−laws, the Board of Directors must approve, with the prior opinion of the Corporate Practices Committee the transactions between Vitro or its subsidiaries and our related parties. On March 23, 2009 the Board of Directors enacted the Transactions with Related Parties Policy that establishes the following: (i) basis to execute transactions with related parties, (ii) transactions with related parties that must be approved by the Corporate Practices Committee, the Board of Directors and/or a Shareholders Meeting, (iii) transactions that do not need approval of the Board of the Directors and (iv) liabilities and penalties for its infringement.

Pursuant to our Policy and article 29 section 14 (c) of our by−laws, our Board of Directors must approve, with the prior opinion of the Corporate Practices Committee the unusual or sporadic transactions or the transactions involving (i) the acquisition or disposition of 5% or more of our consolidated assets, (ii) guarantees or loans in an amount exceeding 5% of our consolidated assets. Investments in debt securities will be excluded if they comply with the corresponding Board of Directors' policies. Pursuant to our Policy and article 29 section 14 (b) of our by−laws, no Board of Directors' approval is needed in the following transactions, so long the Policy is followed: (i) transaction or transactions that individually or when taken as whole the amount involved is not material to the Company or our subsidiaries and does not exceed during a 12 month period, $5,000, (ii) transactions among the Company and its subsidiaries made in the ordinary course of business, at fair market value or appraised by external independent appraisals and (iii) transactions with employees, so long as they are made on an arm's length basis or as part of their labor fringe benefits.

In addition, our by−laws require that our key executive directors ("Key Executive Directors") obtain the authorization from our Board of Directors with the prior approval of our Audit Committee to enter into any transaction with Vitro or its subsidiaries outside the ordinary course of business.

Our Business Conduct and Professional Responsibility Code requires our employees to disclose any circumstance which is or appears to be a conflict of interest between our employees and us.

**Directors' Compensation**

Article 13 and 22 of our by−laws and article 181 of the Mexican General Law of Corporations require that a majority of our shares present at the annual general ordinary shareholders' meeting determine our directors' compensation for the immediately subsequent year.

**Capital Structure**

As a *sociedad anónima bursátil de capital variable*, a portion of our capital must be fixed capital and we may have variable capital.

Our fixed capital amounts to Ps. 324 million, represented by 324,000,000 of our class I Series A shares and our variable capital amounts to Ps. 63 million, represented by 62,857,143 of our class II Series A shares.

Pursuant to our by−laws and Mexican law, our shares may be held only by Mexican investors. No share can be owned directly or indirectly by non−Mexican investors. However, non−Mexican investors may acquire an economic interest in our shares by holding CPOs. Any acquisition of our shares by non−Mexican investors in violation of our by−laws or Mexican law would be null and void and could even be cancelled. See "Item 10. Additional Information—Mexican Corporate Law and By−Laws—Description of CPOs."

96

**Share Registration and Transfer**

Our shares are evidenced by share certificates in registered form. Our shareholders may hold their shares in the form of physical certificates or indirectly through institutions that have an account with S.D. Indeval Institución para el Depósito de Valores, S.A. de C.V., which we refer to as "Indeval." Brokers, banks or other entities approved by the CNBV, which we collectively refer to as "Indeval Depositors," may maintain accounts at Indeval. We maintain a registry of our shareholders who have either received physical certificates evidencing our shares or are holding our shares through an Indeval Depositors. Only persons listed in such registry and persons holding statements issued by Indeval or an Indeval Depositor evidencing ownership of our shares will be recognized as our shareholders, as long as they are not holding shares in violation of our by−laws.

**Limitation on Acquiring Shares**

In accordance with article 48 of the Mexican Law of The Securities Market, our bylaws prohibit the ownership by an individual, or group acting in concert, of more than 9.9% of our outstanding shares without the prior written approval of our Board of Directors.

The above applies to, among other things: a) the purchase or acquisition by any mean of Series "A" shares representing the capital stock of the Company or any other Series issued or to be issued by the Company, including CPOs whose underlying value is provided by shares issued by the Company; share deposit certificates or any other document that evidences rights over share of the Company; b) the purchase or acquisition of any right of the holders of Series "A" shares or any other Series to be issued by the Company in the future; c) any agreement or legal act which intends to limit or results in the transfer of any other right of the stockholders of the Company, including financial derivatives, as well as any other act that involves the loss or limitation of the voting rights granted by the shares representing the capital stock of the Company; and d) a purchase or acquisition intended by one or more interested parties acting as a group or who are related to one another, *de facto or de jure,* to take decisions as a group, partnership or consortium.

The prior written approval by our Board of Directors referred to above, is required notwithstanding whether the purchase or acquisition of any share, securities and/or rights is executed in or out of the Mexican Stock Exchange, directly or indirectly through public offer, private offer or through any other way, in one or several transactions of any nature, simultaneously or successive, in Mexico or abroad.

Also, the prior written approval by the Board of Directors is required for entering into agreements, or taking other acts, whether oral or written, which create mechanisms or arrangements under which the number of votes covered by such agreements or actions is more than 9.9% of our outstanding shares. The approval of our Board of Directors of such ownership, the entering into of such agreements or the taking of such actions is based upon considerations set forth in our bylaws, as provided by the Mexican Law of the Securities Market.

The agreements by minority shareholders to appoint a director are not subject to the above. Such agreements shall be subject to the Mexican Law of the Securities Market and shall not be enforceable against the Company in prejudice of the other shareholders or the economic or business interest of the Company.

In the event of any purchase of shares of our common stock or the entering into of such agreements or taking of such actions covering shares of our common stock without complying with the provisions of our bylaws, the shares shall not be entitled to any voting right or authority in the Shareholders Meetings of the Company, nor any authority to exercise any other corporate right. Further, in such event, the Company will not register, acknowledge or provide any value to the share deposit certificates issued by any financial institution or securities deposit certificates in the country, to evidence the right of attendance at a Shareholders' Meeting. Such shares, rights or securities will not be registered in the Share Registry of the Company, or if such registration occurs, the Company will cancel the registration in its Share Registry.

All of the provisions mentioned above shall not apply to: a) hereditary transfer of shares; and b) increases in the percentages of stock equity due to any reductions or increases of the capital stock approved by the Shareholders Meeting, except for any merger with entities affiliated with a corporate group different than the one headed by the Company.

**Voting Rights; Preferences and Restrictions**

Although at least 50% of our outstanding shares acting at a general extraordinary shareholders' meeting must approve the issuance of new series or classes of our common stock, whose terms may contain certain preferences or impose certain restrictions, no such series of our common stock has been issued. Each of our shares entitles the holder thereof to one vote at each of our general shareholders' meetings. However, the holders of CPOs or ADSs are not entitled to the voting rights appurtenant to our shares underlying their CPOs or ADSs. For a detailed description of this limitation, see "Item 10. Additional Information—Mexican Corporate Law and By−Laws—Description of CPOs."

So long as our shares are registered at the Securities Section of the RNV we may not issue shares of common stock that do not grant a right to vote or limit other corporate rights without the approval of (i) the CNBV and (ii) at least 50% of our outstanding shares acting at a general extraordinary shareholders' meeting. Pursuant to article 7 of our by−laws, there may not exist outstanding shares of our common stock whose terms are different than the terms of our shares in excess of 25% of outstanding capital stock provided however, that the CNBV may authorize the increase of the foregoing limit by an additional 25% of our outstanding capital stock, which the CNBV considers that are actually trading and provided further that such additional shares must be non voting or otherwise restricted shares and must be converted into our common shares within five years of their issuance.

**Dividends**

At each of our annual general ordinary shareholders' meetings, our CEO must submit our consolidated financial statements for the previous fiscal year, together with the external auditors' opinion, to our shareholders for their consideration and approval. If our shareholders approve such financial statements, they must determine, subject to the immediately following sentence, the allocation of our distributable earnings for the preceding fiscal year. Pursuant to our by−laws, 5% of our net income in any year must be allocated to a legal reserve fund until such fund reaches an amount equal to at least 20% of our capital. Allocation to the legal reserve is determined without reference to inflation adjustments required by MFRS. Thereafter, a majority of our shareholders present at such annual general ordinary shareholders' meeting may allocate all or a portion of the remainder of our net income to a reserve fund for the repurchase of our shares or for the creation of other reserve funds, if the requirements to make such allocation are fulfilled.

Those of our shares that are fully paid and outstanding at the time a dividend or other distribution is declared are entitled to share equally in such dividend or other distribution. Those of our shares that are partially paid are entitled to share in a dividend or distribution in the same proportion that such shares have been paid at the time of the declaration of such dividend or distribution. In accordance with the *Código de Comercio*, which we refer to as the "Mexican Code of Commerce," our shareholders have five years to claim their dividends, beginning on the date the dividends are declared payable. If the dividends are not claimed during such period, a shareholder's right to the dividend is extinguished. For a description of dividend rights applicable to holders of CPOs, see "Item 10. Additional Information—Mexican Corporate Law and By−Laws—Description of CPOs."

Pursuant to article 17 of the Mexican General Law of Corporations, any agreement which excludes one or more of our shareholders from receiving its proportional share of our distributable net income is unenforceable.

**Liquidation**

Upon our dissolution, one or more liquidators, which will wind up our affairs, must be appointed by a majority of our shares present at a general extraordinary shareholders' meeting. Those of our shares that are fully paid and outstanding at the time of our dissolution will be entitled to share equally in any distribution upon liquidation. Those of our shares that are partially paid at the time of our dissolution will be entitled to share in a liquidation distribution in the same manner as they would in a dividend distribution.

**Employee's Mandatory Share in the Company's Profits**

Pursuant to Mexican law, each of us and our subsidiaries with employees must pay to such employees 10% of the previous year's taxable income of such entity (as computed for these purposes), pursuant to such law.

**Capital Reduction**

Our shares are subject to redemption in connection with a reduction in our capital. Our capital may be reduced in the following situations: (i) to absorb losses, (ii) to return paid−in capital to shareholders, (iii) to redeem our shares with retained earnings, (iv) to release shareholders with respect to subscribed but unpaid shares, (v) as a result of a violation of clause fifth of its by−laws, and (vi) upon a purchase of our shares conducted in accordance with article 8 of our by−laws. A reduction in clauses (i) to (vi) above must be approved by at least 50% of our outstanding shares acting at a general extraordinary shareholders' meeting. The reduction of variable capital must be approved by majority in the general ordinary shareholders' meeting.

98

The capital reduction described in clause (i) of the foregoing paragraph must be on a pro rata basis among all of our outstanding shares. Upon such capital reduction, we are not required to cancel the redeemed shares.

In the event of a capital reduction described in clause (ii) of foregoing paragraph, we will select which of our shares will be canceled by lot before a Notary Public or an authorized mercantile official (*corredor titulado*). Resolutions regarding any such capital reduction must be published three times in the official gazette of our corporate domicile, which currently is San Pedro, Garza García, Nuevo León, allowing at least ten days after each publication.

Pursuant to article 136 of the Mexican General Law of Corporation, if we redeem our shares as described in clause (iii) of the foregoing paragraph, such redemption must be effected through: (i) the acquisition of such shares pursuant to public offer made on the Mexican Stock Exchange, or if a price and offer terms were determined by our shareholders, acting at a general extraordinary shareholders' meeting or, our Board of Directors acting on their behalf by lot before a Notary Public or an authorized mercantile official (*corredor titulado*) or (ii) pursuant to clause 9 of our bylaws, on a pro rata basis among all of our outstanding shares, so that after the redemption is made, each of our shareholders will have the same ownership percentage of our outstanding shares that he, she or it had before the redemption. The redeemed shares must be canceled and our capital stock must be reduced accordingly.

A capital reduction described in clause (iv) of the foregoing paragraph must be published three times in the official gazette of our corporate domicile, which is currently San Pedro, Garza García, Nuevo León, allowing at least ten days after each publication.

In case of a violation of clause fifth of its by−laws, in connection with the exclusion of foreign direct or indirect investment (other than through CPO's or ADS's), Vitro is also entitled and compelled to reduce its capital, in an amount equal to such infringing investment.

Pursuant to article 50 of the Mexican Law of the Securities Market the shareholders of the variable portion of the capital stock a of corporation (*"sociedad anónima bursátil"*) do not have the right of withdrawal (*"derecho de retiro"*) referred to in article 220 of the Mexican General Law of Corporation.

**Purchase by us of our Shares**

We may also decrease the number of outstanding shares by purchasing our shares in the Mexican Stock Exchange at prevailing market prices. Purchases would have the effect of reducing either (i) shareholders' equity or (ii) paid−in capital. In accordance with our by−laws and the terms of article 56 of the Mexican Law of the Securities Market, we may acquire our shares through the Mexican Stock Exchange, at the current market price, provided that such purchase is accounted for either (i) as a reduction of our shareholders' equity (if we choose to cancel the purchased shares) or (ii) as a reduction of our paid−in capital (if we choose to hold the purchased shares as treasury stock).

Our shareholders, acting at our annual general ordinary shareholders' meeting, must resolve, for each year, the maximum amount we may use to purchase our shares. The aggregate amount we may use to purchase our shares may not exceed our cumulative retained earnings. Our Board of Directors may recommend to our annual general ordinary shareholders' meeting the maximum amount we may use to purchase our shares.

**Purchase Obligation**

In accordance with our by−laws, if our registration with the RNV is canceled, whether by request of the CNBV or by our initiative with the prior approval of an extraordinary shareholders' meeting, the shareholders holding at least a 95% of our shares (with or without the right to vote) must make a public offer to purchase all other outstanding shares prior to effectiveness of such cancellation. In addition, if less than all of the outstanding shares are sold pursuant to the public offer to purchase, such shareholders must place in trust, for at least six months, the amount necessary to purchase all other outstanding shares.

The price at which such shares must be purchased is the higher of (i) the average closing quotation price made for the 30 trading days prior to the date at which the purchase will become effective, during a period which shall not be greater than six months and (ii) the book value per share, as reflected in the last quarterly report filed with the CNBV and the Mexican Stock Exchange. If the numbers of days on which the shares have been traded during the period set forth in the preceding paragraph is less than 30 days, the number of days on which the shares were effectively traded shall be used instead for purposes of calculating the purchase price of the shares and if no trades were made during such period the purchase must be done at book value. Notwithstanding the foregoing, the shareholders holding a majority of our shares having the right to make decisions, regardless their voting right at general shareholders' meetings are not required to make such public offer if at least 95% of our shares present at the relevant general shareholders' meeting approve the delisting of our shares from the Mexican Stock Exchange.

If there is one or more series of shares trading, the average closing quotation price mentioned above must be calculated for each series and the price at which such shares must be purchased must be the highest average closing quotation price.

**Capital Increase; Preemptive Rights**

At least 50% of our outstanding shares acting at a general extraordinary shareholders' meeting may authorize an increase of the fixed portion of our capital and a majority of our shares present at a general ordinary shareholders' meeting may increase the variable portion of our capital. Capital increases and decreases must be recorded in our *Libro de Variaciones de Capital,* which we refer to as the "Variations of Capital Stock Book". An increase in our capital cannot be effected if the shares representing our then existing capital have not been paid in full. Our capital may be increased either through (i) contributions made by existing or new shareholders, (ii) the capitalization of share–related premiums or advances previously made by our shareholders, (iii) the capitalization of retained earnings or valuation reserves or (iv) the capitalization of our indebtedness.

In the event of a capital increase, a holder of issued and outstanding shares has a preferential right to subscribe for a sufficient number of our shares to maintain such holder's existing proportional holdings of our shares. Preemptive rights must be exercised within 15 days following the publication of notice of the capital increase in the *Periódico Oficial del Estado de Nuevo León*. Under Mexican law, such preferential rights may be assigned.

Pursuant to article 53 of the Mexican Law of Securities Market, our shareholders are not entitled to preferential rights to subscribe for our authorized but unissued shares issued in connection with a public offering.

**Appraisal Rights**

The Mexican General Law of Corporations provides that upon the adoption, at a general extraordinary shareholders' meeting, of any of the resolutions described in the following paragraph, dissenting shareholders will have the right to have the shares they hold appraised and to compel us to redeem such shares at the appraised price, subject to the satisfaction of certain terms and conditions. The appraisal price will be determined by the proportion of shares submitted for appraisal to our net worth as stated in our financial statements approved at the most recent general ordinary shareholders' meeting.

Such appraisal rights are triggered by shareholders' resolutions approving (i) changes in our corporate purpose, (ii) our reincorporation in a jurisdiction other than Mexico or (iii) our transformation from one corporate form to another. Dissenting shareholders must perfect their appraisal rights by making a request for appraisal of their shares within 15 days following the date on which the meeting adopting the relevant resolution adjourns.

**Modification of Shareholders' Rights**

The rights appurtenant to our shares may be modified only through a resolution adopted by at least 50% of our outstanding shares acting at a general extraordinary shareholders' meeting.

**Shareholders' Meetings and Resolutions**

General shareholders' meetings may be ordinary meetings or extraordinary meetings. General extraordinary meetings are those called to consider (i) those matters specified in Article 182 of the Mexican General Law of Corporations, (ii) redemption of our shares with retained earnings, (iii) the issuance of treasury shares pursuant to the Mexican Law of the Securities Market, regarding the approval of the maximum amount of capital increase (iv) cancellation of the registration of our shares with the Securities Section of the RNV, which shall be approved by at least 95% of our outstanding shares with or without vote and the previous approval of the CNBV, (v) authorization of clauses that prevent the acquisition of shares that grant the control either directly or indirectly to third parties of our shares as established in the Mexican Law of the Securities Market so long as 5% of the present shares do not vote against it and (vi) any other matter stated in the applicable law and the bylaws. General shareholders meetings called to consider all other matters, including increases and decreases of the variable portion of our capital, are ordinary meetings.

A general ordinary shareholders' meeting must be held at least once a year within the first four months following the end of the prior fiscal year. This annual general ordinary shareholders' meeting shall analyze: (i) the annual reports of the Corporate Practices Committee, the Audit Committee and any other Committee of the Board of Directors, (ii) the CEO's annual report including the external auditors audited financial statements, (iii) the Board of Directors opinion on the CEO's annual report, (iv) the report referred to in article 172 section b) of the Mexican General Law of Corporations, which shall include the principal policies and accounting criteria used in the preparation of the financial information, (v) the report on the activities and operations where the Board of Directors was involved pursuant to the Mexican Law of Securities Market, (vi) the application of the balance of the profit and loss statement, (vii) the maximum amount of resources that may be used for the acquisition of shares or negotiable instruments representing such shares with the limitation that the total amount may not exceed the total amount of net earnings, including the retained earnings, (viii) the appointment and removal of the members of our Board of Directors, the qualification of their independence and their compensation and (ix) the appointment or removal of the President of the Corporate Practices Committee and the President of the Audit Committee A general ordinary shareholders' meeting may be called and held at any time to (i) to approve the transactions made by the Company or its subsidiaries during the fiscal year, if the transaction represents 25% or more of the consolidated assets according to the financial statements of the immediately previous quarter and that due to their terms may be consider as one transaction in the understanding that at such stockholders meeting all holders of shares may vote whether their vote is limited or not, (ii) to approve an increase or decrease of the variable portion of our capital, with the obligation of formalizing the resolution before the public notary, except as provided in clause eighth of our by–laws and (iii) any other matter where the General Extraordinary Shareholders Meeting is not competent or any matter established in the applicable law or our bylaws. At any such general ordinary shareholders' meeting, any shareholder or group of shareholders holding 10% or more of our outstanding shares may appoint one of our directors. A majority of our shares present at the annual general ordinary shareholders' meeting must determine the number of directors that will comprise the Board of Directors for the immediately subsequent fiscal year. The directors elected at the annual general ordinary shareholders' meeting serve for a renewable term of one year. If at the end of the one year term of office any of our directors is not reelected at the annual general shareholders' meeting or if a director resigns and there is no designation of a substitute or the most recently elected one has not taken office, then the prior director will continue to serve for up to a maximum term of 30 calendar days. Thereafter, the Board of Directors may appoint provisional directors that will be ratified or substituted at the next shareholders' meeting.

The quorum for a general ordinary shareholders' meeting convened at the first call is at least 50% of our outstanding shares entitled to vote at such meeting and action may be taken by holders of a majority of our shares present at such meeting. If a quorum is not present, a subsequent meeting may be called at which a quorum shall exist regardless of the number of our shares present at such subsequent meeting and action may be taken by a majority of our shares present at such subsequent meeting. The quorum for a general extraordinary shareholders' meeting convened at the first call is at least 75% of our shares entitled to vote at such meeting. If a quorum is not present, subsequent meetings may be called at which at least 50% of our shares entitled to vote at such subsequent meeting will constitute a quorum. Whether on first or subsequent calls to a meeting, actions at a general extraordinary shareholders' meeting may be taken only by at least 50% of our outstanding shares, except for the cancellation of the registration of our shares with the Securities Section of the RNV or the delisting of our shares from the Mexican Stock Exchange, which actions may only be taken by at least 95% of our outstanding shares.

General shareholders' meetings may be called by (i) our Board of Directors through its President or Secretary, by the Corporate Practices Committee, or the Audit Committee, (ii) 10% of our shares entitled to vote at such meeting by means of a request to the President of our Board of Directors, the President of the Corporate Practices Committee or the President of the Audit Committee to call such a meeting, (iii) a Mexican court if our Board of Directors or the Corporate Practices Committee or Audit Committee does not comply with a request as described in clause (ii) above and (iv) any of our shareholders, if no general shareholders' meeting has been held for two consecutive years or if any of the following matters has not been addressed at a general shareholders' meeting within such two year period: (a) the annual report of our CEO regarding our financial statements, (b) the allocation of our net income, (c) the appointment of our directors and qualification of their independence, (d) the compensation of our directors, (e) the annual

reports on activities performed by the Committees, (f) Board of Directors' reports on operations and activities where the latter intervened during the year, (g) Board of Directors' report pursuant to article 172 paragraph b) of the Mexican General Law of Corporations, (h) report on tax compliance and (i) appointment of the Presidents of the Audit and Corporate Practices Committees. Notice of general shareholders' meetings must be published in the *Periódico Oficial del Estado de Nuevo León* or in a newspaper of wide distribution in Monterrey, Mexico at least 15 calendar days prior to a general shareholders' meeting. Only shareholders who are registered in our Share Registry and have deposited their shares at our offices or those who comply with the Mexican Law of Securities Market and our by−laws will be admitted as a shareholder to a general shareholders' meeting. In order to attend and participate in a general shareholders' meeting, each shareholder must obtain from our Secretary a certificate acknowledging his, her or its status as a shareholder at least 48 hours before the date of the general shareholders' meeting. A shareholder may be represented by an attorney−in−fact who holds a duly granted proxy or power−of−attorney.

In accordance with article 51 of the Mexican Law of the Securities Market, at least 20% of our shares entitled to vote on a particular matter may oppose in court any shareholder action with respect to such matter, by filing a complaint with a court of law within 15 days after the adjournment of the general shareholders' meeting at which such action was adopted. Such relief is only available to holders (i) who were entitled to vote on, or whose rights as shareholders were adversely affected by, the challenged shareholder action and (ii) whose shares were not represented when the action was taken or, if represented, voted against it.

Under article 38 of the Mexican Law of the Securities Market, we must initiate an action for civil liabilities against one or more of our directors upon the approval of a resolution of our shareholders to that effect. If our shareholders approve such a resolution, the persons against whom such action is brought will immediately cease to be one of our directors. Additionally, at least 5% of our outstanding shares may directly initiate such an action against our directors.

**Asset Acquisitions and Divestitures**

Pursuant to our by−laws, our Board of Directors has the exclusive and non assignable power to approve transactions involving (i) the acquisition or disposition of 5% or more of our total assets and (ii) guarantees by us in an amount exceeding 5% of our total assets.

**Description of CPOs**

The following is a description of certain provisions of (i) the Trust Agreement dated as of November 24, 1989, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "First Trust Agreement," (ii) the Trust Agreement dated as of November 28, 1990, between Nacional Financiera, as CPO Trustee, and us, which we refer to as the "Second Trust Agreement" and, together with the First Trust Agreement, the "CPO Trust Agreements," (iii) the public deed dated as of November 29, 1990, which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "First CPO Deed," (iv) the public deed dated as of June 24, 1998 which evidences the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements and which deed is registered with, and may be examined at, the *Registro Público del Comercio de la Ciudad de México, D.F.*, which deed we refer to as the "Second CPO Deed," and (v) applicable provisions of the *Ley General de Títulos y Operaciones de Crédito*, which we refer to as the "Negotiable Instruments Law." We refer to the First CPO Deed and the Second CPO Deed together as the "CPO Deeds." This description does not purport to be complete and is qualified in its entirety by reference to the CPO Trust Agreements, the CPO Deeds and the provisions of Mexican law referred to in this description.

The CPO Trust Agreements established a master trust that enables non−Mexican investors to acquire CPOs representing economic interests in our shares. The trust is necessary because, under our by−laws, our shares may not be purchased or held directly or indirectly by non−Mexican investors, other than through these mechanisms.

The terms of the CPO Trust Agreement were authorized by an official communication dated November 27, 1990 from the *Dirección General de Inversiones Extranjeras de la Comisión Nacional de Inversiones Extranjeras*. The CPO Trust Agreement is registered with the *Registro Nacional de Inversiones Extranjeras*, which we refer to as the "National Registry of Foreign Investment." An official communication of the CNBV authorized the issuance of CPOs by the CPO Trustee pursuant to the CPO Trust Agreements.

CPOs, which are negotiable instruments under Mexican law, have been issued by the CPO Trustee pursuant to the terms of the CPO Trust Agreements and the CPO Deeds and may be redeemed as described in "—Deposit and Withdrawal of our shares." Each CPO represents an economic interest in one of our shares held in the CPO Trust. Currently, the maximum number of CPOs that can be issued pursuant to the CPO Deeds is 200,000,000. Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such rights are exercisable by the CPO Trustee pursuant to the terms of the CPO Trust Agreements. Pursuant to the *Ley de Inversión Extranjera*, which we refer to as the "Foreign Investment Law," the CPO Trust Agreement qualifies as a "neutral investment" trust because, among other things, voting rights in respect of the underlying shares are exercisable only by the CPO Trustee and not by the holders of the CPOs.

**Deposit and Withdrawal of our Shares**

Holders of our shares may deliver such shares to the account of the CPO Trustee at Indeval and receive in return CPOs delivered by the CPO Trustee pursuant to the CPO Trust Agreements. All of our shares delivered to the CPO Trustee will be held in trust by the CPO Trustee in accordance with the terms and conditions of the CPO Trust Agreements. We will deem the CPO Trustee to be the holder of the shares delivered to the CPO Trustee. Transfer of ownership of those of our shares that underlie CPOs will be effected through the records maintained by Indeval and Indeval Depositors.

The CPO Trustee will deliver CPOs in respect of our shares transferred as described above. All of the CPOs are evidenced by a single certificate, which we refer to as the "Global CPO," which has been issued to and deposited with Indeval, acting as depositary. Ownership of CPOs deposited with Indeval will be shown on, and transfer of the ownership of such CPOs will be effected through, records maintained by Indeval and Indeval Depositors. Holders of CPOs are not entitled to receive physical certificates evidencing such CPOs but may request statements issued by Indeval and Indeval Depositors evidencing ownership of CPOs. Holders of CPOs that are non−Mexican investors are not entitled to withdraw the shares that are held in the CPO Trust and represented by CPOs.

Holders of CPOs may sell their CPOs (i) to a non−Mexican investor, in which case the non−Mexican investor will become the transferee of such CPOs or (ii) to a Mexican investor, through the Mexican Stock Exchange, in which case the Mexican investor would be the transferee of the shares underlying such CPOs directly or, by keeping such shares deposited at an account at Indeval, such CPOs will be held by the CPO Trustee pending delivery.

**Dividends, Other Distributions and Preemptive and Other Rights**

Holders of CPOs are entitled to receive the economic benefits related to the shares underlying such CPOs, including those dividends or distributions approved by our shareholders, and to receive the proceeds from the sale of such shares at the termination of the CPO Trust Agreement. See "Item 10. Additional Information—Mexican Coporate Law and By−Laws—Termination of the CPO Trust." The CPO Trustee, through Indeval, will distribute cash dividends and other cash distributions received by it with respect to our shares held in the CPO Trust to the holders of the CPOs in proportion to their respective holdings in the same currency in which they were received. Dividends paid with respect to our shares underlying CPOs will be distributed to CPO holders by Indeval on the business day following the date on which Indeval receives the funds on behalf of the CPO Trustee.

If a distribution by us consists of a stock dividend on our shares, such distributed shares will be transferred to Indeval on behalf of the CPO Trustee, and held in the CPO Trust. The CPO Trustee will distribute to the holders of outstanding CPOs, in proportion to their holdings, additional CPOs in an aggregate number equal to the aggregate number of our shares received by the CPO Trustee as the stock dividend. If the maximum amount of CPOs that may be delivered under the CPO Deeds would be exceeded as a result of a dividend on our shares, a new CPO deed will be entered into setting forth that new CPOs (including those CPOs exceeding the number of CPOs authorized under the CPO Deed) may be issued. If the CPO Trustee receives any distribution with respect to our shares held in the CPO Trust (other than in the form of cash or additional shares), the CPO Trustee will adopt such method as it may deem legal, equitable and practicable to effect the distribution of such property. If we offer, or cause to be offered, to the holders of our shares, the right to subscribe for additional shares, subject to applicable law, the CPO Trustee will offer to each holder of CPOs the right to instruct the CPO Trustee to subscribe for such holder's proportionate share of such additional shares (subject to such holder providing the CPO Trustee (through Indeval) with the funds necessary to subscribe for such additional shares). If an offering of rights occurs and CPO holders provide the CPO Trustee with the necessary funds, the CPO Trustee (through Indeval) will subscribe for the corresponding number of our shares, which will be placed in the CPO Trust (to the extent possible), and deliver additional CPOs (through Indeval) in respect of such shares to the applicable CPO holders pursuant to the CPO Deeds or, if applicable, through a new CPO deed.

According to Mexican law, dividends or other distributions and the proceeds from the sale of our shares held in the CPO Trust that are not received or claimed by a CPO holder within three years from the receipt of such dividends or distributions by the CPO Trustee or ten years from such sale will become the property of the Mexican *Secretaría de Salud*.

**Changes Affecting our Shares**

With respect to our shares, upon any change in par value, a stock split, any other reclassification, a merger or consolidation affecting us, or if we pay dividends by distributing shares or other goods different from our shares, the CPO Trustee shall determine, in an equitable and proportional manner, any required amendments to be made to the CPO Trust, the CPO Deeds and the CPOs, as well as to the instruments representing such CPOs. If in connection with a redemption of our shares, any of our shares held in the CPO Trust are called for redemption, the CPO Trustee will, in accordance with the instructions of the CPO Technical Committee (as defined in "—Administration of the CPO Trust") determine, in any manner deemed to be legal, equitable and practicable, the CPOs that are to be redeemed (in a number equal to the number of our shares held in the CPO Trust called for redemption) and pay the holders of such CPOs their proportionate share of the consideration paid by us in respect thereof.

**Voting of our Shares**

Holders of CPOs are not entitled to exercise any voting rights with respect to our shares held in the CPO Trust. Such voting rights are exercisable only by the CPO Trustee, which is required by the terms of the CPO Trust to vote such shares in the same manner as a majority of our outstanding shares that are not held in the CPO Trust are voted at the relevant shareholders' meeting. Because CPOs grant no voting rights to holders thereof, such holders do not have the benefit of any rights (including minority protection rights) granted under applicable law or our by−laws to holders of our shares.

**Administration of the CPO Trust**

Pursuant to the terms of the CPO Trust Agreement, the CPO Trustee administers the CPO Trust under the direction of a technical committee. The technical committee of the CPO Trust, which we refer to as the "CPO Technical Committee," consists of five members and their respective alternates. Each of the following entities appoints one member of the CPO Technical Committee: the *Comisión Nacional de Inversiones Extranjeras*, the Mexican Stock Exchange, the *Asociación Mexicana de Casas de Bolsa*, the Common Representative (as defined below) and the CPO Trustee. Actions taken by the CPO Technical Committee must be approved by a majority of the members present at any meeting of such committee, at which at least the majority of the members are present. Banco Santander México, S.A., has been appointed as the common representative of the holders of CPOs and we refer to it as the "Common Representative."

Pursuant to the Negotiable Instruments Law, the duties of the Common Representative include, among others (i) verifying the due execution and terms of the CPO Trust Agreements, (ii) verifying the existence of our shares being held in the CPO Trust, (iii) authenticating the Global CPO, (iv) exercising the rights of the CPO holders in connection with the payment of any dividend or distribution to which such CPO holders are entitled, (v) undertaking any other action to protect the rights, actions or remedies to which CPO holders are entitled, (vi) calling and presiding over CPO holders' general meetings, each of which we refer to as a "CPO General Meeting," and (vii) carrying out the decisions adopted thereat. The Common Representative may request from the CPO Trustee all information and data necessary for the performance of its duties. The CPO holders, by a resolution adopted at a duly held CPO General Meeting, may (i) revoke the appointment of the Common Representative and appoint a substitute Common Representative and (ii) instruct the Common Representative to undertake certain actions.

Holders of CPOs representing at least 10% of the aggregate number of outstanding CPOs may request that the Common Representative call a CPO General Meeting, including in such request the order of business for such meeting. Announcements of CPO General Meetings shall be published in the *Diario Oficial de la Federación* and in one of the newspapers with the widest distribution in the domicile of the CPO Trustee, which is currently Mexico City, at least ten days in advance of the date on which the CPO General Meeting is scheduled. Announcements of CPO General Meetings shall include the order of business for such meetings.

In order for holders of CPOs to be entitled to attend CPO General Meetings, such holders must request a statement from Indeval or an Indeval Depositor, not less than two days prior to the date on which such meeting is scheduled evidencing their holdings of CPOs and must submit such statement to the institution designated for such purpose in the notice for such meeting on or before the day prior to the date on which such meeting is scheduled. Persons appointed by an instrument in writing as representatives for a holder of CPOs will be entitled to attend CPO General Meetings.

At CPO General Meetings, each holder of a CPO will be entitled to one vote per CPO owned by him, her or it. Resolutions of the CPO holders must be approved by at least a majority of CPOs present at a CPO General Meeting at which there is a quorum. A quorum at a CPO General Meeting initially is constituted by holders of a majority of CPOs delivered and, if no quorum is present at such meeting, any CPOs present at a subsequently called CPO General Meeting shall constitute a quorum. Resolutions adopted by the required number of CPO at a duly convened CPO General Meeting will bind all CPOs, including absent and dissident holders.

Certain matters must be approved at a special CPO General Meeting at which, for the first call, at least 75% of the CPOs delivered must be present, and resolutions with respect to such matters must be approved by a majority of CPOs present at such meeting. Such matters include appointment and revocation of the Common Representative and the granting of consents, waivers or grace periods to the CPO Trustee. If a quorum is not present with respect to a CPO General Meeting discussing any such matters, a subsequent meeting may be called at which action may be taken regardless of the percentage of delivered CPOs present at such meeting.

**Enforcement of Rights of CPO Holders**

In accordance with the Negotiable Instruments Law, CPO holders may, with certain limitations, individually and directly exercise certain rights with respect to CPOs. Such rights include the right to cause the CPO Trustee to distribute dividends or other distributions received by it (directly or through Indeval), to cause the Common Representative to protect the rights to which the CPO holders are entitled and to enforce such rights and to bring actions against the Common Representative for civil liabilities in the event of willful misconduct.

**Status of CPO Holders**

The CPO Trust Agreements and the CPO Deeds provide that any investor deemed a non−Mexican investor acquiring CPOs shall be considered under the CPO Trust Agreement, by virtue of its acquisition of CPOs, to be a Mexican national with respect to its holdings of CPOs and shall be deemed to have agreed not to invoke the protection of its own government. If such protection is invoked, such CPO holder will forfeit its CPOs to the Mexican government. A holder of CPOs is deemed to have invoked the protection of the home government of such holder by, for example, asking such government to interpose a diplomatic claim against the Mexican government with respect to the CPO holders' rights or by bringing suit in its home jurisdiction against the Mexican government with respect to such rights. CPO holders will not be deemed to have waived any of their other rights, including any rights such holders may have pursuant to the terms and provisions of the CPOs.

**Termination of the CPO Trust**

The CPO Trust Agreement and the CPOs issued under the CPO Deeds will expire 30 years after the date of execution of the CPO Trust Agreement. The CPO Trustee will commence the procedure for the termination of the CPO Trust Agreement 12 months prior to its expiration. At the time of such termination, the CPO Trustee will sell our shares held in the CPO Trust and will distribute the proceeds of such sale to the holders of the CPOs on a pro rata basis in accordance with the number of CPOs owned by each holder. The CPO Trust may also be terminated upon a resolution approved by a majority of the CPOs present at a CPO General Meeting. Notwithstanding the foregoing, the CPO Trust Agreement cannot be terminated if any dividends or other distributions previously received by the CPO Trustee remain unpaid to the CPO holders.

Upon the expiration of the CPO Trust Agreement, subject to obtaining the applicable authorizations from the Mexican government, the CPO Trustee and any CPO holder may execute a new trust agreement with the same terms as the CPO Trust Agreement. There can be no assurances that a new trust agreement will be executed. In such a case, our shares represented by the CPOs owned by any holder who executes the new trust agreement will be transferred by the CPO Trustee to the new trust created pursuant to such new trust agreement, and new ordinary participation certificates issued under the new trust agreement will be issued by the trustee and delivered to such holder.

**Limitations Affecting CPOs Holders**

Each of our shares is entitled to one vote at general shareholders' meetings. Holders of CPOs and CPOs are not entitled to vote the underlying shares. Voting rights with respect to the underlying shares are exercisable only by the CPO Trustee, which is required to vote all such shares in the same manner as the majority of our shares that are not held in the CPO Trust are voted at the relevant meeting.

Our by−laws prohibit direct or indirect ownership of our shares by non−Mexican nationals. Any acquisition of our shares in violation of such provision would be null and void under Mexican law and such shares would be cancelled and our capital accordingly reduced. Non−Mexican nationals may, however, hold an economic interest in our shares through a neutral investment trust such as the CPO Trust.

106

**MATERIAL CONTRACTS**

**Indebtedness**

See "Item 5. Operating and Financial Review and Prospects—Liquidity and Capital Resources—Indebtedness" for a summary of the terms of the agreements and instruments governing our and our subsidiaries' material indebtedness.

**Derivatives**

See. "Item 11. Quantitative and Qualitative Disclosures about Market Risk— Natural Gas Price Risk" for a description of our Pemex DFIs.

**EXCHANGE CONTROLS**

See "Item 3. Key Information—Risk Factors—Risk Factors Relating to Economies in Which We Participate—If foreign currency exchange controls and other restrictions are imposed, we may not be able to service our debt in U.S. dollars, which exposes investors to foreign currency exchange risk."

Mexican law does not restrict our ability to remit dividends and interest payments, if any, to non-Mexican holders of our securities. Payments of dividends to equity-holders generally will not be subject to Mexican withholding tax. See "—Material Tax Consequences—Mexican Federal Income Taxation—Our ADSs, CPOs and Shares—Taxation of Cash Distributions." Mexico has had a free market for foreign exchange since 1991, and the government has allowed the peso to float freely against the U.S. dollar since December 1994.

## MATERIAL TAX CONSEQUENCES

The following summary contains a description of material U.S. federal income tax and Mexican federal income tax consequences of the purchase, ownership, sale or other disposition of our CPOs. This discussion does not purport to be a description of all of the possible tax considerations that may be relevant to the purchase, ownership, sale or other disposition of our CPOs.

**Mexican Federal Income Taxation**

The following general summary of Mexican taxes is based on Mexican federal income tax laws in force on the date of this annual report, which laws are subject to change. It is not intended to constitute a complete analysis of the tax consequences under Mexican law of the purchase, ownership, sale or other disposition of our CPOs by persons or entities which are not residents of Mexico for tax purposes.

This summary is limited to non−residents of Mexico, as defined below, who own our CPOs. Each prospective investor should consult his, her or its own tax adviser as to the tax consequences of an investment in, the ownership of, and the disposition of, our CPOs, including the effects of any Mexican, United States or any other jurisdiction's federal, state or local tax laws (including, without limitation, income, estate and gift tax consequences in any of these jurisdictions).

For purposes of this summary, the term "Non−Resident Holder" means a holder that is not a resident of Mexico and does not hold our CPOs in connection with the conduct of a trade or business through a permanent establishment in Mexico. For purposes of Mexican tax law, an individual is a resident of Mexico if he or she has established his or her domicile in Mexico, or if he or she has another domicile outside Mexico but his or her "center of vital interest" (as defined under the Mexican Fiscal Code) is located in Mexico. In addition to certain other circumstances, it is considered that the "center of vital interests" of an individual is located in Mexico, if more than 50% of that person's total income during a calendar year originates from within Mexico and/or the individual's main center of professional activities is in Mexico. A Mexican citizen is presumed to be a resident of Mexico unless such person can demonstrate that he or she is not a tax resident. A legal entity is a resident of Mexico if it has its principal place of business or its place of effective management located in Mexico. If a legal entity or an individual is deemed to have a permanent establishment in Mexico for tax purposes, all income attributable to such a permanent establishment will be subject to Mexican taxes, in accordance with applicable tax laws.

*Taxation of Cash Distributions*

Pursuant to the Mexican Income Tax Law, dividends or profits distributed by entities organized in Mexico will not be subject to income tax if such profits were previously taxed at the entity level. Otherwise such entities shall compute the income tax owed on such profits at the then effective tax rate and pay such taxes to the Ministry of Finance and Public Credit. In 2009 the effective tax rate will be 28% and in 2010, 2011 and 2012, the effective tax rate will be 30%.

*Taxation of Sale or Other Disposition*

For Non−Resident Holders, proceeds from the sale or disposition of ADSs or CPOs made through an authorized stock exchange (such as the BMV) recognized under a tax treaty to which Mexico is a party and, meeting certain additional requirements are exempt from Mexican tax, provided that the shares of the issuer of such stock are sold or disposed of through a stock market holding a concession under the Mexican Law of the Securities Market.

In the case of a public offer to purchase shares, there is a taxation exemption of gains realized by stockholders who meet certain requirements (LISR, Art.109. XXVI). If a sale of our shares is made by a Non−Resident Holder on a stock exchange in Mexico, who fails to satisfy such requirements, taxes will be withheld at a rate of 5%, with no deduction, on the gross revenue realized by the seller. Non−Resident Holders may instead elect to have tax withheld equal to 20% of the net profit realized from the sale of our shares. In either case, the tax would be withheld by the party selling the shares through a stock market holding a concession under the Mexican Law of the Securities Market.

Non−Resident Holders are exempt from income tax in Mexico arising from the sale or other disposition of our CPOs, provided the sale satisfies the requirements in the first paragraph of this section. If the Non−Resident Holder has a representative in Mexico according to the Income Tax Law, and such stockholder is a resident of a country which is not deemed subject to a territorial tax regime or a territory with a preferred tax regime, such stockholder may instead apply the maximum tax rate of 28% on the net profit realized. In addition, such stockholder is required to file an opinion of a public accountant registered with the tax authorities setting forth such accountant's opinion that the tax was computed in accordance with the applicable provisions.

According to the Tax Treaty (as defined below), gains realized by a resident of the United States (a "U.S. Stockholder") from the sale of stock (such as our CPOs) may only be taxed in Mexico if, during the 12 month period preceding such sale, the U.S. Stockholder owned, directly or indirectly, at least 25% of our capital stock. Otherwise such gain to a U.S. Stockholder will not be subject to income tax in Mexico.

**United States Federal Income Taxation**

The following summary of United States federal income tax consequences is based on United States federal income tax laws in force on the date on which this annual report is filed, which laws are subject to change, possibly with retroactive effect. It describes the material United States federal income tax consequences of the purchase, ownership, sale or other taxable disposition of our CPOs, as the case may be by a United States Holder, as defined below. As used herein, a "United States Holder" means a beneficial owner of CPOs that is, for United States federal income tax purposes:

- a citizen or resident of the United States;
- a corporation (or entity taxable as a corporation) organized or created in the United States, any state thereof or the District of Columbia;
- an estate the income of which is subject to United States federal income tax regardless of its source; or
- a trust if (i) a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions of the trust or (ii) such trust has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a United States person.

This section applies only to holders who hold CPOs as capital assets (generally, property held for investment) within the meaning of the Internal Revenue Code of 1986, as amended, (the "Code"). This section does not provide a complete analysis, listing or other description of all of the possible tax consequences of the purchase, ownership, sale or other taxable disposition of our CPOs, and does not address tax consequences to persons with a special tax status such as dealers or traders in securities or currencies, United States Holders whose functional currency is not the U.S. dollar, persons holding our CPOs as part of a hedge, straddle, conversion or other integrated transaction, banks, insurance companies, real estate investment trusts (REITs), regulated investment companies (RICs), holders subject to the alternative minimum tax, holders that acquired the CPOs pursuant to a compensatory transaction, tax−exempt entities, certain United States expatriates or holders that own or have owned, actually or constructively, 10% or more of the total combined voting power of our CPOs or capital stock. Except where specifically noted, this section does not address any non−U.S. tax consequences. This section also does not address any U.S. state or local tax consequences or any U.S. federal tax other than U.S. federal income tax consequences (such as the estate and gift tax or the Medicare tax on net investment income) that may be relevant to the purchase, sale or other taxable disposition of our CPOs.

If a partnership holds our CPOs, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. A partner of a partnership holding our CPOs should consult his, her or its own tax advisor.

Investors should consult their own tax advisors with respect to the tax consequences of the purchase, ownership, sale or other disposition of our CPOs including consequences under state, local and non−U.S. tax laws.

Each of our CPOs will represent an economic interest in one of our shares.

*Taxation of Cash Distributions and Distributions of Stock*

The gross amount of any distribution, including the fair market value of all distributions of our CPOs whenever a holder may elect to receive cash distributions in lieu of distributions of our CPOs, that you receive with respect to our CPOs (before reduction for any Mexican tax, if any, withheld from such distributions) generally will be treated as received by a holder on the day on which the distribution is actually or constructively received.

To the extent that distributions paid by us with respect to the underlying shares do not exceed our current or accumulated earnings and profits ("E&P"), as calculated for United States federal income tax purposes, such distributions will be taxed as dividends. To the extent that distributions by us exceed our E&P, such distributions will be treated as a tax−free return of capital to the extent of the United States Holder's basis in our CPOs, and will reduce such United States Holder's basis in such CPOs on a dollar−for−dollar basis (thereby increasing any gain or decreasing any loss on a taxable disposition of such CPOs). To the extent that the distributions exceed the United States Holder's basis in our CPOssuch United States Holder will be treated as having recognized taxable gain on a deemed sale of such CPOs. We do not currently maintain calculations of our E&P for United States federal income tax purposes, and a United States Holder should thus expect distributions on our CPOs to be treated as a dividend.

Subject to certain exceptions for short−term and hedged positions, dividends received by certain non−corporate United States Holders before January 1, 2013 will be subject to taxation at reduced rates if the dividends are "qualified dividends." Dividends received with respect to the CPOs will be qualified dividends if (i) we are eligible for the benefits of a comprehensive income tax treaty with the United States that the U.S. Internal Revenue Service has approved for purposes of the qualified dividend rules and (ii) we were not, in the year prior to the year in which the distribution was made, and are not, in the year in which the distribution is made, a passive foreign investment company, as described below. The Tax Treaty, as defined below, has been approved by the U.S. Internal Revenue Service for this purpose. There can be no assurance, however, that we will remain eligible for the benefits of the Tax Treaty in the future.

We anticipate that any distributions on our CPOs will be made in pesos, and any dividends so paid generally will be includible in a United States Holder's gross income in a U.S. dollar amount calculated by reference to the exchange rate in effect on the day the distribution is actually or constructively received. To the extent that a United States Holder does not convert the pesos received into U.S. dollars at the time that such United States Holder actually or constructively receives the distribution for United States federal income tax purposes, such United States Holder may recognize foreign exchange gain or loss, taxable as ordinary income or loss, on the later conversion of the pesos into U.S. dollars. The gain or loss recognized will generally be based upon the difference between the exchange rate in effect when the pesos are actually converted and the "spot" exchange rate in effect at the time the distribution is included in such United States Holder's gross income. Any foreign exchange gain will generally be treated as United States−source income for United States foreign tax credit limitation purposes.

Dividends paid by us will generally be treated as foreign source income for United States foreign tax credit limitation purposes. Subject to certain limitations, United States Holders generally may elect to claim a foreign tax credit against their United States federal income tax liability for foreign income tax withheld (if any) from dividends received in respect of our CPOs. The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, dividends paid in respect of our CPOs, generally will be "passive category income". United States Holders that do not elect to claim foreign tax credits in a taxable year may instead claim a deduction for foreign tax withheld (if any) if such United States Holder elects to deduct, rather than credit, all foreign taxes in such taxable year. The rules governing the use of foreign tax credits are complex, and United States Holders should consult their own tax advisors regarding the creditability or deductibility of foreign taxes in their particular situation.

Distributions of our shares to the CPO Trustee with respect to its holdings of our shares and distributions of our CPOs to United States Holders with respect to their holdings of our CPOs, as the case may be (such previously held CPOs, "Old Stock"), that are pro rata with respect to their holdings of Old Stock will generally not be subject to United States federal income tax (except with respect to cash received in lieu of fractional shares and CPOs). The basis of our CPOs so received will be determined by allocating the United States Holder's adjusted basis in the Old Stock between the Old Stock and the CPOs so received.

*Sale or Other Taxable Disposition*

A United States Holder generally will recognize capital gain or loss upon a sale or other taxable disposition of our CPOs in an amount equal to the difference between the amount realized on their disposition and such United States Holder's tax basis in our CPOs. Long−term capital gains recognized by non−corporate United States Holders are generally eligible for preferential rates of taxation. Certain limitations exist on the deductibility of capital losses by both corporate and individual taxpayers. Capital gains and losses on the sale or other taxable disposition by a United States Holder of our CPOs generally should constitute gains or losses from sources within the United States.

110

For cash basis United States Holders who receive foreign currency in connection with a sale or other taxable disposition of our CPOs, the amount realized will be based on the U.S. dollar value of the foreign currency received with respect to such CPOs as determined on the settlement date of such sale or other taxable disposition.

Accrual basis United States Holders who receive foreign currency in connection with a sale or other taxable disposition of our CPOs may elect the same treatment required of cash basis taxpayers provided that the election is applied consistently from year to year. Such election may not be changed without the consent of the United States Internal Revenue Service. Accrual basis United States Holders that do not elect to be treated as cash basis taxpayers (pursuant to the United States Treasury Regulations applicable to foreign currency transactions) for this purpose may have a foreign currency gain or loss for United States federal income tax purposes because of differences between the U.S. dollar value of the foreign currency received prevailing on the date of the sale or other taxable disposition of our CPOs, and the date of payment. Any such currency gain or loss generally will constitute gain or loss from sources within the United States and generally will be treated as ordinary income or loss and would be in addition to gain or loss, if any, recognized on the sale or other taxable disposition of our CPOs.

*Passive Foreign Investment Company Considerations*

We believe that we were not, for our 2009 taxable year, a passive foreign investment company ("PFIC") for U.S. federal income tax purposes. Because this determination is made annually at the end of each of our taxable years and is dependent upon a number of factors, some of which are beyond our control, including the value of our assets and the amount and type of our income (including a proportionate amount of the income and assets of certain entities in which we hold at least a 25% equity interest by value), there can be no assurance that we are not currently, and will not become a PFIC. In general, a corporation organized outside the United States will be treated as a PFIC for United States federal income tax purposes in any taxable year in which either (a) at least 75% of its gross income is "passive income" or (b) on average at least 50% of the value of its assets is attributable to assets that produce passive income or are held for the production of passive income. If a United States Holder owns our CPOs at a time when we become a PFIC and is not eligible to make or does not make certain elections with respect to our CPOs, such United States Holder could be liable for additional taxes and interest charges upon certain distributions by us or upon a sale, exchange or other disposition of such shares at a gain, whether or not we continue to be a PFIC. A United States Holder will also have increased reporting requirements with respect to an investment in a PFIC. United States Holders should consult their own tax advisors regarding the application of the PFIC rules to our CPOs and the availability and advisability of making an election to avoid the adverse tax consequences of the PFIC rules should we be considered a PFIC for any taxable year.United States Backup Withholding and Information Reporting

In general, information reporting requirements will apply to payments of dividends on our CPOs and the proceeds of certain sales of our CPOs in respect of United States Holders other than certain exempt persons. A backup withholding tax will apply to such payments if the United States Holder fails to provide a correct taxpayer identification number or other certification of exempt status or, with respect to certain payments, the United States Holder fails to report in full all dividend and interest income and the United States Internal Revenue Service notifies the payer of such under−reporting. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal tax liability, and a refund of any excess amounts withheld under the backup withholding rules may be obtained by timely filing the appropriate claim form with the United States Internal Revenue Service.

Recently enacted legislation requires certain United States Holders to report information with respect to their investment in equity of a non−U.S. issuer not held through a custodial account with a U.S. financial institution to the United States Internal Revenue Service. Investors who fail to report required information could become subject to substantial penalties. Prospective investors are urged to consult their own tax advisors regarding the possible implications of this new legislation on their investment in our CPOs.

**Tax Treaties**

The benefits of treaties for avoidance of double taxation shall be applicable to taxpayers who can demonstrate that they are tax residents in the applicable country for tax purposes and who comply with the conditions of the respective treaty.

A Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and a Protocol thereto (as amended by two additional Protocols, the "Tax Treaty") between the United States and Mexico became effective on January 1, 1994. Provisions of the Tax Treaty that may affect the taxation of certain United States Holders are included above. The United States and Mexico have also entered into an agreement that covers the exchange of information with respect to tax matters.

## WHERE YOU CAN FIND MORE INFORMATION

We are in the process of terminating our registration under Section 12(g) of the Exchange Act and our obligations to file periodic reports with the U.S. Securities and Exchange Commission (the "SEC") under Section 13 and Section 15(d) of the Exchange Act, as described further below. You may access and read our SEC filings through the SEC's website at www.sec.gov. This website contains reports and other information that we file electronically with the SEC. You may also read and copy any reports or other information that we have filed with the SEC at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1−800−SEC−0330 for further information on the public reference room.

You may request a copy of our SEC filings or any other document described in this annual report by contacting us at the number or address specified below:

Ave. Roble 660,
Col. Valle del Campestre, San Pedro Garza García,
Nuevo León, 66265 Mexico
Attention: Investor Relations Department
Telephone number: (52−81) 8863−1600

You may obtain additional information about us through our web site at http://www.vitro.com. The information contained therein is not part of this annual report.

## AVAILABLE INFORMATION

We file reports, including annual reports on Form 20−F, and other information with the SEC pursuant to the rules and regulations of the SEC that apply to foreign private issuers. You may read and copy any materials filed with the SEC at its Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1−800−SEC−0330. As a foreign private issuer, we have been required to make filings with the SEC by electronic means since November 2002. Any filings we make electronically will be available to the public over the Internet at the SEC's web site at www.sec.gov and at our web site at http://www.vitro.com. (This URL is intended to be an inactive textual reference only. It is not intended to be an active hyperlink to our web site. The information on our web site, which might be accessible through a hyperlink resulting from this URL, is not and shall not be deemed to be incorporated into this annual report).

The Company has filed a Form 15−F and a Form 15 with the SEC, as described under "Item 3. Key Information—Recent Developments—Termination of ADRs".

**Item 11. Quantitative and Qualitative Disclosures About Market Risk**

Our business activities require that we hold or issue financial instruments which expose us to market fluctuations of natural gas prices, interest rates and foreign currency exchange rates. To minimize our exposure to these risks, we have utilized DFIs. See "Item 3. Key Information—Recent Developments—Derivative Fiancial Instruments".

Due to our current financial condition and restructuring process, we are currently unable to utilize DFIs to limit our exposure to market fluctuations other than with respect to natural gas, for which we have certain DFIs with Pemex. As of yet, Pemex does not require us to maintain a credit line or post margin calls. See "—Natural Gas Price Risk."

Under normal conditions, our policy is to use DFIs to mitigate our exposure to liquidity and market risks related to our production and financial operations, caused mainly by our natural gas needs, as well as by future commitments made in foreign currencies. The DFIs that we have historically entered into to mitigate these risks are swaps, options and forwards, both simple and structured.

From an economic point of view, DFIs are entered into for hedging purposes, however, for accounting purposes our DFIs have not been designated as hedges because they do not meet all the accounting requirements established by both MFRS and U.S. GAAP, and therefore have been classified as trading instruments. DFIs employed by us are operated in the over−the−counter market with international financial institutions. The main characteristics of the transactions refer to the obligation to buy or sell a certain underlying asset given certain criteria such as cap rate, trigger level, spread, and strike price, among others.

The counterparties function as the calculation agent for the valuations of the operations that the Company maintains in position, based on the contracts of the International Securities Dealer Association (ISDA). The counterparties with which the Company has operated IFD are Credit Suisse, Citibank, Deutsche Bank, Merril Lynch, Calyon, Barclays, Morgan Stanley, Cargill and PEMEX. Due to the fact that the counterparties which the Company has operated are considered highly solvent, there is no formal policy of guarantees and lines of credit. Nevertheless, the ISDA contracts establish a regulatory framework related with those requests.

Our policy for Financial Derivatives Instrument Operations (the "Policy") sets guidelines for the analysis, negotiation, authorization, contracting, operating, monitoring and recording of DFIs, in order to analyze the risk exposure to financial markets, commodities and fluctuations in the economic and financial variables. The Policy is based on the concept that is not permitted to hire IFD for speculative purposes.

For risk strategy and the surveillance of risk compliance, a committee (the "Risk Committee") exists that operates according to certain guidelines. The Risk Committee is made up of various officials of the Company.

The Risk Committee normally has a session once a month and the agenda is developed and presented by the risk administration area ("AR") of the Company, which, at the same time, documents the agreements and topics of the monthly sessions.

The Company handles all the DFI agreements through its AR area, which analyzes, reports and operates the different instruments.

The guidelines establish that operations must be authorized by different organizational levels according to the notional amounts.

Due to our financial condition, at present we cannot enter in additional transactions to minimize our exposure to fluctuations in the exchange rate, the price of natural gas and interest rate. Were we able to enter into such transactions, we could not assure you they would be on favorable terms.

The Risk Committee must define the strategy to be implemented in order to hedge our financial risks. The strategy must take into consideration the following factors:

- Risk tolerance
- Market risks to which we are exposed
- Types of DFIs to use
- Time frames for the strategy
- Circumstances in which we must change our hedging strategy
- Operating budgets and projections

For the purpose of monitoring the strategy and to assure its control, the Risk Committee is required to establish the acceptable parameters of the financial risk that should be monitored in order to avoid surpassing the Company's risk tolerance. The parameters take into account:

- The identification of variables.

- The definition of the authorized instruments for the risk administration strategy.

- The maximum and minimums limits of control.

- Frequency of monitoring.

- Responsible for the monitoring of the variables.
  The Policy requires the annual appointment of an expert to evaluate and certify the process of operation with IFD.

During 2007 and most of 2008, we had or entered into various DFIs to hedge our exposure to natural gas price fluctuations, interest rate and foreign currency exchange rate risks, which exposed us to associated market risks. However, in the second half of 2008 we closed all of our DFI positions, except those entered into with Pemex, and are, therefore, no longer exposed to the market risks associated with those DFI positions. As of December 31, 2009, the Company had hedges for approximately 32% of its estimated consumption at an average price of approximately $6.80 per MMBTU for 2010 and approximately 19% of its estimated consumption at an average price of approximately $7.32 per MMBTU for 2011. For further discussion, see "Item 3. Key Information—Recent Developments— Claims relating to Our Derivative financial instruments."

**Debt Subject to Market Risk**

The table below sets forth information, as of December 31, 2009, regarding our debt obligations that are sensitive to changes in interest rates or foreign currency exchange rates. For these debt obligations, the table presents scheduled principal payments according to their respective maturity dates. In our financial statements, $1,207 million ($1,216 million—$9 million of discount) was reclassified from long−term to short−term since we are not in full compliance under our bond indentures. The fair value of long−term fixed−rate debt is based on (i) if there is an observable market, the quoted market prices for the debt instrument (for example, the 2012 Notes and 2017 Notes) or (ii) if there is not an observable market, the present value of future cash flows, discounted back using the yield curve that applies to the most recent issuance of a comparable instrument. Financial data expressed in pesos and set forth in the following table are presented in nominal pesos

| Expected Maturity Date[1] | 2010 | 2011 | 2012 | 2013 | 2014 | Thereafter | Total | Fair Value |
|---|---|---|---|---|---|---|---|---|
| (million, except for percentages) | | | | | | | | |
| Fixed−Rate Debt: | | | | | | | | |
| Dollar−denominated[2] | 15,911 | 10 | 11 | 12 | 37 | — | 15,981 | 9,146 |
| Weighted−average coupon | 9.49% | | | | | | | |
| Euro−denominated[3] | — | — | — | — | — | — | — | — |
| Weighted−average interest rate | 4.1% | | | | | | | |
| Floating−Rate Debt: | | | | | | | | |
| Dollar−denominated[2] | 963 | 434 | 115 | 112 | 112 | 7 | 1,743 | 1,743 |
| Weighted−average interest rate | LIBOR plus 6.59% | | | | | | | |
| Euro−denominated[3] | 517 | 21 | 17 | 14 | 5 | — | 574 | 574 |
| Weighted−average interest rate | Euribor plus 2.83% | | | | | | | |
| Peso−denominated | 806 | 400 | — | — | 598 | — | 1,804 | 1,804 |
| Weighted−average interest rate | CETES plus 4.95% | | | | | | | |
| | TIIE plus 0.82% | | | | | | | |

[1] The above table was not separated for interest rate and exchange rate risk because the same debt was exposed to both risks. In our financial statements, $1,207 million ($1,216 million — $9 million of discount) were reclassified from long−term to short−term since we are not in full compliance under our Senior Notes indentures.

[2] The principal amount of our dollar−denominated debt was translated to pesos at Ps.13.0587 per U.S. dollar, the Free Exchange Rate as of December 31, 2009.

[3] The principal amount of our euro−denominated debt was translated at Ps. 19.5789 per euro, the exchange rate as of December 31, 2009.

114

**Natural Gas Price Risk**

We define our strategy and objectives in the ordinary course of business, and to fulfill such objectives we limit our exposure to increases in natural gas prices by entering into DFIs suggested by our counterparties and jointly structured with them. This strategy is designed to meet our objectives with the risk that a decrease in natural gas prices could have an adverse effect on the fair value of the derivative instruments, resulting in losses that would be reflected within comprehensive financing result in the income statement. Furthermore, although a further decrease in natural gas prices would have a beneficial impact of substantially reducing our cost of goods sold. However, the benefits to our cost of sales would be realized over a period of time, whereas the effect for the DFIs is recorded immediately in our statements of operations as a result of the mark to market valuation accounting requirements. Additionally, we entered into DFIs suggested by our counterparties and jointly structured with them,,in order to obtain better conditions, such as a reduction in or complete elimination of fees and hedge our exposures. As a result, if natural gas prices significantly decrease, we could be exposed to higher losses than the benefits we would obtain from decreases in our cost of sales.

We have historically entered into swaps and other DFIs in the ordinary course of our business to hedge our exposure to natural gas price increases. As of September 30, 2010, however, the only DFI arrangements to which we remain subject consist of contracts with Pemex for approximately 32% of our estimated consumption for the remainder of the year and approximately 19% of our estimated consumption for 2011. Because of our financial condition, we are currently unable to enter into additional DFI transactions to further minimize our exposure to increases in natural gas prices, and were we able to enter into such transactions, we could not assure you they would be on favorable terms.

For the year ended December 31, 2009, the natural gas price decreased 28% to $4.40 per MMBTU when compared to its closing price for the year ended December 31, 2008 of $6.07 per MMBTU. Our operating income was also affected by the increase in natural gas price as the average price increasing 25% from $3.55 to $4.43 per MMBTU for the nine−month period ended September 30, 2009 compared to the same period of 2010.

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis was performed applying valuation models fully accepted for these types of instruments, and considering changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately $5 million.

**Interest Rate Risk and Foreign Currency Exchange Rate Risk**

Interest rate risk exists primarily with respect to our floating−rate peso and dollar−denominated debt, which generally bear interest based on the TIIE or LIBOR. If the TIIE or LIBOR rates increase significantly, our ability to service our debt will be adversely affected. As of September 30, 2010, our TIIE−rate peso and LIBOR−denominated debt amounted to Ps. 1,548 million ($124 million) and Ps. 486 million ($39 million) respectively.

Because our net sales and a significant portion of our operations are denominated in the Mexican peso and the U.S. dollar, our business is subject to adverse effects of foreign exchange rate fluctuations. These fluctuations may result from changes in economic conditions, investor sentiment, monetary and fiscal policies the liquidity of global markets, international and regional political events, and acts of war or terrorism. In addition, the fluctuation of the foreign exchange rate may adversely affect our U.S. dollar−denominated debt.

We have historically entered into swaps and other DFIs in the ordinary course of our business, in order to hedge interest rates or foreign exchange rates fluctuations. We do not have any hedging transaction regarding interest rates or exchange rates. Because of our current financial condition, we are currently unable to enter into hedging transactions to further minimize our exposure to increases in interest rates or foreign exchange, and were we able to enter into such transactions, we could not assure you they would be on favorable terms. Therefore, increases in interest rates or exchange rates may cause us to realize significant losses in our results of operations.

**Item 12. Description of Securities Other than Equity Securities**
    Not applicable.
**Item 12.D.3 Not applicable.**
**Item 12.D.4 Not applicable.**
**Item 13. Defaults, Dividend Arrearages and Delinquencies**
    As of February 25, 2011, we are in default in the following instruments:

| Company | Bank | Guarantee | Type of Default | Amount |
|---------|------|-----------|-----------------|--------|
| Vitro | 2017 Senior Notes | Substantially all of our subsidiaries | Interest payment default | $162 million |
| Vitro | 2012 Senior Notes | Substantially all of our subsidiaries | Interest payment default | $66 million |
| Vitro | 2013 Senior Notes | Substantially all of our subsidiaries | Interest payment default | $58 million |
| Vitro | RBS | Covisa, Vimexico, Vitro Automotriz, S.A. de C.V. Vidrio y Cristal and Vena. | Principal payment default | $15 million |
| Vitro | Cebures 03 | None | Principal and interest payment default | $13 million |
| Vitro | Cebures 08 | None | Interest payment default | $1 million |
| Vitro | Fintech Investments, LTD. | Substantially all of our subsidiaries | Principal payment default | $10 million |

**Covenant Compliance**
As of September 30, 2010 and as of the issuance date of this annual report on Form 20−F, we are in default on substantially all of our debt. For additional information see "Item 3. Key Information—Recent Developments—Interest and principal payment default on de Old Notes and Vitro's other debt".

**Item 14. Material Modifications to the Rights of Security Holders and Use of Proceeds**
    Not applicable.
**Item 15. Controls and Procedures**
    (a) Disclosure Controls and Procedures
    We have evaluated, with the participation of our chief executive officer and chief financial and administrative officer, the effectiveness of our disclosure controls and procedures as of December 31, 2009. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based upon our evaluation, our chief executive officer, chief administrative officer, and chief financial and administrative officer concluded that our disclosure controls and procedures were effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the applicable rules and forms, and that it is accumulated and communicated to our management, including our chief executive officer and chief financial and administrative officer, as appropriate to allow timely decisions regarding required disclosure.

117

(b) Management's Annual Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a−15(f) and 15d−15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our chief executive officer and chief financial and administrative officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). The evaluation included a review of the documentation of controls, evaluation of the design effectiveness of controls, and testing of the operating effectiveness of controls.

Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with MFRS, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Based on our evaluation under the framework in Internal Controls—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, our management concluded that our internal control over financial reporting was effective as of December 31, 2009.

In addition, any unremediated internal control deficiencies may reduce our ability to provide accurate financial information to our investors. We will continue to monitor and evaluate the effectiveness of our internal controls over financial reporting on an ongoing basis and are committed to taking further action and implementing additional enhancements or improvements, as necessary and as funds allow.

The effectiveness of our internal control over financial reporting as of December 31, 2009 has been audited by Galaz, Yamazaki, Ruiz Urquiza, S.C., Member of Deloitte Touche Tohmatsu, an independent registered public accounting firm, as stated in their report below.

(c) Attestation Report of the Registered Public Accounting Firm

**Report of Independent Registered Public Accounting Firm**
**To the Board of Directors and Stockholders of**
**Vitro, S.A.B. de C.V.**
**Garza García, N.L., Mexico**

We have audited the internal control over financial reporting of Vitro, S.A.B. de C.V. and subsidiaries (the "Company") as of December 31, 2009, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on that risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2009, based on the criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission.

119

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheet and the consolidated statements of operations, cash flows, and changes in stockholders' equity as of and for the year ended December 31, 2009 of the Company, and our report dated February 24, 2011 expressed an unqualified opinion on those financial statements and includes explanatory paragraphs regarding (1) the adoption of the following Mexican Financial Reporting Standards: NIF B−8, Consolidated or Combined Financial Statements; NIF C−8, Intangible Assets and D−8, Share−based Payments, (2) an explanatory paragraph expressing substantial doubt about the Company's ability to continue as a going concern (3) the nature and effect of differences between Mexican Financial Reporting Standards and accounting principles generally accepted in the United States of America (4) the adoption of Financial Accounting Standard Board ("FASB") Accounting Standard Codification ("ASC") 105−10 (previously SFAS No. 168, Financial Accounting Standards Board Accounting Standards Codification), ASC 820−10 (previously SFAS No. 157, Fair Value Measurements), ASC 810−10 (previously SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51) and ASC 855−10 (previously SFAS No. 165, "Subsequent Events"), and (5) that our audit also comprehended the translation of Mexican peso amounts into U.S. dollar amounts in conformity with the basis stated in Note 2a to such consolidated financial statements.

Galaz, Yamazaki, Ruiz Urquiza, S.C.

Member of Deloitte Touche Tohmatsu Limited

*/s/ Jorge Alberto Villarreal*

C.P.C. Jorge Alberto Villarreal

Monterrey, N.L., Mexico

February 24, 2011

(d) Changes in Internal Control Over Financial Reporting

During 2009, there were no changes in our internal control over financial reporting that either materially affected, or would be reasonably likely to have a material effect, on our internal control over financial reporting.

**Item 16. Reserved**

**Item 16A. Audit Committee Financial Expert**

The audit committee hired Mr. Jonathan Davis Arzac to replace Mr. Alfonso González Migoya, who left his position as Financial Expert of our Audit Comitte to become the Chief Executive Officer of Grupo Industrial Saltillo, S.A.B. de C.V. The audit committee believes that Mr. Davis meets the required attributes for the position.

None of our directors meet the qualifications to be an "audit committee financial expert" (as defined under the rules and regulations of the SEC and the listing standards of the NYSE). We consider that the current number and composition of our Board of Directors is appropriate to effectively govern us and set our strategic direction. In addition, in accordance with the guidelines of the Mexican *Código de Mejores Prácticas Corporativas*, or best corporate practices code, we have decided not to increase the size of our Board of Directors, which would have allowed us to include a Director meeting the qualifications to be an "audit committee financial expert" on our Board of Directors and Audit Committee.

**Item 16B. Code of Ethics**

We have adopted a code of ethics (as defined under the rules and regulations of the SEC) that applies to our principal executive officer, principal financial officer and principal accounting officer, among others. The code of ethics became effective on February 1, 2004 and is available on our website at www.vitro.com. If the provisions of the code of ethics that applies to our principal executive officer, principal financial officer or principal accounting officer are amended, or if a waiver therefrom is granted, we will disclose such amendment or waiver on our website at the same address. As part of our Code of Ethics, on March 2005, we launched our anonymous internet submission system where all of our employees, clients, suppliers or any interested person can denounce violations to the Code of Ethics, the website of this system is www.silentwhistle.com/. On the same date, a toll free number was enabled to also receive such complaints; for Mexico, this toll free number is 001−877−LEALTAD (532−5823); for the U.S., this toll free number is 1−877−780−9370.

Since the effectiveness of the code of ethics, it has not been amended nor have any waivers therefore been granted.

120

**Item 16C. Principal Accountant Fees and Services**

The following table sets forth, for the periods indicated, the aggregate fees billed to us by Galaz, Yamazaki, Ruiz Urquiza, S.C., Member of Deloitte Touche Tohmatsu, which we refer to as "Deloitte," our independent registered public accounting firm for (i) Audit Fees, (ii) Audit−Related Fees, (iii) Tax Fees and (iv) Other Fees.

| | | For the year ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2008** | | **2009** | |
| | | (Ps. Millions) | | | |
| Audit Fees | Ps. | 49.5 | 90.6% | Ps. | 44.8 | 86% |
| Audit−Related Fees | | 2.6 | 4.7% | | 4.4 | 8% |
| Tax Fees | | 2.2 | 4% | | 1.4 | 3% |
| All Other Fees | | 0.4 | 0.7% | | 1.5 | 3% |
| Total | Ps. | 54.6 | 100% | Ps. | 52.1 | 100% |

*Audit Fees.* The amount set forth as Audit Fees in the table above represents fees billed to us by Deloitte in connection with their audit of our annual consolidated financial statements, including the audit of our internal control over financial reporting, and the audit of the financial statements of each one of our subsidiaries.

*Audit−Related Fees.* The amount set forth as Audit−Related Fees in the table above represents fees billed to us by Deloitte in connection with attestation services related to the issuance of comfort letters related with our financing activities during 2008 and 2009 and services related to the review of our disclosure controls and procedures.

*Tax Fees.* The amount set forth as Tax Fees in the table above represents fees billed to us by Deloitte in connection with tax advice and compliance services.

*All Other Fees.* The amount set forth as Other Fees in the table above represents fees billed to us by Deloitte in connection with the auditing of payments made to the workers' social security system (*seguro social*) and foreign trade services.

**Audit Committee Pre−Approval Policies and Procedures**

Our Audit Committee is responsible for hiring, compensating and supervising the work of Deloitte, our external auditor. Generally, all services that Deloitte performs for us have to be authorized by our Audit Committee before the performance of those services begins. In some instances, however, we may use the *de minimis* exception provided for in the SEC regulations for non−auditing services. In any case, those amounts have never constituted more than 5% of such services. In each such instance, we will inform our Audit Committee regarding, and present for ratification, such services at the next meeting of our Audit Committee.

**Item 16D. Exemption from the Listing Standards for Audit Committees**

Not applicable.

**Item 16E. Purchases of Equity Securities by the Issuer and Affiliated Purchasers**

As of October 14, 2010, the date of our most recent general ordinary shareholders' meeting, 445,500 of our shares are held as treasury stock. In addition to 39,777,907 of our shares are held in the Stock Option Trust, which are treated as treasury shares for accounting purposes and under Mexican corporate law are considered issued and outstanding.

**Item 16F. Not Applicable**

**Item 16G. Corporate Governance Differences From NYSE Practices**

**DIFFERENCES IN CORPORATE GOVERNANCE PRACTICES**

Pursuant to Section 303A.11 of the Listed Company Manual of the New York Stock Exchange (NYSE), we are required to provide a summary of the significant ways in which our corporate governance practices differ from those required for U.S. companies under the NYSE listing standards.

The table below discloses the significant differences between our corporate governance practices and the NYSE standards.

| NYSE Standards | Our Corporate Governance Practices |
| --- | --- |
| ***Director Independence.*** Majority of board of directors must be independent. *§303A.01* | ***Director Independence.*** Pursuant to the Mexican Law of the Securities Market, our shareholders are required to appoint a Board of Directors in which at least 25% of its members must be independent as defined under the Mexican Law of the Securities Market. However, Vitro has a Board of Directors composed of twelve members, out of whom five are independent, this is, 38% are considered independent directors. The Ordinary Shareholders Meeting is required to make a determination as to the independence of our directors and the CNBV has a term of 30 days to challenge such determination. The definition of independence under Mexican law differs from the NYSE standards. Under Article 26 of the Mexican Law of the Securities Market, a director is not independent if such director is: |
|  | (i) Key Executive Directors, an employee or the subsidiaries of the Company (one year cooling off period); |
|  | (ii) a person who has a significant influence or authority over the Company, the Company's affiliates or the corporate group to which the Company belongs; |
|  | (iii) a shareholder who is part of a "group of persons" who has "control" over the Company. |
|  | (iv) an important client, supplier, debtor or creditor (or a partner, director or employee thereof). A client and supplier is considered important where its sales to or purchases from the company represents more than 10% of the client's or supplier's total sales or purchases. A debtor or creditor is considered important whenever its loan or credit from to the company represents more than 15% of the debtor's or creditor's total assets; |
|  | (v) an employee of a non–profit entity that receives contributions from the company that represent more than 15% of the total contributions received; |
|  | (vi) a CEO or other high ranking officer of another company in which the issuer's CEO or other high ranking officer is a member of the Board of Directors; or |
|  | (vii) a "family member" related to any of the persons mentioned above in (i) through (iv). |
|  | "Family member" includes a person's relative of up to four degrees of consanguinity, affinity or civil, or a person's spouse or partner, in the case of (i) and (iv) above. |
|  | Additionally, our Board of Directors approved to make stricter the classification criteria resolving that a director is not independent if such director is: |
|  | (i) An employee of any foundation, university or non profit entity that receives material donations from the Company. |
|  | (ii) Chief Executive Officer or Key Executive Director of any entity in which board of directors participate the CEO or any Key Ejecutive Director of the Company. |

| **NYSE Standards** | **Our Corporate Governance Practices** |
|---|---|

***Executive Sessions.*** *Non−management directors must meet regularly in executive sessions without management. Independent directors should meet alone in an executive session at least once a year. Also, §303A.03 requires a process for interested parties to communicate their concerns to non−management directors.*

***Executive Sessions.*** Our non−management directors have not held executive sessions without management in the past, and under our bylaws and applicable Mexican law, they are not required to do so.

***Nominating/Corporate Governance Committee.*** *Nominating/corporate governance committee of entirely independent directors is required. The committee must have a written charter specifying the purpose, duties and evaluation procedures of the committee. §303A.04*

***Nominating Committee.*** We do not have a nominating committee or corporate governance committee. We are not required to have a nominating/corporate governance committee, and it is not expressly recommended by the Mexican Law of the Securities Market. However the charter of the Corporate Practices Committee provides that this Committee shall supervise the composition of the Board and ensure compliance with the maximum number of members and with the minimum number of independent directors, as provided by Mexican law.

***Compensation Committee.*** *Compensation committee of independent directors is required, which must evaluate and approve executive officer compensation. The committee must have a charter specifying the purpose, duties and evaluation procedures of the committee. §303A.05*

***Compensation Committee.*** The relevant compensation matters are brought to the attention of the Corporate Practices Committee, such as the (i) appointment and removal of the CEO and his or her total compensation, as well as the total compensation of the Chairman of the Board of Directors; (ii) approval of the policies for the appointment and total compensation of the other Key Executive Directors and (iii) approval of the maximum percentage of wages and salary increases per year.

Our committee does not produce a report on executive compensation. However the charter of the Corporate Practices Committee specifies its duties in this regard.

***Audit Committee.*** *Audit committee satisfying the independence and other requirements of Rule 10A−3 under the Exchange Act and the more stringent requirements under the NYSE standards is required. §§303A.06, 303A.07.*

*The audit committee must be composed of a minimum of three independent directors, one of whom must have accounting or related financial management expertise. The committee must have written charter specifying the purpose, duties and evaluation procedures of the committee. Additionally, a listed company must have an internal audit function to assess risk management processes and the company's system of internal control.*

***Audit Committee.*** We have an audit committee of three members. Each member of the audit committee is independent, as independence is defined under the Mexican Law of the Securities Market, and also meets the independence requirements of Rule 10A−3 under the U.S. Securities Exchange Act of 1934, as amended. Our audit committee operates primarily pursuant to a written charter adopted by our Board of Directors.

123

| NYSE Standards | Our Corporate Governance Practices |
|---|---|

**Equity Compensation Plans.** *Equity compensation plans require shareholder approval, subject to limited exemptions. §§303A.08, 312.03 & 312.04*

**Equity Compensation Plans.** Shareholder approval is not expressly required under Mexican law or our bylaws for the adoption and amendment of an equity−compensation plan. However, the Mexican Law of the Securities Market requires shareholder approval under certain circumstances.

**Shareholder Approval for Issuance of Securities.** *Shareholder approval is required, subject to limited exceptions, for issuance of common stock, or of any securities convertible into or exercisable for common stock (even if not listed on the NYSE), (1) to a director, officer or substantial security holder of the company (each, a "Related Party"), (2) to a subsidiary, affiliate or other closely−related person of a Related Party, (3) to a company or entity in which a Related Party has a substantial interest, if the number of shares of common stock to be issued, or if the number of shares of common stock into which the securities may be convertible or exercisable exceeds one percent of the number of shares of common stock or one percent of the voting power outstanding before such issuance, (4) that have voting power equal to at least 20% of the outstanding common stock voting power before such issuance, (5) that will increase the number of outstanding shares of common stock by at least 20% of the number of outstanding shares before such issuance or (6) that will result in a change of control of the issuer. §§312.03(b)−(e) & 312.04*

**Shareholder Approval for Issuance of Securities.** Mexican law and our bylaws require us to obtain shareholder approval of the issuance of equity securities.

**Code of Business Conduct and Ethics.** *Corporate governance guidelines and a code of business conduct and ethics are required, with prompt disclosure of any waiver for directors or executive officers. The guidelines and code must be disclosed and publicly available and the code must contain compliance standards and procedures that will facilitate the effective operation of the code. §§303 A.09 & 303A.10*

**Code of Business Conduct and Ethics.** We have adopted a code of ethics, which has been accepted by all of our directors and executive officers and other personnel. Our Corporate Practices Committee monitors the applicability of our code of ethics, and may propose amendments to the same, according to its charter. A copy of our code of ethics is available on our web site: www.vitro.com.

**Solicitation of Proxies.** *Solicitation of proxies and provision for proxy materials is required for all meetings of shareholders. Copies of such proxy solicitations are to be provided to NYSE. §§402.01 & 402.04−.06*

**Solicitation of Proxies.** Pursuant to the provisions of the Mexican Law of the Securities Market, beginning on the date when the notice to the shareholders meeting is published, we immediately and free of any charge, make available to the shareholders the documents and information related to each item of the meeting agenda.

Likewise, pursuant to the Mexican Law of the Securities Market, in order for the shareholders to be represented in the shareholders meetings, we elaborate and make available to them power of attorney forms that contain at least: The name of the Company, the items of the agenda and some blank spaces to be filled in by the shareholders to instruct their representatives how to exercise such power of attorney.

| NYSE Standards | Our Corporate Governance Practices |
|---|---|

*Website Requirements. The company must maintain a website that includes printable versions of board committee charters, corporate governance guidelines and the code of business conduct and ethics. Additionally, a foreign private issuer must include on its website English language disclosure of significant differences between its corporate governance practices and the NYSE standards. §§303A.11 & 303A.14*

*Website Requirements*. Pursuant to the applicable Mexican Law, we are not required to maintain printable versions of any document at our website nor information of significant differences between our corporate practices and NYSE standards. Additionally, we are not required to have information available other than in Spanish. Under Mexican Law, we are required to maintain an updated website in Spanish that includes our current bylaws, our annual and quarterly reports and compliance report with the corporate governance code (*código de mejores prácticas corporativas*), material corporate restructuring and information about relevant events. Additionally, our website contains Spanish printable versions of the charters of the Corporate Practices Committee, the Audit Committee and the Finance and Planning Committee as well as of the compliance report with the corporate governance code and of the code of ethics. We also have available at our website the English version of the significant differences between our corporate governance practices and the NYSE standards.

**Item 17. Financial Statements**

Not applicable.

**Item 18. Financial Statements**

Reference is made to pages F−1 through F−164 hereof.

The following financial statements are filed as part of this annual report on Form 20−F:

- Report of Independent Registered Public Accounting Firm for the years ended December 31, 2009, 2008, 2007

- Consolidated Balance Sheets as of December 31, 2009 and 2008

- Consolidated Statements of Operations for the years ended December 31, 2009, 2008 and 2007

- Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2009, 2008 and 2007

- Consolidated Statements of Cash Flows for the years ended December 31, 2009 and 2008.

- Consolidated Statement of Changes in Financial Position for the year ended December 31, 2007.

- Notes to the Consolidated Financial Statements.

**Item 19. Exhibits**

The following documents are included as exhibits to this annual report:

| Exhibit No. | Description | Page |
|---|---|---|
| 1.01 | Amended and restated by−laws (estatutos sociales) of Vitro, S.A.B. de C.V., together with an English translation | c |
| 2.01 | Trust Agreement dated November 28, 1990 between the Common Shares Trustee, as grantor, and the CPO Trustee (the "CPO Trust Agreement"), together with an English translation | i |
| 2.02 | Public Deed dated November 29, 1990 (the "Public Deed"), together with an English translation | i |
| 2.03 | Common Shares Trust Agreement | i |
| 2.04 | CPO Trust Agreement and Public Deed | i |
| 2.05 | Form of Certificado Bursátil | g |
| 2.06 | Indenture dated as of October 22, 2003 ("2013 Indenture") between Vitro, S.A. de C.V. and Wachovia Bank (including exhibits); including Form of 11.75% Senior Note due 2013 | f |
| 2.07 | Form of First Supplemental Indenture dated as of October 23, 2006 to the 2013 Indenture between Vitro, S.A. de C.V. and U.S. Bank National Association as successor trustee to Wachovia Bank, National Association | a |
| 2.08 | First Supplemental Indenture to the 2013 Indenture dated as of February 1, 2007 among Vitro, S.A.B. de C.V., the Guarantors party thereto and U.S. Bank National Association as successor trustee to Wachovia Bank, National Association | c |
| 2.09 | Second Supplemental Indenture to the 2013 Indenture dated as of April 27, 2007 among Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and U.S. Bank National Association as successor trustee to Wachovia Bank, National Association | c |
| 2.10 | Third Supplemental Indenture to the 2013 Indenture dated as of January 16, 2008 between Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and U.S. Bank National Association as successor trustee to Wachovia Bank, National Association | b |
| 2.11 | Fourth Supplemental Indenture to the 2013 Indenture dated as of May 15, 2008 between Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and U.S. Bank National Association as successor trustee to Wachovia Bank, National Association | b |
| 2.12 | Trust Agreement between Banco Invex, S.A., Institucion de Banca Multiple, Invex Grupo Financiero, as issuer and trustee, Distribuidora Nacional de Vidrio, S.A. de C.V. Vitro Flotado Cubiertas, S.A. de C.V., Vitro Automotriz, S.A. de C.V., and Vitro Vidrio y Cristal, S.A. de C.V., dated August 3, 2005, in connection with the issuance of the 6.46% Preferred Notes | d |
| 2.13 | Purchase Agreement between Banco Invex, S.A., Institucion de Banca Multiple, Invex Grupo Financiero, as issuer, Distribuidora Nacional de Vidrio, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitro Automotriz, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V., and Cooperatieve Centrale Raiffeisen−Boerenleenbank B.A. "Rabobank International", as purchaser, dated August 22, 2005, in connection to the sale of 6.46% Preferred Notes — Summary of the document in English attached | d |
| 2.14 | Indenture dated as of February 1, 2007 between Vitro, S.A.B. de C.V., the Guarantors party thereto and The Bank of New York as Trustee ("2012 Indenture") | c |
| 2.15 | Form of 8.625% Senior Note due 2012 | c |

| Exhibit No. | Description | Page |
|---|---|---|
| 2.16 | First Supplemental Indenture to the 2012 Indenture dated as of April 27, 2007 among Vitro, S.A.B. de C.V. the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | c |
| 2.17 | Second Supplemental Indenture to the 2012 Indenture dated as of January 16, 2008 among Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | b |
| 2.18 | Third Supplemental Indenture to the 2012 Indenture dated as of May 15, 2008 among Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | b |
| 2.19 | Indenture dated as of February 1, 2007 between Vitro, S.A.B. de C.V., the Guarantors party thereto and The Bank of New York as Trustee ("2017 Indenture") | c |
| 2.2 | Form of 9.125% Senior Note due 2017 | c |
| 2.21 | First Supplemental Indenture to the 2017 Indenture dated as of April 27, 2007 among Vitro, S.A.B. de C.V. the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | c |
| 2.22 | Second Supplemental Indenture to the 2017 Indenture dated as of January 16, 2008 among Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | b |
| 2.23 | Third Supplemental Indenture to the 2017 Indenture dated as of May 15, 2008 among Vitro, S.A.B. de C.V., the New Guarantors party thereto, the Existing Guarantors party thereto and the Bank of New York | b |
| | There have not been filed as exhibits to this Form 20−F certain long−term debt instruments, none of which relates to indebtedness that exceeds 10% of the consolidated assets of Vitro, S.A.B. de C.V. Vitro, S.A.B. de C.V. agrees to furnish the Securities and Exchange Commission, upon its request, a copy of any instrument defining the rights of holders of long−term debt of Vitro, S.A.B. de C.V. and its consolidated subsidiaries. | |
| 4.01 | Trust Agreement dated as of March 23, 2005 among Compañía Vidriera, S.A. de C.V., Industria del Álcali, S.A. de C.V., Comercializadora Alcali, S. de R.L. de C.V., ABN AMRO Bank (México), S.A., Institución de Banca Múltiple, División Fiduciaria and Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero; Assignment of Rights dated as of March 23, 2005 among Compañía Vidriera, S.A. de C.V., Industria del Alcali, S.A. de C.V., Comercializadora Alcali, S. de R.L. de C.V. and ABN AMRO Bank (México), S.A. Institución de Banca Múltiple, Division Fiduciaru; *Certificados Subordinados* issued by ABN AMRO Bank (México), S.A., Institución de Banca Múltiple, Division Fiduciaria, together with English summary. | e |
| 4.02 | Guaranty dated as of March 31, 2005 among Vitro, S.A.B. de C.V. and of the holders of the *Certificados Subordinados* | e |
| 4.03 | First amendment dated March 31, 2009 to the Trust Agreement dated as of March 23, 2005 among Compañía Vidriera, S.A. de C.V, Industria del Alcali, S.A. de C.V. Bank of America, S.A., Institución de Banca Múltiple, Grupo Financiero Bank of America, División Fiduciaria and Coöperatieve Centrale Raiffeisen−Boerenleenbank, B.A. | j |
| 4.04 | Letter of extension between Pilkington plc and Vitro Vidrio y Cristal, S.A. de C.V., dated April 24, 2006. | e |
| 4.05 | Stock Purchase Agreement of Vidrios Panameños S.A. between the Sellers listed therein and Empresas Comegua, S.A., dated April 4, 2006. | d |
| 4.06 | Partnership Interest Purchase agreement dated January 16, 2009 among Francisco Javier Prado Ovalle, Isaac Prado Ovalle, Recaredo Prado Ovalle, Invergar Participaciones Inmobiliarias, S.L., Isaac Prado Bodelón y Concepción Ovalle Vallinas as Seller and Vimexico, S.A. de C.V. as Purchaser | j |

| Exhibit No. | Description | Page |
|---|---|---|
| 4.07 | Partnership Interest Purchase agreement dated January 30, 2009 among Francisco Javier Prado Ovalle, Isaac Prado Ovalle, Recaredo Prado Ovalle, Invergar Participaciones Inmobiliarias, S.L., Isaac Prado Bodelón y Concepción Ovalle Vallinas as Seller and Vimexico, S.A. de C.V. as Purchaser | j |
| 4.08 | Trust Agreement dated November 3, 2008 among Vitro Envases Norteamerica, S.A. de C.V. Compañia Vidriera, S.A. de C.V., Vitro Corporativo, S.A. de C.V., Vidriera Toluca, S.A. de C.V., Vitro, S.A.B. de C.V. and Nacional Financiera, S.N.C., División Fiduciaria. | j |
| 4.09 | English summary of the Option Agreement dated December 15, 2009 among Skandia Vida, S.A. de C.V., Vitro, S.A.B. de C.V. and Fintech Investments Ltd. | + |
| 4.10 | English summary of the Option Agreement dated December 15, 2009 between Vitro, S.A.B. de C.V. and Fintech Investments Ltd. | + |
| 4.11 | English summary of the Lease agreement dated December 15, 2009 entered into by and between BANCO INVEX, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, INVEX GRUPO FINANCIERO, as Lessor and Compañía Vidriera, S.A. de C.V. as Lessee (as amended). | + |
| 8.1 | List of subsidiaries of Vitro, S.A.B. de C.V. | + |
| 12.1 | Certification of the Chief Executive Officer of Vitro, S.A.B. de C.V. pursuant to Section 302 of the Sarbanes−Oxley Act of 2002. | + |
| 12.2 | Certification of the Chief Financial and Administrative Officer of Vitro, S.A.B. de C.V. pursuant to Section 302 of the Sarbanes−Oxley Act of 2002. | + |
| 13.1 | Certification of the Chief Executive Officer, Chief Financial Officer and Chief Administrative Officer of Vitro, S.A.B. de C.V. pursuant to 18 U.S.C. §1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002. | + |

+    Filed herewith.

a    Filed as an exhibit to the Registration Statement of Vitro, S.A.B. de C.V. on Form F−4 (File No. 333−135546) and incorporated herein by reference thereto.

b    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2007 and incorporated herein by reference thereto.

c    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2006 and incorporated herein by reference thereto.

d    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2005 and incorporated herein by reference thereto.

e    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2004 and incorporated herein by reference thereto.

f    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2003 and incorporated herein by reference thereto.

g    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report for the year ended December 31, 2002 and incorporated herein by reference thereto.

h    Filed as an exhibit to the Registration Statement of Vicap, S.A. de C.V. on Form F−4 (File no. 333−9498) and incorporated herein by reference thereto.

i    Filed as an exhibit to the Registration Statement of Vitro, S.A. de C.V. on Form F−1 (File No. 33−43660) and incorporated herein by reference thereto.

j    Filed as an exhibit to Vitro, S.A.B. de C.V.'s annual report on Form 20−F for the year ended December 31, 2008 and incorporated herein by reference thereto.

**SIGNATURES**

Vitro, S.A.B. de C.V. and Viméxico, S.A. de C.V., hereby certify that they meet all of the requirements for filing on Form 20−F and that they has duly caused and authorized each of the undersigned to sign this annual report on Form 20−F on their behalf.

Date: February 25, 2011

VITRO, S.A.B. DE C.V.,

by    */s/ Hugo Alejandro Lara García*

　　Name: Hugo Alejandro Lara García
　　Title: Chief Executive Officer

by    */s/ Claudio Luis Del Valle Cabello*

　　Name: Claudio Luis Del Valle Cabello
　　Title: Chief Financial and Administrative
　　Officer

VIMÉXICO, S.A. DE C.V.,

by    */s/ Claudio Luis Del Valle Cabello*

　　Name: Claudio Luis Del Valle Cabello
　　Title: Chief Financial and Administrative
　　Officer

129

**Vitro, S.A.B. de C. V. and Subsidiaries**
Consolidated Financial Statements 2007, 2008
and 2009 with Report of Independent Registered Public Accounting Firm
(Translation from Spanish Language Original)

| Content | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F−1 − F−2 |
| Consolidated balance sheets | F−3 − F−4 |
| Consolidated statements of operations | F−5 |
| Consolidated statement of changes in financial position | F−6 − F−7 |
| Consolidated statements of cash flows | F−8 − F−9 |
| Consolidated statements of changes in stockholders' equity | F−10 |
| Notes to consolidated financial statements | F−11 |

# Deloitte.

**Report of Independent Registered Public Accounting Firm**
**To the Board of Directors and Stockholders of**
**Vitro, S.A.B. de C.V.**
**Garza Garcia, N.L., Mexico**

We have audited the accompanying consolidated balance sheets of Vitro, S.A.B. de C.V. and subsidiaries (the "Company") as of December 31, 2008 and 2009, and the related consolidated statements of operations and changes in stockholders' equity for each of the three years in the period ended December 31, 2009, the consolidated statement of changes in financial position for the year ended December 31, 2007 and the consolidated statements of cash flows for the years ended December 31, 2008 and 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in Mexico and with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of Vitro S.A.B. de C.V. and subsidiaries as of December 31, 2008 and 2009, and the results of their operations and changes in their stockholders' equity for each of the three years in the period ended December 31, 2009, their changes in their financial position for the year ended December 31, 2007 and their cash flows for the years ended December 31, 2008 and 2009, in conformity with Mexican Financial Reporting Standards.

As disclosed in note 3 a) to the accompanying consolidated financial statements, the Company adopted the following new Mexican Financial Reporting Standards, which impacted its financial position and results of operations; in 2008: NIF B−2, *Statement of Cash Flows*; NIF B−10, *Effects of Inflation*; NIF D−3, *Employee Benefits* and NIF D−4, *Income Taxes*. In 2009: NIF B−8, *Consolidated or Combined Financial Statements*; NIF C−8, *Intangible Assets* and D−8, *Share−based Payments*.

The accompanying consolidated financial statements for the year ended December 31, 2009, have been prepared assuming that the Company will continue as a going concern. For the years ended December 31, 2008 and 2009, the Company incurred net losses of Ps. 5,682 million and Ps. 754 million, respectively, and one of its business units, which represented 29% of consolidated operating income in 2007 and 11% in 2008, incurred an operating loss in 2009. Additionally, the Company was not in compliance with covenants related to its long−term debt obligations and has received notices of acceleration from its bondholders. As a result, the Company has presented its long−term debt that is currently callable by its creditors as short−term, which has resulted in current liabilities significantly exceeding current assets. As disclosed in Notes 10 and 23 to the accompanying consolidated financial statements, the Company continues to operate normally as it works to achieve its financial restructuring with its creditors. These factors raise substantial doubt about its ability to continue as a going concern. The accompanying financial statements do not include the effects that could result if Company's plans are unable to be realized.

Mexican Financial Reporting Standards vary in certain significant respects from accounting principles generally accepted in the United States of America. The application of the latter would have affected the determination of net income (loss) for each of the three years in the period ended December 31, 2009, and the determination of stockholders' equity as of December 31, 2008 and 2009, to the extent summarized in Note 25.

As disclosed in Note 25 to the accompanying consolidated financial statements, in 2008 the Company adopted the recognition and disclosure provisions of the Financial Accounting Standard Board ("FASB") Accounting Standard Codification ("ASC") 820−10 (previously SFAS No. 157, *Fair Value Measurements*) as it relates to its financial instruments carried at fair value and in 2009 adopted ASC 105−10 (previously SFAS No. 168, *Financial Accounting Standards Board Accounting Standards Codification*), which establishes the FASB Codification as the source of authoritative accounting principles recognized by the FASB, as well as the recognition and disclosure provisions in relation to nonfinancial assets and liabilities recorded at fair value on a non−recurring basis, the accounting and reporting provisions of ASC 810−10 (previously SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51*) as it relates to the Noncontrolling interest in a subsidiary, and the accounting and reporting provisions of ASC 855−10 (previously SFAS 165, *Subsequent Events*) for events that occur after the balance sheet date but before financial statements are issued.

Our audit also comprehended the translation of the Mexican peso amounts into U.S. dollar amounts and, in our opinion; such translation has been made in conformity with the basis stated in Note 2a. The translation of the financial statement amounts into U.S. dollars and the translation of the financial statements into English have been made solely for the convenience of readers.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2009, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated February 24, 2011 expressed an unqualified opinion on the Company's internal control over financial reporting.

Galaz, Yamazaki, Ruiz Urquiza, S.C.
Member of Deloitte Touche Tohmatsu Limited

*/s/ Jorge Alberto Villarreal*
C.P.C. Jorge Alberto Villarreal
Monterrey, N.L., Mexico
February 24, 2011

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | | December 31, | | | Millions of US dollars (Convenience Translation) December 31, |
|---|---|---|---|---|---|
| | | 2008 | 2009 | | 2009 |
| **Assets** | | | | | |
| Cash and cash equivalents | Ps. | 1,428 | Ps. 2,616 | US$ | 200 |
| Trade receivables, net | | 4,301 | 3,201 | | 245 |
| Taxes receivable | | 589 | 146 | | 11 |
| Other receivables | | 1,485 | 961 | | 74 |
| Inventories, net | | 4,178 | 3,172 | | 243 |
| Current assets | | 11,981 | 10,096 | | 773 |
| | | | | | |
| Investment in associated company | | 996 | 886 | | 68 |
| Land and buildings, net | | 8,051 | 6,774 | | 519 |
| Machinery and equipment, net | | 7,890 | 8,001 | | 612 |
| Construction in progress | | 1,332 | 563 | | 43 |
| Goodwill | | 771 | 721 | | 55 |
| Deferred taxes | | 3,418 | 4,515 | | 346 |
| Other assets | | 1,335 | 1,096 | | 84 |
| Long−term assets | | 23,793 | 22,556 | | 1,727 |
| | Ps. | 35,774 | Ps. 32,652 | US$ | 2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

Hugo A. Lara García
Chief Executive Officer

Claudio L. Del Valle Cabello
Chief Financial and Administrative Officer

F−3

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Balance Sheets**
(Millions of Mexican pesos)

| | | December 31, | | Millions of US dollars (Convenience Translation) December 31, |
|---|---|---|---|---|
| | | **2008** | **2009** | **2009** |
| **Liabilities** | | | | |
| Short−term borrowings | Ps. | 2,309 | Ps. 1,680 | US$ 129 |
| Current maturities of long−term debt | | 16,887 | 16,517 | 1,265 |
| Trade payables | | 2,356 | 1,595 | 122 |
| Accrued expenses | | 589 | 713 | 54 |
| Derivative financial instruments | | 3,777 | 3,328 | 255 |
| Interest payable | | 735 | 2,428 | 186 |
| Other current liabilities | | 2,410 | 1,319 | 101 |
| Current liabilities | | 29,063 | 27,580 | 2,112 |
| Long−term debt | | 2,866 | 1,904 | 146 |
| Employee benefits | | 461 | 66 | 5 |
| Deferred taxes | | 11 | | |
| Taxes payable | | | 850 | 65 |
| Other long−term liabilities | | 265 | 268 | 20 |
| Long−term liabilities | | 3,603 | 3,088 | 236 |
| Total liabilities | | 32,666 | 30,668 | 2,348 |
| Commitments and contingencies (note 12) | | | | |
| **Stockholders' equity** | | | | |
| Capital stock: no par value, 386,857,143 shares issued and outstanding in 2008 and 2009 | | 387 | 387 | 30 |
| Restatement of capital stock | | 7,245 | 7,245 | 555 |
| Restated capital stock | | 7,632 | 7,632 | 585 |
| Treasury stock (40,204,310 in 2008 and 2009) | | (547) | (547) | (42) |
| Additional paid−in capital | | 1,761 | 1,645 | 126 |
| Translation effects of foreign subsidiaries | | 402 | 370 | 28 |
| Accumulated deficit | | (7,544) | (8,580) | (657) |
| Controlling interest | | 1,704 | 520 | 40 |
| Noncontrolling interest in consolidated subsidiaries | | 1,404 | 1,464 | 112 |
| Total stockholders' equity | | 3,108 | 1,984 | 152 |
| Total liabilities and stockholders' equity | Ps. | 35,774 | Ps. 32,652 | US$ 2,500 |

The accompanying notes are an integral part of these consolidated financial statements.

F−4

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Operations**
(Millions of Mexican pesos, except per share amounts)

| | | | | | | | | | Millions of US dollars (Convenience Translation) December 31, |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Year ended December 31, | | | | | |
| | | **2007** | | **2008** | | **2009** | | | **2009** |
| Net sales | Ps. | 28,591 | Ps. | 29,013 | Ps. | 23,991 | US$ | | 1,837 |
| Cost of sales | | 20,187 | | 21,279 | | 17,180 | | | 1,316 |
| Gross profit | | 8,404 | | 7,734 | | 6,811 | | | 521 |
| Selling, general and administrative expenses | | 5,700 | | 6,024 | | 5,482 | | | 420 |
| Operating income | | 2,704 | | 1,710 | | 1,329 | | | 101 |
| Total comprehensive financing result | | 1,660 | | 9,077 | | 2,366 | | | 181 |
| Income (loss) after financing cost | | 1,044 | | (7,367) | | (1,037) | | | (80) |
| Other expenses, net | | 869 | | 495 | | 291 | | | 22 |
| Equity in earnings (losses) of associated company | | | | 5 | | (24) | | | (2) |
| Income (loss) before taxes | | 175 | | (7,857) | | (1,352) | | | (104) |
| Income tax expense (benefit) | | 44 | | (2,175) | | (598) | | | (47) |
| Net income (loss) for the year | Ps. | 131 | Ps. | (5,682) | Ps. | (754) | US$ | | (57) |
| Net noncontrolling interest income | Ps. | 144 | Ps. | 24 | Ps. | 33 | US$ | | 3 |
| Net controlling interest loss | | (13) | | (5,706) | | (787) | | | (60) |
| | Ps. | 131 | Ps. | (5,682) | Ps. | (754) | US$ | | (57) |
| Earnings (losses) per common share (based on weighted average shares outstanding of 341,042,193 for 2007, 342,834,251 for 2008 and 346,652,833 for 2009): | | | | | | | | | |
| Income (loss) per share | Ps. | 0.38 | Ps. | (16.57) | Ps. | (2.17) | US$ | | (0.17) |
| Noncontrolling interest income | | (0.42) | | (0.07) | | (0.10) | | | (0.01) |
| Net controlling interest loss | Ps. | (0.04) | Ps. | (16.64) | Ps. | (2.27) | US$ | | (0.18) |

The accompanying notes are an integral part of these consolidated financial statements.

F–5

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statement of Changes in Financial Position**
(Millions of Mexican pesos)

| | | Year ended December 31, 2007 |
|---|---|---:|
| Operating activities: | | |
| Net income from continuing operations | Ps. | 131 |
| Add (deduct) non−cash items: | | |
| Depreciation and amortization | | 1,414 |
| Provision for employee benefits | | 261 |
| Early extinguishment of employee benefits | | 97 |
| Amortization of debt issuance costs | | 170 |
| Loss from sale of subsidiaries and associated companies | | 11 |
| Impairment of long−lived assets | | 122 |
| Loss from sale of long−lived assets | | 47 |
| Mark−to market of derivative financial instruments | | 216 |
| Deferred taxes and workers' profit sharing | | (351) |
| | | 2,118 |
| Increase in trade receivables | | (81) |
| Increase in inventories | | (308) |
| Increase in trade payables | | 243 |
| Change in other current assets and liabilities | | 174 |
| Employee benefits | | (472) |
| Net resources generated by operating activities | | 1,674 |
| | | |
| Financing activities: | | |
| Proceeds from short−term bank loans | | 2,602 |
| Proceeds from long−term bank loans | | 14,289 |
| Amortization in real terms of bank loans | | (611) |
| Payment of short−term bank loans | | (4,864) |
| Payment of long−term bank loans | | (9,459) |
| Debt issuance costs | | (293) |
| Dividends paid to stockholders of Vitro [1] | | (136) |
| Dividends paid to noncontrolling interest | | (79) |
| Purchase of treasury stock | | (1) |
| Other financing activities | | 487 |
| Net resources generated by financing activities | | 1,935 |

F−6

|  |  | Year ended December 31, 2007 |
|---|---|---|
| Investing activities: |  |  |
| Investments in land, buildings, machinery and equipment |  | (2,695) |
| Proceeds from sale of land, buildings, machinery and equipment |  | 72 |
| Restricted cash |  | (88) |
| Investment in subsidiaries |  | (181) |
| Proceeds from sale of subsidiaries and associated companies |  | 37 |
| Other long−term assets |  | (36) |
| Deferred charges |  | (302) |
| Net resources used in investing activities |  | (3,193) |
| Net increase in cash and cash equivalents |  | 416 |
| Balance at beginning of year |  | 1,222 |
| Balance at end of year | Ps. | 1,638 |

<sup>(1)</sup> This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F−7

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Cash Flows**
(Millions of Mexican pesos)

| | | Year ended December 31, | | | | Millions of US dollars (Convenience Translation) |
|---|---|---|---|---|---|---|
| | | 2008 | | 2009 | | 2009 |
| **Operating activities:** | | | | | | |
| Loss before income taxes | Ps. | (7,857) | Ps. | (1,352) | US$ | (104) |
| Items related to investing activities: | | | | | | |
| Depreciation and amortization | | 1,469 | | 1,473 | | 113 |
| Gain from sale of long−lived assets | | (3) | | (209) | | (16) |
| Impairment and retirement of long−lived assets | | 196 | | 207 | | 16 |
| Foreign exchange loss | | 79 | | 6 | | 0 |
| Interest income | | (58) | | (51) | | (4) |
| Equity in (income) loss of associated company | | (5) | | 24 | | 2 |
| Items related to financing activities: | | | | | | |
| Amortization of debt issuance costs | | 55 | | 80 | | 6 |
| Derivative financial instruments | | 3,766 | | 570 | | 44 |
| Foreign exchange loss (gain) | | 3,655 | | (1,177) | | (90) |
| Interest expense | | 2,092 | | 2,750 | | 211 |
| Increase (decrease) for: | | | | | | |
| Trade receivables | | (101) | | 1,049 | | 80 |
| Inventories | | (19) | | 871 | | 67 |
| Trade payables | | (317) | | (587) | | (45) |
| Other current assets and liabilities | | (93) | | 381 | | 29 |
| Employee benefits | | 88 | | (397) | | (30) |
| Income taxes (paid) recoverable | | (211) | | 358 | | 27 |
| Net cash provided by operating activities | | 2,736 | | 3,996 | | 306 |
| **Investing activities:** | | | | | | |
| Investments in machinery and equipment | | (1,798) | | (1009) | | (77) |
| Proceeds from sale of machinery and equipment | | 20 | | 1,410 | | 108 |
| Investment in subsidiaries, net of cash acquired | | (63) | | (454) | | (35) |
| Other assets | | 332 | | 18 | | 1 |
| Deferred charges | | (262) | | (174) | | (13) |
| Interest received | | 60 | | 54 | | 4 |
| Net cash used in investing activities | | (1,711) | | (155) | | (12) |
| **Excess cash to be applied to financing activities** | | 1,025 | | 3,841 | | 294 |

F−8

| | | Year ended December 31, | | | Millions of US dollars (Convenience Translation) |
| | | 2008 | 2009 | | 2009 |
| --- | --- | --- | --- | --- | --- |
| **Financing activities:** | | | | | |
| Proceeds from (payments of) short−term bank loans | Ps. | 1,058 | Ps. (15) | US$ | (1) |
| Interest paid | | (2,044) | (943) | | (72) |
| Dividends paid to stockholders of Vitro, S.A.B. de C.V. [1] | | (143) | | | |
| Dividends paid to noncontrolling interest | | (131) | (14) | | (1) |
| Issuance of capital stock to noncontrolling interest | | 22 | | | |
| Proceeds from long−term bank loans | | 1,976 | 1,559 | | 119 |
| Payments of long−term bank loans | | (1,020) | (2,468) | | (189) |
| Sale of treasury stock | | 75 | | | |
| Debt issuance costs | | (63) | (11) | | (1) |
| Derivative financial instruments | | (1,138) | (824) | | (63) |
| Other financing activities | | (36) | 5 | | 0 |
| Net cash used in financing activities | | (1,444) | (2,711) | | (208) |
| | | | | | |
| Net (decrease) increase in cash and cash equivalents | | (419) | 1,130 | | 86 |
| Adjustment to cash flows due to exchange rate fluctuations | | 93 | 1 | | 0 |
| Deconsolidation of subsidiary | | (105) | | | |
| **Cash and cash equivalents:** | | | | | |
| At the beginning of year (includes restricted cash of Ps. 526 and Ps. 304 at December 31, 2008 and 2009, respectively) | | 2,163 | 1,732 | | 133 |
| | | | | | |
| At the end of year (includes restricted cash of Ps. 304 and Ps. 247 at December 31 2008 and 2009, respectively) | Ps. | 1,732 | Ps. 2,863 | US$ | 219 |

[1]    This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

F−9

**Vitro, S.A.B. de C.V. and Subsidiaries**
**Consolidated Statements of Changes in Stockholders' Equity**
(Millions of Mexican pesos)

| | Restated capital stock | Treasury stock and additional paid-in capital | Shortfall in restatement of capital | Other reserves(1) | Translation effect of foreign subsidiaries | Retained earnings (accumulated deficit) | Noncontrolling interest | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| **Balance at January 1, 2007** | Ps. 7,632 | Ps. 1,816 | Ps. (21,090) | Ps. (2,302) | | Ps. 21,418 | Ps. 1,892 | Ps. 9,366 |
| Dividends (Ps. 0.37 per share)(2) | | | | | | (136) | | (136) |
| Decrease in noncontrolling interest | | | | | | | (57) | (57) |
| Purchase of treasury stock | | (1) | | | | | | (1) |
| Comprehensive income | | | (64) | 166 | | (13) | 125 | 214 |
| **Balance at December 31, 2007** | 7,632 | 1,815 | (21,154) | (2,136) | | 21,269 | 1,960 | 9,386 |
| Reclassification for adoption of new Mexican Financial Reporting Standards | | | 21,154 | 2,136 | | (22,964) | | 326 |
| Dividends (Ps. 0.40 per share)(2) | | | | | | (143) | | (143) |
| Decrease in noncontrolling interest | | (676) | | | | | (815) | (1,491) |
| Sale of treasury stock | | 75 | | | | | | 75 |
| Comprehensive loss | | | | | Ps. 402 | (5,706) | 259 | (5,045) |
| **Balance at December 31, 2008** | 7,632 | 1,214 | 0 | 0 | 402 | (7,544) | 1,404 | 3,108 |
| Effect in retained earnings of cancellation of preoperating costs | | | | | | (12) | (1) | (13) |
| Effect of liability related to Mexican Tax Reform | | | | | | (237) | | (237) |
| Increase in noncontrolling interest | | (116) | | | | | 106 | (10) |
| Comprehensive loss | | | | | (32) | (787) | (45) | (864) |
| **Balance at December 31, 2009** | Ps. 7,632 | Ps. 1,098 | Ps. 0 | Ps. 0 | Ps. 370 | Ps. (8,580) | Ps. 1,464 | Ps. 1,984 |

(1)    Includes the initial cumulative effect of deferred tax and the additional minimum liability related to employee benefits.

(2)    This dividend is recognized for accounting purposes as a capital reimbursement.

The accompanying notes are an integral part of these consolidated financial statements.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
For the years ended December 31, 2007, 2008 and 2009
*(Millions of Mexican pesos, except per share amounts)*

1. **Activities of the Company**

   Vitro, S.A.B. de C.V. (Vitro or the Company) is a Mexican holding company, and together with its subsidiaries serves multiple product markets, including construction and automotive glass; food and beverage, wine, liquor, cosmetics and pharmaceutical glass containers. Vitro's subsidiaries also produce raw materials and equipment and capital goods for industrial use which are vertically integrated into the Glass Containers business unit.

2. **Basis of presentation and principles of consolidation**

   a) *Basis of presentation*

   The accompanying consolidated financial statements of Vitro and its subsidiaries (the Company) are prepared on the basis of Mexican Financial Reporting Standards (NIFs or MFRS) as of the date of these consolidated financial statements.

   The consolidated financial statements and notes as of December 31, 2009 and 2008 and for the years then ended, include balances and transactions denominated in Mexican pesos of different purchasing power, while those as of December 31, 2007 and for the year ended December 31, 2007 are presented in Mexican pesos of purchasing power of December 31, 2007; consequently, they are not comparable.

   Additionally, solely for the convenience of users, the consolidated financial statements as of and for the year ended December 31, 2009, have been translated into United States of America (US) dollars at the rate of Ps. 13.0587 per dollar, the rate of exchange determined by the Banco de México (Mexico's Central Bank) as of December 31, 2009. Such arithmetical translation should not be construed as a representation that the peso amounts shown could be converted into US dollars at such rate or at any other rate.

   In the consolidated financial statements and these notes, references to pesos or "Ps." correspond to Mexican pesos, and references to dollars or "US$" correspond to dollar of the United States of America (the United States).

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

   b)   *Consolidated subsidiaries*

Those companies and special purpose entities in which Vitro either, directly or indirectly, controls are included in the consolidated financial statements. For those companies in which Vitro has joint control, the proportionate consolidation method is used. This method consists of consolidating on a proportionate basis the assets, liabilities, stockholders' equity and revenues and expenses. All significant intercompany balances and transactions have been eliminated in consolidation.

The investment in associated company is valued under the equity method (see note 20 d).

At December 31, 2009, the main subsidiaries the Company consolidates in each reportable segment and its percentage of share ownership, directly or indirectly, are as follows:

| FLAT GLASS | GLASS CONTAINERS | CORPORATE |
|---|---|---|
| Viméxico, S.A. de C.V. (91.80%) | Vitro Envases Norteamérica, S.A. de C.V. (100%) | Vitro Corporativo, S.A. de C.V. (100%) |
| Vidrio y Cristal del Noroeste, S.A. de C.V. (91.80%)(1) | Fabricación de Máquinas, S.A. de C.V. (100%) | Aerovitro, S.A. de C.V.(100%) |
| Vitro Flotado Cubiertas, S.A. de C.V. (91.80%) | Compañía Vidriera, S.A. de C.V. (100%) | Clinica Vitro, A.C.(100%) |
| Vidrio Plano de México, S.A. de C.V. (91.80%) | Vidriera Monterrey, S.A. de C.V. (100%) | American Assets Holding, Co. (100%) |
| Vitro Flex, S.A. de C.V. (91.80%) | Vidriera Guadalajara, S.A. de C.V. (100%) | |
| Cristales Automotrices, S.A. de C.V. (46.81%) | Vidriera Los Reyes, S.A. de C.V. (100%) | |
| Vitro Colombia, S.A. (91.80%) | Vidriera Querétaro, S.A. de C.V. (100%) | |
| Vitro America, LLC. (100%) | Vidriera Toluca, S.A. de C.V. (100%) | |
| Vitro Cristalglass, S.L. (99.29%)(2) | Vitro Packaging, LLC. (100%) | |
| Vitro Chaves Industria de Vidro, S.A. (59.57%) | Vitro Packaging México, S. A. de C.V. (100%) | |
| Vitro Automotriz, S.A. de C.V. (99.92%) | Industria del Álcali, S.A. de C.V. (100%) | |
| Vitro Vidrio y Cristal, S.A. de C.V. (99.99%) | Vidrio Lux, S.A. (100%) | |
| Productos de Valor Agregado en Cristal, S.A. de C.V. (55%) (3) | | |

F−12

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

    (1)   In July 2007, Viméxico acquired the remaining 50% of the outstanding shares of Vitro AFG, S.A. de C.V. (Vitro AFG) from AFG Industries Inc. (AFG Industries), in order to assume control and increase its ownership to 100%, subsequently changing its legal name to Vidrio y Cristal del Noroeste, S.A. de C.V. (see note 20 b).

    (2)   In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated (see note 20 c).

    (3)   In August 2007, Vitro Vidrio y Cristal, S.A. de C.V. (Vitro VyC) acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. (PVA) (see note 20 a).

  *c)*   *Translation of financial statements from foreign subsidiaries*

To consolidate financial statements of foreign subsidiaries, the accounting policies of the foreign entity are first converted to MFRS. The financial statements are subsequently translated to Mexican pesos considering the following methodologies:

Beginning in 2008, foreign operations whose functional currency is the same as their local currency translate their financial statements to Mexican pesos (the Company's reporting currency) using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for assets and liabilities; 2) historical exchange rates for stockholders' equity, revenues, costs and expenses. Through 2007, the financial statements of foreign subsidiaries that operated independently of the Company recognized the effects of inflation of the country in which they operate and were then translated to Mexican pesos using the closing exchange rate in effect at the balance sheet date. In 2007, 2008 and 2009, translation effects are recorded in stockholders' equity.

Beginning in 2008, foreign operations with a functional currency different from the local currency translate their financial statements from the local currency to the functional currency, using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for monetary assets and liabilities; 2) historical exchange rates for non−monetary assets and liabilities and stockholders' equity; and 3) the rate on the date of accrual of revenues, costs and expenses, except those arising from non−monetary items that are translated using the historical exchange rate for the related non−monetary item. Translation effects are recorded within comprehensive financing result. Subsequently, to translate the financial statements from the functional currency to Mexican pesos, the methodology described in the preceding paragraph is used.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*
Recording and functional currencies of foreign subsidiaries are as follows:

| Companies in: | Recording Currency | Functional Currency |
| --- | --- | --- |
| United States of America | Dollar | Dollar |
| Europe | Euro | Euro |
| Central and South America | Local | Dollar |

    *d)*    *Comprehensive income (loss).–* Represents changes in stockholders' equity during the year, for concepts other than distributions and activity in contributed common stock, and is comprised of the net income (loss) of the year, plus other comprehensive income (loss) items of the same period, which are presented directly in stockholders' equity without affecting the consolidated statements of operations. Other comprehensive income (loss) items consist of the translation effects of foreign subsidiaries and, until 2007, the shortfall in restatement of capital and the additional minimum labor liability adjustment.

    *e)*    *Classification of costs and expenses.–* Costs and expenses presented in the consolidated statements of operations were classified according to their function which allows for the analysis of the Company's gross margin.

    *f)*    *Income from operations.–* The Company continues to present operating income in the statements of operations as it is an important financial indicator within the industry and helps to evaluate the Company's performance. Operating income includes ordinary income and cost of sales as well as operating costs. This presentation is comparable with the one used in the consolidated financial statements as of December 31, 2007 and 2008.

F–14

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**3.    Summary of significant accounting policies**

The accompanying consolidated financial statements have been prepared in conformity with MFRS, which require that management make certain estimates and use certain assumptions that affect the amounts reported in the financial statements and their related disclosures; however, actual results may differ from such estimates. The Company's management, upon applying professional judgment, considers that estimates made and assumptions used were adequate under the circumstances. Some of the significant items subject to this estimates and assumptions include the carrying amounts of land, building, machinery and equipment, intangible assets, goodwill, estimates of valuation of account receivables, inventory, deferred income tax assets, valuation of financial instruments and employee benefits liabilities. The significant accounting policies of the Company are as follows:

*a)    Changes in accounting policies*

Beginning January 1, 2008 and 2009, the Company adopted the following new NIF's; consequently the accompanying consolidated financial statements are not comparable.

**For Fiscal Year 2008**

• *NIF B−2, Statement of cash flows* (NIF B−2) — Supersedes Bulletin B−12, *Statement of changes in financial position*. NIF B−2 permits the presentation of such statement using either the direct or the indirect method; the Company elected the indirect method. The statement of cash flows is presented in nominal pesos. According to NIF B−2, this standard should be recognized prospectively; consequently, the Company presents a consolidated statement of cash flows for the years 2008 and 2009, and consolidated statement of changes in financial position for 2007.

• *NIF B−10, Effects of inflation* (NIF B−10) — Considers two economic environments: a) an inflationary environment, where cumulative inflation over a three−year period is 26% or more, in which case, the effects of inflation need to be recognized, and b) non−inflationary environment, where inflation is less than 26% in the same period, in which case, the effects of inflation may not be recognized in the financial statements. Also, NIF B−10 eliminates the replacement cost and specific index valuation methods and requires that the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets be reclassified to retained earnings, except for the gain (loss) from holding non−monetary assets that is identified with inventories or fixed assets that have not been realized as of the effective date of this standard. Such amounts should be maintained in stockholders' equity and realized within current earnings of the period in which such assets are depreciated or sold. The Company determined it was impractical to identify the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets relating to unrealized assets as of January 1, 2008; therefore, on that date, the Company reclassified the entire balance of shortfall in restatement of capital of Ps. 21,154 to retained earnings. NIF B−10 establishes that this accounting change be recognized prospectively.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Since cumulative inflation over the three fiscal years prior to those ended December 31, 2008 and 2009 was 11.56% and 14.34%, respectively, the environment in which the Company operates is no longer inflationary, and the Company discontinued recognition of the effects of inflation in its financial statements beginning January 1, 2008. However, assets, liabilities and stockholders' equity at December 31, 2008 and 2009 include restatement effects recognized through December 31, 2007.

- *NIF D−3, Employee benefits* (NIF D−3) — Incorporates current and deferred statutory employee profit sharing (PTU) as part of its provisions and establishes that deferred PTU must be determined using the asset and liability method established in NIF D−4, *Income Taxes*, instead of only considering temporary differences that arise in the reconciliation between the accounting result and income for PTU purposes. This change did not have effect in the Company's financial position.

  Additionally, as of December 31, 2008, NIF D−3 removed the recognition of the additional minimum liability, which resulted in the elimination of Ps. 796, of which Ps. 338 was related to the intangible labor obligation asset and Ps. 458 was related to the additional minimum labor obligation in stockholders' equity. Additionally, Ps. 42 and Ps. 38 were recognized in earnings for the years ended December 31, 2008 and 2009, respectively, for unamortized items as of December 31, 2007.

  NIF D−3 also incorporates the career salary concept in the actuarial calculation and limits the amortization period of the following items to the lesser of five years or the employee's remaining labor life:

  (i) The beginning balance of the transition liability for termination and retirement benefits.

  (ii) The beginning balance of prior service costs and plan modifications.

  (iii) The beginning balance of actuarial gains and losses from retirement benefits.

- *NIF D−4, Income taxes* (NIF D−4) — Eliminated the permanent difference concept; clarifies and incorporate certain definitions, and required that the balance of the initial cumulative effect of deferred income taxes of Ps. 1,810 to be reclassified to retained earnings.

F−16

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**For Fiscal Year 2009**

- *NIF B−8, Consolidated or combined financial statements* — Establishes that special purpose entities, over which control is exercised, should be consolidated. Provided certain requirements are met, it allows the option to present stand−alone financial statements of intermediate controlling companies and requires that potential voting rights be considered to analyze whether control exists.

  As a result of the analysis performed due to the requirements noted above, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated financial statements (see note 10). The condensed amounts and the effect on the balance sheet as of December 31, 2008 resulting from the retrospective application of the standard, as well as comparative presentation as of December 31, 2009 is as follows:

| | December 31, 2008 As Presented | | Debit (Credit) | | December 31, 2008 As Restated | | December 31, 2009 | |
|---|---|---|---|---|---|---|---|---|
| Other receivables | Ps. | 1,255 | Ps. | 230* | Ps. | 1,485 | Ps. | 90 |
| Trade receivables | | 1,492 | | 2,809 | | 4,301 | | 1,058 |
| Retained undivided interests in securitized receivables | | 1,213 | | (1,213) | | | | |
| Short−term borrowings | | (1,601) | | (708) | | (2,309) | | (845) |
| Interests payable | | (728) | | (7) | | (735) | | (3) |
| Long−term debt | | (1,755) | | (1,111) | | (2,866) | | (300) |

\*    Represents restricted cash presented in other accounts receivable.

- *NIF C−8, Intangible assets* — Establishes the following significant amendments:

(i)    The intangible asset concept is redefined, establishing that the separability condition is not the only condition needed to be identified.

(ii)    Establishes that the acquisition cost must be considered in the initial valuation, identifying the cases of an individual business acquisition or internally arising business, and requiring that it be probable that future economic benefits must flow to the entity.

F−17

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

    (iii)   Establishes that subsequent disbursements on research and development projects in progress must be recognized as expenses when accrued, if they are part of the research phase, or, as an intangible asset, if they meet the criteria to be recognized as such.

    (iv)   The assumption that an intangible asset could not exceed its useful life of twenty years was eliminated.

As a result of adopting this NIF in 2009, the unamortized balance as of December 31, 2008 of capitalized preoperating costs of Ps. 13 net of income tax was written off against retained earnings.

-  *NIF D−8 Share−based payments* — Eliminates the supplemental condition of International Financial Reporting Standard (IFRS) No. 2, Share−based payments, and establishes the same recognition requirements for share−based payment arrangements. The adoption of this new NIF did not impact the Company's financial position or results of operations, as the Company adopted the requirements of IFRS 2 as of its effective date.

*b)*   *Changes in accounting estimates*

Due to the sale of certain plots of land of its subsidiaries in December 2009, the Company revised the estimated useful life of the assets built on such land to a maximum of 15 years, which is equivalent to the term in the lease agreement for such plots of land. The Company recognized the change in estimate prospectively, which impacted current period earnings by Ps. 26.

*c)*   *Recognition of the effects of inflation*

As mentioned in a) above, beginning January 1, 2008, the Company discontinued the recognition of the effects of inflation. Until December 31, 2007, the Company recognized effects of inflation by adjusting its financial statements in terms of pesos with the purchasing power of the date the balance sheets was presented.

Vitro's Mexican subsidiaries previously used the Indice Nacional de Precios al Consumidor (Mexican National Consumer Price Index, or NCPI), published by Banco de Mexico to restate the financial statements. For Vitro's foreign subsidiaries the Consumer Price Index — All Urban Consumers — All Items, Unadjusted (CPI) published by the US Labor Department was previously used to restate the financial statements, and the restated financial statements were translated into Mexican pesos using the applicable exchange rate at the end of the last period presented, except in the case of the Company's subsidiaries located in Spain for which it applied the Price Consumption Index (PCI), published by the National Institute of Statistics of Spain before translation into Mexican pesos using the exchange rate of the Euro of the last period presented.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Through December 31, 2007, such recognition resulted mainly in inflationary gains or losses on non−monetary and monetary items that are presented in the financial statements under the following two captions:

- *Shortfall in restatement of capital* — This item, which is an element of stockholders' equity, represents the accumulated effect of holding nonmonetary assets and the effect of the initial monetary position gain or loss. The cumulative effect of holding nonmonetary assets represents the increase between the specific values of nonmonetary assets in excess of or below the increase attributable to general inflation.

- *Monetary position result* — Monetary position result reflects the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decrease in purchasing power over time. This means that losses are incurred by holding monetary assets, whereas gains are realized by maintaining monetary liabilities. The net effect is presented in the statements of operations as part of the total comprehensive financing result. For foreign subsidiaries the result from monetary position is calculated using the CPI, except in the case of the Company's subsidiaries located in Spain for which it applies the PCI.

    Inflation rates in Mexico for the years ended December 31, 2007, 2008 and 2009, based on the NCPI, are 3.76%, 6.53% and 3.57%, respectively.

d)   *Cash and cash equivalents*

   Consist mainly of bank deposits in checking accounts and readily available investments of highly liquid short−term investments. They are valued at the lower of acquisition cost plus accrued yields or estimated net realizable value and are recognized in results of operations as they accrue.

e)   *Investments in securities*

   According to its intent, from the date of acquisition, the Company classifies its investments in securities instruments in any of the following categories: (1) trading, when the Company intends to trade debt and equity instruments in the short−term, before their maturity, if any. These investments are stated at fair value; any fluctuations in the value of these investments are recognized in current earnings; (2) held−to−maturity, when the Company intends to and is financially capable of holding financial instruments until their maturity. These investments are recognized and maintained at amortized cost; and (3) available−for−sale, investments that include those that are classified neither as trading nor held−to−maturity. These

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

investments are stated at fair value; any unrealized gains and losses resulting from valuation, net of income tax, are recorded as a component of other comprehensive income within stockholders' equity and reclassified to current earnings upon their sale or maturity. The monetary position resulting from the effects of inflation on available−for−sale investment is recorded as a component of other comprehensive income. Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

Investments in securities classified as held−to−maturity and available−for−sale are subject to impairment tests. If there is evidence that the reduction in fair value is other than temporary, the impairment is recognized in current earnings.

Financial liabilities derived from the issuance of debt instruments are recorded at the value of the obligations they represent. Any expenses, premiums and discounts related to the issuance of debt financial instruments are amortized over the life of the instruments.

f)    *Derivative financial instruments*

In addition to market, credit and liquidity risks, the Company is exposed to risks such as: natural gas prices, interest rates and foreign exchange currency fluctuations between the peso/US dollar and peso/euro.

The Company has a policy for its derivative financial instruments (DFI) operations, which sets forth the guidelines for the analysis, negotiation, authorization, contracting, operating, monitoring and recording DFI, in order to analyze the risk exposure to financial markets, commodities and fluctuations in the economic and financial variables.

For the risk strategies and the surveillance regarding the compliance of the chosen risk, there is a Risk Committee which acts in compliance with the policy, and which is comprised by various Company officials.

The Company states all derivatives at fair value in the balance sheet, regardless of the purpose for holding them. The recognition of the changes in the fair value of derivative instruments that are designated as a hedge for accounting purposes depends on if they are fair value hedges or cash flow hedges.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

When derivatives are entered into to hedge risks, and such derivatives meet all hedging requirements, their designation is documented describing the transaction's objective, characteristics, accounting treatment and how the ineffectiveness of the instrument will be measured.

Changes in the fair value of derivative instruments designated as hedges for accounting purposes are recognized as follows: (1) for fair value hedges, changes in both the derivative instrument and the hedged item are recognized in current earnings; (2) for cash flow hedges, changes in the derivative instrument are temporarily recognized as a component of other comprehensive income and then reclassified to current earnings when affected by the hedged item. Any ineffective portion of the change in fair value is immediately recognized in current earnings, within total comprehensive financing result.

The Company's derivative financial instruments have not been designated as hedges for accounting purposes. Changes in fair value of such derivative instruments are recognized in current earnings as a component of total comprehensive financing result.

The Company reviews all contracts entered into to identify embedded derivatives that should be segregated from the host contract for purposes of valuation and recognition. When an embedded derivative is identified and the host contract has not been stated at fair value and adequate elements for its valuation exist, the embedded derivative is segregated from the host contract and stated at fair value. Initial valuation and changes in the fair value of the embedded derivatives at the closing of each period are recognized in current earnings.

g) *Inventories and cost of sales*

Inventories are stated at the average purchase price or at the average production price, without exceeding net realizable value. Cost of sales is determined by applying such average amounts when the inventories are utilized or sold at the time of the sale. Through December 31, 2007, cost of sales was previously restated using replacement cost or the latest production cost at the time of the sale.

h) *Investment in associated company*

Investment in associated company in which the Company holds 49.7% of its capital stock is valued using the equity method of accounting.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

i)    *Land, buildings, machinery and equipment*

Expenditures for land, buildings, machinery and equipment, including major maintenance activities and improvements that extend useful lives, are capitalized and beginning on January 1, 2008, are recorded at acquisition cost. Balances arising from acquisitions made through December 31, 2007 were restated for the effects of inflation by applying factors derived from the NCPI through that date. The initial balance to apply the NCPI was the net replacement value of the Company's long−lived asset as of December 31, 1996. For machinery and equipment purchased in a foreign country, the restatement was based on the inflation index mentioned above and the exchange rate at the end of each period.

Beginning on January 1, 2007, the carrying value of qualifying assets includes the capitalization of total comprehensive financing result (CFR).

Depreciation is calculated using the straight−line method based on the remaining estimated useful lives of the related assets. Depreciation begins in the month in which the asset is placed in service. The estimated useful lives of the assets are as follows:

|  | Years |
| --- | --- |
| Buildings | 15 to 50 |
| Machinery and equipment | 3 to 30 |

Maintenance and repair expenses are recorded as costs and expenses in the period incurred.

j)    *Other assets*

Other assets primarily include debt issuance costs and the capitalized software costs. They are recorded at acquisition value and, until December 31, 2007, were restated using factors derived from the NCPI. The debt issuance costs are amortized over the term of the related financial liability and capitalized software is amortized over a period of 80 months, which is its expected useful life.

k)    *Impairment of long−lived assets in use*

The Company reviews the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price. Impairment is recorded when the carrying amounts exceed the greater of the amounts mentioned above. The impairment indicators considered for these purposes are, among others, the operating losses or negative cash flows in the period if they are combined with a history or projection of losses, depreciation and amortization charged to results, which in percentage terms in relation to revenues are substantially higher than that of previous years, obsolescence, reduction in the demand for the products manufactured, competition and other legal and economic factors.

F−22

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

l)   *Provisions*

Provisions are recognized for current obligations that result from a past event, that are probable to result in the use of economic resources, and can be reasonably estimated.

m)   *Goodwill*

Goodwill represents the excess of cost over fair value of subsidiaries as of the date of acquisition and at least once a year is subject to impairment tests. Through December 31, 2007 it was restated using the NCPI. The Company recognizes goodwill corresponding to the controlling interest and beginning in 2009, the noncontrolling interest.

n)   *Employee benefits*

Direct employee benefits are calculated based on the services rendered by employees, considering their most recent salaries. The liability is recognized as it accrues.

Seniority premiums, pension plans and severance payments are recognized as costs over the expected service period of employees and are calculated by independent actuaries using the projected unit credit method, using nominal interest rates beginning in 2008 and real (inflation−adjusted) interest rates through 2007.

o)   *Share−based payment plans*

The Company has historically utilized equity incentive plans that permit the Company to grant stock options and nonvested shares (equity awards) to certain employees and directors of the Company. The Company recognizes the fair value of equity awards computed at the award's grant date over the period in which the requisite service is rendered.

p)   *Foreign currency balances and transactions*

Foreign currency transactions are recorded at the applicable exchange rate in effect at the transaction date. Monetary assets and liabilities denominated in foreign currency are translated into Mexican pesos at the applicable exchange rate in effect at the balance sheet date. Exchange fluctuations are recorded as a component of net comprehensive financing cost in the consolidated statements of operations.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

q) *Revenue recognition*

Revenues and related costs are recognized in the period in which risks and rewards of ownership of the inventories are transferred to customers, which generally coincides with the shipment of products to customers in satisfaction of orders.

r) *Statutory employee profit sharing (PTU)*

Statutory employee profit sharing is recorded in the results of the year in which it is incurred and presented under other income and expenses in the accompanying consolidated statement of operations. Beginning in 2008 deferred PTU is derived from temporary differences that resulted from comparing the accounting and tax basis of assets and liabilities and, through 2007, resulted from comparing the accounting result and income for PTU purposes. Deferred PTU is recognized only when it can be reasonably assumed that such difference will generate a liability or benefit, and there is no indication that circumstances will change in such a way that the liabilities will not be paid or benefits will not be realized.

s) *Income taxes*

Income taxes, which calculated as the higher of regular income tax (ISR) or the Business Flat Tax (IETU) are recorded in the results of the year they are incurred. To recognize deferred income taxes, based on its financial projections, the Company determines whether it expects to incur ISR or IETU and accordingly recognizes deferred taxes based on the tax it expects to pay. Deferred taxes are calculated by applying the corresponding tax rate to the applicable temporary differences resulting from comparing the accounting and tax bases of assets and liabilities and including, if any, future benefits from tax loss carryforwards and certain tax credits. Deferred tax assets are recorded only when there is a high probability of recovery.

Tax on assets (IMPAC), prevailing until 2007, that were expected to be recoverable are recorded as an advance payment of ISR and presented in the balance sheet increasing the deferred ISR asset.

t) *Earnings (loss) per share*

Basic earnings (loss) per common share are calculated by dividing consolidated net income (loss) for the controlling interest by the weighted average number of shares outstanding during the year. Diluted earnings per share are determined by adjusting consolidated net income and common shares on the assumption that the entity's commitments to issue or exchange its own shares would be realized. Diluted earnings per share is not presented for periods in which the effect of including common stock equivalents is anti−dilutive or periods in which the Company records a net loss from continuing operations as was the case in 2008 and 2009. In 2007 diluted earnings per share was not presented as it is the same as basic earnings per share.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*
    u)     *Foreign subsidiaries as economic hedges*

The Company's management designated some liabilities as economic hedges of their foreign subsidiaries. The resulting exchange rate fluctuation is presented in the shortfall in restatement of capital within stockholders' equity to the extent the net investment in the foreign subsidiary covers the investment. Through December 31, 2007, the result from monetary position is measured using inflation factors from the designated subsidiary's country of origin. The effect related to this hedge for 2007, 2008 and 2009 was a net (loss) gain to comprehensive income, net of income tax, of Ps. (16), Ps. (601) and Ps. 118, respectively.

**4. Trade receivable**
    a)     Trade receivables

Trade receivables are summarized as follows:

|  | | December 31, | | |
|---|---|---|---|---|
|  | | **2008** | | **2009** |
| Trade receivables[1] | Ps. | 4,713 | Ps. | 3,571 |
| Allowance for doubtful accounts and other discounts | | (412) | | (370) |
|  | Ps. | 4,301 | Ps. | 3,201 |

[1] Trade receivables include balances of Ps. 2,850 and Ps. 1,609 as of December 31, 2008 and 2009, respectively, which serve as collateral as part of the Company's accounts receivable securitization facilities. Although the related trusts in which they are held are included in the Company's consolidated financial statements, they are legally independent (see Note 3 a).

    b)     Other receivables:

Other receivables include Ps. 298 and Ps. 218 of restricted cash as of December 31, 2008 and 2009, respectively. This amount includes Ps. 230 and Ps. 90 from the Company's account receivable securitization facilities.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**5.    Inventories**

Inventories are summarized as follows:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Semi−finished and finished products | Ps. | 2,892 | Ps. | 2,120 |
| Raw materials | | 699 | | 474 |
| Packaging materials | | 86 | | 74 |
| Spare parts | | 296 | | 243 |
| Refractory | | 85 | | 94 |
| Merchandise in transit and other | | 241 | | 318 |
| | | 4,299 | | 3,323 |
| Less allowance for obsolescence and slow moving parts | | 121 | | 151 |
| | Ps. | 4,178 | Ps. | 3,172 |

As of December 31, 2009, inventory of Ps. 237 has been provided as a guarantee for certain of the Company's short−term financing transactions.

**6.    Land, buildings, machinery and equipment**

*a)*    Land, buildings, machinery and equipment are summarized as follows:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Land | Ps. | 3,278 | Ps. | 2,351 |
| Buildings | | 10,801 | | 10,589 |
| Less: Accumulated depreciation | | 6,028 | | 6,166 |
| | Ps. | 8,051 | Ps. | 6,774 |
| Machinery and equipment | Ps. | 24,734 | Ps. | 25,399 |
| Less: Accumulated depreciation | | 16,844 | | 17,398 |
| | Ps. | 7,890 | Ps. | 8,001 |

*b)*    In 2007, 2008 and 2009, the Company capitalized CFR of Ps. 10, Ps. 474 and Ps. 3 respectively, directly attributable to the acquisition of qualifying assets.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

   c)    *Sale of real estate*

In December 2006, Vitro sold real estate located in Mexico City for US$100 million, 80% payable on the date of sale and the remainder payable on the delivery date of the property.

Vitro guaranteed up to US$80 million in favor of the purchaser payable in the event that the property was not delivered to the purchaser prior to December 2009. As of December 31, 2008, the Company fulfilled all the requirements demanded under the contract. In 2009 the Company received US$5 million and as of the issuance date of these consolidated financial statements is seeking legal remedies for payment of the remaining amount (see note 23 e).

On December 15, 2009, the Company sold, through a trust, seven real estate properties, on which some of its manufacturing facilities are located, receiving US$75 million in the transaction, and has entered into a 15−year lease agreement that allows the Company to continue using such assets. The Company has the right to repurchase the title to these real estate assets in exchange for US$126 million in cash.

Additionally, subject to the occurrence of uncertain future events, the buyer of such properties may exercise an option obtained on the same date requiring the Company to obtain the rights over the trust, and to deliver its own shares and/or a sub−holding subsidiary's common shares. The option related to the representative shares of the Company's stockholders equity, would be from the shares that are currently held by the Pension and Stock Option Trusts and the remainder to complete US$75 million would be fulfilled with the delivery of a percentage of the sub−holding subsidiary's shares, both valued under the terms included in the agreement. The Company has the option to repurchase the sub−holding subsidiary's shares during the next three years following their delivery.

   d)    *Fixed assets contributed to a trust*

In November 2008, the Company, through one of its subsidiaries, contributed non−productive real estate assets with a book value of Ps. 1,875 as of December 31, 2008 to a trust created for the sole purpose to sell such assets, if necessary, in order to generate the necessary resources to pay off the principal from a US$100 million line of credit obtained from a financial institution. As of December 31, 2008 and 2009, the proceeds drawn against the loan were US$85 million and US$68 million, respectively (see note 23 f).

F−27

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

7. **Other assets**

As of December 31, 2008 and 2009, the balance in other assets includes Ps. 808 and Ps. 639, of capitalized software costs, respectively, and Ps. 286 and Ps. 255, of debt issuance costs, respectively, as well as Ps. 6 and Ps. 29 of restricted cash, respectively.

8. **Derivative financial instruments**

Derivative financial instruments have not been designated as hedges because they do not meet all of the requirements according to MFRS and are therefore classified as trading instruments for accounting purposes.

During 2009, no new derivative financial instruments were purchased. As of December 31, 2009, only those derivative instruments whose purpose is to mitigate the risk of increases in the price of natural gas, which were entered into prior to 2009, remain outstanding, as follows:

| Open derivative financial instruments | Notional MMBTUs* | Period | Fair Value Asset (liability) | |
|---|---|---|---|---|
| Natural gas swaps with Pemex | 8,640,000** | 2010 – 2011** | Ps. | (191) |
| Embedded derivatives identified in supply contracts[1] | | | | 2 |
| Total open derivative financial instruments | | | Ps. | (189) |

\*      Million British Thermal Units.

\*\*    As of December 31, 2009, the Company has hedges for approximately 32% of its estimated consumption at an average price of approximately US$6.80 per MMBTU for 2010 and 19% of its estimated consumption at an average price of approximately US$7.32 per MMBTU for 2011.

[1]    Included in other receivables

The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis was performed applying valuation models fully accepted for these types of instruments, and considering changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately US$5 million.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*
• The following table discloses the derivative financial instruments the Company unwound in 2008:

| Summary of unwound derivative financial instruments | | Value of unwound positions (liability) |
|---|---|---|
| Natural gas contracts | Ps. | (2,825) |
| Foreign exchange options | | (1,556) |
| Interest rate options | | 133 |
| Total unwound derivative financial instruments | | (4,248) |
| Cash deposited as collateral | | 1,111 |
| Total unwound derivative financial instruments, net | Ps. | (3,137) |

In the fourth quarter of 2008 the Company's management decided to unwind a majority of its open derivative positions that had been adversely affected due to high volatility experienced in the financial markets, which resulted in a significant devaluation between the peso/US dollar and peso/euro parity, as well as a significant reduction in energy prices.

As of December 31, 2008, certain positions have been unwound for approximately US$325 million and have not been paid. The cash deposited with the third parties as collateral related to these positions is approximately US$85 million (not including interest) and for accounting purposes in accordance with MFRS, is presented net of the derivative financial instruments liability as a right of offset exists.

During February and March of 2009, six out of the seven banks that are counterparties with whom the Company and some of its subsidiaries entered into derivative financial instruments (the Counterparties) have filed law suits in the Supreme Court of the State of New York demanding the payment of US$240 million plus interest and other fees related to the unwound derivative instruments.

The Counterparties have requested that a resolution be sought through the courts by filing a motion for summary judgment. This solution was postponed on various occasions beginning in August 2009 (see notes 23 b and 23 c).

**9.  Short−term borrowings**

At December 31, 2008 and 2009, the short−term borrowings denominated in pesos totaled Ps. 308 and Ps. 786, respectively, and at December 31, 2008 and 2009 denominated in US dollars totaled Ps. 1,359 and Ps. 404, respectively, and denominated in euros totaled Ps. 642 and Ps. 490, respectively. During 2009, the Company's weighted average interest rate for short−term borrowings denominated in pesos, US dollars and euros was 11.05%, 10.09% and 4.08%, respectively.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*
**10.  Long−term debt**
    Long−term debt consists of the following:

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2008** | | **2009** | |
| *I. Foreign Subsidiaries (payable in US dollars):* | | | | |
| Unsecured debt, floating interest rate based on Fixed Term Deposits (DTF) plus a spread of 6%, principal payable in several installments through 2013 | Ps. | 13 | Ps. | 11 |
| Capital lease, with fixed interest rate ranging between 6% and 7.67%, maturing in several installments through 2012 | | 12 | | 44 |
| *II. Foreign Subsidiaries (payable in euros):* | | | | |
| Unsecured debt, interest rate based on EURIBOR plus a margin ranging from 1.10% to 1.25%, with different maturity dates up to 2014 | | 57 | | 44 |
| Capital leases, floating interest rate based on EURIBOR, plus a margin ranging from 0.625% to 1.25%, with different maturity dates up to 2014 | | 40 | | 37 |
| Fixed interest rate capital leases ranging from 0.84% to 3.84%, with different maturity dates up to 2010 | | 11 | | 2 |
| *III. Vitro and Mexican Subsidiaries (payable in US dollars):* | | | | |
| 11.75% Guaranteed senior unsecured notes due in 2013[1] | | 2,976 | | 2,811 |
| 8.625% Guaranteed senior unsecured notes due in 2012[1] | | 4,120 | | 3,898 |
| 9.125% Guaranteed senior unsecured notes due in 2017[1] | | 9,593 | | 9,062 |
| Secured debt with fixed interest rate of 7.86%, maturing in several installments through 2011 (see note 6 d) | | 1,178 | | 892 |
| Capital lease with fixed interest rate of 10.7494%, maturing in several installments through 2016 | | 92 | | 79 |

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

|  | December 31, | |
|---|---|---|
|  | **2008** | **2009** |
| Unsecured debt, floating interest rate based on LIBOR plus 8%, maturing in several installments through 2014 |  | 392 |
| Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 10.75%,maturing in 2010 | 263 |  |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, fixed interest rate of 6.5%, maturing in 2010 | 298 |  |
| *IV. Vitro and Mexican Subsidiaries (payable in Mexican pesos):* |  |  |
| Unsecured medium−term notes, floating interest rate based on 182− day Mexican treasury bonds (CETES) plus a spread of 3.25%, payable in 2009 | 150 | 150 |
| Unsecured medium−term notes, floating interest based on TIIE plus a spread of 2.50%, and maturing in 2011 | 400 | 400 |
| Secured debt, floating interest rate based on TIIE plus a 4% spread, maturing in several installments through 2014 |  | 299 |
| Secured borrowing related to the glass container businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus 4% spread, maturing in 2010 | 550 |  |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2014 |  | 300 |
| Total long−term debt | 19,753 | 18,421 |
| Less current maturities | 198 | 746 |
| Less reclassification of long−term debt[1] | 16,689 | 15,771 |
| Long−term debt, excluding current maturities of long−term debt | Ps. 2,866 | Ps. 1,904 |

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

[1] As of December 31, 2008 and 2009, the Company was in default under the indentures governing the Senior Notes due 2012, 2013 and 2017 for US$300 million, US$216 million and US$700 million, respectively; therefore, Ps. 16,689 and Ps. 15,771, respectively, were reclassified as short−term. As a result, as of December 31, 2008, other contracts of approximately US$81 million with maturity in 2009, entered into default, of which US$52 million were refinanced.

As of December 31, 2009, the interest rates of EURIBOR, CETES, TIIE, LIBOR and DTF were 1.24%, 4.61%, 8.74%, 0.25% and 4.11%, respectively.

The schedule of contractual principal payments of long−term debt as of December 31, 2009 is as follows:

| Year ending December 31, | | |
|---|---|---|
| 2011 | Ps. | 864 |
| 2012 | | 142 |
| 2013 | | 139 |
| 2014 | | 752 |
| 2015 and thereafter | | 7 |
| | Ps. | 1,904 |

The Company is continuing discussions with the Counterparties, its bondholders and its creditors to achieve an organized financial restructuring to improve its financial position. The Company maintains its normal operations as it seeks to achieve a restructuring of its indebtedness (see notes 23 a and 23 c). In addition, the Company has adopted cost reduction initiatives throughout its entire organization, while optimizing production capacity according to its actual level of operation. Also, the Company has significantly reduced its capital expenditures for 2009 and future years.

In May 2009 the Company received notification of an executive mercantile trial initiated by Scotia Bank Inverlat, Casa de Bolsa, S.A. de C.V. Grupo Financiero Scotia Inverlat in its capacity as common representative for the holders of Certificados Bursátiles with the ticker symbol "VITRO 03" demanding payment of Ps. 150.3 plus interest. Evidence and pleas were heard during September and October 2009. At that time the court ruled that the plaintiff had wrongfully conducted this proceeding and therefore, the process would have to be handled as an ordinary mercantile trial. In October 2009, the judge made a definitive ruling against Vitro, and sentenced it to pay the disputed amount plus interest, therefore, the Company filed an appeal against this ruling, requesting that the proceedings begin again, to cancel the liens, to reverse the ruling and to pronounce judgment against the plaintiff and order payment of legal expenses. During April 2010, the appeals court granted Vitro its petition and revoked the decision of the lower court and invalidated the proceedings and ordered the parties to begin the case again.

F−32

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

In July 2009 the Company and other defendant subsidiaries received notification of an executive mercantile lawsuit brought by RBS Bank in its character as creditor demanding the payment of US$15 million plus interest. During September and October 2009 hearings ended on the evidence and pleas. In October 2009 a preliminary ruling was given requiring the Company to pay the principal amount plus ordinary and default interest. On January 18, 2010 the Company appealed this resolution as well as others that were issued in these proceedings where certain evidence was dismissed. In September 2010 the Court of Appeals accepted one of the appeals being revised, because it had merits due to violation of certain defense rights and order to restart the proceeding to gather evidence by the Company, leaving without effects the first instance judgment and the appeal without merits.

11. **Employee benefits**

   *a)* The Company has a defined benefit pension plan that covers all its personnel, which consists of a lump sum payment or a monthly pension calculated based on the aggregate of a basic pension, an additional seniority pension and an additional pension for equal or less earnings than the ceiling used for the Mexican Social Security Institute.

   The retirement ages are as follows:

   • Normal. — Personnel that are 65 years old with 20 or more years of service.

   • Advanced. — Personnel that are 60 years old with a minimum of 20 or more years of service, reducing the pension by a percentage point each year before reaching 65 years of age.

   • Early. — Personnel that are 50 years old with 10 or more years of service, reducing the pension by a percentage according to the age at the moment of retirement.

   • Aggregate of 100. — With the approval of the Technical Committee, personnel whose aggregate age and years of service is 100.

   • Deferred. — Personnel who do not accept retirement upon becoming 65 years old lose all the rights to receive a pension from the plan.

   This plan also provides seniority premium benefits, which consist of a lump sum payment of 12 days' wage for each year worked, calculated using the most recent salary, not to exceed twice the legal minimum wage established by law, as well as severance payments, which consists of a three month and twenty days wage payment for each year served. The related liability and annual cost of such benefits are calculated by an independent actuary on the basis of formulas defined in the plans using the projected unit credit method.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

b)     The present values of these obligations and the rates used for the calculations are:

| | | December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2008 | | 2009 |
| Vested benefit obligation | Ps. | 2,514 | Ps. | 3,052 |
| Nonvested benefit obligation | | 486 | | 446 |
| Defined benefit obligation | | 3,000 | | 3,498 |
| Plan assets at fair value | | (684) | | (1,140) |
| Unfunded status | | 2,316 | | 2,358 |
| Unrecognized items: | | | | |
| Prior service costs and plan amendments | | (222) | | (163) |
| Unrecognized transition obligation | | (138) | | (125) |
| Unrecognized actuarial gains and losses | | (1,495) | | (2,004) |
| Projected net liability | Ps. | 461 | Ps. | 66 |

At December 31, 2008 and 2009 the plan assets presented above, includes 53.3 million Vitro shares.

Assumptions

| | December 31, | |
| --- | --- | --- |
| | 2008 | 2009 |
| Discount rate | 10.25% | 9.50% |
| Expected rate of return on plan assets | 12.25% | 10.50% |
| Rate of compensation increase | 3.50% | 3.50% |

c)     Net periodic cost consists of:

| | | Year ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2007 | | 2008 | | 2009 |
| Service cost | Ps. | 96 | Ps. | 143 | Ps. | 81 |
| Interest cost | | 149 | | 268 | | 287 |
| Amortization of unrecognized prior service costs | | 56 | | 72 | | 68 |
| Actuarial gains and losses | | 48 | | 177 | | 91 |
| Effect of reduction and early liquidation | | 97 | | | | |
| Expected yield on plan assets | | (88) | | (166) | | (82) |
| Net periodic cost | Ps. | 358 | Ps. | 494 | Ps. | 445 |

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Certain unrecognized items as of December 31, 2007 are being amortized to results of operations within a maximum period of 5 years or the employee's remaining service life, if less. Through December 31, 2007, these items were amortized to results of operations based on the employee's average remaining labor life. Starting in 2008, unrecognized items incurred from January 1, 2008 are amortized to results of operations based on the employees' average remaining service lives, which is between 10 and 16 years. This change represented a charge to current earnings of Ps. 42 and Ps. 38 in 2008 and 2009, respectively.

d) Changes in present value of the defined benefit obligation:

| | | Year ended December 31 | | |
| --- | --- | --- | --- | --- |
| | | **2008** | | **2009** |
| Present value of the defined benefit obligation as of January 1 | Ps. | 3,319 | Ps. | 3,000 |
| Service cost | | 143 | | 81 |
| Interest cost | | 268 | | 287 |
| Benefits paid | | (526) | | (431) |
| Actuarial (gain) loss | | (112) | | 561 |
| Deconsolidation of Comegua | | (92) | | |
| Present value of the defined benefit obligation as of December 31 | Ps. | 3,000 | Ps. | 3,498 |

e) Changes in fair value of plan assets:

| | | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2008** | | **2009** |
| Fair value of plan assets as of January 1 | Ps. | 1,548 | Ps. | 684 |
| Expected return | | 166 | | 82 |
| Actuarial losses | | (912) | | (39) |
| Contributions made by the Company | | 140 | | 774 |
| Benefits paid | | (258) | | (361) |
| Fair value of plan assets as of December 31 | Ps. | 684 | Ps. | 1,140 |

Classification of plan assets as of December 31, 2009:

| | **Expected Yield** | **Actual Yield** |
| --- | --- | --- |
| Capital instruments (Vitro A shares) | 13.00% | 3.00% |
| Other | 8.67% | 4.42% |

The rate of return on the plan assets is determined using a composition of 42% of Vitro's shares and 58% in investments in securities.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**12.    Commitments and contingencies**

*a)*    In October 2000, several subsidiaries of Vitro, which have facilities throughout Monterrey, Mexico and the Mexico City area, entered into a 15−year energy purchase agreement for approximately 90 Megawatts of electricity and 1.3 million tons of steam per year with Tractebel Energía de Monterrey, S. de R.L. de C.V.

*b)*    The Company has several non−cancelable operating lease agreements for the rent of warehouses and equipment. Rental expense for the years ended December 31, 2007, 2008 and 2009 was Ps. 541, Ps. 646 and Ps. 794, respectively.

Future minimum lease payments under these agreements are as follows:

| | | |
|---|---|---|
| 2010 | Ps. | 861 |
| 2011 | | 809 |
| 2012 | | 714 |
| 2013 | | 664 |
| 2014 | | 620 |
| 2015 and thereafter | | 626 |

*c)*    As part of the disposal of Anchor Glass Containers Corporation (Anchor) in August 1996, in a transaction approved by the U.S. Bankruptcy Court, the Company entered into a term sheet which contemplated an agreement pursuant to which the Company would provide to the Pension Benefit Guaranty Corporation (PBGC), a United States governmental agency that guarantees pensions, a limited guaranty of Anchor's unfunded pension liability. No payments would be made under such a guaranty unless the PBGC terminated any of the covered pension plans, and the guaranty would be payable only to the extent the PBGC could not otherwise recover the unfunded liabilities from the entity that purchased Anchor's assets New Anchor. The amount of the guaranty was originally limited to US$70 million. Under the guaranty, payments would not begin until August 1, 2002, and would then generally be payable in equal semi−annual installments over the following 10 years. Payments would not bear interest. The amount and the term of the guaranty would be proportionally reduced if the pension plans were terminated after January 31, 2002. Beginning February 2002, the guaranty would be reduced by US$7 million semiannually until August 1, 2006, when the guaranty would expire if the plans did not terminate.

On April 15, 2002, New Anchor filed a pre−negotiated plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code. On August 8, 2002, an amended plan of reorganization was confirmed, pursuant to which the plan resulting from the merger of the covered pension plans was terminated, and the obligations thereunder were assumed by the PBGC in exchange for cash, securities and a commitment of reorganized New Anchor to make certain future payments.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

On June 20, 2003, the PBGC wrote to the Company, asserting that the plan had been terminated effective as of July 31, 2002, with an estimated unfunded liability of US$219 million. The PBGC stated that the value of the recovery from New Anchor and reorganized New Anchor amounts to no more than US$122.25 million; it alleged that the recovery that it secured in the bankruptcy was insufficient and that an underfunding in excess of the Company's limited guaranty had occurred. Accordingly, to such letter, the PBGC demanded payments pursuant to the term sheet of US$7 million on or before August 1, 2003 and of US$3.5 million semiannually through August 1, 2011. The Company intends to contest this liability. There are various issues concerning such demand and certain defenses that may be asserted by the Company. Management is currently evaluating these issues and defenses. At this point, it is not possible to reasonably estimate the amounts that will ultimately be payable in response to such demand. When management is able to reasonably estimate those amounts, the Company will establish an appropriate accounting reserve. As of this date, the Company has not established any reserves in connection with such potential liability.

*d)*    On December 2006, Viméxico (formerly Vitro Plan) concluded at an extraordinary shareholders' meeting to approve the merger of Vitro Plan into Viméxico, which was a creditor of Vitro Plan. As a result of the merger, all assets, rights, liabilities and obligations of Vitro Plan were absorbed by Viméxico. Prior to the merger, Vitro Plan was a direct 65%−owned subsidiary of Vitro and Pilkington Group LTD (Pilkington) owned the remaining 35%. As a result of the merger, Viméxico became a 91.8%−owned subsidiary of Vitro and Pilkington the owner of the remaining 8.2%.

Although the merger became entirely effective once all the respective authorizations were obtained and having prepared all the respective acts, publications and registrations, Pilkington, who voted against such approval, began a legal procedure in January 2007 against the merger. In February 2008 in first instance, in June 2008 in second instance, and finally in February 2009, the protection requested by Pilkington was denied. The Company was notified that the opposing action exercised by Pilkington was declared unprecedented in a final and unappealable sentence with respect to the resolutions approved by the majority at the extraordinary general stockholders' meeting in December 2006. Thus, the foregoing resolutions were confirmed as valid and mandatory for all stockholders, including those dissenting.

F−37

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

However, in the first week of December 2007, the Company was notified of a new complaint filed by Pilkington, claiming the annulment of such extraordinary general stockholders' meeting. This position goes against the claims sustained in the first trial and was filed after Pilkington specifically desisted from this action after the first trial. Accordingly, Vitro also expects to obtain a favorable resolution from this claim. In this proceeding all evidence and allegations were submitted and the Company is awaiting the final ruling.

e) On June 23, 2008, the Company initiated litigation against Banamex, S.A., Institución de Banca Múltiple, a subsidiary of Grupo Financiero Banamex, S.A. and Citigroup, requesting the court to declare null and void the acquisition and ownership of any of Vitro's common shares due to a violation of its by−laws.

According to the Company's by−laws, no foreign individual or legal entity or Mexican company without a foreign exclusion clause may own or acquire Vitro shares. Such by−laws also specify that in the event this restriction is violated, the holding or acquisition shall be null, and the Company shall not recognize the acquirer as an owner, nor can the latter exercise corporate or economic rights inherent to the shares. A cautionary measure was granted by the court_____to freeze the approximate 53.6 million shares that are subject to this procedure while the trial is resolved in a final sentence, and the Securities Depository Institute (Indeval) has been requested to comply with such measure, nonetheless it was not possible to implement.

In January 2010 a district judge ruled in favor of Banamex. Vitro is contesting the irregular purchase of these shares amounting to 14.9% of its common stock outstanding. The Company has submitted its appeal in a timely and correct manner to this sentence issued by a lower court.

On August 18, 2010, the Appeals Court issued a resolution denying the recourse presented by Vitro opposing the decision issued by the lower court. At this time, Vitro is preparing to present a final appeal through an "Amparo" against the decision issued by the Appeals Court.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**13.** **Foreign currency operations**

   *a)*   At December 31, 2009, the foreign currency denominated assets and liabilities of the Company's Mexican subsidiaries consist of the following:

|  | Millions of dollars | | Mexican pesos | |
|---|---|---|---|---|
| Monetary assets | US$ | 227 | Ps. | 2,969 |
| Inventories |  | 16 |  | 209 |
| Fixed assets |  | 194 |  | 2,533 |
| Monetary liabilities |  | 1,817 |  | 23,729 |

   *b)*   Foreign currency operations of the Company's Mexican subsidiaries for the year ended December 31, 2009, consisted of the following:

|  | Millions of dollars | | Mexican pesos | |
|---|---|---|---|---|
| Exports | US$ | 484 | Ps. | 6,568 |
| Imports |  | 183 |  | 2,487 |
| Interest expense, net |  | 159 |  | 2,158 |

   *c)*   The condensed financial information of the principal foreign subsidiaries of the Company at December 31, 2009, consisted of the following:

|  | United States | | Central and South America | | Europe | |
|---|---|---|---|---|---|---|
| Net sales | Ps. | 6,834 | Ps. | 624 | Ps. | 1,506 |
| Operating income (loss) |  | (148) |  | 96 |  | (190) |
| Total assets |  | 1,948 |  | 718 |  | 2,525 |
| Total liabilities |  | 875 |  | 188 |  | 1,317 |
| Capital expenditures |  | 82 |  | 8 |  | 10 |

   *d)*   The exchange rates of the Mexican peso against the US dollar and the Euro, used for purposes of the Company's consolidated financial statements at the following dates were:

|  | US dollar | | Euro | |
|---|---|---|---|---|
| December 31, 2007 | Ps. | 10.8662 | Ps. | 15.9526 |
| December 31, 2008 |  | 13.8325 |  | 19.2534 |
| December 31, 2009 |  | 13.0587 |  | 19.5789 |

   On September 27, 2010, the exchange rate was Ps. 12.5168 per US dollar and Ps. 16.8539 per Euro.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**14.   Stockholders' equity**

*a)*   The capital stock of the Company consists of 386,857,143, ordinary, nominative, fully paid common shares, without par value, at December 31, 2008 and 2009.

*b)*   The Company maintains an Employee Stock Option Plan established in March 1998 (the Plan). The Plan specifies the amount of shares, time and initial exercise price. The vesting period of the options is five years and the life of such options is 10 years.

The following table summarizes the activity relating to the Plan:

| Options | 2000 | 2001 | 1998* | 2002 | Total Outstanding |
|---|---|---|---|---|---|
| Options granted | 4,851,900 | 3,204,800 | 940,950 | 3,941,950 | |
| Options cancelled or exercised at December 31, 2009 | 3,986,950 | 2,827,950 | 478,050 | 3,208,150 | |
| Options outstanding at December 31, 2009 | 864,950 | 376,850 | 462,900 | 733,800 | 2,438,500 |
| Exercise price | Ps. 11.00 | Ps. 8.27 | Ps. 13.00 | Ps. 7.53 | |

*   During the year 2001, the Company modified the price of the 940,950 options granted in 1998 and its maturity date to 2011.

The closing price of the Company's shares on the BMV on December 31, 2009 was Ps. 8.24.

The estimated fair value of the options was made on the grant date using the Black–Scholes option–pricing model.

*c)*   At December 31, 2008 and 2009, the Company held 40,204,310 of treasury shares, which includes 11,739,741 and 39,758,810 shares held by the Stock Option Trust (see note 14 b) at December 31, 2008 and 2009, respectively.

*d)*   Retained earnings include the statutory legal reserve. Mexican General Corporate Law requires that at least 5% of net income of the year be transferred to the legal reserve until the reserve equals 20% of capital stock at par value (historical pesos). The legal reserve may be capitalized but may not be distributed unless the entity is dissolved. The legal reserve must be replenished if it is reduced for any reason. At December 31, 2008 and 2009, the legal reserve, in historical pesos, was Ps. 72.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

e) Stockholders' equity, except restated paid−in capital and tax retained earnings, will be subject to income tax at the rate in effect when a dividend is distributed. Any tax paid on such distribution may be credited against annual and estimated income taxes of the year in which the tax on dividends is paid and the following two fiscal years.

At December 31, 2009, the majority interest stockholders' equity tax account, corresponding to the contributed capital account and the net tax income account was Ps. 2,513 and Ps. 2,375, respectively.

f) Dividends declared and paid:

| Stockholders' meeting date | Dividend Amount | | | | Payment Date |
|---|---|---|---|---|---|
| | Nominal Value | | Restated Value | | |
| March 28, 2007 | Ps. | 133 | Ps. | 136* | April 2007 |
| April 17, 2008 | | 143 | | 143 | May 2008 |

\* This amount is restated for inflationary effect until December 31, 2007.
During 2009 no dividends were paid.

g) Noncontrolling interest in consolidated subsidiaries consists of the following:

| | December 31 | | | |
|---|---|---|---|---|
| | 2008 | | 2009 | |
| Capital stock | Ps. | 457 | Ps. | 443 |
| Paid in capital | | 616 | | 736 |
| Translation effects of foreign subsidiaries | | 235 | | 155 |
| Retained earnings | | 96 | | 130 |
| | Ps. | 1,404 | Ps. | 1,464 |

F−41

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*
  h)    Controlling interest consists of the following:

| | | December 31, 2009 | | | |
| | Value | | Restatement* | | Value |
|---|---|---|---|---|---|
| Capital stock | Ps. 387 | Ps. | 7,245 | Ps. | 7,632 |
| Treasury stock | (223) | | (324) | | (547) |
| Paid−in capital | 355 | | 1,290 | | 1,645 |
| Translation effects of foreign subsidiaries | 370 | | | | 370 |
| (Accumulated deficit) retained earnings | (11,144) | | 2,564 | | (8,580) |
| | Ps. (10,255) | Ps. | 10,775 | Ps. | 520 |

\*    Amounts are restated for inflationary effect until December 31, 2007.
**15.    Total comprehensive financing result**
  The following represents a summary of the Company's total comprehensive financing result for the periods presented:

| | Year ended December 31, | | | | | |
| | 2007 | | 2008 | | 2009 | |
|---|---|---|---|---|---|---|
| Interest expense on debt denominated in US dollars | Ps. 1,698 | Ps. | 1,703 | Ps. | 1,847 | |
| Interest expense on debt denominated in pesos | 130 | | 157 | | 300 | |
| Interest income | (175) | | (58) | | (51) | |
| Derivative financial instruments | 201 | | 3,766 | | 570 | |
| Exchange loss (gain) | 94 | | 3,222 | | (976) | |
| Gain from monetary position | (471) | | | | | |
| Other financing expenses, net | 183 | | 287 | | 676 | |
| | Ps. 1,660 | Ps. | 9,077 | Ps. | 2,366 | |

F−42

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**16.  Other expenses (income), net**

The following represents a summary of the Company's other expenses (income), net for the periods presented:

| | | Yeard ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2007 | | 2008 | | 2009 |
| Restructuring charges | Ps. | 7 | Ps. | 185 | Ps. | 265 |
| Impairment of long−lived assets | | 122 | | 196 | | 207 |
| (Gain) loss from sale of long−lived | | 47 | | (3) | | (209) |
| (Gain) loss from sale of subsidiaries | | 11 | | | | |
| Early extinguishment of employee retirement obligations | | 97 | | 69 | | |
| Fees and costs for extinguishment of debt | | 488 | | | | 7 |
| Statutory employee profit sharing | | 54 | | 10 | | 13 |
| Other | | 43 | | 38 | | 8 |
| | Ps. | 869 | Ps. | 495 | Ps. | 291 |

**17.  Tax loss carryforwards**

At December 31, 2009, tax loss carryforwards consist of the following:

| | | Tax loss carryforwards | | |
|---|---|---|---|---|
| Expiration Year | | Controlling interest | | Noncontrolling interest |
| 2010 | Ps. | 106 | Ps. | 4 |
| 2011 | | 280 | | 1 |
| 2012 | | 466 | | 1 |
| 2013 | | 156 | | |
| 2014 | | 421 | | |
| 2015 | | 132 | | |
| 2016 | | 266 | | 1 |
| 2017 | | 111 | | |
| 2018 | | 962 | | 59 |
| 2019 | | 1,601 | | 51 |
| | Ps. | 4,501 | Ps. | 117 |

F−43

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**18.  Income and asset taxes**

*a)*  In accordance with the Mexican tax law, the Company in 2008 and 2009 is subject to ISR and IETU. Until 2007, the Company was subject to ISR and IMPAC.

ISR.− The Company pays ISR, together with subsidiaries on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. The ISR rate is 28% for 2007, 2008 and 2009, and, based on changes to the ISR Law on December 7, 2009, will be 30% for 2010 to 2012, 29% for 2013 and 28% for 2014 and subsequent years.

The foreign subsidiaries calculate their ISR based on the individual results of each subsidiary pursuant to the specific tax regimes in each country.

Within the amendments to the ISR Law of 2009, to become effective beginning in 2010, states that: a) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015, and b) ISR relating to tax benefits obtained in the 2005 tax consolidation and thereafter, should be paid during the sixth through the tenth year after that in which the benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained from 1982 (tax consolidation starting year) through 1998 may be required in those cases provided by law.

The effects in the financial information, resulting from the approval of changes to the ISR Law related to the consolidation regime resulted in a decrease in shareholders' equity within retained earnings of $237, an increase of $564 in deferred tax assets and $85 in recoverable taxes, and an increase in taxes payable of $886 (including $36 payable in the short term).

IETU.− On January 1, 2008, the IETU went into effect. IETU applies to the sale of goods, the provision of independent services and the granting of use or enjoyment of goods, according to the terms of the IETU law, less certain authorized deductions. Revenues, as well as deductions and certain tax credits, are determined based on cash flows generated beginning January 1, 2008. The IETU law establishes that the IETU rate will be 16.5% in 2008, 17.0% in 2009, and 17.5% in 2010 and subsequently. Similarly, the IMPAC Law was repealed upon enactment of the IETU Law, however, under certain circumstances, IMPAC paid in the ten years prior to the year in which ISR is paid, may be refunded, according to the terms of the law. In addition, as opposed to ISR which allows for fiscal consolidation, companies that expect to incur IETU must file individual returns.

F−44

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Based on its financial projections and according to INIF 8, *Effects of the Business Flat Tax*, the Company determined that it will basically pay ISR. Therefore, it only recognizes deferred ISR.

IMPAC.− Through 2007, the Company paid tax on assets on a consolidated basis in proportion to Vitro's voting interest in its Mexican subsidiaries. In 2007, IMPAC was calculated by applying 1.25% to the value of the assets of the year, without deducting any debt amounts.

b)   The income and asset tax expense (benefit) included in the Company's results are:

| | | Year ended December 31, | | | |
|---|---|---|---|---|---|
| | | **2007** | | **2008** | **2009** |
| Current | Ps. | 395 | Ps. | 123 | Ps. (3) |
| Deferred | | (145) | | (2,298) | (595) |
| | | 250 | | (2,175) | (598) |
| Asset tax | | (206) | | | |
| | Ps. | 44 | Ps. | (2,175) | Ps. (598) |

c)   Net deferred tax assets presented in the consolidated balance sheets consist of the following:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Allowance for doubtful accounts | Ps. | 42 | Ps. | 125 |
| Reserve for employee benefits | | 231 | | 286 |
| Tax loss carryforwards | | 1,201 | | 2,550 |
| Intangible asset | | 667 | | 700 |
| Fixed assets | | (18) | | (27) |
| Derivative financial instruments | | 1,441 | | 984 |
| Inventories | | 35 | | 51 |
| Other | | 407 | | 185 |
| Total | | 4,006 | | 4,854 |
| Valuation allowance | | (599) | | (339) |
| | Ps. | 3,407 | Ps. | 4,515 |

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | **2008** | | **2009** | |
| Balance: | | | | |
| Deferred tax assets | Ps. | 3,418 | Ps. | 4,515 |
| Deferred tax liabilities | | (11) | | |
|  | Ps. | 3,407 | Ps. | 4,515 |

*d)* Following is a reconciliation between the Company's effective income tax rate and the statutory rate:

|  | Year ended December 31, | | |
| --- | --- | --- | --- |
|  | **2007** | **2008** | **2009** |
| Effective income tax rate | 25% | 28% | 44% |
| Asset tax presented as income tax | 120 | | |
| Intangible asset | (28) | (2) | |
| Sale of subsidiaries | 8 | | |
| Foreign subsidiaries | (5) | (3) | (6) |
| Effect of inflation | (2) | 4 | 7 |
| Effect of reduction in statutory rate on deferred ISR | | | (1) |
| Valuation allowance | (15) | 4 | (20) |
| Nondeductible expenses | (10) | | 4 |
| Other | (65) | (3) | |
| Statutory income tax rate | 28% | 28% | 28% |

*e)* The deferred income tax effect, reduced from the movements in stockholders' equity for insufficiency in restated stockholders' equity, the effect of cancelling preoperating costs, the equity effect of the additional labor liability as well as from the exchange loss capitalized in the translation effect of foreign subsidiaries is presented as follows:

|  | Year ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | **2007** | | **2008** | | **2009** | |
| Income tax effect of: | | | | | | |
| Shortfall in restatement of capital: | Ps. | 119 | | | | |
| Minimum labor liability | | (126) | | | | |
| Effect of cancelling preoperating costs | | | | | Ps. | 6 |
| Translation effects of foreign subsidiaries | | | Ps. | 234 | | (44) |
|  | Ps. | (7) | Ps. | 234 | Ps. | (38) |

F−46

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**19.   Related party transactions**

The transactions with related parties, carried out in the ordinary course of business, were as follows:

*a)*   *Arrangements with respect to real estate.* – On certain occasions, until October 2008, the Company used real estate owned by relatives of certain directors and senior managers to meet with customers, suppliers or for other business purposes. The Company paid an annual fee for the right to use these properties for a specified number of days per year. Additionally, it had agreed to pay maintenance and operating costs. In 2007 and 2008, the aggregate amounts paid as annual fees were approximately Ps. 10, and Ps. 8, respectively.

*b)*   *Goods sold.* – The Company sells flat glass products and glass containers to certain companies whose shareholders are directors and senior managers. In 2007, 2008 and 2009, the aggregate amount of these sales was Ps. 69, Ps. 71 and Ps. 56, respectively.

Empresas Comegua, S.A., an associated company, sells glass containers to Cervecería Centroamericana and to Cervecería de Costa Rica, its noncontrolling interest. In 2007, 2008 and 2009, the aggregate amount of these sales was US$9 million, US$20 million and US$12 million, respectively.

*c)*   *Purchase of supermarket coupons.* – The Company purchases supermarket coupons for its employees at a supermarket store in which one member of its board of directors is a shareholder. In 2008 and 2009, the amount of these purchases was Ps. 80 and Ps. 90, respectively.

*d)*   *Sale of real estate.* – In 2007, a member of the Company's Board of Directors, purchased an unused parcel of real estate from one of its subsidiaries. The price of the real estate was US$5.4 million. The Company received several offers for the property and such member of the Board made the highest offer. The transaction was approved by the Company's Audit Committee in accordance with its charter at the time.

*e)*   *Compensation.* – For the years ended December 31, 2007, 2008 and 2009, the aggregate compensation the Company paid to its directors and senior managers was approximately Ps. 273, Ps. 183 and Ps. 229, respectively. This amount includes fees, salaries, the use of certain assets and services, variable compensation and retirement benefits.

F–47

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**20.  Business dispositions and acquisitions**

  *a)*  *Acquisition of 55% of the shares of PVA.* − In August 2007, Vitro VyC acquired 55% of the outstanding shares of PVA, a company dedicated to the installation of value added crystal products for Ps. 110. As a result of the preliminary purchase price allocation, the Company recorded goodwill of Ps. 85 in 2007. During the first half of 2008, pursuant to the guidelines established in NIF B−7, *Business Acquisitions*, the items comprising such goodwill were analyzed further and Ps. 61 was reclassified as an intangible asset.

  *b)*  *Acquisition of 50% of the shares of Vidrio y Cristal del Noroeste, S.A. de C.V. (formerly Vitro AFG).* − In July 2007, Viméxico exercised its option to acquire the remaining 50% of the outstanding shares of Vitro AFG from its joint venture partner AFG Industries, a subsidiary of Asahi Glass Co. Limited (a Japanese company) for a purchase price of US$6 million. In accordance with NIF C−15, *Impairment of Long−Lived Assets and Their Disposal*, the Company recognized an impairment charge of Ps. 91 related to the termination of the joint venture with AFG Industries.

  With the closing of this transaction, Viméxico terminated the joint venture and became the sole−owner of this entity, located in Mexicali, Baja California, Mexico, whose primary operations include the manufacturing, processing and distribution of flat glass, thereby increasing Vitro's available production capacity by 78,000 tons on an annual basis.

  *c)*  *Purchase of 40% of Vitro Cristalglass.* − In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass. The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527). The difference between the purchase price and the book value resulted in a charge of Ps. 60, recorded in majority stockholders' equity.

  In January 2009 a revised payment was agreed upon with the previous partner, by extending it through the 2009−2010 periods, and that the purchase of the partnership interest in Vitro Cristalglass would be made through the same company and that subsequently, there would be a capital reduction.

  *d)*  *Deconsolidation of Empresas Comegua, S.A.* — In November 2008, the Company announced that together with its two Central American partners, decided to modify the corporate by−laws of Comegua regarding the control of its operations. As a result, beginning on that date, the Company now accounts for its 49.7% participation in Comegua under the equity method.

F−48

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Comegua's relevant data is as follows:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| **Condensed consolidated balance sheet:** | **2008** | | **2009** | |
| Assets: | | | | |
| Cash and cash equivalents | Ps. | 74 | Ps. | 128 |
| Trade receivables | | 775 | | 628 |
| Inventories | | 505 | | 442 |
| Fixed assets and other long−term assets | | 2,366 | | 2,159 |
| Total assets | | 3,720 | | 3,357 |
| Liabilities: | | | | |
| Trade payables | | 474 | | 538 |
| Short−term borrowings | | 389 | | 773 |
| Long−term debt and other liabilities | | 851 | | 264 |
| Total liabilities | Ps. | 1,714 | Ps. | 1,575 |

| | Year ended December 31, 2007 | | From January 1 to November 30, 2008 | | December 2008 | | Year ended December 31, 2009 | |
|---|---|---|---|---|---|---|---|---|
| **Condensed consolidated income statements:** | | | | | | | | |
| Net sales | Ps. | 2,127 | Ps. | 2,159 | Ps. | 233 | Ps. | 2,064 |
| Cost of sales | | 1,546 | | 1,584 | | 163 | | 1,369 |
| Gross profit | | 581 | | 575 | | 70 | | 695 |
| Selling, general and administrative expenses | | 437 | | 449 | | 50 | | 582 |
| Operating income | | 144 | | 126 | | 20 | | 113 |
| Total comprehensive financing result | | 30 | | 56 | | 8 | | 95 |
| Other expenses (income), net | | 51 | | 17 | | (2) | | 13 |
| Income tax expense | | 24 | | 23 | | 4 | | 55 |
| Net income (loss) | Ps. | 39 | Ps. | 30 | Ps. | 10 | Ps. | (50) |

F−49

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**21. Business segment data**

The accounting policies of the Company's segments are the same as those followed by Vitro. The Company evaluates the performance of its segments on the basis of operating income. Intersegment sales and transfers are accounted for as if the sales and transfers were to third parties, that is, at current market prices.

Vitro's reportable segments are strategic business units that offer different products. The segments are managed separately; each requires different manufacturing operations, technology and marketing strategies; and each segment primarily serves a different customer base.

The Company has two reportable segments: Glass Containers and Flat Glass. The principal products of each of the segments are summarized below:

| Segment | Principal products |
|---|---|
| Glass Containers | Glass containers, sodium carbonate and bicarbonate, capital goods, precision components and molds for glass industry. |
| Flat Glass | Flat glass for the construction and automotive industries. |

Segment data is presented as follows:

| 2007 | Glass Containers | | Flat Glass | | Corporate & Eliminations | | Consolidated | |
|---|---|---|---|---|---|---|---|---|
| Net sales | Ps. | 14,676 | Ps. | 13,605 | Ps. | 361 | Ps. | 28,642 |
| Intersegment sales | | 37 | | 14 | | | | 51 |
| Consolidated net sales | | 14,639 | | 13,591 | | 361 | | 28,591 |
| Operating income (loss) | | 2,054 | | 782 | | (132) | | 2,704 |
| Total assets | | 17,803 | | 13,708 | | 2,312 | | 33,823 |
| Capital expenditures | | 2,328 | | 324 | | 43 | | 2,695 |
| Depreciation and amortization | | 870 | | 480 | | 64 | | 1,414 |
| Goodwill | | 3 | | 870 | | | | 873 |
| Impairment | | 31 | | 91 | | | | 122 |

F–50

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

| 2008 | | Glass Containers | | Flat Glass | | Corporate & Eliminations | | Consolidated |
|---|---|---|---|---|---|---|---|---|
| Net sales | Ps. | 15,524 | Ps. | 13,230 | Ps. | 342 | Ps. | 29,096 |
| Intersegment sales | | 40 | | 43 | | | | 83 |
| Consolidated net sales | | 15,484 | | 13,187 | | 342 | | 29,013 |
| Operating income (loss) | | 1,661 | | 186 | | (137) | | 1,710 |
| Total assets | | 19,723 | | 15,358 | | 693 | | 35,774 |
| Capital expenditures | | 1,538 | | 255 | | 5 | | 1,798 |
| Depreciation and amortization | | 897 | | 484 | | 88 | | 1,469 |
| Goodwill | | | | 771 | | | | 771 |
| Impairment | | | | 196 | | | | 196 |

| 2009 | | Glass Containers | | Flat Glass | | Corporate & Eliminations | | Consolidated |
|---|---|---|---|---|---|---|---|---|
| Net sales | Ps. | 12,452 | Ps. | 11,453 | Ps. | 229 | Ps. | 24,134 |
| Intersegment sales | | 67 | | 76 | | | | 143 |
| Consolidated net sales | | 12,385 | | 11,377 | | 229 | | 23,991 |
| Operating income (loss) | | 1,956 | | (591) | | (36) | | 1,329 |
| Total assets | | 21,878 | | 15,029 | | (4,255) | | 32,652 |
| Capital expenditures | | 735 | | 264 | | 10 | | 1,009 |
| Depreciation and amortization | | 854 | | 575 | | 44 | | 1,473 |
| Goodwill | | | | 702 | | 19 | | 721 |
| Impairment | | | | 207 | | | | 207 |

Export sales from Mexico, substantially all of which are denominated in US dollars, are mainly to the United States, Canada and Europe and were as follows (in million of US dollars):

| Year ended December 31, | | |
|---|---|---|
| **2007** | **2008** | **2009** |
| US$601 | US$ 600 | US$ 484 |

Certain geographic information about the Company's operations is summarized as follows:

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Net sales [1] to customers in: | | | | | | |
| Mexico | Ps. | 12,008 | Ps. | 12,831 | Ps. | 11,152 |
| All foreign countries, mainly the United States, Canada and Europe | | 16,583 | | 16,182 | | 12,839 |
| | Ps. | 28,591 | Ps. | 29,013 | Ps. | 23,991 |

[1] Net sales are attributed to countries based on the location of the customer.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

Consolidated net sales to any single external customer did not exceed more than 8% of Vitro's total consolidated net sales in 2007 and 2008, and 3% in 2009.

Geographical information of land and buildings, machinery and equipment, and construction in progress is summarized as follows:

|  | December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2007** | | **2008** | | **2009** | |
| Land and buildings, machinery and equipment |  |  |  |  |  |  |
| Mexico | Ps. | 14,960 | Ps. | 15,816 | Ps. | 14,062 |
| All foreign countries, mainly the United States, Europe, Central and South America |  | 2,881 |  | 1,457 |  | 1,276 |
|  | Ps. | 17,841 | Ps. | 17,273 | Ps. | 15,338 |

**22. New accounting principles**

As part of its efforts to converge Mexican standards with international standards, during 2009, the Mexican Board for Research and Development of Financial Information Standards (CINIF) issued the following NIFs and Interpretations of Financial Reporting Standards (INIF), applicable to profitable entities, which become effective as follows:

*a)*   For the fiscal year that begin on January 1, 2010:

C−1, *Cash and cash equivalents*

Improvements to NIFs for 2010

INIF 14, *Construction contracts, sale of real property and rendering of related services*

INIF 17, *Service concession contracts*

Some of the most important changes established by these standards are:

*NIF C−1, Cash and cash equivalents*, requires restricted cash and cash equivalents to be included within the cash and cash equivalents caption, as opposed to Bulletin C−1, which required presentation under separate captions; NIF C−1 replaces the caption on−demand temporary investments with the caption on−demand available investments clarifying that this type of investment has a maturity of up to three months from its acquisition date.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

*Improvements to NIFs for 2010* — The main improvements generating accounting changes that must be recognized retroactively are:

*NIF B−1, Accounting changes and correction of errors,* requires further disclosures in case the Company applies a particular Standard for the first time.

*NIF B−2, Statement of cash flows,* requires recognition of the effects of fluctuations in exchange rates used for translating cash in foreign currencies, and changes in fair value of cash in the form of precious metal coins, and other cash items, at fair value, in a specific line item.

NIF B−7, *Business acquisitions*, requires recognition of intangible assets or provisions because the acquired business has a contract whose terms and conditions are favorable or unfavorable with respect to market, only when the acquired business is the lessee in an operating lease. This accounting change should be recognized retroactively and not go further than January 1, 2009.

NIF C−7, *Investments in associated companies and other permanent investments*, modifies how the effects derived from increases in equity percentages in an associated company are determined. It also establishes that the effects due to an increase or decrease in equity percentages in associated companies should be recognized under equity in income (loss) of associated companies, rather than in the non−ordinary line item within the statement of income.

NIF C−13, *Related parties,* requires that, if the direct or ultimate controlling entity of the reporting entity does not issue financial statements available for public use, the reporting entity should disclose the name of the closest, direct / indirect, controlling entity that issues financial statements available for public use.

INIF 14, *Construction contracts, sale of real property and rendering of related services,* is a supplement to Bulletin D−7, *Construction and manufacturing contracts for certain capital assets*, and requires segregation of the different components of the contracts in order to define whether the contract refers to construction of real property, sale of real property, or rendering related services, and establishes the rules for recognizing revenue and related costs and expenses, based on the different elements identified in the contract. INIF 14 provides guidance for the appropriate use of the percentage−of−completion method for revenue recognition.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

INIF 17, *Service concession contracts,* is a supplement to Bulletin D−7, *Construction and manufacturing contracts for certain capital assets*, and establishes that, when the infrastructure of the service concession contracts falls within the scope of this INIF, it should not be recognized under property, plant and equipment. It also establishes that when the operator renders construction or improvement services, as well as operation services under the same contract, revenues should be recognized for each type of service, based on the fair value of each consideration received at the time the service is rendered. When amounts are clearly identified and, after they are quantified, the applicable revenue recognition criterion should be followed, taking the nature of the service rendered into consideration. Also, INIF 17 establishes that, when the operator renders construction or improvement services, both revenues and the associated costs and expenses should be recognized under the percentage−of−completion method and consideration received, or receivable, should be recognized, initially, at fair value. Revenues from operation services should be recognized as the services are rendered.

*b)* For the fiscal year that begins on January 1, 2011:

NIF B−5, *Financial segment information,* uses a managerial approach to disclose financial information by segments, as opposed to Bulletin B−5, which also used a managerial approach but required that the financial information be classified by economic segments, geographical areas, or homogenous client groups. NIF B−5 does not require different risks among business areas to separate them. It allows areas in the preoperating stage to be classified as a segment, and requires separate disclosure of interest income, interest expense and liabilities, as well as disclosure of the entity's information as a whole with respect to products, services, geographical areas and major customers and suppliers. Like the previous Bulletin, this Standard is mandatory only for public companies or companies in the process of becoming public.

At the issuance date of these consolidated financial statements, the Company continues determining the effects of adopting these new standards on its financial information.

*c)* International financial reporting standards

In January 2009, the Mexican Banking and Securities Commission published amendments to its National Securities Law, making it compulsory for public entities to prepare and present their financial statements using International Financial Accounting Standards beginning 2012 (early adoption is permitted).

At the issuance date of these consolidated financial statements, the Company continues determining the effects of adopting International Financial Accounting Standards as it relates to its consolidated financial statements.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**23.    Subsequent Events**

a)    Debt

On January 4, 2010, the Company received, from a group of its bondholders, a Notice of Acceleration of payment for the Senior Notes due 2012 and 2017. A minority group of at least twenty five percent of the bond holders may request the Notice of Acceleration, which is considered a standard operating procedure when an issuer is in default. As of the issuance date of these consolidated financial statements, the outstanding principal amount of these Notes is US$1,000 million.

In accordance with the Mexican Bankruptcy Law (Ley de Concurso Mercantil), if more than thirty five percent of a company's outstanding obligations are past due, the company itself, any creditor or the public ministry could request that the company declare bankruptcy.

On April 12, 2010, the Company announced that it received a document on letterhead of the U.S. Bank National Association, which serves as trustee of the Senior Notes due 2013, entitled "Notice of Default and Acceleration" referenced to the 2013 Notes. The outstanding principal amount of these Notes, as of the issuance date of these consolidated financial statements, is US$216 million.

In August, 2010 the Company refinanced the credit lines in euros from its subsidiary in Spain, Vitro Cristalglass, S.L., extending the term for three years from the agreement signature in amount of 44.8 million euros.

b)    Derivative financial instruments

On April 12, 2010 the judge of the Supreme Court of the State of New York issued a ruling regarding the request for summary judgment made by Vitro's counterparties in financial derivatives transactions. The judge granted Vitro's counterparties' motions as to liability only and denied them as to the amounts sought by said counterparties, finding that the financial institutions had not provided sufficient and reasonable detail to verify the methods and accuracy of their calculations. The Court then referred the issue of damages to a Special Referee for further proceedings and recommendation to the Court, and held the motions for summary judgment in abeyance pending receipt of the report of the recommendations of the Special Referee.

On June 7, 2010, the Company reached agreements to settle the amount related to DFIs. Vitro reached an agreement to settle the amount related to derivative financial instruments ("DFIs") with Calyon, London Branch ("Calyon"). In addition, on September 6, 2010 the Company reached a settlement agreement with Fintech Investments Ltd. ("Fintech"), the firm that recently acquired the DFIs claims, previously owned by Credit Suisse International, Deutsche Bank AG, London Branch, Merrill Lynch Capital Services, Citibank, N.A., Barclays Bank, PLC and Cargill, Incorporated.

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

The amount of the settlement agreed with Calyon and Fintech is US$67.3 MM and US$190.0 MM, including interest for US$3.9 and US$13.6, respectively, recognized by the Company.

As a result of these settlements, all of the lawsuits related with the DFIs have been dismissed.

c)   Status or the Restructuring process

As part of Company's debt restructuring discussions with creditors (see note 10), the Company has presented a restructuring counterproposal (the "Counterproposal") to representatives of certain holders of Senior Notes, The Counterproposal for the restructuring includes the Senior Notes and other impaired debt.

While the proposal was not accepted, in order to reach a consensual restructuring agreement, the Company is working on a consent solicitation statement.

The Company believes that the proposal included in the Consent will assure the sustainability of the Company and significantly enhancing the worthiness of its restructured debt. Additionally, the Company believes that the proposal represents a higher recovery than the average market price for the last six months of the senior notes due 2012, 2013 and 2017.

The Company continues to negotiate with the Ad Hoc Bondholder Committee in an effort to secure their support of the Consent in advance of its launch but there can be no assurances that such support will be achieved.

d)   Natural disasters

In April 2010, the Company's flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

On July 1, 2010, manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Float glass manufacturing and automotive processing facilities and facilities at Álcali suffered significant damage and were forced to temporarily suspend operations. In particular:

- Two of four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, the Company was able to minimize the impact for original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- Two of three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July; however, its operations were temporarily suspended due to stability issues and it resumed operations again in the last week of August; the other affected facility is expected to resume operations in October; float glass facility in Mexicali, which is currently operating at 100% capacity, is temporarily supplying glass to its OEM glass processing plants; and

- Facilities at Álcali suspended operations for a few days and a portion of Álcali's end-product, raw material and packaging inventories were damaged; however, the Company was able to minimize the impact on its clients by working jointly to supply only the minimal amount necessary for them to continue operating.

The Company has not yet determined the full impact on its operating results of the damage caused by Hurricane Alex. The Company expects such damages will be covered by insurance less any applicable deductibles; however, it can provide no assurance as to the amount and timing of such recovery.

e)    Receivable from sale of real estate

On August 16, 2010, final decision in first instance was issued in which it absolved the purchaser of the real estate sold by the Company of the remaining payment claimed. The Company has filed an appeal against the decision, which is pending to be resolved. The Company and its legal counsel believe it has sufficient evidence to obtain a favorable final ruling on this issue (see note 6 c).

f)    On August 24, 2010, the Company finalized the sale of non-productive properties, amounting to US$63.8 million. The resources of such sale, and US$5.5 million was contributed in addition by the Company, were intended to pay a debt that is owed to a trust (see note 6 d), by paying in full the balance of US$69.3 million to that date and therefore recovering the property of their two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

F−57

Vitro, S.A.B. de C.V. and Subsidiaries
Notes to Consolidated Financial Statements
*(Millions of Mexican pesos, except per share amounts)*

**24.   Authorization of financial statements issuance**

On September 27, 2010, the issuance of the consolidated financial statements was authorized by Hugo A. Lara García, Chief Executive Officer and Claudio L. Del Valle Cabello, Chief Financial and Administrative Officer.

These consolidated financial statements are subject to approval at the ordinary stockholders' meeting, who may modify the financial statements, based on provisions set forth by the Mexican General Corporate Law.

25. **Differences between MFRS and U.S. generally accepted accounting principles**

The Company's consolidated and combined financial statements are prepared in accordance with MFRS which differ in certain significant respects from accounting principles generally accepted in the United States of America (U.S. GAAP).

The United States Financial Accounting Standards Board ("FASB") released the FASB Accounting Standards Codification, or Codification for short, on January 15, 2008 and it became effective in 2009. At that time all previous U.S. GAAP reference sources became obsolete. The Codification organizes several U.S. GAAP pronouncements under approximately 90 accounting topic areas. The objective of this project was to arrive at a single source of authoritative U.S. accounting and reporting standards, other than guidance issued by the Securities and Exchange Commission ("SEC") of the United States of America. Included in Notes 25 and 26 are references to certain U.S. GAAP Codifications ("ASC") that were adopted in 2009 and certain ASC's that have yet to be adopted by the Company.

Prior to 2008, the MFRS consolidated financial statements include the effects of inflation as provided for under Bulletin B−10, "Recognition of the Effects of Inflation in Financial Information", whereas financial statements prepared under U.S. GAAP are presented on a historical cost basis. The application of Bulletin B−10 represented a comprehensive measure of the effects of price level changes in the inflationary Mexican economy and, as such, was considered a more meaningful presentation than historical cost−based financial reporting for both Mexican and U.S. accounting purposes.

Beginning on January 1, 2008 as disclosed in note 3a), in accordance with new NIF B−10, "Effects of Inflation", the Company discontinued the recognition of inflation in its financial statements under MFRS as the cumulative inflation for the preceding three years was less than 26%. This resulted in the elimination of certain reconciling items between MFRS and U.S. GAAP in 2008 and 2009. Notwithstanding the prior comments, the following reconciliation to U.S. GAAP for the year ended December 31, 2007 does not include the reversal of the adjustments required under Bulletin B−10, as permitted by the rules and regulations of the Securities and Exchange Commission (the SEC).

The other differences between MFRS and U.S. GAAP and the effect on consolidated net income (loss) and consolidated stockholders' equity are presented below:

| | Year ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2007 | | 2008 | | 2009 | 2009 |
| | | | | | | | (US$ millions) (Convenience Translation) |
| | | | | (Ps. millions) | | | |
| **Reconciliation of Net Income (Loss):** | | | | | | | |
| Net income (loss) as reported under MFRS | Ps. | 131 | Ps. | (5,682) | Ps. | (754) | US$ (58) |
| U.S. GAAP adjustments: | | | | | | | |
| Deferred income taxes (see b) | | 55 | | (707) | | (1,130) | (86) |
| Monetary position result on deferred income taxes (see c) | | 31 | | — | | — | — |
| Capitalization of interest (see d) | | 16 | | (358) | | — | — |
| Amortization of capitalized interest (see d) | | (36) | | (39) | | (19) | (2) |
| Goodwill (see e) | | | | (43) | | — | — |
| Effect of applying Bulletin B−10 (see f) | | (36) | | (3) | | — | — |
| Effect of ASC 715 (previously SFAS No. 158 ) (see j) | | — | | 23 | | (30) | (2) |
| Fair value of financial instruments (see g) | | — | | 75 | | (8) | (1) |
| Discontinued operations (see h) | | 26 | | — | | — | — |
| Employee retirement obligations (see j) | | (15) | | 36 | | 26 | 2 |
| Purchase of Visteon's capital investment (see k) | | 5 | | 5 | | 9 | 1 |
| Sale of real estate (see m) | | 429 | | 386 | | — | — |
| Impairment of long−lived assets (see n) | | (10) | | (45) | | 15 | 1 |
| Deconsolidation of Comegua (see i) | | (20) | | (16) | | — | — |
| Sale− leaseback transaction (see p) | | — | | — | | (278) | (21) |
| Fintech option liability (see p) | | | | | | (181) | (14) |
| Impact of changes in income tax law (see q) | | | | | | (237) | (18) |
| Total U.S. GAAP adjustments | | 445 | | (686) | | (1,833) | (140) |
| Net (loss) income under U.S. GAAP | Ps. | 576 | Ps. | (6,368) | Ps. | (2,587) | Ps. (198) |

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | | 2008 | 2009 | 2009 |
| | | | | (US$ millions) (Convenience Translation) |
| | | (Ps. millions) | | |
| **Reconciliation of Stockholders' Equity (Deficit):** | | | | |
| Total stockholders' equity reported under MFRS | Ps. | 3,108 | Ps. 1,984 | US$ 152 |
| U.S. GAAP adjustments: | | | | |
| Deferred income taxes (see b) | | (1,234) | (2,302) | (177) |
| Capitalization of interest (see d) | | 16 | 16 | 1 |
| Accumulated amortization for capitalized interest (see d) | | (224) | (243) | (19) |
| Goodwill (see e) | | 81 | 81 | 6 |
| Fair value of financial instruments (see r−3) | | 75 | 66 | 5 |
| Effect of ASC 715 (previously SFAS No. 158) (see j) | | (1,749) | (2,255) | (173) |
| Employee retirement obligations (see j) | | (64) | (38) | (3) |
| Purchase of Visteon's capital investment (see k) | | (61) | (52) | (4) |
| Purchase of remaining 40% interest in Vitro Cristalglass (see l ) | | 60 | 60 | 5 |
| Impairment of long−lived assets (see n) | | 208 | 223 | 17 |
| Sale− leaseback transaction (see p) | | — | (278) | (21) |
| Fintech option liability (see p) | | | (181) | (14) |
| Total U.S. GAAP adjustments | | (2,892) | (4,903) | (375) |
| Total stockholders' equity (deficit) under U.S. GAAP | Ps. | 216 | Ps. (2,919) | US$ (224) |

**a)** **Non controlling interest**

In January 2009, the Company adopted ASC 810−10 "Consolidation" (previously SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements, an amendment of ARB No. 51) which establishes the accounting and reporting standards for the noncontrolling interest in a subsidiary and the deconsolidation of a subsidiary, and also amends certain consolidation guidance for consistency with revised standards regarding business combinations. The accounting provisions of ASC 810−10 (SFAS No. 160) must be applied prospectively starting at the beginning of the fiscal year in which the provisions are initially adopted, while the presentation and disclosure requirements must be applied retrospectively, to provide comparability in the financial statements. ASC 810−10 (SFAS No. 160) was effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. As a result of adopting this standard, the Company reclassified the noncontrolling interest to stockholders' equity in the year of adoption and in prior periods for purposes of comparability, which resulted in eliminating this difference in the reconciliation between MFRS and U.S. GAAP of Ps. 1,416. The effects of the U.S. GAAP differences as described in this Note reflect the amounts assigned to the noncontrolling interests.

**b)** **Deferred income taxes**

Under MFRS as required by NIF D−4, "Accounting for Income Taxes," income taxes are charged to results as they are incurred and the Company recognizes deferred income tax assets and liabilities for the future consequences of temporary differences between the financial statement carrying amounts of assets and liabilities and their respective income tax bases, measured using enacted rates. The effects of changes in the statutory rates are accounted for in the period that includes the enactment date. Deferred tax assets are also recognized for the estimated future effects of tax loss carryforwards and asset tax credit carryforwards. Deferred tax assets are recognized only when it is highly probable that sufficient future taxable income will be generated to recover such deferred tax assets.

Under U.S. GAAP, as required by ASC 740 "Income Taxes"(previously SFAS No. 109 "Accounting for Income Taxes"), the Company recognizes deferred income tax assets and liabilities for the future consequences of temporary differences between the financial statement carrying amounts of assets and liabilities and their respective income tax bases, measured using enacted rates. The effects of changes in the statutory rates are accounted for in the period that includes the enactment date. Deferred income tax assets are also recognized for the estimated future effects of tax loss carryforwards and asset tax credit carryforwards.

The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income, projections of future taxable income over the periods in which the deferred tax assets are deductible and tax planning strategies that would be taken to prevent an operating loss or tax credit carryforward from expiring unused, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 2009.

For U.S. GAAP purposes the Company recognizes deferred taxes each period for the changes in the taxable portions of its distributable stockholders' equity. The Company's policy is to compare the deferred tax balance that would be required if all of the stockholders' equity were distributed to the total deferred tax balance recorded prior to this adjustment and the difference is recorded as an adjustment to deferred taxes as of the balance sheet date.

Through December 31, 2007, for U.S. GAAP purposes the Company recognized a deferred tax asset for the temporary difference that exists between the book basis and the tax basis of its foreign subsidiaries that legally own Vitro's intellectual property at the applicable tax rate in the foreign jurisdiction based on the expected reversal date. In January 2008, the intellectual property was sold to Vitro's Mexican subsidiaries and the impact of repatriating such asset to Mexico was reflected in the Company's U.S. GAAP reconciliation.

As of December 31, 2009, the Company had a net deferred tax asset of Ps. 4515 million for purposes of MFRS. The Company's management evaluated the relevant facts and circumstances regarding the recoverability of the deferred tax assets, which included financial projections approved by the Board of Directors as well as certain tax planning strategies. For purposes of U.S. GAAP the Company performed an analysis of its subsidiaries and for those entities with cumulative tax losses over the previous three years, from 2007 through 2009, a valuation allowance was recorded. As of December 31, 2009 the valuation allowance was recorded at a consolidated level for U.S. GAAP purposes reflects the amount of the Company's deferred tax assets management expects to be able to utilize based on the factors described above.

U.S. GAAP differences to the extent taxable are reflected in the U.S. GAAP deferred tax balances. The Company has recorded the following additional U.S. GAAP adjustments to the significant components of deferred tax assets and liabilities, recorded under MFRS:

|  | | As of December 31, | | |
|---|---|---|---|---|
|  | | **2008** | | **2009** |
| **Deferred Tax Assets and ( Liabilities):** | | | | |
| Employee retirement obligations | Ps. | 508 | Ps. | 642 |
| Derivative instruments | | (21) | | 110 |
| Purchase of Visteon capital investment | | 17 | | 14 |
| Stockholders' equity | | (1,738) | | (3,068) |
| Net deferred tax liability | Ps. | (1,234) | Ps. | (2,302) |

It is the Company's policy to classify interest and penalties related to income tax related matters within income tax expense and other expenses, respectively. The Company's significant operations are all located in Mexico, the United States of America, Panama, Costa Rica and Spain. The tax laws in these jurisdictions permit the respective tax authorities to examine previously filed tax returns for the following years:

| Mexico | U.S. | Spain | Guatemala | Costa Rica |
|---|---|---|---|---|
| 2005−2009 | 2005−2009 | 2006−2009 | 2006−2009 | 2007−2009 |

c) **Monetary position result on deferred income tax**

The monetary position result impacting deferred income tax (represents the only adjustments that affect monetary assets and liabilities) is determined by (i) applying the annual inflation factor to the net monetary position of the U.S. GAAP adjustments at the beginning of the period, plus (ii) the monetary position effect of such adjustments during the period, determined in accordance with the weighted average inflation factor.

As discussed in the introduction to this note as well as in note 3a), beginning January 1, 2008 with the issuance of NIF B−10, the Company's MFRS financial statements no longer include inflationary effects, for which reason, this reconciling item is no longer applicable.

F−62

**d)   Capitalization of interest**

Under MFRS beginning January 1, 2007, the Company adopted NIF D−6, "Capitalization of Comprehensive Financing Result", accordingly the capitalization of the comprehensive financing result (interest expense, foreign exchange results and monetary position result) generated by borrowings obtained to finance investment directly attributable to the acquisition of qualifying assets is mandatory. Prior to the adoption of NIF D−6, the Company did not capitalize the comprehensive financing result as it was optional.

In accordance with ASC 835−20 "Capitalization of interest"(previously SFAS No. 34, "Capitalization of Interest Cost"), if the comprehensive financing result is incurred during the construction of qualifying assets, capitalization is required as part of the cost of such assets. Accordingly, until December 31, 2006 a reconciling item for the capitalization of a portion of the comprehensive financing result was included in the U.S. GAAP reconciliation. The amortization expense and related accumulated amortization of such items also generates a difference compared to MFRS.

Beginning on January 1, 2007, and through December 31, 2007, a reconciling item was generated related to the foreign exchange results and monetary position result, which are capitalized under MFRS and not for U.S. GAAP. In 2008, a reconciling item was generated for borrowings denominated in US dollars, related to the foreign exchange results, which is capitalized under MFRS and not for U.S. GAAP.

**e)   Goodwill**

As mentioned in note 3 m), under MFRS, until December 31, 2004 goodwill represented the excess of cost over book value of subsidiaries as of the date of acquisition and was restated using the NCPI and amortized using the straight−line method over 20 years. Beginning on January 1, 2005, goodwill represents the excess of cost over fair value of subsidiaries as of the date of acquisition. Through December 31, 2007, goodwill was restated using the NCPI.

In accordance with ASC 350 "Intangibles−Goodwill and Other"(previously SFAS No. 142, "Goodwill and Other Intangibles Assets"), beginning in 2002 goodwill and indefinite−lived assets are also no longer subject to amortization, but rather are subject at least once a year to impairment tests.

As of December 31, 2007, the difference between MFRS and U.S. GAAP as it relates to this item was due to the accumulated amortization of goodwill recorded under MFRS that had been reversed in the reconciliation of stockholders' equity for purposes of U.S. GAAP. In 2008, as disclosed below, the Company recognized a goodwill impairment charge under U.S. GAAP and as a result this difference was eliminated with a charge to the U.S. GAAP statement of operations.

In 2008, the Company recorded an impairment of goodwill in its U.S. reporting unit. The impairment recorded in accordance with MFRS was less than what was recorded in accordance with U.S. GAAP as such goodwill had previously been amortized as discussed in the first paragraph of this item. As a result, an adjustment to the reconciliation of net income (loss) has been included in order to properly reflect the impairment loss recorded for purposes of U.S. GAAP.

The changes in the carrying amount of goodwill for the years ended December 31, 2008 and 2009 are as follows:

| | | |
|---|---|---:|
| Balance as of December 31, 2007 | Ps. | 994 |
| Acquisition[1] | | 60 |
| Impairment | | (239) |
| Changes for effects of exchange rates | | 159 |
| Reclassification to intangible assets[2] | | (61) |
| Balance as of December 31, 2008 | | 913 |
| Impairment | | (61) |
| Changes for effects of exchange rates | | 10 |
| Balance as of December 31, 2009 | Ps. | 862 |

**(1)**  The Company recorded goodwill of Ps. 60 related to the acquisition of 40% of the shares of Vitro Cristalglass, S.L. (see note 25 i).

**(2)**  During 2008 Ps. 61 was reclassified as an intangible asset when the purchase price allocation was finalized (see Note 20 a).

**f)    Effect of applying Bulletin B−10**

As discussed in note 3 c), through December 31, 2007 MFRS Bulletin B−10 allows the restatement of the value of machinery and equipment purchased in a foreign country using the consumer price index of the country of origin and the period−end exchange rate. For U.S. GAAP purposes, such restatement is based on the NCPI.

As discussed in the introduction to this note as well as note (3c), beginning January 1, 2008 with the issuance of NIF B−10, the Company's MFRS financial statements no longer include inflationary effects, for which reason, this reconciling item is no longer applicable. Further, even during inflationary periods, the alternate methodology described above has been eliminated by NIF B−10.

**g)    Derivative financial instruments**

The Company determined that the accounting for derivative financial instruments is the same for MFRS and U.S. GAAP as they relate to their consolidated financial statements as of and for the years ended December 31, 2007. Beginning January 1 2008, the Company adopted the provisions of ASC 820 "Fair Value Measurements and disclosures" (previously SFAS No. 157), which impacted the fair value of its derivative financial instruments as disclosed in note (25 r3) and is reflected as a difference in the accompanying reconciliation to U.S. GAAP.

**h)    Discontinued operations**

The basis of the assets and liabilities under U.S. GAAP of the entities disposed by the Company at the time of their sale differed from the basis of such assets and liabilities under MFRS; accordingly, the gain recorded on disposal of such entities under U.S. GAAP differs from that under MFRS.

**i)    Deconsolidation of Comegua**

For MFRS purposes prior to November 2008, based on: (a) the Company's control over the CEO whose function is to govern the operating decisions and financial policies of Comegua; (b) the Company's sole right to propose the CEO for designation by the Board of Directors of Comegua; and (c) the Company's sole right to remove the CEO, the Company concluded that it controlled Comegua as defined by Bulletin B−8, "Consolidated and Combined Financial

Statements and Valuation of Permanent Investments in Shares" and therefore, Comegua should be consolidated in accordance with MFRS. As disclosed in note 20 d), in November 2008, the Company announced that together with its two Central American partners, decided to modify the corporate by−laws of Comegua regarding the control of its operations. As a result, beginning on that date, the Company now accounts for its 49.7% participation in Comegua under the equity method.

For U.S. GAAP purposes, the Company has determined that the control it retained over the management of the annual budget of Comegua was not unilateral and was not sufficient to meet all of the technical requirements for consolidation. The Company's position is based on the guidance provided by ASC 810 "The effect of Noncontrolling Rights on Consolidation" (previously EITF 96−16, "Investor's Accounting for an Investee when the Investor has a Controlling of the Voting Interest but the Noncontrolling Shareholder or Shareholders have Certain Approval of Veto Rights"). Under US GAAP, such approval and veto rights held by the noncontrolling shareholders of Comegua, including the approval of annual budget, qualify as substantive participating rights and therefore do not allow the Company to consolidate Comegua in its financial statements for U.S. GAAP purposes. Therefore, the Company's investment in Comegua is recorded by applying the equity method in the Company's U.S. GAAP consolidated financial statements. Beginning in November 2008 this GAAP difference has been eliminated as discussed above.

**j)  Employee retirement obligations**

The Company maintains defined benefit pension plans for all of its subsidiaries and provides for seniority premiums and severance payments (severance indemnities) for all of its Mexican subsidiaries. For its MFRS consolidated financial statements, the Company applies NIF D−3. The Company records the pension cost determined by actuarial computations, as described in notes 3 n) and 11. Significant assumptions (weighted−average rates) used in determining net periodic pension cost and the Company's related pension obligations for 2008 and 2009 are also described in note 11.

Severance indemnities — Under MFRS NIF D−3 requires the recognition of a severance indemnity liability calculated based on actuarial computations. Similar recognition criteria under U.S. GAAP are established in ASC 712 "Nonretirement Postemployment Benefits" (previously SFAS No. 112, "Employers' Accounting for Postemployment Benefits"), which requires that a liability for certain termination benefits provided under an ongoing benefit arrangement such as these statutorily mandated severance indemnities, be recognized when the likelihood of future settlement is probable and the liability can be reasonably estimated. MFRS allows for the Company to amortize the transition obligation related to the adoption of revised Bulletin D−3 over the expected service life of the employees. However, U.S. GAAP required the Company to recognize such effect upon initial adoption, which results in a difference in the amount recorded under the two accounting principles. The tables below reflect the requirements under U.S. GAAP, which applies ASC 712 standard for all years presented.

The Company adopted ASC 715 "Compensation−Retirement Benefits (previously SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans), an amendment of ASC 715 "Compensation−Retirement Benefits" (previously FASB Statements No. 87, 88, 106 and 132(R)"), in its December 31, 2006 consolidated financial statements. This statement requires companies to (1) fully recognize, as an asset or liability, the over funded or under funded status of defined pension and other postretirement benefit plans; (2) recognize changes in the funded status through other comprehensive income in the year in which the changes occur; and (3) provide enhanced disclosures.

A reconciliation of the Company's employee retirement obligations from MFRS to U.S. GAAP is shown in the following table:

|  | | 2008 | | 2009 |
|---|---|---|---|---|
| Employee retirement obligations under MFRS | Ps. | 461 | Ps. | 66 |
| Effect of ASC 715 (previously SFAS No 158) adjustment |  | 1,749 |  | 2,255 |
| Effect of retirement obligations |  | 64 |  | 38 |
| Employee retirement obligations under U.S. GAAP | Ps. | 2,274 | Ps. | 2,359 |

For purposes of determining the cost of its pension plans, seniority premiums and severance indemnities under U.S. GAAP, the Company applies ASC 715, and ASC 712. The Company uses a December 31 measurement date for its pension plans, seniority premiums and severance indemnities. The additional pension disclosures required by ASC 715−30(previously SFAS No. 132, "Employers' Disclosures about Pensions and Other Postretirement Benefits"), as amended by ASC 715 (previously SFAS No. 158), which are applicable to the Company, are presented below:

|  | | 2008 | | 2009 |
|---|---|---|---|---|
| Change in benefit obligation: | | | | |
| Benefit obligation at beginning of year | Ps. | 3,235 | Ps. | 2,958 |
| Service cost |  | 78 |  | 81 |
| Interest cost |  | 249 |  | 287 |
| Actuarial (losses) gains |  | (170) |  | 639 |
| Benefits paid |  | (434) |  | (466) |
| Benefit obligation at end of year |  | 2,958 |  | 3,499 |
| Changes in plan assets: | | | | |
| Fair value of plan assets at beginning of year |  | 1,549 |  | 684 |
| Contribution of cash and securities |  | 140 |  | 774 |
| Return (loss) on plan assets |  | (747) |  | 43 |
| Benefits paid |  | (258) |  | (361) |
| Fair value of plan assets at end of year[(1)] |  | 684 |  | 1,140 |
| Employee retirement obligations— unfunded status | Ps. | 2,274 | Ps. | 2,359 |

(1)  Includes approximately Ps. 438 and Ps. 426 as of December 31, 2009 and 2008, respectively of 53,197,549 shares of Vitro common stock. No benefit payments were made in the form of stock during 2007, 2008 or 2009.

Net periodic pension cost for 2007, 2008 and 2009 are summarized below:

|  | | | Year ended December 31, | | | |
|---|---|---|---|---|---|---|
|  | | 2007 | | 2008 | | 2009 |
| Service cost | Ps. | 74 | Ps. | 78 | Ps. | 81 |
| Interest cost |  | 150 |  | 249 |  | 287 |
| Return on plan assets |  | (88) |  | (151) |  | (82) |
| Net amortization and deferral |  | 86 |  | 78 |  | 116 |
| Settlement cost |  | 117 |  | 7 |  | 35 |
| Net periodic pension cost | Ps. | 339 | Ps. | 261 | Ps. | 437 |

The unrecognized items included in accumulated other comprehensive income (AOCI) as of December 31, 2008 and 2009 are as follows:

|  | | 2008 | | 2009 |
|---|---|---:|---|---:|
| Unrecognized items included in AOCI: | | | | |
| Transition obligation | Ps. | 115 | Ps. | 82 |
| Prior service cost | | 180 | | 162 |
| Net actuarial losses | | 1,454 | | 2,011 |
| Unrecognized items | Ps. | 1,749 | Ps. | 2,255 |

Unrecognized items included in AOCI, net of tax of Ps. 473 and Ps. 631 respectively      Ps.   1,276    Ps.   1,624

The amounts related to the Company's employee retirement obligations recognized in other comprehensive income, arising during 2008 and 2009 are as follows:

|  | | Transition obligation | | Prior service cost | | Net actuarial loss | | Total |
|---|---|---:|---|---:|---|---:|---|---:|
| Balance as of December 31, 2007 | Ps. | 142 | Ps. | 181 | Ps. | 897 | Ps. | 1,220 |
| Amounts arising during the period | | — | | 16 | | 596 | | 612 |
| Curtailment / settlement effect | | (5) | | — | | — | | (5) |
| Amounts recognized as components of net periodic cost | | (22) | | (17) | | (39) | | (78) |
| Balance as of December 31, 2008 | Ps. | 115 | Ps. | 180 | Ps. | 1,454 | Ps. | 1,749 |
| Amounts arising during the period | | | | | | 638 | | 638 |
| Curtailment / Settlement effect | | (16) | | | | — | | (16) |
| Amounts recognized as components of net periodic cost | | (17) | | (18) | | (81) | | (116) |
| Balance as of December 31, 2009 | Ps. | 82 | Ps. | 162 | Ps. | 2,011 | Ps. | 2,255 |

The amounts in accumulated other comprehensive income expected to be recognized as components of net periodic service cost during 2010 are summarized below:

|  | | 2010 |
|---|---|---:|
| Transition obligation | Ps. | 16 |
| Prior service cost | | 17 |
| Net actuarial loss | | 119 |

F−67

The fair values of the Company pension plan assets at December 31, 2009, by asset category are as follows:

| Description | Fair Value Measurements at Reporting Date Using | | | |
| | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Fixed-income securities | | | | |
| Cash | Ps. 81 | — | — | Ps. 81 |
| Investment in corporate bonds | 540 | — | — | 540 |
| Investment in government bonds | 40 | — | — | 40 |
| | 661 | — | — | 661 |
| Investment in marketable securities | 440 | — | — | 440 |
| Other investments and private funds | 14 | — | 25 | 39 |
| | 454 | — | 25 | 479 |
| Total | Ps. 1,115 | — | Ps. 25 | Ps. 1,140 |

The trust assets consist of fixed income and variable funds, valued at market value. As of December 31, 2008 and 2009, the pension plan assets were invested in the following financial instruments:

| | 2008 | 2009 |
|---|---|---|
| Fixed Rate: | | |
| Federal Government instruments | 34% | 60% |
| Variable Rate: | | |
| Equity securities traded on the Mexican Stock Exchange | 66% | 40% |
| | 100% | 100% |

We develop our expected long−term rate of return assumption based on the historical experience of our portfolio and the review of projected returns by asset class on broad, publicly traded equity and fixed−income indices. The composition of the objective portfolio is consistent with the share composition of the portfolios of five of the best−known international companies located in Mexico that manage long−term funds.

Contributions to the pension plans amounted to Ps. 140 and Ps. 414 as of December 31, 2008 and 2009, respectively. The Company estimates that the contributions to the pension plan funds during 2010 are expected to be approximately Ps. 143. Expected benefit payments for our pension plans, seniority premium and severance indemnities are as follows:

| Year ended December 31, | Pension | | Seniority Premium | | Severance Indemnities | |
|---|---|---|---|---|---|---|
| 2010 | Ps. | 285 | Ps. | 9 | Ps. | 36 |
| 2011 | | 281 | | 9 | | 32 |
| 2012 | | 275 | | 9 | | 28 |
| 2013 | | 270 | | 9 | | 25 |
| 2014 | | 265 | | 9 | | 22 |
| 2015 – 2019 | | 1,288 | | 44 | | 76 |

As discussed in note 3 a), NIF D−3, "Employee Benefits", became effective January 1, 2008. NIF D−3 eliminates the recognition of the additional liability because its determination does not incorporate a salary increase, incorporates the career salary concept, and the amortization period of most unrecognized items (those not related to retirement benefits) is reduced to five years, with the option to fully amortize them against current earnings of 2008 under other income and expense. The Company chose to amortize such items over a period of five years. Additionally, the beginning balance of actuarial gains and losses from termination benefits was recorded against results of 2008 for purposes of MFRS, in other income and expense. For U.S. GAAP purposes unamortized items are recognized over the estimated service period of the Company's employees.

**k)  Purchase of Visteon's capital investment**

In connection with the termination of the joint venture agreement between Viméxico and Visteon under MFRS as established in Bulletin B−7, "Business Acquisitions" the Company recognized the difference between the price paid and the book value of Ps. 70 as a credit in the controlling stockholders' equity. Under U.S. GAAP, in accordance with ASC 805 "Business Combinations"(previously SFAS No. 141, "Business Combinations") the excess of fair value over cost of Ps. 90 was allocated as a pro rata reduction of the acquired assets.

**l)  Purchase of remaining 40% interest in Vitro Cristalglass**

In connection with Vimexico's purchase of the additional 40% interest in Vitro Cristalglass discussed in note 20 c), under Mexican standard NIF Bulletin B−7, "Business Acquisitions", this is considered to be a transaction between shareholders that does not impact the net assets of the Company, and the payment in excess of the book value of the shares acquired is recorded in stockholders' equity as a reduction of additional paid−in capital. Under U.S. GAAP, ASC 805 (previously SFAS No. 141 purchases of noncontrolling interest represent a "step acquisition" that must be accounted for under the purchase method, whereby the purchase price is allocated to the proportionate fair value of assets and liabilities acquired. The difference between the fair value and the price paid for the 40% of Vitro Cristalglass equity is presented as part of investment in Vitro Cristalglass shares in the consolidated balance sheet under U.S. GAAP. The Company recognized Ps. 60 goodwill as part of the purchase price allocation.

**m)  Sale of real estate**

In December 14, 2006, Vitro sold real estate located in Mexico City used by COVISA for US$ 100 million, 80% payable on the date of sale and the remainder payable on the delivery date of the property. In connection with the sale of the property, the Company agreed to deliver the real estate within 24 months following the sale, free and clear of all buildings and fixtures, as well as any environmental claims, recording reserves of Ps. 56 for the estimated asset retirement costs and prepaid rent of Ps. 62 for the estimated fair value of the rental expense over the 24 months. Under U.S. GAAP, in accordance with SFAS No. 66, "Accounting for Sales of Real Estate", ASC 840 "Leases" (previously SFAS No. 13, "Leases" and SFAS No. 98, "Accounting for leases") as a result of the Company's level of continuing involvement the gain on the sale of the land has been deferred and is being recognized in earnings during the two years over which the Company continues to utilize the property. In 2008, Vitro delivered the real estate in compliance with the terms of the agreement.

The depreciation estimates of the fixed assets that were disposed of as a result of the real estate sale have been adjusted to reflect the use of the assets over their shortened useful lives. Such change in estimate is being accounted for prospectively. For purposes of MFRS, the Company wrote off the net book value of the fixed assets against the gain on sale.

For U.S. GAAP purposes, a difference resulted due to the depreciation expense related to the fixed assets that were written off under MFRS. This difference was eliminated upon the sale of the real estate in 2008 per U.S. GAAP.

**n)** **Impairment of long−lived assets**

For U.S. GAAP purposes, in accordance with ASC 360−10−05 "Impairment or disposal of long−lived assets" (previously SFAS No. 144 "Impairment of long−lived assets"), long−lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The carrying amount of an asset is not recoverable when the estimated future undiscounted cash flows expected to result from the use of the asset are less than the carrying value of the asset. Impairment is recorded when the carrying amount of the asset exceeds its fair value. Impairment charges and asset write−downs are presented in selling, general and administrative expenses in operating income in our U.S. GAAP consolidated financial statements.

For MFRS purposes, in accordance with Bulletin C−15, the Company reviews the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price upon disposal. Impairment is recorded when the carrying amount of the asset exceeds the greater of the amounts mentioned above. Impairment charges and asset write−downs are presented in other expenses in our MFRS consolidated financial statements.

In 2005, 2006 and 2009, for MFRS purposes, while performing its annual impairment test using its best estimates based on reasonable and supportable assumptions and projections, the Company recorded an impairment charge of Ps. 111, Ps. 334 and Ps. 60, respectively within its Flat Glass reportable segment as the carrying amount of the long−lived assets exceeded the present value of their future discounted cash flows. For U.S. GAAP purposes no impairment charge was recorded as the assets were considered to be recoverable given that the estimated undiscounted cash flows expected to result from the use of the assets were greater than the carrying value of the asset.

In 2005 for U.S. GAAP purposes, based on fair value appraisals received, the Company recorded an impairment charge of Ps. 195 for land and buildings located at its corporate offices classified as available for sale in accordance with SFAS No. 144. This charge is recorded in operating income for U.S. GAAP purposes. Under MFRS, the assets did not meet the definition of held for sale as required by Bulletin C−15 as such assets were still in use by the Company at the time. The discounted cash flow model utilized by the Company did not result in an impairment charge for MFRS purposes. Additionally during 2006, Vitro sold one of its buildings located at its corporate headquarters recognizing a loss on sale of Ps. 138 under MFRS and Ps. 93 under U.S. GAAP.

F−70

As a result of the transactions described above, differences result between MFRS and U.S. GAAP due to the depreciation expense on fixed assets being recorded each year.

Impairment charges are recorded in operating income for U.S. GAAP purposes and in the other income and expenses under MFRS.

**o)** **Securitization of trade receivables**

Under MFRS beginning January 1, 2008 the Company adopted NIF B−8, (Note 3a), which establishes that special purpose entities, over which control is exercised, should be consolidated. The guidance in NIF B−8 differs from the current requirements of US GAAP, that qualifying special purposes entities ("QSPEs") not be consolidated if they meet certain specific requirements.

As a result of adopting NIF B−8, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated financial statements (see note 10) for purposes of MFRS. For US GAAP purposes as they meet the definition of QSPEs they are not consolidated, which is consistent with the presentation of prior years. The disclosures related to such transactions are as follows:

- Securitization of Vitro Envases Norteamérica, S.A. de C.V. (VENA) trade receivables.− On March 31, 2005, Compañía Vidriera, S.A. de C.V., Industria del Álcali, S.A. de C.V. and Comercializadora Álcali, S. de R.L. de C.V., all subsidiaries of VENA, closed a five−year non−recourse revolving accounts receivable facility, through which such companies obtained approximately Ps. 550 (nominal amount) and US$ 19 million. The VENA subsidiaries entered into an agreement to sell all of their trade accounts receivable, on a revolving basis, to a trust (the Trust, a qualifying special purpose entity) that was formed prior to the execution of this agreement for the sole purpose of buying and selling accounts receivable and is designed to be bankruptcy remote. The Ps. 550 (nominal amount) was obtained through the issuance of certified preferred securities (certificados bursátiles preferentes) that trade on the Mexican Stock Exchange (BMV) issued by the Trust, and US$ 19 million in subordinated notes issued in United States of America, which are guaranteed by the Company. The interest payments and eventual principal reimbursement on the certified preferred securities and the subordinated notes are payable from the collection of the receivables originated by the VENA subsidiaries and sold to the Trust. During June of 2009, the Company made a principal payment of US$9 million, reducing the total amount of securities outstanding to US$10 million as of December 31, 2009. At December 31, 2008 and 2009 the gross receivables sold to the Trust totaled Ps. 1,327 and Ps. 1,004, respectively, and are reflected as a reduction of trade accounts receivable.

The estimated fair value of the retained undivided interests in securitized receivables at December 31, 2008 and 2009 was Ps. 492 and Ps. 309, respectively. The Company has completed a sensitivity analysis on the estimated fair value of the retained undivided interests with the objective of measuring the change in value associated with changes in individual key variables. A 10% increase in expected credit losses and allowance, to 2.88%, would decrease the year−end valuation by approximately Ps. 19, and a 20% increase in expected credit losses and allowances, to 3.14%, would decrease the year−end valuation by approximately Ps. 37. Similarly, 10% or 20% adverse fluctuations in either average receivable collection times or expected short−term commercial paper rates would not significantly affect the recorded fair value of the retained undivided interests. This sensitivity analysis is hypothetical and should be used with caution.

Proceeds received by the Company from the revolving securitizations aggregated to Ps. 9,835 and Ps. 8,425 for the years ended December 31, 2008 and 2009, and are included in cash flows from operating activities. Delinquencies on securitized receivables, representing amounts over 60 days past due, totaled Ps. 62 and Ps. 23 as of December 31, 2008 and 2009, respectively. The servicing of the trade receivables is provided by a third party.

- Securitization of Viméxico trade receivables.− On August 22, 2005, Viméxico, closed a private issuance of promissory notes in the United States for US$21.5 million, at an interest rate of 6.5%. Viméxico entered into an agreement to sell all of its trade accounts receivable, on a revolving basis, to a trust (the Trust, a qualifying special purpose entity) that was formed prior to the execution of this agreement for the sole purpose of buying and selling accounts receivable and is designed to be bankruptcy remote. The interest payments and eventual principal reimbursement will be provided from the collection of the receivables originated by four subsidiaries of Viméxico and sold to the Trust, which are: Distribuidora Nacional de Vidrio, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitro Automotriz, S.A. de C.V. and Vitro Vidrio y Cristal, S.A. de C.V. At December 31, 2008 and 2009, the gross receivables sold to the Trust totaled Ps. 577 and Ps. 531, respectively, and are reflected as a reduction of trade accounts receivable. The estimated fair value of the retained undivided interests in securitized receivables at December 31, 2008 and 2009 was Ps. 261 and Ps. 231, respectively. The Company has completed a sensitivity analysis on the estimated fair value of the retained undivided interests with the objective of measuring the change in value associated with changes in individual key variables. A 10% increase in expected credit losses and allowance, to 0.66%, would decrease the year−end valuation by approximately Ps. 14, and 20% increase in expected credit losses and allowances, to 3.94%, would decrease the year−end valuation by approximately Ps. 27. Similarly, 10% or 20% adverse fluctuations in either average receivable collection times or expected short−term commercial paper rates would not significantly affect the recorded fair value of the retained undivided interests. This sensitivity analysis is hypothetical and should be used with caution.

  Proceeds received by the Company from the revolving securitizations aggregated to Ps. 2,592 and US$152 million, and Ps. 2,089 and US$122 million for the years ended December 31, 2008 and 2009, respectively, and are included in cash flows from operating activities. Delinquencies on securitized receivables, representing amounts over 60 days past due, totaled Ps. 67 and US$3 million, and Ps. 25 and US$0.566 million at December 31, 2008 and 2009, respectively. Viméxico continues to service the securitized receivables, receiving compensation approximately equal to its cost of such servicing plus a reasonable profit margin; accordingly, no servicing assets or liabilities are recorded. For the years ended December 31, 2008 and 2009, the Company received servicing fees totaling Ps. 12 and Ps. 11, respectively.

- *Vitro America, Inc. ("Vitro America").*− Effective January 30, 2009, the Company's accounts receivable securitization agreement was terminated. At termination, the gross receivables sold totaled US$72.4 million with estimated delinquencies of US$13.6 million, representing amounts over 60 days past due. The estimated fair value of the retained undivided interests in those securitized receivables was US$33.4 million, at January 30, 2009. As a result of the termination, approximately US$26.6 million, of trade receivables

  and related debt obligations reverted to the Company. In February 2009, US$15 million of the debt obligations were repaid with capital contributions from American Asset Holding Corp. ("AAH"). The remaining US$11.6 million was financed through an amendment of the Company's existing asset based Bank Loan Agreement.

Prior to the agreement termination, Vitro America sold all of its accounts receivable, on a revolving basis, to VVP Funding a wholly owned subsidiary of Vitro America. VVP Funding, a special purpose entity, was formed prior to the execution of the agreement for the sole purpose of buying and selling accounts receivable and was designed to be bankruptcy remote. Also, Vitro America and VVP Funding entered into an agreement with an unrelated financial institution whereby VVP Funding, on a revolving basis and subject to the maintenance of certain financial and receivables−based ratios, sold an undivided percentage ownership in all eligible accounts receivable, as defined, for consideration composed of cash and Vitro America retained an interests in securitized receivables. The maximum selling amount during the years ended December 31, 2009 and 2008 was US$50 million. The agreement expired annually each April, subject to annual renewal approval by the financial institution. The transfer of undivided ownership interest from VVP Funding to the unrelated major financial institution for cash consideration was accounted for as a sale of receivables in accordance with US GAAP.

The gross receivables sold totaled US$74 million at December 31, 2008, and are reflected as a reduction of trade accounts receivable. The estimated fair value of the retained undivided interests in securitized receivables at December 31, 2008 totaled US$ 33.6 million, and was determined based on expected credit losses and allowance of 3%, expected average receivable collection time of 52 days, and expected short−term commercial paper rates of 2.3% per annum.

Proceeds received by the Company from the revolving securitizations aggregated to US$ 463 and US$32.5 million for the years ended December 31, 2008 and 2009, respectively, and are included in cash flows from operating activities in the accompanying consolidated statements of cash flows. Securitization fees totaled US$2.1 millions and US$0.2 millions for the years ended December 31, 2008 and 2009, respectively, and are included in general and administrative expenses in the accompanying amounts over 60 days past due, totaled US$15 million at December 31, 2008, with credit losses totaling US$2.6 million for the year ended December 31, 2008. VVP continues to service the securitized receivables under the agreement, receiving compensation that is approximately equal to its cost of such servicing plus a reasonable profit margin; accordingly, no servicing assets or liabilities were recorded. For the years ended December 31, 2008 and 2009, the Company received servicing fees totaling US$0.6 and US$0.1 million, respectively.

**p)** **Fintech sale and leaseback transaction**

In December 2009, the Company completed a US$75 million transaction with Fintech Advisory Limited, an affiliate of Fintech ("Fintech Advisory"), through the creation of a Mexican trust (the "Real Estate Trust"). Vitro and its subsidiaries, Comercializadora Álcali, S.A. de C.V. ("Álcali"), Vidriera Guadalajara, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V. and Vidriera Toluca, S.A. de C.V. contributed seven real estate assets (industrial land) to the Real Estate Trust, receiving US$75 million in cash contributed by Fintech Advisory to acquire these assets. The Company entered into a 15 year lease agreement that allows it to continue using the assets. The Company has the right to repurchase the title to these real estate assets in exchange for US$126 million in cash in certain circumstances. If it defaults on a payment under the lease agreement or if certain other specified events were to occur, Fintech Advisory will have the right to sell such assets to third parties (assuming the Company has not already repurchased the assets), with the exception of certain parties such as competitors or creditors. If Fintech exercises its right to sell or lease the real estate assets, this could adversely affect the Company's business. Additionally, after the execution of a restructuring plan or agreement for the restructuring of substantially all of the Company's financial indebtedness and the satisfaction of certain other conditions precedent, Fintech may exercise one of two options obtained on the same date to

F−73

exchange the rights over the Real Estate Trust for shares of the Company and/or a sub−holding subsidiary's common shares. The option related to the common shares of the Company, if exercised, would be for up to a maximum of 93,099,849 shares that in the aggregate are currently held by the Company's Pension and Stock Option Trusts, valued in accordance with the relevant valuation formula set forth in the option agreement and would leave Fintech with up to a maximum equity stake in the Company of approximately 24%. If those common shares are not sufficient to satisfy the US$75 million option purchase, the remainder of the purchase option would be fulfilled with the delivery to Fintech of the necessary shares of the sub−holding subsidiary valued in accordance with the relevant valuation formula set forth in the option agreement. Alternatively, Fintech may elect to exercise the second option, over certain shares of the sub−holding subsidiary exclusively (only one of the two options may be exercised). Fintech's equity options expire three years after a restructuring plan or agreement for the restructuring of substantially all of the Company's financial indebtedness is executed. The Company has the option to repurchase the sub−holding subsidiary's shares during the three years following Fintech's exercise of either option. In the event that Fintech exercises the option related to the Company's common shares, a shareholders agreement among Fintech and the Company's controlling shareholders will come into effect and would continue to be in effect as long as Fintech holds at least a 5% ownership in Vitro. Pursuant to the terms of such shareholders agreement, among other things, subject to certain limitations and qualifications, Fintech specifically agreed to vote with Mr. Adrian Sada Gonzalez, Ms. Esther Cueva de Sada, Ms. Maria Alejandra Sada Gonzalez and Mr. Adrian Sada Cueva, and the consent of such persons (including Fintech) will be required with respect to certain fundamental actions and voting matters affecting the Company. Moreover, under the shareholders agreement, Fintech and the other shareholders party thereto will be subject to certain transfer restrictions, in each case customary for a significant shareholder of a Company like ours.

For purposes of MFRS, the Company recognized a gain on sale as the sale−leaseback transaction was accounted for as an operating lease. For purposes of US GAAP, the requirements of ASC 840−40 "Sale Leaseback Transactions" (previously SFAS 98, Accounting for Leases) require that a sale−leaseback transaction involving real estate, including real estate with equipment, that includes any continuing involvement other than a normal leaseback in which the seller−lessee intends to actively use the property during the lease should be accounted for by the deposit method or as a financing. The level of continuing involvement is other than normal as Vitro has the option to repurchase the land subject to the lease and as a result the sale leaseback transaction has been accounted for as a deposit as per the requirements of ASC 30−20 "Real Estate Sales" (previously SFAS 66, Accounting for Sales of Real Estate). Under the deposit method, the Company did not recognize any profit, did not record notes receivable, and continues to report in its financial statements the property. The US$75 million in cash received was recorded as a deposit on the contract on the property. Additionally, for purpose of US GAAP, the options held by Fintech, which are interrelated with the sale−leaseback transaction embody an unconditional obligation that Vitro must or may settle by issuing a variable number of its equity shares meet the definition of a liability in accordance with ASC 480 "Financial Instruments with Characteristics of Debt and Equity" (previously SFAS 150, Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity). The fair value of the options as of December 31, 2009 is US$78.4 million.

F−74

**q)** <u>Impact of changes in income tax law</u>

As a result of changes to the Mexican Income Tax Law, which became effective in 2010 the Company recorded an additional income tax liability of Ps. 237. For purposes of MFRS, the Company recorded the corresponding charge directly in stockholders' equity. Under U.S. GAAP, the Company reflected the effects within current earnings.

**r)** <u>Other differences and supplemental U.S. GAAP disclosures</u>

**1.** **Reclassifications:**

(a) Gain or loss on sale of assets — The gain or loss on sale of assets that do not meet the definition of a component of a business as described in ASC 360−10−35 "Impairment or Disposal of long−lived Assets" (previously SFAS No. 144, Impairment of long−lived Assets) are included in operating income in the Company's U.S. GAAP consolidated financial statements. Gains or losses on sales of assets not presented as discontinued operations under MFRS are included in other expenses in the Company's consolidated MFRS financial statements (see note 16).

(b) Classification of workers' profit sharing — Under MFRS, statutory employee profit sharing is presented under other income and expenses. In the Company's U.S. GAAP statements of operations, workers' profit sharing expense is classified as an operating expense.

(c) Restructuring charges — During 2008 and 2009, the Company restructured certain operating units and its corporate and administrative functions. For MFRS purposes the corresponding costs met the definition of a restructuring charge and were included in other expenses in the Company's consolidated financial statements, but for U.S. GAAP purposes the Company applied ASC 712 (previously SFAS No. 112). These costs are included in general and administrative expenses in the accompanying U.S. GAAP consolidated statements of operations.

(d) In August, 2010 the Company refinanced the 44.8 million Euro credit line for its subsidiary in Spain, Vitro Cristalglass, S.L., extending the term for three years from the agreement date. As a result, the Company reclassified from short term to long term debt an amount of 9.4 million Euros.

**2.** **Equity method investments —** Through July 27, 2007, the Company accounted for its 50% joint venture investments in Vitro AFG under the equity method for US GAAP purposes and under proportionate consolidation method for MFRS. Subsequent to acquiring the remaining 50% of the outstanding shares and assuming complete control over its operations, the Company began to consolidate its wholly−owned subsidiary (see note 20 b) for both MFRS and U.S. GAAP.

Summary information of AFG is as follows:

| AFG | | 2007* |
|---|---|---|
| Net sales | Ps. | 368 |
| Net income (loss) | | (134) |
| Cash flow information: | | |
| Operating activities | | (6) |

\* For the period from January 1 through July 2007.

3. **Fair value of financial instruments** — ASC 825−10−20 "Fair Value of Financial Instruments", (previously SFAS No. 107 "Disclosures about fair value of Financial Instruments"), requires disclosure of the estimated fair values of certain financial instruments. The carrying amounts and estimated fair values of the Company's significant financial instruments not previously disclosed in these financial statements were as follows:

| | December 31, 2008 | | | | December 31, 2009 | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Carrying Amount | | Fair Value | | Carrying Amount | | Fair Value | |
| Liabilities: | | | | | | | | |
| Short−term borrowings | Ps. | 2,309 | Ps. | 2,166 | Ps. | 1,680 | Ps. | 1,568 |
| Derivative liabilities | | 3,777 | | 1,499 | | 3,328 | | 1,541 |
| Long−term debt[1] | | 19,753 | | 7,808 | | 18,421 | | 9,054 |
| Accrued interests | | 735 | | 230 | | 2,428 | | 1,044 |

(1) Includes current portion of long−term debt.

The fair value of long−term debt was determined using available quoted market prices or other appropriate valuation methodologies that require considerable judgment in interpreting market data and developing estimates. Accordingly, the estimates presented above on long−term financial instruments are not necessarily indicative of the amounts that the Company could realize in a current market exchange. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated fair value amounts.

The fair value information presented herein is based on information available to management as of December 31, 2008 and 2009. Although management is not aware of any factors that would significantly affect the estimated fair value amounts, such amounts have not been comprehensively revalued for purposes of these financial statements since that date and, therefore, the current estimates of fair value may differ significantly from the amounts presented herein.

As disclosed in insert r) 12, the Company adopted ASC 820, "Fair Value Measurements and Disclosures" (previously SFAS No. 157 "Fair Value Measurements"), as it relates to its financial instruments carried at fair value beginning in 2008. ASC 820 establishes a framework for measuring fair value and expands disclosures about fair value measurements. Under this standard, fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (i.e., the "exit price") in an orderly transaction between market participants at the measurement date.

ASC 820 (SFAS No. 157) establishes a hierarchy for inputs used in measuring fair value that maximizes the use of observable inputs and minimizes the use of unobservable inputs by requiring that the most observable inputs be used when available. Observable inputs are inputs that market participants would use in pricing the asset or liability developed based on market data obtained from sources independent of the Company. Unobservable inputs are inputs that reflect the Company's assumptions about the assumptions market participants would use in pricing the asset or liability developed based on the best information available in the circumstances. The hierarchy is broken down into three levels based on the observability of inputs as follows:

• Level I—Valuations based on quoted prices in active markets for identical assets or liabilities that the Company has the ability to access. Valuation adjustments and block discounts are not applied to Level 1 instruments. Since valuations are based on quoted prices that are readily and regularly available in an active market, valuation of these products does not entail a significant degree of judgment.

• Level 2—Valuations based on one or more quoted prices in markets that are not active or for which all significant inputs are observable, either directly or indirectly.

• Level 3—Valuations based on inputs that are unobservable and significant to the overall fair value measurement.

The availability of observable inputs can vary from product to product and is affected by a wide variety of factors, including, for example, the type of product, whether the product is new and not yet established in the marketplace, the liquidity of markets and other characteristics particular to the transaction. To the extent that valuation is based on models or inputs that are less observable or unobservable in the market, the determination of fair value requires more judgment. Accordingly, the degree of judgment exercised by the Company in determining fair value is greatest for instruments categorized in Level 3.

In certain cases, the inputs used to measure fair value may fall into different levels of the fair value hierarchy. In such cases, for disclosure purposes the level in the fair value hierarchy within which the fair value measurement falls in its entirety is determined based on the lowest level input that is significant to the fair value measurement in its entirety.

*Valuation Techniques.* Many over the counter ("OTC") contracts have bid and ask prices that can be observed in the marketplace. Bid prices reflect the highest price that a party is willing to pay for an asset. Ask prices represent the lowest price that a party is willing to accept for an asset. For financial instruments whose inputs are based on bid−ask prices, the Company does not require that the fair value estimate always be a predetermined point in the bid−ask range. The Company's policy is to allow for mid−market pricing and adjusting to the point within the bid−ask range that meets the Company's best estimate of fair value. For offsetting positions in the same financial instrument, the same price within the bid−ask spread is used to measure both the long and short positions.

Fair value for many OTC contracts is derived using pricing models. Pricing models take into account the contract terms (including maturity) as well as multiple inputs, including, where applicable, commodity prices, equity prices, interest rate yield curves, credit curves, correlation, creditworthiness of the counterparty, option volatility and currency rates. In accordance with ASC 820, the impact of the Company's own credit spreads is also considered when measuring the fair value of liabilities, including OTC derivative contracts. Where appropriate, valuation adjustments are made to account for various factors such as liquidity risk (bid−ask adjustments), credit quality and model uncertainty. These adjustments are subject to judgment, are applied on a consistent basis and are based upon observable inputs where available. The Company generally subjects all valuations and models to a review process initially and on a periodic basis thereafter.

Fair value is a market−based measure considered from the perspective of a market participant rather than an entity−specific measure. Therefore, even when market assumptions are not readily available, the Company's own assumptions are set to reflect those that the Company believes market participants would use in pricing the asset or liability at the measurement date. As a result of adopting ASC 820 in 2008, the Company recorded a gain in its U.S. GAAP income statement as a result of adjusting the fair value of its derivative financial instruments.

Disclosures related to the Company's financial instruments recorded at fair value as of and for the year ended December 31, 2009 are shown below.

Assets (liabilities) that are measured at fair value as of December 31, 2008 on a recurring basis are as follows:

| Description | Amount | | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|
| | | | Fair Value Measurements at Reporting Date Using | | | | |
| Derivative financial instruments | Ps. | 379 | | Ps. | 379 | Ps. | — |
| Retained undivided interests in securitized receivables | | 1,213 | | | | | 1,213 |
| Total | Ps. | 1,592 | | Ps. | 379 | Ps. | 1,213 |

Assets (liabilities) that are measured at fair value as of December 31, 2009 on a recurring basis are as follows:

| Description | Amount | | Quoted Prices In Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|
| | | | Fair Value Measurements at Reporting Date Using | | | | |
| Derivative financial instruments | Ps. | (106) | | Ps. | (106) | Ps. | — |
| Fintech option liability | | (1,154) | | | (1,154) | | |
| Retained undivided interests in securitized receivables | | 523 | | | | | 523 |
| Total | Ps. | (737) | | Ps. | (1,260) | Ps. | 523 |

The definition of fair value under U.S. GAAP, which is based on an exit price notion, differs from the definition established by MFRS, which is based on a settlement price notion. Therefore, the Company has included a reconciling item in U.S. GAAP reconciliation as a result of adopting this new accounting pronouncement.

**Fair value of non−financial assets and non−financial liabilities**

On January 1, 2009, Vitro adopted ASC Topic 820, *Fair Value Measurements and Disclosures*, for fair value measurements of non−financial assets and non−financial liabilities that are recognized or disclosed at fair value in the financial statements on a non−recurring basis.

F−78

Pursuant to ASC 350−20−35, *Intangibles—Goodwill and Other—Recognition and Measurement of an Impairment Loss* ("ASC 350−20−35"), goodwill with a previous carrying amount of Ps. 903 (US$69) was adjusted in connection with the 2009 impairment test, to its estimated fair value of Ps. 862 (US$66). The fair values were determined using multiple comparable analyzes of similar companies and discontinued cash flow analysis on the forecasted operating results of the Company's reporting units.

| Description | Balance at December 31, 2009 | | Fair Value Hierarchy | | Total impairment charge |
| | | Level 1 | Level 2 | Level 3 | |
| --- | --- | --- | --- | --- | --- |
| Goodwill | Ps. 862 | — | — | Ps. 862 | Ps. 41 |

**Effects of derivative instruments in the statements of income**

The net losses recognized related to the Company's derivative instruments in the consolidated statements of income in 2007, 2008 and 2009, were Ps. 203, Ps. 3,691 and Ps. 578, respectively.

4. **Earnings per share in accordance with U.S. GAAP** — Earnings per share in accordance with U.S. GAAP is based on the provisions of ASC 260 "Earnings per Share" (previously SFAS No. 128, "Earnings Per Share"). The methodologies required by MFRS and U.S. GAAP as it relates to the calculation and presentation of the Company's basic and diluted earnings per share differs only in the net income (loss) utilized for purposes of the calculation.

Income (loss) per common share computed in accordance with U.S. GAAP is presented below:

| | Year ended December 31, | | |
| | 2007 | 2008 | 2009 |
| --- | --- | --- | --- |
| Basic and diluted (loss) income per common share | Ps. 1.37 | Ps. (18.57) | Ps. (7.54) |

5. **Comprehensive income** − Under U.S. GAAP, ASC 220 "Comprehensive Income" (previously SFAS No. 130, "Reporting Comprehensive Income"), establishes standards for reporting and display of comprehensive income and its components. Vitro's items of other comprehensive income are: loss from holding nonmonetary assets, unrealized gain (loss) on long−term investments, the currency translation adjustment and the amortization of unrecognized items related to its labor obligations.

See note 25 s), for consolidated financial statements presented on a U.S. GAAP basis, which reflect the provisions of ASC 220.

6. **Share−based Payment** — In 2006 the Company adopted and currently applies ASC 718 "Compensation−Stock Compensation" (previously SFAS No. 123(R) "Share−Based Payment"), in accounting for its share−based payment awards. The Company's employee stock option plan was adopted in 1998. The disclosures required under U.S. GAAP as they relate to this plan are included in note 14 b).

7. **Restrictions that limit the payment of dividends by the registrant** — The Company derives substantially all of its operating income from advances, fees, interest and dividends paid to the Company by its subsidiaries. Accordingly, in paying the principal of, premium, if any, interest on, and additional amounts, if any, with respect to the Company's indebtedness, the Company relies on income from advances, fees, interest and dividends from its' subsidiaries, as well as income from the disposition of one or more of its subsidiaries, interests therein or assets thereof. Therefore, the Company's subsidiaries' ability to pay such dividends or make such distributions are subject to (i) such subsidiaries having net income and the requisite amount of paid−in capital under Mexican law, (ii) such subsidiaries' shareholders (including the Company's joint venture partners) having approved the payment of such dividends at the annual general ordinary shareholders' meeting and (iii) applicable laws and, in certain circumstances, restrictions contained in joint venture and debt agreements. At December 31, 2007, 2008 and 2009, the net assets of the Company's subsidiaries were not restricted.

8. **Concentration of credit risk** — The Company sells products to customers primarily in Mexico, the U.S. and Europe, although no single customer accounted for more than 8% of consolidated net sales in 2007, 2008 and 2009, the Company has customers that are significant to its business units and to its consolidated financial statements taken as a whole. The Company's three largest customers accounted for approximately 15% of its consolidated net sales in 2007, 2008 and 2009. The Company conducts periodic evaluations of its customers' financial condition and generally does not require collateral. The Company does not believe that significant risk of loss from a concentration of credit risk exists given the large number of customers that comprise its customer base and their geographical dispersion. The Company also believes that its potential credit risk is adequately covered by the allowance for doubtful accounts.

9. **Irrevocable Standby Letters of Credit** — As of December 31, 2008 and 2009 VVP Holdings Corp. (one of the Company's U.S. subsidiaries), had outstanding irrevocable standby letters of credit issued, for insurance purposes, totaling US$14 million.

10. **Vicap Notes** — 11 3/8% Vicap Notes registered under the U.S. Securities Act of 1933 were issued by Vicap (now known as SOFIVSA and in 2008 SOFIVSA merged with COVISA), the Company's 100% owned finance subsidiary, and fully and unconditionally guaranteed by Vitro. There are no restrictions on the ability of Vitro to obtain funds from COVISA by dividend or loan. The Vicap Notes were repaid prior to their maturity date in March 2007.

11. **Statement of Changes in Financial Position** — Under MFRS, prior to 2008, Company presented a consolidated statement of changes in financial position in accordance with Bulletin B−12, "Statement of Changes in Financial Position", which identifies the generation and application of resources by the differences between beginning and ending balance sheet items presented in constant Mexican pesos. Bulletin B−12 also requires that monetary and foreign exchange gains and losses be treated as cash items for the determination of resources generated by operating activities.

   In accordance with U.S. GAAP, the Company follows ASC 230 "Statement of Cash Flows" (previously SFAS No. 95, "Statement of Cash Flows"), which is presented in historical Mexican pesos, without the effects of inflation.

   As mentioned in note 3 a), NIF B−2, is effective January 1, 2008. NIF B−2 requires that the statement show a company's cash inflows and outflows during the period and establishes general rules for the presentation, structure and preparation of a cash flow statement and replaces the statement of changes in financial position on a prospective basis. Differences continue to exist compared to U.S. GAAP in the presentation for items such as interest received and paid.

12. **Recently Issued Accounting Standards.** The following accounting standards have been issued under U.S. GAAP, the application of which is required as indicated below.

   The Company adopted the disclosure requirements of ASC 820−10 (SFAS No. 157) in relation to nonfinancial assets and liabilities in 2009. See Note 25r3 for related disclosures.

   In January 2009, the Company adopted FASB ASC 810−10 (SFAS No. 160) which establishes the accounting and reporting standards for the noncontrolling interest in a subsidiary and the deconsolidation of a subsidiary, and also amends certain consolidation guidance for consistency with revised standards regarding business combinations. The accounting provisions of FASB ASC 810−10 (SFAS No. 160) must be applied prospectively as of the beginning of the fiscal year in which the provisions are initially adopted, while the presentation and disclosure requirements must be applied retrospectively, to provide comparability in the financial statements. FASB ASC 810−10 (SFAS No. 160) was effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. As a result of adopting this standard, the Company reclassified the noncontrolling interest to stockholders' equity in the year of adoption and in prior periods for purposes of comparability (see Note 25a).

F−80

In January 2009, the Company adopted FASB ASC 805−10 (SFAS No. 141(R)), which, among other changes, requires an acquirer in a business combination to (a) recognize assets acquired, liabilities assumed, and any noncontrolling interest in the acquiree at fair value as of the acquisition date, and (b) expense all acquisition−related costs. FASB ASC 805−10 (SFAS No. 141(R)), also amends FASB ASC 740−10 (SFAS No. 109) to require that any reductions to an acquired entity's valuation allowances on deferred taxes and acquired tax contingencies that occur after the measurement period be recorded as a component of income tax expense. FASB ASC 805−10 (SFAS No. 141(R)) must be applied prospectively to all business combinations for which the acquisition date occurs during fiscal years beginning on or after December 15, 2008, with the exception to ASC 740−10 (SFAS No. 109), which will also be applied to business combinations with acquisition dates prior to the effective date of this standard. The adoption of this guidance did not have an impact on the Company's consolidated financial statements and related disclosures and any future impact will be dependent on any future acquisitions.

In July 2009, the Company adopted FASB ASC 855−10 (SFAS 165, Subsequent Events). FASB ASC 855−10 (SFAS 165) establishes accounting and reporting standards for events that occur after the balance sheet date but before financial statements are issued or are available to be issued. In addition, FASB ASC 855−10 (SFAS 165) requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for selecting that date, that is, whether that date represents the date the financial statements were issued or were available to be issued. FASB ASC 855−10 (SFAS 165) was effective for fiscal years and interim periods ending after June 15, 2009.

- On February 24, 2011, the issuance of the consolidated financial statements, which include Notes 25 and 26, was authorized by Hugo A. Lara García, Chief Executive Officer and Claudio L. Del Valle Cabello, Chief Financial and Administrative Officer.

- The Company has evaluated events subsequent to December 31, 2009 to assess the need for potential recognition or disclosure in the accompanying consolidated financial statements. Such events were evaluated through February 24, 2011, the date these consolidated financial statements were available to be issued and included the transactions disclosed in Note 23 and below:

***DFI claims***

As disclosed in Note 23 the Company has been engaged in settlement negotiations with Fintech regarding its DFI Claims. During the last quarter of 2010, the Company engaged in settlement negotiations with Fintech and acknowledged the debt outstanding under our DFI Claims, and issued Promissory Notes, which are guaranteed ("por aval") by Vitro and certain of its Mexican Subsidiaries.

***Status of the Debt RestructuringProcess***

As disclosed in Note 23 Vitro and its subsidiaries are currently engaged in various legal proceedings, including (i) an involuntary Chapter 11 filing against its US Subsidiaries, for which a hearing to consider whether such orders for relief should be entered or the involuntary petitions should be dismissed was commenced on February 24, 2011 and was adjourned until March 31, 2011; (ii) two legal demands in the Supreme Court of the State of New York against Vitro and certain subsidiaries based on Vitro's default and non− payment of the Old Notes which on February 8, 2011, Justice Kornreich of the New York State Court entered an order on Invex's order to show cause vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables and at the direction of Justice Kornreich, the parties have also been negotiating the terms on which they will mediate their disputes; and (iii) a voluntary filing in Mexico for Vitro and an involuntary filing in Mexico against Vitro and some Mexican subsidiaries, of which none of them have been accepted.

***Natural Disasters***

As disclosed in Note 23, in April 2010, the Company' flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The Company estimates the damage to its inventories and fixed assets to be $7.0 million. The Company recorded a receivable related to the insurance proceeds expected to be received net of applicable deductibles, which resulted in a net loss of $0.9 million recorded in its 2010 consolidated statement of operations.

On July 1, 2010, the Company's manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Its float glass manufacturing and automotive processing facilities and its facilities at Alcali suffered significant damage and were forced to temporarily suspend operations.

The Company's insurance policy covers such events, minus applicable deductibles. As of December 31, 2010, the Company's insurance claims, net of applicable deductibles, were $6.8 million for damaged inventories and $14.2 million for damaged fixed assets. As a result of the insurance claims described above, the insurance company made an advance payment to the Company of $20 million, which reduced the losses related to such losses in the Company's consolidated statement of operations.

The Company is currently evaluating the negative impact of business interruption resulting from Hurricane Alex. The Company is also evaluating all damages caused to its assets, most significantly to its float glass furnaces, which at some point during 2011 will likely have to be shut down in order to evaluate any internal damages and estimate time and costs of repairs.

The Company's management expects all aforementioned damages will be covered by insurance less any applicable deductibles; however, there is no assurance as to the amount and timing of such potential recoveries.

***Receivable from Sale of Real Estate***

As disclosed in Note 23 regarding the receivable from the sale of real−estate, on January 10, 2011 the Appeals Court in Mexico City issued its decision revoking the ruling issued by the lower court and granting Vitro all of its petitions, and condemning the other party to pay Vitro all of its claims of approximately US$15 million plus legal costs and attorneys fees. The Company expects that the counterpart will appeal the decision through the Amparo proceeding in the upcoming weeks.

***Banamex Litigation***

As disclosed in Note 12 d) regarding litigation against Banamex, the amparo proceeding was filed before the Federal Circuit Court promptly after the Federal Appeals Court issued its decision denying the recourse described above. The Company expects that before the end of the first quarter of 2011, the court will issue a final decision on this matter.

On June 12, 2009, the FASB issued ASC 860−10 (SFAS No. 166, Accounting for Transfer of Financial Assets — an amendment of FASB Statement No. 140), which eliminates the concept of a qualifying special purpose entity ("QSPE") and modifies the derecognition provisions of a previously issued accounting standard. FASB ASC 860−10 (SFAS No. 166) also required additional disclosures which focus on the transferor's continuing involvement with the transferred assets and the related risks retained. FASB ASC 860−10 (SFAS No. 166) is effective for financial asset transfers occurring after the beginning of an entity's first fiscal year that begins after November 15, 2009. Early adoption is prohibited. The Company expects the adoption of this standard to impact its consolidated financial statements as it relates to its securitization transactions due to the elimination of the concept of a qualifying special purposes entity.

F−81

On June 12, 2009, the FASB issued ASC 810−10 (SFAS No. 167, Amendments to FASB Interpretation No. 46 (R)), which amends the consolidation guidance that applies to variable interest entities. The new guidance requires an entity to carefully reconsider its previous consolidation conclusions, including (1) whether an entity is a variable interest entity (VIE), (2) whether the enterprise is the VIE's primary beneficiary, and (3) what type of financial statement disclosures are required. FASB ASC 810−10 (SFAS No. 167) is effective as of the beginning of the first fiscal year that begins after November 15, 2009. The amendments to the consolidation guidance affect all entities and enterprises currently within the scope of FASB ASC 810−10 (SFAS No. 167), as well as qualifying special−purpose entities that are currently outside the scope of FASB ASC 810−10 (FIN 46(R)). Early adoption is prohibited. The Company expects the adoption of this standard to impact its consolidated financial statements as it relates to its securitization transactions.

In October 2009, the FASB issued Accounting Standards Update (ASU) 2009−13, which contains new guidance on accounting for revenue arrangements with multiple deliverables. When vendor specific objective evidence or third party evidence for deliverables in an arrangement cannot be determined, a best estimate of the selling price is required to separate deliverables and allocate arrangement consideration using the relative selling price method. The new guidance includes new disclosure requirements on how the application of the relative selling price method affects the timing and amount of revenue recognition. The guidance in the ASU will be effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning after June 15, 2010. Early adoption is permitted. The adoption of this standard is not expected to impact the Company's consolidated financial position, results of operations or cash flows.

On January 21, 2010, the FASB issued ASU 2010−06. The ASU amends ASC 820 (SFAS No. 157) to add new requirements for disclosures about transfers into and out of Levels 1 and 2 and separate disclosures about purchases, sales, issuances, and settlements relating to Level 3 measurements. It also clarifies existing fair value disclosures about the level of disaggregation and about inputs and valuation techniques used to measure fair value. This ASU amends guidance on employers' disclosures about postretirement benefit plan assets under ASC 715, Compensation — Retirement Benefits, to require that disclosures be provided by classes of assets instead of by major categories of assets. The guidance in the ASU is effective for the first reporting period (including interim periods) beginning after December 15, 2009, except for the requirement to provide the Level 3 activity of purchases, sales, issuances, and settlements on a gross basis, which will be effective for fiscal years beginning after December 15, 2010, and for interim periods within those fiscal years. In the period of initial adoption, entities will not be required to provide the amended disclosures for any previous periods presented for comparative purposes. However, those disclosures are required for periods ending after initial adoption. Early adoption is permitted.

13. **Valuation and Qualifying Accounts —** Changes in the Company's allowance for doubtful accounts and deferred tax valuation allowance for the years ended December 31, 2009, 2008 and 2007 is as follows:

| | Balance at the beginning of year | | Additions | | Deductions | | Changes for effects of inflation | | Balance at the end of the year |
|---|---|---|---|---|---|---|---|---|---|
| **Year ended December 31, 2009** | | | | | | | | | |
| Allowance for doubtful accounts | Ps. | 368 | Ps. | 340 | Ps. | 338 | Ps. | — | Ps. | 370 |
| Deferred tax valuation allowance | | 599 | | 276 | | 514 | | (22) | | 339 |
| | Ps. | 967 | Ps. | 616 | Ps. | 852 | Ps. | (22) | Ps. | 709 |
| **Year ended December 31, 2008** | | | | | | | | | |
| Allowance for doubtful accounts | Ps. | 262 | Ps. | 113 | Ps. | 7 | Ps. | — | Ps. | 368 |
| Deferred tax valuation allowance | | 286 | | 313 | | | | | | 599 |
| | Ps. | 548 | Ps. | 426 | Ps. | 7 | Ps. | — | Ps. | 967 |
| **Year ended December 31, 2007** | | | | | | | | | |
| Allowance for doubtful accounts | Ps. | 213 | Ps. | 115 | Ps. | 59 | Ps. | (7) | Ps. | 262 |
| Deferred tax valuation allowance | | 269 | | 159 | | 132 | | (10) | | 286 |
| | Ps. | 482 | Ps. | 274 | Ps. | 191 | Ps. | (17) | Ps. | 548 |

s)     **Comparative consolidated financial statements — U.S. GAAP**

**CONSOLIDATED BALANCE SHEETS**

**U.S. GAAP BASIS**

(Millions of pesos)

| | | December 31, | | |
|---|---|---:|---|---:|
| | | **2008** | | **2009** |
| **Assets** | | | | |
| Cash and cash equivalents | Ps. | 1,428 | Ps. | 2,616 |
| Trade receivables, net | | 1,492 | | 1,785 |
| Retained undivided interests in securitized receivables | | 1,213 | | 523 |
| Other receivables | | 1,804 | | 962 |
| Inventories | | 4,178 | | 3,172 |
| Land and buildings held for sale | | 40 | | 55 |
| Deferred income taxes | | 1,713 | | 1,265 |
|     Current assets | | 11,868 | | 10,378 |
| | | | | |
| Investment in unconsolidated and associated companies | | 996 | | 886 |
| Land and buildings, net | | 8,181 | | 7,470 |
| Machinery and equipment, net | | 7,693 | | 7,943 |
| Construction in progress | | 1,332 | | 563 |
| Goodwill | | 913 | | 862 |
| Deferred income taxes | | 471 | | 947 |
| Other assets | | 1,335 | | 1,096 |
|     Total assets | Ps. | 32,789 | Ps. | 30,145 |
| | | | | |
| **Liabilities** | | | | |
| Short−term borrowings | Ps. | 1,601 | Ps. | 1,000 |
| Current maturities of long−term debt | | 16,887 | | 16,331 |
| Trade payables | | 2,355 | | 1,597 |
| Derivative financial instruments | | 3,709 | | 3,260 |
| Sundry creditors | | 2,399 | | 1,318 |
| Accrued expenses | | 1,317 | | 3,138 |
|     Current liabilities | | 28,268 | | 26,644 |
| | | | | |
| Long−term debt | | 1,755 | | 2,943 |
| Employee retirement obligations | | 2,274 | | 2,359 |
| Deferred income taxes | | 11 | | — |
| Other long−term liabilities | | 265 | | 1,118 |
|     Long−term liabilities | | 4,305 | | 6,420 |
|     Total liabilities | | 32,573 | | 33,064 |
| | | | | |
| **Stockholders' Equity (Deficit)** | | | | |
|     Controlling interest | | (1,164) | | (4,335) |
| Noncontrolling interest | | 1,380 | | 1,416 |
|     Total stockholders' equity (deficit) | | 216 | | (2,919) |
|     Total liabilities and stockholders' equity | Ps. | 32,789 | Ps. | 30,145 |

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**U.S. GAAP BASIS**
(Millions of pesos)

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2007 | | 2008 | | 2009 |
| Net sales | Ps. | 26,159 | Ps. | 26,854 | Ps. | 23,991 |
| Cost of sales | | 18,429 | | 19,736 | | 17,199 |
| Gross profit | | 7,730 | | 7,118 | | 6,792 |
| Selling, general and administrative expenses, net | | 5,206 | | 5,664 | | 6,014 |
| Operating income | | 2,524 | | 1,454 | | 778 |
| Interest expense | | 1,935 | | 2,103 | | 3,008 |
| Derivative instruments | | 203 | | 3,691 | | 578 |
| Interest income | | (169) | | (63) | | (51) |
| Exchange loss (gain), net | | 83 | | 3,580 | | (976) |
| Gain from monetary position | | (504) | | — | | — |
| Total financing cost | | 1,548 | | 9,311 | | 2,559 |
| Operating income (loss) after financing cost | | 976 | | (7,857) | | (1,781) |
| Other income (expenses), net | | (491) | | 21 | | (15) |
| Income (loss) before taxes | | 485 | | (7,836) | | (1,796) |
| Income and asset tax (benefit) expense | | (74) | | (1,489) | | 767 |
| Share in earnings (loss) of unconsolidated associated companies | | 17 | | 21 | | (24) |
| Consolidated net income (loss) | Ps. | 576 | Ps. | (6,368) | Ps. | (2,587) |
| Net noncontrolling interest income (loss) | Ps. | 107 | Ps. | (31) | Ps. | 29 |
| Net controlling interest loss | | 469 | | (6,337) | | (2,616) |
| | Ps. | 576 | Ps. | 6,368 | Ps. | 2,587 |
| Income (loss) per share | Ps. | 1.69 | Ps. | (18.57) | Ps. | (7.46) |
| Noncontrolling interest (income) loss | | (0.32) | | 0.09 | | (0.08) |
| Net controlling interest income (loss) | Ps. | 1.37 | | (18.48) | | (7.54) |

**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
**U.S. GAAP BASIS**
(Millions of pesos)

|  | 2007 | 2008 | 2009 |
|---|---|---|---|
| Stockholders' equity at the beginning of the year | Ps. 6,825 | Ps. 7,062 | Ps. 216 |
| Comprehensive income (loss): |  |  |  |
| Net income (loss) | 576 | (6,368) | (2,587) |
| Other comprehensive income (loss): |  |  |  |
| Employee retirement obligations | (210) | (553) | (476) |
| Gain from holding nonmonetary assets | (141) | — | — |
| Cumulative translation adjustment | 11 | 661 | (77) |
| Deferred income taxes | 235 | 98 | 15 |
| Effect of applying NIF B−10 | 32 |  |  |
| Other comprehensive (loss) income | (73) | 206 | (538) |
| Comprehensive income (loss) | 503 | (6,162) | (3,125) |
| Bulletin B−15 adjustments | (72) | — | — |
| Dividends declared and paid | (136) | (143) | — |
| Sale of treasury stock | 75 |  |  |
| Dilution of noncontrolling interest | (58) | (616) | (10) |
| Stockholders' equity (deficit) at the end of the year | Ps. 7,062 | Ps. 216 | Ps. (2,919) |

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. GAAP BASIS**
(Millions of pesos)

| | | | Year ended December 31, | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| **Operating Activities:** | | | | | | |
| Net income (loss) | Ps. | 576 | Ps. | (6,368) | Ps. | (2,587) |
| Effect of constant pesos and monetary gain | | (531) | | — | | — |
| Net income (loss) | | (45) | | (6,368) | | (2,587) |
| Add (deduct) non−cash items: | | | | | | |
| Depreciation and amortization | | 1,400 | | 1,500 | | 1,466 |
| Provision for employee retirement obligations and other long−term liabilities | | 344 | | 437 | | 416 |
| Impairment | | | | 239 | | 207 |
| Amortization of debt issuance costs | | 166 | | 55 | | 80 |
| Share in earnings of unconsolidated associated companies | | (17) | | (21) | | 24 |
| Dividends received from unconsolidated associated companies | | 28 | | | | |
| Derivative financial instruments | | 208 | | 3,691 | | 578 |
| Loss from sale of subsidiaries | | 12 | | — | | |
| (Gain) loss from sale of fixed assets | | (371) | | (488) | | 69 |
| Deferred income tax and workers' profit sharing | | (404) | | (1,806) | | 1,125 |
| Exchange (gain) loss | | 145 | | 3,972 | | (1,171) |
| Changes in operating assets and liabilities | | | | | | |
| Increase (decrease) in trade payables | | 278 | | (291) | | (587) |
| (Increase) decrease in trade receivables | | (181) | | (12) | | 1,049 |
| (Increase) decrease in inventories | | (265) | | (17) | | 871 |
| Changes in other current assets and liabilities | | 467 | | (42) | | 2,376 |
| Employee retirement obligations | | (472) | | (425) | | (809) |
| Derivative financial instruments | | — | | (1,138) | | (824) |
| Net cash provided by (used in) operating activities | | 1,383 | | (714) | | 2,283 |
| **Investing Activities:** | | | | | | |
| Sale of land, buildings, machinery and equipment | | 71 | | 20 | | 437 |
| Investment in land, buildings, machinery and equipment | | (2,146) | | (1,550) | | (1,009) |
| Sale of subsidiaries and associated companies | | 38 | | | | |
| Investment in subsidiaries | | (177) | | (63) | | (454) |
| Restricted cash | | (327) | | 314 | | 57 |
| Capital distribution to noncontrolling interest | | (21) | | — | | |
| Deferred charges and other long−term assets | | (316) | | 70 | | (155) |
| Net cash used in investing activities | | (2,878) | | (1,209) | | (1,124) |
| **Financing Activities:** | | | | | | |
| Proceeds from short−term borrowings | | 2,413 | | 1,072 | | |
| Proceeds from long−term debt | | 13,581 | | 2,018 | | 2,532 |
| Payment of short−term borrowings | | (4,644) | | — | | (15) |
| Payment of long−term debt | | (9,201) | | (1,020) | | (2,468) |
| Debt issuance costs | | (285) | | (63) | | (11) |
| (Purchase) sale of treasury stock | | (1) | | 75 | | — |
| Dividends paid to stockholders of Vitro | | (133) | | (143) | | — |
| Dividends paid to noncontrolling interests | | (47) | | (109) | | (14) |

F−86

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Other financing activities | | 279 | | (36) | | 5 |
| | | | | | | |
| Net cash provided by financing activities | | 1,962 | | 1,794 | | 29 |
| | | | | | | |
| Net increase (decrease) in cash and cash equivalents | | 467 | | (129) | | 1,188 |
| Exchange rate effect on cash and cash equivalents | | (18) | | 66 | | 1 |
| Balance at beginning of year | | 1,042 | | 1,491 | | 1,428 |
| | | | | | | |
| Balance at end of year | Ps. | 1,491 | Ps. | 1,428 | Ps. | 2,616 |
| | | | | | | |
| Net cash provided by operating activities reflects net cash payments of interest and income taxes as follows: | | | | | | |
| Interest | Ps. | 1,369 | Ps. | 1,993 | Ps. | 943 |
| Income taxes | | 441 | | 185 | | 358 |

26.  **Guarantor and non−guarantor financial information**

As disclosed in note 10), the Company issued US$700 million of senior guaranteed notes due February 1, 2017 callable after year 2012 at a coupon of a 9.125% and US$300 million of senior unsecured notes due February 1, 2012 not callable for the notes' life at a coupon of 8.65% (together the "Notes") principally to refinance existing third−party debt at the Vitro holding company level, substantially all of the third−party debt at its subsidiary VENA and certain third−party debt at its less than 100%−owned subsidiary Viméxico.

The obligations of the Company pursuant to each series of the Notes, including any repurchase obligation resulting from a change of control, are unconditionally guaranteed, jointly and severally, on an unsecured basis, by most of Vitro's directly and indirectly owned subsidiaries. The following Vitro subsidiaries are designated as guarantors as of December 31, 2009: Viméxico, VENA, Vitro Corporativo, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Vidriera Los Reyes, S.A. de C.V., Vidriera Guadalajara, S.A. de C.V., Vidriera Querétaro, S.A. de C.V., Vidriera Toluca, S.A. de C.V., Compañía Vidriera, S.A. de C.V., Fabricación de Máquinas, S.A. de C.V., Servicios Integrales de Acabados, S.A. de C.V.,Vitro Packaging de México, S. de R.L. de C.V., Industria del Alcali, S.A. de C.V., Servicios Vitro Cosmos, S.A. de C.V., Servicios Vidriera los Reyes, S.A. de C.V., Servicios Vidriera Guadalajara, S.A. de C.V., Servicios Vidriera Querétaro, S.A. de C.V., Servicios Vidriera Toluca, S.A. de C.V., Vidrio Lux, S.A., Vitro Packaging, Inc., Vitro Europa, Ltd., American Asset Holdings, Corp., Crisa Holding Corp., Troper Inc., Troper Services, Inc., Amsilco Holdings, Inc., BBO Holdings, Inc., Crisa Corp., Vitro Automotriz, S.A. de C.V., Vitro Flex, S.A. de C.V, Vitro Vidrio y Cristal, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V., Vitrocar, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., Vau, S.A. de C.V., VVP Holdings Corp., VVP Autoglass, Inc., Vitro America, Inc., Super Sky Products, Inc., Super Sky International, Inc., VVP Finance Corp., Super Sky Constructors, Inc., Vitro Colombia, S.A., VVP Europa Holdings, B.V., Vitro do Brasil Industria e Comercio, Ltda., Vitro Chemicals, Fibers and Mining, Inc., Vitro Global, Ltd, Vidrio y Cristal del Noroeste, S.A. Vidrio Plano, S.A. de C.V., Distribuidora de Vidrio y Cristal, S.A. de C.V., Vidrio Plano de Mexicali, S.A. de C.V., and FIC Regiomontano, S.A.P.I de C.V. Certain of these subsidiaries, including VVP Holdings Corp. and its five subsidiaries, Vitrocar, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. and Vitrio Automotriz, S.A. de C.V. were sold from Vimexico to Vitro during 2009. These sales are reflected in the columnar presentation described below.

The following condensed consolidating financial information includes separate columnar information for:
- Vitro (the parent company issuer),

- Vitro's combined 100%−owned guarantors, including two Swiss−domiciled subsidiary guarantors 100%−owned by Vitro and two Swiss−domiciled subsidiary guarantors 100%−owned by VENA,

- Combined information for Viméxico and its 15 100%−owned subsidiaries plus (a) VVP Holdings and its five subsidiaries, 100%−owned subsidiary guarantors which were sold from Viméxico to Vitro in January 2009, (b) Vitrocar, a 100%−owned subsidiary guarantor which was sold from Viméxico to Vitro in December 2009 and (c) Vitro Vidrio y Cristal and Vitrio Automotriz, non−100% owned subsidiary guarantors which were sold from Viméxico to Vitro in December 2009 (financial information for Viméxico, its 100%−owned subsidiaries and the additional entities described herein is included in note 23 of Viméxico's consolidated financial statements,)

- Vitro's combined non−guarantors (combined amounts of Vitro's non−guarantor subsidiaries not already included in the consolidated Viméxico column,)

Investments in subsidiaries are accounted for by Vitro under the equity method for purpose of the supplemental consolidating information. The principal elimination entries eliminate the parent company's investment in subsidiaries and intercompany balances and transactions.

a) **Supplemental condensed consolidating balance sheets presented in accordance with MFRS:**

| As of December 31, 2008 | Combined Consolidated Vitro | | Combined Wholly−Owned Guarantors | | Adjustments Viméxico and Subsidiaries | | Vitro Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | Ps. | 922 | Ps. | 169 | Ps. | 271 | Ps. | 66 | Ps. | — | Ps. | 1,428 |
| Trade receivables and other current assets | | 6,282 | | 5,138 | | 3,912 | | 521 | | (9,478) | | 6,375 |
| Inventories, net | | — | | 1,991 | | 2,199 | | 4 | | (16) | | 4,178 |
| Current assets | | 7,204 | | 7,298 | | 6,382 | | 591 | | (9,494) | | 11,981 |
| Property, plant and equipment, net | | 1,377 | | 8,738 | | 5,813 | | 1,843 | | (498) | | 17,273 |
| Deferred taxes | | 202 | | 1,959 | | 1,318 | | 13 | | (74) | | 3,418 |
| Other assets | | 17,772 | | 5,167 | | 1,444 | | 72 | | (21,353) | | 3,102 |
| Long−term assets | | 19,351 | | 15,864 | | 8,575 | | 1,928 | | (21,925) | | 23,793 |
| Total assets | Ps. | 26,555 | Ps. | 23,162 | Ps. | 14,957 | Ps. | 2,519 | Ps. | (31,419) | Ps. | 35,774 |
| Short−term borrowings | Ps. | 17,354 | Ps. | 415 | Ps. | 1,427 | | — | | — | Ps. | 19,196 |
| Derivative financial instruments | | — | | 4,031 | | 986 | | — | | (1,240) | | 3,777 |
| Accrued expenses and other current liabilities | | 6,760 | | 5,116 | | 6,049 | | 1,284 | | (13,119) | | 6,090 |
| Current liabilities | | 24,114 | | 9,562 | | 8,462 | | 1,284 | | (14,359) | | 29,063 |
| Long−term liabilities | | 737 | | 9,854 | | 1,101 | | 1,187 | | (9,276) | | 3,603 |
| Total liabilities | | 24,851 | | 19,416 | | 9,563 | | 2,471 | | (23,635) | | 32,666 |
| Controlling interest | | 1,704 | | 3,746 | | 1,377 | | 48 | | (5,171) | | 1,704 |
| Non controlling interest in consolidated subsidiaries | | — | | — | | 4,017 | | — | | (2,613) | | 1,404 |
| Total stockholders' equity | | 1,704 | | 3,746 | | 5,394 | | 48 | | (7,784) | | 3,108 |
| Total liabilities and stockholders' equity | Ps. | 26,555 | Ps. | 23,162 | Ps. | 14,957 | Ps. | 2,519 | Ps. | (31,419) | Ps. | 35,774 |

| As of December 31, 2009 | Vitro | Combined Wholly−Owned Guarantors | Combined Viméxico and Subsidiaries | Combined Non−Guarantors | Adjustments and Eliminations | Vitro Consolidated |
|---|---|---|---|---|---|---|
| Cash | Ps. 20 | Ps. 2,003 | Ps. 574 | Ps. 20 | Ps. — | Ps. 2,616 |
| Trade receivables and other current assets | 8,370 | 24,071 | 5,546 | 449 | (34,128) | 4,308 |
| Inventories, net | — | 1,838 | 1,547 | 3 | (216) | 3,172 |
| Current assets | 8,390 | 27,912 | 7,667 | 472 | (34,344) | 10,096 |
| Property, plant and equipment, net | 1,063 | 7,826 | 5,230 | 1,586 | (368) | 15,338 |
| Deferred taxes | 990 | 2,716 | 1,516 | 40 | (747) | 4,515 |
| Other assets | 32,933 | 5,386 | 1,315 | 37 | (36,969) | 2,703 |
| Long−term assets | 34,986 | 15,587 | 8,061 | 1,663 | (37,087) | 22,556 |
| Total assets | Ps. 43,376 | Ps. 43,840 | Ps. 15,587 | Ps. 2,135 | Ps. (72,427) | Ps. 32,652 |
| Short−term borrowings | Ps. 16,118 | Ps. 706 | Ps. 851 | Ps. 521 | Ps. 1 | Ps. 18,197 |
| Derivative financial instruments | — | 3,579 | 1,068 | — | (1,318) | 3,328 |
| Interest and accrued expenses | 2,425 | 693 | 262 | 81 | (320) | 3,141 |
| Trade payables and Other current liabilities | 22,536 | 5,671 | 6,309 | 1,326 | (32,929) | 2,914 |
| Current liabilities | 41,079 | 10,649 | 8,490 | 1,928 | (34,565) | 27,580 |
| Long−term liabilities | 1,777 | (1,133) | 794 | 389 | (1,005) | 3,088 |
| Total liabilities | 42,856 | 11,782 | 9,284 | 2,317 | (35,570) | 30,668 |
| Controlling interest | 520 | 30,594 | 2,403 | (182) | (32,815) | 520 |
| Noncontrolling interest in consolidated subsidiaries | — | 1,464 | 4,041 | — | (4,041) | 1,464 |
| Total stockholders' equity | 520 | 32,058 | 6,444 | (182) | (36,856) | 1,984 |
| Total liabilities and stockholders' equity | Ps. 43,376 | Ps. 43,840 | Ps. 15,728 | Ps. 2,135 | Ps. (72,427) | Ps. 32,652 |

b)    Supplemental condensed consolidating statements of operations presented in accordance with MFRS:

| For the year ended December 31, 2007 | Vitro | | Combined Wholly-Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non-Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | 775 | Ps. | 13,487 | Ps. | 13,605 | Ps. | 2,511 | Ps. | (1,787) | Ps. | 28,591 |
| Cost of sales | | — | | 9,255 | | 9,578 | | 1,556 | | (202) | | 20,187 |
| Selling, general and administrative expenses | | 100 | | 2,360 | | 3,245 | | 859 | | (864) | | 5,700 |
| Total financing cost | | 803 | | 797 | | 443 | | 66 | | (449) | | 1,660 |
| Other (Income) expenses, net | | (2) | | 544 | | 91 | | 56 | | 180 | | 869 |
| Income tax (benefit) expense | | (113) | | 360 | | 152 | | 36 | | (391) | | 44 |
| Net (loss) income for the year | Ps. | (13) | Ps. | 171 | Ps. | 96 | Ps. | (62) | Ps. | (61) | Ps. | 131 |

| For the year ended December 31, 2008 | Vitro | | Combined Wholly-Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non-Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | (628) | Ps. | 14,752 | Ps. | 13,230 | Ps. | 2,537 | Ps. | (878) | Ps. | 29,013 |
| Cost of sales | | — | | 10,633 | | 9,703 | | 1,573 | | (630) | | 21,279 |
| Selling, general and administrative expenses | | 161 | | 2,175 | | 3,341 | | 918 | | (571) | | 6,024 |
| Total financing cost | | 5,294 | | 5,616 | | 1,398 | | 189 | | (3,420) | | 9,077 |
| Other (income) expenses, net | | 25 | | (257) | | 141 | | 4 | | 577 | | 490 |
| Income tax (benefit) expense | | (402) | | (847) | | (735) | | 10 | | (201) | | (2,175) |
| Net (loss) income for the year | | (5,706) | | (2,568) | | (618) | | (157) | | 3,367 | | (5,682) |

F-91

| For the year ended December 31, 2009 | Vitro | | Combined Wholly−Owned Guarantors | | Combined Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | 1,111 | Ps. | 12,538 | Ps. | 11,453 | Ps. | 322 | Ps. | (1,433) | Ps. | 23,991 |
| Cost of sales | | — | | 8,708 | | 8,839 | | 15 | | (382) | | 17,180 |
| Selling, general and administrative expenses | | 167 | | 2,315 | | 3,205 | | 382 | | (587) | | 5,482 |
| Total financing cost | | 1,707 | | 1,538 | | 782 | | 91 | | (1,752) | | 2,366 |
| Other (income) expenses, net | | 47 | | (163) | | 422 | | 17 | | (8) | | 315 |
| Income tax (benefit) expense | | (23) | | (372) | | (171) | | (25) | | (7) | | (598) |
| Net (loss) income for the year | Ps. | (787) | Ps. | 512 | Ps. | (1,624) | Ps. | (158) | Ps. | 1,303 | Ps. | (754) |

c) **Supplemental condensed consolidating statements of changes in financial position present in accordance with MFRS:**

| For the year ended December 31, 2007 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustment And Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Activities:** | | | | | | | | | | | | |
| Net (loss) income | Ps. | (13) | Ps. | 171 | Ps. | 96 | Ps. | (62) | Ps. | (61) | Ps. | 131 |
| Depreciation and amortization | | 15 | | 771 | | 480 | | 148 | | — | | 1,414 |
| Provision for employee retirement obligations | | — | | 176 | | 57 | | 28 | | | | 261 |
| Amortization of debt issuance costs | | 24 | | 142 | | 4 | | — | | — | | 170 |
| Impairment of long−lived assets | | — | | — | | 91 | | 31 | | — | | 122 |
| Loss (gain) from sale of long−lived assets | | — | | (89) | | (55) | | — | | 191 | | 47 |
| Derivative financial instruments | | 87 | | 100 | | 29 | | — | | | | 216 |
| Deferred taxes | | (113) | | (184) | | (104) | | 3 | | 47 | | (351) |
| Other non−cash charges | | 148 | | 22 | | 20 | | — | | (82) | | (108) |
| (Increase) decrease in trade receivables | | — | | 11 | | (163) | | (39) | | (110) | | (81) |
| (Increase) decrease in inventories | | — | | (334) | | (19) | | 42 | | 3 | | (308) |
| Increase (decrease) in trade payables | | — | | — | | 223 | | 55 | | (35) | | 243 |
| Changes in other current assets and liabilities | | 818 | | (462) | | 105 | | (32) | | (255) | | 174 |
| Employee retirement obligations | | — | | (351) | | (101) | | (20) | | — | | (472) |
| Net resources generated by (used in) operating activities | | 966 | | (27) | | 663 | | 154 | | (82) | | 1,674 |
| **Financing Activities:** | | | | | | | | | | | | |
| Banks loans, net | | 9,959 | | (7,837) | | (356) | | 243 | | (52) | | 1,957 |
| Debt issuance cost | | (76) | | (208) | | (9) | | — | | — | | (293) |
| Dividends paid | | (136) | | — | | (51) | | (101) | | 73 | | (215) |
| Other financing activities | | (10,364) | | 7,911 | | 261 | | 134 | | 2,544 | | 486 |
| Net resources (used in) generated by financing activities | | (617) | | (134) | | (155) | | 276 | | 2,565 | | 1,935 |
| **Investing Activities:** | | | | | | | | | | | | |
| Investments in land, buildings, machinery and equipment | | (306) | | (1,919) | | (324) | | (445) | | 299 | | (2,695) |
| Proceeds from sale of land, machinery and equipment | | — | | 239 | | 131 | | 1 | | (299) | | 72 |
| Restricted cash | | — | | 108 | | 46 | | — | | — | | (88) |
| Investments in subsidiaries | | 37 | | (134) | | (181) | | — | | (37) | | (181) |
| Proceeds from sale of subsidiaries and associated companies | | — | | 24 | | — | | — | | 13 | | 37 |
| Other long−term assets | | — | | — | | — | | — | | (85) | | (85) |
| Deferred charges | | — | | (80) | | (206) | | (16) | | | | (302) |
| Other investing activities | | — | | 2,336 | | 49 | | 38 | | (2,374) | | 49 |
| Net resources (used in) generated by investing activities | | (269) | | 466 | | (485) | | (422) | | (2,483) | | (3,193) |
| Net increase in cash and cash equivalents | | 80 | | 305 | | 23 | | 8 | | | | 416 |
| Balance at beginning of year | | 673 | | 235 | | 170 | | 144 | | — | | 1,222 |
| Balance at end of year | Ps. | 753 | Ps. | 540 | Ps. | 193 | Ps. | 152 | Ps. | | Ps. | 1,638 |

d) **Supplemental condensed consolidating statements of cash flow presented in accordance with MFRS:**

| For the year ended December 31, 2008 | | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments And Eliminations | | Vitro Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OPERATING ACTIVITIES: | | | | | | | | | | | | |
| Loss (income) before income taxes | Ps. | (6,108) | Ps. | (3,415) | Ps. | (1,353) | Ps. | (147) | Ps. | 3,166 | Ps. | (7,857) |
| Items related to investing and financing activities: | | | | | | | | | | | | |
| Depreciation and amortization | | 97 | | 749 | | 488 | | 149 | | (14) | | 1,469 |
| Other from operating activities | | 1,716 | | (230) | | (92) | | — | | (1,402) | | (8) |
| Impairment of long−lived assets | | — | | — | | 196 | | — | | — | | 196 |
| Derivative financial instruments | | (21) | | 3,254 | | 617 | | — | | (84) | | 3,766 |
| Foreign exchange loss | | 3,697 | | 1,268 | | 231 | | (6) | | (1,456) | | 3,734 |
| Interest expense | | 1,646 | | 992 | | 610 | | 148 | | (1,307) | | 2,089 |
| Trade receivables | | | | 148 | | (243) | | 7 | | (13) | | (101) |
| Other current assets and liabilities | | (302) | | 601 | | 307 | | (325) | | (622) | | (341) |
| Income tax paid | | (127) | | (213) | | 10 | | (28) | | 147 | | (211) |
| Net cash provided by (used in) operating activities | | 598 | | 3,154 | | 771 | | (202) | | (1,585) | | 2,736 |
| INVESTING ACTIVITIES | | | | | | | | | | | | |
| Investments in machinery and equipment, net | | (44) | | (280) | | (136) | | (1,356) | | 38 | | (1,778) |
| Other assets | | — | | 241 | | (13) | | 15 | | 89 | | 332 |
| Deferred charges | | (6) | | (137) | | (119) | | (38) | | 38 | | (262) |
| Other investing activities | | 1,510 | | 305 | | (657) | | (5) | | (1,156) | | (3) |
| Net cash generated by (used in) investing activities | | 1,460 | | 129 | | (925) | | (1,384) | | (991) | | (1,711) |
| Excess cash to apply to financing activities | | 2,058 | | 3,283 | | (154) | | (1,586) | | (2,576) | | 1,025 |
| FINANCING ACTIVITIES: | | | | | | | | | | | | |
| Proceeds from short−term bank loans | | 457 | | 312 | | 218 | | 71 | | (97) | | 1,155 |
| Interest paid | | (1,447) | | (1,048) | | (645) | | (127) | | 1,223 | | (2,044) |
| Proceeds from long−term bank loans | | 400 | | 433 | | 88 | | 1,055 | | — | | 1,976 |
| Payments of long−term bank loans | | (299) | | (644) | | (77) | | — | | — | | (1,020) |
| Derivative financial instruments | | 187 | | (681) | | 156 | | — | | (800) | | (1,138) |
| Other financing activities | | (1,187) | | (2,491) | | 584 | | 665 | | 2,056 | | (373) |
| Net cash provided by financing activities | | (1,889) | | (4,119) | | 324 | | 1,664 | | 2,576 | | (1,444) |
| Net decrease in cash and cash equivalents | | 169 | | (836) | | 170 | | 78 | | — | | (419) |
| Adjustment to cash flows due to exchange rate fluctuations | | — | | 115 | | (23) | | — | | — | | 92 |
| Deconsolidation of subsidiary | | — | | — | | — | | (105) | | — | | (105) |
| Cash and cash equivalents at the beginning of year (includes restricted cash of Ps. 388) | | 753 | | 984 | | 276 | | 151 | | — | | 2,164 |
| Cash and cash equivalents at the end of year (includes restricted cash of Ps. 74) | Ps. | 922 | Ps. | 263 | Ps. | 423 | Ps. | 124 | Ps. | — | Ps. | 1,732 |

F−94

| For the year ended December 31, 2009 | Vitro | | Wholly–Owned Guarantors | | Combined Viméxico and Subsidiaries | | Combined Non–Guarantors | | Adjustments And Eliminations | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OPERATING ACTIVITIES: | | | | | | | | | | | |
| Loss (income) before income taxes | Ps. | (810) | Ps. | 140 | Ps. | (1,795) | Ps. | (183) | 1296 | Ps. | (1,352) |
| Items related to investing and financing activities: | | | | | | | | | | | |
| Depreciation and amortization | | 86 | | 841 | | 575 | | 14 | (43) | | 1,473 |
| Other from operating activities | | 962 | | (337) | | (177) | | 39 | (717) | | (230) |
| Impairment of long–lived assets | | — | | | | 207 | | | (48) | | 207 |
| Derivative financial instruments | | — | | 556 | | 130 | | 161 | (277) | | 570 |
| Foreign exchange loss | | (1,097) | | (662) | | (115) | | | 697 | | (1,177) |
| Interest expense | | 2,032 | | 1,797 | | 893 | | (61) | (1,911) | | 2,750 |
| Trade receivables | | — | | 588 | | 1,098 | | (28) | (609) | | 1,049 |
| Inventories | | — | | 194 | | 606 | | 1 | 70 | | 871 |
| Employe retirement obligations | | | | (397) | | (9) | | 8 | 1 | | (397) |
| Other current assets and liabilities | | (197) | | (42) | | (144) | | 74 | 770 | | 461 |
| Trade payables | | — | | (439) | | (166) | | (4) | 22 | | (587) |
| Income tax paid | | 385 | | (177) | | 29 | | (12) | 133 | | 358 |
| Net cash provided by operating activities | | 1,361 | | 2,062 | | 1,132 | | 9 | (568) | | 3,996 |
| INVESTING ACTIVITIES | | | | | | | | | | | |
| Investments in machinery and equipment | | — | | (735) | | (264) | | (6) | (4) | | (1,009) |
| Proceeds from sale of machinery and equipment | | 206 | | 1,155 | | 32 | | 230 | (213) | | 1,410 |
| Investment in subsidiaries, net of cash acquired | | — | | (349) | | (454) | | | 349 | | (454) |
| Other investing activities | | 231 | | (2,668) | | (1,096) | | (135) | 3,566 | | (102) |
| Net cash used in investing activities | | 437 | | (2,597) | | (1,782) | | 89 | 3,698 | | (155) |
| Excess cash to apply to financing activities | | 1,798 | | (535) | | (650) | | 98 | 3,130 | | 3,841 |
| FINANCING ACTIVITIES: | | | | | | | | | | | |
| Proceeds from short–term bank loans | | (281) | | 829 | | (563) | | | | | (15) |
| Interest paid | | (115) | | (1,653) | | (741) | | (107) | 1,673 | | (943) |
| Proceeds from long–term bank loans | | | | 1,218 | | 341 | | | | | 1,559 |
| Payments of long–term bank loans | | | | (1,921) | | (322) | | (225) | 219 | | (2,468) |
| Derivative financial instruments | | | | (996) | | (47) | | | | | (824) |
| Other financing activities | | (2,295) | | 4,905 | | 2206 | | 186 | (5,022) | | (20) |
| Net cash provided by financing activities | | (2,691) | | 2,382 | | 874 | | (146) | (3,130) | | (2,711) |
| Net decrease in cash and cash equivalents | | (893) | | 1,847 | | 224 | | (48) | | | 1,130 |
| Adjustment to cash flows due to exchange rate fluctuations | | | | | | | | | 1 | | 1 |
| Deconsolidation of subsidiary | | | | | | | | | | | — |
| Cash and cash equivalents at the beginning of year (includes restricted cash of Ps. 74) | | 922 | | 263 | | 423 | | 124 | | | 1,732 |
| Cash and cash equivalents at the end of year (includes restricted cash of Ps. 9) | Ps. | 29 | Ps. | 2,110 | Ps. | 647 | Ps. | 76 | Ps. 1 | Ps. | 2,863 |

**e)    Supplemental condensed consolidating financial information reconciled from MFRS to U.S. GAAP:**

As disclosed in note 25, through December 31, 2007, the Company's reconciliation from MFRS to U.S. GAAP does not eliminate the effects of inflation as it represents a comprehensive measure of the effects of price level changes in the inflationary Mexican economy and, as such, is considered a more meaningful presentation than historical cost−based financial reporting for both Mexican and U.S. accounting purposes

The other differences between MFRS and U.S. GAAP and the effects on consolidated net income (loss) and consolidated stockholders' equity as it relates to the Company's guarantor and non−guarantor subsidiaries are presented below (see note 25 for a description of such differences):

| For the year ended December 31, 2007 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments And Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated net (loss) income as reported under MFRS | Ps. | (13) | Ps. | 171 | Ps. | 96 | Ps. | (62) | Ps. | (61) | Ps. | 131 |
| U.S. GAAP adjustments: | | | | | | | | | | | | |
| Deferred income taxes (see note 25 b) | | (120) | | 110 | | (37) | | — | | 102 | | 55 |
| Monetary position result on deferred income taxes (see note 25 c) | | (10) | | 24 | | 17 | | — | | — | | 31 |
| Capitalization of interest (see note 25 d) | | — | | 16 | | — | | — | | — | | 16 |
| Amortization of capitalized interest (see note 25 d) | | — | | (32) | | (4) | | — | | — | | (36) |
| Effect of applying Bulletin B−10 (see note 25 f) | | — | | (15) | | (21) | | — | | — | | (36) |
| Discontinued operations (see note 25 h) | | 26 | | — | | — | | — | | — | | 26 |
| Employee retirement obligations (see note 25 j) | | — | | (8) | | (7) | | — | | — | | (15) |
| Purchase of Visteon's capital investment (see note 25 k) | | — | | — | | 5 | | — | | — | | 5 |
| Sale of real estate (see note 25 m) | | 429 | | — | | — | | — | | — | | 429 |
| Impairment of long—lived assets (see note 25 n) | | — | | — | | (10) | | — | | — | | (10) |
| Deconsolidation of Comegua | | (20) | | — | | — | | — | | — | | (20) |
| Investment in subsidiaries | | 157 | | — | | — | | — | | (157) | | — |
| Total U.S. GAAP adjustments | | 462 | | 95 | | (57) | | 0 | | (55) | | 445 |
| Net income (loss) under U.S. GAAP | Ps. | 449 | Ps. | 266 | Ps. | 39 | Ps. | (62) | Ps. | (116) | Ps. | 576 |

| For the year ended December 31, 2008 | Vitro | | Combined Wholly-Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non-Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated net (loss) income as reported under MFRS | Ps. | (5,706) | Ps. | (2,568) | Ps. | (618) | Ps. | (157) | Ps. | 3,367 | Ps. | (5,682) |
| U.S. GAAP adjustments: | | | | | | | | | | | | |
| Deferred income taxes (see note 25 b) | | 108 | | (870) | | 55 | | — | | — | | (707) |
| Negative goodwill and reduction in depreciation expense (see e) | | — | | — | | (43) | | — | | — | | (43) |
| Capitalization of interest (see note 25 d) | | — | | (358) | | — | | — | | — | | (358) |
| Amortization of capitalized interest (see note 25 d) | | — | | (34) | | (5) | | — | | — | | (39) |
| Effect of applying Bulletin B−10 (see note 25 f) | | — | | (21) | | 18 | | — | | — | | (3) |
| Effect of ASC 715 (previously SFAS No. 158 (see j) | | — | | 23 | | | | — | | — | | 23 |
| Derivative financial instruments (see g) | | — | | 58 | | 17 | | — | | — | | 75 |
| Employee retirement obligations (see note 25 j) | | — | | 25 | | 11 | | — | | — | | 36 |
| Purchase of Visteon's capital investment (see note 25 k) | | — | | — | | 5 | | — | | — | | 5 |
| Sale of real estate (see note 25 m) | | 386 | | — | | — | | — | | — | | 386 |
| Deconsolidation of Comegua | | (16) | | — | | — | | — | | — | | (16) |
| Impairment of long—lived assets (see note 25 n) | | — | | — | | (45) | | — | | — | | (45) |
| Total U.S. GAAP adjustments | | 478 | | (1,177) | | 13 | | — | | — | | (686) |
| Net income (loss) under U.S. GAAP | Ps. | (5,228) | Ps. | (3,745) | Ps. | (605) | Ps. | (157) | Ps. | 3,367 | Ps. | (6,368) |

F−97

| For the year ended December 31, 2009 | Vitro | | Combined Wholly−Owned Guarantors | | Combined Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Consolidated net (loss) income as reported under MFRS | Ps. | (787) | Ps. | 512 | Ps. | (1,624) | Ps. | (158) | Ps. | 1,303 | Ps. | (754) |
| | | | | | | | | | | | | |
| U.S. GAAP adjustments: | | | | | | | | | | | | |
| Deferred income taxes (see note 25 b) | | 1,493 | | (1,096) | | (1,488) | | (39) | | — | | (1,130) |
| Amortization of capitalized interest (see note 25 f) | | — | | (15) | | (4) | | — | | — | | (19) |
| Effect of ASC 715 (previously SFAS No. 158 (see m) | | — | | (23) | | (7) | | — | | — | | (30) |
| Derivative financial instruments (see j) | | — | | (6) | | (2) | | — | | — | | (8) |
| Employee retirement obligations (see note 25 m) | | — | | 10 | | 16 | | — | | — | | 26 |
| Purchase of Visteon's capital investment (see note 25 n) | | — | | — | | 9 | | — | | — | | 9 |
| Sale−leaseback transaction (see note 25 p) | | — | | (278) | | — | | — | | — | | (278) |
| Impairment of long—lived assets (see note 25 q) | | — | | — | | 15 | | — | | — | | 15 |
| Impact of changes in income tax law (see 25 q) | | (237) | | | | | | | | | | (237) |
| Fintech option liability (see 25 p) | | | | (181) | | | | | | | | (181) |
| | | | | | | | | | | | | |
| Total U.S. GAAP adjustments | | 1,256 | | (1,589) | | (1,461) | | (39) | | — | | (1,833) |
| | | | | | | | | | | | | |
| Net income (loss) under U.S. GAAP | Ps. | 469 | Ps. | (1,077) | Ps. | (3,085) | Ps. | (197) | Ps. | 1,303 | Ps. | (2,587) |

| As of December 31, 2008 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total stockholders' equity reported under MFRS | Ps. | 1,704 | Ps. | 3,746 | Ps. | 5,394 | Ps. | 48 | Ps. | (7,784) | Ps. | 3,108 |
| U.S. GAAP adjustments: | | | | | | | | | | | | |
| Deferred income taxes (see note 25b) | | 38 | | (872) | | (415) | | 15 | | — | | (1,234) |
| Capitalization of interest (see note 25 d) | | — | | (26) | | 42 | | — | | — | | 16 |
| Goodwill (see note 25 e) | | — | | — | | 81 | | — | | — | | 81 |
| Accumulated amortization of capitalized interest (see note 25 d) | | — | | (197) | | (27) | | — | | — | | (224) |
| Effect of ASC 715 (previously SFAS No. 158 (see note 25 j) | | — | | (1,280) | | (414) | | (55) | | — | | (1,749) |
| Derivative financial instruments (see Note 25 g) | | — | | 58 | | 17 | | — | | — | | 75 |
| Employee retirement obligations (see note 25 j) | | — | | (36) | | (28) | | — | | — | | (64) |
| Purchase of Visteon's capital investment (see note 25 k) | | — | | — | | (61) | | — | | — | | (61) |
| Purchase of remaining 40% interest in Vitro Cristalglass (see note 25 l) | | — | | — | | 60 | | — | | — | | 60 |
| Impairment of long−lived assets (see note 25 n) | | (149) | | 12 | | 345 | | — | | — | | 208 |
| Total U.S. GAAP adjustments | | (111) | | (2,341) | | (400) | | (40) | | — | | (2,892) |
| Total stockholders' equity under U.S. GAAP | Ps. | 1,593 | Ps. | 1,405 | Ps. | 4,994 | Ps. | 8 | Ps. | (7,784) | Ps. | 216 |

| As of December 31, 2009 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total stockholders' equity reported under MFRS | Ps. | 520 | Ps. | 32,058 | Ps. | 6,444 | Ps. | (182) | Ps. | (36,856) | Ps. | 1,984 |
| U.S. GAAP adjustments: | | | | | | | | | | | | |
| Deferred income taxes (see note 25b) | | 416 | | (718) | | (1,973) | | (27) | | | | (2,302) |
| Capitalization of interest (see note 25 d) | | — | | (26) | | 42 | | | | | | 16 |
| Goodwill (see note 25 g) | | — | | — | | 81 | | | | | | 81 |
| Accumulated amortization of capitalized interest (see note 25 d) | | — | | (212) | | (31) | | | | | | (243) |
| Effect of ASC 715 (previously SFAS No. 158 (see note 25j) | | — | | (1,678) | | (535) | | (42) | | | | (2,255) |
| Derivative financial instruments (see note 25g) | | — | | 52 | | 15 | | (1) | | | | 66 |
| Employee retirement obligations (see note 25 j) | | — | | (26) | | (12) | | | | | | (38) |
| Purchase of Visteon's capital investment (see note 25k) | | — | | — | | (52) | | | | | | (52) |
| Purchase of remaining 40% interest in Vitro Cristalglass (see note 25o) | | — | | — | | 60 | | | | | | 60 |
| Impairment of long—lived assets (see note 25 n) | | (149) | | 11 | | 361 | | | | | | 223 |
| Sale−lease−back transaction (see note 25p) | | | | (278) | | | | | | | | (278) |
| Fintech option liability (see note 25p) | | | | (181) | | | | | | | | (181) |
| Total U.S. GAAP adjustments | | 267 | | (3,056) | | (2,044) | | (70) | | | | (4,903) |
| Total stockholders' equity under U.S. GAAP | Ps. | 787 | Ps. | 29,002 | | 4,400 | | (252) | | (36,856) | Ps. | (2,919) |

**f)    Supplemental U.S. GAAP Cash Flow Information**

The classifications of cash flows under MFRS and U.S. GAAP are basically the same in respect of the transactions presented under each caption in 2007. The nature of the differences between MFRS and U.S. GAAP in the amounts reported is primarily due to (i) the elimination in 2007 of inflationary effects in the variations of monetary assets and liabilities arising from financing and investing activities, against the corresponding monetary position result in operating activities, (ii) the elimination of exchange rate fluctuations resulting from financing and investing activities, against the corresponding unrealized foreign exchange gain or loss included in operating activities, and (iii) the recognition in operating, financing and investing activities of the U.S. GAAP adjustments.

For the Guarantors, the following table summarizes the cash flow items as required under SFAS No. 95 provided by (used in) operating, financing and investing activities for the years ended December 31, 2007, 2008 and 2009, giving effect to the U.S. GAAP adjustments, excluding the effects of inflation required by Bulletin B−10 for 2007. The following information is presented, in millions of pesos, on a historical peso basis and it is not presented in pesos of constant purchasing power.

| As of December 31, 2007 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | Ps. | 476 | Ps. | 629 | Ps. | 549 | Ps. | (30) | Ps. | (241) | Ps. | 1,383 |
| Net cash (used in) provided by financing activities | | (102) | | (879) | | (7) | | 141 | | 2,809 | | 1,962 |
| Net cash (used in) provided by investing activities | | (269) | | 582 | | (505) | | (116) | | (2,570) | | (2,878) |

Net cash flow from operating activities reflects cash payments for interest and income taxes as follows:

| As of December 31, 2007 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest paid | Ps. | 914 | Ps. | 1,492 | Ps. | 373 | Ps. | 88 | Ps. | (1,498) | Ps. | 1,369 |
| Income taxes paid | | (581) | | 834 | | 204 | | 10 | | (26) | | 441 |

| As of December 31, 2008 | Vitro | | Combined Wholly−Owned Guarantors | | Consolidated Viméxico and Subsidiaries | | Combined Non−Guarantors | | Adjustments and Eliminations | | Vitro Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | Ps. | (662) | Ps. | 1,673 | Ps. | 187 | Ps. | (491) | Ps. | (1,421) | | (714) |
| Net cash (used in) provided by financing activities | | (629) | | (2,389) | | 909 | | 1,750 | | 2,153 | | 1,794 |
| Net cash (used in) provided by investing activities | | 1,460 | | 168 | | (977) | | (1,130) | | (730) | | (1,209) |

Net cash flow from operating activities reflects cash payments for interest and income taxes as follows:

| As of December 31, 2008 | Vitro | Combined Wholly−Owned Guarantors | Consolidated Viméxico and Subsidiaries | Combined Non−Guarantors | Adjustments and Eliminations | Vitro Consolidated |
|---|---|---|---|---|---|---|
| Interest paid | Ps. 1,447 | Ps. 1,048 | Ps. 645 | Ps. 127 | Ps. (1,274) | Ps. 1,993 |
| Income taxes paid | 127 | 213 | 10 | 2 | (167) | 185 |

| As of December 31, 2009 | Vitro | Combined Wholly−Owned Guarantors | Combined Viméxico and Subsidiaries | Combined Non−Guarantors | Adjustments and Eliminations | Vitro Consolidated |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | 1,246 | (476) | 497 | (93) | 1,107 | 2,282 |
| Net cash (used in) provided by financing activities | (2,576) | 6,004 | 1,663 | (39) | (5,021) | 30 |
| Net cash (used in) provided by investing activities | 427 | (3,618) | (1,935) | 88 | 3,913 | (1,125) |

Net cash flow from operating activities reflects cash payments for interest and income taxes as follows:

| As of December 31, 2009 | Vitro | Combined Wholly−Owned Guarantors | Combined Viméxico and Subsidiaries | Combined Non−Guarantors | Adjustments and Eliminations | Vitro Consolidated |
|---|---|---|---|---|---|---|
| Interest paid | 115 | (1,653) | (741) | (107) | 1673 | (943) |
| Income taxes paid | 385 | (177) | 29 | (12) | 133 | 358 |

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V. (Subsidiaries of Vitro, S.A.B. de C.V.)** Consolidated and Combined Financial Statements For the Years Ended December 31, 2007, 2008 and 2009, and Report of Independent Registered Public Accounting Firm Dated February 24, 2011

F−103

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Report of Independent Registered Public Accounting Firm and Consolidated and Combined Financial Statements for 2007, 2008 and 2009**
**Table of contents**

|                                                                                      | Page    |
| ------------------------------------------------------------------------------------ | ------- |
| Report of Independent Registered Public Accounting Firm                              | F−105   |
| Consolidated and Combined Balance Sheets                                             | F−107   |
| Consolidated and Combined Statements of Operations                                   | F−108   |
| Consolidated and Combined Statements of Changes in Stockholders' Equity              | F−109   |
| Consolidated Statement of Changes in Financial Position                              | F−110   |
| Consolidated and Combined Statements of Cash Flows                                   | F−111   |
| Notes to Consolidated and Combined Financial Statements                              | F−112   |

# Deloitte.

**Report of Independent Registered Public Accounting Firm**
**To the Board of Directors and Stockholders of**
**Viméxico, S.A. de C.V. VVP Holdings Corporation, Vitro Vidrio y Cristal, S.A. de C.V., Vitro**
**Automotriz, S.A. de C.V., Vitro Cristalglass, S.L. and Vitrocar, S.A. de C.V.**
**Garza García, N.L., Mexico**

We have audited the accompanying consolidated and combined balance sheets of Viméxico, S.A. de C.V. and subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V. (all together, the Company); subsidiaries of Vitro S.A.B. de C.V. ("Vitro"), as of December 31, 2008 and 2009, and the related consolidated and combined statements of operations and changes in stockholders' equity for each of the three years in the period ended December 31, 2009, the consolidated statement of changes in financial position for the year ended December 31, 2007 and the consolidated and combined statements of cash flows for the years ended December 31, 2008 and 2009. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in Mexico and with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated and combined financial statements present fairly, in all material respects, the financial position of Viméxico, S.A. de C.V. and subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V. as of December 31, 2008 and 2009, the results of their operations and changes in their stockholder's equity for each of the three years in the period ended December 31, 2009, as well as changes in their financial position for the year ended December 31, 2007 and their cash flows for the years ended December 31, 2008 and 2009, in conformity with Mexican Financial Reporting Standards.

The accompanying consolidated financial statements for the year ended December 31, 2009, have been prepared assuming that the Company will continue as a going concern. As disclosed in note 2a), to the accompanying consolidated and combined financial statements, as of December 31, 2008 and 2009, the Company incurred a net loss of Ps. 618 million and Ps.1,624 million and its current liabilities exceed their current assets by Ps. 2,080 million and Ps. 823 million, respectively. Additionally as mentioned in Notes 12 d) and 21 a), to the accompanying consolidated and combined financial statements, Vitro has not met the obligations stipulated in its debt issuance agreements, and has received payment acceleration notices from a group of its bondholders. Vitro continues its productive operations regularly and is working, at the same time, on the negotiations with its financial creditors to restructure its debt. The Company guarantees such debt. The Company and certain of its affiliates are guarantors of such debt. These factors raise substantial doubt about its ability to continue as a going concern. The accompanying consolidated and combined financial statements do not include the effect that might arise if the Company's and Vitro's plans could not be realized.

As disclosed in note 3 a) to the accompanying consolidated and combined financial statements, the Company adopted the following new Mexican Financial Reporting Standards, which impacted its financial position and results of operations; in 2008: NIF B−2, Statement of Cash Flows; NIF B−10, Effects of Inflation; NIF D−3, Employee Benefits and NIF D−4, Income Taxes. In 2009: NIF B−8, Consolidated or Combined Financial Statements and NIF C−8, Intangible Assets.

Mexican Financial Reporting Standards vary in certain significant respects from accounting principles generally accepted in the United States of America. The application of the latter would have affected the determination of consolidated and combined net income (loss) for each of the three years in the period ended December 31, 2009, and the determination of consolidated and combined stockholders' equity as of December 31, 2009 and 2008, to the extent summarized in Note 23.

As disclosed in Note 23) to the accompanying consolidated and combined financial statements, in 2008 the Company adopted the recognition and disclosure provisions of the Financial Accounting Standard Board ("FASB") Accounting Standard Codification ("ASC") 820−10 (previously SFAS No. 157, *Fair Value Measurements*) as it relates to its financial instruments carried at fair value and in 2009 adopted ASC 105−10 (previously SFAS No. 168, *Financial Accounting Standards Board Accounting Standards Codification*), which establishes the FASB Codification as the source of authoritative accounting principles recognized by the FASB, as well as the recognition and disclosure provisions in relation to nonfinancial assets and liabilities recorded at fair value on a non−recurring basis, the accounting and reporting provisions of ASC 810−10 (previously SFAS No. 160, *Noncontrolling Interests in Consolidated Financial Statements — an amendment of ARB No. 51*) as it relates to the Noncontrolling interest in a subsidiary, and the accounting and reporting provisions of ASC 855−10 (previously SFAS 165, *Subsequent Events*) for events that occur after the balance sheet date but before financial statements are issued.

The accompanying financial statements have been translated into English for the convenience of readers in the United States of America.

Galaz, Yamazaki, Ruiz Urquiza, S.C.

Member of Deloitte Touche Tohmatsu Limited

/s/ Gricelda García Ruiz

C.P.C. Gricelda García Ruiz

Monterrey, N.L., Mexico

February 24, 2011

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries,Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Consolidated and Combined Balance Sheets**
**As of December 31, 2008 and 2009**
**(Millions of Mexican pesos)**

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| **Assets** | | | | |
| Cash and cash equivalents | Ps. | 271 | Ps. | 574 |
| Trade receivables, net | | 2,356 | | 1,755 |
| Taxes receivable | | 203 | | 178 |
| Trade and debt receivables from affiliates | | 873 | | 3,217 |
| Other receivables | | 480 | | 396 |
| Inventories | | 2,199 | | 1,547 |
| Current assets | | 6,382 | | 7,667 |
| Land and buildings, net | | 2,598 | | 2,487 |
| Machinery and equipment, net | | 2,843 | | 2,532 |
| Construction in progress | | 372 | | 211 |
| Goodwill | | 771 | | 702 |
| Prepaid pension asset | | 66 | | 75 |
| Deferred taxes | | 1,318 | | 1,516 |
| Other assets | | 607 | | 538 |
| Long−term assets | | 8,575 | | 8,061 |
| Total assets | Ps. | 14,957 | Ps. | 15,728 |
| **Liabilities** | | | | |
| Short−term borrowings | Ps. | 1,379 | Ps. | 803 |
| Current maturities of long−term debt | | 48 | | 48 |
| Trade payables | | 1,028 | | 848 |
| Accrued expenses | | 321 | | 262 |
| Derivative financial instruments | | 986 | | 1,068 |
| Accounts and notes payable to affiliates | | 3,008 | | 4,548 |
| Other current liabilities | | 1,692 | | 913 |
| Current liabilities | | 8,462 | | 8,490 |
| Long−term debt | | 849 | | 536 |
| Other long−term liabilities | | 252 | | 258 |
| Long−term liabilities | | 1,101 | | 794 |
| Total liabilities | | 9,563 | | 9,284 |
| Commitments and contingencies (note 12) | | | | |
| **Stockholders' equity** | | | | |
| Capital stock | | 4,721 | | 12,421 |
| Additional paid−in capital | | (1,885) | | (4,082) |
| Translation effects of foreign affiliated companies | | (396) | | (376) |
| Accumulated deficit | | (1,063) | | (5,560) |
| Total controlling interest | | 1,377 | | 2,403 |
| Noncontrolling interest | | 4,017 | | 4,041 |
| Total stockholders' equity | | 5,394 | | 6,444 |
| Total liabilities and stockholders' equity | Ps. | 14,957 | Ps. | 15,728 |

The accompanying notes are part of the consolidated and combined financial statements.

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Consolidated and Combined Statements of Operations**
**For the years ended December 31, 2007, 2008 and 2009**
**(Millions of Mexican pesos)**

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Net sales | Ps. | 13,605 | Ps. | 13,230 | Ps. | 11,453 |
| Cost of sales | | 9,578 | | 9,703 | | 8,839 |
| Gross profit | | 4,027 | | 3,527 | | 2,614 |
| Selling, general and administrative expenses | | 3,245 | | 3,341 | | 3,205 |
| Operating income (loss) | | 782 | | 186 | | (591) |
| Comprehensive financing result: | | | | | | |
| Financing expenses, net | | 472 | | 610 | | 662 |
| Exchange loss (gain), net | | 86 | | 171 | | (10) |
| Derivative financial instruments (gain) loss | | (3) | | 617 | | 130 |
| Gain from monetary position | | (112) | | | | |
| | | 443 | | 1,398 | | 782 |
| Operating income (loss) after financing cost | | 339 | | (1,212) | | (1,373) |
| Other expenses, net | | 91 | | 141 | | 422 |
| Income (loss) before taxes | | 248 | | (1,353) | | (1,795) |
| Income tax expense (benefit) | | 152 | | (735) | | (171) |
| Net income (loss) for the year | Ps. | 96 | Ps. | (618) | Ps. | (1,624) |
| Noncontrolling interest income | Ps. | 182 | Ps. | 206 | Ps. | 277 |
| Controlling interest loss | | (86) | | (824) | | (1,901) |
| Combined net income (loss) | Ps. | 96 | Ps. | (618) | Ps. | (1,624) |

The accompanying notes are part of the consolidated and combined financial statements.

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Consolidated and Combined Statements of Changes in Stockholders' Equity**
**For the years ended December 31, 2007, 2008 and 2009**
**(Millions of Mexican pesos)**

| | Capital stock | Additional paid-in capital | Shortfall in restatement of capital | Other reserves (1) | Translation effect of foreign affiliated companies | Retained earnings (accumulated deficit) | Noncontrolling interest | Total Stockholders' equity |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2006 | Ps. 4,721 | | Ps. (2,493) | Ps. (1,740) | | Ps. 4,028 | Ps. 1,438 | Ps. 5,954 |
| Dividends paid | | | | | | | (51) | (51) |
| Comprehensive income | | | (44) | 67 | | (86) | 207 | 144 |
| Balance at December 31, 2007 | 4,721 | | (2,537) | (1,673) | | 3,942 | 1,594 | 6,047 |
| Reclassification for adoption of new Mexican Financial Reporting Standards | | | 2,537 | 1,673 | | (4,181) | | 29 |
| Dividends paid | | | | | | | (108) | (108) |
| Capital distribution | | Ps. (1,825) | | | | | 1,825 | |
| Decrease in noncontrolling interest | | (60) | | | | | (375) | (435) |
| Comprehensive loss | | | | | Ps. (396) | (824) | 1,081 | (139) |
| Balance at December 31, 2008 | 4,721 | (1,885) | — | — | (396) | (1,063) | 4,017 | 5,394 |
| Effect in retained earnings of cancellation of preoperating costs | | | | | | (10) | | (10) |
| Dividends paid | | | | | | | (14) | (14) |
| Capital distribution | | (876) | | | | | | (876) |
| Effect on stockholders' equity of combining the Affiliated Companies | 7,700 | (1,321) | | | (18) | (2,586) | | 3,775 |
| Comprehensive loss | | | | | 38 | (1,901) | 38 | (1,825) |
| Balance at December 31, 2009 | Ps. 12,421 | Ps. (4,082) | Ps. — | Ps. — | Ps. (376) | Ps. (5,560) | Ps. 4,041 | Ps. 6,444 |

(1)    Includes the initial cumulative effect of deferred tax and the additional minimum liability related to employee retirement obligations.

The accompanying notes are part of the consolidated and combined financial statements.

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Consolidated Statement of Changes in Financial Position**
**For the year ended December 31, 2007**
**(Millions of Mexican pesos)**

| | | Year ended December 31, 2007 |
|---|---|---:|
| Operating activities: | | |
| Net income | Ps. | 96 |
| Add (deduct) non–cash items: | | |
| Depreciation and amortization | | 480 |
| Provision for employee retirement obligations | | 57 |
| Early extinguishment of employee retirement obligations | | 20 |
| Amortization of debt issuance costs | | 4 |
| Impairment of long–lived assets | | 91 |
| Gain from sale of long–lived assets | | (55) |
| Mark–to market of derivative financial instruments | | 29 |
| Deferred taxes and workers' profit sharing | | (104) |
| | | 618 |
| Increase in trade receivables | | (163) |
| Increase in inventories | | (19) |
| Increase in trade payables | | 223 |
| Decrease in retained undivided interests in securitized receivables | | 37 |
| Change in other current assets and liabilities, net | | 68 |
| Employee retirement obligations | | (101) |
| Net resources generated by operating activities | | 663 |
| | | |
| Financing activities: | | |
| Notes payable to Affiliated Companies | | 317 |
| Proceeds from short– term bank loans | | 508 |
| Proceeds from long– term bank loans | | 145 |
| Amortization in real terms of bank loans | | (61) |
| Payment of short–term bank loans | | (564) |
| Payment of long–term bank loans | | (384) |
| Debt issuance costs | | (9) |
| Dividends paid to minority interest | | (51) |
| Other financing activities | | (56) |
| Net resources used in financing activities | | (155) |
| | | |
| Investing activities: | | |
| Investments in land, buildings, machinery and equipment | | (324) |
| Proceeds from sale of land, buildings, machinery and equipment | | 131 |
| Restricted cash | | 46 |
| Investment in affiliated companies | | (181) |
| Accounts receivable long–term | | 53 |
| Other long–term assets | | (4) |
| Deferred charges | | (206) |
| Net resources used in investing activities | | (485) |
| | | |
| Net increase in cash and cash equivalents | | 23 |
| Balance at beginning of year | | 170 |
| Balance at end of year | Ps. | 193 |

The accompanying notes are part of the consolidated and combined financial statements.

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Consolidated and Combined Statements of Cash Flows**
**For the years ended December 31, 2008 and 2009**
**(Millions of Mexican pesos)**

|  |  | Year ended December 31, |  |  |
|---|---|---|---|---|
|  |  | **2008** |  | **2009** |
| Operating activities: |  |  |  |  |
| Loss before income taxes | Ps. | (1,353) | Ps. | (1,795) |
| Items related to investing activities: |  |  |  |  |
| Depreciation and amortization |  | 488 |  | 575 |
| (Gain) loss from sale of long−lived assets |  | (92) |  | 55 |
| Impairment of long−lived assets |  | 196 |  | 207 |
| Foreign exchange loss |  | (7) |  |  |
| Interest income |  | (50) |  | (232) |
| Items related to financing activities: |  |  |  |  |
| Derivative financial instruments |  | 617 |  | 130 |
| Foreign exchange loss (income) |  | 238 |  | (115) |
| Interest expense |  | 660 |  | 893 |
| Changes in: |  |  |  |  |
| Trade receivables |  | 169 |  | 1,098 |
| Inventories |  | 44 |  | 606 |
| Trade payables |  | (372) |  | (166) |
| Other current assets and liabilities |  | 226 |  | (144) |
| Employee benefits |  | (3) |  | (9) |
| Income taxes |  | 10 |  | 29 |
|  |  |  |  |  |
| Net cash provided by operating activities |  | 771 |  | 1,132 |
|  |  |  |  |  |
| Investing activities: |  |  |  |  |
| Investments in machinery and equipment |  | (286) |  | (264) |
| Proceeds from sale of machinery and equipment |  | 150 |  | 32 |
| Investment in affiliated companies |  | (43) |  | (454) |
| Other assets |  | 7 |  | 11 |
| Deferred charges |  | (119) |  | (36) |
| Interest received |  | 49 |  | 153 |
| Notes receivables to affiliates |  | (663) |  | (1,224) |
| Capital distribution to noncontrolling interest |  | (20) |  |  |
|  |  |  |  |  |
| Net cash used in investing activities |  | (925) |  | (1,782) |
|  |  |  |  |  |
| Cash to be obtained from financing activities |  | (154) |  | (650) |
|  |  |  |  |  |
| Financing activities: |  |  |  |  |
| Proceeds from (payments of) short−term bank loans |  | 218 |  | (563) |
| Interest paid |  | (645) |  | (741) |
| Dividends paid to minority interest |  | (108) |  | (14) |
| Proceeds from long−term bank loans |  | 88 |  | 341 |
| Payments of long−term bank loans |  | (77) |  | (322) |
| Notes payable to affiliates |  | 529 |  | 1,995 |
| Derivative financial instruments |  | 156 |  | (47) |
| Issuance of capital stock |  |  |  | 224 |
| Other financing activities |  | 163 |  | 1 |
|  |  |  |  |  |
| Net cash provided by financing activities |  | 324 |  | 874 |
|  |  |  |  |  |
| Net increase in cash and cash equivalents |  | 170 |  | 224 |
| Adjustment to cash flows due to exchange rate fluctuations |  | (23) |  |  |
| Cash and cash equivalents at the beginning of year (includes restricted cash of Ps. 18 and Ps. 20 at December 31, 2008 and 2009, respectively) |  | 276 |  | 423 |
|  |  |  |  |  |
| Cash and cash equivalents at the end of year (includes restricted cash of Ps. 20 and Ps. 73 at December 31, 2008 and 2009, respectively) | Ps. | 423 | Ps. | 647 |

The accompanying notes are part of the consolidated and combined financial statements.

**Viméxico, S. A. de C. V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.**
**Notes to Consolidated and Combined Financial Statements**
**For the years ended December 31, 2007, 2008 and 2009**
**(Millions of Mexican pesos)**

1. **Activities of the companies**

   Viméxico, S.A. de C.V. (Viméxico) and subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V., subsidiaries of Vitro, S.A.B. de C.V. ("Vitro"), are primarily dedicated to the manufacturing and selling of float glass in the housing and automotive industries.

2. **Basis of presentation and principles of combination**

   a. ***Basis of presentation*** — The accompanying combined financial statements of Viméxico, S.A. de C.V. and subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V. (the Company) are prepared on the basis of Mexican Financial Reporting Standards (MFRS, individually referred to as *Normas de Información Financiera* or NIFs).

   On January 1, 2009, VVP Holdings Corporation and Subsidiaries, which was previously 100% owned by Viméxico, was sold to Vitro. On December 15, 2009, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries and Vitro Automotriz, S.A. de C.V. and Subsidiaries, which was previously 100% owned by Viméxico, was sold to Vitro through a dilution of Viméxico's interest. On December 15, 2009, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V., which was previously 100% owned by Viméxico, was sold to Fic Regimontano, S.A.P.I. de C.V. Such entities have been combined in the 2009 financial statements to ensure the comparability of the financial position, results of operations and cash flows for all years presented (Note 18).

   The consolidated and combined financial statements and notes as of December 31, 2008 and 2009 and for the years then ended, include balances and transactions denominated in Mexican pesos of different purchasing power, while those as of December 31, 2007 and for the year ended December 31, 2007 are presented in Mexican pesos of purchasing power of December 31, 2007; consequently, they are not comparable.

   In the consolidated and combined financial statements and these notes, references to pesos or "Ps." correspond to Mexican pesos, and references to dollars or "US$" correspond to dollar of United States of America (the United States).

   The accompanying consolidated and combined financial statements for the year ended December 31, 2009 have been prepared assuming that the Company will continue as a going concern. As shown in the accompanying consolidated and combined financial statements for the years ended December 31, 2008 and 2009 the Company incurred a net loss of Ps. 618 and Ps.1,624, respectively, its current liabilities exceed their current assets in Ps. 2,080 and Ps. 823, respectively. Additionally, as mentioned in Notes 12 d) and 21 a), to the accompanying financial statements, Vitro has not met the obligations stipulated in its debt issuance agreements, and has received payment acceleration notices from a group of its bondholders. Vitro continues its productive operations regularly, and is working, at the same time, on the negotiations with its financial creditors to restructure its debt. The Company guarantees such debt. These factors raise substantial doubt about its ability to continue as a going concern. The accompanying consolidated and combined financial statements do not include the effect that might arise if the Company's and Vitro's plans could not be realized.

b. **Consolidated and Combined financial statements**— The consolidated and combined financial statements include those of Viméxico, S.A. de C.V. and Subsidiaries, VVP Holdings Corporation and Subsidiaries, Vitro Vidrio y Cristal, S.A. de C.V. and Subsidiaries, Vitro Automotriz, S.A. de C.V. and Subsidiaries, Vitro Cristalglass, S.L. and Subsidiaries and Vitrocar, S.A. de C.V.

As of December 31, 2008 and 2009, the main subsidiaries and Affiliated Companies presented within the consolidated and combined financial statements are:

| | Ownership Percentage 2008 | Ownership Percentage 2009 |
|---|---|---|
| Vidrio Plano de México, S.A. de C.V. | 100 | 100 |
| Vidrio Plano, S.A. de C.V. | 100 | 100 |
| Cristales Inastillables de México, S.A. de C.V. | 100 | 100 |
| Vitro Flex, S.A. de C.V. | 100 | 100 |
| Distribuidora de Vidrio y Cristal S.A. de C.V. | 100 | 100 |
| Vitrocar, S.A. de C.V. [5] | 100 | — |
| Cristales Automotrices, S.A. de C.V. | 51 | 51 |
| Distribuidor Vidriero Lan, S.A. de C.V. | 100 | 100 |
| Vitro Automotriz, S.A. de C.V. [6] | 100 | 0.08 |
| Vitro Vidrio y Cristal, S.A. de C.V. [7] | 100 | 0.007 |
| Productos de Valor Agregado en Cristal, S.A. de C.V. [1] | 55 | 0.001 |
| Vitro Flotado Cubiertas, S.A. de C.V. | 100 | 100 |
| Vidrio Plano de Mexicali, S.A. de C.V. | 100 | 100 |
| Vidrio y Cristal del Noroeste, S.A. de C.V. [2] | 100 | 100 |
| IP Vitro Vidrio y Cristal, Ltd | 0.01 | 0.01 |
| VVP Europa Holdings BV | 100 | 100 |
| Vitro Cristalglass, S.L. [3] [4] | 100 | 8.6 |
| Vitro Chaves Industria de Vidrio, S.A. | 60 | 5.1 |
| VVP Holdings Corporation. [8] | 100 | — |
| Vitro America, Inc. | 100 | — |
| Vitro Colombia, S.A. | 100 | 100 |
| Cristales Centroamericanos, S.A. | 100 | 100 |
| Vau, S.A. de C.V. | 100 | 100 |

(1) In August 2007, Vitro Vidrio y Cristal, S.A. de C.V. ("Vitro VyC"), a subsidiary of Viméxico, acquired 55% of the outstanding shares of Productos de Valor Agregado en Cristal, S.A. de C.V. ("PVA") (see note 18 b).

(2) In July 2007, Viméxico acquired the remaining 50% of the outstanding shares of Vitro AFG, S.A. de C.V. ("Vitro AFG") from AFG Industries Inc. ("AFG Industries"), in order to assume control and increase its ownership to 100%, subsequently changing its legal name to Vidrio y Cristal del Noroeste, S.A. de C.V. (see note 18 a).

(3) In July 2008, Viméxico was notified by its partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass, S.L. ("Vitro Cristalglass"). The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated (see note 18 c).

(4) In December 2009, 60% of the shares of Vitro Cristalglass, S.L. were sold to FIC Regiomontano, S.A.P.I. de C.V. ("FIC Regiomontano") (See Note 18 c).

(5) In December 2009, 100% of the shares of Vitrocar, S.A. de C.V. were sold to FIC Regiomontano (See Note 18 e).

(6) Pursuant to a unanimous resolution of Vitro Automotriz, S.A. de C.V. ("VAU") on December 15, 2009, variable capital was increased by Ps.133 and Series B shares by 133,489,105, by Vitro; therefore Viméxico's shareholding decreased (See Note 18 g).

(7) Pursuant to a unanimous resolution of Vitro Vidrio y Cristal, S.A. de C.V. on December 15, 2009, variable capital was increased by Ps. 1,509 and Series B−2 shares by 3,201,509,234,159, by Vitro, therefore Viméxico's shareholding decreased (See Note 18 f).

(8) In January 2009, 100% of the shares of VVP Holdings Corporation were sold to Vitro. (See Note 18 d).

The following combined companies are referred to in these notes as Affiliated Companies:

| |
|---|
| VVP Holdings Corporation and its subsidiary: |
|    Vitro America, Inc. 100% ownership |
| Vitro Vidrio y Cristal, S.A. de C.V. and its subsidiary: |
|    Productos de Valor Agregado en Cristal, S.A. de C.V. 55% ownership |
| Vitro Automotriz, S.A. de C.V. and its subsidiary: |
|    Cristales y Servicios, S.A. de C.V. 51% ownership |
| Vitro Cristalglass, S.L. and its subsidiary: |
|    Vitro Chaves Industria de Vidrio, S.A. 60% ownership |
| Vitrocar, S.A. de C.V. |

Intercompany balances and transactions have been eliminated from these consolidated and combined financial statements.

    **c.**    *Translation of financial statements from foreign companies* — The consolidated and combined financial statements of the Company's foreign operations are translated to Mexican pesos considering the following methodologies:

Beginning in 2008, foreign operations whose functional currency is the same as their local currency translate their financial statements to Mexican pesos (the Company's reporting currency) using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for assets and liabilities; 2) historical exchange rates for stockholders' equity, revenues, costs and expenses. Through 2007, the financial statements of foreign operations that operated independently of the Company recognized the effects of inflation of the country in which they operate and were then translated to Mexican pesos using the closing exchange rate in effect at the balance sheet date, with such effects recorded in cumulative translation adjustment within stockholders' equity.

Beginning in 2008, foreign operations with a functional currency different from the local currency translate their financial statements from the local currency to the functional currency, using the following exchange rates: 1) the closing exchange rate in effect at the balance sheet date for monetary assets and liabilities; 2) historical exchange rates for non−monetary assets and liabilities and stockholders' equity; and 3) the rate on the date of accrual of revenues, costs and expenses, except those arising from non−monetary items that are translated using the historical exchange rate for the related non−monetary item. Translation effects are recorded within comprehensive financing result. Subsequently, to translate the financial statements from the functional currency to Mexican pesos, the methodology described in the preceding paragraph is used.

Local and functional currencies of the Company's foreign operations are as follows:

| Companies in: | Recording currency | Functional currency |
|---|---|---|
| United States of America | Dollar | Dollar |
| Europe | Euro | Euro |

    **d.**    *Comprehensive income (loss)* — Represents changes in stockholders' equity during the year, for concepts other than distributions and activity in contributed common stock, and is comprised of the net income (loss) of the year, plus other comprehensive income (loss) items of the same period, which are presented directly in stockholders' equity without affecting the consolidated and combined statements of operations. Other comprehensive income (loss) items consist of the translation effects of foreign operations and, until 2007, the shortfall in restatement of capital and the additional minimum labor liability adjustment.

    **e.**    *Classification of costs and expenses* — Costs and expenses presented in the consolidated and combined statements of operations were classified according to their function which allows for the analysis of the Company's gross margin.

    **f.**    *Income from operations* — The Company presents operating income in the consolidated and combined statements of operations as it is an important financial indicator within the industry and helps to evaluate the Company's performance. Operating income includes ordinary income and cost of sales as well as operating costs. This presentation is comparable with the one used in the consolidated and combined financial statements as of December 31, 2007 and 2008.

3. **Summary of significant accounting policies**

The accompanying consolidated and combined financial statements have been prepared in conformity with MFRS, which require that management make certain estimates and use certain assumptions that affect the amounts reported in the consolidated and combined financial statements and their related disclosures; however, actual results may differ from such estimates. The Company's management, upon applying professional judgment, considers that estimates made and assumptions used were adequate under the circumstances. The significant accounting policies of the Company are as follows:

*a.* ***Changes in accounting policies***

Beginning January 1, 2008 and 2009, the Company adopted the following new NIF's; and a result the accompanying consolidated and combined financial statements are not comparable.

**For Fiscal Year 2008**

- *NIF B−2, Statement of Cash Flows ("NIF B−2")* — Supersedes Bulletin B−12, *Statement of Changes in Financial Position*. NIF B−2 permits the presentation of such statement using either the direct or the indirect method; the Company elected the indirect method. The statement of cash flows is presented in nominal pesos. According to NIF B−2, this standard should be recognized prospectively; consequently, the Company presents a consolidated and combined statement of cash flows for the years 2008 and 2009, and a consolidated and combined statement of changes in financial position for 2007.

- *NIF B−10, Effects of inflation ("NIF B−10")* — Considers two economic environments: a) an inflationary environment, where cumulative inflation over a three−year period is 26% or more, in which case, the effects of inflation need to be recognized, and b) non−inflationary environment, where inflation is less than 26% in the same period, in which case, the effects of inflation may not be recognized in the financial statements. Also, NIF B−10 eliminates the replacement cost and specific index valuation methods and requires that the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets be reclassified to retained earnings, except for the gain (loss) from holding non−monetary assets that is identified with inventories or fixed assets that have not been realized as of the effective date of this standard. Such amounts should be maintained in stockholders' equity and realized within current earnings of the period in which such assets are depreciated or sold. The Company determined it was impractical to identify the gain (loss) from monetary position in equity and the cumulative gain (loss) from holding non−monetary assets relating to unrealized assets as of January 1, 2008; therefore, on that date, the Company reclassified the entire balance of shortfall in restatement of capital stockholders' equity of Ps. 2,537. NIF B−10 establishes that this accounting change be recognized prospectively.

  Since cumulative inflation over the three fiscal years prior to those ended December 31, 2008 and 2009 was 11.56% and 14.34%, respectively, the environment in which the Company operates is no longer inflationary, and the Company discontinued recognition of the effects of inflation in its financial statements beginning January 1, 2008. However, assets, liabilities and stockholders' equity at December 31, 2008 and 2009 include restatement effects recognized through December 31, 2007.

- *NIF D−3, Employee Benefits ("NIF D−3")* — Incorporates current and deferred statutory employee profit sharing ("PTU") as part of its provisions and establishes that deferred PTU must be determined using the asset and liability method established in NIF D−4, *Income Taxes*, instead of only considering temporary differences that arise in the reconciliation between the accounting result and income for PTU purposes. This change did not have effect in the Company's financial position.

  Additionally, as of December 31, 2008, NIF D−3 removed the recognition of the additional minimum liability, which resulted in the elimination of Ps. 117, of which Ps. 72 (is presented in the category of other assets) was related to the prepaid pension asset and Ps. 45 was related to the additional minimum labor obligation recognized in stockholders' equity (Ps. 29 net of tax). Additionally, the beginning balance of Ps. 13 of unrecognized actuarial gains and losses from termination benefits was recorded against results of operations.

NIF D−3 also incorporates the career salary concept in the actuarial calculation and limits the amortization period of the following items to the lesser of five years or the employee's remaining labor life:

- The beginning balance of the transition liability for termination and retirement benefits.

- The beginning balance of prior service costs and plan modifications.

- The beginning balance of actuarial gains and losses from retirement benefits.

- *NIF D−4, Income Taxes ("NIF D−4")* — Eliminated the permanent difference concept; clarified and incorporated certain definitions, and requires that the balance of the initial cumulative effect of deferred income taxes of Ps. (1,644) be reclassified to retained earnings.

**For Fiscal Year 2009**

- NIF B−8, *Consolidated or Combined Financial Statements* — Establishes that special purpose entities, over which control is exercised, should be consolidated. Provided certain requirements are met, it allows the option to present stand−alone financial statements of intermediate controlling companies and requires that potential voting rights be considered to analyze whether control exists.

As a result of the analysis performed due to the requirements noted above, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated and combined financial statements (see note 9 b). The condensed amounts and the effect on the balance sheet as of December 31, 2008 resulting from the retrospective application of the standard, as well as comparative presentation as of December 31, 2009 is as follows:

| | December 31, 2008 As Presented | | Debit (credit) | | December 31, 2008 As Restated | | December 31, 2009 | |
|---|---|---|---|---|---|---|---|---|
| Other receivables | Ps. | 349 | Ps. | 131* | Ps. | 480 | Ps. | 396 |
| Trade receivables | | 755 | | 1,601 | | 2,356 | | 1,755 |
| Retained undivided interests in securitized receivables | | 726 | | (726) | | | | |
| Short−term borrowings | | (671) | | (708) | | (1,379) | | (803) |
| Interests payable | | (48) | | | | (48) | | (68) |
| Long−term debt | | (177) | | (298) | | (475) | | (470) |

\* Represents restricted cash presented in other accounts receivable.

- NIF C−8, *Intangible assets* — Establishes the following significant amendments:

   (i) The intangible asset concept is redefined, establishing that the separability condition is not the only condition needed to be identified.

   (ii) Establishes that the acquisition cost must be considered in the initial valuation, identifying the cases of an individual business acquisition or internally arising business, and requiring that it be probable that future economic benefits must flow to the entity.

   (iii) Establishes that subsequent disbursements on research and development projects in progress must be recognized as expenses when accrued, if they are part of the research phase, or, as an intangible asset, if they meet the criteria to be recognized as such.

   (iv) The assumption that an intangible asset could not exceed its useful life of twenty years was eliminated.

As a result of adopting this NIF in 2009, the unamortized balance capitalized preoperating costs of Ps. 10 net of income tax as of December 31, 2008 was written off against retained earnings.

b.   *Recognition of the effects of inflation* — As mentioned in a) above, beginning January 1, 2008, the Company discontinued the recognition of the effects of inflation. Until December 31, 2007, the Company recognized effects of inflation by adjusting its consolidated and combined financial statements in terms of pesos with the purchasing power of the date the most recent balance sheets was presented. Vimexico's Mexican subsidiaries and Mexican Affiliated Companies used the Indice Nacional de Precios al Consumidor (Mexican National Consumer Price Index, or NCPI) published by Banco de Mexico to restate the consolidated and combined financial statements. For Vimexico's foreign subsidiaries and foreign Affiliated Companies the Consumer Price Index — All Urban Consumers — All Items, Unadjusted (CPI) published by the US Labor Department was used to restate the consolidated and combined financial statements, and the restated consolidated and combined financial statements were translated into Mexican pesos using the applicable exchange rate at the end of the last period presented, except in the case of the Company's companies located in Spain for which it applied the Price Consumption Index (PCI), published by the National Institute of Statistics of Spain before translation into Mexican pesos using the exchange rate of the Euro of the last period presented.

Through December 31, 2007, such recognition results mainly in inflationary gains or losses on non−monetary and monetary items that are presented in the consolidated and combined financial statements under the following two captions:

- *Shortfall in restatement of capital* — This item, which is an element of stockholders' equity, represents the accumulated effect of holding nonmonetary assets and the effect of the initial monetary position gain or loss. The cumulative effect of holding nonmonetary assets represents the difference between the specific values of nonmonetary assets in excess of or below the increase attributable to general inflation.

- *Monetary position result* — Monetary position result reflects the result of holding monetary assets and liabilities during periods of inflation. Values stated in current monetary units decrease in purchasing power over time. This means that losses are incurred by holding monetary assets, whereas gains are realized by maintaining monetary liabilities. The net effect is presented in the statements of operations as part of the total comprehensive financing result. For foreign companies the result from monetary position is calculated using the CPI, except in the case of the Company's operations located in Spain for which it applies the PCI.

Inflation rates in Mexico for the years ended December 31, 2007, 2008 and 2009 were based on the NCPI are 3.76%, 6.53% and 3.57%, respectively.

c.   *Cash and cash equivalents* — Consist mainly of bank deposits in checking accounts and readily available investments of highly liquid short−term investments. They are valued at the lower of acquisition cost plus accrued yields or estimated net realizable value and are recognized in results of operations as they accrue.

d.   *Investments in securities* — According to its intent, from the date of acquisition, the Company classifies its investments in securities instruments in any of the following categories: (1) trading, when the Company intends to trade debt and equity instruments in the short−term, before their maturity, if any. These investments are stated at fair value; any fluctuations in the value of these investments are recognized in current earnings; (2) held−to−maturity, when the Company intends to and is financially capable of holding financial instruments until their maturity. These investments are recognized and maintained at amortized cost; and (3) available−for−sale, investments that include those that are classified neither as trading nor held−to−maturity. These investments are stated at fair value; any unrealized gains and losses resulting from valuation, net of income tax, are recorded as a component of other comprehensive income within stockholders' equity and reclassified to current earnings upon their sale or maturity. The monetary position resulting from the effects of inflation on available−for−sale investments is recorded as a component of other comprehensive income. Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

Investments in securities classified as held−to−maturity and available−for−sale are subject to impairment tests. If there is evidence that the reduction in fair value is other than temporary, the impairment is recognized in current earnings.

Financial liabilities derived from the issuance of debt instruments are recorded at the value of the obligations they represent. Any expenses, premiums and discounts related to the issuance of debt financial instruments are amortized over the life of the instruments.

F−117

e. ***Derivative financial instruments*** —In addition to market, credit and liquidity risks, the Company is exposed to risks such as: natural gas prices, interest rates and foreign exchange currency fluctuations between the peso/US dollar and peso/euro.

The Company has a policy for its derivative financial instruments ("DFI") operations, which sets forth the guidelines for the analysis, negotiation, authorization, contracting, operating, monitoring and recording DFI, in order to analyze the risk exposure to financial markets, commodities and fluctuations in the economic and financial variables.

For the risk strategies and the surveillance regarding the compliance of the chosen risk, there is a Risk Committee which acts in compliance with the policy, and which is comprised by various Company officials.

The Company states all derivatives at fair value in the balance sheet, regardless of the purpose for holding them. The recognition of the changes in the fair value of derivative instruments that are designated as a hedge for accounting purposes depends on if they are fair value hedges or cash flow hedges.

Fair value is determined using prices quoted in recognized markets. If such instruments are not traded, fair value is determined by applying recognized technical valuation models.

When derivatives are entered into to hedge risks, and such derivatives meet all hedging requirements, their designation is documented describing the transaction's objective, characteristics, accounting treatment and how the ineffectiveness of the instrument will be measured.

Changes in the fair value of derivative instruments designated as hedges for accounting purposes are recognized as follows: (1) for fair value hedges, changes in both the derivative instrument and the hedged item are recognized in current earnings; (2) for cash flow hedges, changes in the derivative instrument are temporarily recognized as a component of other comprehensive income and then reclassified to current earnings when affected by the hedged item. Any ineffective portion of the change in fair value is immediately recognized in current earnings, within total comprehensive financing result.

The Company's derivative financial instruments have not been designated as hedges for accounting purposes. Changes in fair value of such derivative instruments are recognized in current earnings as a component of total comprehensive financing result.

The Company reviews all contracts entered into to identify embedded derivatives that should be segregated from the host contract for purposes of valuation and recognition. When an embedded derivative is identified and the host contract has not been stated at fair value and adequate elements for its valuation exist, the embedded derivative is segregated from the host contract, stated at fair value and classified as trading or designated as a financial instrument for hedging. Initial valuation and changes in the fair value of the embedded derivatives at the closing of each period are recognized in current earnings.

f. ***Inventories and cost of sales*** — Inventories are stated at the average purchase price or at the average production price, without exceeding net realizable value. Cost of sales is determined by applying such average amounts when the inventories are utilized or sold at the time of the sale. Through December 31, 2007, cost of sales was previously restated using replacement cost or the latest production cost at the time of the sale.

g. ***Land, buildings, machinery and equipment*** — Expenditures for land, buildings, machinery and equipment, including renewals and improvements that extend useful lives, are capitalized and beginning on January 1, 2008, are recorded at acquisition cost. Balances arising from acquisitions made through December 31, 2007 were restated for the effects of inflation by applying factors derived from the NCPI through that date. The initial balance to apply the NCPI was the net replacement value of the Company's long−lived asset as of December 31, 1996. For machinery and equipment purchased in a foreign country, the restatement was based on the inflation index mentioned above and the exchange rate at the end of each period.

Beginning on January 1, 2007, the carrying value of qualifying assets includes the capitalization of total comprehensive financing result (CFR).

Depreciation is calculated using the straight−line method based on the remaining estimated useful lives of the related assets. Depreciation begins in the month in which the asset is placed in service. The estimated useful lives of the assets are as follows:

|  | Years |
|---|---|
| Buildings | 20 to 50 |
| Machinery and equipment | 3 to 30 |

Maintenance and repair expenses are recorded as costs and expenses in the period incurred.

**h.** *Other assets* — Other assets primarily include debt issuance costs and the capitalized software costs. They are recorded at acquisition value and, until December 31, 2007, were restated using factors derived from the NCPI. The debt issuance costs are amortized over the term of the related financial liability and capitalized software is amortized over a period of 80 months, which is its expected useful life.

**i.** *Impairment of long−lived assets in use* — The Company reviews the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price upon disposal. Impairment is recorded when the carrying amounts exceed the greater of the amounts mentioned above. The impairment indicators considered for these purposes are, among others, the operating losses or negative cash flows in the period if they are combined with a history or projection of losses, depreciation and amortization charged to results, which in percentage terms in relation to revenues are substantially higher than that of previous years, obsolescence, reduction in the demand for the products manufactured, competition and other legal and economic factors.

**j.** *Provisions* — Provisions are recognized for current obligations that result from a past event, that are probable to result in the use of economic resources, and can be reasonably estimated.

**k.** *Goodwill* — Goodwill represents the excess of cost over fair value of subsidiaries and Affiliated Companies as of the date of acquisition and at least once a year are subject to impairment tests. Through December 31, 2007 it was restated using the NCPI. The Company recognizes goodwill corresponding to the controlling interest and beginning in 2009, the non−controlling interest.

**l.** *Employee benefits* — Direct employee benefits are calculated based on the services rendered by employees, considering their most recent salaries. The liability is recognized as it accrues.

**m.** *Labor obligations* — Seniority premiums, pension plans and severance payments are recognized as costs over the expected service period of employees and are calculated by independent actuaries using the projected unit credit method, using nominal interest rates beginning in 2008 and real (inflation−adjusted) interest rates through 2007.

**n.** *Foreign currency balances and transactions* — Foreign currency transactions are recorded at the applicable exchange rate in effect at the transaction date. Monetary assets and liabilities denominated in foreign currency are translated into Mexican pesos at the applicable exchange rate in effect at the consolidated and combined balance sheet date. Exchange fluctuations are recorded as a component of net comprehensive financing cost in the consolidated and combined statements of operations.

**o.** *Revenue recognition* — Revenues and related costs are recognized in the period in which risks and rewards of ownership of the inventories are transferred to customers, which generally coincide with the shipment of products to customers in satisfaction of orders.

**p.** *Statutory employee profit sharing ("PTU")* — Statutory employee profit sharing is recorded in the results of the year in which it is incurred and presented under other income and expenses in the accompanying consolidated and combined statements of operations. Beginning in 2008 deferred PTU is derived from temporary differences that resulted from comparing the accounting and tax basis of assets and liabilities and, through 2007, resulted from comparing the accounting result and income for PTU purposes. Deferred PTU is recognized only when it can be reasonably assumed that such difference will generate a liability or benefit, and there is no indication that circumstances will change in such a way that the liabilities will not be paid or benefits will not be realized.

**q.** *Income taxes* — Income taxes, which calculated as the higher of regular income tax (ISR) or the Business Flat Tax ("IETU"), are recorded in the results of the year they are incurred. To recognize deferred income taxes, based on its financial projections, the Company determines whether it expects to incur ISR or IETU and accordingly recognizes deferred taxes based on the tax it expects to pay. Deferred taxes are calculated by applying the corresponding tax rate to the applicable temporary differences resulting from comparing the accounting and tax bases of assets and liabilities and including, if any, future benefits from tax loss carryforwards and certain tax credits. Deferred tax assets are recorded only when there is a high probability of recovery.

F−119

Tax on assets ("IMPAC"), prevailing until 2007, that were expected to be recoverable are recorded as an advance payment of ISR and presented in the consolidated and combined balance sheet increasing the deferred ISR asset.

r. ***Foreign affiliated companies as economic hedges*** — The Company's management designated some of its foreign affiliated companies as economic hedges. The resulting exchange rate fluctuation is presented in the shortfall in restatement of capital within stockholders' equity to the extent the net investment in the foreign affiliated companies' covers the debt. Through December 31, 2007, the result from monetary position is measured using inflation factors from the designated affiliated companies' country of origin. The effect related to this hedge for 2007, 2008 and 2009 was a net (loss) gain recognized within comprehensive income, net of income tax of Ps. (5), Ps. 40 and Ps. 2, respectively.

**4. Trade receivables**

a. Trade receivables

|  | | December 31, | | |
|---|---|---|---|---|
|  | | **2008** | | **2009** |
| Trade receivables are summarized as follows: | | | | |
| Trade receivables [(1)] | Ps. | 2,660 | Ps. | 2,050 |
| Allowance for doubtful accounts | | (304) | | (295) |
|  | Ps. | 2,356 | Ps. | 1,755 |

(1) Trade receivables include balances of Ps. 1,006 and Ps. 466 as of December 31, 2008 and 2009, respectively, which serve as collateral as part of the Company's accounts receivable securitization facilities. Although the related trusts in which they are held are included in the Company's consolidated and combined financial statements, they are legally independent (see Note 3 a).

b. Other receivables — Other receivables include Ps.10 and Ps. 43 of restricted cash from the Company's account receivable securitization facilities as of December 31, 2008 and 2009, respectively.

**5. Inventories**

Inventories are summarized as follows:

|  | | December 31, | | |
|---|---|---|---|---|
|  | | **2008** | | **2009** |
| Semi−finished and finished products | Ps. | 1,364 | Ps. | 1,002 |
| Raw materials | | 503 | | 324 |
| Packaging materials | | 20 | | 12 |
|  | | 1,887 | | 1,338 |
| Spare parts | | 183 | | 142 |
| Merchandise in transit | | 108 | | 66 |
| Refractory and other | | 21 | | 1 |
|  | Ps. | 2,199 | Ps. | 1,547 |

As of December 31, 2008 and 2009, inventories include obsolescence reserves of Ps. 31 and Ps. 42, respectively.

As of December 31, 2009, inventory of Ps. 237 has been provided as a guarantee for certain of the Company's short−term financing transactions.

6. **Land, buildings, machinery and equipment**

Land, buildings, machinery and equipment are summarized as follows:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Buildings | Ps. | 4,841 | Ps. | 4,811 |
| Accumulated depreciation | | (2,704) | | (2,773) |
| | | 2,137 | | 2,038 |
| Land | | 461 | | 449 |
| | Ps. | 2,598 | Ps. | 2,487 |

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Machinery and equipment | Ps. | 9,167 | Ps. | 8,738 |
| Accumulated depreciation | | (6,324) | | (6,206) |
| | Ps. | 2,843 | Ps. | 2,532 |

In 2008 and 2009, the Company capitalized CFR of Ps. 2 and Ps. 3, respectively, directly attributable to the acquisition of qualifying assets.

7. **Other assets**

As of December 31, 2008 and 2009, other assets includes Ps. 403 and Ps. 307, of capitalized software costs, respectively, Ps. 20 of debt issuance costs, as well as Ps. 0 and Ps. 30 of restricted cash, respectively.

8. **Derivative financial instruments**

Derivative financial instruments have not been designated as hedges because they do not meet all of the requirements according to MFRS and are therefore classified as trading instruments for accounting purposes.

Vitro Envases de Norteamérica, S.A. de C.V., (Vena), Vidriera Querétaro, S.A. de C.V., (Viquesa),Vitro Corporativo, S.A. de C.V., (Vicorp) and Compañía Vidriera, S.A. de C.V., (Covisa), subsidiaries of Vitro, entered into an agreement to hedge their natural gas consumption needs and those of certain affiliated companies. Simultaneously, Vena, Viquesa, Vicorp and Covisa entered into an agreement that transferred a portion of the rights and obligations received from their natural gas hedging agreement to the Company.

**Derivative financial instruments held for trading purposes:**

| Open derivative financial instruments | Notional MMBTUs* | Period | | Fair value liability |
|---|---|---|---|---|
| Natural gas swaps and options contracted through affiliated | 1921 | 2009 to 2011** | Ps. | 219 |

\* Million British Thermal Units.

\** As of December 31, 2009, the Company has hedges for approximately 32% of its estimated consumption at an average price of approximately US$6.80 per MMBTU for 2010 and 19% of its estimated consumption at an average price of approximately US$7.32 per MMBTU for 2011. The Company performed a sensitivity analysis to determine its exposure to market risks for derivative financial instruments held as of December 31, 2009. The sensitivity analysis was performed applying valuation models fully accepted for these types of instruments, and considering changes in the underlying value that imply variances of 10% of the reference price. The additional variances affecting the valuation model such as interest rate and exchange rates, for purposes of the analysis, were deemed constant. Before an adverse change of 10% in the reference price, the fair value of the position of the Company's derivative financial instruments would be affected by approximately US$1 million.

**The following table discloses the derivative financial instruments the Company unwound in 2008:**

| Summary of unwound derivative financial instruments | | Liability |
|---|---|---|
| Natural gas contracts | Ps. | 853 |

In the fourth quarter of 2008 the Company's management decided to unwind a majority of its open derivative positions that had been adversely affected due to high volatility experienced in the financial markets, which resulted in a significant reduction in energy prices.

As of December 31, 2008, certain positions have been unwound for approximately Ps. 853 million and have not been paid.

During February and March of 2009, six out of the seven banks that are counterparties with whom Vitro and some of its subsidiaries entered into derivative financial instruments (the "Counterparties") have filed law suits against companies as mentioned in the second paragraph of this note in the Supreme Court of the State of New York demanding the payment of US$240 million plus interest and other fees related to the unwound derivative instruments.

The Counterparties have requested that a resolution be sought through the courts by filing a motion for summary judgment. This solution was postponed on various occasions beginning in August 2009. (See notes 21 b and 21 c).

**Embedded derivatives:**

The Company identified embedded derivatives within certain supply agreements. As of December 31, 2009, the amount recognized was an asset of Ps. 4 and a credit to comprehensive financing cost in the statement of operations.

**9.** **Short and Long−term debt**

a. As of December 31, 2008 and 2009, short−term borrowings denominated in Pesos totaled Ps. 0 and Ps. 105, respectively, denominated in US dollars totaled Ps. 961 and Ps. 208, respectively, and denominated in euros totaled Ps. 418 and Ps. 490, respectively. During 2009, the Company's weighted average interest rate for short−term borrowings denominated in Ps, US dollars and euros was 11.05%, 11.08% and 4.08%, respectively.

b. Long−term debt consists of the following:

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2008** | | **2009** | |
| **Payable in US dollars:** | | | | |
| Capital lease with fixed interest rate of 10.7494%, maturing in several installments through 2016. | Ps. | 92 | Ps. | 79 |
| Capital lease with interest rate ranging between 6% and 7.67%, maturing in several installments through 2012. | | 12 | | 5 |
| Capital lease with fixed interest rate of 7.00%, maturing in several installments through 2015. | | | | 38 |
| Notes payables to Vitro with fixed annual interest rate between 9% and 11%, maturing in 2012. | | 374 | | 66 |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 6.5% spread, maturing in 2010. | | 298 | | |
| **Payable in Euros:** | | | | |
| EURIBOR plus a margin ranging from 1.10% to 1.25%, with different maturity dates up to 2014. | | 57 | | 44 |
| Capital lease, floating interest rate based on capital leases and on EURIBOR, plus a margin ranging from 0.625% and 1.25%, with different maturity dates up to 2014. | | 40 | | 37 |
| Fixed interest rate capital leases ranging from 0.84% to 3.84%, with different maturity dates up to 2010. | | | | 2 |
| Capital lease, with fixed interest rate based on capital leases and on EURIBOR, plus a margin ranging of 0.62% with different maturity dates up to 2014. | | 11 | | 2 |
| **Payable in Colombian pesos:** | | | | |
| Unsecured debt floating interest rate based on fixed term deposits (DFT) plus a spread of 6%, principal payable in several installments through 2013. | | 13 | | 11 |
| **Payable in Mexican pesos:** | | | | |
| Secured borrowing related to the flat glass businesses' securitization transactions, guaranteed by trade receivables, variable interest rate based on TIIE plus a 4% spread, maturing in 2014. | | | | 300 |
|  | | 897 | | 584 |
| Less current maturities | | 48 | | 48 |
|  | Ps. | 849 | Ps. | 536 |

As of December 31, 2009, the interest rates of EURIBOR, TIIE, and DTF were 1.24%, 8.74%, and 4.11%, respectively.

F−123

The schedule of contractual principal payments of long−term debt as of December 31, 2009 is as follows:

| Year | | Amount |
|---|---|---|
| 2011 | Ps. | 41 |
| 2012 | | 104 |
| 2013 | | 34 |
| 2014 | | 350 |
| 2015 and thereafter | | 7 |
| | Ps. | 536 |

**10. Other long−term liabilities**

As of December 31, 2008 and 2009, the balance in other long−term liabilities includes Ps.56 and Ps.58, of casualty insurance, respectively, as well Ps.140 Ps.139 of government loans to its subsidiary in Spain, respectively.

**11. Employee benefits**

a. The Company has a defined benefit pension plan that covers all its personnel, which consists of a lump sum payment or a monthly pension calculated, based on the aggregate of a basic pension, an additional seniority pension and an additional pension for equal or less earnings than the ceiling used for the Mexican Social Security Institute.

The retirement ages are as follows:

- Normal. — Personnel that are 65 years old with 20 or more years of service.

- Advanced. — Personnel that are 60 years old with a minimum of 20 or more years of service, reducing the pension by a percentage point each year before reaching 65 years of age.

- Early. — Personnel that are 50 years old with 10 or more years of service, reducing the pension by a percentage according to the age at the moment of retirement.

- Aggregate of 100. — With the approval of the Technical Committee, personnel whose aggregate age and years of service is 100.

- Deferred. — Personnel who do not accept retirement upon becoming 65 years old lose all the rights to receive a pension from the plan.

This plan also provides seniority premium benefits, which consist of a lump sum payment of 12 days' wage for each year worked, calculated using the most recent salary, not to exceed twice the legal minimum wage established by law, as well as severance payments, which consists of a three month and twenty days wage payment for each year served. The related liability and annual cost of such benefits are calculated by an independent actuary on the basis of formulas defined in the plans using the projected unit credit method.

b. The present values of these obligations and the rates used for the calculations are:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2009** | | **2008** |
| Vested benefit obligation | Ps. | 513 | Ps. | 573 |
| Nonvested benefit obligations | | 142 | | 220 |
| Defined benefit obligation | | 655 | | 793 |
| Plan assets at fair value | | (278) | | (315) |
| Unfunded status | | 377 | | 478 |
| Unrecognized items: | | | | |
| Prior service costs and plan amendments | | (77) | | (33) |
| Unrecognized transition obligation | | (24) | | (43) |
| Unrecognized actuarial gains and losses | | (342) | | (477) |
| Prepaid pension asset | Ps. | (66) | Ps. | (75) |

F−124

As of December 31, 2008 and 2009 the plan assets presented above, include 17.1 and 14.2 million Vitro shares, respectively.

| | December 31, | |
|---|---|---|
| | **2008** | **2009** |
| Assumptions: | | |
| Discount rate | 10.25% | 9.50% |
| Expected rate of return on plan assets | 12.25% | 10.50% |
| Rate of compensation increase | 3.50% | 3.50% |

c.    Net periodic cost consists of:

| | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Service cost | Ps. | 46 | Ps. | 70 | Ps. | 30 |
| Interest cost | | 31 | | 55 | | 60 |
| Amortization of unrecognized prior service costs | | 12 | | 23 | | 22 |
| Actuarial gains and losses | | 16 | | 35 | | 6 |
| Effect of reduction and early liquidation | | | | (2) | | 18 |
| Expected yield on plan assets | | (29) | | (55) | | (32) |
| Net periodic cost | Ps. | 76 | Ps. | 126 | Ps. | 104 |

Certain unrecognized items as of December 31, 2007 are being amortized to results of operations within a maximum period of 5 years or the employee's remaining service life, if less. Through December 31, 2007, these items were amortized to results of operations based on the employee's average remaining labor life. Starting 2008, unrecognized items incurred from January 1, 2008 are amortized to results of operations based on the employees' average remaining service lives, which is between 10 and 16 years. This change represented a charge to current earnings of Ps.13 and Ps. 11 in 2008 and 2009, respectively.

d.    Changes in present value of the defined benefit obligation:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Present value of the defined benefit obligation as of January 1 | Ps. | 673 | Ps. | 655 |
| Service cost | | 70 | | 30 |
| Interest cost | | 55 | | 60 |
| Benefits paid | | (85) | | (89) |
| Actuarial (gain) loss | | (58) | | 137 |
| Present value of the defined benefit obligation as of December 31 | Ps. | 655 | Ps. | 793 |

e.    Changes in fair value of plan assets:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Fair value of plan assets as of January 1 | Ps. | 517 | Ps. | 278 |
| Expected return | | 52 | | 32 |
| Actuarial losses | | (289) | | (30) |
| Contributions made by the Company | | 40 | | 117 |
| Benefits paid | | (42) | | (82) |
| Fair value of plan assets as of December 31 | Ps. | 278 | Ps. | 315 |

F–125

f.   Classification of plan assets as of December 31, 2009:

| | Expected Yield | Actual Yield |
|---|---|---|
| Capital instruments (Vitro A shares) | 13.00% | 3.00% |
| Other | 8.67% | 4.42% |

The rate of return on the plan assets is determined using a composition of 37% of Vitro's shares and 63% in investments in securities.

**12.   Commitments and contingencies**

a.   In October 2000, several of Vimexcom's subsidiaries and Affiliated Companies, which have facilities throughout Monterrey, Mexico and the Mexico City area, entered into a 15−year energy purchase agreement for approximately 33 megawatts of electricity pear year with Tractebel Energía de Monterrey, S. de R.L. de C.V.

b.   The Company has several non−cancelable operating lease agreements for the rent of warehouses and equipment. Rental expense for the years ended December 31, 2007, 2008 and 2009 was Ps. 365, Ps. 364 and Ps. 367, respectively.

Future minimum lease payments under these agreements are as follows:

| Year | | Amount |
|---|---|---|
| 2010 | Ps. | 306 |
| 2011 | | 273 |
| 2012 | | 226 |
| 2013 | | 191 |
| 2014 | | 170 |
| 2015 and thereafter | | 161 |

c.   On December 2006, Viméxico (formerly Vitro Plan) concluded at an extraordinary shareholders' meeting to approve the merger of Vitro Plan into Viméxico, which was a creditor of Vitro Plan. As a result of the merger, all assets, rights, liabilities and obligations of Vitro Plan were absorbed by Viméxico. Prior to the merger, Vitro Plan was a direct 65%−owned subsidiary of Vitro and Pilkington Group LTD (Pilkington) owned the remaining 35%. As a result of the merger, Viméxico became a 91.8%−owned subsidiary of Vitro and Pilkington the owner of the remaining 8.2%.

Although the merger became entirely effective once all the respective authorizations were obtained and having prepared all the respective acts, publications and registrations, Pilkington, who voted against such approval, began a legal procedure in January 2007 against the merger. In February 2008 in first instance, in June 2008 in second instance, and finally in February 2009, the protection requested by Pilkington was denied. The Company was notified that the opposing action exercised by Pilkington was declared unprecedented in a final and unappealable sentence with respect to the resolutions approved by the majority at the extraordinary general stockholders' meeting in December 2006. Thus, the foregoing resolutions were confirmed as valid and mandatory for all stockholders, including those dissenting. However, in the first week of December 2007, the Company was notified of a new complaint filed by Pilkington, claiming the annulment of such extraordinary general stockholders' meeting. This position goes against the claims sustained in the first trial and was filed after Pilkington specifically desisted from this action after the first trial. Accordingly, Vitro also expects to obtain a favorable resolution from this claim. In this proceeding all evidence and allegations were submitted and the Company is awaiting the final ruling.

d.   As of December 31, 2009, Vitro has not met the obligations stipulated in its debt issuance agreements and has received payment acceleration notices from a group of its bondholders. Vitro continues its productive operations, and is working on negotiations with its financial creditors to restructure its debt (See Note 21a). The Company serves as a guarantor of such debt.

F−126

**13. Foreign currency operations**

As of December 31, 2009, the foreign currency denominated assets and liabilities of the Company's Mexican subsidiaries and Mexican Affiliated Companies consist of the following:

| | Millions of US dollars | | Mexican pesos | |
|---|---|---|---|---|
| Monetary assets | US$ | 36 | Ps. | 469 |
| Inventories | | 6 | | 85 |
| Fixed assets | | 11 | | 146 |
| Monetary liabilities | | 20 | | 264 |

Foreign currency operations of the Vimexico's Mexican subsidiaries and Mexican Affiliated Companies for the year ended December 31, 2009, consisted of the following:

| | Millions of US dollars | | Mexican pesos | |
|---|---|---|---|---|
| Exports | US$ | 136 | Ps. | 1,831 |
| Imports | | 69 | | 932 |
| Interest expense, net | | 3 | | 48 |

The condensed financial information of the principal Vimexico's foreign subsidiaries and foreign Affiliated Companies as of December 31, 2009, consisted of the following:

| | United States | | Central America and South America | | Europe | |
|---|---|---|---|---|---|---|
| Net sales | Ps. | 4,544 | Ps. | 488 | Ps. | 1,506 |
| Operating (loss) income | | (339) | | 63 | | (181) |
| Total assets | | 1,492 | | 524 | | 2,493 |
| Total liabilities | | 813 | | 156 | | 1,314 |
| Capital expenditures | | 76 | | 4 | | 10 |

The exchange rates of the Mexican peso against the US dollar and the Euro, used for purposes of the Company's consolidated and combined financial statements at the following dates were:

| | US dollar | | Euro | |
|---|---|---|---|---|
| December 31, 2007 | Ps. | 10.8662 | Ps. | 15.9526 |
| December 31, 2008 | | 13.8325 | | 19.2534 |
| December 31, 2009 | | 13.0587 | | 19.5789 |

On February 24, 2011, the exchange rate was Ps. 12.1900 per US dollar and Ps. 16.7455 per Euro.

**14. Stockholders' equity**

    a. As of December 31, 2009, the fixed portion of the Company's capital stock is represented by 1,504,021,600 series "A" and the variable portion by 3,396,582,622,960 series "B", ordinary, nominative, fully paid and issued common shares, without par value as follows:

| | Serie "A" shares | Serie "B" shares | Total shares |
|---|---|---|---|
| Vimexico, S.A. de C.V. and Subsidiaries | 1,503,510,000 | | 1,503,510,000 |
| VVP Holdings Corporation and subsidiaries | 1,000 | | 1,000 |
| Vitro Vidrio y Cristal, S.A. de C.V. and subsidiaries | 50,000 | 3,204,385,523,705 | 3,204,385,573,705 |
| Vitro Automotriz, S.A. de C.V. and subsidiaries | 50,000 | 191,986,078,704 | 191,986,128,704 |
| Vitro Cristalglass, S.L. and subsidiaries | 360,600 | 60,100 | 420,700 |
| Vitrocar, S.A. de C.V. | 50,000 | 210,960,451 | 211,010,451 |
| | | | |
| Total | 1,504,021,600 | 3,396,582,622,960 | 3,398,086,644,560 |

As of December 31, 2008, the capital stock is represented by that of Viméxico only and is represented by 1,503,510,000 series "A" ordinary, nominative, fully paid and issued common shares, without par value

b. Retained earnings include the statutory legal reserve. Mexican General Corporate Law requires that at least 5% of net income of the year be transferred to the legal reserve until the reserve equals 20% of capital stock at par value (historical pesos). The legal reserve may be capitalized but may not be distributed unless the entity is dissolved. The legal reserve must be replenished if it is reduced for any reason. As of December 31, 2008 and 2009, the legal reserve, in historical pesos was Ps. 10.

c. Stockholders' equity, except restated paid−in capital and tax retained earnings, will be subject to income tax at the rate in effect when a dividend is distributed. Any tax paid on such distribution may be credited against annual and estimated income taxes of the year in which the tax on dividends is paid and the following two fiscal years.

At December 31, 2009, the majority interest stockholders' equity tax account corresponding to the contributed capital account and the net consolidated and combined tax income account was Ps. 2,233 and Ps. 2,157, respectively.

d. On January 15, 2008, Vitro VyC, Vitrocar and VAU acquired the intellectual property of an affiliated company for $1,835, which is presented as a capital distribution of $1,321, net of deferred taxes.

e. Noncontrolling interest in subsidiaries of Viméxico and Affiliated Companies financial statements consists of the following:

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2008** | | **2009** | |
| Capital stock | Ps. | 157 | Ps. | 157 |
| Paid−in capital | | 1,825 | | 1,825 |
| Translation effects of foreign Affiliated Companies | | 877 | | 638 |
| Retained earnings | | 952 | | 1,144 |
| Net income | | 206 | | 277 |
|  | Ps. | 4,017 | Ps. | 4,041 |

**15. Other expenses, net**

The following represents a summary of the Company's other expenses (income), net for the periods presented:

|  | Year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2007** | | **2008** | | **2009** | |
| Restructuring charges | Ps. | 9 | Ps. | 32 | Ps. | 184 |
| Impairment of long−lived assets | | 91 | | 196 | | 209 |
| (Gain) loss from sale of long−lived assets | | (55) | | (92) | | 55 |
| Statutory employee profit sharing | | 24 | | 4 | | 3 |
| Other | | 22 | | 1 | | (29) |
|  | Ps. | 91 | Ps. | 141 | Ps. | 422 |

**16.   Tax loss carryforwards**

As of December 31, 2009, tax loss carryforwards consist of the following:

| Expiration Year | | Amount |
|---|---|---|
| 2010 | Ps. | 50 |
| 2011 | | 19 |
| 2012 | | 28 |
| 2013 | | 14 |
| 2014 | | 269 |
| 2015 | | 4 |
| 2016 | | 11 |
| 2017 | | 28 |
| 2018 | | 1,125 |
| 2019 | | 3,000 |
| | Ps. | 4,548 |

**17.   Income and asset taxes**

a.   In accordance with the Mexican tax law, the Company in 2008 and 2009 is subject to ISR and IETU. Until 2007, the Company was subject to ISR and IMPAC.

ISR.– The Company pays ISR. The ISR rate is 28% for 2007, 2008 and 2009, and, based on changes to the ISR Law on December 7, 2009, will be 30% for 2010 to 2012, 29% for 2013 and 28% for 2014 and subsequent years.

The foreign Affiliated Companies calculate their ISR based on the individual results of each subsidiary pursuant to the specific tax regimes in each country.

IETU.– On January 1, 2008, the IETU went into effect. IETU applies to the sale of goods, the provision of independent services and the granting of use or enjoyment of goods, according to the terms of the IETU law, less certain authorized deductions. Revenues, as well as deductions and certain tax credits, are determined based on cash flows generated beginning January 1, 2008. The IETU law establishes that the IETU rate will be 16.5% in 2008, 17.0% in 2009, and 17.5% in 2010 and subsequently. Similarly, the IMPAC Law was repealed upon enactment of the IETU Law, however, under certain circumstances, IMPAC paid in the ten years prior to the year in which ISR is paid, may be refunded, according to the terms of the law.

Based on its financial projections and according to INIF 8, *Effects of the Business Flat Tax*, the Company determined that it will essentially pay ISR. Therefore, it only recognizes deferred ISR.

IMPAC.– In 2007, IMPAC was calculated by applying 1.25% to the value of the assets of the year, without deducting any debt amounts.

b.   The income and asset tax expense (benefit) included in the Company's results are:

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Current | Ps. | 208 | Ps. | 57 | Ps. | 33 |
| Deferred | | (104) | | (782) | | (204) |
| | | 104 | | (725) | | (171) |
| Asset tax | | 48 | | (10) | | |
| | Ps. | 152 | Ps. | (735) | Ps. | (171) |

F–129

c.  Net deferred tax assets presented in the consolidated and combined balance sheets consist of the following:

| | | December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| Assets: | | | | |
| Allowance for doubtful accounts | Ps. | 59 | Ps. | 21 |
| Reserve for employee benefits | | 96 | | 63 |
| Tax loss carryforwards | | 630 | | 1,273 |
| Asset tax credit carryforwards | | 1 | | |
| Derivate financial instruments | | 276 | | 284 |
| Intangible asset | | 542 | | 548 |
| Other | | 119 | | 44 |
| | | 1,723 | | 2,233 |
| Valuation allowance | | (88) | | (551) |
| | | 1,635 | | 1,682 |
| Liabilities: | | | | |
| Fixed assets | | 317 | | 166 |
| Net deferred tax asset | Ps. | 1,318 | Ps. | 1,516 |

d.  Following is a reconciliation between the Company's effective income tax rate and the statutory rate:

| | Year ended December 31, | | |
|---|---|---|---|
| | **2007** %  | **2008** % | **2009** % |
| Statutory income tax rate | 28 | 28 | 28 |
| Asset tax presented as income tax | 21 | | |
| Intangible asset | 17 | 7 | |
| Foreign Affiliated Companies | (17) | 19 | (18) |
| Investment in subsidiaries | 4 | | |
| Difference between tax and accounting basis for monetary gain | | (8) | (4) |
| Tax restatement of fixed assets and deferred charges | | 7 | 3 |
| Other | 8 | 1 | 1 |
| Effective income tax rate | 61 | 54 | 10 |

e.  The deferred income tax effect, reduced from the movements in stockholders' equity for insufficiency in restated stockholders' equity, the equity effect of the additional labor liability as well as form the exchange loss capitalized in the translation effect of foreign companies is presented as follows:

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| Shortfall in restatement of capital | Ps. | 98 | | | | |
| Minimum labor liability | | (24) | | | | |
| Translation effects of foreign Affiliated Companies | | | Ps. | 16 | Ps. | 1 |
| | Ps. | 74 | Ps. | 16 | Ps. | 1 |

18.  **Business dispositions and acquisitions**

    a.    *Acquisition of 50% of the shares of Vidrio y Cristal del Noroeste, S.A. de C.V. (formerly Vitro AFG)* — In July 2007, Viméxico exercised its option to acquire the remaining 50% of the outstanding shares of Vitro AFG from its joint venture partner AFG Industries, a subsidiary of Asahi Glass Co. Limited (a Japanese company) for a purchase price of US$6 million. In accordance with Bulletin B−7, the Company recognized an impairment charge of Ps. 91 related to the termination of the joint venture with AFG Industries.

        With the closing of this transaction, Viméxico terminated the joint venture and became the wholly−owner of this entity, located in Mexicali, Baja California, Mexico, whose primary operations include the manufacturing, processing and distribution of flat glass, thereby increasing Vitro's available production capacity by 78,000 tons on an annual basis.

    b.    *Acquisition of 55% of the shares of PVA* — In August 2007, Vitro VyC acquired 55% of the outstanding shares of PVA, a company dedicated to the installation of value added crystal products for Ps. 110. As a result of the preliminary purchase price allocation, the Company recorded goodwill of Ps. 85 in 2007. During the first half of 2008, pursuant to the guidelines in NIF B−7 *Business Acquisitions*, the items comprising such goodwill were analyzed further and Ps. 61 was reclassified as an intangible asset.

    c.    *Purchase of 40% of Vitro Cristalglass* — In July 2008, Viméxico was notified by its joint venture partner of its right to exercise the put option related to the sale of its 40% interest in Vitro Cristalglass, S. L. (Vitro Cristalglass). The option was officially exercised in August 2008 and beginning in September 2008, Vitro Cristalglass is 100% consolidated. The purchase price agreed upon was 27.4 million euros (approximately Ps. 527). The difference between the purchase price and the book value resulted in a charge of Ps. 60, recorded in majority stockholders' equity.

        In January 2009 a revised payment schedule was agreed upon with the previous partner, by extending it through the 2009−2010 periods, and that the purchase of the partnership interest in Vitro Cristalglass would be made through a capital reduction.

        *Sale of 60% of Vitro Cristalglass* — In December 2009, 60% of the shares of Vitro Cristalglass were sold to a subsidiary of Vitro FIC Regiomontano. The price was Ps. 398 and the difference between the cost and the book value resulted in a credit of Ps. 26 recorded in stockholders' equity.

    d.    *Sale of 100% of VVP Holdings* — In January 2009, 100% of the shares of V.V.P. Holdings Corporation were sold to Vitro. The price was Ps. 448 and the difference between the cost and the book value resulted in a charge of Ps. 179 recorded in stockholders' equity.

    e.    *Sale of 100% of Vitro Car* — In December 2009, 100% of the shares of Vitrocar were sold to FIC Regiomontano. The price was Ps. 1,293 and the difference between the cost and the book value resulted in a charge of Ps. 29 recorded in stockholders' equity.

    f.    *Diluted equity in Vitro Vidrio and Cristal* — Pursuant to a unanimous resolution of Vitro VyC's stockholders, on December 15, 2009, variable capital was increased by Ps. 1,509 and Series B−2 shares by 3,201,509,234,159 by Vitro; therefore Viméxico's shareholding decreased. The difference between the cost and book value resulted in a charge of Ps. 144 recorded in stockholders' equity.

    g.    *Diluted equity in Vitro Automotriz* — Pursuant to a unanimous resolution of VAU's stockholders, on December 15, 2009, variable capital was increased by Ps.133 and Series B−3 shares by133,489,105 by Vitro; therefore Viméxico's shareholding decreased. The difference between the cost and book value resulted in a charge of Ps. 550 recorded in stockholders' equity.

**19.   Transactions and balances with related parties**

   a.   The main transactions and balances with related parties not shown separately in the consolidated and combined financial statements are as follows:

| | 2007 | | 2008 | | 2009 |
|---|---|---|---|---|---|
| Trade receivables | Ps. | 5 | Ps. | 9 | Ps. | 11 |
| Trade payables | | 33 | | 6 | | 77 |
| Net sales | | 14 | | 42 | | 76 |
| Cost of sales | | 95 | | 121 | | 550 |
| Operating expenses | | 200 | | 270 | | 244 |
| Interest income | | — | | 31 | | 214 |
| (Gain) loss on derivative financial instruments | | (3) | | 617 | | 136 |
| Exchange (gain) loss | | (6) | | 74 | | (53) |
| Interest expense | | 325 | | 394 | | 590 |
| Other income, net | | 80 | | 95 | | (4) |

   b.   **Loans receivable from affiliates**

   As of December 31, 2008 and 2009, short−term loans denominated in Mexican pesos amounted to Ps. 672 and Ps. 2,043, respectively. As of December 31, 2009 short−term loans denominated in U.S. dollars amounted to Ps. 426, in Swiss francs (CHF) amounted to Ps. 141 and in euros amounted to Ps. 392. During 2009, the Company's interest rate for short−term loans denominated in Mexican pesos fluctuated between 12.25% and 24.50%; in U.S. dollars was 9.95%; in CHF was 2.50% and in Euros was 2.73%.

   c.   **Notes payable to affiliates**

   As of December 31, 2008 and 2009, short−term loans denominated in Mexican pesos amounted to Ps. 2,471 and Ps. 3,449, respectively and those denominated in U.S. dollars as of December 31, 2009 amounted to Ps.83. During 2009, the Company's interest rate for short−term loans denominated in U.S. dollars fluctuated between 9.95% and 19.90% and in Mexican Pesos was 12.50%.

**20.   New accounting principles**

As part of its efforts to converge Mexican standards with international standards, during 2009, the Mexican Board for Research and Development of Financial Information Standards (CINIF) issued the following NIFs and Interpretations of Financial Reporting Standards (INIF), applicable to profitable entities, which became effective on January 1, 2010:

   NIF C−1, *Cash and cash equivalents*, requires restricted cash and cash equivalents to be included within the cash and cash equivalents caption, as opposed to Bulletin C−1, which required presentation under separate captions; NIF C−1 replaces the caption on−demand temporary investments with the caption on−demand available investments clarifying that this type of investment has a maturity of up to three months from its acquisition date. The impact of adopting this new standard in 2010 was a reclassification to cash and cash equivalents of Ps. 43 applied retrospectively to the 2009 combined balance sheet.

   Improvements to NIFs for 2010 — The main improvements generating accounting changes that must be recognized retroactively are:

   NIF B−1, *Accounting changes and correction of errors*, requires further disclosures in case the Company applies a particular Standard for the first time.

   NIF B−2, *Statement of cash flows*, requires recognition of the effects of fluctuations in exchange rates used for translating cash in foreign currencies, and changes in fair value of cash in the form of precious metal coins, and other cash items, at fair value, in a specific line item.

   NIF B−7, *Business acquisitions*, requires recognition of intangible assets or provisions because the acquired business has a contract whose terms and conditions are favorable or unfavorable with respect to market, only when the acquired business is the lessee in an operating lease. This accounting change should be recognized retroactively and not go further than January 1, 2009.

NIF C−7, *Investments in associated companies and other permanent investments*, modifies how the effects derived from increases in equity percentages in an associated company are determined. It also establishes that the effects due to an increase or decrease in equity percentages in associated companies should be recognized under equity in income (loss) of associated companies, rather than in the non−ordinary line item within the statement of income.

NIF C−13, *Related parties*, requires that, if the direct or ultimate controlling entity of the reporting entity does not issue financial statements available for public use, the reporting entity should disclose the name of the closest, direct / indirect, controlling entity that issues financial statements available for public use.

Other than as described above, the adoption of these new financial reporting standards was not material to the Company's consolidated and combined financial position, results of operations or cash flows.

21. **Subsequent events**

    a)  Debt

On January 4, 2010, Vitro received, from a group of its bondholders, a Notice of Acceleration of payment for the Senior Notes due 2012 and 2017. A minority group of at least twenty five percent of the bond holders may request the Notice of Acceleration, which is considered a standard operating procedure when an issuer is in default. As of the issuance date of these consolidated financial statements, the outstanding principal amount of these Notes is US$ 1,000 million.

In accordance with the Mexican Bankruptcy Law (Ley de Concurso Mercantil), if more than thirty five percent of a company's outstanding obligations are past due, the company itself, any creditor or the public ministry could request that the company declare bankruptcy.

On April 12, 2010, Vitro announced that it received a document on letterhead of the U.S. Bank National Association, which serves as trustee of the Senior Notes due 2013, entitled "Notice of Default and Acceleration" referenced to the 2013 Notes.

In August, 2010 the Company refinanced the credit lines in euros from its operations in Spain, Vitro Cristalglass, S.L., extending the term for three years from the agreement signature in amount of 44.8 million euros.

    b)  Derivative financial instruments

On April 12, 2010 the judge of the Supreme Court of the State of New York issued a ruling regarding the request for summary judgment made by Vitro's counterparties in financial derivatives transactions. The judge granted Vitro's counterparties' motions as to liability only and denied them as to the amounts sought by said counterparties, finding that the financial institutions had not provided sufficient and reasonable detail to verify the methods and accuracy of their calculations. The Court then referred the issue of damages to a Special Referee for further proceedings and recommendation to the Court, and held the motions for summary judgment in abeyance pending receipt of the report of the recommendations of the Special Referee.

On June 7, 2010, Vitro reached agreements to settle the amount related to DFIs. Vitro reached an agreement to settle the amount related to derivative financial instruments ("DFIs") with Calyon, London Branch ("Calyon"). In addition, on September 6, 2010 Vitro reached a settlement agreement with Fintech Investments Ltd. ("Fintech"), the firm that recently acquired the DFIs claims, previously owned by Credit Suisse International, Deutsche Bank AG, London Branch, Merrill Lynch Capital Services, Citibank, N.A., Barclays Bank, PLC and Cargill, Incorporated.

The amount of the settlement agreed with Calyon and Fintech is US$67.3 MM and US$190.0 MM, including interest for US$ 3.9 and US$ 13.6, respectively, recognized by Vitro.

As a result of these settlements, all of the lawsuits related with the DFIs have been dismissed.

During the last quarter of 2010, Vitro engaged in settlement negotiations with Fintech and acknowledged the debt outstanding under its DFI Claims, and issued Promissory Notes, which are guaranteed ("por aval") by Vitro and certain of its Mexican Subsidiaries.

F−133

c)    Status or the Restructuring process

As part of Vitro's debt restructuring discussions with creditors, it has presented a restructuring counterproposal (the "Counterproposal") to representatives of certain holders of Senior Notes, The Counterproposal for the restructuring includes the Senior Notes and other impaired debt.

While the proposal was not accepted, in order to reach a consensual restructuring agreement, Vitro launched on a consent solicitation statement.

Vitro believes that the proposal included in the Consent assures its sustainability and significantly enhance the worthiness of its restructured debt. Additionally, Vitro believes that the proposal represents a higher recovery than the average market price for the six months previous to the launching of the senior notes due 2012, 2013 and 2017.

Vitro and its subsidiaries are currently engaged in various legal proceedings, including (i) an involuntary Chapter 11 filing against its US Subsidiaries, for which a hearing to consider whether such orders for relief should be entered or the involuntary petitions should be dismissed was commenced on February 24, 2011 and was adjourned until March 31, 2011; (ii) two legal demands in the Supreme Court of the State of New York against Vitro and certain subsidiaries based on Vitro's default and non− payment of the Old Notes which on February 8, 2011, Justice Kornreich of the New York State Court entered an order on Invex's order to show cause vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables and at the direction of Justice Kornreich, the parties have also been negotiating the terms on which they will mediate their disputes; and (iii) a voluntary filing in Mexico for Vitro and an involuntary filing in Mexico against Vitro and some Mexican subsidiaries, including certain of the Affiliated Companies, of which none of them have been accepted.

Vitro continues to negotiate with the Ad Hoc Bondholder Committee in an effort to secure their support of the Consent in advance of its launch but there can be no assurances that such support will be achieved.

d) Natural disasters

***Earthquake in Mexicali temporarily affected the Company's facility***

In April 2010, the Company's flat glass facility in Mexicali and the inventories in that plant sustained damage as a result of an earthquake. The plant resumed normal operations in 7 days. The Company is working to recover the amount of the damages through the insurance companies. The Company estimates the damage to its inventories and fixed assets to be US$7.0 million. The Company recorded a receivable related to the insurance proceeds expected to be received net of applicable deductibles, which resulted in a net loss of US$0.9 million recorded in its 2010 consolidated and combined statement of operations.

***Temporary suspension of operations at manufacturing facilities in García, Nuevo León***

On July 1, 2010, the Company's manufacturing facilities in the Municipality of García in Nuevo León, Mexico were affected as a result of the severe flooding and damage caused by Hurricane Alex. Its float glass manufacturing and automotive processing facilities suffered significant damage and were forced to temporarily suspend operations. In particular:

- two of the Company's four automotive glass manufacturing facilities (both located in García) were affected by this event; however, because of current inventory levels and measures taken to restore production in the succeeding days, we were able to minimize the impact on its original equipment manufacturer ("OEM") clients and auto glass replacement clients;

- two of the Company's three float glass manufacturing facilities (both located in García) were also affected by this event; one of the affected facilities resumed normal operations initially in the last week of July 2010; however, its operations were temporarily suspended due to stability issues and it resumed full operations again in the last week of August 2010; the other affected facility resumed operations in September 2010; its float glass facility in Mexicali, which is currently operating at 100% capacity, temporarily supplied glass to its OEM glass processing plants.

The Company's insurance policy covers such events, minus applicable deductibles. As of December 31, 2010, the Company's insurance claims, net of applicable deductibles, were U$6 million for damaged inventories and U$12 million for damaged fixed assets. As a result of the insurance claims described above, the insurance company made an advance payment to the Company of U$18 million, which reduced the losses related to such losses in the Company's consolidated statements of operations.

As of December 31, 2010, the Company is currently evaluating the negative impact of business interruption resulting from Hurricane Alex. The Company is also evaluating all damages caused to its assets, most significantly to its float glass furnaces, which at some point during 2011 will likely have to be shut down in order to evaluate any internal damages and estimate time and costs of repairs.

The Company expects all aforementioned damages will be covered by insurance less any applicable deductibles; however, we can provide no assurance as to the amount and timing of such recovery. The Company's operations may be adversely affected by earthquakes, hurricanes or some other natural disaster that could have an effect on its service to clients.

22. **Authorization of financial statements issuance**

On February 24, 2011, the issuance of the consolidated and combined financial statements was authorized by:

|  |  |
|---|---|
| Lic. David González Morales | Ing. Jorge Mario Guzmán Guzmán |
| Chief Executive Officer | Chief Financial Officer |

\* \* \* \* \*

F−135

23. **Differences between MFRS and U.S generally accepted accounting principles.**

The Company's consolidated and combined financial statements are prepared in accordance with MFRS which differ in certain significant respects from accounting principles generally accepted in the United States of America (U.S. GAAP).

The United States Financial Accounting Standards Board ("FASB") released the FASB Accounting Standards Codification, or Codification for short, on January 15, 2008 and it became effective in 2009. At that time all previous U.S. GAAP reference sources became obsolete. The Codification organizes several U.S. GAAP pronouncements under approximately 90 accounting topic areas. The objective of this project was to arrive at a single source of authoritative U.S. accounting and reporting standards, other than guidance issued by the Securities and Exchange Commission of the United States of America ("SEC"). Included in Notes 23 and 24 are references to certain U.S. GAAP Codifications ("ASC") that were adopted in 2009 and certain ASC's that have yet to be adopted by the Company.

Prior to 2008, the MFRS consolidated financial statements include the effects of inflation as provided for under Bulletin B−10, "Recognition of the Effects of Inflation in Financial Information", whereas financial statements prepared under U.S. GAAP are presented on a historical cost basis. The application of Bulletin B−10 represented a comprehensive measure of the effects of price level changes in the inflationary Mexican economy and, as such, was considered a more meaningful presentation than historical cost−based financial reporting for both Mexican and U.S. accounting purposes.

Beginning on January 1, 2008 as disclosed in note 3 a), in accordance with new NIF B−10, "Effects of Inflation", the Company discontinued the recognition of inflation in its financial statements under MFRS as the cumulative inflation for the preceding three years was less than 26%. This resulted in the elimination of certain reconciling items between MFRS and U.S. GAAP in 2008 and 2009. Notwithstanding the prior comments, the following reconciliation to U.S. GAAP for the year ended December 31, 2007 does not include the reversal of the adjustments required under Bulletin B−10, as permitted by the rules and regulations of the Securities and Exchange Commission (the SEC).

F−136

The other differences between MFRS and U.S. GAAP and the effect on consolidated net loss and consolidated stockholders' equity are presented below:

| | | Year ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2007** | | **2008** | | **2009** |
| **Reconciliation of Net Income (loss)** | | | | | | |
| **Net income (loss) reported under MFRS** | Ps. | 96 | Ps. | (618) | Ps. | (1,624) |
| U.S. GAAP adjustments: | | | | | | |
| Deferred income taxes (see b) | | (37) | | 55 | | (1,488) |
| Income position result on deferred income taxes (see c) | | 17 | | — | | |
| Amortization of capitalized interest (see d) | | (4) | | (5) | | (4) |
| Goodwill (see e) | | — | | (43) | | |
| Effect of applying Bulletin B—10 (see f) | | (21) | | 18 | | |
| Effect of ASC 715 previously SFAS No. 158 (see h) | | | | | | (7) |
| Fair value of financial instruments (see g) | | — | | 17 | | (2) |
| Employee retirement obligations (see h) | | (7) | | 11 | | 16 |
| Purchase of Visteon's capital investment (see i) | | 5 | | 5 | | 9 |
| Impairment of long—lived assets (see k) | | (10) | | (45) | Ps. | 15 |
| Total U.S. GAAP adjustments | | (57) | | 13 | | (1,461) |
| **Net income (loss) under U.S. GAAP** | Ps. | 39 | Ps. | (605) | Ps. | (3,085) |

| | | Year ended December 31, | | |
|---|---|---|---|---|
| | | **2008** | | **2009** |
| **Reconciliation of stockholders equity (Deficit)** | | | | |
| **Total stockholders' equity reported under MFRS** | Ps. | 5,394 | Ps. | 6,444 |
| US GAAP adjustments: | | | | |
| Deferred income taxes (see b) | | (415) | | (1,973) |
| Capitalization of interest (see d) | | 42 | | 42 |
| Accumulated amortization of capitalized interest (see d) | | (27) | | (31) |
| Goodwill (see e) | | 81 | | 81 |
| Fair value financial instrument (see g) | | 17 | | 15 |
| Effect of ASC 715 (previously SFAS No. 158 (see h) | | (414) | | (535) |
| Employee retirement obligations (see h) | | (28) | | (12) |
| Purchase of Visteon's capital investment (see i) | | (61) | | (52) |
| Purchase of remaining 40% interest in Vitro Cristal glass (see j) | | 60 | | 60 |
| Impairment of long—lived assets (see k) | | 345 | | 361 |
| Total U.S. GAAP adjustments | | (400) | | (2,044) |
| **Total stockholders' equity under U.S. GAAP** | Ps. | 4,994 | Ps. | 4,400 |

a) **Noncontrolling interest**

In January 2009, the Company adopted ASC 810−10 "Consolidation" (previously SFAS No. 160, Noncontrolling Interests in Consolidated Financial Statements, an amendment of ARB No. 51) which establishes the accounting and reporting standards for the noncontrolling interest in a subsidiary and the deconsolidation of a subsidiary, and also amends certain consolidation guidance for consistency with revised standards regarding business combinations. The accounting provisions of ASC 810−10 (previously SFAS No. 160) must be applied prospectively starting at the beginning of the fiscal year in which the provisions are initially adopted, while the presentation and disclosure requirements must be applied retrospectively, to provide comparability in the financial statements. ASC 810−10 (previously SFAS No. 160) was effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. As a result of adopting this standard, the Company reclassified the noncontrolling interest to stockholders' equity in the year of adoption and in prior periods for purposes of comparability, which resulted in eliminating this difference in the reconciliation of between MFRS and U.S. GAAP of Ps. 4,041.

The effects of the U.S. GAAP differences as described in this note reflect the amounts assigned to the noncontrolling interest.

b) **Deferred income taxes**

Under MFRS as required by Bulletin D−4, "Accounting for Income Tax, Tax on Assets and Employee Statutory Profit Sharing," income taxes are charged to results as they are incurred and the Company recognizes deferred income tax assets and liabilities for the future consequences of temporary differences between the financial statement carrying amounts of assets and liabilities and their respective income tax bases, measured using enacted rates. The effects of changes in the statutory rates are accounted for in the period that includes the enactment date. Deferred income tax assets are also recognized for the estimated future effects of tax loss carryforwards and asset tax credit carryforwards. Deferred tax assets are recognized only when it is highly probable that sufficient future taxable income will be generated to recover such deferred tax assets.

Under U.S. GAAP, as required by ASC 740 "Income Taxes"(previously SFAS No. 109, "Accounting for Income Taxes"), the Company recognizes deferred income tax assets and liabilities for the future consequences of temporary differences between the financial statement carrying amounts of assets and liabilities and their respective income tax bases, measured using enacted rates. The effects of changes in the statutory rates are accounted for in the period that includes the enactment date. Deferred income tax assets are also recognized for the estimated future effects of tax loss carryforwards and asset tax credit carryforwards.

The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income, and tax planning strategies in making this assessment. Based upon the level of historical taxable income, projections of future taxable income over the periods in which the deferred tax assets are deductible and tax planning strategies that would be taken to prevent an operating loss or tax credit carryforward from expiring unused, management believes it is more likely than not that the Company will realize the benefits of these deductible differences, net of the existing valuation allowance at December 31, 2009.

For U.S. GAAP purposes the Company recognizes deferred taxes each period for the changes in the taxable portions of its distributable stockholders' equity. The Company's policy is to compare the deferred tax balance that would be required if all of the stockholders' equity were distributed. This amount is compared to the total deferred tax balance recorded prior to this adjustment. The difference between the amount recorded and the amount calculated from the stockholders' equity taxable accounts is recorded as an adjustment to deferred taxes as of the balance sheet date.

F−138

Through December 31, 2007, for U.S. GAAP purposes the Company recognized a deferred tax asset for the temporary difference that exists between the book basis and the tax basis of its foreign subsidiaries that legally own Vitro's intellectual property at the applicable tax rate in the foreign jurisdiction based on the expected reversal date. In January 2008, the intellectual property was sold to some of Vitro's Mexican subsidiaries and the impact of repatriating such asset to Mexico was reflected in the Company's U. S. GAAP reconciliation.

As of December 31, 2009, the Company had a net deferred tax asset of Ps.1,516 million for purposes of MFRS. The Company's management evaluated the relevant facts and circumstances regarding the recoverability of the deferred tax assets, which included financial projections approved by the Board of Directors as well as certain tax planning strategies. For purposes of U.S. GAAP the Company performed an analysis of its subsidiaries and for those entities with cumulative tax losses over the previous three years (2007−2009), a valuation allowance was recorded. As of December 31, 2009, the valuation allowance recorded at a consolidated level for U.S. GAAP purposed reflects the amount of the Company's deferred tax assets management expects to be able to utilize based on the factors described above.

U.S. GAAP differences to the extent taxable are reflected in the U.S. GAAP deferred tax balances.

.It is the Company's policy to classify interest and penalties related to income tax related matters within income tax expense and other expenses, respectively. The Company's significant operations are all located in Mexico, the United States of America and Spain. The tax laws in these jurisdictions permit the respective tax authorities to examine previously filed tax returns for the following years:

| Mexico | U.S. | Spain |
|--------|------|-------|
| 2005−2009 | 2005−2009 | 2006−2009 |

**c)** **Monetary position result on deferred income tax**

The monetary position result impacting deferred income tax (represents the only adjustments that affect monetary assets and liabilities) is determined by (i) applying the annual inflation factor to the net monetary position of the U.S. GAAP adjustments at the beginning of the period, plus (ii) the monetary position effect of such adjustments during the period, determined in accordance with the weighted average inflation factor.

As discussed in the introduction to this note as well as in note 3 a), beginning January 1, 2008 with the issuance of NIF B−10, the Company's MFRS financial statements no longer include inflationary effects, for which reason, this reconciling item is no longer applicable.

**d)** **Capitalization of interest**

Under MFRS beginning January 1, 2007, and thrush December 31, 2007, the Company adopted NIF D−6, "Capitalization of Comprehensive Financing Result", accordingly the capitalization of the comprehensive financing result (interest expense, foreign exchange results and monetary position result) generated by borrowings obtained to finance investment directly attributable to the acquisition of qualifying assets is mandatory. Prior to the adoption of NIF D−6, the Company did not capitalize the comprehensive financing result as it was optional.

In accordance with ASC 835−20 "Capitalization of interest"(previously SFAS No. 34, "Capitalization of Interest Cost"), if the comprehensive financing result is incurred during the construction of qualifying assets, capitalization is required as part of the cost of such assets. Accordingly, until December 31, 2006 a reconciling item for the capitalization of a portion of the comprehensive financing result was included in the U.S. GAAP reconciliation. The amortization expense and related accumulated amortization of such items generates a difference compared to MFRS.

Beginning on January 1, 2007, and through December 31, 2007 a reconciling item was generated related to foreign exchange results and the monetary position result, which are capitalized under MFRS and not for U.S. GAAP. In 2008, a reconciling item was generated for borrowings denominated in US dollars, related to the foreign exchange results, which is capitalized under MFRS and not for U.S. GAAP.

**e)**    **Goodwill**

As mentioned in note 3 k), under MFRS, until December 31, 2004 goodwill represented the excess of cost over book value of subsidiaries as of the date of acquisition and was restated using the NCPI and amortized using the straight−line method over 20 years. Beginning in January 1, 2005, goodwill represents the excess of cost over fair value of subsidiaries as of the date of acquisition. Through December 31, 2007, goodwill was restated using the NCPI.

In accordance with ASC 350 "Intangibles−Goodwill and Other" (previously SFAS No. 142, "Goodwill and Other Intangibles Assets"), beginning in 2002 goodwill and indefinite−lived assets are also no longer subject to amortization, but rather are subject at least once a year to impairment tests.

As of December 31, 2007, the difference between MFRS and U.S. GAAP as it relates to this item was due to the accumulated amortization of goodwill recorded under MFRS that had been reversed in the reconciliation of stockholders' equity for purposes of U.S. GAAP. In 2008, as disclosed below, the Company recognized a goodwill impairment charge under U.S. GAAP and as a result this difference was eliminated with a charge to the U.S. GAAP statement of operations.

In 2008, the Company recorded an impairment of goodwill in its U.S. reporting unit. The impairment recorded in accordance with MFRS was less than what was recorded in accordance with U.S. GAAP as such goodwill had previously been amortized as discussed in the first paragraph of this item. As a result, an adjustment to the reconciliation of net income (loss) has been included in order to properly reflect the impairment loss recorded for purposes of U.S. GAAP.

**f)**    **Effect of applying Bulletin B−10**

As discussed in note 3 g), through December 31, 2007 under MFRS Bulletin B−10 allows the restatement of the value of machinery and equipment purchased in a foreign country using the consumer price index of the country of origin and the period−end exchange rate. For U.S. GAAP purposes, such restatement is based on the NCPI.

As discussed in the introduction to this note as well as note 3 a), beginning January 1, 2008 with the issuance of NIF B−10, the Company's MFRS financial statements no longer include inflationary effects, for which reason, this reconciling item is no longer applicable. Further, even during inflationary periods, the alternate methodology described above has been eliminated by NIF B−10.

**g)**    **Derivative financial instruments**

The Company determined that the accounting for derivative financial instruments is the same for MFRS and U.S. GAAP as they relate to their consolidated financial statements as of and for the year ended December 31, 2007. Beginning January, 2008 the Company adopted the provisions of ASC 820 "Fair Value Measurements and disclosures" (previously SFAS No. 157), which impacted the fair value of its derivative financial instruments and is reflected as a difference in the accompanying reconciliation to US GAAP.

**h)** **Employee retirement obligations**

The Company maintains defined benefit pension plans for all of its subsidiaries and provides for seniority premiums and severance payments (severance indemnities) for all of its Mexican subsidiaries. For its MFRS consolidated and combined financial statements, the Company applies Bulletin D−3, "Labor Obligations". The Company and combined records the pension cost determined by actuarial computations, as described in notes 3 m) and 11. Significant assumptions (weighted−average rates) used in determining net periodic pension cost and the Company's related pension obligations for 2008 and 2009 are also described in note 11.

Severance indemnities — Under MFRS NIF D−3 requires the recognition of a severance indemnity liability calculated based on actuarial computations. Similar recognition criteria under U.S. GAAP are established in ASC 712 "Nonretirement Postemployment Benefits" (previously SFAS No. 112, "Employers' Accounting for Postemployment Benefits"), which requires that a liability for certain termination benefits provided under an ongoing benefit arrangement such as these statutorily mandated severance indemnities, be recognized when the likelihood of future settlement is probable and the liability can be reasonably estimated. MFRS allows for the Company to amortize the transition obligation related to the adoption of revised Bulletin D−3 over the expected service life of the employees. However, U.S. GAAP required the Company to recognize such effect upon initial adoption, which results in a difference in the amount recorded under the two accounting principles.

The Company adopted ASC 715 "Compensation−Retirement Benefits" (previously SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans, an amendment of ASC 715 "Compensation−Retirement Benefits" (previously FASB Statements No. 87, 88, 106 and 132(R)"), in its December 31, 2006 consolidated financial statements. This statement requires companies to (1) fully recognize, as an asset or liability, the over funded or under funded status of defined pension and other postretirement benefit plans; (2) recognize changes in the funded status through other comprehensive income in the year in which the changes occur; and (3) provide enhanced disclosures.

The Company has prepared a study of pension costs under U.S. GAAP based on actuarial calculations using the same assumptions applied under MFRS (see note 3 m). Prior to the adoption of ASC 715 "Compensation−Retirement Benefits" (previously SFAS No. 158, "Employers' Accounting for Defined Benefit Pension and Other Postretirement Plans"), there was no difference in the liabilities for pension plans and seniority premiums between MFRS and U.S. GAAP.

As discussed in note 3 a), NIF D−3, "Employee Benefits", became effective January 1, 2008. NIF D−3 eliminates the recognition of the additional liability because its determination does not incorporate a salary increase, incorporates the career salary concept, and the amortization period of most unrecognized items (those not related to retirement benefits) is reduced to five years, with the option to fully amortize them against current earnings of 2008 under other income and expense. The Company chose to amortize such items over a period of five years. Additionally, the beginning balance of actuarial gains and losses from termination benefits was recorded against results of 2008 for purposes of MFRS, in other income and expense. For U.S. GAAP purposes unamortized items are recognized over the estimated service period of the Company's employees.

**i)** **Purchase of Visteon's capital investment**

In connection with the termination of the joint venture agreement between Viméxico and Visteon, under MFRS as established in Bulletin B−7 "Business Acquisitions", the Company recognized the difference between the price paid and the book value of Ps. 70 as a credit in the controlling stockholders' equity. Under U.S. GAAP, in accordance with ASC 805 "Business Combinations" (previously SFAS No. 141, "Business Combinations"), the excess of fair value over cost of Ps. 90 was allocated as a pro rata reduction of the acquired assets.

**j)** **Purchase of remaining 40% interest in Vitro Cristalglass**

In connection with Vimexico's purchase of the additional 40% interest in Vitro Cristalglass discussed in note 18 c ), under Mexican standard NIF Bulletin B−7, "Business Acquisitions", this is considered to be a transaction between shareholders that does not impact the net assets of the Company, and the payment in excess of the book value of the shares acquired is recorded in stockholders' equity as a reduction of additional paid−in capital. Under U.S. GAAP, ASC 805 "Business Combinations" (previously SFAS No. 141, "Business Combinations"), purchases of noncontrolling interest represent a "step acquisition" that must be accounted for under the purchase method, whereby the purchase price is allocated to the proportionate fair value of assets and liabilities acquired. The difference between the fair value and the price paid for the 40% of Vitro Cristalglass equity is presented as part of investment in Vitro Cristalglass shares in the consolidated balance sheet under U.S. GAAP. The Company recognized Ps. 60 goodwill as part of the preliminary purchase price allocation.

**k)** **Impairment of long−lived assets**

For U.S. GAAP purposes, in accordance with ASC 360−10−05 "Impairment or disposal of long−lived assets" (previously SFAS No. 144 "Impairment of long−lived assets"), long−lived assets are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The carrying amount of an asset is not recoverable when the estimated future undiscounted cash flows expected to result from the use of the asset are less than the carrying value of the asset. Impairment is recorded when the carrying amount of the asset exceeds its fair value. Impairment charges and asset write−downs are presented in selling, general and administrative expenses in operating income in our U.S. GAAP consolidated financial statements.

For MFRS purposes, in accordance with Bulletin C−15, the Company reviews the carrying amounts of long−lived assets in use when an impairment indicator suggests that such amounts might not be recoverable, considering the greater of the present value of future net cash flows or the net sales price upon disposal. Impairment is recorded when the carrying amount of the asset exceeds the greater of the amounts mentioned above. Impairment charges and asset write−downs are presented in other expenses in our MFRS consolidated financial statements.

In 2005, 2006 and 2009, for MFRS purposes, while performing its annual impairment test using its best estimates based on reasonable and supportable assumptions and projections, the Company recorded an impairment charge of Ps. 111, Ps. 334 and Ps. 60, respectively within its Flat Glass reportable segment as the carrying amount of the long−lived assets exceeded the present value of their future discounted cash flows. For U.S. GAAP purposes no impairment charge was recorded as the assets were considered to be recoverable given that the estimated undiscounted cash flows expected to result from the use of the assets were greater than the carrying value of the asset.

In 2005 for U.S. GAAP purposes, based on fair value appraisals received the Company recorded an impairment charge of Ps. 45 for land and buildings located at its corporate offices classified as available for sale in accordance with SFAS No. 144. This charge is recorded in operating income for U.S. GAAP purposes. Under MFRS, the assets did not meet the definition of held for sale as required by Bulletin C−15 as such assets were still in use by the Company at the time. The discounted cash flow model utilized by the Company did not result in an impairment charge for MFRS purposes. Additionally during 2006, the Company sold one of its buildings located at its corporate headquarters recognizing a loss on sale of Ps. 138 under MFRS and Ps. 93 under U.S. GAAP.

As a result of the transactions described above, differences result between MFRS and U.S. GAAP due to the depreciation expense on fixed assets being recorded each year.

Impairment charges are recorded in operating income for U.S. GAAP purposes and in other income and expenses under MFRS.

**l)** **Securitization of trade receivables**

Under MFRS beginning January 1, 2008 the Company adopted NIF B−8, (Note 3 a), which establishes that special purpose entities, over which control is exercised, should be consolidated. The guidance in NIF B−8 differs from the current requirements of US GAAP, that qualifying special purposes entities ("QSPEs") not be consolidated if they meet certain specific requirements.

As a result of adopting NIF B−8, the special purposes entities that hold accounts receivable related to the Company's securitization transactions are now included within the consolidated financial statements (see note 9) for purposes of MFRS. For US GAAP purposes as they meet the definition of QSPEs they are not consolidated, which is consistent with the presentation of prior years. The disclosures related to such transactions are as follows:

• Securitization of Viméxico trade receivables.− On August 22, 2005, Viméxico, closed a private issuance of promissory notes in the United States for US$21.5 million, at an interest rate of 6.5%. Viméxico entered into an agreement to sell all of its trade accounts receivable, on a revolving basis, to a trust (the Trust, a qualifying special purpose entity) that was formed prior to the execution of this agreement for the sole purpose of buying and selling accounts receivable and is designed to be bankruptcy remote. The interest payments and eventual principal reimbursement will be provided from the collection of the receivables originated by four subsidiaries of Viméxico and sold to the Trust, which are: Distribuidora Nacional de Vidrio, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitro Automotriz, S.A. de C.V. and Vitro Vidrio y Cristal, S.A. de C.V. At December 31, 2008 and 2009, the gross receivables sold to the Trust totaled Ps. 577 and Ps. 531, respectively, and are reflected as a reduction of trade accounts receivable. The estimated fair value of the retained undivided interests in securitized receivables at December 31, 2008 and 2009 was Ps. 261 and Ps. 231, respectively. The Company has completed a sensitivity analysis on the estimated fair value of the retained undivided interests with the objective of measuring the change in value associated with changes in individual key variables. A 10% increase in expected credit losses and allowance, to 0.66%, would decrease the year−end valuation by approximately Ps. 14, and 20% increase in expected credit losses and allowances, to 3.94%, would decrease the year−end valuation by approximately Ps. 27. Similarly, 10% or 20% adverse fluctuations in either average receivable collection times or expected short−term commercial paper rates would not significantly affect the recorded fair value of the retained undivided interests. This sensitivity analysis is hypothetical and should be used with caution.

Proceeds received by the Company from the revolving securitizations aggregated to Ps. 2,592 and US$152 million, and Ps. 2,089 and US$122 million for the years ended December 31, 2008 and 2009, respectively, and are included in cash flows from operating activities. Delinquencies on securitized receivables, representing amounts over 60 days past due, totaled Ps. 67 and US$3 million, and Ps. 25 and US$0.566 million at December 31, 2008 and 2009, respectively. Viméxico continues to service the securitized receivables, receiving compensation approximately equal to its cost of such servicing plus a reasonable profit margin; accordingly, no servicing assets or liabilities are recorded. For the years ended December 31, 2008 and 2009, the Company received servicing fees totaling Ps. 12 and Ps. 11, respectively.

Vitro America, Inc. ("Vitro America").— Effective January 30, 2009, the Company's accounts receivable securitization agreement was terminated. At termination, the gross receivables sold totaled US$72.4 million with estimated delinquencies of US$13.6 million, representing amounts over 60 days past due. The estimated fair value of the retained undivided interests in those securitized receivables was US$33.4 million, at January 30, 2009. As a result of the termination, approximately US$26.6 million, of trade receivables and related debt obligations reverted to the Company. In February 2009, US$15 million of the debt obligations were repaid with capital contributions from American Asset Holding Corp. ("AAH"). The remaining US$11.6 million was financed through an amendment of the Company's existing asset based Bank Loan Agreement.

Prior to the agreement termination, Vitro America sold all of its accounts receivable, on a revolving basis, to VVP Funding a wholly owned subsidiary of Vitro America. VVP Funding, a special purpose entity, was formed prior to the execution of the agreement for the sole purpose of buying and selling accounts receivable and was designed to be bankruptcy remote. Also, Vitro America and VVP Funding entered into an agreement with an unrelated financial institution whereby VVP Funding, on a revolving basis and subject to the maintenance of certain financial and receivables—based ratios, sold an undivided percentage ownership in all eligible accounts receivable, as defined, for consideration composed of cash and Vitro America retained an interests in securitized receivables. The maximum selling amount during the years ended December 31, 2009 and 2008 was US$50 million. The agreement expired annually each April, subject to annual renewal approval by the financial institution. The transfer of undivided ownership interest from VVP Funding to the unrelated major financial institution for cash consideration was accounted for as a sale of receivables in accordance with US GAAP.

The gross receivables sold totaled US$74 million at December 31, 2008, and are reflected as a reduction of trade accounts receivable. The estimated fair value of the retained undivided interests in securitized receivables at December 31, 2008 totaled US$33.6 million, and was determined based on expected credit losses and allowance of 3%, expected average receivable collection time of 52 days, and expected short—term commercial paper rates of 2.3% per annum.

Proceeds received by the Company from the revolving securitizations aggregated to US$463 and US$32.5 million for the years ended December 31, 2008 and 2009, respectively, and are included in cash flows from operating activities in the accompanying consolidated statements of cash flows. Securitization fees totaled US$2.1 and US$0.2 million for the years ended December 31, 2008 and 2009, respectively, and are included in general and administrative expenses in the accompanying amounts over 60 days past due, totaled US$15 million at December 31, 2008, with credit losses totaling US$2.6 million for the year ended December 31, 2008. VVP continues to service the securitized receivables under the agreement, receiving compensation that is approximately equal to its cost of such servicing plus a reasonable profit margin; accordingly, no servicing assets or liabilities were recorded. For the years ended December 31, 2008 and 2009, the Company received servicing fees totaling $0.6 and $0.1 million, respectively.

**m)  Reclassifications**

Gain or loss on sale of assets — The gain or loss on sale of assets that do not meet the definition of a component of a business as described in SFAS No. 144 are included in operating income in the Company's U.S. GAAP consolidated financial statements. Gains or losses on sales of assets not presented as discontinued operations under MFRS are included in other expenses in the Company's consolidated MFRS financial statements (see note 15).

Classification of workers' profit sharing — Under MFRS, statutory employee profit sharing is presented under other income and expenses. In the Company's U.S. GAAP statements of operations, workers' profit sharing expense is classified as an operating expense.

Restructuring charges — During 2008 and 2009, the Company restructured certain operating units and its corporate and administrative functions. For MFRS purposes the corresponding costs met the definition of a restructuring charge and were included in other expenses in the Company's consolidated financial statements, but for U.S. GAAP purposes the Company applied ASC 712 previously (SFAS No. 112), "Employers' Accounting for Postemployment Benefits". These costs are included in general and administrative expenses in the accompanying U.S. GAAP consolidated statements of operations.

Refinancing – In August, 2010 the Company refinanced the 44.8 million Euro credit line for Vitro Cristalglass, S.L., extending the term for three years from the agreement date. As a result, the Company reclassified from short term to long term debt an amount of 9.4 million Euros.

n) **Supplemental U.S. GAAP Cash Flow Information**

The following table summarizes the cash flow items as required under SFAS No. 95, "Statement of Cash Flows", provided by (used in) operating, financing and investing activities for the years ended December 31, 2006, 2007 and 2008, giving effect to the U.S. GAAP adjustments, excluding the effects of inflation required by Bulletin B−10 and Bulletin B−15 for periods through December 31, 2007. The following information is presented, in millions of pesos, on a historical peso basis and it is not presented in pesos of constant purchasing power:

|  | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2007** | | **2008** | | **2009** | |
| Net cash provided by (used in) operating activities | Ps. | 549 | Ps. | 186 | Ps. | 497 |
| Net cash provided by (used in) financing activities |  | (7) |  | 909 |  | 1,663 |
| Net cash (used in) provided by investing activities |  | (505) |  | (977) |  | (1,862) |

Net cash flow from operating activities reflects cash payments for interest and income taxes as follows:

|  | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2007** | | **2008** | | **2009** | |
| Interest paid | Ps. | 373 | Ps. | 645 | Ps. | 741 |
| Income taxes paid |  | 204 |  | 10 |  | 29 |

F−145

o) **Recently Issued Accounting Standards**

The following accounting standards have been issued under U.S. GAAP, the application of which is required as indicated below.

In January 2009, the Company adopted FASB ASC 810−10 (previously SFAS No. 160) which establishes the accounting and reporting standards for the noncontrolling interest in a subsidiary and the deconsolidation of a subsidiary, and also amends certain consolidation guidance for consistency with revised standards regarding business combinations. The accounting provisions of FASB ASC 810−10 (SFAS No. 160) must be applied prospectively as of the beginning of the fiscal year in which the provisions are initially adopted, while the presentation and disclosure requirements must be applied retrospectively, to provide comparability in the financial statements. FASB ASC 810−10 (SFAS No. 160) was effective for fiscal years, and interim periods within those fiscal years, beginning on or after December 15, 2008. As a result of adopting this standard, the Company reclassified the noncontrolling interest to stockholders' equity in the year of adoption and in prior periods for purposes of comparability (see Note 23a).

In January 2009, the Company adopted FASB ASC 805−10 (SFAS No. 141(R)), which, among other changes, requires an acquirer in a business combination to (a) recognize assets acquired, liabilities assumed, and any noncontrolling interest in the acquiree at fair value as of the acquisition date, and (b) expense all acquisition−related costs. FASB ASC 805−10 (SFAS No. 141(R)), also amends FASB ASC 740−10 (SFAS No. 109) to require that any reductions to an acquired entity's valuation allowances on deferred taxes and acquired tax contingencies that occur after the measurement period be recorded as a component of income tax expense. FASB ASC 805−10 (SFAS No. 141(R)) must be applied prospectively to all business combinations for which the acquisition date occurs during fiscal years beginning on or after December 15, 2008, with the exception to the amendments to ASC 740−10 (SFAS No. 109), which will also be applied to business combinations with acquisition dates prior to the effective date of this standard. The adoption of this guidance did not have an impact on the Company's consolidated financial statements and related disclosures and any future impact will be dependent on any future acquisitions.

In July 2009, the Company adopted FASB ASC 855−10 (SFAS 165, Subsequent Events). FASB ASC 855−10 (SFAS 165) establishes accounting and reporting standards for events that occur after the balance sheet date but before financial statements are issued or are available to be issued. In addition, FASB ASC 855−10 (SFAS 165) requires the disclosure of the date through which an entity has evaluated subsequent events and the basis for selecting that date, that is, whether that date represents the date the financial statements were issued or were available to be issued. FASB ASC 855−10 (SFAS 165) was effective for fiscal years and interim periods ending after June 15, 2009.

- The Company has evaluated events subsequent to December 31, 2009 to assess the need for potential recognition or disclosure in the accompanying consolidated and combined financial statements. Such events were evaluated through February 24, 2011, the date these consolidated and combined financial statements were available to be issued and included the transactions disclosed in Note 21:

On June 12, 2009, the FASB issued ASC 860−10 (SFAS No. 166, Accounting for Transfer of Financial Assets — an amendment of FASB Statement No. 140), which eliminates the concept of a qualifying special purpose entity ("QSPE") and modifies the derecognition provisions of a previously issued accounting standard. FASB ASC 860−10 (SFAS No. 166) also required additional disclosures which focus on the transferor's continuing involvement with the transferred assets and the related risks retained. FASB ASC 860−10 (SFAS No. 166) is effective for financial asset transfers occurring after the beginning of an entity's first fiscal year that begins after November 15, 2009. Early adoption is prohibited. The Company expects the adoption of this standard to impact its consolidated financial statements as it relates to its securitization transactions due to the elimination of the concept of a qualifying special purposes entity.

On June 12, 2009, the FASB issued ASC 810−10 (SFAS No. 167, Amendments to FASB Interpretation No. 46 (R)), which amends the consolidation guidance that applies to variable interest entities. The new guidance requires an entity to carefully reconsider its previous consolidation conclusions, including (1) whether an entity is a variable interest entity (VIE), (2) whether the enterprise is the VIE's primary beneficiary, and (3) what type of financial statement disclosures are required. FASB ASC 810−10 (SFAS No. 167) is effective as of the beginning of the first fiscal year that begins after November 15, 2009. The amendments to the consolidation guidance affect all entities and enterprises currently within the scope of FASB ASC 810−10 (SFAS No. 167), as well as qualifying special−purpose entities that are currently outside the scope of FASB ASC 810−10 (FIN 46(R)). Early adoption is prohibited. The Company expects the adoption of this standard to impact its consolidated financial statements as it relates to its securitization transactions.

In October 2009, the FASB issued Accounting Standards Update (ASU) 2009−13, which contains new guidance on accounting for revenue arrangements with multiple deliverables. When vendor specific objective evidence or third party evidence for deliverables in an arrangement cannot be determined, a best estimate of the selling price is required to separate deliverables and allocate arrangement consideration using the relative selling price method. The new guidance includes new disclosure requirements on how the application of the relative selling price method affects the timing and amount of revenue recognition. The guidance in the ASU will be effective prospectively for revenue arrangements entered into or materially modified in fiscal years beginning after June 15, 2010. Early adoption is permitted. The adoption of this standard is not expected to impact the Company's consolidated financial position, results of operations or cash flows.

**23. Guarantor and non−guarantor financial information**

As disclosed in note 12 d ) and 21 a), Vitro issued US$700 million of senior guaranteed notes due February 1, 2017 callable after year 2012 at a coupon of a 9.125% and US$300 million of senior unsecured notes due February 1, 2012 not callable for the notes' life at a coupon of 8.65% (together the Notes) principally to refinance existing third−party debt at the Vitro holding company level, substantially all of the third−party debt at its subsidiary VENA and certain third−party debt at its less than 100%−owned subsidiary Viméxico.

The obligations of Vitro pursuant to each series of the Notes, including any repurchase obligation resulting from a change of control, are unconditionally guaranteed, jointly and severally, on an unsecured basis, by VENA and its wholly−owned subsidiaries and Viméxico and its wholly−owned subsidiaries.

The following of Viméxico's subsidiaries are designated as guarantors as of December 31, 2009: Viméxico, Vitro Automotriz, S.A. de C.V., Vitro Flex, S.A. de C.V, Vitro Vidrio y Cristal, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V., Vitrocar, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., VAU, S.A. de C.V., VVP Holdings Corp., VVP Autoglass, Inc., Vitro America, Inc., Super Sky Products, Inc., Super Sky International, Inc., VVP Finance Corp., Super Sky Constructors, Inc., Vitro Colombia, S.A., VVP Europa Holdings, B.V., Vidrio y Cristal del Noroeste, S.A de C.V., Vidrio Plano, S.A. de C.V., Distribuidora de Vidrio y Cristal, S.A. de C.V., and Vidrio Plano de Mexicali, S.A. de C.V.Certain of Vimexico's prior subsidiaries, including VVP Holdings Corp. and its five subsidiaries, Vitrocar, S.A. de C.V., Vitro Vidrio y Cristal, S.A. de C.V. and Vitrio Automotriz, S.A. de C.V. were sold from Vimexico to Vitro during 2009 and are now subsidiary guarantors of Vitro. These sales are reflected in the columnar presentation described below.

The following condensed combining financial information includes separate columnar information for:
• Viméxico (the holding company),
• Viméxico's combined 100%−owned guarantors, representing the 15 subsidiary guarantors that remain 100%−owned by Viméxico,
• Vimexico's 100%−owned guarantors which were sold to Vitro during 2009, representing (a) VVP Holdings and its five subsidiaries, 100%−owned subsidiary guarantors which were sold from Viméxico to Vitro in January 2009 and (b) Vitrocar, a 100%−owned subsidiary guarantor which was sold from Viméxico to Vitro in December 2009,
• Vitro Vidrio y Cristal, a 100%−owned subsidiary of Viméxico which was sold from Vimexico to Vitro in December 2009,
• Vitro Automotriz, a 100%−owned subsidiary of Viméxico which was sold from Vimexico to Vitro in December 2009, and
• Viméxico's combined non−guarantors.

Investments in subsidiaries are accounted for by Viméxico under the equity method for purpose of the supplemental consolidating information. The principal elimination entries eliminate the Viméxico's investment in subsidiaries and intercompany balances and transactions.

a) **Supplemental condensed consolidating balance sheets presented in accordance with MFRS**

| As of December 31, 2008 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash, trade receivables and other current assets | Ps. | 2,376 | Ps. | 4,108 | Ps. | 4,743 | Ps. | (7,044) | Ps. | 4,183 |
| Inventories, net | | — | | 1,702 | | 481 | | 16 | | 2,199 |
| Current assets | | 2,376 | | 5,810 | | 5,224 | | (7,028) | | 6,382 |
| Property plant and equipment, net | | — | | 4,983 | | 830 | | — | | 5,813 |
| Deferred taxes | | 18 | | 1,244 | | 53 | | 3 | | 1,318 |
| Other assets | | 821 | | 1,221 | | 852 | | (1,450) | | 1,444 |
| Long−term assets | | 839 | | 7,448 | | 1,735 | | (1,447) | | 8,575 |
| Total assets | Ps. | 3,215 | Ps. | 13,258 | Ps. | 6,959 | Ps. | (8,475) | Ps. | 14,957 |
| Short−term borrowings, current maturities of long−term debt and derivative financial instruments | Ps. | 45 | Ps. | 3,146 | Ps. | 840 | Ps. | (269) | Ps. | 3,762 |
| Current liabilities | | 960 | | 7,171 | | | | (5,342) | | 2,789 |
| Accrued expenses and other current liabilities | | 833 | | 1,922 | | 410 | | (1,254) | | 1,911 |
| Current liabilities | | 1,838 | | 12,239 | | 1,250 | | (6,865) | | 8,462 |
| Long−term liabilities | | — | | 1,240 | | 472 | | (611) | | 1,101 |
| Total liabilities | | 1,838 | | 13,479 | | 1,722 | | (7,476) | | 9,563 |
| Total controlling interest | | 1,377 | | (221) | | 5,237 | | (5,016) | | 1,377 |
| Noncontrolling interest in consolidated subsidiaries | | — | | — | | — | | 4,017 | | 4,017 |
| Total stockholders' equity | | 1,377 | | (221) | | 5,237 | | (999) | | 5,394 |
| Total liabilities and stockholders' equity | Ps. | 3,215 | Ps. | 13,258 | Ps. | 6,959 | Ps. | (8,475) | Ps. | 14,957 |

F−149

| As of December 31, 2009 | Viméxico | Combined Wholly−Owned Guarantors | Wholly−Owned Guarantors Sold to Vitro | Vitro Vidrio y Cristal | Vitro Automotriz | Combined Non−Guarantors | Adjustments and Eliminations | Viméxico Combined |
|---|---|---|---|---|---|---|---|---|
| Cash, trade receivables and other current assets | Ps. 3,577 | Ps. 3,826 | Ps. 768 | Ps. 4,168 | 1,738 | Ps. 4,793 | Ps. (12,750) | Ps. 6,120 |
| Inventories, net | | 232 | 306 | 390 | 294 | 329 | (4) | 1,547 |
| Current assets | 3,577 | 4,058 | 1,074 | 4,558 | 2,032 | 5,122 | (12,754) | 7,667 |
| Property plant and equipment, net | | 3,325 | 377 | 14 | 606 | 730 | 178 | 5,230 |
| Deferred taxes | 1 | 7 | 90 | 830 | 499 | 195 | (106) | 1,516 |
| Other assets | 2,021 | 604 | 161 | 215 | 174 | 806 | (2,666) | 1,315 |
| Long−term assets | 2,022 | 3,936 | 628 | 1,059 | 1,279 | 1,731 | (2,594) | 8,061 |
| Total assets | Ps. 5,599 | Ps. 7,994 | Ps. 1,702 | Ps. 5,617 | Ps. 3,311 | Ps. 6,853 | Ps. (15,348) | Ps. 15,728 |
| Short−term borrowings, current maturities of long−term debt and derivative financial instruments | Ps. | Ps. 132 | Ps. 173 | Ps. 804 | Ps. 269 | Ps. 517 | Ps. 24 | Ps. 1,919 |
| Current liabilities Accrued expenses and other current liabilities | 5,972 | 5,574 | 955 | 3,167 | 2,266 | 919 | (12,282) | 6,571 |
| Current liabilities | 5,972 | 5,706 | 1,128 | 3,971 | 2,535 | 1,436 | (12,258) | 8,490 |
| Long−term liabilities | | 352 | 295 | 115 | 181 | 907 | (1,056) | 794 |
| Total liabilities | 5,972 | 6,058 | 1,423 | 4,086 | 2,716 | 2,343 | (13,314) | 9.284 |
| Total controlling interest | (373) | 1,936 | 279 | 1,531 | 595 | 4,510 | (6,075) | 2,403 |
| Noncontrolling interest in consolidated subsidiaries | | | | | | | 4,041 | 4,041 |
| Total stockholders' equity | (373) | 1,936 | 279 | 1,531 | 595 | 4,510 | (2,034) | 6,444 |
| Total liabilities' and stockholders' equity | Ps. 5,599 | Ps. 7,994 | Ps. 1,702 | Ps. 5,617 | Ps. 3,311 | Ps. 6,853 | Ps. (15,348) | Ps. 15,728 |

b)    Supplemental condensed consolidating statements of operations presented in accordance with MFRS

| For the year ended December 31, 2007 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | 164 | Ps. | 11,123 | Ps. | 2,962 | Ps. | (644) | Ps. | 13,605 |
| Cost of sales | | — | | 7,957 | | 1,946 | | (325) | | 9,578 |
| Selling, general and administrative expenses | | 6 | | 2,724 | | 545 | | (30) | | 3,245 |
| Total financing cost | | 187 | | 431 | | 91 | | (266) | | 443 |
| Other (income) expenses, net | | 1 | | 74 | | 17 | | (1) | | 91 |
| Income and asset tax expense (benefit) | | 56 | | 23 | | 73 | | — | | 152 |
| Net (loss) income for the year | Ps. | (86) | Ps. | (86) | Ps. | 290 | Ps. | (22) | Ps. | 96 |

| For the year ended December 31, 2008 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | (574) | Ps. | 10,933 | Ps. | 2,451 | Ps. | 420 | Ps. | 13,230 |
| Cost of sales | | — | | 7,983 | | 1,833 | | (113) | | 9,703 |
| Selling, general and administrative expenses | | 9 | | 2,883 | | 492 | | (43) | | 3,341 |
| Total financing cost | | 221 | | 2,463 | | (141) | | (1,145) | | 1,398 |
| Other expenses (income), net | | — | | 67 | | (700) | | 774 | | 141 |
| Income tax expense (benefit) | | 20 | | (752) | | (4) | | 1 | | (735) |
| Net (loss) income for the year | Ps. | (824) | Ps. | (1,711) | Ps. | 971 | Ps. | 946 | Ps. | (618) |

| For the year ended December 31, 2009 | Viméxico | | Combined Wholly−Owned Guarantors | | Wholly−Owned Guarantors Sold to Vitro | | Vitro Vidrio y Cristal | | Vitro Automotriz | | Combined Non− Guarantors | | Adjustments and Eliminations | | Viméxico Combined |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales and equity in earnings of subsidiaries | Ps. | (933) | Ps. | 3,082 | Ps. | 4,912 | Ps. | 2,500 | Ps. | 2,242 | Ps. | 1,894 | Ps. | (2,244) | Ps. 11,453 |
| Cost of sales | | | | 2,464 | | 3,468 | | 2,174 | | 2,063 | | 1,613 | | (2,943) | 8,839 |
| Selling, general and administrative expenses | | 22 | | 428 | | 1,795 | | 426 | | 294 | | 465 | | (225) | 3,205 |
| Total financing cost | | (33) | | 326 | | 83 | | 461 | | (84) | | (148) | | 177 | 782 |
| Other expenses (income), net | | | | 150 | | 133 | | 40 | | 46 | | 60 | | (7) | 422 |
| Income tax expense (benefit) | | 16 | | (59) | | 134 | | (153) | | (24) | | (86) | | 1 | (171) |
| Net (loss) income for the year | Ps. | (938) | Ps. | (227) | Ps. | (701) | Ps. | (448) | Ps. | (53) | Ps. | (10) | Ps. | 753 | Ps. (1,624) |

c) **Supplemental condensed consolidating statement of changes in financial position presented in accordance with MFRS**

| For the year ended December 31, 2007 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments And Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Operating Activities: | | | | | | | | | | |
| Net (loss) income | Ps. | (86) | Ps. | (86) | Ps. | 290 | Ps. | (22) | Ps. | 96 |
| Depreciation and amortization | | 2 | | 374 | | 104 | | — | | 480 |
| Provision for employee retirement obligations | | — | | 45 | | 12 | | — | | 57 |
| Amortization of debt issuance costs | | — | | 4 | | — | | — | | 4 |
| Impairment of long−lived assets | | — | | — | | 91 | | — | | 91 |
| Loss (gain) from sale of long−lived assets | | — | | (55) | | — | | — | | (55) |
| Derivative financial instruments | | — | | 27 | | 9 | | (7) | | 29 |
| Deferred taxes | | 21 | | (122) | | (3) | | — | | (104) |
| Other non−cash activities | | 102 | | (106) | | — | | 24 | | 20 |
| (increase) decrease in trade receivables | | 2 | | (132) | | (188) | | 155 | | (163) |
| Decrease in inventories | | — | | 138 | | (157) | | — | | (19) |
| (Decrease) increase in trade payables | | — | | 96 | | 186 | | (59) | | 223 |
| Change in other current assets and liabilities | | 12 | | 235 | | (62) | | (80) | | 105 |
| Employee retirement obligations | | — | | (100) | | (1) | | — | | (101) |
| Net resources generated by operating activities | | 53 | | 318 | | 281 | | 11 | | 663 |
| Financing Activities: | | | | | | | | | | |
| Bank loans, net | | — | | (344) | | (12) | | — | | (356) |
| Debt issuance cost | | — | | (7) | | (2) | | — | | (9) |
| Dividends paid to noncontrolling interest | | — | | — | | (67) | | 16 | | (51) |
| Other financing activities | | (1,265) | | 403 | | (54) | | 1,177 | | 261 |
| Net resources (used in) generated by financing activities | | (1,265) | | 52 | | (135) | | 1,193 | | (155) |
| Investing Activities: | | | | | | | | | | |
| Investments in land, buildings, machinery and equipment | | — | | (216) | | (108) | | — | | (324) |
| Proceeds from sale of land, machinery and equipment | | — | | 131 | | — | | — | | 131 |
| Restricted cash | | — | | 55 | | (9) | | — | | 46 |
| Investment in subsidiaries | | (67) | | (114) | | — | | — | | (181) |
| Deferred charges | | — | | (175) | | (31) | | — | | (206) |
| Other investing activities | | 1,279 | | (37) | | 11 | | (1,204) | | 49 |
| Net resources generated by (used in) investing activities | | 1,212 | | (356) | | (137) | | (1,204) | | (485) |
| Net increase (decrease) in cash and cash equivalents | | — | | 24 | | (1) | | — | | 23 |
| Balance at beginning of year | | — | | 123 | | 47 | | — | | 170 |
| Balance at end of year | Ps. | — | Ps. | 147 | Ps. | 46 | Ps. | — | Ps. | 193 |

d)    Supplemental condensed consolidating statements of cash flows presented in accordance with MFRS

| For the year ended December 31, 2008 | Viméxico | Combined Wholly-Owned Guarantors | Combined Non-Guarantors | Adjustments and Eliminations | Viméxico Consolidated |
|---|---|---|---|---|---|
| OPERATING ACTIVITIES: | | | | | |
| Loss (income) before income taxes | Ps.    (804) | (2,462) | Ps.    967 | Ps.    946 | Ps.    (1,353) |
| Items related to investing and financing activities: | | | | | |
| Depreciation and amortization | 2 | 418 | 68 | — | 488 |
| Gain from sale of long-lived assets | — | 102 | — | (194) | (92) |
| Impairment of long-lived assets | — | — | — | 196 | 196 |
| Interest income | (1) | (63) | (124) | 138 | (50) |
| Derivative financial instruments | — | 617 | 1 | (1) | 617 |
| Foreign exchange loss | 77 | 1004 | (616) | (234) | 231 |
| Interest expense | 145 | 842 | 75 | (402) | 660 |
| Trade receivables | — | 86 | 190 | (107) | 169 |
| Inventories | — | (28) | 72 | — | 44 |
| Trade payables | — | (116) | (219) | (37) | (372) |
| Other current assets and liabilities | 867 | 47 | (137) | (544) | 233 |
| Net cash provided by operating activities | 286 | 447 | 277 | (239) | 771 |
| | | | | | |
| INVESTING ACTIVITIES | | | | | |
| Investments in machinery and equipment | — | (61) | (76) | 1 | (136) |
| Investment in subsidiaries | 60 | — | (43) | (60) | (43) |
| Deferred charges | — | (92) | (27) | — | (119) |
| Interest received | (261) | 116 | 126 | 68 | 49 |
| Trade receivables to affiliates | (18) | (496) | (1,995) | 1,846 | (663) |
| Others from investing activities | — | (11) | (1) | (1) | (13) |
| Net cash used in investing activities | (219) | (544) | (2,016) | 1,854 | (925) |
| | | | | | |
| To obtain cash from financing activities | 67 | (97) | (1,739) | 1,615 | (154) |
| | | | | | |
| FINANCING ACTIVITIES: | | | | | |
| Proceeds from short-term bank loans | — | 85 | 133 | — | 218 |
| Interest paid | (128) | (348) | (69) | (100) | (645) |
| Dividends paid to noncontrolling interest | — | (60) | (113) | 65 | (108) |
| Proceeds from long-term bank loans | — | 41 | 47 | — | 88 |
| Payments of long-term bank loans | — | (51) | (26) | — | (77) |
| Notes payables to affiliates | 60 | 2,090 | 6 | (1,627) | 529 |
| Derivative financial instruments | — | 166 | (10) | — | 156 |
| Other financing activities | — | (1,709) | 1,825 | 47 | 163 |
| Net cash provided by financing activities | (68) | 214 | 1,793 | (1,615) | 324 |
| | | | | | |
| Net increase in cash and cash equivalents | (1) | 117 | 54 | — | 170 |
| | | | | | |
| Adjustment to cash flows due to exchange rate fluctuations | — | (7) | (16) | — | (23) |
| Cash and cash equivalents at the beginning of year (includes restricted cash of Ps. 83) | 1 | 212 | 63 | — | 276 |
| | | | | | |
| Cash and cash equivalents at the end of year (includes restricted cash of Ps. 152) | Ps.    — | Ps.    322 | Ps.    101 | Ps.    — | Ps.    423 |

| For the year ended December 31, 2009 | Vimexico | Combined Wholly owned guarantors | Wholly owned Guarantors sold to Vitro | Vidrio y Cristal | Vitro Automotriz | No Guarantors | Adjuntments and eliminations | Vimexico combined |
|---|---|---|---|---|---|---|---|---|
| OPERATING ACTIVITIES: | | | | | | | | |
| Loss (income) before income taxes | Ps. (922) | Ps. (286) | Ps. (567) | Ps. (601) | Ps. (77) | Ps. (96) | Ps. 754 | Ps. (1,795) |
| Items related to investing and financing activities: | | | | | | | | |
| Depreciation and amortization | 2 | 239 | 112 | 16 | 104 | 102 | (648) | 575 |
| Gain from sale of long-lived assets | | (17) | | 3 | (7) | 7 | 69 | 55 |
| Impairment of long-lived assets | | 81 | 13 | 17 | 60 | 36 | | 207 |
| Interest income | (286) | (42) | (4) | (56) | | (192) | 348 | (232) |
| Derivative financial instruments | | 15 | | 96 | 19 | | | 130 |
| Foreign exchange loss | (70) | (32) | (9) | (184) | 85 | | 95 | (115) |
| Interest expense | 211 | 333 | 96 | 466 | (6) | 125 | (332) | 893 |
| Trade receivables | | (396) | 367 | 134 | 39 | 199 | 755 | 1,098 |
| Inventories | | 106 | 246 | 103 | 21 | 137 | (7) | 606 |
| Trade payables | | 46 | (74) | 151 | (212) | 65 | (142) | (166) |
| Other current assets and liabilities | 1,020 | (192) | 50 | (50) | (270) | 132 | (814) | (124) |
| Net cash provided by operating activities | (45) | (145) | 230 | 95 | (244) | 515 | 726 | 1,132 |
| | | | | | | | | |
| INVESTING ACTIVITIES | | | | | | | | |
| Investments in machinery and equipment | | (7) | (76) | (41) | (4) | (23) | (81) | (232) |
| Investment in subsidiaries | 1 | | | | | (429) | (26) | (454) |
| Deferred charges | | (12) | | | | 2 | (26) | (36) |
| Interest received | 69 | 22 | 4 | 30 | | 33 | (5) | 153 |
| Trade receivables to affiliates | (486) | (494) | (3) | (594) | 15 | (224) | 562 | (1,224) |
| Others from investing activities | | (14) | 13 | (1) | | 31 | (18) | 11 |
| Net cash used in investing activities | (416) | (505) | (62) | (605) | 10 | (610) | 406 | (1,782) |
| | | | | | | | | |
| Excess cash to be applied to (obtained from) financial activities | (461) | (650) | 168 | (510) | (234) | (95) | 1,132 | (650) |
| | | | | | | | | |
| FINANCING ACTIVITIES: | | | | | | | | |
| Proceeds from short-term bank loans | | 2 | (507) | 105 | | (162) | (1) | (563) |
| Interest paid | 60 | (192) | (103) | (470) | | (113) | 77 | (741) |
| Dividends paid to noncontrolling interest | | | 224 | | | (29) | (209) | (14) |
| Proceeds from long-term bank loans | | 344 | | (16) | | 13 | | 341 |
| Payments of long-term bank loans | | (322) | | | | | | (322) |
| Notes payables to affiliates | 500 | 933 | 37 | 1,144 | (1,206) | 371 | 216 | 1,995 |
| Derivative financial instruments | | (29) | | (26) | | | 8 | (47) |
| Other financing activities | (79) | (25) | 35 | | 1,522 | (4) | (1,224) | 225 |
| | | | | | | | | |
| Net cash provided by financing activities | 481 | 711 | (314) | 737 | 316 | 76 | (1,133) | 874 |

| For the year ended December 31, 2009 | Vimexico | | Combined Wholly owned guarantors | Guarantors Vitro | Vidrio y Cristal | Vitro Automotriz | No Guarantors | Adjuntments and eliminations | Vimexico consolidated |
|---|---|---|---|---|---|---|---|---|---|
| Net increase in cash and cash equivalents | 20 | | 61 | (146) | 227 | 82 | (20) | | 224 |
| Adjustment to cash flows due to exchange rate fluctuations | | | | | | | | | |
| Cash and cash equivalents at the beginning of year (includes restricted cash of Ps. 152) | | | 74 | 226 | 10 | 12 | 101 | | 423 |
| Cash and cash equivalents at the end of year (includes restricted cash of Ps. 73) | Ps. | 20 | Ps. 135 | Ps. 80 | Ps. 237 | Ps. 94 | Ps. 81 | Ps. | Ps. 647 |

**e)    Supplemental condensed consolidating financial information reconciled from MFRS to U.S. GAAP:**

As disclosed in note 23, through December 31, 2007, the Company's reconciliation from MFRS to U.S. GAAP does not eliminate the effects of inflation as it represents a comprehensive measure of the effects of price level changes in the inflationary Mexican economy and, as such, is considered a more meaningful presentation than historical cost−based financial reporting for both Mexican and U.S. accounting purposes.

The other differences between MFRS and U.S. GAAP and the effects on consolidated net income (loss) and consolidated stockholders' equity as it relates to the Company's guarantor and non−guarantor subsidiaries are presented below:

| For the year ended December 31, 2007 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (loss) income as reported under MFRS | Ps. | (86) | Ps. | (86) | Ps. | 290 | Ps. | (22) | Ps. | 96 |
| | | | | | | | | | | |
| U.S. GAAP adjustments: | | | | | | | | | | |
| Deferred income taxes | | (103) | | 63 | | 3 | | — | | (37) |
| Monetary position result on deferred income taxes and deferred workers profit sharing | | 5 | | 14 | | (2) | | — | | 17 |
| Amortization of capitalized interest | | — | | (4) | | — | | — | | (4) |
| Effect of applying Bulletin B−10 | | — | | (15) | | (6) | | — | | (21) |
| Employee retirement obligations | | — | | (4) | | (3) | | — | | (7) |
| Purchase of Visteon's capital investment | | 5 | | — | | — | | — | | 5 |
| Impairment of long—lived assets | | — | | (10) | | — | | — | | (10) |
| Investment in subsidiaries | | 39 | | — | | — | | (39) | | — |
| | | | | | | | | | | |
| Total U.S. GAAP adjustments | | (54) | | 44 | | (8) | | (39) | | (57) |
| | | | | | | | | | | |
| Net (loss) income under U.S. GAAP | Ps. | (140) | Ps. | (42) | Ps. | 282 | Ps. | (61) | Ps. | 39 |

| For the year ended December 31, 2008 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net (loss) income as reported under MFRS | Ps. | (824) | Ps. | (1,711) | Ps. | 971 | Ps. | 946 | Ps. | (618) |
| | | | | | | | | | | |
| U.S. GAAP adjustments: | | | | | | | | | | |
| Deferred income taxes | | (184) | | 238 | | 1 | | — | | 55 |
| Amortization of capitalized interest | | — | | (5) | | — | | — | | (5) |
| Goodwill | | — | | (5) | | (38) | | — | | (43) |
| Effect of applying Bulletin B−10 | | — | | 23 | | (5) | | — | | 18 |
| Derivative Financial Instruments | | — | | 17 | | — | | — | | 17 |
| Employee retirement obligations | | — | | 11 | | — | | — | | 11 |
| Purchase of Visteon's capital investment | | 5 | | — | | — | | — | | 5 |
| Impairment of long—lived assets | | — | | (45) | | — | | — | | (45) |
| Investment in subsidiaries | | 236 | | — | | — | | (236) | | — |
| | | | | | | | | | | |
| Total U.S. GAAP adjustments | | 57 | | 234 | | (42) | | (236) | | 13 |
| | | | | | | | | | | |
| Net (loss) income under U.S. GAAP | Ps. | (767) | Ps. | 1,477 | Ps. | 929 | Ps. | 710 | Ps. | 605 |

| For the year ended December 31, 2009 | Viméxico | | Combined Wholly-Owned Guarantors | | Wholly-Owned Guarantors Sold to Vitro | | Vitro Vidrio y Cristal | | Vitro Automotriz | | Combined Non-Guarantors | | Adjustments and Eliminations | | Viméxico Combined | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net (loss) income of as reported under MFRS | Ps. | (938) | Ps. | (227) | Ps. | (701) | Ps. | (448) | Ps. | (53) | Ps. | (10) | Ps. | 755 | Ps. | (1,624) |
| U.S. GAAP adjustments: | | | | | | | | | | | | | | | | |
| Deferred income taxes | | (3) | | (144) | | (57) | | (767) | | (499) | | (13) | | (5) | | (1,488) |
| Amortization of capitalized interest | | | | (4) | | | | | | | | | | | | (4) |
| Effect to ASC 715 (previously SFAS No. 158) | | | | (7) | | | | | | | | | | | | (7) |
| Fair value of financial instruments | | | | (2) | | | | | | | | | | | | (2) |
| Employee retirement obligations | | | | 6 | | | | | | | | 10 | | | | 16 |
| Purchase of Visteon's capital investment | | 9 | | | | | | | | | | | | | | 9 |
| Impairment of long—lived assets | | | | (46) | | | | | | 60 | | | | | | 15 |
| Total U.S. GAAP adjustments | | 6 | | (196) | | (57) | | (767) | | (439) | | (3) | | (5) | | (1,461) |
| Net (loss) income under U.S. GAAP | Ps. | (932) | Ps. | (424) | Ps. | (758) | | (1,215) | Ps. | (492) | Ps. | (13) | Ps. | 750 | Ps. | (3,085) |

F–159

| As of December 31, 2008 | Viméxico | | Combined Wholly-Owned Guarantors | | Combined Non-Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total stockholders' equity reported under MFRS | Ps. | 1,377 | Ps. | (221) | Ps. | 5,237 | Ps. | (999) | Ps. | 5,394 |
| | | | | | | | | | | |
| U.S. GAAP adjustments: | | | | | | | | | | |
| Deferred income taxes | | (442) | | 16 | | 11 | | — | | (415) |
| Capitalization of interest | | — | | 38 | | 4 | | — | | 42 |
| Accumulated amortization of capitalized interest | | — | | (25) | | (2) | | — | | (27) |
| Goodwill | | — | | — | | 81 | | — | | 81 |
| Derivative financial Instruments | | — | | 17 | | — | | — | | 17 |
| Effect of SFAS No. 158 | | — | | (381) | | (33) | | — | | (414) |
| Employee retirement obligations | | — | | (17) | | (10) | | — | | (27) |
| Purchase of Visteon's capital investment | | (62) | | — | | — | | — | | (62) |
| Purchase of remaining 40% interest in Vitro Cristalglass | | — | | — | | 60 | | — | | 60 |
| Impairment of long—lived assets | | — | | 345 | | — | | — | | 345 |
| Investment in subsidiaries | | 150 | | — | | — | | (150) | | — |
| | | | | | | | | | | |
| Total U.S. GAAP adjustments | | (354) | | (7) | | 111 | | (150) | | (400) |
| | | | | | | | | | | |
| **Total stockholders' equity under U.S. GAAP** | Ps. | 1,023 | Ps. | (228) | Ps. | 5,348 | Ps. | (1,149) | Ps. | 4,994 |

| | Viméxico | Combined Wholly−Owned Guarantors | Wholly−Owned Guarantors Sold to Vitro | Vitro Vidrio y Cristal | Vitro Automotriz | Combined Non−Guarantors | Adjustments and Eliminations | Viméxico Combined |
|---|---|---|---|---|---|---|---|---|
| | | | | **2009** | | | | |
| Total stockholders' equity reported under MFRS | Ps. (373) | Ps. 1,936 | Ps. 279 | Ps. 1,531 | Ps. 595 | Ps. 4,510 | Ps. (2,034) | Ps. 6,444 |
| U.S. GAAP adjustments: | | | | | | | | |
| Deferred income taxes | (508) | (122) | (57) | (767) | (515) | (4) | | (1,973) |
| Capitalization of interest | | 38 | | | | 4 | | 42 |
| Accumulated amortization for capitalized interest | | (28) | | | | (3) | | (31) |
| Goodwill | | | | | | 81 | | 81 |
| Fair value of financial Instruments | | 15 | | | | | | 15 |
| Effect of ASC 715 (previously SFAS No. 158) (see) | | (514) | | | | (21) | | (535) |
| Employee retirement obligations | | (12) | | | | | | (12) |
| Purchase of Visteon's capital investment | (52) | | | | | | | (52) |
| Impairment of long−lived assets | | 301 | | | 60 | | | 361 |
| Purchase of remaining 40% interest in Vitro Cristalglass | | | | | | 60 | | 60 |
| Total U.S. GAAP adjustments | (560) | (322) | (57) | (767) | (455) | 117 | | (2,044) |
| **Total stockholders' equity under U.S. GAAP** | Ps. (933) | Ps. 1,614 | Ps. 222 | Ps. 764 | Ps. 140 | Ps. 4,627 | Ps. (2,034) | Ps. 4,400 |

F−161

**f.    Suplemental U.S. GAAP Cash Flow Information**

The classifications of cash flows under MFRS and U.S. GAAP are basically the same in respect of the transactions presented under each caption. The nature of the differences between MFRS and U.S. GAAP in the amounts reported is primarily due to (i) the elimination of inflationary effects in 2007 in the variations of monetary assets and liabilities arising from financing and investing activities, against the corresponding monetary position result in operating activities, (ii) the elimination of exchange rate fluctuations resulting from financing and investing activities, against the corresponding unrealized foreign exchange gain or loss included in operating activities, and (iii) the recognition in operating, financing and investing activities of the U.S. GAAP adjustments.

The following table summarizes the cash flow items as required under ASC 230 (previously SFAS No. 95) provided by (used in) operating, financing and investing activities for the years ended December 31, 2007, 2008 and 2009, giving effect to the U.S. GAAP adjustments, excluding the effects of inflation in 2007. The following information is presented, in millions of pesos, on a historical peso basis and it is not presented in pesos of constant purchasing power.

| As of December 31, 2007 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by operating activities | Ps. | 6 | Ps. | 270 | Ps. | 229 | Ps. | 44 | Ps. | 549 |
| Net cash (used in) provided by financing activities | | (1,193) | | 225 | | (47) | | 1,008 | | (7) |
| Net cash provided by (used in) investing activities | | 1,188 | | (470) | | (171) | | (1,052) | | (505) |

Net cash flows from operating activities reflect cash payments for interest and income taxes as follows:

| As of December 31, 2007 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Interest paid | Ps. | 244 | Ps. | 522 | Ps. | 69 | Ps. | (462) | Ps. | 373 |
| Income taxes paid | | 16 | | 174 | | 14 | | — | | 204 |

| As of December 31, 2008 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | Ps. | (103) | Ps. | 235 | Ps. | 324 | Ps. | (270) | Ps. | 186 |
| Net cash (used in) provided by financing activities | | 60 | | 492 | | 1,873 | | (1,516) | | 909 |
| Net cash (used in) provided by investing activities | | 42 | | (662) | | (2,143) | | 1,786 | | (977) |

Net cash flows from operating activities reflect cash payments for interest and income taxes as follows:

| As of December 31, 2008 | Viméxico | | Combined Wholly−Owned Guarantors | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Consolidated | |
|---|---|---|---|---|---|---|---|---|---|---|
| Interest paid | Ps. | 128 | Ps. | 349 | Ps. | 68 | Ps. | 100 | Ps. | 645 |
| Income taxes paid | | | | 69 | | (59) | | | | 10 |

| As of December 31, 2009 | Viméxico | | Combined Wholly−Owned Guarantors | | Wholly−Owned Guarantors Sold to Vitro | | Vitro Vidrio y Cristal | | Vitro Automotriz | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Combined | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | Ps. | 84 | Ps. | (344) | Ps. | 131 | Ps. | (371) | Ps. | (244) | Ps. | 435 | Ps. | 806 | Ps. | 497 |
| Net cash (used in) provided by financing activities | | 421 | | 932 | | (211) | | 1,233 | | 316 | | 189 | | (1,217) | | 1,663 |
| Net cash (used in) provided by investing activities | | (485) | | (527) | | 52 | | (644) | | (10) | | (659) | | 411 | | (1,862) |

Net cash flows from operating activities reflect cash payments for interest and income taxes as follows:

| As of December 31, 2009 | Viméxico | | Combined Wholly−Owned Guarantors | | Wholly−Owned Guarantors Sold to Vitro | | Vitro Vidrio y Cristal | | Vitro Automotriz | | Combined Non−Guarantors | | Adjustments and Eliminations | | Viméxico Combined | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Interest paid | Ps. | 60 | Ps. | (192) | Ps. | (103) | Ps. | (470) | Ps. | — | Ps. | (113) | Ps. | 77 | Ps. | (741) |
| Income taxes paid | | (12) | | (16) | | (6) | | 6 | | (25) | | 2 | | 80 | | 29 |

F−164

**Exhibit C**



# Vitro Reports 4Q'10 increase of 9.8% in Sales and 10.7% decrease in EBITDA

**San Pedro Garza García, Nuevo León, México – February 28, 2011 – Vitro S.A.B. de C.V. (BMV: VITROA)** one of the world's largest producers and distributors of glass products, today announced 4Q'10 unaudited results. Year-over-year consolidated net sales increased 9.8 percent benefited by a 5.4 percent peso appreciation during the last twelve months. Consolidated EBITDA decreased 10.7 percent YoY and the consolidated EBITDA margin fell to 11.4 percent from 14.1 percent in the same period last year, driven primarily by an adjustment which reduced a recovery reserve for damages caused by Hurricane Alex, expenses related to legal services incurred in the defense of the involuntary *"Concurso Mercantil"* and Capter 11 in Mexico and US respectively, as well as leasing expenses related to the asset sales in 4Q'09, This effect was offset by the positive impact of the peso appreciation.

Mr. Hugo Lara, Chief Executive Officer, commented: "We continue to make progress towards achieving our debt restructuring goal while conducting operations as usual. We are focusing on building the business and have seen some benefit from varying levels of economic recovery in most of our markets. Our goal is to seek greater financial flexibility in support of this goal although there have been various attempts from dissident bondholders to disrupt this process.

"Domestic glass containers sales volumes increased by 16 percent YoY driven by growth in all segments except food. While we successfully defended our market share, this came at the expense of price and margin erosion reflecting excess capacity in local markets. However, increased demand for new products and larger bottles resulted in a stronger product mix in the soft drinks, and wine and liquor segments. Export volumes for Glass Containers rose by 24.9 percent this quarter, reflecting growth in all segments despite a weaker product mix. Higher sales volumes, increased capacity utilization, lower natural gas prices together with the peso appreciation, resulted in a 13.5 percent increase in EBITDA for the quarter."

"In the Flat Glass business unit, domestic float glass sales volume increased by 8.2 percent YoY principally driven by increased sales of float glass to third party auto glass manufacturers. Export sales decreased, as float glass volume was redirected to the domestic market to respond to product scarcity resulting from Hurricane Alex therefore benefiting our sales mix. The tighter domestic glass supply supported stable to slightly increased prices. Auto glass volume, both domestic and exports, increased 8 percent principally driven by the continued recovery in OEMs. Sales at our foreign subsidiaries, however, declined 8.3 percent reflecting continued weakness in the Spanish and US construction markets. EBITDA was negative US$6 million principally as a result of an adjustment which reduced a reserve for damages caused by Hurricane Alex that we expect to recover in 2011. This reserve covers the damage caused by Hurricane Alex, which are covered by our insurance policy, and was generated in 3Q'10 following the storm in July 2010. We are finalizing documentation of total damages caused by Hurricane Alex, including this year's planned repairs. Collection is expected in 2011 after the filing is approved by the insurance company.

"Cash flow from operations reflect our efforts to maximize liquidity through strict control of our cash position. This quarter we recovered US$36 million in working capital, which added to the EBIDTA gives us a generation of US$90 million in cash flow from operations with positive net free cash flow of US$25 million, noted Mr. Lara."

Mr. Claudio Del Valle, Chief Restructuring Officer, commented, "On November 17th, 2010 dissident minority group of four bondholders representing US$75 MM commenced involuntary cases under Chapter 11 of the U.S. Bankruptcy Code in

## FINANCIAL HIGHLIGHTS*

| | 4Q'10 | 4Q'09 | % Change |
|---|---|---|---|
| Consolidated Net Sales | 472 | 430 | 9.8% |
| *Glass Containers* | 255 | 212 | 20.3% |
| *Flat Glass* | 207 | 213 | -2.6% |
| Cost of Sales | 355 | 319 | 11.3% |
| Gross Income | 117 | 111 | 5.5% |
| *Gross Margins* | 24.8% | 25.8% | -1 pp |
| SG&A | 108 | 90 | 19.7% |
| *SG&A % of sales* | 22.8% | 20.9% | 1.9 pp |
| EBIT | 9 | 21 | -55.7% |
| *EBIT Margins* | 2.0% | 4.9% | -2.9 pp |
| EBITDA | 54 | 60 | -10.7% |
| *Glass Containers* | 61 | 53 | 13.5% |
| *Flat Glass* | (6) | 0 | - |
| *EBITDA Margins* | 11.4% | 14.1% | -2.7 pp |
| Net Income (loss) | (58) | 41 | - |
| *Net Income (loss) Margins* | -12.3% | 9.6% | -22 pp |
| Total Debt[1] | 1,710 | 1,539 | 11.1% |
| *Short Term Debt* [2] | 1,595 | 1,393 | 14.5% |
| *Long Term Debt* | 115 | 146 | -21.2% |
| Cash & Cash Equivalents[3] | 175 | 219 | -20.2% |
| Total Net Debt | 1,535 | 1,320 | 16.3% |

*\* Million US$ Nominal*

(1) Total debt includes account receivables debt programs according to a change in Mexican FRS. Aditionally, it includes US$253 million from derivatives settlements recognized in 3Q'10.

(2) Since we are not in full compliance under our bond indentures, the outstanding amount of the Senior Notes debt was reclassified from long-term to short-term.

(3) In 4Q'09, Cash & Cash Equivalents include restricted cash for interest payments and cash on our accounts receivables debt programs. In 4Q'10, it include restricted cash for our accounts receivables debt programs, lease payments and other long-term assets.

Texas against Vitro's US subsidiaries. Vitro has contested the basis of the petition asserting that its U.S. affiliates are paying their debts as they come due. A status conference was held on February 24, 2011 in which the judge again postponed the hearing to March 31, 2011 and strongly suggested both parties to reach an out of court economic settlement."

"On December 13, 2010 we filed a Voluntary Petition for a Prepackaged Concurso Plan in the Mexican Court. This filing is aimed at expediting a prearranged Concurso Mercantil for which Vitro has the requisite majority among debt controlled by the Company and debt subject to lock-up agreements. The filing was rejected in the first instance and we appealed the Court's decision. The Court did not admit a review of the appeal under the grounds that the decision in the first instance was not appealable. Vitro has filed an ordinary remedy against the Court's decision and we expect a favorable ruling soon. If required, Vitro will file an appeal for legal protection ("Juicio de Amparo") in addition to the one that we also filed regarding such denial. On December 13 and 23, 2010, Vitro and some of our Mexican operating subsidiaries, as a guarantors under the Bonds, received notice of an Involuntary Petition for Concurso Mercantil. These subsidiaries are paying down their debt as it becomes due and are operating as usual.. Therefore, we have requested the dismissal of all the cases, based on lack of grounds. The Company's Concurso Mercantil, voluntary or involuntary, will not in any way affect its operating subsidiaries. This is a protection provided by Mexican Law to help companies restructure their debt while continuing to operate under normal conditions. During this period, management, all manufacturing plants, operations, new product development, customer shipments, and payment to suppliers will continue as usual".

"On December 18, 2010 Vitro commenced an ancillary case under Chapter 15 of the U.S. Bankruptcy Code in the NY Court, requesting that the U.S. Bankruptcy Court recognize and give deference to its proceedings in Mexico. However, Vitro withdraw the request temporarily pending the declaration of the Mexican Concurso. A resolution should be issued soon after the declaration in the U.S. Vitro has also asked the U.S. Bankruptcy Court to protect it and its non-U.S. subsidiaries from creditor actions in the U.S. while the Mexican proceedings are pending."

"Vitro has prevailed and continued to make progress towards achieving its debt restructuring goal despite various attempts from dissident bondholders to disrupt this process. On December 3 and 9, 2010 Aurelius Capital Management and Elliott Management Corp. filed suit against Vitro and several of its Mexican subsidiaries in New York State Court, premised on Vitro's default and non-payment of the Old Notes, and obtained from the Court a pre-judgment Orders of Attachment on any of Vitro's assets located in NY. This resulted in a delay in the settlement of the Tender Offer and the distribution of the Consent Payments pending further guidance. Certain clients based in NY received an order from the Court to stop payment on Vitro's invoices. On December 17, 2010 the Judge accepted Vitro's arguments that settlements under the Tender Offer and Exchange Offer were not subject to the orders of attachment and Vitro was able to settle the amounts. On February 8, 2011 Vitro obtained a favorable court ruling in which the orders of attachment on clients of the Flat Glass subsidiaries were vacated. Plaintiffs appealed the decision which was rejected by the Supreme Court, Appellate Division, on February 10, 2011. Payments from these clients were immediately resumed."

"Furthermore, notwithstanding various baseless allegations made in the press and circulating in the market relating to certain legal aspects of Vitro's proposed restructuring and pre-packaged insolvency process in Mexico, Vitro's Concurso Plan has been prepared and negotiated with the advice and approval of some of the leading insolvency law practitioners in Mexico. Vitro and its advisors are fully confident that any challenges that may be brought against its Concurso Plan based on these baseless allegations will be discredited and set aside by the relevant Mexican Court and that Vitro's Concurso Plan will be approved by the Mexican Court, commented Mr. del Valle."

"We continue to maintain our natural gas hedges with PEMEX, 18 percent at US$7.3/mmbtu for 2011, with no margin call requirements," commented Mr. Del Valle.

"While the business communities in Mexico and worldwide have faced important challenges over the past two years, we see signs of recovery in some of our markets but remain cautious while we position Vitro in every way to effectively serve our clients. At the same time, we continue to focus on achieving our debt restructuring goal to reach a conclusion to achieve important financial flexibility," concluded Mr. Lara.

*All peso figures provided in this announcement are in accordance with Mexican Financial Reporting Standards (Mexican FRS or NIFs) issued by the Mexican Board for Research and Development of Financial Reporting Standards (CINIF), except otherwise indicated. The Peso Figures included in the document are presented in nominal Pesos which could affect its comparability. Dollar figures are nominal US dollars and are obtained by dividing nominal pesos for each month by the end of month fix exchange rate published by Banco de Mexico. In the case of the Balance Sheet, US dollar translations are made at the fix exchange rate as of the end of the period. Certain amounts may not sum due to rounding. All figures and comparisons are in US dollar terms, unless otherwise stated, and may differ from the peso amounts due to the difference in exchange rates.*

*This announcement contains historical information, certain management's expectations, estimates and other forward-looking information regarding Vitro, S.A.B. de C.V. and its Subsidiaries (collectively the "Company"). While the Company believes that these management's expectations and forward looking statements are based on reasonable assumptions, all such statements reflect the current views of the Company with respect to future events and are subject to certain risks and uncertainties that could cause actual results to differ materially from those contemplated in this report. Many factors could cause the actual results, performance or achievements of the Company to be materially different from any future results, performance or achievements that may be expressed or implied by such forward-looking statements, including, among others, changes in general*

|  | Dic'10 | Dic'09 |
|---|---|---|
| **Inflation in Mexico** | | |
| Quarter | 1.9% | 1.2% |
| Accumulated | 4.4% | 3.6% |
| **Inflation in USA** | | |
| Quarter | 0.3% | 0.0% |
| Accumulated | 1.5% | 2.7% |
| **Exchange Rate** | | |
| Closing | 12.3571 | 13.0587 |
| Average (year) | 12.6409 | 13.5723 |
| Average (4Q) | 12.4161 | 13.0296 |
| **Devaluation** | | |
| Quarter (closing) | -1.2% | -3.3% |
| Accumulated | -5.4% | -5.6% |
| Quarter (average) | -4.7% | -2.2% |

*economic, political, governmental and business conditions worldwide and in such markets in which the Company does business, changes in interest rates, changes in inflation rates, changes in exchange rates, the growth or reduction of the markets and segments where the Company sells its products, changes in raw material prices, changes in energy prices, particularly gas, changes in the business strategy, and other factors. Should one or more of these risks or uncertainties materialize, or should the underlying assumptions prove incorrect, actual results may vary materially from those described herein as anticipated, believed, estimated or expected. The Company does not assume any obligation, to and will not update these forward-looking statements.*

### CASH AND CASH EQUIVALENTS

• *NIF C-1, Cash and cash equivalents, requires restricted cash and cash equivalents to be included within the cash and cash equivalents caption, as opposed to Bulletin C-1, which required presentation under separate captions.*

*As a result of adopting this NIF in 2010, the short-term restricted cash was included within the cash and cash equivalents caption, long-term restricted cash remained recorded in other long-term assets. This change is reflected in comparative years, resulting from the retrospective application requirement of the standard.*

### CONSOLIDATION

• *NIF B-8, Due to changes in Mexican FRS, regarding the consolidation of controlled entities, our accounts receivable securitization trusts and off-balance sheet debt were included in the consolidated Financial Statements of Vitro and Subsidiaries. The effects of the changes in accounting principles increased debt of fiscal years 2009 and 2010. The mentioned trusts were designated as finance subsidiaries by our Board Meeting; therefore, those trusts are not guarantors of our Senior Notes 2012, 2013 and 2017.*

### SPECIAL NOTE REGARDING NON-GAAP FINANCIAL MEASURES

*A body of generally accepted accounting principles is commonly referred to as "GAAP". A non-GAAP financial measure is generally defined by the SEC as one that purports to measure historical or future financial performance, financial position or cash flows but excludes or includes amounts that would not be so adjusted in the most comparable U.S. GAAP measure. We disclose in this report certain non-GAAP financial measures, including EBITDA. EBITDA for any period is defined as consolidated net income (loss) excluding (i) depreciation and amortization, (ii) non-cash items related to pension liabilities, (iii) total net comprehensive financing cost (which is comprised of net interest expense, exchange gain or loss, monetary position gain or loss and other financing costs and derivative transactions), (iv) other expenses, net, (v) income tax, (vi) provision for employee retirement obligations, (vii) cumulative effect of change in accounting principle, net of tax and (viii) (income) loss from discontinued operations.*

*In managing our business we rely on EBITDA as a means of assessing our operating performance and a portion of our management's compensation and employee profit sharing plan is linked to EBITDA performance. We believe that EBITDA can be useful to facilitate comparisons of operating performance between periods and with other companies because it excludes the effect of (i) depreciation and amortization, which represents a non-cash charge to earnings, (ii) certain financing costs, which are significantly affected by external factors, including interest rates, foreign currency exchange rates and inflation rates, which have little or no bearing on our operating performance, (iii) income tax and tax on assets and statutory employee profit sharing, which is similar to a tax on income and (iv) other expenses or income not related to the operation of the business. EBITDA is also a useful basis of comparing our results with those of other companies because it presents operating results on a basis unaffected by capital structure and taxes.*

*We also calculate EBITDA in connection with covenants related to some of our financings. We believe that EBITDA enhances the understanding of our financial performance and our ability to satisfy principal and interest obligations with respect to our indebtedness as well as to fund capital expenditures and working capital requirements. EBITDA is not a measure of financial performance under U.S. GAAP or Mexican FRS. EBITDA should not be considered as an alternate measure of net income or operating income, as determined on a consolidated basis using amounts derived from statements of operations prepared in accordance with Mexican FRS, as an indicator of operating performance or as cash flows from operating activity or as a measure of liquidity. EBITDA has material limitations that impair its value as a measure of a company's overall profitability since it does not address certain ongoing costs of our business that could significantly affect profitability such as financial expenses and income taxes, depreciation, pension plan reserves or capital expenditures and associated charges. The EBITDA presented herein relates to Mexican FRS, which we use to prepare our consolidated financial statements.*

Vitro, S.A.B. de C.V. (BMV: VITROA), is the leading glass manufacturer in Mexico and one of the largest in the world backed by more than 100 years of experience. Through our subsidiary companies we offer products with the highest quality standards and reliable services to satisfy the needs of two distinct business sectors: glass containers and flat glass. Our manufacturing facilities produce, process, distribute and sell a wide range of glass products that form part of the everyday lives of millions of people as well as offering excellent solutions to multiple industries that include: wine, beer, cosmetic, pharmaceutical, food and beverage, as well as the automotive and construction industry. In addition, we supply raw materials, machinery and industrial equipment to different industries. We constantly strive to improve the quality of life of our employees, as well as the communities where we operate, by generating employment and economic prosperity given our permanent focus on quality and continuous improvement, as well as through our consistent efforts to promote sustainable development. Located in Monterrey, Mexico, and founded in 1909, Vitro currently has major facilities and a broad distribution network in 10 countries in the Americas and Europe and the Company's products can be found all around the world. For more information, you can access Vitro's Website at: http://www.vitro.com

#### For further information, please contact:

| Investor Relations | U.S. agency | Media |
|---|---|---|
| Adrian Meouchi / Jesus Flores del Bosque | Susan Borinelli / Barbara Cano | Albert Chico |
| Vitro S.A.B. de C.V. | Breakstone Group | Vitro, S.A.B. de C.V. |
| + (52) 81-8863-1765 / 1730 | (646) 330-5907 / 452-2334 | + (52) 81-8863-1661 |
| ameouchi@vitro.com | sborinelli@breakstone-group.com | achico@vitro.com |
| jfloresb@vitro.com | bcano@breakstone-group.com | |

#### DETAILED FINANCIAL INFORMATION FOLLOWS:

Consolidated Results
Sales ................................................ 4
EBIT and EBITDA ................................ 4
Consolidated Financing Result .............. 5
Taxes .............................................. 6
Consolidated Net Income ..................... 7
Capital Expenditures ........................... 7
Consolidated Financial Position ............. 8
Cash Flow ........................................ 9
Key Developments .............................. 10
Glass Containers ................................ 13
Flat Glass ........................................ 14
Consolidated Financial Statements ........ 16
Segmented Information ........................ 17

## Sales

Consolidated net sales for 4Q'10 increased 9.8 percent YoY to US$472 million from US$430 million last year, this increase was driven by the peso appreciation versus the dollar. For fiscal year 2010, consolidated net sales increased 4.5 in 4Q'09 percent to US$1,849 million from US$1,770 million during the same period last year. Glass Containers sales for the quarter increased YoY by 20.3 percent while Flat Glass sales decreased 2.6 percent over the same period.

During the quarter domestic and export sales increased 15.2 percent and 12.2 percent YoY, respectively, while foreign subsidiaries' sales decreased 5.2 percent YoY.

| | 4Q'10 | 4Q'09 | YoY% Change | 2010 | 2009 | YoY% Change |
|---|---|---|---|---|---|---|
| **Pesos** | | | | | | |
| Total Consolidated Sales | 5,862 | 5,602 | *4.6* | 23,360 | 23,991 | *(2.6)* |
| | | | | | | |
| Glass Containers | 3,168 | 2,768 | *14.5* | 12,339 | 12,385 | *(0.4)* |
| Flat Glass | 2,576 | 2,777 | *(7.2)* | 10,688 | 11,377 | *(6.1)* |
| | | | | | | |
| Domestic Sales | 3,123 | 2,814 | *11.0* | 12,017 | 11,152 | *7.8* |
| Export Sales | 1,594 | 1,492 | *6.9* | 6,737 | 6,568 | *2.6* |
| Foreign Subsidiaries | 1,145 | 1,297 | *(11.7)* | 4,606 | 6,271 | *(26.5)* |
| **Nominal Dollars** | | | | | | |
| Total Consolidated Sales | 472 | 430 | *9.8* | 1,849 | 1,770 | *4.5* |
| | | | | | | |
| Glass Containers | 255 | 212 | *20.3* | 977 | 914 | *6.9* |
| Flat Glass | 207 | 213 | *(2.6)* | 846 | 839 | *0.8* |
| | | | | | | |
| Domestic Sales | 251 | 218 | *15.2* | 952 | 825 | *15.4* |
| Export Sales | 128 | 114 | *12.2* | 533 | 484 | *10.0* |
| Foreign Subsidiaries | 92 | 97 | *(5.2)* | 365 | 461 | *(20.9)* |
| | | | | | | |
| % Foreign Currency Sales* / Total Sales | 47% | 49% | *-2.5 pp* | 49% | 53% | *-4.4 pp* |
| % Export Sales / Total Sales | 27% | 27% | *0.6 pp* | 29% | 27% | 1.4 pp |

Table 1 — Sales (Million)

\* Exports + Foreign Subsidiaries

## EBIT and EBITDA

Consolidated EBIT for the quarter decreased 55.9 percent YoY to US$9 million from US$21 million during the same period last year. EBIT margin decreased in 2.9 percentage points to 2 percent from 4.9 percent. For fiscal year 2010, consolidated EBIT decreased 5.3 percent to US$93 million from US$98 million in fiscal year 2009. During this same period, EBIT margin decreased 0.5 percentage points to 5.0 percent from 5.5 percent.

EBIT for the quarter at Glass Containers increased 1.3 percent YoY, while at Flat Glass EBIT decreased to negative US$20 million in 4Q'10 from negative US$15 million when compared to the same period last year.

Consolidated EBITDA for the quarter decreased 10.7 percent to US$54 million from US$60 million in 4Q'09. The EBITDA margin decreased 2.7 percentage points YoY mainly as a result of an adjustment which reduced a reserve for damages caused by Hurricane Alex, expenses related to legal services incurred in the defense of the involuntary "Concurso Mercantil" and Capter 11 in Mexico and US respectively, as well as leasing expenses related to the asset sales in 4Q'09.

This reserve covers the damage caused by Hurricane Alex, which are covered by our insurance policy, and was generated in 3Q'10 following the storm in July 2010. We are finalizing documentation of total damages caused by Hurricane Alex, including this year's planned repairs. Collection is expected in 2011 after the filing is approved by the insurance company.

For fiscal year 2010, consolidated EBITDA increased 5.1 percent to US$250 million from US$237 million during the same period last year.

During the quarter, EBITDA at Glass Containers increased 13.5 percent YoY to US$61 million from US$53 million, while EBITDA at Flat Glass decreased to negative US$6 million from US$0 million in 4Q'09.

For details on both business units please refer to page 13 and 14.

| Table 2 EBIT and EBITDA (Million) | | | | | | |
|---|---|---|---|---|---|---|
| | 4Q'10 | 4Q'09 | YoY% Change | 2010 | 2009 | YoY% Change |
| **Pesos** | | | | | | |
| Consolidated EBIT | 116 | 272 | *(57.2)* | 1,181 | 1,328 | *(11.1)* |
| *Margin* | *2.0%* | *4.9%* | *-2.9 pp* | *5.1%* | *5.5%* | *-0.4 pp* |
| Glass Containers | 419 | 433 | *(3.2)* | 1,662 | 1,956 | *(15.0)* |
| Flat Glass | (253) | (193) | *31.2* | (435) | (591) | *(26.4)* |
| Consolidated EBITDA | 672 | 787 | *(14.7)* | 3,161 | 3,217 | *(1.7)* |
| *Margin* | *11.5%* | *14.1%* | *-2.6 pp* | *13.5%* | *13.4%* | *0.1 pp* |
| Glass Containers | 753 | 696 | *8.2* | 2,839 | 3,023 | *(6.1)* |
| Flat Glass | -72 | 4 | *--* | 223 | 84 | *165.5* |
| **Nominal Dollars** | | | | | | |
| Consolidated EBIT | 9 | 21 | *(55.9)* | 93 | 98 | *(5.3)* |
| *Margin* | *2.0%* | *4.9%* | *-2.9 pp* | *5.0%* | *5.5%* | *-0.5 pp* |
| Glass Containers | 34 | 33 | *1.3* | 131 | 144 | *(9.1)* |
| Flat Glass | (20) | (15) | *38.4* | (35) | (44) | *(19.9)* |
| Consolidated EBITDA | 54 | 60 | *(10.7)* | 250 | 237 | *5.1* |
| *Margin* | *11.4%* | *14.1%* | *-2.7 pp* | *13.5%* | *13.4%* | *0.1 pp* |
| Glass Containers | 61 | 53 | *13.5* | 225 | 223 | *0.6* |
| Flat Glass | (6) | 0 | *--* | 17 | 6 | *176.4* |

## Consolidated Financing Result

Consolidated financing result for the quarter resulted in an expense of US$51 million from an expense of US$20 million during 4Q'09. This result was mainly driven by a non-cash foreign exchange gain of US$10 million in 4Q'10 compared with a gain of US$46 million during the same period last year, due to a 1.2 percent QoQ appreciation of the peso compared with an 3.3 percent peso appreciation in the same period last year.

For fiscal year 2010, total consolidated financing result increased to an expense of US$176 million from an expense of US$165 million in fiscal year 2009, mainly driven by a non-cash foreign exchange gain of US$49 million, due to 5.4 percent appreciation of the peso. This compares to a non-cash foreign exchange gain of US$79 million during the same period last year, due to a 5.6 percent peso appreciation. This was partially compensated by lower Other Financial Expenses of US$48 million compared with an expense of US$74 million during fiscal year 2009 due to lower derivative instrument losses.

| Table 3 Total Financing Result (Million) | | | | | | |
|---|---|---|---|---|---|---|
| | 4Q'10 | 4Q'09 | YoY% Change | 2010 | 2009 | YoY% Change |
| **Pesos** | | | | | | |
| Interest Expense | (604) | (572) | *5.5* | (2,286) | (2,362) | *(3.2)* |
| Interest Income | 20 | 14 | *44.1* | 55 | 51 | *8.9* |
| Other Financial Expenses[1] | (168) | (306) | *(45.2)* | (606) | (1,030) | *(41.2)* |
| Foreign Exchange Gain (Loss) | 123 | 598 | *(79.4)* | 578 | 976 | *(40.8)* |
| Total Financing Result | (629) | (267) | *135.7* | (2,260) | (2,366) | *(4.5)* |
| **Nominal Dollars** | | | | | | |
| Interest Expense | (49) | (44) | *11.1* | (181) | (174) | *4.3* |
| Interest Income | 2 | 1 | *51.2* | 4 | 4 | *16.3* |
| Other Financial Expenses[1] | (14) | (23) | *(42.2)* | (48) | (74) | *(35.3)* |
| Foreign Exchange Gain (Loss) | 10 | 46 | *(78.2)* | 49 | 79 | *(38.7)* |
| Total Financing Result | (51) | (20) | *148.3* | (176) | (165) | *6.9* |

(1) Includes derivative transactions and expenses related to debt restructuring.

## Taxes

Total income tax decreased from an income of US$36 million in 4Q'09 to an income of US$4 million during this quarter. Deferred income tax decreased due to the amortization of previous year fiscal losses mainly as a result of the recognition of a non-cash foreign exchange gain. Accrued Income Tax decreased from an income of US$6 million to an income of US$1 million mainly due to an increase of Income taxes in our foreign operations. For fiscal year 2010, Total Income Tax decreased to an income of US$18 from an income of US$43 in fiscal year 2009. This reduction is attributable to lower foreign exchange gain for the fiscal year 2010 compared with the foreign exchange gain in the same period of 2009.

| Table 4 Taxes (Million) | | | | | | |
|---|---|---|---|---|---|---|
| | 4Q'10 | 4Q'09 | YoY% Change | 2010 | 2009 | YoY% Change |
| **Pesos** | | | | | | |
| Accrued Income Tax | (12) | (77) | *(84.1)* | 239 | (3) | *--* |
| Deferred Income Tax (gain) | (35) | (391) | *(91.0)* | (484) | (595) | *(18.7)* |
| Total Income Tax | (47) | (468) | *(89.9)* | (245) | (598) | *(59.1)* |
| **Nominal Dollars** | | | | | | |
| Accrued Income Tax | (1) | (6) | *(82.9)* | 18 | (0) | *--* |
| Deferred Income Tax (gain) | (3) | (30) | *(90.5)* | (36) | (43) | *(16.7)* |
| Total Income Tax | (4) | (36) | *(89.2)* | (18) | (43) | *(58.6)* |

## Consolidated Net Loss

During 4Q'10 the Company recorded a consolidated net loss of US$58 million compared to a net gain of US$41 million during the same period last year. This variation is principally explained by the US$51 million expense in total financing result compared with an expense of US$20 million in 4Q'09, mainly derived from a non-cash foreign exchange income related to a 1.2 percent peso appreciation compared to a non-cash foreign exchange income related to a 3.3 percent peso appreciation in 4Q'09. In addition, due to an US$20MM Other Expenses during the quarter, related to the accelerated amortization of fees associated with previous issued debt vs. other income of US$7MM for the same period last year mostly as a result of a gain related to asset sales.



*Certain amounts may not sum due to rounding.

## Capital Expenditures (CapEx)

Capital expenditures for the quarter totaled US$33 million, compared with US$21 million in 4Q'09. Glass Containers represented 66 percent of total CapEx and was mainly invested in maintenance and molds. Flat Glass accounted for 34 percent and was mainly invested in maintenance and the expansion of lines for the auto segment glass.

Net debt, starting from September 30, 2010 includes US$253 million from derivative settlements, (not previously recognized as debt), and calculated by deducting cash and cash equivalents and other long term assets, increased QoQ by US$36 million to US$1,535 million. On a YoY comparison, net debt increased by US$215 million, mainly due to the recognition of derivative claims as debt.

As of December 31, 2010, the Company had a cash balance of US$175 million, of which US$2 million are classified as other long-term assets and US$9 million are restricted cash collateralizing lease payments, and cash on our accounts receivable debt programs.  Moreover US$23 million are destined to the restructuring consideration as part of our debt restructuring proposal.  Therefore, unrestricted cash balance as of December 31, 2010 was US$141 million. During the quarter US$52 million were used to make the initial consent payment.

Consolidated gross debt as of December 31, 2010 totaled US$1,710 million, which includes the recognition of US$253 million from derivative settlements, a QoQ increase of US$4 million and a YoY increase of US$171 million.

| Table 5<br>Debt Indicators<br>(Million dollars; except as indicated) | | | | | |
|---|---|---|---|---|---|
| | **4Q'10** | **3Q'10** | **2Q'10** | **1Q'10** | **4Q'09** |
| **Interest Coverage**[1] | | | | | |
| (EBITDA/ Interest Expense) (Times) LTM | 1.4 | 1.5 | 1.4 | 1.4 | 1.4 |
| **Leverage**[1] | | | | | |
| (Total Debt / EBITDA) (Times) LTM | 6.7 | 6.5 | 6.0 | 6.2 | 6.2 |
| (Total Net Debt / EBITDA) (Times) LTM | 6.0 | 5.7 | 5.2 | 5.4 | 5.4 |
| **Total Debt**[4][5] | **1,710** | **1,706** | **1,529** | **1,540** | **1,539** |
| Short-Term Debt[2] | 1,595 | 1,568 | 1,388 | 1,390 | 1,393 |
| Long-Term Debt | 115 | 138 | 141 | 151 | 146 |
| Cash and Equivalents[3] | 175 | 207 | 201 | 206 | 219 |
| **Total Net Debt** | **1,535** | **1,499** | **1,328** | **1,334** | **1,320** |
| Currency Mix (%) dlls&Euros/Pesos | 92/8 | 92/8 | 91/9 | 91/9 | 91/9 |

(1)  Financial ratios are calculated using figures in pesos.

(2)  Since we are not in compliance under our bond indentures, the outstanding amount of the Senior Notes debt was reclassified from long-term to short-term.

(3)  Cash & Cash Equivalents include restricted cash for the consent payment and restructuring consideration, rents payments and cash on our accounts receivables debt programs. In 2010 also include lease payments.

(4)  Starting 3Q'10, debt includes US$253 million from derivative settlements, previously accounted in other current liabilities.

(5) NIF B-8, Due to changes in Mexican FRS, regarding to consolidation or controlled entities, our accounts receivable securitization trusts and off-balance sheet debt were included in the Consolidated Financial Statements of Vitro and Subsidiaries. The effects of the changes in accounting principles increased debt of fiscal year of all periods herein presented.



**Debt Profile as of December 31, 2010 :**

(1)    LIBOR, TIIE and CETE base rates

## Cash Flow

Net Free Cash Flow decreased to US$25 million from US$63 million in 4Q'09. This was mainly the result of a working capital recovery of US$36 million in 4Q'10 compared to a recovery of US$47 million in 4Q'09 and lower EBITDA, moreover the decrease was strengthen by a higher net interest paid, and an increase in Capital Expenditures, in 4Q'10 when compared to the same period last year.

For the fiscal year 2010, the Company recorded a net free cash flow of US$82 million compared to US$179 million during the previous year. This change was mainly due to a lower working capital recovery and higher paid taxes, compared to cash taxes recovered during the same period last year, which was partially compensated by lower net interest paid due to lower derivatives payments in fiscal year 2010.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Table 6** | | | | | | |
| **Cash Flow from Operations Analysis**[(1)] | | | | | | |
| **(Million)** | | | | | | |
| | **4Q'10** | **4Q'09** | **YoY% Change** | **2010** | **2009** | **YoY% Change** |
| **Pesos** | | | | | | |
| EBITDA | 672 | 787 | *(14.7)* | 3,161 | 3,217 | *(1.7)* |
| Working Capital[(2)] | 448 | 619 | *(27.6)* | (73) | 996 | -- |
| Cash Flow from Operations | 1,119 | 1,406 | *(20.4)* | 3,088 | 4,213 | *(26.7)* |
| | | | | | | |
| Net Interest Paid [(3)] | (380) | (339) | *12.0* | (1,025) | (1,490) | *(31.2)* |
| Cash Taxes (paid) recovered[(4)] | (8) | 30 | -- | (163) | 342 | -- |
| Capex | (414) | (275) | *50.7* | (860) | (638) | *34.8* |
| Dividends | (2) | (15) | *(85.1)* | (8) | (15) | *(45.3)* |
| Net Free Cash Flow | 316 | 807 | *(60.9)* | 1,032 | 2,411 | *(57.2)* |
| **Nominal Dollars** | | | | | | |
| EBITDA | 54 | 60 | *(10.7)* | 250 | 237 | *5.1* |
| Working Capital[(2)] | 36 | 47 | *(23.3)* | (4) | 78 | -- |
| Cash Flow from Operations | 90 | 108 | *(16.2)* | 245 | 316 | *(22.3)* |
| | | | | | | |
| Net Interest Paid [(3)] | (31) | (26) | *17.7* | (81) | (111) | *(26.8)* |
| Cash Taxes (paid) recovered[(4)] | (1) | 2 | -- | (13) | 24 | -- |
| Capex | (33) | (21) | *58.9* | (68) | (48) | *43.5* |
| Dividends | (0) | (0) | *(47.1)* | (1) | (1) | *(38.2)* |
| Net Free Cash Flow | 25 | 63 | *(59.5)* | 82 | 179 | *(54.4)* |

(1) This statement is a Cash Flow statement and it does not represent a Statement according with Mexican FRS

(2) Includes: Clients, inventories, suppliers, other current assets and liabilities and IVA (Value Added Tax)

(3) Also includes interest income, derivative financial transactions and expenses related to debt restructuring

(4) Includes PSW (Profit Sharing to Workers)

## FINANCIAL POSITION AND RESTRUCTURING PROCESS

For almost two years, Vitro has worked diligently to resolve its financial situation by seeking to achieve a consensual restructuring on terms that would provide Vitro's creditors a fair recovery in light of the Company's financial capacity and permit the Company to regain its financial footing. To that end, Vitro has engaged in active negotiations with various groups of creditors, including an ad hoc group of holders of Old Notes (the Ad Hoc Bondholders Group"), as well as Fintech, a significant creditor of the Company.

### *Vitro's Tender Offer and Exchange Offer and Consent Solicitation*

As a result of the negotiations mentioned above, Vitro conducted two alternative offers in respect of the outstanding Old Notes: (1) a cash tender offer which was conducted as a modified Dutch auction (the "Tender Offer") and (2) an exchange offer and consent solicitation (the "Exchange Offer and Consent Solicitation" and, together with the Tender Offer, the "Offers"). Both offers applied to all three series of the Old Notes. The Offers were conducted in contemplation of, and as a step towards, restructuring most of Vitro's outstanding debt through an in-court proceeding under the insolvency law of Mexico, as described below. Both Offers were launched on November 1, 2010 and have since expired in accordance with their respective terms. Old Notes in the aggregate principal amount of approximately $44 million were tendered pursuant to the Tender Offer and Restructured Debt in the aggregate principal amount of approximately $520 million were tendered in the Exchange Offer and Consent Solicitation. There was a delay in the settlement of payments with respect to both Offers as a result of the Attachment Orders (defined and described below), but this delay was resolved and the Tender Offer consideration and the consent payments pursuant to the Exchange Offer and Consent Solicitation have been made.

### *Minority Noteholders commence involuntary chapter 11 cases against Vitro's U.S. subsidiaries*

On November 17, 2010 four members of the Ad Hoc Bondholders Group who together hold approximately $75 million in face amount of Old Notes (the "Minority Noteholders"), or less than 5% of Vitro's outstanding consolidated debt to be restructured, filed involuntary petitions under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court for the Northern District of Texas Fort Worth Division (the "Texas Bankruptcy Court") against fifteen U.S. subsidiaries of Vitro which are guarantors of Vitro's obligations under the Old Notes (the "U.S. Alleged Debtors").

On December 9, 2010, the U.S. Alleged Debtors filed an answer to the involuntary petitions, asserting that such petitions should be dismissed because the Minority Noteholders do not hold non-contingent undisputed claims and because the U.S. Alleged Debtors are generally paying their debts as they become due -- which are prerequisites for the commencement of involuntary bankruptcy cases under the U.S. Bankruptcy Code. As of the date hereof, no orders for relief have been entered by the Texas Bankruptcy Court in respect of the involuntary petitions. A hearing before the Texas Bankruptcy Court to consider whether such orders for relief should be entered or the involuntary petitions should be dismissed was commenced on February 24, 2011 and was adjourned until March 31, 2011.

Since the filing of the involuntary petitions, the U.S. Alleged Debtors have continued to operate their businesses in the ordinary course, as they are authorized to do under the U.S. Bankruptcy Code. After filing the involuntary petitions, the Minority Noteholders sought to restrict the U.S. Alleged Debtors' ability to enter into transactions with their non-U.S. affiliates or participate in Vitro's planned restructuring in Mexico. However, on November 24, 2010, the Texas Bankruptcy Court denied the requested restrictions in their entirety. Additionally, the Texas Bankruptcy Court approved Vitro America LLC's continued utilization, on unchanged terms, of its working capital facility with its secured lender, Bank of America, first, on December 3, 2010, on an interim basis, and on January 21, 2011, on a final basis. The Texas Bankruptcy Court also authorized Vitro America LLC to incur additional unsecured indebtedness from Vitro S.A.B. or a non-debtor affiliate.

### *New York State Litigation against Vitro and certain of its non-U.S. subsidiaries*

On December 3, 2010, three funds managed by the Ad Hoc Bondholders Group member Aurelius Capital Management (collectively, "Aurelius") filed suit against Vitro and 49 of its non-U.S. subsidiaries (collectively, the "Defendants") in the Supreme Court of the State of New York (the "New York State Court") premised on Vitro's default and non-payment of the Old Notes (the "Aurelius Case"), and obtained a pre-judgment order of attachment from the New York State Court with respect to any assets of Vitro located in New York (the "Aurelius Order"). On December 9, 2010, certain funds managed by another Ad Hoc Bondholders Group member, Elliott Management Corp. (collectively, "Elliott"), also filed suit against the Defendants in the New York State Court (the "Elliott Case") and also obtained a pre-judgment order of attachment (the "Elliott Order" and, together with the Aurelius Order, the "Attachment Orders"). On December 28, 2010, Vitro removed the Aurelius Case and the Elliott Case to the U.S. District Court for the Southern District of New York, both of which were in turn referred to the U.S. Bankruptcy Court for the Southern District of New York (the "New York Bankruptcy Court") in which the Chapter 15 Case (as defined and described below) was pending at the time. However, after certain developments in Mexico (discussed below) resulted in the withdrawal of the Chapter 15 Petition (as defined

below), the Defendants agreed to the remand of the Aurelius Case and Elliott Case back to the New York State Court. An order of remand was entered on January 14, 2011, and the cases have been reactivated in, and are currently pending before the New York State Court.

On December 9, 2010, the Aurelius Order was served on D.F. King & Co., Inc. ("D.F. King"), the Depositary for the Tender Offer and Information and Exchange Agent for the Exchange Offer and Consent Solicitation. In response, D.F. King determined not to direct the settlement of the Tender Offer or instruct the Depository Trust Company to complete the settlement until D.F. King received further guidance from the New York State Court as to whether its instructions to settle the Tender Offer would violate the terms of the Attachment Orders. As a result, the settlement of the Tender Offer and the distribution of the consent payments pursuant to the Exchange Offer and Consent Solicitation were temporarily delayed. On December 16, 2010, the New York State Court issued an order clarifying that the Old Notes tendered or exchanged pursuant to the Offers were not subject to the Orders of Attachment. However, before such order took effect, Aurelius appealed to the New York State Supreme Court, Appellate Division, First Department and requested that the order be stayed while the appeal was pending. On December 21, 2010, the New York State Supreme Court, Appellate Division, First Department denied the stay, and the New York State Court's order took effect. Subsequently, D.F. King took the requisite actions and the Tender Offer consideration and the consent payments pursuant to the Exchange Offer and Consent Solicitation were made.

Aurelius and Elliott have served copies of the Attachment Orders on certain of Vitro's customers, some of which had suspended payments to Vitro pending an order by the New York State Court vacating the Attachment Orders or otherwise clarifying that such payments were not subject thereto. In particular, some customers suspended payments on account of receivables previously assigned by certain Vitro subsidiaries to an independent trust. Certain of Vitro's subsidiaries, including Vitro Automotriz, S.A. de C.V. ("Automotriz"), established an independent trust, pursuant to a contrato de fideicomiso signed on August 3, 2005 in Mexico (the "Flat Glass Payment Trust"), to which they sold and assigned their trade receivables. The trustee of the Flat Glass Payment Trust is Banco Invex, S.A., Institución de Banca Múltiple, Division Fiduciaria Invex Grupo Financiero ("Invex"). On February 1, 2011, Invex submitted an an order to show cause seeking entry of an order clarifying that payments due to the Flat Glass Payment Trust from customers on account of receivables generated by Automotriz were not subject to the Attachment Orders, which as explained further below, was recently heard and decided by the New York State Court.

On December 13, 2010, the Defendants moved the New York State Court to vacate the Attachment Orders. Aurelius and Elliott opposed this motion and, on December 15, 2010 and December 21, 2010, respectively, moved to confirm their respective Attachment Orders. On January 4, 2011, the Defendants made their submission in further support of the pending motion to vacate and in opposition to Aurelius and Elliotts' motion to confirm the Attachment Orders, and on January 21, Aurelius and Elliott submitted their response on both motions. On February 8, 2011, Justice Kornreich of the New York State Court heard argument on the cross-motions to confirm and to vacate the Attachment Orders, as well as Invex's order to show cause. At the conclusion of the hearing, Justice Kornreich took the cross-motions under advisement and entered an order on Invex's order to show cause (the "Partial Vacatur Order") vacating the Attachment Orders with respect to the Flat Glass Payment Trust receivables. Justice Kornreich briefly stayed the Partial Vacatur Order and the plaintiffs appealed. On February 10, 2011, the New York State Supreme Court, Appellate Division, First Department denied plaintiffs' application for a stay pending appeal and the Partial Vacatur Order became final.

At the direction of Justice Kornreich, the parties have also been negotiating the terms on which they will mediate their disputes. Counsel for the Ad Hoc Bondholders Group advised Justice Kornreich that the group intends to participate fully in the mediation.

### *Vitro's Voluntary Concurso Proceeding and Chapter 15 Case*

On December 13, 2010, to accomplish its proposed in-court restructuring as contemplated by the Exchange Offer and Consent Solicitation, Vitro commenced a voluntary concurso mercantil proceeding (the "Voluntary Concurso Proceeding") under the Mexican Business Reorganization Act by filing a petition and pre-packaged Concurso Plan in the Fourth District Court for Civil and Labor Matters for the State of Nuevo León (the "Mexican Bankruptcy Court"). On December 14, 2010, Alejandro Francisco Sánchez-Mujica, as Vitro's duly-authorized foreign representative, filed a chapter 15 petition for recognition of the Voluntary Concurso Proceeding as a foreign main proceeding under the U.S. Bankruptcy Code (the "Chapter 15 Petition") with the New York Bankruptcy Court, commencing Vitro's chapter 15 case (the "Chapter 15 Case"). Later that same day, the Minority Noteholders filed a motion (the "Venue Transfer Motion") in the Texas Bankruptcy Court, seeking to transfer venue of the Chapter 15 Case to the Texas Bankruptcy Court. The filing of the Venue Transfer Motion had the automatic effect under applicable rules of staying all proceedings in the Chapter 15 Case until the Venue Transfer Motion was resolved.

By resolution dated January 7, 2011, Judge Francisco Eduardo Flores Sánchez of the Fourth Federal District Court of the Fourth Judicial Circuit located in Monterrey, México denied Vitro's request for issuance of a "business reorganization judgment" (sentencia de concurso mercantil), stating that Vitro's petition and Concurso Plan did not meet the requirements for a pre-packaged proceeding under the Mexican Business Reorganization Act. This decision was appealed and on January 28, 2011, the Magistrate for the Federal Unitary Second Appeals Court (Tribunal Unitario) for the Fourth Circuit in Monterrey concluded that the appeals, against the ruling that dismissed the pre-packaged insolvency request submitted by Vitro and certain creditors was also dismissed arguing that such decision is not appealable. An ordinary remedy was filed to appeal this procedural decision and a decision is expected at any time. If

the ordinary remedy is denied or dismissed, Vitro would still be in a position to file for a constitutional recourse (Amparo) to review the decision issued by the Appeals Court.

Meanwhile, since no voluntary concurso proceeding with respect to Vitro was pending in Mexico, Vitro agreed to withdraw its Chapter 15 Petition, which in turn rendered moot the Venue Transfer Motion. On January 26, 2011, the New York Bankruptcy Court approved the withdrawal of the Chapter 15 Petition without prejudice to Vitro's right to re-file it at a later date, and closed the Chapter 15 Case.

### *Involuntary Concurso Proceedings*

On December 13, 2010, certain members of the Ad Hoc Bondholders Group filed involuntary petitions in the Mexican Bankruptcy Court against Vitro, and beginning on December 23, 2010, also filed involuntary petitions against certain of its Mexican subsidiaries. The Mexican Bankruptcy Court has entered orders commencing involuntary proceedings (each, an "Involuntary Concurso Proceeding") against Vitro and Vitro Vidrio y Cristal, S.A. de C.V., Viméxico, S.A. de C.V., Vitro Automotríz, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitrocar, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V., Comercializadora Álcali, S.A. de C.V., Industria del Álcali, S.A. de C.V., FIC Regiomontano, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Fabricación de Máquinas, S.A. de C.V., Vidriera Guadalajara, S.A. de C.V., Vidriera los Reyes, S.A. de C.V., Vitro Envases Norteamérica, and Servicios Integrales de Acabados, S.A. de C.V. Under the Mexican Business Reorganization Act, before the Mexican Bankruptcy Court considers whether to issue a declaration of concurso mercantil in any of the Involuntary Concurso Proceedings, a court-appointed "visitador" must examine each alleged debtor's books and records to determine if it satisfies the eligibility requirements to be a debtor in concurso mercantil and issue a report to the Mexican Bankruptcy Court. This process may last several weeks from the appointment of the visitador, and is followed by a 30-day period during which parties may submit additional evidence. Thereafter, the Mexican Bankruptcy Court will issue a ruling on whether the Involuntary Concurso Proceedings will proceed or be dismissed.

Under Mexican bankruptcy law upon admission of a Concurso proceeding, the Mexican Bankruptcy Court has 24 hours to request from the Federal Institute of Bankruptcy Specialists, or IFECOM, the designation of a "visitador" within the following five days. Once such designation is made, the IFECOM must immediately inform the court and the "visitador" of its designation. Under the foregoing rules, a "visitador" has been or will be appointed for the Concurso proceedings of Vitro Vidrio y Cristal, S.A. de C.V., Viméxico, S.A. de C.V., Vitro Automotríz, S.A. de C.V., Cristales Inastillables de México, S.A. de C.V., Vidrio Plano de México, S.A. de C.V., Vitro Flotado Cubiertas, S.A. de C.V., Vitrocar, S.A. de C.V., Distribuidor Vidriero Lan, S.A. de C.V. Comercializadora Álcali, S.A. de C.V., Industria del Álcali, S.A. de C.V., FIC Regiomontano, S.A. de C.V., Vidriera Monterrey, S.A. de C.V., Fabricación de Máquinas, S.A. de C.V., Vidriera Guadalajara, S.A. de C.V., Vidriera los Reyes, S.A. de C.V. and Vitro Envases Norteamérica, S.A. de C.V. and Servicios Integrales de Acabados, S.A. de C.V.

## Glass Containers

(53 percent of fiscal year 2010 Consolidated Sales)

## Sales

Sales for the quarter increased 20.3 percent YoY to US$255 million from US$212 million in 4Q'10.

Domestic sales increased 16 percent in part as a result of the peso appreciation coupled with higher volumes across all segments, with the exception of food, and stronger product mix in the soft drinks and wine and liquor segments.

Export sales increased 24.9 percent YoY due to higher volumes in every segment, despite a lower price mix in all segments.

Sales from Glass Containers' foreign subsidiaries increased to US$5 million from US$2 million on a YoY basis.

## EBIT and EBITDA

EBIT for the quarter remained almost flat with an increase of 1.3 percent YoY to US$34 million. EBITDA for the same period increased 13.5 percent to US$61 million from US$53 million. During this quarter, EBIT and EBITDA were benefited by increased capacity utilization, higher prices and richer product mix and partially benefited by a 5.4 percent peso appreciation. Despite being affected by the leasing payments of the assets sold in December 2009.

EBITDA from Mexican glass containers operations, which is Glass Container's core business and represents approximately 83 percent of total EBITDA, increased 21.2 percent YoY due to the above mentioned factors.

| Table 7 Glass Containers (Million) | | | | | | |
|---|---|---|---|---|---|---|
| | 4Q'10 | 4Q'09 | YoY% Change | 2010 | 2009 | YoY% Change |
| **Pesos** | | | | | | |
| Consolidated Net sales | 3,168 | 2,768 | 14.5 | 12,339 | 12,385 | (0.4) |
| Net Sales | | | | | | |
| Domestic Sales | 1,959 | 1,776 | 10.3 | 7,434 | 7,534 | (1.3) |
| Exports | 1,144 | 961 | 19.0 | 4,722 | 4,731 | (0.2) |
| Foreign Subsidiaries | 65 | 31 | 109.5 | 183 | 119 | 53.3 |
| EBIT | 419 | 433 | (3.2) | 1,662 | 1,956 | (15.0) |
| EBITDA | 753 | 696 | 8.2 | 2,839 | 3,023 | (6.1) |
| EBIT Margin | 13.2% | 15.7% | -2.5 pp | 13.5% | 15.8% | -2.3 pp |
| EBITDA Margin | 23.8% | 25.1% | -1.3 pp | 23.0% | 24.4% | -1.4 pp |
| | | | | | | |
| **Nominal Dollars** | | | | | | |
| Consolidated Net sales | 255 | 212 | 20.3 | 977 | 914 | 6.9 |
| Domestic Sales | 158 | 136 | 16.0 | 589 | 559 | 5.4 |
| Export Sales | 92 | 74 | 24.9 | 374 | 349 | 7.1 |
| Foreign Subsidiaries | 5 | 2 | 119.8 | 14 | 6 | 123.3 |
| EBIT | 34 | 33 | 1.3 | 131 | 144 | (9.1) |
| EBITDA | 61 | 53 | 13.5 | 225 | 223 | 0.6 |
| EBIT Margin | 13.2% | 15.7% | -2.5 pp | 13.4% | 15.8% | -2.4 pp |
| EBITDA Margin | 23.8% | 25.2% | -1.4 pp | 23.0% | 24.4% | -1.4 pp |
| **Glass Containers** | | | | | | |
| Domestic (Millions of Units) | 883 | 775 | 14.0 | 3,355 | 3,262 | 2.8 |
| Exports (Millions of Units) | 353 | 273 | 29.4 | 1,361 | 1,235 | 10.3 |
| Total | 1,236 | 1,047 | 18.0 | 4,716 | 4,497 | 4.9 |
| Installed capacity utilization (furnaces) | 83.2% | 58.9% | 24.3 pp | | | |
| Alcali (Thousands Tons sold)* | 161 | 168 | (4.2) | 630 | 645 | (2.3) |

\*   Includes sodium carbonate, sodium bicarbonate, sodium chlorine and calcium chlorine

| Flat Glass |
|:---:|

(47 percent of fiscal year 2010 Consolidated Sales)

## Sales

Flat Glass sales for the quarter decreased 2.6 percent YoY to US$207 million from US$213 million.

Domestic sales increased 8.2 percent YoY, driven by higher volumes in the domestic float glass market mainly driven by sales of float glass to 3rd party auto glass manufacturers coupled with recuperating prices, due to product scarcity as a consequence of Hurricane Alex.

Export sales decreased 10.9 percent YoY as we focused on serving the domestic market, as a result of a glass inventory shortage due to Hurricane Alex, instead of exporting what was previously considered excess capacity. This was partially offset by a demand increase from the Original Equipment Manufacturer ("OEM") market coupled with an improved price mix.

Automotive sales increased 4.8 percent YoY driven by higher volumes and better price mix in OEM market. OEM market sales volumes increased 6 percent, while AGR market sales volumes increased 17 percent with a lower price mix.

Sales from foreign subsidiaries decreased 8.3 percent YoY to US$87 million from US$95 million as a result of weakening demand, especially in the construction market of Spain and the U.S.

## EBIT & EBITDA

EBIT for the quarter decreased YoY to negative US$20 million from negative US$15 million, while EBITDA also decreased to negative US$6 million from US$0 million YoY. During the same period, EBIT and EBITDA margins decreased 3 and 3 percentage points, respectively.

On a YoY comparison, EBIT and EBITDA were benefited by increased sales volume and better price mix in OEM and in the domestic Construction market. However, these effects were not enough to compensate the drop in demand and prices from our US and Spanish flat glass subsidiaries as well as the adjustment which reduced a reserve for damages caused by Hurricane Alex that we expect to recover in 2011. This reserve covers the damage caused by Hurricane Alex, which are covered by our insurance policy, and was generated in 3Q'10 following the storm in July 2010. We are finalizing documentation of total damages caused by Hurricane Alex, including this year's planned repairs. Collection is expected in 2011 after the filing is approved by the insurance company.

| | 4Q'10 | 4Q'09 | YoY%<br>Change | 2010 | 2009 | YoY%<br>Change |
|---|---|---|---|---|---|---|
| **Table 8**<br>**Flat Glass**<br>**(Million)** | | | | | | |
| **Pesos** | | | | | | |
| Consolidated Net sales | 2,576 | 2,777 | *(7.2)* | 10,688 | 11,377 | *(6.1)* |
| Net Sales | | | | | | |
|     Domestic Sales | 1,046 | 980 | *6.7* | 4,249 | 3,389 | *25.4* |
|     Exports | 451 | 531 | *(15.1)* | 2,015 | 1,836 | *9.7* |
|     Foreign Subsidiaries | 1,079 | 1,266 | *(14.7)* | 4,424 | 6,152 | *(28.1)* |
| EBIT | (253) | (193) | *31.2* | (435) | (591) | *(26.4)* |
| EBITDA | (72) | 4 | *--* | 223 | 84 | *165.5* |
| | | | | | | |
| *EBIT Margin* | -9.8% | -6.9% | *-2.9 pp* | -4.1% | -5.2% | *1.1 pp* |
| *EBITDA Margin* | -2.8% | 0.2% | *-3 pp* | 2.1% | 0.7% | *1.4 pp* |
| | | | | | | |
| **Nominal Dollars** | | | | | | |
| Consolidated Net sales | 207 | 213 | *(2.6)* | 846 | 839 | *0.8* |
|     Domestic Sales | 84 | 77 | *8.2* | 337 | 249 | *35.3* |
|     Export Sales | 36 | 41 | *(10.9)* | 159 | 136 | *17.4* |
|     Foreign Subsidiaries | 87 | 95 | *(8.3)* | 350 | 454 | *(23.0)* |
| EBIT | (20) | (15) | *38.4* | (35) | (44) | *(19.9)* |
| EBITDA | (6) | 0 | *--* | 17 | 6 | *176.4* |
| | | | | | | |
| *EBIT Margin* | -9.9% | -6.9% | *-3 pp* | -4.1% | -5.2% | *1.1 pp* |
| *EBITDA Margin* | -2.8% | 0.2% | *-3 pp* | 2.0% | 0.7% | *1.3 pp* |
| | | | | | | |
| **Volumes** | | | | | | |
| Flat Glass (Thousands of m2R) [1] [2] | 28,530 | 33,399 | *(14.6)* | 122,183 | 118,156 | *3.4* |
| | | | | | | |
| **Capacity utilization** | | | | | | |
| Float Glass furnaces [3] | 88.4% | 107.5% | *-19.1 pp* | | | |
| Flat Glass auto | 72.5% | 59.9% | *12.6 pp* | | | |

(1)  Flat Glass volumes only include float and automotive glass manufactured at our Mexican subsidiaries

(2)  m2R = Reduced Squared Meters

(3)  Capacity utilization may sometimes be greater than 100 percent because pulling capacity is calculated based on a certain number of changes in glass
color & thickness, determined by historical averages.

# CONSOLIDATED

## VITRO, S.A.B. DE C.V. AND SUBSIDIARIES
### CONSOLIDATED FINANCIAL STATEMENTS
FOR THE PERIODS, (MILLION)

| Item | INCOME STATEMENT | Fourth Quarter Nominal Pesos 2010 | 2009 | % Var. | Nominal Dollars 2010 | 2009 | % Var. | January-December Nominal Pesos 2010 | 2009 | % Var. | Nominal Dollars 2010 | 2009 | % Var. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Consolidated Net Sales | 5,862 | 5,602 | 4.6 | 472 | 430 | 9.8 | 23,360 | 23,991 | (2.6) | 1,849 | 1,770 | 4.5 |
| 2 | Cost of Sales | 4,410 | 4,158 | 6.0 | 355 | 319 | 11.3 | 17,211 | 17,181 | 0.2 | 1,363 | 1,268 | 7.5 |
| 3 | **Gross Income** | 1,453 | 1,444 | 0.6 | 117 | 111 | 5.5 | 6,149 | 6,810 | (9.7) | 486 | 502 | (3.1) |
| 4 | SG&A Expenses | 1,336 | 1,172 | 14.0 | 108 | 90 | 19.7 | 4,967 | 5,482 | (9.4) | 393 | 404 | (2.6) |
| 5 | **Operating Income** | 117 | 272 | (57.0) | 9 | 21 | (55.7) | 1,182 | 1,328 | (11.0) | 93 | 98 | (5.3) |
| 6 | Other Expenses (income), net | 259 | (21) | -- | 21 | (7) | -- | 568 | 291 | 95.3 | 45 | 21 | 117.4 |
| 7 | Share in earnings of unconsolidated associated companies | 7 | (21) | -- | 1 | (2) | -- | 26 | (25) | -- | 2 | (2) | -- |
| 8 | Interest Expense | (604) | (572) | 5.5 | (49) | (44) | 11.1 | (2,286) | (2,362) | (3.2) | (181) | (174) | 4.3 |
| 9 | Interest Income | 20 | 14 | 44.1 | 2 | 1 | 51.2 | 55 | 51 | 8.9 | 4 | 4 | 16.3 |
| 10 | Other Financial Expenses (net) | (168) | (306) | (45.2) | (14) | (23) | (42.2) | (606) | (1,030) | (41.2) | (48) | (74) | (35.3) |
| 11 | Exchange (Loss) Income | 123 | 598 | (79.4) | 10 | 46 | (78.2) | 578 | 976 | (40.8) | 49 | 79 | (38.7) |
| 12 | **Total Financing Result** | (629) | (267) | 135.7 | (51) | (20) | 148.3 | (2,260) | (2,366) | (4.5) | (176) | (165) | 6.9 |
| 13 | **Inc. (loss) bef. Tax** | (763) | 70 | -- | (62) | 5 | -- | (1,619) | (1,353) | (19.7) | (127) | (90) | (41.1) |
| 14 | Income Tax | (47) | (468) | 89.9 | (4) | (36) | 89.2 | (245) | (598) | 59.1 | (18) | (43) | 58.6 |
| 15 | **Net Income (Loss)** | (716) | 538 | -- | (58) | 41 | -- | (1,375) | (754) | (82.3) | (109) | (47) | (133.8) |
| 16 | Net Income (loss) of Maj. Int. | (703) | 511 | -- | (57) | 39 | -- | (1,374) | (787) | (74.7) | (109) | (49) | (120.1) |
| 17 | Net Income (loss) of Min. Int. | (13) | 26 | -- | (1) | 2 | -- | (1) | 33 | -- | 0 | 3 | (99.6) |

## VITRO, S.A.B. DE C.V. AND SUBSIDIARIES
### CONSOLIDATED FINANCIAL STATEMENTS
As of December 2010

| Item | BALANCE SHEET | Nominal Pesos 2010 | 2009 | % Var. | Nominal Dollars 2010 | 2009 | % Var. |
|---|---|---|---|---|---|---|---|
| 18 | Cash & Cash Equivalents | 2,137 | 2,835 | (24.6) | 173 | 217 | (20.3) |
| 19 | Trade Receivables | 3,213 | 3,200 | 0.4 | 260 | 245 | 6.1 |
| 20 | Inventories | 3,243 | 3,172 | 2.2 | 262 | 243 | 7.8 |
| 21 | Other Current Assets | 1,119 | 889 | 25.9 | 90 | 68 | 32.4 |
| 22 | **Total Current Assets** | 9,712 | 10,096 | (3.8) | 785 | 773 | 1.6 |
| 23 | Prop., Plant & Equipment | 13,422 | 15,339 | (12.5) | 1,085 | 1,175 | (7.7) |
| 24 | Deferred Assets | 6,608 | 6,209 | 6.4 | 537 | 475 | 13.1 |
| 25 | Other Long-Term Assets | 124 | 123 | 0.8 | 10 | 9 | 7.1 |
| 26 | Investment in Affiliates [2] | 861 | 886 | (2.8) | 70 | 68 | 2.9 |
| 27 | **Total Assets** | 30,727 | 32,653 | (5.9) | 2,487 | 2,500 | (0.5) |
| 28 | Short-Term & Curr. Debt [3](4) | 19,714 | 18,197 | 8.3 | 1,595 | 1,393 | 14.5 |
| 29 | Trade Payables | 1,590 | 1,595 | (0.3) | 129 | 122 | 5.7 |
| 30 | Other Current Liabilities | 6,411 | 7,790 | (17.7) | 519 | 597 | (13.1) |
| 31 | **Total Curr. Liab.** | 27,715 | 27,582 | 0.5 | 2,243 | 2,112 | 6.2 |
| 32 | Long-Term Debt | 1,420 | 1,904 | (25.4) | 115 | 146 | (21.2) |
| 33 | Other LT Liabilities | 1,100 | 1,184 | (7.1) | 89 | 91 | (2.2) |
| 34 | **Total Liabilities** | 30,235 | 30,670 | (1.4) | 2,447 | 2,349 | 4.2 |
| 35 | Majority Interest | (910) | 520 | -- | (74) | 40 | -- |
| 36 | Minority Interest | 1,404 | 1,464 | (4.1) | 114 | 112 | 1.8 |
| 37 | **Total Shar. Equity** | 494 | 1,984 | (75.1) | 40 | 152 | (73.7) |

| FINANCIAL INDICATORS [1] | 4Q10 | 4Q09 |
|---|---|---|
| Debt/EBITDA (LTM, times) | 6.7 | 6.2 |
| EBITDA/ Interest. Exp. (LTM, times) | 1.4 | 1.4 |
| Debt / (Debt + Equity) (times) | 1.0 | 0.9 |
| Debt/Equity (times) | 42.8 | 10.1 |
| Total Liab./Stockh. Equity (times) | 61.2 | 15.5 |
| Curr. Assets/Curr. Liab. (times) | 0.4 | 0.4 |
| Sales/Assets (times) | 0.8 | 0.7 |
| EPS (Ps$) * | (1.82) | 1.35 |

* Based on the weighted average shares outstanding.

| OTHER INFORMATION | | |
|---|---|---|
| # Shares Issued (thousands) | 386,857 | 386,857 |
| # Average Shares Outstanding (thousands) | 386,412 | 379,407 |
| # Employees | 17,628 | 16,807 |

(1) Financial ratios are calculated using figures in pesos.
(2) Investment in Affiliates includes 49.7% participation in Comegua under the equity method starting December 2008, as a result of the deconsolidation of Comegua.
(3) Since we are not in compliance under our bond indentures, the outstanding amount of the Senior Notes debt was reclassified from long-term to short-term.
(4) Includes derivative instruments settlements for US$253 million recognized by the Company in 3Q10, previously accounted in other current liabilities.

# VITRO, S.A.B. DE C.V. AND SUBSIDIARIES
## SEGMENTED INFORMATION
### FOR THE PERIODS, (MILLION)

| | Fourth Quarter | | | | | | January-December | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Nominal Pesos | | | Nominal Dollars | | | Nominal Pesos | | | Nominal Dollars | | |
| | 2010 | 2009 | % | 2010 | 2009 | % | 2010 | 2009 | % | 2010 | 2009 | % |
| **GLASS CONTAINERS** | | | | | | | | | | | | |
| Net Sales | 3,185 | 2,779 | 14.6% | 257 | 213 | 20.7% | 12,403 | 12,452 | -0.4% | 982 | 919 | 6.9% |
| Interd. Sales | 17 | 11 | 54.5% | 2 | 1 | 100.0% | 64 | 67 | -4.5% | 5 | 5 | 0.0% |
| Con. Net Sales | 3,168 | 2,768 | 14.5% | 255 | 212 | 20.3% | 12,339 | 12,385 | -0.4% | 977 | 914 | 6.9% |
| Expts. | 1,144 | 961 | 19.0% | 92 | 74 | 24.9% | 4,722 | 4,731 | -0.2% | 374 | 349 | 7.1% |
| EBIT | 419 | 433 | -3.2% | 34 | 33 | 1.3% | 1,662 | 1,956 | -15.0% | 131 | 144 | -9.1% |
| Margin [1] | 13.2% | 15.7% | | 13.2% | 15.7% | | 13.5% | 15.8% | | 13.4% | 15.8% | |
| EBITDA | 753 | 696 | 8.2% | 61 | 53 | 13.5% | 2,839 | 3,023 | -6.1% | 225 | 223 | 0.6% |
| Margin [1] | 23.8% | 25.1% | | 23.8% | 25.2% | | 23.0% | 24.4% | | 23.0% | 24.4% | |
| **Glass containers volumes (MM Pieces)** | | | | | | | | | | | | |
| Domestic | | | | 883 | 775 | 14.0% | | | | 3,355 | 3,262 | 2.8% |
| Exports | | | | 353 | 273 | 29.4% | | | | 1,361 | 1,235 | 10.3% |
| Total:Dom.+Exp. | | | | 1,236 | 1,047 | 18.0% | | | | 4,716 | 4,497 | 4.9% |
| Soda Ash (Thousand Tons) | | | | 161 | 168 | -4.2% | | | | 630 | 645 | -2.3% |
| **FLAT GLASS** | | | | | | | | | | | | |
| Net Sales | 2,576 | 2,778 | -7.3% | 207 | 213 | -2.6% | 10,703 | 11,453 | -6.5% | 847 | 845 | 0.2% |
| Interd. Sales | - | 1 | -- | - | - | -- | 15 | 76 | -80.3% | 1 | 6 | -83.3% |
| Con. Net Sales | 2,576 | 2,777 | -7.2% | 207 | 213 | -2.6% | 10,688 | 11,377 | -6.1% | 846 | 839 | 0.8% |
| Expts. | 451 | 531 | -15.1% | 36 | 41 | -10.9% | 2,015 | 1,836 | 9.7% | 159 | 136 | 17.4% |
| EBIT | (253) | (193) | 31.2% | (20) | (15) | 38.4% | (435) | (591) | -26.4% | (35) | (44) | -19.9% |
| Margin [1] | -9.8% | -6.9% | | -9.9% | -6.9% | | -4.1% | -5.2% | | -4.1% | -5.2% | |
| EBITDA | (72) | 4 | -- | (6) | 0 | -- | 223 | 84 | 165.5% | 17 | 6 | 176.4% |
| Margin [1] | -2.8% | 0.2% | | -2.8% | 0.2% | | 2.1% | 0.7% | | 2.0% | 0.7% | |
| **Flat Glass Volumes (Thousand m2R)[2]** | | | | | | | | | | | | |
| Const + Auto | 28,530 | 33,399 | -14.6% | | | | 122,183 | 118,156 | 3.4% | | | |
| **CONSOLIDATED [3]** | | | | | | | | | | | | |
| Net Sales | 5,879 | 5,614 | 4.7% | 474 | 431 | 10.0% | 23,439 | 24,134 | -2.9% | 1,855 | 1,781 | 4.2% |
| Interd. Sales | 17 | 12 | 41.7% | 2 | 1 | 100.0% | 79 | 143 | -44.8% | 6 | 11 | -45.5% |
| Con. Net Sales | 5,862 | 5,602 | 4.6% | 472 | 430 | 9.8% | 23,360 | 23,991 | -2.6% | 1,849 | 1,770 | 4.5% |
| Expts. | 1,594 | 1,492 | 6.9% | 128 | 114 | 12.2% | 6,737 | 6,568 | 2.6% | 533 | 484 | 10.0% |
| EBIT | 116 | 272 | -57.2% | 9 | 21 | -55.9% | 1,181 | 1,328 | -11.1% | 93 | 98 | -5.3% |
| Margin [1] | 2.0% | 4.9% | | 2.0% | 4.9% | | 5.1% | 5.5% | | 5.0% | 5.5% | |
| EBITDA | 672 | 787 | -14.7% | 54 | 60 | -10.7% | 3,161 | 3,217 | -1.7% | 250 | 237 | 5.1% |
| Margin [1] | 11.5% | 14.1% | | 11.4% | 14.1% | | 13.5% | 13.4% | | 13.5% | 13.4% | |

[1] EBIT and EBITDA Margins consider Consolidated Net Sales.
[2] m2R = Reduced Squared Meters
[3] Includes corporate companies and other's sales and EBIT.

**Exhibit D**

15F-12B/A 1 y90341e15fv12bza.htm FORM 15F-12B/A

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 15F/A

**CERTIFICATION OF A FOREIGN PRIVATE ISSUER'S TERMINATION OF
REGISTRATION OF A CLASS OF SECURITIES UNDER SECTION 12(G) OF
THE SECURITIES EXCHANGE ACT OF 1934 OR ITS TERMINATION OF THE
DUTY TO FILE REPORTS UNDER SECTION 13(A) OR SECTION 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission File Number **001-10905**

# Vitro, S.A.B. de C.V.

(Exact name of registrant as specified in its charter)

# Vitro, S.A.B. de C.V.

(Translation of Registrant's name into English)

**Ave. Ricardo Margain Zozaya 400, Col. Valle del Campestre,
San Pedro Garza Garcia, Nuevo Leon, 66265 Mexico
52-81-8863-1200**

(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**American Depositary Shares**

**11.75% Senior Notes due 2013**

**8.625% Senior Notes due 2012**

**9.125% Senior Notes due 2017**

(Title of each class of securities covered by this Form)

Place an X in the appropriate box(es) to indicate the provision(s) relied upon to terminate the
duty to file reports
under the Securities Exchange Act of 1934:

| | | | |
|---|---|---|---|
| Rule 12h-6(a) | **X** | Rule 12h-8(d) | |
| *(for equity securities)* | | *(for successor registrants)* | |
| Rule 12h-8(c) | **X** | Rule 12h-6(i) | |
| *(for debt securities)* | | *(for prior Form 15 fliers)* | |

## PART I

### Item 1.  Exchange Act Reporting History

VITRO, S.A.B. DE C.V. (the "Registrant") first incurred the duty to file reports under Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") on October 30, 1991, the date the Company filed a Registration Statement on Form F-1 (Commission File No. 033-43660) with the Securities and Exchange Commission (the "Commission"). The Registrant filed an initial Form 15F on September 9, 2010 and the current Form 15F/A is being filed to reflect that the Registrant meets all the conditions to deregister and terminate its reporting obligations pursuant to the Exchange Act.

For the 12 months preceding the filing of this Form 15F/A, the Registrant has filed or submitted all reports required under Sections 13(a) and 15(d) of the Exchange Act and corresponding Commission rules, and has filed at least one annual report under section 13(a).

### Item 2.  Recent United States Market Activity

The Registrant's securities were last sold in the United States in a registered offering under the Securities Act of 1933 required to be disclosed under this Item on August 2, 2007 pursuant to a Registration Statement on Form F-4 (Commission File No. 333-144726).

### Item 3.  Foreign Listing and Primary Trading Market

The Registrant has maintained a listing of its common shares on the Mexican Stock Exchange (Bolsa Mexicana de Valores) located in Mexico City, Mexico. Mexico constitutes the primary trading market for the Registrant's common shares. The Registrant's common shares were initially listed on the Mexican Stock Exchange on January 5, 1976.

During the 12-month period beginning February 1, 2010 and ending February 1, 2011, 99.2% of trading in the Registrant's common shares occurred in Mexico. The trading market for the Registrant's common shares in Mexico is larger than the trading market for the Registrant's common shares in the United States as of the same 12-month period.

## Item 4. Comparative Trading Volume Data

The Registrant is relying on Rule 12h-6(a)(4)(i) and is using the 12-month period beginning February 1, 2010 and ending February 1, 2011 to meet the requirements of that rule provision.

During this 12-month period, the average daily trading volume ("ADTV") of the Registrant's common shares and the ADRs (when expressed in terms of the underlying shares) was 1,256 shares in the United States and 152,795 shares on a worldwide basis.

For the same 12-month period, the ADTV of the Registrant's ADRs (when expressed in terms of the underlying shares) in the United States as a percentage of the ADTV for the Registrant's common shares and ADRs on a worldwide basis was 0.8%.

The Registrant delisted its ADRs from the New York Stock Exchange on August 24, 2009. As of August 24, 2009, the ADTV of the Registrant's common shares and the ADRs (when expressed in terms of the underlying shares) was 16.73% of the ADTV for the Registrant's common shares on a worldwide basis for the preceding 12-month period.

The Registrant terminated its ADR facility on August 24, 2009. As of August 24, 2009, the ADTV of the Registrant's common shares and the ADRs (when expressed in terms of the underlying shares) was 16.73% of the ADTV for the Registrant's common shares on a worldwide basis for the preceding 12-month period.

The source of the trading volume information used for determining whether the Registrant meets the requirements of Rule 12h-6 is Bloomberg L.P.

## Item 5. Alternative Record Holder Information

Not applicable.

## Item 6. Debt Securities

As of December 10, 2010, the number of record holders of the Company's debt securities on a worldwide basis was as follows:

| Debt Securities | | Number of Record Holders |
|---|---|---|
| 11.75% | Senior Notes Due 2013 | 28 |
| 8.625% | Senior Notes Due 2012 | 24 |
| 9.125% | Senior Notes Due 2017 | 26 |

The number of record holders of these Notes on a worldwide basis was determined on the basis of the records of the Depositary Trust Company as of December 10, 2010.

## Item 7. Notice Requirement

The Registrant published the notice, required by Rule 12h-6(h), disclosing its intent to terminate its duty to file reports under section 13(a) and section 15(d) of the Exchange Act on September 8,

2010. The notice was disseminated in the United States through PR Newswire and filed with the Commission on September 9, 2010 as an exhibit to the Registrant's Form 15F.

### Item 8. Prior Form 15 Filers

Not applicable.

## PART II

### Item 9. Rule 12g3-2(b) Exemption

Not applicable.

## PART III

### Item 10. Exhibits

Not applicable.

### Item 11. Undertakings

The undersigned issuer hereby undertakes to withdraw this Form 15F/A if, at any time before the effectiveness of its termination of reporting under Rule 12h-6, it has actual knowledge of information that causes it reasonably to believe that, at the time of filing the Form 15F/A:

(1) The average daily trading volume of its subject class of securities in the United States exceeded 5 percent of the average daily trading volume of that class of securities on a worldwide basis for the same recent 12-month period that the issuer used for purposes of Rule 12h-6(a)(4)(i);

(2) Its subject class of securities was held of record by 300 or more United States residents or 300 or more persons worldwide, if proceeding under Rule 12h-6(a)(4)(ii) or Rule 12h-6(c); or

(3) It otherwise did not qualify for termination of its Exchange Act reporting obligations under Rule 12h-6.

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934, Vitro, S.A.B. de C.V. has duly authorized the undersigned person to sign on its behalf this certification on Form 15F/A. In so doing, Vitro, S.A.B. de C.V. certifies that, as represented on this Form, it has complied with all of the conditions set forth in Rule 12h-6 for terminating its registration under section 12(g) of the Exchange Act, or its duty to file reports under section 13(a) or section 15 (d) of the Exchange Act, or both.

Dated: March 16, 2011

**VITRO, S.A.B. DE C.V.**

By:  **/s/ Claudio Luis Del Valle**
    Name:  **Claudio Luis Del Valle**
    Title:  **Chief Administrative and Financial Officer**

**Exhibit E**

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM T-3/A
# (Amendment No. 1)

## FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
## UNDER THE TRUST INDENTURE ACT OF 1939

---

# Vitro, S.A.B. de C.V.
**(Name of Applicant)**

**Ave. Ricardo Margáin 400**
**Col. Valle del Campestre**
**San Pedro Garza García, Nuevo León, 66265**
**United Mexican States ("Mexico")**
**(Address of Principal Executive Offices)**

**Securities to be Issued Under the Indentures to be Qualified**

---

| Title of Class | Amount |
|---|---|
| 8.0% Notes due 2019 | $850 million in aggregate principal amount |
| Mandatory Convertible Debentures | $100.0 million in aggregate principal amount, subject to adjustment |

Approximate date of proposed public offering:
**As promptly as practicable after the date of this Application for Qualification**

**Name and Address of Agent for Service:**

**Puglisi & Associates**
**850 Library Avenue, Suite 204**
**Newark, Delaware 19711**
**(302) 738-6680**
**With copies to:**

| | |
|---|---|
| **Joy K. Gallup, Esq.** | **Alejandro Sanchez Mujica** |
| **Milbank, Tweed, Hadley & McCloy LLP** | **General Counsel** |
| **1 Chase Manhattan Plaza** | **Ave. Ricardo Margain Zozaya #400** |
| **New York, NY 10005** | **Col. Valle del Campestre** |
| **(212) 530-5000** | **San Pedro Garza Garcia** |
| | **Nuevo Leon, 66265 Mexico** |
| | **+52 (81) 8863-1200** |

---

**The Applicant hereby amends this application for qualification on such date or dates as may be necessary to delay its effectiveness until (i) the 20th day after the filing of a further amendment which specifically states that it shall supersede this amendment, or (ii) such date as the SEC, acting pursuant to Section 307(c) of the Act, may determine upon the written request of the Applicant.**

## EXPLANATORY NOTE

This Amendment No. 1 to Form T-3 (this "Amendment") is being filed on behalf of Vitro, S.A.B. de C.V. and the guarantors listed in Schedule A of the Form T-3 filed on November 1, 2010. This Amendment is solely to file the Exhibit filed herewith and to update the Exhibits list. This Amendment is not intended to amend or delete any other part of the Applicants' Application for Qualification (the "Application"). All other information in the Application is unchanged and has been omitted from this Amendment.

## EXHIBIT LIST

| | |
|---|---|
| Exhibit T3A* | Amended and Restated Certificate of Incorporation (acta constitutiva) of Vitro, S.A.B. de C.V., together with an English translation, is contained in the bylaws incorporated by reference herein as Exhibit T3B. |
| Exhibit T3B* | Amended and Restated Bylaws (estatutos sociales) of Vitro, S.A.B. de C.V., together with an English translation, incorporated by reference to Exhibit 1.01 of the Company's Form 20-F filed with the Commission on July 1, 2009. |
| Exhibit T3C1** | New 2019 Notes Indenture between Vitro, S.A.B. de C.V., the guarantors named therein and The Bank of New York Mellon, as trustee. |
| Exhibit T3C2** | New MCDs Indenture between Vitro, S.A.B. de C.V. and The Bank of New York Mellon, as trustee. |
| Exhibit T3D | Not Applicable. |
| Exhibit T3E.1* | Tender Offer and Exchange Offer and Consent Solicitation Statement to offer to purchase for cash or exchange outstanding 2012 Notes, 2013 Notes, 2017 Notes, DFI Claims and the Other Debt for Notes due 2019 and mandatory convertible debentures. |
| Exhibit T3E.2* | Letter of Transmittal. |
| Exhibit T3E.3* | Letter of Instructions to Beneficial Holders. |
| Exhibit T3E.4 | Solicitation Statement Supplement. |
| Exhibit T3F** | Cross-reference sheet showing the location in the Indentures of the provisions inserted therein pursuant to Section 310 through 318(a), inclusive, of the Trust Indenture Act of 1939 (included as part of Exhibit T3C1 and T3C2). |
| Exhibit T3G* | Statement of eligibility and qualification on Form T-1 of The Bank of New York Mellon, as trustee, under the Indentures to be qualified. |
| Exhibit T3H* | Item 3 diagram depicting the relationship of each affiliate to Vitro, S.A.B. de C.V. |

---

\*     Previously filed.

\*\*    To be filed by amendment.

**SIGNATURE**

Pursuant to the requirements of the Trust Indenture Act of 1939, the applicant, Vitro, S.A.B. de C.V., a corporation organized and existing under the laws of Mexico, has duly caused this application to be signed on its behalf by the undersigned, thereunto duly authorized, and its seal to be hereunto affixed and attested all in the City of San Pedro Garza Garcia and State of Nuevo León, on the 12th day of November, 2010.

VITRO, S.A.B. DE C.V.

By: /s/ Claudio del Valle Cabello
Name:   Claudio del Valle Cabello
Title:   Attorney-in-Fact

By: /s/ Alejandro Sánchez Mújica
Name:   Alejandro Sánchez Mújica
Title:   Attorney-in-Fact

3

**CONFIDENTIAL**

**Vitro, S.A.B. de C.V.**
**SOLICITATION STATEMENT SUPPLEMENT**
**DATED NOVEMBER 12, 2010**

This document supplements the Offer to Purchase and Offer to Exchange and Consent Solicitation Statement dated November 1, 2010 (the "Statement"), relating to our offer to purchase the Old Notes for cash (the "Tender Offer") and our proposed exchange offer and consent solicitation (the "Exchange Offer and Consent Solicitation"). The information set forth in this supplement is not complete — this supplement is intended to be read together with the Statement only. To the extent information in this supplement is inconsistent with the Statement, you should rely on this supplement. Defined terms used in this supplement but not defined in this supplement have the meanings assigned to them in the Statement.

This supplement includes a section titled "Revised and Supplemented Questions and Answers Relating to the Tender Offer and the Exchange Offer and Consent Solicitation," which clarifies and slightly revises the procedures for participating in the Tender Offer and the Exchange Offer and Consent Solicitation. **Both beneficial owners and DTC Participants should read the updated disclosure in that section carefully.** The primary revision to previously announced procedures is that an original executed Letter of Instructions will be required to be submitted (together with the corresponding original executed Letter of Transmittal and all other required documents) to the Depositary or the Information and Exchange Agent, as applicable, in order to: (i) participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation or (ii) participate solely in the Exchange Offer and Consent Solicitation.

Also set forth in this supplement is our unaudited financial information as of and for the nine-month periods ended September 30, 2009 and 2010. In the opinion of management, the unaudited financial information set forth in this supplement includes all adjustments, consisting of only normally recurring adjustments, necessary for a fair presentation of this financial information. The unaudited financial information set forth in this supplement should be read in conjunction with our audited consolidated financial statements as of December 31, 2008 and 2009 and for each of the three years in the period ended December 31, 2009, which are included in the Statement.

This supplement also provides information regarding the treatment of the Company's *Certificados Bursátiles* in the Company's restructuring, including an amended *Concurso* Plan set forth in Annex A.

Information in this supplement is presented in nominal Pesos as of September 30, 2009 and 2010 and U.S. Dollar amounts are translated at the rate of 13.5042 and 12.5011 to US$1.00, respectively. The exchange rates used are calculated and published by the Banco de México, or the Mexican Central Bank, in the Diario Oficial de la Federación, Mexico's Daily Official Gazette of the Federal Government, which we refer to as the "Free Exchange Rate." See "Exchange Rates" in the Statement for additional information regarding exchange rates.

The information contained in this supplement does not contain all of the information and disclosures normally included in interim financial statements prepared in accordance with Mexican GAAP. We have not undertaken a U.S. GAAP reconciliation for the period ended on or as of September 30, 2010.

**The Expiration Time for the Tender Offer and the Exchange Offer and Consent Solicitation remains 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated.**

Questions and requests for assistance or for additional copies of this supplement and the Statement or any other documents may be directed to the Depositary or the Information and Exchange Agent, as applicable, at its address and telephone number set forth on the back cover of the Statement. Beneficial owners may also contact their broker, dealer, commercial bank, trust company or other nominee through which they hold the Old Notes with questions and requests for assistance.

**REVISED AND SUPPLEMENTED QUESTIONS AND ANSWERS RELATING TO THE TENDER OFFER
AND THE EXCHANGE OFFER AND CONSENT SOLICITATION**

The text below supplements and amends the corresponding questions and answers under the heading "Questions and Answers Relating to the Tender Offer and the Exchange Offer and Consent Solicitation." It does not restate the questions and answers from the Statement in their entirety, and those remain applicable except as modified below.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to have any Old Notes that are not accepted in the Tender Offer returned to me?**

**A.** In order to participate in the Tender Offer and elect to have your Old Notes returned to you if they are not accepted in the Tender Offer you must complete the following steps:

(1) From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2) In order to complete the instruction letter and tender your Old Notes in the Tender Offer you must:

- Execute and notarize the instruction letter in Section I and check the first box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series; and

- Promptly return all pages of the completed instruction letter to your bank, broker, dealer, trust company or other nominee.

(3) We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. **Only if you have received a Letter of Transmittal and have been instructed to complete it, you must:**

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute and notarize the Letter of Transmittal in Section II.A.1, checking box 1;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal.

(4) Promptly return all pages of the completed instruction letter to your bank, broker, dealer, trust company or other nominee.

**Q. I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation?**

**A.** In order to participate in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must complete the following steps:

(1) From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2) In order to complete the instruction letter and tender your Old Notes in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation you must:

- Execute and notarize the instruction letter in Section I and check the second box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section II.A.1 or II.A.2, as applicable;

- Indicate in Section II.A.3 the aggregate principal amount of each series of Old Notes that you wish to tender and the Bid Price at which you wish to tender each series; and

- Promptly return originals of all pages of the completed instruction letter to your bank, broker, dealer, trust company or other nominee.

(3)  We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually tenders your Old Notes in the Tender Offer to sign and obtain notarization and an apostille of the Letter of Transmittal and to deliver originals of your executed and notarized instruction letter to the Depositary). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. **Only if you have received a Letter of Transmittal and have been instructed to complete it, you must:**

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section III.A.1, checking box 2;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal;

- Execute and notarize the applicable Power of Attorney attached to the Letter of Transmittal as Schedule I.A, I.B or I.C; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(4)  Promptly return originals of all completed documents together to your bank, broker, dealer, trust company or other nominee.

**Q.    I am a beneficial owner of Vitro's outstanding Old Notes and I am not a DTC Participant. How do I participate in the Exchange Offer and Consent Solicitation?**

**A.**    In order to participate in the Exchange Offer and Consent Solicitation you must complete the following steps:

(1)  From your bank, broker, dealer, trust company or other nominee, you should have received an instruction letter entitled "Letter of Instructions to Beneficial Owners" which you must complete.

(2)  In order to complete the instruction letter and participate in the Exchange Offer and Consent Solicitation you must:

- Execute and notarize the instruction letter in Section I and check the third box in Section I;

- Provide the relevant details about yourself and special payment instructions, if any, in Section III.A.1 or III.A.2, as applicable;

- Indicate in Section III.A.3 the aggregate principal amount of each series of Old Notes that you wish to submit; and

- Promptly return originals of all pages of the completed instruction letter to your bank, broker, dealer, trust company or other nominee.

(3) We do not require you, as a beneficial owner, to complete the Letter of Transmittal (though we will require the DTC Participant that actually submits your Old Notes in the Exchange Offer and Consent Solicitation to sign and obtain notarization and an apostille of the Letter of Transmittal and to deliver originals of your executed and notarized instruction letter to the Information and Exchange Agent). However, for its own record-keeping purposes, your bank, broker, dealer, trust company or other nominee may have sent you a Letter of Transmittal. **Only if you have received a Letter of Transmittal and have been instructed to complete it, you must:**

- Indicate in Section II the aggregate principal amounts of the Old Notes you wish to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section III.A.1, checking box 3;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.3;

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal;

- Execute and notarize the applicable Power of Attorney attached to the Letter of Transmittal as Schedule I.A, I.B or I.C; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(4) Promptly return originals of all pages of the completed documents together to your bank, broker, dealer, trust company or other nominee.

**Q. If I am a DTC Participant, and I have been instructed and authorized by the beneficial owner of Vitro's outstanding Old Notes to participate in the Tender Offer and elect to have any Old Notes that are not accepted in the Tender Offer returned, what must I do?**

**A.** In order to participate in the Tender Offer and elect to have any Old Notes that are not accepted in the Tender Offer returned on behalf of the beneficial owner, you must complete the following steps:

(1) From the beneficial owner, you should have received originals of all pages of the completed instruction letter.

(2) In order to complete the Transmittal Letter you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price the beneficial owner wishes to submit;

- Execute and notarize the Letter of Transmittal in Section II.A.1, checking box 1;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2; and

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal.

(3) Tender the amounts of Old Notes in accordance with DTC's ATOP procedures as instructed and authorized prior to the Expiration Time and promptly return all pages of the completed Letter of Transmittal.

**Q. If I am a DTC Participant, and I have been instructed and authorized by the beneficial owner of Vitro's outstanding Old Notes to participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation, what must I do?**

4

**A.** In order to participate in the Tender Offer and exchange any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation on behalf of the beneficial owner, you must complete the following steps:

(1) From the beneficial owner, you should have received originals of all pages of the completed instruction letter.

(2) In order to complete the Transmittal Letter you must:

- Indicate in Section I the aggregate principal amounts of the Old Notes and the Bid Price the beneficial owner wishes to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section III.A.1, checking box 2;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.2;

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal;

- Execute and notarize the applicable Power of Attorney attached to the Letter of Transmittal as Schedule I.A, I.B or I.C; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(3) Tender the amounts of Old Notes in accordance with DTC's ATOP procedures as instructed and authorized prior to the Expiration Time and promptly return originals of all pages of the completed Letter of Transmittal, applicable Power of Attorney and signature page to the *Concurso* Plan together with the originals of all pages of the completed instruction letter to the Depositary.

**Q. If I am a DTC Participant, and I have been instructed and authorized by the beneficial owner of Vitro's outstanding Old Notes to participate solely in the Exchange Offer and Consent Solicitation, what must I do?**

**A.** In order to participate in the Exchange Offer and Consent Solicitation on behalf of the beneficial owner, you must complete the following steps:

(1) From the beneficial owner, you should have received originals of all pages of the completed instruction letter.

(2) In order to complete the Transmittal Letter you must:

- Indicate in Section II the aggregate principal amounts of the Old Notes the beneficial owner wishes to submit;

- Execute, notarize and apostille the Letter of Transmittal in Section III.A.1, checking box 3;

- Provide the relevant details about special payment instructions, if any, and about yourself and your accounts in Section III.A.3;

- Complete the IRS Form W-9 or other withholding forms described in the Letter of Transmittal;

- Execute and notarize the applicable Power of Attorney attached to the Letter of Transmittal as Schedule I.A, I.B or I.C; and

- Execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II.

(3) Tender the amounts of Old Notes in accordance with DTC's ATOP procedures as instructed and authorized prior to the Expiration Time and promptly return originals of all pages of the completed Letter of Transmittal, applicable Power of Attorney and signature page to the *Concurso* Plan together with the originals of all pages of the completed instruction letter to the Information and Exchange Agent.

**Q.** **Who must execute and notarize a Power of Attorney attached to the Letter of Transmittal as Schedule I?**

**A.** If you are one of the following you must execute and notarize the applicable Power of Attorney attached to the Letter of Transmittal as Schedule I.A, I.B or I.C:

- A beneficial owner who has received a Letter of Transmittal from your bank, broker, dealer, trust company or other nominee and has been instructed to complete it and you wish to participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation;

- A beneficial owner who has received a Letter of Transmittal from your bank, broker, dealer, trust company or other nominee and has been instructed to complete it and you wish to participate solely in the Exchange Offer and Consent Solicitation;

- A DTC Participant who has been instructed and authorized by a beneficial owner to participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation; or

- A DTC Participant who has been instructed and authorized by a beneficial owner to participate solely in the Exchange Offer and Consent Solicitation.

The Power of Attorney attached in Schedule I.A is for signatories who are companies whose notary public certifies the signature and the corporate records of the company. The Power of Attorney attached in Schedule I.B is for signatories who are companies whose notary public only certifies the signature and an officer of the company certifies the company records. The Power of Attorney attached as Schedule I.C. is for signatories who are individuals.

**Q.** **Who must execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II?**

**A.** If you are one of the following you must execute and notarize the signature page to the *Concurso* Plan attached to the Letter of Transmittal as Schedule II:

- A beneficial owner who has received a Letter of Transmittal from your bank, broker, dealer, trust company or other nominee and has been instructed to complete it and you wish to participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation;

- A beneficial owner who has received a Letter of Transmittal from your bank, broker, dealer, trust company or other nominee and has been instructed to complete it and you wish to participate in the Exchange Offer and Consent Solicitation;

- A DTC Participant who has been instructed and authorized by a beneficial owner to participate in the Tender Offer and elect to submit any Old Notes that are not accepted in the Tender Offer in the Exchange Offer and Consent Solicitation; or

- A DTC Participant who has been instructed and authorized by a beneficial owner to participate solely in the Exchange Offer and Consent Solicitation.

**Additional Information Regarding the *Certificados Bursátiles***

Concurrently with the Exchange Offer and Consent Solicitation, the Company will be soliciting consents from holders of its *Certificados Bursátiles Vitro 03* and *Certificados Bursátiles Vitro 08* in Mexico. The *Certificados Bursátiles* are senior notes issued by the Company pursuant to applicable Mexican Law and are a component of the "Other Debt" described in the Statement.

The Company will request holders of *Certificados Bursátiles* to grant their consent and to instruct the corresponding brokerage houses through which they hold the *Certificados Bursátiles* to request an information package from Vitro. Vitro shall deliver the information packages to the brokerage houses for delivery to each interested holder of *Certificados Bursátiles*. Such packages will include: (i) an instruction letter; (ii) a description of the consent solicitation; (iii) a Lock-Up Agreement; (iv) a mandate to be granted by the consenting holders of *Certificados Bursátiles* to their corresponding brokerage houses; (v) a power of attorney to be granted by the consenting holders of *Certificados Bursátiles* in favor of Vitro; and (vi) a copy of the *Concurso Plan*, all on terms substantially similar to those in the documents provided pursuant to the Statement, as adapted and modified pursuant to applicable Mexican Law.

Consenting holders of *Certificados Bursátiles* shall execute the documents and shall deliver their consents to their corresponding brokerage houses for delivery to Vitro before the expiration date of the consent solicitation to the holders of *Certificados Bursátiles*, which is the same as the Expiration Time for the Tender Offer and the Exchange Offer and Consent Solicitation. Vitro shall review such consents to verify compliance with all necessary requirements and shall notify the Payment Trust, and the brokerage houses, as to which holders of *Certificados Bursátiles* delivered their consents in time complying with all applicable requirements. The payment trust shall pay the applicable consent fee to such consenting holders of *Certificados Bursátiles*.

Pursuant to the Concurso Plan, Vitro would exchange the *Certificados Bursátiles Vitro 03* and *Certificados Bursátiles Vitro 08* for: (i) new *Certificados Bursátiles* (the "New Cebures") issued on terms and conditions identical to the New 2019 Notes in all material respects, in place of the *pro rata* share of New 2019 Notes of the holders of *Certificados Bursátiles*, (ii) New MCDs *(Nuevas Obligaciones Convertibles Forzosamente en Acciones)* and (iii) the *pro rata* portion of the Restructuring Cash Payment and Restructuring Fee (depending on the issue date of the New Cebures). The consents granted by holders of *Certificados Bursátiles* will not affect or in any way change the terms and conditions of the New 2019 Notes or the New MCDs, except that the principal amount of the New 2019 Notes will be slightly reduced in an amount equal to the principal amount of the New Cebures to be issued. If a holder of *Certificados Bursátiles Vitro 03* or *Certificados Bursátiles Vitro 08* prefers to receive New 2019 Notes instead of New Cebures, such holder may request New 2019 Notes following the effectiveness of the *Convenio Concursal*. If a holder of Old Notes prefers to receive New Cebures instead of New 2019 Notes, such holder may request New Cebures following the effectiveness of the *Convenio Concursal*.

**Capitalization**

The following table sets forth our capitalization on a consolidated basis as of September 30, 2010:

- on an actual basis; and

- as adjusted to give effect to the *Concurso* Plan.

This table should be read in conjunction with "Selected Historical Consolidated Financial Information," "Unaudited Pro Forma Financial Information," "Liquidity and Capital Resources" and the consolidated financial statements included elsewhere in this supplement or in the Statement.

| | As of September 30, 2010 | | | |
|---|---|---|---|---|
| | **Actual** (Ps. millions) | **Actual** ($ millions)[1] | **As Adjusted** (Ps. millions) | **As Adjusted** ($ millions)[1] |
| **Restructured Debt:** | | | | |
| **Old Notes** | | | | |
| 2012 Notes | 3,750 | 300 | — | — |
| 2013 Notes | 2,700 | 216 | — | — |
| 2017 Notes | 8,751 | 700 | — | — |
| DFI Claims (including Promissory Notes) | 3,168 | 253 | | |
| **Total** | **18,369** | **1,469** | — | — |
| **Other Debt** | | | | |
| *Certificados Bursátiles Vitro 03* | 150 | 12 | — | — |
| *Certificados Bursátiles Vitro 08* | 400 | 32 | — | — |
| Other | 188 | 15 | — | — |
| **Total** | **738** | **59** | — | — |
| **Total debt subject to restructuring** | **19,107** | **1,528** | — | — |
| Total past-due interest | 3,435 | 275 | — | — |
| Unamortized discounts | (90) | (7) | — | — |
| **Total** | **22,452** | **1,796** | — | — |
| **Non-restructured Debt:** | | | | |
| **Total debt not subject to restructuring** | **2,306** | **185** | **2,306** | **185** |
| **New 2019 Notes and New Cebures[2]** | **—** | **—** | **10,625[2]** | **850[2]** |
| **Total Debt** | **24,758** | **1,981** | **12,931** | **1,035** |
| **Stockholders' Equity:** | | | | |
| Majority stockholders' equity | (233) | (19) | 6,979[3] | 558[3] |
| Minority stockholders' equity | 1,417 | 113 | 1,417 | 113 |
| New MCDs and New Obligaciones Convertibles en Acciones[4] | — | — | 1,250[4] | 100[4] |
| **Total stockholders' equity** | **1,184** | **94** | **9,646** | **771** |
| **Total Capitalization** | **25,942** | **2,075** | **22,577** | **1,806** |

(1) Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.5011 pesos per one U.S. dollar, the Free Exchange Rate as of September 30, 2010.

(2) This amount reflects New 2019 Notes and New Cebures for a total of $850 million.

(3) Includes gains from Restructured Debt, net of applicable tax.

(4) This amount reflects the New MCDs and the New Obligaciones Convertibles en Acciones for a total of $100 million.

**Financial and Operating Highlights—Unaudited**

| | Nine Months Ended September 30, | | |
| --- | --- | --- | --- |
| | 2009 | 2010 | 2010 |
| | (Ps. millions)[1] | | ($ millions)[2] |
| **Income Statement Data:** | | | |
| **MFRS:** | | | |
| Net sales | Ps.18,389 | Ps.17,498 | $ 1,400 |
| Cost of sales | 13,023 | 12,801 | 1,024 |
| Gross profit | 5,367 | 4,697 | 376 |
| Selling, general and administrative expenses | 4,310 | 3,632 | 291 |
| Operating income | 1,056 | 1,065 | 85 |
| Financing result: | | | |
|   Interest expense, net | 1,995 | 1,928 | 154 |
|   Derivative financial instruments | 482 | 158 | 13 |
|   Exchange loss (gain), net | (378) | (454) | (36) |
|   Total comprehensive financing result | 2,099 | 1,632 | 131 |
| Other expenses (income), net[3] | 376 | 309 | 25 |
| Profit of equity accounted investees | (3) | 19 | 2 |
| (Loss) income before income and asset tax | (1,422) | (857) | (68) |
| Income and asset tax expense (benefit) | (130) | (198) | (16) |
| Net income (loss) | (1,292) | (659) | (52) |
| Net noncontrolling (loss) interest income | 6 | 12 | 1 |
| Net controlling (loss) interest income | (1,298) | (671) | (53) |
| Net income (loss) per share | (3.44) | (1.74) | (0.13) |

| | As of September 30, | | |
| --- | --- | --- | --- |
| | 2009 | 2010 | 2010 |
| | (Ps. millions) | | ($ millions)[2] |
| **Balance Sheet Data:** | | | |
|   **MFRS:** | | | |
|   Cash and cash equivalents[10] | Ps. 1,702 | Ps. 2,563 | $ 205 |
|   Current assets | 9,793 | 10,288 | 823 |
|   Total assets | 32,542 | 31,112 | 2,489 |
|   Current liabilities | 28,469 | 27,024 | 2,162 |
|   Total debt [11] | 20,839 | 21,323 | 1,706 |
|   Total liabilities | 30,878 | 29,927 | 2,394 |
|   Stockholders' equity | 1,664 | 1,184 | 94 |
|   Minority interest in consolidated subsidiaries | 1,353 | 1,417 | 113 |
|   Majority stockholders' equity | 311 | (233) | (19) |

|  | Nine Months Ended September 30, | | |
|  | 2009 | 2010 | 2010 |
|  | (Ps. millions) | | ($ millions)[2] |
| **Other Data:** | | | |
| **MFRS:** | | | |
| Capital expenditures[9] | Ps.    363 | Ps.    446 | $    36 |
| Depreciation and amortization | 1,139 | 1,102 | 80 |
| Total shares issued at end of period[4] | 386.9 | 386.9 | |
| Total shares held in Stock Option Trust at end of period[4][8] | 39.8 | 39.8 | |
| Total shares held as treasury stock at end of period[4][8] | 0.4 | 0.4 | |
| Total shares issued and outstanding at end of period[4] | 346.7 | 346.7 | |
| Average total shares outstanding during period[4] | 346.7 | 346.7 | |
| **Inflation and Foreign Currency Exchange Rate Data:** | | | |
| Percentage of change in INPC[5] | 2.30% | 2.46% | |
| Peso/dollar exchange rate at the end of period[6] | 13.5042 | 12.5011 | |
| Average exchange rate[7] | 13.7532 | 12.7158 | |

---

(1)    Except per share amounts, number of shares and inflation and foreign currency exchange rate data.

(2)    Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at the rate of 12.5011 pesos per one U.S. dollar, the Free Exchange Rate on September 30, 2010.

(3)    Other expenses (income), net, include:

|  | Nine Months Ended September 30, | |
|  | 2009 | 2010 |
|  | Ps. millions | |
| Restructuring charges (i) | 179 | 58 |
| Loss (gain) from sale of long-lived assets | 138 | 175 |
| Fees and costs for extinguishment of debt | 4 | 17 |
| Statutory employee profit sharing | 55 | 59 |
|  | 376 | 309 |

---

(i)    The restructuring charges relate to the downsizing and streamlining of our corporate functions and organization at some of our business units and are part of an ongoing benefit arrangement.

(4)    Millions of shares.

(5)    Calculated using year-end INPC of the most recent year divided by the year-end INPC of the previous year.

(6)    Based on the Free Exchange Rate at the end of the period.

(7)    Calculated using the average of Free Exchange Rates on the last day of each month during the period.

(8)    See "Major Shareholders" in the Statement.

(9)    These amounts represent the capital expenditures paid over the period, which differ from the capital expenditures realized for financial matters.

(10)    Includes restricted cash due to the change in NIF C-1.

As mentioned NIF B-8 establishes that special purpose entities, over which control is exercised, should be consolidated. We adopted this bulletin beginning January 1, 2009. As a result of this bulletin the amounts as of September 30, 2009 and 2010 include the Company's securitization transactions.

As of September 30, 2010, we were in default under the indentures governing the Old Notes for $300 million, $216 million and $700 million and certain other debt; therefore, Ps. 15,111 million were reclassified as short-term debt.

**Unaudited Pro Forma Financial Information**

We have prepared the following unaudited pro forma consolidated balance sheet as of September 30, 2010 and the unaudited pro forma consolidated statements of operations for the year ended December 31, 2009 and for the nine-month and twelve-month periods ended September 30, 2010, to illustrate the estimated effects on our consolidated financial position and results of operations for the proposed debt restructuring described in the Statement, which contemplates the cancellation of Restructured Debt in exchange for the Restructuring Consideration.

The unaudited pro forma balance sheet has been prepared assuming the transaction was consummated as of the balance sheet date. The unaudited pro forma statements of operations have been prepared assuming the transaction was consummated at the beginning of the period presented. The pro forma balance sheet includes adjustments that are both recurring and non-recurring, while the pro forma statements of operations only include adjustments that have a continuing impact. Because the pro forma balance sheet and pro forma statements of operations assume that the transaction occurred on different dates (i.e., the most recent balance sheet date, as compared to the beginning of the fiscal year presented for the pro forma statements of operations), and because of the difference in presenting non-recurring adjustments, the adjustments reflected in the pro forma balance sheet do not reconcile with the adjustments in the pro forma statements of operations.

We have prepared the unaudited pro forma financial information for informational purposes only. It does not purport to indicate the results of operations that would actually have occurred had the transaction taken place on the date indicated or which may be expected to be achieved in the future. You should read the unaudited pro forma consolidated financial information together with our consolidated financial statements and the notes thereto included elsewhere in the Statement and the information under the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" in the Statement. Our consolidated financial statements are prepared in accordance with MFRS, which differs in certain significant respects from U.S. GAAP.

U.S. dollar amounts are translated at a rate of Ps. 13.0587 as of December 31, 2009 and Ps. 12.5011 as of September 30, 2010.

**Unaudited Pro Forma Consolidated Balance Sheet**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Consolidated Balance Sheet as of September 30, 2010**

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted (Millions of U.S. dollars) |
|---|---|---|---|---|
| | | (Millions of Mexican Pesos) | | |
| **Assets** | | | | |
| Cash and cash equivalents | Ps. 2,563 | Ps. (938)(a) | Ps. 1,625 | $ 130 |
| Trade receivables, net | 3,566 | | 3,566 | 285 |
| Taxes receivable | 124 | | 124 | 10 |
| Other receivables | 806 | | 806 | 64 |
| Inventories, net | 3,229 | | 3,229 | 258 |
| Current assets | 10,288 | (938) | 9,350 | 747 |
| | | | | |
| Investments in associated company | 848 | | 848 | 68 |
| Land and buildings, net | 5,420 | | 5,420 | 434 |
| Machinery and equipment, net | 7,684 | | 7,684 | 615 |
| Construction in progress | 460 | | 460 | 37 |
| Goodwill | 594 | | 594 | 48 |
| Deferred taxes | 4,840 | (2,426)(b) | 2,414 | 193 |
| Other assets | 978 | | 978 | 78 |
| Non-current assets | 20,824 | (2,426) | 18,398 | 1,473 |
| Total assets | Ps.31,112 | Ps. (3,364) | Ps. 27,748 | $ 2,220 |

|  | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted |
|---|---|---|---|---|
|  |  | (Millions of Mexican Pesos) |  | (Millions of U.S. dollars) |
| **Liabilities** |  |  |  |  |
| Short-term borrowings | Ps. 3,765 | Ps. (3,356) (d) | Ps. 409 | $ 33 |
| Current maturities of long-term debt | 15,837 | (15,661)(c) | 176 | 14 |
| Trade payables | 1,476 |  | 1,476 | 118 |
| Accrued expenses | 1,014 |  | 1,014 | 81 |
| Derivative financial instruments | 214 |  | 214 | 17 |
| Interest payable | 3,545 | (3,435)(e) | 110 | 9 |
| Other current liabilities | 1,174 |  | 1,174 | 94 |
| Current liabilities | 27,025 | (22,452) | 4,573 | 366 |
| Long-term debt | 1,721 | 10,626(f) | 12,347 | 988 |
| Other long-term liabilities | 1,182 |  | 1,182 | 95 |
| Long-term liabilities | 2,903 | 10,626 | 13,529 | 1,083 |
| Total liabilities | 29,928 | (11,826) | 18,102 | 1,449 |
|  |  |  |  |  |
| **Stockholder's equity** |  |  |  |  |
| Capital stock | 387 |  | 387 | 31 |
| Restatement of capital stock | 7,245 |  | 7,245 | 580 |
| Restated capital stock | 7,632 |  | 7,632 | 611 |
| Treasury stock | (547) |  | (547) | (44) |
| Additional paid-in capital | 1,644 |  | 1,644 | 132 |
| Translation effects of foreign subsidiaries | 290 |  | 290 | 23 |
| Mandatory convertible debentures |  | 1,250(g) | 1,250 | 100 |
| Accumulated deficit | (9,252) | 7,212(h) | (2,040) | (164) |
| Controlling interest | (233) | 8,462 | 8,229 | 658 |
| Non-controlling interest in consolidated subsidiaries | 1,417 |  | 1,417 | 113 |
| Total stockholders' equity | 1,184 | 8,462 | 9,646 | 771 |
| Total liabilities and stockholders' equity | Ps.31,112 | Ps. (3,364) | Ps. 27,748 | $ 2,220 |

_____

\* Reflects the following pro forma adjustments:

(a) This amount reflects the Restructuring Cash Payment.

(b) This amount reflects the tax effect related to the proposed debt restructuring. In a *concurso mercantil* proceeding in Mexico, any gain resulting from the reduction in net debt is taxable up to the amount of net operating tax loss carryforwards.

(c) This amount reflects the cancellation of the Old Notes and Other Debt.

(d) This amount reflects the cancellation of the DFI Claims and Other Debt.

(e) This amount reflects the cancellation of interest payable in relation to the Restructured Debt.

(f) This amount reflects the issuance of $850.0 million of New 2019 Notes and New Cebures.

(g) This amount reflects the issuance of $100.0 million of New MCDs and New Obligaciones Convertibles en Acciones.

(h) This amount reflects the gain that would be recognized as a result of the proposed restructuring based on the terms described in this Statement.

**Unaudited Pro Forma Consolidated Statements of Operations**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Statement of Operations for the nine-month period ended September 30, 2010**

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted |
|---|---|---|---|---|
| | | **(Millions of Mexican Pesos)** | | **(Millions of U.S. dollars)** |
| Net sales | Ps. 17,498 | Ps. — | Ps. 17,498 | $ 1,400 |
| Cost of sales | 12,801 | — | 12,801 | 1,024 |
| Gross profit | 4,697 | — | 4,697 | 376 |
| Selling, general and administrative expenses | 3,632 | — | 3,632 | 291 |
| Operating income | 1,065 | — | 1,065 | 85 |
| | | | | |
| Interest expense (income), net | 1,928 | (850)(a) | 1,078 | 86 |
| Derivative financial instruments | 158 | — | 158 | 13 |
| Exchange (gain) loss | (454) | 329(b) | (125) | (10) |
| Total comprehensive financing result | 1,632 | (521) | 1,111 | 89 |
| (Loss) gain after financing cost | (567) | 521 | (46) | (4) |
| Other expenses (income), net | 309 | — | 309 | 25 |
| Equity in earnings of associated company | 19 | — | 19 | 2 |
| Income (loss) before taxes | (857) | 521 | (336) | (27) |
| Income tax (benefit) expense | (198) | 156(c) | (42) | (3) |
| Net (loss) income for the period | Ps. (659) | Ps. 365 | Ps. (294) | $ (24) |
| | | | | |
| Net noncontrolling interest (loss) income | Ps. 12 | Ps. — | Ps. 12 | $ 1 |
| Net controlling interest (loss) income | (671) | 365 | (306) | (25) |
| | Ps. (659) | Ps. 365 | Ps. (294) | $ (24) |

---

\*     Reflects the following pro forma adjustments:

(a)    This amount reflects the net decrease in interest expense related to the cancellation of the Restructured Debt, which was offset by an increase in interest expense associated with the Restructuring Consideration (assuming interest expense related to the New 2019 Notes and New Cebures based on an interest rate of 8.0%, less interest income earned as a result of the $75 million Restructuring Cash Payment).

(b)    This amount reflects the net decrease in our foreign exchange gain related to the cancellation of the Restructured Debt (a significant portion of which is denominated in U.S. dollars), which was offset by an increase in our foreign exchange gain related to the Restructuring Consideration (100% of which is denominated in U.S. dollars).

(c)    This amount reflects the tax effects of the pro forma adjustments noted in (a) and (b) above.

**Unaudited Pro Forma Consolidated Statements of Operations**

**Vitro, S.A.B. de C.V. and Subsidiaries**

**Statement of Operations for the twelve-month period ended September 30, 2010**

| | Actual | Pro Forma Adjustment* | As Adjusted | As Adjusted |
|---|---|---|---|---|
| | | (Millions of Mexican Pesos) | | (Millions of U.S. dollars) |
| Net sales | Ps.23,099 | Ps. | Ps. 23,099 | $ 1,848 |
| Cost of sales | 16,959 | | 16,959 | 1,357 |
| Gross profit | 6,140 | | 6,140 | 491 |
| Selling, general and administrative expenses | 4,803 | | 4,803 | 384 |
| Operating income | 1,337 | | 1,337 | 107 |
| | | | | |
| Interest expense (income), net | 2,705 | (1,155)(a) | 1,550 | 124 |
| Derivative financial instruments. | 246 | | 246 | 20 |
| Exchange (gain) loss | (1,053) | 499(b) | (554) | (44) |
| Total comprehensive financing result | 1,898 | (656) | 1,242 | 100 |
| Gain (loss) after financing cost | (561) | 656 | 95 | 7 |
| Other expenses (income), net | 223 | | 223 | 18 |
| Equity in earnings of associated company | (2) | | (2) | 0 |
| Income (loss) before taxes | (786) | 656 | (130) | (11) |
| Income tax (benefit) expense | (665) | 197(c) | (468) | (37) |
| Net (loss) income for the year | Ps. (121) | Ps. 459 | Ps. 338 | $ 26 |
| | | | | |
| Net noncontrolling interest income | 39 | | 39 | 3 |
| Net controlling interest (loss) income | Ps. (160) | Ps. 459 | Ps. 299 | $ 23 |
| | Ps. (121) | Ps. 459 | Ps. 338 | $ 26 |

---

\* Reflects the following pro forma adjustments:

(a) This amount reflects the net decrease in interest expense related to the cancellation of the Restructured Debt, which was offset by the effects of the Restructuring Consideration (includes interest expense related to the New 2019 Notes and New Cebures with an interest rate of 8% and less interest income earned as a result of the $75 million Restructuring Cash Payment).

(b) This amount reflects the net decrease in our foreign exchange gain related to the cancellation of the Restructured Debt (a significant portion is in U.S. dollars), which was offset by the effects of the Restructuring Consideration (100% is in U.S. dollars).

(c) This amount reflects the tax effect related to the pro forma adjustments noted in (a) and (b) above.

**Unaudited Pro Forma Consolidated Ratios**

**Vitro, S.A.B. de C.V. and Subsidiaries**

| | Actual (Ps. millions) | Actual ($ millions) | Pro Forma Adjustment (Ps. millions) | Pro Forma Adjustment ($ millions) |
|---|---|---|---|---|
| **Twelve-month period ended September 31, 2010:** | | | | |
| Operating income | Ps. 1,337 | $ 107 | Ps. 1,337 | $ 107 |
| Add non-cash items: | | | | |
| Depreciation and amortization | 1,531 | 122 | 1,531 | 122 |
| Non-cash provision of employee benefits | 409 | 33 | 409 | 33 |
| 2010 EBITDA* | Ps. 3,276 | $ 262 | Ps. 3,276 | $ 262 |
| | | | | |
| **Twelve-month period ended September 2010, Ratios:** | | | | |
| 2010 EBITDA / 2010 Net Interest | 1.21 x | | 2.11 x | |
| Sep 2010 Debt / 2010 EBITDA | 5.54 x | | 2.98 x | |
| Sep 2010 Debt + DFI debt / 2010 EBITDA | 6.57 x | | 4.01 x | |
| Sep 2010 Total Liabilities / Stockholders' Equity | 27.02 x | | 1.90 x | |

\*   This amount reflects earning before interest, taxes plus depreciation and amortization, and provision for employee benefits (EBITDA).

| | Actual | Pro Forma Adjustment |
|---|---|---|
| Ratios of Earning to Fixed Charges | | |
| September 2010 | _(1) | _(2) |

(1)   Our earnings were insufficient to cover fixed charges for the twelve-month period ended September 30, 2010 by approximately Ps. 784 million.

(2)   Our earnings after pro forma adjustments were insufficient to cover fixed charges for the twelve-moth period ended September 30, 2010 by approximately Ps. 279.

## Results of Operations

### *Inflation and Foreign Currency Exchange Rate Fluctuations*

The following table sets forth, for the periods presented, certain information relating to inflation and foreign currency exchange rates:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | **2009** | **2010** |
| Nominal Mexican peso devaluation relative to the U.S. dollar[1] | (2.4)% | (4.3)% |
| Nominal dollar devaluation relative to the euro | 3.1% | (15.2)% |
| Mexican inflation (based on changes in INPC)[1] | 2.3% | 2.5% |
| Free Exchange Rate as of year end[1] | Ps. 13.5042 | Ps. 12.5011 |
| Exchange rate of euro per Mexican peso as of year end[3] | Ps. 19.3771 | Ps. 15.8913 |
| Exchange rate of dollar per euro as of year end [2] | $ 1.4348 | $ 1.2711 |

_____

(1)   Source: Banco de México.

(2)   Source: Federal Reserve Bank of New York—Noon Buying Rates as to euro-to-dollar exchange rate and Banco de México as to U.S. dollar-to-Mexican peso exchange rate.

### *Nine-Month Period Ended September 30, 2010 Compared to Nine-Month Period Ended September 30, 2009*

#### *Net Sales*

Our consolidated net sales decreased 4.8% from Ps. 18,389 million ($1,471 million) for the nine-month period ended September 30, 2009 to Ps. 17,498 million ($1,400 million) for the same period of 2010. Net sales in our Flat Glass business unit decreased 5.7% primarily due to lower sales volumes from our Flat Glass business unit subsidiaries located in the United States, Spain and Colombia, which were partially offset by a slight recovery in the automotive original equipment manufacturers ("OEM") market and float glass sales volumes for the construction industry. The sales in dollars were affected when measured in pesos by a 7.5% average peso appreciation, from an average of Ps. 13.75 in 2009 to an average of Ps. 12.72 in 2010. Net Sales in our Glass Containers business unit decreased 4.6% due to price erosion caused by overall excess capacity.

Domestic sales increased 4.5% from Ps. 8,338 million ($667 million) for the nine-month period ended September 30, 2009 to Ps. 8,710 million ($697 million) for the same period of 2010. This increase was mainly driven by higher sales volumes in the automotive and domestic construction industries, which were partially offset by lower volumes in domestic sales for the Glass Containers business unit.

Export sales increased 9.5%, measured in nominal U.S. dollars, from $369 million for the nine-month period ended September 30, 2009 to $404 million for the same period of 2010. This increase was mainly due to higher export sales volumes to the automotive OEM market.

Foreign subsidiaries' sales decreased 21.3%, measured in nominal U.S. dollars, from $356 million for the nine-month period ended September 30, 2009 to $280 million for the same period of 2010. This decrease was mainly triggered by lower demand in the construction markets in the United States and Spain. Foreign subsidiaries' sales and export sales represented 20% and 29%, respectively; of our consolidated net sales for the nine-month period ended September 30, 2010.

18

*Glass Containers Business Unit*

Consolidated net sales of our Glass Containers business unit decreased 4.6% from Ps. 9,617 million ($769 million) for the nine-month period ended September 30, 2009 to Ps. 9,172 million ($734 million) for the same period of 2010. The main driver for this decrease was price erosion caused by overall excess capacity.

In the domestic market, sales volumes increased in all segments, except for beer, which experienced a 48% decrease. For the nine-month period ended September 30, 2010, CFT and soft drinks volume increased 9% and 7%, respectively, compared to the same period last year. Overall, domestic market volumes decreased 1%, which coupled with price erosion resulted in a 4% sales decrease.

Export sales increased 2.2%, measured in nominal U.S. dollars, in the nine-month period ended September 30, 2010 compared to the same period of 2009 due to higher sales volumes in all segments, except for the beer segment, which experienced a 57% decrease. Although foreign subsidiaries' sales increased 154% from $4 million for the nine-month period ended September 30, 2009 to $9 million for the same period of 2010, such sales represented only 1% of the net sales of the Glass Containers business unit for that period.

*Flat Glass Business Unit*

Consolidated net sales of our Flat Glass business unit decreased 5.7% from Ps. 8,600 million ($688 million) for the nine-month period ended September 30, 2009 to Ps. 8,111 million ($649 million) for the same period of 2010. In 2010, we recovered volumes in float glass for the construction industry and safety glass for the automotive industry, offset by lower sales by foreign subsidiaries in United States, Spain and Colombia. The sales in dollars are affected when measured in pesos by a 7.5% average peso appreciation, from an average of Ps. 13.75 in 2009 to an average of Ps. 12.72 in 2010.

Domestic sales increased 27.3% from Ps. 2,366 million ($189 million) for the nine-month period ended September 30, 2009 to Ps. 3,013 million ($241 million) for the same period of 2010. This increase was mainly driven by an important recovery in the automotive OEM market and float glass sales volumes for the construction industry.

Export sales increased 31%, measured in nominal U.S. dollars, from $94 million for the nine-month period ended September 30, 2009 to $123 million for the same period of 2010. This increase was mainly due to higher automotive sales volumes to the OEM and automotive glass replacement ("AGR") markets.

Foreign subsidiaries' sales decreased 23%, measured in nominal U.S. dollars, from $353 million for the nine-month period ended September 30, 2009 to $271 million for the same period of 2010. This decrease was due to adverse economic conditions that mainly affected the construction markets in the United States and Spain, which are both crucial markets for us.

Generally, we realize higher profit margins in our domestic market business and, accordingly, our strategic goal is to direct our production volume to Mexico and adjust export levels to match our remaining production capacity whenever possible.

*Operating Income*

Our consolidated operating income increased 0.8% from Ps. 1,056 million ($84 million) for the nine-month period ended September 30, 2009 to Ps. 1,065 million ($85 million) for the same period of 2010. This increase was due to a slight recovery in the automotive industry and by savings related to our cost and expense reduction initiatives implemented in 2008 through the third quarter of 2009. Our operating income was also affected by the increase in natural gas price as the average price increased 25% from $3.55 per MMBTU for the nine-month period ended September 30, 2009 compared to $4.43 per MMBTU for the same period of 2010.

*Glass Containers Business Unit*

Operating income of our Glass Containers business unit decreased 18.4% from Ps. 1,523 million ($122 million) for the nine-month period ended September 30, 2009 to Ps. 1,242 million ($99 million) for the same period of 2010. This decrease was mainly driven by the lower volumes in the domestic beer market, a 24% increase in the average gas price and price erosion due to overcapacity in the markets in which we participate.

*Flat Glass Business Unit*

Operating loss of our Flat Glass business unit was Ps. 182 million ($15 million) for the nine-month period ended September 30, 2010, compared to the loss of Ps. 398 million ($32 million) for the same period of 2009. This recovery was due to improved sales volumes in the domestic market and a better price mix, partially offset by higher energy costs, which experienced a 24% increase, and the negative results in our foreign subsidiaries.

*Total Comprehensive Financing Result*

Our total comprehensive financing cost decreased 28% from Ps. 2,099 million ($168 million) for the nine-month period ended September 30, 2009 to Ps. 1,632 million ($130 million) for the same period of 2010. This decrease was primarily due to lower derivative financial instruments losses from Ps. 482 million ($39 million) for the nine-month period ended September 30, 2009 to Ps. 158 million ($13 million) for the same period of 2010. Additionally, we had a higher exchange gain of Ps. 454 million ($36 million) in 2010 compared to a gain of Ps. 378 million ($30 million) in 2009.

*Other Expenses (Income), Net*

Other expenses (income), net decreased from Ps. 376 million ($30 million) for the nine-month period ended September 30, 2009 to Ps. 309 million ($25 million) for the same period of 2010. During the nine-month period ended September 30, 2010, the balance included (i) loss from the sale of long-lived assets of Ps. 175 million ($14 million), (ii) severance expense of Ps. 58 million ($5 million), (iii) workers profit sharing (PTU) of Ps. 59 million ($5 million) and (iv) fees and costs for extinguishment of debt of Ps. 17 million ($1 million).

*Income Taxes*

On December 7, 2009, amendments to the Regular Income Tax ("ISR") Law of 2009 were published, to become effective beginning in 2010. These amendments state that: (i) ISR relating to tax consolidation benefits obtained from 1999 through 2004 should be paid in installments beginning in 2010 through 2015 and (ii) ISR relating to any tax consolidation benefit obtained in 2005 and thereafter should be paid during the sixth through the tenth year after such benefit was obtained. Payment of ISR in connection with tax consolidation benefits obtained between 1982 (the tax consolidation starting year) and 1998 may be required in those cases provided by law.

Income tax represented an income tax gain of Ps. 198 million ($16 million) for the period ended September 30, 2010 compared to an income tax gain of Ps. 130 million ($10 million) for the same period of 2009. The amount for 2010 represents a deferred income tax gain of Ps. 490 million ($39 million) that was offset by an accrued income tax expense of Ps. 292 million ($23 million), and the amount for 2009 represents a deferred income tax of Ps. 204 million ($16 million) that was offset by an accrued income tax expense of Ps. 74 million ($6 million).

*Net Income*

For the nine-month period ended September 30, 2010, we generated a consolidated net loss of Ps. 659 million ($53 million) compared to a net loss of Ps. 1,292 million ($103 million) for the same period of 2009. This decrease in the net loss was mainly due to decreased total comprehensive financing costs.

**Liquidity and Capital Resources**

*Indebtedness*

The following table sets forth the aggregate amounts of our outstanding short-term and long-term debt as of September 30, 2010.

As of September 30, 2010, we were in default related to our long-term debt obligations; therefore, substantially all of our long-term debt is now presented as short-term debt. We are currently in payment default under our Old Notes and our *Certificados Bursátiles Vitro 03* and other credit agreements.

| | As of September 30, 2010 | |
| | (Ps. millions) | ($ millions)[1] |
|---|---|---|
| Short-term debt[2][3][6] | Ps.  19,602 | $  1,568 |
| Long-term debt[4][5] | 1,721 | 138 |

---

(1)  Peso amounts have been translated into U.S. dollars, solely for the convenience of the reader, at a rate of 12.5011 Mexican pesos per U.S. dollar, the Free Exchange Rate on September 30, 2010.

(2)  Includes the current portion of our long-term debt, which was Ps. 15,838 million ($1,267 million) as of September 30, 2010.

(3)  96%, 3% and 1% of the aggregate amount of our short-term debt as of September 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

(4)  Excludes the current portion of our long-term debt. If the current portion of our long-term debt were included, the aggregate amount of outstanding long-term debt as of September 30, 2010 would be Ps. 17,559 million ($1,405 million).

(5)  25%, 61% and 14% of the aggregate amount of our long-term debt as of September 30, 2010 was denominated in U.S. dollars, Mexican pesos and euros, respectively.

(6)  The short-term debt includes $253.4 million dollars of debt acknowledged regarding the DFI Claims.

*Short-Term Debt*—Our short-term debt consists primarily of (i) long-term debt obligations which were reclassified due to defaults and are now presented as short-term obligations, (ii) unsecured and secured borrowing arrangements with Mexican and foreign banks denominated in Mexican pesos, U.S. dollars and euros and (iii) accounts receivable financing programs. We engage, from time to time, in the ordinary course of business, in a number and variety of short-term loan arrangements with a number of Mexican and foreign banks. Such loans generally have a maturity ranging from 30 to 365 days and have interest rates ranging from 1.5% to 8% above LIBOR for the U.S. dollar-denominated loans and from 1.10% to 1.25% above Euribor for our euro-denominated loans, and have fixed and floating market rates for the Mexican peso-denominated loans.

The short-term debt includes $253.4 million of debt acknowledged regarding the DFI Claims.

**Long-term debt reclassified to short-term due to defaults:**

| Facility | Outstanding Principal Amount as of September 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| 2012 Notes<br>*Issuer:* Vitro<br>*Guarantors:* Wholly owned subsidiaries of Vitro, Vitro Envases Norteamérica, S.A. de C.V. ("VENA") and Viméxico | $300 million | *Interest Rate:* 8.625% per annum.<br>*Interest Payment Dates:* Semiannually on August 1 and February 1 of each year. | February 1, 2012 |
| 2017 Notes<br>*Issuer:* Vitro<br>*Guarantors:* Wholly owned subsidiaries of Vitro, VENA and Viméxico | $700 million | *Interest Rate:* 9.125% per annum.<br>*Interest Payment Dates:* Semiannually on August 1 and February 1 of each year. | February 1, 2017 |
| 2013 Notes<br>*Issuer:* Vitro<br>*Guarantors:* Wholly owned subsidiaries of Vitro, VENA and Viméxico | $216 million | *Interest Rate:* 11.75% per annum.<br>*Interest Payment Dates:* Semiannually on May 1 and November 1 of each year. | November 1, 2013 |

*Long-Term Debt*—The following is a brief summary of our significant long-term indebtedness outstanding as of September 30, 2010:

**Long-term debt:**

| Facility | Outstanding Principal Amount as of September 30, 2010 | Interest Rate and Payment Dates | Final Amortization/ Maturity |
|---|---|---|---|
| *Certificados Bursatiles Vitro 03* *Issuer:* Vitro | Ps. 150 million ($12.0 million) | *Interest Rate:* Cetes + 3.25% *Interest Payment Dates:* Every 28th day from October 21, 2004. | February 5, 2009 |
| *Certificados Bursatiles Vitro 08* *Issuer:* Vitro | Ps. 400 million ($32.0 million) | *Interest Rate:* TIIE (28 days) + 2.50% *Interest Payment Dates:* Every 28th day from July 2, 2008. | April 7, 2011 |
| *Capital Leases* | $9.4 million | *Interest rate on case by case basis* | Several installments through 2015 |
| *Secured debt* | Ps. 298 million ($23.8 million) | *Interest Rate:* TIIE + 4% | Several installments through 2014 |
| *Secured borrowing related to the Glass Containers accounts receivable securitization* | Ps. 550 million $(44.0 million) | *Interest Rate:* TIIE + 4% | Several installments through 2012 |
| *Secured borrowing related to the Flat Glass accounts receivable financing program* | Ps. 300 million ($24.0 million) | *Interest Rate:* TIIE + 4% | Several installments through 2014 |
| *Unsecured debt* | $28 million | *Interest Rate:* LIBOR + 8% | Several installments through 2014 |

(1)   See "—Indebtedness" in the Statement.

Below is a summary of the terms of the foregoing facilities or securities.

*2012 Notes and 2017 Notes.* On February 1, 2007 we completed the offering of $1.0 billion of Senior Notes, comprised of $300 million of 2012 Notes and $700 million of 2017 Notes. The 2012 Notes and the 2017 Notes are general unsecured obligations of Vitro. The indenture governing the 2012 Notes and the 2017 Notes contains certain customary restrictive covenants, including, but not limited to, restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. The 2012 Notes and the 2017 Notes are guaranteed by substantially all of Vitro's wholly owned subsidiaries.

We are currently in payment default with respect to these notes.

*2013 Notes*. On October 22, 2003, we completed an offering of $225 million aggregate principal amount of 2013 Notes. The 2013 Notes are general unsecured obligations of Vitro. The indenture governing the 2013 Notes contains certain customary restrictive covenants, including restrictions on the ability of Vitro and certain of its subsidiaries to (i) incur additional indebtedness, (ii) pay dividends and make other restricted payments, (iii) grant certain liens on assets, (iv) make certain investments, (v) engage in transactions with affiliates and (vi) take part in certain merger, consolidation and asset sale activities. Upon issuance of the 2012 Notes and 2017 Notes mentioned above, the holders of the 2013 Notes have been extended the benefit of a guarantee by the subsidiary guarantors substantially similar to the guarantee provided with respect to the 2012 Notes and the 2017 Notes. Part of the 2013 Notes were prepaid on June 25, 2008 and, as of September 30, 2010, the total amount outstanding was $216 million.

We are currently in payment default with respect to these notes.

*Certificados Bursátiles Vitro 03*. On October 10, 2002, we opened a medium-term notes program under which we were able to issue up to an aggregate principal amount of Ps. 2.5 billion. On February 13, 2003 we issued a *Certificados Bursátiles* note which bears an annual floating interest rate of 3.25% over the 182-day CETES. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of September 30, 2010, the total amount outstanding for this program was Ps. 150 million ($12.0 million).

We are currently in payment default with respect to this debt.

*Certificados Bursátiles Vitro 08*. On July 2, 2008, we opened a medium-term notes program under which we were able to issue up to an aggregate principal amount of Ps. 1.0 billion. On this same date, we issued a *Certificados Bursátiles* note which bears an annual floating interest rate of 2.50% over the 28-day TIIE. The *Certificados Bursátiles* are senior unsecured obligations of Vitro and do not impose restrictive covenants on us. As of September 30, 2010, the total amount outstanding for this program was Ps. 400 million ($32.0 million).

*Bancomext*. In November 2008, through one of our subsidiaries, we contributed non-productive real estate assets with a book value of Ps. 1,875 million ($136 million), as of December 31, 2009, to a trust created for the sole purpose of selling such assets (the "Bancomext Trust") if necessary in order to generate the resources to pay off the principal from a $100 million credit obtained from a financial institution. As of December 31, 2008 and 2009 and September 30, 2010, the proceeds drawn against the loan were $85 million, $68 million and $68 million, respectively. On August 24, 2010, we finalized the sale of non-productive properties, amounting to US $63.8 million. The resources of such sale and $5.5 million were contributed to the trust to pay in full the balance of US $69.3 million to that date and thereby recover the property of our two corporate office buildings, which were part of the assets that were originally provided as collateral for such support.

*Flat Glass Accounts Receivable Financing Program*. In December 2009, we refinanced our Flat Glass accounts receivable program originally due August 22, 2010. The original $21.5 million private issuance was replaced with a new issuance of Ps. 300 million ($24.0 million) with a five-year maturity. The new issuance bears an annual floating interest rate of 4.0% over the 28-day TIIE.

*Covisa / Álcali Securitization*. In April 2010, we refinanced the senior Ps. 550 million ($44.0 million) variable rate TIIE+ 4% bond issued by the Trustee of the accounts receivable securitization program of our subsidiaries Covisa and Álcali for an additional two years. The bond bears an annual floating interest rate of 4.0% over the 28-day TIIE. The remaining $10 million balance of the subordinated notes was repaid.

*Bladex Credit Facility*. In July 2009, we refinanced a $30 million credit with Bladex for five years. The new note has several scheduled amortizations and a final maturity date of July 30, 2014. As of September 30, 2010, the total amount outstanding under this program was $28.0 million.

---

**THIS SUPPLEMENT IS PART OF THE STATEMENT AND MUST ACCOMPANY THE STATEMENT**

## AMENDMENTS TO THE *CONCURSO* PLAN

The following provisions of the *Concurso* Plan would be amended as follows (amended provisions shown in strikethrough and underlined text).

**RESTRUCTURING AGREEMENT EXECUTED PURSUANT TO ARTICLES 3, 153, 157, 165, 339 AND OTHER APPLICABLE ARTICLES OF THE MEXICAN BANKRUPTCY AND REORGANIZATION LAW (*LEY DE CONCURSOS MERCANTILES*) ENTERED INITIALLY INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. AND THE EXECUTING CREDITORS AND FOR ITS FURTHER SUBSCRIPTION, IN ITS CASE, BY THE ADHERING CREDITORS.**

**INDEX**

ANTECEDENTS A-3
REPRESENTATIONS A-4
CLAUSES A-6
 **FIRST. DEFINITIONS AND EXHIBITS** A-6
  **Section 1.01** Defined Terms A-10
  **Section 1.02 Rules of Interpretation** A-10
  **Section 1.03** Exhibits A-10
  **Section 1.04** Representation Inclusions A-10
 **SECOND. PURPOSE** A-11
 **THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS** A-11
 **FOURTH. ACKNOWLEDGEMENT OF CLAIMS** A-11
 **FIFTH. PAYMENT AND IMPLEMENTATION** A-11
  **Section 5.01** Payment A-11
  **Section 5.02** Implementation A-11
   **Section 5.02.1** Description of the New Notes A-12
   **Section 5.02.2** Description of the New Mandatory Convertible Debentures A-13
   **Section 5.02.3** Cash Payment Description A-14
   **Section 5.02.4** Restructuring Fee Description A-14
  **Section 5.03** Treatment of Acknowledged Creditors A-14
  **Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment A-14
  **Section 5.05** Other obligations to consider A-15
 **SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PAYMENT AND THE RESTRUCTURING FEE** A-16
 **SEVENTH. CURRENCY** A-16
 **EIGHTH. FURTHER DOCUMENTS** A-16
 **NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT** A-16
 **TENTH. BINDING EFFECT** A-17
 **ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES** A-17
 **TWELFTH. PATRIMONY** A-17
 **THIRTEENTH. MANAGEMENT AND SURVEILLANCE** A-17
 **FOURTEENTH. CONTINUANCE** A-17
 **FIFTEENTH. EQUAL TREATMENT** A-17
 **SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN** A-17
 **SEVENTEENTH. NULLITY** A-18
 **EIGHTEENTH. APPLICABLE LAW** A-18
 **NINETEENTH. JURISDICTION AND VENUE** A-18
 **TWENTIETH. HEADINGS** A-18

A-2

**RESTRUCTURING AGREEMENT (THIS "AGREEMENT" OR "VITRO RESTRUCTURING AGREEMENT") ENTERED INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. ("VITRO"), AND THOSE PERSONS WHOSE NAMES ARE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT ON BEHALF OF THE VITRO CREDITORS (JOINTLY REFERRED TO AS THE "EXECUTING CREDITORS") AND THE CREDITORS WHOSE NAMES WILL BE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT THAT FROM TIME TO TIME MAY BE INCLUDED IN THIS AGREEMENT (THE "ADHERING CREDITORS"), SUBJECT TO THE FOLLOWING ANTECEDENTS, REPRESENTATIONS AND CLAUSES:**

## ANTECEDENTS

I.  On October 10, 2002, Vitro registered a program for the issuance of medium term stock traded certificates (*certificados bursátiles de mediano plazo*) for a total sum of $2,500,000,000.00 (two billion five hundred million pesos 00/100 Mexican Currency) (the "Vitro 02 Program"). On February 13, 2003, Vitro issued 11,400,000 (eleven million four hundred thousand) stock traded certificates (*certificados bursátiles*) for a total amount of $1,140,000,000.00 (one billion one hundred forty million pesos 00/100 Mexican Currency) pursuant to the Vitro 02 Program (the "Cebures Vitro 03"). The common representative (*representante común*) for the holders of the Cebures Vitro 03 is Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II. On October 22, 2003, Vitro completed an issuance throughout international markets of US$225,000,000.00 (two hundred twenty-five million dollars 00/100 Currency of the United States of America) with 11.75% Senior Notes due on 2013 (the "2013 Notes").

III. On February 1, 2007, Vitro completed an issuance throughout international markets of US$1,000,000,000.00 (one billion dollars 00/100 Currency of the United States of America), which consisted of US$300,000,000.00 (three hundred million dollars 00/100 currency of the United States of America) with 8.625% Senior Notes due 2012 (the "2012 Notes") and US$700,000,000.00 (seven hundred million dollars 00/100 Currency of the United States of America) with 9.125% Senior Notes due 2017 (the "2017 Notes" and jointly with the 2013 Notes and the 2012 Notes, the "Notes").

IV. On September 29, 2008, Vitro issued a promissory note in favor of ABN AMRO BANK N.V. (owned at one time by RBS Bank), for US$15,000,000.00 (fifteen million dollars 00/100 Currency of the United States of America) (the "ABN Note").

V.  On July 1, 2008, Vitro registered a program for the issuance of long term stock traded certificates (*certificados bursátiles de largo plazo*) for an amount of up to $1,000,000,000.00 (one billion pesos 00/100 Mexican Currency) (the "Vitro 08 Program"). On July 2, 2008, Vitro issued 4,000,000 (four million) stock traded certificates (*certificados bursátiles*) for $400,000,000.00 (four hundred million pesos 00/100 Mexican Currency) pursuant to the Vitro 08 Program (the "Cebures Vitro 08", and jointly with the Cebures Vitro 03, the "Cebures"). The common representative (*representante común*) of the holders of Cebures Vitro 08 is Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI. On September 3, 2010, Vitro entered into, as guarantor for its subsidiaries Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. and Comercializadora Álcali, S.A. de C.V., a Settlement and Debt Acknowledgement Agreement with Fintech Investments Ltd., in its capacity of creditor (the "Settlement Agreement") whereby it secured payment of the total amount of US$189,999,282.00 (one hundred eighty-nine million nine hundred ninety-nine thousand two hundred eighty-two dollars 00/100 Currency of the United States of America) plus interest accrued at 4.25% (four point twenty five percent) up to the maturity date, in favor of Fintech Investments Ltd, and executed as "*aval*" three promissory notes for the aforementioned amount (the "Fintech Notes").

VII. Vitro has reached an agreement with the Executing Creditors in order to restructure its indebtedness upon the Closing Date (as such term is defined below), pursuant to the following terms and conditions

provided in this Agreement which will be filed though a *concurso mercantil* proceeding, in any of its modalities pursuant to what is set forth in the LCM (as defined below), including, if necessary, a *concurso mercantil* petition, whereby this Agreement will be attached as a prearranged agreement or a prepackage reorganization agreement.

VIII.  Pursuant to Article 339, Section IV, of the Mexican Bankruptcy and Reorganization Law (*Ley de Concursos Mercantiles)* ("LCM"), this Agreement contains the terms and conditions agreed between Vitro, the Executing Creditors and, in as the case may be the Adhering Creditors, for the Vitro indebtedness restructuring; *provided, however,* that Vitro, the Executing Creditors and the Adhering Creditors intend for this Agreement to become, once it has been approved by the Judge, a reorganization agreement as set forth in Title V, Sole Chapter of the LCM, in order for this Agreement, once all legal requirements have been satisfied, to be presented by means of the *Conciliador* (as such term is defined below) appointed in the *concurso mercantil* by the Federal Institute of *Concurso Mercantil* Specialists ("IFECOM") pursuant to article 43 section IV if the LCM (the "*Conciliador*") before all other creditors which are legally acknowledged by means of the Debt Acknowledgement Judgment (as such term is defined below), pursuant to article 132 of the LCM (the "Remaining Creditors", and jointly with the Executing Creditors, the "Acknowledged Creditors").

## REPRESENTATIONS

**I.  Vitro represents, under oath and through its representatives, that:**

A.  It is a corporation duly incorporated and existing under the Laws of Mexico and that its restructuring of indebtedness which is the purpose of this Agreement, as well as its execution and performance, have been duly authorized by its board of directors through its meeting held on September 24, 2010, pursuant applicable law and regulations.

B.  Its representatives have sufficient authority to enter into this Agreement, which has not been revoked or limited in any way as of the date hereof, pursuant to a certified copy of the public instrument attached hereto as **Exhibit "B"**, which shall also form part of this Agreement.

C.  It wishes to enter into this Agreement in order to agree on the form, restructuring terms, payment and/or novation conditions, as the case may be, of its indebtedness as set forth herein and that, on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Furthermore, it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil* proceeding, pursuant to what is set forth in Articles 166 and 262, Section I and other relative and applicable provisions of the LCM.

D.  Pursuant to its accounting records, as of September 30, 2010 it has (a) non subsidiary direct or indirect credit liabilities which amount to $20,508,000,000.00 (twenty billion five hundred and eight million pesos 00/100 Mexican Currency), equivalent to US$1,640,000,000.00 (one billion six hundred and forty million dollars 00/100 Currency of the Unites States of America), (b) liabilities as a result of the "*aval*" granted in favor of third parties regarding its subsidiaries' obligations which amount to $2,383,771,567.00 (two billion three hundred and eighty three million seven hundred and seventy one thousand five hundred and sixty seven pesos 00/100 Mexican Currency), equivalent to US$190,627,335.00 (one hundred and ninety million six hundred and twenty seven thousand three hundred and thirty five dollars 00/100 Currency of the United States of America), and (c) direct or indirect subsidiary liabilities, for an amount of $23,872,000,000.00 (twenty three billion eight hundred and seventy two million pesos 00/100 Mexican Currency), equivalent to US$1,910,000,000.00 (one billion nine hundred and ten million dollars 00/100 Currency of the United States of America) (amounts mentioned in item (c) above will be referred to as "Intercompany Claims").

A-4

E.    That the liabilities owed to the Executing Creditors represent at least [•]% of the total Vitro liabilities, pursuant to its accounting records.

F.    That it is a holding company and as such, its ability to meet its obligations is dependant on the dividends that it receives from its subsidiaries.

G.    That it acknowledges the claims of the Executing Creditors and those of the Remaining Creditors, in the amounts, degree and specific characteristics indicated in the creditors and debtors description which pursuant to Article 20, Section III of the LCM, shall be attached as an exhibit to the *concurso mercantil* petition to be filed.

H.    That it does not owe (i) any claims from those mentioned in Article 224, Section I of the LCM, nor (ii) any claims singularly privileged (as defined in Article 218 of the LCM), nor (iii) any claims with other guarantees and privileges (as defined in Article 219 of the LCM).

I.    That it does not have due tax claims of any kind, including but not limited to, claims related to social security claims.

J.    That the Company has not executed any specific agreements with any of its creditors with regards to a repayment of indebtedness, contrary to the LCM.

K.    The execution of this Agreement does not violate or breach, or in any way contravene any provisions of its current corporate by-laws nor any law, including without limitation, the LCM.

L.    That the Company is authorized, under the laws of Mexico, to enter into and comply with its obligations set forth in this Agreement, without any other necessary authorizations, aside from those required from *concurso mercantil* proceedings.

M.    That it completely accepts the terms set forth herein and that this Agreement, once approved by the Judge, will provide the terms needed to Consummate the Restructuring (as such term is defined below) on the Closing Date (as such term is defined below).

**II.**    **Each of the Executing Creditors, as well as the Adhering Creditors that execute this Agreement, hereby represents under oath that:**

A.    It is Vitro's creditor as respectively identified under its own signature page under this Agreement.

B.    As for holders of the Notes, it evidences its capacity as a Vitro creditor by means of (i) The certification issued and delivered by the Depository Trust Company ("DTC") to Vitro, whereby the record holders are evidenced and (ii) the duly notarized and apostilled Letter of Transmittal issued and delivered by all of the last beneficial owners of the Notes (or their authorized representatives) which contains a certification regarding its ownership of the Notes regarding the beneficial owner; and (iii) the Letter of Instruction issued by the beneficial owner of the Notes to the corresponding record holder.

C.    As for holders of Cebures, it evidences its capacity as a Vitro creditor by means of (i) a Cebures deposit certificate issued by the S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima ("Indeval") to the brokerage houses where each holder of Cebures holds its positions and (ii) a Cebures holder's partial certificate issued by the brokererage house with whom each holder of Cebures has executed an intermediary agreement pursuant to which such holder of Cebures holds its positions.

D.    It wishes to enter into this Agreement in order to agree on the form, terms and conditions of Vitro's payment of indebtedness pursuant to what is set forth herein, which on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below).

Likewise it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil*, pursuant to what is set forth in Articles 166 and 262 Section I and other related and applicable articles of the LCM.

E.  At the latest within the term provided in Article 122 Section II of the LCM, it shall request the Acknowledgement of all of its credits before the *Conciliador* which is appointed in Vitro's *concurso mercantil* proceeding.

F.  Its representatives have the necessary authority to enter into this Agreement, which has not been revoked or limited in any way as of this date, pursuant to the document which is attached hereto as **Exhibit "C"**, and which shall form part of this Agreement.

**III.  All parties to this Agreement represent, by means of their representative and under oath that:**

A.  They mutually agree to their authority and capacity with which they execute this Agreement, for all necessary legal effects.

As a consequence of the above, and pursuant to the previous representations, Vitro, the Executing Creditors and, as the case may be, the Adhering Creditors agree to execute this Agreement pursuant to what is set forth if the following clauses, and as of this moment request that the *Conciliador* present to the Remaining Creditors this Agreement, which Vitro, the Executing Creditors and the Adhering Creditors propose to the Remaining Creditors for their acceptance and execution, pursuant to what is set forth in articles 4 Section I, 132, 146 and 161 of the LCM:

CLAUSES

**FIRST. DEFINITIONS AND EXHIBITS**

**Section 1.01** Defined Terms.

Unless otherwise set forth in this Agreement, any capitalized term used herein shall have the following meaning:

| *TERM* | *DEFINITION* |
| --- | --- |
| *2012 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *2013 Notes* | shall have the meaning ascribed to it in Antecedent II of this Agreement. |
| *2017 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *ABN Note* | shall have the meaning ascribed to it in Antecedent IV of this Agreement. |
| *Acknowledged Claims* | shall mean the credits which are acknowledged in the Debt Acknowledgement Judgment. |
| *Acknowledged Creditors* | shall mean all creditors which are legally acknowledged pursuant to Article 132 of the LCM by means of a definitive sentence issued by the Judge which rules over the corresponding *concurso mercantil*. |

A-6

| TERM | DEFINITION |
|---|---|
| **Adhering Creditors** | shall mean all Remaining Creditors that execute this Agreement. |
| **Agreement** | shall mean this Restructuring Agreement, which may be amended from time to time during the *concurso mercantil* proceedings, and once definitively approved by the Judge, shall be converted into the restructuring agreement provided in Title V, Sole Chapter of the LCM. |
| **Cash Payment** | shall mean the cash payment made on the Closing Date, as provided in Section 5.02(c) of this Agreement. |
| **Cebures** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| **Cebures Vitro 03** | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| **Cebures Vitro 08** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| **Closing Date** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| **Conciliador** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| **Consent Payment** | shall have the meaning ascribed to it in the Trust. |
| **Consummate the Restructuring** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| **Debt Acknowledgement Judgment** | shall mean the debt Acknowledgement, degree and order sentence dictated by the Judge pursuant to what is set forth in Article 132 of the LCM. |
| **Description of the Notes** or **DON** | shall mean the Description of the New Notes, pursuant to the document which is attached hereto as **Exhibit "D"** which provides the principal characteristics of the New 2019 Notes and the New Mandatory Convertible Debentures. |
| **Executing Creditors** | shall mean all creditors which are listed in **Exhibit "A"** of this Agreement. |
| **Existing Indebtedness** | shall mean jointly liabilities being restructured by means of this Agreement, which include the Notes, the Cebures, the ABN Note, the Fintech Notes and the Settlement Agreement. |
| **Extended Closing Date** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| **Fintech Notes** | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |

| TERM | DEFINITION |
|---|---|
| *Guarantors* | shall mean all Vitro subsidiaries which shall act as guarantors under the New Notes, which are identified under the definition of Guarantors of Certain Definitions within the Description of the Notes. |
| *IFECOM* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Intercompany Claims* | shall have the meaning ascribed to it in representation I.D. of this Agreement. |
| *Issue Date Adjustment* | shall mean the adjustment or increase made by Vitro on the date the New Mandatory Convertible Debentures are issued equal to an annual rate of return of 10.50% (ten point one percent) of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) calculated for the period between Value Date and the issuance date of the New Mandatory Convertible Debentures. |
| *Judge* | shall mean the District Judge for Civil and Labor Matters in Monterrey, Nuevo Leon, who shall rule over the Vitro *concurso mercantil* proceeding. |
| *LCM* | shall mean the Mexican Bankruptcy and Reorganization Act (*Ley de Concursos Mercantiles*). |
| *LGTOC* | shall mean the Mexican Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*). |
| *Mexico* | shall mean the United States of Mexico. |
| *New 2019 Notes* | shall have the meaning ascribed to it in Section 5.02(a) of this Agreement. |
| *New Cebures 2019* | shall have the meaning ascribed to it in Section 5.02 (a) of this Agreement |
| *New Debt* | shall mean the indebtedness created as a result of the Restructuring Instruments. |
| *New Mandatory Convertible Debentures* | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| *New Mandatory Convertible Debentures* | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| *New Notes* | shall mean jointly the New 2019 Notes and the New Cebures 2019. |
| *Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |

| TERM | DEFINITION |
|---|---|
| *Ordinary Course Intercompany Debt* | shall have the meaning ascribed to it in the DON. |
| *Remaining Creditors* | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| *Restructuring* | shall have the meaning ascribed to it in Clause Second of this Agreement. |
| *Restructuring Fee* | shall have the meaning ascribed to it in Section 5.02 of this Agreement. |
| *Restructuring Instruments* | shall mean jointly the definitive documentation with regards to the 2019 New Notes, the New Cebures 2019, the New Mandatory Convertible Debentures and other documentation related to the restructuring of the Existing Indebtedness. |
| *Settlement Agreement* | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |
| *Trust* | shall mean the irrevocable management and payment trust number 986 dated September 8, 2010 created by Vidriera Los Reyes, S.A. de C.V., a direct subsidiary of Vitro, in its capacity of settlor; before Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, in its capacity of trustee. A copy of the Trust is attached hereto as **Exhibit "E"**, which shall form part of this Agreement. |
| *Value Date* | shall mean January 1, 2011. |
| *Visitador* | shall mean the person appointed by the IFECOM which shall determine if Vitro complied with the provisions set forth in Article 10 of the LCM, as well as to confirm if the termination of the credits caused such actions, and shall also suggest the Judge to issue precautionary measures to be issued as considered necessary to protect the restructured assets, pursuant to Article 37 of the LCM. |
| *Vitro* | shall mean Vitro, S.A.B. de C.V. |
| *Vitro 02 Program* | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| *Vitro 08 Program* | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| *Voting Trust* | shall mean the irrevocable management trust to be created pursuant to section 5.04. |

**Section 1.02 Rules of Interpretation**

In this Agreement as well as its Exhibits:

I.   the index and headings of the Clauses and Sections are for reference only and shall not affect the interpretation of this Agreement;

II.  references to any document or agreement, including this Agreement, shall include: (a) all exhibits or other documents attached thereto; (b) all documents or agreements issued or executed to substitute such agreements; and (c) any amendments, additional modifications or compilations of such agreements;

III. "*include*" or "*including*" are deemed to be followed by "*without limitation*";

IV.  a reference to a party includes that party's authorized successors and permitted assigns;

V.   the words "*of this*", "*in this*" and "*under this*" and similar words or phrases, will refer to this Agreement in general and not to a particular provision of this Agreement;

VI.  reference to "*days*" shall mean calendar days;

VII. words importing the singular include the plural and vice versa;

VIII. references to a Clause, Exhibit or Section are references to a relevant clause or section of, or exhibit to this Agreement, unless otherwise expressly stated; and

IX.  all documents which are attached to this Agreement shall form part this Agreement as if they were fully set forth herein.

**Section 1.03** Exhibits.

The following Exhibits shall form part of this Agreement:

**Exhibit "A"** List of Executing Creditors.

**Exhibit "B"** Public instrument, which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"** Public instruments which contain the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"** Description of the New Notes, attached in English, accompanied by its Spanish translation.

**Exhibit "E"** Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.
**Exhibit "F"** Form of Cash Payment and Restructuring Fee.

**Section 1.04** Representation Inclusions.

The parties agree that those representations made by Vitro herein are the main reason for which the Executing Creditors are executing this Agreement.

**SECOND. PURPOSE.**

Pursuant to Articles 1, 48, 157, 166, 262, Section I, and other applicable articles of the LCM, the purpose of this Agreement is, subject to the terms and conditions provided herein and subject to the implementation of the transactions described herein, and subject to the approval of this Agreement by the Judge, that Vitro continues operations, preserves its existence and avoids payment default which may put at risk its viability, as well as other companies with which it maintains a business relation, through the restructuring to which the parties to this Agreement have agreed (the "Restructuring"), which includes the payment, possible capitalization, restructuring and/or novation, as the case may be, of the Acknowledged Claims with the acquittals, forbearances, restructures, grants and/or amendments and/or releases of security interests provided for and subject to the terms herein.

**THIRD.   TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**

**Section 3.01** General Operating Expenses.

Vitro will continue to make payment of all direct and indirect labor and tax obligations and operating expenses, on a timely basis, as they become due, and will continue to perform under all of its contractual obligations pursuant to the LCM.

**FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**

Vitro hereby acknowledges and accepts to owe to the Executing Creditors and the Remaining Creditors, the claims corresponding to the Existing Indebtedness in the amounts provided under section I.D. of the representations section of this Agreement on the terms and conditions of each of the documents which originated such liabilities and for the principal amount, interest and other accessories, the amount that appears in front of the name of each Executing Creditor in each signature page of this Agreement.

Notwithstanding the foregoing, each of the Executing Creditors and, as the case may be the Adhering Creditors, are hereby obligated to file, at the latest within in the term set forth in article 122 section II of the LCM, before the *Conciliador*, their respective proofs of claim or debt acknowledgment petitions and to take all necessary procedural on that regard.

**FIFTH. PAYMENT AND IMPLEMENTATION.**

**Section 5.01** Payment.

Vitro will pay the corresponding Executing Creditors' as well as the Remaining Creditors' Acknowledged Claims, in the terms set forth herein.

This Agreement, once approved by the Judge shall be extensive to the Remaining Creditors as provided in article 165 of the LCM.

**Section 5.02** Implementation.

The Executing Creditors, the Adhering Creditors and Vitro will implement the Restructuring by means of the filing, voting and approval, in each case, of this Agreement pursuant to the LCM, its further recognition and enforcement in the United States of America through the filing and presentment of a Chapter 15 proceeding under the United States Bankruptcy Code, as well as by means of issuance and delivery at the Closing Date to the Acknowledged Creditors of the instruments referred to in subsections (a) and (b) as well as the payments referred to in subsections (c) and (d), as follows:

(a)     pro rata amongst the Acknowledged Creditors, the notes (the "New 2019 Notes") or, as the case may be, at the option of each of the Acknowledged Creditors, the New Cebures ("the New Cebures 2019"), in both cases to be

issued by Vitro in the terms and conditions provided under Section 5.02.1 of this Agreement;

(b)    pro rata amongst the Acknowledged Creditors, the Mandatory Convertible Debentures to be issued by Vitro in the terms and conditions provided under Section 5.02.2 of this Agreement (the "New Mandatory Convertible Debentures");

(c)    pro rata amongst the Acknowledged Creditors, a cash payment for the remaining US$75,000,000.00 (seventy five million dollars 00/100 Currency of the United States of America) which are contributed to the Trust, once the Consent Payments have been discounted (the "Cash Payment"); and

(d)    pro rata cash payment which shall correspond to restructuring fee resulting from the application of the formula provided under Section 5.02.4 of this Agreement (hereinafter, the "Restructuring Fee").

The parties agree that notwithstanding the provisions under this Agreement, creditors under the Intercompany Debt will not receive any instruments or payments described above and that their liabilities will be restructured as provided for in Section 5.04 of this Agreement.

None of the instruments offered by Vitro pursuant to this Agreement and which comprise the New Debt will be registered under the United States Securities Act of 1933, as such has been amended from time to time, based on the exemption provided under Section 3(a)(9) of such law, nor shall they be registered before the National Stock Registry (*Registro Nacional de Valores*) controlled by the Mexican National Securities and Exchange Commission (*Comisión Nacional Bancaria y de Valores*). Therefore, Vitro, as a result of the legal opinion provided by the legal advisors for the Executing Creditors, shall have the right to implement such processes and to request from the Acknowledged Creditors, any such statements and/or certifications which are reasonably considered as necessary or convenient to verify compliance with necessary requirements to apply the corresponding legal exemptions.

**Section 5.02.1** Description of the New Notes.

The New 2019 Notes shall be issued by Vitro in and in accordance with the laws of the United States of America on the Closing Date pursuant to the terms and conditions of Section I of the Description of the Notes and the terms and conditions provided for in the corresponding New 2019 Notes indenture. Also, the New Cebures 2019 shall be issued by Vitro in and in accordance with the laws of Mexico on the Closing Date pursuant to terms and conditions identical to those governing the New 2019 Notes.

The New 2019 Notes and the New Cebures 2019 shall:

I.    have a principal total amount, jointly, of US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America);

II.    have a term of eight (8) years following the Value Date;

III.    constitute direct, unconditional and non-subordinated obligations of Vitro, and rank *pari passu* or identical, one on one basis, versus Vitro's non-secured and non-subordinated debt;

IV.    be unconditionally and jointly guaranteed by each of the Guarantors;

V.    have a fixed annual interest rate of 8.0%, payable semiannually in due installments and which may be partially capitalized and paid in kind, by 50% (fifty percent), during the first 3 (three) years following the Value Date, at Vitro's election, subject to the compliance by Vitro with certain conditions set forth in the Description of the Notes;

A-12

VI.    not have amortization or principal payments during the first 4 (four) years following the Value Date and, from the fifth year until the seventh year following the Value Date, shall have amortizations or principal payments of US$25,000,000.00 (twenty-five million dollars 00/100 Currency of the United States of America) payable semiannually;

VII.    totally or partially redeemable at Vitro's option, at any time during their term, subject to certain conditions set forth in the Description of the Notes, at a price equal to 100% of their value *plus* interest generated up to the redemption date;

VIII.    be totally or partially mandatorily redeemable, in the event that Vitro (i) performs a stock issuance subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

IX.    be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its value *plus* interests generated up to the redemption date.

All of the terms and conditions, as well as the customary and regular negative and affirmative for this kind of transactions, including without limitation, any limitations to incur in additional debt, limitations on investments and creation of liens or encumbrances, limitations on certain payments, limitations on the sale of assets, limitations of transactions with partners or affiliates, and early termination events under which the New 2019 Notes and the New Cebures 2019 will be subject, are contained in Section I of the Description of the Notes called New 2019 Notes and in the New 2019 Notes and the New Cebures 2019 indentures.

The principal amount of the New 2019 Notes and of the New Cebures 2019 may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.2** Description of the New Mandatory Convertible Debentures.

The New Mandatory Convertible Debentures shall be issued by Vitro pursuant to the laws of the Unites States of America, complying with all applicable provisions under the General Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*), on the Closing Date pursuant to the terms and conditions of Section II of the Description of the Notes and the terms and conditions provided under the New Mandatory Convertible Debentures indenture.

The New Mandatory Convertible Debentures shall:

I.    have a principal total amount of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) *plus* the Issue Date Adjustment;

II.    have a term of five (5) years following the Value Date;

III.    constitute direct obligations of Vitro, and shall rank *pari passu* or identical, one on one basis, versus Vitro's non-guaranteed debt;

IV.    have an annual fixed interest rate equal to 10.50%, which may be totally capitalized and paid in kind, on an annual basis, during its term;

V.    be mandatorily convertible into shares of Vitro which represent 15% of its corporate capital at the end of its term, in the event that they are not paid in cash at the end of its term or in the absence of mandatory redemptions pursuant to the Description of the Notes;

VI.    be totally or partially redeemable at Vitro's option, at any time during their term, subject to the terms and conditions set forth in the Description of the Notes, at a price equal to 100% of their value (subject

to prepayment discounts set forth in the Description of the New Notes) *plus* the interest generated up to the redemption date;

VII. be totally or partially mandatorily redeemable, in the event that Vitro (i) issues capital stock subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

VIII. be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its principal *plus* the interest generated up to the redemption date.

All of the terms and conditions, terms and conversion procedures, as well as the negative and affirmative covenants and early termination events which govern the New Mandatory Convertible Debentures are provided under Section II of the Description of the Notes and in the New Mandatory Convertible Debentures indenture.

The principal amount of the New Mandatory Convertible Debentures and as a consequence the basis for the Issue Date Adjustment calculation may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.3** Cash Payment Description.

Vitro shall pay in cash, on the Closing Date, pro-rata, in favor of all Acknowledged Creditors (except for Intercompany Claims), an amount equal to US$75,000,000.00 (seventy-five million dollars 00/100 Currency of the United States of America), which are contributed to the Trust, *minus* the Consent Payment.

**Section 5.02.4** Restructuring Fee Description.

Vitro shall pay as a Restructuring Fee on the Closing Date, pro rata, in favor of all Acknowledged Creditors (except for Intercompany Claims) an amount equal to the annual interest rate of 8.0% (eight percent) regarding the US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America) calculated for the period between the Value Date and the New 2019 Note issuance.

The principal amount used to estimate the Restructuring Fee may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.03** Treatment of Acknowledged Creditors.

All Acknowledged Creditors (except for Intercompany Claims) shall receive a pro rata portion of (i) the New 2019 Notes or the New Cebures 2019, as the case may be to the option of each of the Acknowledged Creditors, who shall notify their election to Vitro within five (5) calendar days following the date in which the Judge approves this Agreement, provided that, in the event that Vitro does not receive the election during such period, the Acknowledged Creditors will receive New 2019 Notes in exchange of their Notes and New Cebures 2019 in exchange of their Cebures, (ii) the New Mandatory Convertible Debentures, (iii) the Cash Payment and (iv) the Restucturing Fee.

The parties expressly agree and accept that the terms and conditions set forth herein grant a just, equal and reasonable treatment to all claims of the Acknowledged Creditors.

**Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.

The holders of Intercompany Claims against Vitro accept that they will receive a less favorable treatment than the rest of the Acknowledged Creditors, since they shall not be entitled to receive any of the instruments and payments set forth in Section 5.02 of this Agreement.

Pursuant to the foregoing paragraph, creditors holding Intercompany Claims (except for Ordinary Course Intercompany Debt holders) accept to receive a note for the amount of such claims , payable within a 9 (nine) year term which shall begin on the date in which the New Notes and the New Mandatory Convertible Debentures are issued, and shall have a fixed annual interest rate of 2.5% (two point five percent) and shall be payable in one sole single bullet payment at maturity.

Additionally, no principal or interest concerning the Intercompany Claims shall be made prior to payment of principal, interest or any other amounts owed under the New Notes and the New Mandatory Convertible Debentures; except for payments of principal or interest in the ordinary course of business and consistent with past practice with respect to Ordinary Course Intercompany Debt. Vitro and its subsidiaries will execute an Intercompany Subordination and Credit Agreement as set forth in the Description of the New Notes.

Vitro and its subsidiariaries shall create an irrevocable trust agreement (the "Voting Trust") where they shall contribute all of their Intercompany Claims in order to be managed and voted pursuant to what is set forth under such Voting Trust. Such Intercompany Claims shall remain in the Voting Trust for the remainder of the credit term, or 9 (nine) years, which shall begin on the date in which the New Notes and the New Mandatory Convertible Debentures are issued.

**Section 5.05** Other obligations to consider.

Pursuant to what is stated in representation I.F of this Agreement, Vitro is a holding company and it is in its best interest to achieve a comprehensive restructuring of its liabilities and those of its subsidiaries, and Vitro has included, within the economic terms set forth herein, those liabilities of its subsidiary denominated Vitro Envases Norteamérica, S.A. de C.V., which acts as a Guarantor in this Agreement, and currently owes Calyon Credit Agricole CIB ("Calyon"), an amount equal to US$63,383,806.00 (sixty three million three hundred eighty three thousand eight hundred six dollars 00/100 Currency of the United States of America) plus interest and commissions owed up to June 30, 2010 for an amount equal to US$3,905,298.00 (three million nine hundred five thousand two hundred ninety eight dollars 00/100 Currency of the United States of America). In the event the terms of this Agreement are accepted by Calyon, Vitro shall assume such debt and will deliver Calyon its proportional share of the New 2019 Notes, the New Mandatory Convertible Debentures, the Restructuring Fee and its Cash Payment, pursuant to what is set forth in Section 5.02 herein. Furthermore, Calyon shall be considered as an Adhering Creditor for all legal and economic purposes under this Agreement, as of the date in which the Judge approved this Agreement.

Vitro shall grant Calyon with the same term to execute and approve this Agreement as well as to accept the benefits bestowed in its favor under this Section 5.05 as the one granted in favor of the Remaining Creditors pursuant to article 161 third paragraph of the LCM.

In the event Calyon does not accept the benefits bestowed in its favor pursuant to this Section 5.05, the corresponding amounts of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee to be delivered and paid to each Acknowledged Creditor shall remain unchanged, pursuant to what is set forth in Section 5.02, and Vitro shall only reduce the amount of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee, in order to deduct such proportional amounts which would have been distributed to Calyon if it had accepted the rights granted in its favor; *provided, however,* that the Cash Payment available to the Acknowledged Creditors shall remain unchanged pursuant to Section 5.02(c). Furthermore, in the event Calyon does not accept the benefits bestowed in its favor pursuant to Section 5.05, Vitro shall not be in a position to offer Calyon a more favorable treatment regarding payment of its indebtedness than the treatment offered to the Acknowledged Creditors under this Agreement.

## SIXTH.   METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PAYMENT AND THE RESTRUCTURING FEE.

Vitro shall be obligated to pay the Cash Payment and the Restructuring Fee, through electronic wire transfer to the account indicated by each one of the Acknowledged Creditors in a written form pursuant to the forms attached hereto as Annex F, or before the court through certified or cash checks.

Vitro must pay the Cash Payment and the Restructuring Fee and shall issue the New Notes, the New Mandatory Convertible Debentures, and in general terms consummate the Restructuring, ("Consummate the Restructuring") provided for in this Agreement no later than (15) fifteen calendar days following the date in which the publication in the lists of the court where the *concurso mercantil* proceeding is taking place becomes effective, of the resolution issued by the Judge approving this Agreement (notwithstanding existing recourses or appeals pending of resolution), or the immediate following business day in the event case the effective date falls on a non-business day ( the "Closing Date"), unless:

  a) There is a court order or decree granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring, as set forth in this Agreement; or

  b) There is a recourse or appeal which, if resolved against Vitro, may invalidate this Agreement as approved by the Judge and within the fifteen (15) calendar days following the date on which the resolution approving this Agreement has become effective, the majority of the Acknowledged Creditors vote in favor of extending the Consummation Date, in which case the Closing Date shall be extended to the earlier of (A) the date in which the recourse or appeal is resolved in final and non-amendable form and (B) ten (10) months starting as of the date on which the resolution approving this Agreement becomes effective (in either case, the "Extended Closing Date").

For the avoidance of doubt, in the event that the recourse or appeal mentioned in paragraph (b)(i) is still pending and the majority of the Acknowledged Creditors vote against the extension of the Closing Date, then Vitro shall Consummate the Restructuring no later than the Closing Date notwithstanding such recourse or appeal. Likewise, in the event the majority of the Acknowledged Creditors vote in favor of extending the Closing Date, but such recourse or appeal is not resolved before the Extended Closing Date, then Vitro shall Consummate the Restructuring within five (5) calendar days following the Extended Closing Date or the immediately following business day if such date falls on a non-business day (except in the event that a judicial order or decree has been issued granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring).

## SEVENTH. CURRENCY.

According to the last paragraph of Article 159 of the LCM, the claims will subsist in the same currency in which they were originally agreed.

## EIGHTH. FURTHER DOCUMENTS.

The parties agree to take any necessary actions to ratify the terms of this Agreement, once approved by the Judge, and any other agreement derived therefrom, including the Restructuring Instruments, at the latest at the Closing Date.

Vitro shall be obligated to make and cause all of the Guarantors to agree to the terms of this Agreement, once approved by the Judge, and the Restructuring Instruments pursuant to what is set forth in the Description of the Notes, through their signature to the Restructuring Instruments.

## NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.

Given the nature of this Agreement and the objectives of the *concurso* proceeding, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, this Agreement and the Restructuring Instruments issued by Vitro thereto, novate, substitute and extinguish the prior obligations, indentures, instruments, documents, agreements and guarantees in which the Acknowledged Claims were stipulated or agreed upon, and also extinguishes the personal guarantees that were granted by third parties

and/or Vitro's direct or indirect subsidiaries with respect to the obligations, instruments, documents and agreements from which the claims of the Acknowledged Claims arose.

The Acknowledged Creditors shall hereby expressly acknowledge and approve the waiver of the difference between the face amount of the Acknowledged Claims and the New Debt resulting from this Agreement, and, as a consequence of the execution of this Agreement, grant Vitro and its guarantors the fullest release with respect to such original claims, and as of the date of the judicial approval of this Agreement, only the New Debt, in the terms set forth in this Agreement shall survive.

## TENTH. BINDING EFFECT.

Pursuant to the provisions of the LCM, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, it shall be mandatory to Vitro and to all the Acknowledged Creditors, including those Remaining Creditors who, through absence or explicit rejection, have not executed this Agreement.

## ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.

The consent granted by the Executing Creditors with regards to this Agreement, as well as by the Adhering Creditors that execute this Agreement, shall be irrevocable and binds any transferee of the same, and any successor and/or assignee of the same from the moment in which this Agreement was executed; therefore, in the event there is any assignment or transfer of the claims of such creditors, the assignees, successors and/or transferees by any cause or title or reason, are bound irrevocably by the terms of this Agreement; *provided, however,* that the Executing Creditors and the Adhering Creditors that execute this Agreement, must ratify this Agreement in the event of amendments or modifications to the Agreement which breach or contravene the terms and conditions set forth herein, or in the event such changes or amendments materially affect any of the Executing Creditors or Adhering Creditors or any of their interests or rights as set forth herein.

## TWELFTH. PATRIMONY.

In terms of article 2964 of the Federal Civil Code, Vitro responds for the compliance of its obligations under this Agreement with its entire patrimony.

## THIRTEENTH. MANAGEMENT AND SURVEILLANCE.

During the *concurso mercantil* proceedings, Vitro will continue its ordinary course of business, and shall maintain management and administration of its assets under the surveillance of the court through the *Conciliador*, as well as during the term referred to in Clause Sixth of this Agreement, in which case surveillance will be the responsibility of its corresponding corporate entities.

## FOURTEENTH. CONTINUANCE.

Vitro agrees that during the *concurso mercantil* proceedings it shall comply with its operational obligations and activities in which it is involved, in order to secure the continuance of its corporate existence.

## FIFTEENTH. EQUAL TREATMENT.

This Agreement is intended, and shall be always construed in such manner, to provide equal treatment to all the Acknowledged Creditors.

## SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.

The execution of this Agreement by the Executing Creditors and the Adhering Creditors implies the execution, acceptance and consent of such Executing Creditors and the Adhering Creditors with respect to the

*concurso mercantil* petition that may be filed by Vitro to be considered as a prepackaged restructuring plan, pursuant to what is set forth in Title Fourteen of the LCM.

Subject to the condition precedent that this Agreement be approved by the Judge pursuant to article 164 of the LCM, the Executing Creditors and the Adhering Creditors, agree and irrevocably consent to each and every one of the clauses stated herein regarding claims against Vitro which each of them holds and are indicated in the signature pages of this Agreement or the ones which result in their favor in the Debt Acknowledgement Judgment.

## SEVENTEENTH. NULLITY.

If for any reason any of the clauses of this Agreement is deemed invalid, such circumstance shall only affect that clause and the rest of the terms and conditions herein shall survive in its terms.

## EIGHTEENTH. APPLICABLE LAW.

This Agreement shall be governed by the LCM and other applicable laws pursuant to Article 8 of the LCM.

## NINETEENTH. JURISDICTION AND VENUE.

The parties that execute this Agreement and those who agree and consent to its execution in the future pursuant to Articles 161 and 162 of the LCM, agree that construction, compliance and enforcement of this Agreement will be subject to the exclusive jurisdiction of the H. District Judge which shall rule over the Vitro *concurso mercantil* proceeding.

## TWENTIETH. HEADINGS.

The headings of the clauses of this Agreement are merely for reference and do not affect its content.

This Agreement is signed by Vitro, Executing Creditors and the Adhering Creditors, as well as by the Recognized Creditors that consent to it, on the date which appears on each signature page.

[*REST OF THE PAGE WAS INTENTIONALLY LEFT BLANK*]

A-18

Signature page of the Vitro Restructuring Agreement.

VITRO, S.A.B. DE C.V.

By: _____
     Name:
     Title:
     Date:

Signature page of the Vitro Restructuring Agreement.

Credit:

2012 Notes

Note Number: [          ]
Nominal Value: [          ]

2013 Notes

Note Number: [          ]
Nominal Value: [          ]

2017 Notes

Note Number: [          ]
Nominal Value: [          ]

Cebures Vitro 03

Certificate Number: [          ]
Nominal Value: [          ]

Cebures Vitro 08

Certificate Number: [          ]
Nominal Value: [          ]

Other credits:

Identification: [          ]

Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgement Judgment in favor of the Creditor's name which is indicated below.

_____
[CREDITOR'S NAME]

Represented by:_____
Name:
Title:
Date:

## EXHIBIT LIST

**Exhibit "A"**   List of Executing Creditors.

**Exhibit "B"**   Public instrument which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"**   Public instrument which contains the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"**   Description of the Notes, attached in English form, accompanied by its Spanish translation.

**Exhibit "E"**   Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.

**Exhibit "F"**   Form of Cash Payment and Restructuring Fee.

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

# FORM T-3/A
**(Amendment No. 2)**

## FOR APPLICATIONS FOR QUALIFICATION OF INDENTURES
## UNDER THE TRUST INDENTURE ACT OF 1939

———————————

# Vitro, S.A.B. de C.V.

**(Name of Applicant)**

**Ave. Ricardo Margáin 400**
**Col. Valle del Campestre**
**San Pedro Garza García, Nuevo León, 66265**
**United Mexican States ("Mexico")**
**(Address of Principal Executive Offices)**

**Securities to be Issued Under the Indentures to be Qualified**

———————————

| Title of Class | Amount |
|---|---|
| 8.0% Notes due 2019 | $850 million in aggregate principal amount |
| Mandatory Convertible Debentures | $100.0 million in aggregate principal amount, subject to adjustment |

Approximate date of proposed public offering:
**As promptly as practicable after the date of this Application for Qualification**

**Name and Address of Agent for Service:**

**Puglisi & Associates**
**850 Library Avenue, Suite 204**
**Newark, Delaware 19711**
**(302) 738-6680**
**With copies to:**

| | |
|---|---|
| **Joy K. Gallup, Esq.** | **Alejandro Sanchez Mujica** |
| **Milbank, Tweed, Hadley & McCloy LLP** | **General Counsel** |
| **1 Chase Manhattan Plaza** | **Ave. Ricardo Margain Zozaya #400** |
| **New York, NY 10005** | **Col. Valle del Campestre** |
| **(212) 530-5000** | **San Pedro Garza Garcia** |
| | **Nuevo Leon, 66265 Mexico** |
| | **+52 (81) 8863-1200** |

———————————

**The Applicant hereby amends this application for qualification on such date or dates as may be necessary to delay its effectiveness until (i) the 20th day after the filing of a further amendment which specifically states that it shall supersede this amendment, or (ii) such date as the SEC, acting pursuant to Section 307(c) of the Act, may determine upon the written request of the Applicant.**

**EXPLANATORY NOTE**

This Amendment No. 2 to Form T-3 (this "Amendment") is being filed on behalf of Vitro, S.A.B. de C.V. and the guarantors listed in Schedule A of the Form T-3 filed on November 1, 2010. This Amendment is solely to file and replace Annex A to Amendment No. 1, which filed a new Exhibit T3E.4, showing amended provisions in strikethrough and underlined text.

**SIGNATURE**

Pursuant to the requirements of the Trust Indenture Act of 1939, the applicant, Vitro, S.A.B. de C.V., a corporation organized and existing under the laws of Mexico, has duly caused this application to be signed on its behalf by the undersigned, thereunto duly authorized, and its seal to be hereunto affixed and attested all in the City of San Pedro Garza Garcia and State of Nuevo León, on the 12th day of November, 2010.

VITRO, S.A.B. DE C.V.

By:    /s/ Claudio del Valle Cabello
Name:  Claudio del Valle Cabello
Title:   Attorney-in-Fact


By:    /s/ Alejandro Sánchez Mújica
Name:  Alejandro Sánchez Mújica
Title:   Attorney-in-Fact

3

## AMENDMENTS TO THE *CONCURSO* PLAN

The following provisions of the *Concurso* Plan would be amended as follows (amended provisions shown in strikethrough and underlined text).

**RESTRUCTURING AGREEMENT EXECUTED PURSUANT TO ARTICLES 3, 153, 157, 165, 339 AND OTHER APPLICABLE ARTICLES OF THE MEXICAN BANKRUPTCY AND REORGANIZATION LAW (*LEY DE CONCURSOS MERCANTILES*) ENTERED INITIALLY INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. AND THE EXECUTING CREDITORS AND FOR ITS FURTHER SUBSCRIPTION, IN ITS CASE, BY THE ADHERING CREDITORS.**

**INDEX**

ANTECEDENTS ......................................................................................................................... A-3

REPRESENTATIONS ............................................................................................................... A-4

CLAUSES ................................................................................................................................... A-6

    **FIRST. DEFINITIONS AND EXHIBITS** ....................................................................... A-6

        **Section 1.01** Defined Terms ....................................................................................... A-10

        **Section 1.02 Rules of Interpretation** ...................................................................... A-10

        **Section 1.03** Exhibits ................................................................................................. A-10

        **Section 1.04** Representation Inclusions .................................................................. A-10

    **SECOND. PURPOSE** ....................................................................................................... A-11

    **THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS** ............................................................................................ A-11

    **FOURTH. ACKNOWLEDGEMENT OF CLAIMS** ...................................................... A-11

    **FIFTH. PAYMENT AND IMPLEMENTATION** .......................................................... A-11

        **Section 5.01** Payment ................................................................................................ A-11

        **Section 5.02** Implementation ................................................................................... A-11

            **Section 5.02.1** Description of the New ~~2019~~ Notes ........................................ A-12

            **Section 5.02.2** Description of the New Mandatory Convertible Debentures ..... A-13

            **Section 5.02.3** Cash ~~Contribution~~ <u>Payment</u> Description ............................... A-14

            **Section 5.02.4** Restructuring Fee Description ....................................................... A-14

        **Section 5.03** Treatment of Acknowledged Creditors ........................................... A-14

        **Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment ... A-14

        **Section 5.05** Other obligations to consider ............................................................ A-15

    **SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH ~~PORTION~~ <u>PAYMENT</u> AND THE RESTRUCTURING FEE** ................................................. A-16

    **SEVENTH. CURRENCY** ................................................................................................ A-16

    **EIGHTH. FURTHER DOCUMENTS** ............................................................................. A-16

    **NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT** ..................................................................................................... A-16

    **TENTH. BINDING EFFECT** .......................................................................................... A-17

    **ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES** ... A-17

    **TWELFTH. PATRIMONY** .............................................................................................. A-17

    **THIRTEENTH. MANAGEMENT AND SURVEILLANCE** .......................................... A-17

    **FOURTEENTH. CONTINUANCE** ................................................................................. A-17

    **FIFTEENTH. EQUAL TREATMENT** ............................................................................ A-17

    **SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN** ... A-17

    **SEVENTEENTH. NULLITY** ........................................................................................... A-18

    **EIGHTEENTH. APPLICABLE LAW** ............................................................................ A-18

    **NINETEENTH. JURISDICTION AND VENUE** ........................................................... A-18

    **TWENTIETH. HEADINGS** ............................................................................................ A-18

A-2

**RESTRUCTURING AGREEMENT (THIS "AGREEMENT" OR "VITRO RESTRUCTURING AGREEMENT") ENTERED INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. ("VITRO"), AND THOSE PERSONS WHOSE NAMES ARE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT ON BEHALF OF THE VITRO CREDITORS (JOINTLY REFERRED TO AS THE "EXECUTING CREDITORS") AND THE CREDITORS WHOSE NAMES WILL BE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT THAT FROM TIME TO TIME MAY BE INCLUDED IN THIS AGREEMENT (THE "ADHERING CREDITORS"), SUBJECT TO THE FOLLOWING ANTECEDENTS, REPRESENTATIONS AND CLAUSES:**

### ANTECEDENTS

I.    On October 10, 2002, Vitro registered a program for the issuance of medium term stock traded certificates (*certificados bursátiles de mediano plazo*) for a total sum of $2,500,000,000.00 (two billion five hundred million pesos 00/100 Mexican Currency) (the "Vitro 02 Program"). On February 13, 2003, Vitro issued 11,400,000 (eleven million four hundred thousand) stock traded certificates (*certificados bursátiles*) for a total amount of $1,140,000,000.00 (one billion one hundred forty million pesos 00/100 Mexican Currency) pursuant to the Vitro 02 Program (the "Cebures Vitro 03"). The common representative (*representante común*) for the holders of the Cebures Vitro 03 is Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II.    On October 22, 2003, Vitro completed an issuance throughout international markets of US$225,000,000.00 (two hundred twenty-five million dollars 00/100 Currency of the United States of America) with 11.75% Senior Notes due on 2013 (the "2013 Notes").

III.    On February 1, 2007, Vitro completed an issuance throughout international markets of US$1,000,000,000.00 (one billion dollars 00/100 Currency of the United States of America), which consisted of US$300,000,000.00 (three hundred million dollars 00/100 currency of the United States of America) with 8.625% Senior Notes due 2012 (the "2012 Notes") and US$700,000,000.00 (seven hundred million dollars 00/100 Currency of the United States of America) with 9.125% Senior Notes due 2017 (the "2017 Notes" and jointly with the 2013 Notes and the 2012 Notes, the "Notes").

IV.    On September 29, 2008, Vitro issued a promissory note in favor of ABN AMRO BANK N.V. (owned at one time by RBS Bank), for US$15,000,000.00 (fifteen million dollars 00/100 Currency of the United States of America) (the "ABN Note").

V.    On July 1, 2008, Vitro registered a program for the issuance of long term stock traded certificates (*certificados bursátiles de largo plazo*) for an amount of up to $1,000,000,000.00 (one billion pesos 00/100 Mexican Currency) (the "Vitro 08 Program"). On July 2, 2008, Vitro issued 4,000,000 (four million) stock traded certificates (*certificados bursátiles*) for $400,000,000.00 (four hundred million pesos 00/100 Mexican Currency) pursuant to the Vitro 08 Program (the "Cebures Vitro 08", and jointly with the Cebures Vitro 03, the "Cebures"). The common representative (*representante común*) of the holders of Cebures Vitro 08 is Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI.    On September 3, 2010, Vitro entered into, as guarantor for its subsidiaries Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. and Comercializadora Álcali, S.A. de C.V., a Settlement and Debt Acknowledgement Agreement with Fintech Investments Ltd., in its capacity of creditor (the "Settlement Agreement") whereby it secured payment of the total amount of US$189,999,282.00 (one hundred eighty-nine million nine hundred ninety-nine thousand two hundred eighty-two dollars 00/100 Currency of the United States of America) plus interest accrued at 4.25% (four point twenty five percent) up to the maturity date, in favor of Fintech Investments Ltd, and executed as "*aval*" three promissory notes for the aforementioned amount (the "Fintech Notes").

VII.    Vitro has reached an agreement with the Executing Creditors in order to restructure its indebtedness upon the Closing Date (as such term is defined below), pursuant to the following terms and conditions

provided in this Agreement which will be filed though a *concurso mercantil* proceeding, in any of its modalities pursuant to what is set forth in the LCM (as defined below), including, if necessary, a *concurso mercantil* petition, whereby this Agreement will be attached as a prearranged agreement or a prepackage reorganization agreement.

VIII.   Pursuant to Article 339, Section IV, of the Mexican Bankruptcy and Reorganization Law (*Ley de Concursos Mercantiles)* ("LCM"), this Agreement contains the terms and conditions agreed between Vitro~~and~~, the Executing Creditors and, in as the case may be the Adhering Creditors, for the Vitro indebtedness restructuring; *provided, however,* that Vitro~~and~~, the Executing Creditors and the Adhering Creditors intend for this Agreement to become, once it has been approved by the Judge, a reorganization agreement as set forth in Title V, Sole Chapter of the LCM, in order for this Agreement, once all legal requirements have been satisfied, to be presented by means of the *Conciliador* (as such term is defined below) appointed in the *concurso mercantil* by the Federal Institute of *Concurso Mercantil* Specialists ("IFECOM") pursuant to ~~Article 43, Section~~article 43 section IV if the LCM (the "*Conciliador*") before all other creditors which are legally acknowledged by means of the Debt Acknowledgment Judgment (as such term is defined below), pursuant to ~~Article~~article 132 of the LCM (the "Remaining Creditors", and jointly with the Executing Creditors, the "Acknowledged Creditors").

## REPRESENTATIONS

**I.   Vitro represents, under oath and through its representatives, that:**

A.   It is a corporation duly incorporated and existing under the Laws of Mexico and that its restructuring of indebtedness which is the purpose of this Agreement, as well as its execution and performance, have been duly authorized by its board of directors through its meeting held on September 24, 2010, pursuant applicable law and regulations.

B.   Its representatives have sufficient authority to enter into this Agreement, which has not been revoked or limited in any way as of the date hereof, pursuant to a certified copy of the public instrument attached hereto as **Exhibit "B"**, which shall also form part of this Agreement.

C.   It wishes to enter into this Agreement in order to agree on the form, restructuring terms, payment and/or novation conditions, as the case may be, of its indebtedness as set forth herein and that, on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Furthermore, it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil* proceeding, pursuant to what is set forth in Articles 166 and 262, Section I and other relative and applicable provisions of the LCM.

D.   Pursuant to its accounting records, as of ~~[September] [30]~~, 30, it has (a) non subsidiary direct or indirect credit liabilities which amount to $~~[•] [•] [•]~~20,508,000,000.00 (twenty billion five hundred and eight million pesos 00/100 Mexican Currency), equivalent to US$~~[•] 1.00 ([•]~~1,640,000,000.00 (one billion six hundred and forty million dollars 00/100 Currency of the Unites States of America), (b) liabilities as a result of the "*aval*" granted in favor of third parties regarding its subsidiaries' obligations which amount to $~~[•] [•]~~2,383,771,567.00 (two billion three hundred and eighty three million seven hundred and seventy one thousand five hundred and sixty seven pesos 00/100 Mexican Currency), equivalent to US$~~[•] 1.00 ([•]~~190,627,335.00 (one hundred and ninety million six hundred and twenty seven thousand three hundred and thirty five dollars 00/100 Currency of the United States of America), and (c) direct or indirect subsidiary liabilities, for an amount of $~~[•] [•]~~23,872,000,000.00 (twenty three billion eight hundred and seventy two million pesos 00/100 Mexican Currency), equivalent to US$~~[•] [•]~~1,910,000,000.00 (one billion nine hundred and ten million dollars 00/100 Currency of the United States of America) (amounts mentioned in item (c) above will be referred to as "Intercompany Claims").

E.  That the liabilities owed to the Executing Creditors represent at least [•]% of the total Vitro liabilities, pursuant to its accounting records.

F.  That it is a holding company and as such, its ability to meet its obligations is dependant on the dividends that it receives from its subsidiaries.

G.  That it acknowledges the claims of the Executing Creditors and those of the Remaining Creditors, in the amounts, degree and specific characteristics indicated in the creditors and debtors description which pursuant to Article 20, Section III of the LCM, shall be attached as an exhibit to the *concurso mercantil* petition to be filed.

H.  That it does not owe (i) any claims from those mentioned in Article 224, Section I of the LCM, nor (ii) any claims singularly privileged (as defined in Article 218 of the LCM), nor (iii) any claims with other guarantees and privileges (as defined in Article 219 of the LCM).

I.  That it does not have due tax claims of any kind, including but not limited to, claims related to social security claims.

J.  That the Company has not executed any specific agreements with any of its ~~Acknowledged Creditors~~creditors with regards to a repayment of indebtedness, contrary to the LCM.

K.  The execution of this Agreement does not violate or breach, or in any way contravene any provisions of its current corporate by-laws nor any law, including without limitation, the LCM.

L.  That the Company is authorized, under the laws of Mexico, to enter into and comply with its obligations set forth in this Agreement, without any other necessary authorizations, aside from those required from *concurso mercantil* proceedings.

M.  That it completely accepts the terms set forth herein and that this Agreement, once approved by the Judge, will provide the terms needed to Consummate the Restructuring (as such term is defined below) on the Closing Date (as such term is defined below).

**II.  Each of the Executing Creditors, as well as the Adhering Creditors that execute this Agreement, hereby represents under oath that:**

A.  It is Vitro's creditor as respectively identified under its own signature page under this Agreement.

B.  As for holders of the Notes, it evidences its capacity as a Vitro creditor by means of (i) The certification issued and delivered by the Depository Trust Company ("DTC") to Vitro, whereby the record holders are evidenced and (ii) the duly notarized and apostilled Letter of Transmittal issued and delivered by all of the last beneficial owners of the Notes (or their authorized representatives) which contains a certification regarding its ownership of the Notes regarding the beneficial owner; and (iii) the Letter of Instruction issued by the beneficial owner of the Notes to the corresponding record holder.

C.  As for holders of Cebures, it evidences its capacity as a Vitro creditor by means of (i) a Cebures deposit certificate issued by the S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima ("Indeval") to the brokerage houses where each holder of Cebures holds its positions and (ii) a Cebures holder's partial certificate issued by the ~~broker who acts as a custodian for such~~ brokererage house with whom each holder of Cebures has executed an intermediary agreement pursuant to which such holder of Cebures holds its positions.

D.  It wishes to enter into this Agreement in order to agree on the form, terms and conditions of Vitro's payment of indebtedness pursuant to what is set forth herein, which on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below).

Likewise it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil*, pursuant to what is set forth in Articles 166 and 262 Section I and other related and applicable articles of the LCM.

E.   At the latest within the term provided in Article 122 Section II of the LCM, it shall request the Acknowledgement of all of its credits before the *Conciliador* which is appointed in Vitro's *concurso mercantil* proceeding.

F.   Its representatives have the necessary authority to enter into this Agreement, which has not been revoked or limited in any way as of this date, pursuant to the document which is attached hereto as **Exhibit "C"**, and which shall form part of this Agreement.

**III.   All parties to this Agreement represent, by means of their representative and under oath that:**

A.   They mutually agree to their authority and capacity with which they execute this Agreement, for all necessary legal effects.

As a consequence of the above, and pursuant to the previous representations, Vitro ~~and~~ the Executing Creditors and, as the case may be, the Adhering Creditors agree to execute this Agreement pursuant to what is set forth if the following clauses, and as of this moment request that the *Conciliador* present to the Remaining Creditors this Agreement, which Vitro ~~and~~ the Executing Creditors and the Adhering Creditors propose to the Remaining Creditors for their acceptance and execution, pursuant to what is set forth in ~~Articles 4~~ articles 4 Section I, 132, 146 and 161 of the LCM:

**CLAUSES**

**FIRST. DEFINITIONS AND EXHIBITS**

**Section 1.01** Defined Terms.

Unless otherwise set forth in this Agreement, any capitalized term used herein shall have the following meaning:

| *TERM* | *DEFINITION* |
|---|---|
| *2012 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *2013 Notes* | shall have the meaning ascribed to it in Antecedent II of this Agreement. |
| *2017 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *ABN Note* | shall have the meaning ascribed to it in Antecedent IV of this Agreement. |
| *Acknowledged Claims* | shall mean the credits which are acknowledged in the Debt Acknowledgement Judgment. |
| *Acknowledged Creditors* | shall mean all creditors which are legally acknowledged pursuant to Article 132 of the LCM by means of a definitive sentence issued by the Judge which rules over the corresponding *concurso mercantil*. |

A-6

| TERM | DEFINITION |
|---|---|
| ***Adhering Creditors*** | shall mean all Remaining Creditors that execute this Agreement. |
| ***Agreement*** | shall mean this Restructuring Agreement, which may be amended from time to time during the *concurso mercantil* proceedings, and once definitively approved by the Judge, shall be converted into the restructuring agreement provided in Title V, Sole Chapter of the LCM. |
| ***Cash ~~Contribution~~ Payment*** | shall mean the cash payment made on the Closing Date, as provided in Section 5.02(c) of this Agreement. |
| ***Cebures*** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| ***Cebures Vitro 03*** | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| ***Cebures Vitro 08*** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| ***Closing Date*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Conciliador*** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| ***Consent Payment*** | shall have the meaning ascribed to it in the Trust. |
| ***Consummate the Restructuring*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Debt Acknowledgement Judgment*** | shall mean the debt Acknowledgement, degree and order sentence dictated by the Judge pursuant to what is set forth in Article 132 of the LCM. |
| ***Description of the Notes* or *DON*** | shall mean the Description of the New Notes, pursuant to the document which is attached hereto as **Exhibit "D"** which provides the principal characteristics of the New 2019 Notes and the New Mandatory Convertible Debentures. |
| ***Executing Creditors*** | shall mean all creditors which are listed in **Exhibit "A"** of this Agreement. |
| ***Existing Indebtedness*** | shall mean jointly liabilities being restructured by means of this Agreement, which include the Notes, the Cebures, the ABN Note, the Fintech Notes and the Settlement Agreement. |
| ***Extended Closing Date*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Fintech Notes*** | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |

| TERM | DEFINITION |
|------|------------|
| **_Guarantors_** | shall mean all Vitro subsidiaries which shall act as guarantors under the New ~~2019~~ Notes, which are identified under the definition of Guarantors of Certain Definitions within the Description of the Notes. |
| **_IFECOM_** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| **_Intercompany Claims_** | shall have the meaning ascribed to it in representation I.D. of this Agreement~~, expressly excluding any Intercompany Claims in the Ordinary Course of Business (as such term is defined in the Description of the Notes)~~. |
| **_Issue Date Adjustment_** | shall mean the adjustment or increase made by Vitro on the date the New Mandatory Convertible Debentures are issued equal to an annual rate of return of 10.50% (ten point one percent) of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) calculated for the period between Value Date and the issuance date of the New Mandatory Convertible Debentures. |
| **_Judge_** | shall mean the District Judge for Civil and Labor Matters in Monterrey, Nuevo Leon, who shall rule over the Vitro _concurso mercantil_ proceeding. |
| **_LCM_** | shall mean the Mexican Bankruptcy and Reorganization Act (_Ley de Concursos Mercantiles_). |
| **_LGTOC_** | shall mean the Mexican Law of Credit Transactions and Negotiable Instruments (_Ley General de Títulos y Operaciones de Crédito_). |
| **_Mexico_** | shall mean the United States of Mexico. |
| **_New 2019 Notes_** | shall have the meaning ascribed to it in Section 5.02(a) of this Agreement. |
| **_<u>New Cebures 2019</u>_** | <u>shall have the meaning ascribed to it in Section 5.02 (a) of this Agreement</u> |
| **_New Debt_** | shall mean the indebtedness created as a result of the Restructuring Instruments. |
| **_New Mandatory Convertible Debentures_** | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| **_<u>New Mandatory Convertible Debentures</u>_** | <u>shall have the meaning ascribed to it in Section 5.02(b) of this Agreement.</u> |
| **_<u>New Notes</u>_** | <u>shall mean jointly the New 2019 Notes and the New Cebures 2019.</u> |
| **_Notes_** | shall have the meaning ascribed to it in Antecedent III of this Agreement. |

| TERM | DEFINITION |
|------|------------|
| ***Ordinary Course Intercompany Debt*** | shall have the meaning ascribed to it in the DON. |
| ***Remaining Creditors*** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| ***Restructuring*** | shall have the meaning ascribed to it in Clause Second of this Agreement. |
| ***Restructuring Fee*** | shall have the meaning ascribed to it in Section 5.02 of this Agreement. |
| ***Restructuring Instruments*** | shall mean jointly the definitive documentation with regards to the 2019 New Notes, the New Cebures 2019, the New Mandatory Convertible Debentures and other documentation related to the restructuring of the Existing Indebtedness. |
| ***Settlement Agreement*** | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |
| ***Trust*** | shall mean the irrevocable management and payment trust number 986 dated September 8, 2010 created by Vidriera Los Reyes, S.A. de C.V., a direct subsidiary of Vitro, in its capacity of settlor; before Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, in its capacity of trustee. A copy of the Trust is attached hereto as **Exhibit "E"**, which shall form part of this Agreement. |
| ***Value Date*** | shall mean January 1, 2011. |
| ***Visitador*** | shall mean the person appointed by the IFECOM which shall determine if Vitro complied with the provisions set forth in Article 10 of the LCM, as well as to confirm if the termination of the credits caused such actions, and shall also suggest the Judge to issue precautionary measures to be issued as considered necessary to protect the restructured assets, pursuant to Article 37 of the LCM. |
| ***Vitro*** | shall mean Vitro, S.A.B. de C.V. |
| ***Vitro 02 Program*** | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| ***Vitro 08 Program*** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| ***Voting Trust*** | shall mean the irrevocable management trust to be created pursuant to section 5.04. A copy of the Voting Trust is attached here to as **Exhibit "G"**, which shall form part of this Agreement. |

A-9

**Section 1.02 Rules of Interpretation**

In this Agreement as well as its Exhibits:

I.   the index and headings of the Clauses and Sections are for reference only and shall not affect the interpretation of this Agreement;

II.  references to any document or agreement, including this Agreement, shall include: (a) all exhibits or other documents attached thereto; (b) all documents or agreements issued or executed to substitute such agreements; and (c) any amendments, additional modifications or compilations of such agreements;

III. "*include*" or "*including*" are deemed to be followed by "*without limitation*";

IV.  a reference to a party includes that party's authorized successors and permitted assigns;

V.   the words "*of this*", "*in this*" and "*under this*" and similar words or phrases, will refer to this Agreement in general and not to a particular provision of this Agreement;

VI.  reference to "*days*" shall mean calendar days;

VII. words importing the singular include the plural and vice versa;

VIII. references to a Clause, Exhibit or Section are references to a relevant clause or section of, or exhibit to this Agreement, unless otherwise expressly stated; and

IX.  all documents which are attached to this Agreement shall form part this Agreement as if they were fully set forth herein.

**Section 1.03** Exhibits.

The following Exhibits shall form part of this Agreement:

**Exhibit "A"** List of Executing Creditors.

**Exhibit "B"** Public instrument, which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"** Public instruments which contain the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"** Description of the New Notes, attached in English, accompanied by its Spanish translation.

**Exhibit "E"** Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.

**Exhibit "F"** Form of Cash ~~Contribution~~Payment and Restructuring Fee.

~~**Exhibit "G"** Form of Voting Trust.~~

**Section 1.04** Representation Inclusions.

The parties agree that those representations made by Vitro herein are the main reason for which the Executing Creditors are executing this Agreement.

A-10

**SECOND. PURPOSE.**

Pursuant to Articles 1, 48, 157, 166, 262, Section I, and other applicable articles of the LCM, the purpose of this Agreement is, subject to the terms and conditions provided herein and subject to the implementation of the transactions described herein, and subject to the approval of this Agreement by the Judge, that Vitro continues operations, preserves its existence and avoids payment default which may put at risk its viability, as well as other companies with which it maintains a business relation, through the restructuring to which the parties to this Agreement have agreed (the "Restructuring"), which includes the payment, possible capitalization, restructuring and/or novation, as the case may be, of the Acknowledged Claims with the acquittals, forbearances, restructures, grants and/or amendments and/or releases of security interests provided for and subject to the terms herein.

**THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**

**Section 3.01** General Operating Expenses.

Vitro will continue to make payment of all direct and indirect labor and tax obligations and operating expenses, on a timely basis, as they become due, and will continue to perform under all of its contractual obligations pursuant to the LCM.

**FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**

Vitro hereby acknowledges and accepts to owe to the Executing Creditors and the Remaining Creditors, the claims corresponding to the Existing Indebtedness in the amounts provided under section I.D. of the representations section of this Agreement on the terms and conditions of each of the documents which originated such liabilities and for the principal amount, interest and other accessories, the amount that appears in front of the name of each Executing Creditor in each signature page of this Agreement.

Notwithstanding the foregoing, each of the Executing Creditors ~~is~~and, as the case may be the Adhering Creditors, are, hereby obligated to file, at the latest within in the term set forth in ~~Article 122, Section~~article 122 section II of the LCM, before the *Conciliador*, their respective proofs of claim or debt ~~Acknowledgment~~acknowledgment petitions and to ~~undertake~~take all necessary ~~procedures in~~procedural on that regard.

**FIFTH. PAYMENT AND IMPLEMENTATION.**

**Section 5.01** Payment.

Vitro will pay the corresponding Executing Creditors' as well as the Remaining Creditors' Acknowledged Claims, in the terms set forth herein.

This Agreement, once approved by the Judge shall be extensive to the Remaining Creditors as provided in article 165 of the LCM.

**Section 5.02** Implementation.

The Executing Creditors, the Adhering Creditors and Vitro will implement the Restructuring by means of the filing, voting and approval, in each case, of this Agreement pursuant to the LCM, its further recognition and enforcement in the United States of America through the filing and presentment of a Chapter 15 proceeding under the United States Bankruptcy Code, as well as by means of issuance and delivery at the Closing Date to the Acknowledged Creditors of the instruments referred to in subsections (a) and (b) as well as the payments referred to in subsections (c) and (d), as follows:

(a)    pro rata amongst the Acknowledged Creditors, the ~~Notes~~notes (the "New 2019 Notes") or, as the case may be, at the option of each of the Acknowledged Creditors, the New Cebures ("the New Cebures 2019"), in both cases to be

issued by Vitro ~~on~~in the terms and conditions provided under Section 5.02.1 of this Agreement ~~(the "New 2019 Notes")~~;

(b)     pro rata amongst the Acknowledged Creditors, the Mandatory Convertible Debentures to be issued by Vitro ~~on~~in the terms and conditions provided under Section 5.02.2 of this Agreement (the "New Mandatory Convertible Debentures");

(c)     pro rata amongst the Acknowledged Creditors, a cash payment for the remaining US$75,000,000.00 (seventy- five million dollars 00/100 Currency of the United States of America) which are contributed to the Trust, once the Consent Payments have been discounted (the "Cash ~~Contribution~~Payment"); and

(d)     pro rata cash payment which shall correspond to restructuring fee resulting from the application of the formula provided under Section 5.02.4 of this Agreement (hereinafter, the "Restructuring Fee").

The parties agree that notwithstanding the provisions under this Agreement, creditors under the Intercompany Debt will not receive any instruments or payments described above and that their liabilities will be restructured as provided for in Section 5.04 of this Agreement.

None of the instruments offered by Vitro pursuant to this Agreement and which comprise the New Debt will be registered under the United States Securities Act of 1933, as such has been amended from time to time, based on the exemption provided under Section 3(a)(9) of such law, nor shall they be registered before the National Stock Registry (*Registro Nacional de Valores*) controlled by the Mexican National Securities and Exchange Commission (*Comisión Nacional Bancaria y de Valores*). Therefore, Vitro, as a result of the legal opinion provided by the legal advisors for the Executing Creditors, shall have the right to implement such processes and to request from the Acknowledged Creditors, any such statements and/or certifications which are reasonably considered as necessary or convenient to verify compliance with necessary requirements to apply the corresponding legal exemptions.

**Section 5.02.1** Description of the New ~~2019~~Notes.

The New 2019 Notes shall be issued by Vitro <u>in and</u> in accordance with the laws of the United States of America on the Closing Date pursuant to the terms and conditions of Section I of the Description of the Notes and the terms and conditions provided for in the corresponding New 2019 Notes indenture. <u>Also, the New Cebures 2019 shall be issued by Vitro in and in accordance with the laws of Mexico on the Closing Date pursuant to terms and conditions identical to those governing the New 2019 Notes.</u>

The New 2019 Notes <u>and the New Cebures 2019</u> shall:

I.     have a principal <u>total</u> amount<u>, jointly,</u> of US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America);

II.    have a term of eight (8) years following the Value Date;

III.   constitute direct, unconditional and non-subordinated obligations of Vitro, and rank *pari passu* or identical, one on one basis, versus Vitro's non-secured and non-subordinated debt;

IV.    be unconditionally and jointly guaranteed by each of the Guarantors;

V.     have a fixed annual interest rate of 8.0%, payable semiannually in due installments and which may be partially capitalized and paid in kind, by 50% (fifty percent), during the first 3 (three) years following the Value Date, at Vitro's election, subject to the compliance by Vitro with certain conditions set forth in the Description of the Notes;

VI. not have amortization or principal payments during the first 4 (four) years following the Value Date and, from the fifth year until the seventh year following the Value Date, shall have amortizations or principal payments of US$25,000,000.00 (twenty-five million dollars 00/100 Currency of the United States of America) payable semiannually;

VII. totally or partially redeemable at Vitro's option, at any time during their term, subject to certain conditions set forth in the Description of the Notes, at a price equal to 100% of their value *plus* interest generated up to the redemption date;

VIII. be totally or partially mandatorily redeemable, in the event that Vitro (i) performs a stock issuance subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

IX. be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its value *plus* interests generated up to the redemption date.

All of the terms and conditions, as well as the customary and regular negative and affirmative ~~covenants~~covenants for this kind of ~~transaction~~transactions, including without limitation, any limitations to incur in additional debt, limitations on investments and creation of liens or encumbrances, limitations on certain payments, limitations on the sale of assets, limitations of transactions with partners or affiliates, and early termination events under which the New 2019 Notes and the New Cebures 2019 will be subject, are contained in Section I of the Description of the Notes called New 2019 Notes and in the New 2019 Notes ~~indenture~~and the New Cebures 2019 indentures.

The principal amount of the New 2019 Notes and of the New Cebures 2019 may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.2** Description of the New Mandatory Convertible Debentures.

The New Mandatory Convertible Debentures shall be issued by Vitro pursuant to the laws of the Unites States of America, complying with all applicable provisions under the General Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*), on the Closing Date pursuant to the terms and conditions of Section II of the Description of the Notes and the terms and conditions provided under the New Mandatory Convertible Debentures indenture.

The New Mandatory Convertible Debentures shall:

I. have a principal total amount of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) *plus* the Issue Date Adjustment;

II. have a term of five (5) years following the Value Date;

III. constitute direct obligations of Vitro, and shall rank *pari passu* or identical, one on one basis, versus Vitro's non-guaranteed debt;

IV. have an annual fixed interest rate equal to 10.50%, which may be totally capitalized and paid in kind, on an annual basis, during its term;

V. be mandatorily convertible into shares of Vitro which represent 15% of its corporate capital at the end of its term, in the event that they are not paid in cash at the end of its term or in the absence of mandatory redemptions pursuant to the Description of the Notes;

VI. be totally or partially redeemable at Vitro's option, at any time during their term, subject to the terms and conditions set forth in the Description of the Notes, at a price equal to 100% of their value (subject

to prepayment discounts set forth in the Description of the New Notes) *plus* the interest generated up to the redemption date;

VII. be totally or partially mandatorily redeemable, in the event that Vitro (i) issues capital stock subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

VIII. be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its principal *plus* the interest generated up to the redemption date.

All of the terms and conditions, terms and conversion procedures, as well as the negative and affirmative covenants and early termination events which govern the New Mandatory Convertible Debentures are provided under Section II of the Description of the Notes and in the New Mandatory Convertible Debentures indenture.

The principal amount of the New Mandatory Convertible Debentures and as a consequence the basis for the Issue Date Adjustment calculation may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.3** Cash ~~Contribution~~Payment Description.

Vitro shall pay in cash, on the Closing Date, pro-rata, in favor of all Acknowledged Creditors (except for Intercompany Claims), an amount equal to US$75,000,000.00 (seventy-five million dollars 00/100 Currency of the United States of America), which are contributed to the Trust, *minus* the Consent Payment.

**Section 5.02.4** Restructuring Fee Description.

Vitro shall pay as a Restructuring Fee on the Closing Date, ~~in the~~pro rata, in favor of all Acknowledged Creditors (except for Intercompany Claims) an amount equal to the annual interest rate of 8.0% (eight percent) regarding the US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America) calculated for the period between the Value Date and the New 2019 Note issuance.

The principal amount used to estimate the Restructuring Fee may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.03** Treatment of Acknowledged Creditors.

All Acknowledged Creditors (except for Intercompany Claims) shall receive a pro ~~rata portion of the New 2019 Notes and~~rata portion of (i) the New 2019 Notes or the New Cebures 2019, as the case may be to the option of each of the Acknowledged Creditors, who shall notify their election to Vitro within five (5) calendar days following the date in which the Judge approves this Agreement, provided that, in the event that Vitro does not receive the election during such period, the Acknowledged Creditors will receive New 2019 Notes in exchange of their Notes and New Cebures 2019 in exchange of their Cebures, (ii) the New Mandatory Convertible Debentures, ~~as provided under the Description of the Notes, as well as,~~ (iii) the Cash ~~Contribution and Restructuring~~ Payment and (iv) the Restucturing Fee.

The parties expressly agree and accept that the terms and conditions set forth herein grant a just, equal and reasonable treatment to all claims of the Acknowledged Creditors.

**Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.

The holders of Intercompany Claims against Vitro accept that they will receive a less favorable treatment than the rest of the Acknowledged Creditors, since they shall not be entitled to receive any of the instruments and payments set forth in Section 5.02 of this Agreement.

~~As a substitution to what is set forth above, such~~Pursuant to the foregoing paragraph, creditors holding Intercompany Claims (except for Ordinary Course Intercompany Debt holders) accept to receive a note for the amount of ~~their Intercompany Claim~~such claims, payable within a 9 (nine) year term which shall begin on the date ~~on~~in which the New ~~2019~~Notes and the New Mandatory Convertible Debentures are issued, and shall have a fixed annual interest rate of 2.5% (two point five percent) and shall be payable in one sole single bullet payment at maturity.

Additionally, no principal or interest payment concerning the Intercompany Claims shall be made prior to payment of principal, interest or any other amounts owed under the New ~~2019~~Notes and the New Mandatory Convertible Debentures; except for payments of principal or interest in the ordinary course of business and consistent with past practice with respect to Ordinary Course Intercompany Debt. Vitro and its subsidiaries will execute an Intercompany Subordination and Credit Agreement as set forth in the Description of the New Notes.

Vitro and ~~the Guarantors~~its subsidiariaries shall create an irrevocable trust agreement (the "Voting Trust") where they shall contribute all of their Intercompany Claims in order to be managed and voted pursuant to what is set forth under such Voting Trust. Such Intercompany Claims shall remain in the Voting Trust for the remainder of the credit term, or 9 (nine) years, which shall begin on the date ~~on~~in which the New ~~2019~~ Notes and the New Mandatory Convertible Debentures are issued.

**Section 5.05** Other obligations to consider.

Pursuant to what is stated in representation I.F of this Agreement, Vitro is a holding company and it is in its best interest to achieve a comprehensive restructuring of its liabilities and those of its subsidiaries, and Vitro has included, within the economic terms set forth herein, those liabilities of its subsidiary denominated Vitro Envases Norteamérica, S.A. de C.V., which acts as a Guarantor in this Agreement, and currently owes Calyon Credit Agricole CIB ("Calyon"), an amount equal to US$63,383,806.00 (sixty three million three hundred eighty three thousand eight hundred six dollars 00/100 Currency of the United States of America) plus interest and commissions owed up to June 30, 2010 for an amount equal to US$3,905,298.00 (three million nine hundred five thousand two hundred ninety eight dollars 00/100 Currency of the United States of America). In the event the terms of this Agreement are accepted by Calyon, Vitro shall assume such debt and will deliver Calyon its proportional share of the New 2019 Notes, the New Mandatory Convertible Debentures, the Restructuring Fee and its ~~Cash Contribution~~ Payment, pursuant to what is set forth in Section 5.02 herein. Furthermore, Calyon shall be considered as an Adhering Creditor for all legal and economic purposes under this Agreement, as of the date in which the Judge approved this Agreement.

Vitro shall grant Calyon with the same term to execute and approve this Agreement as well as to accept the benefits bestowed in its favor under this Section 5.05 as the one granted in favor of the Remaining Creditors pursuant to article 161 third paragraph of the LCM.

In the event Calyon does not accept the benefits bestowed in its favor pursuant to this Section 5.05, the corresponding amounts of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee to be delivered and paid to each Acknowledged Creditor shall remain unchanged, pursuant to what is set forth in Section 5.02, and Vitro shall only reduce the amount of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee, in order to deduct such proportional amounts which would have been distributed to Calyon if it had accepted the rights granted in its favor; *provided, however*, that the Cash ~~Contribution~~ Payment available to the Acknowledged Creditors shall remain unchanged pursuant to Section 5.02(c). Furthermore, in the event Calyon does not accept the benefits bestowed in its favor pursuant to Section 5.05, Vitro shall not be in a position to offer Calyon a more favorable treatment regarding payment of its indebtedness than the treatment offered to the Acknowledged Creditors under this Agreement.

**SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH ~~PORTION~~ PAYMENT AND THE RESTRUCTURING FEE.**

Vitro shall be obligated to pay the Cash ~~Contribution~~ Payment and the Restructuring Fee, through electronic wire transfer to the account indicated by each one of the Acknowledged Creditors in a written form pursuant to the forms attached hereto as ~~Exhibit~~ Annex F, or before the court through certified or cash checks.

Vitro must pay the Cash ~~Contribution~~ Payment and the Restructuring Fee and shall issue the New Notes, the New Mandatory Convertible Debentures, and~~,~~ in general terms consummate the Restructuring, ("Consummate the Restructuring") provided for in this Agreement no later than (15) fifteen calendar days following the date in which the publication in the lists of the court where the *concurso mercantil* proceeding is taking place becomes effective, of the resolution issued by the Judge approving this Agreement (notwithstanding existing recourses or appeals pending of resolution), or the immediate following business day in the event case the effective date falls on a non-business day ( the "Closing Date"), unless:

a) There is a court order or decree granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring, as set forth in this Agreement; or

b) There is a recourse or appeal which, if resolved against Vitro, may invalidate this Agreement as approved by the Judge and within the fifteen (15) calendar days following the date on which the resolution approving this Agreement has become effective, the majority of the Acknowledged Creditors vote in favor of extending the Consummation Date, in which case the Closing Date shall be extended to the earlier of (A) the date in which the recourse or appeal is resolved in final and non-amendable form and (B) ten (10) months starting as of the date on which the resolution approving this Agreement becomes effective (in either case, the "Extended Closing Date").

For the avoidance of doubt, in the event that the recourse or appeal mentioned in paragraph (b)(i) is still pending and the majority of the Acknowledged Creditors vote against the extension of the Closing Date, then Vitro shall Consummate the Restructuring no later than the Closing Date notwithstanding such recourse or appeal. Likewise, in the event the majority of the Acknowledged Creditors vote in favor of extending the Closing Date, but such recourse or appeal is not resolved before the Extended Closing Date, then Vitro shall Consummate the Restructuring within five (5) calendar days following the Extended Closing Date or the immediately following business day if such date falls on a non-business day (except in the event that a judicial order or decree has been issued granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring).

**SEVENTH. CURRENCY.**

According to the last paragraph of Article 159 of the LCM, the claims will subsist in the same currency in which they were originally agreed.

**EIGHTH. FURTHER DOCUMENTS.**

The parties agree to take any necessary actions to ratify the terms of this Agreement, once approved by the Judge, and any other agreement derived therefrom, including the Restructuring Instruments, at the latest at the Closing Date.

Vitro shall be obligated to make and cause all of the Guarantors to agree to the terms of this Agreement, once approved by the Judge, and the Restructuring Instruments pursuant to what is set forth in the Description of the Notes, through their signature to the Restructuring Instruments.

**NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.**

Given the nature of this Agreement and the objectives of the *concurso* proceeding, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, this Agreement and the Restructuring Instruments issued by Vitro thereto, novate, substitute and extinguish the prior obligations, indentures, instruments, documents, agreements and guarantees in which the Acknowledged Claims were stipulated or agreed upon, and also extinguishes the personal guarantees that were granted by third parties

and/or Vitro's direct or indirect subsidiaries with respect to the obligations, instruments, documents and agreements from which the claims of the Acknowledged Claims arose.

The Acknowledged Creditors shall hereby expressly acknowledge and approve the waiver of the difference between the face amount of the Acknowledged Claims and the New Debt resulting from this Agreement, and, as a consequence of the execution of this Agreement, grant Vitro and its guarantors the fullest release with respect to such original claims, and as of the date of the judicial approval of this Agreement, only the New Debt, in the terms set forth in this Agreement shall survive.

## TENTH. BINDING EFFECT.

Pursuant to the provisions of the LCM, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, it shall be mandatory to Vitro and to all the Acknowledged Creditors, including those Remaining Creditors who, through absence or explicit rejection, have not executed this Agreement.

## ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.

The consent granted by the Executing Creditors with regards to this Agreement, as well as by the Adhering Creditors that execute this Agreement, shall be irrevocable and binds any transferee of the same, and any successor and/or assignee of the same from the moment in which this Agreement was executed; therefore, in the event there is any assignment or transfer of the claims of such creditors, the assignees, successors and/or transferees by any cause or title or reason, are bound irrevocably by the terms of this Agreement; *provided, however,* that the Executing Creditors and the Adhering Creditors that execute this Agreement, must ratify this Agreement in the event of amendments or modifications to the Agreement which breach or contravene the terms and conditions set forth herein, or in the event such changes or amendments materially affect any of the Executing Creditors or Adhering Creditors or any of their interests or rights as set forth herein.

## TWELFTH. PATRIMONY.

In terms of article 2964 of the Federal Civil Code, Vitro responds for the compliance of its obligations under this Agreement with its entire patrimony.

## THIRTEENTH. MANAGEMENT AND SURVEILLANCE.

During the *concurso mercantil* proceedings, Vitro will continue its ordinary course of business, and shall maintain management and administration of its assets under the surveillance of the court through the *Conciliador*, as well as during the term referred to in Clause Sixth of this Agreement, in which case surveillance will be the responsibility of its corresponding corporate entities.

## FOURTEENTH. CONTINUANCE.

Vitro agrees that during the *concurso mercantil* proceedings it shall comply with its operational obligations and activities in which it is involved, in order to secure the continuance of its corporate existence.

## FIFTEENTH. EQUAL TREATMENT.

This Agreement is intended, and shall be always construed in such manner, to provide equal treatment to all the Acknowledged Creditors.

## SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.

The execution of this Agreement by the Executing Creditors and the Adhering Creditors implies the execution, acceptance and consent of such Executing Creditors and the Adhering Creditors with respect to the

*concurso mercantil* petition ~~to~~ <u>that may</u> be filed by Vitro to be considered as a prepackaged restructuring plan, pursuant to what is set forth in Title Fourteen of the LCM.

Subject to the condition precedent that this Agreement be approved by the Judge pursuant to ~~Article~~<u>article</u> 164 of the LCM, the Executing Creditors and ~~those who execute this Agreement in the future~~ <u>the Adhering Creditors</u>, agree and irrevocably consent to each and every one of the clauses stated herein regarding claims against Vitro which each of them holds and are indicated in the signature pages of this Agreement or the ones which result in their favor in the Debt Acknowledgement Judgment.

## SEVENTEENTH. NULLITY.

If for any reason any of the clauses of this Agreement is deemed invalid, such circumstance shall only affect that clause and the rest of the terms and conditions herein shall survive in its terms.

## EIGHTEENTH. APPLICABLE LAW.

This Agreement shall be governed by the LCM and other applicable laws pursuant to Article 8 of the LCM.

## NINETEENTH. JURISDICTION AND VENUE.

The parties that execute this Agreement and those who agree and consent to its execution in the future pursuant to Articles 161 and 162 of the LCM, agree that construction, compliance and enforcement of this Agreement will be subject to the exclusive jurisdiction of the H. District Judge which shall rule over the Vitro *concurso mercantil* proceeding.

## TWENTIETH. HEADINGS.

The headings of the clauses of this Agreement are merely for reference and do not affect its content.

This Agreement is signed by Vitro~~and the~~<u>,</u> Executing <u>Creditors and the Adhering</u> Creditors, as well as by the Recognized Creditors that consent to it, on the date which appears on each signature page.

[*REST OF THE PAGE WAS INTENTIONALLY LEFT BLANK*]

A-18

Signature page of the Vitro Restructuring Agreement.

VITRO, S.A.B. DE C.V.

By: _____
    Name:
    Title:
    Date:

Signature page of the Vitro Restructuring Agreement.

Credit:

    2012 Notes

        Note Number:     [     ]
        Nominal Value:   [     ]

    2013 Notes

        Note Number:     [     ]
        Nominal Value:   [     ]

    2017 Notes

        Note Number:     [     ]
        Nominal Value:   [     ]

    Cebures Vitro 03

        Certificate Number: [     ]
        Nominal Value:   [     ]

    Cebures Vitro 08

        Certificate Number: [     ]
        Nominal Value:   [     ]

Other credits:

    Identification: [     ]

**{**Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgement Judgment in favor of the Creditor's name which is indicated below.**}**

                      _____
                      [CREDITOR'S NAME]

                      Represented by:_____
                        Name:
                        Title:
                        Date:

## EXHIBIT LIST

**Exhibit "A"**   List of Executing Creditors.

**Exhibit "B"**   Public instrument which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"**   Public instrument which contains the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"**   Description of the Notes, attached in English form, accompanied by its Spanish translation.

**Exhibit "E"**   Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.

**Exhibit "F"**   Form of Cash Payment and Restructuring Fee.

~~**Exhibit "G"**   Form of Voting Trust.~~

**Exhibit F**

**CONVENIO DE REESTRUCTURA QUE CON FUNDAMENTO EN LOS ARTÍCULOS 3, 153, 157, 165, 339 Y DEMÁS RELATIVOS Y APLICABLES DE LA LEY DE CONCURSOS MERCANTILES SUSCRIBEN INICIALMENTE VITRO, S.A.B. DE C.V. Y LOS ACREEDORES COMPARECIENTES, PARA SU POSTERIOR SUSCRIPCIÓN, EN SU CASO, POR LOS ACREEDORES ADHERENTES**

# ÍNDICE

ANTECEDENTES ................................................................................................................1

DECLARACIONES .............................................................................................................2

CLÁUSULAS ......................................................................................................................5

  **PRIMERA. DEFINICIONES Y ANEXOS** ..................................................................5

    **Sección 1.01** Términos Definidos ...............................................................................5

    **Sección 1.02** Reglas de Interpretación ........................................................................9

    **Sección 1.03** Anexos .................................................................................................10

    **Sección 1.04** Incorporación de las Declaraciones. ...................................................10

  **SEGUNDA. OBJETO.** ...................................................................................................10

  **TERCERA. TRATAMIENTO DE GASTOS DE OPERACIÓN, COSTOS LABORALES, IMPUESTOS Y OTROS ADEUDOS.** ..........................................................................10

    **Sección 3.01** Gastos Generales de Operación. .........................................................110

  **CUARTA. RECONOCIMIENTO DE ADEUDOS.** ....................................................11

  **QUINTA. PAGO E IMPLEMENTACIÓN.** .................................................................11

    **Sección 5.01** Pago. .....................................................................................................11

    **Sección 5.02** Implementación. ...................................................................................11

      **Sección 5.02.1** Descripción de los Nuevos Valores ................................................12

      **Sección 5.02.2** Descripción de las Nuevas Obligaciones Forzosamente Convertibles en Acciones.....13

      **Sección 5.02.3** Descripción del Pago en Efectivo ...................................................14

      **Sección 5.02.4** Descripción del Honorario por Reestructura ...................................15

    **Sección 5.03** Tratamiento a todos los Acreedores Reconocidos. ...............................15

    **Sección 5.04** Implementación de los Créditos Intercompañías; Aceptación de trato Menos Favorable...15

    **Sección 5.05** Otras obligaciones que se consideran……………………………………15

  **SEXTA. FORMA, FECHA Y LUGAR DE PAGO DEL PAGO EN EFECTIVO Y DEL HONORARIO POR REESTRUCTURA.** ......................................................................16

  **SEPTIMA. MONEDA.** ..................................................................................................17

  **OCTAVA. DOCUMENTOS ADICIONALES** ..............................................................17

  **NOVENA. SUSTITUCIÓN DE CONVENIOS ANTERIORES, NOVACIÓN Y EXTINCIÓN.** .......18

  **DÉCIMA. OBLIGATORIEDAD** ................................................................................18

  **DÉCIMA PRIMERA. CESIÓN DE CRÉDITOS, SUCESORES Y/O CAUSAHABIENTES.**............18

  **DÉCIMA SEGUNDA. PATRIMONIO.** .......................................................................18

  **DÉCIMA TERCERA. ADMINISTRACIÓN Y VIGILANCIA.** ...................................19

  **DÉCIMA CUARTA. CONTINUIDAD.** ........................................................................19

  **DÉCIMA QUINTA. IGUALDAD.** ................................................................................19

  **DÉCIMA SEXTA. SOLICITUD DE CONCURSO MERCANTIL Y PLAN DE REESTRUCTURA PREVIO.** ......................................................................................19

  **DÉCIMA SEPTIMA. INVALIDEZ.** .............................................................................19

  **DÉCIMA OCTAVA. LEY APLICABLE.** .....................................................................19

  **DÉCIMA NOVENA. JURISDICCIÓN Y COMPETENCIA.** .....................................19

  **VIGÉSIMA. ENCABEZADOS.** ...................................................................................20

**CONVENIO DE REESTRUCTURA (ESTE "CONVENIO" O EL "CONVENIO DE REESTRUCTURA DE VITRO") QUE CELEBRAN POR UNA PARTE VITRO, S.A.B. DE C.V. ("VITRO"), POR OTRA PARTE LOS ACREEDORES DE VITRO CUYOS NOMBRES SE IDENTIFICAN EN LAS HOJAS DE FIRMA DE ESTE CONVENIO (CUANDO SEAN REFERIDOS EN FORMA CONJUNTA, LOS "ACREEDORES COMPARECIENTES"), ASI COMO LOS ACREEDORES CUYOS NOMBRES SE IDENTIFIQUEN EN LAS HOJAS DE FIRMA QUE DE TIEMPO EN TIEMPO SE INCLUYAN EN ESTE CONVENIO (LOS "ACREEDORES ADHERENTES"), AL TENOR DE LOS SIGUIENTES ANTECEDENTES, DECLARACIONES Y CLÁUSULAS:**

### ANTECEDENTES

I.   El 10 de octubre de 2002, Vitro llevó a cabo la inscripción de un programa de certificados bursátiles de mediano plazo por un monto total de hasta $2,500,000,000.00 (dos mil quinientos millones de pesos 00/100 Moneda Nacional) (el "Programa Vitro 02"). Con fecha 13 de febrero de 2003, Vitro emitió 11,400,000 (once millones cuatrocientos mil) certificados bursátiles por un monto de $1,140,000,000.00 (un mil ciento cuarenta millones de pesos 00/100 Moneda Nacional) al amparo del Programa Vitro 02 (los "Cebures Vitro 03"). El representante común de los tenedores de Cebures Vitro 03 es Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II.  El 22 de octubre de 2003, Vitro completó una oferta en los mercados internacionales por EUA$225'000,000.00 (doscientos veinticinco millones de dólares 00/100 Moneda de los Estados Unidos de América) de 11.75% Notas Senior con vencimiento en el 2013 (las "Notas 2013").

III. El 1º de febrero de 2007, Vitro completó una oferta en los mercados internacionales por EUA$1,000'000,000.00 (un mil millones de dólares 00/100 Moneda de los Estados Unidos de América), consistente en EUA$300'000,000.00 (trescientos millones de dólares 00/100 Moneda de los Estados Unidos de América) de 8.625% Notas Senior con vencimiento en el 2012 (las "Notas 2012") y EUA$700'000,000.00 (setecientos millones de dólares 00/100 Moneda de los Estados Unidos de América) de 9.125% Notas Senior con vencimiento en el 2017 (las "Notas 2017" y conjuntamente con las Notas 2013 y las Notas 2012, las "Notas").

IV.  El día 29 de septiembre de 2008, Vitro suscribió un pagaré a favor de ABN AMRO BANK N.V., por la cantidad de EUA$15,000,000.00 (quince millones de dólares 00/100 Moneda de los Estados Unidos de América) (el "Pagaré ABN").

V.   Con fecha 1 de julio de 2008, Vitro llevó a cabo la inscripción de un programa de certificados bursátiles de largo plazo por un monto total de hasta $1,000'000,000.00 (un mil millones de pesos 00/100 Moneda Nacional) (el "Programa Vitro 08"). Con fecha 2 de julio de 2008, Vitro emitió 4,000,000 (cuatro millones) de certificados bursátiles por un monto de $400,000,000.00 (cuatrocientos millones de pesos 00/100 Moneda Nacional) al amparo del Programa Vitro 08 (los "Cebures Vitro 08", y conjuntamente con los Cebures Vitro 03, los "Cebures"). El representante común de los tenedores de Cebures Vitro 08 es Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI.  Con fecha 3 de septiembre de 2010, Vitro suscribió con el carácter de garante de sus subsidiarias Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. y Comercializadora Álcali, S.A. de C.V., un Convenio de Transacción y Reconocimiento de

Adeudo (*Settlement and Debt Acknowledgment Agreement*) con Fintech Investments Ltd., en su carácter de acreedora (el "Convenio de Transacción") a través del cual garantizó pagar a ésta la cantidad de EUA\$189,999,282.00 (ciento ochenta y nueve millones novecientos noventa y nueve mil doscientos ochenta y dos dólares 00/100 Moneda de los Estados Unidos de América) más los intereses que se generen a una tasa del 4.25% (cuatro punto veinticinco por ciento) hasta la fecha de su vencimiento, suscribiendo asimismo en su carácter de aval tres pagarés por dicho monto (los "Pagarés Fintech").

VII. Vitro ha llegado a un acuerdo con los Acreedores Comparecientes a fin de reestructurar sus pasivos en la Fecha de Cierre (según dicho término se define más adelante), en los términos y condiciones previstos en el presente Convenio a ser presentado en un juicio de concurso mercantil bajo cualquiera de las modalidades que establece la LCM, así como solicitar, en su caso, su declaración de concurso mercantil exhibiendo conjuntamente con dicha solicitud el presente Convenio como un convenio previo o plan de reorganización previamente concertado.

VIII. De conformidad con el Artículo 339, fracción IV, de la Ley de Concursos Mercantiles ("LCM"), el presente Convenio contempla los términos y condiciones acordados entre Vitro, los Acreedores Comparecientes y, en su caso, los Acreedores Adherentes, para la reestructura de los pasivos de Vitro; en el entendido, sin embargo, que es intención tanto de Vitro como de los Acreedores Comparecientes y los Acreedores Adherentes, que el presente Convenio, una vez aprobado por el Juez, sea el convenio concursal previsto en el Título V, Capítulo Único de la LCM, con el fin de que el mismo, una vez que se hayan cumplido los requisitos de ley, sea propuesto por conducto del conciliador que en su oportunidad se designe en el concurso mercantil por el Instituto Federal de Especialistas en Concursos Mercantiles ("IFECOM") de conformidad con el artículo 43 fracción IV de la LCM (el "Conciliador") a los demás acreedores que sean legalmente reconocidos en la Sentencia de Reconocimiento de Créditos (según dicho término se define más adelante), en términos del artículo 132 de la LCM (los "Acreedores Restantes", y en forma conjunta con los Acreedores Comparecientes, los "Acreedores Reconocidos").

## DECLARACIONES

**I.  Declara Vitro, a través de sus representantes, bajo protesta de decir verdad, que:**

A.  Es una sociedad mercantil debidamente constituida y existente de conformidad con las leyes de los Estados Unidos Mexicanos y la reestructura de sus pasivos objeto del presente Convenio, así como la firma y cumplimiento del mismo, han sido debidamente aprobados por su consejo de administración en su sesión celebrada el pasado 24 de septiembre de 2010, de conformidad con las leyes y la regulación aplicable.

B.  Sus representantes legales cuentan con las facultades necesarias y suficientes para la celebración del presente Convenio, las cuales no les han sido revocadas ni limitadas de forma alguna a esta fecha, según consta en la escritura pública que se agrega al presente como **Anexo "B"**, formando parte integrante del mismo.

C.  Es su voluntad celebrar el presente Convenio a fin de acordar la forma, términos y condiciones de reestructuración, pago y/o novación, según sea el caso de los pasivos a su cargo conforme éstos se establecen en el presente Convenio y sean, en el momento procesal oportuno, confirmados en la Sentencia de Reconocimiento de Créditos (según dicho

término se define más adelante). Asimismo, es su voluntad que el presente Convenio, una vez aprobado por el Juez, sea el convenio concursal que de por terminado el concurso mercantil de Vitro, de conformidad con lo dispuesto por los Artículos 166 y 262 fracción I y demás relativos y aplicables de la LCM.

D.    Conforme a sus registros contables, al día 30 de septiembre del año 2010, tiene (a) pasivos directos con acreedores que no son subsidiarias directas o indirectas de la misma, por $20,508,000,000.00 (veinte mil quinientos ocho millones de pesos 00/100 Moneda Nacional), equivalentes a EUA$1,640,000,000.00 (un mil seiscientos cuarenta millones de dólares 00/100 Moneda de los Estados Unidos de América), (b) pasivos por avales otorgados a favor de terceros respecto de obligaciones de sus subsidiarias por $2,383,771,567 (dos mil trescientos ochenta y tres millones setecientos setenta y un mil quinientos sesenta y siete pesos 00/100 Moneda Nacional), equivalentes a EUA$190,627,335.00 (ciento noventa millones seiscientos veintisiete mil trescientos treinta y cinco dólares 00/100 Moneda de los Estados Unidos de América), y (c) pasivos directos con subsidiarias directas o indirectas de la misma, por la cantidad de $23,872,000,000.00 (veintitrés mil ochocientos setenta y dos millones de pesos 00/100 Moneda Nacional), equivalentes a EUA$1,910,000,000.00 (un mil novecientos diez millones de dólares 00/100 Moneda de los Estados Unidos de América) (las cantidades descritas en el inciso (c) anterior, los "Créditos Intercompañías").

E.    Los pasivos que adeuda a los Acreedores Comparecientes representan al menos el [•]% del total de los pasivos de Vitro, conforme a sus registros contables.

F.    Es una empresa tenedora de acciones y, como tal, su posibilidad de pagar sus obligaciones depende de los dividendos que recibe de sus subsidiarias.

G.    Reconoce su deuda con cada uno de los Acreedores Comparecientes y los Acreedores Restantes en el monto, graduación y con las características especiales que se indican en la relación de acreedores y deudores que, de conformidad con lo dispuesto por el artículo 20 fracción III de la LCM, se exhibe como anexo a la solicitud de declaración de concurso mercantil.

H.    A la fecha no adeuda (i) créditos de los previstos en el artículo 224 fracción I de la LCM, ni (ii) créditos singularmente privilegiados (como los define el artículo 218 de la LCM), ni (iii) créditos con otras garantías y privilegios (como los define el artículo 219 de la LCM).

I.    No tiene adeudos fiscales exigibles y a su cargo de ninguna especie, incluyendo sin limitar, adeudos relacionados con obligaciones en materia de seguridad social.

J.    No ha celebrado contratos o convenios en relación con el repago de sus deudas con ninguno de sus acreedores en contravención de la LCM.

K.    La celebración del presente Convenio no viola, incumple o en cualquier forma contraviene las disposiciones de sus estatutos sociales vigentes ni disposición legal alguna, incluyendo, en forma enunciativa pero no limitativa, a la LCM.

L.    Está autorizado por la legislación de México, para celebrar y cumplir con sus obligaciones bajo el presente Convenio, sin necesidad de obtener autorización adicional alguna de cualquier autoridad, más que las exigidas dentro del procedimiento concursal.

M.      Acepta en su totalidad los términos aquí previstos y que el presente Convenio, una vez aprobado por el Juez, establezca los términos para Consumar la Reestructura (según dicho término se define más adelante) en la Fecha de Cierre (según dicho término se define más adelante).

**II.     Declara cada uno de los Acreedores Comparecientes, así como cada uno de los Acreedores Adherentes, a través de sus representantes, bajo protesta de decir verdad, que:**

A.      Es un acreedor de Vitro cuyos créditos se identifican en su respectiva hoja de firma del presente Convenio.

B.      En el caso de acreedores tenedores de Notas, demuestra su calidad de acreedor de Vitro con (i) la certificación expedida y entregada por el Depositary Trust Company a favor de Vitro, en la que se listan los acreedores tenedores de Notas que se encuentran en sus registros, también denominados tenedores registrados (*record holders*); (ii) la Carta de Transmisión (*Letter of Transmittal*) debidamente notarizada y apostillada, expedida y entregada por cada uno de los tenedores registrados (*record holders*) por instrucciones de los beneficiarios últimos (*beneficial owners*) de las Notas (o sus representantes autorizados) que contiene la certificación respecto de la tenencia de Notas del respectivo beneficiario último (*beneficial owner*); y (iii) la Carta de Instrucciones (*Letter of Instructions*) emitida por el respectivo beneficiario último (*beneficial owner*) de las Notas al respectivo tenedor registrado (*record holder*).

C.      En el caso de acreedores tenedores de Cebures, demuestra su calidad de acreedor de Vitro con (i) la certificación de depósito de Cebures expedida por el S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima a la casa de bolsa en la que cada tenedor de Cebures mantiene sus posiciones, y (ii) la certificación parcial de tenencia de Cebures por la casa de bolsa a cada tenedor de Cebures con el que tiene celebrado un contrato de intermediación bursátil y conforme al cual mantiene las posiciones de los mismos.

D.      Es su voluntad celebrar el presente Convenio a fin de acordar la forma, términos y condiciones de pago de los pasivos a cargo de Vitro conforme éstos se establecen en el presente Convenio y sean, en el momento procesal oportuno, confirmados en la Sentencia de Reconocimiento de Créditos (según dicho término se define más adelante). Asimismo, es su voluntad que el presente Convenio, una vez aprobado por el Juez, sea el convenio concursal que de por terminado el concurso mercantil de Vitro, de conformidad con lo dispuesto por los Artículos 166 y 262 fracción I y demás relativos y aplicables de la LCM.

E.      Solicitará a más tardar en el plazo indicado en el artículo 122 fracción II de la LCM, el reconocimiento de todos sus créditos ante el Conciliador que se designe en el concurso mercantil de Vitro.

F.      Sus respectivos representantes legales cuentan con las facultades necesarias y suficientes para la celebración del presente Convenio, las cuales no les han sido revocadas ni limitadas de forma alguna a esta fecha, según consta en las escrituras públicas que se agrega al presente como **Anexo "C"**, formando parte integrante del mismo.

**III.**   **Declaran las partes en este Convenio, a través de sus representantes, bajo protesta de decir verdad, que:**

A.      Que se reconocen mutuamente y entre sí la personalidad y capacidad con que comparecen a la celebración del presente Convenio, para todos los efectos legales a que haya lugar.

Expuesto lo anterior, en vista de las anteriores declaraciones, Vitro, los Acreedores Comparecientes y, en su caso, los Acreedores Adherentes, convienen en la celebración del presente Convenio conforme a lo establecido en las siguientes cláusulas, y que solicitan desde este momento al Conciliador ponga a la vista de los Acreedores Restantes, el cual Vitro y los Acreedores Comparecientes proponen a los Acreedores Restantes para su aceptación y suscripción, en términos de lo dispuesto por los artículos 4º fracción I, 132, 146 y 161 de la LCM:

## CLÁUSULAS

## PRIMERA.  DEFINICIONES Y ANEXOS

**Sección 1.01** Términos Definidos

Salvo que se establezca expresamente lo contrario en el presente Convenio, los términos con mayúscula inicial aquí utilizados, tendrán los significados que se indican a continuación:

| *TÉRMINO* | *SIGNIFICADO* |
|---|---|
| *Acreedores Adherentes* | significa todos aquellos Acreedores Restantes que suscriban el presente Convenio. |
| *Acreedores Comparecientes* | significa todos aquellos acreedores que aparecen listados en el **Anexo "A"** del presente Convenio. |
| *Acreedores Reconocidos* | significan todos aquellos acreedores que sean legalmente reconocidos en términos del artículo 132 de la LCM mediante sentencia firme que al efecto dicte el juez que conozca del concurso mercantil correspondiente. |
| *Acreedores Restantes* | tendrá el significado que se le atribuye en el Antecedente VIII del presente Convenio. |
| *Ajuste por Fecha de Emisión* | significa el ajuste e incremento a ser realizado por Vitro en la fecha de emisión de las Nuevas Obligaciones Convertibles Forzosamente en Acciones en un monto equivalente al retorno anual a una tasa de 10.50% (diez punto cincuenta por ciento) sobre un monto de EUA$100'000,000.00 (cien millones de dólares 00/100 Moneda de los Estados Unidos de América) calculado para el periodo entre la Fecha de Referencia de Valor a la fecha de |

| TÉRMINO | SIGNIFICADO |
|---|---|
| | emisión de las Nuevas Obligaciones Convertibles Forzosamente en Acciones. |
| *Cebures* | tendrá el significado que se le atribuye en el Antecedente V del presente Convenio. |
| *Cebures Vitro 03* | tendrá el significado que se le atribuye en el Antecedente I del presente Convenio. |
| *Cebures Vitro 08* | tendrá el significado que se le atribuye en el Antecedente V del presente Convenio. |
| *Conciliador* | tendrá el significado que se le atribuye en el Antecedente VIII del presente Convenio. |
| *Consumar la Reestructura* | tendrá el significado que se le atribuye en la Cláusula Sexta del presente Convenio. |
| *Convenio* | significa el presente Convenio de Reestructura, que según pueda ser modificado en el curso del procedimiento concursal, una vez aprobado de manera definitiva por el Juez, será el convenio concursal previsto en el Título V, Capítulo Único de la LCM. |
| *Convenio de Transacción* | tendrá el significado que se le atribuye en el Antecedente VI del presente Convenio. |
| *Créditos Intercompañías* | tendrá el significado que se le atribuye en la declaración I.D del presente Convenio. |
| *Créditos Intercompañías en el Curso Ordinario* | tendrá el significado que se le atribuye al término *Ordinary Course Intercompany Debt* en la Descripción de las Nuevas Notas. |
| *Créditos Reconocidos* | significa los créditos que sean reconocidos en la Sentencia de Reconocimiento de Créditos. |
| *Deuda Existente* | significa el conjunto de los pasivos que son reestructurados a través del presente Convenio, que comprenden las Notas, los Cebures, el Pagaré ABN, los Pagarés Fintech y el Convenio de Transacción. |
| *Descripción de las Nuevas Notas o DON* | significa la Descripción de las Nuevas Notas (*Description of the New Notes*), de conformidad con el documento que se adjunta al presente como **Anexo "D"** y que detalla las características principales de las Nuevas Notas |

| *TÉRMINO* | *SIGNIFICADO* |
|---|---|
| | 2019 y las Nuevas Obligaciones Convertibles Forzosamente en Acciones. |
| *Fecha de Cierre* | tendrá el significado que se le atribuye en la Cláusula Sexta del presente Convenio. |
| *Fecha de Cierre Extendida* | tendrá el significado que se le atribuye en la Cláusula Sexta del presente Convenio. |
| *Fecha de Referencia de Valor* | significa el 1º de enero de 2011 |
| *Fideicomiso* | significa el fideicomiso irrevocable de administración y pago número 986 de fecha 8 de septiembre de 2010 constituido por Vidriera Los Reyes, S.A. de C.V., subsidiaria indirecta de Vitro, en su carácter de fideicomitente; ante Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, en su carácter de fiduciario. Copia del Fideicomiso se agrega al presente Convenio como **Anexo "E"**, formando parte integrante del mismo. |
| *Fideicomiso de Voto* | significa el fideicomiso irrevocable de administración a ser suscrito de conformidad con lo establecido en la Sección 5.04. |
| *Garantes* | significan todas aquellas subsidiarias de Vitro que actuarán como garantes bajo los Nuevos Valores, mismas que se identifican en la definición de "Garantes" ("*Guarantors")* en la Sección "Ciertas Definiciones" ("*Certain Definitions*") de la Descripción de las Nuevas Notas. |
| *Honorario por Reestructura* | tendrá el significado que se le atribuye en la Sección 5.02 del presente Convenio. |
| *IFECOM* | tendrá el significado que se le atribuye en el Antecedente VIII del presente Convenio. |
| *Instrumentos de la Reestructura* | significa en conjunto la documentación definitiva en relación con las Nuevas Notas 2019, los Nuevos Cebures 2019, las Nuevas Obligaciones Convertibles Forzosamente en Acciones y demás documentación relacionada con la reestructuración de la Deuda Existente. |
| *Juez* | significa el C. Juez de Distrito en Materia Civil y del Trabajo en Monterrey, Nuevo León, a |

| TÉRMINO | SIGNIFICADO |
|---|---|
| | quien corresponda conocer del concurso mercantil de Vitro |
| **LCM** | significa la Ley de Concursos Mercantiles |
| **LGTOC** | significa la Ley General de Títulos y Operaciones de Crédito |
| **México** | significa los Estados Unidos Mexicanos |
| **Notas** | tendrá el significado que se le atribuye en el Antecedente III del presente Convenio. |
| **Notas 2012** | tendrá el significado que se le atribuye en el Antecedente III del presente Convenio. |
| **Notas 2013** | tendrá el significado que se le atribuye en el Antecedente II del presente Convenio. |
| **Notas 2017** | tendrá el significado que se le atribuye en el Antecedente III del presente Convenio. |
| **Nueva Deuda** | significa la deuda resultante de los Instrumentos de Reestructura |
| **Nuevas Notas 2019** | tendrá el significado que se le atribuye en la Sección 5.02(a) del presente Convenio. |
| **Nuevos Cebures 2019** | tendrá el significado que se le atribuye en la Sección 5.02(a) del presente Convenio. |
| **Nuevos Valores** | significa de manera conjunta las Nuevas Notas 2019 y los Nuevos Cebures 2019 |
| **Nuevas Obligaciones Convertibles Forzosamente en Acciones** | tendrá el significado que se le atribuye en la Sección 5.02(b) del presente Convenio. |
| **Pagaré ABN** | tendrá el significado que se le atribuye en el Antecedente IV del presente Convenio. |
| **Pagarés Fintech** | tendrá el significado que se le atribuye en el Antecedente VI del presente Convenio. |
| **Contraprestación por el Consentimiento** | tendrá el significado que se le atribuye en el Fideicomiso. |
| **Pago en Efectivo** | significa aquél pago en efectivo que se realizará en la Fecha de Cierre, según se describe en la Sección 5.02(c) del presente Convenio. |

| TÉRMINO | SIGNIFICADO |
|---|---|
| *Programa Vitro 02* | tendrá el significado que se le atribuye en el Antecedente I del presente Convenio. |
| *Programa Vitro 08* | tendrá el significado que se le atribuye en el Antecedente V del presente Convenio. |
| *Reestructura* | tendrá el significado que se le atribuye en la Cláusula Segunda del presente Convenio |
| *Sentencia de Reconocimiento de Créditos* | significa la sentencia de reconocimiento, graduación y prelación de créditos dictada por el Juez en términos de lo establecido por el artículo 132 de la LCM. |
| *Vitro* | significa Vitro, S.A.B. de C.V. |

**Sección 1.02** Reglas de Interpretación

En este Convenio y en todos los Anexos del mismo:

I. el índice y los encabezados de las Cláusulas y Secciones son para referencia únicamente y no afectarán la interpretación de este Convenio;

II. las referencias a cualquier instrumento o contrato, incluyendo el presente Convenio, incluirán: (a) todos los anexos u otros documentos adjuntos a los mismos; (b) todos los documentos, instrumentos o contratos emitidos o celebrados en sustitución de los mismos; (c) cualesquiera reformas, modificaciones adiciones o compulsas de dichos documentos;

III. las palabras "*incluye*" o "*incluyendo*" se entenderán como "*incluyendo, sin limitar*";

IV. las referencias a cualquiera persona incluirán a los causahabientes y cesionarios permitidos de dicha persona;

V. las palabras "*del presente*", "*en el presente*" y "*bajo el presente*" y palabras o frases de naturaleza similar, se referirán a este Convenio en general y no a alguna disposición en particular de este Convenio;

VI. las referencias a "*días*" significarán días calendario;

VII. el singular incluye el plural y el plural incluye el singular;

VIII. las referencias a una Cláusula, Anexo o Sección son referencias a la cláusula o sección relevante de, o anexo relevante de este Convenio, salvo que se indique lo contrario; y

IX. todos los documentos que se adjuntan al presente Convenio forman parte integrante del mismo como si a la letra se insertasen.

**Sección 1.03** Anexos

Los Anexos que se indican a continuación forman parte integrante de este Convenio:

**Anexo "A"**    Listado de Acreedores Comparecientes.

**Anexo "B"**    Escritura pública en la que constan las facultades del representante legal de Vitro.

**Anexo "C"**    Escrituras públicas en las que constan las facultades de los representantes legales de los Acreedores Comparecientes.

**Anexo "D"**    Descripción de las Nuevas Notas *(Description of the New Notes)*, documento que se agrega en el idioma inglés, acompañado de una traducción al español

**Anexo "E"**    Fideicomiso Irrevocable de Administración y Pago Número 986 de fecha 8 de septiembre de 2010.

**Anexo "F"**    Formato para el Pago en Efectivo y Honorario por Reestructura.

**Sección 1.04** Incorporación de las Declaraciones.

Las partes convienen en que las declaraciones de Vitro son motivo determinante de la voluntad de los Acreedores Comparecientes para celebrar este Convenio.

**SEGUNDA. OBJETO.**

Con fundamento en los artículos 1º, 148, 157, 166, 262, fracción I, y demás aplicables de la LCM, es objeto del presente Convenio que, en los términos y condiciones establecidos en el mismo, y sujeto a la implementación de las operaciones descritas en el presente, y sujeto a la aprobación del mismo por el Juez, Vitro continúe operando, se conserve la empresa misma y se evite que el incumplimiento de sus obligaciones de pago ponga en riesgo su viabilidad, así como también la de otras empresas con las que mantiene relación de negocios, mediante la reestructura acordada por las partes del presente Convenio (la "Reestructura"), la cual incluye el pago, posible capitalización, reestructuración y/o novación, según sea el caso, de los Créditos Reconocidos, con las quitas, esperas, reestructuras, otorgamiento y/o modificaciones y/o liberaciones de garantías que se establecen en, y sujeto a los términos de, este Convenio.

**TERCERA. TRATAMIENTO DE GASTOS DE OPERACIÓN, COSTOS LABORALES, IMPUESTOS Y OTROS ADEUDOS.**

**Sección 3.01** Gastos Generales de Operación.

Vitro continuará cumpliendo con todas sus obligaciones laborales y fiscales, directas e indirectas y pagando sus gastos de operación, de manera oportuna, según se hagan exigibles, y continuará cumpliendo con todas sus obligaciones contractuales de conformidad con la LCM.

**CUARTA. RECONOCIMIENTO DE ADEUDOS.**

Vitro reconoce y acepta que adeuda a los Acreedores Comparecientes y a los Acreedores Restantes, los créditos correspondientes a la Deuda Existente en los montos establecidos en el inciso I.D. del capítulo de declaraciones de este Convenio en los términos y condiciones de cada uno de los documentos que le dan origen a dichos pasivos y por concepto de suma principal, intereses y demás accesorios, la cantidad que aparece frente al nombre de cada uno de dichos Acreedores Comparecientes en la hoja de firmas del presente Convenio.

Con independencia de lo anterior, cada uno de los Acreedores Comparecientes y, en su caso, cada uno de los Acreedores Adherentes, se obliga a solicitar a más tardar dentro del plazo indicado en el artículo 122 fracción II de la LCM ante el Conciliador, sus respectivas solicitudes o demandas de reconocimiento de crédito y a realizar los actos procesales que resulten necesarios para tal efecto.

**QUINTA. PAGO E IMPLEMENTACIÓN.**

**Sección 5.01** Pago.

Vitro pagará los Créditos Reconocidos tanto de los Acreedores Comparecientes que correspondan, como los de los Acreedores Restantes, en la manera que se indica en la presente Cláusula.

El presente Convenio una vez que sea aprobado por el Juez será extensivo a los Acreedores Restantes conforme a lo dispuesto por el artículo 165 de la LCM.

**Sección 5.02** Implementación.

Los Acreedores Comparecientes, los Acreedores Adherentes y Vitro implementarán la Reestructura a través de la presentación, votación y aprobación, en su caso, del presente Convenio de acuerdo con la LCM, su posterior reconocimiento y homologación en los Estados Unidos de América a través de la presentación y tramitación de un procedimiento bajo el Capítulo 15 de la Ley de Bancarrota de los Estados Unidos de América ("*United States Bankruptcy Code*"), así como de la emisión y entrega en la Fecha de Cierre a los Acreedores Reconocidos, de los instrumentos que se indican en los subincisos (a) y (b) y la realización de los pagos que se indican en los subincisos (c) y (d), siguientes:

(a) las notas (las "Nuevas Notas 2019") o, en su caso, a elección de cada uno de los Acreedores Reconocidos, los Certificados Bursátiles (los "Nuevos Cebures 2019"), en ambos casos a ser emitidos por Vitro a *pro rata* entre los Acreedores Reconocidos en los términos y condiciones establecidos en la Sección 5.02.1 del presente Convenio;

(b) las Obligaciones Convertibles Forzosamente en Acciones a ser emitidas por Vitro a *pro rata* entre los Acreedores Reconocidos en los términos y condiciones establecidos en la Sección 5.02.2 del presente Convenio (las "Nuevas Obligaciones Convertibles Forzosamente en Acciones");

(c) un pago en efectivo a ser entregado por Vitro a *pro rata* entre los Acreedores Reconocidos por el remanente de la cantidad de EUA$75'000,000.00 (setenta y cinco millones de dólares 00/100 Moneda de los Estados Unidos de América) mismos que se encuentran afectos al

Fideicomiso, una vez descontada la Contraprestación por el Consentimiento (el "Pago en Efectivo"); y

(d) un pago en efectivo a ser entregado por Vitro a *pro rata* entre los Acreedores Reconocidos por concepto de honorario por reestructura por la cantidad resultante de la aplicación de la fórmula establecida en la Sección 5.02.4 del presente Convenio (en lo sucesivo, el "Honorario por Reestructura").

Las partes acuerdan que no obstante lo establecido en el presente Convenio, los acreedores bajo los Créditos Intercompañías no recibirán ninguno de los instrumentos y pagos descritos en los incisos anteriores y que sus pasivos serán reestructurados conforme a lo establecido en la Sección 5.04 del presente Convenio.

Ninguno de los instrumentos ofrecidos por Vitro conforme al presente Convenio y que conforman la Nueva Deuda, estarán registrados bajo la Ley de Valores de 1933 de los Estados Unidos de América (*United States Securities Act of 1933*), según la misma ha sido modificada de tiempo en tiempo, con base en la exención prevista en la Sección 3(a)(9) de dicha ley ni serán registrados ante el Registro Nacional de Valores a cargo de la Comisión Nacional Bancaria y de Valores. Por tal motivo, Vitro, oyendo la opinión de los asesores legales de los Acreedores Comparecientes, tendrá el derecho de implementar aquellos procesos, y a solicitar de los Acreedores Reconocidos, aquellas declaraciones y/o certificaciones que, razonablemente, considere necesarias o convenientes para asegurar el cumplimiento de los requisitos necesarios, para gozar de las exenciones legales correspondientes.

**Sección 5.02.1** Descripción de los Nuevos Valores

Las Nuevas Notas 2019 serán emitidas por Vitro en y conforme a las leyes de los Estados Unidos de América en la Fecha de Cierre, conforme a los términos y condiciones establecidos en la Sección I de la Descripción de las Nuevas Notas y a los términos y condiciones establecidos en el contrato de emisión (*Indenture*) correspondiente a dichas Nuevas Notas 2019. Asimismo, los Nuevos Cebures 2019 serán emitidos por Vitro en y conforme a las leyes de México en la Fecha de Cierre, conforme a términos y condiciones idénticos a los términos y condiciones de las Nuevas Notas 2019.

Las Nuevas Notas 2019 y los Nuevos Cebures 2019:

I. tendrán un monto principal total, de manera conjunta, de EUA$850'000,000.00 (ochocientos cincuenta millones de dólares 00/100 Moneda de los Estados Unidos de América);

II. tendrán una vigencia de ocho (8) años contados a partir de la Fecha de Referencia de Valor;

III. constituirán obligaciones directas, incondicionales y no subordinadas de Vitro, y tendrán una prioridad de pago *pari passu* o idéntica uno a uno con la deuda no garantizada y no subordinada de Vitro;

IV. serán garantizadas de forma incondicional y solidaria por cada uno de los Garantes;

V. tendrán un interés a tasa fija de 8.0% anual, pagadera semestralmente en exhibiciones vencidas mismos que podrán ser capitalizados parcialmente y pagados en especie, en un 50% (cincuenta por ciento), durante los 3 (tres) primeros años a partir de la Fecha de Referencia de

Valor, a elección de Vitro, sujeto al cumplimiento por parte de Vitro de ciertas condiciones establecidas en la Descripción de las Nuevas Notas;

VI. no contarán con amortización o pagos a cuenta de principal durante los primeros 4 (cuatro) años a partir de la Fecha de Referencia de Valor y, a partir del quinto año hasta el séptimo año a partir de la Fecha de Referencia de Valor, tendrán amortizaciones o pagos a cuenta de principal de EUA$25,000,000.00 (veinticinco millones de dólares 00/100 Moneda de los Estados Unidos de América) pagaderos semestralmente;

VII. podrán ser redimibles a opción de Vitro en cualquier momento durante la vigencia de las mismas, de forma total o parcial, sujeto a ciertas condiciones establecidas en la Descripción de las Nuevas Notas a un precio equivalente a 100% de su valor *más* los intereses que se hayan generado a la fecha de redención;

VIII. serán redimibles obligatoriamente, de forma total o parcial, en caso de que Vitro (i) realice una emisión de acciones, sujeto a ciertas condiciones establecidas en la Descripción de las Nuevas Notas; y (ii) cuente con un flujo de efectivo por encima de un monto establecido en la Descripción de las Nuevas Notas; y

IX. serán redimibles obligatoriamente, de forma total, en caso de un cambio de control de Vitro a un precio equivalente a 101% de su valor *más* los intereses que se hayan generado a la fecha de redención.

La totalidad de los términos y condiciones, así como las obligaciones de hacer y de no hacer comunes y regulares para este tipo de operaciones, incluyendo sin limitar las restricciones para incurrir deuda adicional, restricciones en inversiones y gravámenes, restricciones de ciertos pagos, restricciones para venta de activos, restricciones de operaciones con socios o compañías afiliadas, y las causales de vencimiento anticipado a los cuales estarán sujetas las Nuevas Notas 2019 y los Nuevos Cebures 2019, se encuentran establecidos en la Sección I de la Descripción de las Nuevas Notas denominada como Nuevas Notas 2019 (*New 2019 Notes*) y en el contrato de emisión (*Indenture*) correspondiente a dichas Nuevas Notas 2019.

El monto principal de las Nuevas Notas 2019 y de los Nuevos Cebures podrá ser ajustado, en su caso, en términos de la Sección 5.05 de este Convenio.

**Sección 5.02.2** Descripción de las Nuevas Obligaciones Forzosamente Convertibles en Acciones

Las Nuevas Obligaciones Convertibles Forzosamente en Acciones serán emitidas por Vitro en y conforme a los Estados Unidos de América, cumpliendo con los requisitos aplicables de la Ley General de Títulos y Operaciones de Crédito para tal efecto, en la Fecha de Cierre conforme a los términos y condiciones establecidos en la Sección II de la Descripción de las Nuevas Notas y a los términos y condiciones establecidos en el contrato de emisión (*Indenture*) correspondiente a dichas Nuevas Obligaciones Convertibles Forzosamente en Acciones.

Las Nuevas Obligaciones Convertibles Forzosamente en Acciones:

I. tendrán un monto principal total de EUA$100'000,000.00 (cien millones de dólares 00/100 Moneda de los Estados Unidos de América) *más* el Ajuste por Fecha de Emisión;

II. tendrán una vigencia de cinco (5) años contados a partir de la Fecha de Referencia de Valor;

III. constituirán obligaciones directas de Vitro, y tendrán una prioridad de pago *pari passu* o idéntica uno a uno con la deuda no garantizada de Vitro;

IV. tendrán un interés a tasa fija de 10.50% anual, mismos que serán totalmente capitalizables y pagaderos en especie de forma anual durante su vigencia;

V. serán convertibles obligatoriamente en acciones representativas del 15% del capital social de Vitro al término de su vigencia en caso de no ser pagadas en efectivo al término de su vigencia o en caso de no existir redenciones obligatorias de conformidad con la Descripción de las Nuevas Notas;

VI. podrán ser redimibles a opción de Vitro en cualquier momento durante la vigencia de las mismas, de forma total o parcial, sujeto a ciertas condiciones establecidas en la Descripción de las Nuevas Notas, a un precio equivalente a 100% de su valor (sujeto a los descuentos de prepago establecidos en la Descripción de las Nuevas Notas) *más* los intereses que se hayan generado a la fecha de redención;

VII. serán redimibles obligatoriamente, de forma total o parcial, en caso de que Vitro (i) realice una emisión de acciones, sujeto a ciertas condiciones establecidas en la Descripción de las Nuevas Notas; y (ii) cuente con un flujo de efectivo por encima de un monto establecido en la Descripción de las Nuevas Notas; y

VIII. serán redimibles obligatoriamente, de forma total, en caso de un cambio de control de Vitro a un precio equivalente a 101% de su monto de principal *más* los intereses que se hayan generado a la fecha de redención.

La totalidad de los términos y condiciones, los términos y procedimientos para la conversión, así como las obligaciones de hacer y de no hacer y las causales de vencimiento anticipado a los cuales estarán sujetas las Nuevas Obligaciones Convertibles Forzosamente en Acciones, se encuentran establecidos en la Sección II de la Descripción de las Nuevas Notas denominada como Nuevas Obligaciones Convertibles Forzosamente en Acciones *(New MCDs)* y en el contrato de emisión (*Indenture*) correspondiente a dichas Nuevas Obligaciones Convertibles Forzosamente en Acciones.

El monto principal de las Nuevas Obligaciones Convertibles Forzosamente en Acciones y, en consecuencia, la base para el cálculo del Ajuste por Fecha de Emisión, podrán ser ajustados, en su caso, en términos de la Sección 5.05 de este Convenio.

**Sección 5.02.3** Descripción del Pago en Efectivo

Vitro realizará un pago en efectivo, en la Fecha de Cierre, a *pro rata*, a favor de todos los Acreedores Reconocidos (excepto los acreedores de Créditos Intercompañías), en un monto equivalente al remanente de la cantidad de EUA$75'000,000.00 (setenta y cinco millones de dólares 00/100 Moneda de los Estados Unidos de América), que se encuentran afectos al Fideicomiso, una vez descontada la Contraprestación por el Consentimiento.

**Sección 5.02.4** Descripción del Honorario por Reestructura

Vitro realizará el pago del Honorario por Reestructura en la Fecha de Cierre, a *pro rata*, a favor de todos los Acreedores Reconocidos (excepto los acreedores de Créditos Intercompañías), en un monto equivalente al retorno anual a una tasa del 8.0% (ocho por ciento) sobre un monto de EUA$850,000,000.00 (ochocientos cincuenta millones de dólares 00/100 Moneda de los Estados Unidos de América) calculado para el periodo entre la Fecha de Referencia de Valor a la fecha de emisión de las Nuevas Notas 2019.

El monto total base sobre el cual se calculará el pago del Honorario por Reestructura podrá ser ajustado, en su caso, en los términos de la Sección 5.05 de este Convenio.

**Sección 5.03** Tratamiento a todos los Acreedores Reconocidos.

Todos los Acreedores Reconocidos (excepto los acreedores de Créditos Intercompañías) recibirán, a *pro rata*, (i) las Nuevas Notas 2019 o los Nuevos Cebures 2019, según corresponda a elección de cada uno los Acreedores Reconocidos, quienes deberán notificar dicha elección a Vitro dentro de los cinco (5) días calendario siguientes contados a partir de la aprobación por parte del Juez del presente Convenio, en el entendido que, en caso de que Vitro no reciba dicha elección en el plazo establecido, éstos recibirán Nuevas Notas 2019 en el caso de acreedores tenedores de Notas y Nuevos Cebures 2019 en el caso de acreedores tenedores de Cebures, (ii) las Nuevas Obligaciones Convertibles Forzosamente en Acciones, (iii) el Pago en Efectivo y (iv) el Honorario por Reestructura.

Las partes reconocen y convienen expresamente que los términos y condiciones pactados en el presente Convenio otorgan a todos los Acreedores Reconocidos un tratamiento justo, equitativo y razonable a sus respectivos créditos.

**Sección 5.04** Implementación de los Créditos Intercompañías; Aceptación de trato Menos Favorable.

Los acreedores titulares de Créditos Intercompañías a cargo de Vitro aceptan recibir un trato menos favorable que el resto de los Acreedores Reconocidos, en tanto que no recibirán ninguno de los instrumentos o pagos establecidos en la Sección 5.02 del presente Convenio.

En sustitución de lo anterior, los acreedores titulares de Créditos Intercompañías (excepto por los titulares de Créditos Intercompañías en el Curso Ordinario). aceptan recibir un pagaré por el monto de dichos créditos, con vencimiento en 9 (nueve) años contados a partir de la emisión de los Nuevos Valores y las Nuevas Obligaciones Convertibles Forzosamente en Acciones, con un interés anual a tasa fija de 2.5% (dos punto cinco por ciento) pagadera en una sola exhibición al vencimiento del pago de principal.

En adición a lo anterior, ningún pago de principal o de intereses respecto de los Créditos Intercompañías se podrá realizar con anterioridad al pago total de principal, intereses y cualquier otra cantidad que se adeude respecto de los Nuevos Valores y las Nuevas Obligaciones Convertibles Forzosamente en Acciones; excepto por pagos de principal o de intereses en el curso ordinario y consistente con prácticas pasadas respecto de los Créditos Intercompañías en el Curso Ordinario. Vitro y sus subsidiarias celebrarán un Contrato de Crédito y Subordinación Intercompañías (*Intercompany Subordination and Credit Agreement*) según se establece en la Descripción de las Nueva Notas.

Vitro y sus subsidiarias constituirán un fideicomiso irrevocable de administración (el "Fideicomiso de Voto") al cual aportarán la totalidad de los Créditos Intercompañías para efecto de que ser administrados y votados conforme a lo establecido en dicho Fideicomiso de Voto. Dichos Créditos Intercompañías permanecerán afectados al Fideicomiso de Voto por el plazo de vigencia de dicha deuda, es decir, 9 (nueve) años contados a partir de la emisión de los Nuevos Valores y las Nuevas Obligaciones Convertibles Forzosamente en Acciones (el "Fideicomiso de Voto").

**Sección 5.05**  Otras obligaciones que se consideran.

En virtud de que, como se indicó en la declaración I.F de este Convenio, Vitro es una empresa tenedora de acciones y es en su mejor interés lograr una reestructuración integral de sus propios pasivos y los de sus subsidiarias, Vitro ha incluido dentro de los términos económicos contenidos en el presente Convenio, los adeudos que su subsidiaria Vitro Envases Norteamérica, S.A. de C.V., quien funge como Garante en este Convenio, mantiene con Calyon Credit Agricole CIB ("Calyon"), por un monto de EUA$63'383,806 (sesenta y tres millones trescientos ochenta y tres mil ochocientos seis dólares 00/100 Moneda de los Estados Unidos de América) más intereses y comisiones que, calculados al 30 de junio de 2010, ascienden a la cantidad de EUA$3'905,298 (tres millones novecientos cinco mil doscientos noventa y ocho dólares 00/100 Moneda de los Estados Unidos de América). En caso de que los términos del presente Convenio sean aceptados por Calyon, Vitro asumiría dicha deuda y entregaría a Calyon la parte proporcional de las Nuevas Notas 2019, de las Nuevas Obligaciones Convertibles Forzosamente en Acciones, del Pago en Efectivo y del Honorario por Reestructura correspondientes, de conformidad con los términos establecidos en la Sección 5.02 del presente Convenio. Asimismo, Calyon sería considerado como un Acreedor Adherente para todos los efectos legales y económicos a que haya lugar a partir de la aprobación por parte del Juez del presente Convenio.

El plazo que otorgará Vitro a Calyon para aceptar la estipulación en su favor establecida en esta Sección 5.05 será el mismo que se concederá a los Acreedores Restantes para aprobar y suscribir este Convenio según lo dispuesto por el artículo 161 párrafo tercero de la LCM.

En caso de que Calyon no acepte la estipulación en su favor establecida en esta Sección 5.05, el monto correspondiente a ser entregado o pagado a cada Acreedor Reconocido de Nuevas Notas 2019, de Nuevas Obligaciones Convertibles Forzosamente en Acciones, y del Honorario por Reestructura conforme a la Sección 5.02 de este Convenio no cambiará, pues Vitro únicamente reducirá los montos de las Nuevas Notas 2019, de las Nuevas Obligaciones Convertibles Forzosamente en Acciones y del Honorario por Reestructura a fin de deducir de los mismos el monto proporcional que en su caso hubiera correspondido a Calyon en caso de que hubiese aceptado esta estipulación; en el entendido, sin embargo, que no habrá cambio alguno en el monto del Pago en Efectivo disponible para los Acreedores Reconocidos conforme a la Sección 5.02(c). Asimismo, en caso de que Calyon no acepte la estipulación en su favor contenida en la Sección 5.05, Vitro no podrá ofrecer a Calyon un trato más favorable respecto del pago de su deuda que el que se considera en este Convenio para los Acreedores Reconocidos.

## SEXTA. FORMA, FECHA Y LUGAR DE PAGO DEL PAGO EN EFECTIVO Y DEL HONORARIO POR REESTRUCTURA.

Vitro se obliga a realizar el pago del Pago en Efectivo y del Honorario por Reestructura, mediante transferencia electrónica de fondos a la cuenta receptora que indique cada uno de los

Acreedores Reconocidos por escrito conforme al formato que se acompaña al presente como Anexo "F", o en su defecto mediante cheque de caja o certificado ante la presencia judicial.

Vitro deberá realizar el pago del Pago en Efectivo y del Honorario por Reestructura y deberá emitir los Nuevos Valores y las Nuevas Obligaciones Convertibles Forzosamente en Acciones y, en general, consumar la Reestructura (conjuntamente, "Consumar la Reestructura") establecida en el presente Convenio, a más tardar dentro de los quince (15) días calendario siguientes a la fecha en que surta efectos la publicación, en las listas del juzgado que conozca de su concurso mercantil, de la resolución emitida por el Juez aprobando el presente Convenio (no obstante existan recursos o apelaciones pendientes de resolver), o el día hábil inmediato posterior en caso de resultar el mismo inhábil (la "Fecha de Cierre"), a menos que:

(a)     exista una orden judicial o decreto que otorgue la suspensión provisional o que prohíba legalmente a Vitro Consumar la Reestructura según se establece en el presente Convenio; o

(b)     exista algún recurso o apelación que, de ser resuelto en contra de Vitro, invalide el presente Convenio según haya sido aprobado por el Juez y (ii) dentro de los quince (15) días calendario siguiente a la fecha en que surta efectos la resolución aprobando el presente Convenio, la mayoría de los Acreedores Reconocidos vote a favor de extender la Fecha de Cierre hasta lo que ocurra primero entre (A) la fecha en que se resuelva dicho recurso o apelación de forma final e inmodificable, o (B) diez (10) meses contados a partir de la fecha en que surta efectos la resolución aprobando el presente Convenio (la "Fecha de Cierre Extendida").

Para efectos aclaratorios, en caso de que algún recurso o apelación de los descritos en el inciso (b)(i) se encuentre pendiente y la mayoría de los Acreedores Reconocidos vote en contra de extender la Fecha de Cierre, entonces Vitro deberá Consumar la Reestructura a más tardar en la Fecha de Cierre no obstante la existencia de dicho recurso o apelación.  Asimismo, en caso de que la mayoría de los Acreedores Reconocidos vote a favor de extender la Fecha de Cierre pero dicho recurso o apelación no se resuelve antes de la Fecha de Cierre Extendida, entonces Vitro deberá Consumar la Reestructura dentro de los cinco (5) días calendario siguientes a la Fecha de Cierre Extendida o el día hábil inmediato posterior en caso de resultar el mismo inhábil (excepto en el caso que exista una orden judicial o decreto que otorgue la suspensión provisional o que prohíba legalmente a Vitro Consumar la Reestructura).

**SÉPTIMA. MONEDA.**

De conformidad con lo dispuesto por el artículo 159 último párrafo de la LCM, los créditos se mantendrán en la moneda en que fueron originalmente pactados.

**OCTAVA. DOCUMENTOS ADICIONALES**

Las partes se obligan a llevar a cabo todos los actos necesarios a efecto de ratificar en todos sus términos tanto el presente Convenio, una vez aprobado por el Juez, así como cualquier otro acuerdo que emane del mismo, incluyendo los Instrumentos de la Reestructura, a más tardar en la Fecha de Cierre.

Vitro se obliga a hacer y causar que todos y cada uno de los Garantes, acepten los términos del presente Convenio, una vez aprobado por el Juez, y en los Instrumentos de la Reestructura

conforme a los establecido en la Descripción de las Nuevas Notas, mediante la firma de los Instrumentos de la Reestructura, según corresponda.

**NOVENA. SUSTITUCIÓN DE CONVENIOS ANTERIORES, NOVACIÓN Y EXTINCIÓN.**

Dada la naturaleza del presente Convenio y los fines del procedimiento concursal, una vez que el presente Convenio sea aprobado por el Juez en términos del artículo 164 de la LCM, el presente Convenio y los Instrumentos de la Reestructura que se suscriban por Vitro con motivo del mismo, novarán, sustituirán y extinguirán las obligaciones, instrumentos, títulos, convenios y garantías anteriores en los que se hayan pactado los Créditos Reconocidos y asimismo extinguirán las garantías personales que hubieren otorgado terceros y/o las subsidiarias directas e indirectas de Vitro respecto de las obligaciones, instrumentos, títulos y convenios que dieron lugar a los Créditos Reconocidos.

En consecuencia, con la firma del presente Convenio, los Acreedores Reconocidos condonarán la diferencia entre los Créditos Reconocidos en su favor y la Nueva Deuda resultantes del presente Convenio una vez que sea aprobado por el Juez, así como otorgarán a Vitro y sus garantes el más amplio finiquito respecto de tales créditos originales, subsistiendo únicamente a partir de la aprobación judicial firme del presente Convenio, únicamente la Nueva Deuda, en los términos que se pactan en el presente Convenio.

**DÉCIMA. OBLIGATORIEDAD**

Una vez que el presente Convenio sea aprobado por el Juez en términos del artículo 164 de la LCM, obligará a Vitro y a todos los Acreedores Reconocidos, tanto ausentes como disidentes, en los términos de la LCM.

**DÉCIMA PRIMERA. CESIÓN DE CRÉDITOS, SUCESORES Y/O CAUSAHABIENTES.**

El consentimiento otorgado por los Acreedores Comparecientes respecto del presente Convenio, así como el que otorguen en su caso los Acreedores Adherentes, es irrevocable y obliga a cualquier cesionario de los mismos, así como a cualesquiera sucesores y/o causahabientes de los mismos a partir de la firma del mismo, por lo que en caso de existir cesión de los créditos de los mismos, se encontrarán los cesionarios, sucesores y/o causahabientes por cualquier título o causa, vinculados irrevocablemente a los términos pactados en este Convenio; en el entendido, sin embargo, que los Acreedores Comparecientes y los Acreedores Adherentes deberán volver a ratificar el presente Convenio en el caso de que existan cambios o modificaciones que violen o contravengan los términos y condiciones establecidos en el mismo, o en caso de que dichos cambios o modificaciones afecten o perjudiquen de manera sustancial a alguno de los Acreedores Comparecientes o los Acreedores Adherentes o cualquiera de sus intereses o derechos conforme al mismo.

**DÉCIMA SEGUNDA. PATRIMONIO.**

En términos de lo dispuesto por el artículo 2964 del Código Civil Federal, Vitro responde por el cumplimiento de las obligaciones contenidas en el presente Convenio con todo su patrimonio.

**DÉCIMA TERCERA. ADMINISTRACIÓN Y VIGILANCIA.**

Durante el procedimiento de concurso mercantil, Vitro continuará con las operaciones ordinarias de su objeto social, conservando la administración de sus bienes bajo la vigilancia del Tribunal, por conducto del Conciliador, al igual que durante los plazos a que se refiere la Cláusula Sexta de este Convenio, en la que la vigilancia corresponderá a sus órganos sociales correspondientes.

**DÉCIMA CUARTA. CONTINUIDAD.**

Vitro está de acuerdo en que durante el procedimiento de concurso mercantil deberá cumplir con las obligaciones relacionadas con el funcionamiento y operación de la actividad que desempeña, para obtener la continuidad de su existencia corporativa.

**DÉCIMA QUINTA. IGUALDAD.**

El presente Convenio establece, debiendo ser interpretado en todo momento en ese sentido, una absoluta igualdad de trato a todos los Acreedores Reconocidos.

**DÉCIMA SEXTA. SOLICITUD DE CONCURSO MERCANTIL Y PLAN DE REESTRUCTURA PREVIO.**

La suscripción del presente Convenio por parte de los Acreedores Comparecientes y los Acreedores Adherentes implica la suscripción, aceptación y consentimiento de los mismos respecto de la solicitud de concurso mercantil que en su caso realice Vitro y será asimismo considerado como plan de reestructura previo, en términos y para los efectos del Título Décimo Cuarto de la LCM.

Sujeto a la condición suspensiva de que el presente Convenio sea aprobado por el Juez en términos del artículo 164 de la LCM, los Acreedores Comparecientes y los Acreedores Adherentes aceptan y acuerdan irrevocablemente todas y cada una de las cláusulas del presente acuerdo de voluntades, por lo que respecta a los créditos a cargo de Vitro de los cuales es titular cada uno de ellos y que se indican en las hojas de firma del presente Convenio o de los que resulten a su favor en la Sentencia de Reconocimiento de Créditos.

**DÉCIMA SÉPTIMA. INVALIDEZ.**

En caso de que por cualquier causa cualquiera de las cláusulas de este Convenio resultare ineficaz, ello no afectará más que a dicha cláusula y los restantes términos y condiciones, así como cláusulas de este Convenio subsistirán en sus términos.

**DÉCIMA OCTAVA. LEY APLICABLE.**

Este Convenio se regirá e interpretará de conformidad con la LCM y las demás normas de aplicación supletoria previstas en su artículo 8.

**DÉCIMA NOVENA. JURISDICCIÓN Y COMPETENCIA.**

Para todo lo relativo a la interpretación, cumplimiento y ejecución del presente Convenio, las partes que lo suscriben y las que lo hagan en el futuro, en términos de los artículos 161 y 162 de

la LCM, se encuentran sometidas a la jurisdicción del C. Juez de Distrito a quien corresponda conocer del concurso mercantil de Vitro.

**VIGÉSIMA. ENCABEZADOS.**

Los encabezados utilizados en el presente Convenio son únicamente enunciativos y no afectan el contenido de sus cláusulas.

El presente Convenio se firma por Vitro y por los Acreedores Comparecientes, así como por los Acreedores Adherentes, en la fecha que aparece en cada hoja de firmas.

[*EL RESTO DE LA PÁGINA FUE INTENCIONALMENTE DEJADO EN BLANCO*]

Hoja de firma del Convenio de Reestructura de Vitro.

VITRO, S.A.B. DE C.V.

Por:_____
                   [Firma]
     Nombre:
     Cargo o Título:
     Fecha:

Hoja de firma del Convenio de Reestructura de Vitro.

Crédito:

    Notas 2012:

        Número de notas: [           ]
        Valor nominal:  [      ]

    Notas 2013

        Número de notas: [           ]
        Valor nominal:  [      ]

    Notas 2017

        Número de notas: [           ]
        Valor nominal:  [      ]

    Cebures Vitro 03

        Número de certificados: [           ]
        Valor nominal: [      ]

    Cebures Vitro 08

        Número de certificados: [           ]
        Valor nominal: [      ]

Otros créditos:

    Identificación: [           ]

El consentimiento que se otorga a través de esta firma es por el monto que resulte reconocido en la Sentencia de Reconocimiento de Créditos a favor del Acreedor cuyo nombre se indica a continuación.

_____
[NOMBRE DEL ACREEDOR]

Representado por:_____
[Firma]
    Nombre:
    Cargo o Título:
    Fecha:

## LISTA DE ANEXOS

**Anexo "A"**     Listado de Acreedores Comparecientes;

**Anexo "B"**     Escritura pública en la que constan las facultades del representante legal de Vitro;

**Anexo "C"**     Escrituras públicas en las que constan las facultades de los representantes legales de los Acreedores Comparecientes;

**Anexo "D"**     Descripción de las Nuevas Notas *(Description of the New Notes)*, documento que se agrega en el idioma inglés, acompañado de una traducción certificada por perito traductor al español;

**Anexo "E"**     Fideicomiso Irrevocable de Administración y Pago Número 986 de fecha 8 de septiembre de 2010.

**Anexo "F"**     Formato para el Pago en Efectivo y Honorario por Reestructura.

**Exhibit G**

<h1 align="center">AMENDMENTS TO THE <em>Concurso</em> PLAN</h1>

The following provisions of the *Concurso* Plan would be amended as follows (amended provisions shown in strikethrough and underlined text).

---

**RESTRUCTURING AGREEMENT EXECUTED PURSUANT TO ARTICLES 3, 153, 157, 165, 339 AND OTHER APPLICABLE ARTICLES OF THE MEXICAN BANKRUPTCY AND REORGANIZATION LAW (*LEY DE CONCURSOS MERCANTILES*) ENTERED INITIALLY INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. AND THE EXECUTING CREDITORS AND FOR ITS FURTHER SUBSCRIPTION, IN ITS CASE, BY THE ADHERING CREDITORS.**

---

**INDEX**

ANTECEDENTS ................................................................................................................... A-3

REPRESENTATIONS ........................................................................................................... A-4

CLAUSES ............................................................................................................................... A-6

    **FIRST. DEFINITIONS AND EXHIBITS** ................................................................... A-6

        **Section 1.01** Defined Terms ........................................................................................ A-10

        **Section 1.02 Rules of Interpretation** ....................................................................... A-10

        **Section 1.03** Exhibits .................................................................................................. A-10

        **Section 1.04** Representation Inclusions ..................................................................... A-10

    **SECOND. PURPOSE** ..................................................................................................... A-11

    **THIRD. TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS** ........................................................................... A-11

    **FOURTH. ACKNOWLEDGEMENT OF CLAIMS** .................................................... A-11

    **FIFTH. PAYMENT AND IMPLEMENTATION** ........................................................ A-11

        **Section 5.01** Payment ................................................................................................ A-11

        **Section 5.02** Implementation ..................................................................................... A-11

            **Section 5.02.1** Description of the New Notes ........................................................ A-12

            **Section 5.02.2** Description of the New Mandatory Convertible Debentures ......... A-13

            **Section 5.02.3** Cash Payment Description ............................................................ A-14

            **Section 5.02.4** Restructuring Fee Description ........................................................ A-14

        **Section 5.03** Treatment of Acknowledged Creditors ............................................... A-14

        **Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment ..... A-14

        **Section 5.05** Other obligations to consider ............................................................... A-15

    **SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PAYMENT AND THE RESTRUCTURING FEE** ..................................................... A-16

    **SEVENTH. CURRENCY** ............................................................................................... A-16

    **EIGHTH. FURTHER DOCUMENTS** ........................................................................... A-16

    **NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT** ...................................................................................................... A-16

    **TENTH. BINDING EFFECT** ......................................................................................... A-17

    **ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES** ............................................................................................................... A-17

    **TWELFTH. PATRIMONY** ............................................................................................. A-17

    **THIRTEENTH. MANAGEMENT AND SURVEILLANCE** ....................................... A-17

    **FOURTEENTH. CONTINUANCE** ............................................................................... A-17

    **FIFTEENTH. EQUAL TREATMENT** ......................................................................... A-17

    **SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN** .. A-17

    **SEVENTEENTH. NULLITY** ......................................................................................... A-18

    **EIGHTEENTH. APPLICABLE LAW** ......................................................................... A-18

    **NINETEENTH. JURISDICTION AND VENUE** ........................................................ A-18

    **TWENTIETH. HEADINGS** ........................................................................................... A-18

A-2

**RESTRUCTURING AGREEMENT (THIS "AGREEMENT" OR "VITRO RESTRUCTURING AGREEMENT") ENTERED INTO BY AND BETWEEN VITRO, S.A.B. DE C.V. ("VITRO"), AND THOSE PERSONS WHOSE NAMES ARE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT ON BEHALF OF THE VITRO CREDITORS (JOINTLY REFERRED TO AS THE "EXECUTING CREDITORS") AND THE CREDITORS WHOSE NAMES WILL BE IDENTIFIED IN THE SIGNATURE PAGES OF THIS AGREEMENT THAT FROM TIME TO TIME MAY BE INCLUDED IN THIS AGREEMENT (THE "ADHERING CREDITORS"), SUBJECT TO THE FOLLOWING ANTECEDENTS, REPRESENTATIONS AND CLAUSES:**

## ANTECEDENTS

I.  On October 10, 2002, Vitro registered a program for the issuance of medium term stock traded certificates (*certificados bursátiles de mediano plazo*) for a total sum of $2,500,000,000.00 (two billion five hundred million pesos 00/100 Mexican Currency) (the "Vitro 02 Program"). On February 13, 2003, Vitro issued 11,400,000 (eleven million four hundred thousand) stock traded certificates (*certificados bursátiles*) for a total amount of $1,140,000,000.00 (one billion one hundred forty million pesos 00/100 Mexican Currency) pursuant to the Vitro 02 Program (the "Cebures Vitro 03"). The common representative (*representante común*) for the holders of the Cebures Vitro 03 is Scotia Inverlat Casa de Bolsa, Grupo Financiero Scotiabank Inverlat.

II.  On October 22, 2003, Vitro completed an issuance throughout international markets of US$225,000,000.00 (two hundred twenty-five million dollars 00/100 Currency of the United States of America) with 11.75% Senior Notes due on 2013 (the "2013 Notes").

III.  On February 1, 2007, Vitro completed an issuance throughout international markets of US$1,000,000,000.00 (one billion dollars 00/100 Currency of the United States of America), which consisted of US$300,000,000.00 (three hundred million dollars 00/100 currency of the United States of America) with 8.625% Senior Notes due 2012 (the "2012 Notes") and US$700,000,000.00 (seven hundred million dollars 00/100 Currency of the United States of America) with 9.125% Senior Notes due 2017 (the "2017 Notes" and jointly with the 2013 Notes and the 2012 Notes, the "Notes").

IV.  On September 29, 2008, Vitro issued a promissory note in favor of ABN AMRO BANK N.V. (owned at one time by RBS Bank), for US$15,000,000.00 (fifteen million dollars 00/100 Currency of the United States of America) (the "ABN Note").

V.  On July 1, 2008, Vitro registered a program for the issuance of long term stock traded certificates (*certificados bursátiles de largo plazo*) for an amount of up to $1,000,000,000.00 (one billion pesos 00/100 Mexican Currency) (the "Vitro 08 Program"). On July 2, 2008, Vitro issued 4,000,000 (four million) stock traded certificates (*certificados bursátiles*) for $400,000,000.00 (four hundred million pesos 00/100 Mexican Currency) pursuant to the Vitro 08 Program (the "Cebures Vitro 08", and jointly with the Cebures Vitro 03, the "Cebures"). The common representative (*representante común*) of the holders of Cebures Vitro 08 is Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, Fiduciario.

VI.  On September 3, 2010, Vitro entered into, as guarantor for its subsidiaries Vitro Envases Norteamérica, S.A. de C.V., Compañía Vidriera, S.A. de C.V. and Comercializadora Álcali, S.A. de C.V., a Settlement and Debt Acknowledgement Agreement with Fintech Investments Ltd., in its capacity of creditor (the "Settlement Agreement") whereby it secured payment of the total amount of US$189,999,282.00 (one hundred eighty-nine million nine hundred ninety-nine thousand two hundred eighty-two dollars 00/100 Currency of the United States of America) plus interest accrued at 4.25% (four point twenty five percent) up to the maturity date, in favor of Fintech Investments Ltd, and executed as "*aval*" three promissory notes for the aforementioned amount (the "Fintech Notes").

VII.  Vitro has reached an agreement with the Executing Creditors in order to restructure its indebtedness upon the Closing Date (as such term is defined below), pursuant to the following terms and conditions

provided in this Agreement which will be filed though a *concurso mercantil* proceeding, in any of its modalities pursuant to what is set forth in the LCM (as defined below), including, if necessary, a *concurso mercantil* petition, whereby this Agreement will be attached as a prearranged agreement or a prepackage reorganization agreement.

VIII. Pursuant to Article 339, Section IV, of the Mexican Bankruptcy and Reorganization Law (*Ley de Concursos Mercantiles*) ("LCM"), this Agreement contains the terms and conditions agreed between Vitro, the Executing Creditors and, in as the case may be the Adhering Creditors, for the Vitro indebtedness restructuring; *provided, however,* that Vitro, the Executing Creditors and the Adhering Creditors intend for this Agreement to become, once it has been approved by the Judge, a reorganization agreement as set forth in Title V, Sole Chapter of the LCM, in order for this Agreement, once all legal requirements have been satisfied, to be presented by means of the *Conciliador* (as such term is defined below) appointed in the *concurso mercantil* by the Federal Institute of *Concurso Mercantil* Specialists ("IFECOM") pursuant to article 43 section IV if the LCM (the "*Conciliador*") before all other creditors which are legally acknowledged by means of the Debt Acknowledgement Judgment (as such term is defined below), pursuant to article 132 of the LCM (the "Remaining Creditors", and jointly with the Executing Creditors, the "Acknowledged Creditors").

<h2 style="text-align:center">REPRESENTATIONS</h2>

**I.** **Vitro represents, under oath and through its representatives, that:**

A. It is a corporation duly incorporated and existing under the Laws of Mexico and that its restructuring of indebtedness which is the purpose of this Agreement, as well as its execution and performance, have been duly authorized by its board of directors through its meeting held on September 24, 2010, pursuant applicable law and regulations.

B. Its representatives have sufficient authority to enter into this Agreement, which has not been revoked or limited in any way as of the date hereof, pursuant to a certified copy of the public instrument attached hereto as **Exhibit "B"**, which shall also form part of this Agreement.

C. It wishes to enter into this Agreement in order to agree on the form, restructuring terms, payment and/or novation conditions, as the case may be, of its indebtedness as set forth herein and that, on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below). Furthermore, it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil* proceeding, pursuant to what is set forth in Articles 166 and 262, Section I and other relative and applicable provisions of the LCM.

D. Pursuant to its accounting records, as of September 30, 2010 it has (a) non subsidiary direct or indirect credit liabilities which amount to $20,508,000,000.00 (twenty billion five hundred and eight million pesos 00/100 Mexican Currency), equivalent to US$1,640,000,000.00 (one billion six hundred and forty million dollars 00/100 Currency of the Unites States of America), (b) liabilities as a result of the "*aval*" granted in favor of third parties regarding its subsidiaries' obligations which amount to $2,383,771,567.00 (two billion three hundred and eighty three million seven hundred and seventy one thousand five hundred and sixty seven pesos 00/100 Mexican Currency), equivalent to US$190,627,335.00 (one hundred and ninety million six hundred and twenty seven thousand three hundred and thirty five dollars 00/100 Currency of the United States of America), and (c) direct or indirect subsidiary liabilities, for an amount of $23,872,000,000.00 (twenty three billion eight hundred and seventy two million pesos 00/100 Mexican Currency), equivalent to US$1,910,000,000.00 (one billion nine hundred and ten million dollars 00/100 Currency of the United States of America) (amounts mentioned in item (c) above will be referred to as "Intercompany Claims").

E.   That the liabilities owed to the Executing Creditors represent at least [•]% of the total Vitro liabilities, pursuant to its accounting records.

F.   That it is a holding company and as such, its ability to meet its obligations is dependant on the dividends that it receives from its subsidiaries.

G.   That it acknowledges the claims of the Executing Creditors and those of the Remaining Creditors, in the amounts, degree and specific characteristics indicated in the creditors and debtors description which pursuant to Article 20, Section III of the LCM, shall be attached as an exhibit to the *concurso mercantil* petition to be filed.

H.   That it does not owe (i) any claims from those mentioned in Article 224, Section I of the LCM, nor (ii) any claims singularly privileged (as defined in Article 218 of the LCM), nor (iii) any claims with other guarantees and privileges (as defined in Article 219 of the LCM).

I.   That it does not have due tax claims of any kind, including but not limited to, claims related to social security claims.

J.   That the Company has not executed any specific agreements with any of its creditors with regards to a repayment of indebtedness, contrary to the LCM.

K.   The execution of this Agreement does not violate or breach, or in any way contravene any provisions of its current corporate by-laws nor any law, including without limitation, the LCM.

L.   That the Company is authorized, under the laws of Mexico, to enter into and comply with its obligations set forth in this Agreement, without any other necessary authorizations, aside from those required from *concurso mercantil* proceedings.

M.   That it completely accepts the terms set forth herein and that this Agreement, once approved by the Judge, will provide the terms needed to Consummate the Restructuring (as such term is defined below) on the Closing Date (as such term is defined below).

**II.   Each of the Executing Creditors, as well as the Adhering Creditors that execute this Agreement, hereby represents under oath that:**

A.   It is Vitro's creditor as respectively identified under its own signature page under this Agreement.

B.   As for holders of the Notes, it evidences its capacity as a Vitro creditor by means of (i) The certification issued and delivered by the Depository Trust Company ("DTC") to Vitro, whereby the record holders are evidenced and (ii) the duly notarized and apostilled Letter of Transmittal issued and delivered by all of the last beneficial owners of the Notes (or their authorized representatives) which contains a certification regarding its ownership of the Notes regarding the beneficial owner; and (iii) the Letter of Instruction issued by the beneficial owner of the Notes to the corresponding record holder.

C.   As for holders of Cebures, it evidences its capacity as a Vitro creditor by means of (i) a Cebures deposit certificate issued by the S.D. Indeval, Institución para el Depósito de Valores, Sociedad Anónima ("Indeval") to the brokerage houses where each holder of Cebures holds its positions and (ii) a Cebures holder's partial certificate issued by the brokererage house with whom each holder of Cebures has executed an intermediary agreement pursuant to which such holder of Cebures holds its positions.

D.   It wishes to enter into this Agreement in order to agree on the form, terms and conditions of Vitro's payment of indebtedness pursuant to what is set forth herein, which on the corresponding procedural moment, are confirmed by the Debt Acknowledgement Judgment (as such term is defined below).

Likewise it wishes that this Agreement, once approved by the Judge, be the restructuring agreement which consummates the Vitro *concurso mercantil*, pursuant to what is set forth in Articles 166 and 262 Section I and other related and applicable articles of the LCM.

E. At the latest within the term provided in Article 122 Section II of the LCM, it shall request the Acknowledgement of all of its credits before the *Conciliador* which is appointed in Vitro's *concurso mercantil* proceeding.

F. Its representatives have the necessary authority to enter into this Agreement, which has not been revoked or limited in any way as of this date, pursuant to the document which is attached hereto as **Exhibit "C"**, and which shall form part of this Agreement.

**III. All parties to this Agreement represent, by means of their representative and under oath that:**

A. They mutually agree to their authority and capacity with which they execute this Agreement, for all necessary legal effects.

As a consequence of the above, and pursuant to the previous representations, Vitro, the Executing Creditors and, as the case may be, the Adhering Creditors agree to execute this Agreement pursuant to what is set forth if the following clauses, and as of this moment request that the *Conciliador* present to the Remaining Creditors this Agreement, which Vitro, the Executing Creditors and the Adhering Creditors propose to the Remaining Creditors for their acceptance and execution, pursuant to what is set forth in articles 4 Section I, 132, 146 and 161 of the LCM:

**CLAUSES**

**FIRST. DEFINITIONS AND EXHIBITS**

**Section 1.01** Defined Terms.

Unless otherwise set forth in this Agreement, any capitalized term used herein shall have the following meaning:

| *TERM* | *DEFINITION* |
|---|---|
| *2012 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *2013 Notes* | shall have the meaning ascribed to it in Antecedent II of this Agreement. |
| *2017 Notes* | shall have the meaning ascribed to it in Antecedent III of this Agreement. |
| *ABN Note* | shall have the meaning ascribed to it in Antecedent IV of this Agreement. |
| *Acknowledged Claims* | shall mean the credits which are acknowledged in the Debt Acknowledgement Judgment. |
| *Acknowledged Creditors* | shall mean all creditors which are legally acknowledged pursuant to Article 132 of the LCM by means of a definitive sentence issued by the Judge which rules over the corresponding *concurso mercantil*. |

A-6

| TERM | DEFINITION |
|---|---|
| ***Adhering Creditors*** | shall mean all Remaining Creditors that execute this Agreement. |
| ***Agreement*** | shall mean this Restructuring Agreement, which may be amended from time to time during the *concurso mercantil* proceedings, and once definitively approved by the Judge, shall be converted into the restructuring agreement provided in Title V, Sole Chapter of the LCM. |
| ***Cash Payment*** | shall mean the cash payment made on the Closing Date, as provided in Section 5.02(c) of this Agreement. |
| ***Cebures*** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| ***Cebures Vitro 03*** | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| ***Cebures Vitro 08*** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| ***Closing Date*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Conciliador*** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| ***Consent Payment*** | shall have the meaning ascribed to it in the Trust. |
| ***Consummate the Restructuring*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Debt Acknowledgement Judgment*** | shall mean the debt Acknowledgement, degree and order sentence dictated by the Judge pursuant to what is set forth in Article 132 of the LCM. |
| ***Description of the Notes* or *DON*** | shall mean the Description of the New Notes, pursuant to the document which is attached hereto as **Exhibit "D"** which provides the principal characteristics of the New 2019 Notes and the New Mandatory Convertible Debentures. |
| ***Executing Creditors*** | shall mean all creditors which are listed in **Exhibit "A"** of this Agreement. |
| ***Existing Indebtedness*** | shall mean jointly liabilities being restructured by means of this Agreement, which include the Notes, the Cebures, the ABN Note, the Fintech Notes and the Settlement Agreement. |
| ***Extended Closing Date*** | shall have the meaning ascribed to it in Clause Sixth of this Agreement. |
| ***Fintech Notes*** | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |

| TERM | DEFINITION |
|---|---|
| **Guarantors** | shall mean all Vitro subsidiaries which shall act as guarantors under the New Notes, which are identified under the definition of Guarantors of Certain Definitions within the Description of the Notes. |
| **IFECOM** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| **Intercompany Claims** | shall have the meaning ascribed to it in representation I.D. of this Agreement. |
| **Issue Date Adjustment** | shall mean the adjustment or increase made by Vitro on the date the New Mandatory Convertible Debentures are issued equal to an annual rate of return of 10.50% (ten point one percent) of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) calculated for the period between Value Date and the issuance date of the New Mandatory Convertible Debentures. |
| **Judge** | shall mean the District Judge for Civil and Labor Matters in Monterrey, Nuevo Leon, who shall rule over the Vitro *concurso mercantil* proceeding. |
| **LCM** | shall mean the Mexican Bankruptcy and Reorganization Act (*Ley de Concursos Mercantiles*). |
| **LGTOC** | shall mean the Mexican Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*). |
| **Mexico** | shall mean the United States of Mexico. |
| **New 2019 Notes** | shall have the meaning ascribed to it in Section 5.02(a) of this Agreement. |
| **New Cebures 2019** | shall have the meaning ascribed to it in Section 5.02 (a) of this Agreement |
| **New Debt** | shall mean the indebtedness created as a result of the Restructuring Instruments. |
| **New Mandatory Convertible Debentures** | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| **New Mandatory Convertible Debentures** | shall have the meaning ascribed to it in Section 5.02(b) of this Agreement. |
| **New Notes** | shall mean jointly the New 2019 Notes and the New Cebures 2019. |
| **Notes** | shall have the meaning ascribed to it in Antecedent III of this Agreement. |

| TERM | DEFINITION |
|---|---|
| **Ordinary Course Intercompany Debt** | shall have the meaning ascribed to it in the DON. |
| **Remaining Creditors** | shall have the meaning ascribed to it in Antecedent VIII of this Agreement. |
| **Restructuring** | shall have the meaning ascribed to it in Clause Second of this Agreement. |
| **Restructuring Fee** | shall have the meaning ascribed to it in Section 5.02 of this Agreement. |
| **Restructuring Instruments** | shall mean jointly the definitive documentation with regards to the 2019 New Notes, the New Cebures 2019, the New Mandatory Convertible Debentures and other documentation related to the restructuring of the Existing Indebtedness. |
| **Settlement Agreement** | shall have the meaning ascribed to it in Antecedent VI of this Agreement. |
| **Trust** | shall mean the irrevocable management and payment trust number 986 dated September 8, 2010 created by Vidriera Los Reyes, S.A. de C.V., a direct subsidiary of Vitro, in its capacity of settlor; before Banco Invex, S.A., Institución de Banca Múltiple, Invex Grupo Financiero, fiduciario, in its capacity of trustee. A copy of the Trust is attached hereto as **Exhibit "E"**, which shall form part of this Agreement. |
| **Value Date** | shall mean January 1, 2011. |
| **Visitador** | shall mean the person appointed by the IFECOM which shall determine if Vitro complied with the provisions set forth in Article 10 of the LCM, as well as to confirm if the termination of the credits caused such actions, and shall also suggest the Judge to issue precautionary measures to be issued as considered necessary to protect the restructured assets, pursuant to Article 37 of the LCM. |
| **Vitro** | shall mean Vitro, S.A.B. de C.V. |
| **Vitro 02 Program** | shall have the meaning ascribed to it in Antecedent I of this Agreement. |
| **Vitro 08 Program** | shall have the meaning ascribed to it in Antecedent V of this Agreement. |
| **Voting Trust** | shall mean the irrevocable management trust to be created pursuant to section 5.04. |

**Section 1.02 Rules of Interpretation**

In this Agreement as well as its Exhibits:

I.  the index and headings of the Clauses and Sections are for reference only and shall not affect the interpretation of this Agreement;

II.  references to any document or agreement, including this Agreement, shall include: (a) all exhibits or other documents attached thereto; (b) all documents or agreements issued or executed to substitute such agreements; and (c) any amendments, additional modifications or compilations of such agreements;

III.  "*include*" or "*including*" are deemed to be followed by "*without limitation*";

IV.  a reference to a party includes that party's authorized successors and permitted assigns;

V.  the words "*of this*", "*in this*" and "*under this*" and similar words or phrases, will refer to this Agreement in general and not to a particular provision of this Agreement;

VI.  reference to "*days*" shall mean calendar days;

VII.  words importing the singular include the plural and vice versa;

VIII.  references to a Clause, Exhibit or Section are references to a relevant clause or section of, or exhibit to this Agreement, unless otherwise expressly stated; and

IX.  all documents which are attached to this Agreement shall form part this Agreement as if they were fully set forth herein.

**Section 1.03** Exhibits.

The following Exhibits shall form part of this Agreement:

**Exhibit "A"** List of Executing Creditors.

**Exhibit "B"** Public instrument, which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"** Public instruments which contain the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"** Description of the New Notes, attached in English, accompanied by its Spanish translation.

**Exhibit "E"** Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.
**Exhibit "F"** Form of Cash Payment and Restructuring Fee.

**Section 1.04** Representation Inclusions.

The parties agree that those representations made by Vitro herein are the main reason for which the Executing Creditors are executing this Agreement.

**SECOND. PURPOSE.**

Pursuant to Articles 1, 48, 157, 166, 262, Section I, and other applicable articles of the LCM, the purpose of this Agreement is, subject to the terms and conditions provided herein and subject to the implementation of the transactions described herein, and subject to the approval of this Agreement by the Judge, that Vitro continues operations, preserves its existence and avoids payment default which may put at risk its viability, as well as other companies with which it maintains a business relation, through the restructuring to which the parties to this Agreement have agreed (the "Restructuring"), which includes the payment, possible capitalization, restructuring and/or novation, as the case may be, of the Acknowledged Claims with the acquittals, forbearances, restructures, grants and/or amendments and/or releases of security interests provided for and subject to the terms herein.

**THIRD.  TREATMENT OF OPERATING EXPENSES, LABOR COSTS, TAXES AND OTHER INDEBTEDNESS.**

**Section 3.01** General Operating Expenses.

Vitro will continue to make payment of all direct and indirect labor and tax obligations and operating expenses, on a timely basis, as they become due, and will continue to perform under all of its contractual obligations pursuant to the LCM.

**FOURTH. ACKNOWLEDGEMENT OF CLAIMS.**

Vitro hereby acknowledges and accepts to owe to the Executing Creditors and the Remaining Creditors, the claims corresponding to the Existing Indebtedness in the amounts provided under section I.D. of the representations section of this Agreement on the terms and conditions of each of the documents which originated such liabilities and for the principal amount, interest and other accessories, the amount that appears in front of the name of each Executing Creditor in each signature page of this Agreement.

Notwithstanding the foregoing, each of the Executing Creditors and, as the case may be the Adhering Creditors, are hereby obligated to file, at the latest within in the term set forth in article 122 section II of the LCM, before the *Conciliador*, their respective proofs of claim or debt acknowledgment petitions and to take all necessary procedural on that regard.

**FIFTH. PAYMENT AND IMPLEMENTATION.**

**Section 5.01** Payment.

Vitro will pay the corresponding Executing Creditors' as well as the Remaining Creditors' Acknowledged Claims, in the terms set forth herein.

This Agreement, once approved by the Judge shall be extensive to the Remaining Creditors as provided in article 165 of the LCM.

**Section 5.02** Implementation.

The Executing Creditors, the Adhering Creditors and Vitro will implement the Restructuring by means of the filing, voting and approval, in each case, of this Agreement pursuant to the LCM, its further recognition and enforcement in the United States of America through the filing and presentment of a Chapter 15 proceeding under the United States Bankruptcy Code, as well as by means of issuance and delivery at the Closing Date to the Acknowledged Creditors of the instruments referred to in subsections (a) and (b) as well as the payments referred to in subsections (c) and (d), as follows:

(a)   pro rata amongst the Acknowledged Creditors, the notes (the "New 2019 Notes") or, as the case may be, at the option of each of the Acknowledged Creditors, the New Cebures ("the New Cebures 2019"), in both cases to be

issued by Vitro in the terms and conditions provided under Section 5.02.1 of this Agreement;

(b) pro rata amongst the Acknowledged Creditors, the Mandatory Convertible Debentures to be issued by Vitro in the terms and conditions provided under Section 5.02.2 of this Agreement (the "New Mandatory Convertible Debentures");

(c) pro rata amongst the Acknowledged Creditors, a cash payment for the remaining US$75,000,000.00 (seventy five million dollars 00/100 Currency of the United States of America) which are contributed to the Trust, once the Consent Payments have been discounted (the "Cash Payment"); and

(d) pro rata cash payment which shall correspond to restructuring fee resulting from the application of the formula provided under Section 5.02.4 of this Agreement (hereinafter, the "Restructuring Fee").

The parties agree that notwithstanding the provisions under this Agreement, creditors under the Intercompany Debt will not receive any instruments or payments described above and that their liabilities will be restructured as provided for in Section 5.04 of this Agreement.

None of the instruments offered by Vitro pursuant to this Agreement and which comprise the New Debt will be registered under the United States Securities Act of 1933, as such has been amended from time to time, based on the exemption provided under Section 3(a)(9) of such law, nor shall they be registered before the National Stock Registry (*Registro Nacional de Valores*) controlled by the Mexican National Securities and Exchange Commission (*Comisión Nacional Bancaria y de Valores*). Therefore, Vitro, as a result of the legal opinion provided by the legal advisors for the Executing Creditors, shall have the right to implement such processes and to request from the Acknowledged Creditors, any such statements and/or certifications which are reasonably considered as necessary or convenient to verify compliance with necessary requirements to apply the corresponding legal exemptions.

**Section 5.02.1** Description of the New Notes.

The New 2019 Notes shall be issued by Vitro in and in accordance with the laws of the United States of America on the Closing Date pursuant to the terms and conditions of Section I of the Description of the Notes and the terms and conditions provided for in the corresponding New 2019 Notes indenture. Also, the New Cebures 2019 shall be issued by Vitro in and in accordance with the laws of Mexico on the Closing Date pursuant to terms and conditions identical to those governing the New 2019 Notes.

The New 2019 Notes and the New Cebures 2019 shall:

I. have a principal total amount, jointly, of US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America);

II. have a term of eight (8) years following the Value Date;

III. constitute direct, unconditional and non-subordinated obligations of Vitro, and rank *pari passu* or identical, one on one basis, versus Vitro's non-secured and non-subordinated debt;

IV. be unconditionally and jointly guaranteed by each of the Guarantors;

V. have a fixed annual interest rate of 8.0%, payable semiannually in due installments and which may be partially capitalized and paid in kind, by 50% (fifty percent), during the first 3 (three) years following the Value Date, at Vitro's election, subject to the compliance by Vitro with certain conditions set forth in the Description of the Notes;

VI. not have amortization or principal payments during the first 4 (four) years following the Value Date and, from the fifth year until the seventh year following the Value Date, shall have amortizations or principal payments of US$25,000,000.00 (twenty-five million dollars 00/100 Currency of the United States of America) payable semiannually;

VII. totally or partially redeemable at Vitro's option, at any time during their term, subject to certain conditions set forth in the Description of the Notes, at a price equal to 100% of their value *plus* interest generated up to the redemption date;

VIII. be totally or partially mandatorily redeemable, in the event that Vitro (i) performs a stock issuance subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

IX. be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its value *plus* interests generated up to the redemption date.

All of the terms and conditions, as well as the customary and regular negative and affirmative for this kind of transactions, including without limitation, any limitations to incur in additional debt, limitations on investments and creation of liens or encumbrances, limitations on certain payments, limitations on the sale of assets, limitations of transactions with partners or affiliates, and early termination events under which the New 2019 Notes and the New Cebures 2019 will be subject, are contained in Section I of the Description of the Notes called New 2019 Notes and in the New 2019 Notes and the New Cebures 2019 indentures.

The principal amount of the New 2019 Notes and of the New Cebures 2019 may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.2** Description of the New Mandatory Convertible Debentures.

The New Mandatory Convertible Debentures shall be issued by Vitro pursuant to the laws of the Unites States of America, complying with all applicable provisions under the General Law of Credit Transactions and Negotiable Instruments (*Ley General de Títulos y Operaciones de Crédito*), on the Closing Date pursuant to the terms and conditions of Section II of the Description of the Notes and the terms and conditions provided under the New Mandatory Convertible Debentures indenture.

The New Mandatory Convertible Debentures shall:

I. have a principal total amount of US$100,000,000.00 (one hundred million dollars 00/100 Currency of the United States of America) *plus* the Issue Date Adjustment;

II. have a term of five (5) years following the Value Date;

III. constitute direct obligations of Vitro, and shall rank *pari passu* or identical, one on one basis, versus Vitro's non-guaranteed debt;

IV. have an annual fixed interest rate equal to 10.50%, which may be totally capitalized and paid in kind, on an annual basis, during its term;

V. be mandatorily convertible into shares of Vitro which represent 15% of its corporate capital at the end of its term, in the event that they are not paid in cash at the end of its term or in the absence of mandatory redemptions pursuant to the Description of the Notes;

VI. be totally or partially redeemable at Vitro's option, at any time during their term, subject to the terms and conditions set forth in the Description of the Notes, at a price equal to 100% of their value (subject

to prepayment discounts set forth in the Description of the New Notes) *plus* the interest generated up to the redemption date;

VII.  be totally or partially mandatorily redeemable, in the event that Vitro (i) issues capital stock subject to certain conditions set forth in the Description of the Notes; and (ii) has a cash flow above the amount set forth in the Description of the Notes; and

VIII.  be totally mandatorily redeemable, in the event of a change of control in Vitro at a price equal to 101% of its principal *plus* the interest generated up to the redemption date.

All of the terms and conditions, terms and conversion procedures, as well as the negative and affirmative covenants and early termination events which govern the New Mandatory Convertible Debentures are provided under Section II of the Description of the Notes and in the New Mandatory Convertible Debentures indenture.

The principal amount of the New Mandatory Convertible Debentures and as a consequence the basis for the Issue Date Adjustment calculation may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.02.3** Cash Payment Description.

Vitro shall pay in cash, on the Closing Date, pro-rata, in favor of all Acknowledged Creditors (except for Intercompany Claims), an amount equal to US$75,000,000.00 (seventy-five million dollars 00/100 Currency of the United States of America), which are contributed to the Trust, *minus* the Consent Payment.

**Section 5.02.4** Restructuring Fee Description.

Vitro shall pay as a Restructuring Fee on the Closing Date, pro rata, in favor of all Acknowledged Creditors (except for Intercompany Claims) an amount equal to the annual interest rate of 8.0% (eight percent) regarding the US$850,000,000.00 (eight hundred and fifty million dollars 00/100 Currency of the United States of America) calculated for the period between the Value Date and the New 2019 Note issuance.

The principal amount used to estimate the Restructuring Fee may be adjusted, pursuant to what is provided under Section 5.05 of this Agreement.

**Section 5.03** Treatment of Acknowledged Creditors.

All Acknowledged Creditors (except for Intercompany Claims) shall receive a pro rata portion of (i) the New 2019 Notes or the New Cebures 2019, as the case may be to the option of each of the Acknowledged Creditors, who shall notify their election to Vitro within five (5) calendar days following the date in which the Judge approves this Agreement, provided that, in the event that Vitro does not receive the election during such period, the Acknowledged Creditors will receive New 2019 Notes in exchange of their Notes and New Cebures 2019 in exchange of their Cebures, (ii) the New Mandatory Convertible Debentures, (iii) the Cash Payment and (iv) the Restucturing Fee.

The parties expressly agree and accept that the terms and conditions set forth herein grant a just, equal and reasonable treatment to all claims of the Acknowledged Creditors.

**Section 5.04** Intercompany Claims; Acceptance of a Less Favorable Treatment.

The holders of Intercompany Claims against Vitro accept that they will receive a less favorable treatment than the rest of the Acknowledged Creditors, since they shall not be entitled to receive any of the instruments and payments set forth in Section 5.02 of this Agreement.

Pursuant to the foregoing paragraph, creditors holding Intercompany Claims (except for Ordinary Course Intercompany Debt holders) accept to receive a note for the amount of such claims , payable within a 9 (nine) year term which shall begin on the date in which the New Notes and the New Mandatory Convertible Debentures are issued, and shall have a fixed annual interest rate of 2.5% (two point five percent) and shall be payable in one sole single bullet payment at maturity.

Additionally, no principal or interest payment concerning the Intercompany Claims shall be made prior to payment of principal, interest or any other amounts owed under the New Notes and the New Mandatory Convertible Debentures; except for payments of principal or interest in the ordinary course of business and consistent with past practice with respect to Ordinary Course Intercompany Debt. Vitro and its subsidiaries will execute an Intercompany Subordination and Credit Agreement as set forth in the Description of the New Notes.

Vitro and its subsidiariaries shall create an irrevocable trust agreement (the "Voting Trust") where they shall contribute all of their Intercompany Claims in order to be managed and voted pursuant to what is set forth under such Voting Trust. Such Intercompany Claims shall remain in the Voting Trust for the remainder of the credit term, or 9 (nine) years, which shall begin on the date in which the New Notes and the New Mandatory Convertible Debentures are issued.

**Section 5.05** Other obligations to consider.

Pursuant to what is stated in representation I.F of this Agreement, Vitro is a holding company and it is in its best interest to achieve a comprehensive restructuring of its liabilities and those of its subsidiaries, and Vitro has included, within the economic terms set forth herein, those liabilities of its subsidiary denominated Vitro Envases Norteamérica, S.A. de C.V., which acts as a Guarantor in this Agreement, and currently owes Calyon Credit Agricole CIB ("Calyon"), an amount equal to US$63,383,806.00 (sixty three million three hundred eighty three thousand eight hundred six dollars 00/100 Currency of the United States of America) plus interest and commissions owed up to June 30, 2010 for an amount equal to US$3,905,298.00 (three million nine hundred five thousand two hundred ninety eight dollars 00/100 Currency of the United States of America). In the event the terms of this Agreement are accepted by Calyon, Vitro shall assume such debt and will deliver Calyon its proportional share of the New 2019 Notes, the New Mandatory Convertible Debentures, the Restructuring Fee and its Cash Payment, pursuant to what is set forth in Section 5.02 herein. Furthermore, Calyon shall be considered as an Adhering Creditor for all legal and economic purposes under this Agreement, as of the date in which the Judge approved this Agreement.

Vitro shall grant Calyon with the same term to execute and approve this Agreement as well as to accept the benefits bestowed in its favor under this Section 5.05 as the one granted in favor of the Remaining Creditors pursuant to article 161 third paragraph of the LCM.

In the event Calyon does not accept the benefits bestowed in its favor pursuant to this Section 5.05, the corresponding amounts of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee to be delivered and paid to each Acknowledged Creditor shall remain unchanged, pursuant to what is set forth in Section 5.02, and Vitro shall only reduce the amount of New 2019 Notes, New Mandatory Convertible Debentures and Restructuring Fee, in order to deduct such proportional amounts which would have been distributed to Calyon if it had accepted the rights granted in its favor; *provided*, *however*, that the Cash Payment available to the Acknowledged Creditors shall remain unchanged pursuant to Section 5.02(c). Furthermore, in the event Calyon does not accept the benefits bestowed in its favor pursuant to Section 5.05, Vitro shall not be in a position to offer Calyon a more favorable treatment regarding payment of its indebtedness than the treatment offered to the Acknowledged Creditors under this Agreement.

**SIXTH. METHOD, DATE AND PLACE OF PAYMENT OF THE CASH PAYMENT AND THE RESTRUCTURING FEE.**

Vitro shall be obligated to pay the Cash Payment and the Restructuring Fee, through electronic wire transfer to the account indicated by each one of the Acknowledged Creditors in a written form pursuant to the forms attached hereto as Annex F, or before the court through certified or cash checks.

Vitro must pay the Cash Payment and the Restructuring Fee and shall issue the New Notes, the New Mandatory Convertible Debentures, and in general terms consummate the Restructuring, ("Consummate the Restructuring") provided for in this Agreement no later than (15) fifteen calendar days following the date in which the publication in the lists of the court where the *concurso mercantil* proceeding is taking place becomes effective, of the resolution issued by the Judge approving this Agreement (notwithstanding existing recourses or appeals pending of resolution), or the immediate following business day in the event case the effective date falls on a non-business day ( the "Closing Date"), unless:

a) There is a court order or decree granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring, as set forth in this Agreement; or

b) There is a recourse or appeal which, if resolved against Vitro, may invalidate this Agreement as approved by the Judge and within the fifteen (15) calendar days following the date on which the resolution approving this Agreement has become effective, the majority of the Acknowledged Creditors vote in favor of extending the Consummation Date, in which case the Closing Date shall be extended to the earlier of (A) the date in which the recourse or appeal is resolved in final and non-amendable form and (B) ten (10) months starting as of the date on which the resolution approving this Agreement becomes effective (in either case, the "Extended Closing Date").

For the avoidance of doubt, in the event that the recourse or appeal mentioned in paragraph (b)(i) is still pending and the majority of the Acknowledged Creditors vote against the extension of the Closing Date, then Vitro shall Consummate the Restructuring no later than the Closing Date notwithstanding such recourse or appeal. Likewise, in the event the majority of the Acknowledged Creditors vote in favor of extending the Closing Date, but such recourse or appeal is not resolved before the Extended Closing Date, then Vitro shall Consummate the Restructuring within five (5) calendar days following the Extended Closing Date or the immediately following business day if such date falls on a non-business day (except in the event that a judicial order or decree has been issued granting the provisional suspension or which legally forbids Vitro from Consummating the Restructuring).

**SEVENTH. CURRENCY.**

According to the last paragraph of Article 159 of the LCM, the claims will subsist in the same currency in which they were originally agreed.

**EIGHTH. FURTHER DOCUMENTS.**

The parties agree to take any necessary actions to ratify the terms of this Agreement, once approved by the Judge, and any other agreement derived therefrom, including the Restructuring Instruments, at the latest at the Closing Date.

Vitro shall be obligated to make and cause all of the Guarantors to agree to the terms of this Agreement, once approved by the Judge, and the Restructuring Instruments pursuant to what is set forth in the Description of the Notes, through their signature to the Restructuring Instruments.

**NINTH. SUBSTITUTION OF PRIOR AGREEMENTS, NOVATION AND EXTINGUISHMENT.**

Given the nature of this Agreement and the objectives of the *concurso* proceeding, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, this Agreement and the Restructuring Instruments issued by Vitro thereto, novate, substitute and extinguish the prior obligations, indentures, instruments, documents, agreements and guarantees in which the Acknowledged Claims were stipulated or agreed upon, and also extinguishes the personal guarantees that were granted by third parties

A-16

and/or Vitro's direct or indirect subsidiaries with respect to the obligations, instruments, documents and agreements from which the claims of the Acknowledged Claims arose.

The Acknowledged Creditors shall hereby expressly acknowledge and approve the waiver of the difference between the face amount of the Acknowledged Claims and the New Debt resulting from this Agreement, and, as a consequence of the execution of this Agreement, grant Vitro and its guarantors the fullest release with respect to such original claims, and as of the date of the judicial approval of this Agreement, only the New Debt, in the terms set forth in this Agreement shall survive.

## TENTH. BINDING EFFECT.

Pursuant to the provisions of the LCM, once this Agreement is approved by the Judge in terms of Article 164 of the LCM, it shall be mandatory to Vitro and to all the Acknowledged Creditors, including those Remaining Creditors who, through absence or explicit rejection, have not executed this Agreement.

## ELEVENTH. ASSIGNMENT OF CLAIMS, SUCCESSORS AND/OR TRANSFEREES.

The consent granted by the Executing Creditors with regards to this Agreement, as well as by the Adhering Creditors that execute this Agreement, shall be irrevocable and binds any transferee of the same, and any successor and/or assignee of the same from the moment in which this Agreement was executed; therefore, in the event there is any assignment or transfer of the claims of such creditors, the assignees, successors and/or transferees by any cause or title or reason, are bound irrevocably by the terms of this Agreement; *provided, however,* that the Executing Creditors and the Adhering Creditors that execute this Agreement, must ratify this Agreement in the event of amendments or modifications to the Agreement which breach or contravene the terms and conditions set forth herein, or in the event such changes or amendments materially affect any of the Executing Creditors or Adhering Creditors or any of their interests or rights as set forth herein.

## TWELFTH. PATRIMONY.

In terms of article 2964 of the Federal Civil Code, Vitro responds for the compliance of its obligations under this Agreement with its entire patrimony.

## THIRTEENTH. MANAGEMENT AND SURVEILLANCE.

During the *concurso mercantil* proceedings, Vitro will continue its ordinary course of business, and shall maintain management and administration of its assets under the surveillance of the court through the *Conciliador*, as well as during the term referred to in Clause Sixth of this Agreement, in which case surveillance will be the responsibility of its corresponding corporate entities.

## FOURTEENTH. CONTINUANCE.

Vitro agrees that during the *concurso mercantil* proceedings it shall comply with its operational obligations and activities in which it is involved, in order to secure the continuance of its corporate existence.

## FIFTEENTH. EQUAL TREATMENT.

This Agreement is intended, and shall be always construed in such manner, to provide equal treatment to all the Acknowledged Creditors.

## SIXTEENTH. *CONCURSO* PETITION AND PREVIOUS RESTRUCTURING PLAN.

The execution of this Agreement by the Executing Creditors and the Adhering Creditors implies the execution, acceptance and consent of such Executing Creditors and the Adhering Creditors with respect to the

*concurso mercantil* petition that may be filed by Vitro to be considered as a prepackaged restructuring plan, pursuant to what is set forth in Title Fourteen of the LCM.

Subject to the condition precedent that this Agreement be approved by the Judge pursuant to article 164 of the LCM, the Executing Creditors and the Adhering Creditors, agree and irrevocably consent to each and every one of the clauses stated herein regarding claims against Vitro which each of them holds and are indicated in the signature pages of this Agreement or the ones which result in their favor in the Debt Acknowledgement Judgment.

## SEVENTEENTH. NULLITY.

If for any reason any of the clauses of this Agreement is deemed invalid, such circumstance shall only affect that clause and the rest of the terms and conditions herein shall survive in its terms.

## EIGHTEENTH. APPLICABLE LAW.

This Agreement shall be governed by the LCM and other applicable laws pursuant to Article 8 of the LCM.

## NINETEENTH. JURISDICTION AND VENUE.

The parties that execute this Agreement and those who agree and consent to its execution in the future pursuant to Articles 161 and 162 of the LCM, agree that construction, compliance and enforcement of this Agreement will be subject to the exclusive jurisdiction of the H. District Judge which shall rule over the Vitro *concurso mercantil* proceeding.

## TWENTIETH. HEADINGS.

The headings of the clauses of this Agreement are merely for reference and do not affect its content.

This Agreement is signed by Vitro, Executing Creditors and the Adhering Creditors, as well as by the Recognized Creditors that consent to it, on the date which appears on each signature page.

*[REST OF THE PAGE WAS INTENTIONALLY LEFT BLANK]*

Signature page of the Vitro Restructuring Agreement.

VITRO, S.A.B. DE C.V.

By: _____
    Name:
    Title:
    Date:

Signature page of the Vitro Restructuring Agreement.

Credit:

2012 Notes

      Note Number:     [        ]
      Nominal Value:    [        ]

2013 Notes

      Note Number:     [        ]
      Nominal Value:    [        ]

2017 Notes

      Note Number:     [        ]
      Nominal Value:    [        ]

Cebures Vitro 03

      Certificate Number: [        ]
      Nominal Value:    [        ]

Cebures Vitro 08

      Certificate Number: [        ]
      Nominal Value:    [        ]

Other credits:

      Identification: [        ]

Consent granted hereby corresponds to the amount which is acknowledged by means of the Debt Acknowledgement Judgment in favor of the Creditor's name which is indicated below.

                        _____

                        [CREDITOR'S NAME]

                        Represented by:_____
                          Name:
                          Title:
                          Date:

**EXHIBIT LIST**

**Exhibit "A"**  List of Executing Creditors.

**Exhibit "B"**  Public instrument which contains the power of attorney of the legal representative of Vitro.

**Exhibit "C"**  Public instrument which contains the power of attorney of the legal representatives for the Executing Creditors.

**Exhibit "D"**  Description of the Notes, attached in English form, accompanied by its Spanish translation.

**Exhibit "E"**  Irrevocable Management and Payment Trust Number 986 dated September 8, 2010.

**Exhibit "F"**  Form of Cash Payment and Restructuring Fee.

# Exhibit H



# Vitro Announces Offers for its Outstanding Senior Notes
### Offers are Step Toward Potential Restructuring under Mexican Insolvency Laws

**San Pedro Garza García, Nuevo León, México, November 1, 2010 - Vitro S.A.B. de C.V. (BMV: VITROA)** announced today that it has commenced two alternative offers in respect of its outstanding senior notes: (1) a cash tender offer (which is being conducted as a modified Dutch auction) and (2) an exchange offer and consent solicitation. Both offers apply to all three series of Vitro's outstanding senior notes, which are described in the following table:

| Series of Senior Notes | CUSIP No. | Outstanding Principal Amount |
|---|---|---|
| 8.625% Senior Notes due 2012 | 92851RAC1 | $300,000,000 |
| 11.75% Senior Notes due 2013 | 92851FAD5 | $216,000,000 |
| 9.125% Senior Notes due 2017 | 92851RAD9 | $700,000,000 |

The offers are being conducted in contemplation of, and as a step towards, restructuring Vitro's outstanding debt through an in-court proceeding under the insolvency law of Mexico.

## Background of the Proposed Restructuring

For the past 18 months Vitro has worked diligently to resolve its financial situation by seeking to achieve a consensual restructuring on terms that provide Vitro's creditors a fair recovery in light of the Company's financial capacity and permit the Company to regain its financial footing. To that end, Vitro has engaged in active negotiations with various groups of creditors, including an ad hoc group of bondholders and Fintech Advisory Ltd., the Company's single largest creditor.

The exchange offer and consent solicitation launched today reflects Vitro's commitment to significantly deleverage and return to financial soundness while at the same time providing consenting creditors with a fair recovery. Depending on the level of creditor participation, consenting creditors stand to receive a nominal recovery between 68% to 73% of their total claims. Moreover, the terms of the proposed restructuring, once implemented, will leave the Company with a sustainable debt load and strong financial position, both of which will mitigate the risk of a subsequent restructuring and will provide the Company with the necessary financial flexibility to improve and maintain its business performance and remain competitive.

The Company's restructuring proposal reflects months of arms-length negotiations with Fintech Advisory Ltd., the Company's largest creditor. Fintech Advisory recognizes the benefits and fair recovery that our restructuring proposal provides to all creditors of the

1

Company and, accordingly, has agreed to support our restructuring proposal by entering into a lock-up and plan support agreement (as described in the offer documents mentioned below). As stated by David Martinez, the managing director of Fintech Advisory Ltd., "Vitro's restructuring proposal is the outcome of long and involved arms-length negotiations and, in my view, represents a fair and balanced restructuring package for all creditors, not only with respect to potential recovery but also with respect to the financial and legal terms and conditions of the new offered securities."

**General Information Relating to the Offers**

Holders of Vitro's senior notes may either tender their senior notes in the tender offer or submit their senior notes for exchange in the exchange offer and consent solicitation. Because the size of the tender offer is limited (as described below), holders that tender senior notes in the tender offer will be required to specify whether, if their senior notes are not accepted in the tender offer, they elect to tender them into the exchange offer and consent solicitation instead.

Both offers are being made pursuant to, and on the conditions described in, a tender offer and exchange offer and consent solicitation statement dated November 1, 2010 and the related letter of transmittal (together, the "offer documents").

Both offers will expire at 9:00 a.m., New York City time, on December 1, 2010, unless extended or earlier terminated. Any tenders of senior notes in either offer are irrevocable. Vitro may, in its sole discretion (subject to applicable law), terminate either or both offers, and reserves the right to amend the terms or waive any of the conditions to either or both offers.

**The Tender Offer**

Vitro is making the tender offer jointly with its wholly-owned subsidiary Administración de Inmuebles Vitro, S.A. de C.V. Together, they are offering, upon the terms and subject to the conditions set forth in the offer documents, to purchase Vitro's outstanding senior notes for cash pursuant to a modified Dutch auction.

Because the tender offer is being conducted as a modified Dutch auction, tendering holders must specify the minimum price they would be willing to accept in exchange for each $1,000 principal amount of their senior notes. This minimum amount is known as the "bid price." The bid price may not be less than $500.00 or more than $575.00. Bids outside of this range will not be accepted. Bids between those numbers must be in minimum increments of $2.50 above $500.00.

The total amount available to purchase senior notes that are accepted in the tender (the "maximum payment amount") will be $100,000,000 (subject to increase as described in the offer documents). Using procedures that are described in the offer documents, the bid prices of all tendering holders will be used to determine the clearing price at which the largest possible principal amount of senior notes can be purchased without exceeding, in the aggregate, the maximum payment amount. The price, or "tender offer consideration," that holders will receive for their senior notes that are accepted in the tender offer, will be equal to that clearing price.

All holders whose senior notes are accepted in the tender offer will receive the same tender offer consideration even if they tendered at a bid price that was lower than the clearing price.

Senior notes that are tendered at a bid price greater than the clearing price will be rejected from the tender offer. In addition, a portion of the senior notes tendered at a bid price equal to the clearing price may be rejected due to proration procedures.

The tender offer will be financed by a loan from an affiliate of Fintech Advisory and will be repaid by delivery to such Fintech affiliate of the senior notes that are accepted in the tender offer. As mentioned above, an affiliate of Fintech Advisory has executed a lock-up agreement with the Company to support an in-court restructuring under the *Ley de Concursos Mercantiles*, or insolvency law, of Mexico (the "*Concurso* Plan") (as defined herein).

**The Exchange Offer and Consent Solicitation**

Concurrently with the tender offer, Vitro is also proposing, upon the terms and subject to the conditions set forth in the offer documents, an exchange offer and solicitation of consents to the *Concurso* Plan, from holders of the senior notes and certain claims relating to derivative financial instruments and other debt of Vitro (together with the senior notes, the "restructured debt").

Pursuant to the *Concurso* Plan, Vitro is proposing to exchange all of the restructured debt which including the senior notes, had an outstanding balance of $1,515 million as of June 30th 2010 for the following consideration on a pro rata basis:

- $850.0 million in aggregate principal amount of new senior notes maturing in 2019 (the "new 2019 notes");

- $100.0 million (plus an issue date adjustment) in aggregate principal amount of newly issued mandatory convertible debentures (the "new MCDs" and, together with the new 2019 notes, the "new notes"), which will mandatorily convert into 15.0% of Vitro's equity on a fully diluted basis if not paid in full at maturity or upon the occurrence of certain events of default;

- a cash payment (the "restructuring cash payment") in an amount equal to the unpaid portion of an aggregate of $75.0 million in cash held in a Mexican trust remaining after the payment of the consent payment described below (the "payment trust"); and

- a restructuring fee, in cash, based on the issue date of the new notes.

The payment trust will pay a consent payment in an amount (to be determined as described in the offer documents) of no less than 5% and no greater than 10% of the aggregate principal amount of restructured debt held by the holder (the "consent payment") which is exchanged and for which a consent to the *Concurso* Plan is provided prior to the expiration time specified above.

Vitro is seeking the exchange of the senior notes and consent of each person in whose name a senior note is registered as of 5:00 p.m., New York City time, on November 1, 2010 (the "record date"), or persons who held senior notes through The Depository Trust Company as of the record date; however, Vitro may proceed with filing the proposed *Concurso* Plan without any such consents.

For each U.S.$1,000 principal amount of the senior notes that is exchanged, holders will be entitled to receive:

- $562 of New 2019 Notes,

- $66 of New MCDs (not including the issue date adjustment),

- a portion of the restructuring cash payment on a pro rata basis (depending on how many holders consent), and

- a portion of the restructuring fee (depending on the issue date),

all to be delivered following the approval of Vitro's *concurso mercantil* proceeding. This does not include the consent payment for holders of between 5% and 10% of the principal amount of exchanged senior notes, which will be paid promptly following the expiration of the exchange offer and solicitation of consents.

### Further Information

D.F. King & Co., Inc. will act as the depositary for the tender offer and information and exchange agent for the exchange offer and consent solicitation for holders of senior notes. Questions regarding the tender offer and exchange offer and consent solicitation and requests for additional copies of the tender offer and exchange offer and consent solicitation materials may be directed to D.F. King & Co., Inc. at (800) 431-9633 (toll free) or (212) 269-5550 (bankers and brokers). Holders of restructured debt other than the senior notes may contact Vitro at +52 (81) 8863-1731 (attn: Carlos Garza).

This press release does not constitute an offer to purchase or the solicitation of an offer to sell the senior notes. It also does not constitute an offer to sell or the solicitation of an offer to buy the new notes. There shall not be any such offers or solicitations, or purchases or sales, in any jurisdiction in which such offers, solicitations, purchases or sales would be unlawful. The tender offer and exchange offer and consent solicitation are being made solely pursuant to the offer documents, as described above.

Vitro, S.A.B. de C.V. (BMV: VITROA), is the leading glass manufacturer in Mexico and one of the largest glass manufacturers in the world backed by more than 100 years of experience. Through our subsidiary companies we offer products with the highest quality standards and reliable services to satisfy the needs of two distinct business sectors: glass containers and flat glass. Our manufacturing facilities produce, process, distribute and sell a wide range of glass products that form part of the everyday lives of millions of people as well as offering excellent solutions to multiple industries that include: wine, beer, cosmetic, pharmaceutical, food and beverage, as well as the automotive and construction industries. In addition, we supply raw materials, machinery and industrial equipment to different industries. We constantly strive to improve the quality of life of our employees and of the communities in which we operate by generating employment and economic prosperity based on our focus on quality and continuous improvement, as well as through our ongoing efforts to promote sustainable development. Located in Monterrey, Mexico, and founded in 1909, Vitro currently has major facilities and a broad distribution network in 10 countries in

the Americas and Europe with products that can be found throughout all around the world. For more information Vitro's website can be accessed at: http://www.vitro.com

This announcement contains statements about future events regarding Vitro, S.A.B. de C.V. and its subsidiaries. While Vitro believes that forward-looking statements are based on reasonable assumptions, all such statements reflect Vitro's current views with respect to future events and are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated in this press release. Many factors could cause Vitro's actual results, performance or achievements to be materially different from anticipated future results, performance or achievements that may be expressed or implied by such forward-looking statements. In particular, completion of the offers described above or the *Concurso* Plan on the basis described, or at all, is uncertain. Vitro does not assume any obligation to, and will not, update these forward-looking statements.

**For further information, please contact:**

| Investor Relations | U.S. agency | Media Relations |
|---|---|---|
| Adrian Meouchi / Carlos Garza | Susan Borinelli / Barbara Cano | Albert Chico/ Roberto Riva Palacio |
| Vitro S.A.B. de C.V. | Breakstone Group | Vitro, S.A.B. de C.V. |
| + (52) 81-8863-1765 / 1730 | (646) 330-5907 | + (52) 81-8863-1661/ 1689 |
| ameouchi@vitro.com | sborinelli@breakstone-group.com | achico@vitro.com |
| cgarza@vitro.com | bcano@breakstone-group.com | rriva@vitro.com |

# Exhibit I



### Ad Hoc Committee of Vitro Noteholders Reject Vitro's Initial Consent Solicitation

*NEW YORK, Oct. 26, 2010 (GLOBE NEWSWIRE) -- The Steering Group for the Ad Hoc Committee of Vitro Noteholders (the "Steering Group") is comprised of holders, or investment advisors to holders, of more than $500 million of the Senior Notes due 2012, 2013 and 2017 (collectively, the "Senior Notes") issued by Vitro S.A.B. de C.V. ("Vitro"). In addition, its advisors continue to be in contact with additional holders of approximately $300 million of the Senior Notes, who have indicated their support for the Steering Group. The Steering Group would like to provide all holders of Senior Notes ("Noteholders") with an update with respect to the status of negotiations with Vitro and its shareholder representatives.*

TO ALL VITRO NOTEHOLDERS:

Vitro is shortly expected to launch its long-awaited consent solicitation ("Initial Consent Solicitation"). It has chosen to do so without the support of any member of the Steering Group, nor from any other independent creditor constituent. Assuming the Initial Consent Solicitation is launched on the terms that we have been led to believe by Vitro and its advisors, the Initial Consent Solicitation will offer an unacceptably poor economic outcome for Noteholders and as such, the Steering Group intends at this time, based upon available information, to reject the Initial Consent Solicitation and encourages all Noteholders to do the same.

We would draw Noteholders attention to two important considerations when reviewing the Initial Consent Solicitation:

First, as proposed, the economic terms are considerably less favorable than terms put forward by Vitro during recent meetings with certain Steering Group members. Further, the Steering Group understands that Vitro will incorporate various coercive incentives designed to intimidate Noteholders into supporting the Initial Consent Solicitation and will no doubt claim that it has widespread support among creditors.

Second, none of the Steering Group members, nor our financial and legal advisors, have had any involvement or participation with respect to the new debt indentures and associated legal or other documentation governing the proposed restructured securities. Both the Initial Consent Solicitation and the documentation have been drafted by Vitro with input only from its informal advisor, and future shareholder, Fintech, thus we expect that it will compromise the economic and legal position of the Noteholders.

Notwithstanding almost 18 months of patient negotiation, the Steering Group is surprised and disappointed at Vitro's decision to launch the Initial Consent Solicitation on terms worse than previously offered during discussions and without giving the Steering Group any opportunity to review and give input to the Initial Consent Solicitation documents. The Steering Group encourages all Noteholders to defer taking any action with respect to the Initial Consent Solicitation until they have had the opportunity to properly analyze the terms of the proposal and understand its potential legal and economic implications.

Accordingly, once the Initial Consent Solicitation is launched, the Steering Group and its advisors, White & Case LLP and Chanin Capital Partners LLC, will schedule and hold a conference call open to all Noteholders during which we will discuss the Initial Consent Solicitation and its consequences.

**Other Company Press Releases**

Vitro Noteholders Commence Involuntary Bankruptcy Cases Against Vitro's U.S. Subsidiaries - Nov 18, 2010

The Ad Hoc Committee Continues to Evaluate Options and Reserves All Rights and Remedies Regarding Vitro's Initial Consent Solicitation - Nov 10, 2010

Ad Hoc Committee of Vitro Noteholders Reject Vitro's Initial Consent Solicitation - Oct 26, 2010

Ad Hoc Committee of Vitro Noteholders Continue to Oppose Vitro's Anticipated Consent Solicitation - Sep 24, 2010

Ad Hoc Committee of Vitro Noteholders in Contact With a Majority of Senior Notes; Continues to Oppose Vitro's Anticipated Consent Solicitation - Aug 16, 2010

More >>

**Related News**

- CORPORATE

**Blogging/Bookmarking**

 Blogger
Blog Search

The foregoing shall not be construed as tax, legal, business, financial, accounting or other advice, and Noteholders are encouraged to consult their own advisors. The Steering Group reserves all of its rights and remedies available to it under law and contract.

Sincerely,

Steering Group for the Ad Hoc Committee of Vitro Noteholders

Care of

White & Case LLP

John Cunningham

(305) 995-5252

JCunningham@whitecase.com

Richard Kebrdle

(305) 995-5276

RKebrdle@whitecase.com

Chanin Capital Partners LLC

Brian Cullen

(310) 445-4010

BCullen@chanin.com

Mark Catania

(310) 445-4010

MCatania@chanin.com

Digg
del.icio.us
Facebook
Google Bookmarks
Newsvine
Reddit
StumbleUpon
Technorati
Yahoo MyWeb

© 2010 GlobeNewswire, Inc. All Rights Reserved.

B5 (Official Form 5) (12/07)

| United States Bankruptcy Court | INVOLUNTARY PETITION |
|---|---|

**Northern** District of **Texas**

**IN RE (Name of Debtor - If Individual: Last, First, Middle)**
Vitro Asset Corp.

**ALL OTHER NAMES used by debtor in the last 8 years**
(Include married, maiden, and trade names.)
American Asset Holding Corp.
Imperial Arts Corp.
VK Corp.
Oriental Glass, Inc.

**Last four digits of Social-Security or other Individual's Tax-I.D. No./Complete EIN**
(If more than one, state all.): N/A

**STREET ADDRESS OF DEBTOR (No. and street, city, state, and zip code)**
350 N. Saint Paul Street, Suite 2900
Dallas, Texas 75201-4234
COUNTY OF RESIDENCE OR PRINCIPAL PLACE OF BUSINESS

ZIP CODE

**MAILING ADDRESS OF DEBTOR (If different from street address)**

ZIP CODE

**LOCATION OF PRINCIPAL ASSETS OF BUSINESS DEBTOR (If different from previously listed addresses)**

**CHAPTER OF BANKRUPTCY CODE UNDER WHICH PETITION IS FILED**

☐ Chapter 7    ☒ Chapter 11

## INFORMATION REGARDING DEBTOR (Check applicable boxes)

**Nature of Debts**
(Check one box.)

Petitioners believe:

☐ Debts are primarily consumer debts
☒ Debts are primarily business debts

**Type of Debtor**
(Form of Organization)

☐ Individual (Includes Joint Debtor)
☒ Corporation (Includes LLC and LLP)
☐ Partnership
☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.)

**Nature of Business**
(Check one box.)

☐ Health Care Business
☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51)(B)
☐ Railroad
☐ Stockbroker
☐ Commodity Broker
☐ Clearing Bank
☒ Other

### VENUE

☒ Debtor has been domiciled or has had a residence, principal place of business, or principal assets in the District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐ A bankruptcy case concerning debtor's affiliate, general partner or partnership is pending in this District.

### FILING FEE (Check one box)

☒ Full Filing Fee attached

☐ Petitioner is a child support creditor or its representative, and the form specified in § 304(g) of the Bankruptcy Reform Act of 1994 is attached.

*[If a child support creditor or its representative is a petitioner, and if the petitioner files the form specified in § 304(g) of the Bankruptcy Reform Act of 1994, no fee is required.]*

### PENDING BANKRUPTCY CASE FILED BY OR AGAINST ANY PARTNER
### OR AFFILIATE OF THIS DEBTOR (Report information for any additional cases on attached sheets.)

| Name of Debtor | Case Number | Date |
|---|---|---|
| See Attached Annex A | | |
| Relationship | District | Judge |

### ALLEGATIONS
(Check applicable boxes)

COURT USE ONLY

1. ☒ Petitioner(s) are eligible to file this petition pursuant to 11 U.S.C. § 303(b).
2. ☒ The debtor is a person against whom an order for relief may be entered under title 11 of the United States Code.
3.a. ☒ The debtor is generally not paying such debtor's debts as they become due, unless such debts are the subject of a bona fide dispute as to liability or amount;

   or

   b. ☐ Within 120 days preceding the filing of this petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

Name of Debtor     Vitro Asset Corp.

Case No.

## TRANSFER OF CLAIM

☒ Check this box if there has been a transfer of any claim against the debtor or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a).

## REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

| Petitioner(s) declare under penalty of perjury that the foregoing is true and | x /s/ Jeff Prostok     11/17/10 |
|---|---|
| x _____ <br> Signature of Petitioner or Representative (State Title) | Signature of Attorney    Date |
| | Jeff Prostok <br> Name of Attorney Firm (If any) |
| Knighthead Master Fund, L.P.    11/17/10 <br> Name of Petitioner      Date Signed <br> Name & Mailing    Knighthead Master Fund, L.P, c/o <br> Address of Individual   Knighthead Capital Management, LLC <br>     623 Fifth Avenue, 29th Floor <br>     New York, NY 10022 <br> Signing in Representative   Knighthead Capital Management, L.L.C., <br> Capacity     Investment Manager <br>     Ara Cohen, Managing Member | Jeff Prostok     John K. Cunningham <br> Forshey Prostok LLP    White & Case LLP <br> 777 Main Street, Suite 1290   200 S. Biscayne Blvd., Suite 4900 <br> Fort Worth, TX 76102    Miami, FL 33131 <br><br> Address _____ <br><br> Telephone No. (817) 877-8855 |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and <br><br> x _____ <br> Signature of Petitioner or Representative (State Title) | x _____ <br> Signature of Attorney     Date <br><br> Name of Attorney Firm (If any) |
| Name of Petitioner     Date Signed <br> Name & Mailing <br> Address of Individual <br> Signing in Representative <br> Capacity | Address _____ <br><br> Telephone No. _____ |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and <br><br> x _____ <br> Signature of Petitioner or Representative (State Title) | x _____ <br> Signature of Attorney     Date <br><br> Name of Attorney Firm (If any) |
| Name of Petitioner     Date Signed <br> Name & Mailing <br> Address of Individual <br> Signing in Representative <br> Capacity | Address _____ <br><br> Telephone No. _____ |

## PETITIONING CREDITORS

| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
|---|---|---|
| Knighthead Master Fund, L.P. <br> c/o Knighthead Capital Management, LLC <br> 623 Fifth Avenue, 29th Floor <br> New York, NY 10022 | Beneficial interests in 9-1/8% Senior Notes and 8-5/8% Senior Notes | $42,047,250.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| | | |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| | | |

| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | Total Amount of Petitioners' Claims |
|---|---|

_X_ continuation sheets attached

Name of Debtor    Vitro Asset Corp.

Case No.

## TRANSFER OF CLAIM

☒ Check this box if there has been a transfer of any claim against the debtor or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a).

## REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

| | |
|---|---|
| Petitioner(s) declare under penalty of perjury that the foregoing is true and | x /s/ Jeff Prostok    11/17/10 <br> Signature of Attorney    Date |
| x _____ <br> Signature of Petitioner or Representative (State Title) | |
| | Jeff Prostok <br> Name of Attorney Firm (If any) |
| Brookville Horizons Fund, L.P.    11/17/10 <br> Name of Petitioner      Date Signed | Jeff Prostok      John K. Cunningham <br> Forshey Prostok LLP    White & Case LLP |
| Name & Mailing    Brookville Horizons Fund, L.P. <br> Address of Individual    2 Greenwich Plaza <br> Greenwich, CT 06830 | 777 Main Street, Suite 1290    200 S. Biscayne Blvd., Suite 4900 <br> Fort Worth, TX 76102    Miami, FL 33131 |
| Signing in Representative    Brookville Horizons Fund GP, LLC <br> Capacity      T.A. McKinney, Authorized Signatory | Address _____ |
| | Telephone No. (817) 877-8855 |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and | x _____ <br> Signature of Attorney    Date |
| x _____ <br> Signature of Petitioner or Representative (State Title) | |
| | Name of Attorney Firm (If any) |
| Name of Petitioner    Date Signed <br> Name & Mailing <br> Address of Individual <br> Signing in Representative <br> Capacity | Address _____ <br><br> Telephone No. |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and | x _____ <br> Signature of Attorney    Date |
| x _____ <br> Signature of Petitioner or Representative (State Title) | |
| | Name of Attorney Firm (If any) |
| Name of Petitioner    Date Signed <br> Name & Mailing <br> Address of Individual <br> Signing in Representative <br> Capacity | Address _____ <br><br> Telephone No. |

## PETITIONING CREDITORS

| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
|---|---|---|
| Brookville Horizons Fund, L.P. <br> 2 Greenwich Plaza <br> Greenwich, CT 06830 | Beneficial interests in 9-1/8% Senior Notes | $2,000,000.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

___X___ continuation sheets attached

## TRANSFER OF CLAIM

☒ Check this box if there has been a transfer of any claim against the debtor or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a).

## REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

| | |
|---|---|
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _____<br>Signature of Petitioner or Representative (State Title)<br><br>Davidson Kempner Distressed Opportunities Fund LP   11/17/10<br>Name of Petitioner       Date Signed<br><br>Name & Mailing    Davidson Kempner Distressed<br>                Opportunities Fund LP<br>Address of Individual   65 East 55th Street, 19th Floor<br>                New York, NY 10022<br>Signing in Representative   Anthony A. Yoseloff<br>Capacity           Managing Member | x /s/ Jeff Prostok     11/17/10<br>Signature of Attorney    Date<br><br>Jeff Prostok<br>Name of Attorney Firm (If any)<br>Jeff Prostok        John K. Cunningham<br>Forshey Prostok LLP    White & Case LLP<br>777 Main Street, Suite 1290   200 S. Biscayne Blvd., Suite 4900<br>Fort Worth, TX 76102     Miami, FL 33131<br><br>Address<br><br>Telephone No. (817) 877-8855 |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _____<br>Signature of Petitioner or Representative (State Title)<br><br>Name of Petitioner       Date Signed<br>Name & Mailing<br>Address of Individual<br>Signing in Representative<br>Capacity | x _____<br>Signature of Attorney    Date<br><br><br>Name of Attorney Firm (If any)<br><br>Address<br><br>Telephone No. |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _____<br>Signature of Petitioner or Representative (State Title)<br><br>Name of Petitioner       Date Signed<br>Name & Mailing<br>Address of Individual<br>Signing in Representative<br>Capacity | x _____<br>Signature of Attorney    Date<br><br><br>Name of Attorney Firm (If any)<br><br>Address<br><br>Telephone No. |

## PETITIONING CREDITORS

| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
|---|---|---|
| Davidson Kempner Distressed Opportunities Fund LP<br>65 East 55th Street, 19th Floor<br>New York, NY 10022 | Beneficial interests in 9-1/8% Senior Notes, 11-¾% Senior Notes and 8-5/8% Senior Notes | $11,637,000.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

__x__ continuation sheets attached

Name of Debtor    Vitro Asset Corp.
Case No.

## TRANSFER OF CLAIM

☒  Check this box if there has been a transfer of any claim against the debtor or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a).

## REQUEST FOR RELIEF

Petitioner(s) request that an order for relief be entered against the debtor under the chapter of title 11, United States Code, specified in this petition. If any petitioner is a foreign representative appointed in a foreign proceeding, a certified copy of the order of the court granting recognition is attached.

| | |
|---|---|
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _Lawrence H. Kaplan_<br>Lawrence H. Kaplan, Vice President & Secretary<br>Signature of Petitioner or Representative (State Title)<br><br>_Lord Abbett Bond-Debenture Fund, Inc._     11/17/10<br>Name of Petitioner            Date Signed<br><br>Name & Mailing        Lord Abbett Bond-Debenture Fund, Inc.<br>Address of Individual    90 Hudson Street Jersey City, NJ 07302<br>Signing in Representative  Attn: John K. Forst, Esq.<br>Capacity | x /s/ Jeff Prostok _____   11/17/10<br>Signature of Attorney     Date<br><br>_Jeff Prostok_<br>Name of Attorney Firm (If any)<br>Jeff Prostok          John K. Cunningham<br>Forshey Prostok LLP      White & Case LLP<br>777 Main Street, Suite 1290   200 S. Biscayne Blvd., Suite 4900<br>Fort Worth, TX  76102     Miami, FL  33131<br><br>Address<br><br>Telephone No.  (817) 877-8855 |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _____<br>Signature of Petitioner or Representative (State Title)<br><br>Name of Petitioner        Date Signed<br>Name & Mailing<br>Address of Individual<br>Signing in Representative<br>Capacity | x _____<br>Signature of Attorney      Date<br><br>Name of Attorney Firm (If any)<br><br>Address<br>Telephone No. |
| Petitioner(s) declare under penalty of perjury that the foregoing is true and<br><br>x _____<br>Signature of Petitioner or Representative (State Title)<br><br>Name of Petitioner        Date Signed<br>Name & Mailing<br>Address of Individual<br>Signing in Representative<br>Capacity | x _____<br>Signature of Attorney      Date<br><br>Name of Attorney Firm (If any)<br><br>Address<br>Telephone No. |

## PETITIONING CREDITORS

| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
|---|---|---|
| Lord Abbett Bond-Debenture Fund, Inc.<br>90 Hudson Street  Jersey City, NJ 07302<br>Attn: John K. Forst, Esq. | Beneficial interests in 9-1/8% Senior Notes | $20,000,000.00 |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Name and Address of Petitioner | Nature of Claim | Amount of Claim |
| Note: If there are more than three petitioners, attach additional sheets with the statement under penalty of perjury, each petitioner's signature under the statement and the name of attorney and petitioning creditor information in the format above. | | Total Amount of Petitioners' Claims |

_____ continuation sheets attached

## Annex A

Bankruptcy Cases Concurrently Filed Against
Any Partner or Affiliate of the Debtor

Involuntary petitions under chapter 11 of title 11 of the United States Code are being filed in this Court against the following affiliated entities listed below:

Amsilco Holdings, Inc.

B.B.O. Holdings, Inc.

Binswanger Glass Company

Crisa Corporation

Super Sky International, Inc.

Super Sky Products, Inc.

Troper Services, Inc.

V-MX Holdings, LLC

Vitro America, LLC

Vitro Asset Corp.

Vitro Chemicals, Fibers & Mining, LLC

Vitro Packaging, LLC

VVP Auto Glass, Inc.

VVP Finance Corporation

VVP Holdings, LLC

## CORPORATE OWNERSHIP STATEMENT

Rule 1007(a)(1) and Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") incorporate the disclosure required under Bankruptcy Rule 7007.1, which

provides that any corporation that is party to an adversary proceeding shall file a statement that

identifies any corporation that directly or indirectly owns 10% or more of any class of the

corporation's equity interests, or otherwise states that there are no entities to report. Knighthead

Master Fund, L.P. (the "Petitioning Creditor") hereby submits that it is a limited partnership, and

therefore is not subject to the disclosure requirements contained in Bankruptcy Rule 7007.1.

In accordance with 28 U.S.C. § 1746, I, the undersigned authorized officer of the

Petitioning Creditor, hereby declare under penalty of perjury under the laws of the United States

of America that I have reviewed the foregoing and that it is true and correct to the best of my

information and belief.

Date: November 17, 2010

KNIGHTHEAD MASTER FUND, L.P.

By: Knighthead Capital Management, L.L.C., its
Investment Manager

Name: Ara Cohen
Title: Managing Member

**Rule 1003 Statement Regarding Claims of**
**Knighthead Master Fund, L.P.**

The undersigned hereby state that the claims totaling $42,047,250 held by Knighthead

Master Fund, L.P. (the "Petitioning Creditor") against the company named in the attached

involuntary petition (the "Debtor") were acquired on various dates in a range of consideration

from 44.00% to 50.13% as reflected in the attached documents. Such claims are based on the

Petitioning Creditor's holdings of $42,047,250 outstanding amount of Series of Notes Held:

$21,844,000 $9\frac{1}{8}$% Senior Notes due 2017 and $20,203,250 $8\frac{5}{8}$% due 2012. Such claims are

based upon principal only and are exclusive of interest, fees, costs and other charges. The

Petitioning Creditor acquired its claims on the open market for investment purposes and not for

the purpose of commencing a bankruptcy case against the Debtor.

Date: November 17, 2010

KNIGHTHEAD MASTER FUND, L.P.

By: Knighthead Capital Management, L.L.C., its
investment manager

By _____
Ara Cohen
Managing Member

**Vitro 9 1/8 02/01/17**

| Trade date | SettleDt | Account | B/S | Qty | Face value | Price | Purchased from |
|---|---|---|---|---|---|---|---|
| 03/31/10 | 04/06/10 | KHMF | B | 2,850.00 | 2,850,000.00 | 45.00 | BCAPUK |
| 03/05/10 | 03/10/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 48.50 | JPCHUS |
| 03/05/10 | 03/10/10 | KHMF | B | 3,325.00 | 3,325,000.00 | 48.13 | BCAPUK |
| 01/20/10 | 01/25/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 50.13 | PRINCE |
| 01/19/10 | 01/22/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 50.00 | BCAPUK |
| 01/19/10 | 01/22/10 | KHMF | B | 2,850.00 | 2,850,000.00 | 49.00 | BCAPUK |
| 01/12/10 | 01/15/10 | KHMF | B | 950.00 | 950,000.00 | 49.00 | BCAPUK |
| 01/12/10 | 01/15/10 | KHMF | B | 950.00 | 950,000.00 | 49.00 | JPCHUS |
| 01/11/10 | 01/14/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 47.25 | JPCHUS |
| 01/08/10 | 01/13/10 | KHMF | B | 950.00 | 950,000.00 | 45.25 | BCAPUK |
| 01/07/10 | 01/12/10 | KHMF | B | 2,369.00 | 2,369,000.00 | 44.00 | BCAPUK |
| | | | | 21,844.00 | 21,844,000.00 | | |

**Vitro 8 5/8 02/01/12**

| Trade date | SettleDt | Account | B/S | Qty | Face value | Price | Purchased from |
|---|---|---|---|---|---|---|---|
| 07/14/10 | 07/19/10 | KHMF | B | 1,906.00 | 1,906,000.00 | 46.75 | BCAPUK |
| 03/05/10 | 03/10/10 | KHMF | B | 2,850.00 | 2,850,000.00 | 48.5 | JPCHUS |
| 03/05/10 | 03/10/10 | KHMF | B | 2,850.00 | 2,850,000.00 | 48.25 | BCAPUK |
| 03/05/10 | 03/10/10 | KHMF | B | 1,425.00 | 1,425,000.00 | 48.125 | BCAPUK |
| 03/02/10 | 03/05/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 46.25 | JPCHUS |
| 01/20/10 | 01/25/10 | KHMF | B | 1,268.25 | 1,268,250.00 | 50 | PRINCE |
| 01/13/10 | 01/19/10 | KHMF | B | 1,615.00 | 1,615,000.00 | 49 | JPCHUS |
| 01/12/10 | 01/15/10 | KHMF | B | 950.00 | 950,000.00 | 49 | JPCHUS |
| 01/12/10 | 01/15/10 | KHMF | B | 950.00 | 950,000.00 | 49 | BCAPUK |
| 01/11/10 | 01/14/10 | KHMF | B | 1,900.00 | 1,900,000.00 | 47.25 | JPCHUS |
| 01/07/10 | 01/12/10 | KHMF | B | 220.00 | 220,000.00 | 44 | MITRUS |
| 01/07/10 | 01/12/10 | KHMF | B | 2,369.00 | 2,369,000.00 | 44 | BCAPUK |
| | | | | 20,203.25 | 20,203,250.00 | | |

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

PERIOD: Jan 07, 2010
RUN DATE: Jan 08, 2010 12:51 AM

FUND: KNIGHTHEAD MASTER FUND LP

PAGE 4 OF 4
BASE CURRENCY: USD

Trade Date Activity

Goldman
Sachs

GLOBAL
SECURITIES
SERVICES

510

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided to you is used in your management of the reference portfolio. This material contains certain information produced by you and other parties, including pricing services, which may not be complete, accurate or correct and Goldman Sachs has no liability with respect thereto. The material and the material information are subject to change without notice and charges. The material and the material information may relied upon under your discretion or control any other management or other investment business, or for your own business, or for your own investments and purposes and should not be relied upon as a representation made to you. This material is intended solely for use by a representative of the recipient. This material is intended only as a general and should not be relied upon, to constitute, with your professional advisors, to ascertain the suitability for each participant and to consider any investments and appropriately every such circumstances, including positions are held at Goldman Sachs or its affiliated have not been verified by and resource Regulatory reporting purposes, or for your decisions and purposes and should be relied upon as a representation or based on any judgement or information.

DETAIL • TRADE ACTIVITY

| | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # • BROKER/ | REFERENCE # DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|---|
| **U S DOLLAR • TRADE ACTIVITY** CONTINUED | | | | | | | | | | |
| .....rU S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M-W-50.006P 928051RAC1 | 01/07/10 | 01/12/10 | BUY | 06 | 220,000.00 | 44.0000 | 0.00 | (96,800.00) | | |
| VITRO S.A. DE C.V. 6.625% 02/01/2012 USD SER B SR LIEN M-W-50.006P 928051RAC1 | 01/07/10 | 01/12/10 | BUY | 06 | 2,369,000.00 | 44.0000 | 0.00 | (1,042,360.00 | | |

**U S DOLLAR • NON-TRADE ACTIVITY**

**U S DOLLAR CLOSING BALANCE •**

**UK POUND STERLING OPENING BALANCE •**

**UK POUND STERLING • TRADE ACTIVITY**

**UK POUND STERLING CLOSING BALANCE •**

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MANAGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

Trade Date Activity

GLOBAL
SECURITIES
SERVICES

Goldman Sachs

510

PERIOD: Jan 08,2010
RUN DATE: Jan 09,2010 05:04 AM

PAGE 3 OF 4
BASE CURRENCY: USD

This material is for your private information, and we and our affiliates (herein) is not soliciting any action based upon it. This material is provided to you to assist in your management of the reference portfolio. This material contains information provided by us and third parties, including pricing services, which may not be complete, accurate or current and Goldman Sachs has no obligation to update you as to any such changes. The material may not be relied upon for the purposes of entering into any transaction and any prices indicated herein are indicative only. The material and any and all information herein, including any implied assumptions and methodologies (the information) are the property of Goldman Sachs, provided on a confidential basis, and may not be reproduced, redistributed or transmitted, in whole or in part, without the prior written consent of Goldman Sachs. The information is based on certain assumptions, models and other factors, which are inherently subject to significant uncertainties and contingencies. This information should not be relied upon for the purposes of pursuing any trading, investment or hedging strategies. The material and information herein are not intended to predict actual results and no assurances are given with respect thereto. Certain transactions give rise to substantial risk and are not suitable for all investors. Although this material is based upon information that we consider reliable, we do not represent that it is accurate or complete, and it should not be relied upon as such. Any opinions expressed herein reflect our judgment at this date and are subject to change. We, our affiliates, officers, directors, and employees, including persons involved in the preparation or issuance of this material, may from time to time have "long" or "short" positions in, act as principal in, and buy or sell the securities or derivatives (including options) thereof, and receive compensation for these activities in instruments discussed herein. The information contained herein is not intended to provide professional, investment or any other type of advice or recommendation and does not take into account the particular investment objectives, financial situation or needs of individual recipients. Before acting on any advice or recommendation in this material, you should consider whether it is suitable for your particular circumstances and, if appropriate, seek professional advice, including tax advice. Certain transactions, including those involving futures, options and high yield securities, give rise to substantial risk and are not suitable for all investors. For your protection please verify any transaction with your Goldman Sachs contact person.

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (3)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER/ DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

**NEW MEXICAN PESO OPENING BALANCE**

**NEW MEXICAN PESO • TRADE ACTIVITY**

**NEW MEXICAN PESO CLOSING BALANCE •**

**U S DOLLAR OPENING BALANCE**

**U S DOLLAR • TRADE ACTIVITY**

| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M-W-60.006P | 01/08/10 | 07/13/10 | BUY | 06 | 950,000.00 | 45.2500 | 0.00 | (429,875.00) | .... |
| 92851PAG9 | | | | | | | | | |

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.



ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

Trade Date Activity

PERIOD: Jan 11,2010
RUN DATE: Jan 12,2010 12:54 AM

PAGE 3 OF 5
BASE CURRENCY: USD

GLOBAL
SECURITIES
SERVICES

510

Goldman
Sachs

This material is prepared by your sales/advisor representative, your Goldman Sachs is not soliciting or called herein upon it. This material is prepared by your to be assisted by your management of the advisory portfolio. This material contains information provided by law and third parties, including equity dealers, which may not be complete, accurate or correct and Goldman Sachs has no obligation to verify any ...

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST OR COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER / DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

**JAPANESE YEN OPENING BALANCE**

JAPANESE YEN • NON-TRADE ACTIVITY

**NEW MEXICAN PESO CLOSING BALANCE**

**U S DOLLAR OPENING BALANCE**

U S DOLLAR • TRADE ACTIVITY

| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD Sed b SR LIEN H-H-500.00BP | | | | 06 | 2,369,000.00 | 44.0000 | 0.00 | (1,042,360.00) | |
| 92851R408 01/07/10 01/12/10 BUY | | | | | | | | | |

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

Trade Date Activity

PERIOD: Jan 11,2010
RUN DATE: Jan 12,2010 12:54 AM

PAGE 4 OF 5
BASE CURRENCY: USD

GLOBAL
SECURITIES
SERVICES

510

Goldman
Sachs

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided to you to assist in your management of the relevant portfolio. This material contains information provided by you and third parties, including pricing portfolio, which may not be complete, accurate or current and Goldman Sachs has not verified its accuracy or currentness. The actual information reflected in this material supersedes all other statements or communications regarding the same subject matter.

## DETAIL

| | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # / BROKER / DESCRIPTION | REFERENCE # |
|---|---|---|---|---|---|---|---|---|---|---|

**U S DOLLAR  •  TRADE ACTIVITY**

VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M-W-H-50.00BP
928551PAC1    01/11/10    01/14/10    BUY    06    1,900,000.00    47.2500    0.00    (897,750.00)

VITRO S.A. DE C.V. 8.125% 02/01/2017 USD SER b SR LIEN M-W-H-50.00BP
928551HAD8    01/11/10    01/14/10    BUY    06    1,900,000.00    47.2500    0.00    (897,750.00)

**U S DOLLAR  •  NON-TRADE ACTIVITY**

**U S DOLLAR CLOSING BALANCE**  •

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

Trade Date Activity

PERIOD: Jan 12, 2010
RUN DATE: Jan 13, 2010 01:27 AM

PAGE 3 OF 4
BASE CURRENCY: USD

510

GLOBAL
SECURITIES
SERVICES

Goldman
Sachs

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided to you to assist in your management of the reference portfolio. This material contains information provided by you and Client parties, including pricing services, including pricing services...

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST BY/ COMMISSION | NET AMOUNT | ACCOUNT # BROKER / REFERENCE DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M+H+50.000BP 9285150A61 | 01/12/10 | 01/15/10 | BUY | 06 | 950,000.00 | 49.0000 | 0.00 | (465,500.0) | |
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M+H+50.000BP 9285150A61 | 01/12/10 | 01/15/10 | BUY | 06 | 950,000.00 | 49.0000 | 0.00 | (465,500.00) | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M+H+50.000BP 928515AD39 | 01/12/10 | 01/15/10 | BUY | 06 | 950,000.00 | 49.0000 | 0.00 | (465,500.00) | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M+H+50.000BP 928515AD39 | 01/12/10 | 01/15/10 | BUY | 05 | 950,000.00 | 49.0000 | 0.00 | (465,500.00) | |

U S DOLLAR CLOSING BALANCE                                          113,190,650.14

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MANAGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

**Trade Date Activity**

GLOBAL
SECURITIES
SERVICES

PERIOD: Mar 05,2010
RUN DATE: Mar 06,2010 02:05 AM

PAGE 3 OF 4
BASE CURRENCY: USD

S10

The material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided for your information, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors. The material is based upon information that we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such. Opinions expressed are our present opinions only. The material is based upon information that we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such.

**DETAIL**

| | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (0)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER / DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

NO ACTIVITY

### NEW MEXICAN PESO CLOSING BALANCE

### U S DOLLAR OPENING BALANCE

### U S DOLLAR • TRADE ACTIVITY

| | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (0)/ COMMISSION | NET AMOUNT | |
|---|---|---|---|---|---|---|---|---|---|
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER'B SR LIEN M+W+50.00BP 92851RAC1 | 03/05/10 | 03/10/10 | BUY | 06 | 2,850,000.00 | 48.5000 | 0.00 | (1,382,250.00) | |
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M+W+50.00BP 92851RAC1 | 03/05/10 | 03/10/10 | BUY | 06 | 2,850,000.00 | 48.2500 | 0.00 | (1,375,125.00) | |
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M+W+50.00BP 92851RAC1 | 03/05/10 | 03/10/10 | BUY | 06 | 1,425,000.00 | 48.1250 | 0.00 | (685,781.25) | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M+W+50.00BP 92851RAD9 | 03/05/10 | 03/10/10 | BUY | 06 | 1,900,000.00 | 48.5000 | 0.00 | (921,500.00) | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M+W+50.00BP 92851RAD9 | 03/05/10 | 03/10/10 | BUY | 06 | 3,325,000.00 | 48.1250 | 0.00 | (1,600,156.25) | |

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.



ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

PERIOD: Jan 13,2010
RUN DATE: Jan 14,2010 01:54 AM

FUND: KNIGHTHEAD MASTER FUND LP

PAGE 4 OF 4
BASE CURRENCY: USD

GLOBAL
SECURITIES
SERVICES

510

Goldman
Sachs

Trade Date Activity

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided for you to consult to your management at the reference portfolio. This material contains information provided by you and third parties, including pricing services, broker and Goldman Sachs to use in determining fair values for certain instruments. While every step is used to obtain and utilize the information provided, Goldman Sachs has no obligation to update or change this pricing data in any such manner. This material and any such pricing data is intended only as a convenient and indication. For the stated price for the maintenance of your books and records or for tax, accounting, financial or other business value of Goldman Sachs. The material contains information pertaining to securities, and cannot be relied on as a representation that the transaction can be effected at this price. The reliance is intended only as a convenient and indication. For the stated price for the maintenance of your books and records or for tax, accounting, financial or other business value of Goldman Sachs. The material contains information pertaining to securities, and cannot be relied on as a representation that the transaction can be effected at this price. The reliance is intended only for the maintenance of your books and records or for the securities or of your books and records. Securities positions are stated at indicative values for which Goldman Sachs or its affiliates have no obligation or regulatory reporting purposes, or for any decision to purchase without first obtaining appropriate professional advice. Your professional advisors, your investment or otherwise, are appropriate given your own circumstances. Securities positions are stated at indicative values for which Goldman Sachs or its affiliates have no liability for their accuracy. Any questions regarding the information should be routed properly with your Goldman Sachs contact persons.

**DETAIL**

| TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER / DESCRIPTION |
|---|---|---|---|---|---|---|---|---|

**U S DOLLAR • TRADE ACTIVITY**
CONTINUED

VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN 144A/600008P
9280TRACH          01/13/10   01/19/10   BUY   06   1,615,000.00   49.0000   0.00   (791,350.00)

**U S DOLLAR • NON-TRADE ACTIVITY**

**U S DOLLAR CLOSING BALANCE  •**

**UK POUND STERLING OPENING BALANCE**

NO ACTIVITY

**UK POUND STERLING CLOSING BALANCE  •**

KNIGHTHEAD MASTER FUND LP is comprised of account number(s) 0022253631, 0022254456, 002337936, 002416350, 023529821, 029344077

This material is not an official Goldman Sachs statement; if there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

# Trade Date Activity

GLOBAL
SECURITIES
SERVICES

Goldman Sachs

PERIOD: Jan 19,2010
FUND DATE: Jan 20,2010 12:14 AM

PAGE 3 OF 5
BASE CURRENCY: USD

510

This material is for your please information, and Goldman Sachs is not soliciting any action based upon it. This material is provided to you to enable to your management of the reference portfolio. This material contains information provided by you and that parties, including pricing services, which may not be complete, accurate or current and Goldman Sachs has no liability for such information. None of the information constitutes a recommendation by us, or an offer or solicitation, or the basis for any contract for the purchase or sale of any security or other financial instrument. The material is not intended as an offer or solicitation for the purchase or sale of any financial instrument. [illegible]

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (0)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER / DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|
| **NEW MEXICAN PESO CLOSING BALANCE** • | | | | | | | | | |
| **U S DOLLAR OPENING BALANCE** | | | | | | | | | |
| [illegible] **TRADE ACTIVITY** | | | | | | | | | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN 144H+50.00RP 9288TRAD9 | 07/19/10 | 01/22/10 | BUY | 06 | 2,850,000.00 | 49.0000 | 0.00 | (1,396,500.00) | |
| VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN 144H+50.00EP 9288TRAD9 | 07/19/10 | 01/22/10 | BUY | 06 | 1,900,000.00 | 50.0000 | 0.00 | (950,000.00) | |
| **U S DOLLAR** • **NON-TRADE ACTIVITY** | | | | 06 | | | | | |

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

PERIOD: Jan 20,2010
RUN DATE: Jan 21,2010 01:51 AM

PAGE 8 OF 3
BASE CURRENCY: USD

Trade Date Activity

GLOBAL
SECURITIES
SERVICES

510

Goldman
Sachs

This material is for your private information, and Goldman Sachs is not advising any entity based upon it. The material is provided to you to assist in your management of the reference portfolio. This material contains information provided by you and third parties, including pricing services, which may not be complete, accurate or current and Goldman Sachs has no liability with respect hereto. Values may be obtained from pricing services and/or Goldman Sachs has no obligation to update or correct any information. The material may not reflect actual or indicative current values of a more recent valuation. The actual day-to-day values reported here may differ materially from the values shown. The valuation indicators and the valuation methodology may be subject to change from time to time. The actual representations and the prices of the actual transactions that are transacted and settled hereunder may differ materially from the values shown. You should consult your own professional advisors, and should make an appropriate inquiry, as respects any indicative and/or the transactions of your trades and transfers or for tax, accounting, financial or legal/regulatory assistance, or in any information herein, without first consulting your own professional advisors. Accounting positions and level of statements should be relied upon by you for such reasons.

Any questions regarding the content of this report should be raised directly with your Goldman Sachs contact person.

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER / DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN M-WH-50.008P
928S1PAG1      01/20/10     01/25/10   BUY

VITRO S.A. DE C.V. 9.125% 02/01/2017 USD SER b SR LIEN M-WH-50.008P
928S1PAD9      01/20/10     01/25/10   BUY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | 06 | 1,268,250.00 | 50.0000 | 0.00 | (634,125.00) | |
| | | | 06 | 1,900,000.00 | 50.1250 | 0.00 | (952,375.00) | |

U S DOLLAR CLOSING BALANCE      •      ... ...

UK POUND STERLING OPENING BALANCE

NO ACTIVITY

UK POUND STERLING CLOSING BALANCE      •

KNIGHTHEAD MASTER FUND LP is comprised of account number(s) 002253631, 002254456, 002337996, 002416550, 023929821, 023944077

This material is not an official Goldman Sachs statement; if there is any discrepancy between this material and your official statement, the official statement should be relied upon.



ADVISOR: KNIGHTHEAD CAPITAL MANAGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

PERIOD: Mar 02, 2010
RUN DATE: Mar 03, 2010 12:21 AM

PAGE 3 of 4
BASE CURRENCY: USD

**Goldman Sachs**

GLOBAL
SECURITIES
SERVICES

510

# Trade Date Activity

This material is for your private information, and we and Goldman Sachs is not soliciting any action based upon it. This material is provided to you to assist in your management of the reference portfolio. This material contains information provided to you by one or more third parties, including pricing services, which may not be complete, accurate or current and Goldman Sachs has no liability for the accuracy or completeness of such information. The material and the valuation methodologies used are subject to change without notice and are subject to change at any time without notice. The material may be based upon information which we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such. Past performance is not indicative of future results. The material is intended for your professional and private use, and the information in it may be relevant only to us. This material or any portion thereof may not be reproduced, distributed or given in whole or in part to any other person without our prior written consent. Goldman Sachs reporting purposes, or for any disclosure purposes. Goldman Sachs should be relied upon only in connection with your professional advisors, and any determination of whether any agreements are appropriate given your circumstances. Prices or security position and not an official statement and have not been verified for that purpose or otherwise. Any questions regarding the content of this material should be asked promptly with your Goldman Sachs contact person.

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # BROKER/ DESCRIPTION | REFERENCE # |
|---|---|---|---|---|---|---|---|---|---|---|

**NEW MEXICAN PESO OPENING BALANCE**

NO ACTIVITY

**NEW MEXICAN PESO CLOSING BALANCE** •

**US DOLLAR OPENING BALANCE**

**US DOLLAR • TRADE ACTIVITY**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| VITRO S.A. DE C.V. 8.625% 02/01/2012 USD SER B SR LIEN 144A+60.00BP SSSS1RAC1 | 03/02/10 | 03/05/10 | BUY | 06 | 1,900,000.00 | 46.2500 | 0.00 | (878,750.00) | | |

**US DOLLAR • NON-TRADE ACTIVITY**

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.

ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

PERIOD: Mar 31, 2010
RUN DATE: Apr 01, 2010 12:57 AM

FUND: KNIGHTHEAD MASTER FUND LP

PAGE 3 OF 5
BASE CURRENCY: USD

# Trade Date Activity

Goldman Sachs
GLOBAL
SECURITIES
SERVICES
STO

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. This material is provided to you to assist in your management of the reference portfolio. This material contains information provided by you and third parties, including pricing services, which may not be complete, accurate or current and Goldman Sachs has not verified its accuracy or completeness. You should not rely on such information in making investment decisions. This material is based upon information that we consider reliable, but we do not represent that it is accurate or complete, and it should not be relied upon as such...

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # BROKER / DESCRIPTION | REFERENCE # |
|---|---|---|---|---|---|---|---|---|---|---|
| HONG KONG DOLLAR OPENING BALANCE | | | | | | | | | | |
| HONG KONG DOLLAR • NON-TRADE ACTIVITY | | | | | | | | | | |
| HONG KONG DOLLAR CLOSING BALANCE • | | | | | | | | | | |
| JAPANESE YEN OPENING BALANCE | | | | | | | | | | |
| JAPANESE YEN • NON-TRADE ACTIVITY | | | | | | | | | | |
| JAPANESE YEN CLOSING BALANCE • | | | | | | | | | | |
| NEW MEXICAN PESO OPENING BALANCE | | | | | | | | | | |
| NEW MEXICAN PESO • NON-TRADE ACTIVITY | | | | | | | | | | |
| NEW MEXICAN PESO CLOSING BALANCE • | | | | | | | | | | |
| U S DOLLAR OPENING BALANCE | | | | | | | | | | |
| U S DOLLAR • TRADE ACTIVITY | | | | | | | | | | |
| VITRO S.A. DE C.V. 8.125% 02/01/2017 USD 12410-3H U EN M H+50.00BP 92851RAC8 | 03/31/10 | 04/05/10 | BUY | 06 | 2,650,000.00 | 45.0000 | 0.00 | (1,229,500.00) | | |

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.



ADVISOR: KNIGHTHEAD CAPITAL MAN-
AGEMENT LLC

FUND: KNIGHTHEAD MASTER FUND LP

Trade Date Activity

PERIOD: Jul 14, 2010
RUN DATE: Jul 15, 2010 12:29 AM

PAGE 3 OF 4
BASE CURRENCY: USD

GLOBAL
SECURITIES
SERVICES

510

Goldman Sachs

This material is for your private information, and Goldman Sachs is not soliciting any action based upon it. The material is provided to you to assist in your management of the reference symbols. The material contains information provided by you and third parties, including pricing services, which may not be complete, accurate or correct and Goldman Sachs does not endorse or warrant the value or completeness of the material or any information contained therein. The material and the value of any position are subject to change without notice and Goldman Sachs is under no obligation to update you on any such change. This material may contain information you are not entitled to receive and which may be of a confidential nature. If you are not the intended recipient of this material or other business associate of Goldman Sachs. This material should not be relied on by you. You should consult your own advisors as to legal, tax, accounting, financial or regulatory reporting aspects, or the value of any positions or the suitability of any transaction for your purposes or otherwise, or whether any referenced transactions are appropriate given your professional advisors.

| DETAIL | TRADE DATE | SETTLE DATE | ACTIVITY | ACCOUNT TYPE | TRADE QUANTITY | TRADE PRICE | INTEREST (I)/ COMMISSION | NET AMOUNT | ACCOUNT # • REFERENCE # BROKER/ DESCRIPTION |
|---|---|---|---|---|---|---|---|---|---|

**NEW MEXICAN PESO OPENING BALANCE**

NO ACTIVITY

**NEW MEXICAN PESO CLOSING BALANCE** •

**U S DOLLAR OPENING BALANCE**

**U S DOLLAR** • **TRADE ACTIVITY**

VII HQ JSA LtH C.V. 8.625% 02/01/2012 USD SER B SR LIEN / M+HK+50.00BP
92861H4G7       07/14/10      07/19/10    BUY      06      1,906,000.00      46.7500      0.00      (891,055.00)

**U S DOLLAR CLOSING BALANCE** •

**UK POUND STERLING OPENING BALANCE**

This material is not an official Goldman Sachs statement. If there is any discrepancy between this material and your official statement, the official statement should be relied upon.



## CORPORATE OWNERSHIP STATEMENT

Rule 1007(a)(1) and Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") incorporate the disclosure required under Bankruptcy Rule 7007.1, which provides that any corporation that is party to an adversary proceeding shall file a statement that identifies any corporation that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or otherwise states that there are no entities to report. Brookville Horizons Fund, L.P. (the "Petitioning Creditor") hereby submits that it is a limited partnership, and therefore is not subject to the disclosure requirements contained in Bankruptcy Rule 7007.1.

In accordance with 28 U.S.C. § 1746, I, the undersigned authorized officer of the Petitioning Creditor, hereby declare under penalty of perjury under the laws of the United States of America that I have reviewed the foregoing and that it is true and correct to the best of my information and belief.

Date: November 17, 2010

BROOKVILLE HORIZONS FUND, L.P.

By: Brookville Horizons Fund GP, LLC

Name: T. A. McKinney
Title: Authorized Signatory

**Rule 1003 Statement Regarding Claims of**
**Brookville Horizons Fund, L.P.**

The undersigned hereby state that the claims totaling $2,000,000 held by Brookville

Horizons Fund, L.P. (the "Petitioning Creditor") against the company named in the attached

involuntary petition (the "Debtor") were acquired on July 29, 2010 for the approximate

consideration of $1,015,000 as reflected in the attached documents. Such claims are based on

the Petitioning Creditor's holdings of $9\frac{1}{8}$ % Senior Notes due 2017. Such claims are based upon

principal only and are exclusive of interest, fees, costs and other charges. The Petitioning

Creditor acquired its claims on the open market for investment purposes and not for the purpose

of commencing a bankruptcy case against the Debtor.

Date: November 17, 2010

Brookville Horizons Fund, L.P.

By _____

Name  T.A. McKinney

Title  Authorized Signatory

From: EILEEN MCLOUGHLIN, JPMORGAN SECURITIES [mailto:em012103@bloomberg.net]
Sent: Thursday, July 29, 2010 4:50 PM
To: #DerivOps
Subject: ID : 92851RAD9 *Trade Ticket* As of Date: 7/29/2010

```
ID : 92851RAD9    *Trade Ticket* As of Date: 7/29/2010
TRDR/SLS   : CHRISTOPHER BOEGE          Settlement : 8/3/2010
SELLS      : 2M (M)                      ISSUER:VITRO SAB DE CV
Security   : VITROA 9 ¼ 02/01/17
   Price   : 50.75         Yield:22.789252   Yield to: 2/1/2017   at 100.00


Notes :JPM SELL - BROOKVILLE A/C GS - THANKS

                                         {92851RAD9    CORP DES
<GO>}
Principal           USD        1,015,000.00
Accrued          (  0 days)            0.00
Transaction Costs                      0.00
Total               USD        1,015,000.00
```

** THIS TICKET GENERATED BY BLOOMBERG TOMS / POMS SYSTEM **
   To learn more about the BLOOMBERG Professional® service,
   http://www.bloomberg.com

## CORPORATE OWNERSHIP STATEMENT

Rule 1007(a)(1) and Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") incorporate the disclosure required under Bankruptcy Rule 7007.1, which provides that any corporation that is party to an adversary proceeding shall file a statement that identifies any corporation that directly or indirectly owns 10% or more of any class of the corporation's equity interests, or otherwise states that there are no entities to report. Davidson Kempner Distressed Opportunities Fund LP (the "Petitioning Creditor") hereby submits that it is a limited partnership, and therefore is not subject to the disclosure requirements contained in Bankruptcy Rule 7007.1.

In accordance with 28 U.S.C. § 1746, I, the undersigned authorized officer of the Petitioning Creditor, hereby declare under penalty of perjury under the laws of the United States of America that I have reviewed the foregoing and that it is true and correct to the best of my information and belief.

Date:  November 17, 2010

DAVIDSON KEMPNER DISTRESSED
OPPORTUNITIES FUND, LP

By: DK Group, LLC, its General Partner

Name: Anthony A. Yoseloff
Title:  Managing Member

**Rule 1003 Statement Regarding Claims of**
**Davidson Kempner Distressed Opportunities Fund LP**

The undersigned hereby states that the claims totaling $11,637,000.00 held by Davidson

Kempner Distressed Opportunities Fund LP (the "Petitioning Creditor") against the company

named in the attached involuntary petition (the "Debtor") were acquired on various dates from

June 23, 2010 to August 11, 2010 for the approximate consideration of $5,474,913.75 as

reflected in the attached documents. Such claims are based on the Petitioning Creditor's

holdings of $9^{1}/_{8}$ % Senior Notes due 2017, $11^{3}/_{4}$% Senior Notes due 2013, and $8^{5}/_{8}$% Senior Notes

due 2012. Such claims are based upon principal only and are exclusive of interest, fees, costs

and other charges. The Petitioning Creditor acquired its claims on the open market for

investment purposes and not for the purpose of commencing a bankruptcy case against the

Debtor.

Date:   November 17, 2010

                              DAVIDSON KEMPNER DISTRESSED
                              OPPORTUNITIES FUND, LP

                              By: DK Group, LLC, its General Partner

                              Name: Anthony A. Yoseloff
                              Title:   Managing Member

DAVIDSON KEMPNER DISTRESSED

113-60246-17

| SEDOL | CUSIP | QUANTITY | DESCRIPTION | PRICE PER SHARE/BOND | MARKET VALUE | ACCRUED COUPON/INTEREST DIVIDEND | NET VALUE |
|---|---|---|---|---|---|---|---|
| B1GLJHP1 | 92851FAD5 | 908,000.00000 | ****VITRO S A DE C V SR NT 11.7500    11/01/2013 | 49.2500 | 447,190.00 | 43,861.44 | 491,051.44 |
| * | 92851RAC1 | 227,000.00000 | ****VITRO S A B DE C V SR NT 8.6250    02/01/2012 | 49.2500 | 111,797.50 | 6,471.86 | 118,269.36 |
| * | 92851RAD9 | 2,983,000.00000 | ****VITRO S A B DE C V SR NT | 49.2500 | 1,469,127.50 | 43,854.24 | 1,512,981.74 |

## Daily Margin Position Summary Report
### As of 09/28/2010

| Sec No / Sec Des | SYMBOL | CUSIP / ISIN | Previous Position | Quantity Bought | Sold | Closing Position | Closing Price | Market Value | Cum | Profit / Loss Daily |
|---|---|---|---|---|---|---|---|---|---|---|
| | REG T | | $325,542 MAINTENANCE | | $325,542 | NET MV | | 325,542 NET PL | 11,660 | 1,652 |
| 589VXN7 ***VITRO S A B DE C V SR NT 02/01/17  9.1250 | | 92851RAD9 | (C) 6,859,000L | * | 6,859,000L | 49 1/4 | | 3,377,566 | 150,661 | 17,145 |

© 2010  J.P. Morgan Clearing Corp.  All rights reserved. This information is provided without warranties of any kind, either express or implied, including any implied warranties of accuracy, completeness, fitness for a particular purpose, or non-infringement. Only confirmations and statements constitute the legal and official record of your account and its activity.

| Sec No / Sec Des | SYMBOL | CUSIP / ISIN | Previous Position | Quantity Bought | Quantity Sold | Closing Position | Closing Price | Market Value | Profit / Loss Cum | Profit / Loss Daily |
|---|---|---|---|---|---|---|---|---|---|---|
| 59231042 | | 92851FAD5 | (C) | | | | | | | |
| ***VITRO S A DE C V SR RT | | | 661,000L | | • | 661,000L | 49  1/4 | 325,542 | 11,660 | 1,652 |
| 11/01/13 11.7500 | | | | | | | | | | |
| --- SETT. DATE POS --- | | | 661,000L | | | | | | | |

© 2010  J.P. Morgan Clearing Corp.  All rights reserved. This information is provided without warranties of any kind, either express or implied, including any implied warranties of accuracy, completeness, fitness for a particular purpose, or non-infringement. Only confirmations and statements constitute the legal and official record of your account and its activity.

Report ID: BSC565-A   Run Date/Time: 09/29/10  00:49:03

## CORPORATE OWNERSHIP STATEMENT

In accordance with Rule 1007(a)(1) and Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which incorporate the disclosure required under Rule 7007.1 of the Bankruptcy Rules, Lord Abbett Bond Debenture Fund (the "Petitioning Creditor") hereby states that the following corporations directly or indirectly own 10% or more of any class of the Petitioning Creditor's equity interests as of the date hereof:

Edward Jones & Co. (on behalf of various beneficial owners)

MLPF&S For the Sole Benefit of Its Customers

In accordance with 28 U.S.C. § 1746, I, the undersigned authorized officer of the Petitioning Creditor, hereby declare under penalty of perjury under the laws of the United States of America that I have reviewed the foregoing and that it is true and correct to the best of my information and belief, with reliance on appropriate corporate officers.

Date: **NOVEMBER 17** , 2010

LORD ABBETT BOND-DEBENTURE FUND, INC.

By _Lawrence H. Kaplan_
Name: Lawrence H. Kaplan
Title: Vice President & Secretary

## Rule 1003 Statement Regarding Claims of
## Lord Abbett Bond-Debenture Fund, Inc.

The undersigned hereby state that the claims totaling $20,000,000.00 held by Lord Abbett Bond Debenture Fund (the "Petitioning Creditor") against the company named in the attached involuntary petition (the "Debtor") were acquired on various dates from January 25, 2007 to November 6, 2007 for the approximate consideration of $20,294,881.25 as reflected in the attached documents. Such claims are based on the Petitioning Creditor's holdings of 9⅛% Senior Notes due 2017. Such claims are based upon principal only and are exclusive of interest, fees, costs and other charges. The Petitioning Creditor acquired its claims on the open market for investment purposes and not for the purpose of commencing a bankruptcy case against the Debtor.

Date: **NOVEMBER 17** , 2010

LORD ABBETT BOND-DEBENTURE FUND, INC.

By _Lawrence H. Kaplan_
Name: Lawrence H. Kaplan
Title:   Vice President & Secretary

TRANSACTION ADVICE

TRANS NO.: 4283193
VENDOR TRANS NO.: 10846020070518

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:              Lord Abbett Bond Debenture Fund, Inc.
Account No.:       FDB1
BROKER/DEALER: Lehman Brothers

Security ID:       92851RAB3            TRADE DATE:   05/18/2007
                                        SETTLEMENT DATE:    05/23/2007


SECURITY DESCRIPTION                    PURCHASE
                                        _____

Vitro S.A.                              UNITS:                      1,400,000.00
144A NCV 9.125% 02/01/2017              PRICE:                       105.375000
9 1/8 Due 2/1/2017 FA1                  PRINCIPAL                   1,475,250.00
Dated Code:   Normal                    ACCRUED INTEREST:              39,744.44
Dated Date:    02/01/2007               COMMISSION:                         0.00
                                        FEES                                0.00
                                        _____

                                        CASH: USD                   1,514,994.44

BK ACCT CURR:
FUNC. FX RATE: USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____        _____

Authorized Signature                   Authorized Signature


Date:      09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4271635
VENDOR TRANS NO.: 10393320070514

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:              Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER: Lehman Brothers

Security ID:       92851RAB3          TRADE DATE:    05/14/2007
                                      SETTLEMENT DATE:    05/17/2007


SECURITY DESCRIPTION              PURCHASE

Vitro S.A.                        UNITS:                    1,600,000.00
144A NCV 9.125% 02/01/2017        PRICE:                     104.550000
9 1/8 Due 2/1/2017 FA1            PRINCIPAL               1,672,800.00
Dated Code:   Normal              ACCRUED INTEREST:          42,988.89
Dated Date:   02/01/2007          COMMISSION:                     0.00
                                  FEES                            0.00

                                  CASH: USD               1,715,788.89

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____        _____

Authorized Signature                     Authorized Signature


Date:     09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4226333
VENDOR TRANS NO.: 9207620070425

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169

Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:                    Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER:  Barclay Investments

Security ID:        92851RAB3           TRADE DATE:    04/25/2007
                                        SETTLEMENT DATE:      04/30/2007

SECURITY DESCRIPTION                    PURCHASE

Vitro S.A.                              UNITS:                    925,000.00
144A NCV 9.125% 02/01/2017              PRICE:                    105.000000
9 1/8 Due 2/1/2017 FA1                  PRINCIPAL                 971,250.00
Dated Code:   Normal                    ACCRUED INTEREST:          20,867.10
Dated Date:    02/01/2007               COMMISSION:                     0.00
                                        FEES                            0.00

                                        CASH: USD                 992,117.10

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:

_____        _____

Authorized Signature                   Authorized Signature

Date:      09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4225704
VENDOR TRANS NO.: 9179720070424

DATE:     09/23/2010

To:    State Street Bank
        1200 Crown Colony Drive
        Quincy, MA 02169

Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:                    Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER: Credit Suisse Algo

Security ID:        92851RAB3            TRADE DATE:    04/24/2007
                                         SETTLEMENT DATE:     04/27/2007

SECURITY DESCRIPTION                     PURCHASE

Vitro S.A.                               UNITS:                     900,000.00
144A NCV 9.125% 02/01/2017               PRICE:                     104.750000
9 1/8 Due 2/1/2017 FA1                   PRINCIPAL                  942,750.00
Dated Code:   Normal                     ACCRUED INTEREST:           19,618.75
Dated Date:    02/01/2007                COMMISSION:                      0.00
                                         FEES                             0.00

                                         CASH: USD                  962,368.75

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:

_____          _____

Authorized Signature                     Authorized Signature

Date:     09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4205928
VENDOR TRANS NO.: 8872620070417

DATE:     09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:                 Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER: Morgan Stanley

Security ID:      92851RAB3          TRADE DATE:    04/17/2007
                                     SETTLEMENT DATE:     04/20/2007


SECURITY DESCRIPTION                 PURCHASE
_____

Vitro S.A.                           UNITS:                    1,375,000.00
144A NCV 9.125% 02/01/2017           PRICE:                     103.750000
9 1/8 Due 2/1/2017 FA1               PRINCIPAL                 1,426,562.50
Dated Code:   Normal                 ACCRUED INTEREST:            27,533.42
Dated Date:    02/01/2007            COMMISSION:                       0.00
                                     FEES                              0.00
                                                      _____

                                     CASH: USD                 1,454,095.92

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____      _____

Authorized Signature                 Authorized Signature


Date:     09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4163926
VENDOR TRANS NO.: 7623420070330

DATE: 09/23/2010

To:   State Street Bank
      1200 Crown Colony Drive
      Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:              Lord Abbett Bond Debenture Fund, Inc.
Account No.:     FDB1
BROKER/DEALER: Morgan Stanley

Security ID:       92851RAB3          TRADE DATE:   03/30/2007
                                      SETTLEMENT DATE:    04/04/2007

SECURITY DESCRIPTION                  PURCHASE

Vitro S.A.                            UNITS:                    1,475,000.00
144A NCV 9.125% 02/01/2017            PRICE:                      102.625000
9 1/8 Due 2/1/2017 FA1                PRINCIPAL                 1,513,718.75
Dated Code:   Normal                  ACCRUED INTEREST:            23,553.91
Dated Date:    02/01/2007             COMMISSION:                       0.00
                                      FEES                              0.00

                                      CASH: USD                 1,537,272.66

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____        _____

Authorized Signature               Authorized Signature


Date:      09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4159314
VENDOR TRANS NO.: 7475020070328

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:                    Lord Abbett Bond Debenture Fund, Inc.
Account No.:        FDB1
BROKER/DEALER: Credit Suisse Algo

Security ID:         92851RAB3           TRADE DATE:    03/28/2007
                                         SETTLEMENT DATE:    04/02/2007

SECURITY DESCRIPTION                     PURCHASE
_____                _____

Vitro S.A.                               UNITS:                  1,500,000.00
144A NCV 9.125% 02/01/2017               PRICE:                    102.500000
9 1/8 Due 2/1/2017 FA1                   PRINCIPAL               1,537,500.00
Dated Code:   Normal                     ACCRUED INTEREST:          23,192.71
Dated Date:    02/01/2007                COMMISSION:                     0.00
                                         FEES                            0.00
                                                                 _____

                                         CASH: USD               1,560,692.71

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____          _____

Authorized Signature                     Authorized Signature


Date:     09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4156184
VENDOR TRANS NO.: 7414220070326

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169

Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:                 Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER: UBS Securities Inc.

Security ID:      92851RAB3           TRADE DATE:   03/26/2007
                                      SETTLEMENT DATE:    03/29/2007

SECURITY DESCRIPTION                  PURCHASE

Vitro S.A.                            UNITS:                  2,000,000.00
144A NCV 9.125% 02/01/2017            PRICE:                    102.625000
9 1/8 Due 2/1/2017 FA1                PRINCIPAL               2,052,500.00
Dated Code:   Normal                  ACCRUED INTEREST:          29,402.78
Dated Date:    02/01/2007             COMMISSION:                     0.00
                                      FEES                            0.00

                                      CASH: USD               2,081,902.78

BK ACCT CURR:
FUNC. FX RATE: USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:

_____        _____

Authorized Signature                   Authorized Signature

Date:     09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4003261
VENDOR TRANS NO.: 3568520070125

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:               Lord Abbett Bond Debenture Fund, Inc.
Account No.:     FDB1
BROKER/DEALER: Morgan Stanley

Security ID:       92851RAB3           TRADE DATE:   01/25/2007
                                       SETTLEMENT DATE:    02/01/2007

SECURITY DESCRIPTION                   PURCHASE

Vitro S.A.                             UNITS:                6,325,000.00
144A NCV 9.125% 02/01/2017             PRICE:                  98.400000
9 1/8 Due 2/1/2017 FA1                 PRINCIPAL             6,223,800.00
Dated Code:   Normal                   ACCRUED INTEREST:             0.00
Dated Date:    02/01/2007              COMMISSION:                   0.00
                                       FEES                          0.00

                                       CASH: USD             6,223,800.00

BK ACCT CURR:
FUNC. FX RATE:  USD/USD   1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____        _____
Authorized Signature                   Authorized Signature


Date:      09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4648563
VENDOR TRANS NO.: 21508320071106

DATE:    09/23/2010

To:    State Street Bank
       1200 Crown Colony Drive
       Quincy, MA 02169


Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:              Lord Abbett Bond Debenture Fund, Inc.
Account No.:      FDB1
BROKER/DEALER: Barclay Investments

Security ID:          92851RAD9          TRADE DATE:   11/06/2007
                                         SETTLEMENT DATE:      11/09/2007

SECURITY DESCRIPTION                     PURCHASE

Vitro S.A.                               UNITS:                      1,500,000.00
NCV 9.125% 02/01/2017                    PRICE:                         98.750000
9 1/8 Due 2/1/2017 FA1                   PRINCIPAL                   1,481,250.00
Dated Code:   Normal                     ACCRUED INTEREST:              37,260.42
Dated Date:   08/01/2007                 COMMISSION:                         0.00
                                         FEES                                0.00

                                         CASH: USD                   1,518,510.42

BK ACCT CURR:
FUNC. FX RATE:  USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:


_____          _____

Authorized Signature                     Authorized Signature


Date:      09/23/2010

TRANSACTION ADVICE

TRANS NO.: 4633458
VENDOR TRANS NO.: 21197120071031

DATE:    09/23/2010

To:    State Street Bank
        1200 Crown Colony Drive
        Quincy, MA 02169

Attn: State Street Bank

In accordance with the terms of our existing custody agreement, you are
authorized to settle the transaction set forth below:

ACCOUNT:              Lord Abbett Bond Debenture Fund, Inc.
Account No.:     FDB1
BROKER/DEALER: Barclay Investments

Security ID:      92851RAD9                TRADE DATE:    10/31/2007
                                           SETTLEMENT DATE:    11/05/2007

SECURITY DESCRIPTION                       PURCHASE

Vitro S.A.                                 UNITS:                   1,000,000.00
NCV 9.125% 02/01/2017                      PRICE:                      99.750000
9 1/8 Due 2/1/2017 FA1                     PRINCIPAL                   997,500.00
Dated Code:   Normal                       ACCRUED INTEREST:            23,826.39
Dated Date:   08/01/2007                   COMMISSION:                       0.00
                                           FEES                              0.00

                                           CASH: USD                 1,021,326.39

BK ACCT CURR:
FUNC. FX RATE: USD/USD    1.00000000
SETTLEMENT METHOD: US - DTC
MANAGER: Chris Towle

SPECIAL INSTRUCTIONS:

_____          _____

Authorized Signature                     Authorized Signature

Date:      09/23/2010

## Exhibit K

Thomas E Lauria
State Bar No. 11998025
J. Christopher Shore (admission <u>pro</u> <u>hac</u> <u>vice</u>)
John K. Cunningham (admission <u>pro</u> <u>hac</u> <u>vice</u>)
Richard Kebrdle (admission <u>pro</u> <u>hac</u> <u>vice</u>)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
Telephone:  (212) 819-8200
Facsimile:   (212) 354-8113

Jeff P. Prostok
State Bar No. 16352500
Lynda L. Lankford
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Ft. Worth, TX  76102
Telephone:  (817) 877-8855
Facsimile:  (817) 877-4151

ATTORNEYS FOR THE PETITIONING CREDITORS AND
THE AD HOC GROUP OF VITRO NOTEHOLDERS

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case (Involuntary) |
| | ) | |
| VITRO ASSET CORP., <u>et al.</u>, | ) | Case No. 10-47470-rfn-11 |
| | ) | **Jointly Administered** |
| | ) | |
| Debtors. | ) | |
| | ) | |

## VERIFIED STATEMENT OF WHITE & CASE LLP REGARDING ITS
## <u>REPRESENTATION OF THE AD HOC GROUP OF VITRO NOTEHOLDERS</u>

TO THE HONORABLE RUSSELL F. NELMS, UNITED STATES BANKRUPTCY JUDGE:

White & Case LLP ("White & Case") represents the individual creditors and

parties in interest identified below in the above-captioned chapter 11 cases (the "Chapter 11

Cases") of Vitro Asset Corp. and certain of its affiliates (collectively the "Debtors") and states as

follows:

1.      White & Case is an international law firm that maintains its principal

office at 1155 Avenue of the Americas, New York, New York 10036, and numerous additional

offices throughout the United States and worldwide.

2.     White & Case serves as counsel to members of an informal group of holders, or advisors or affiliates of advisors to holders, of senior notes (the "Vitro Notes") issued by Vitro S.A.B. de C.V. and guaranteed by each of the Debtors, and such group is referred to as the Ad Hoc Group of Vitro Noteholders (the "Ad Hoc Noteholder Group"). The names and addresses of each of the Ad Hoc Noteholder Group members are set forth on Exhibit A attached hereto.

3.     White & Case has been advised by the Ad Hoc Noteholder Group that they or their affiliates collectively are the advisor to or beneficial owner of, or the holder or manager of, various accounts with investment authority, contractual authority or voting authority for approximately $672,901,000 principal amount of the Vitro Notes as of the date hereof.

4.     Although the members of the Ad Hoc Noteholder Group have hired White & Case to represent their interests, each of the Ad Hoc Noteholder Group members makes its own decisions as to how it wishes to proceed and does not speak for, or on behalf of, any other creditor, including the other Ad Hoc Noteholder Group members in their individual capacities.

5.     White & Case also represents Knighthead Master Fund, L.P., Brookville Horizons Fund, L.P., Davidson Kempner Distressed Opportunities Fund L.P., and Lord Abbett Bond-Debenture Fund, Inc., who are members of the Ad Hoc Noteholder Group in connection with these Chapter 11 Cases.

Dated:  Miami, Florida
        November 29, 2010

By  /s/ John K. Cunningham_____
    John K. Cunningham

Thomas E Lauria
State Bar No. 11998025
J. Christopher Shore (pending admission pro hac vice)
John K. Cunningham (pending admission pro hac vice)
Richard Kebrdle (pending admission pro hac vice)
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200

ATTORNEYS FOR THE PETITIONING
CREDITORS AND THE AD HOC GROUP
OF VITRO NOTEHOLDERS

## **VERIFICATION**

I, John K. Cunningham, a member of White & Case LLP, a law firm with offices at 200 South Biscayne Blvd., Suite 4900, Miami, Florida 33131, declare under penalty of perjury that I have read the foregoing Verified Statement of White & Case LLP Regarding its Representation of the Ad Hoc Group of Vitro Noteholders and that it is true and correct to the best of my knowledge, information and belief.

Executed on November 29, 2010     By:  /s/ John K. Cunningham_____
                                        John K. Cunningham

## Exhibit A

The Ad Hoc Group of Vitro Noteholders is as follows:

| Member | Address |
|---|---|
| Aurelius Capital Management, LP | 535 Madison Avenue<br>22nd Floor<br>New York, NY 10022 |
| Beach Point Capital Management LP | 1620 26th Street, Ste. 6000<br>Santa Monica, CA 90404 |
| Brookville Horizons Fund, L.P. | Two Greenwich Plaza<br>4th Floor<br>Greenwich, CT 06830-7153 |
| Davidson Kempner Capital Management LLC | 65 East 55th St., 19th Floor<br>New York, NY 10022 |
| Elliott Management Corp. | 712 Fifth Ave., 35th Floor<br>New York, NY 10019 |
| Knighthead Capital Management, L.L.C. | 623 Fifth Avenue, Floor 29<br>New York, NY 10022 |
| Lord, Abbett & Co. LLC | 90 Hudson Street<br>Jersey City, NJ 07302-3973 |
| Moneda S.A. Administradora de Fondos de Inversión on behalf of Moneda Deuda Latinoamericana Fondo de Inversión | Isidora Goyenechea 3621<br>Piso 8, Las Condes<br>Santiago, Chile |
| Moneda International Inc on behalf of Moneda Latin American Corporate Debt | Isidora Goyenechea 3621<br>Piso 8, Las Condes<br>Santiago, Chile |

## Exhibit L

| | |
|---|---|
| In Re: | ) **Case No. 10-47470-RFN-11** |
| | ) Chapter 11 |
| VITRO ASSET CORPORATION, | ) |
| *et al.*, | ) Fort Worth, Texas |
| | ) Wednesday, November 24, 2010 |
| Alleged Debtors. | ) 3:00 p.m. Docket |
| | ) |
| | ) RULING ON MOTIONS |
| | ) |
| | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE RUSSELL F. NELMS,
UNITED STATES BANKRUPTCY JUDGE.

COURTROOM APPEARANCES:

For the Petitioning            Jeff P. Prostok
Creditors:                     FORSHEY & PROSTOK, LLP
                               777 Main Street, Suite 1290
                               Fort Worth, TX  76102
                               (817) 877-8855

For the Alleged Debtors:       Liz Boydston
                               FULBRIGHT & JAWORSKI, LLP
                               2200 Ross Avenue, Suite 2800
                               Dallas, TX  75201-2784
                               (214) 855-8000

For the U.S. Trustee:          Elizabeth Ann Ziegler
                               OFFICE OF THE U.S. TRUSTEE
                               1100 Commerce Street, Room 976
                               Dallas, TX  75242
                               (214) 767-8967

TELEPHONIC APPEARANCES:

For the Petitioning            John Cunningham
Creditors:                     WHITE & CASE, LLP
                               Wachovia Financial Center, Suite
                                 4900
                               200 South Biscayne Boulevard
                               Miami, FL  33131
                               (305) 995-5252

```
1   TELEPHONIC APPEARANCES, cont'd.

2   For Bank of America:        C. Edward Dobbs
                                PARKER, HUDSON, RAINER & DOBBS
3                               1500 Marquis Two Tower
                                285 Peachtree Center Avenue, N.E.
4                               Atlanta, GA  30303
                                (404) 523-5300
5
    For the Alleged Debtors:    Dennis Dunne
6                               MILBANK, TWEED, HADLEY & MCCLOY,
                                  LLP
7                               One Chase Manhattan Plaza
                                New York, NY  10005-1413
8                               (212) 530-5770

9   For the Alleged Debtors:    Louis Strubeck
                                William Greendyke
10                              FULBRIGHT & JAWORSKI, LLP
                                2200 Ross Avenue, Suite 2800
11                              Dallas, TX  75201
                                (214) 855-8000
12
    For Bank of America:        Robert Jones
13                              PATTON BOGGS, LLP
                                2000 McKinney Avenue, Suite 1700
14                              Dallas, TX  75201
                                (214) 758-6624
15
    For the Alleged Debtors:    Andrew M. Leblanc
16                              MILBANK, TWEED, HADLEY & MCCLOY,
                                  LLP
17                              International Square Building
                                1850 K Street, NW
18                              Washington, D.C.  20006
                                (202) 835-7574
19
    For the Alleged Debtors:    Chris Shore
20                              WHITE & CASE, LLP
                                1155 Avenue of the Americas
21                              New York, NY  10036-2787
                                (212) 819-8394
22
    For Bank of New York:       Francisco Vazquez
23                              CHADBOURNE & PARK, LLP
                                30 Rockefeller Plaza
24                              New York, NY  10112
                                (212) 408-5111
25
```

1   Court Recorder:                Dennis Baird
                                        UNITED STATES BANKRUPTCY COURT

2                                        510 W. 10th Street
                                       Fort Worth, TX  76102

3                                        (817) 333-6038

4   Transcription Service:       Kathy Rehling
                                       209 Bay Circle

5                                        Coppell, TX  75019
                                       (972) 304-1998

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25         Proceedings recorded by digital sound recording;
         transcript produced by transcription service.

THE COURT: Good afternoon. At 3:00 o'clock, we have the Vitro Asset Corporation case. We have a number of telephonic appearances, and so I'm going to call the telephonic list and ask for those people to acknowledge their appearance to the extent that they're participating live.

First is Kathy Choi. She's listen-only. Mr. Cohen, listen-only. Mr. Cunningham, you're participating live?

MR. CUNNINGHAM: Yes, Your Honor.

THE COURT: Okay. Ephraim Diamond is listen-only. Mr. Dobbs, you're appearing live?

MR. DOBBS: Yes, Your Honor.

THE COURT: Mr. Dunne, live?

MR. DUNNE: Yes, Your Honor.

THE COURT: Mr. Esserman, live? (No response.) Mr. Esserman?

MR. FELSENTHAL: Judge, this is Steve Felsenthal. We're both signed up, but we should not be live. We're listen-only.

THE COURT: Okay. Thank you. Jonathan Gan, listen-only. Mr. Greendyke, you're appearing live?

MR. GREENDYKE: I'm here live, Judge. Thanks.

THE COURT: Okay. Mr. Harris, listen-only. Mr. Hiersteiner, you're appearing live?

MR. HIERSTEINER: I'm listen-only also, Your Honor.

1          THE COURT:  Okay.  Mr. Jones, you're appearing live?

2          MR. JONES:  Yes, Your Honor.

3          THE COURT:  Mr. Kebrdle, you're listen-only.  Mr.

4    Leblanc, you're appearing live.  Correct?

5          MR. LEBLANC:  Yes, Your Honor.

6          THE COURT:  Okay.  Mr. Leavitt, listen-only.  Mr.

7    Manns, appearing live.  Is that correct?

8          MR. MANNS:  Listen-only, Your Honor.  Thank you.

9          THE COURT:  Okay.  Mr. Prieto is listen-only.  Ms.

10   Rosenberg is live.  That's correct, Ms. Rosenberg?

11         MS. ROSENBERG:  Listen-only, Your Honor.  Thank you.

12         THE COURT:  Okay.  Mr. Shore, you're appearing live,

13   correct?

14         MR. SHORE:  I am, Your Honor.

15         THE COURT:  Mr. Singer, you're appearing live?

16         MR. SINGER:  Listen-only, Your Honor.

17         THE COURT:  Okay.  Mr. Strubeck, you're appearing

18   live?

19         MR. STRUBECK:  Yes, Your Honor.

20         THE COURT:  And Mr. Stuart is listen-only.  Ms.

21   Torrado is listen-only.  Mr. Vazquez is appearing live.  Is

22   that correct?  Mr. Vazquez?

23         MR. VAZQUEZ:  Yes, that's correct, Your Honor.

24         THE COURT:  Okay.  Mr. Warner is listen-only.  Mr.

25   Webster is listen-only.  And Ms. Zuccarello is appearing live.

1    Correct, Ms. Zuccarello?

2             MS. ZUCCARELLO:  No, Your Honor.  I'm listen-only.

3             THE COURT:  Okay.  Then now let's take appearances

4    here in the courtroom.

5             MR. PROSTOK:  Good afternoon, Your Honor.  Jeff

6    Prostok for the Petitioning Creditors.

7             MS. BOYDSTON:  Good afternoon, Your Honor.  Liz

8    Boydston for the Alleged Debtors.

9             MS. ZIEGLER:  Good morning, Your Honor.  Liz Ziegler

10    for the U.S. Trustee.

11             THE COURT:  Okay.  Thank you.

12     All right.  Parties, first of all, let me thank you for

13    your presentations and your briefings with respect to the

14    hearing that we had yesterday.  The hearing was really

15    performed skillfully and efficiently.  It was a pretty

16    complicated subject.  It was addressed by the parties

17    extremely well.  So, thank you for that.

18     I'm going to start with the motion of the Petitioning

19    Creditors for an order conditioning the Debtors' use of

20    property.  Of course, that deals specifically with Section

21    303(f) of the Bankruptcy Code.  And the Legislative History of

22    Section 303(f) tells us that an alleged debtor's ability to

23    operate its business without restriction can be circumscribed

24    if it is shown that the debtor may abscond with assets,

25    dispose of them at less than fair market value, or dismantle

its business, all to the detriment of creditors.

In their motion, the Petitioning Creditors address this concern -- that is, that the Alleged Debtors here may attempt to place assets beyond the reach of this Court and beyond the reach of creditors, transferring those assets to Mexico. And the Court has no doubt that that fear is articulated in good faith by the Petitioning Creditors. But the evidence presented yesterday simply, in the Court's opinion, did not make a case for applying Section 363 in response to that concern. The evidence established a default by the Alleged Debtors. It suggested that at some point the Alleged Debtors and their parent ceased to negotiate with the Movants, that they then prepared a solicitation that dramatically affected the rights of the noteholders, and that they plan to seek approval of that solicitation in a Mexican *concurso* proceeding.

But all of those acts, individually and taken together, don't constitute evidence that the Alleged Debtors are attempting to place assets beyond the reach of this Court. So, even if the Court were to construe those acts by the Alleged Debtors to be heavy-handed, they just don't logically lead to the conclusion that the Debtors will, in effect, start making fraudulent transfers to Mexico.

Consequently, I don't find evidentiary support for the relief sought. And now I'm going to refer to the proposed

order submitted by the Movants, because I think that's the best way to address the relief that they seek. But I don't find evidentiary support for the relief sought in Decretal Paragraphs 2, 3 and 4 of the proposed order.

There are other aspects of the proposed order that concern me, that trouble me. Decretal Paragraphs 2 and 3 would purport to apply Section 363 to transfers that "materially alter the Debtors' current assets and liabilities." In the Court's opinion, that provision is just impermissibly vague. I don't know what the Alleged Debtors would think that they could do or that they could not do in response to that type of language.

And in the Court's opinion, Decretal Paragraph 4 of the proposed order is just simply too broad on its face. So far as I can tell, it would apply Section 363 to all transactions, including ordinary course of business transactions, and it would do so without any showing that prejudicial transfers have occurred or will be occurring.

So, those particular portions of the proposed order are not approved.

So I now turn to the fifth decretal paragraph of the proposed order, and that relates to enjoining voting for or participating in the solicitation or in the *concurso*. An underlying premise of the Movants' argument with respect to this is that, I think as Mr. Shore put it, none of the Alleged

Debtors is eligible for Mexican restructuring. And this is based upon Section 10.04 of the indenture, which makes the guaranty subject to New York law. I'm going to assume that this argument is correct without actually deciding that particular issue. The problem that I have with the argument is that the Movants are seeking an injunction, and in order to get that, they must show, among other things, the likelihood of immediate and irreparable injury.

As the Fifth Circuit noted in the case of *Lewis v. S.S. Baune*, 534 F.2d 1115, the concepts of irreparable injury and no adequate remedy at law are often indistinguishable. Here too in this case, those concepts might be conflated. As I understand it, the Movants are saying that permitting the Alleged Debtors here to vote on the solicitation and then subject them to the *concurso* proceeding would cause them irreparable harm. But there is no evidence that they're likely to suffer some type of irreparable harm.

Now, it's true that the elimination of the guaranties through the solicitation and the *concurso* process could very well be the type of harm that could trigger the need for equitable intervention, but there's no evidence to suggest that the mere voting on or even the approval of the solicitation would cause irreparable injury. And that's because there is, at least ostensibly, an adequate remedy at law. Even if the solicitation were approved, the parties

would then move to the *concurso* process and then to the
Chapter 15 process, and there's nothing in the record to
suggest that the argument that Mr. Shore makes -- namely, that
the Alleged Debtors are not subject to Mexican restructuring
-- that that argument could not be made in either the *concurso*
proceeding or in a Chapter 15 proceeding, or that, if they
were made, the courts administering those proceedings would
ignore them and disregard the law.

In contrast to what we have in this case, I direct the
parties to the case of *Yukos Oil Co. v. Russian Federation*,
320 B.R. 130. In that case, the plaintiffs asked the court to
enjoin the auction of the debtor's subsidiary, an auction
which had been approved by some Russian agency in order to
collect on a $27.5 billion tax liability. In that case, Judge
Clark issued an injunction because she found that the tax
assessment itself had not been conducted in accordance with
Russian law. In doing so, she was mindful of the need for
deference to judicial determinations of other jurisdictions, a
need which she says is even more pressing when it involves
agencies of another sovereign. But in that case, she issued
the injunction because the plaintiff made a showing that the
Russian assessment was improper and that the subsidiary would
be sold for half of its value.

That is the type of evidence that's really lacking in this
record.

1    Now, it is true that American bankruptcy laws are among

2  the most liberal in the world, and it's also true that those

3  of us who practice in this particular area here in the United

4  States tend to like our laws and to prefer them over others.

5  And so I think there is a natural tendency on our part to be

6  suspicious of the laws of other countries, and perhaps to be

7  suspicious of the way in which foreign laws are implemented

8  there.  But these suspicions on our part do not constitute

9  evidence of irreparable harm.

10    As the Fifth Circuit instructed us in the *Lewis* case that

11  I previously cited, an injunction is an extraordinary remedy

12  and should not issue except upon a clear showing of possible

13  irreparable harm.  Because there is no clear showing at this

14  time of possible or probable injury resulting from the Alleged

15  Debtors' participating in the solicitation or the *concurso*

16  procedure, the Court denies the relief that's sought in the

17  fifth decretal paragraph of the order, and therefore denies

18  the motion *in toto*.

19    Turning now to the financing motion, as I understand it,

20  the only contested part of that motion is the part that

21  relates to the loan to the Alleged Debtors by an affiliate.

22  The Petitioning Creditors object to the affiliate loan because

23  it will be secured and will thus prime their debt.  They argue

24  that the parent shouldn't be able to prime the debt with this

25  loan just because the parent company doesn't want to lend on

1  an unsecured basis.  For their part, the Alleged Debtors say

2  that the borrowing on a secured basis from the parent is in

3  the ordinary course of their business.

4     So we go to the testimony provided to us yesterday by Mr.

5  Stewart, and Mr. Stewart testified, among other things, as

6  follows.  First of all, he said that Bank of America requires

7  the affiliate loan as a condition to the Alleged Debtors'

8  continued borrowing under the prepetition line of credit.  He

9  did not say that Bank of America required the affiliate loan

10  to be secured.  The BOA line of credit has a $4 million

11  liquidity covenant which the Alleged Debtors cannot meet

12  without the $3 million loan.  The Alleged Debtors may not need

13  to use the $3 million until later in December, but they will

14  need the affiliate loan in early December in order to meet the

15  $4 million liquidity covenant.

16     According to Mr. Stewart, he's not familiar with any other

17  security arrangements between the Alleged Debtors and the

18  parent, but testified that he understands the Alleged Debtors

19  owe between $15 to $20 million to the parent.  He didn't say

20  if the Alleged Debtors ever asked to borrow money on an

21  unsecured basis.  He did say that the Alleged Debtors did not

22  seek additional financing from other sources because they just

23  plain didn't have the time to do it.  And when asked about

24  that portion of his affidavit that says unsecured credit

25  cannot be obtained from another source, he said, well, it's

true:  In the time frame that we had, we worked with the two
most logical sources of financing.

So, based upon that record, the evidence doesn't support
the argument that the Alleged Debtors sought unsecured
financing from the parent and couldn't get it from the parent,
necessarily, and it doesn't support the notion that the parent
ordinarily does lend to the Alleged Debtors on a secured
basis.  In fact, the contrary appears to be true.  It appears
that the intercompany debts typically have been unsecured up
until this request.

So, while the Alleged Debtors have satisfied the
requirements of Rule 4001 -- that is, they have established
that they may suffer immediate and irreparable harm if they
can't get the loan in order to comply with the BOA covenant --
they don't meet the requirement of Section 364(c), which is
that they demonstrate that they can't procure debt on an
unsecured basis.

So I'll grant that motion except for the provision that
provides for lending on a secured basis.  And as I understand
it, that constitutes the only objection by the Alleged Debtors
to that order anyway.

My recollection also is that someone was going to be doing
some clean-up on the language of that order, and I'm assuming
that the parties are otherwise in agreement with the language
and the only remaining dispute had to do with the secured

1   lending part of that motion.

2       So, those are the Court's findings and conclusions.  The

3   Court reserves the right, if it decides to do so, to update,

4   amend, or modify any of those rulings in writing, if it chose

5   to do so.  But those are the Court's rulings for today.  And

6   I'm going to ask counsel for the Alleged Debtors to prepare

7   both orders.

8       With respect to the order denying the motion to condition

9   the Debtors' use of property, the party preparing that order

10  should not attempt to summarize the Court's findings and

11  conclusions.  You can just refer to the fact that the Court

12  made its findings and conclusions on the record, and otherwise

13  it should just be a plain garden-variety order denying that

14  motion.

15      I realize the other order is going to be a little bit more

16  complex.  I had one question about that.  I know the parties

17  wanted to meet payroll.  You obviously have my oral ruling

18  this afternoon to the extent that you need it, but do the

19  parties need a signed order here this afternoon?  Because,

20  quite frankly, I was preparing to leave right after this

21  ruling.  What do you think about that, Ms. Boydston?

22          MS. BOYDSTON:  Your Honor, may I refer to Lou

23  Strubeck or Andy Leblanc on that issue, because they've been

24  in contact.  I've been in the *Texas Rangers* hearing all

25  afternoon.

1    THE COURT: Okay.

2    MS. BOYDSTON: I'm sorry.

3    THE COURT: All right. Mr. Leblanc or --

4    MR. LEBLANC: Your Honor?

5    THE COURT: -- Mr. Greendyke, either one of you?

6    MR. LEBLANC: Your Honor, this is Andrew Leblanc from

7 Milbank Tweed. I think it actually is probably a question

8 that we need to direct or to at least discuss with Bank of

9 America, what they require. I think if the Court at a minimum

10 simply so ordered the record that you've just made, that at

11 least gets us part of the way there, and it really is a

12 question for Bank of America on what would make them

13 comfortable, if there needs to be a written order entered. I

14 would hope that they would agree, particularly given the

15 holiday and the payroll, to lend simply with the so-ordered

16 record.

17    THE COURT: Okay. All right, then. Well, parties,

18 again, thank you for your participation today, and we will be

19 adjourned.

20    MR. SHORE: Your Honor?

21    THE COURT: Yes?

22    MR. SHORE: Your Honor, this is Chris Shore, and I --

23 sorry. First of all, I'd like to thank Your Honor for, on a

24 holiday time, devoting all the time to us and solving our

25 issues.

1    I've got one issue that I forgot to raise and I need to

2  raise now, which is, with respect to this 2004 which is

3  scheduled next Wednesday -- and I just have been traveling all

4  day and haven't been able to reach opposing counsel -- they

5  said that they have an opposition ready.  If we could just get

6  everyone to commit that we'd get the opposition on Monday, so

7  that we can identify whatever issues they have and try to

8  resolve it before the Wednesday hearing.

9            THE COURT:  Mr. Leblanc, did you want to address

10  that?

11            MR. LEBLANC:  Your Honor, when I said I had a

12  response -- this is Andrew Leblanc again.  When I said I had a

13  response ready, I think actually I gave it to you.  We didn't

14  have a written response.  I was prepared to argue the motion

15  orally.  We -- I think if we can have until the calendar day

16  Monday, so meaning it will be significantly later than the

17  close of business, I think we'd be able to do that.  It's

18  just, in a couple of hours, we begin a holiday weekend.  And

19  we'll --

20            MR. SHORE:  That'll be fine.

21            MR. LEBLANC:  -- endeavor to get it done by, you

22  know, 11:59 on Monday and file it, if that's okay with the

23  Court.

24            THE COURT:  What about that, Mr. Shore?

25            MR. SHORE:  That's fine with us, Your Honor.

1          THE COURT:  Will that work with you?

2          MR. SHORE:  Absolutely.

3          THE COURT:  Okay.  All right.  Parties, thank you.

4   Now we'll be adjourned.

5          COUNSEL:  Thank you, Your Honor.

6          THE CLERK:  All rise.

7       (Proceedings concluded 3:21 p.m.)

8                          --oOo--

9

10

11

12

13

14

15

16

17

18                        CERTIFICATE

19      I certify that the foregoing is a correct transcript from

20  the digital sound recording of the proceedings in the above-

21  entitled matter.

22      *Kathy Rehling*          Digitally signed by Kathy Rehling
                                  DN: cn=Kathy Rehling, c=US, ou=Transcription
                                  Service, email=kathy.rehling@tx.rr.com
23  _____          _____
                                  Date: 2010.11.29 14:14:32 -06'00'

24  Kathy Rehling                                Date
    Certified Electronic Court Transcriber
25  CET**D-444

INDEX

PROCEEDINGS                                                    4

WITNESSES

-none--

EXHIBITS

-none-

RULINGS                                                       4

Expedited Motion of the Petitioning Creditors Under           6
Sections 105(a) and 303(f) of the Bankruptcy Code for
an Order Conditioning the Debtors' Use of Property
Filed by Petitioning Creditors Brookville Horizons Fund,
L.P. (5)

Expedited Motion to Use Cash Collateral filed by Alleged     11
Debtor Vitro Asset Corp (22)

END OF PROCEEDINGS                                            17

INDEX                                                         18

**Exhibit M**



U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

Signed April 11, 2011

---

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| | § | |
| **VITRO ASSET CORP., et al.,** | § | **Case No. 10-47470-rfn-11** |
| | § | |
| Alleged Debtors. | § | **Jointly Administered** |
| | § | |

**Order Denying Petitions for Relief Against Vitro Packaging, LLC, Vitro Chemical, Fibers and Mining, LLC, and VVP Auto Glass, Inc. and Continuing Under Advisement Status as to Petitions for Relief Against Other Alleged Debtors**

On this day the court considered the involuntary petitions against the following Alleged Debtors[1] Vitro Asset Corp. (f/k/a American Asset Holdings Corp.), Vitro Chemicals, Fibers & Mining, LLC, Troper Services, Inc., In, VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company (f/k/a Troper Inc.), Crisa Corporation, VVP Auto Glass, Inc., V-MX Holdings, LLC (f/k/a Crisa Holdings Corp.), and Vitro Packaging, LLC.

---

[1] Vitro America, LLC, Super Sky International, Inc., Super Sky Products, Inc., and VVP Finance Corporation have filed motions for entry of orders for relief, which have been granted, so those entities are now debtors in chapter 11 and are no longer Alleged Debtors.

Vitro Packaging, LLC, Vitro Chemical, Fibers and Mining, LLC, and VVP Auto Glass, Inc. (the "Operating Alleged Debtors") are operating companies. The remaining eight Alleged Debtors are non-operating companies (the "Non-Operating Alleged Debtors").

The court held a trial on the involuntary petitions on March 31, 2011 and April 1, 2011, and took the involuntary petitions under advisement. As to the Non-Operating Alleged Debtors, the involuntary petitions shall remain under advisement. Essentially three issues control the resolution of the petitions for relief against the Operating Alleged Debtors.

The first issue is whether the Petitioning Creditors' claims are contingent as to liability because the petitioning creditors did not make a formal, written demand on the Alleged Debtors. The court made a preliminary ruling on March 31, 2011 that the Alleged Debtors had waived demand under the §10.04 of the 2012 and 2017 Indentures and §11.04 of the 2013 Indenture. The Alleged Debtors asked the court to reconsider that ruling. For purposes of this Order, the court assumes without deciding that the Alleged Debtors waived demand on their guaranties. Alternatively, the court assumes without deciding that proper demand was made. For purposes of this Order, the court assumes without deciding that the Petitioning Creditors' claims have not been rendered ineligible under section 303(b)(1) of the Bankruptcy Code by any contingency as to liability.

The second issue is whether the Petitioning Creditors' claims are subject to a bona fide dispute as to amount, thus disqualifying the Petitioning Creditors from commencing these involuntary cases. The court made a preliminary ruling on March 31, 2011 that the "Limitation on Amount of Guaranty" clauses in §10.07 of the 2012 and 2017 Indentures and §11.07 of the 2013 Indenture did not, in and of itself, create a bona fide dispute as to the amount of the Petitioning Creditors' claims that would make them ineligible to file these cases. The Alleged

Debtors asked the court to reconsider that ruling.  For purposes of this Order, the court assumes without final decision that the Petitioning Creditors' claims are not subject to bona fide dispute as to amount.  For purposes of this Order, the court assumes without deciding that the Petitioning Creditors' claims have not been rendered ineligible under section 303(b)(1) of the Bankruptcy Code by any bona fide dispute as to amount.

The third issue is whether the Operating Alleged Debtors are generally paying their debts as such debts become due. The Petitioning Creditors have the burden of proof on that issue by a preponderance of the evidence. The Bankruptcy Code does not define the phrase "generally paying debts as they become due," but courts have developed various factors to aid in the consideration of whether, under the totality of the circumstances, an alleged debtor is not paying its debts as they become due.  Courts should consider the amount of debt not being paid as well as the number of creditors not being paid.  *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009)(Judge Hale)*.* Stated another way, courts should consider (1) the number of unpaid claims, (2) the amount of the unpaid claims, (3) the materiality of the non-payments, and (4) the debtor's overall conduct of its financial affairs.  *In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000)(Judge Houser).

The evidence submitted on this issue is that each of the Operating Alleged Debtors has a significant number of third-party trade creditors, which have been and continue to be paid on invoice terms, in the ordinary course of business or as agreed.  There is some indication, although the evidence is not clear, that some of the Operating Alleged Debtors may be paying their debts due to assistance from their parent companies.   The Operating Alleged Debtors have not, however, paid their largest debt—the guaranty obligations.  The Petitioning Creditors argue that the failure to pay on the guaranty obligations means that the Operating Alleged Debtors are

failing to pay their debts as they come due.  While there are authorities that support such a conclusion, based on the totality of the circumstances as to these three Operating Alleged Debtors, the court concludes otherwise. Each of the Operating Alleged Debtors has a meaningful number of third party trade vendors that are being paid.  Although the unpaid debts to the Petitioning Creditors far exceed the paid debts in amount, the only debts not being paid as due are the guaranty obligations that are owed jointly and severally with 48 other affiliated guarantors and the ultimate parent Vitro, S.A.B. de C.V.  Under these circumstances, the court finds that the Operating Alleged Debtors are generally paying their debts as they come due.  It is therefore

**ORDERED** that the petitions for orders for relief against Vitro Packaging, LLC, Vitro Chemical, Fibers and Mining, LLC, and VVP Auto Glass, Inc. are denied; and it is further

**ORDERED** that the petitions for orders for relief against Vitro Asset Corp. (f/k/a American Asset Holdings Corp.), Troper Services, Inc., In, VVP Holdings, LLC, Amsilco Holdings, Inc., B.B.O. Holdings, Inc., Binswanger Glass Company (f/k/a Troper Inc.), Crisa Corporation, and V-MX Holdings, LLC (f/k/a Crisa Holdings Corp.) shall remain under advisement.

**### End of Order ###**

**Exhibit N**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

ACP MASTER, LTD., AURELIUS CAPITAL    :
MASTER, LTD., and AURELIUS CONVERGENCE  :
MASTER, LTD.,    :

           :

        Plaintiffs,    :   **SUMMONS**

           :

    - against -    :   Index No. 652146/2010

           :

VITRO, S.A.B. DE C.V., VIMÉXICO, S.A. DE C.V.,  :
VITRO ENVASES NORTÉAMERICA, S.A. DE C.V., :
COMERCIALIZADORA ÁLCALI, S.A. DE C.V.   :
(FORMERLY VITRO CORPORATIVO, S.A. DE   :
C.V.), FIC REGIOMONTANO, S.A.P.I. DE C.V.  :
(FORMERLY SERVICIOS CORPORATIVOS DE  :
EDIFICACIONES, S.A. DE C.V.), VITRO    :
PACKAGING DE MÉXICO, S.A. DE C.V.    :
(FORMERLY INMOBILIARIA LOMA DEL TORO, :
S.A. DE C.V.), VIDRIERA MONTERREY, S.A. DE :
C.V., VIDRIERA LOS REYES, S.A. DE C.V.,   :
VIDRIERA GUADALAJARA, S.A. DE C.V.,   :
VIDRIERA QUERÉTARO, S.A. DE C.V., VIDRIERA :
TOLUCA, S.A. DE C.V., COMPAÑÍA VIDRIERA,  :
S.A. DE C.V., FABRICACIÓN DE MÁQUINAS, S.A. :
DE C.V., SERVICIOS INTEGRALES DE    :
ACABADOS, S.A. DE C.V., VIDRIO PLANO, S.A.  :
DE C.V., INDUSTRIA DEL ÁLCALI, S.A. DE C.V.,  :
DISTRIBUIDORA DE VIDRIO Y CRISTAL, S.A. DE :
C.V., VIDRIO LUX, S.A., VIDRIO PLANO DE   :
MEXICALI, S.A. DE C.V., VITRO EUROPA, LTD.,  :
VITRO PANAMÁ, S.A., VITEMCO ECUADOR,   :
S.A., VITRO AUTOMOTRIZ, S.A. DE C.V., VITRO  :
FLEX, S.A. DE C.V., VITRO VIDRIO Y CRISTAL,  :
S.A. DE C.V., VITRO FLOTADO CUBIERTAS, S.A. :
DE C.V., DISTRIBUIDOR VIDRIERO LAN, S.A. DE :
C.V., VITROCAR, S.A. DE C.V., CRISTALES   :
INASTILLABLES DE MÉXICO, S.A. DE C.V.,   :
VIDRIO PLANO DE MÉXICO, S.A. DE C.V., VITRO :
COLOMBIA, S.A., VVP EUROPA HOLDINGS, B.V., :
VITRO DO BRASIL INDÚSTRIA E COMÉRCIO,   :
LTDA., VITRO GLOBAL, LTD., VIDRIO Y    :
CRISTAL DEL NOROESTE, S.A. DE C.V.,    :
**(Caption continued on next page)**    :

**(Caption continued)**
SERVICIOS VIDRIERA GUADALAJARA,                    :
S.A. DE C.V., SERVICIOS VIDRIERA TOLUCA,           :
S.A. DE C.V., SERVICIOS VITRO COSMOS, S.A.         :
DE C.V., SERVICIOS VIDRIERA QUERÉTARO,             :
S.A. DE C.V., SERVICIOS VIDRIERA LOS REYES,        :
S.A. DE C.V., VAU, S.A. DE C.V., CENTRO DE         :
TECNOLOGIA VIDRIERA, LTD.,                         :
COMERCIALIZADORA ALCALI, S. DE R.L. DE             :
C.V., DISTRIBUIDORA NACIONAL DE VIDRIO,            :
S.A. DE C.V., SERVICIOS Y OPERACIONES             :
FINANCIERAS VITRO, TALLER DE COLECCION             :
VITRO, S.A. DE C.V., VIDRIERA MEXICO, S.A. DE:
C.V., VITEMCO VENEZUELA, S.A., VITRO              :
ENVASES HOLDING, S.A. DE C.V., and VITROSA         :
HOLDING, LTD.,                                     :

                    Defendants.

-----------------------------------------------------------------x

TO:             All Defendants Named Above
                  c/o CT Corporation System
                  111 Eighth Avenue, 13th Floor
                  New York, New York, 10011

YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance, on plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Venue is properly laid in this Court pursuant to CPLR § 501 because the defendants have consented to fix the venue for suits regarding the subject matter of this action as the Borough of Manhattan in the City of New York.

Dated: New York, New York
       December 2, 2010

                          FRIEDMAN KAPLAN SEILER
                          & ADELMAN LLP

                By:

                          Edward A. Friedman
                          Jeffrey C. Fourmaux
                          Benjamin S. Holzer

                      1633 Broadway
                      New York, New York 10019
                      (212) 833-1100

                      *Attorneys for Plaintiffs*

938228.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------x

ACP MASTER, LTD., AURELIUS CAPITAL          :
MASTER, LTD., and AURELIUS CONVERGENCE     :
MASTER, LTD.,                               :
                                            :
                        Plaintiffs,         :       **VERIFIED COMPLAINT**
                                            :
                  - against -               :       Index No. 652146/2010
                                            :
VITRO, S.A.B. DE C.V., VIMÉXICO, S.A. DE C.V.,   :
VITRO ENVASES NORTÉAMERICA, S.A. DE C.V.,        :
COMERCIALIZADORA ÁLCALI, S.A. DE C.V.            :
(FORMERLY VITRO CORPORATIVO, S.A. DE            :
C.V.), FIC REGIOMONTANO, S.A.P.I. DE C.V.        :
(FORMERLY SERVICIOS CORPORATIVOS DE             :
EDIFICACIONES, S.A. DE C.V.), VITRO             :
PACKAGING DE MÉXICO, S.A. DE C.V.               :
(FORMERLY INMOBILIARIA LOMA DEL TORO,           :
S.A. DE C.V.), VIDRIERA MONTERREY, S.A. DE      :
C.V., VIDRIERA LOS REYES, S.A. DE C.V.,         :
VIDRIERA GUADALAJARA, S.A. DE C.V.,             :
VIDRIERA QUERÉTARO, S.A. DE C.V., VIDRIERA:
TOLUCA, S.A. DE C.V., COMPAÑÍA VIDRIERA,         :
S.A. DE C.V., FABRICACIÓN DE MÁQUINAS, S.A.:
DE C.V., SERVICIOS INTEGRALES DE                :
ACABADOS, S.A. DE C.V., VIDRIO PLANO, S.A.      :
DE C.V., INDUSTRIA DEL ÁLCALI, S.A. DE C.V.,    :
DISTRIBUIDORA DE VIDRIO Y CRISTAL, S.A. DE:
C.V., VIDRIO LUX, S.A., VIDRIO PLANO DE         :
MEXICALI, S.A. DE C.V., VITRO EUROPA, LTD.,     :
VITRO PANAMÁ, S.A., VITEMCO ECUADOR,            :
S.A., VITRO AUTOMOTRIZ, S.A. DE C.V., VITRO     :
FLEX, S.A. DE C.V., VITRO VIDRIO Y CRISTAL,     :
S.A. DE C.V., VITRO FLOTADO CUBIERTAS, S.A.     :
DE C.V., DISTRIBUIDOR VIDRIERO LAN, S.A. DE:
C.V., VITROCAR, S.A. DE C.V., CRISTALES         :
INASTILLABLES DE MÉXICO, S.A. DE C.V.,          :
VIDRIO PLANO DE MÉXICO, S.A. DE C.V., VITRO:
COLOMBIA, S.A., VVP EUROPA HOLDINGS, B.V.,:
VITRO DO BRASIL INDÚSTRIA E COMÉRCIO,           :
LTDA., VITRO GLOBAL, LTD., VIDRIO Y             :
CRISTAL DEL NOROESTE, S.A. DE C.V.,             :
SERVICIOS VIDRIERA GUADALAJARA, S.A. DE:
C.V., SERVICIOS VIDRIERA TOLUCA, S.A. DE        :

C.V., SERVICIOS VITRO COSMOS, S.A. DE C.V., :
SERVICIOS VIDRIERA QUERÉTARO, S.A. DE :
C.V., SERVICIOS VIDRIERA LOS REYES, S.A. DE :
C.V., VAU, S.A. DE C.V., CENTRO DE :
TECNOLOGIA VIDRIERA, LTD., :
COMERCIALIZADORA ALCALI, S. DE R.L. DE :
C.V., DISTRIBUIDORA NACIONAL DE VIDRIO, :
S.A. DE C.V., SERVICIOS Y OPERACIONES :
FINANCIERAS VITRO, TALLER DE COLECCION :
VITRO, S.A. DE C.V., VIDRIERA MEXICO, S.A. DE :
C.V., VITEMCO VENEZUELA, S.A., VITRO :
ENVASES HOLDING, S.A. DE C.V., and VITROSA :
HOLDING, LTD., :
                                            :
          Defendants.                        :
------------------------------------------------------------------x

Plaintiffs ACP Master, Ltd., Aurelius Capital Master, Ltd., and Aurelius

Convergence Master Ltd. ("plaintiffs" or the "Aurelius Funds"), by their undersigned counsel,

allege as follows, based upon knowledge as to their own acts and upon information and belief as

to all others:

## Nature of the Action

1.     This is an action for breach of contract brought to recover unpaid principal and

accrued interest due on three series of U.S. dollar-denominated senior notes issued by defendant

Vitro, S.A.B. de C.V. ("Vitro") and guaranteed by substantially all of the subsidiaries of Vitro

(the "Guarantors"), including each of the other defendants. Plaintiffs in the aggregate

beneficially own more than $206 million in principal amount of Vitro's 8.675% Senior Notes

due February 1, 2012 (the "2012 Notes"), 11.75% Senior Notes due November 1, 2013 (the

"2013 Notes"), and 9.125% Senior Notes due February 1, 2017 (the "2017 Notes," and together

with the 2012 Notes and 2013 Notes, the "Notes"). Defendants have defaulted on their

obligations under the Notes by failing to make contractually required semiannual interest

payments on the Notes since Fall 2008. Pursuant to notices of acceleration served on Vitro in

2

January and April 2010 in accordance with the terms of the Notes, all principal and accrued interest on all of the Notes became immediately due and payable. Defendants have not paid any of the past-due principal or interest. Plaintiffs therefore seek damages in an amount equal to the unpaid principal and accrued interest, including capitalized interest, on their Notes, which, as of December 1, 2010, totals more than $257 million.

## The Parties

2.      Plaintiff ACP Master, Ltd. ("ACP Master") is an exempted company with limited liability incorporated in the Cayman Islands.

3.      Plaintiff Aurelius Capital Master, Ltd. ("Aurelius Capital Master") is an exempted company with limited liability incorporated in the Cayman Islands.

4.      Plaintiff Aurelius Convergence Master, Ltd. ("Aurelius Convergence Master") is an exempted company with limited liability incorporated in the Cayman Islands.

5.      Defendant Vitro, S.A.B. de C.V. ("Vitro") is a Mexican corporation. Vitro describes itself as the leading glass manufacturer in Mexico and one of the largest in the world. Through its subsidiaries, Vitro produces, processes, distributes, and sells glass container and flat glass products.

6.      Defendant Viméxico, S.A. de C.V. is a Mexican corporation.

7.      Defendant Vitro Envases Nortéamerica, S.A. de C.V. is a Mexican corporation.

8.      Defendant Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) is a Mexican corporation.

9.      Defendant FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) is a Mexican corporation.

3

10. Defendant Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) is a Mexican corporation.

11. Defendant Vidriera Monterrey, S.A. de C.V. is a Mexican corporation.

12. Defendant Vidriera los Reyes, S.A. de C.V. is a Mexican corporation.

13. Defendant Vidriera Guadalajara, S.A. de C.V. is a Mexican corporation.

14. Defendant Vidriera Querétaro, S.A. de C.V. is a Mexican corporation.

15. Defendant Vidriera Toluca, S.A. de C.V. is a Mexican corporation.

16. Defendant Compañía Vidriera, S.A. de C.V. is a Mexican corporation.

17. Defendant Fabricación de Máquinas, S.A. de C.V. is a Mexican corporation.

18. Defendant Servicios Integrales de Acabados, S.A. de C.V. is a Mexican corporation.

19. Defendant Vidrio Plano, S.A. de C.V. is a Mexican corporation.

20. Defendant Industria del Álcali, S.A. de C.V. is a Mexican corporation.

21. Defendant Distribuidora de Vidrio y Cristal, S.A. de C.V. is a Mexican corporation.

22. Defendant Vidrio Lux, S.A. is a Bolivian corporation.

23. Defendant Vidrio Plano de Mexicali, S.A. de C.V. is a Mexican corporation.

24. Defendant Vitro Europa, Ltd. is a Swiss limited company.

25. Defendant Vitro Panamá, S.A. is a Panamanian corporation.

26. Defendant Vitemco Ecuador, S.A. is an Ecuadorian corporation.

27. Defendant Vitro Automotriz, S.A. de C.V. is a Mexican corporation.

28. Defendant Vitro Flex, S.A. de C.V. is a Mexican corporation.

29. Defendant Vitro Vidrio y Cristal, S.A. de C.V. is a Mexican corporation.

4

30. Defendant Vitro Flotado Cubiertas, S.A. de C.V. is a Mexican corporation.

31. Defendant Distribuidor Vidriero LAN, S.A. de C.V. is a Mexican corporation.

32. Defendant Vitrocar, S.A. de C.V. is a Mexican corporation.

33. Defendant Cristales Inastillables de México, S.A. de C.V. is a Mexican corporation.

34. Defendant Vidrio Plano de México, S.A. de C.V. is a Mexican corporation.

35. Defendant Vitro Colombia, S.A. is a Columbian corporation.

36. Defendant VVP Europa Holdings, B.V. is a Dutch corporation.

37. Defendant Vitro do Brasil Indústria e Comércio, Ltda. is a Brazilian corporation.

38. Defendant Vitro Global, Ltd. is a Swiss limited company.

39. Defendant Vidrio y Cristal del Noroeste, S.A. de C.V. is a Mexican corporation.

40. Defendant Servicios Vidriera Guadalajara, S.A. de C.V. is a Mexican corporation.

41. Defendant Servicios Vidriera Toluca, S.A. de C.V. is a Mexican corporation.

42. Defendant Servicios Vitro Cosmos, S.A. de C.V. is a Mexican corporation.

43. Defendant Servicios Vidriera Querétaro, S.A. de C.V. is a Mexican corporation.

44. Defendant Servicios Vidriera Los Reyes, S.A. de C.V. is a Mexican corporation.

45. Defendant VAU, S.A. de C.V. is a Mexican corporation.

46. Defendant Centro de Tecnologia Vidriera, Ltd. is a Swiss limited company.

47. Defendant Comercializadora Alcali, S. de R.L. de C.V. is a Mexican limited company.

48. Defendant Distribuidora Nacional de Vidrio, S.A. de C.V. is a Mexican corporation.

49.     Defendant Servicios y Operaciones Financieras Vitro, S.A. de C.V. is a Mexican corporation.

50.     Defendant Taller de Coleccion Vitro, S.A. de C.V. is a Mexican corporation.

51.     Defendant Vidriera Mexico, S.A. de C.V. is a Mexican corporation.

52.     Defendant Vitemco Venezuela, S.A. is a Venezuelan corporation.

53.     Defendant Vitro Envases Holding, S.A. de C.V. is a Mexican corporation.

54.     Defendant Vitrosa Holding, Ltd. is a Swiss limited company.

55.     Defendants other than Vitro are referred to herein collectively as the "Defendant Guarantors." The Defendant Guarantors are direct or indirect, wholly or partly owned subsidiaries of Vitro.

## Jurisdiction and Venue

56.     This Court has personal jurisdiction over all defendants under CPLR § 301 because, in the indentures and supplemental indentures governing the 2012 Notes and the 2017 Notes, all of the defendants voluntarily and irrevocably submitted to the personal jurisdiction of the state courts in the Borough of Manhattan in the City of New York for any legal suit, action, or proceeding relating to the 2012 Notes or the 2017 Notes. In addition, in the indenture governing the 2013 Notes, defendant Vitro voluntarily and irrevocably submitted to the personal jurisdiction of the state courts in the Borough of Manhattan of the City of New York for any legal suit, action, or proceeding relating to the 2013 Notes.

57.     Venue is proper in this Court under CPLR § 501 because the indentures governing all of the Notes fix the venue for suits on the Notes as the Borough of Manhattan in the City of New York.

6

## Applicable Law

58.     The Notes, indentures, and supplemental indentures establishing the contractual obligations of Vitro and the Defendant Guarantors with respect to the Notes all expressly provide that they shall be governed by, and construed in accordance with, the laws of the State of New York.

## The Notes

59.     On or about November 1, 2003, Vitro issued the 2013 Notes in an aggregate principal amount of $225 million.

60.     The 2013 Notes are governed by an Indenture, dated as of October 22, 2003, between Vitro and Wachovia Bank, National Association as trustee (later succeeded by U.S. Bank, National Association), and by First, Second, Third, and Fourth Supplemental Indentures, among Vitro, the Guarantors, and U.S. Bank, National Association as trustee, dated as of February 1, 2007, April 27, 2007, January 16, 2008, and May 15, 2008, respectively. True and correct copies of the aforesaid Indenture and First, Second, Third, and Fourth Supplemental Indentures are attached hereto as Exhibits A, B, C, D, and E, respectively, and are collectively referred to herein as the "2013 Notes Indenture."

61.     As memorialized in the 2013 Notes Indenture, Vitro promised to pay interest at a rate of 11.75% per annum on the 2013 Notes. The interest was to be paid semiannually, on May 1 and November 1 of each year commencing May 1, 2004, until maturity on November 1, 2013. In addition, Vitro promised to pay interest on any overdue payments of interest or principal at a rate of 11.75% per annum.

62.     On or about February 1, 2007, Vitro issued the 2012 Notes in an aggregate principal amount of $300 million.

7

63. The 2012 Notes are governed by an Indenture, dated as of February 1, 2007, among Vitro, the Guarantors, and The Bank of New York as trustee, and by First, Second, and Third Supplemental Indentures, among the same parties, dated as of April 27, 2007, January 16, 2008, and May 15, 2008, respectively. True and correct copies of the aforesaid Indenture and First, Second, and Third Supplemental Indentures are attached hereto as Exhibits F, G, H, and I, respectively, and are collectively referred to herein as the "2012 Notes Indenture."

64. As memorialized in the 2012 Notes Indenture, Vitro promised to pay interest on the 2012 Notes at a rate of 8.625% per annum. The interest was to be paid semiannually, on February 1 and August 1 of each year commencing August 1, 2007, until the maturity on February 1, 2012. In addition, Vitro promised to pay interest on overdue payments of principal or interest at a rate of 10.625% per annum.

65. Also, on or about February 1, 2007, Vitro issued the 2017 Notes in an aggregate principal amount of $700 million.

66. The 2017 Notes are governed by an Indenture, dated as of February 1, 2007, among Vitro, the Guarantors , and The Bank of New York as trustee, and by First, Second, and Third Supplemental Indentures, among the same parties, dated as of April 27, 2007, January 16, 2008, and May 15, 2008, respectively. True and correct copies of the aforesaid Indenture and First, Second, and Third Supplemental Indentures are attached hereto as Exhibits J, K, L, and M, respectively, and are collectively referred to herein as the "2017 Notes Indenture."

67. As memorialized in the 2017 Notes Indenture, Vitro promised to pay interest on the 2017 Notes at a rate of 9.125% per annum. The interest was to be paid semiannually, on February 1 and August 1 of each year commencing August 1, 2007, until maturity on February 1,

8

2017. In addition, Vitro promised to pay interest on any overdue payments of interest or principal at a rate of 11.125% per annum.

68.     All of the Notes were registered under the Securities Act of 1933 by means of registration statements filed with the U.S. Securities and Exchange Commission.

## The Note Guaranties

69.     Vitro is a holding company that conducts substantially all of its operations through its subsidiaries. Accordingly, to provide greater assurance of payment and thus to improve the marketability of the Notes, substantially all of Vitro's subsidiaries (including each of the Defendant Guarantors) "irrevocably and unconditionally guarantee[d], jointly and severally, the full and punctual payment (whether at Stated Maturity, . . ., acceleration, or otherwise) of the principal of, . . ., and interest on, and all amounts payable under each Note" in the governing indentures and supplemental indentures. (2012 Notes Indenture § 10.01; 2013 Notes Indenture, as amended by the First Supplemental Indenture thereto, § 11.01; 2017 Notes Indenture § 10.01.)

## The Defaults and Accelerations

70.     Vitro has failed to make any of the semiannual interest payments on the 2012 Notes due on February 1, 2009; August 1, 2009; February 1, 2010; and August 1, 2010. Despite the guaranties they executed, none of the Defendant Guarantors has paid any part of these overdue installments of interest.

71.     Under Section 6.01(2) of the 2012 Notes Indenture, a failure to make a scheduled interest payment that remains uncured for 30 days constitutes an event of default, which, under Section 6.02(a) of the 2012 Notes Indenture, entitles holders of at least 25% of the principal amount outstanding on the 2012 Notes to declare all principal and accrued interest on the 2012 Notes immediately due and payable. In recognition of these facts, Vitro acknowledged in its

9

annual report on Form 20-F filed with the U.S. Securities and Exchange Commission on July 1, 2009 that Vitro and its subsidiaries were "in default" under the 2012 Notes Indenture and that it had reclassified the outstanding principal on the 2012 Notes as short-term debt. A true and correct copy of Vitro's aforesaid Form 20-F is attached hereto as Exhibit N.

72.     On January 4, 2010, holders of at least 25% of the principal amount outstanding on the 2012 Notes declared all principal and accrued interest immediately due and payable pursuant to Section 6.02 of the 2012 Notes Indenture. A true and correct copy of the Notice of Acceleration for the 2012 Notes is attached hereto as Exhibit O. Vitro and the Defendant Guarantors have failed to repay the accelerated principal and accrued interest on the 2012 Notes.

73.     Vitro and the Defendant Guarantors have likewise failed to make any of the semiannual interest payments on the 2017 Notes due on February 1, 2009; August 1, 2009; February 1, 2010; and August 1, 2010.

74.     Under Section 6.01(2) of the 2017 Notes Indenture, a failure to make a scheduled interest payment that remains uncured for 30 days constitutes an event of default, which, under Section 6.02(a) of the 2017 Notes Indenture, entitles holders of at least 25% of the principal amount outstanding on the 2017 Notes to declare all principal and accrued interest on the 2017 Notes immediately due and payable. In recognition of these facts, Vitro acknowledged in its annual report on Form 20-F filed with the U.S. Securities and Exchange Commission on July 1, 2009 that Vitro and its subsidiaries were "in default" under the 2017 Notes Indenture and that it had reclassified the outstanding principal on the 2017 Notes as short-term debt.

75.     On January 4, 2010, holders of at least 25% of the principal amount outstanding on the 2017 Notes declared all principal and accrued interest on all of the 2017 Notes immediately due and payable pursuant to Section 6.02 of the 2017 Notes Indenture. A true and

correct copy of the Notice of Acceleration for the 2017 Notes is attached hereto as Exhibit P. Vitro and the Defendant Guarantors have failed to repay the accelerated principal and accrued interest on the 2017 Notes.

76.     Vitro and the Defendant Guarantors have also failed to make any of the semiannual interest payments on the 2013 Notes due on May 1, 2009; November 1, 2009; May 1, 2010; and November 1, 2010.

77.     Under Section 4.01(b) of the 2013 Notes Indenture, a failure to make a scheduled interest payment that remains uncured for 30 days constitutes an event of default, which, under Section 4.02 of the 2013 Notes Indenture, entitles the trustee for the 2013 Notes to declare all principal and accrued interest on the 2013 Notes immediately due and payable. In recognition of these facts, Vitro acknowledged in its annual report on Form 20-F filed with the U.S. Securities and Exchange Commission on July 1, 2009 that Vitro and its subsidiaries were "in default" under the 2013 Notes Indenture and that it had reclassified the outstanding principal on the 2013 Notes as short-term debt.

78.     On April 12, 2010, Vitro publicly reported that it had received a notice of default and acceleration from the trustee for the 2013 Notes, U.S. Bank, National Association, which declared all principal and accrued interest on the 2013 Notes immediately due and payable pursuant to Section 4.02 of the 2013 Notes Indenture. A true and correct copy of the notice, which bears the date April 7, 2010, is attached as Exhibit Q. Vitro and the Defendant Guarantors have failed to pay the accelerated principal and accrued interest on the 2013 Notes.

## The Aurelius Funds' Holdings of the Notes

79.     ACP Master is the beneficial owner of:

        (a)     2012 Notes with an aggregate principal amount of $26,595,000;

11

(b)    2013 Notes with an aggregate principal amount of $9,537,000; and

(c)    2017 Notes with an aggregate principal amount of $42,327,000.

80.    Aurelius Capital Master is the beneficial owner of:

(a)    2012 Notes with an aggregate principal amount of $36,775,000;

(b)    2013 Notes with an aggregate principal amount of $13,177,000; and

(c)    2017 Notes with an aggregate principal amount of $58,917,000.

81.    Aurelius Convergence Master is the beneficial owner of:

(a)    2012 Notes with an aggregate principal amount of $6,678,000;

(b)    2013 Notes with an aggregate principal amount of $2,395,000; and

(c)    2017 Notes with an aggregate principal amount of $9,863,000.

82.    These holdings are summarized in the following table:

| Principal amounts held by the Aurelius Funds | Aurelius Capital Master | ACP Master | Aurelius Convergence Master | Total |
|---|---|---|---|---|
| 2012 Notes | $36,775,000 | $26,595,000 | $6,678,000 | $70,048,000 |
| 2013 Notes | $13,177,000 | $9,537,000 | $2,395,000 | $25,109,000 |
| 2017 Notes | $58,917,000 | $42,327,000 | $9,863,000 | $111,107,000 |
| Total | $108,869,000 | $78,459,000 | $18,936,000 | $206,264,000 |

83.    As a result of the failures of Vitro and the Defendant Guarantors to pay scheduled semiannual installments of interest or to pay accelerated principal as alleged above, ACP Master is owed unpaid interest, including capitalized interest, as of December 1, 2010, totaling:

(a)    $6,315,252 on the 2012 Notes;

(b)    $2,547,576 on the 2013 Notes; and

(c)    $10,627,087 on the 2017 Notes.

84.    Aurelius Capital Master is owed unpaid interest, including capitalized interest, as of December 1, 2010, totaling:

(a)     $8,732,596 on the 2012 Notes;

(b)     $3,519,913 on the 2013 Notes; and

(c)     $14,792,356 on the 2017 Notes.

85.     Aurelius Convergence Master is owed unpaid interest, including capitalized

interest, as of December 1, 2010, totaling:

(a)     $1,585,759 on the 2012 Notes;

(b)     $639,766 on the 2013 Notes; and

(c)     $2,476,314 on the 2017 Notes.

86.     These amounts are summarized in the following table:

| Unpaid interest owed to the Aurelius Funds, including capitalized interest and interest on past due principal (As of December 1, 2010) | Aurelius Capital Master | ACP Master | Aurelius Convergence Master | Total |
|---|---|---|---|---|
| 2012 Notes | $8,732,596 | $6,315,252 | $1,585,759 | $16,633,606 |
| 2013 Notes | $3,519,913 | $2,547,576 | $639,766 | $6,707,255 |
| 2017 Notes | $14,792,356 | $10,627,087 | $2,476,314 | $27,895,757 |
| Total | $27,044,865 | $19,489,914 | $4,701,839 | $51,236,617 |

87.     Together, the unpaid principal and interest, including capitalized interest, that

Vitro and the Defendant Guarantors owe to the Aurelius Funds, as of December 1, 2010, total

$257,500,617 as shown in the following table:

| Unpaid principal and interest owed to the Aurelius Funds (As of December 1, 2010) | Aurelius Capital Master | ACP Master | Aurelius Convergence Master | Total |
|---|---|---|---|---|
| 2012 Notes | $45,507,596 | $32,910,252 | $8,263,759 | $86,681,606 |
| 2013 Notes | $16,696,913 | $12,084,576 | $3,034,766 | $31,816,255 |
| 2017 Notes | $73,709,356 | $52,954,087 | $12,339,314 | $139,002,757 |
| Total | $135,913,865 | $97,948,914 | $23,637,839 | $257,500,617 |

13

88.     Pursuant to the terms of the Notes, interest continues to accrue on the unpaid principal and interest on the Notes beneficially owned by plaintiffs. Accordingly, the total principal and interest due at the time of judgment in this action will be greater than the amounts shown above.

## FIRST CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Vitro)

89.     Plaintiffs repeat and re-allege the allegations of paragraphs 1-88 as if fully set forth herein.

90.     Under the terms of the Notes, Vitro is contractually obligated to pay interest and principal to holders of the Notes in accordance with the terms thereof.

91.     Vitro breached its contractual obligations to the holders of the Notes by failing to pay principal and interest, including capitalized interest, on the Notes when due in accordance with the terms thereof.

92.     As a result of Vitro's breaches, the plaintiff Note holders have suffered damages in an amount to be determined at trial, but not less than $257,500,617.

## SECOND CAUSE OF ACTION

### Breach of Contract
### (Against the Defendant Guarantors)

93.     Plaintiffs repeat and re-allege the allegations of paragraphs 1-92 as if fully set forth herein.

94.     Under the terms of the Notes, each of the Defendant Guarantors is contractually obligated, on a joint and several basis, to pay any interest and principal due on the Notes in accordance with the terms thereof if Vitro fails to do so.

14

95.     Each of the Defendant Guarantors breached its contractual obligations to holders of the Notes by failing to pay principal and accrued interest, including capitalized interest, on the Notes due in accordance with the terms thereof after Vitro failed to do so.

96.     As a result of each of the Defendant Guarantor's breaches, the plaintiff Note holders have suffered damages in an amount to be determined at trial, but not less than $257,500,617.

## Prayer for Relief

WHEREFORE, plaintiffs request the entry of judgment against defendants, and severally, as follows:

A.      Awarding plaintiffs damages equal to the principal amount of the Notes that they beneficially own, and all unpaid accrued interest due thereon, including capitalized interest, under the terms of the Notes, together with pre-judgment and/or post-judgment interest, as applicable; and

B.      Granting plaintiffs such other legal and equitable relief as the Court deems just and proper.

Dated: New York, New York
December 2, 2010

FRIEDMAN KAPLAN SEILER
& ADELMAN LLP

By:     _____
        Edward A. Friedman
        Jeffrey C. Fourmaux
        Benjamin S. Holzer

1633 Broadway
New York, New York 10019
(212) 833-1100

*Attorneys for Plaintiffs*

15

## VERIFICATION

STATE OF NEW YORK    )
                         ) ss:
COUNTY OF NEW YORK  )

MARK D. BRODSKY, being duly sworn, deposes and says:

I am the Chairman of Aurelius Capital Management, LP. Aurelius Capital Management, LP serves as the investment manager to: plaintiff ACP Master, Ltd.; plaintiff Aurelius Capital Master, Ltd.; and plaintiff Aurelius Convergence Master, Ltd. I have read the foregoing complaint and know its contents. The complaint is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

Mark D. Brodsky

Sworn to before me
this 1st day of December 2010

Notary Public

JEFFREY FOURMANX
Notary Public, State of New York
No. 02FO6202041
Qualified in New York County
Commission Expires March 9, 2013

**Exhibit O**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------x

ELLIOTT INTERNATIONAL L.P. and
THE LIVERPOOL LIMITED PARTNERSHIP,

      Plaintiffs,

v.

VITRO, S.A.B. DE C.V., VIMÉXICO, S.A. DE C.V.,
VITRO ENVASES NORTÉAMERICA, S.A. DE C.V.,
COMERCIALIZADORA ÁLCALI, S.A. DE C.V.
(FORMERLY VITRO CORPORATIVO, S.A. DE C.V.),
FIC REGIOMONTANO, S.A.P.I. DE C.V. (FORMERLY
SERVICIOS CORPORATIVOS DE EDIFICACIONES,
S.A. DE C.V.), VITRO
PACKAGING DE MÉXICO, S.A. DE C.V.
(FORMERLY INMOBILIARIA LOMA DEL TORO,
S.A. DE C.V.), VIDRIERA MONTERREY, S.A. DE C.V.;
VIDRIERA LOS REYES, S.A. DE C.V.,
VIDRIERA GUADALAJARA, S.A. DE C.V.,
VIDRIERA QUERÉTARO, S.A. DE C.V.,VIDRIERA
TOLUCA, S.A. DE C.V., COMPAÑÍA VIDRIERA,
S.A. DE C.V., FABRICACIÓN DE MÁQUINAS, S.A.
DE C.V., SERVICIOS INTEGRALES DE ACABADOS,
S.A. DE C.V., VIDRIO PLANO, S.A.
DE C.V., INDUSTRIA DEL ÁLCALI, S.A. DE C.V.,
DISTRIBUIDORA DE VIDRIO Y CRISTAL, S.A. DE
C.V., VIDRIO LUX, S.A., VIDRIO PLANO DE
MEXICALI, S.A. DE C.V., VITRO EUROPA, LTD.,
VITRO PANAMÁ, S.A., VITEMCO ECUADOR, S.A.,
VITRO AUTOMOTRIZ, S.A DE C.V., VITRO FLEX,
S.A. DE C.V., VITRO VIDRIO Y CRISTAL, S.A. DE
C.V., VITRO FLOTADO CUBIERTAS, S.A.
DE C.V., DISTRIBUIDOR VIDRIERO LAN, S.A. DE
C.V., VITROCAR S.A. DE C.V., CRISTALES
INASTILLABLES DE MÉXICO, S.A. DE C.V.,
VIDRIO PLANO DE MÉXICO, S.A. DE C.V., VITRO
COLOMBIA, S.A., VVP EUROPA HOLDINGS, B.V.,
VITRO DO BRASIL INDÚSTRIA E COMÉRCIO,
LTDA., VITRO GLOBAL, LTD., VIDRIO Y
CRISTAL DEL NOROESTE, S.A. DE C.V.,
SERVICIOS VIDRIERA GUADALAJARA, S.A. DE
C.V., SERVICIOS VIDRIERA TOLUCA, S.A. DE
**(Caption continued on next page)**

**SUMMONS**

Index No.

    _____/2010

16110532

**(Caption continued)**
C.V., SERVICIOS VITRO COSMOS, S.A. DE C.V.,      :
SERVICIOS VIDRIERA QUERÉTARO, S.A. DE           :
C.V., SERVICIOS VIDRIERA LOS REYES, S.A. DE      :
C.V., VAU, S.A. DE C.V., CENRO DE                :
TECNOLOGIA VIDRIERA, LTD.,                       :
COMERCÏALIZADORA ALCALI, S. DE R.L. DE           :
C.V., DISTRIBUIDORA NACIONAL DE VIDRIO,          :
S.A., DE C.V., SERVICIOS Y OPERACIONES           :
FINANCIERAS VITRO, TALLER DE COLECCION           :
VITRO, S.A. DE C.V., VIDRIERA MEXICO, S.A. DE    :
C.V., VITEMCO VENEZUELA, S.A., VITRO             :
ENVASES HOLDING, S.A. DE C.V., and VITROSA       :
HOLDING, LTD.,                                   :
                                                 :
     Defendants.        :
------------------------------------------------------------------------x

TO:         All Defendants Named Above
              c/o CT Corporation System
              111 Eighth Avenue, 13th Floor
              New York, New York, 10011

     YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a copy of your answer or, if the complaint is not served with this summons, to serve a notice of appearance, on plaintiffs' attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

     Venue is properly laid in this Court pursuant to CPLR § 501 because the defendants have consented to fix the venue for suits regarding the subject matter of this action as the Borough of Manhattan in the City of New York.

Dated: New York, New York         DECHERT LLP
       December 9, 2010

                             By:
                             Dennis H. Hranitzky
                             Eric C. Kirsch
                             1095 Avenue of the Americas
                             New York, New York  10036
                             Tel. (212) 698-3500
                             Fax. (212) 698-3599
                             *Attorneys for Plaintiffs*
                             *Elliott International L.P. and*
                             *The Liverpool Limited Partnership*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

ELLIOTT INTERNATIONAL L.P. and                         :
THE LIVERPOOL LIMITED PARTNERSHIP,                     :
                                                       :       **VERIFIED COMPLAINT**
     Plaintiffs,                                      :
                                                       :       Index No. _____ /2010
v.                                                     :
                                                       :
VITRO, S.A.B. DE C.V., VIMÉXICO, S.A. DE C.V.,         :
VITRO ENVASES NORTÉAMERICA, S.A. DE C.V.,              :
COMERCIALIZADORA ÁLCALI, S.A. DE C.V.                  :
(FORMERLY VITRO CORPORATIVO, S.A. DE C.V.),:
FIC REGIOMONTANO, S.A.P.I. DE C.V.                     :
(FORMERLY SERVICIOS CORPORATIVOS DE                    :
EDIFICACIONES, S.A. DE C.V.), VITRO                    :
PACKAGING DE MÉXICO, S.A. DE C.V.                      :
(FORMERLY INMOBILIARIA LOMA DEL TORO,                  :
S.A. DE C.V.), VIDRIERA MONTERREY, S.A. DE             :
C.V.; VIDRIERA LOS REYES, S.A. DE C.V.,                :
VIDRIERA GUADALAJARA, S.A. DE C.V.,                    :
VIDRIERA QUERÉTARO, S.A. DE C.V.,VIDRIERA              :
TOLUCA, S.A. DE C.V., COMPAÑÍA VIDRIERA,               :
S.A. DE C.V., FABRICACIÓN DE MÁQUINAS, S.A.            :
DE C.V., SERVICIOS INTEGRALES DE                       :
ACABADOS, S.A. DE C.V., VIDRIO PLANO, S.A.             :
DE C.V., INDUSTRIA DEL ÁLCALI, S.A. DE C.V.,           :
DISTRIBUIDORA DE VIDRIO Y CRISTAL, S.A. DE             :
C.V., VIDRIO LUX, S.A., VIDRIO PLANO DE                :
MEXICALI, S.A. DE C.V., VITRO EUROPA, LTD.,            :
VITRO PANAMÁ, S.A., VITEMCO ECUADOR, S.A.,             :
VITRO AUTOMOTRIZ, S.A DE C.V., VITRO FLEX,             :
S.A. DE C.V., VITRO VIDRIO Y CRISTAL, S.A. DE          :
C.V., VITRO FLOTADO CUBIERTAS, S.A.                    :
DE C.V., DISTRIBUIDOR VIDRIERO LAN, S.A. DE            :
C.V., VITROCAR S.A. DE C.V., CRISTALES                 :
INASTILLABLES DE MÉXICO, S.A. DE C.V.,                 :
VIDRIO PLANO DE MÉXICO, S.A. DE C.V., VITRO            :
COLOMBIA, S.A., VVP EUROPA HOLDINGS, B.V.,             :
VITRO DO BRASIL INDÚSTRIA E COMÉRCIO,                  :
LTDA., VITRO GLOBAL, LTD., VIDRIO Y                    :
CRISTAL DEL NOROESTE, S.A. DE C.V.,                    :
SERVICIOS VIDRIERA GUADALAJARA, S.A. DE                :
C.V., SERVICIOS VIDRIERA TOLUCA, S.A. DE               :
**(Caption continued on next page)**                       :

**(Caption continued)**
C.V., SERVICIOS VITRO COSMOS, S.A. DE C.V.,     :
SERVICIOS VIDRIERA QUERÉTARO, S.A. DE   :
C.V., SERVICIOS VIDRIERA LOS REYES, S.A. DE  :
C.V., VAU, S.A. DE C.V., CENRO DE      :
TECNOLOGIA VIDRIERA, LTD.,       :
COMERCÏALIZADORA ALCALI, S. DE R.L. DE   :
C.V., DISTRIBUIDORA NACIONAL DE VIDRIO,  :
S.A., DE C.V., SERVICIOS Y OPERACIONES   :
FINANCIERAS VITRO, TALLER DE COLECCION  :
VITRO, S.A. DE C.V., VIDRIERA MEXICO, S.A. DE  :
C.V., VITEMCO VENEZUELA, S.A., VITRO   :
ENVASES HOLDING, S.A. DE C.V., and VITROSA  :
HOLDING, LTD.,          :
              :
    Defendants.         :
-------------------------------------------------------------------x

Plaintiffs Elliott International L.P. ("Elliott") and The Liverpool Limited Partnership ("Liverpool," and together with Elliott, "Plaintiffs"), by their undersigned counsel, allege as follows, based upon knowledge as to their own acts and upon information and belief as to all others:

## NATURE OF THE ACTION

1.    This is an action for breach of contract brought to recover unpaid principal and accrued interest due on two series of U.S. dollar-denominated senior notes issued by defendant Vitro, S.A.B. de C.V. ("Vitro") and guaranteed by substantially all of the subsidiaries of Vitro (the "Guarantors"), including each of the other defendants. Plaintiffs in the aggregate beneficially own more than $85 million in principal amount of Vitro's 8.625% Senior Notes due February 1, 2012 (the "2012 Notes") and 9.125% Senior Notes due February 1, 2017 (the "2017 Notes," and together with the 2012 Notes, the "Notes"). Defendants have defaulted on their obligations under the Notes by failing to make contractually required semiannual interest payments on the Notes since Fall 2008. Pursuant to notices of acceleration served on Vitro in

January 2010 in accordance with the terms of the Notes, all principal and accrued interest on all of the Notes became immediately due and payable. Defendants have not paid any of the past-due principal or interest. Plaintiffs therefore seek damages in an amount equal to the unpaid principal and accrued interest, including capitalized interest, on their Notes, which, as of December 9, 2010, totals $106,688,367.74.

## THE PARTIES

2.      Plaintiff Elliott International L.P. is a Limited Partnership organized in the Cayman Islands.

3.      Plaintiff The Liverpool Limited Partnership is a Limited Partnership organized in Bermuda.

4.      Defendant Vitro, S.A.B. de C.V. ("Vitro") is a Mexican corporation. Vitro describes itself as the leading glass manufacturer in Mexico and one of the largest in the world. Through its subsidiaries, Vitro produces, processes, distributes, and sells glass container and flat glass products.

5.      Defendant Viméxico, S.A. de C.V. is a Mexican corporation.

6.      Defendant Vitro Envases Nortéamerica, S.A. de C.V. is a Mexican corporation.

7.      Defendant Comercializadora Álcali, S.A. de C.V. (formerly Vitro Corporativo, S.A. de C.V.) is a Mexican corporation.

8.      Defendant FIC Regiomontano, S.A.P.I. de C.V. (formerly Servicios Corporativos de Edificaciones, S.A. de C.V.) is a Mexican corporation.

9.      Defendant Vitro Packaging de México, S.A. de C.V. (formerly Inmobiliaria Loma del Toro, S.A. de C.V.) is a Mexican corporation.

10.     Defendant Vidriera Monterrey, S.A. de C.V. is a Mexican corporation.

11.     Defendant Vidriera los Reyes, S.A. de C.V. is a Mexican corporation.

12. Defendant Vidriera Guadalajara, S.A. de C.V. is a Mexican corporation.

13. Defendant Vidriera Querétaro, S.A. de C.V. is a Mexican corporation.

14. Defendant Vidriera Toluca, S.A. de C.V. is a Mexican corporation.

15. Defendant Compañía Vidriera, S.A. de C.V. is a Mexican corporation.

16. Defendant Fabricación de Máquinas, S.A. de C.V. is a Mexican corporation.

17. Defendant Servicios Integrales de Acabados, S.A. de C.V. is a Mexican corporation.

18. Defendant Vidrio Plano, S.A. de C.V. is a Mexican corporation.

19. Defendant Industria del Álcali, S.A. de C.V. is a Mexican corporation.

20. Defendant Distribuidora de Vidrio y Cristal, S.A. de C.V. is a Mexican corporation.

21. Defendant Vidrio Lux, S.A. is a Bolivian corporation.

22. Defendant Vidrio Plano de Mexicali, S.A. de C.V. is a Mexican corporation.

23. Defendant Vitro Europa, Ltd. is a Swiss limited company.

24. Defendant Vitro Panamá, S.A. is a Panamanian corporation.

25. Defendant Vitemco Ecuador, S.A. is an Ecuadorian corporation.

26. Defendant Vitro Automotriz, S.A. de C.V. is a Mexican corporation.

27. Defendant Vitro Flex, S.A. de C.V. is a Mexican corporation.

28. Defendant Vitro Vidrio y Cristal, S.A. de C.V. is a Mexican corporation.

29. Defendant Vitro Flotado Cubiertas, S.A. de C.V. is a Mexican corporation.

30. Defendant Distribuidor Vidriero LAN, S.A. de C.V. is a Mexican corporation.

31. Defendant Vitrocar, S.A. de C.V. is a Mexican corporation.

32.     Defendant Cristales Inastillables de México, S.A. de C.V. is a Mexican corporation.

33.     Defendant Vidrio Plano de México, S.A. de C.V. is a Mexican corporation.

34.     Defendant Vitro Colombia, S.A. is a Columbian corporation.

35.     Defendant VVP Europa Holdings, B.V. is a Dutch corporation.

36.     Defendant Vitro do Brasil Indústria e Comércio, Ltda. is a Brazilian corporation.

37.     Defendant Vitro Global, Ltd. is a Swiss limited company.

38.     Defendant Vidrio y Cristal del Noroeste, S.A. de C.V. is a Mexican corporation.

39.     Defendant Servicios Vidriera Guadalajara, S.A. de C.V. is a Mexican corporation.

40.     Defendant Servicios Vidriera Toluca, S.A. de C.V. is a Mexican corporation.

41.     Defendant Servicios Vitro Cosmos, S.A. de C.V. is a Mexican corporation.

42.     Defendant Servicios Vidriera Querétaro, S.A. de C.V. is a Mexican corporation.

43.     Defendant Servicios Vidriera Los Reyes, S.A. de C.V. is a Mexican corporation.

44.     Defendant VAU, S.A. de C.V. is a Mexican corporation.

45.     Defendant Centro de Tecnologia Vidriera, Ltd. is a Swiss limited company.

46.     Defendant Comercializadora Alcali, S. de R.L. de C.V. is a Mexican limited company.

47.     Defendant Distribuidora Nacional de Vidrio, S.A. de C.V. is a Mexican corporation.

48.     Defendant Servicios y Operaciones Financieras Vitro, S.A. de C.V. is a Mexican corporation.

49.     Defendant Taller de Coleccion Vitro, S.A. de C.V. is a Mexican corporation.

50.     Defendant Vidriera Mexico, S.A. de C.V. is a Mexican corporation.

51.    Defendant Vitemco Venezuela, S.A. is a Venezuelan corporation.

52.    Defendant Vitro Envases Holding, S.A. de C.V. is a Mexican corporation.

53.    Defendant Vitrosa Holding, Ltd. is a Swiss limited company.

54.    Defendants other than Vitro are referred to herein collectively as the "Defendant Guarantors." The Defendant Guarantors are direct or indirect, wholly or partly owned subsidiaries of Vitro.

## JURISDICTION AND VENUE

55.    This Court has personal jurisdiction over all defendants under CPLR § 301 because, in the indentures and supplemental indentures governing the 2012 Notes and the 2017 Notes, all of the defendants voluntarily and irrevocably submitted to the personal jurisdiction of the state courts in the Borough of Manhattan in the City of New York for any legal suit, action, or proceeding relating to the 2012 Notes or the 2017 Notes.

56.    Venue is proper in this Court under CPLR § 501 because the indentures governing all of the Notes fix the venue for suits on the Notes as the Borough of Manhattan in the City of New York.

## APPLICABLE LAW

57.    The Notes, indentures, and supplemental indentures establishing the contractual obligations of Vitro and the Defendant Guarantors with respect to the Notes all expressly provide that they shall be governed by, and construed in accordance with, the laws of the State of New York.

## THE NOTES

58.    On or about February 1, 2007, Vitro issued the 2012 Notes in an aggregate principal amount of $300 million.

59.     The 2012 Notes are governed by an Indenture, dated as of February 1, 2007, among Vitro, the Guarantors, and The Bank of New York as trustee, and by First, Second, and Third Supplemental Indentures, among the same parties, dated as of April 27, 2007, January 16, 2008, and May 15, 2008, respectively.  True and correct copies of the aforesaid Indenture and First, Second, and Third Supplemental Indentures are attached hereto as Exhibits A, B, C, and D, respectively, and are collectively referred to herein as the "2012 Notes Indenture."

60.     As memorialized in the 2012 Notes Indenture, Vitro promised to pay interest on the 2012 Notes at a rate of 8.625% per annum.  The interest was to be paid semiannually, on February 1 and August 1 of each year commencing August 1, 2007, until the maturity on February 1, 2012.  In addition, Vitro promised to pay interest on overdue payments of principal or interest at a rate of 10.625% per annum.

61.     Also, on or about February 1, 2007, Vitro issued the 2017 Notes in an aggregate principal amount of $700 million.

62.     The 2017 Notes are governed by an Indenture, dated as of February 1, 2007, among Vitro, the Guarantors, and The Bank of New York as trustee, and by First, Second, and Third Supplemental Indentures, among the same parties, dated as of April 27, 2007, January 16, 2008, and May 15, 2008, respectively.  True and correct copies of the aforesaid Indenture and First, Second, and Third Supplemental Indentures are attached hereto as Exhibits E, F, G, and H, respectively, and are collectively referred to herein as the "2017 Notes Indenture."

63.     As memorialized in the 2017 Notes Indenture, Vitro promised to pay interest on the 2017 Notes at a rate of 9.125% per annum.  The interest was to be paid semiannually, on February 1 and August 1 of each year commencing August 1, 2007, until maturity on February 1,

2017. In addition, Vitro promised to pay interest on any overdue payments of interest or principal at a rate of 11.125% per annum.

64.     All of the Notes were registered under the Securities Act of 1933 by means of registration statements filed with the U.S. Securities and Exchange Commission.

## THE NOTE GUARANTIES

65.     Vitro is a holding company that conducts substantially all of its operations through its subsidiaries. Accordingly, to provide greater assurance of payment and thus to improve the marketability of the Notes, substantially all of Vitro's subsidiaries (including each of the Defendant Guarantors) "irrevocably and unconditionally guarantee[d], jointly and severally, the full and punctual payment (whether at Stated Maturity, ... , acceleration, or otherwise) of the principal of, ... , and interest on, and all amounts payable under each Note" in the governing indentures and supplemental indentures. (2012 Notes Indenture § 10.01; 2017 Notes Indenture § 10.01.)

## THE DEFAULTS AND ACCELERATIONS

66.     Vitro has failed to make any of the semiannual interest payments on the 2012 Notes due on February 1, 2009; August 1, 2009; February 1, 2010; and August 1, 2010. Despite the guaranties they executed, none of the Defendant Guarantors has paid any part of these overdue installments of interest.

67.     Under Section 6.01(2) of the 2012 Notes Indenture, a failure to make a scheduled interest payment that remains uncured for 30 days constitutes an event of default, which, under Section 6.02(a) of the 2012 Notes Indenture, entitles holders of at least 25% of the principal amount outstanding on the 2012 Notes to declare all principal and accrued interest on the 2012 Notes immediately due and payable. In recognition of these facts, Vitro acknowledged in its annual report on Form 20-F filed with the U.S. Securities and Exchange Commission on July 1,

2009 that Vitro and its subsidiaries were "in default" under the 2012 Notes Indenture and that it had reclassified the outstanding principal on the 2012 Notes as short-term debt. A true and correct copy of Vitro's aforesaid Form 20-F is attached hereto as Exhibit I.

68.     On January 4, 2010, holders of at least 25% of the principal amount outstanding on the 2012 Notes declared all principal and accrued interest immediately due and payable pursuant to Section 6.02 of the 2012 Notes Indenture. A true and correct copy of the Notice of Acceleration for the 2012 Notes is attached hereto as Exhibit J. Vitro and the Defendant Guarantors have failed to repay the accelerated principal and accrued interest on the 2012 Notes.

69.     Vitro and the Defendant Guarantors have likewise failed to make any of the semiannual interest payments on the 2017 Notes due on February 1, 2009; August 1, 2009; February 1, 2010; and August 1, 2010.

70.     Under Section 6.01(2) of the 2017 Notes Indenture, a failure to make a scheduled interest payment that remains uncured for 30 days constitutes an event of default, which, under Section 6.02(a) of the 2017 Notes Indenture, entitles holders of at least 25% of the principal amount outstanding on the 2017 Notes to declare all principal and accrued interest on the 2017 Notes immediately due and payable. In recognition of these facts, Vitro acknowledged in its annual report on Form 20-F filed with the U.S. Securities and Exchange Commission on July 1, 2009 that Vitro and its subsidiaries were "in default" under the 2017 Notes Indenture and that it had reclassified the outstanding principal on the 2017 Notes as short-term debt.

71.     On January 4, 2010, holders of at least 25% of the principal amount outstanding on the 2017 Notes declared all principal and accrued interest on all of the 2017 Notes immediately due and payable pursuant to Section 6.02 of the 2017 Notes Indenture. A true and correct copy of the Notice of Acceleration for the 2017 Notes is attached hereto as Exhibit K.

Vitro and the Defendant Guarantors have failed to repay the accelerated principal and accrued interest on the 2017 Notes.

## THE PLAINTIFFS' HOLDINGS OF THE NOTES

72.     Elliott is the beneficial owner of:

     (a)     2012 Notes with an aggregate principal amount of $13,950,000; and

     (b)     2017 Notes with an aggregate principal amount of $37,102,000.

73.     Liverpool is the beneficial owner of:

     (a)     2012 Notes with an aggregate principal amount of $9,300,000; and

     (b)     2017 Notes with an aggregate principal amount of $24,735,000.

74.     These holdings are summarized in the following table:

| Principal amounts held by the Plaintiffs | Elliott | Liverpool | Total |
|---|---|---|---|
| 2012 Notes | $13,950,000 | $9,300,000 | $23,250,000 |
| 2017 Notes | $37,102,000 | $24,735,000 | $61,837,000 |
| **Total** | **$51,052,000** | **$34,035,000** | **$85,087,000** |

75.     As a result of the failures of Vitro and the Defendant Guarantors to pay scheduled semiannual installments of interest or to pay accelerated principal as alleged above, Elliott is owed unpaid interest, including capitalized interest, as of December 9, 2010, totaling:

     (a)     $ 3,398,065.44 on the 2012 Notes; and

     (b)     $ 9,562,703.66 on the 2017 Notes.

76.     Liverpool is owed unpaid interest, including capitalized interest, as of December 9, 2010, totaling:

     (a)     $ 2,265,376.96 on the 2012 Notes; and

     (b)     $ 6,375,221.69 on the 2017 Notes.

77.    These amounts are summarized in the following table:

| Unpaid interest owed to the Plaintiffs, including capitalized interest and interest on past due principal (As of December 9, 2010) | Elliott | Liverpool | Total |
|---|---|---|---|
| 2012 Notes | $3,398,065.44 | $2,265,376.96 | $5,663,442.39 |
| 2017 Notes | $9,562,703.66 | $6,375,221.69 | $15,937,925.34 |
| **Total** | **$12,960,769.09** | **$8,640,598.64** | **$21,601,367.74** |

78.    Together, the unpaid principal and interest, including capitalized interest, that Vitro and the Defendant Guarantors owe to Plaintiffs, as of December 9, 2010, total $106,688,367.74 as shown in the following table:

| Unpaid principal and interest owed to the Plaintiffs (As of December 9, 2010) | Elliott | Liverpool | Total |
|---|---|---|---|
| 2012 Notes | $17,348,065.44 | $11,565,376.96 | $28,913,442.39 |
| 2017 Notes | $46,664,703.66 | $31,110,221.69 | $77,774,925.34 |
| **Total** | **$64,012,769.09** | **$42,675,598.64** | **$106,688,367.74** |

79.    Pursuant to the terms of the Notes, interest continues to accrue on the unpaid principal and interest on the Notes beneficially owned by plaintiffs.    Accordingly, the total principal and interest due at the time of judgment in this action will be greater than the amounts shown above.

## FIRST CAUSE OF ACTION

### Breach of Contract
### (Against Defendant Vitro)

80.    Plaintiffs repeat and re-allege the allegations of paragraphs 1-79 as if fully set forth herein.

81.     Under the terms of the Notes, Vitro is contractually obligated to pay interest and principal to holders of the Notes in accordance with the terms thereof.

82.     Vitro breached its contractual obligations to the holders of the Notes by failing to pay principal and interest, including capitalized interest, on the Notes when due in accordance with the terms thereof.

83.     As a result of Vitro's breaches, the Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $106,688,367.74.

## SECOND CAUSE OF ACTION

### Breach of Contract
### (Against the Defendant Guarantors)

84.     Plaintiffs repeat and re-allege the allegations of paragraphs 1-83 as if fully set forth herein.

85.     Under the terms of the Notes, each of the Defendant Guarantors is contractually obligated, on a joint and several basis, to pay any interest and principal due on the Notes in accordance with the terms thereof if Vitro fails to do so.

86.     Each of the Defendant Guarantors breached its contractual obligations to holders of the Notes by failing to pay principal and accrued interest, including capitalized interest, on the Notes due in accordance with the terms thereof after Vitro failed to do so.

87.     As a result of each of the Defendant Guarantors' breaches, the Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $106,688,367.74.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request the entry of judgment against defendants, jointly and severally, as follows:

A.   Awarding plaintiffs damages equal to the principal amount of the Notes

that they beneficially own, and all unpaid accrued interest due thereon,

including capitalized interest, under the terms of the Notes, together with

pre-judgment and/or post-judgment interest, as applicable; and

B.   Granting plaintiffs such other legal and equitable relief as the Court deems

just and proper.

Dated: New York, New York
      December 9, 2010

DECHERT LLP

By: _____

Dennis H. Hranitzky
Eric C. Kirsch
1095 Avenue of the Americas
New York, New York 10036
Tel. (212) 698-3500
Fax. (212) 698-3599

*Attorneys for Plaintiffs*
*Elliott International L.P. and*
*The Liverpool Limited Partnership*

# VERIFICATION

STATE OF NEW YORK     )
                             ) ss:
COUNTY OF NEW YORK  )

Elliot Greenberg, being duly sworn, deposes and says:

I am the Vice President of Elliott International Capital Advisors, Inc ("Elliott Advisors"). Elliott Advisors serves as the investment manager to plaintiff Elliott International, L.P.

I am also the Vice President of Liverpool Associates, Ltd. which is the general partner of the plaintiff The Liverpool Limited Partnership.

I have read the foregoing complaint and know its contents. The complaint is true to my knowledge, except as to matters alleged on information and belief, and as to those matters alleged on information and belief, I believe them to be true.

Sworn to before me
this 9th day of December 2010

Notary Public

OKSANA BITETTI
Notary Public, State of New York
No. 01BI6137693 Qualified in Richmond County
Certificate Filed in New York County
Commission Expires December 05, 20_13_

16109217

# Exhibit P

RECORD OF VISIT

VITRO SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE

In the municipality of San Pedro Garza Garcia, in the State of Nuevo León, at 8 pm on today's date, March 9, 2011, at the company's headquarters located at Avenida Roble number 660, Colonia Valle del Campestre, C.P. 66265, in the municipality of San Pedro Garza Garcia Nuevo León, Mexico, the undersigned visitor JOSE LUIS ELIZONDO CANTU identified with a valid passport issued by the Ministry of Foreign Affairs of Mexico, number 02190155629 (zero, two, one, nine, zero, one, five, five, six, two, nine) issued July 15, 2002, as well as VICTOR MANUEL AGUILERA GOMEZ, in his role as assistant to the visitor, identified with his voter registration card issued by the *Instituto Federal Electoral*, or the Federal Institute for Elections, card number 111230678 (one, one, one, two, three, zero, six, seven, eight); ROGELIO GONZALEZ VILLAGOMEZ, in his role as assistant to the visitor, identified with his voter registration card issued by the Federal Institute for Elections, card number 0000034460518 (zero, zero, zero, zero, zero, three, four, four, six, zero, five, one, eight), and C. RAFAEL COLOME CARRASCO, as the legal representative of the entity called VITRO SOCIEDAD ANONIMA BURSATIL DE CAPITAL VARIABLE, identified with his voter registration card issued by the Federal Institute for Elections, card number 0000035216664 (zero, zero, zero, zero, zero, three, five, two, one, six, six, six, four), and legal representing the company, with Public Deed number 17, 261 (seventeen thousand two hundred sixty one) of August 11, 2006, made before and witnessed by Notary Public number 25 of Monterrey, Nuevo León and containing the protocol on powers granted by the minutes of the meeting of the Board of Directors of VITRO, S.A. de C.V. (currently VITRO, S.A.B. de C.V.), number 678, held on April 28, 2006; same as for legal purposes is duly registered with the Public Registry of Property and Commerce since August 25, 2006, under electronic commercial page number 1062*9-------------------------------------------------------------------------------
------------------From the corporation VITRO SOCIEDAD ANONIMA BURSATIL DE CAPITAL VARIABLE, their legal existence and subsistence by Public Deed number 6,184 (six thousand one hundred eighty four) of December 29, 2006 made before and witnessed by Notary Public 122 of Monterrey, Nuevo León which is credited with transforming VITRO, S.A. DE C.V. to VITRO, S.A.B. DE C.V. and formalizes the certifying of the company's statutes as a *Sociedad Anónima Bursátil de Capital Variable*, Public Deed that through the accreditation section as a legal entity under oath of the Notary Public that formalizes and also supports the existence and survival of VITRO, S.A.B. de C.V. since the date of its establishment and is duly registered in the Public Registry of Property and Commerce under electronic commercial page number 1062*9, whose registration records are under key V9L0I53, documents which we had both regular and certified copies of in plain view for the purpose of the visit.-------------------------------
------------------The article also states that on December 10, 2010 between the subsidiaries and those that are consolidated under VITRO S.A.B. de C.V. in its role as holder and controller and by the percentage of VITRO shareholders either directly or indirectly they are:---------------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------------

| Name of Subsidiary Company: | Percentage of Shareholding |
|---|---|
| **Flat Glass** | |
| VIMEXICO, S.A. DE C.V | (91.80%) |
| VIDRIO Y CRISTAL DEL NOROESTE, S.A. DE C.V. | (91.80%) |
| VITRO FLOTADO CUBIERTAS, S.A. DE C.V. | (91.80%) |
| VIDRIO PLANO DE MÉXICO, S.A. DE C.V. | (91.80%) |
| VITRO FLEX, S.A. DE C.V | (91.80%) |
| CRISTALES AUTOMOTRICES, S.A. DE C.V. | (46.81%) |
| VITRO COLOMBIA, S.A. | (91.80%) |
| VITRO AMERICA, LLC. | (100.0%) |
| VITRO CRISTALGLASS, S.L. | (99.29%) |
| VITRO CHAVES INDUSTRIA DE VIDRIO, S.A. | (59.57%) |
| VITRO AUTOMOTRIZ, S.A. DE C.V. | (99.92%) |
| VITRO VIDRIO Y CRISTAL, S.A. DE C.V. | (99.99%) |
| PRODUCTOS DE VALOR AGREGADO EN CRISTAL, S.A. DE C.V. | (55.0%) |
| | |
| **Packaging** | |
| VITRO ENVASES NORTEAMERICA, S.A. DE C.V. | (100%) |
| FABRICACION DE MAQUINAS, S.A. DE C.V. | (100%) |
| COMPAÑÍA VIDRIERA, S.A. DE C.V | (100%) |
| VIDRIERA MONTERREY, S.A. DE C.V. | (100%) |
| VIDRIERA GUADALAJARA, S.A. DE C.V. | (100%) |
| VIDRIERA LOS REYES, S.A. DE C.V. | (100%) |
| VIDRIERA QUERETARO, S.A. DE C.V. | (100%) |
| VIDRIERA TOLUCA, S.A. DE C.V. | (100%) |
| VITRO PACKAGING, LLC. | (100%) |
| VITRO PACKAGING MEXICO, S.A. DE C.V | (100%) |
| INDUSTRIA DEL ALCALI S.A. DE C.V. | (100%) |
| VIDRIO LUX, S.A. | (100%) |
| | |
| **Corporate** | |
| VITRO CORPORATIVO, S.A. DE C.V. | (100%) |
| AEROVITRO, S.A. DE C.V. | (100%) |
| CLINICA VITRO, A.C. | (100%) |
| VITRO ASSETS HOLDING, CO. | (100%) |

---------In this record, and based on Article 36 of *Ley de Concurso Mercantiles* (Bankruptcy Act), before Raúl Armando Contrerras Villafranca, designated by the Company to serve as a witness, who provided his voter registration card issued by the Federal Institute for Elections as identification, card number 0000034293655 and Gustavo Rodriguez Manrique, an attorney designated by the Company to serve as a witness, who provided a valid passport issued by the Ministry of Foreign Affairs of Mexico, number G06149807, the following is set for the record------------------------------
---------------------------------------------------------------------------------------------------------
-------------------------------------------------FACTS--------------------------------------------------
---------------------------------------------------------------------------------------------------------

------------------Due to the Bankruptcy petition of **Brookville Horizons Fund, L.P. and Others**, Vs. **Vitro** *Sociedad Anónima Bursátil de Capital Variable*, the following is derived: ------------------------------------------------------------------------------------------- ---------In compliance with the visitation order contained in the agreement of February 2011, ordered by the Fourth District Court for civil and labor matters in the state of Nuevo León, in the bankruptcy proceeding of VITRO, *Sociedad Anónima Bursátil de Capital Variable* for acts related to 37/2010-VI, the undersigned visitor at 10:00 am, on February 8, 2011, to kick off the ordered visit for the investigation. The Legal Representative of the Company informed me that the documentation was located within the facilities of CENTRO DE SERVICIOS COMPARTIDOS (CSC) of VITRO SAB DE CV, located on Keramos 225 Norte, Colonia del Prado, Monterrey, N.L.; a work place was designated in the above referenced facility. The verification visits took place in twenty-four sessions, taking place in the Company's offices and in the undersigned visitor's office, and the work sessions are listed below with meticulous descriptions of the specific activities that took place detailed in each of the participants' logs. ------------------ -----

1. On Tuesday, February 8, the visitation to 660 Colonia Valle del Campestre, C.P. 66265, San Pedro Garza Garcia, Nuevo León was officially initiated. Jose Luis Elizondo Cantu, as visitor, Rafael Colome Carrasco, as legal representative of the Company, and Raul Armando Contreras Villafranca, Gustavo Rodriguez Manrique, Monica Chapa Espinoza, Rosa Carmen Anguiano Cardenas, Olga Elizabeth Gonzalez Cepeda, Victor Manuel Aguilera Gomez and Rogelio Gonzalez Villagomez as witnesses; initiating the session at 10:00 am and concluding at 12:30 pm. We then went to the offices of CENTRO DE SERVICIOS COMPARTIDOS (CSC) located at Keramos 225 Norte, Colonia del Prado in Monterrey Nuevo León, in where we stayed until 8:00 pm. ----------------
2. Wednesday, February 9, we worked at the Company's office, we began working at 10:00 am and ended at 7:00 pm.------------------------------------------------------
3. Thursday, February 10, we began working at 11:00 am and ended at 1:30 pm, we reconvened at 3:20 pm and ended at 8:20 pm. --------------------------------------
4. Friday, February 11, we began working at 10:00 am, and we took recess from 2:00 pm to 4:00 pm, reconvening at 4:00 pm and ended at 7:30 pm.------------------
5. Monday, February 14, we started at 10:00 am, we worked at the Company's office until 1:00 pm, we reconvened at 4:00 pm and ended at 7:00 pm.--------------
6. Tuesday, February 15 we worked at the Company's office, we started at 10:00 am and ended at 1:30 pm, we reconvened at 3:30 pm and we ended at 7:00 pm.--------
7. Wednesday, February 16, we worked at the Company's office, where we started at 9:00 am and ended at 1:30 pm, we reconvened at 2:00 pm and ended at 7:00 pm.--------------------------------------------------------------------------------------
8. Thursday, February 17 at the Company's office, we started working at 9:00 am and ended at 1:30 pm, reconvening at 4:00 pm and we ended at 7:00 pm. ----------
9. Friday, February 18 at the Company's office we started working at 10:30 am and ended at 1:30 pm, reconvening at 4:00 pm and we ended at 7:00 pm. ----------------
10. Monday, February 21 at the Company's office we started working at 10:30 am taking a recess from 1:30 pm, reconvening at 3:00 pm and we ended at 6:00 pm.--
11. Tuesday, February 22, we worked at the Company's office, where we started working at 11:00 am ended at 2:00 pm, we reconvened at 4:00 pm and ended at 8:00 pm. --------------------------------------------------------------------------------

12. Wednesday, February 23, we worked at the Company's office, we started at 9:00 am ended at 1:15 pm, and reconvened at 4:00 pm and ended at 7:00 pm. -----------
13. Thursday, February 24, we worked at the Company's office, we started at 9:45 am ended at 1:30 pm. We reconvened at 4:00 pm and ended at 7:00 pm.-----------------
14. Friday, February 25, we worked at the Company's office, we started at 10:00 am and ended at 1:30 pm. We reconvened at 4:00 pm and ended at 7:00 pm.------------
15. Monday, February 28, at the Company's office, we started at 10:30 am and ended at 1:30 pm. Subsequently we resumed working at the address of the undersigned, where we worked from 3:00 pm until 12:00 am.----------------------------------------
16. Tuesday, March 1, we worked in the offices of the undersigned visitor, where we started at 11:00 am and ended at 3:00 pm, we reconvened at 4:00 pm and ended at 11:00 pm. --------------------------------------------------------------------------------
17. Wednesday, March 2, at the Company's office, we started at 9:00 am and ended at 1:15 pm, we reconvened and continued working from 4:00 pm to 7:00 pm.------
18. Thursday, March 3, at the Company's office, we started at 9:50 am and ended at 1:30 pm, we reconvened and continued working from 4:00 pm to 7:00 pm.---------
19. Friday, March 4, at the Company's office, we started at 10:30 am and ended at 1:30 pm, we reconvened at 4:00 pm ended at 7:00 pm.--------------------------------
20. Saturday, March 5, we worked in the offices of the undersigned visitor from 1:00 pm to 11:00 pm. --------------------------------------------------------------------------
21. Sunday, March 16, we worked in the offices of the undersigned visitor from 2:00 pm to 11:00 pm. --------------------------------------------------------------------------
22. Monday, March 16, at the Company's office, we started working at 8:30 am and took a recess at 1:30 pm. We reconvened at 3:00 pm and ended at 6:00 pm. Subsequently we resumed working at undersigned visitor's office from 7:00 pm to 12:00 am. --------------------------------------------------------------------------
23. Tuesday, March 8, working at the Company's office, we started working at 9:00 am and ended at 11:30 am. We reconvened at 3:00 pm and ended at 6:00 pm. Subsequently we resumed working at undersigned visitor's office from 12:00 pm to 12:00 am.--------------------------------------------------------------------------

------------------Clarifications are made to the Company for the personal log of each of the participants in the visit, the hours worked in the Company's offices are registered, as well as the hours each worked in their own places of work, both for the visitors and their assistants. ----------------------------------------------------------------------------------

------------------Today, March 9, 2011, the twenty-fourth (24th) and final session, taking place at the Company's office, starting at 9:00 am, taking recess at 1:30 pm. We reconvened at 3:00 pm ended at 7:00 pm, subsequently we began to sign this document at 8:00 pm. -------------------------------------------------------------------------------------
-------------------------------------------------------------------------------------------------
------------------During the first visitor's session, a request was made to the Company for documents and records stored electronically, basically all data needed to render an opinion, which are described below, stating that all documentation and the Company's instructions should be provided to us by CP. Raúl Armando Contreras Villafranca and/or Gustavo-Rodríguez Manrique, except legal information that should be provided by Monica Chapa Espinoza, attorney. Below is a description of the required documentation and settles whether or not access was granted to the same, and the reasons why, under oath, the Company argued for this. **1.** Trial Balance, dated December 10, 2010, same date of the bankruptcy application and ancillary accounting records of the Company; **2.**

Financial statements dated as of the date of the claim (December 10, 2010), the financial statements for the last three years including supporting documents and thereto signed by the Company's legal representative and the Company's accountant, information was provided; **3.** Daily accounting policies, accounting expenses, income and checking expenses as well as supporting documentation for each of them, information was provided; **4.** Reports of the Company's activities (production, purchases and sales), in this case I was informed that it is not applicable because it is the type of operation that the Company participates in, according to its Corporate purpose; **5.** Value of securities obtained and/or offered and guarantees granted to have the date of filing of the application, information was provided; **6.** Letter from the legal representative attesting to the integrity, reliability and accuracy of the information that was provided, the letter was provided and is attached to this record; **7.** Letter from the Secretary of the Board of Directors, which attests that the Board Minutes have been registered to date, the letter was provided and is attached to this record; **8.** Letter from the Company's Legal council which lists all trials that the Company has contingent liabilities arising from, the letter was provided and is attached to this record; **9.** Adjunct book for banks, collated and bank reconciliations reconciling items cleared and bank statements in national currency, as in other currencies, information was provided; **10.** Issued checks and checkbooks, were provided; **11.** Relationship of people who are authorized to sign checks and authorized signatures, information was provided; **12.** Cancelled checks, information was provided; **13.** Statement of the current security investments at the date of the application, information was provided; **14.** Proof of having registered types of investments with interest earnings, information was provided; **15.** Statements for individual accounts for each client or debtor along with the original documentation supporting the accounts receivable, the information was provided; **16.** Bad debt analysis, information was provided; **17.** Collecting proceedings, information was provided; **18.** Analysis of returned checks, I was informed this does not apply because there are no returned checks for debtor clients; **19.** Control records of customers' credit, it is not applicable because there are no clients who have such records; **20.** Value of securities held by collectors, I was informed that it does not apply because they do not work with collectors; **21.** Seniority list of balances of accounts receivable, information was provided; **22.** List of discounted documents, we were informed that such documents do not exist; **23.** Balance of notes payable with an expiry date, information was provided; **24.** Documentation that supports the balance of credit providers and notes payable, copies which included such information were provided; **25.** Records of selected suppliers, we were informed that it is not applicable because no suppliers exist ; **26.** Individual statements and contracts of the current account of each rights and obligation to collect payment together with supporting documents that support such balance; **27.** Study of transfer prices, information was provided; **28.** Integration of bank loans, information was provided; **29.** Copy of Contracts with financial institutions and companies for borrowed loans, information was provided; **30.** Schedule of computation of interest due and unpaid interest, information was provided; **31.** Analysis of contributions by the Company as taxpayer or withholdings and copy of the monthly, bimonthly, quarterly or semiannual statements, as well the corresponding paper work used to make such determination, information was provided; **32.** Outstanding payroll payments, outstanding payments related to the participation of working in the profits and benefits required by law or collective paying agreements, we were informed that in this case it includes a provision on the sole employee profit sharing (PTU), we were informed that for the greater benefit of law, no debits exist; **33.** Actuarial

computation of labor obligations, pension and seniority premiums, information was provide; **34.** Copy of the collective bargaining contract, information was provided; **35.** List of legal, financial, industrial and commercial advisers, information was provided; **36.** List of judgments, litigation or claims by or on behalf of the Company, identifying the current situation and the amounts, information was provided; **37.** List of all assets given as security, including subsidiaries, partners, shareholders or third parties, information was provided; **38.** Existing powers granted, information was provided; **39.** INDEVAL's list issued on October 2010, for the celebration of the Company's shareholders last meeting and the list of the registered series "A" shares, the information was provided; **40.** Copies of the public deeds credited with the kind of moral person in question and details of their registration in the commercial register, the document was provided.--------------------------

------------------For the record, it is stated that we were given access to the Company's data storage systems, and other information that was provided via email, most of the documents were provided to us electronically, the originals were provided for comparison, and under oath the Company attested that the documents are the same as those in the database system. ------------------------------------------------------------------

------------------I acknowledge that I made the internal control evaluation for the Company, Vitro, S.A.B. de C.V., and determined the reliability of the information provided. ------------------------------------------------------------------------------------

------------------I acknowledge, that when necessary, I referred to the original documents and the records that gave rise to legal and accounting consequences without any limitation of the time of occurrence.------------------------------------------------------------

------------------It is noted that I made sure of the validity of each and every one of the powers granted in favor of the people that carried out operations on behalf of the Company as well as their powers and limitations of each, having certified copies in hand, the same which were returned to the Company.-------------------------------------------------

------------------In accordance with the stipulated terms in connection to the verification of the visitation order, the objective of the same as the undersigned inspector appointed to decide whether the Company committed the alleged case provided for in Article 10 of the Bankruptcy Act, to determine the date of expiry of the credit related to the facts and, where appropriate to suggest to the court hearing the case, the precautionary measures it considers necessary for the protection of the public, as well as to provide other information provided by law.------------------------------------------------------------------

------------------Furthermore, in accordance with what was established in the Order of Business, this was held at the company headquarters located on Avenida Roble number 660 Colonia Valle del Campestre, in the municipality of San Pedro Garza Garcia Nuevo León, and the office located on Keramos number 225 in Colonia del Prado de Monterrey, NL, and dealt with the accounting books, records and financial statements of the Company, and included the documents to record its accounting and financial situation, including the opinions of audits for fiscal years 2007, 2008 and 2009, issued by Deloitte, as well as contracts that support the operations that were carried out as function of its social objective and that constitute the legal basis for them. Similarly, as mandated by Article 40 of the Bankruptcy Act,-------------------------------------------------------------

------------------Article 40.- The visitor, based on the information contained in the inspection report, should render to the judge, within fifteen calendar days counted from the date of commencement of the visit, a reasoned and detailed opinion taking into consideration the facts raised in the complaint and the reply, attaching to it the inspection report. The opinion must be presented in the formats that in effect will be given by the

institute.------------------------------------------------------------------------------------------------
---------The visitor must submit his or her opinion within the period referred to in the preceding paragraph, however, by just cause, the visitor may request an extension from the judge to finish the visit and present the opinion. In no case shall the extension exceed fifteen calendar days.-----------------------------------------------------------------------------
---------Consistent with the provisions of the article of Law that is transcribed, it was taken into consideration the facts stated in the suit and in the response to this suit, both the facts asserted by plaintiffs, as well as the exceptions in the reply to the suit made by the defendant, interviews were held with the directors, management personnel, and administrative personnel of the dealer and with its external financial and legal counsel.---
---------It is worth mentioning that in the suit and in the reply to the suit, I observed controversial situations, diametrically opposed between the parties, consistent with the updating or not of the acceleration in the expiration of the bonds emitted by Vitro S.A.B. de CV.--------------------------------------------------------------------------------------------
---------1.- On the one hand, the legal guardian of the defendant, makes the following assertions:-----------------------------------------------------------------------------------------------
------------------"a) The public debt issued in the United States. The Bonds are identified as the 11.75% Senior Notes Due 2013 (2013 Bonds), the 8.65% Senior Notes Due 2012 (2012 Bonds) and 9,125% Senior Notes Due 2017 (2017 Bonds) (together known as the "U.S. Bonds")"----------------------------------------------------------------------------------------
------------------"b) In relation to the U.S. Bonds, the group comprising the holders of the debt, filed a competing application that in the opinion of our outside counsel and our in-house counsel, is not appropriate because according to the issuance records (Indenture), of the U.S. Bonds, for these to expire in advance, it is required that this right is exercised and reported:-----------------------------------------------------------------------------------------
---------------------------i) By the Common Representatives of the holders; or-----------------
---------------------------ii) By the holders themselves that hold at least 25% of the U.S. bonds, and in this case, that these notify the issuer and the Common Representatives of the holders so that the Common Representatives of the holders may also notify the issuer."------------------------------------------------------------------------------------------------
------------------"c) In our case, the notification received about the acceleration of the 2012 Bonds and 2017 Bonds was sent to us via diverse entities that manifested themselves as owners of the Bonds by more than 25%, but it was not accredited to us, nor did they meet the most essential of the requirements, that is, prove that they are their representatives and sign the documents".-----------------------------------------------------------------------------
------------------"d) Additionally, there is no evidence that in the cases of the 2012 Bonds and 2017 Bonds, the Common Representative had given any notification of the acceleration at the request of the 25% of the Holders, as provided in the issuance records (Indenture) of such Bonds."-------------------------------------------------------------------------
------------------"e) As far as the acceleration of the 2013 Bonds, the document received does not indicate the sender nor the character or faculty that it is a part of and it is not signed."-------------------------------------------------------------------------------------------------
------------------Given the above, it is that the trader decided to oppose the application that was applied for in the month of December 2010, since from his or her point of view, it is inappropriate for the holders of U.S. Bonds, seeking to initiate legal proceedings before complying with the rules laid down in the issuance records (Indentures). Also, the Company confirmed that in the judicial proceeding in the U.S. these arguments were also presented in defense of their interests.-------------------------------------------------------------

------------------Moreover, the creditors argue that it should operate the acceleration of early expiration of the bonds issued, provided the interest on the issuance has not been paid since February 2009, and they declare that it is indeed true, the requirements of the notifications of acceleration of anticipated expiration were met, and therefore should be considered the expiration of the interest plus the value of the bonds.--------------------------

------------------The position of the plaintiff creditors and Vitro SAB de CV,  is based on assessments of foreign law (State of New York U.S.), a situation which by its nature, is beyond the faculties of the Visitor, therefore my opinion is based on: i) the accounting books, records and financial statements of the trader, ii) The basis of Articles 10, 30, 31, 34, last paragraph of Article 36 and 29 of the LCM, which orders the visit to be practiced: a) under a visitation order in which they must express the books, records and documents of the dealer who is authorized to examine, such documents are precisely what the trader is bound to exhibit b) must make explicit reference to cases marked by Article 10 and produce an opinion which concluded on that basis, if the defendant is or is not in widespread default of payments and iii) What the Mexican Financial Reporting Standards (NIF) establish.--------------------------------------------------------------------------------

------------------Given the importance that lines the determination of the status of the expiration of the issuance of the 2012, 2013 and 2017 Bonds, the C judge hearing the case, as rector of the procedure, has the power in the LCM to resolve the issue under applicable  law.--------------------------------------------------------------------------------

------------------With regard to the definition of the anticipated expiration of the capital of the issuances of bonds cited above, I recognize that today, March 9 at 12:00 pm (twelve) a letter was presented at my office signed by C Jesus Angel Guerra Mendez, legal representative for the actors, through which various claims were made, exhibiting two certified copies of the documents referred to in writs (copy attached) that include sworn statements made by Laura L Moran, Vice President of Corporate Trust Services Division of U.S. Bank National Association and J Roberto Kampfner, Partner attorney at White & Case, legal representative of the Holders of the 2012, 2013 and 2017 Bonds, respectively, through which would like to prove that the notifications that were made to declare the acceleration of anticipated expiration of the above bonds were valid and correct. The undersigned visitor makes it known without further statement, with attention to, in accordance with the LCM, constrains its function to make the visit to the company in terms of the order form, ordered by the C Judge hearing the cause, and pursuant to that established in articles 10, 30 and 54 LCM.--------------------------------------------------------

-----------------------------------The Bankruptcy Act establishes:---------------------------------

------------------"Article 10.- For the effectiveness of this law, widespread default in the payment of the obligations of a Company that is referred to in the prior Article, consists in the default of its payment obligations to two or more distinct creditors and with the following conditions presented:--------------------------------------------------------------------

---------------------------I.- Of those expired obligations that are referred to in the previous paragraph, those that have expired for at least 30 days and 5% or more of all of the obligations that the Company is in charge of to the date the suit was presented or solicitation of the Bankruptcy".--------------------------------------------------------------------

---------------------------II.- The vendor does not have assets set out in the next paragraph, to meet at least eighty percent of its obligations due to the date of demand.------------------

------------------The assets that should be considered for the effects of the established in Section II of this article will be:--------------------------------------------------------------------

-----------------------------------a) Cash on hand and demand deposits;--------------------------

------------------------------------b) Deposits and term investments with a maturity not exceeding ninety calendar days after the date of admission of the claim;---------------------------------------------------c) Customers and accounts receivable with terms not exceeding ninety calendar days after the date of admission of the claim, and----------------------------------------------d) The securities for which if registered could be sold within a maximum period of thirty operating bank days, whose valuation at the date of the filing of the application of bankruptcy is known.---------------------------------------------

-------With the work of data collection finished, out of the analysis emerges the following------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------CONCLUSIONS-----------------------------------------------------------------------------------------------------------------------------

---------**1.-** VITRO, S.A.B. DE C.V. is a (parent) holding company whose purpose, stated in the second clause of its bylaws provides, among other things the following:--------------

-------------a) Subscribe, sell or purchase stocks, bonds, debentures, certificates, notes, warrants and other securities and documents issued in series or in mass and in general perform all operations permitted by law.-----------------------------------------------------------

-------------b) Acquire or place the shares of its capital stock, in accordance with applicable laws and policies and agreements issued by the Board, through the *Bolsa Mexicana de Valores, SA de CV* (the Mexican Stock Exchange) or any other exchange on which they are listed.------------------------------------------------------------------------------

-------------c) To enter into all kinds of contracts and civil operations, business, credit and financial services, including derivative transactions, repurchase agreements and trusts, in terms of law.-----------------------------------------------------------------------------------------------

-------------d) To hold all kinds of mutual agreements or loans and to in any way endorse or guarantee, through real or personal guarantees or as a guarantor or wholly responsible, the fulfillment of the obligations or credit instruments by its subsidiaries, affiliates or associates or, with the authorization of the Board of Directors, any other person.-----------

-------------e) Turn, accept, endorse and guarantee debt securities underwritten by their own account, or of subsidiaries or affiliates or with the authorization of the board of directors of any other person.-------------------------------------------------------------------------

-------------f) Provide all sorts of services and conduct studies for the promotion, expansion and restructuring of its subsidiaries or affiliates.-------------------------------------

-------------g) Acquire, sell, transfer, lease, manage, extend, modify, repair, servicing of all kinds of movable and immovable property.-------------------------------------------------------

-------------h) In making general contracts, perform operations and perform all acts necessary or convenient for carrying out the above objects of the society.--------------------

---------**2.-** The total payment obligations of the company VITRO SAB DE CV, whether outstanding or overdue as of December 10, 2010, the bankruptcy application filing date, were $45,892,643,383.41 (Forty-five billion, eight hundred ninety-two million, six hundred forty-three thousand, three hundred eighty-three pesos and forty-one cents).------

---------**3.-** The company's payment obligations, due after 30 days from the date of the bankruptcy application filing, were $14,134,795,967.31 (fourteen billion, one hundred thirty-four million, seven hundred ninety-five thousand, nine hundred sixty-seven pesos and thirty-one cents) for (54) (fifty-four) creditors and represent 30.80% (thirty point eighty percent) of the total of the company's payment obligations, whether outstanding or overdue, amounting to $45,892,643,383.41 (Forty-five billion, eight hundred ninety-two million, six hundred forty-three thousand, three hundred eighty-three pesos and forty-one

cents).------------------------------------------------------------------------------------------------
---------**4.-** The company's payment obligations, due within 30 days from the date of the bankruptcy application filing were $2,425,675,379.15 (two billion, four hundred twenty-five million, six hundred seventy-five thousand, three hundred seventy-nine) and represent 5.28% (five point twenty-eight percent) of the company's total payment obligations, whether outstanding or overdue, amounting to $45,892,643,383.41 (Forty-five billion, eight hundred ninety-two million, six hundred forty-three thousand, three hundred eighty-three pesos and forty-one cents).------------------------------------------------
---------**5.-** The total payment obligations not due to be paid by the bankruptcy application filing date were $29,332,172,036.95 (twenty-nine billion, three hundred thirty-two million, one hundred seventy-two thousand, thirty-six pesos and ninety-five cents), representing 63.92% (sixty-three point ninety-two percent) de the company's total payment obligations, whether outstanding or overdue, amounting to $45,892,643,383.41 (Forty-five billion, eight hundred ninety-two million, six hundred forty-three thousand, three hundred eighty-three pesos and forty-one cents).------------------------------------------
---------**6.-** The amount of the company's outstanding and overdue financial obligations by the date of the bankruptcy application filing include accounts payable to subsidiaries of VITRO SAB DE CV for the amount of $23,499,591,970.00 (twenty-three billion, four hundred ninety-nine million, five hundred ninety-one thousand, nine hundred seventy pesos and no cents) representing 51.2% (fifty-one point two percent) of the company's total outstanding and overdue payment obligations.  The integration of accounts payable to the subsidiaries of VITRO SAB DE CV are shown in the table below.---------------------

| Name of the Subsidiary | Amount of Debt in Local Currency |
|---|---|
| ADMINISTRACIÓN DE INMUEBLES VITRO SA DE CV | 4,749,999.00 |
| AEROVITRO SA DE CV | 75,566,350.00 |
| COMERCIALIZADORA ALCALI SA DE CV | 12,725,213.98 |
| COMPAÑÍA VIDRIERA SA DE CV | 4,395,515,941.89 |
| FIC REGIOMONTANO SAPI DE CV | 368,116,869.05 |
| INDUSTRIA DEL ALCALI SA DE CV | 214,180,897.76 |
| IP VITRO VIDIRIO Y CRISTAL LTD | 142,512,337.72 |
| SERVICIOS VIDRIERA GUDALAJARA SA DE CV | 727,706.00 |
| SERVICIO VITRO COSMOS SA DE CV | 1,212,844.00 |
| VIDRIERA LOS REYES SA DE CV | 22,865,930.68 |
| VIDRIERA MONTERREY SA DE CV | 479,143,825.61 |
| VIDRIERA TOLUCA SA DE CV | 324,089.49 |
| VIDRIO PLANO DE MEXICO SA DE CV | 1,750,786.20 |
| VIDRIO PLANO SA DE CV | 2,838,897.00 |
| VIMEXICO SA DE CV | 404,969,991.92 |
| VITRO AUTOMOTRIZ SA DE CV | 1,200,624,048.00 |
| VITRO CRISTALGLASS SL | 12,639.18 |
| VITRO ENVASES NORTEAMERICA SA DE CV | 13,904,423,469.13 |
| VITRO EDROPA LTD | 1,191,959,328.59 |
| VITRO GLOBAL LTD | 42,880,430.96 |
| VITRO PACKAGING LLC | 130,301,996.26 |

| VITRO VIDRIO Y CRISTAL SA DE CV | 559,608,831.22 |
| VVP EUROPA HOLDING LTD | 342,579,546.36 |
| **Total Accounts Payable to Subsidiaries** | **$23,499,591,970.00** |

---------**7.**- The aggregate amount of Accounts Payable to Subsidiaries increased significantly during fiscal year 2009, as a result of restructuring or the financial and corporate reorganization undertaken by the administration of the company, which was reflected in an increase in the balances of balance sheets of Vitro SAB de CV from December 2008 to December 2009 in the following accounts: i) Investment in shares, ii) Accounts receivable from subsidiaries and iii) Accounts payable to subsidiaries.-----------
---------The restructuring or reorganization, as I was informed by the company, was necessary because of the need to secure financing to maintain a minimum cash balance to enable it to continue operating. In order to try to secure financing, they approached various financial institutions, which either did not take interest in supporting Vitro, or the conditions in which they would have offered or provided support would have been too burdensome for Vitro.--------------------------------------------------------------------------
----------------------------According to the report released by the company, the only institution that offered acceptable terms, given the implicit risk of the operation, was Fintech Investments, Ltd (Fintech), which offered its support in the form of a structured transaction that complied with the following:-------------------------------------------------------
------------------i) That certain subsidiaries of Vitro contribute land in a Mexican trust, in exchange for a contribution of $75 million dollars; ----------------------------------------------
------------------ii) That Compañía Vidriera, SA de CV enter into a leasing contract with the abovementioned trust; ------------------------------------------------------------------------------
------------------iii) That the trustees have the right to the reacquisition of the land, subject to the fulfillment of certain requirements, and-------------------------------------------------------
------------------iv) That Vitro guarantees the right to participate in the capital of the company "SAPI", which would be the holding company of certain subsidiaries of Vitro, later capitalizing on its accounts payable.-------------------------------------------------------------
---------The company reported during the development of the verification visit for that transaction, every implicit detail was presented and approved by the Board of Directors of Vitro, as well as by the Corporate Practices Committee, the Audit Committee and the Federal Competition Commission, and that the transactions that the Securities Market Law designated as revealing were made public through the Mexican Stock Exchange and the Securities and Exchange Commission of the United States.---------------------------------
---------The company also reported that, in order to comply with the requirements requested by the Investor, constituting a trust in Banco Invex, they contributed seven pieces of land, mostly industrial with a market value of $75 million dollars, and entered into a lease contract with this banking institution in its capacity as trustee of the trust.-----
---------Also, to create a subsidiary that meets the conditions set by the Investor, in December of 2009, Vitro conducted a restructuring or corporate reorganization, that resulted in the creation of a subsidiary called FIC Regiomontanus, SAPI de CV.------------
---------According to the company, the process of restructuring and corporate reorganization involved a series of intercompany transactions involving various capitalization of subsidiaries, stock sales, subrogation and debt assumption, among others, which created the previously mentioned SAPI with the subsidiaries required by the Investor, with a minimal debt level and resulting in Vitro SAB de CV experiencing growth in the balance of the Equity Investment accounts, Accounts Receivable from

Subsidiaries and Accounts Payable to Subsidiaries, without having any effect on the consolidated financial statements of Vitro, for transactions between companies.------------ ---------**8.**- Among the payment obligations not fulfilled by the company as of December 10, 2010, the date of the bankruptcy application filing, there are three certain senior notes issued in the New York market, and whose amount of capital, without taking into consideration the normal or late-payment interest amount to $1,216,000,000 (one billion, two hundred sixteen million dollars), which is equivalent to $15,137,254,400 (fifteen billion, one hundred thirty-seven million, two hundred fifty-four thousand, four hundred pesos) based on the exchange rate effective on December 10, 2010 of 12.4484 that represents 33.0% of the company's total obligations outstanding and overdue and whose integration is presented below:--------------------------------------------------------------

| Bond Issuance | U.S. Dollars | Mexican Pesos |
|---|---|---|
| 8.525% Senior Bond due 2012 | 300,000,000 | 3,734,520,000 |
| 11.75% Senior Bond due 2013 | 216,000,000 | 2,688,854,400 |
| 9.125% Senior Bond due 2017 | 700,000,000 | 8,713,880,000 |
| Total | 1,216,000,000 | 15,137,254,400 |

------------------The company has failed to pay the interest on the these bond issuances since February of 2009, however, considering the grounds established in the relevant record of issuance have not been updated to be considered as lost capital, under which, in their opinion, they were not properly served with a notice of acceleration for early termination, and on behalf of the Trustee, or the bondholders representing over 25% of the value of each issuance. To support this statement, the company provided the following documents:--------------------------------------------------------------------------- ---------------------------i) Company Balance Sheet from December 10, 2010, signed by their Legal Representative, in which the credits are recorded as current liabilities under the non-payment of interest, but excluding capital debts of the bond issues as due, in accordance with paragraph 55 of newsletter C9 Mexican *Normas de Información Financiera (NIF)*, or Mexican Financial Reporting Standards, which states: "*The current liability is that the settlement will occur within one year. An exception is made to this rule if the normal cycle of operations is more than a year and a similar exception is made in the classification of assets. In this case, the current liabilities include all debts that are incurred within the normal cycle of operations and this should be mentioned in the financial statements and accompanying notes. Likewise, those maturing debts not subject to the control of the entity are classified as current liabilities.*"-------------------------------- ---------------------------ii) Letter from the director of the internal legal department, which states that, from the company's point of view, the notices of acceleration of the early maturity of the payment of principal made with respect to the 2012, 2013 and 2017 bonds, do not comply with the formalities necessary to consider them as valid, so the capital bond issuances will not be considered expired up to December 10, 2010.------------ ---------------------------iii) Company letter signed by the legal representative, which sets the accounting criteria applied in relation to capital bond issuances and the reasoning that supports the criteria for registering them as non-current liabilities, as well as its basis according to the Mexican Financial Reporting Standards (NIF).------------------------------- ---------------------------iv) Letter from the external auditor of the company, in which it is confirmed that the criteria applied by company staff to record their financial transactions is in compliance with the stated criteria of the Mexican Financial Reporting Standards

enforced in the country.--------------------------------------------------------------------------------
----------------------------v) Based on the documents set forth above, I have considered the interest not paid as due, and the capital issuances as unexpired.--------------------------------
---------**9.**- The total assets in bankruptcy to meet the company's payment obligations is $41,349,976.77 (forty-one million, three hundred forty-nine thousand, nine hundred seventy-six pesos and seventy-seven cents) representing 0.25% (zero point twenty-five percent) of the company's total overdue obligations.---------------------------------------------
---------**10.**- In accordance with the foregoing, we conclude that:------------------------------
------------------a) The merchant has breached its obligations to pay more than two creditors.-----------------------------------------------------------------------------------------
------------------b) There is no update to the assumptions of Section I of Article 10 to the Bankruptcy Act, since the payment obligations are overdue after 30 days from December 10, 2010, the bankruptcy application filing date, representing 30.80% (Thirty point eighty percent) of the total outstanding or overdue obligations, which is less than the 35% established in this fraction-----------------------------------------------------------------------
------------------c) If you upgrade the assumptions of Section II of Article 10 of the Bankruptcy Act, as the amount of assets in bankruptcy represent 9.25% (zero point twenty-five percent) of all of the company's payment obligations, the result is lower than the 80% established in this fraction.--------------------------------------------------------------
---------**11.**- The Bankruptcy Act provides in Article 9.- "The Company that widely fails to pay its obligations will have to declare bankruptcy."---------------------------------------------
---------It is understood that the Company widely failed in the payment of its obligations when:---------------------------------------------------------------------------------------------
------------------I. The Company declares bankruptcy and is located in one of these recorded cases in Sections I and II of the following article, or---------------------------
------------------II. Any creditor or the Public Prosecutor had demanded the company declare bankruptcy and this is located in the two cases recorded in Sections I and II of the following article.-----------------------------------------------------------------------------------
---------**12.**- Under the Bankruptcy application filing derived from the demand of a creditor and considering the obligations overdue for more than 30 days as of December 10, 2010, the company VITRO SAB DE CV demonstrated widespread non-compliance by not making payments, because if it had fulfilled its obligations to pay more than two creditors and updated the assumptions of Section II of Article 10 of the Bankruptcy Act, rather than updating the assumptions of Section I of the same Article of the Bankruptcy Act, so it does not fall under the assumptions of Section II of Article 9 of the Bankruptcy Act.--------------------------------------------------------------------------------------------
---------**13.**- Pursuant to the provisions of Article 40 of the LCM which provides that the visitor render his or her opinion taking into consideration the facts of the case, as well as those raised in the answer to the same and, by virtue of the claim one must question the legitimacy of the accounts payable of VITRO SAB de CV and its subsidiaries, it was determined that the amount of the payment obligations that the company had on the date of the bankruptcy application filing with third parties other than its subsidiaries were as follows :-----------------------------------------------------------------------------------------
------------------i.- The total payment obligations of the company, VITRO SAB DE CV, overdue and outstanding, as of December 10, 2010, the date of the bankruptcy application filing, without considering the payment obligations with its subsidiaries, which amount to $22,393,051,413.41 (twenty-two billion, three hundred ninety-three million, fifty-one thousand, four hundred thirteen pesos and forty-one cents)-------------------------------------

------------------ii.- The company's payment obligations, due after 30 days from the date of the bankruptcy application filing, amount to $3,497,496,446.52 (three billion, four hundred ninety-seven million, four hundred ninety-six thousand, four hundred forty-six pesos and fifty-two cents), for 31 (thirty-one) different creditors, representing 15.62% (fifteen point sixty-two percent) of the company's total payment obligations, outstanding and overdue totaling $22,393,051,413.41 (twenty-two billion, three hundred ninety-three million, fifty-one thousand, four hundred thirteen pesos and forty-one cents)----------------

------------------iii.- The company's payment obligations, due within 30 days from the date of the bankruptcy application filing total $4,753,217.62 (four million, seven hundred fifty-three thousand, two hundred seventeen pesos and sixty-two cents)----------------------

------------------iv.- The company's total outstanding payment obligations by the bankruptcy application filing date totaled $18,890,801,749.28 (eighteen billion, eight hundred ninety million, eight hundred one thousand, seven hundred forty-nine pesos and twenty-eight cents), representing 84.4% (eighty-four point four percent) of the total of the company's total payment obligations, outstanding and overdue, amounting to $22,393,051,413.41 (twenty-two billion, three hundred ninety-three million, fifty-one thousand, four hundred thirteen pesos and forty-one cents)-------------------------------------

------------------v.- The total assets in bankruptcy to comply with the company's payment obligations amount to $41,349,976.77 (forty-one million, three hundred forty-nine thousand, nine hundred seventy-six pesos and seventy-seven cents), representing 1.18% (one point eighteen percent) of the company's total overdue payment obligations, which amount to $22,393,051,413.41(twenty-two billion, three hundred ninety-three million, fifty-one thousand, four hundred thirteen pesos and forty-one cents)-------------------------

---------**14.**- Taking the operations of VITRO SAB de CV into consideration and those of its subsidiaries, as a single economic unit, the company VITRO SAB DE CV demonstrated widespread non-compliance by not making payments, because if it had fulfilled its obligations to pay more than two creditors and updated the assumptions of Section II of Article 10 of the Bankruptcy Act, rather than updating the assumptions of Section I of the same Article of the Bankruptcy Act, so it does not fall under the assumptions of Section II of Article 9 of the Bankruptcy Act-----------------------------------

---------Finally it is noted that during the period of this visit there were no incidences, which is why I write with my assistants that we were able to perform our work without any setbacks.-------------------------------------------------------------------------------

------------------Reading what occurred and being informed of its contents and legal scope, this record is complete, at 1:00 pm on March 9, 2011 and comprised of 8 total pages of text: 7 (seven) double-sided pages of text and one page only single-sided--------------------

-------------------------------------------------------------------------------------------------

-------------------------------------------I attest------------------------------------------------

----------------------------Aware of its contents and legal scope, we the following, have signed this record: RAFAEL COLOME CARRASCO as legal representative of VITRO SAB DE CV, RAÚL ARMANDO CONTRERAS VILLAFRANCA and GUSTAVO RODRÍGUEZ MANRIQUE as witnesses of VITRO SAB DE CV, JOSÉ LUÍS ELIZONDO CANTU, in his capacity as an inspector appointed by the Federal Institute of Bankruptcy Specialists, VÍCTOR MANUEL AGUILERA GÓMEZ and ROGELIO GONZÁLEZ VILLAGÓMEZ in their capacity as witnesses of the visitor, at 10:30 pm on March 9, 2011, in the municipality of San Pedro Garza García, Nuevo León. This record was presented in four original copies, each consisting of eight total pages, which included seven double-sided pages and one single-sided page, one copy given to the company in

this record, one will appear before the Fourth District Court on Civil and Labor Matters in the State of Nuevo León, one copy is for the Federal Institute of Bankruptcy Specialists, which leaves one copy for my personal file, EVIDENCED-----------------------
---------------------------------------------------------------------------------------------------------

**JOSE LUIS ELIZONDO CANTU**
VISITADOR DESIGNADO POR EL IFECOM

**RAFAEL COLOME CARRASCO**
REPRESENTANTE LEGAL DE VITRO, S.A.B. DE C.V.

**RAÚL ARMANDO CONTRERAS VILLAFRANCA**
TESTIGO DESIGNADO POR EL COMERCIANTE

**GUSTAVO RODRÍGUEZ MANRIQUE**
TESTIGO DESIGNADO POR EL COMERCIANTE
**VÍCTOR MANUEL AGUILERA GÓMEZ**
AUXILIAR DEL VISITADOR

**ROGELIO GONZÁLEZ VILLAGÓMEZ**
AUXILIAR DEL VISITADOR

**Exhibit Q**

**VITRO, S.A.B. DE C.V.**
**PETITION IN BANKRUPTCY**
**WITH PRIOR RESTRUCTURING PLAN**


**FILE NUMBER:**


**DISTRICT JUDGE IN CIVIL AND LABOR**
**MATTERS ON DUTY HEADQUARTERED**
**IN MONTERREY, NUEVO LEÓN.**


    **ALEJANDRO FRANCISCO SÁNCHEZ MÚJICA,** representing **VITRO, S.A.B. DE C.V.,** which identity I prove with the notarized instrument attached with this brief as exhibit **1)**, indicating as procedural domicile of the company represented by me to hear and receive all types of notifications located at Condominio Torre Comercial América, floor 6, office 603, located on Avenida Batallón de San Patricio number 111, colonia Valle Oriente, postal code 66269, in San Pedro Garza García, Nuevo León, Mexico, and authorizing to hear and receive notifications and in the broadest terms of third paragraph of article 1069 of the Commercial Code Attorneys Alonso Rivera Gaxiola, José Luís Carrasco Tovar, Fernando José Barrera Ramírez, Fabián Bartolini Esparza, Abraham Gómez Velázquez, Carlos Fernando Chapela de Alvarado, Bela Kalloi Romero, Pedro Iván Quevedo Ramos, and Alejandro Del Castillo Ramírez, who are co-holders of professional card number 2758882, 3734044, 4594543, 5852047, 5912429, 3793773, 5743541, 6147032 y 6024819, respectively, duly recorded with the register established for this purpose by the Federal Judiciary, and authorizing to hear and receive notifications, documents and securities and

obtain files Messrs. Rodrigo Lagos Scherer, Ramón Fernández Vigil, Jorge Roberto Mora Nieto, Rodrigo Said Adam, Marlene Fabiola Colín González, Diego Machuca Rojas, Gerardo Millán Betancourt, Rafael Plancarte Gómez and Santiago Barroso Torres, indistinctively, respectfully state to Your Honor:

That by this brief, pursuant to articles 1, 2, 3, 9, 10, 17, 20, 22, 339 and other relative and applicable articles of the Bankruptcy Law and in the terms of this Petition in Bankruptcy with Prior Restructuring Plan, I request Your Honor to declare and constitute **VITRO, S.A.B. DE C.V.** in bankruptcy, in order to preserve the company and avoid its generalized default on payment obligations in a way that would place at risk its viability and that of the other companies with which it does business.

I base this petition on the following facts and considerations of law, expressed pursuant to articles 20, 22, 339 and other relevant and applicable articles of the Bankruptcy Law:

## THE FACTS

## I.- GENERAL BACKGROUND

**1.- VITRO, S.A.B. DE C.V.** (hereinafter, for purposes of procedural economy "**VITRO**") is a Mexican company, incorporated since 1936 under the name **FOMENTO DE INDUSTRIA Y COMERCIO, S.A.**

I prove the above with certified copy of the notarized instrument enclosed as exhibit number **2**).

**2.-** Its corporate existence originates from the company named Vidriera Monterrey, S.A. de C.V., which was incorporated in 1909. Vitro has more than 100 years in operation and enjoys ample recognition and prestige at national and international level and, through its subsidiaries, is the largest glass producer in Mexico and one of the main glass producers in the world.

**3.-** The main activity of **VITRO** is the holding of shares of other companies, through which it engages in the manufacture and offering of its products, with the best quality, to meet the basic needs of the various types of industries through its two large business lines: Glass Containers and Flat Glass.

Thus, the subsidiaries of **VITRO** produce, process, distribute and market a broad range of glass articles in order to offer solutions to multiple markets that include the wine, liquor, cosmetics, pharmaceuticals, food and beverage markets as well the automotive and construction markets.

**4. VITRO** has contributed to improving the quality of life not only of its personnel but also of the communities where it operates, generating jobs and economic

prosperity thanks to its permanent focus of quality and continuous improvement as well as constant effort to promote sustainable development.

**5.** The operations of the company represented by me are carried out mainly in the Mexican Republic; currently it has installations and a broad distribution network in nine countries in America and Europe in addition to the fact that its products are marketed around the world, through its subsidiaries and partners.

**6. VITRO** generates more than 17,000 (seventeen thousand) direct jobs and a significantly higher number of indirect jobs.

## II. CORPORATE BACKGROUND

**1.** By public instrument 158 dated August 27, 1936 executed before Notary Public active in this city Atty. Carlos Hinojosa Guarjardo duly registered under No. 139, volume 82, book 3, second auxiliary book and the registration page number 53, page 171, volume 9, book 1, registration section, both registrations dated October 3, 1936 in the Public Register of Property and Commerce of the Municipality of Monterrey, the company named **FOMENTO DE INDUSTRIA Y COMERCIO S.A.,** today "**VITRO S.A.B. DE C.V.**" was incorporated, domiciled in this city with a term of 50 years and an initial capital of $1,000,000.00 (one million pesos 00/100 National Tender).

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **2**).

**2.** After multiple capital increases as well as multiple amendments in various clauses of bylaws, by public instrument 19,528 dated May 9, 1980 executed before Notary Public 12 active in this Municipality, Attorney Fernando Mendez Lopez, duly registered under number 1,224, volume 117, book 4, third auxiliary book, miscellaneous acts and contracts, commercial section, dated June 9, 1980, the public register of Property and Commerce of Municipality recorded minutes of general extraordinary shareholders meeting in which it was decided to change the name of the company from **FOMENTO DE INDUSTRIA Y COMERCIO SOCIEDAD ANONIMA** to **VITRO, SOCIEDAD ANONIMA** to increase the capital of the company to the amount of $2,000,000,000.00 (two billion pesos 00/100 National Tender) and amend clauses One, Six, Seven, Eleven and add clause Thirty-eight to the bylaws, after permission from the Secretariat of Foreign Relations number 20418, file number 20280, dated April 24, 1980 and number 10833, file number 20280, dated February 28, 1980.

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **3**).

**3.** By public instrument 16,043 dated April 13, 2005 executed before Attorney Oscar Elizondo Garze, notary public owner of Notary Public Office number 25 of the first

registration district of this city, minutes of extraordinary shareholders meetings were recorded, deciding on the merger by absorption carried out by **VITRO** S.A. DE C.V. as absorbing company with the legal person named FOMENTO INMOBILIARIO Y DE LA CONSTRUCCION, S.A. DE C.V., as absorbed company, which was duly recorded in the electronic commercial folio number 1062\*9, internal control 99, commercial section, on May 12, 2005, in the Public Register of Commerce of this city.

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **4).**

**4.-** By public instrument 17,738 of December 7, 2006, executed before attorney Oscar Elizondo Garza, at the time notary public owner of notary public office number 25 of the first registration district of this city, there were recorded minutes of a general extraordinary shareholders' meeting dated November 29, 2006, in which it was decided to consider and issue a resolution concerning a project to amend clauses one, two, three, four, five, six, seven, eight, nine, ten, eleven, thirteen, fourteen, fifteen, sixteen, seventeen, eighteen, nineteen, twenty, twenty-one, twenty-three, twenty-four, twenty-five, twenty-six, twenty-nine, thirty, thirty-one, thirty-two, thirty-three, forty-one and forty-two of the bylaws, inter alia, in order to adapt them to the Securities Market Law, including the content of the measures referred to in article 48 of said body of law, which was recorded under electronic commercial folio 1062\*9, internal control 63, in the Public Register of Commerce of this City, on December 15, 2006.

Thus, in that meeting, the name of the company represented by me was established as it exists currently, **VITRO, S.AB. DE C.V.**

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **5)**.

**5.-** Pursuant to clause two of its bylaws, the corporate object of **VITRO** is the following:

"I.- To subscribe, sell or acquire shares, bonds, debentures, certificates, promissory notes, optional securities and other securities and documents issued in series or in mass, and in general, carry out with them all types of operations permitted by legal provisions."

II.- To acquire or place shares representing its capital, pursuant to the applicable legal provisions and the policies and decisions issued by the Board of Directors, through Bolsa Mexicana de Valores, S.A. de C.V., or any other stock exchange on which they are listed.

III.- To execute all types of contracts and civil, commercial, credit and financial operations, including derivatives, repo and trusts, pursuant to the law.

IV.- To execute all types of loan or borrowing contracts and endorse or guarantee in any manner, through real or personal guarantees or as guarantor or joint obligor, the performance of the obligations or credit instruments assumed by its subsidiaries, affiliates or associates or with the authorization of

the Board of Directors, of any other person.

V.- To issue, accept, endorse and guarantee securities subscribed on behalf of its subsidiaries, associate or affiliates, or with the authorization of the Board of Directors, of any other person.

VI.- To render all types of services and carry out studies of promotion, expansion and restructuring of its subsidiaries, associates or affiliates.

VII.- To buy, sell, transmit, lease, administer, expand, modify, repair, give maintenance to all types of movables and real estate assets.

VIII.- In general, to execute contracts, to carry out operations and acts necessary or convenient for the achievement of the above objects of the company.

**6.** Well now, the capital of **VITRO** is variable, the fixed minimum being $324,000,000.00 (Three hundred twenty-four million pesos 00/100 National Tender) represented by 324,000,000 (Three hundred twenty-four million) common registered shares without par value. The fixed and variable parts of the capital are represented by a single series of common shares named Series "A," which is divided into Class I, representing the fixed part of the capital, and Class II, representing the variable part of the capital. Pursuant to the General Law of Commercial Companies, the shares certificates do not indicate the amount of the capital.

**7.-** The current capital of **VITRO** consists of 386,857,143 (Three hundred eighty-six million eight hundred fifty-seven thousand one hundred forty-three) common registered shares without par value, Vitro Series "A." of which 386,411,643 (Three hundred

eighty-six million four hundred eleven thousand six hundred forty-three) shares are paid in and outstanding.

I prove the statements made in this section and in section 6 above with the certified copy of Public Instrument number 17,471 dated October 6, 2006, executed before Assistant Notary Public active at Notary Public Office number 25 owned by Attorney Oscar Elizondo Garza, Attorney Oscar Elizondo Alfonso, containing the registration of the minutes of the General Ordinary Shareholders' Meeting of **VITRO** dated September 27, 2006, which determine the last modification, namely an increase, of the variable part of the capital of the company, which is attached as exhibit **6).**

**8.-** The Capital of **VITRO** is constituted as follows:

| TOTAL CAPITAL | CAPITAL (FIXED PART) | CAPITAL (VARIABLE PART) |
|---|---|---|
| $386,857,143.00, represented by 386,857,143 Vitro Series "A" shares. | $324,000,000.00, represented by 324,000,000 Vitro Series "A" Class I shares. | $62,857,143.00, represented by 62,857,143 Vitro Series "A" Class II shares. |

**9.- VITRO** is a listed corporation whose shares are traded on Bolsa Mexicana de Valores under the symbol VITRO A.

**10.- VITRO** is administered by a Board of Directors which to date consists of Atty. Adrián Sada González, Atty. Joaquín Vargas Guajardo, C.P.A. Manuel Güemez de la Vega, Eng. Tomás González Sada, C.P.A. Mario Laborín Gómez, Atty. Ricardo Martin Bringas, Dr. Guillermo Ortíz Martínez, Eng. Jaime Rico Garza, Atty. Adrián Sada Cueva, Atty. Federico Sada Melo, Dr. Jaime Serra Puche and C.P.A. Andrés Yarte Cantú and by a Director and CEO, who is Eng. Hugo Alejandro Lara García. The Secretary of the Board of Directors, who is not a member thereof, is the undersigned Alejandro Francisco Sánchez Mújica.

I prove the above with certified copy of Public Instrument number 2,602 dated June 10, 2010, executed before Attorney Oscar Elizondo Alonso, owner of Notary Public office number 25 in this City, which contains the registration of the minutes of the Ordinary General Shareholders' Meeting of **VITRO** dated April 29, 2010, which is enclosed as exhibit **7).**

**11.-** The corporate domicile of **VITRO** is in San Pedro Garza García, Nuevo León, Mexico, with the main place of business and its main administration place at its administrative offices located at calle de Ricardo Margáin Zozaya # 400 , colonia Valle del Campestre, in San Pedro Garza García, Nuevo León, Mexico, also with offices and tax

domicile at calle de Roble 660, Colonia Valle del Campestre, in San Pedro Garza García, Nuevo León, without other offices, warehouses, storerooms and factories as identified in the list which I enclose herewith as exhibit **8)**; this is reported in the terms and for the purposes of article 20 paragraph two of the Bankruptcy Law.

## III.- FINANCIAL SITUATION

**1.-** To date, the main direct and indirect subsidiaries of **VITRO** are operating with the regularity allowed by the world economic situation and the markets where it carries out its activity, but the group faces an aggravated situation of limited liquidity, which places it at risk of generalized default on its obligations that would place at risk its viability and that of the other companies with which it does business.

Indeed, on the one hand, due to the need to import inputs and the denomination of some of its financial obligations, **VITRO** was compelled to seek mechanisms of protection and hedging for its exchange risk, due to the fluctuation in the rate of exchange of the Mexican peso versus the US dollar, currency in which most of its debt is denominated.

Equally, for daily operations of purchase of natural gas of its operating subsidiaries (indispensable for the operation of its furnaces), they were also obligated to

resort to mechanism of protection and hedging due to their own fluctuation in the price of said input.

Such being the case, various **VITRO** subsidiaries contracted derivative financial instruments, mainly hedging, the determination of whose value or position is precisely derived from or depending on an underlying security, which is listed on the relevant markets. Said contracts are known in the international markets as ISDAs, according to the association or agency that created them (International Swaps and Derivatives Association, Inc.).

In said class of operations, during the term of the contract margins are generated in favor or against each of the counterparties to the contract, depending on the fluctuation of the corresponding underlying security and the parameters or indexes established therein; with obligation for the party in whose charge a difference margin is generated to guarantee it immediately at the request of the counterparty ("margin calls"), within an extremely short period of time (normally 48 business hours) in the manner established in each contract, which is generally cash or extremely solid and immediately realizable securities, such as short-term US Treasury bonds. It must be noted that the ISDAs are framework or standard contracts precisely issued by said association from time to time, and in which the parties, by regulation, establish only certain specific or particular questions of each operation in the annexes of each contract.

**2.-** It so happens that international or even global macro-economic factors which occurred especially starting in the last quarter of 2008 seriously affected the financial situation of the company and of its direct and indirect subsidiaries, making it imminent for them a serious problem of immediate liquidity, in spite of their solvency, since the fluctuation of the value of their positions resulting from their derivative operations caused margin calls and notices of early termination from their counterparties in the various derivative financial instruments causing havoc in the liquidity of the company, which was forced to suddenly use the operating cash flow to cover or guarantee said margins.

The above was aggravated by the corresponding recession in the US economy, and the consequent slowdown of world economy, which caused a very significant effect on the reconsideration of the global sales of the subsidiaries of the company represented by me and therefore in its income, as well in its capacity to face the service and amortization of its debt, with the consequent imminence of the acceleration and early maturity of its obligations.

To cite some examples, in the automotive market of original equipment, Vitro obtains a large part of its sales to large car suppliers, known as "OEM's" or Original Engine Manufacturers, whose sales of new automobiles were reduced and which accumulated inventories at historical levels, so that an important part of their manufacturing centers had to be temporarily closed and consequently eliminated the purchases from their providers such as Vitro. In the case of this automotive industry, it was necessary for the U.S. government to

give its support by the program known as "cash for clunkers" and subsequently, the Mexican government did the same thing with programs of incentives to the industry.

Another clear example of recession in the markets in which Vitro is active is in the beer market. One of the main customers of Vitro came to represent approximately 12% of the consolidated income. The world recession, which mainly affected the United States of America, generated levels of unemployment similar to those experienced during the Great Depression, which affected the purchasing power of the people of said country, which caused the export sales of this client to be drastically reduced, and consequently, it had to slow down its purchases from Vitro, which caused Vitro to stop receiving a significant part of income, strongly affecting its operating margins since it had a mainly high mix of fixed costs, which do not vary depending on the variation of the sales.

In another vein, but continuing with the impacts on the markets that made Vitro default on its financial obligations, another important factor is the consolidation of some of the industries in which Vitro participates; an example can be given with another of its significant customers which was acquired by a company which has a subsidiary engaging in the manufacture of glass containers, which made the customer decide to integrate vertically, choosing to manufacture its own containers and withdrawing the orders from the Vitro subsidiary which used to manufacture them.

Well now, concerning the topic of the construction markets where **VITRO** subsidiaries have a significant participation not only in Mexico but in other countries as well

we can indicate the case of the US market which, following the mortgage crisis significantly increased the supply of houses and commercial spaces for sale, which caused the construction of new spaces to be materially reduced; consequently, the glass previous exported by **VITRO** to the United States experienced a sudden and precipitated drop in demand, causing **VITRO**, in the midst of the crisis, to be obligated to seek new markets to sell its products; as a way to move this product, it found the Brazilian market but given the high transport cost involved in bringing the glass to this country, this market has lower profit margins. Concerning other countries where **VITRO** is active in the construction market, there is Spain, which, to a higher extent than in the United States, had its commercial activities slowed down in various aspects, including construction and currently, in order to maintain a competitive position in the Spanish market, the business reduced its activity to a minimum but even so it continues operating with negative margins.

**3.** Thus, **VITRO** was seriously affected in its finance, because of the following reasons.

**(A)** The collapse of the financial system and consequent recession in the United States economy and the significant reduction in the production of the automobile industry, construction and glass containers in North America and Europe.

**(B)** The growing slow down of the economy and industrial activity which consequently affected the economies of the world.

**(C)** Strong depreciation of the peso versus the dollar which occurred during the first quarter of 2009 reaching 39.4% versus the average of the third quarter 2008, which made its costs more expensive, especially financial costs, since the operating companies of the company represented by me are significant importers who had to protect or hedge their foreign exchange position by contracting hedging or derivative contracts, ISDAs, mentioned above.

**(D)** Said fluctuation in the value of its positions resulting from its derivative operations caused margin calls for 85 million dollars and sudden debt of more than 320 million dollars and notices of early termination from their counterparts in the various derivatives.

**4.-** Furthermore, **VITRO's** liquidity problem became acute mainly because of the exhaustion of the short-term lines of credit and the narrowing of the national and international debt markets which are a fundamental support for large-scale economic and industrial activity.

**5.-** In this adverse environment, which caused the lack of liquidity of the company represented by me, I must repeat that the operations of its direct and indirect subsidiaries have been maintained, timely filling the requests of their clients and preserving the largest quantity possible of sources of employment.

**6.-** Given this situation and the imminent maturity of its liabilities, the company represented by me has taken countless steps with its known creditors in order to maintain an orderly restructuring of its debt, hiring financial experts with the highest international prestige, such as the firm Rothschild, Inc. with vast experience, not only international, but in many financial restructuring operations in Mexico, making countless presentations to its creditors on its financial situation, presenting many offerings for restructuring, contemplating the highest level of debt sustainable for the company, offering optional capitalization of part thereof and even offering to cover part of its debts by significant cash payments to the benefit of its creditors, all in order to avoid a state of generalized default on its obligations that would place at risk its viability and that of the companies with which it does business, such as its providers and customers.

**7.-** According to its accounting records, as of September 30, 2010, the date of the most recent quarterly financial statements expressed in millions of pesos, **VITRO** had (a) direct liabilities to creditors which are not direct or indirect subsidiaries for $20,508,000,000.00 (twenty billion five hundred eight million pesos 00/100 National Tender), approximately US$1,640,000,000.00 (one billion six hundred forty million dollars 00/100 U.S. Currency), (b) liabilities due to guarantees granted in favor of third parties for the obligations of its subsidiaries for $2,375,000,000.00 (two billion three hundred seventy-five million pesos 00/100 National Tender), equivalent to approximately US$190,000,000.00 (one hundred ninety million dollars 00/100 U.S. Currency), and (c) direct liabilities to its direct or indirect subsidiaries in the amount of $23,872,000,000.00 (twenty-three billion eight

hundred seventy-two million pesos 00/100 National Tender), equivalent to US$1,910,000,000.00 (one billion nine hundred ten million dollars 00/100 U.S. Currency).

**8.-** VITRO is a completely viable business, however, I declare Under Penalty of Perjury that in the very near future, it will lack current assets among those stated in the second paragraph, section II, article 10 of the Bankruptcy Law in order to face at least 80% (eighty percent) of its matured obligations and within 30 days more than 35% of its total debt for more than 30 days will be matured so that, complying with the conditions and requisites referred to in articles 9, 10, 11, 20, 22 and 339 of the Bankruptcy Law, it seeks the restructuring of its liabilities in order to preserve the company and avoid its generalized default on payment obligations in a manner that would place at risk its viability and that of the other companies with which it does business.

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **9).**

**9.-** Concerning the financial situation of the company (considered individually without consolidation with its subsidiaries) at the end of the most recent fiscal year ended and audited, i.e. as at December 31, 2009, it must be indicated that it had total liabilities in the amount of $42,826,000,000.00 (forty two billion eight hundred twenty six million pesos), versus total assets in the amount of $43,376,000,000.00 (forty three billion three hundred seventy-six million pesos).

We attach to this petition as exhibit **10),** the individual audited financial statements as at December 31, 2009, as well as those for fiscal years 2008 and 2007, as exhibits **11)** and **12)**, pursuant to article 20, section I of the Bankruptcy Law.

**10.-** On the other hand, concerning **VITRO's** financial situation consolidated with its subsidiaries, considered as at December 31, 2009, it must be indicated that the company reported total liabilities in the amount of $30,668,000,000.00 (thirty billion six hundred sixty eight million pesos), versus total assets in the amount of $32,652,000,000.00 (Thirty two billion six hundred fifty two million).

I prove the above with the certified copy of said public instrument, which is enclosed as exhibit number **13**).

**11.-** Such being the case, given **VITRO's** financial situation and the foreseeable maturity of its liabilities, it took countless steps with its creditors in order to achieve a restructuring of its liabilities and reached an agreement with most of them, in the terms and conditions provided in the Settlement Agreement signed by the petitioner and its creditors who signed it and which I enclose with this brief as **14)** (the "Settlement Agreement"); for this reason, it requests to be declared in bankruptcy with Prior Restructuring Plan.

Pursuant to article 339 section II of the Bankruptcy Law I declare to your Honor, Under Penalty of Perjury, that the Creditors who signed this petition with the company represented by me account for approximately 68% of all debts of the company represented by me, greater than the 40% required by article 339, section II of the Bankruptcy Law, for which I also request to be declared by VITRO under the terms stated in Declaration I.E. of the Restructuring Agreement.

The abovementioned creditors are also required to submit the present request for the creditors' meeting, conforming with clause 16 of the Restructuring Agreement and in the terms outlined in article 339 section II of the Bankruptcy Law, in addition to those who signed physically through the respective signature pages of this petition.

**12.-** Equally, in order to comply with article 339 section III of the Bankruptcy Law, the authorized attorneys of VITRO declare to your Honor, Under Penalty of Perjury, that before the expiration date of the various credits in this position and from the refusal of the creditors to extend these dates due to VITRO's current situation, imminently the company represented by me will be in the situation referred to in articles 10 and 11 of the Bankruptcy Law because of the following:

**(A)** The company represented by me will have up to 30 days in the short term matured obligations accounting for more than 35% (thirty five percent) of all its obligations for more than thirty days.

**(B)** The company represented by me will not have up to 30 days in the short term assets among those stated in the second paragraph section II of article 10 of the Bankruptcy Law in order to face at least 80% (eighty percent) of its matured obligations.

**(C)** Due to the causes already explained in this brief, the company represented by me has been prevented from complying with the payment of its obligations towards more than two of its creditors.

**13.-** In light of the above, this petition for declaration of bankruptcy with prior restructuring plan is admissible, because it meets, in this case, the premises in articles 9 section I, 20, 22, 339 and 340 of the Bankruptcy Law, without need in this case to designate an inspector or to conduct any inspection visit, pursuant to article 341 of the Bankruptcy Law.

**A special mention must be made that the current Pre-Packaged Bankruptcy Petition is preferable to any other involuntary bankruptcy request possibly up for consideration. First, it meets each and every requirement of the law for its acceptance. Second, there are procedural efficiencies that will save and avoid idle stages and unnecessary procedural activities, such as the response to the counterclaim, the visit (the object of which is to verify if my representation is or is not found under the assumptions of article 10 of the Bankruptcy Law of which I have already declared under law to be truthful in the case), the relief of expert tests and other unnecessary**

**activities, in order to allow the fastest and most expedient administration of justice, in the terms outlined in article 17 of the Constitution, and the fastest restructuring in order to preserve the business, which is the fundamental object and essential protection of solvency laws, under the terms in article 1 of the Bankruptcy Law and its statements of reasons; combined with that the same purpose of the Bankruptcy Law favors this class of proceedings as they serve to better reach this set aim, the difference is that these involuntary and contentious proceedings tend to the liquidation of the company and the destruction of the value of the same, to the detriment of the same, and all of those with which it maintains a business relationship.**

## IV.- PROPOSAL FOR RESTRUCTURING PLAN

As indicated above, the intense negotiations carried out by the company represented by me, with its various known creditors, have allowed it to reach with a majority of them a restructuring agreement or plan of its debts, through the Restructuring Agreement, which is enclosed with this petition as exhibit **14**), and which meets the requisites of articles 157 and 159 of the Bankruptcy Law and which is proposed by **VITRO** jointly with the signing creditors to the other creditors of the former, requesting as of now the Conciliator that may be timely appointed by the Instituto Federal de Especialistas en Concoursos Mercantiles, to be shown to the remaining creditors recognized in this procedure, for their acceptance in

signing, in the terms and for the purposes of articles 4 section I, 132, 146, 161, 339 section IV, of the Bankruptcy Law.

The Restructuring Agreement enclosed as an exhibit has been duly signed by the creditors of the company represented by me, identified in the list enclosed as exhibit **15)** and which propose it jointly with the petitioner and the other creditors of the latter that they be recognized in the sentence to that effect dictated by Your Honor.

These creditors are represented by the persons whose name appear respectively in their signature pages, proving their identity and representation with the instruments also submitted, when applicable, together with the Restructuring Agreement, as well as those to be produced in due time before the conciliator that in his/her opportunity is designated before Your Honor, and the same applies to the remaining annexes, sufficing for the origin of the present petition of the formal protests to speak the truth realized by the undersigned subchapters 11 and 12 of Chapter III, that sufficiently satisfy the established requirements in article 339, section II, second paragraph, and section III of the Bankruptcy Law.

Concerning the signature pages of the Restructuring Agreement which are produced together with it, and which are included among other documents written in foreign languages, as Your Honor may see, said signature pages of the agreement exhibited and is requested to be exhibited, are written in Spanish so that they do not require any translation

but in any case if legally required or if Your Honor so deems, the company represented by me offers as of now, if appropriate, to produce the corresponding translations for all legal purposes.

## V. PROVISIONAL MEASURES AND PROTECTIVE MEASURES

Pursuant to articles Article 25, 26, 37 and 340 of the Bankruptcy Law I am asking Your Honor that, in the order admitting this petition decree the following provisional measures and protective measures until the rendering of the sentence to which will, if applicable declare the company represented by me in bankruptcy:

**1.** Prohibition to make payments of obligations matured prior to the admission date of this petition in bankruptcy.

**2.** Suspension of any execution proceeding against the assets and rights of the company represented by me.

It is necessary to also to take into account, in particular, the provisions of article 87 of the Bankruptcy Law which provides that any stipulation in a contract that aggravates its terms for the merchant because of the fact of petitioning of being declared in bankruptcy will be deemed null and void.

## VI. DE JURE

The petition in bankruptcy is based on the provisions of articles 1, 9, 10, 17 20, 22, 339 and other relative and applicable articles of the Bankruptcy Law.

Your Honor is competent to take cognizance of this action, pursuant to article 17 of the Bankruptcy Law.

## VII.- DOCUMENTS AND SUBMISSIONS

In order to comply with article 20 of the Bankruptcy Law, we enclose with this petition the documentation of the petitioner company identified as follows:

**I.-** Audited Financial Statements of the company for fiscal years 2007, 2008 and 2009, which include General Balance Sheets, Statements of Income (Profit and Loss), Statements of Variations in the Investment Accounts of the Shareholders, Statements of Changes in Financial Position and Notes to the Financial Statements.

**II.-** Motivated report on the causes that brought the petitioner company to its current financial state, as exhibit **16).**

**III.-** List including the names and addresses of all creditors and debtors of the company, as well as the maturity date of each of the credits, the degree to which they are

estimated to be recognized, the special characteristics thereof and the guarantees granted to secure debts of the company and of third parties, as exhibit **17).**

**IV.-** Inventory of all real estate and movables assets, securities, commercial paper and rights of all types of the petitioner company, as exhibit **18).**

**V.-** List of lawsuits to which the petitioner is a party, with the requisites indicated in section V article 20 of the Bankruptcy Law, as exhibit **19).**

**VI.-** If this petition is admitted, the guarantee referred to in article 24 of the Bankruptcy Law, turns out to not be necessary, of which to treat a bankruptcy request with a previous restructuring plan, and it is not admissible to conform to all of the processes in accordance with the provisions in article 341 of the Bankruptcy Law.

**On these grounds;**

I respectfully request **YOUR HONOR**:

**ONE.-** To recognize my capacity which I have proven, as representative of **VITRO,** based on the notarized instrument enclosed for this purpose.

**TWO.-** To take note of my presentation requesting to declare and constitute the company represented by me in legal state of bankruptcy and submit to the consideration and,

if applicable, approval and signing of the creditors, the restructuring agreement or plan enclosed.

**THREE.-** To take note of the signing of this petition also by the creditors indicated therein and who sign for this purpose at the foot, through their respective representatives whose identity I also request to recognize, based on the notarized instruments which are also enclosed.

**FOUR.-** Given the compliance with the premises and attachment to this brief of all the documents required under the Bankruptcy Law for this purpose, to declare in bankruptcy the company represented by me without need to designate an inspector, ordering that this petition be processed, based on the declaration of bankruptcy, as ordinary proceedings, with the exception of the consideration of the debt restructuring plan produced as a proposal of agreement for the purposes set forth in article 161 et seq. of the applicable law.

**DULY AFFIRMED UNDER PENALTY OF PERJURY**

**Monterrey, Nuevo León, at December 13, 2010.**

**ALEJANDRO FRANCISCO SÁNCHEZ MÚJICA**

## Exhibit R



# Vitro Wins Appeal; Begins its
# Pre-Packaged Concurso Mercantil Process

**San Pedro Garza García, Nuevo León, México, April 11, 2011 - Vitro S. A. B. de C.V. ("Vitro" or the "Company")**, announced today that in a resolution from the Judge for the Second Unitary Court of the Fourth Circuit in Monterrey (the Court), the appeal proceedings submitted by Vitro has been resolved in favor of the Company.

As part of such resolution, the Court has already declared Vitro as in concurso mercantil based on its pre-packaged voluntary proceedings petition which is supported by more than 650 bondholders and other financial instruments.

Regarding this ruling, Alejandro Sánchez Mújica, Executive Legal President and General Counsel of Vitro, commented "it is now the responsibility of the Fourth Federal District Court for Civil and Labor Matters in the State of Nuevo León to continue with the pre-packaged *concurso mercantil* process, and to stay or make a ruling regarding the involuntary *concurso mercantil* suit filed by a minority group of bondholders in which the *Visitador* appointed by the IFECOM (Federal Institute of Specialists on Mercantile Procedures) rendered his opinion stating that on the date the involuntary suit was filed, this petition did not comply with the legal requirements established in the Mexican Law to grant the *concurso mercantil* as petitioned by the plaintiffs."

Vitro expects that this resolution will expedite its restructuring process, while it continues operating normally and fulfilling its commitments to customers, suppliers and employees as has been the case to date.

*Founded in 1909, Vitro, S.A.B. de C.V. (BMV: VITROA), is the leading glass manufacturer in Mexico, and one of the largest in the world, backed by more than 100 years of experience in the industry. Headquartered in Monterrey, Mexico, the Company has subsidiaries in 10 countries throughout Europe and the Americas, through which it offers high quality products and reliable services that address the needs of two distinct businesses: containers and flat glass. Vitro's manufacturing facilities produce, process, distribute and sell a wide range of glass products that form an important part of millions of people's everyday lives. The Company also provides excellent solutions to a variety of industries, including: food, beverage, wines & spirits, cosmetics, and pharmaceutical, as well as the automotive and construction industries. In addition Vitro is a supplier of raw materials, machinery and industrial equipment. As part of its culture of corporate responsibility, the Company continues to create new initiatives to improve the well-being of its employees, support the communities in which it conducts business, preserve the environment, and manage its business with the highest ethical standards and in complete transparency. For more information, you can access Vitro's Website at: http://www.vitro.com*

## For more information, please contact:

| Medio Relations | Investor Relations | Agencia en EUA |
|---|---|---|
| Albert Chico Smith | Adrián Meouchi / Jesús Flores | Kay Breakstone / Barbara Cano |
| Vitro S.A.B. de C.V. | Vitro, S.A.B. de C.V. | Breakstone Group |
| + (52) 81-8863-1661 | + (52) 81-8863-1765/1730 | (646) 452-2332 / 2334 |
| achico@vitro.com | ameouchi@vitro.com | kbreakstone@breakstone-group.com |
| | jfloresb@vitro.com | bcano@breakstone-group.com |

[*Appears logo of the United Mexican States Federal Judicial Power*]

[*Appears logo of the Judiciary Council which reads:*
Federal Judicial Power.- Judiciary Council.- Federal Institute of Specialists of Insolvency Procedures – (*Instituto Federal de Especialistas de Concursos Mercantiles, IFECOM*)]

GENERAL DIRECTION OF THE INSTITUTE

IFECOM Official Document /DG/179/2011
Mexico, Federal District, March 23rd, 2011

Appeal File 2/2011
Matter: Response to official document 546

Mr. Claudio Perez Hernandez
Magistrate of the Second Unitary
Court of the Fourth Circuit

Gricelda Nieblas Aldana, in her capacity of General Director of the Federal Institute of Specialists of Insolvency Procedures, according to the criteria issued by the Board of Directors thereof and based on section VII of article 321 and section IX of article 311, both of the Commercial Reorganization and Bankruptcy Law (*Ley de Concursos Mercantiles*); and with the representation bestowed upon the undersigned through section II of article 324 of such law, as ordered in the official document 546 dated February 28th of this year, in which the resolution issued in such date by the court in the appeal file referred to herein, in which as submission of evidence offered by the appealer, it is required to report: "...*a) Which is the criteria of the institute regarding the credits among related companies or between controlled companies payable by holding companies, and if such credits have been or are considered as credits, for the purposes of the insolvency procedure*", the following opinion is issued, without a binding character:

1.- Regarding the "...*criteria of the institute regarding the credits among related companies or between controlled companies payable by holding companies,...*" it is stated:

1.1 There is no provision in the Commercial Reorganization and Bankruptcy Law that excludes from recognition as creditors the related companies or those that are controlled by a holding company in insolvency procedures.

1.2 Through the procedure established in Chapter I, Title Fourth of the quoted law and, with respect to the characteristics of the legal act executed between creditor and debtor and the collateral granted, if applicable, the acknowledgment, adjustment and priority of credits is carried out according to the classification established in Chapter II, Title Seventh of such law, there being no exclusion or limitation regarding the character of related, subsidiary or holding company that the insolvent party may have with its creditors.

1.3 On the other hand, such insolvency law addresses the issue of exclusions, limitations, or forms, etc., that may be considered as possible exceptions to the rule established in the foregoing paragraph, listing them expressly, as established below:

a) For such purposes, article 126 of the Commercial Reorganization and Bankruptcy Law establishes that it may not be considered as creditors of an insolvent party which is an individual: his/her spouse, concubine, which are credit holders by onerous contracts or by



payment of debts of the insolvent parties, given that it is inferred, unless proven otherwise, that the credits were granted and the debts were paid with assets of the insolvent party.

b) Likewise, the abovementioned law expressly establishes the event in which it is feasible to acknowledge a creditor with such character, but establishes formalities regarding the priority, such as the case provided in its article 228, related to articles 14 and 43 section I of such law, in accordance to which the declaration of insolvency of a company determines that the unlimited liable partner shall be considered insolvent; however, regarding the order in which the creditors of an unlimited liable partner shall make effective their credits charged to the personal estate of such partner, expressly introduces changes to the general rule and establishes for them that, when their credit is subsequent to the commencement of the unlimited liability of the debtor partner, they shall only have the right to collect their credits with the remnants of the Estate of the unlimited liable partner after the debts of the company have been paid.

c)The Commercial Reorganization and Bankruptcy Law also expressly sets forth the possible exceptions regarding the exercise of some rights; a noteworthy case is such described in its articles 156, 221 and section I of article 224, which states that, the credits of tax creditors, and two kinds of labor credits shall be subject of acknowledgement, adjustment, and priority; however, it is also stated that all the acknowledged creditors may subscribe the insolvency agreement, except for the tax and labor creditors pursuant to the provisions of section XXIII of subsection A of the constitutional article 123 and in the Commercial Reorganization and Bankruptcy Law.

1.4 It is not only concluded that among the exceptions established in the Commercial Reorganization and Bankruptcy Law in order not to acknowledge someone the capacity of creditor or to limit the exercise of several rights to the acknowledged creditors, the case of related companies or subsidiary companies of a holding company is not included, but, on the contrary, the case in which the same may be acknowledged as creditors, even if it is determined that fraud committed against creditors occurred, is regulated. In regard to that matter, section IV of article 117 of the quoted law, establishes that for insolvent entities, the transactions against the Estate carried out by the insolvent party with entities controlled by the insolvent party, having control over it or which are controlled by such holding company are considered as acts of fraud against creditors, if such transactions are carried out as of the retroactive date, unless the interested party proves its *bona fide* nature, and, last paragraph of article 114 of the same law establishes that if the third party (which, under the terms of article 113 of such law is the party intervening in the act of fraud committed against creditors with the insolvent party) returns what it received from the insolvent party, it may request the acknowledgement of its credit. From the foregoing it is concluded that if the entities controlled by the insolvent parties, having control thereof or controlled by such holding company, which have been determined to have carried out acts of fraud against creditors with the insolvent entity, return what they received from the insolvent party, they may then be acknowledged as creditors.

1.5 The fact that article 146-B of the Federal Tax Code (*Código Fiscal de la Federación*) establishes that any party having the capacity of related party may be considered as creditor or debtor in the exercise of their rights on an insolvency procedure is highlighted. In regard to this matter it is established in such article that, regarding taxpayers subject to an insolvency procedure, the tax authorities may exempt some tax credits, as long as the trader has executed an insolvency agreement with creditors, and, to establish the maximum amount of such exemption that the tax authority may grant, establishes several criteria among which the following is included: *"...the exemption shall not exceed the*



*minimum benefit among those that, granted by the creditors which, not being related parties, jointly represent ...".* It is understood from the foregoing that, if entities having the capacity of subsidiary and holding companies are considered as "related parties" it is implied the concept that such related parties are creditors in the insolvency procedure that executed an agreement *"pursuant to the terms of the corresponding Law...",* i.e., with its declared debtor in insolvency procedure according to the Commercial Reorganization and Bankruptcy Law.

1.6 From the foregoing it is concluded, without this opinion having a binding character, that is a criteria of the Institute that the credits of related companies or between subsidiaries payable by holding companies, are not included in the exception cases provided in the Commercial Reorganization and Bankruptcy Law which excludes them from being acknowledged as credits or establishes some limitation to such respect, due to the fact that the creditor and debtor are related companies, or, one of them is a subsidiary and the other a holding company, but, on the contrary, implies the possibility to acknowledge a credit given that not only it does not exclude it, but allows the subsequent acknowledgement as creditor of a subsidiary entity or a holding entity of an insolvent party, for the equivalent of what they eventually return to the Estate, from what they have previously received from the insolvent parties due to acts classified as fraud against creditors; likewise, this criteria is supported by the provisions of the Federal Tax Code, everything according to the terms described in the foregoing paragraphs.

2. Regarding to *"...if such credits have been or are considered as credits, for the purposes of the insolvency procedure",* it is established that this Institute, in its knowledge of insolvency procedures, knows that they are in fact considered as credits, for example, among other procedures, the following:

TRADER: Grupo Iusacell, S.A. de C.V.
FILE NUMBER: 107/2006-I
COURT: Seventh District in Civil Matters in the Federal District.

TRADER: Grupo Iusacell Celular, S.A. de C.V.
FILE NUMBER: 107/2006-I cumulative to the foregoing.
COURT: Seventh District in Civil Matters in the Federal District.

TRADER: Grupo Iusacell Celular, S.A. de C.V.
FILE NUMBER: 718/2010
COURT: Ninth District in Civil Matters in the Federal District.

TRADER: Grupo Iusacell, S.A. de C.V.
FILE NUMBER: 727/2010
COURT: Ninth District in Civil Matters in the Federal District.

TRADER: Corporacion Durango, S.A. de C.V.
FILE NUMBER: 3/2004
COURT: First District in the State of Durango.

TRADER: Corporacion Durango, S.A.B. de C.V.
FILE NUMBER: 16/2008
COURT: First District in the State of Durango.

TRADER: Grupo Tribasa, S.A. de C.V. and Other.

Elena García Beltrán
Expert Translator

FILE NUMBER: 157/2001
COURT: First District in Civil Matters in the Federal District.

TRADER: Controladora Comercial Mexicana, S.A.B. de C.V.
FILE NUMBER: 403/2010-III
COURT: Sixth District in Civil Matters in the Federal District.

Due to the foregoing, I hereby request:

SOLE.- That the opinion of this Institute, which lacks a binding character, required through the official document 546 dated February 28th, 2011, to be considered as issued pursuant to the terms established in the content of this official document.

Cordially yours,

*[Appears illegible signature]*

Mrs. Gricelda Nieblas Aldana
General Director

*[Appears logo of the Judiciary Council which reads:*
*Federal Judicial Power.- Judiciary Council.- Federal Institute of Specialists of Insolvency Procedures]*

The undersigned, ELENA GARCIA BELTRAN, Expert Translator appointed by the Supreme Court of the State of Nuevo León, as evidenced in authorization number 993/2011 dated on the 31st of January, 2011, certify under oath that this translation to the English language is, to my knowledge, true, complete and accurate, without additions or omissions, and is composed of 4 page(s) corresponding to the document in Spanish which is composed of 4 page(s) and which original was delivered to the undersigned for its translation. Each page of the translated document contains the legend "Elena García Beltrán.- Expert Translator" and has been initialized by the undersigned. This translation is issued in the City of Monterrey, Nuevo León, on the 29th day of march, 2011.

Elena García Beltrán
GABE-860308-JP1

**Exhibit T**

Dennis F. Dunne
Risa M. Rosenberg
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Attorneys for Alejandro Francisco Sánchez-Mujica*
*as Petitioner for Vitro, S.A.B. de C.V.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>VITRO, S.A.B. de C.V.,<br><br>    Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 10-16619 (SHL) |

**CONSENT ORDER REGARDING (I) SUBSEQUENT INFORMATION PURSUANT TO 11
U.S.C. § 1518 AND (II) WITHDRAWAL OF CHAPTER 15 PETITION FOR RECOGNITION
OF A FOREIGN MAIN PROCEEDING**

       **WHEREAS**, Alejandro Francisco Sánchez-Mujica, the petitioner for Vitro, S.A.B. de C.V.

("Vitro"), the chapter 15 debtor in the above-captioned chapter 15 case (the "Chapter 15 Case"),

hereby informs the Court, pursuant to 11 U.S.C. § 1518, that, by resolution dated January 7, 2011,

Judge Francisco Eduardo Flores Sánchez of the Fourth District Court for Civil and Labor Matters in

the State of Nuevo León, Mexico, denied the declaration requested by Vitro for a pre-packaged

*concurso* proceeding that was the basis for the Chapter 15 Case; and

       **WHEREAS**, based on the foregoing, although Vitro has informed the Court that it intends to

appeal the denial of the pre-packaged *concurso* declaration, there is currently no voluntary foreign

main proceeding pending with respect to Vitro.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** as follows:

1.    Vitro's Chapter 15 Petition for Recognition of a Foreign Main Proceeding, filed on December 14, 2010 (the "Chapter 15 Petition"), is hereby withdrawn without prejudice.

2.    The Chapter 15 Case is hereby closed, pursuant to sections 350 and 1517(d) of the Bankruptcy Code; provided that this Court retains jurisdiction to enforce and interpret this Order.

3.    If another petition for relief under chapter 15 of the Bankruptcy Code is filed with respect to Vitro (the "Subsequent Chapter 15 Petition"), then (i) to the extent the involuntary chapter 11 cases of Vitro's affiliates, Vitro Asset Corp., et al. (Case No. 10-47470-rfn-11), are still pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Texas Bankruptcy Court") at the time the Subsequent Chapter 15 Petition is filed, and the Subsequent Chapter 15 Petition is filed in a court other than the Texas Bankruptcy Court, Vitro (and/or its foreign representative) will comply with the stay that would have been imposed by Rule 1014(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for three business days following the filing of the Subsequent Chapter 15 Petition regardless of whether a motion to transfer venue pursuant to Bankruptcy Rule 1014(b) will have been filed; and (ii) Vitro (and/or its foreign representative) will advise the court in which the Subsequent Chapter 15 Petition is filed that the Chapter 15 Petition had been filed with this Court and voluntarily withdrawn on consent of the parties.

4.    Notwithstanding the entry of this Consent Order, the withdrawal of the Chapter 15 Petition, or the closing of the Chapter 15 Case, neither the Ad Hoc Group of Vitro Noteholders, nor any of its members, have waived any rights any of them may have in connection with the Chapter 15 Case, and such rights are hereby fully reserved (as are

the rights of Vitro (and/or its foreign representative) to oppose any assertion of such

rights on any grounds other than the entry of this Consent Order).


Respectfully submitted,


By: /s/ Risa M. Rosenberg
Dennis F. Dunne
Risa M. Rosenberg
Jeremy C. Hollembeak
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Andrew M. Leblanc (*pro hac vice* pending)
MILBANK, TWEED, HADLEY & McCLOY LLP
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

*Attorneys for Alejandro Francisco Sanchez-Mujica, as
Petitioner for Vitro S.A.B. de C.V.*


So Ordered this **26th** day of **January 2011**.



*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE

# Exhibit U



MUDICIAL DE LA FEDERACIÓN

**MONTERREY, NUEVO LEÓN, A OCHO DE ABRIL DE DOS MIL ONCE.**

V I S T O para resolver el **TOCA CIVIL 02/2011,** formando en este con motivo del recurso de apelación hecho valer por Alejandro Francisco Sánchez Mújica, en su carácter de representante de **VITRO, SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE;** Javier Arechavaleta Santos, representante de **VVP EUROPA HOLDINGS, BV, SERVICIOS VITRO COSMOS, SERVICIOS VIDRIERA GUADALAJARA, INDUSTRIA DEL ALCALI, COMPAÑÍA VIDRIERA, VITRO AUTOMOTRIZ** y **VITRO ENVASES NORTEAMÉRICA,** todos **SOCIEDAD ANÓNIMA** de **CAPITAL VARIABLE,** a excepción de la primera, así como de los diversos tenedores de certificados bursátiles **VITRO03** y **VITRO08;** Marcela Mayela Rodríguez Quintanilla, apoderada de **VITRO GLOBAL, SOCIEDAD ANÓNIMA, VIDRIERA MONTERREY, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE e IP VIDRIO Y CRISTAL, LTD;** Rodrigo Quintanilla Ramírez, en representación de **TRABAJO DE ADMINISTRACIÓN Y SERVICIOS, VIDRIO PLANO DE MÉXICO, VITRO VIDRIO Y CRISTAL** y **VITRO EUROPA, LTD, todos SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE** y Armando Cuevas Brun, apoderado de **JP MORGAN CLEARING CORP, THE BANK OF NEW YORK MELLON, RBC DOMINION SECURITIES, INC, JP MORGAN CHASE BANK, NA, BNP PARIBAS PRIMER BROKERAGE, INC, CITIBANK, NA, OPPENHEIMER & CO., INC** y **UBS FINANCIAL SERVICES,** en contra de la sentencia de **siete de enero de dos mil once,** dictada por el **Juez Cuarto de Distrito en Materias Civil y de Trabajo en el Estado,** dentro del expediente **38/2010-IV-A,** relativo a la solicitud de concurso mercantil con plan de reestructura previo promovida por Alejandro Francisco Sánchez Mújica, en representación

de **VITRO, S.A.B. de C.V.**, en suscripción de diversos acreedores; y,

### R E S U L T A N D O :

*PRIMERO.-* La resolución impugnada, en sus puntos resolutivos, establece lo siguiente:

"*... Se declara improcedente la solicitud de declaración de concurso mercantil con plan de reestructura previo, formulada por Alejandro Francisco Sánchez Mújica, como representante de la comerciante "Vitro", Sociedad Anónima Bursátil de Capital Variable.--- SEGUNDO. Una vez que quede firme esta resolución se ordena que las cosas vuelvan al estado que tenían con anterioridad a la presentación de la solicitud....*" (fojas 15885 vuelta y 15886 del tomo XV del concurso).

*SEGUNDO.-* Mediante ocursos recibidos en la Oficina de Correspondencia Común de los Juzgados de Distrito del IV Circuito, en auxilio del Juzgado Cuarto de Distrito en el Estado el día veinte y veinticuatro de enero del año que transcurre, respectivamente las inconformes interpusieron el presente recurso de apelación; y el A quo, mediante proveídos de veinticuatro y veintiséis siguiente, admitió tal medio de defensa en **ambos efectos**, de conformidad con lo dispuesto por los artículos **49, 50, 51, 52 y 53** de la Ley de Concursos Mercantiles.

*TERCERO.-* El veintisiete de enero del presente año, se recibió en este Tribunal el oficio **1436**, del Juez Cuarto de Distrito en Materias Civil y del Trabajo en el Estado, al que acompañó **agravios y quince tomos del expediente 38/2010-IV-A**, para la substanciación del medio de defensa interpuesto; por auto de veintiocho siguiente se desechó de plano por improcedente el recurso de apelación planteado, asimismo por escrito presentado en oficialía de partes de este Tribunal Federal el tres de febrero de la anualidad en curso el representante legal de **VITRO, S.A.B. de C. V**, interpuso



recurso de revocación en contra del auto dictado en primer
término, el cual fue admitido a trámite mediante acuerdo de
cuatro de febrero último y resuelto el veintiocho siguiente de
forma fundada y en consecuencia se admitieron los recursos
de apelación interpuestos por **VITRO, SOCIEDAD ANÓNIMA
BURSÁTIL DE CAPITAL VARIABLE;** Javier Arechavaleta
Santos, representante de **VVP EUROPA HOLDINGS, BV,
SERVICIOS VITRO COSMOS, SERVICIOS VIDRIERA
GUADALAJARA, INDUSTRIA DEL ALCALI,** COMPAÑÍA
VIDRIERA, VITRO AUTOMOTRIZ y VITRO ENVASES
NORTEAMÉRICA,** todos **SOCIEDAD ANÓNIMA** de
**CAPITAL VARIABLE, a excepción de la primera, así como
de los diversos tenedores de certificados bursátiles
VITRO03 y VITRO08;** Marcela Mayela Rodríguez Quintanilla,
apoderada de **VITRO GLOBAL, SOCIEDAD ANÓNIMA,
VIDRIERA MONTERREY, SOCIEDAD ANÓNIMA DE
CAPITAL VARIABLE e IP VIDRIO Y CRISTAL, LTD;**
Rodrigo Quintanilla Ramírez, en representación de
**TRABAJO DE ADMINISTRACIÓN Y SERVICIOS, VIDRIO
PLANO DE MÉXICO, VITRO VIDRIO Y CRISTAL y VITRO
EUROPA, LTD,** todos **SOCIEDAD ANÓNIMA DE** CAPITAL
**VARIABLE** y Armando Cuevas Brun, apoderado de JP
**MORGAN CLEARING CORP, THE BANK OF NEW YORK
MELLON, RBC DOMINIO SECURITIES, INC, JP MORGAN
CHASE BANK, NA, BNP PARIBAS PRIMER BROKERAGE,
INC, CITIBANK, NA, OPPENHEIMER & CO., INC y UBS
FINANCIAL SERVICES,** se abrió el periodo probatorio
correspondiente y por auto de fecha veintiocho de marzo de
dos mil once, se tuvieron por ofrecidas y desahogadas las
pruebas ofrecidas por la parte recurrente, así mismo de
conformidad con el artículo 51 de la Ley de Concursos
Mercantiles se citó a las partes para que en el término de diez
días presentaran sus alegatos, lo que una vez acontecido se
puso el presente expediente en estado de sentencia; y,



## CONSIDERANDO:

**PRIMERO.-** Este Tribunal es competente para conocer del presente recurso, de acuerdo a lo dispuesto en los artículos 17, 94 y 104 de la Constitución Política de los Estados Unidos Mexicanos; 29, fracción II, de la Ley Orgánica del Poder Judicial de la Federación, y en el Acuerdo General 57/2006, del Pleno del Consejo de la Judicatura Federal, relativo a la determinación del número y límites territoriales de los circuitos en que se divide la República Mexicana, y al número, a la jurisdicción territorial y especialización por materia de los Tribunales Colegiados y Unitarios de Circuito y de los Juzgados de Distrito por tratarse de la apelación interpuesta contra una resolución dictada por un Juez de Distrito, con sede en el territorio donde este Tribunal ejerce Jurisdicción, en la que determinó declarar improcedente unas solicitud de concurso mercantil.

**SEGUNDO.-** La resolución impugnada, se sustenta en las siguientes consideraciones:

"**...PRIMERO.** Este Juzgado Cuarto de Distrito en Materias Civil y de Trabajo en el Estado de Nuevo León, es competente para conocer del presente asunto de conformidad con lo dispuesto por los artículos 104, fracción I. de la Constitución Política de los Estados Unidos Mexicanos, 53 de la Ley Orgánica del Poder Judicial de la Federación, así como los numerales 17 y 341 de la Ley de Concursos Mercantiles.-- **SEGUNDO.** La personalidad con la que comparecieron los representantes de la concursada y acreedores suscribientes, se encuentra acreditada debidamente en autos con los documentos exhibidos junto con el escrito de demanda.--- Asimismo, la legitimación de la promovente para solicitar el concurso mercantil se justifica en términos del artículo 9° de la Ley de la Materia, la cual indica que la declaración de concurso mercantil debe tener como sujeto a un comerciante, por lo que es preciso demostrar que la interesada tiene dicho carácter.--- En la especie, basta imponerse del contenido de las copias certificadas de las escrituras públicas anexadas al escrito inicial, particularmente de la número diecisiete mil setecientos treinta y ocho (17,738), pasada ante la fe del licenciado Oscar Elizondo Garza, Notario Público número 25 con ejercicio en esta ciudad, para advertir que después de diversas transformaciones, la comerciante se constituyó como una Sociedad Anónima Bursátil de Capital Variable.-- Entonces, la especie y forma de constitución de la demandada implica el carácter de comerciante en términos de lo dispuesto por la fracción II del artículo 4° de la Ley de Concursos Mercantiles, en relación con el artículo 3°, fracción II, del Código de Comercio, de aplicación supletoria a la primera, conforme al cual se reputan comerciantes a las



*sociedades constituidas con arreglo a las leyes mercantiles. A su vez, la fracción IV y el último párrafo del artículo 1° de la Ley General de Sociedades Mercantiles, reconocen entre las especies de sociedades mercantiles a la sociedad anónima, la cual podrá constituirse como sociedad de capital variable, en tanto que el numeral 22 de la Ley del Mercado de Valores expresa que las sociedades anónimas cuyas acciones representativas del capital social o títulos de crédito que representen dichas acciones se encuentren inscritas en el Registro, formarán su denominación social libremente conforme a lo previsto en el artículo 88 de la Ley General de Sociedades Mercantiles, debiendo adicionalmente agregar a su denominación social la expresión "Bursátil", o su abreviatura "B", por lo cual es claro que la promovente reúne el requisito indicado.--- **TERCERO.** La solicitud de declaración de concurso mercantil con plan de reestructura previo, se formuló con base en la hipótesis prevista en los artículos 339, 341 y 342 de la Ley de Concursos Mercantiles; preceptos adicionados en la reforma publicada el veintisiete de diciembre de dos mil siete, en el Diario Oficial de la Federación, que establecen lo siguiente: (se transcriben)--- La característica primordial de la solicitud de concurso mercantil en la modalidad indicada (plan de reestructura previo), promovida en términos del artículo 339 antes transcrito, es que para su admisión, además de cumplir con los requisitos del artículo 20, la comerciante debe reconocer que las personas que firman la solicitud representan cuando menos el cuarenta por ciento (40%) del total de sus adeudos, que se encuentra dentro de los supuestos de los artículos 10 y 11 de la misma ley, y adicionalmente, acompañar a la solicitud una propuesta de plan de reestructura de pasivos firmada por los acreedores referidos, lo que hace innecesario el trámite previo de verificación a que se refieren los distintos numerales 29 y 30, a fin de poder dictar sentencia de concurso.--- Es decir, al obviarse este trámite generalmente ordinario (visita) no es necesario comprobar si la Comerciante ha incumplido generalizadamente en el pago de sus obligaciones, como requisito indispensable para ser declarada en concurso mercantil.--- **CUARTO.** En el caso concreto, la Comerciante bajo protesta de decir verdad manifiesta que de manera inminente incumplirá generalizadamente el pago de sus obligaciones con base en los siguientes hechos.--- "a) Al día 30 de septiembre del año 2010, **VITRO** tenía (a) pasivos directos con acreedores que no son subsidiarias directas o indirectas de la misma, por $20,508,000,000.00 (veinte mil quinientos ocho millones de pesos 00/100 Moneda Nacional), equivalentes a aproximadamente EUA$1,640,000,000.00 (un mil seiscientos cuarenta millones de dólares 00/100 Moneda de los Estados Unidos de América), (b) pasivos por avales otorgados a favor de terceros respecto de obligaciones de sus subsidiarias por $2,375,000,000.00 (dos mil trescientos setenta y cinco millones de pesos 00/100 Moneda Nacional), equivalentes aproximadamente a EUA$190,000,000.00 (ciento noventa millones de dólares 00/100 Moneda de los Estados Unidos de América), y (c) pasivos directos con subsidiarias directas o indirectas de la misma, por la cantidad de $23,872,000,000.00 (veintitrés mil ochocientos setenta y dos millones de pesos 00/100 Moneda Nacional), equivalentes a EUA$1,910,000,000.00 (un mil novecientos diez millones de dólares 00/100 Moneda de los Estados Unidos de América).--- b) Por lo que respecta a la situación financiera de la empresa (considerada en forma individual sin consolidar con sus subsidiarias) al cierre del ejercicio terminado y auditado más reciente, esto es, al 31 de diciembre de 2009, es de señalarse que tenía un pasivo total por la cantidad de $42,826,000,000.00 (Cuarenta y dos mil ochocientos veintiséis millones de pesos), contra activos totales por la cantidad de $43,376,000,000.00 (Cuarenta y tres mil trescientos setenta y seis millones de pesos).--- c) Por otra parte, en cuanto a la situación financiera de VITRO*

*consolidada con sus subsidiarias, considerada al 31 de diciembre de 2009, es de señalarse que la empresa reportaba un pasivo total por la cantidad de $30,668,000,000.00 (Treinta mil seiscientos sesenta y ocho millones de pesos), contra activos totales por la cantidad de $32,652,000,000.00 (Treinta y dos mil seiscientos cincuenta y dos millones de pesos).--- VITRO es una sociedad que desde su creación fue organizada con la intención de ser una empresa tenedora de acciones y participaciones en empresas, así como para servir de vehículo para el financiamiento de sus empresas subsidiarias.--- Actualmente VITRO es propietaria, directa o indirectamente de empresas dedicadas a la fabricación del vidrio en los ramos de la construcción, automotriz y de envases para diferentes usos, tales como alimentos, bebidas, cosméticos, vinos y licores, cerveza, etc. De las utilidades obtenidas por estas empresas en el desarrollo de su objeto social, Vitro obtiene sus flujos para pagar el principal e intereses de su deuda.--- Para que sus subsidiarias lleven a cabo sus actividades, VITRO se encarga de conseguir diversas fuentes de financiamiento, mismas que obtiene y asigna a sus subsidiarias conforme a sus requerimientos, los cuales pueden ser para inversión en activos fijos o bien, para capital de trabajo. Por lo anterior, los principales activos de Vitro son las acciones de sus subsidiarias y entre ellas y Vitro se generan múltiples operaciones de todo tipo.-- Así mismo, su principal pasivo con personas distintas del grupo, es el referente a la contratación de deuda pública, tanto en México como en Estados Unidos y en una menor cuantía directamente con instituciones financieras nacionales o internacionales.--- Como se mencionó anteriormente, la fuente de ingresos que tiene VITRO para cubrir sus pasivos financieros es el flujo que le generan sus subsidiarias, por lo que si los mercados que atienden sus subsidiarias se ven afectados negativamente, los resultados de Vitro y su fuente de pago, en consecuencia, se ven seriamente afectados.--- A raíz de la crisis financiera que inició a mediados de 2008 y que, no obstante el paso del tiempo persiste hasta esta fecha, las subsidiarias se vieron y se siguen viendo impedidas a pagar el capital y los intereses de la deuda que tienen con VITRO, así como a repartir dividendos a sus accionistas por falta de flujos.--- La falta de flujo, a su vez está originada por la caída en las ventas que las subsidiarias de VITRO han tenido ya que los mercados en los que participan (automotriz, construcción y envases de vidrio), como en otros tantos, fueron fuertemente afectados, lo que causó que VITRO esté enfrentando un serio problema de liquidez.-- En el negocio de la producción de vidrio, uno de los principales costos que enfrenta la industria, son los energéticos, mayormente el gas natural. Este insumo ha tenido dramáticos incrementos de precio en el pasado, lo que merma el margen de utilidad de las subsidiarias de VITRO. Con la finalidad de evitar que un incremento mayor en el precio de este insumo afecte más sus márgenes, las subsidiarias de VITRO iniciaron la contratación desde hace más de 10 años de instrumentos de cobertura de precio de gas natural, sin embargo, derivado de la señalada crisis financiera de 2008, la demanda de este insumo se vio reducida al caer la actividad productiva en México y en los Estados Unidos de América, lo que provocó una drástica disminución en su precio. Al darse por terminados los citados instrumentos de cobertura, las subsidiarias sufrieron importantes pérdidas y se les requirió el pago inmediato de fuertes cantidades de dinero, que aunadas a la baja de la actividad industrial, hicieron que en un afán de defender sus plantas productivas, tuvieran que suspender los pagos de sus obligaciones financieras para con VITRO así como con otras entidades financieras.--- Por otra parte, una porción significativa de los ingresos recibidos por VITRO y por sus subsidiarias son en dólares americanos, sin embargo, una parte importante de sus gastos operativos son en pesos, por*


ejemplo, *sueldos* y salarios, pago de energéticos, empaque, etc. Durante *2007* y principios de 2008, el peso mexicano tuvo una fortaleza muy *importante*, lo que generó una reevaluación del peso ante el dólar, es *decir, el* tipo de cambio constantemente venía a la baja, lo que generaba que cuando VITRO recibía dólares y acudía al mercado a venderlos para comprar pesos para cubrir sus gastos, cada vez recibía menos pesos, por lo que tomó la decisión de entrar en diversos instrumentos financieros que le garantizaran poder vender dólares a un tipo de cambio predefinido. Sin embargo, derivado de la multicitada crisis financiera de 2008, el peso sufrió una fuerte devaluación ante el dólar, lo que generó que VITRO sufriera una importante pérdida económica en los citados instrumentos de cobertura, la que sumada con las pérdidas de sus subsidiaras en dichos instrumentos hizo que su deuda se elevara súbitamente en la cantidad de $320 millones de dólares.— Por otro lado, aunado al incremento súbito de la deuda de VITRO con vencimiento en el corto plazo, las ventas de sus subsidiarias sufrieron una disminución muy importante ya que los mercados en los que VITRO participa a través de sus subsidiarias sufrieron disminuciones sin precedente en su actividad. Por citar algunos ejemplos, en el mercado automotriz de equipo original, Vitro realiza una importante parte de sus ventas a clientes a los grandes armadores de coches, conocidos como OEM's su Original Engine Manufacturers, los cuáles vieron disminuidas sus ventas de automóviles nuevos y acumularon inventarios a niveles históricos, por lo que una parte importante de sus centros de fabricación tuvo que ser cerrada temporalmente y en consecuencia, eliminaron las compras a sus proveedores como Vitro. En el caso de esta industria automotriz, tuvo que entrar el gobierno estadounidense a brindar su apoyo con el programa conocido como "cash for clunkers" y posteriormente, el gobierno Mexicano hizo lo suyo con programas de incentivos a la industria. Otro claro ejemplo de recesión en los mercados en los que participa Vitro, se da en el mercado cervecero. Uno de los principales clientes de Vitro llegó a representar aproximadamente el 12% de los ingresos consolidados. La recesión mundial, que afectó primeramente a los Estados Unidos de América, generando niveles de desempleo similares a los vistos durante la Gran Depresión, afectando esto el poder adquisitivo de la gente de dicho país, hizo que las ventas de exportación de dicho cliente se vieran drásticamente reducidas y en consecuencia, se vio en la necesidad de frenar sus compras a Vitro, lo que hizo que Vitro dejara de percibir una parte importante de ingresos, afectando fuertemente sus márgenes operativos al tener una mezcla preponderantemente alta de costos fijos que no varían en concordancia con la variación de las ventas.— En otro orden de ideas, pero continuando con las afectaciones en los mercados que hicieron que Vitro incumpliera con sus obligaciones financieras, otro factor importante radica en la consolidación de algunas de las industrias en las que participa Vitro, un ejemplo se presenta con otro de los clientes importantes de la misma, que fue adquirido por una empresa que cuenta con una subsidiaria dedicada a la fabricación de envases de vidrio, lo que hizo que el cliente tomara la decisión de integrarse verticalmente optando por fabricar sus propios envases, retirando los pedidos a la subsidiaria de Vitro dedicada a su fabricación.--- Ahora bien, tocando el tema de los mercados de la construcción, en los que las subsidiarias de VITRO tienen una participación importante, no solo en México, si no en otros países, podemos señalar el caso del mercado estadounidense, que a raíz de la crisis hipotecaria incrementó significativamente la oferta de casas y espacios comerciales en venta, lo que generó que la construcción de nuevos espacios se viera materialmente disminuido, por lo que el vidrio que antes exportaba Vitro a los Estados Unidos de América, tuvo una súbita y precipitada baja en

*su demanda, generando que Vitro tuviera, en medio de la crisis, que buscar nuevos mercados para vender sus productos, encontrando como vía de desplazamiento para este producto el mercado brasileño; sin embargo, dados los altos costos de transporte involucrados en hacer llegar el vidrio a este país, este mercado presenta menores márgenes de utilidad. En lo que respecta a otros países en donde Vitro participa en el mercado de la construcción, está el caso de España, que en una medida más grave que en los Estados Unidos de América vio frenada su actividad comercial en diversos frentes, incluyendo el de construcción, y actualmente y con el propósito de mantener una posición competitiva en el mercado español, el negocio redujo su actividad al mínimo pero aún así continúa operando con márgenes negativos.--- En el resto de los mercados en los que Vitro participa, se han visto también disminuciones significativas, en menor medida generados por la crisis financiera iniciada a fines de 2008 pero sí por la situación económica y de liquidez de Vitro, ya que algunos clientes están buscando otras alternativas de proveedores porque están cuestionando la viabilidad financiera (y por lo tanto operativa) de Vitro y de sus subsidiarias, ya que su situación económica se ha deteriorado por su nivel de deuda a corto plazo y por pertenecer a un grupo cuya situación financiera también se ha deteriorado en meses pasados y que está en imposibilidad de renegociar su deuda. En particular, algunos clientes piensan que al tener que pagar toda la deuda pública se podrían dejar de cubrir los pagos a proveedores y estos podrían dejar de suministrar las materias primas necesarias para poder operar y en consecuencia Vitro dejaría de fabricar los productos que vende, generado con esto un tipo de efecto dominó que implica que si un productor deja de producir sus productos, afectará a todos sus clientes al cortar el suministro de su materia prima, en este caso, el vidrio producido en México.— Más aún, a pesar de los esfuerzos hechos por la sociedad para renegociar su deuda total y no obstante los esfuerzos hechos para reducir sus gastos y la venta de activos para alcanzar los fondos necesarios para mantener la operación, la empresa no ha podido llegar a un acuerdo que resuelva sus actuales obligaciones de pago y las documente para el largo plazo. Este proceso se inició hace meses y sigue habiendo acreedores que se oponen a las propuestas de reestructura hechas por la sociedad."— **QUINTO.** Con base en los hechos expuestos y documentación exhibida, que gozan de valor probatorio en términos de los artículos 1237, 1238, 1241, 1292 y 1296 del Código de Comercio, se desprende que la comerciante:— a) Cumplió con las formalidades previstas en el artículo 20 de la ley de la materia, dado que en la solicitud de declaración de concurso mercantil, señaló su denominación o razón social completa, domicilio para oír y recibir notificaciones, así como el de su oficina, aclarando que no tenía otros establecimientos, plantas, almacenes o bodegas. Asimismo, acompañó los siguientes anexos: I. Estados financieros de los últimos tres años; II. Una memoria en la que razonó acerca de las causas que la llevaron al estado de incumplimiento en que se encuentra; III. Una relación de acreedores y deudores, donde señaló nombres y domicilios, la fecha de vencimiento del crédito o créditos de cada uno de ellos, el grado con que estima se les debe reconocer, indicando las características particulares de dichos créditos, así como las de las garantías que otorgó para deudas propias y de terceros; IV. Un inventario de todos sus bienes inmuebles y muebles, títulos valores, géneros de comercio y derechos de cualquier otra especie; y V. Una relación de los juicios en los cuales interviene, donde indica las partes de los procedimientos, datos de identificación de los litigios, su tipo, estado de los juicios y ante qué autoridad se tramitan.— b) **Bajo protesta de decir verdad,** manifestó encontrarse en los supuestos previstos en los artículos 10 y 11 de la ley concursal, además de que*



explicó los motivos por los cuales considera ubicarse en esa situación.
según los hechos transcritos en el considerando que antecede.--- Ahora
bien, pese a la observancia de los anteriores requisitos, la comerciante
no cumple con la exigencia señalada en las fracciones II, párrafo
primero, y IV del numeral 339 de Ley de la Materia, por las razones que
enseguida se explicarán.--- Para comprender ésta postura, es menester
precisar que el apoderado de la comerciante en la solicitud de concurso
mercantil con plan de reestructura previo, expresó dentro de los
antecedentes que la actividad preponderante de su representada es la
tenencia de acciones de otras sociedades a través de las cuales realiza
la fabricación y el ofrecimiento de sus productos, para satisfacer las
necesidades de dos distintos tipos de industrias: envases de vidrio y
vidrio plano.--- Que las empresas subsidiarias de "Vitro" producen,
procesan, distribuyen y comercializan una amplia gama de artículos de
vidrio para brindar soluciones a múltiples mercados que incluyen los de
vinos, licores, cosméticos, farmacéutico, alimentos y bebidas, así como
el automotriz y el de la construcción.— En cuanto a la situación
financiera, refiere que sus principales subsidiarias directas e indirectas
se encuentran operando con la regularidad que permite el entorno
económico mundial y los mercados donde las mismas ejercen su
actividad, sin embargo, **el grupo enfrenta una situación agravada de
liquidez** limitada que la pone en riesgo de incumplimiento generalizado
de obligaciones, que da lugar a su vez a una incertidumbre en su
viabilidad y la de las demás empresas con las que tiene relación de
negocios.— Que debido a las necesidades de importación de insumos y
la denominación de algunas de sus obligaciones financieras, "Vitro" se
vio en la necesidad de buscar mecanismos de protección y cobertura,
por la fluctuación del tipo de cambio del peso mexicano frente al dólar
de los Estados Unidos de América, moneda en que se encuentra
denominada la mayor parte de su deuda.--- De la misma manera, sus
subsidiarias para las operaciones cotidianas efectúan compras de gas
natural (indispensable para la operación de sus hornos), por lo que se
vieron igualmente en la necesidad de acudir a mecanismos de
protección y cobertura frente a la fluctuación propia del precio de dicho
insumo.— Que por ello, diversas subsidiarias de "Vitro" contrataron
sendos instrumentos financieros derivados, fundamentalmente de
cobertura, cuyo valor o posición es precisamente derivado o
dependiente de un valor subyacente que se cotiza en mercados
relevantes.— Que los factores macro-económicos internacionales e
incluso mundiales acontecidos especialmente a partir del último
trimestre del año dos mil ocho, **afectaron seriamente la situación
financiera de la empresa y de sus subsidiarias directas e
indirectas**, haciendo inminente para las mismas un severo problema de
liquidez inmediata, no obstante su solvencia, pues la fluctuación del
valor de las posiciones resultantes de sus operaciones de derivados
provocaron llamadas de margen ("margin calls") y notificaciones de
terminación anticipada por parte de sus contrapartes en los distintos
instrumentos financieros derivados, causando estragos en la liquidez de
la compañía, al verse forzada a utilizar súbitamente flujo operativo para
cubrir o garantizar dichos márgenes.--- Que lo anterior, se vio agravado
con la correspondiente recesión de la economía de los Estados Unidos
de América y la consecuente desaceleración de la economía mundial,
**que provocó un importante efecto en la reconsideración de las
ventas globales de las subsidiarias y por lo tanto en sus ingresos**,
así como en su capacidad de hacer frente al servicio y amortización de
su deuda, con la consecuente inminencia de la aceleración y
vencimiento anticipado de sus obligaciones.--- Estos antecedentes
dejan ver con claridad que la comerciante está constituida como una
sociedad anónima bursátil, que como tenedora de acciones, encabeza
un grupo de empresas a quienes controla en lo general, al grado de que

*los problemas financieros que dice enfrentar, en buena medida, se deben a las diversas deudas contraídas por y con sus subsidiarias.---Entonces, como primera conclusión se tiene que la comerciante es una empresa que en el ámbito financiero se le denomina "Holding", es decir, aquella que no se ocupa directamente de la operación de ningún negocio, pero que posee acciones de subsidiarias y afiliadas con el fin de controlarlas.[1]--- Al respecto, el artículo 64 de la Ley del Impuesto sobre la Renta, considera controladoras a las sociedades residentes en México que sean propietarias de más del 50% de las acciones con derecho a voto de otra u otras sociedades controladas -inclusive cuando dicha propiedad se tenga por conducto de otras sociedades que a su vez sean controladas por la misma controladora-, siempre que no más del 50% de sus acciones con derecho a voto sea a su vez poseído por otra u otras sociedades, salvo que con el país de residencia de estas se tenga celebrado un acuerdo amplio de intercambio de información: para estos fines no se computarán las acciones colocadas entre el gran público inversionista.--- Estas consideraciones son semejantes a las contempladas en la Ley de Concursos Mercantiles, en su ordinal 15, que textualmente dispone: (se transcribe)--- La naturaleza o tipo de sociedad que constituye la comerciante, se trae a colación en razón de que el apoderado de aquella estableció que sus pasivos se dividen en los siguientes rubros:--- 1. Pasivos directos con acreedores que no son subsidiarias directas o indirectas de la misma, por $20,508,000,000.00 (veinte mil quinientos ocho millones de pesos 00/100 Moneda Nacional), equivalentes a aproximadamente EUA $1,640,000,000.00 ( mil seiscientos cuarenta millones de dólares 00/100 Moneda de los Estados Unidos de América),--- 2. Pasivos por avales otorgados a favor de terceros respecto de obligaciones de sus subsidiarias por $2,375,000,000.00 (dos mil trescientos setenta y cinco millones de pesos 00/100 Moneda Nacional), equivalentes aproximadamente a EUA$190,000,000.00 (ciento noventa millones de dólares 00/100 Moneda de los Estados Unidos de América), y;--- 3. Pasivos directos con subsidiarias directas o indirectas de la misma, por la cantidad de $23,872,000,000.00 (veintitrés mil ochocientos setenta y dos millones de pesos 00/100 Moneda Nacional), equivalentes a EUA$1,910,000,000.00 ( mil novecientos diez millones de dólares 00/100 Moneda de los Estados Unidos de América).--- Lo anterior motivó que este órgano jurisdiccional antes de proveer sobre la admisión de la solicitud de concurso mercantil con plan de reestructura previo, ordenara aclarar diversos puntos o aspectos imprecisos relacionados con ese tipo de pasivos, entre otras, para que precisara el desglosara el porcentaje que constituían los acreedores que firmaron el convenio frente a la totalidad de sus adeudos (68%), según el pasivo que refería, es decir, aquellos que tuvieran que ver con acreedoras que no son subsidiarias y aquellos con quienes si lo eran; además para que especificara si las que suscribieron el convenio preconcertado se encontraban las empresas subsidiarias con las que había contraído obligaciones o adeudos, y adicionalmente, para que exhibiera la documentación idónea que acreditara que aquellas eran controladas o subsidiarias de la comerciante.--- En acatamiento a lo anterior, el autorizado de la comerciante "Vitro", Sociedad Anónima Bursátil de Capital Variable, en ocurso recibido el veintidós de diciembre anterior, anexó una tabla y una lista de las que se advierte la manera en que su representada computó el porcentaje aproximado de los acreedores que suscribieron y consintieron el plan o convenio preconcertado, así como*

---

1 http://www.serfinco.com/glossary/default.asp?t=H



la enumeración de las empresas subsidiarias que participaron o que se adhirieron al convenio, que para mayor objetividad se reproducen:

**ANEXO: 2**

| Pasivo de VITRO SAB al 30 de septiembre de 2010 | |
|---|---|
| (in millones de dólares)[1] | |
| Pasivo a favor de personas distintas (de sus subsidiarias)[1] | 1,737.50 |
| Deuda Intercompañías | 1,909.60 |
| **OBLIGACIONES TOTALES** | **3,647.10** |

| Consentimiento para adeudos | | | |
|---|---|---|---|
| Avalista a favor de Fintech Principal | 170.4 | | |
| Avalista a favor de Fintech Imprimex | 14.1 | | |
| Bonos que faltan a Fintech | 135.3 | | |
| Intereses bonos de Fintech | 29.3 | | |
| Consentimiento de tenedores de bonos[X] | 166.1 | | |
| Intereses tenedores de bonos compromisos | 32.6 | | |
| Consentimiento de tenedores de Cebures | 3.9 | | |
| Intereses tenedores de Cebures consentidos (Vitro 08 no Bono Intereses) | | | |
| DEUDA PERSONAS DISTINTAS DE SUBSIDIARIA CON CONSENTIMIENTO AL PLAN O CONVENIO DE REESTRUCTURA PREVIO | 575.4 | 15.80% | |
| DEUDA INTERCOMPAÑÍAS CON CONSENTIMIENTO AL PLAN O CONVENIO DE REESTRUCTURA PREVIO | 1,899.60 | 52.08% | |
| **TOTAL DEUDA A FAVOR** | **2,475.00** | **67.88%** | |

[1] Tipo de cambio utilizado para el cómputo 12.5011
[X] Incluye avales otorgados a favor de Fintech Inversiones Ltd. ("Fintech"), acreedor compareciente, que por su naturaleza no son cuenta de balance
[2] Incluye consentimientos otorgados a través de la firma del Convenio de Reestructura y de la solicitud por parte de los apoderados Armando Garza, Raúl y Carlos Martens Flores, así como de las hojas de firmas del Convenio de Reestructura y la Solicitud en términos de la Cláusula décima sexta del primero, a bonos cuyo titular es Fintech en adición a los 135.3 indicados arriba, indebidas como anexo 200 a la Solicitud.

ACREEDORES COMPARECIENTES SUBSIDIARIAS DIRECTAS E INDIRECTAS

**ANEXO: 3**

COMPAÑÍA VIDRIERA, S.A. DE C.V.
INDUSTRIA DEL ALCALI, S.A. DE C.V.
IP VIDRIO Y CRISTAL LTD.
TRABAJO DE ADMINISTRACION Y SERVICIOS, A.C.
VIDRIERA MONTERREY, S.A. DE C.V.
VIDRIO PLANO DE MÉXICO, S.A. DE C.V.
SERVICIOS VIDRIERA GUADALAJARA, S.A. DE C.V.
VITRO AUTOMOTRIZ, S.A. DE C.V.
SERVICIOS VITRO COSMOS, S.A. DE C.V.
VITRO ENVASES NORTEAMERICA, S.A. DE C.V.
VITRO EUROPA LTD.
VITRO GLOBAL, S.A.
VITRO VIDRIO Y CRISTAL, S.A. DE C.V.
VVP EUROPA HOLDINGS BV.

*De estos antecedentes, se observa que el total de los adeudos de la comerciante es de aproximadamente USD $3,647.10 (tres mil seiscientos cuarenta y siete millones 10/100 moneda de los Estados Unidos de Norte América), de los cuales USD $1.737.50 (mil setecientos treinta y siete millones 50/100 moneda de los Estados Unidos de Norteamérica), representan pasivos a favor de personas ajenas a sus subsidiarias y USD $1909.60 (mil novecientos nueve millones 60/100 moneda de los Estados Unidos de Norteamérica) representan deudas inter compañías.--- Ahora, en cuanto a los acreedores que suscribieron el convenio se reafirmó que constituyen aproximadamente el sesenta y ocho por ciento del total de sus adeudos, de los cuales el **15.80** por ciento equivalente a USD **$575.4** (quinientos setenta y cinco millones 40/100 moneda de los Estados Unidos de Norteamérica) representan deudas distintas de las subsidiarias y el **52.08** por ciento equivalente a USD **$1899.60** (mil ochocientos noventa y nueve millones 60/100 moneda de los Estados Unidos de Norteamérica) constituyen deudas inter compañías con consentimiento al plan o reestructura.--- En este orden de ideas, es importante no perder de vista que, de acuerdo con el numeral 66 de la Ley de Impuesto sobre la Renta, se considera empresa controlada aquella en la que más del 50% (cincuenta por ciento), de sus acciones con derecho a voto es poseído directa o indirectamente, o en ambas formas, por una corporación controladora. Que para esos efectos por tenencia indirecta se entiende la que ejerce la sociedad dominante por conducto de otra u otras compañías que a su vez son manejadas por ella.[2]--- Esta definición, está prevista igualmente*

---

[2] "Artículo 66. Para los efectos de esta Ley se consideran sociedades controladas aquéllas en las cuales más del 50% de sus acciones con derecho a voto sean

*en términos semejantes por la Ley de Concursos Mercantiles, en su ordinal 15. pues en esencia la describe del mismo modo.*[3]*--- De este modo. las sociedades subsidiarias o controladas, también son conocidas como subordinadas, porque aun cuando tienen personalidad jurídica distinta, la controladora o la sociedad "madre"*[4] *ejerce el control económico, financiero y administrativo directa o indirectamente, y por ende. carecen de autonomía por el hecho de ser dominadas por otra.--- En el caso concreto, a pesar de que la comerciante reconoce expresamente que son sus subsidiarias las empresas listadas en el anexo tres. no está por demás precisar que de acuerdo con los demás documentos exhibidos en el escrito aclaratorio, "Vitro" Sociedad Anónima Bursátil de Capital Variable, ejerce control sobre esas sociedades, ya sea porque respecto de unas posee mas del cincuenta por ciento del total de sus acciones, y de otras, por tenencia indirecta, es decir, ejerce el dominio a través de otras compañías que también son manejadas por aquella.--- Trasladados estos conceptos a la materia. se comprende porqué entonces, para los efectos de la Ley de Concursos Mercantiles, se considera comerciante tanto a la controladora como a sus controladas. Así lo establece claramente el artículo 4° al disponer lo siguiente: "Para los efectos de esta Ley, se entenderá por: [....] II. Comerciante, a la persona física o moral que tenga ese carácter conforme al Código de Comercio. Este concepto comprende al patrimonio fideicomitido cuando se afecte a la realización de actividades empresariales. Igualmente, comprende a las sociedades mercantiles controladoras o controladas a que se refiere el artículo 15 de esta Ley."--- Incluso, acorde con esta distinción el diverso numeral 15 de esta normatividad permite únicamente la acumulación de procedimientos concúrsales entre esta clase de sociedades, y además en el artículo 117, fracción IV, identifica como fraude de acreedores las operaciones entre ellas durante la fecha de retroacción.*[5]*--- Esto último*

---

*propiedad. ya sea en forma directa, indirecta o de ambas formas, de una sociedad controladora. Para estos efectos. la tenencia indirecta a que se refiere este artículo será aquella que tenga la sociedad controladora por conducto de otra u otras sociedades que a su vez sean controladas por la misma sociedad controladora."*

[3] *Se considerarán sociedades controladas aquéllas en las cuales más del cincuenta por ciento de sus acciones con derecho a voto sean propiedad. ya sea en forma directa, indirecta o de ambas formas, de una sociedad controladora. Para ello la tenencia indirecta a que se refiere este párrafo será aquélla que tenga la controladora por conducto de otra u otras sociedades que a su vez sean controladas por la misma controladora.*

[4] *Véase a Joaquín Rodríguez Rodríguez, Tratado de Sociedades Mercantiles, Editorial Porrúa. Pág. 983.*
[5] *"Artículo 15. No se acumularán los procedimientos de concurso mercantil de dos o más Comerciantes. salvo lo previsto en el párrafo siguiente.*

*Se acumularán, pero se llevarán por cuerda separada, los procedimientos de concurso mercantil de:*

*Las sociedades controladoras y sus controladas, y*

*Dos o más sociedades controladas por una misma controladora.*

*Artículo 117. En caso de Comerciantes que sean personas morales se presumen actos en fraude de acreedores, si se realizan a partir de la fecha de retroacción. salvo que el interesado pruebe su buena fe, las operaciones en contra de la Masa realizadas con las personas siguientes:*

*IV. Aquellas personas morales controladas por el Comerciante, que ejerzan control sobre este último. o bien que sean controladas por la misma sociedad que controla al Comerciante."*



es de especial relevancia, en tanto el legislador contempló la posibilidad de que empresas vinculadas que presentan una relación de subordinación, pudieran efectuar actos en fraude de acreedores, por lo que estableció que cualquier operación entre ellas en contra de la masa durante la fecha de retroacción, da lugar a presumir el fraude de acreedores, salvo que el interesado pruebe su buena fe, arrojando la carga de la prueba a la sociedad beneficiada en dicha operación.--- En atención a lo expuesto, este órgano jurisdiccional considera que la mayoría de los participantes del convenio que suscriben la solicitud de concurso mercantil con plan de reestructura previo, no tienen el carácter de acreedores en la forma prevista por la ley concursal y por lo mismo están imposibilitados para representar cuando menos el cuarenta por ciento del total de los adeudos de la comerciante según lo exige el ordinal 339 de la Ley de la Materia.--- Es decir, no se desconoce ni se niega que entre los distintos entes que conforman la sociedad controladora y sus subordinadas pueda existir autonomía financiera, ni tampoco que entre ellas exista imposibilidad de intercambio de flujos créditos, deudas, mercancías, etcétera; tan así que la legislación fiscal autoriza y alienta esta forma de operación al establecer que las empresas controladoras pueden optar por un régimen de consolidación fiscal en términos de la Ley de Impuesto sobre la Renta, cuyo objetivo es determinar su resultado fiscal en forma consolidada, en proporción a su participación accionaria, pagando exclusivamente el ISR correspondiente al grupo de empresas[6], lo cual es tan lógico porque de este modo se facilita la operatividad de los grandes consorcios financieros que caracterizan al entorno global.--- Pero desde luego que esto tampoco pasó inadvertido para el legislador concursal, quien nunca perdió de vista los fenómenos financieros que pueden generarse entre esos entes, tanto en su interior y hacia el exterior, por lo cual desde la conceptualización de las partes que intervienen en los procedimientos concúrsales estableció con claridad quienes pueden ser catalogados como acreedores (reconocidos) y quienes como comerciantes (comprendidos aquí tanto a las controladoras como a las controladas), para efectos de determinar cuál es la "masa" (artículo 4°, fracción V, que está en juego en el procedimiento mercantil.--- Esto ocurre en el caso concreto, pues de acuerdo con lo especificado en parágrafos que preceden, "Vitro", Sociedad Anónima Bursátil de Capital Variable ejerce el control económico, financiero y administrativo sobre las controladas directa o indirectamente, y en ese sentido, para los efectos de la procedencia de una solicitud de concurso mercantil mediante convenio preconcertado, no es jurídicamente posible decretarlo mediante un convenio en el que se incorporen créditos ínter compañías que representen la mayoría de los supuestos adeudos, con el objeto de lograr alcanzar el porcentaje mínimo requerido por la ley para ese efecto[7], en tanto tal fin no es el deseado por el legislador para este procedimiento especial, ya que su establecimiento fue reconocer o recompensar los esfuerzos extrajudiciales de las comerciantes que logran resolver las diferencias con sus acreedores en una situación de

---

[6] "Artículo 64. La sociedad controladora que opte por considerar su resultado fiscal consolidado, deberá determinarlo conforme a lo previsto en el artículo 68 de esta Ley. Al resultado fiscal consolidado se le aplicará la tasa establecida en el artículo 10 de esta Ley, en su caso, para obtener el impuesto a pagar por la sociedad controladora en el ejercicio."

"Artículo 68. Para los efectos de este Capítulo, la participación consolidable será la participación accionaria que una sociedad controladora tenga en el capital social de una sociedad controlada durante el ejercicio fiscal de ésta, ya sea en forma directa o indirecta. Para estos efectos, se considerará el promedio diario que corresponda a dicho ejercicio. La participación consolidable de las sociedades controladoras, será del 100%."

[7] Titulares de al menos el cuarenta por ciento del total de sus adeudos.



igualdad y de independencia, respetando siempre los derechos de aquellos.--- En efecto, de la exposición de motivos y de la discusión a la propuesta de aquella reforma, destaca que los legisladores adicionaron ese procedimiento con el objeto de *reconocer las negociaciones*[8] *preliminares* efectuadas por el deudor con una buena parte de sus acreedores, compensando la actitud de la comerciante de reestructurar sus deudas a través de un procedimiento expedito, en el que se limita la actividad del visitador, toda vez que la comerciante y los acreedores de antemano reconocen en la solicitud y convenio que se dan los supuestos del concurso, y por ende, se agiliza la determinación de la naturaleza de los acreedores y su legitimidad para suscribir el convenio.--- Una vez agotado el procedimiento, y en caso de que se llegue a aprobar el convenio, adquiere todos los efectos del convenio concursal contemplados por la Ley de Concursos Mercantiles, lo cual permite que el deudor *y la mayoría de sus acreedores* dispongan de un instrumento procesal ágil para obtener los beneficios que a todos ellos otorga una resolución de esa índole, incluyendo el carácter de cosa juzgada frente a los acreedores negligentes o disidentes, sin necesidad de presentar y tramitar un concurso mercantil ordinario con mayor duración y gastos. [9] Como se ve, los comerciantes para que tengan acceso a este procedimiento especial, resulta menester que presenten o acompañen a la solicitud un plan de reestructura de su pasivo, que extrajudicialmente hayan negociado con acreedores titulares de un

---

[8] Negociación. (Del lat. negotiatĭo. -ōnis). 1. f. Acción y efecto de negociar. 2. f. Der. Tratos dirigidos a la conclusión de un convenio o pacto.
http://buscon.rae.es/draeI/SrvltConsulta?TIPO_BUS=3&LEMA=negociacion.

[9] EXPOSICIÓN DE MOTIVOS
CÁMARA DE ORIGEN: SENADORES
México, D. F., a 8 de marzo de 2005.
INICIATIVA DE DIPUTADOS (GRUPO PARLAMENTARIO DEL PAN)

"....En virtud de lo anterior, proponemos adicionar la Ley de Concursos Mercantiles a efecto de reconocer la figura de un "Concurso Mercantil Preconvenido", que tuviese un trámite expedito consistente en que la solicitud de concurso sea presentada por el comerciante en unión al convenio que haya celebrado con sus acreedores, el cual deberá reunir todos los requisitos que actualmente exige el Título Quinto, Capítulo Único de la Ley de Concursos Mercantiles.

Las normas que regirían el Concurso Mercantil Preconvenido deberían reducir la duración de los términos que se prevé en la Ley para concursos ordinarios, deberían limitar la actividad del visitador, toda vez que el comerciante y los acreedores estarían reconociendo en la solicitud y convenio que se dan los supuestos del concurso, deberían agilizar la determinación de la naturaleza de los acreedores y su legitimidad para suscribir el convenio, y deberían establecer las bases para aprobar la legalidad del mismo convenio.

Agotado el procedimiento expedito que sugerimos, el juez aprobaría el convenio, el cual tendría todos los efectos del convenio concursal contemplados por la Ley de Concursos Mercantiles, lo cual permitiría que el deudor y la mayoría de sus acreedores dispondrían de un instrumento procesal para obtener los beneficios que a todos ellos otorga un convenio concursal, incluyendo su carácter de cosa juzgada frente a los acreedores negligentes o disidentes, sin necesidad de presentar y tramitar un concurso mercantil ordinario, con mayor duración y gastos."

SENADORES
DISCUSIÓN
México, D. F., a 18 de octubre de 2005.

"Noveno.- un aspecto destacado en la modificaciones es la inclusión de un nuevo título que se denomina Concurso Mercantil con plan de reestructuración previo, el cual tiene como propósito reconocer que en algunas ocasiones el deudor ha negociado con la mayoría de sus acreedores un convenio que ha merecido la aprobación de dicha mayoría, pero no puede evitar el concurso en virtud de que ignora el domicilio de alguno de ellos o bien alguno de sus acreedores se muestra desinteresado o no esté de acuerdo con tal convenio.



JUDICIAL DE LA FEDERACIÓN

monto relevante (al menos representativos del cuarenta por ciento del total de sus adeudos), situación que en la especie, aunque bajo protesta legal el apoderado de la comerciante sostiene que si lo representan, no debe soslayarse que la mayoría lo suscribieron sus subsidiarias, pese a que con ellas no necesitaba efectuar acuerdos o tratos en situación de equilibrio o independencia, ya que se encuentran subordinadas a sus decisiones.--- Se insiste que esto no sucede con los supuestos acuerdos que celebró la comerciante con sus subordinadas, pues obvio que con éstas no tiene necesidad de solicitar la intervención judicial para lograr reestructurar los adeudos de que es titular, por ser precisamente quien las controla en todos los aspectos, dado que en términos del artículo 64 de la Ley del Impuesto sobre la Renta, ejerce por lo menos el control sobre el 51% de sus acciones, de donde resulta que todo tipo de decisiones en los ámbitos financiero, legal, corporativo, régimen, aumento o disminución de capital, socios, créditos, etcétera, están sujetos a las determinaciones de quien ejerce ese control. Máxime que la legislación que regula a las sociedades anónimas bursátiles considera a las controladoras y a las controladas como _una misma unidad económica_ para efectos de revelación de información, _contabilidad y celebración de operaciones_.[10]--- En materia de contabilidad se produce un efecto similar en el momento de consolidar los estados financieros, puesto que al prepararse una consolidación contable es principio fundamental que un ente económico no puede poseerse ni deberse a sí mismo, ni puede realizar utilidades o excedentes o pérdidas por operaciones efectuadas entre sí, dado que dichas operaciones se efectúan con integrantes de grupos económicos donde existe control, de tal modo que en el momento de consolidar los estados financieros se debe tener en cuenta que operaciones inter compañías han producido resultados no realizados para ser eliminados. Por tanto, no se puede tener como realizada una utilidad sino solamente cuando el bien haya sido vendido a un tercero, pues no se puede generar utilidad o pérdida a sí misma.--- Entonces, si por diversas legislaciones se ha considerado que controladora y controladas constituyen un grupo de intereses económicos común representados por la primera, resultaría completamente contraria a la teleología de la legislación concursal conceder a la comerciante, que ejerce control sobre aquellas, un trámite especial a través de un convenio en el que figuran y sobresalen las sociedades controladas quienes poseen el cincuenta y dos por ciento de sus adeudos.--- Al margen de lo anterior, la propia comerciante en la solicitud reconoce que con aquellas **conforma un grupo económico**, pues al exponer las causas que la llevaron a promover el concurso mercantil, refiere textualmente en el capítulo III que denominó "Situación Financiera", lo siguiente: "las principales subsidiarias directas e indirectas de VITRO se encuentran operando con la regularidad que permite el entorno económico mundial y los mercados donde las mismas ejercen su actividad, sin embargo, **el grupo enfrenta una situación agravada de liquidez limitada que la pone en riesgo de un incumplimiento generalizado de obligaciones que pondría en riesgo su viabilidad** y la de las demás empresas con las que tiene relación de negocios.."; de modo que resulta incongruente que, por un lado, al fundamentar sus problemas financieros se refiera como un grupo de intereses económicos comunes, y por otro, a través de la solicitud pretenda

---

[10] _LEY DEL MERCADO DE VALORES "Artículo 3, segundo párrafo "Las sociedades anónimas bursátiles y las personas morales que éstas controlen, se considerarán como una misma unidad económica para efectos de revelación de información, contabilidad y celebración de las operaciones a que hacen referencia los artículos 28, fracción III y 47 de esta Ley, sin perjuicio de las obligaciones que otras leyes impongan a las citadas personas morales."_

reestructurar las deudas que tiene con su propio grupo.--- De ahí que, por las razones apuntadas no sea viable decretar procedente este procedimiento mediante el convenio propuesto, pues el precepto 342 de la ley de la materia privilegia el plan de reestructura, al obligar al conciliador que antes de proponer cualquier convenio, tome en cuenta el exhibido en la solicitud.--- Además, no se desconoce que pudiera surgir una posible situación de ventaja en el procedimiento, porque la comerciante contaría con la representación mayoritaria a que se refiere el ordinal 157 de la Ley de Concursos Mercantiles, al representar las deudas de sus subsidiarias el cincuenta y dos por ciento del total de sus pasivos. y por ende, tendría el control de las negociaciones durante la etapa de conciliación, siendo factible que quede en manos de ella, a través de las subsidiarias los términos y condiciones del convenio final. Incluso, ni siquiera los acreedores que no participaron en el convenio previo tendrían la posibilidad de vetarlo, por no llegar a alcanzar la mayoría simple, o bien, el cincuenta por ciento del monto total de los créditos reconocidos, pues se insiste las deudas inter compañías adheridas al convenio preconsertado representan el cincuenta y dos por ciento del total de los adeudos.[11] --- Escenario que desnaturalizaría al procedimiento concursal, porque no habría concurrencia, participación y oposición efectiva entre los interesados, al coexistir un arreglo preconsertado dominado por la propia comerciante a través de sus subsidiarias.[12]--- Cabe aclarar, que esta conclusión no se aparta de uno de los objetos primordiales de la Ley de Concursos Mercantiles, que de acuerdo con el contenido de los artículos 1° y 3° de la Ley de Concursos Mercantiles, consiste en conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas, pues paralelamente debe

---

[11] "Artículo 157. Para que sea eficaz, el convenio deberá ser suscrito por el Comerciante y sus Acreedores Reconocidos que representen más del cincuenta por ciento de la suma de:

      I. El monto reconocido a la totalidad de los Acreedores Reconocidos comunes, y

      II. El monto reconocido a aquellos Acreedores Reconocidos con garantía real o privilegio especial que suscriban el convenio."

    "Artículo 163. El convenio podrá ser vetado por una mayoría simple de Acreedores Reconocidos comunes, o bien por cualquier número de éstos, cuyos créditos reconocidos representen conjuntamente al menos el cincuenta por ciento del monto total de los créditos reconocidos a dichos acreedores.

No podrán ejercer el veto los Acreedores Reconocidos comunes que no hayan suscrito el convenio si en éste se prevé el pago de sus créditos en los términos del artículo 158 de este ordenamiento.

    Artículo 342. La sentencia de concurso mercantil deberá reunir los requisitos que esta Ley le exige y a partir de ese momento el concurso mercantil con plan de reestructura se tramitará como un concurso mercantil ordinario, con la única salvedad de que el conciliador deberá considerar el plan de reestructura exhibido con la solicitud al proponer cualquier convenio."

[12] concurso. (Del lat. concursus). 1. m. concurrencia (ǁ conjunto de personas). 2. m. Reunión simultánea de sucesos, circunstancias o cosas diferentes. 3. m Asistencia, participación, colaboración. 4. m. Oposición por que por medio de ejercicios científicos, artísticos o literarios, o alegando méritos, se hace a prebendas, cátedras, etc. de acreedores. 1. m. Der. Juicio universal para aplicar los haberes de un deudor no comerciante al pago de sus acreedores. (http://buscon.rae.es/draeI/SrvltConsulta?TIPO_BUS=3&LEMA=concurso).



privilegiarse el equilibrio sano con los acreedores, a fin de no crear un estado de desventaja en el que sean estos quienes posteriormente queden en estado de iliquidez.--- Desde esta óptica, no puede permitirse la utilización de las bondades que contempla la ley para emplearla en beneficio particular, sin observar los derechos de los demás acreedores, pues la mecánica que ofrece la norma para conservar a las empresas en el procedimiento preconsertado, es incentivar que entre comerciantes y acreedores o al menos la mayoría, logren subsanar las diferencias a fin de negociar y consolidar el convenio de reestructuración, que a su vez, abarque a los demás acreedores desinteresados o que se opusieron.--- Tampoco sería valido sostener que el comerciante al someterse a las reglas de un procedimiento concursal con plan de reestructura, por ese sólo hecho está en condiciones de acceder a una situación de ventaja frente a sus diversos acreedores, pues aunque es verdad que a través de ese trámite especial obtiene diversos beneficios para lograr su conservación, ello no implica que sus acreedores queden en estado de inequidad. Por el contrario, la ley concursal busca mantener el equilibrio entre los derechos de la comerciante y de sus acreedores.--- Bajo esos principios, los cuales obran plasmados en la exposición de motivos que dio origen a la Ley de Concursos Mercantiles publicada en el Diario Oficial de la Federación el doce de mayo de dos mil[13], se llega a la firme convicción que el decretar procedente la solicitud a través del convenio presentado por el comerciante, sería tanto como consentir u otorgarle una ventaja no permitida por la Ley Concursal, pues como se dijo anteriormente, al representar las deudas de sus subsidiarias el cincuenta y dos por ciento del total de sus pasivos, sería factible que contara con la representación mayoritaria a que se refiere el ordinal 157 de la Ley de Concursos Mercantiles, y por ende, tendría el control de las negociaciones durante la etapa de conciliación, quedando en manos de ésta los términos y condiciones del convenio final, rompiéndose de este modo el equilibrio que debe prevalecer en este tipo de



---

[13] CAMARA DE ORIGEN: SENADORES
EXPOSICION DE MOTIVOS
México D.F. a 23 de noviembre de 1999.

"....Para que la legislación concursal resulte eficaz es necesario que se caracterice por ser predecible equitativa y transparente. La predecibilidad se consigue estableciendo reglas claras y precisas que permitan su aplicación de manera consistente y por lo tanto, ofrezcan certeza y desincentiven los litigios. La equidad, por su parte no se alcanza dando un trato igual a los distintos acreedores, sino reconociendo las diferencias y, sobre todo, evitando el fraude y el favoritismo. Por último la transparencia obliga a proveer de información suficiente a los diferentes participantes para que todos puedan ejercer sus derechos, y obliga también a que los procedimientos judiciales sean abiertos y que las decisiones se fundamenten y se hagan del conocimiento del público.

Las características anteriores permiten establecer los incentivos apropiados para que acreedores y deudores potenciales puedan tomar las mejores decisiones y éstas contribuyan a elevar la eficiencia del sistema productivo. Además, una vez que la empresa ha incurrido en incumplimiento generalizado de sus obligaciones, la ley debe contribuir a que las partes puedan alcanzar acuerdos privados con la menor participación del Estado o si ello no es posible, se ejecuten expedita y ordenadamente los derechos, en las mejores condiciones posibles. Concretamente, los criterios más importantes que orientaron el desarrollo de la Iniciativa fueron los siguientes:

a) Maximizar el valor social de la empresa;
b) Conservar el equilibrio entre deudor y acreedores, para que ambos sean plenamente respetados;
c) Inducir el flujo de información relevante que permita a los interesados participar constructivamente;

".....

h) Simplificar los trámites judiciales y procedimientos administrativos para hacerlos más transparentes y expeditos, reduciendo oportunidades e incentivos para litigios frívolos..."



*procedimientos.— Esta situación de inequidad no deseado por el legislador concursal, se patentiza al aplicar el método denominado "reducción al absurdo", pues sería irrazonable que las subordinadas llegaren a demandar el concurso mercantil (involuntario) de su controlada, o que la última, estuviera dispuesta a hacer lo propio respecto de sus subsidiarias, precisamente porque iría en detrimento del propio grupo económico, de ahí que al concebirlas como una sola unidad económica (controladas y controladora) el legislador anticipo un impedimento para acceder a posibles ventajas mediante la participación de las primeras en el plan de reestructura, de suerte que no sea procedente aceptar una solicitud que invariablemente iría en contra de la propia teleología de la ley concursal.— Entonces, al excluirse en el convenio a los acreedores que controla la comerciante (subsidiarias), es indudable que con los restantes que constituyen el 15.80% quince punto ochenta por ciento del total de sus adeudos no alcanza el rango exigido para aceptar el plan de reestructura previsto por la ley (40% del total de sus adeudos), lo que lleva ha decretar IMPROCEDENTE la SOLICITUD DE CONCURSO MERCANTIL CON PLAN DE REESTRUCTURA PREVIO, formulada por el representante de la comerciante "Vitro", Sociedad Anónima Bursátil de Capital Variable.— En el entendido, que quedan a salvo los derechos de los acreedores que representan aproximadamente el 15.80% quince punto ochenta por ciento del total de los adeudos de la comerciante, para que lo hagan valer en la vía y forma que corresponda.— No obsta a lo anterior, que el segundo párrafo de la fracción II del artículo 339 de la Ley de Concursos Mercantiles refiera que será suficiente que el Comerciante manifieste bajo protesta de decir verdad que las personas que firman la solicitud representan cuando menos el cuarenta por ciento del total de sus adeudos, pues esa declaración sólo trasciende o impera para la admisión del concurso mercantil, pero no para el dictado de la sentencia de concurso.— Además, dicha protesta sólo tiene el alcance de reconocer en forma presuntiva que los participantes del convenio preconsertado representan por lo menos ese porcentaje, lo que desde luego, debe dilucidarse en forma amplia y con base en consideraciones sólidas en la sentencia, donde es factible analizar a fondo si con la calidad[14] que acuden la mayoría de los suscribientes era posible decretar procedente el procedimiento especial establecido por el legislador a través de la reforma a la Ley de Concursos Mercantiles, publicada el veintisiete de diciembre de dos mil siete, en el que se adicionó el título décimo cuarto denominado "Del concurso mercantil con plan de reestructura previo".— Por tanto, se ordena que las cosas vuelvan al estado que tenían con anterioridad a la presentación de la demanda, por lo que una vez que quede firme este fallo, deberán levantarse las providencias precautorias impuestas en proveído de veinticuatro de diciembre de dos mil diez." (fojas* **vuelta 15866** *a* **vuelta 15886** *del tomo XV del concurso).*

**TERCERO.-** En principio, cabe señalar que tratándose de la apelación en materia concursal, donde se aplican supletoriamente el Código de Comercio, la Legislación Mercantil, los usos Mercantiles especiales y generales, el Código Federal de Procedimientos Civiles y el Código Civil Federal; en ese orden, según lo dispone expresamente el

---

[14] *En su carácter de sociedades controladas por la comerciante.*



JUDICIAL DE LA FEDERACIÓN

artículo 8 de la Ley Concursos Mercantiles; es de explorado derecho que en estos ordenamientos no aplica la suplencia de la queja, salvo casos excepcionales, entre los cuales no se encuentran el Juicio Concursal. En tal virtud no procede suplir la deficiencia de los agravios de la recurrente, de manera que los defectos o las omisiones que se aprecien en sus argumentos no podrán ser subsanados, es decir, habrá de estarse únicamente a lo expresado en los mismos, sin añadir consideraciones que no hubiesen sido expuestas por la inconforme, estudiándose sus disconformidades de estricto derecho.

Esto significa, que el recurrente no debe concretarse a señalar que la determinación combatida le causa agravios por ser contraria a derecho, por haberse incurrido en violación a los principios reguladores de la valoración de la prueba, por no estar fundada ni motivada, o porque en su concepto las constancias del juicio indican algo que es opuesto a la decisión impugnada; sino que habrá de expresar los argumentos jurídicos que constituyan el sustento de sus apreciaciones, de manera tal que se pongan de manifiesto las violaciones aducidas, a fin de que sea procedente el estudio correspondiente, pues de otra forma dicho examen sería oficioso y tal vez hasta se tendrían que añadir consideraciones legales no expresadas en los agravios respectivos, acerca de los puntos no tratados por el apelante.

Además conviene recordar que el recurso de apelación no es una renovación de la instancia, sino que tiene por objeto que el superior confirme, revoque o modifique la resolución del inferior, de tal manera que el examen del Ad quem sólo se limita a la determinación apelada, a la luz de los razonamientos jurídicos que realice la parte apelante en sus agravios, y si los motivos de inconformidad son expuestos en forma deficiente, la autoridad revisora no puede

suplir los mismos, atento al principio de estricto derecho que rige al recurso de apelación en materia civil.

Sirven de apoyo a lo anterior la tesis **VI, 2°. J/67**, emitida por el entonces Segundo Tribunal Colegiado del Sexto Circuito, octava época, tomo VI, segunda parte-1, página 316, julio a diciembre de 1990, del Semanario Judicial de la Federación, que reza:

"**AGRAVIOS EN LA APELACIÓN.** *La materia de la segunda instancia queda circunscrita a las cuestiones que se plantean en los agravios, por lo que el tribunal ad quem, queda impedido para entrar al estudio de cuestiones que no fueron planteadas, pues si lo hiciera supliría la deficiencia de los agravios, lo que sería ilegal*".

Asimismo, cobra aplicación la tesis **424**, de la Instancia de los Tribunales Colegiados de Circuito, octava época, tomo IV, parte TCC, página 289, apéndice de 1995, del Semanario Judicial de la Federación, que dice:

"**APELACIÓN. EL TRIBUNAL DE ALZADA AL PRONUNCIAR RESOLUCIÓN DEBE CONSTREÑIRSE AL FALLO RECURRIDO Y A LOS AGRAVIOS HECHOS VALER POR EL APELANTE.** *El tribunal de apelación al pronunciar resolución debe constreñirse al análisis del fallo recurrido y a los motivos de inconformidad aducidos por el apelante como fundamento el recurso interpuesto*".

**CUARTO.-** Los agravios hechos valer por Alejandro Francisco Sánchez Mújica, en su carácter de representante de **VITRO, SOCIEDAD ANÓNIMA BURSÁTIL DE CAPITAL VARIABLE**; Javier Arechavaleta Santos, representante de **VVP EUROPA HOLDINGS, BV, SERVICIOS VITRO COSMOS, SERVICIOS VIDRIERA GUADALAJARA, INDUSTRIA DEL ALCALI, COMPAÑÍA VIDRIERA, VITRO AUTOMOTRIZ y VITRO ENVASES NORTEAMÉRICA,** todos **SOCIEDAD ANÓNIMA de CAPITAL VARIABLE,** a excepción de la primera, así como de los diversos tenedores de certificados bursátiles VITRO03 y VITRO 08; Marcela Mayela Rodríguez Quintanilla, apoderada de **VITRO**



GLOBAL, SOCIEDAD ANÓNIMA, VIDRIERA MONTERREY, SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE e IP VIDRIO Y CRISTAL, LTD; Rodrigo Quintanilla Ramírez, en representación de **TRABAJO DE ADMINISTRACIÓN Y SERVICIOS, VIDRIO PLANO DE MÉXICO, VITRO VIDRIO Y CRISTAL y VITRO EUROPA, LTD, todos SOCIEDAD ANÓNIMA DE CAPITAL VARIABLE** y Armando Cuevas Brun, apoderado de **JP MORGAN CLEARING CORP, THE BANK OF NEW YORK MELLON, RBC DOMINIO SECURITIES, INC, JP MORGAN CHASE BANK, NA, BNP PARIBAS PRIMER BROKERAGE, INC, CITIBANK, NA, OPPENHEIMER & CO., INC** y **UBS FINANCIAL SERVICES** en contra de la sentencia de **siete de enero de dos mil once**, dictada por el **Juez Cuarto de Distrito en Materias Civil y de Trabajo en el Estado**, dentro del expediente **38/2010-IV-A**, relativo a la solicitud de concurso mercantil con plan de reestructura previo promovida por Alejandro Francisco Sánchez Mújica, en representación de **VITRO, S.A.B. de C.V.**, en esta instancia deben analizarse de forma conjunta por la estrecha relación que guardan entre sí, sin dejar de observar puntual y exhaustivamente cada uno de dichos agravios, que en forma clara, sustancial y especifica se recogen para ser contestados como sigue:

Al respecto resulta ilustrativa la tesis que sustenta la otrora Tercera Sala de nuestro más Alto Tribunal con número de registro **241574**, séptima época, 70 cuarta parte, página 13, materia civil del Semanario Judicial de la Federación, del rubro y texto siguiente:

*"AGRAVIOS EN LA APELACIÓN. ESTUDIO CONGRUENTE DE LOS, EN LA SENTENCIA. La congruencia de las sentencias consiste, esencialmente, en la armonía o concordancia que debe existir entre lo pedido por las partes, y lo resuelto en definitiva. No significa, pues, que el tribunal de apelación tenga necesariamente que estudiar separadamente cada uno de los agravios expresados en la segunda instancia, y hacer pronunciamiento correspondiente*

*a cada uno de ellos. Efectivamente, conforme a las reglas de la congruencia, contenidas en el artículo 81 del Código de Procedimientos Civiles del Distrito Federal, la autoridad de segunda instancia está obligada a estudiar, ciertamente, todos los agravios; pero puede hacerlo conjunta o separadamente; pues lo que interesa no es precisamente la forma como los agravios sean examinados, en su conjunto o globalmente, separando todo lo expuesto en distintos grupos o bien uno por uno y en el mismo orden de su exposición o en diverso orden, etcétera; lo que verdaderamente importa es el dato sustancial de que se estudien todos, de que ninguno quede libre de examen, cualquiera que sea la forma que al efecto se elija, ya que no debe perderse de vista que el artículo 82 del mismo Código de Procedimientos Civiles abolió las antiguas fórmulas de las sentencias y dispuso que basta con que el juzgador apoye los puntos resolutivos de éstas en preceptos legales o principios jurídicos, de acuerdo con el artículo 14 constitucional; precepto fundamental que, a su vez, dispone que en los juicios del orden civil la sentencia definitiva deberá ser conforme a la letra o a la interpretación jurídica de la ley, y que, a falta de ésta, se fundará en los principios generales del derecho."*

Ahora bien, las apelantes expresaron los agravios de su intención, sin que se haga necesario transcribirlos en este apartado, por razón de que los libelos que los contienen obran agregado al presente toca; además, al no existir disposición legal expresa que establezca esa obligación, se omite ella, máxime que este tribunal analizará los fundamentos y motivos de la sentencia apelada a la luz de cs motivos de disenso expresados para combatirla.

Sirve de apoyo a lo anterior, por las razones que informa, la jurisprudencia 58/2010, sustentada por la Segunda Sala de la Suprema Corte de Justicia de la Nación, al resolver el expediente de Contradicción de Criterios 50/2010, en sesión de veintiuno de abril del presente año, del rubro y texto que establecen:

*"CONCEPTOS DE VIOLACIÓN O AGRAVIOS. PARA CUMPLIR CON LOS PRINCIPIOS DE CONGRUENCIA Y EXHAUSTIVIDAD EN LAS SENTENCIAS DE AMPARO ES INNECESARIA SU TRANSCRIPCIÓN. De los preceptos integrantes del capítulo X "De las sentencias", del título primero "Reglas generales", del libro primero "Del amparo en*



*general", de la Ley de Amparo, no se advierte como obligación para el juzgador que transcriba los conceptos de violación o, en su caso, los agravios, para cumplir con los principios de congruencia y exhaustividad en las sentencias, pues tales principios se satisfacen cuando precisa los puntos sujetos a debate, derivados de la demanda de amparo o del escrito de expresión de agravios, los estudia y les da respuesta, la cual debe estar vinculada y corresponder a los planteamientos de legalidad o constitucionalidad efectivamente planteados en el pliego correspondiente, sin introducir aspectos distintos a los que conforman la litis. Sin embargo, no existe prohibición para hacer tal trascripción, quedando al prudente arbitrio del juzgador realizarla o no, atendiendo a las características especiales del caso, sin demérito de que para satisfacer los principios de exhaustividad y congruencia se estudien los planteamientos de legalidad o inconstitucionalidad que efectivamente se hayan hecho valer".*

Asimismo, por los principios jurídicos que contiene, la jurisprudencia sustentada por el Segundo Tribunal Colegiado en Materias Penal y Administrativa del Vigésimo Primer Circuito, publicada en la página 2811 del Tomo XXX, septiembre del dos mil nueve, Novena Época del Semanario Judicial de la Federación y su Gaceta, cuyo rubro y texto a continuación se transcriben:

*"CONCEPTOS DE VIOLACIÓN. LOS TRIBUNALES COLEGIADOS DE CIRCUITO NO ESTÁN OBLIGADOS A TRANSCRIBIRLOS EN LAS SENTENCIAS QUE EMITAN. El hecho de que en las sentencias que emitan los Tribunales Colegiados de Circuito no se transcriban los conceptos de violación hechos valer por el quejoso, no infringe disposiciones de la Ley de Amparo a la cual sujetan su actuación, pues el artículo 77 de dicha legislación, que establece los requisitos formales que deben contener las sentencias, no lo prevé así ni existe precepto alguno que establezca esa obligación; por ende, la falta de transcripción de los aludidos motivos de inconformidad no deja en estado de indefensión a la parte quejoso, puesto que son precisamente de quien provienen y, por lo mismo, obran en autos, amén de que para resolver la controversia planteada. el tribunal debe analizar los fundamentos y motivos en los que se sustentan los actos reclamados o la resolución recurrida conforme a los preceptos constitucionales y legales aplicables, pero siempre en relación con los conceptos de violación expresados para combatirlos."*

De igual modo, la tesis que aparece publicada en la página 288 del Tomo XII, Noviembre de 1993, Materia Civil, del Semanario Judicial de la Federación, Octava Época, Instancia Tribunales Colegiados de Circuito, del rubro y texto que se leen:

*"AGRAVIOS. LA FALTA DE TRANSCRIPCIÓN DE LOS MISMOS EN LA SENTENCIA, NO CONSTITUYE VIOLACIÓN DE GARANTÍAS. El hecho de que la sala responsable no haya transcrito los agravios que el quejoso hizo valer en apelación, ello no implica en manera alguna que tal circunstancia sea violatoria de garantías, ya que no existe disposición alguna en el Código de Procedimientos Civiles para el Distrito Federal que obligue a la sala a transcribir o sintetizar los agravios expuestos por la parte apelante, y el artículo 81 de éste solamente exige que las sentencias sean claras, precisas y congruentes con las demandas, contestaciones, y con las demás pretensiones deducidas en el juicio, condenando o absolviendo al demandado, así como decidiendo todos los puntos litigiosos sujetos a debate".*

*QUINTO.-* Este Tribunal Unitario estima fundados y suficientes para revocar la sentencia apelada los motivos de inconformidad planteados por los recurrentes en el primer agravio, mismo que coincide en cuanto a su contenido legal en las apelaciones interpuestas, las cuales como se mencionó se estudian de manera conjunta.

Los recurrentes hacen valer en su primer agravio que se viola en su perjuicio lo dispuesto por los artículos *1°, 9, 10, 11, 17, 20, 22, 132, 145, 146, 147, 164, 165, 166, 229, 241, 339, 340, 341, 342 y demás relativos y aplicables de la Ley de Concursos Mercantiles, en relación con lo dispuesto por los artículos 1324, 1325, 1329 y demás relativos y aplicables del Código de Comercio, de aplicación supletoria a la primera, así mismo hacen valer que la sentencia reclamada viola en su perjuicio los principios de equidad y exhaustividad procesales.*

*Estiman que en la sentencia de fecha siete de enero del dos mil once dictada por el Juez Cuarto de Distrito en*



*Materia Civil y del Trabajo en el Estado de Nuevo León, en los autos del concurso mercantil 38/2010-VI promovido por Alejandro Francisco Sánchez Mújica en representación de la comerciante VITRO, Sociedad Anónima de Capital Variable, ilegalmente se consideró improcedente la solicitud de declaración de concurso mercantil con plan de reestructura previo presentado por VITRO, Sociedad Anónima Bursátil de Capital Variable y diversos acreedores de la misma, entre los cuales se encuentran los ahora apelantes, por haber considerado que la comerciante no cumplió con la exigencia señalada en las fracciones II, párrafo primero, y IV del numeral 339 de la Ley de Concursos Mercantiles, porque el Juez de Distrito juzgó que "la mayoría de los participantes del convenio que suscriben la solicitud de concurso mercantil con plan de reestructura previo, no tienen el carácter de acreedores en la forma prevista por la ley concursal, y por lo mismo, están imposibilitados para representar cuando menos el cuarenta por ciento del total de los adeudos de la comerciante, según lo exige el ordinal 339 de la Ley de la Materia" y que "Entonces, al excluirse en el convenio a los acreedores que controla la comerciante (subsidiarias), es indudable que con los restantes que constituyen el 15.80% quince punto ochenta por ciento del total de sus adeudos no alcanza el rango exigido para aceptar el plan de reestructura previsto por la ley (40% del total de sus adeudos)".*

*Asimismo continua haciendo valer la parte recurrente que el a quo resolvió sobre el reconocimiento de créditos aún antes de iniciar tal procedimiento, sosteniendo que los créditos de las empresas subsidiarias, no lo son, y además, que no son aptos para participar en un convenio por considerar que están imposibilitados "para representar cuando menos el cuarenta por ciento del total de los adeudos" de VITRO, Sociedad Anónima Bursátil de Capital Variable, ello en forma contraria al procedimiento y respeto a*

su derecho de audiencia, al no permitir iniciar el procedimiento.

Asimismo continúan combatiendo la resolución impugnada señalando que el a quo prejuzgó al calificar los adeudos que VITRO, Sociedad Anónima Bursátil de Capital Variable tiene con sus subsidiarias en esta etapa procesal e impidió el debido inicio del proceso para llegar al análisis de todos los créditos de los acreedores de VITRO que han comparecido y lleguen a comparecer al mismo, pues señalan que la calificación de todos los créditos debió haberse realizado –y debe- en la etapa de conciliación y a través del procedimiento legal para el reconocimiento de créditos, pues el a quo debió haberse limitado a verificar que se reunieran los requisitos establecidos en el artículo 339 de la Ley de Concursos Mercantiles.

Que consta en la solicitud de la declaración de concurso mercantil con plan de reestructura previo presentado por Vitro y diversos acreedores de la misma, ante la Oficialía de Partes Común de los Juzgados de Distrito en Materias Civil y del Trabajo con Residencia en Monterrey Nuevo León, con fecha 13 de diciembre de 2010, que Vitro Sociedad Anónima Bursátil de Capital Variable claramente cumplió con todos y cada uno de los requisitos establecidos en el artículo 20 de la Ley de la Materia, informando al Juzgado todos los requisitos establecidos en el segundo párrafo del artículo referido; adjuntando como anexos números 10), 11) y 12) los Estados Financieros individuales auditados de los últimos tres años de Vitro; adjuntando como anexo número 16) una memoria clara en la que se razonan las causas que llevaron a Vitro al estado de incumplimiento en que se encuentra; adjuntando como anexo número 17) una relación de sus acreedores y deudores en los términos establecidos en la fracción III del artículo 20 referido; se



adjuntó igualmente como anexo número 18) un inventario de todos los bienes muebles e inmuebles, títulos valores, géneros de comercio y derechos de cualquier otra especie; se adjuntó como anexo número 19) una relación de los juicios en que Vitro es parte; y se hizo referencia a la garantía a la que se refiere el artículo 24 de la Ley de Concursos Mercantiles haciendo notar que no es necesario llevar a cabo la visita de conformidad con lo establecido por el artículo 341 de la Ley de la Materia por tratarse de un concurso con plan de reestructura previo.

Que de todo lo anterior y de la lectura de la solicitud del concurso mercantil con plan de reestructura previo presentada por Vitro Sociedad Anónima Bursátil de Capital Variable y diversos de sus acreedores, se desprende que los apelantes sí reunieron los requisitos establecidos en la fracción I del artículo 339 de la Ley de Concursos Mercantiles en relación a lo dispuesto por el artículo 20 del mismo ordenamiento.

Así mismo señalan que la solicitud de concurso mercantil de Vitro Sociedad Anónima Bursátil de Capital Variable se firmó por la comerciante y por titulares de un porcentaje mucho mayor al 40% de la deuda total de la comerciante y que así fue manifestado bajo protesta de decir verdad por el representante legal de Vitro, con lo cual se cumplió con el requisito establecido en la fracción II del artículo 339 de la Ley de Concursos Mercantiles.

Que consta en los autos del juicio en que se actúa que Vitro claramente acompañó a su solicitud de concurso mercantil con plan de reestructura previo, como anexo 14), una propuesta de plan de reestructura de pasivos suscrita por acreedores que bajo su protesta de decir verdad representan más del 40% del total de sus adeudos. Entre dichos acreedores se encuentran los ahora apelantes.

Destacan que dicho plan de reestructura es una propuesta que tendrá que ser atendida en el procedimiento concursal en su oportunidad procesal, según lo prevé expresamente el artículo 342 de la Ley de Concursos Mercantiles, es decir, dicho plan de reestructura es un convenio propuesto, y que será aprobado y sancionado en los términos de la ley de la materia en el momento procesal oportuno (fase última de la etapa de conciliación del concurso según lo disponen los preceptos contenidos en el Título Quinto de la Ley de Concursos Mercantiles), lo cual impidió el A quo al prejuzgar la calificación de ciertos créditos de VITRO Sociedad Anónima Bursátil de Capital Variable al emitir la sentencia impugnada.

Que la admisión de la solicitud y declaración del concurso solicitado no prejuzga sobre el mismo, pues es hasta una etapa procesal muy posterior que el mismo debe ser considerado por el conciliador que en su oportunidad se designe, para ser propuesto para aprobación por parte de los acreedores y posterior a ello ser sancionado por el juez, de conformidad con lo dispuesto por los artículos 161 a 166 de la Ley de Concursos Mercantiles, mediante la sentencia **QUE PONE FIN A JUICIO**, en términos expresos del último precepto citado.

Que con base a la exposición de motivos de la Ley de Concursos Mercantiles y específicamente conforme a lo establecido en los artículos 341 y 339 de dicha ley, que es obligación del juzgador con base en las manifestaciones bajo protesta de decir verdad dar trámite a la solicitud del concurso mercantil con plan de reestructura previo presentado de diversos acreedores y que la etapa para calificar los créditos no es en la admisión de la solicitud sino en la de conciliación. Asimismo argumentan que el a quo en la resolución combatida, prejuzga infundada e



*injustificadamente la calidad de ciertos créditos a cargo de VITRO, Sociedad Anónima Bursátil de Capital Variable, considerando que los existentes entre ésta y sus empresas subsidiarias no son créditos en términos concursales.*

De los agravios antes expresados, este Tribunal Unitario considera que el aspecto fundamental en el presente recurso de apelación es resolver sobre sí es procedente el Concurso Mercantil con Plan de Reestructura Previo para las empresas subsidiarias y demás acreedores en relación con la empresa Vitro, Sociedad Anónima Bursátil de Capital Variable, conforme a la Ley de Concursos Mercantiles vigente y si se cumplieron con los requisitos legales que establece la ley para su procedencia, ello tomando en consideración dichos agravios de la parte recurrente que combaten la sentencia reclamada, asimismo debe determinarse si la calificación de los crédito es susceptible de ser analizada en el momento de resolver sobre la procedencia del Plan de Reestructura Previo.

En efecto, para lo anterior se considera necesario hacer alusión a la exposición de motivos en la parte relativa y finalidad perseguida con la reforma legal para incorporar a la legislación vigente dicho Plan y la opinión que sobre este aspecto emitió la Junta Directiva del Instituto Federal de Especialistas Mercantiles del Consejo de la Judicatura Federal mediante oficio IFECOM/DG/179/2011 de fecha veintitrés de marzo de 2011, rendido por conducto de su Directora General Griselda Nieblas Aldana, que obra agregado en autos por haber sido solicitada la consulta por la parte recurrente.

En la exposición de motivos se establece:

*"INICIATIVA DE REFORMA A LA LEY DE CONCURSOS MERCANTILES*
*(EXPOSICIÓN DE MOTIVOS)*

*LUGAR DE PUBLICACIÓN: GACETA PARLAMENTARIA NO. 96*

*FECHA DE PUBLICACIÓN: 8 DE MARZO DE 2005*

*CÁMARA DE ORIGEN: CÁMARA DE SENADORES*

*INICIATIVAS DE CIUDADANOS SENADORES*

*DE LOS SENADORES FAUZI HAMDÁN AMAD, JORGE ZERMEÑO INFANTE, CÉSAR*

*JÁUREGUI ROBLES, JESÚS GALVÁN MUÑOZ, GILDARDO GÓMEZ VERÓNICA Y*

*FERNANDO MARGAIN BERLANGA, LA QUE CONTIENE PROYECTO DE DECRETO POR EL QUE SE REFORMAN Y ADICIONAN DIVERSAS DISPOSICIONES DE LA LEY DE CONCURSOS MERCANTILES.*

*SE TURNO A LAS COMISIONES UNIDAS DE COMERCIO Y FOMENTO INDUSTRIAL; Y DE ESTUDIOS*

*LEGISLATIVOS.*

*C. PRESIDENTE DE LA MESA DIRECTIVA DE LA*

*H. CÁMARA DE SENADORES DE LA*

*LIX LEGISLATURA*

*P R E S E N T E*

*Los infrascritos, Senadores de la LIX Legislatura del H. Congreso de la Unión, con fundamento en los Artículos 71 Fracción II, 72 y 73 Fracción X, de la Constitución Política de los Estados Unidos Mexicanos, sometemos a la consideración de esta Cámara de Senadores, la siguiente Iniciativa con proyecto de Decreto por el que se reforma y adicionan diversas disposiciones de la Ley de Concursos Mercantiles y se reforman los artículos 50 de la Ley de Adquisiciones, Arrendamientos y Servicios del Sector Público y 51 de la Ley de Obras Públicas y Servicios Relacionados con las Mismas.*

*EXPOSICIÓN DE MOTIVOS*

*La Ley de Concursos Mercantiles publicada en el Diario Oficial de la Federación el día 12 de mayo de 2000, tiene como objetivo central, según se desprende de su exposición de motivos, ".*

*. . . proporcionar la normatividad pertinente para maximizar el valor de una empresa en crisis mediante su conservación . . ." y "en caso de que fuese imposible conservar la empresa . . . contener las normas que permitieran preservar el valor económico de la empresa o de los bienes y derechos que la integran mediante un procedimiento de liquidación ordenada que maximizara el producto de la enajenación y diera trato equitativo al comerciante y sus acreedores.".*

*La importancia de lo anterior se plasma expresamente en el artículo 1° de la propia Ley de Concursos Mercantiles, que en su segundo párrafo establece:*

*"Artículo 1°...*

*Es de interés público, conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios."*

*Para efectos de lograr el anterior objeto, la Ley de Concursos Mercantiles establece un*

*procedimiento moderno y eficaz, que subsana los vicios de la antigua Ley de Quiebras y*

*Suspensión de Pagos en su última etapa. Dicho procedimiento evita que el mismo sirva como herramienta para dilatar el pago e intenta provocar la supervivencia de la empresa, otorgando las herramientas para tales efectos.*

*La Ley de Concursos Mercantiles (artículo 2° y relativos) divide al concurso mercantil en una etapa preliminar y dos etapas nominadas, cada una con distintas finalidades, términos y resoluciones. Estas son: La preliminar de verificación, la de conciliación y la de quiebra:*



La etapa preliminar de verificación está regulada por los artículos 1° al 41, 44, 48, 49, 54 al 61 y transitorios de la Ley de Concursos Mercantiles, y tiene como finalidad básica determinar si el comerciante se encuentra o no dentro de los supuestos del concurso mercantil.

En esta etapa no se hace el estudio ni se resuelve respecto del reconocimiento de los créditos del comerciante, y el Juez de Distrito que conoce del asunto es auxiliado por el visitador, quien tiene como únicas funciones las de solicitar las medidas precautorias necesarias para conservar la empresa y verificar en la contabilidad del comerciante la actualización de los supuestos del concurso mercantil. El visitador es nombrado aleatoriamente por el Instituto Federal de Especialistas de Concursos Mercantiles.

La verificación empieza con la presentación de la solicitud o demanda de concurso mercantil y termina con la sentencia de concurso mercantil.

La visita verificación tiene un plazo de 15 días naturales y puede ser prorrogada por una sola vez por causa justificada por un máximo de 15 días naturales (artículo 40 de la Ley de Concursos Mercantiles).

La etapa de conciliación está regulada por los artículos 42 al 170, 173, 175, 177, 180, 181, 217 al 228, 262 al 277 y transitorios de la Ley de Concursos Mercantiles y tiene como finalidades básicas las siguientes:

- El reconocimiento de los adeudos a cargo del comerciante, lo que implica la revisión integral de cada uno de los créditos que se deriven de la contabilidad del comerciante y/o cuyo reconocimiento demanden los acreedores.

- Lograr la conservación de la empresa mediante el convenio que el comerciante suscriba con sus acreedores reconocidos.

De acuerdo a la Ley de Concursos Mercantiles, "acreedores reconocidos", significa aquellos que adquieran tal carácter por virtud de la sentencia de reconocimiento, graduación y prelación de créditos que dicta el juez que conoce del concurso.

Para que los actos y obligaciones pactados en el convenio surtan efectos la Ley de Concursos Mercantiles establece ciertos requisitos (Título Quinto, Capítulo Único), entre otros, que el mismo lo suscriban el comerciante y sus acreedores reconocidos que representen más del 50% del (i) monto reconocido a la totalidad de los acreedores reconocidos comunes y del (ii) monto reconocido a aquellos acreedores con garantía real o privilegio especial (artículo 157 de la Ley de Concursos Mercantiles).

El convenio se considerará suscrito por todos los acreedores reconocidos cuando se prevea el pago de sus créditos en los términos ordenados por el artículo 158 de la Ley de Concursos Mercantiles.

Es de suma importancia destacar que el convenio concursal tiene el carácter de cosa juzgada y que otorga beneficios y obligaciones adicionales al comerciante y a sus acreedores, que no confiere un convenio de transacción ordinario.

El Juez de Distrito es auxiliado por el conciliador, quien tiene como funciones proponer al juez el reconocimiento de los créditos del comerciante mediante la elaboración de las listas provisionales y definitivas de créditos, y buscar un arreglo entre el comerciante y sus acreedores reconocidos.

El conciliador es nombrado por el Instituto Federal de Especialistas de Concursos Mercantiles en forma aleatoria y tiene importantes funciones en el procedimiento de concurso mercantil.



Empieza con la sentencia de concurso mercantil y termina con el convenio o con la sentencia de quiebra. Tiene una sentencia intermedia de reconocimiento, graduación y prelación de créditos.

Con motivo de la sentencia de concurso mercantil no podrá ejecutarse ningún mandamiento de embargo o ejecución contra los bienes y derechos del comerciante.

En esta etapa se debe revisar la causa u origen, destino y validez de cada crédito a cargo del comerciante y cuando sus acreedores pueden opinar y/o impugnar la veracidad de dichos créditos, mediante la vista que se les da con las listas provisional y definitiva y/o apelando de la sentencia intermedia de reconocimiento, graduación y prelación de créditos.

La etapa de conciliación tiene un plazo de seis meses, contados a partir de la última publicación de la sentencia de concurso mercantil (artículo 145 de la Ley de Concursos Mercantiles).

El anterior plazo puede ser prorrogado por tres meses por el conciliador o por los acreedores reconocidos que representen por lo menos las dos terceras partes del monto total de los créditos reconocidos.

Además, el comerciante y el 90% de los acreedores podrán solicitar una segunda prorroga de otros tres meses, pero en ningún caso la etapa de conciliación puede durar más de un año.

La etapa de quiebra está regulada por los artículos 167 al 236, 262 al 277 y transitorios de la Ley de Concursos Mercantiles y tiene como finalidad básica la venta de la empresa del comerciante, de sus unidades productivas o de los bienes que la integran, para el pago a los acreedores reconocidos.

El Juez de Distrito es auxiliado por el síndico, quien tiene como funciones la administración y liquidación de la empresa. El síndico también es nombrado aleatoriamente por el Instituto Federal de Especialistas de Concursos Mercantiles.

Esta última etapa empieza con la sentencia de quiebra y termina con la sentencia de terminación del concurso mercantil.

Expuesto lo anterior y con la finalidad de sustentar la presente Iniciativa, es importante señalar que durante los más de cuatro años en que ha estado vigente la Ley de Concursos Mercantiles, se han probado las bondades que se esperaban de este nuevo ordenamiento relativo a empresas que enfrentan crisis de liquidez financiera, puesto que han propiciado las negociaciones constructivas entre la empresa en crisis y sus acreedores, negociaciones con las cuales se encuentra apegada la normatividad concursal.

Como resultado de lo anterior, el número de empresas que están sujetas al procedimiento de concurso mercantil es considerablemente menor a aquél a que se hubiese presentado de continuar con la antigua legislación.

No obstante lo anterior, al establecer la Ley de Concursos Mercantiles un procedimiento judicial original, resulta obvio que durante los primeros años de su ejecución emergieron leves lagunas y discrepancias en las reglas de su ejecución, imposibles de prever por el legislador.

Por lo tanto, se considera necesario continuar con el perfeccionamiento de ese ordenamiento, a efecto de lograr la simplificación del procedimiento, para lograr la justicia pronta y expedita que ordena nuestra Constitución.

En tal virtud, se proponen reformas para aclarar plazos, simplificar notificaciones, para cubrir pequeñas omisiones en el texto original y para resolver posibles contradicciones entre diversos artículos.

....Ahora bien, como ya se ha venido diciendo, los objetivos principales de la Ley de Concursos Mercantiles son maximizar el valor



















































































de una empresa en crisis mediante su conservación y, en caso de que fuese imposible conservar la empresa, preservar su valor económico o de los bienes y derechos que la integran mediante un procedimiento de liquidación ordenada que maximice el producto de la enajenación y le de un trato equitativo al comerciante y a sus acreedores.

Como herramienta para lograr la primera de las anteriores finalidades del concurso mercantil, el legislador estableció la figura del convenio suscrito entre el comerciante y sus acreedores, cuyo objeto principal precisamente debe ser el de conservar la empresa (artículo 3º de la Ley de Concursos Mercantiles).

No obstante, de la lectura de la Ley de Concursos Mercantiles se limita la celebración y sanción del mencionado convenio a la etapa de conciliación.

Lo anterior limita los momentos en los cuales dicho convenio puede celebrarse, no obstante que aún en la etapa de quiebra puede surgir el acuerdo entre los acreedores y el deudor que permita terminar el concurso por convenio y asegurar la supervivencia de la empresa. que es uno de los objetivos de la Ley de Concursos Mercantiles.

Por lo tanto, proponemos se reforme la Ley de Concursos Mercantiles para efectos de que la celebración y sanción del convenio referido pueda realizarse en cualquier etapa del concurso mercantil. incluyendo la etapa de quiebra.

Por otro lado, no debe perderse de vista que la vida económica del país ha presentado situaciones no contempladas por la Ley de Concursos Mercantiles, conforme a la cual tales concursos se desarrollan en las etapas que ya hemos descrito, sin que la Ley haya previsto que en algunas ocasiones el deudor ha negociado con la mayoría de sus acreedores un convenio que ha merecido la aprobación de dicha mayoría, pero no puede evitar el concurso en virtud de que o ignora el domicilio de alguno de sus acreedores o alguno de sus acreedores se muestra desinteresado en el convenio o alguno de sus acreedores se opone a dicho convenio.



Es obvio que para celebrar un convenio entre un deudor y sus acreedores que permita evitar que el deudor entre a un procedimiento concursal, se requiere que la totalidad de sus acreedores expresen su voluntad favorable a dicho convenio, pero no tenemos disposición legal que atienda las situaciones a las que nos referimos en el párrafo anterior.

Si no se logra por el deudor el acuerdo con la totalidad de sus acreedores, no tiene otra alternativa que solicitar su concurso mercantil, el cual queda sujeto a las normas ordinarias que lo rigen, las cuales no suponen que previamente el deudor haya logrado la conformidad de las mayorías que la propia ley establece para la aprobación de un convenio en la etapa de conciliación, y debe sujetarse a todas las exigencias de un concurso mercantil ordinario, lo que origina dilaciones y gastos que pueden y deben ser evitados.

En virtud de lo anterior, proponemos adicionar la Ley de Concursos Mercantiles a efecto de reconocer la figura de un "Concurso Mercantil Preconvenido", que tuviese un trámite expedito consistente en que la solicitud de concurso sea presentada por el comerciante en unión al convenio que haya celebrado con sus acreedores. el cual deberá reunir todos los requisitos que actualmente exige el Título Quinto, Capítulo Único de la Ley de Concursos Mercantiles.

El Concurso Mercantil Preconvenido podría ser incorporado a la Ley de Concursos Mercantiles bien dentro del Capítulo III del Título Primero, adicionando artículos 28 bis, o bien como un Título Décimo Cuarto, Capítulo Único, con los artículos 239 y siguientes.

Las normas que regirían el Concurso Mercantil Preconvenido deberían reducir la duración de los términos que se prevee en la Ley para concursos ordinarios, deberían limitar la actividad del visitador.

toda vez que el comerciante y los acreedores estarían reconociendo en la solicitud y convenio que se dan los supuestos del concurso, deberían agilizar la determinación de la naturaleza de los acreedores y su legitimidad para suscribir el convenio, y deberían establecer las bases para aprobar la legalidad del mismo convenio.

Agotado el procedimiento expedito que sugerimos, el juez aprobaría el convenio, el cual tendría todos los efectos del convenio concursal contemplados por la Ley de Concursos Mercantiles, lo cual permitiría que el deudor y la mayoría de sus acreedores dispondrían de un instrumento procesal para obtener los beneficios que a todos ellos otorga un convenio concursal, incluyendo su carácter de cosa juzgada frente a los acreedores negligentes o disidentes, sin necesidad de presentar y tramitar un concurso mercantil ordinario, con mayor duración y gastos.

En consecuencia, se propone la adición de un Título Décimo Cuarto a la Ley de Concursos Mercantiles titulado "Concurso Mercantil con Plan de Reestructura Previo a efecto de incorporar las normas que rijan al Concurso Mercantil Preconvenido.

Por otra parte, se considera conveniente atribuir al Instituto Federal de Especialistas de Concursos Mercantiles facultades de órgano consultivo para los especialistas de concursos mercantiles y los órganos jurisdiccionales ante los cuales se promuevan los concursos mercantiles.

Lo anterior con el propósito de que se pueda aprovechar de manera óptima los conocimientos y experiencias que tiene este Instituto en el tratamiento de la materia concursal.

Por último, resulta indispensable establecer la posibilidad legal de que los comerciantes que enfrentan un problema de liquidez, no se vean excluidos de las fuentes de su negocio por el hecho de estar en proceso su concurso.

Esto es así, porque es claro que el propósito que la Ley Concursal mexicana persigue es dar oportunidades a que las empresas que enfrentan problemas de liquidez encuentren un camino para salir adelante y conservar la fuente económica y laboral.

Contra ese propósito existen algunas normas que deterioran la posibilidad del comerciante de seguir realizando su objeto social por el mero hecho de estar en proceso de concurso. Con espíritu de que ello no suceda. el legislador incluyó en la Ley el artículo 87 que declara nulos todos los pactos que establezcan circunstancias más gravosas a los contratos del comerciante por el sólo hecho de estar en concurso.

El artículo 50 de la Ley de Adquisiciones, Arrendamientos y Servicios del Sector Público contiene la siguiente disposición:

Artículo 50.- Las dependencias y entidades se abstendrán de recibir propuestas o celebrar
contrato alguno en las materias a que se refiere esta Ley, con las personas siguientes:

VI. Aquellas que hayan sido declaradas en suspensión de pagos, estado de quiebra o sujetas a concurso de acreedores;

De tal suerte, las empresas que colaboran con el sector grupo y que tienen necesidad de una reestructuración, se ven impedidas para ello porque una fuente de sus negocios, tan importante como lo es el sector público se vería constreñida impidiéndole llegar a una reorganización, lo cual además de contrario al espíritu de la Ley de Concursos Mercantiles produce una desigualdad anticonstitucional de trato con las empresas que no contratan con el sector público.

Siendo razonable que el sector público no tome riesgos innecesarios debe permanecer la norma para cuando las empresas han caído en la etapa de quiebra, puesto que ésta supone una terminación de sus relaciones jurídicas, pero no así cuando esté en la etapa de


conciliación durante la cual se estima posible el acuerdo para reorganizar a la empresa concursada y mantenerla como un negocio viable.

Lo anterior, también se propone para la Ley de Obras Públicas y Servicios relacionados con las mismas.

En vista de todos los motivos expuestos con antelación, se somete a su consideración la siguiente Iniciativa:

"Decreto por el que se reforman y adicionan diversas disposiciones de la Ley de Concursos Mercantiles; se reforma el artículo 50 de la Ley de Adquisiciones, Arrendamientos y Servicios del Sector Público y se reforma el artículo 51 de la Ley de Obras Públicas y Servicios relacionados con las mismas.

Artículo Primero.- Se reforman los artículos 10, 15. 18, 20, 23. 24, 26, 30, 34, 40, 41, 43, 44, 45, 48, 49, 59, 60, 75, 121, 122. 128. 130. 136, 145, 172, 177, 224, 326 y 333 y se adicionan: un título Décimo Cuarto intitulado Concurso Mercantil con Plan de Reestructura Previo y los artículos 339 a 342...".

Título Décimo Cuarto
Concurso Mercantil con Plan de Reestructura Previo
Artículo 339.- Será admitida a trámite la solicitud de concurso mercantil con plan de reestructura cuando:

I. La solicitud reúna todos los requisitos que ordena el artículo 20 de la Ley de Concursos Mercantiles;

II. La solicitud la suscriba el comerciante con los titulares de cuando menos el cuarenta por ciento del total de sus adeudos.

Para la admisión del concurso mercantil con plan de reestructura será suficiente que el comerciante manifieste bajo protesta de decir verdad que las personas que firman la solicitud representan cuando menos el cuarenta por ciento del total de sus adeudos.

III.- El comerciante manifieste bajo protesta de decir verdad que:
a). Se encuentra dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos, o

b). Es inminente que se encuentre dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos.

Por inminencia debe entenderse un periodo inevitable de treinta días.

IV. La solicitud venga acompañada de una propuesta de plan de reestructura de pasivos del comerciante, firmada por los acreedores referidos en la fracción II.

Artículo 340.- El comerciante y los acreedores que suscriban la solicitud de concurso mercantil con plan de reestructura podrán pedir al Juez las providencias precautorias que contempla el artículo 37 de esta Ley y el Código de Comercio.

Artículo 341.- Si la solicitud de concurso mercantil con plan de reestructura reúne todos los anteriores requisitos, el Juez: dictará sentencia que declare el concurso mercantil con plan de reestructura sin que sea necesario designar visitador.

Artículo 342.- La sentencia de concurso mercantil deberá reunir los requisitos que esta Ley le exige y partir de ese momento el concurso mercantil con plan de reestructura se tramitará como un concurso mercantil ordinario, con la única salvedad de que el conciliador deberá considerar el plan de reestructura exhibido con la solicitud al proponer cualquier convenio.

Artículo segundo.- Se reforma el artículo 50 de la Ley de Adquisiciones, Arrendamientos y Servicios del Sector Público para quedar como sigue:

Artículo 50.- Las dependencias y entidades se abstendrán de recibir propuestas o celebrar contrato alguno en las materias a que se refiere esta Ley, con las personas siguientes:
...

*VI. Aquellas que hayan sido declaradas sujetas a concurso mercantil o alguna figura análoga, siempre que en el caso de concurso mercantil haya sido declarada la quiebra del comerciante.*

*...*

*Artículo tercero.- Se reforma el artículo 51, fracción V, de la Ley de Obras Públicas y Servicios Relacionados con las Mismas para quedar como sigue:*

*Artículo 51.- ...*

*...*

*V. Aquellas que hayan sido declaradas o sujetas a concurso mercantil o alguna figura análoga, siempre que en el caso de concurso mercantil haya sido declarada la quiebra del comerciante.*

*...*

*TRANSITORIO*

*Único.- Las presentes reformas y adiciones entrarán en vigor el día siguiente de su publicación en el Diario Oficial de la Federación.*

*Dado en el salón de sesiones del Honorable Senado de la República, en la Ciudad de México, Distrito Federal, a los ocho días del mes de marzo de 2005.*

De la lectura de la exposición de motivos antes transcrita se advierte que:

1.- Es de interés público, conservar las empresas y evitar que el incumplimiento generalizado de las obligaciones de pago ponga en riesgo la viabilidad de las mismas y de las demás con las que mantenga una relación de negocios.

2.- La etapa preliminar de verificación está regulada por los artículos 1º al 41, 44, 48, 49, 54 al 61 y transitorios de la Ley de Concursos Mercantiles, y tiene como finalidad básica determinar si el comerciante se encuentra o no dentro de los supuestos del concurso mercantil.

**Se puntualiza que en esta etapa no se hace el estudio ni se resuelve respecto del reconocimiento de los créditos del comerciante.**

3.- En la reforma se propone la adición de un Título Décimo Cuarto a la Ley de Concursos Mercantiles titulado "Concurso Mercantil con Plan de Reestructura Previo" a efecto de incorporar las normas que rijan al Concurso Mercantil Preconvenido, cuya finalidad es acortar los plazos y agilizar la determinación de la naturaleza de los acreedores y su legitimidad para suscribir el convenio.


JUDICIAL DE LA FEDERACIÓN

4.- Que es la etapa de conciliación y no en la etapa preliminar en donde debe realizarse el reconocimiento de los adeudos a cargo del comerciante, lo que implica la revisión integral de cada uno de los créditos que se deriven de la contabilidad del comerciante y/o cuyo reconocimiento demanden los acreedores, y tiene como objetivo lograr la conservación de la empresa mediante el convenio que el comerciante suscriba con sus acreedores reconocidos.

5.- Se advierte que el propósito que la Ley Concursal mexicana persigue es dar oportunidades a las empresas que enfrentan problemas de liquidez y encuentren un camino para salir adelante, así como para conservar la fuente económica y laboral.

6.- Así mismo, se establecen los requisitos que deberán cumplirse para admitir a trámite la solicitud de concurso mercantiles con plan de reestructura previo, conforme al precepto 339 de la legislación en cita, que al respecto establece:

*"Artículo 339.- Será admitida a trámite la solicitud de concurso mercantil con plan de reestructura cuando:*

*I. La solicitud reúna todos los requisitos que ordena el artículo 20 de la Ley de Concursos Mercantiles;*

*II. La solicitud la suscriba el comerciante con los titulares de cuando menos el cuarenta por ciento del total de sus adeudos.*

*Para la admisión del concurso mercantil con plan de reestructura será suficiente que el comerciante manifieste bajo protesta de decir verdad que las personas que firman la solicitud representan cuando menos el cuarenta por ciento del total de sus adeudos.*

*III.- El comerciante manifieste bajo protesta de decir verdad que:*

*a). Se encuentra dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos, o*

*b). Es inminente que se encuentre dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos.*

*Por inminencia debe entenderse un periodo inevitable de treinta días.*

*IV. La solicitud venga acompañada de una propuesta de plan de reestructura de pasivos del comerciante, firmada por los acreedores referidos en la fracción II.*

7.- Además del contenido de los artículos 340 y 341 de a ey referida se desprende lo siguiente: que el comerciante y los acreedores que suscriban la solicitud de concurso mercantil con plan de reestructura podrán pedir al Juez las providencias precautorias que contempla el artículo 37 de esta Ley y el Código de Comercio, y que si la solicitud de concurso mercantil con plan de reestructura reúne todos los anteriores requisitos, el Juez: dictará sentencia que declare el concurso mercantil con plan de reestructura sin que sea necesario designar visitador.

Por su parte en la sentencia que se combate por la parte recurrente, dictada el siete de enero del dos mil once por el Juez Cuarto de Distrito en Materia Civil y de Trabajo en el Estado de Nuevo León, se resolvió lo siguiente:

*"En atención a lo expuesto, este órgano jurisdiccional "considera que la mayoría de los participantes del convenio "que suscriben la solicitud de concurso mercantil con plan de "reestructura previo, no tienen el carácter de acreedores en la "forma prevista en la ley concursal y por lo mismo están "imposibilitados para representar el cuarenta por ciento del "total de los adeudos de la comerciante según lo exige el "ordinal 339 de la ley de la materia.*

*"…. Esto ocurre en el caso concreto, pues de acuerdo "con lo especificado en parágrafos que preceden, "Vitro" "Sociedad Anónima Bursátil de Capital Variable ejerce el "control económico, financiero y administrativo sobre las "controladoras directa o indirectamente, y en este sentido, "para los efectos de la procedencia de una solicitud de "concurso mercantil mediante convenio preconcertado, no es "jurídicamente posible decretarlo mediante un convenio en el "que se incorporen créditos inter compañías que representen "la mayoría de los supuestos adeudos, con el objeto de lograr "alcanzar el porcentaje mínimo requerido por la ley para ese "efecto (Titulares de al menos el cuarenta por ciento del total "de sus adeudos), en tanto tal fin no es el deseado por el "legislador para este procedimiento especial, ya que su "establecimiento fue reconocer o recompensar los esfuerzos "extrajudiciales de las comerciante que logran resolver las "diferencias*



con sus acreedoras en una situación de igualdad "y de dependencia, respetando siempre los derechos de "aquellos.

"En efecto, de la exposición de motivos y de la "discusión a la propuesta de aquella reforma, destaca que los "legisladores adicionaron ese procedimiento con el objeto de "reconocer las negociaciones preliminares efectuadas por el "deudor con una buena parte de sus acreedores, "compensando la actitud de la comerciante de reestructurar "sus deudas a través de un procedimiento expedito, en el que "se limita la actividad del visitador, toda vez que la "comerciante y los acreedores de antemano reconocen en la "solicitud y convenio que se dan los supuestos del concurso, "y por ende, se agiliza la determinación de la naturaleza de "los acreedores y su legitimidad para suscribir el convenio.

"...Como se ve, los comerciantes para que tengan acceso a este procedimiento especial, resulta menester que "presenten o acompañen a la solicitud un plan de reestructura "de su pasivo, que extrajudicialmente hayan negociado con "acreedores titulares de un monto relevante (al menos "cuarenta por ciento del total de sus agudos) situación que en "la especie, aunque bajo protesta leal el apoderado del "comerciante sostiene que si lo representan, no debe "soslayarse que la mayoría de lo suscribieron sus "subsidiarias, pese a que con ellas no necesitaba efectuar los "acuerdos o tratos en situación de equilibrio o independencia, "ya que se encuentran subordinadas a sus decisiones.

"Se insiste que esto no sucede con los supuestos "acuerdos que celebró la comerciante con sus subordinadas, "pues obvio que con éstas no tiene necesidad de solicitar la "intervención judicial para lograr reestructurar los adeudos de "que es titular, por ser quien las controla en todos los "aspectos dado que en términos del artículo 64 de la Ley del "Impuesto sobre la Renta, ejerce por lo menos el control "sobre el 51% de sus acciones....

"Entonces al excluirse en el convenio a los acreedores "que controla la comerciante (subsidiarias), es indudable que "con los restantes que constituyen el 15.80% quince punto "ochenta por ciento del total de sus adeudos no alcanza el "rango exigido para aceptar el plan de reestructura previsto "por la ley (40% del total de sus adeudos) lo que lleva ha "decretar IMPROCEDENTE LA SOLICITUD DE CONCURSO "MERCANTIL CON PLAN DE REESTRUCTURA PREVIO, "formulada por el representante de la comerciante "Vitro" "Sociedad Anónima Bursátil de Capital Variable".

De lo anterior se desprende que el juzgador, sin ser la etapa procesal correspondiente, desconoció ciertos créditos a cargo de la comerciante, específicamente los que corresponden a sociedades controladas por la misma (subsidiarias) y los calificó como no aptos para participar, ser parte y suscribir un convenio concursal con la Comerciante, violentando efectivamente con ello las reglas del procedimiento en perjuicio de las apelantes y su derecho a iniciar el procedimiento, pues como se ha visto resolvió cuestiones que no eran propias de la cuestión a dilucidar, esto es, si procedía o no la solicitud de la comerciante de ser

declarada en concurso mercantil con plan de reestructura previo, y con base en las mismas negó su solicitud, siendo que debió constreñirse a verificar si se reunieron o no los requisitos establecidos en el artículo 339 de la Ley de Concursos Mercantiles para tales efectos, motivo por el cual igualmente asiste la razón a los recurrentes cuando alegan que la calificación de los créditos a cargo de las subsidiarias controladas por la Comerciante solicitante no puede ser motivo para negar tal solicitud, lo que corresponde verificar en una diversa etapa procedimental, pues, se insiste, en que para conceder o negar dicha solicitud, el juzgador debe constreñirse a analizar si en el caso se cumplieron o no los requisitos establecidos por el citado artículo 339 de la Ley de Concursos Mercantiles, como expresamente lo dispone el artículo 341 de dicha legislación, sin que pase inadvertido para este Tribunal que tal y como lo alegan los recurrentes, la Ley de Concursos Mercantiles no diferencia ni califica créditos entre compañías subsidiarias o relacionadas y entre créditos entre la comerciante y sus demás acreedores, ni prohíbe que las deudas entre empresas subsidiarias controladas puedan ser contabilizadas para efectos de la celebración de un convenio concursal, pues en ninguna de sus partes la Ley de Concursos Mercantiles excluye a las empresas relacionadas o a las empresas controladas por una empresa controladora que se encuentra en concurso mercantil.

Asimismo, de la exposición de motivos se infiere que la etapa para calificar los créditos no es la preeliminar sino que es hasta la etapa de conciliación, pues así lo establece la Ley de Concursos Mercantiles.

Dicha etapa procesal (de conciliación) consta del procedimiento de reconocimiento de créditos regulado por los artículos 120 a 144 de la Ley de Concursos Mercantiles, que



tiene por objeto el reconocimiento y existencia de créditos a cargo del comerciante, a través de la elaboración de un listado definitivo por parte del Conciliador cuya base lo será la lista provisional de créditos a cargo del Comerciante que dicho especialista elaborará en términos de ley y las objeciones que en su caso se presenten en su contra y en donde se incluyan en los términos aprobados en sentencia que constituye cosa juzgada los créditos respecto de los cuales se conozca la existencia, así como los créditos fiscales y laborales que hasta ese plazo hubieren sido notificados al Comerciante, atendiendo además todas las solicitudes adicionales presentadas con posterioridad a la lista provisional de créditos, culminando con el dictado de la sentencia de reconocimiento, graduación y prelación de créditos regulada por el artículo 132 de la Ley de Concursos Mercantiles, y la etapa de presentación, adopción y, en su caso, el procedimiento de aprobación de un convenio que celebre el comerciante con sus acreedores, regulado por los artículos 145 a 166 de dicha legislación, con la única salvedad de que para el caso de que fuere solicitado el concurso mercantil por el propio comerciante bajo la modalidad de un plan de reestructura previo, entonces el conciliador deberá considerar el plan de reestructura exhibido con la solicitud al proponer cualquier convenio, en términos del ya transcrito artículo 342 de la legislación en cita.

Además, la etapa de la conciliación tiene como finalidad primordial el que el comerciante y sus acreedores reconocidos lleguen a un convenio en términos de la propia ley, como expresamente lo regula el artículo 148 de la Ley de Concursos Mercantiles.

Es importante destacar que la aprobación de tal convenio, como se ha examinado, da por terminado el procedimiento concursal, sea cual fuere la modalidad bajo la

cual inició el mismo, y cumple la finalidad primordial y principal objetivo de la Ley de Concursos Mercantiles, que es lograr la conservación de la empresa del Comerciante mediante el convenio que suscriba con sus Acreedores Reconocidos, como lo establece expresamente el artículo 3º. de la misma.

De lo anteriormente expuesto, este Tribunal Unitario considera que asiste la razón a los recurrentes, pues tal y como los mismos lo afirman, el procedimiento de reconocimiento de créditos y la aprobación o no de un convenio concursal constituyen cuestiones de orden público regulados por la Ley de Concursos Mercantiles, y etapas y partes sustanciales del procedimiento concursal, a tal grado que las mismas tienden al cumplimiento del principal objetivo de dicha Ley que, como se ha expuesto, es lograr la conservación de la empresa del Comerciante mediante el convenio que suscriba con sus Acreedores Reconocidos, siendo claro que el reconocimiento de los créditos a cargo de la comerciante y en consecuencia del carácter de Acreedores a los titulares de los mismos, así como la presentación de un convenio, en su caso, para su aprobación por parte del Juzgador, se trata de cuestiones que deben dilucidarse durante la etapa de Conciliación, que evidentemente es posterior a la declaración de concurso mercantil bajo cualquier modalidad que este sea solicitado, cuestiones sobre las cuales en el fallo recurrido se prejuzgó, pues de su lectura se aprecia que precisamente la razón por la cual se negó la solicitud de la comerciante de ser declarada en concurso mercantil bajo la modalidad de la existencia de un plan de reestructura previo lo fue la consideración de que la mayoría de los participantes que suscribieron el Convenio propuesto no tienen el carácter de acreedores en la forma prevista por la legislación concursal, por tratarse de empresas subsidiarias de la Comerciante solicitante, y que al excluirse



en el convenio a acreedores controlados por la comerciante, como precisamente lo son las subsidiarias referidas, entonces no se reúne el porcentaje mínimo previsto por la ley para suscribir el convenio.

Es necesario destacar que a petición de la parte recurrente se solicitó al Instituto Federal de Especialistas de Concursos Mercantiles del Consejo de la Judicatura Federal opinión sobre cuál es el criterio que tienen sobre los créditos de empresas relacionadas o entre empresas controladas, a cargo de empresa controladoras, y si los mismos han sido y son considerados como créditos, para los efectos del concurso mercantil.

Sobre este aspecto, debe indicarse que mediante oficio IFECOM/DG/179/2011 de fecha veintitrés de marzo de 2011 recibido en Oficialía de Partes, se dio contestación al oficio 546 girado por este Segundo Tribunal Unitario, y del cual se desprende que la Junta Directiva, por conducto de la Directora General del Instituto Federal de Especialistas Mercantiles, Griselda Nieblas Aldana, emite opinión y concluye que entre las excepciones que en la Ley de Concursos Mercantiles se establecen con el fin de no reconocer a alguien con el carácter de acreedor o para limitar el ejercicio de algunos de su derechos a los acreedores reconocidos, no está incluido el caso de empresas relacionadas con o controladas por una sociedad controladora declarada en concurso mercantil, sino que. por el contrario, se regula el caso en que las mismas pueden ser reconocidas como acreedoras inclusive si se diera el caso de que se estableciera que se cometieron actos en fraude de acreedores.

Asimismo, señala que conforme al artículo 146-B del Código Fiscal de la Federación se menciona el hecho de que pueden ser acreedora y deudora sin limitaciones en el

ejercicio de sus derechos dentro de un procedimiento de concurso mercantil, las autoridades fiscales podrán condonar créditos fiscales, siempre que el comerciante haya celebrado convenio concursal con sus acreedores. Siendo así, que el precepto considera como "partes relacionadas" a sociedades que guarden entre sí el carácter de controlada y controladora, por lo que está implícito el concepto de que dichas partes relacionadas son acreedores concursales que suscribieron un convenio en términos de la Ley de Concursos Mercantiles

Asimismo señala que tienen conocimiento de asuntos concursales en el instituto en el que sí han sido considerados como dichos créditos para efectos del concurso mercantil, entre otros. los siguientes:

COMERCIANTE: Grupo Iusacell, S.A. Expedientes 107/2006-I. y acumulado. 718/2010 y 727/2010, el primero tramitado ante el Juzgado Séptimo de Distrito en Materia Civil en el Distrito Federal y los dos restantes ante el Juzgado Noveno de Distrito en Materia Civil del Distrito Federal.

COMERCIANTE: Corporación Durango, S.A de C.V. Expediente 16/2008 tramitado en el Juzgado Primero de Distrito en el Estado de Durango.

COMERCIANTE: Grupo Tribasa, S.A. de C.V. Expediente 157/2001 tramitado ante el Juzgado Primero de Distrito en Materia Civil en el Distrito Federal.

COMERCAINTE: Controladora Comercial Mexicana, S.A.B. de C.V. Expediente 403/2010-III tramitado ante el Juzgado Sexto de Distrito en Materia Civil en el Distrito Federal.

Dicha opinión fue emitida en términos del artículo 311, fracción IX, de la Ley de Concursos Mercantiles, y aun y cuando se señala en este precepto que su carácter no es obligatorio, se considera relevante tomarlo en consideración,


porque además de que la opinión forma parte del expediente, establece los criterios de interpretación aplicables al caso, y que han sido considerados por otros órganos jurisdiccionales en los expedientes antes relacionados.

Por todo lo anteriormente expuesto, se concluye que contrario a lo considerado por el Juez de Distrito, la Ley de Concursos Mercantiles no distingue o califica créditos entre compañías subsidiarias o relacionadas y entre créditos entre la comerciante y sus demás acreedores, ni prohíbe que las deudas entre empresas subsidiarias puedan ser contabilizadas para efectos de la celebración de un convenio concursal. Por lo tanto, si el artículo 339, fracción II, de la Ley de Concursos Mercantiles, establece que para la admisión del concurso mercantil con plan de reestructura será suficiente que el comerciante manifieste bajo protesta de decir verdad que las personas que firman la solicitud represente cuando menos el cuarenta por ciento del total de sus adeudos, como aconteció en la especie, luego entonces, debió tenerse por colmada esa exigencia legal.

Así las cosas, se considera que se reúne el requisito mencionado para el trámite de la solicitud del concurso mercantil con plan de reestructura en términos de lo dispuesto en el artículo 339 de la Ley citada, y siendo así, procede dejar sin efecto el fallo impugnado por resultar incorrectas las consideraciones en las cuales se pretendió sustentar el mismo, y al no existir reenvío en la materia, este Segundo Tribunal Unitario del Cuarto Circuito, deberá proceder a analizar si se reúnen los demás requisitos del artículo 339, en relación con el 20 de la Ley de Concursos Mercantiles, de acuerdo con las pruebas que obran en los autos. y posteriormente de ser procedente, se pronunciará respecto de las providencias precautorias conforme el artículo

340. en relación con el 37 de la Ley de Concursos Mercantiles.

Así, se tiene que, tal y como lo hizo ver el Juez de origen, en el caso: La solicitud de declaración de concurso mercantil con plan de reestructura previo, se formuló con base en la hipótesis prevista en los artículos 339, 341 y 342 de la Ley de Concursos Mercantiles; preceptos adicionados en la reforma publicada el veintisiete de diciembre de dos mil siete, en el Diario Oficial de la Federación, que establecen lo siguiente:

*"Artículo 339.-* Será admitida a trámite la solicitud de concurso mercantil con plan de reestructura cuando:
*I. La solicitud reúna todos los requisitos que ordena el artículo 20 de esta Ley;*
*II. La solicitud la suscriba el Comerciante con los titulares de cuando menos el cuarenta por ciento del total de sus adeudos.*
Para la admisión del concurso mercantil con plan de reestructura será suficiente que el Comerciante manifieste bajo protesta de decir verdad que las personas que firman la solicitud representan cuando menos el cuarenta por ciento del total de sus adeudos;
*III. El Comerciante manifieste bajo protesta de decir verdad que:*
*a). Se encuentra dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos, o*
*b). Es inminente que se encuentre dentro de los supuestos de los artículos 10 y 11 de esta Ley, explicando los motivos.*
*Por inminencia debe entenderse un periodo inevitable de treinta días, y*
*IV. La solicitud venga acompañada de una propuesta de plan de reestructura de pasivos del Comerciante, firmada por los acreedores referidos en la fracción II."*

*"Artículo 341.- Si la solicitud de concurso mercantil con plan de reestructura reúne todos los anteriores requisitos, el juez dictará sentencia que declare el concurso mercantil con plan de reestructura sin que sea necesario designar visitador."*

*"Artículo 342.- La sentencia de concurso mercantil deberá reunir los requisitos que esta Ley le exige y a partir de ese momento el concurso mercantil con plan de reestructura se tramitará como un concurso mercantil ordinario, con la única salvedad de que el conciliador deberá considerar el plan de reestructura exhibido con la solicitud al proponer cualquier convenio."*

Que de acuerdo al contenido de la norma transcrita, en efecto, la característica primordial de la solicitud de concurso mercantil en la modalidad indicada (plan de reestructura



JUDICIAL DE LA FEDERACIÓN

previo), promovida en términos del artículo 339 antes transcrito, es que para su admisión, además de cumplir con los requisitos del artículo 20, la comerciante debe reconocer que las personas que firman la solicitud representan cuando menos el cuarenta por ciento (40%) del total de sus adeudos; que se encuentra dentro de los supuestos de los artículos 10 y 11 de la misma ley, y adicionalmente, acompañar a la solicitud una propuesta de plan de reestructura de pasivos firmada por los acreedores referidos, lo que hace innecesario el trámite previo de verificación a que se refieren los distintos numerales 29 y 30, a fin de poder dictar sentencia de concurso.

Es decir, señala, y se está de acuerdo con ello, al obviarse este trámite generalmente ordinario (visita), no es necesario comprobar si la Comerciante ha incumplido generalizadamente en el pago de sus obligaciones, como requisito indispensable para ser declarada en concurso mercantil.

Siguiendo en la misma lógica argumentativa del a quo, es de advertirse que en el caso la Comerciante solicitante del concurso bajo protesta de decir verdad adujo que de manera inminente incumplirá generalizadamente el pago de sus obligaciones al tenor de los siguientes hechos:

*"a) Al día 30 de septiembre del año 2010, VITRO tenía (a) pasivos directos con acreedores que no son subsidiarias directas o indirectas de la misma, por $20,508,000,000.00 (veinte mil quinientos ocho millones de pesos 00/100 Moneda Nacional), equivalentes a aproximadamente EUA$1,640,000,000.00 (un mil seiscientos cuarenta millones de dólares 00/100 Moneda de los Estados Unidos de América), (b) pasivos por avales otorgados a favor de terceros respecto de obligaciones de sus subsidiarias por $2,375,000,000.00 (dos mil trescientos setenta y cinco millones de pesos 00/100 Moneda Nacional), equivalentes aproximadamente a EUA$190,000,000.00 (ciento noventa millones de dólares 00/100 Moneda de los Estados Unidos de América), y (c) pasivos directos con subsidiarias directas o indirectas de la misma, por la cantidad de $23,872,000,000.00 (veintitrés mil ochocientos setenta y dos millones de pesos 00/100 Moneda Nacional),*

*equivalentes a EUA$1,910,000,000.00 (un mil novecientos diez millones de dólares 00/100 Moneda de los Estados Unidos de América).*

*b) Por lo que respecta a la situación financiera de la empresa (considerada en forma individual sin consolidar con sus subsidiarias) al cierre del ejercicio terminado y auditado más reciente, esto es, al 31 de diciembre de 2009, es de señalarse que tenía un pasivo total por la cantidad de $42,826,000,000.00 (Cuarenta y dos mil ochocientos veintiséis millones de pesos), contra activos totales por la cantidad de $43,376,000,000.00 (Cuarenta y tres mil trescientos setenta y seis millones de pesos).*

*c) Por otra parte, en cuanto a la situación financiera de VITRO consolidada con sus subsidiarias, considerada al 31 de diciembre de 2009, es de señalarse que la empresa reportaba un pasivo total por la cantidad de $30,668,000,000.00 (Treinta mil seiscientos sesenta y ocho millones de pesos), contra activos totales por la cantidad de $32,652,000,000.00 (Treinta y dos mil seiscientos cincuenta y dos millones de pesos).*

*VITRO es una sociedad que desde su creación fue organizada con la intención de ser una empresa tenedora de acciones y participaciones en empresas, así como para servir de vehículo para el financiamiento de sus empresas subsidiarias.*

*Actualmente VITRO es propietaria, directa o indirectamente de empresas dedicadas a la fabricación del vidrio en los ramos de la construcción, automotriz y de envases para diferentes usos, tales como alimentos, bebidas, cosméticos, vinos y licores, cerveza, etc. De las utilidades obtenidas por estas empresas en el desarrollo de su objeto social, Vitro obtiene sus flujos para pagar el principal e intereses de su deuda.*

*Para que sus subsidiarias lleven a cabo sus actividades, VITRO se encarga de conseguir diversas fuentes de financiamiento, mismas que obtiene y asigna a sus subsidiarias conforme a sus requerimientos, los cuales pueden ser para inversión en activos fijos o bien, para capital de trabajo. Por lo anterior, los principales activos de Vitro son las acciones de sus subsidiarias y entre ellas y Vitro se generan múltiples operaciones de todo tipo.*

*Así mismo, su principal pasivo con personas distintas del grupo, es el referente a la contratación de deuda pública, tanto en México como en Estados Unidos y en una menor cuantía directamente con instituciones financieras nacionales o internacionales.*

*Como se mencionó anteriormente, la fuente de ingresos que tiene VITRO para cubrir sus pasivos financieros es el flujo que le generan sus subsidiarias, por lo que si los mercados que atienden sus subsidiarias se ven afectados negativamente, los resultados de Vitro y su fuente de pago, en consecuencia, se ven seriamente afectados.*

*A raíz de la crisis financiera que inició a mediados de 2008 y que, no obstante el paso del tiempo persiste hasta esta fecha, las subsidiarias se vieron y se siguen viendo impedidas a pagar el*



capital y los intereses de la deuda que tienen con **VITRO**, así como a repartir dividendos a sus accionistas por falta de flujos.

La falta de flujo, a su vez está originada por la caída en las ventas que las subsidiarias de **VITRO** han tenido ya que los mercados en los que participan (automotriz, construcción y envases de vidrio), como en otros tantos, fueron fuertemente afectados, lo que causó que **VITRO** esté enfrentando un serio problema de liquidez.

En el negocio de la producción de vidrio, uno de los principales costos que enfrenta la industria, son los energéticos, mayormente el gas natural. Este insumo ha tenido dramáticos incrementos de precio en el pasado, lo que merma el margen de utilidad de las subsidiarias de **VITRO**. Con la finalidad de evitar que un incremento mayor en el precio de este insumo afecte mas sus márgenes, las subsidiarias de **VITRO** iniciaron la contratación desde hace mas de 10 años de instrumentos de cobertura de precio de gas natural, sin embargo, derivado de la señalada crisis financiera de 2008, la demanda de este insumo se vio reducida al caer la actividad productiva en México y en los Estados Unidos de América, lo que provocó una drástica disminución en su precio. Al darse por terminados los citados instrumentos de cobertura, las subsidiarias sufrieron importantes pérdidas y se les requirió el pago inmediato de fuertes cantidades de dinero, que aunadas a la baja de la actividad industrial, hicieron que en un afán de defender sus plantas productivas, tuvieran que suspender los pagos de sus obligaciones financieras para con **VITRO** así como con otras entidades financieras.

Por otra parte, una porción significativa de los ingresos recibidos por **VITRO** y por sus subsidiarias son en dólares americanos, sin embargo, una parte importante de sus gastos operativos son en pesos, por ejemplo, sueldos y salarios, pago de energéticos, empaque, etc. Durante 2007 y principios de 2008, el peso mexicano tuvo una fortaleza muy importante, lo que generó una revaluación del peso ante el dólar, es decir, el tipo de cambio constantemente venía a la baja, lo que generaba que cuando **VITRO** recibía dólares y acudía al mercado a venderlos para comprar pesos para cubrir sus gastos, cada vez recibía menos pesos, por lo que tomó la decisión de entrar en diversos instrumentos financieros que le garantizaran poder vender dólares a un tipo de cambio predefinido. Sin embargo, derivado de la multicitada crisis financiera de 2008, el peso sufrió una fuerte devaluación ante el dólar, lo que generó que **VITRO** sufriera una importante pérdida económica en los citados instrumentos de cobertura, la que sumada con las pérdidas de sus subsidiarias en dichos instrumentos hizo que su deuda se elevara súbitamente en la cantidad de $320 millones de dólares.

Por otro lado, aunado al incremento súbito de la deuda de **VITRO** con vencimiento en el corto plazo, las ventas de sus subsidiarias sufrieron una disminución muy importante ya que los mercados en los que **VITRO** participa a través de sus subsidiarias sufrieron disminuciones sin precedente en su actividad. Por citar algunos ejemplos, en el mercado automotriz de equipo original, Vitro realiza una importante parte de sus ventas a clientes a los

*grandes armadores de coches, conocidos como OEM's u Original Engine Manufacturers, los cuáles vieron disminuidas sus ventas de automóviles nuevos y acumularon inventarios a niveles históricos, por lo que una parte importante de sus centros de fabricación tuvo que ser cerrada temporalmente y en consecuencia, eliminaron las compras a sus proveedores como Vitro. En el caso de esta industria automotriz, tuvo que entrar el gobierno estadounidense a brindar su apoyo con el programa conocido como "cash for clunkers" y posteriormente, el gobierno Mexicano hizo lo suyo con programas de incentivos a la industria.*

*Otro claro ejemplo de recesión en los mercados en los que participa Vitro, se da en el mercado cervecero. Uno de los principales clientes de Vitro llegó a representar aproximadamente el 12% de los ingresos consolidados. La recesión mundial, que afectó primeramente a los Estados Unidos de América, generando niveles de desempleo similares a los vistos durante la Gran Depresión, afectando esto el poder adquisitivo de la gente de dicho país, hizo que las ventas de exportación de dicho cliente se vieran drásticamente reducidas y en consecuencia, se vio en la necesidad de frenar sus compras a Vitro, lo que hizo que Vitro dejara de percibir una parte importante de ingresos, afectando fuertemente sus márgenes operativos al tener una mezcla preponderantemente alta de costos fijos que no varían en concordancia con la variación de las ventas.*

*En otro orden de ideas, pero continuando con las afectaciones en los mercados que hicieron que Vitro incumpliera con sus obligaciones financieras, otro factor importante radica en la consolidación de algunas de las industrias en las que participa Vitro, un ejemplo se presenta con otro de los clientes importantes de la misma, que fue adquirido por una empresa que cuenta con una subsidiaria dedicada a la fabricación de envases de vidrio, lo que hizo que el cliente tomara la decisión de integrarse verticalmente optando por fabricar sus propios envases, retirando los pedidos a la subsidiaria de Vitro dedicada a su fabricación.*

*Ahora bien, tocando el tema de los mercados de la construcción, en los que las subsidiarias de **VITRO** tienen una participación importante, no solo en Mexico, si no en otros países, podemos señalar el caso del mercado estadounidense, que a raíz de la crisis hipotecaria incrementó significativamente la oferta de casas y espacios comerciales en venta, lo que generó que la construcción de nuevos espacios se viera materialmente disminuido, por lo que el vidrio que antes exportaba Vitro a los Estados Unidos de America, tuvo una súbita y precipitada baja en su demanda, generando que Vitro tuviera, en medio de la crisis, que buscar nuevos mercados para vender sus productos, encontrando como vía de desplazamiento para este producto el mercado brasileño; sin embargo, dados los altos costos de transporte involucrados en hacer llegar el vidrio a este país, este mercado presenta menores márgenes de utilidad. En lo que respecta a otros países en donde Vitro participa en el mercado de la construcción, está el caso de España, que en una medida más grave que en los Estados Unidos de América vio frenada su actividad comercial en diversos frentes, incluyendo el de construcción, y actualmente y con el propósito de mantener una*



*posición competitiva en el mercado español, el negocio redujo su actividad al mínimo pero aún así continúa operando con márgenes negativos.*

*En el resto de los mercados en los que Vitro participa, se han visto también disminuciones significativas, en menor medida generados por la crisis financiera iniciada a fines de 2008 pero sí por la situación económica y de liquidez de Vitro, ya que algunos clientes están buscando otras alternativas de proveedores porque están cuestionando la viabilidad financiera (y por lo tanto operativa) de Vitro y de sus subsidiarias, ya que su situación económica se ha deteriorado por su nivel de deuda a corto plazo y por pertenecer a un grupo cuya situación financiera también se ha deteriorado en meses pasados y que está en imposibilidad de renegociar su deuda. En particular, algunos clientes piensan que al tener que pagar toda la deuda pública se podrían dejar de cubrir los pagos a proveedores y estos podrían dejar de suministrar las materias primas necesarias para poder operar y en consecuencia Vitro dejaría de fabricar los productos que vende, generado con esto un tipo de efecto dominó que implica que si un productor deja de producir sus productos, afectará a todos sus clientes al cortar el suministro de su materia prima, en este caso, el vidrio producido en México.*

*Más aún, a pesar de los esfuerzos hechos por la sociedad para renegociar su deuda total y no obstante los esfuerzos hechos para reducir sus gastos y la venta de activos para alcanzar los fondos necesarios para mantener la operación, la empresa no ha podido llegar a un acuerdo que resuelva sus actuales obligaciones de pago y las documente para el largo plazo. Este proceso se inició hace meses y sigue habiendo acreedores que se oponen a las propuestas de reestructura hechas por la sociedad."*

Ahora, se conviene, con el Juzgador recurrido, en relación a que con base en los hechos expuestos y documentación exhibida, que gozan de valor probatorio en términos de los artículos 1237, 1238, 1241, 1292 y 1296 del Código de Comercio, se desprende que la comerciante:

Cumplió con las formalidades previstas en el artículo 20 de la ley de la materia, dado que en la solicitud de declaración de concurso mercantil, señaló su denominación o razón social completa, domicilio para oír y recibir notificaciones, así como el de su oficina, aclarando que no tenía otros establecimientos, plantas, almacenes o bodegas. Asimismo, acompañó los siguientes anexos: I. Estados financieros de los últimos tres años; II. Una memoria en la que razonó acerca de las causas que la llevaron al estado de

incumplimiento en que se encuentra; III. Una relación de acreedores y deudores, donde señaló nombres y domicilios, la fecha de vencimiento del crédito o créditos de cada uno de ellos, el grado con que estima se les debe reconocer, indicando las características particulares de dichos créditos, así como las de las garantías que otorgó para deudas propias y de terceros; IV. Un inventario de todos sus bienes inmuebles y muebles, títulos valores, géneros de comercio y derechos de cualquier otra especie; y V. Una relación de los juicios en los cuales interviene, donde indica las partes de los procedimientos, datos de identificación de los litigios, su tipo, estado de los juicios y ante qué autoridad se tramitan.

Asimismo, bajo protesta de decir verdad, manifestó encontrarse en los supuestos previstos en los artículos 10 y 11 de la ley concursal, además de que explicó los motivos por los cuales considera ubicarse en esa situación, según los hechos transcritos.

Por otra parte, en lo tocante al requisito que se contiene en la fracción IV del numeral 339 de la Ley de Concursos Mercantiles, consistente en que la solicitud venga acompañada de una propuesta de plan de reestructura de pasivos del Comerciante, firmada por los acreedores referidos en la fracción II; también se cubre, porque la solicitante del concurso mercantil presentó como anexo Catorce, el Plan de Reestructuración que suscribió **Vitro, Sociedad Anónima Bursátil de Capital Variable**, y sus acreedores firmantes del plan en comento, los cuales fueron mencionados al inicio de esta resolución; documental privada que posee valor probatorio al tenor de los artículos 1238 y 1296 del supletorio Código de Comercio; de cuyas cláusulas décima y décima sexta se colige que este plan de reestructura, incluyendo sus declaraciones, adquirirá obligatoriedad para Vitro y para todos los acreedores



reconocidos, ausentes como disidentes, y tendrá validez y surtirá sus efectos a partir de que sea aprobado por el juzgador como convenio concursal dentro del procedimiento de concurso mercantil.

Merced a lo anterior, y al quedar evidenciado con los estados financieros consolidados dictaminados al treinta y uno de diciembre de dos mil nueve, y no consolidados dictaminados al treinta y uno de diciembre de los años dos mil siete, dos mil ocho, y dos mil nueve, elaborados por auditores independientes al Consejo de Administración de Accionistas de **Vitro, Sociedad Anónima Bursátil de Capital Variable**; que la solicitante del concurso mercantil tenía al cierre del ejercicio de dos mil nueve (treinta y uno de diciembre de dos mil nueve), un pasivo total individual, sin consolidar con sus subsidiarias, de $42,856,000,000.00 (cuarenta y dos mil ochocientos cincuenta y seis millones de pesos 00/100, moneda nacional), contra activos por la cantidad de $43,376,000,000.00 (cuarenta y tres mil trescientos setenta y seis millones de pesos 00/100, moneda nacional); y al cierre del mismo ejercicio (treinta y uno de diciembre de dos mil nueve), un pasivo total en consolidación con sus subsidiarias, de $30,668,000,000.00 (treinta mil seiscientos sesenta y ocho millones de pesos 00/100, moneda nacional), contra activos por la cantidad de $32,652,000,000.00 (treinta y dos mil seiscientos cincuenta y dos millones de pesos 00/100, moneda nacional); como lo reflejan las documentales exhibidas como anexos Nueve, Diez, Once, Doce y Trece, a su escrito de solicitud de concurso mercantil; asimismo, que bajo protesta de decir verdad manifestó que dentro de treinta días a la fecha de su solicitud de concurso, tendrá de manera inminente. vencido más del treinta y cinco por ciento de todas sus deudas y carecerá además de los activos circulantes a que se refiere el segundo párrafo de la fracción II, del artículo 10 de la Ley de

Concursos Mercantiles (efectivo en caja y depósitos a la vista; depósitos e inversiones a plazo, así como cuentas por cobrar con vencimiento menor a noventa días; títulos de valor para los cuales se registren regularmente operaciones de compra y venta en los mercados relevantes) para hacer frente a por lo menos el ochenta por ciento de sus obligaciones vencidas, lo que lo hará incurrir en el incumplimiento generalizado de sus obligaciones; con lo cual evidentemente se posiciona dentro de los supuestos que establecen los artículos 10 y 11 de la Ley Instrumental de la Materia, respecto de lo cual explicó los motivos por los cuales considera ubicarse en esa situación, lo que se insiste, lo evidencia con los estados financieros consolidados dictaminados al treinta y uno de diciembre de dos mil nueve, y estados financieros no consolidados dictaminados al treinta y uno de diciembre de los años dos mil siete, dos mil ocho y dos mil nueve, de **Vitro, Sociedad Anónima Bursátil de Capital Variable**; a más de que, como quedó precisado en el presente considerando, dicho ente jurídico cumplió con las formalidades previstas en el artículo 20 de la Ley de la Materia.

Por tanto, como lo solicita **Vitro, Sociedad Anónima Bursátil de Capital Variable**, y sus acreedores firmantes del escrito inicial y del plan de reestructura previo, es procedente declarar, como así se hace, **el concurso mercantil de Vitro, Sociedad Anónima Bursátil de Capital Variable**, <u>con plan de reestructura previo.</u>

Consecuentemente, deberá hacerse del conocimiento de los acreedores del comerciante con obligaciones de pago vencidas y no vencidas a la fecha de presentación de la demanda, el contenido de la presente resolución, sobre todo, para aquellos acreedores distintos de quienes aquí firmaron el escrito inicial y el plan de reestructura.


Sin que con los mencionados acreedores se agote el procedimiento de reconocimiento, graduación y prelación de créditos a que se refiere el Título Cuarto de la Ley de Concursos Mercantiles.

**SEXTO.-** Por las razones expuestas en el cuerpo de esta sentencia, se declara el concurso mercantil de Vitro, Sociedad Anónima Bursátil de Capital Variable, con plan de reestructura previo, y en esa medida, el Juez Cuarto de Distrito en Materias Civil y de Trabajo en el Estado de Nuevo León, deberá ordenar la apertura de la etapa de conciliación, cuya finalidad es la conservación de la empresa del comerciante mediante el convenio que suscriba con sus acreedores reconocidos, en términos del artículo 3° de la Ley de Concursos Mercantiles.

**SÉPTIMO.-** En atención a lo anterior, y con fundamento en el artículo 146 de la Ley de Concursos Mercantiles, dicho juzgador deberá ordenar girar oficio al Instituto Federal de Especialistas de Concursos Mercantiles, para que en el plazo de cinco días designe a la persona que vaya a desempeñar el cargo de conciliador respectivo, a través del mecanismo aleatorio previamente establecido; y en tanto se realiza esa designación, quien esté a cargo de la administración de **Vitro, Sociedad Anónima Bursátil de Capital Variable**, tendrá obligaciones de depositario respecto de los bienes y derechos que integran la masa de la indicada empresa; lo anterior de conformidad con el artículo 43, fracción IV, del ordenamiento legal citado.

También deberá ordenar al conciliador, que dentro de los cinco días siguientes a su designación, proceda a inscribir la sentencia de concurso mercantil **con plan de reestructura previo**, en los registros públicos respectivos (en el registro público de comercio que corresponda al domicilio del Comerciante y en todos aquellos lugares en donde tenga una



agencia, sucursal o bienes sujetos a inscripción en algún registro público), y hará publicar un extracto de la resolución en el Diario Oficial de la Federación y en uno de los diarios de mayor circulación en la localidad donde se siga el juicio, pudiéndose también difundir por otros medios que el Instituto estime conveniente. Las partes que no hayan sido notificadas en términos del artículo anterior, se entenderán notificadas de la declaración de concurso mercantil, en el día en que se haga la última publicación de las señaladas en el artículo 45 de la Ley de la Materia.

Transcurridos cinco días contados a partir del vencimiento del plazo para la publicación de la sentencia sin haberse publicado, cualquier acreedor o interventor podrá solicitar al juez del conocimiento que se le entreguen los documentos necesarios para hacer las publicaciones. El juez proporcionará los documentos a quien primero se los solicite. Los gastos correspondientes serán créditos contra la Masa, con fundamento en el artículo 46 de la Ley Instrumental del Ramo.

Deberá también el A quo, ordenar al conciliador dar inicio al procedimiento de reconocimiento de créditos, en términos de lo dispuesto por el artículo 43, fracción XIII, de la Ley en cita, considerando el plan de reestructura exhibido con la solicitud de concurso, al proponer cualquier convenio.

Así también, ordenar dar aviso a los acreedores para que aquellos que así lo deseen, soliciten el reconocimiento de sus créditos, con fundamento en la fracción XIV del precepto legal invocado.

Igualmente, el Juez de Distrito deberá hacer del conocimiento de la empresa **Vitro, Sociedad Anónima Bursátil de Capital Variable**, sus administradores, gerentes o dependientes, mediante notificación personal, que deberán



entregar al conciliador los libros, registros y demás documentos de su empresa, así como los recursos necesarios para sufragar las publicaciones previstas por la Ley de Concursos Mercantiles; en la inteligencia de que **Vitro, Sociedad Anónima Bursátil de Capital** Variable, deberá permitir al conciliador y a los interventores la realización de las actividades propias de sus cargos.

También deberá ordenar a la empresa en cuestión suspender el pago de los adeudos contraídos con anterioridad a la fecha en que comience a surtir sus efectos la sentencia de concurso mercantil, salvo los que sean indispensables para la operación ordinaria de la empresa, respecto de los cuales deberá informar a ese juzgado federal dentro de las veinticuatro horas siguientes de efectuados.

Así mismo, el juez del conocimiento deberá ordenar suspender durante la etapa de conciliación, todo mandamiento de embargo y ejecución contra los bienes y derechos del comerciante, <u>con excepción del embargo o ejecución de carácter laboral</u>, en términos de lo dispuesto por el artículo 65, segundo párrafo, de la Ley de Concursos Mercantiles.

Lo anterior, sin perjuicio de las providencias precautorias impuestas por el juez natural, mediante proveído de veinticuatro de diciembre de dos mil diez.

En el caso que nos ocupa, **la fecha de retroacción del concurso mercantil** es el día doscientos setenta natural inmediato anterior a la fecha en que se dicta la presente resolución; esto es, el **doce de julio de dos mil diez**.

También deberá expedir a costa de quien lo solicite copia certificada de esta resolución.

Finalmente, el juez de primer grado deberá notificar la presente resolución a la comerciante Vitro, Sociedad Anónima Bursátil de Capital Variable, al **Instituto Federal de Especialistas de Concursos Mercantiles**; a los acreedores cuyos domicilios se conozcan, y a las autoridades fiscales competentes, esto es, al **Servicio de Administración Tributaria correspondiente dependiente de la Secretaría de Hacienda y Crédito Público**, y mediante oficio al **Agente del Ministerio Público Federal de su adscripción** y al **Procurador de la Defensa del Trabajo**.

Hágase del conocimiento la presente resolución, mediante oficio que al efecto se gire, al Magistrado del Primer Tribunal Unitario del Cuarto Circuito, para los efectos legales a que haya lugar dentro de los juicios de amparo indirecto 8/2011, 9/2011, 10/2011, 11/2011 y 14/2011, que se substancian ante ese órgano de control constitucional.

Por lo expuesto, fundado y con apoyo además en los artículos 43, 49, 51, 342 y demás aplicables de la Ley de Concursos Mercantiles, se resuelve el presente juicio concursal al tenor de los siguientes,

### PUNTOS RESOLUTIVOS:

**PRIMERO.-** Se revoca la sentencia de siete de enero de dos mil once, dictada por el Juez Cuarto de Distrito en Materias Civil y de Trabajo en el Estado de Nuevo León, dentro de los autos del concurso mercantil con plan de reestructura previo 38/2010-VI, promovido por Alejandro Francisco Sánchez Mújica, en su carácter de representante de la Comerciante **Vitro, Sociedad Anónima Bursátil de Capital Variable**.

**SEGUNDO.-** Por las razones expuestas en el cuerpo de esta sentencia, se **declara el concurso mercantil** de



Vitro, Sociedad Anónima Bursátil de Capital Variable, con plan de reestructura previo.

**TERCERO.-** Atento a lo anterior, el juez de primera instancia deberá ordenar la apertura de la etapa de conciliación en el citado concurso mercantil.

**CUARTO.-** Con fundamento en lo establecido por el artículo 146 de la Ley de la Materia, el resolutor de origen deberá girar oficio al Instituto Federal de Especialistas de Concursos Mercantiles, para que en el plazo de cinco días designe conciliador.

**QUINTO.-** Mientras se cuenta con un conciliador, quien esté a cargo de la administración de Vitro, Sociedad **Anónima Bursátil de Capital Variable**, tendrá obligaciones de depositario respecto de los bienes y derechos que integran la masa de la indicada empresa.

**SEXTO.-** Una vez que sea designado, el conciliador deberá cumplir con las obligaciones que le impone la ley y enunciadas en esta resolución.

**SÉPTIMO.-** Las partes que no hayan sido notificadas de esta resolución, se entenderán notificadas de la declaración de concurso mercantil, en el día en que se haga la última publicación de las señaladas en el artículo 45 de la Ley de la Materia.

**OCTAVO.-** Transcurridos cinco días contados a partir del vencimiento del plazo para la publicación de la sentencia sin haberse publicado, cualquier acreedor o interventor podrá solicitar al Juez de Distrito, que se le entreguen los documentos necesarios para hacer las publicaciones. El juez proporcionará los documentos a quien primero se los solicite. Los gastos correspondientes serán créditos contra la Masa,



JUDICIAL

con fundamento en el artículo 46 de la Ley Instrumental del Ramo.

**NOVENO.-** El juzgador primigenio deberá ordenar dar aviso a los acreedores para que aquellos que así lo deseen, soliciten el reconocimiento de sus créditos. Sin que con la lista de acreedores citada en esta resolución, se agote el procedimiento de reconocimiento, graduación y prelación de créditos.

**DÉCIMO.-** Del mismo modo, el A quo deberá hacer del conocimiento de **Vitro, Sociedad Anónima Bursátil de Capital Variable**, sus administradores, gerentes o dependientes, mediante notificación personal, que deberán entregar al conciliador los libros, registros y demás documentos de su empresa, así como los recursos necesarios para sufragar las publicaciones previstas por la Ley de Concursos Mercantiles.

**DÉCIMO PRIMERO.-** En virtud de lo anterior, **Vitro, Sociedad Anónima Bursátil de Capital Variable**, permitirá al conciliador y a los interventores la realización de las actividades propias de sus cargos.

**DÉCIMO SEGUNDO.-** También ordenará el juez federal, a la empresa en cuestión, suspender el pago de los adeudos contraídos con anterioridad a la fecha en que comience a surtir sus efectos la sentencia de concurso mercantil, salvo los que sean indispensables para la operación ordinaria de la empresa, respecto de los cuales deberá informar al mismo juzgado dentro de las veinticuatro horas siguientes de efectuados.

**DÉCIMO TERCERO.-** Asimismo, dicha autoridad judicial deberá ordenar suspender durante la etapa de conciliación, todo mandamiento de embargo y ejecución contra los bienes y derechos del comerciante, con excepción



JUDICIAL DE LA FEDERACIÓN

del embargo o ejecución de carácter laboral, en términos de lo dispuesto por el artículo 65, segundo párrafo, de la Ley de Concursos Mercantiles.

**DÉCIMO CUARTO.-** La fecha de retroacción de este concurso mercantil es el día doscientos setenta natural inmediato anterior a la fecha en que se dicta la presente resolución; esto es, el <u>doce de julio de dos mil diez</u>.

**DÉCIMO QUINTO.-** El juez de primer grado deberá notificar la presente resolución a la comerciante Vitro, Sociedad Anónima Bursátil de Capital Variable, al Instituto Federal de Especialistas de Concursos Mercantiles; a los acreedores cuyos domicilios se conozcan, y a las autoridades fiscales competentes, esto es, al Servicio de Administración Tributaria correspondiente dependiente de la Secretaría de Hacienda y Crédito Público, y mediante oficio al Agente del Ministerio Público Federal de la adscripción y al Procurador de la Defensa del Trabajo.

**DÉCIMO SEXTO.-** Igualmente ordenará expedir a costa de quien lo solicite copia certificada de la resolución de concurso.

**DÉCIMO SÉPTIMO.-** Hágase del conocimiento la presente resolución, mediante oficio que al efecto se gire, al Magistrado del Primer Tribunal Unitario del Cuarto Circuito, para los efectos legales a que haya lugar dentro de los juicios de amparo indirecto 8/2011, 9/2011, 10/2011, 11/2011 y 14/2011, que se substancian ante ese órgano de control constitucional.

***Notifíquese personalmente a las partes***, con testimonio de la presente resolución, devuélvanse los autos correspondientes, al juzgado de su origen; háganse las anotaciones que correspondan en el libro de gobierno de este

tribunal y, en su oportunidad, archívese el toca como asunto concluido.

Así, lo resolvió y firma el licenciado **Claudio Pérez Hernández**, Magistrado del Segundo Tribunal Unitario del Cuarto Circuito, ante el licenciado Axel Edgueny González Macedo, secretario que autoriza y da fe.

CPH/AEGM/juvt

*En la misma fecha (ocho de abril de dos mil once, se giraron los oficios II-947 y II-948, al Juez Cuarto de Distrito en Materias Civil y de Trabajo en el Estado de Nuevo León y al Magistrado del Primer Tribunal Unitario del Cuarto Circuito, respectivamente.- Conste.*

AEGM/juvt

ESTA FOJA PERTENECE A LA ÚLTIMA PARTE DE LA RESOLUCIÓN DE FECHA OCHO DE ABRIL DE DOS MIL ONCE, DICTADA POR EL MAGISTRADO DEL SEGUNDO TRIBUNAL UNITARIO DEL CUARTO CIRCUITO, EN EL **TOCA CIVIL 2/2011**, DERIVADO DEL EXPEDIENTE 38/2010-IV-A, DEL ÍNDICE DEL JUZGADO CUARTO DE DISTRITO EN MATERIA CIVIL Y DE TRABAJO EN EL ESTADO, RELATIVO A LA SOLICITUD DE CONCURSO MERCANTIL CON PLAN DE REESTRUCTURA PREVIO PROMOVIDA POR ALEJANDRO FRANCISCO SÁNCHEZ MÚJICA, EN REPRESENTACIÓN DE **VITRO**, SOCIEDAD ANÓNIMA BURSATIL DE CAPITAL VARIABLE.- CONSTE.

# Exhibit V

**SECRETARY'S CERTIFICATE OF VITRO, S.A.B. DE C.V.**


I, Alejandro Francisco Sánchez Mújica, hereby certify that:

1.    I am the duly elected, qualified and acting Secretary of Vitro, S.A.B. de C.V. and, in such capacity, have access to and the authority to certify to the books and records of Vitro, S.A.B. de C.V.

2.    Attached hereto as Exhibit A are true translations of the resolutions duly adopted by the Board of Directors of Vitro, S.A.B. de C.V., on October 29, 2010, relating to the filing of bankruptcy petitions in Mexican and U.S. courts and the appointment of representatives of Vitro, S.A.B. de C.V. in such proceedings; such resolutions have not been amended, modified, annulled or revoked and are in full force and effect.


IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of December 2010.


By:    Alejandro Francisco Sánchez Mújica
Name: Alejandro Francisco Sánchez Mújica
Title: Attorney-In-Fact


I, Claudio del Valle, hereby certify on this 14th day of December 2010 that Alejandro Francisco Sánchez Mújica is the duly elected, qualified and acting Secretary of Vitro, S.A.B. de C.V. and that the signature above is his genuine signature.


By:    Claudio del Valle
Name: Claudio del Valle
Title: Chief Financial Officer

**Exhibit A**

CLAUSES

FIRST: It is notarized for all legal efects whatsoever, the Board of Directors Minutes of the Corporation named "VITRO", SOCIEDAD ANÓNIMA BURSATIL DE CAPITAL VARIABLE held at 11:00 o'clock on October 29, 2010.

SECOND: It is hereby instructed and granted the following special powers of attorney for acts of domain, lawsuits and collections, and to execute negotiable instruments and credit operations, limited to its purpose but as fully as necessary regarding to their authority, in accordance with articles 2445, 2447, 2448, and 2449 of the Civil Code for the State of Nuevo Leon 2554, 2553, 2554, and 2555 of the Federal Civil Code and its related articles of the Civil Code of the rest of the States in the United Mexican States and the Federal District, including the granting of guarantees and authority requiring special clause according with article 2481 of the Civil Code for the State of Nuevo Leon, 2587 of the Federal Civil Code and the corresponding articles of the Civil Codes of the States in the United Mexican States and those for the Federal District, 9 and 85 of the General Law of Negotiable Instruments and Credit Operations, to Messrs: Hugo Alejandro Lara García, Claudio Luis del Valle Cabello, Alejandro Francisco Sánchez Mújica, Javier Arechavaleta Santos, Adrián Carlos Meouchi Cueva and Rafael Colomé Carrasco, so that in the name and on behalf of the Corporation, any two of them may, without distinction: (i) negotiate, enter and execute the loan agreement (hereinafter Loan Agreement) between Fintech Investments Ltd. or any of its subsidiaries or affiliates and Administración de Inmuebles Vitro, S.A. de C.V. under the aforementioned terms, in the understanding that said agreement shall also be signed by Vitro, but only for certain limited purposes, (ii) negotiate, enter and execute the Lock-up agreements ("Lock-up Agreements") with the different creditors of Vitro (iii) negotiate, enter and execute any other document that is advisable or necessary for issuing the Solicitation, and (iv) carry out all the acts and sign all the documentation that is advisable or necessary to enter or complete the aforementioned acts as submitted for the approval of the Board.

Third: It is hereby authorized that the subsidiary Administración de Inmuebles Vitro, S.A. de C.V., ("AIV") enter into the aforementioned loan for a sum of up to $130 million dollars, for the purpose and under the general conditions that have been detailed, in the understanding that the Audit Committee analyzed this transaction and issued a favorable opinion in respect thereof. For this purpose, the legal representatives and attorneys-in-fact of the Corporation are authorized to ensure that the necessary measures are adopted at AIV to enter into the aforementioned loan.

Fourth.- The Corporation is hereby authorized to submit those applications, requests or defenses deemed necessary, convenient or advisable by the duly designated legal representatives, in order to resolve the financial condition of the Corporation and of their subsidiaries and/or affiliates, in or through the bankruptcy producedures (Concurso Mercantil) in any modality, whether voluntary or involuntary with or without prior restructuring plan, reorganization, bankruptcy as referred to in the *Ley de Concursos Mercantiles* of the United Mexican States (hereinafter referred to as "Mexico") and the United States Bankruptcy Code (herinafter the "Bankrupcy Code") including, but not limited to the proceedings pursuant to the Chapter 11 and Chapter 15 of the United States Bankcruptcy Code (hereinafter the "Proceedings"), since this Board of Directors considers that such Proceedings are in the best interest and benefit for the Corporation, its Creditors, Shareholders and other interested parties.

Fifth. Notwithstanding the general powers that Vitro has granted to several people, that have not been revoked or limited and that are still in effect as of the date of their corresponding execution, Messrs. Hugo Alejandro Lara Garcia, Claudio Luis del Valle Cabello, Alejandro Francisco Sánchez Mújica, Javier Arechavaleta Santos, Adrian Carlos Meouchi Cueva and Rafael Colome Carrasco (hereinafter the "Appointed Attorneys-in-Fact") are hereby authorized so that jointly or separately any of them can execute the Proceedings and grant and subscribe the petitions, demands or defenses referred to in the previous resolution and order to file before the United States Bankruptcy Court with jurisdiction in any of the districts in the United States that the Appointed Attorneys-in-Fact determine, as well as in the Courts in Mexico where the Appointed Attorneys-in-Fact decide to present or file the requests, defenses or petitions. Additionaly, unlimited capacities are granted to Mr. Alejandro Francisco Sanchez Mujica, officer of the Corporation, to act as representative, of the Corporation, its assets and rights abroad (hereinafter the "Foreign Representative") regarding the Proceedings which will take place in the United States including, among others, granting and the execution of all and each of the actions, requests, defenses, petitions and presentations related to the Proceeding mentioned in Chapter 15 of the United States of the Bankruptcy Code before any United States Bankruptcy Court where the Foreign Representative deems necessary.

Sixth. It is hereby authorized that any of the Appointed Attorneys-in-Fact, and specifically the Foreign Representative, in any proceedings which take place in the United States, so that on behalf and in representation of the Corporation and regarding the start of the Proceedings, negotiate, subscribe and grant credit and loan programs including without limitation debtor in possession loan facility or any other kind of credit support or for the improvement of the Corporation (including the subscription of those securities, negotiable instruments, guarantor agreement and any other agreement or document that the Appointed Attorneys-in-Fact and the Foreign Representative deem necessary, adequate or desirable, including granting guarantees super priority Chapter 11 administrative claims, and the guarantee of any subsidiary or affiliated or which conclusion is definitively shown through the performance of the corresponding action, as well as the conclusion of the foreseen transactions under such agreements or documents on behalf of the Corporation and/or the presentation of the resources, defenses or appeals deemed as necessary, before the Authorities where the Proceeding is being followed.

Seventh. It is hereby ratified, confirmed and approved all the acts and actions carried out pursuant to the Mexican and the United States Laws by the Appointed Attorneys-in-Fact or the Foreign Representative, regarding the filing of the Proceedings or in any other related thereto.

Eighth. It is hereby approved to authorized that in case of Proceedings in the United States, the Appointed Attorneys-in-Fact or specifically the Foreign Representative, jointly or separately, on behalf and in representation of Vitro, to execute or cause to execute all and every additional action which they deem necessary, adequate or recommendable, and to execute or cause to execute all the other agreements, deals, contracts, certifications and any other document that the Corporation or any of its affiliated companies entered into, as well as to incur in any expenditure and fees they deem necessary or convenient, in other to execute any of the resolutions hereunder accepted.

Ninth. It is hereby granted to the Appointed Attorneys-in-Fact, Hugo Alejandro Lara Garcia, Claudio Luis del Valle Cabello, Alejandro Francisco Sánchez Mujica, Javier Arechavaleta Santos, Adrian Carlos Meouchi Cueva and Rafael Colomé Carrasco, (i) GENERAL POWER OF ATTORNEY FOR LAWSUITS AND COLLECTIONS AND FOR ADMINISTRATION ACTS, assignable and transferable and to be executable in a jointly or separately way by any of them, pursuant to the terms in Articles 2445,

2447, first and second paragraphs of Articles 2448 and 2449 of the Civil Code of the Mexican State of Nuevo Leon, Articles 2551, 2553, first and second paragraphs of Articles 2554 and 2555 of the Federal Civil Code and the corresponding articles of the Civil Codes of the States in the United Mexican States and those for the Federal District, including the capacities which required of special clause, pursuant to Article 2481 of the Civil Code of the Mexican State of Nuevo Leon, Article 2587 of the Federal Civil Code and the corresponding articles of the Civil Codes of the States in the United Mexican States and those for the Federal District and all others which are considered necessary under the terms and for the purposes of Articles 25, 37 section VII, and Article 47 of the *Ley de Concursos Mercantiles*; as well as to subscribe an agreement, a debt restructuring plan, a bankruptcy agreement and to make a binding agreement on behalf and representation of the Corporation; (ii) POWERS TO EXECUTE NEGOTIABLE INSTRUMENTS AND CREDIT OPERATIONS, pursuant to paragraphs I and II of Articles 9 and 85 of the General Law of Negotiable Instruments and Credit Operations and understanding that including without limitation, the Appointed Attorneys-in-Fact may endorse, receive payments, protest, accept payments, pay, change, grant and in general carry out any other related action, whether the negotiable instruments were issued by the Corporation or by Third Parties, as well as to execute any other credit operations including without limitations, issuing negotiable instruments, issuance of convertible bonds, fixed asset loans, working capital loans, unsecured loans, pledge-secured loans, mortgage loans or of any other kind, as well as to fund trusts of any kind or repurchase agreements without haircut, pledging and receiving any kind of securities that may include without limitations: mortgages, securities, bails, guarantees and binding bails contracted by the Corporation or by third parties; so that in order to execute the capacities mentioned before, it will suffice to hand in a written statement addressed to the third party which was hired or the entry of these resolutions in the corresponding Public Registry of Commerce. All of the above is LIMITED to the enforcement of the authorized resolutions and of the resulting acts and activities.